# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SAAD ALJABRI,

    *Plaintiff*,

v.

    Civil Action No. 20-2146 (TJK)

MOHAMMED BIN SALMAN BIN
ABDULAZIZ AL SAUD, *et al.*,

    *Defendants*.

---

## DEFENDANT MOHAMMED BIN SALMAN BIN ABDULAZIZ AL SAUD'S MOTION TO DISMISS

---

Michael K. Kellogg (DC 372049)
Gregory G. Rapawy (DC 493973)
Andrew C. Shen (DC 500071)
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900

*Attorneys for Defendant*
*Mohammed bin Salman bin Abdulaziz Al Saud*

December 7, 2020

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................. iv

INTRODUCTION ............................................................................................... 1

SUMMARY OF ALLEGATIONS AND MATERIALS CITED IN THE
    COMPLAINT ............................................................................................... 4

ALJABRI'S PURPORTED SERVICE OF THE COMPLAINT .................................. 7

STANDARD OF REVIEW ................................................................................... 10

ARGUMENT ...................................................................................................... 12

I.    Aljabri Fails To Establish Personal Jurisdiction over the Crown Prince .......... 12

    A.    The Complaint Fails To Allege Suit-Related Contacts Between the
        Crown Prince and the United States ...................................................... 13

        1.    Other Defendants' Alleged Actions in the United States Do
            Not Support Personal Jurisdiction over the Crown Prince ............ 13

            a.    There Is No Basis To Attribute the Alleged
                Contacts to the Crown Prince ........................................ 14

            b.    There Is No Causal Relationship Between the
                Alleged Contacts and Aljabri's Claims ........................... 17

        2.    Aljabri's Alleged Contacts with the United States Do Not
            Support Personal Jurisdiction ................................................... 18

        3.    Allegations of Other Contacts Do Not Support Personal
            Jurisdiction ............................................................................ 20

    B.    Exercising Jurisdiction Would Offend Notions of Fair Play and
        Substantial Justice .............................................................................. 21

    C.    Jurisdictional Discovery Is Unwarranted ............................................. 23

II.    Aljabri's Claims Are Barred by Official Immunity, Because Saudi Arabia
    Cannot Be Joined, and by the Act of State Doctrine ...................................... 24

    A.    The Crown Prince Is Immune from Suit ............................................... 24

        1.    The Crown Prince Is Entitled to Head-of-State Immunity ........... 26

        2.    The Crown Prince Is Entitled to Conduct-Based Immunity .......... 30

a.    Aljabri's Claims Are Barred Under the State
Department's Policy.................................................................32

b.    Aljabri's Claims Are Barred Under the Second
Restatement...............................................................................34

3.    No Exception to the Crown Prince's Immunity Exists or
Applies ........................................................................................36

B.    Saudi Arabia Is Necessary, Indispensable, and Immune from Suit.....................38

C.    The Act of State Doctrine Bars Aljabri's Claims ..................................44

III.    Aljabri Fails To State a Claim Under Statutory or Common Law ...................48

A.    Aljbari Fails To State a Claim Under the TVPA .....................................48

1.    The Complaint Fails To Allege an "Extrajudicial Killing" .....................48

2.    Aljabri Has Not Exhausted Adequate, Available Remedies......................52

a.    Aljabri Has Not Exhausted Remedies in Canada .........................53

b.    Aljabri Has Not Exhausted Remedies in Saudi
Arabia...........................................................................................53

B.    Aljabri Fails To Establish Jurisdiction or State a Claim Under the
ATS ...............................................................................................54

1.    An Attempted Extrajudicial Killing Does Not Violate Any
Specific, Universal, and Obligatory Norm of International
Law .............................................................................................56

2.    The Domestic Conduct Alleged in the Complaint Did Not
Plausibly Aid or Abet a Primary Violation of the ATS ...........................58

C.    The Court Should Dismiss Aljabri's Claim for Intentional
Infliction of Emotional Distress..........................................................61

1.    Applicable Saudi Arabian Law Does Not Recognize
Intentional Infliction of Emotional Distress as a Cause of
Action..........................................................................................61

2.    Aljabri Also Fails To State a Claim Under D.C. Law ...........................65

3.    If the Court Dismisses Aljabri's Federal Claims, It Lacks
Personal Jurisdiction over the Crown Prince .........................................67

4.      Alternatively, the Court Should Decline To Exercise
        Supplemental Subject-Matter Jurisdiction over Aljabri's
        Claim..........................................................................................................68

CONCLUSION................................................................................................................69

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES[*]

Page

CASES

*Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81 (D.D.C. 2010)............................................66

*Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184 (5th Cir. 2017) ......................................55

\* *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1 (D.D.C. 2010)................................................56, 57

*Al Shimari v. CACI Premier Tech., Inc.*, 368 F. Supp. 3d 935 (E.D. Va.),
   *appeal dismissed*, 775 F. App'x 758 (4th Cir. 2019), *pet. for cert. pending*,
   No. 19-648 (U.S. Nov. 15, 2019).......................................................................30

*Ali v. Mid-Atl. Settlement Servs., Inc.*, 640 F. Supp. 2d 1 (D.D.C. 2009),
   *aff'd sub nom. Ali v. Tolbert*, 636 F.3d 622 (D.C. Cir. 2011) ...........................................66

*Ali Shafi v. Palestinian Auth.*, 642 F.3d 1088 (D.C. Cir. 2011)................................................69

*Aluminum Warehousing Antitrust Litig.*, *In re*, 90 F. Supp. 3d 219
   (S.D.N.Y. 2015) ...................................................................................17

*APA Assessment Fee Litig.*, *In re*, 766 F.3d 39 (D.C. Cir. 2014) ................................61, 62, 63, 64

*Araya v. JPMorgan Chase Bank, N.A.*, 775 F.3d 409 (D.C. Cir. 2014) .......................................69

*Artis v. District of Columbia*, 51 F. Supp. 3d 135 (D.D.C. 2014) .................................................68

*Asahi Metal Indus. Co. v. Superior Ct. of California*, 480 U.S. 102 (1987) ..........................22, 23

\* *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................11, 15, 61

*Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34 (D.D.C. 2003)........................................14

*Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121 (2015) .........................................................37

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964) .................................................44, 45

*Belhas v. Ya'alon*, 515 F.3d 1279 (D.C. Cir. 2008)...................................................................36

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...............................................................11, 16

*Bernhardt v. Islamic Republic of Iran*, 2020 WL 6743066 (D.D.C. Nov. 16, 2020) ..............11, 17

*Boles v. Greeneville Hous. Auth.*, 468 F.2d 476 (6th Cir. 1972) ..................................................42

---

[*] Authorities principally relied upon are marked with an asterisk.

iv

*Boniface v. Viliena*, 338 F. Supp. 3d 50 (D. Mass. 2018)................................................52

*Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020) ...........................................................49

*Bristol-Myers Squibb Co. v. Superior Ct. of California*, 137 S. Ct. 1773 (2017) ........................12

*Brit UW, Ltd. v. Manhattan Beachwear, LLC*, 235 F. Supp. 3d 48 (D.D.C. 2017)......................24

*Broidy Capital Mgmt. LLC v. Muzin*, 2020 WL 1536350 (D.D.C. Mar. 31, 2020) ...............30, 31

*Carazani v. Zegarra*, 972 F. Supp. 2d 1 (D.D.C. 2013) ....................................................50

*Carswell v. Air Line Pilots Ass'n, Int'l*, 540 F. Supp. 2d 107 (D.D.C. 2008) ...............................15

*Celgard, LLC v. SK Innovation Co.*, 792 F.3d 1373 (Fed. Cir. 2015)...........................................15

*Cheyenne Arapaho Tribes of Oklahoma v. United States*, 558 F.3d 592
    (D.C. Cir. 2009) .............................................................................................23

*Comcast Corp. v. National Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009
    (2020)............................................................................................................50

*Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019 (W.D. Wash. 2005), *aff'd*,
    503 F.3d 974 (9th Cir. 2007) ..............................................................................52

*D'Addario v. Geller*, 264 F. Supp. 2d 367 (E.D. Va. 2003) ..........................................67

*Daimler AG v. Bauman*, 571 U.S. 117 (2014) ................................................12, 17, 21

*Davenport v. International Bhd. of Teamsters, AFL-CIO*, 166 F.3d 356
    (D.C. Cir. 1999) .............................................................................................38

*de Csepel v. Republic of Hungary*, --- F. Supp. 3d ---, 2020 WL 2343405
    (D.D.C. May 11, 2020), *interlocutory appeal pending*, No. 20-7047
    (D.C. Cir.) ....................................................................................................42

*Doe v. Exxon Mobil Corp.*:

    393 F. Supp. 2d 20 (D.D.C. 2005) ("*Exxon I*"), *appeal dismissed*,
    473 F.3d 345 (D.C. Cir. 2007).............................................................50, 52, 58

    654 F.3d 11 (D.C. Cir. 2011) ("*Exxon II*"), *vacated*, 527 F. App'x 7
    (D.C. Cir. 2013) ..................................................................55, 58, 60, 61

    527 F. App'x 7 (D.C. Cir. 2013)...........................................................................59

    2015 WL 5042118 (D.D.C. July 6, 2015) ("*Exxon III*")................................. 49-50, 55, 59

*Doe v. Federal Democratic Republic of Ethiopia*, 851 F.3d 7 (D.C. Cir. 2017)..........................43

*Doe 1 v. Buratai*:

    318 F. Supp. 3d 218 (D.D.C. 2018), *aff'd*, 2019 WL 668339 (D.C. Cir.
    Feb. 15, 2019), and *aff'd*, 792 F. App'x 6 (D.C. Cir. 2019)........................................35, 36

    792 F. App'x 6 (D.C. Cir. 2019) ..................................................................................13

*Doe I v. State of Israel*, 400 F. Supp. 2d 86 (D.D.C. 2005)..........................................................45

*Doğan v. Barak*, 932 F.3d 888 (9th Cir. 2019) ................................................................34, 36, 37

*Domestic Airline Travel Antitrust Litig.*, *In re*, 221 F. Supp. 3d 46 (D.D.C. 2016) ......................1

*Duarte v. Nolan*, 190 F. Supp. 3d 8 (D.D.C. 2016), *aff'd*, 2017 WL 7736939
    (D.C. Cir. Apr. 18, 2017) ...................................................................................................14

*Enterprise Mgmt. Consultants, Inc. v. United States ex rel. Hodel*, 883 F.2d 890
    (10th Cir. 1989)...................................................................................................................42

*Estate of Domingo v. Marcos*, 1983 WL 482332 (W.D. Wash. July 14, 1983) ...........................27

*Estate of Klieman v. Palestinian Auth.*, 923 F.3d 1115 (D.C. Cir. 2019),
    *cert. granted, vacated, and remanded*, 140 S. Ct. 2713 (2020)............................12, 13, 19

*FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087 (D.C. Cir. 2008) .........................................23

*FiberLight, LLC v. National R.R. Passenger Corp.*, 81 F. Supp. 3d 93
    (D.D.C. 2015) ....................................................................................................................68

*First Chicago Int'l v. United Exchange Co.*, 836 F.2d 1375 (D.C. Cir. 1988)............................14

*Fisher v. Great Socialist People's Libyan Arab Jamahiriya*, 541 F. Supp. 2d 46
    (D.D.C. 2008) ....................................................................................................................49

\* *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323 (D.D.C. 2020) ................................51, 66

*Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*,
    582 F.3d 393 (2d Cir. 2009)..............................................................................................30

*GEICO v. Fetisoff*, 958 F.2d 1137 (D.C. Cir. 1992).....................................................................62

*Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88 (D.D.C. 2017)...........................................51

*Giraldo v. Drummond Co.*, 808 F. Supp. 2d 247 (D.D.C. 2011), *aff'd*,
    493 F. App'x 106 (D.C. Cir. 2012).....................................................................................36

*Grand Jury Proceedings, Doe No. 700*, *In re*, 817 F.2d 1108 (4th Cir. 1987)............................25

*Gregorio v. Gordon*, 215 F. Supp. 3d 1 (D.D.C. 2015)....................................................14, 16, 21

*Habyarimana v. Kagame*, 696 F.3d 1029 (10th Cir. 2012) ........................................37

*Haim v. Neeman*, 2013 WL 12157279 (D.N.J. Jan. 23, 2013), *aff'd*,
543 F. App'x 152 (3d Cir. 2013) ..........................................................54

*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) ........................................................57

*Harbury v. Hayden*, 444 F. Supp. 2d 19 (D.D.C. 2006), *aff'd*, 522 F.3d 413
(D.C. Cir. 2008) ..........................................................................52

*Heath v. Alabama*, 474 U.S. 82 (1985).........................................................35, 45

*Heck v. Humphrey*, 512 U.S. 477 (1994).........................................................50

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984) ................................17

* *Hourani v. Mirtchev*, 796 F.3d 1 (D.C. Cir. 2015)........................................44, 45, 46, 47

*Howard Univ. v. Best*, 484 A.2d 958 (D.C. 1984) ............................................63

*Hungerstation LLC v. Fast Choice LLC*, 2020 WL 137160 (N.D. Cal. Jan. 13,
2020), *appeal pending*, No. 20-15090 (9th Cir.) ...............................................21

*IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95 (D.D.C. 2018)...............................21, 22, 23

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) .......................................12

*Isbrandtsen Tankers, Inc. v. President of India*, 446 F.2d 1198 (2d Cir. 1971) ...........................25

*Jerez v. Republic of Cuba*, 775 F.3d 419 (D.C. Cir. 2014).............................................43

*Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386 (2018) ..................................................54

*Jones v. United States*, 318 F. Supp. 3d 15 (D.D.C. 2018)...........................................11

*Kaplan v. Central Bank of Islamic Republic of Iran*, 896 F.3d 501
(D.C. Cir. 2018) ..........................................................................58

*Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12 (D.D.C. 2019)....................................51

*Karem v. Trump*, 404 F. Supp. 3d 203 (D.D.C. 2019), *aff'd as modified*,
960 F.3d 656 (D.C. Cir. 2020) ................................................................37-38

*Khatib v. Alliance Bankshares Corp.*, 846 F. Supp. 2d 18 (D.D.C. 2012) ....................................14

* *Kickapoo Tribe of Indians of Kickapoo Reservation in Kansas v. Babbitt*,
43 F.3d 1491 (D.C. Cir. 1995)...............................................................39, 44

*Kilroy v. Windsor*, 1978 U.S. Dist. LEXIS 20419 (N.D. Ohio, Dec. 7, 1978) ...............................27

*Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013) ..........................................................54

*Kline v. Kaneko*, 535 N.Y.S.2d 303 (Sup. Ct., N.Y. Cty., 1988), *aff'd sub nom.*
    *Kline v. Cordero De La Madrid*, 154 A.D.2d 959 (N.Y. App. Div. 1989)................24, 27

*Knapp Med. Ctr. v. Hargan*, 875 F.3d 1125 (D.C. Cir. 2017)......................................................11

*Lattisaw v. District of Columbia*, 118 F. Supp. 3d 142 (D.D.C. 2015), *aff'd,*
    672 F. App'x 22 (D.C. Cir. 2016)....................................................................68, 69

\* *Lewis v. Mutond*, 918 F.3d 142 (D.C. Cir. 2019), *cert. denied*, No. 19-185
    (U.S. June 29, 2020) ..........................................................................24, 25, 26,
                                                     31, 34, 35, 37, 38

\* *Livnat v. Palestinian Auth.*, 851 F.3d 45 (D.C. Cir. 2017)............................11, 12, 13, 14, 16, 19

*Manoharan v. Rajapaksa*, 711 F.3d 178 (D.C. Cir. 2013) ......................................................25, 37

*Margolis v. U-Haul Int'l, Inc.*, 818 F. Supp. 2d 91 (D.D.C. 2011) ..............................................63

\* *Maryland Digital Copier v. Litigation Logistics, Inc.*, 394 F. Supp. 3d 80
    (D.D.C. 2019) ..........................................................................................17

*Mastafa v. Chevron Corp.*, 770 F.3d 170 (2d Cir. 2014)......................................................55, 58

*Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843 (D.C. Cir. 2006) .........................................61

*Matar v. Dichter*, 563 F.3d 9 (2d Cir. 2009)..........................................................25, 34, 36, 37

*McGhee v. Arabian Am. Oil Co.*, 871 F.2d 1412 (9th Cir. 1989).........................................62, 63

*McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066 (D.C. Cir. 2012) ....................44, 48

*Mezerhane v. Republica Bolivariana de Venezuela*, 785 F.3d 545 (11th Cir. 2015) .............44-45

*Miango v. Democratic Republic of Congo*, 2020 WL 3498586 (D.D.C. June 29,
    2020), *appeals pending*, Nos. 20-5244 et al. (D.C. Cir.)......................................26, 31, 34

*Mwani v. bin Laden*, 417 F.3d 1 (D.C. Cir. 2005)......................................................................21

*Nnaka v. Federal Republic of Nigeria*:

    238 F. Supp. 3d 17 (D.D.C. 2017), *aff'd*, 756 F. App'x 16 (D.C. Cir. 2019)....................45

    756 F. App'x 16 (D.C. Cir. 2019)....................................................................35, 42, 45

*Oetiker v. Jurid Werke, G.m.b.H.*, 556 F.2d 1 (D.C. Cir. 1977)..................................................67

*Ofisi v. Al Shamal Islamic Bank*, 2019 WL 1255096 (D.D.C. Mar. 19, 2019) ....................15, 17

*Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84 (D.D.C. 2017)....................................58, 59, 60, 61

*Olin Corp. v. Fisons PLC*, 47 F. Supp. 2d 151 (D. Mass. 1999)....................................67

*Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017), *vacated in part
   sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020) ..........................................49

*Papst Licensing GMBH & Co. KG Litig.*, *In re*, 590 F. Supp. 2d 94 (D.D.C. 2008) ...................23

*Petersen v. Boeing Co.*, 2015 WL 12090213 (D. Ariz. Feb. 18, 2015)........................................63

*Philippine Nat'l Bank*, *In re*, 397 F.3d 768 (9th Cir. 2005)..........................................................46

*Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*, 68 A.3d 697
   (D.C. 2013) ..............................................................................................................................63

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981)......................................................................52

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244
   (2d Cir. 2009)..........................................................................................................................57

*Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82 (D.C. Cir. 2002) ...................13

*Rehberg v. Paulk*, 566 U.S. 356 (2012) ....................................................................................37

*Republic of Mexico v. Hoffman*, 324 U.S. 30 (1945)................................................................25

\* *Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008)....................................39, 40, 41, 42, 44

*Republic of Sudan v. Owens*, 194 A.3d 38 (D.C. 2018) .......................................................65, 66

*Riggs Nat'l Corp. & Subsidiaries v. Commissioner*, 163 F.3d 1363
   (D.C. Cir. 1999) ......................................................................................................................45

*RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090 (2016)..................................................54

*Rojas Mamani v. Sanchez Berzain*, 636 F. Supp. 2d 1326 (S.D. Fla. 2009) ................................52

*Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018)..........................................................43

*Rush v. Savchuk,* 444 U.S. 320 (1980)......................................................................................18

\* *Samantar v. Yousuf*, 560 U.S. 305 (2010) ...............................................24, 25, 31, 42

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993)..........................................................................35

*Schermerhorn v. State of Israel*, 876 F.3d 351 (D.C. Cir. 2017)................................................44

*Schertzman Cohen v. Islamic Republic of Iran*, 2019 WL 3037868
(D.D.C. July 11, 2019) ...................................................................51

*Search of Info. Assoc. with [redacted]@gmail.com that is Stored at Premises
Controlled by Google, Inc.*, *In re*, 2017 WL 3445634 (D.D.C. July 31,
2017) ...........................................................................................60

*Second Amend. Found. v. U.S. Conference of Mayors*, 274 F.3d 521
(D.C. Cir. 2001) ...........................................................................14

*Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016 (D.C. Cir. 2020) ...................................13, 19

*Shekoyan v. Sibley Int'l*, 409 F.3d 414 (D.C. Cir. 2005) ......................................68, 69

*Sikhs for Justice v. Singh*, 64 F. Supp. 3d 190 (D.D.C. 2014) .......................................24

*Society of Lloyd's v. Siemon-Netto*, 457 F.3d 94 (D.C. Cir. 2006) ...............................45

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) ...................................54, 55, 56, 57, 58

*Spacil v. Crowe*, 489 F.2d 614 (5th Cir. 1974) .....................................................26

*Spanski Enters., Inc. v. Telewizja Polska, S.A.*, 883 F.3d 904 (D.C. Cir. 2018) ...........................54

*Stand Up for California! v. U.S. Dep't of the Interior*, 204 F. Supp. 3d 212
(D.D.C. 2016), *aff'd*, 879 F.3d 1177 (D.C. Cir. 2018), *cert. denied*,
139 S. Ct. 786 (2019) ...................................................................38, 39

*Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300
(2d Cir. 1981) ...............................................................................30

\* *TJGEM LLC v. Republic of Ghana*, 26 F. Supp. 3d 1 (D.D.C. 2013), *aff'd*,
2015 WL 3653187 (D.C. Cir. June 9, 2015) .................................39, 40, 41, 42, 44

*Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15 (D.D.C. 2017), *aff'd*,
2018 WL 4440459 (D.C. Cir. July 17, 2018) ....................................17

*Two Shields v. Wilkinson*, 790 F.3d 791 (8th Cir. 2015) ................................................42

*United Mine Workers of Am. v. Gibbs*, 383 U.S. 715 (1966) ...........................................69

*United States v. Ali*, 885 F. Supp. 2d 17 (D.D.C. 2012), *aff'd in relevant part*,
718 F.3d 929 (D.C. Cir. 2013) ........................................................57

*United States v. Botefuhr*, 309 F.3d 1263 (10th Cir. 2002) ............................................67

*United States v. Texas*, 507 U.S. 529 (1993) ..................................................37

*University of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013) ..............................50

*Van Beneden v. Al-Sanusi*, 709 F.3d 1165 (D.C. Cir. 2013) ........................................51

*W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., Int'l*, 493 U.S. 400
    (1990)...............................................................................................................44

\* *Walden v. Fiore*, 571 U.S. 277 (2014) ...............................................12, 13, 18, 23

*Washkoviak v. Student Loan Mktg. Ass'n*, 900 A.2d 168 (D.C. 2006) ...........................61, 62, 64

*Weinstein v. Islamic Republic of Iran*, 831 F.3d 470 (D.C. Cir. 2016) ........................43

*Weisskopf v. United Jewish Appeal-Fed'n of Jewish Philanthropies of New York,
    Inc.*, 889 F. Supp. 2d 912 (S.D. Tex. 2012) .......................................................14

*WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129 (2018) ................................54, 55

*Williams v. District of Columbia*, 9 A.3d 484 (D.C. 2010) ........................................63

*Williams v. Yamaha Motor Co.*, 851 F.3d 1015 (9th Cir. 2017)...................................15

*World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154
    (D.C. Cir. 2002) ...............................................................................................44, 45

*Ye v. Zemin*, 383 F.3d 620 (7th Cir. 2004).......................................................26, 37

*Yousuf v. Samantar*, 699 F.3d 763 (4th Cir. 2012) ....................................24, 25, 26, 27

INTERNATIONAL CASES

*Apex Global Mgmt. Ltd. v. Fi Call Ltd.*, [2013] EWHC 587 (Ch) ........................................29, 30

*Application for Arrest Warrant Against General Shaul Mofaz* (Bow St. Mag. Ct.
    Feb. 12, 2004) (Eng.) (Pratt, Dist. J.), *reprinted in Current Developments:
    Public International Law*, 53 Int'l & Comp. L.Q. 769 (July 2004)....................................30

*Boucher v. Wal-Mart Canada Corp.*, 2014 ONCA 419 (Can.) ..............................................62, 63

*Nevsun Res. Ltd. v. Araya*, 2020 SCC 5 (Can.) .........................................................53

*Prosecutor v. Perišić*, Case No. IT-04-81-T, Judgement (Feb. 28, 2013),
    https://www.icty.org/x/cases/perisic/acjug/en/130228_judgement.pdf ...........................59

*Re Bo Xilai* (Bow St. Mag. Ct. Nov. 8, 2005) (Eng.) (Workman, Sr. Dist. J.),
    *available at Weixum v. Xilai*, No. 1:04-cv-00649-RJL, ECF No. 16-7
    (D.D.C. July 24, 2006).........................................................................................30

TREATIES, CONSTITUTION, STATUTES, AND RULES

Geneva Convention for the Amelioration of the Condition of the Wounded and
    Sick in Armed Forces in the Field, Aug. 12, 1949, 6 U.S.T. 3114 ...................................50

U.S. Const. amend. V (Due Process Clause) ..................................................................17

\* Alien Tort Statute, 28 U.S.C. § 1350 ................................................................. *passim*

Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891
    (codified as amended at, *inter alia*, 28 U.S.C. §§ 1602-1611) .........................................43

        28 U.S.C. § 1604 .....................................................................................................43

        28 U.S.C. § 1605(a)(5)...........................................................................................43

        28 U.S.C. § 1605A.........................................................................................43, 44, 51

        28 U.S.C. § 1605A(a)(2)(A)(i) .............................................................................43

        28 U.S.C. § 1605A(a)(2)(A)(ii) ............................................................................43

        28 U.S.C. § 1605B .................................................................................................43, 44

        28 U.S.C. § 1605B(b) ............................................................................................44

\* Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992),
    *reprinted in* 28 U.S.C. § 1350 note ..................................................................... *passim*

        § 2(a), 106 Stat. 73................................................................................................48

        § 2(a)(2), 106 Stat. 73 ...........................................................................................48, 49

        § 2(b), 106 Stat. 73................................................................................................52

        § 3(a), 106 Stat. 73................................................................................................48

28 U.S.C. § 1367 ...........................................................................................................68, 69

28 U.S.C. § 1367(a) ......................................................................................................68

28 U.S.C. § 1367(c)(3)..................................................................................................68

42 U.S.C. § 1983 ...........................................................................................................37

D.C. Code § 16-2701 ....................................................................................................49

Mass. Gen. Laws ch. 229, § 2 ......................................................................................49

Family Law Act, R.S.O. 1990, c. F.3, § 61(1) (Can.)....................................................49

State Immunity Act 1978, c. 33 (U.K.)......................................................................30

Fed. R. Civ. P.:

    Rule 4(k)(2)....................................................................................12, 16, 67

    Rule 12(b)(7)...........................................................................................38

    Rule 19..................................................................................................3, 38

    Rule 19(a)....................................................................................38, 41, 42

    Rule 19(a)(1)(B).......................................................................................42

    Rule 19(a)(1)(B)(i)..............................................................................39, 41

    Rule 19(b)...........................................................................................40, 44

## LEGISLATIVE MATERIALS

H.R. Rep. No. 102-367, pt. 1 (1991), *reprinted in* 1992 U.S.C.C.A.N. 84 ...................................49

S. Rep. No. 102-249 (1991) ........................................................................................50

## ADMINISTRATIVE MATERIALS

Br. for the United States as Amicus Curiae, *Mutond v. Lewis*, No. 19-185
    (U.S. May 26, 2020), 2020 WL 2866592 .............................................31, 32, 37

Br. for the United States as Amicus Curiae Supporting Petitioners, *Nestlé USA,
    Inc. v. Doe I*, Nos. 19-416 & 19-453 (U.S. Sept. 8, 2020), 2020 WL
    5498509........................................................................................................55

Br. for the United States in Opp., *Bahlul v. United States*, No. 16-1307
    (U.S. Sept. 6, 2017), 2017 WL 3948468 .........................................................57

Br. for the United States of America as Amicus Curiae in Support of Affirmance,
    *Mahar v. Dichter*, No. 07-2579-cv (2d Cir. Dec. 19, 2007), 2007 WL
    6931924........................................................................................................36

Central Intelligence Agency, *The World Factbook:  Saudi Arabia*,
    https://www.cia.gov/library/publications/the-world-factbook/geos/sa.html
    (last visited Nov. 27, 2020).............................................................................29

Ltr. from Harold Hongju Koh, Legal Adviser, U.S. Dep't of State, to Stuart F.
Delery, Acting Ass't Att'y Gen., Civil Div., U.S. Dep't of Justice (Sept. 7,
2012), *docketed at Doe v. Zedillo*, No. 3:11-cv-01433-AWT, ECF No.
38-1 (D. Conn. Sept. 7, 2012) ...............................................................................32

Ltr. from Harold Hongju Koh, Legal Adviser, U.S. Dep't of State, to Stuart F.
Delery, Principal Dep. Ass't Att'y Gen., Civil Div., U.S. Dep't of Justice
(Dec. 17, 2012), *docketed at Ragsdale v. Lashkar-E-Taiba*, No. 1:11-cv-
03893-DLI-CLP, ECF No. 19-1 (E.D.N.Y. Dec. 17, 2012) .............................32

Press Release, U.S. Dep't of State, *Crown Prince Mohammed bin Salman* (June
21, 2017), https://www.state.gov/crown-prince-mohammed-bin-salman/
(last visited Nov. 27, 2020) .....................................................................................6

Readout, *Secretary Pompeo's Call with Saudi Crown Prince Mohammed bin
Salman Al Saud*, Office of the Spokesperson, U.S. Dep't of State (Mar. 25,
2020), https://www.state.gov/secretary-pompeos-call-with-saudi-crown-
prince-mohammed-bin-salman-al-saud-4/ ...........................................................29

Readout, *Secretary Pompeo's Meeting with Saudi Crown Prince Mohammed bin
Salman*, Office of the Spokesperson, U.S. Dep't of State (Feb. 21, 2020),
https://www.state.gov/secretary-pompeos-meeting-with-saudi-crown-
prince-mohammed-bin-salman-2/ .........................................................................29

*Readout of President Donald J. Trump's Meeting with Crown Prince Mohammed
Bin Salman of Saudi Arabia*, The White House (Mar. 21, 2018),
https://www.whitehouse.gov/briefings-statements/readout-president-
donald-j-trumps-meeting-crown-prince-mohammed-bin-salman-saudi-
arabia/ ............................................................................................................... 28-29

*Remarks by President Trump and Crown Prince Mohammad Bin Salman of the
Kingdom of Saudi Arabia Before Working Breakfast | Osaka, Japan*,
The White House (June 28, 2019), https://www.whitehouse.gov/briefings-
statements/remarks-president-trump-crown-prince-mohammad-bin-
salman-kingdom-saudi-arabia-working-breakfast-osaka-japan/ .........................28

U.S. Dep't of State, *Digest of United States Practice in International Law*
(CarrieLyn D. Guymon ed., 2015), *available at* https://2009-2017.
state.gov/documents/organization/258206.pdf ...................................................32

OTHER MATERIALS

Tamara Abueish, *Saudi Arabia's Public Prosecution issues final verdict in Khashoggi case*, Al Arabiya (Sept. 7, 2020), *available at* https://english.alarabiya.net/en/News/gulf/2020/09/07/Saudi-Arabia-s-Public-Prosecution-verdict-against-8-people-involved-in-Khashoggi-case ......................10

Basic Law of Governance, https://www.saudiembassy.net/basic-law-governance ...........27, 28, 30

John B. Bellinger III, *The Dog that Caught the Car:  Observations on the Past, Present, and Future Approaches of the Office of the Legal Adviser to Official Acts Immunities*, 44 Vand. J. Transnat'l L. 819 (2011) ........................................27

Commission for the Control of INTERPOL's Files, *Request Concerning Saad Aljabri* (Ref. CCF/R960.17): Decision of the Commission (105th session, July 2-5, 2018) (July 4, 2018) ..........................................................................................7

Hazel Fox, *The Law of State Immunity* (2d ed. 2008) ................................................25

Bradley Hope, Justin Scheck & Warren P. Strobel, *Saudi Arabia Wants Its Fugitive Spymaster Back*, Wall St. J. (July 17, 2020, 12:47 pm), https://www.wsj.com/articles/a-spymaster-ran-off-after-saudis-say-billions-went-missing-they-want-him-back-11595004443 ...........................................1, 7

Chimène I. Keitner, *The Common Law of Foreign Official Immunity*, 14 Green Bag 2d 61 (2010) ....................................................................................24

*Mohammed bin Salman Named Saudi Arabia's Crown Prince*, Al Jazeera (June 21, 2017), https://www.aljazeera.com/news/2017/06/21/mohammed-bin-salman-named-saudi-arabias-crown-prince/ (last visited Nov. 27, 2020) ..........................6

4 James W. Moore, *Moore's Federal Practice* (3d ed. 1998) .......................................38

Press Release, *Readout of PM's Call with Mohammed bin Salman:  2 September 2020*, Prime Minister's Office, 10 Downing Street (Sept. 2, 2020), https://www.gov.uk/government/news/readout-of-pms-call-with-mohammed-bin-salman-2-september-2020 ......................................................................29

Restatement (Second) of Agency (1958) ......................................................................15

Restatement (Second) of Conflict of Laws (1971) ................................................63, 64

Restatement (Second) of Foreign Relations Law of the United States (1965) .......31, 34

Restatement (Second) of Torts (1965) .................................................................51, 65, 66

Restatement (Third) of Agency (2006) .........................................................................15

Restatement (Third) of Foreign Relations Law of the United States (1987) ................31

Royal Order A/226, issued 1440/06/18 AH (02/23/2019 AD) ......................................28

Royal Order A/229, issued 1440/06/18 AH (02/23/2019 AD) ......................................28

Royal Order A/292, issued 1436/04/03 AH (07/21/2017 AD) ......................................28

Royal Order A/313, issued 1438/11/01 AH (07/24/2017 AD) ......................................28

Royal Order A/352, issued 1441/05/18 AH (01/13/2020 AD) ......................................28

*Saudi Crown Prince Mohammed bin Salman Arrives in Pakistan*, Al Jazeera
    (Feb. 17, 2019), https://www.aljazeera.com/news/2019/02/saudi-crown-
    prince-mohammed-bin-salman-arrives-pakistan-190217061720354.html ......................29

*Webster's Third New International Dictionary* (2002) ..................................................49

Kim Willsher, *French President and Saudi Crown Prince Vow Partnerships
    on Syria and Economic Issues*, L.A. Times (Apr. 10, 2018),
    https://www.latimes.com/world/europe/la-fg-france-saudi-arabia-
    20180410-story.html ........................................................................................29

Lewis S. Yelin, *Head of State Immunity as Sole Executive Lawmaking*,
    44 Vand. J. Transnat'l L. 911 (2011) .............................................................24, 27

# INTRODUCTION

Plaintiff Saad Aljabri ("Aljabri") was once a high-ranking official in the Kingdom of Saudi Arabia's ("Saudi Arabia") Ministry of Interior.  From 2001 to 2015, Saudi Arabia entrusted him with managing a counterterrorism fund created in the wake of the terrorist attacks of September 11, 2001.[1]  During that time, Saudi Arabia allocated $19.7 billion to the fund to finance efforts to combat terrorism.[2]  More than half of those funds – a staggering $11 billion – were misspent or outright stolen by Aljabri and his associates, causing incalculable harm to public safety and government integrity.[3]  Aljabri even involved his adult children in the scheme, funneling vast amounts of money through their accounts and out of the country.

Saudi Arabia has prosecuted this blatant corruption and theft, and is actively seeking to extradite Aljabri to face criminal charges.  Since 2017, Aljabri has lived as an "international fugitive," Compl. ¶¶ 90(o), 180, successfully evading accountability for his crimes.  Now Aljabri brings this lawsuit against His Royal Highness Mohammed bin Salman bin Abdulaziz Al Saud, the Crown Prince of Saudi Arabia ("the Crown Prince" or "Prince Mohammed bin Salman"); 23 other named and unnamed Saudi nationals; and the Crown Prince's charitable foundation, asserting claims under the Torture Victim Protection Act of 1991 ("TVPA") and the Alien Tort Statute ("ATS"), as well as a common-law claim for intentional infliction of emotional distress – all based on allegations of an elaborate effort, overseen by the Crown Prince, to kill Aljabri.

---

[1] *See* Bradley Hope, Justin Scheck & Warren P. Strobel, *Saudi Arabia Wants Its Fugitive Spymaster Back*, Wall St. J. (July 17, 2020, 12:47 pm), https://www.wsj.com/articles/a-spymaster-ran-off-after-saudis-say-billions-went-missing-they-want-him-back-11595004443 (cited and discussed at Compl. ¶¶ 90(n) & n.46, 180 & n.95).  On a motion to dismiss, a court may consider "documents . . . incorporated by reference in the complaint."  *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 54 (D.D.C. 2016).

[2] *See* Hope, Scheck & Strobel, *Saudi Arabia Wants Its Fugitive Spymaster Back*.

[3] *See id.*

Aljabri's Complaint is steeped in drama, including an introduction that likens the Crown Prince to one of Shakespeare's greatest villains. *See id.* ¶¶ 1-3. But, regardless of its merits as literature, the Complaint fails as a legal pleading. Aljabri's lead claim invokes a provision of the TVPA that authorizes suit by the "legal representative" of the victim of an "extrajudicial killing" or by an appropriate "claimant . . . for wrongful death." It creates no claim for Aljabri, who is very much alive and suing in his own name. As for the ATS, that statute requires domestic conduct, and even then grants jurisdiction over "a tort only, committed in violation of the law of nations or a treaty of the United States." An alleged attempted killing in Canada is not domestic, is no tort, and does not violate the law of nations.

The flaws in this Complaint are so apparent and run so deep that it can only be regarded as an attempt to divert attention from Plaintiff's massive theft. Plaintiff can say whatever he wants to the newspapers. But this case does not belong in federal court. Aljabri cannot establish personal jurisdiction over the Crown Prince. He cannot establish subject-matter jurisdiction in this Court. And he cannot state a single claim on the merits.

**I.**     This Court lacks personal jurisdiction over the Crown Prince. The Complaint alleges an attempt to kill Aljabri in Canada, directed from Saudi Arabia. None of the scant allegations pertaining to the United States establishes the contacts between the Crown Prince, the United States, and Aljabri's legal claims that are necessary for specific jurisdiction.

**II.**     Aljabri's claims are barred by three separate, but related, doctrines that prevent litigation from interfering with the sovereignty of a foreign nation and thereby harming the foreign relations of the United States.

**A.**     The Court lacks subject-matter jurisdiction over Aljabri's claims under the doctrine of foreign official immunity. The Crown Prince is the King's son and designated

successor.  Together with the King, he sits at the apex of Saudi Arabia's government.  He is entitled to status-based immunity from any suit in U.S. court.  He is also entitled to conduct-based immunity because Aljabri's claims arise from the Crown Prince's alleged official acts.

**B.**     Although Aljabri strains to personalize his Complaint against the Crown Prince, he asks the Court to decide the propriety and validity of official acts with great domestic significance to Saudi Arabia, including Saudi Arabia's criminal investigation into Aljabri's corruption and its ongoing attempts to bring him and his co-conspirators to justice.  Saudi Arabia is thus a necessary party under Rule 19 of the Federal Rules of Civil Procedure – and, where an immune sovereign is a necessary party, no part of the case can proceed.

**C.**     The Complaint asks the Court to declare unlawful Saudi Arabia's official acts committed within, or rooted in, its own territory, including the Crown Prince's appointment (the Complaint calls it a "coup"), the Saudi government's pursuit of corruption charges against Aljabri (the Complaint calls them "bogus"), and the arrest of Aljabri's adult children (the Complaint calls it a "kidnapping").  The act of state doctrine requires the Court to presume that Saudi Arabia's official acts are valid – and dismiss claims that seek a contrary ruling.

**III.**     Aljabri fails to state a claim on any of the three counts in the Complaint.

**A.**     In relevant part, the TVPA creates a cause of action for an extrajudicial killing. Aljabri is alive and, according to the Complaint itself, has never been so much as touched.  By its plain terms, the TVPA does not reach an attempt at an extrajudicial killing.  The TVPA also requires exhaustion of remedies in the place where the alleged conduct occurred, but Aljabri fails to allege he has done anything to seek remedies in either Canada or Saudi Arabia.

**B.**     Aljabri fails to allege jurisdiction or state a claim under the ATS, which encompasses violations of only a limited class of universal and obligatory international norms.

The conduct alleged in the Complaint – which is, at most, an unsuccessful attempt to carry out an extrajudicial killing – does not violate such norms as a matter of law.  Independently, dismissal is required because the ATS does not apply outside the United States, and Aljabri fails to allege any conduct in the United States regulated by the ATS.

      **C.**      Aljabri also fails to state a claim for intentional infliction of emotional distress. Saudi Arabian law, which governs his non-statutory claims, recognizes no stand-alone action for emotional harm.  Even if D.C. law applies, Aljabri fails to state a claim.  Alternatively, if the Court dismisses the ATS and TVPA claims, it should dismiss Aljabri's emotional-distress claim for lack of personal jurisdiction or should decline to exercise supplemental jurisdiction.

### SUMMARY OF ALLEGATIONS AND MATERIALS CITED IN THE COMPLAINT

      Saud Aljabri is a Saudi and Maltese national, and permanent Canadian resident.  Compl. ¶ 31.  Until September 2015, he was a senior official of Saudi Arabia's Ministry of Interior, where he was a "trusted advisor" of the former Minister of Interior (and former Crown Prince), His Royal Highness Mohammed bin Nayef bin Abdulaziz Al Saud ("Prince Mohammed bin Nayef"), *id.* ¶ 29, and a "trusted partner" of the U.S. intelligence community, *id.* ¶ 5.  In September 2015, His Majesty King Salman bin Abdulaziz Al Saud ("King Salman") removed Aljabri from his government role in September 2015 after Aljabri held "unauthorized meetings" with then-Director of the CIA, John Brennan.  *Id.* ¶ 111.

      According to the Complaint, Aljabri warned Brennan that Prince Mohammed bin Salman, who then served as Deputy Crown Prince, was allegedly "encouraging Russian intervention in Syria" in "recent communications with Russian President Vladimir Putin."  *Id.* ¶ 109.  Aljabri also informed Brennan of his "disagreement[s]" with other policy decisions of the Deputy Crown Prince.  *Id.* ¶ 110.  At that time, Prince Mohammed bin Nayef was the Crown

Prince and Aljabri's direct superior.  *Id.* ¶ 30.  Aljabri nevertheless alleges (without factual

support) that King Salman terminated Aljabri "at the behest of" Prince Mohammed bin Salman,

who had no direct oversight of Aljabri.  *Id.* ¶ 111.

The Complaint further alleges that Aljabri posed an "urgent threat" to Prince Mohammed

bin Salman.  *Id.* ¶ 112.  Despite that supposed urgency, it does not allege that Prince Mohammed

bin Salman took any actions against Aljabri from the time of Aljabri's termination by the King

in September 2015 until early 2017.  During that time, Aljabri was free to travel and free from

any state-imposed restraints.  Aljabri alleges that, as of late 2016, representatives of Prince

Mohammed bin Salman were in contact with then-President-elect Donald Trump's transition

team, *see id.* ¶¶ 113-115, and that those discussions led to a May 2017 visit by President Trump

to Saudi Arabia and "an agreement in which Saudi Arabia would invest more than $350 billion

in U.S. defense manufacturers," *id.* ¶¶ 118, 120, 124.

On May 17, 2017, a few days before President Trump's visit, Aljabri fled Saudi Arabia

for Turkey.  *See id.* ¶ 122.  The Complaint alleges that he did so in response to fears that Prince

Mohammed bin Salman would assume that Aljabri was involved in a contract signed between

the Ministry of Interior – from which Aljabri had been dismissed nearly two years before – and

a "lobbying firm with ties to the Trump administration."  *Id.* ¶¶ 121-122.  The Complaint further

alleges that the corruption charges brought against him by Saudi Arabia are a "bogus" and

"baseless" pretext to "lure" him back to Saudi Arabia and/or to "trap[ ]" him in Canada, so that

he can be "hunt[ed] down" and killed.  *E.g.*, *id.* ¶¶ 15, 126, 136, 176.  Aljabri alleges that the

Crown Prince "wants [him] dead" because Aljabri knows (and threatens to publicize to U.S.

authorities) "sensitive, humiliating, and damning information" about the Crown Prince, *id.* ¶¶ 6, 8,

which purportedly poses a "threat" to the Crown Prince's "chances of U.S. support for his

ascension" to the Saudi throne, *id.* ¶ 23.  That is, the Complaint asks this Court to assume the implausible premise that the United States controls the selection and appointment of the next King of Saudi Arabia – a premise that itself is an affront to Saudi Arabia's sovereign dignity.

Aljabri alleges that, from June to September 2017, Prince Mohammed bin Salman attempted to convince him to return to Saudi Arabia.  *See id.* ¶¶ 127-143.  Aljabri alleges, for example, that the Prince told Aljabri that, if he did not voluntarily return, Saudi Arabia would "pursue [him] legally, and by using all available means," *id.* ¶ 136, and offered to send an airplane to facilitate Aljabri's return, *id.* ¶ 135.  Aljabri also alleges that the Prince attempted to pressure Aljabri to return from Turkey by imposing a travel ban on two of Aljabri's children, *id.* ¶ 140, and arranging to cancel a scholarship that the Ministry of Interior had awarded to a third, *see id.* ¶¶ 157-159.  During this same period, on June 20, 2017, Prince Mohammed bin Salman assumed his current position as Crown Prince by order of King Salman.  *See id.* ¶ 129.  Aljabri alleges that, to obtain this position, Prince Mohammed bin Salman "orchestrated a coup in which he ousted Mr. bin Nayef from power and assumed the mantle of Crown Prince of Saudi Arabia." *Id.*  The description of the Crown Prince's appointment as a "coup," like so much else in the Complaint, is without any basis.[4]

On September 12, 2017, after allegedly learning that the Crown Prince "was pressuring the Government of Turkey to formally extradite" him, Aljabri secretly fled to Canada.  *Id.*

---

[4] The Court may take notice that King Salman, who was then and remains the King, issued a Royal Decree appointing the Crown Prince to his current position.  *See Mohammed bin Salman Named Saudi Arabia's Crown Prince*, Al Jazeera (June 21, 2017), https://www.aljazeera.com/news/2017/06/21/mohammed-bin-salman-named-saudi-arabias-crown-prince/ (last visited Nov. 27, 2020).  The United States recognized the legitimacy of the appointment.  *See* Press Release, U.S. Dep't of State, *Crown Prince Mohammed bin Salman* (June 21, 2017) (congratulating the Crown Prince on his appointment as Crown Prince), https://www.state.gov/crown-prince-mohammed-bin-salman/ (last visited Nov. 27, 2020).

¶¶ 137-138.  At that same time, the Crown Prince allegedly "arranged for the filing of a notice about [Aljabri] and his family with INTERPOL."  *Id.* ¶ 176; *see* Ex. A.  That notice concerned Aljabri's misappropriation of billions of dollars in counterterrorism funds that the Saudi government had entrusted Aljabri to oversee.[5]  INTERPOL concluded that there was "extensive information and sufficient elements of the possible concrete and effective participation of [Aljabri] to the offences of which he is accused."  Ex. B, Commission for the Control of INTERPOL's Files, *Request Concerning Saad Aljabri* (Ref. CCF/R960.17): Decision of the Commission (105th session, July 2-5, 2018), ¶ 60 (July 4, 2018) (*cited in* Compl. ¶ 178 & n.93).  INTERPOL nonetheless rescinded the notice at Aljabri's behest "on the basis of Article 3" of INTERPOL's Constitution, *id.* ¶ 84, which states that it is "strictly forbidden for the Organization to undertake any intervention or activities of a political . . . character," *see id.* ¶ 14.

Aljabri alleges that the Crown Prince, apparently under the impression that Aljabri fled to the United States, "orchestrated a hunt" to locate Aljabri there, Compl. ¶ 162, with the Crown Prince's private foundation – co-defendant MiSK Foundation (the "Foundation") – serving as a "front" for the operation, *id.* ¶ 56.  He further alleges that co-defendant Bader Alasaker ("Alasaker") – the Secretary-General of the Foundation and a Saudi national, *id.* ¶ 38 – "recruited and cultivated" three U.S.-based students through the Foundation, and "directed" the activities of these "agents."  *Id.* ¶ 163.  The only concrete actions that Aljabri describes those students taking as part of the purported "hunting" consisted of speaking with Aljabri family members and acquaintances and asking about the whereabouts of Aljabri's wife:

- Co-defendant Youssef Alrajhi ("Alrajhi"), a Saudi national, allegedly spoke with an Aljabri family acquaintance and met with one of Aljabri's sons in Boston, in attempts to learn information on the whereabouts of Aljabri's wife.  *See id.* ¶¶ 167-169.

---

[5] *See* Hope, Scheck & Strobel, *Saudi Arabia Wants Its Fugitive Spymaster Back*.

- Co-defendant Mohammed Alhamed ("Alhamed"), a Saudi national, allegedly attempted to convince a family acquaintance to meet with Alrajhi in person, and also made his own attempts in Boston to learn information on the whereabouts of Aljabri's wife. *See id.* ¶¶ 168, 170.

- Co-defendant Layla Abuljadayel ("Abuljadayel"), a Saudi national, allegedly contacted the wife of one of Aljabri's sons in Boston in an attempt to learn the whereabouts of Aljabri's wife. *See id.* ¶ 171.

According to the Complaint, Alrajhi, Alhamed, and Abuljadayel all acted under the "false pretext of arranging a marriage with [Aljabri's] daughter." *Id.* ¶ 167.[6]

Aljabri alleges that another co-defendant, Bijad Alharbi, is a "long-time former associate" of Aljabri who "had worked for many years in Saudi Arabia in close cooperation with [Aljabri] and Mr. bin Nayef." *Id.* ¶¶ 173-174. Alharbi allegedly met with one of Aljabri's sons in Boston in December 2017 and asked about Aljabri's location. *Id.* ¶ 173.

The Complaint does not allege that any inquiries by any of the Defendants in the United States yielded information that assisted in locating Aljabri. Rather, Aljabri alleges that, at an unspecified time after Alharbi's trip to the United States, Alharbi traveled to Toronto, Canada, to "confirm[ ]" information he had learned from an unspecified source that Aljabri was in Toronto. *Id.* ¶ 174. Alharbi met with Aljabri in Toronto and allegedly "tried to convince" him to "visit his family" in Turkey, *id.*, where his wife and two of his sons were living at the time, *see id.* ¶¶ 160, 177. Aljabri further alleges that, in or around July 2018, the Crown Prince or his agents "remotely planted malware in [Aljabri's] personal phones" in Canada, which allowed them to learn Aljabri's "precise location." *Id.* ¶ 221.

While the inquiries in the United States were ongoing, the Crown Prince allegedly utilized "additional sources of leverage" over Aljabri. *Id.* ¶ 151. According to the Complaint,

---

[6] Aljabri also alleges that in November 2017 an unidentified "John Doe 1" surveilled the Mandarin Oriental in Boston, Massachusetts, where Aljabri maintained a residence, Compl. ¶ 172, although the Complaint acknowledges that he "did not live there at the time," *id.* ¶¶ 169, 172.

the Crown Prince directed the freezing of Saudi-based bank accounts belonging to Aljabri and two of his adult children, and "expropriated" a business in which Aljabri had an interest.  *Id.* ¶ 183.  Aljabri also alleges that one of his relatives was arrested in the United Arab Emirates and extradited to Saudi Arabia, where he was detained for several months and allegedly tortured.  *Id.* ¶¶ 152-153.  That relative is allegedly now barred from leaving Saudi Arabia.  *Id.* ¶ 154.

Aljabri alleges that a group of Saudi nationals allegedly operating as agents of the Crown Prince – labeled the "Tiger Squad" in the Complaint[7] – arrived at Ottawa International Airport on October 15, 2018, and attempted to enter Canada.  *Id.* ¶ 222.  The Complaint makes the entirely conclusory allegation that the intended purpose of this trip was to kill Aljabri in Canada. *Id.*  This supposed plot was thwarted by Canada Border Services Agency officers who discovered a photograph showing some of the Tiger Squad members together, after they had denied knowing each other.  *See id.* ¶¶ 228-230.  The Tiger Squad members, with the exception of Alhomid, were not admitted to Canada.  *Id.* ¶ 232.  Aljabri remains alive, *id.* ¶ 233, and does not allege that he suffered any physical assault or confrontation in 2018 or otherwise.

Aljabri alleges that, since that time, the Crown Prince and his agents have taken other actions targeting Aljabri and his family, including detaining members of Aljabri's family in Saudi Arabia, *see id.* ¶¶ 146-147, 155-156; disclosing information about Aljabri to the media, *id.* ¶ 180; and seeking the closure of the U.S.-based bank accounts of Aljabri and his sons, *id.* ¶ 186. Aljabri alleges that two of his children were "disappeared" and/or "kidnapp[ed]" by the government of Saudi Arabia, which he alleges caused him emotional distress.  *Id.* ¶¶ 12, 144,

---

[7] This "Tiger Squad" allegedly included co-defendants Khalid Ibrahim Abdulaziz Algasem, Mishal Fahad Alsayed, Ibrahim Hamad Abdulrahman Alhomid, Saud Abdulaziz Alsaleh, and Bandar Saeed Alhaqbani, as well as "John Does 2–11," Compl. ¶¶ 77-82, though only Algasem, Alsayed, Alhomid, and Alhaqbani are alleged to have traveled to Canada, *id*. ¶ 222.  In addition, the Complaint alleges that two other co-defendants – Saud Alqahtani and Ahmed Alassiri – oversaw the Tiger Squad.  *Id.* ¶¶ 45, 52.

149.  In fact, as Aljabri seems to admit, the two adult children, Omar and Sarah Aljabri, were forbidden from leaving the country while charges of money laundering were being investigated by Saudi Arabia's public prosecutor.  *Id.* ¶ 143.

Aljabri also includes in his Complaint allegations concerning the well-publicized murder of Jamal Khashoggi in October 2018.  *See id.* ¶¶ 193-212.  The individuals who killed Khashoggi have been prosecuted and convicted in Saudi Arabia.[8]  Aljabri does not allege that the death of Khashoggi caused him personal harm or injury.  Relying on "a leaked assessment by the CIA," *id.* ¶ 209, and other second-hand sources, however, he attributes responsibility for that death to the Crown Prince.  He acknowledges, as he must, that the President has indicated that no such attribution has been made by the United States.  *See id.* ¶ 212.

Finally, Aljabri alleges that, in May 2020, the Crown Prince made statements to "close advisers" who were "overheard" by unspecified sources that "he had obtained a *fatwa*," or "ruling by religious authorities," authorizing "the killing" of Aljabri.  *Id.* ¶ 235.  The Complaint further alleges that statements by the Crown Prince "and his agents were . . . overheard saying that they planned to send men to kill [Aljabri] in Canada 'by land.'"  *Id.* ¶ 236.  The Complaint does not allege that any such an attempt has been made.  Nor does it explain why, if religious authorization were required for an attempt to kill Aljabri, such a ruling would be obtained in 2020, two years after the alleged attempt in 2018.

## ALJABRI'S PURPORTED SERVICE OF THE COMPLAINT

Aljabri claims to have served the Complaint on the Crown Prince by mail and by a message from the messaging software WhatsApp.  *See* ECF No. 36, ¶¶ 3-4.  Contrary to the

---

[8] *See* Tamara Abueish, *Saudi Arabia's Public Prosecution issues final verdict in Khashoggi case*, Al Arabiya (Sept. 7, 2020), *available at* https://english.alarabiya.net/en/News/gulf/2020/09/07/Saudi-Arabia-s-Public-Prosecution-verdict-against-8-people-involved-in-Khashoggi-case.

assertions made in his *ex parte* motion for alternative service and in the supporting Declaration of Abdullah Alaoudh, *see* ECF No. 14, Ex. A at 9 & Ex. E, these purported methods of service violate Saudi law.  In civil actions initiated in the United States, service of process on individuals in Saudi Arabia must be made through diplomatic channels and must also be sent to the general court where the person in Saudi Arabia resides.  *See* Ex. C, Declaration of Fahad Nasser Al Arfaj ¶ 17.  Saudi Arabia is also not a party to any international treaties that permit service of process by mail or by WhatsApp.  *Id.* ¶ 16.  Nonetheless, to avoid delay and to expedite the dismissal of this case, the Crown Prince has chosen not to challenge service.

## STANDARD OF REVIEW

On a "motion to dismiss for lack of personal jurisdiction, [the] plaintiff bears the burden of making 'a *prima facie* showing of the pertinent jurisdictional facts.'"  *Bernhardt v. Islamic Republic of Iran*, 2020 WL 6743066, at *2 (D.D.C. Nov. 16, 2020) (Kelly, J.) (quoting *Livnat v. Palestinian Auth.*, 851 F.3d 45, 56-57 (D.C. Cir. 2017)).  "Factual disputes must be resolved in favor of the plaintiff, but the Court need not accept unsupported inferences."  *Id.*  Similarly, "[o]n a motion to dismiss for lack of subject matter jurisdiction . . . , 'plaintiffs bear the burden of establishing jurisdiction.'"  *Jones v. United States*, 318 F. Supp. 3d 15, 19 (D.D.C. 2018) (Kelly, J.) (quoting *Knapp Med. Ctr. v. Hargan*, 875 F.3d 1125, 1128 (D.C. Cir. 2017)).  Such a motion may be resolved on the face of the complaint provided that the allegations of the complaint are taken as true.  *See id.*  A motion to dismiss for failure to state a claim tests whether "a complaint . . . contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand such a motion.  *Id.*

**ARGUMENT**

I.      **Aljabri Fails To Establish Personal Jurisdiction over the Crown Prince**

The Complaint fails to establish personal jurisdiction over the Crown Prince because it does not allege sufficient well-pleaded facts, taken as true, to show the minimum contacts required by due process.  "'[D]ue process requires'" that, "before a defendant outside a forum's borders may be subject to suit[,] the defendant must 'have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."'"  *Livnat v. Palestinian Auth.*, 851 F.3d 45, 48 (D.C. Cir. 2017) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  Where, as here, a plaintiff asserts personal jurisdiction over a foreign defendant under Federal Rule of Civil Procedure 4(k)(2), *see* Compl. ¶ 86, the forum is the United States as a whole.  *See Livnat*, 851 F.3d at 55.

The federal courts recognize two categories of personal jurisdiction:  general and specific.  General jurisdiction, which "'permits a court to assert jurisdiction over a defendant based on a forum connection unrelated to the underlying suit,'" *id.* at 56 (quoting *Walden v. Fiore*, 571 U.S. 277, 283 n.6 (2014)), is limited to "'only a limited set of affiliations with a forum,' all analogous to an individual's domicile," *id.* (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014)).  Because the Crown Prince lives and works in Saudi Arabia, *see* Compl. ¶ 34, general jurisdiction is clearly lacking here.

For a forum "to exercise specific jurisdiction, 'the *suit*' must 'aris[e] out of or relat[e] to the defendant's contacts with the *forum*.'"  *Bristol-Myers Squibb Co. v. Superior Ct. of California*, 137 S. Ct. 1773, 1780 (2017) (quoting *Daimler*, 571 U.S. at 127) (brackets in original).  That is, "'the defendant's *suit-related conduct* must create a *substantial connection* with the forum.'"  *Estate of Klieman v. Palestinian Auth.*, 923 F.3d 1115, 1120 (D.C. Cir. 2019) (quoting *Walden*, 571 U.S. at 284) (emphases in *Klieman*), *cert. granted, vacated, and remanded*

12

*on other grounds*, 140 S. Ct. 2713 (2020).  Contacts between the plaintiff and the forum, or those between the defendant and persons who reside in the forum, cannot meet this requirement.  *See Walden*, 571 U.S. at 284-85.

### A.    The Complaint Fails To Allege Suit-Related Contacts Between the Crown Prince and the United States

This is a lawsuit by a dual Saudi and Maltese citizen and permanent resident of Canada, Aljabri, Compl. ¶ 31, against a Saudi citizen and resident, the Crown Prince, *id.* ¶ 34, alleging that the Crown Prince orchestrated a plot from Saudi Arabia to attempt to kill Aljabri in Canada, purportedly to obtain an "unencumbered" claim to the "throne of the Kingdom of Saudi Arabia," *id.* ¶ 3.  The D.C. Circuit has repeatedly rejected personal jurisdiction over foreign individuals and organizations for legal claims arising out of alleged attacks carried out on foreign soil.  *See*, *e.g.*, *Livnat*, 851 F.3d at 56-58 (no personal jurisdiction over legal claims by alleged victims of attacks by Palestinian governmental organizations against American citizens in West Bank); *Klieman*, 923 F.3d at 1124-25 (same); *Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016, 1037 (D.C. Cir. 2020) (same); *Doe 1 v. Buratai*, 792 F. App'x 6, 9-10 (D.C. Cir. 2019) (per curiam) (no personal jurisdiction over legal claims by Nigerian citizens of alleged attacks by Nigerian officials on Nigerian soil); *cf. Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 95 (D.C. Cir. 2002) (describing as "insufficient to satisfy the usual 'minimum contacts' requirement" allegations that the government of Libya "tortured two American citizens in Libya").  The basis for personal jurisdiction is even weaker here, where no actual attack occurred and no Americans were targeted.  Although Aljabri strains to allege connections to the United States, none suffices to establish specific jurisdiction.

### 1.    Other Defendants' Alleged Actions in the United States Do Not Support Personal Jurisdiction over the Crown Prince

Aljabri alleges that three Defendants made inquiries in the United States about the

13

location of Aljabri's wife, and one Defendant inquired about the location of Aljabri.  Compl.
¶¶ 167-173.  But he fails to allege facts showing either that these individuals acted as the agents
of the Crown Prince or that their actions gave rise to the alleged torts.

### a.   There Is No Basis To Attribute the Alleged Contacts to the Crown Prince

Aljabri has not sufficiently alleged or established a basis to impute other Defendants'
contacts to the Crown Prince for purposes of personal jurisdiction.  Aljabri alleges only that other
individuals, not the Crown Prince himself, took actions in the United States to attempt to locate
Aljabri.  But "a plaintiff 'cannot aggregate factual allegations concerning multiple defendants in
order to demonstrate personal jurisdiction over any individual defendant.' "  *Duarte v. Nolan*, 190
F. Supp. 3d 8, 11 (D.D.C. 2016) (quoting *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34,
42 (D.D.C. 2003)), *aff'd*, 2017 WL 7736939 (D.C. Cir. Apr. 18, 2017) (per curiam).  Instead,
such contacts support jurisdiction over the Crown Prince only if "an agency relationship" existed
between the Crown Prince and those third parties.  *Gregorio v. Gordon*, 215 F. Supp. 3d 1, 6
(D.D.C. 2015).  Although Aljabri refers to those third parties as the "U.S.-Based Covert Agent
Defendants," *e.g.*, Compl. ¶ 14, "a 'bare allegation of . . . agency is insufficient to establish
personal jurisdiction.' "  *Khatib v. Alliance Bankshares Corp.*, 846 F. Supp. 2d 18, 33 (D.D.C.
2012) (quoting *First Chicago Int'l v. United Exchange Co.*, 836 F.2d 1375, 1378-79 (D.C. Cir.
1988)) (alteration in original).[9]  Similarly, mere allegations that a defendant "plann[ed]" or

---

[9] *Accord Second Amend. Found. v. U.S. Conference of Mayors*, 274 F.3d 521, 524
(D.C. Cir. 2001) ("the bare allegation of conspiracy or agency is insufficient to establish personal
jurisdiction"); *Livnat*, 851 F.3d at 57 (same); *Gregorio*, 215 F. Supp. 3d at 6 (same); *Weisskopf v.
United Jewish Appeal-Fed'n of Jewish Philanthropies of New York, Inc.*, 889 F. Supp. 2d 912,
927 (S.D. Tex. 2012) ("At the end of the day, Plaintiff's conclusory assertions that JFH acted as
UJA-Federation's local office in this District and that JFH is a conduit between local donors and
UJA-Federation cannot subject UJA-Federation to personal jurisdiction in Texas.").

"orchestrat[ed]" actions directed at the United States are conclusory and insufficient. *Ofisi v. Al Shamal Islamic Bank*, 2019 WL 1255096, at *6 (D.D.C. Mar. 19, 2019).

"[A]n agency relationship arises only where the principal 'has the right to control the conduct of the agent with respect to matters entrusted to him.'" *Carswell v. Air Line Pilots Ass'n, Int'l*, 540 F. Supp. 2d 107, 122 (D.D.C. 2008) (quoting Restatement (Second) of Agency § 14 (1958)); *see also* Restatement (Third) of Agency § 1.01 (2006) (stating that an agency relationship is "the fiduciary relationship that arises when [a principal] manifests assent to [an agent] that the agent shall act on the principal's behalf and subject to the principal's control"). Aljabri does not allege facts that plausibly suggest that the purported agents or the Crown Prince manifested assent to form an agency relationship. Although the Complaint makes broad statements that the Crown Prince "exercised command and operational control" and "exercised command responsibility" over the purported agents in the United States, Compl. ¶¶ 250, 257, those are "no more than conclusions" and are "not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The Complaint alleges no action the Crown Prince took to exercise control, no mechanism by which he did so, and no manifestation of intent that he would exercise such control.[10] Indeed, there is no allegation that the Crown Prince ever met or spoke with the purported U.S.-based agents, or even knew who they were. Agency-based theories of personal jurisdiction fail when the plaintiff fails to allege how the principal exercised control.[11]

---

[10] Although the Complaint alleges that Defendant Alasaker "recruit[ed]" or "direct[ed]" other Defendants to search for Aljabri, *e.g.*, Compl. ¶¶ 39, 42, those allegations are themselves conclusory and insufficient to impute the so-called agents' conduct to either Alasaker or the Crown Prince. *See* Bader Alasaker's Mem. in Support of His Mot. To Dismiss, Part I.A.1.

[11] *See, e.g.*, *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1024-25 (9th Cir. 2017) ("Appellants fail to make out a prima facie case for any such agency relationship. . . . Appellants neither allege nor otherwise show that YMC had the right to control YMUS's activities in any manner at all."); *Celgard, LLC v. SK Innovation Co.*, 792 F.3d 1373, 1379 (Fed. Cir. 2015)

Nor do the alleged actions of the purported agents support an inference that they were acting as agents of the Crown Prince. Three Defendants allegedly asked about the location of Aljabri's wife for the purpose of arranging a marriage with Aljabri's daughter. *See* Compl. ¶¶ 167, 169-171. The one named Defendant who allegedly inquired about Aljabri's location in the United States was Alharbi, who "had worked for many years in Saudi Arabia in close cooperation with" Aljabri. *Id.* ¶ 173. The allegation that this Defendant purportedly tried to reconnect with his "long-time former associate," *id.* ¶ 174, does not "nudge[] . . . across the line from conceivable to plausible," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), the claim that he was acting as the personal agent of the Crown Prince. The Complaint also alleges an unsuccessful attempt to locate Aljabri by "Defendant John Doe 1," Compl. ¶ 172, but again alleges no facts that could support a reasonable inference of an agency relationship.

For similar reasons, Aljabri's allegations of a conspiracy between the Crown Prince and U.S.-based actors do not support personal jurisdiction. "Conclusory statements or a bare allegation of conspiracy" are insufficient for personal jurisdiction. *Livnat*, 851 F.3d at 57. Aljabri's allegations of conspiracy are just as conclusory as his allegations of agency. *See* Compl. ¶¶ 241, 244 (alleging, without support, that the Crown Prince "conspired with" other Defendants). Further, even well-pleaded allegations of conspiracy (which are not present here) do not support jurisdiction under Rule 4(k)(2). As another court in this District recently concluded, "as far as the Court is aware, no court to have considered the question has permitted the assertion

("Here, Celgard does not point to any evidence on the record establishing that the dealers were operating either as SKI's agents or alter egos. The record does not show any attempt by SKI to purposefully direct or control the activities of the dealers in North Carolina. As such, Celgard has not shown the requisite control for jurisdiction to be premised on the acts of agents."); *Gregorio*, 215 F. Supp. 3d at 6 ("[T]he plaintiff has not pleaded sufficiently an agency relationship between defendant Atherton and his co-defendants. He does not sufficiently allege that the conduct of the co-defendants, or even Mr. Reese, was at the behest of defendant Atherton.").

of conspiracy jurisdiction under Rule 4(k)(2)." *Ofisi*, 2019 WL 1255096, at *5 n.8 (citing *In re*

*Aluminum Warehousing Antitrust Litig.*, 90 F. Supp. 3d 219, 226-27 (S.D.N.Y. 2015)).

**b.      There Is No Causal Relationship Between the Alleged Contacts and Aljabri's Claims**

Mere inquiries into Aljabri's location also do not support personal jurisdiction because

they are disconnected from Aljabri's legal claims.  Allegations that a defendant has some

contacts with the forum do not alone establish specific jurisdiction.  The plaintiff's legal claims

must "'aris[e] out of or relate[] to'" those contacts.  *Daimler*, 571 U.S. at 127 (quoting

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)).  The Due

Process Clause requires "a causal relationship between the defendant's contacts with the forum

and the plaintiff's claims."  *Maryland Digital Copier v. Litigation Logistics, Inc.*, 394 F. Supp.

3d 80, 93-94 (D.D.C. 2019) (Kelly, J.); *accord Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp.

3d 15, 27 (D.D.C. 2017), *aff'd*, 2018 WL 4440459 (D.C. Cir. July 17, 2018) (per curiam); *see*

*also Bernhardt v. Islamic Republic of Iran*, 2020 WL 6743066, at *3 (D.D.C. Nov. 16, 2020)

(Kelly, J.).  At a minimum, this requires that the U.S. contact be the "but-for cause" of the

alleged injury.  *Triple Up*, 235 F. Supp. 3d at 26-28.[12]

The alleged efforts to inquire about the location of Aljabri's wife, and Alharbi's inquiries

into Aljabri's location, bear no relationship, let alone a causal relationship, to Aljabri's purported

injury.  Aljabri's legal claims are all based on the alleged attempted killing, which occurred in

Canada.  *See, e.g.*, Compl. ¶¶ 255, 268, 275.  There is no allegation that Aljabri suffered any

injury in connection with the limited efforts to locate him in the United States, much less that

---

[12] The D.C. Circuit affirmed *Triple Up* per curiam, without specifically addressing the level of causal relationship required for specific jurisdiction.  *See Triple Up*, 2018 WL 4440459. In *Maryland Digital Copier*, this Court noted that "[t]he proper standard for determining relatedness . . . is an open question in this Circuit," but surveyed the persuasive authority to conclude that at least some sort of causal relationship was required.  394 F. Supp. at 93-94.

these limited efforts were a "but for" cause of any purported injury.  To the contrary, his allegations concede that any efforts to locate him in the United States were unsuccessful.  *See* Compl. ¶¶ 167, 169-171 ("attempted to extract" information); *id*. ¶ 168 ("The effort did not work."); *id*. ¶ 169 (Aljabri's son "misdirect[ed] Alrajhi and the larger ongoing hunt for [Aljabri]"); *id*. ¶ 173 (Alharbi "asked highly intrusive and unusual questions about [Aljabri], causing [his son] to become suspicious"); *id.* ¶ 172 (alleged "John Doe" was merely informed that Aljabri was not home).  Instead, Aljabri alleges that Defendants located him in Canada through one Defendant's trip to Toronto, *see id.* ¶ 174, and through an electronic message sent from Saudi Arabia to Canada that planted malware on Aljabri's phone, *see id.* ¶ 221.  Thus, even taking Aljabri's allegations as true, he does not and cannot allege that the supposed attempt on his life in Canada was caused by any conduct in the United States.

## 2.     Aljabri's Alleged Contacts with the United States Do Not Support Personal Jurisdiction

Aljabri fills his Complaint with self-aggrandizing claims that he has been a valuable asset to the U.S. intelligence community.  *See*, *e.g.*, Compl. ¶¶ 5, 22, 27, 28, 32, 104-107.  But contacts between *Aljabri* and the United States cannot create personal jurisdiction over the Crown Prince.  "Put simply, however significant the plaintiff's contacts with the forum may be, those contacts cannot be 'decisive in determining whether the defendant's due process rights are violated.' "  *Walden*, 571 U.S. at 285 (quoting *Rush v. Savchuk*, 444 U.S. 320, 332 (1980)).  Courts, including the Supreme Court, "have consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State."  *Id.* at 284.

Aljabri contends that, due to his relationships with the intelligence community, the alleged attempt to kill him should be considered conduct aimed at the United States because the

18

Crown Prince allegedly "wants [Aljabri] dead" in order to protect the Crown Prince's "standing with the U.S. government." Compl. ¶ 5. This attempt to recast an alleged attempted killing in Canada as U.S.-directed conduct is implausible. The Crown Prince is the second-highest-ranking official in Saudi Arabia and heir to the throne. On his own version of events, Aljabri is a former senior Saudi official who is a close ally of the Crown Prince's predecessor and who wants to attack the Crown Prince's political standing by spreading "sensitive, humiliating, and damning information" about him. *See id.* ¶¶ 6, 29-30, 103. Even taking it as true (which it is not) that the Crown Prince attempted to silence Aljabri in order to seek "the unencumbered throne of the Kingdom of Saudi Arabia," *id.* ¶ 3, that allegation describes conduct directed at Saudi Arabia, not at the United States.

A far closer connection to the United States is needed to conclude that alleged attacks on foreign soil were directed at the United States. In a series of cases against the Palestinian Authority, the D.C. Circuit has rejected arguments that terrorist attacks in the West Bank were directed at the United States, even though American citizens were injured or killed in the attacks and even though the plaintiffs proffered evidence that Palestinian groups engaged in terrorism in efforts to affect U.S. policy. *See Livnat*, 851 F.3d at 57 ("The Livnats and Safras presented a declaration from a professor asserting that the Palestinian Authority encourages terrorism against Jews and Israelis in order to influence U.S. policy in the Palestinian Authority's favor. Even if true, that evidence establishes no link between that practice and the Joseph's Tomb attack."); *Klieman*, 923 F.3d at 1124 ("Even if some terrorist acts carried out in Israel or the West Bank were used by defendants to influence U.S. policy, nothing in the record indicates that *this* attack fills that bill."); *Shatsky*, 955 F.3d at 1037 ("The Families do not identify any evidence in the record connecting the Karnei Shomron bombing to the alleged public relations campaign."). Here, Aljabiri's own theory of the case shows that Saudi Arabia generally and the Crown Prince

specifically had reasons to pursue him (though, in reality, that pursuit has been conducted through lawful means such as the INTERPOL notice) wholly unrelated to the United States.

### 3.    Allegations of Other Contacts Do Not Support Personal Jurisdiction

The Complaint's other scattered allegations regarding the United States cannot give rise to specific jurisdiction over the Crown Prince.  *First*, Aljabri alleges that the MiSK Foundation and certain individual Defendants (but not the Crown Prince) participated in various leadership development programs, art festivals, lectures, and other cultural events in the United States. Compl. ¶ 90(a).  But he does not allege that the Crown Prince participated in these events personally, nor does he allege any link between those events and the alleged attempted killing.

*Second*, Aljabri alleges that the Crown Prince "suspended Saudi Arabian government services to the Aljabri family in the United States, including denying a request by [Aljabri's] son to renew his Saudi Arabian passport in New York, New York."  *Id.* ¶ 90(l).  The allegation that the Crown Prince was personally presiding over passport renewals in New York is implausible; and Aljabri again alleges no link between this passport denial and the alleged attempted killing.

*Third*, Aljabri alleges that the Crown Prince arranged for the filing of a notice with INTERPOL of corruption charges against Aljabri and notes that INTERPOL is "an intergovernmental law enforcement agency of which the United States is a member."  *Id.* ¶¶ 90(m), 176.  The United States' membership in INTERPOL does not make the filing of notices with INTERPOL a contact with the United States.  Further, the allegation of the Crown Prince's personal involvement is again conclusory; and Aljabri again alleges no link between the INTERPOL notice and the alleged attempted killing.  To the contrary, the Complaint effectively admits that the INTERPOL notice did not restrict Aljabri's movements because he successfully petitioned INTERPOL to rescind it.  *Id.* ¶ 178.

*Fourth*, Aljabri alleges that the Crown Prince's "agents made misleading statements to journalists in the United States" regarding Aljabri's theft and corruption.  *Id.* ¶ 90(n).  But the allegation that these statements came from the Crown Prince's "agents" is conclusory, *see Gregorio*, 215 F. Supp. 3d at 6 ("bare allegation of agency" is "insufficient to establish personal jurisdiction"); and, once more, there is no link to the alleged attempted killing.

*Fifth*, Aljabri alleges that the Crown Prince "transmitted threatening text messages to [Aljabri] over WhatsApp's U.S.-based servers."  Compl. ¶ 90(p).  But "the mere location of a third party or its servers is insufficient to give rise to personal jurisdiction."  *Hungerstation LLC v. Fast Choice LLC*, 2020 WL 137160, at *5 (N.D. Cal. Jan. 13, 2020) (collecting cases), *appeal pending*, No. 20-15090 (9th Cir.).  Further, Aljabri again does not allege that the WhatsApp messages had any link to the alleged attempted killing.  To the contrary, Aljabri alleges that he ignored the Crown Prince's requests that he return to Saudi Arabia from Turkey and instead traveled from Turkey to Canada.  Compl. ¶¶ 134, 138.

*Finally*, Aljabri alleges that the Crown Prince traveled to the United States "to meet with, *inter alia*, government officials and media and corporate executives."  *Id.* ¶ 37.  Once again, he fails to allege any connection between those diplomatic visits and the alleged attempted killing.

## B.    Exercising Jurisdiction Would Offend Notions of Fair Play and Substantial Justice

Jurisdiction is also inappropriate over the Crown Prince because the exercise of jurisdiction would not comport with fair play and substantial justice.  *See Mwani v. bin Laden*, 417 F.3d 1, 15 (D.C. Cir. 2005).  In this analysis, courts consider "'the burden on the defendant, the interests of the forum State, the plaintiff's interest in obtaining relief in the forum State, and the interests of other sovereigns in resolving the dispute.'"  *IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 115-16 (D.D.C. 2018) (Kelly, J.) (quoting *Daimler*, 571 U.S. at 145 (Sotomayor,

J., concurring in the judgment)).  All those factors weigh heavily against exercising jurisdiction here and present a "compelling case" that jurisdiction is "unreasonable."  *Id.* at 116.

*First*, the burden on the Crown Prince would be "severe" if he were required "to submit [this] dispute . . . to a foreign nation's judicial system."  *Asahi Metal Indus. Co. v. Superior Ct. of California*, 480 U.S. 102, 114 (1987); *see id.* ("The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders.").

*Second*, the interests of the forum – the United States – are minimal because neither Aljabri nor the Crown Prince is a U.S. citizen or resident; the alleged conduct giving rise to the claim occurred in Saudi Arabia and Canada, not the United States; and the dispute involves the highest levels of and the official actions of the Saudi Arabian government.

*Third*, Aljabri has no special interest in obtaining relief in the United States in particular. He has not chosen to bring suit in the forum in which he currently resides and where he alleges the group was dispatched to kill him, Canada; or in the forum in which he is a citizen, Saudi Arabia.  Although he alleges that Saudi Arabia lacks adequate remedies, Compl. ¶ 253, he provides no factual support for that claim and makes no such argument as to Canada.  *See infra* Part III.A.2.  Accordingly, his interest should be accorded little weight.  *See Asahi*, 480 U.S. at 114 ("Cheng Shin has not demonstrated that it is more convenient for it to litigate its indemnification claim against Asahi in California rather than in Taiwan or Japan.").

*Finally*, both Canada, where Aljabri resides, and Saudi Arabia, where he is a citizen, have a stronger connection to this suit than the United States.  The Crown Prince also resides in Saudi Arabia, and the relationships that give rise to Aljabri's claims are based there.  In addition, the law of Saudi Arabia (or alternatively Canada) applies to Aljabri's non-statutory claim.

Accordingly, asserting jurisdiction over the Crown Prince would not comport with due process, and the Court should dismiss the claims against him.  *See id.* at 115 (emphasizing that courts should be "unwilling[ ] to find the serious burdens on an alien defendant outweighed by minimal interests on the part of the plaintiff or the forum State").

### C.    Jurisdictional Discovery Is Unwarranted

If Aljabri seeks jurisdictional discovery to cure his insufficient jurisdictional allegations, the Court should deny it.  A district court "has discretion to order" jurisdictional discovery "when presented with ' "a good faith belief that such discovery will enable [the plaintiff] to show that the court has personal jurisdiction over the defendant," ' as opposed to 'mere conjecture or speculation.' "  *IMAPizza*, 334 F. Supp. 3d at 108 (Kelly, J.) (quoting *FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1093-94 (D.C. Cir. 2008)) (alteration in original).  Here, the Complaint's assertions that Defendants such as Alrajhi, Alhamed, Abuljadayel, or Alharbi acted as the Crown Prince's personal agents are speculative and generic.  *See supra* Part I.A.1.a. Discovery to explore such vague contentions would amount to "a fishing expedition in the hopes of discovering some basis of jurisdiction," *In re Papst Licensing GMBH & Co. KG Litig.*, 590 F. Supp. 2d 94, 101 (D.D.C. 2008), which this Court need not and should not permit.

Further, jurisdictional discovery is inappropriate where additional facts "would not change the court's jurisdictional analysis." *Cheyenne Arapaho Tribes of Oklahoma v. United States*, 558 F.3d 592, 597 (D.C. Cir. 2009).  Here, that principle forecloses discovery related to Aljabri's alleged contacts with the United States (which are irrelevant under *Walden v. Fiore*) or to the Crown Prince's various alleged miscellaneous connections with the United States, none of which could possibly establish jurisdiction even if proved in detail.  *See supra* Parts I.A.2, I.A.3. Indeed, in view of Aljabri's own allegation that his location was established through contacts with Canada rather than with the United States, *see supra* Part I.A.1.b, even the allegations that

agents sought him in the United States are legally insufficient as well as unsupported and

conclusory.  *See Brit UW, Ltd. v. Manhattan Beachwear, LLC*, 235 F. Supp. 3d 48, 63 (D.D.C.

2017) (explaining that jurisdictional discovery should be denied where "futile").

## II.     Aljabri's Claims Are Barred by Official Immunity, Because Saudi Arabia Cannot Be Joined, and by the Act of State Doctrine

### A.     The Crown Prince Is Immune from Suit

The immunity of foreign officials from suit in the United States is governed by the

doctrine of common-law foreign sovereign immunity.  *See Samantar v. Yousuf*, 560 U.S. 305,

325 (2010).  "The doctrine of common law foreign immunity distinguishes between two types of

immunity:  status-based and conduct-based immunity."  *Lewis v. Mutond*, 918 F.3d 142, 145

(D.C. Cir. 2019), *cert. denied*, No. 19-185 (U.S. June 29, 2020).

Status-based immunity includes head-of-state immunity, which "attach[es] whenever an

individual is a sitting head of state," *Sikhs for Justice v. Singh*, 64 F. Supp. 3d 190, 193 (D.D.C.

2014), and which also protects other "'"holders of high-ranking office in a State" such as "the

Head of Government and Minister of Foreign Affairs,"'" *Yousuf v. Samantar*, 699 F.3d 763, 769

n.2 (4th Cir. 2012) (quoting Lewis S. Yelin, *Head of State Immunity as Sole Executive

Lawmaking*, 44 Vand. J. Transnat'l L. 911, 921 n.42 (2011)), and "immediate members of their

families," *Kline v. Kaneko*, 535 N.Y.S.2d 303, 304 (Sup. Ct., N.Y. Cty., 1988), *aff'd sub nom.

Kline v. Cordero De La Madrid*, 154 A.D.2d 959 (N.Y. App. Div. 1989).  "[D]uring their time in

office," such individuals "are absolutely immune from suit in the United States," *Sikhs for

Justice*, 64 F. Supp. 3d at 193, "'regardless of the substance of the claim,'" *Lewis*, 918 F.3d at

145 (quoting Chimène I. Keitner, *The Common Law of Foreign Official Immunity*, 14 Green Bag

2d 61, 64 (2010)).  "[T]he rationale of head-of-state immunity is to promote comity among

nations by ensuring that leaders can perform their duties without being subject to detention,

arrest or embarrassment in a foreign country's legal system." *In re Grand Jury Proceedings, Doe No. 700*, 817 F.2d 1108, 1110 (4th Cir. 1987).

Conduct-based immunity, by contrast, "does not depend on tenure in office." *Matar v. Dichter*, 563 F.3d 9, 14 (2d Cir. 2009); *see Yousuf*, 699 F.3d at 769 (noting that conduct-based immunity "applies to current and former foreign officials"). This immunity for "foreign official[s] derives from the immunity of the State" and is based on the "'classical'" theory that "'any act performed by the individual as an act of the State enjoys the immunity which the State enjoys.'" *Id.* at 774 (quoting Hazel Fox, *The Law of State Immunity* 455 (2d ed. 2008)); *see Samantar*, 560 U.S. at 322 ("[W]e do not doubt that in some circumstances the immunity of the foreign state extends to an individual for acts taken in his official capacity.").

Courts employ a "two-step procedure" to determine whether a defendant in a particular case is entitled to common-law foreign sovereign immunity. *Lewis*, 918 F.3d at 145 (discussing *Samantar*, 560 U.S. at 311-12). "At the first step, a foreign official requests a 'suggestion of immunity' from the State Department." *Id.* (quoting *Samantar*, 560 U.S. at 311). If a suggestion of immunity is "granted" by the State Department, "the District Court is divested of its jurisdiction." *Id.* (case involving conduct-based immunity); *see Manoharan v. Rajapaksa*, 711 F.3d 178, 179 (D.C. Cir. 2013) (per curiam) (affirming the dismissal of a complaint asserting TVPA claims, because, "as the district court recognized, it was without jurisdiction" after the United States submitted a suggestion of immunity asserting that the sitting President of Sri Lanka enjoys head-of-state immunity).[13] At the second step, "[i]f the State Department does not grant a

---

[13] *See also*, *e.g.*, *Republic of Mexico v. Hoffman*, 324 U.S. 30, 35 (1945) ("[i]t is . . . not for the courts to deny an immunity which our government has seen fit to allow"); *Isbrandtsen Tankers, Inc. v. President of India*, 446 F.2d 1198, 1201 (2d Cir. 1971) ("The State Department is to make th[e] [immunity] determination, in light of the potential consequences to our own

suggestion of immunity, the District Court is authorized to decide whether all the requisites for foreign-official immunity exist." *Lewis*, 918 F.3d at 145-46 (emphasis removed); *see Miango v. Democratic Republic of Congo*, 2020 WL 3498586, at *5-7 (D.D.C. June 29, 2020) (finding that the "requisites for conduct-based immunity" apply to members of the President of the Democratic Republic of Congo's entourage who physically assaulted plaintiffs even though the State Department had suggested immunity only for the President himself), *appeals pending*, Nos. 20-5244 et al. (D.C. Cir.).

Here, the Royal Embassy of Saudi Arabia in Washington, D.C. (the "Embassy") has already requested a suggestion of immunity from the State Department with respect to the Crown Prince. This request was sent on October 8, 2020, and the State Department has advised that it remains under consideration. If the State Department suggests immunity, then the Court "is divested of its jurisdiction" over Aljabri's claims against the Crown Prince. *Lewis*, 918 F.3d at 145. Even "[i]f the State Department does not grant a suggestion of immunity," this Court is still "authorized to decide" whether the Crown Prince is immune. *Id.* at 145-46.

### 1.    The Crown Prince Is Entitled to Head-of-State Immunity

" 'Under customary international law, head of state immunity encompasses the immunity of not only the heads of state but also of other "holders of high-ranking office in a State" such as "the Head of Government and Minister of Foreign Affairs." ' " *Yousuf*, 699 F.3d at 769 n.2

---

international position. Hence once the State Department has ruled in a matter of this nature, the judiciary will not interfere."); *Spacil v. Crowe*, 489 F.2d 614, 617 (5th Cir. 1974) ("[O]nce the State Department has determined that immunity is warranted, and has submitted that ruling to the court through a suggestion, the matter is for diplomatic rather than judicial resolution. The suit must be dismissed . . . ."); *Ye v. Zemin*, 383 F.3d 620, 625 (7th Cir. 2004) ("[T]he Executive Branch's suggestion of immunity is conclusive and not subject to judicial inquiry."); *but see Yousuf*, 699 F.3d at 773 (holding that absolute deference is owed to the State Department's position on the applicability of a status-based immunity, but that only "substantial weight" is owed its position on conduct-based immunity).

(quoting Yelin, *Head of State Immunity*, 44 Vand. J. Transnat'l L. at 921 n.42); *see* John B. Bellinger III, *The Dog that Caught the Car:  Observations on the Past, Present, and Future Approaches of the Office of the Legal Adviser to Official Acts Immunities*, 44 Vand. J. Transnat'l L. 819, 830 (2011) (describing immunity as "absolute for sitting heads of state, heads of government, foreign ministers, and other high-ranking officials").  This immunity also protects members of the head of state's immediate family, including a son or daughter who is the head of state's designated successor.  *See*, *e.g.*, *Kilroy v. Windsor*, 1978 U.S. Dist. LEXIS 20419, at *3 (N.D. Ohio, Dec. 7, 1978) (dismissing a lawsuit against the Prince of Wales; observing that, when a defendant is "the Heir Apparent to the throne of the possibly offended nation, the foreign policy ramifications are extraordinary"); *see also Kline*, 535 N.Y.S.2d at 304 (wife of the President of Mexico); *Estate of Domingo v. Marcos*, 1983 WL 482332 (W.D. Wash. July 14, 1983) (wife of the President of the Philippines).

The Crown Prince is the son of, and designated successor to, the King of Saudi Arabia. He therefore has immunity based not only on his immediate familial relationship to the King, but also on his own "high-ranking office," *Yousuf*, 699 F.3d at 769 n.2 (citation omitted), as set out in Saudi Arabia's Basic Law of Governance (the "Basic Law").[14]  Under the Basic Law, the Crown Prince is the only individual with the prerogative to exercise sovereign power alongside or on behalf of the King.  *See* Basic Law art. 65 ("The King may delegate some powers of authority to the Crown Prince by Royal Decree.").  Moreover, "[s]hould the King happen to travel abroad, he shall issue a Royal Decree to deputize the Crown Prince to manage the affairs of state and look after the interests of the people, as set out in the Royal Decree."  *Id.* art. 66.

---

[14] An English-language version of the Basic Law is available on the Embassy's website. *See* Basic Law of Governance, https://www.saudiembassy.net/basic-law-governance.

That has happened several times since the Crown Prince assumed his current position.[15]  In his capacity as "Acting King," the Crown Prince himself has issued a number of Royal decrees, including one appointing Her Royal Highness Princess Reema bint Bandar bin Sultan bin Abdulaziz Al Saud as Saudi Arabia's Ambassador to the United States.[16]

Upon the King's death, "the Crown Prince shall assume the Royal powers until a pledge of allegiance (bay'a) is given," at which point the Crown Prince would formally become the King.  *Id.* art. 5.  The Crown Prince currently occupies numerous high-ranking positions in Saudi Arabia's government, serving as its Deputy Prime Minister, Minister of Defense, Chairman of the Council for Economic and Development Affairs, Chairman of the Council of Political and Security Affairs, and Chairman of the Supreme Anti-Corruption Committee.[17]  He thus exercises day-to-day control over critical sectors of that government.

Consistent with his high-ranking status, the Crown Prince routinely engages directly with the U.S. government's most senior officials, including the President[18] and the Secretary of

---

[15] *See*, *e.g.*, Royal Order A/352, issued 1441/05/18 AH (01/13/2020 AD) (instructing the Crown Prince "to manage state affairs, and to look after the interests of the people during [the King's] travel outside the Kingdom"); Royal Order A/226, issued 1440/06/18 AH (02/23/2019 AD) (same); Royal Order A/313, issued 1438/11/01 AH (07/24/2017 AD) (same).

[16] Royal Order A/229, issued 1440/06/18 AH (02/23/2019 AD).

[17] *See* Ex. D (press release on Royal Orders "[s]electing Prince Mohammed bin Salman bin Abdulaziz Al Saud as Crown Prince, appointing him as Deputy Premier, and continuing as Minister of Defense"); Ex. E (press release on Royal Decree "appointing Prince Mohammed bin Salman bin Abdulaziz Al Saud as the Minister of Defense"); Ex. F (Royal Order A/292, issued 1436/04/03 AH (07/21/2017 AD) and appointing the Crown Prince as Chairman of the Council of Political and Security Affairs); Ex. G (press release on Royal Orders creating the Supreme Anti-Corruption Committee and appointing the Crown Prince as Chairman).

[18] *See*, *e.g.*, *Remarks by President Trump and Crown Prince Mohammad Bin Salman of the Kingdom of Saudi Arabia Before Working Breakfast | Osaka, Japan*, The White House (June 28, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-crown-prince-mohammad-bin-salman-kingdom-saudi-arabia-working-breakfast-osaka-japan/; *Readout of President Donald J. Trump's Meeting with Crown Prince Mohammed Bin Salman of Saudi*

State.[19]   Indeed, his interactions with the President and the President's senior advisers are repeatedly emphasized – and criticized – in the Complaint, *see* Compl. ¶¶ 113-125, 185, which insinuates that the President's expressions of goodwill and support for the Crown Prince are evidence of improper conduct.  These types of allegations underscore that this case presents the potential for embarrassment and disruption of foreign relations that form the foundation for head-of-state immunity.  Other agencies of the United States have also recognized that the Crown Prince, although second to the King, can properly be described as a "chief of state" and "head of government" when discussing Saudi Arabia.[20]   The leaders of other countries have also received him as a visiting head of state.[21]

The practice of other states confirms that the position of Crown Prince of Saudi Arabia is entitled to status-based immunity.  In *Apex Global Management Ltd. v. Fi Call Ltd.*, [2013] EWHC 587 (Ch), the High Court of Justice of England and Wales observed that, under

---

*Arabia*, The White House (Mar. 21, 2018), https://www.whitehouse.gov/briefings-statements/readout-president-donald-j-trumps-meeting-crown-prince-mohammed-bin-salman-saudi-arabia/.

[19] *See*, *e.g.*, Readout, *Secretary Pompeo's Call with Saudi Crown Prince Mohammed bin Salman Al Saud*, Office of the Spokesperson, U.S. Dep't of State (Mar. 25, 2020), https://www.state.gov/secretary-pompeos-call-with-saudi-crown-prince-mohammed-bin-salman-al-saud-4/; Readout, *Secretary Pompeo's Meeting with Saudi Crown Prince Mohammed bin Salman*, Office of the Spokesperson, U.S. Dep't of State (Feb. 21, 2020), https://www.state.gov/secretary-pompeos-meeting-with-saudi-crown-prince-mohammed-bin-salman-2/.

[20] *See* Central Intelligence Agency, *The World Factbook:  Saudi Arabia* (identifying both the King and the Crown Prince as Saudi Arabia's "[C]hief of [S]tate" and "[H]ead of [G]overnment"), https://www.cia.gov/library/publications/the-world-factbook/geos/sa.html (last visited Nov. 27, 2020).

[21] *See* Press Release, *Readout of PM's Call with Mohammed bin Salman:  2 September 2020*, Prime Minister's Office, 10 Downing Street (Sept. 2, 2020), https://www.gov.uk/government/news/readout-of-pms-call-with-mohammed-bin-salman-2-september-2020; *Saudi Crown Prince Mohammed bin Salman Arrives in Pakistan*, Al Jazeera (Feb. 17, 2019), https://www.aljazeera.com/news/2019/02/saudi-crown-prince-mohammed-bin-salman-arrives-pakistan-190217061720354.html; Kim Willsher, *French President and Saudi Crown Prince Vow Partnerships on Syria and Economic Issues*, L.A. Times (Apr. 10, 2018), https://www.latimes.com/world/europe/la-fg-france-saudi-arabia-20180410-story.html.

"customary international law," an "heir to the throne . . . undertaking the offices of state on behalf of the sovereign or head of State" would be entitled to "immunity" from suit. *Id.* ¶ 107.[22] Although *Apex Global* held that two other members of Saudi Arabia's royal family were not entitled to status-based immunity, the English court indicated that it would have reached a different result with respect to the Crown Prince at the time, who "can officially exercise power in Saudi Arabia alongside or on behalf of the King" under the "Basic Law." *Id.* ¶ 122.  English courts have also extended immunity under customary international law to the Defense Minister of the State of Israel and the Minister for Commerce and International Trade of the People's Republic of China – each of whom is less senior with respect to their governments than the Crown Prince is with respect to Saudi Arabia.[23]

### 2. The Crown Prince Is Entitled to Conduct-Based Immunity

"To date, neither the D.C. Circuit nor the Supreme Court has identified precisely how a court should determine whether the defendants have satisfied the[ ] requisites" for conduct-based immunity. *Broidy Capital Mgmt. LLC v. Muzin*, 2020 WL 1536350, at *5 (D.D.C. Mar. 31, 2020).  Some authorities point to the criteria recognized by "'the established policy of the State

---

[22] The *Apex Global* court was interpreting the United Kingdom's State Immunity Act, but explained that the Act was "intended to reflect the common law and customary international law position." [2013] EWHC 587, ¶ 107.  Indeed, federal courts have looked to the Act, and British courts' interpretations of it, as indicative of international law.  *See, e.g.*, *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 310 (2d Cir. 1981), *overruled on other grounds by Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393 (2d Cir. 2009); *Al Shimari v. CACI Premier Tech., Inc.*, 368 F. Supp. 3d 935, 956-57 (E.D. Va.), *appeal dismissed*, 775 F. App'x 758 (4th Cir. 2019), *pet. for cert. pending*, No. 19-648 (U.S. Nov. 15, 2019).

[23] *See Application for Arrest Warrant Against General Shaul Mofaz* (Bow St. Mag. Ct. Feb. 12, 2004) (Eng.) (Pratt, Dist. J.), *reprinted in Current Developments:  Public International Law*, 53 Int'l & Comp. L.Q. 769, 771-73 (July 2004); *Re Bo Xilai* (Bow St. Mag. Ct. Nov. 8, 2005) (Eng.) (Workman, Sr. Dist. J.), *available at Weixum v. Xilai*, No. 1:04-cv-00649-RJL, ECF No. 16-7 (D.D.C. July 24, 2006).

Department.'"  *Id.* (quoting *Samantar*, 560 U.S. at 312).  Others point to the test outlined in

§ 66(f) of the Restatement (Second) of Foreign Relations Law of the United States (1965)

("Second Restatement").  *Id.* at *6; *see Lewis*, 918 F.3d at 146 (applying § 66(f), because the

parties assumed it should apply).  Conduct-based immunity under § 66(f) requires that

> (1) the actor must be a "public minister, official, or agent of the foreign state";
> (2) the act must have been performed in the actor's "official capacity"; and
> (3) "exercising jurisdiction" would have the effect of "enforc[ing] a rule of law
> against the [foreign] state."

*Miango*, 2020 WL 3498586, at *5 (quoting *Lewis*, 918 F.3d at 146) (alterations in original).

The better view is that the Court should take guidance from "'the established policy of

the State Department,'" not the Second Restatement.  *Broidy*, 2020 WL 1536350, at *5 (quoting

*Samantar*, 560 U.S. at 312); *see* Br. for the United States as Amicus Curiae at 14-17, *Mutond v.*

*Lewis*, No. 19-185 (U.S. May 26, 2020) ("U.S. *Mutond* Br."), 2020 WL 2866592 (explaining the

faults of § 66(f)).  The Second Restatement's drafters conceded "[t]he paucity of adjudicated

decisions in the international field," Restatement (Second) § 1 cmt. c, and "admitted their reliance

on less conventional sources to divine the principles of foreign-relations law," U.S. *Mutond* Br.

14.  Foreign-relations law has also "changed substantially" in the years since publication of that

document.  Restatement (Third) of Foreign Relations Law of the United States Intro. (1987).

Neither the Third nor the Fourth Restatement repeats the test for conduct-based immunity

outlined in § 66(f).  Moreover, on its face, § 66(f) "is not written in terms that address the

circumstances in which foreign officials may enjoy common law conduct-based immunity

independently of their sovereigns."  U.S. *Mutond* Br. 16.

Nevertheless, like the court in *Broidy*, this Court need not resolve the issue.  Whether the

Court applies the State Department's established policy or the Second Restatement, the result is

the same:  The Crown Prince is entitled to conduct-based immunity.

### a. Aljabri's Claims Are Barred Under the State Department's Policy

The settled policy of the State Department is that "acts of defendant foreign officials who are sued for exercising the powers of their office are treated as acts taken in an official capacity," so that such officials are entitled to conduct-based immunity.  Ltr. from Harold Hongju Koh, Legal Adviser, U.S. Dep't of State, to Stuart F. Delery, Principal Dep. Ass't Att'y Gen., Civil Div., U.S. Dep't of Justice, at 2 (Dec. 17, 2012), *docketed at Ragsdale v. Lashkar-E-Taiba*, No. 1:11-cv-03893-DLI-CLP, ECF No. 19-1 (E.D.N.Y. Dec. 17, 2012).[24]  That policy applies to the Complaint, which alleges that "[t]he acts described herein were carried out under actual or apparent authority or color of law of the government of Saudi Arabia."  Compl. ¶ 239.

As Deputy Prime Minister, Minister of Defense, Chairman of the Council of Political and Security Affairs, and Chairman of the Supreme Anti-Corruption Committee, the Crown Prince is charged with overseeing criminal prosecutions, protecting national security, and investigating and prosecuting corruption.  His responsibilities encompass pursuing massive thefts and any threats to national security.[25]  *See supra* pp. 27-28 & nn.15-17.

---

[24] *See also* Ltr. from Harold Hongju Koh, Legal Adviser, U.S. Dep't of State, to Stuart F. Delery, Acting Ass't Att'y Gen., Civil Div., U.S. Dep't of Justice, at 1 (Sept. 7, 2012) ("In a case involving conduct-based immunity, . . . the Department of State generally presumes that actions taken by a foreign official exercising the powers of his office were taken in his official capacity."), *docketed at Doe v. Zedillo*, No. 3:11-cv-01433-AWT, ECF No. 38-1 (D. Conn. Sept. 7, 2012); U.S. *Mutond* Br. 10-11 (citing examples dating from 1794 to 2019); U.S. Dep't of State, *Digest of United States Practice in International Law* ch. 10, § B(3), at 426 (CarrieLyn D. Guymon ed., 2015), *available at* https://2009-2017.state.gov/documents/organization/258206.pdf.

[25] By Aljabri's own account, he is a former senior official of Saudi Arabia's government who was terminated for having unauthorized meetings with intelligence officials of another government, *see* Compl. ¶ 111; who supposedly possesses sensitive information that he repeatedly threatens to reveal, *see id.* ¶¶ 6, 76, 103; and who repeatedly describes himself as a "threat" to the Crown Prince's relationship with senior officials of the U.S. government, *e.g.*, *id.* ¶¶ 5, 23, 112.

When acting in his capacity as Chairman of the Supreme Anti-Corruption Committee, the Crown Prince operates under a mandate directly from the King that grants the Committee an "[e]xemption from laws, regulations, instructions, orders and decisions" when performing its assigned "tasks." Ex. G.  Those tasks include:  (1) "identify[ing] offenses, crimes, persons and entities involved in cases of public corruption"; and (2) undertaking the "investigation, issuance of arrest warrants, travel ban, disclosure and freezing of accounts and portfolios, tracking of funds, assets and preventing their remittance or transfer by persons and entities, whatever they might be." *Id.*  Moreover, the same mandate includes authority to "take[] whatever measures deemed necessary to deal with those involved in public corruption cases and take what [the Committee] considers to be the right of persons, entities, funds, fixed and movable assets, at home and abroad," *id.*; and to "seek the assistance of those [the Committee] deems necessary and [to] set up teams for investigation, prosecution, etc.," *id.*  In addition, the Committee has discretion to "delegate some or all of its powers to these teams."  *Id.*

All of the specific acts that the Complaint alleges and attributes to the Crown Prince fall within his authority, or would fall within his authority if he had committed them.  These include investigating Aljabri's embezzlement of counterterrorism funds, including the filing of a notice with INTERPOL concerning Aljabri, and seeking Aljabri's arrest and extradition, *see* Compl. ¶¶ 137, 176, 180; prohibiting members of Aljabri's family from leaving Saudi Arabia, *see id.* ¶¶ 140, 154; freezing Aljabri's bank accounts and the accounts of members of Aljabri's family, *see id.* ¶¶ 183, 186; and "expropriat[ing]" an interest that Aljabri owned in a jet charter service, *id.* ¶ 183.  They also include the exercise of state executive powers to arrest and prosecute two of Aljabri's adult children – a specific basis for Aljabri's claim for intentional infliction of emotional distress, *id.* ¶ 149 – as well as the arrest, detainment, and monitoring of other relatives, *see id.* ¶¶ 146-148, 152-153, 155-156, and the alleged attempted entry into Canada of "an

33

interagency group of employees selected from across the Saudi government," *see id.* ¶¶ 222-232. To be sure, the allegations of the Crown Prince's personal involvement in those actions are largely conclusory; but whether attributable to the Crown Prince or not, these and other alleged acts are clearly acts of the government of Saudi Arabia.

### b.    Aljabri's Claims Are Barred Under the Second Restatement

The Crown Prince also satisfies the test outlined in § 66(f) of the Second Restatement. *First*, the Crown Prince is a "'public minister, official, or agent'" of Saudi Arabia. *Miango*, 2020 WL 3498586, at *5 (quoting *Lewis*, 918 F.3d at 146).

*Second*, Aljabri affirmatively alleges that his claims against the Crown Prince arise from "'acts performed [by the Crown Prince] in his official capacity.'" *Matar*, 563 F.3d at 14 (quoting § 66(f)); *see Miango*, 2020 WL 3498586, at *5 (conduct-based immunity is available when an act was "performed in the actor's 'official capacity'") (quoting *Lewis*, 918 F.3d at 146).

*Third*, a judgment in Aljabri's favor would have the practical effect of "'enforc[ing] a rule of law against'" Saudi Arabia. *Miango*, 2020 WL 3498586, at *5 (quoting *Lewis*, 918 F.3d at 146) (alteration in original); *see Doğan v. Barak*, 932 F.3d 888, 894 (9th Cir. 2019) (concluding that exercising jurisdiction over claims against the former Israeli Defense Minister "would be to enforce a rule of law against the sovereign state of Israel," where the allegations concerned the Defense Minister's exercise of his official powers and the complaint alleged that the conduct at issue "w[as] done under 'actual or apparent authority, or color of law, of the Israeli Ministry of Defense and the Government of the State of Israel'").

The conduct challenged by Aljabri goes to the heart of Saudi Arabia's ongoing efforts to investigate Aljabri's corruption and to extradite Aljabri to face criminal prosecution, which are authorized by Royal Order. *See* Ex. G.  For example, the alleged "hunt" for Aljabri in the United States purportedly occurred between September and December 2017, Compl. ¶ 162 – the same

period during which Saudi Arabia filed a notice with INTERPOL concerning Aljabri and was

seeking Aljabri's arrest and extradition, *see id.* ¶¶ 137, 176, 180.  The Complaint challenges

investigative and prosecutorial measures taken by Saudi Arabia, some of which form the basis of

Aljabri's intentional infliction of emotional harm claim – particularly the arrest and prosecution

of his adult children for their involvement in his embezzlement scheme.  *See id.* ¶ 149.  It also

challenges other executive and prosecutorial state actions such as the prohibition on Aljabri's

family members leaving Saudi Arabia, *see id.* ¶¶ 140, 154; the arrest, detention, and monitoring

of Aljabri's relatives, *see id.* ¶¶ 146-148, 152-153, 155-156; the freezing of Aljabri's bank

accounts and the accounts of Aljabri's family members, *see id.* ¶¶ 183, 186; and the

"expropriat[ion]" of Aljabri's interest in a jet charter service, *id.* ¶ 183.

A ruling against the Crown Prince based on Aljabri's challenge to these sovereign acts

would effectively "force [Saudi Arabia] to take specific action," *Lewis*, 918 F.3d at 147 –

namely, to cease its criminal investigation of Aljabri's wrongdoing, including its efforts to

extradite Aljabri, to prosecute his adult family members in Saudi Arabia, and to take

administrative actions against his property.  Indeed, Aljabri asks the Court for a "declaratory

judgment" stating that Saudi Arabia's investigative measures amount to violations of the TVPA

and the law of nations.  *See* Compl. ¶¶ 266, 272.  Any such judgment by this Court would

substantially interfere with Saudi Arabia's ability to investigate and prosecute one of its own

former senior officials for crimes against Saudi Arabia, even though "an executive decision to

conduct a criminal investigation . . . ranks '[f]oremost among the prerogatives of sovereignty.' "

*Nnaka v. Federal Republic of Nigeria*, 756 F. App'x 16, 18 (D.C. Cir. 2019) (per curiam)

(quoting *Heath v. Alabama*, 474 U.S. 82, 93 (1985)) (brackets in original); *see also Saudi Arabia*

*v. Nelson*, 507 U.S. 349, 361 (1993) (describing prosecutorial and police powers as "peculiarly

sovereign in nature"); *Doe 1 v. Buratai*, 318 F. Supp. 3d 218, 233 (D.D.C. 2018) (determining

that a decision interfering with the Nigerian government "would effectively enforce a rule of law

against Nigeria"), *aff'd*, 2019 WL 668339 (D.C. Cir. Feb. 15, 2019) (per curiam), and *aff'd*, 792

F. App'x 6 (D.C. Cir. 2019) (per curiam).

### 3.    No Exception to the Crown Prince's Immunity Exists or Applies

Aljabri may contend that his allegations against the Crown Prince are so grave that

foreign official immunity cannot stand in their way.  The Court should reject any such argument.

As an initial matter, although some have urged an exception to foreign official immunity for *jus*

*cogens* violations of international law,[26] a category that would include actual extrajudicial

killings, such arguments have been rejected by the Second and Ninth Circuits,[27] by courts in this

District,[28] and by the Executive Branch.  As the Department of Justice explained in successfully

presenting that position to the Second Circuit:

> [T]he Executive does not recognize any exception to a foreign official's immunity
> for civil suits alleging *jus cogens* violations. . . . [T]he recognition of such an
> exception by the United States would be out of step with international law and
> could prompt reciprocal limitations by foreign jurisdictions, exposing U.S.
> officials to suit abroad on that basis.

Br. for the United States of America as Amicus Curiae in Support of Affirmance at 4, *Mahar v.*

*Dichter*, No. 07-2579-cv (2d Cir. Dec. 19, 2007), 2007 WL 6931924 (brief signed by the Legal

Adviser of the State Department).

---

[26] *Jus cogens* norms are those "'accepted and recognized by the international
community of states as a whole as . . . norm[s] from which no derogation is permitted and
which can be modified only by a subsequent norm of general international law having the same
character.'"  *Giraldo v. Drummond Co.*, 808 F. Supp. 2d 247, 250 n.1 (D.D.C. 2011) (quoting
*Belhas v. Ya'alon*, 515 F.3d 1279, 1286 (D.C. Cir. 2008)), *aff'd*, 493 F. App'x 106 (D.C. Cir.
2012) (per curiam).

[27] *See*, *e.g.*, *Doğan*, 932 F.3d at 896-97 (declining to recognize an exception from official
immunity for *jus cogens* violations); *Matar*, 563 F.3d at 15 ("A claim premised on the violation
of *jus cogens* does not withstand foreign sovereign immunity.").

[28] *See Doe 1*, 318 F. Supp. 3d at 236 ("[T]he Court—following courts in this circuit and
other circuits—declines to adopt and apply a *jus cogens* exception."); *Giraldo*, 808 F. Supp. 2d
at 251 ("[P]laintiffs' allegations of *jus cogens* violations do not defeat . . . immunity.").

Nor does the statutory cause of action created by the TVPA overcome foreign official immunity.  The D.C. Circuit has held that the TVPA does not abrogate status-based immunity.  *See Manoharan*, 711 F.3d at 179 (President of Sri Lanka); *accord Habyarimana v. Kagame*, 696 F.3d 1029, 1030-32 (10th Cir. 2012) (President of Rwanda); *Ye*, 383 F.3d at 622, 625-26 (President of China).

In cases involving conduct-based immunity, the Second and Ninth Circuits have correctly held that "the TVPA does not abrogate foreign official immunity."  *Doğan*, 932 F.3d at 896; *see Matar*, 563 F.3d at 15 (rejecting as "incorrect" the argument that foreign official immunity "is overridden by . . . alleged violations of the TVPA").  As the Solicitor General has explained on behalf of the United States, "[b]ecause the TVPA does not 'speak directly to the question addressed by the common law' concerning conduct-based immunity for foreign officials, the statute does not abrogate that doctrine."  U.S. *Mutond* Br. 18 (quoting *United States v. Texas*, 507 U.S. 529, 534 (1993)); *see also Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 126 (2015) (applying presumption in favor of retaining common-law principles).  Indeed, the TVPA does not speak at all – directly or indirectly – to the question of official immunity.  Accordingly, just as common-law domestic official immunity coexists with the remedy created by 42 U.S.C. § 1983, *see* U.S. *Mutond* Br. 19-20 (citing, *inter alia*, *Rehberg v. Paulk*, 566 U.S. 356, 361 (2012)), foreign official immunity can and should coexist with the remedy created by the TVPA.

The D.C. Circuit's recent decision in *Lewis v. Mutond* is not to the contrary.  In that case, two judges expressed the view that the TVPA does abrogate conduct-based (but not status-based) immunity.  *See Lewis*, 918 F.3d at 150 (Randolph, J., concurring in the judgment); *id.* at 148 (Srinavasan, J., concurring) (joining Judge Randolph's opinion in relevant part).  Judge Wilkins, writing for the court of appeals, described Judge Randolph's reasoning as an "alternative holding," *id.* at 144, language that ordinarily indicates "binding precedent," *e.g.*, *Karem v.*

*Trump*, 404 F. Supp. 3d 203, 211 (D.D.C. 2019), *aff'd as modified*, 960 F.3d 656 (D.C. Cir. 2020).  Judge Randolph, however, stated merely that he found the "assumption[]" that common-law immunity would apply to be "dubious" and that it had not been "tested in an adversary proceeding."  *Lewis*, 918 F.3d at 148 (Randolph, J., concurring in the judgment); *see also id.* at 150 ("The conflict between the [TVPA]'s basis for liability and the Restatement's basis for immunity from liability was neither briefed nor argued, although it should have been.").  That opinion is therefore best read to leave the question open for another day, not to resolve it finally.

Even if taken as precedent, Judge Randolph's opinion does not cut against immunity here.  As set forth in Part III.A, *infra*, the TVPA creates a cause of action for an "extrajudicial killing," to be brought by a "legal representative" or other claimant for "wrongful death."  It does not create a cause of action for an attempted, unsuccessful extrajudicial killing, which is the most that Aljabri, who is alive and suing in his own name, can possibly allege.  At a minimum, there is no "clear conflict," *Lewis*, 918 F.3d at 150 (Randolph, J., concurring in the judgment), between the TVPA and the doctrine of official immunity on the facts alleged here, because the TVPA does not clearly create the cause of action that Aljabri seeks to assert against the Crown Prince. Accordingly, no statutory abrogation of immunity applies on the facts alleged.

### B.      Saudi Arabia Is Necessary, Indispensable, and Immune from Suit

Under Federal Rule of Civil Procedure 12(b)(7), a party may move to dismiss a complaint for "failure to join a party under Rule 19."  Rule 19 governs the "'procedural propriety of joinder.'"  *Davenport v. International Bhd. of Teamsters, AFL-CIO*, 166 F.3d 356, 366 (D.C. Cir. 1999) (Garland, J.) (quoting 4 James W. Moore, *Moore's Federal Practice* § 19.04(1)(a) (3d ed. 1998)) (emphasis removed).

Under Rule 19(a), "the Court must determine if the absent party is required (or, necessary) for a just adjudication."  *Stand Up for California! v. U.S. Dep't of the Interior*, 204 F. Supp. 3d

212, 251 (D.D.C. 2016), *aff'd*, 879 F.3d 1177 (D.C. Cir. 2018), *cert. denied*, 139 S. Ct. 786 (2019).

An absent party is necessary if it "claims an interest relating to the subject of the action and is so

situated that disposing of the action in the person's absence may . . . as a practical matter impair

or impede the person's ability to protect the interest." Fed. R. Civ. P. 19(a)(1)(B)(i).  Where a

case involves a "matter of significant importance to the people" of a foreign state, that state is a

necessary party.  *TJGEM LLC v. Republic of Ghana*, 26 F. Supp. 3d 1, 13 (D.D.C. 2013), *aff'd*,

2015 WL 3653187 (D.C. Cir. June 9, 2015) (per curiam).  The presence of other parties in the

case who may be aligned with the sovereign is irrelevant.  *See id.* at 11-12 (concluding that the

Republic of Ghana and the Accra Metropolitan Assembly were necessary parties in a suit that

also involved Ghana's Minister of Finance and the Metropolitan Chief Executive of the Accra

Metropolitan District).

Once the court determines that the absent party is necessary, it then "determine[s]

whether the person's joinder is feasible."  *Stand Up for California!*, 204 F. Supp. 3d at 251.

"One reason joinder may be infeasible is that the absent party enjoys sovereign immunity."

*Kickapoo Tribe of Indians of Kickapoo Reservation in Kansas v. Babbitt*, 43 F.3d 1491, 1495

(D.C. Cir. 1995) ("*Kickapoo II*").  Where that is so – that is, where a sovereign is necessary but

immune – then the case should be dismissed.  *See Republic of Philippines v. Pimentel*, 553 U.S.

851, 867 (2008) ("A case may not proceed when a required-entity sovereign is not amenable to

suit."); *see TJGEM*, 26 F. Supp. 3d at 13 ("*Pimentel* holds unambiguously that . . . , where a

sovereign is a required party for the purposes of Rule 19, the case must be dismissed."); *see also*

*Kickapoo II*, 43 F.3d at 1496 (explaining, even before *Pimentel*, that a district court had "'very

little room'" to hear a case involving a required-entity sovereign because of the sovereign's "compelling" interest in "immunity" from suit).[29]

Saudi Arabia is a required party to this suit. This case will require the Court to adjudicate specific acts undertaken by the Crown Prince, and other Saudi government officials and employees, that are alleged to have been taken in an official governmental capacity. *See* Compl. ¶ 239. These include numerous acts of great "significance" to Saudi Arabia, *TJGEM*, 26 F. Supp. 3d at 13, such as: (1) the validity of Saudi Arabia's criminal investigation into Aljabri's years-long theft of public funds appropriated to combat terrorism and accompanying corruption charges, which the Complaint labels as "bogus" and baseless," Compl. ¶¶ 15, 90(m)-(n), 136, 176, 180, 245; (2) Saudi Arabia's continuing investigation and prosecution of Aljabri's co-conspirators, including members of his family, *see id.* ¶¶ 146-148, 152-153, 155-156; and (3) Saudi Arabia's ongoing efforts to bring an "international fugitive," *id.* ¶ 90(o), to justice, which the Complaint alleges are steps in a plot to "trap," *id.* ¶ 13, and then extrajudicially kill Aljabri, *see id.* ¶¶ 162-174 (alleged searches for Aljabri in the United States), 175-179 (filing of a notice with INTERPOL), 183 (freezing Saudi-based bank accounts held by Aljabri and members of his family), 186 (attempting to close U.S.-based bank accounts). The Complaint even challenges the legitimacy of the Crown Prince's ascension to his current position, which it repeatedly labels a "coup." *Id.* ¶¶ 22, 35, 113, 128-129.

---

[29] In cases that are not subject to *Pimentel*'s rule, the district court determines whether to dismiss after considering four factors: "(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided by: (A) protective provisions in the judgment; (B) shaping the relief; or (C) other measures; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder." Fed. R. Civ. P. 19(b).

This Court's scrutiny of those governmental actions would infringe Saudi Arabia's "dignity interests" as a sovereign. *Pimentel*, 553 U.S. at 866. As in *Pimentel*, the issues in dispute arise from "events of historical and political significance for [Saudi Arabia] and its people," and Saudi Arabia has a "unique interest" in resolving these issues. *Id.* It is an "affront" to Saudi Arabia's sovereignty, as well as a strain on its long-standing alliance with the United States, to have a federal district court adjudicate the propriety of these sovereign acts. *Id.* The Supreme Court's observation in *Pimentel* that "[t]here is a comity interest in allowing a foreign state to use its own courts for a dispute if it has a right to do so," *id.*, applies with particular force to Aljabri's attempt to litigate in the United States the legitimacy of his and his family members' investigation, prosecution, and detention in Saudi Arabia.

*TJGEM* is particularly instructive. There, the plaintiff brought an assortment of tort claims arising from its unsuccessful attempt to win a contract with the Ghanaian government to reconstruct the sewer system in Accra, Ghana. *See* 26 F. Supp. 3d at 4-6. The court found that, at their core, the plaintiff's claims were asking the U.S. court to "examin[e] . . . the reasons for, and propriety of, a foreign sovereign's decision to award a contract for a construction project in a foreign state." *Id.* at 12. "Such an examination," the court explained, "is prohibited by *Pimentel*." *Id.* The court further found, applying *Pimentel*, that the plaintiff's allegation that a Ghanaian official engaged in "corrupt practices" were "claims based on alleged public corruption [that] implicate 'important comity concerns,'" requiring the court to "'accord proper weight to the compelling claim of sovereign immunity.'" *Id.* at 13 (quoting *Pimentel*, 553 U.S. at 869).

Given this significant sovereign interest, and because adjudication of the case in Ghana's absence posed the risk of "'imped[ing]'" Ghana's "'ability to protect the[ir] interest,'" the court held that Ghana was a required party under Rule 19(a). *Id.* (quoting Fed. R. Civ. P. 19(a)(1)(B)(i)) (alterations in original). And because Ghana was entitled to sovereign immunity, the court

41

concluded that the case "must be dismissed."  *Id.*; *see Pimentel*, 553 U.S. at 867; *cf. Enterprise Mgmt. Consultants, Inc. v. United States ex rel. Hodel*, 883 F.2d 890, 894 (10th Cir. 1989) (in tribal immunity context, holding that a "Tribe's interest . . . in its sovereign right not to have its legal duties judicially determined without consent is an interest which the United States' presence in this suit cannot protect").[30]

This case threatens sovereign interests even more substantial than those in *TJGEM*. Those interests include Saudi Arabia's criminal investigation and prosecution of a former high-level Saudi official and his co-conspirators for corruption, and Saudi Arabia's efforts to locate that former official – now an international fugitive – and bring him to justice.[31]  The case even challenges the legitimacy of Saudi Arabia's line of succession.  Thus, Saudi Arabia unquestionably "has 'an interest relating to the subject of the action' and 'disposing of the action in [Saudi Arabia's] absence may . . . as a practical matter impair or impede [Saudi Arabia's] ability to protect the interest,'" and is therefore a required party to this suit under Rule 19(a).  *Samantar*, 560 U.S. at 324 (quoting Fed. R. Civ. P. 19(a)(1)(B)) (ellipsis in original).

---

[30] The recent decision in *de Csepel v. Republic of Hungary*, --- F. Supp. 3d ---, 2020 WL 2343405 (D.D.C. May 11, 2020), *interlocutory appeal pending*, No. 20-7047 (D.C. Cir.), is not to the contrary.  In that case, the court concluded that the Republic of Hungary was not an indispensable party and thus the case could proceed in its absence.  *Id.* at *17.  In the process, the court determined that the interests of the Republic of Hungary could be adequately protected by the non-immune parties in the case.  *Id.* at *15.  But *de Csepel* did not involve a challenge to core sovereign interests, such as "an executive decision to conduct a criminal investigation," *Nnaka*, 756 F. App'x at 18, or the legitimacy of a current government.  Also, the court in *de Csepel* addressed the possibility of prejudice to Hungary by limiting the plaintiffs' claims to monetary relief, *see* 2020 WL 2343405, at *15, while Aljabri expressly seeks declaratory relief, *see* Compl. ¶¶ 266, 272, as a means to prevent Saudi Arabia's officials from taking future actions against him.

[31] *See Nnaka*, 756 F. App'x at 18 (recognizing a sovereign's interest in "an executive decision to conduct a criminal investigation"); *see also Two Shields v. Wilkinson*, 790 F.3d 791, 796 (8th Cir. 2015) (same for actions that "'indirectly attack' . . . administrative decisions") (quoting *Boles v. Greeneville Hous. Auth.*, 468 F.2d 476, 479 (6th Cir. 1972)).

It is also clear that Saudi Arabia is immune from suit.  The Foreign Sovereign Immunities Act of 1976 ("FSIA")[32] "is 'the "sole basis for obtaining jurisdiction over a foreign state in our courts."'"  *Doe v. Federal Democratic Republic of Ethiopia*, 851 F.3d 7, 9 (D.C. Cir. 2017) (quoting *Weinstein v. Islamic Republic of Iran*, 831 F.3d 470, 478 (D.C. Cir. 2016), *abrogated on other grounds by Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018)).  "Unless an exception applies, 'a foreign state shall be immune from the jurisdiction of the courts of the United States.'"  *Id.* (quoting 28 U.S.C. § 1604).  This case does not come close to falling within any FSIA exception.  For example, the noncommercial-tort exception, 28 U.S.C. § 1605(a)(5),[33] requires that "'the entire tort' – including not only the injury but also the act precipitating that injury – must occur in the United States."  *Jerez v. Republic of Cuba*, 775 F.3d 419, 424 (D.C. Cir. 2014).  The alleged injury to Aljabri occurred in Canada (where Aljabri resides, *see* Compl. ¶ 31), and the vast majority of the acts that allegedly led to the injury occurred in either Saudi Arabia (*e.g.*, *id.* ¶¶ 146-148 (the arrest of two of Aljabri's adult children)) or Canada (*e.g.*, *id.* ¶¶ 228-232 (the "Tiger Squad" attempts to enter Canada)).

The two FSIA exceptions for acts of terrorism, § 1605A and § 1605B, likewise do not apply.  Section 1605A is unavailable to Aljabri because, among other things, it applies only to foreign states that have been designated as state sponsors of terrorism, *see* 28 U.S.C. § 1605A(a)(2)(A)(i), and can be invoked only by U.S. nationals or government employees, *see id.* § 1605A(a)(2)(A)(ii).  *See Schermerhorn v. State of Israel*, 876 F.3d 351, 359 (D.C. Cir.

---

[32] Pub. L. No. 94-583, 90 Stat. 2891 (codified as amended at, *inter alia*, 28 U.S.C. §§ 1602-1611).

[33] The noncommercial-tort exception abrogates immunity, with some exceptions, in actions involving "personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of [a] foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment." 28 U.S.C. § 1605(a)(5).

2017) (discussing § 1605A's "state-sponsor and U.S.-national requirements").  Section 1605B is unavailable because it covers only "case[s] in which money damages are sought against a foreign state for physical injury to person or property or death *occurring in the United States*," 28 U.S.C. § 1605B(b) (emphasis added), which Aljabri does not allege.  Thus, as in *Pimentel* and *TJGEM*, this case should be dismissed.  *See Pimentel*, 553 U.S. at 867; *TJGEM*, 26 F. Supp. 3d at 13.[34]

## C.     The Act of State Doctrine Bars Aljabri's Claims

"The act of state doctrine in its traditional formulation precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964).  "It applies when 'the relief sought or the defense interposed would [require] a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory.'" *McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066, 1073 (D.C. Cir. 2012) (quoting *W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990)) (alteration in original); *cf. Hourani v. Mirtchev*, 796 F.3d 1, 15 (D.C. Cir. 2015) (explaining that the doctrine did not apply in *Kirkpatrick* "because the case could be decided without directly adjudicating the lawfulness of the Nigerian government's conduct").

"[T]he doctrine serves as a rule of decision for the courts of this country, which requires that, in the process of deciding [a case], the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid." *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1165 (D.C. Cir. 2002) (citation omitted) (first alteration added); *see Mezerhane v.*

---

[34] Although an examination of the Rule 19(b) factors is unneeded where a sovereign is a necessary party, those factors would simply reinforce that Saudi Arabia is an indispensable party to this case.  *See, e.g.*, *Kickapoo II*, 43 F.3d at 1497 n.9 ("The inquiry as to prejudice under Rule 19(b) is the same as the inquiry under Rule 19(a)(2)(i) regarding whether continuing the action will impair the absent party's ability to protect its interest.").

*Republica Bolivariana de Venezuela*, 785 F.3d 545, 552 (11th Cir. 2015) (applying the doctrine

to affirm the dismissal of TVPA and ATS claims); *Nnaka v. Federal Republic of Nigeria*, 238 F.

Supp. 3d 17, 33 (D.D.C. 2017) (applying the doctrine to dismiss a claim for intentional infliction

of emotional distress), *aff'd*, 756 F. App'x 16 (D.C. Cir. 2019) (per curiam).

For instance, "an executive decision to conduct a criminal investigation, which ranks

'[f]oremost among the prerogatives of sovereignty,'" is clearly an "official act." *Nnaka*, 756 F.

App'x at 18 (quoting *Heath*, 474 U.S. at 93). The doctrine also has been applied in cases that

would have required a court to assess the validity of: (i) a letter from the Nigerian Attorney

General to the U.S. Department of Justice "regarding who had authority to represent the Nigerian

government in an asset-forfeiture action," *id.*; (ii) an order by the Brazilian Minister of Finance

to the Central Bank of Brazil "to withhold and pay the income tax on the interest paid to the

Bank," *Riggs Nat'l Corp. & Subsidiaries v. Commissioner*, 163 F.3d 1363, 1368 (D.C. Cir.

1999); (iii) a decision not to issue an export license for a natural resource, *World Wide Minerals*,

296 F.3d at 1165; (iv) the "transfer and alleged conversion" of corporate shares to a state entity

"pursuant to an official decree," *id.* at 1166; (v) an English statute, *Society of Lloyd's v. Siemon-Netto*, 457 F.3d 94, 102-03 (D.C. Cir. 2006); (vi) detentions by military officials "during a

political revolution," *Doe I v. State of Israel*, 400 F. Supp. 2d 86, 113 (D.D.C. 2005); and

(vii) the taking of land or possessions, *id.* at 114.

To qualify as an official act of a foreign government "within its own territory," *Banco

Nacional*, 376 U.S. at 401, it is enough that the act "is rooted, in all relevant respects, within

foreign sovereign territory," *Hourani*, 796 F.3d at 13. This occurs when an act performed

beyond a foreign government's borders is "necessarily official governmental [conduct]

formulated and directed" by the foreign government. *Id.* at 13-14 (applying the act of state

doctrine to a defamation claim based on statements on the website of the Kazakh Embassy in the

United States, because, "once the statements appeared on the official Embassy website with the active approval and support of the Ambassador, they became the official speech of the Kazakh government sitting in Astana, Kazakhstan"); *see also In re Philippine Nat'l Bank*, 397 F.3d 768, 773 (9th Cir. 2005) (act of state doctrine applies to acts extending beyond sovereign's borders because they were "governmental").

All of Aljabri's claims should be dismissed under the act of state doctrine. Those claims are premised on numerous alleged official acts that Saudi Arabia undertook within its own territory or that are "rooted, in all relevant respects," within that territory. *Hourani*, 796 F.3d at 13. These include, *inter alia*, Saudi Arabia's criminal investigation into Aljabri's corruption and the filing of a notice with INTERPOL concerning Aljabri and his family, *see* Compl. ¶¶ 137, 176, 180; the dismissal of Aljabri from his position with the Ministry of Interior, *see id.* ¶¶ 108-112; the appointment of then-Deputy Crown Prince Mohammed bin Salman to the position of Crown Prince and the removal of Prince Mohammed bin Nayef from the same (which Aljabri characterizes as a "coup"), *see id.* ¶¶ 22, 129; the alleged travel ban imposed on members of Aljabri's family in Saudi Arabia, *see id.* ¶¶ 140, 154; the alleged arrest, detention, and monitoring of Aljabri's relatives, including his adult children, in Saudi Arabia, *see id.* ¶¶ 146-148, 152-153, 155-156; and the alleged freezing of Aljabri's bank accounts and the accounts of two of his children in Saudi Arabia, *see id.* ¶ 183.

According to the Complaint, all of these acts took place within Saudi Arabia and were undertaken "under actual or apparent authority or color of law of the government of Saudi Arabia." *Id.* ¶ 239. And Aljabri's allegations cannot be resolved without "inqui[ring] into the legal validity or tortiousness" of those acts. *Hourani*, 796 F.3d at 15. If the Complaint were to be considered on the assumption that Saudi Arabia has valid reasons for investigating, charging, and seeking to extradite Aljabri; that the Crown Prince holds his position lawfully and

legitimately; that Saudi Arabia's prosecutions and other enforcement activities directed towards Aljabri's adult children and other relatives are legitimate; and that Saudi Arabia had good cause to freeze Aljabri's assets and those of his adult children (as a remedy for his massive diversion of government funds), it would make no sense whatsoever.  The lawfulness of those "government[ ] activities and official government communications," *id.*, is at the heart of this case – and, under the act of state doctrine, is beyond this Court's role to determine.

Aljabri's allegations concerning the alleged attempted extrajudicial killing in Canada are likewise barred by the act of state doctrine.  If the Court assumes as true the allegation that "an interagency group of employees selected from across the Saudi government," Compl. ¶ 224, traveled to Canada from Saudi Arabia, *see id.* ¶ 232 (trip ended with "deportation back to Saudi Arabia"), one using a diplomatic passport, *see id.*, all receiving advice and assistance from Saudi Arabia's Canadian embassy, *see id.*, and all acting with government authorization, *see id.* ¶ 239, it would be considering the lawfulness of alleged conduct "rooted, in all relevant respects," in Saudi Arabia and "formulated and directed" from Riyadh.  *Hourani*, 796 F.3d at 13.  The act of state doctrine bars the courts of the United States from doing so.

As set forth above, the Crown Prince is charged by Royal Order with "tak[ing] whatever measures deemed necessary" to protect national security and root out corruption, which includes pursuing massive thefts from an antiterrorism fund.  *See supra* p. 33.  Even if the Court were to credit plaintiff's conclusory allegations (which it should not do), any purported directions given by the Crown Prince to the so-called Tiger Squad are alleged by Aljabri himself to have been "carried out under actual or apparent authority or color of law of the government of Saudi Arabia."  Compl. ¶ 239.  Indeed, the Complaint alleges that "only Defendant bin Salman would have had the authority to assemble such an interagency team."  *Id.* ¶ 204.  The authority it is referring to is, of course, the Crown Prince's official authority, which he would have had to use

47

in order to give the alleged directions to these individuals.  Aljabri thus asks the Court to

adjudicate an act on Saudi Arabian soil, within the Crown Prince's authority granted to him by

Saudi Arabia:  an "official act of a foreign sovereign performed within its own territory."

*McKesson*, 672 F.3d at 1073.  Settled law prevents the courts of the United States from ruling

such an act invalid.

## III.    Aljabri Fails To State a Claim Under Statutory or Common Law

### A.    Aljbari Fails To State a Claim Under the TVPA

The Torture Victim Protection Act of 1991 imposes liability on any "individual who,

under actual or apparent authority, or color of law, of any foreign nation," "subjects an individual

to" either "torture" or "extrajudicial killing."  Pub. L. No. 102-256, § 2(a), 106 Stat. 73, 73

(1992), *reprinted in* 28 U.S.C. § 1350 note.  Accordingly, the statute contemplates liability based

only on completed acts of "torture" or "extrajudicial killing."  *Id*.  Aljabri's TVPA claim is

legally deficient because the Complaint fails to allege an "extrajudicial killing" and because

Aljabri has not exhausted the adequate remedies available to him in Canada and Saudi Arabia.

### 1.    The Complaint Fails To Allege an "Extrajudicial Killing"

The TVPA defines an "extrajudicial killing" as "a deliberated killing not authorized by a

previous judgment pronounced by a regularly constituted court affording all the judicial

guarantees which are recognized as indispensable by civilized peoples."  TVPA § 3(a), 106 Stat.

73, *reprinted in* 28 U.S.C. § 1350 note.  It also provides that, if an individual "subjects an[other]

individual to extrajudicial killing," he "shall . . . be liable for damages to the individual's legal

representative, or to any person who may be a claimant in an action for wrongful death."  *Id.*

§ 2(a)(2), 106 Stat. 73.  As a matter of plain language, an inchoate attempt to kill someone is not

an "extrajudicial killing" that is actionable under the TVPA.  Congress could not have been

clearer in defining "extrajudicial killing" as a "killing," *id.* § 3(a), 106 Stat. 73, a word the D.C.

Circuit has interpreted to mean an action that "caused the death" of a person. *Owens v. Republic of Sudan*, 864 F.3d 751, 770 (D.C. Cir. 2017), *vacated in part on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020); *accord, e.g.*, *Webster's Third New International Dictionary* 1242 (2002) (defining "kill" as "to deprive of life", "put to death", or "cause the death of"). The plain meaning of the word "killing" is dispositive. *See Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1738 (2020) ("[O]nly the words on the page constitute the law adopted by Congress and approved by the President.").

The TVPA's structure and purpose confirm that the statutory phrase "extrajudicial killing" does not encompass an inchoate attempt to commit an extrajudicial killing. The statute imposes liability for an "extrajudicial killing" only in favor of third parties who are not themselves the "individual" who was "subject[ed] . . . to extrajudicial killing": "the individual's legal representative, or to any person who may be a claimant in an action for wrongful death." TVPA § 2(a)(2), 106 Stat. 73, *reprinted in* 28 U.S.C. § 1350 note.[35] This structure shows Congress's understanding that anyone "subject[ed] . . . to extrajudicial killing" would be dead and that a cause of action could not be brought in the victim's own name. The TVPA's legislative history further confirms that Congress understood that, "[i]n cases of extrajudicial killing, . . . the victim will not be alive to bring suit." H.R. Rep. No. 102-367, pt. 1, at 4 (1991), *reprinted in* 1992 U.S.C.C.A.N. 84, 87.

The declared purpose of the TVPA is to "codif[y] a norm of customary international law" against extrajudicial killing. *Doe v. Exxon Mobil Corp.*, 2015 WL 5042118, at *5 (D.D.C. July

---

[35] The class of "person[s] who may be a claimant in an action for wrongful death" is governed by the law of the jurisdiction where the plaintiff is domiciled. *See Fisher v. Great Socialist People's Libyan Arab Jamahiriya*, 541 F. Supp. 2d 46, 54-55 (D.D.C. 2008). Regardless of which jurisdiction's law applies, "an action for wrongful death" requires a death, and a decedent cannot bring a wrongful-death action in his own name. *See, e.g.*, Family Law Act, R.S.O. 1990, c. F.3, § 61(1) (Can.); Mass. Gen. Laws ch. 229, § 2; D.C. Code § 16-2701.

6, 2015) ("*Exxon III*"); *see also* S. Rep. No. 102-249, at 6 (1991) ("The TVPA incorporates . . . the definition of extrajudicial killing found in customary international law.").  But as discussed *infra* pp. 56-58, there is no "norm of customary international law" that prohibits an inchoate attempt to commit extrajudicial killing.  Further, the legislative history indicates that Congress understood the international law prohibition to "conform[ ] with that found in the [First] Geneva Convention," S. Rep. No. 102-249, at 6 & n.7 (citing Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, Aug. 12, 1949, art. 3, 6 U.S.T. 3114), which prohibits "murder of all kinds" and "the carrying out of executions without previous judgment pronounced by a regularly constituted court," art. 3(1)(a), (d), 6 U.S.T. 3116, 3118.  Neither prohibition applies by its terms to a mere attempt.

    In addition, courts "generally presume that Congress legislates against the backdrop of the common law." *Comcast Corp. v. National Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1016 (2020).  Thus, when Congress creates "a species of tort liability," its "starting point" is "the common law of torts." *Heck v. Humphrey*, 512 U.S. 477, 483 (1994).  That interpretive rule applies to the TVPA, which "create[s] an action that sound[s] in tort." *Carazani v. Zegarra*, 972 F. Supp. 2d 1, 26 (D.D.C. 2013).  Accordingly, Congress "is presumed to have incorporated" into the TVPA, *University of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 347 (2013), the tort principle that "[a]n attempt to commit a tort . . . is not actionable when no harm results," *Doe v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 24 n.3 (D.D.C. 2005) ("*Exxon I*"), *appeal dismissed*, 473 F.3d 345 (D.C. Cir. 2007).  That principle further confirms that an unsuccessful attempt to kill someone – and certainly one that results in no bodily injury or immediate threat of physical harm – is not an "extrajudicial killing" under the TVPA.

    Despite the TVPA's language, structure, and purpose, some courts have interpreted the phrase "extrajudicial killing," and the same words in the terrorism exception of the FSIA, to

include "attacks in which no one died." *See*, *e.g.*, *Force v. Islamic Republic of Iran*, 464 F.

Supp. 3d 323, 360-63 (D.D.C. 2020) (collecting cases). Those cases do not support recovery

here. In *Force*, Judge Moss recently surveyed decisions in this area and concluded that they

support (1) recovery by "individuals who are injured but not killed in an attack that results in the

death of others," because their injuries are caused by an extrajudicial killing, *id.* at 360; (2) as a

"closer question," recovery for "attempted extrajudicial killings that result in serious physical

injuries, even if no one is killed," *id.*; but *not* (3) recovery for "failed attempts to inflict bodily

harm" that may have caused "emotional distress," but "in which no one suffered physical injuries

and no one was even placed in imminent apprehension of physical harm," *id.* at 361, 363.

    *Force* reasoned that extending recovery to this third category would be too "substantial

[an] expansion on the law" and would "threaten[] to open the door to a broad array of claims that

Congress never contemplated." *Id.* at 361.[36] In reaching that conclusion, it relied on principles

of tort law that require a plaintiff seeking damages for a "failed attempt[] to inflict bodily harm"

to establish that he experienced " 'an apprehension of the immediate infliction of an intended

harmful or offensive contact.' " *Id.* at 363 (quoting Restatement (Second) of Torts § 47 cmt. a

(1965)).[37] Aljabri does not and cannot allege that he suffered such an apprehension here. Thus,

---

[36] In addition, *Force* and other attempt cases relied on guidance that when applying § 1605A, the FSIA's terrorism exception, "courts resolve statutory 'ambiguities flexibly and capaciously' " to serve the statute's "remedial purpose . . . to compensate those injured in terrorist attacks." 464 F. Supp. 3d at 360 (citing *Van Beneden v. Al-Sanusi*, 709 F.3d 1165, 1167 & n.4 (D.C. Cir. 2013)). Thus, although the FSIA and the TVPA definitions are theoretically the same, *see id.* at 359, the analysis in *Force* was colored by the particular statutory context of § 1605A. No comparable rule of interpretation applies here.

[37] Consistent with *Force*'s analysis, either actual physical harm or the immediate apprehension of physical harm has consistently been present in other cases where courts have allowed claims for attempted extrajudicial killings under the FSIA or the TVPA. *See*, *e.g.*, *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 58 (D.D.C. 2019); *Schertzman Cohen v. Islamic Republic of Iran*, 2019 WL 3037868, at *5 (D.D.C. July 11, 2019); *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 93, 101-02 (D.D.C. 2017).

although the text of the TVPA – which requires a "killing" – is and should be controlling,

Aljabri's claims also extend beyond the most flexible interpretations adopted by any court.

### 2. Aljabri Has Not Exhausted Adequate, Available Remedies

The TVPA provides that "[a] court shall decline to hear a [TVPA] claim . . . if the

claimant has not exhausted adequate and available remedies in the place in which the conduct

giving rise to the claim occurred." TVPA § 2(b), 106 Stat. 73, *reprinted in* 28 U.S.C. § 1350

note. Here, Aljabri alleges that the attempt on his life occurred in Canada and was directed from

Saudi Arabia. *See* Compl. ¶¶ 213, 222-233. Thus, under the TVPA, "the conduct giving rise to

the claim occurred" either in Canada or, alternatively, in Saudi Arabia. Adequate remedies are

available to Aljabri in both countries, yet he "has neither alleged nor established that [he] has

ever pursued and/or exhausted" those remedies. *Harbury v. Hayden*, 444 F. Supp. 2d 19, 41

(D.D.C. 2006), *aff'd*, 522 F.3d 413 (D.C. Cir. 2008). His failure to exhaust adequate and

available local remedies is an independent basis to dismiss his TVPA claim. *See id*.

"A foreign remedy is adequate even if not identical to remedies available in the United

States." *Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019, 1025 (W.D. Wash. 2005), *aff'd*,

503 F.3d 974 (9th Cir. 2007). Rather, "[c]ourts usually find a foreign remedy adequate unless it

'is no remedy at all.'" *Id*. at 1025-26 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254

(1981)). For example, a remedy that offers a recovery smaller than what the plaintiff "might be

able to recover in an American court . . . does not mean the remedy is so inadequate so as to

excuse exhaustion." *Rojas Mamani v. Sanchez Berzain*, 636 F. Supp. 2d 1326, 1331 (S.D. Fla.

2009). Moreover, remedies are considered "available" unless "it is apparent that" pursuing them

"would be futile," *Exxon I*, 393 F. Supp. 2d at 25, or they are "unobtainable" because, *e.g.*, the

"country's judicial system is corrupt or ineffective," *Boniface v. Viliena*, 338 F. Supp. 3d 50, 65,

66 (D. Mass. 2018).

### a.   Aljabri Has Not Exhausted Remedies in Canada

Canada's judiciary recognizes a common-law civil "remedy for breaches of customary international law norms," the purpose of which is "to ensure an effective remedy to victims of [such] violations." *Nevsun Res. Ltd. v. Araya*, 2020 SCC 5 ¶¶ 119, 128 (Can.) (permitting damages claim based on alleged torture, slavery, and other human-rights violations to proceed). As explained in the Declaration of Sujit Choudhry submitted in support of this motion (Exhibit H), the *Nevsun Resources* case would permit a plaintiff to bring a claim seeking money damages for an extrajudicial killing committed in a province of Canada. *See* Ex. H, ¶¶ 9-10.  Conduct in Canada that would give rise to a claim for extrajudicial killing could also give rise to claims for other common-law torts including assault and battery. *See id.* ¶¶ 12-13.  The Complaint does not address Aljabri's access to remedies in Canada or allege that Canada's legal system is less than fair and impartial.  That is fatal to his claim under the TVPA.

### b.   Aljabri Has Not Exhausted Remedies in Saudi Arabia

Saudi Arabia's judiciary also recognizes remedies for extrajudicial killing.  As explained in the Declaration of Fahad Nasser Al Arfaj submitted in support of this motion (Exhibit C), such remedies are based on principles of Islamic or Shariah law, which recognize "the right to be free from unjustified deprivation of life." Ex. C, ¶ 9.  Saudi law recognizes extrajudicial killing as a wrong that may be the subject of either criminal or civil actions (or both), and for which damages are an available remedy. *See id.* ¶ 12.  In addition, the legal representative of the victim of an alleged extrajudicial killing could bring administrative claims to the Saudi Arabian Human Rights Commission, an independent government agency; or to the Saudi Arabian National Society for Human Rights, a quasi-governmental agency. *See id.* ¶¶ 10-11.

Aljabri's assertion that he "is not required to exhaust local remedies" because he "does not have access to a fair and impartial legal system in Saudi Arabia," Compl. ¶ 253, is

conclusory, and the Court should not adopt it.  At most, that claim reflects his subjective

perception of bias, which does not make a remedy futile or unobtainable under the TVPA.  *See*,

*e.g.*, *Haim v. Neeman*, 2013 WL 12157279, at *5 (D.N.J. Jan. 23, 2013) (TVPA claim that Israeli

laws discriminated against men must first be pursued in Israel, despite plaintiff's assertion that

doing so "would be an exercise in futility"), *aff'd*, 543 F. App'x 152 (3d Cir. 2013) (per curiam).

### B.     Aljabri Fails To Establish Jurisdiction or State a Claim Under the ATS

The Alien Tort Statute grants federal courts "jurisdiction of any civil action by an alien

for a tort only, committed in violation of the law of nations or a treaty of the United States."

28 U.S.C. § 1350.  It "creat[es] no new causes of action," *Sosa v. Alvarez-Machain*, 542 U.S.

692, 724 (2004), but instead creates jurisdiction to adjudicate "a cause of action under U.S. law

to enforce [those] norm[s] of international law," *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S.

108, 119 (2013), which are "specific, universal, and obligatory" and have "definite content and

acceptance among civilized nations," *Sosa*, 542 U.S. at 729, 732.[38]

Like many federal statutes, the ATS only applies domestically, *see Kiobel*, 569 U.S. at

124, so that "the conduct relevant to the statute's focus" must "occur[ ] in the United States,"

*RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016).  "[T]he conduct relevant to

[a] statute's focus," *id.*, is "[t]he conduct that [the statute] regulates," *WesternGeco LLC v. ION*

*Geophysical Corp.*, 138 S. Ct. 2129, 2138 (2018); *accord Spanski Enters., Inc. v. Telewizja*

*Polska, S.A.*, 883 F.3d 904, 914 (D.C. Cir. 2018) ("[W]e identity the 'conduct relevant to the

[statute's] focus' by asking precisely what it is that the [statute] regulates.") (citation omitted).

---

[38] *See also Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1397 (2018) ("Congress enacted
[the ATS] against the backdrop of the general common law, which [at the time of enactment]
recognized a limited category of torts in violation of the law of nations."); *Sosa*, 542 U.S. at 721
("ATS was meant to underwrite litigation of a narrow set of common law actions derived from
the law of nations").

The "conduct that [the ATS] regulates," *WesternGeco*, 138 S. Ct. at 2138, are violations of "specific, universal, and obligatory" norms of international law, *Sosa*, 542 U.S. at 732, and aiding and abetting such violations, *see Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 20 (D.C. Cir. 2011) ("*Exxon II*"), *vacated on other grounds*, 527 F. App'x 7 (D.C. Cir. 2013); *see also*, *e.g.*, *Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 197 (5th Cir. 2017) (ATS's "focus is conduct that violates international law"); *Exxon III*, 2015 WL 5042118, at *6 (ATS's "primary focus" is "the prohibition of violations of customary international law"); Br. for the United States as Amicus Curiae Supporting Petitioners at 27, *Nestlé USA, Inc. v. Doe I*, Nos. 19-416 & 19-453 (U.S. Sept. 8, 2020) ("U.S. *Nestlé* Br."), 2020 WL 5498509 ("[T]he focus of the ATS is the tortious conduct."). Therefore, an ATS claim is extraterritorial and should be dismissed unless the plaintiff alleges domestic conduct that either violated universal norms of international law or aided and abetted such a violation. *See Mastafa v. Chevron Corp.*, 770 F.3d 170, 187 (2d Cir. 2014) (domestic conduct must constitute "a violation of the law of nations or aiding and abetting another's violation of the law of nations"); *see also Exxon III*, 2015 WL 5042118, at *6 (domestic conduct must be "part of a course of conduct constituting a violation of customary international law").[39]

Here, Aljabri cannot satisfy his burden to demonstrate the existence of ATS jurisdiction because (1) the Complaint does not allege any predicate violation of a specific, universal, and

---

[39] In two cases currently pending before the Supreme Court, the United States has asked that Court to hold "that aiding and abetting is not cognizable under the ATS" because "there are numerous 'sound reasons to think Congress might doubt the efficacy or necessity' of aiding-and-abetting liability in ATS suits." U.S. *Nestlé* Br. 8, 22-26. Those cases were argued on December 1, 2020. If the Supreme Court adopts the United States' position, the ATS would regulate only primary violations of international law, which would foreclose ATS jurisdiction here because the Complaint does not allege any U.S.-based conduct that itself violates international law.

obligatory norm of international law, and (2) the alleged domestic conduct did not plausibly aid

or abet the "attempted extrajudicial killing" that purportedly violated international law.

### 1. An Attempted Extrajudicial Killing Does Not Violate Any Specific, Universal, and Obligatory Norm of International Law

Courts set "a high bar for new private causes of action for violating international law"

because "attempts by federal courts to craft remedies for the violation of new norms of

international law would raise risks of adverse foreign policy consequences." *Sosa*, 542 U.S.

at 727-28. The only violation of international law alleged in the Complaint is an "attempted

extrajudicial killing." *E.g.*, Compl. ¶ 268. An inchoate attempt to commit an extrajudicial

killing is not actionable under the ATS because it does not violate any "specific, universal,

and obligatory" norm of international law. *Sosa*, 542 U.S. at 732.

Judge Bates' decision in *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1 (D.D.C. 2010), is directly

on point. In that case, the father of Anwar Al-Aulaqi, an American citizen with ties to Al Qaeda,

alleged that government officials (including the President) had placed his son on "kill lists"

and "had already ordered 'almost a dozen' unsuccessful drone and air-strikes targeting Anwar

Al-Aulaqi in Yemen," and as a result that his son was "in hiding under threat of death." *Id*.

at 11-12. The plaintiff asserted an ATS claim premised on these allegations of attempted

extrajudicial killing, but the court dismissed that claim because "there is no basis for the

assertion that the threat of a future state-sponsored extrajudicial killing—as opposed to the

commission of a past state-sponsored extrajudicial killing—constitutes a tort in violation of the

law of nations." *Id*. at 37. "[N]o court has ever found that the threat of a future extrajudicial

killing is a recognized tort, much less one that violates the present-day law of nations," and

Judge Bates declined to be the first, concluding that, if such a claim were recognized, "federal

courts could be flooded with ATS suits from persons across the globe who alleged that they were

somehow placed in fear of danger as a result of contemplated government action." *Id.* at 37-38.

The allegations underlying the ATS claim in this case closely resemble the legally insufficient allegations in *Al-Aulaqi*. Both the Complaint here and the complaint in *Al-Aulaqi* allege unsuccessful attempts to commit an extrajudicial killing, *compare* Compl. ¶ 9 ("attempted extrajudicial killing") *with Al-Aulaqi*, 727 F. Supp. 2d at 11 ("'almost a dozen' unsuccessful drone and air-strikes targeting Anwar Al-Aulaqi"); and an ongoing plan to carry out such a killing in the future, *compare* Compl. ¶ 9 ("an attempt that remains ongoing to this day") *and id*. ¶ 24 ("a still-ongoing attempted extrajudicial killing") *with Al-Aulaqi*, 727 F. Supp. 2d at 12 ("in hiding under threat of death"), *and id*. at 11 ("Al-Aulaqi is now subject to a standing order that permits the CIA and JSOC to kill him"). This Court should follow the persuasive reasoning of *Al-Aulaqi* and dismiss Aljabri's ATS claim.

*Al-Aulaqi* is in line with other authority holding that an unsuccessful effort to violate well-defined international norms does not itself violate such norms, with narrow exceptions that do not apply here. For example, although piracy is at the core of ATS jurisdiction because it was among the three violations of the law of nations universally recognized at the time the First Congress enacted the ATS in 1789, *see Sosa*, 542 U.S. at 724, neither attempted piracy nor an inchoate conspiracy to commit piracy is a violation of international law, *see United States v. Ali*, 885 F. Supp. 2d 17, 33 & n.21 (D.D.C. 2012), *aff'd in relevant part*, 718 F.3d 929 (D.C. Cir. 2013). Similarly, "conspiracy as an inchoate offense" is only recognized in international law for "'conspiracy to commit genocide and common plan to wage aggressive war.'" *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 260 (2d Cir. 2009) (quoting *Hamdan v. Rumsfeld*, 548 U.S. 557, 610 (2006) (plurality)). That is the long-held position of the United States. *See* Br. for the United States in Opp. at 26 n.6, *Bahlul v. United States*, No. 16-1307 (U.S. Sept. 6, 2017), 2017 WL 3948468.

In addition, the ATS provides jurisdiction only for "tort[s]," 28 U.S.C. § 1350, that fit within "a very limited category defined by the law of nations *and* recognized at common law," *Sosa*, 542 U.S. at 712 (emphasis added).  That an unsuccessful attempt to commit a tort is not "recognized" as a tort "at common law," *see supra* pp. 50-51, is a further reason the Court should not expand the law of nations to include the concept of "attempted extrajudicial killing."  *See Sosa*, 542 U.S. at 727-28 ("[C]raft[ing] remedies for the violation of new norms of international law . . . should be undertaken, if at all, with great caution.").  Aljabri's ATS claim, which is based entirely on an unsuccessful attempt, is legally deficient and should be dismissed.[40]

### 2.   The Domestic Conduct Alleged in the Complaint Did Not Plausibly Aid or Abet a Primary Violation of the ATS

Secondary liability for aiding and abetting attaches only if Plaintiff has adequately pleaded a primary violation of established international norms.  *See Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84, 103 (D.D.C. 2017) (to allege "secondary liability" under ATS, "the complaint must contain," *inter alia*, "a well-pled allegation of a primary violation of the law of nations").  Because an unsuccessful attempted killing does not violate the law of nations, aiding and abetting such an attempt cannot give rise to ATS liability.

Even if the Court were to find a primary violation, conduct aids and abets a violation of international law only if it (1) "has a substantial effect on the perpetration of the crime," and (2) was done with "knowledge that [it] will assist the perpetrator in the commission of the crime."  *Exxon II*, 654 F.3d at 33-34 (citation omitted).[41]  The first element requires "a link or

---

[40] In an ATS case, a failure to adequately plead a violation of international law is both a failure to establish subject-matter jurisdiction and a failure to state a claim.  *See, e.g., Kaplan v. Central Bank of Islamic Republic of Iran*, 896 F.3d 501, 515 (D.C. Cir. 2018); *Exxon I*, 393 F. Supp. 2d at 28; *Mastafa*, 770 F.3d at 186.

[41] The D.C. Circuit partially vacated its 2011 decision in *Exxon II* "in light of intervening changes in governing law regarding . . . the standard to be applied for aiding and abetting

connection between the [U.S.-based conduct] and the underlying crime" and a showing that the violation "probably would not have occurred absent [that] conduct."  *Ofisi*, 278 F. Supp. 3d at 108-09.  The second element requires that the U.S.-based actor "actually knew" both (1) "the intent of the principal perpetrator" and (2) that its conduct would help the primary perpetrator commit the violation.  *Id*. at 109.

The Complaint does not allege any U.S.-based conduct that plausibly aided or abetted the purported attempted extrajudicial killing.  As set forth above, the only conduct alleged to have occurred in the United States is (1) hosting events allegedly aimed at "cultivating a network of covert agents to hunt down" Aljabri, (2) a handful of attempts to obtain meetings and "extract information" from Aljabri's friends and family in the United States, (3) surveillance of Aljabri's family at a hotel in Boston, and (4) disseminating allegedly false and misleading statements about Aljabri to journalists in the United States.  *See* Compl. ¶ 90.[42]  None of this conduct itself violates international law, nor did it aid and abet a violation of international law.

---

liability."  *Doe v. Exxon Mobil Corp.*, 527 F. App'x 7, 7 (D.C. Cir. 2013) (citing *Prosecutor v. Perišić*, Case No. IT-04-81-T, Judgement (Feb. 28, 2013), https://www.icty.org/x/cases/perisic/acjug/en/130228_judgement.pdf).  The *Perišić* case appeared to articulate an additional "specific direction" requirement for aiding-and-abetting liability, but the International Criminal Tribunal for the former Yugoslavia later "explicitly repudiated the *Perišić* decision."  *Exxon III*, 2015 WL 5042118, at *11.  Therefore, "the [aiding-and-abetting] standard articulated by the Court of Appeals previously" in 2011 "remains unchanged."  *Id.*

[42] Aljabri also purports to allege two other examples of "physical conduct within the United States," Compl. ¶ 90, though neither example actually occurred in the United States. *First*, he claims that the Crown Prince "transmitted threatening text messages to [Aljabri] over WhatsApp's U.S.-based servers," *id.* ¶ 90(p), but those messages were sent and received outside the United States, *see id.* ¶¶ 127-137, and in any event the link between those messages and the alleged attempt to kill Aljabri is attenuated.  *Second*, Aljabri alleges that the Crown Prince "arranged for the filing of a notice about [Aljabri] and his family with INTERPOL," *id.* ¶ 176, but INTERPOL is headquartered in Europe, and the Complaint does not allege that any reporting conduct took place in the United States.

The only U.S.-based conduct that the Complaint even tries to connect to the alleged attempt to kill Aljabri consists of the alleged attempts in the United States to ascertain his whereabouts. *See id.* ¶ 275. But as set forth above: (1) the efforts in the United States to learn about Aljabri's whereabouts were unsuccessful;[43] (2) nearly all of the inquiries in the United States were about Aljabri's family members, not Aljabri himself;[44] and (3) the conduct that allegedly "pinpoint[ed]" Aljabri's whereabouts "so that [the] Tiger Squad knew where to find its target" was an alleged trip by one defendant to Toronto and the alleged remote planting of malware on Aljabri's phone in Canada, *see id.* ¶¶ 174, 221, none of which occurred in the United States. Accordingly, none of the Defendants' U.S.-based conduct is properly alleged to have had a "substantial effect," *Exxon II*, 654 F.3d at 34, on the alleged attempted killing. Nor is there any plausible basis to infer that the alleged attempt on Aljabri's life in Canada "probably would not have occurred absent [the U.S.-based] conduct." *Ofisi*, 278 F. Supp. 3d at 109. At most, the alleged U.S.-based conduct was "preparatory or ancillary" to the events in Canada, which is not enough. *In re Search of Info. Assoc. with [redacted]@gmail.com that is Stored at Premises Controlled by Google, Inc.*, 2017 WL 3445634, at *25 (D.D.C. July 31, 2017).[45]

---

[43] *See* Compl. ¶¶ 167, 169-171 ("attempted to extract" information); *id.* ¶ 168 ("The effort did not work."); *id.* ¶ 169 (Aljabiri's son "misdirect[ed] Alrajhi and the larger ongoing hunt for [Aljabri]"); *id.* ¶ 173 ("asked highly intrusive and unusual questions about [Aljabri], causing [his son] to become suspicious").

[44] *See* Compl. ¶ 166 ("Khalid [Aljabri's] U.S. immigration status"); *id.* ¶ 167 ("the location and contact information of [Aljabri]'s wife"); *id.* ¶ 169 ("the Aljabri family's residence in [Boston]," "Khalid [Aljabri's] U.S. immigration status," and "contact information for [Aljabri]'s wife"); *id.* ¶ 170 ("the location and contact information of [Aljabri]'s wife"); *id.* ¶ 171 ("the whereabouts and contact information of [Aljabri's] wife").

[45] The remaining U.S.-based conduct alleged in the Complaint, discussed *supra* pp. 20-21, has no meaningful "link or connection," *Ofisi*, 278 F. Supp. 3d at 108, to the alleged attempt to kill Aljabri in Canada.

The Complaint also fails to allege any facts that would plausibly establish that any of the alleged U.S.-based conduct was done with "knowledge that [it] w[ould] assist" an attempt on Aljabri's life. *Exxon II*, 654 F.3d at 34. The alleged U.S.-based attempts to locate Aljabri were purportedly conducted by four defendants (Abduljadayel, Alhamed, Alrajhi, Alharbi). *See* Compl. ¶ 90. None is sufficiently alleged to have known about the alleged attempt to kill Aljabri in Canada.[46] And, even if Aljabri argues that those Defendants should have known that their conduct was part of an alleged murder plot, that "w[ould] not suffice in this context" because "actual knowledge" is required. *Ofisi*, 278 F. Supp. 3d at 109.

### C. The Court Should Dismiss Aljabri's Claim for Intentional Infliction of Emotional Distress

#### 1. Applicable Saudi Arabian Law Does Not Recognize Intentional Infliction of Emotional Distress as a Cause of Action

To determine the substantive law that governs Aljabri's claim for intentional infliction of emotional distress, the Court should apply the District of Columbia's choice-of-law rules. *See Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 857 (D.C. Cir. 2006). "D.C. law employs 'a modified governmental interests analysis which seeks to identify the jurisdiction with the most significant relationship to the dispute.' " *In re APA Assessment Fee Litig.*, 766 F.3d 39, 51 (D.C. Cir. 2014) (quoting *Washkoviak v. Student Loan Mktg. Ass'n*, 900 A.2d 168, 180 (D.C. 2006)). *First*, a court "must 'determine whether a "true conflict" exists' between the laws of the two jurisdictions—'that is, whether more than one jurisdiction has a potential interest in having its

---

[46] The Complaint makes conclusory allegations "[o]n information and belief" that each U.S.-based Defendant "[a]ct[ed] at the direction" of the Crown Prince, Compl. ¶¶ 60, 64, 68, 71, and "was aware of the harm that would result to [Aljabri] should their efforts to locate him be successful," *id.* ¶ 164. But these are "mere conclusory statements," not "factual content," and so should be disregarded. *Iqbal*, 556 U.S. at 678. The Complaint does not allege any facts to suggest that any of the U.S.-based Defendants received communication or direction from any of the other Defendants or that any U.S.-based Defendant was aware of any of the other (extraterritorial) conduct alleged in the Complaint.

law applied and, if so, whether the law of the competing jurisdictions is different.'" *Id.* at 51-52

(quoting *GEICO v. Fetisoff*, 958 F.2d 1137, 1141 (D.C. Cir. 1992)). *Second*, if a conflict exists,

the court "evaluat[es] 'the two jurisdictions' respective relationships to the complaint.'" *Id.* at

53 (quoting *Washkoviak*, 900 A.2d at 181).

In this case, both Saudi Arabia and Canada have potential interests in having their law

applied to Aljabri's claim for intentional infliction of emotional distress. Aljabri bases that claim

on allegations that Saudi Arabian nationals took actions in Saudi Arabia and Canada that caused

Aljabri, a Saudi citizen and Canadian resident, to suffer emotional distress in Canada. *See*

Compl. ¶ 149 (identifying the alleged arrest and detention of two of Aljabri's children in Saudi

Arabia as a cause of emotional distress); *id.* ¶ 238 (identifying the alleged attempted extrajudicial

killing in Canada as a cause of the same). The District of Columbia, by contrast, has no

significant interest in applying its law to Aljabri's claim, which involves neither any D.C.

resident nor any significant conduct in D.C.

A "true conflict" exists between Saudi Arabian and Canadian law. Although Canadian

law recognizes a claim analogous to intentional infliction of emotional distress, *see Boucher v.*

*Wal-Mart Canada Corp.*, 2014 ONCA 419, ¶ 41 (Can.) (describing the "tort of intentional

infliction of mental suffering"),[47] Saudi Arabian law does not, *see McGhee v. Arabian Am. Oil*

---

[47] If Canadian law were to apply to Aljabri's claim for intentional infliction of emotional distress, then the Court would apply Ontario law, as Ontario was the site of the relevant events in Canada. *See* Compl. ¶¶ 222, 228-233 (alleging that the "Tiger Squad" attempted to enter Canada through the Ontario International Airport); *see also id.* ¶ 174 (identifying Toronto as Aljabri's "current location"). Under Ontario law, the "tort of intentional infliction of mental suffering has three elements": (1) "flagrant and outrageous" conduct by the defendant that was (2) "calculated to harm the plaintiff" and that (3) "caused the plaintiff to suffer a visible and provable illness." *Boucher*, 2014 ONCA 419, ¶ 41. For the second element, "[t]he defendant must have intended to produce the kind of harm that occurred or have known that it was almost certain to occur." *Id.* ¶ 44. For the third element, the "stress" caused by the defendant's conduct must "cause[] physical symptoms," *e.g.*, "abdominal pain, constipation and weight loss." *Id.* ¶ 52.

*Co.*, 871 F.2d 1412, 1422 (9th Cir. 1989) (explaining, in the context of discussing intentional infliction of emotional distress, that "Saudi law . . . does not allow money damages for injuries of this nature"); *Petersen v. Boeing Co.*, 2015 WL 12090213, at *2 (D. Ariz. Feb. 18, 2015) (noting that intentional infliction of emotional distress is not "cognizable under Saudi law").  In addition to U.S. decisions such as *McGhee* and *Petersen*, this conclusion is supported by the expert Declaration of Fahad Nasser Al Arfaj.  *See* Ex. C, ¶ 14 ("Although Saudi law generally recognizes compensation for intangible damages, including psychological damages, Saudi courts would award compensation for psychological distress only as a consequence of another established tangible harm, such as assault or killing.").

A "conflict may be found when two jurisdictions have different applicable laws, which would result in different outcomes."  *Margolis v. U-Haul Int'l, Inc.*, 818 F. Supp. 2d 91, 101 (D.D.C. 2011).  Further, "'in the choice-of-law process,'" a "rule of non-liability is owed 'the same consideration . . . as is a rule which imposes liability.'"  *APA Assessment Fee Litig.*, 766 F.3d at 53 (quoting Restatement (Second) of Conflict of Laws § 145 cmt. c (1971)).  Because Canada would apply a rule of (potential) liability, but Saudi Arabia would apply a rule of non-liability, the relevant laws of Saudi Arabia and Canada are "'in conflict.'"  *Id.* (quoting *Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*, 68 A.3d 697, 714 (D.C. 2013)).[48]

Because a true conflict is present, the Court should "evaluat[e] 'the two jurisdictions' respective relationships to the complaint' under the factors set forth in the Restatement (Second)

---

[48] To the extent the Court considers applying D.C. law to Aljbri's claim for intentional infliction of emotional distress, that law conflicts with both Canadian and Saudi Arabian law. Unlike Saudi Arabian law, D.C. law recognizes intentional infliction of emotional distress as a cognizable claim.  *See Williams v. District of Columbia*, 9 A.3d 484, 493-94 (D.C. 2010).  And unlike Canadian law, which requires a plaintiff to show "a visible and provable illness" to establish liability, *Boucher*, 2014 ONCA 419, ¶ 41, D.C. law does not, *see Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984) ("A plaintiff [alleging intentional infliction of emotional distress] need not prove actual physical injury.").

of Conflict of Laws." *Id.* (quoting *Washkoviak*, 900 A.2d at 181).  "D.C. courts follow § 145 of

the Restatement, which provides four factors to identify the jurisdiction with the 'most

significant relationship to the occurrence and the parties' in tort cases." *Id.* (quoting § 145(1)).

Those four factors are " '(a) the place where the injury occurred, (b) the place where the conduct

causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and

place of business of the parties, and (d) the place where the relationship, if any, between the

parties is centered.' " *Id.* (quoting § 145(2)).  " 'These contacts are to be evaluated according to

their relative importance with respect to the particular issue.' " *Id.* (same).

Saudi Arabia has the most significant relationship to the parties involved in this case and

to the events alleged in the Complaint.  Although Aljabri resides in Canada, he is a citizen of

Saudi Arabia, *see* Compl. ¶ 31, as are all named individual Defendants, *see id.* ¶¶ 34, 38, 44, 51,

60, 63, 68, 71, 77-81.  The Crown Prince is the son of the King of Saudi Arabia and the heir to

Saudi Arabia's throne.  *See supra* Part II.A.1.  The Complaint alleges that many Defendants are

or have been employed by the government of Saudi Arabia, *see* Compl. ¶¶ 51, 77-81, and that

Defendants' alleged actions "were carried out under actual or apparent authority or color of law

of the government of Saudi Arabia," *id.* ¶ 239.  The one entity Defendant – the MiSK

Foundation – is a Saudi Arabian non-profit organization established by the Crown Prince to work

towards "a better future in Saudi Arabia."  *Id.* ¶¶ 55-56.  Another Defendant, Bader Alasaker,

serves as the MiSK Foundation's "Secretary-General," as well as the "head" of the Crown

Prince's "private office."  *Id.* ¶ 38.  Moreover, the alleged arrest and detention of two of Aljabri's

children, which Aljabri claims has caused him "severe and intense emotional distress," *id.* ¶ 149,

occurred in Saudi Arabia, *id.* ¶ 146.  Likewise, while the "Tiger Squad" purportedly attempted to

enter Canada to kill Aljabri, *see id.* ¶¶ 228-233, Saudi Arabia is the jurisdiction from which the

Crown Prince has purportedly overseen "a multi-year campaign of execution," *id.* ¶ 237, that has resulted in Aljabri "liv[ing] in a state of extreme fear and anxiety," *id.* ¶ 238.

Saudi Arabia is also the center of the relationship between the parties.  Aljabri is a former high-ranking official with Saudi Arabia's Ministry of Interior, where at various times he served as "State Minister" and "Chief of Staff."  *Id.* ¶ 102.  In the Complaint, Aljabri alleges that Saudi Arabia's criminal investigation into Aljabri's theft of counterterrorism funds is in fact a façade for a plot by the Crown Prince of Saudi Arabia to kill Aljabri.  *See*, *e.g.*, *id.* ¶¶ 176 (alleging that Saudi Arabia's filing of a notice with INTERPOL was "an attempt to trap" Aljabri), 182 (alleging that Saudi Arabia's "asset seizure" was "an attempt to remotely trap" Aljabri).  The Crown Prince is purportedly targeting Aljabri out of a fear that Aljabri threatens his position in the Saudi Arabian government.  *See id.* ¶¶ 112, 125.

Taking all of these factors into account, the Court should apply Saudi Arabian law to Aljabri's claim for intentional infliction of emotional distress.  Because such a claim is not cognizable under Saudi Arabian law, that claim should be dismissed.

### 2.      Aljabri Also Fails To State a Claim Under D.C. Law

Even if the law of the District of Columbia applies, Aljabri still fails to state a claim for intentional infliction of emotional distress ("IIED").  To determine liability for intentional infliction of emotional distress, D.C. courts follow the Restatement (Second) of Torts.  *See Republic of Sudan v. Owens*, 194 A.3d 38, 41 (D.C. 2018) ("[T]his court has embraced the Restatement Second's approach to IIED liability.").  The Restatement includes two limitations on liability for intentional infliction of emotional distress that preclude Aljabri's claim.

*First*, where conduct "is directed at a third person," a member of that person's family will have a claim for intentional infliction of emotional distress only if the family member was "present at the time" of the conduct.  Restatement (Second) of Torts § 46(2)(a); *see Owens*,

194 A.3d at 42 (relying on § 46(2)(a) to "hold that, as a general matter, to recover for IIED, a plaintiff whose emotional distress arises from harm suffered by a member of his or her immediate family must be 'present' when the harm" is inflicted).

Second, "conduct which is tortious because intended to result in bodily harm to another . . . does not make the actor liable for an emotional distress which is the only legal consequence of his conduct." Restatement (Second) of Torts § 47. "Victims of failed attempts to inflict bodily harm do have a remedy under tort law . . . , but it is under an assault (rather than intentional infliction of emotional distress) theory." Force, 464 F. Supp. 3d at 363 (relying on § 47 to explain that intentional infliction of emotional distress is unavailable for conduct intended to result in an extrajudicial killing). Aljabri does not and cannot assert an assault claim.

These limitations are fatal to Aljabri's claim on the facts alleged. Aljabri alleges that his emotional distress stems from the arrest of two of his adult children, Compl. ¶ 149, and the attempted extrajudicial killing, id. ¶ 238. But Aljabri cannot base a claim for intentional infliction of emotional distress on conduct directed at his adult children unless he was present to witness the conduct, see Owens, 194 A.3d at 42, which he was not, see Compl. ¶ 149 (noting that Aljabri "learned about" the arrest after the fact). Nor can Aljabri ground such a claim on actions allegedly undertaken with "specific intent to kill" him. Compl. ¶ 261; see Force, 464 F. Supp. 3d at 363. Thus, Aljabri does not identify any conduct that can serve as a basis for a claim for intentional infliction of emotional distress even under D.C. law.[49]

---

[49] Also, without stating an underlying tort, any attempt by Aljabri to hold the Crown Prince secondarily liable necessarily fails. See Acosta Orellana v. CropLife Int'l, 711 F. Supp. 2d 81, 106 (D.D.C. 2010) (noting that, under D.C. law, liability for aiding and abetting, agency, and conspiracy "must be premised on some underlying tort"); cf. Ali v. Mid-Atl. Settlement Servs., Inc., 640 F. Supp. 2d 1, 9 (D.D.C. 2009) (granting summary judgment to two defendants on conspiracy and aiding-and-abetting claims after dismissing the underlying fraud claim), aff'd sub nom. Ali v. Tolbert, 636 F.3d 622 (D.C. Cir. 2011).

### 3.      If the Court Dismisses Aljabri's Federal Claims, It Lacks Personal Jurisdiction over the Crown Prince

Aljabri relies on Federal Rule of Civil Procedure 4(k)(2) in his attempt to establish personal jurisdiction over the Crown Prince.  *See* Compl. ¶ 86.  That rule is available only for a "claim that arises under federal law," Fed. R. Civ. P. 4(k)(2), which Aljabri's common-law claim for intentional infliction of emotional distress does not.  Thus, Aljabri relies on the doctrine of pendent personal jurisdiction for that claim.  *See* Compl. ¶ 92.  "Pendent personal jurisdiction . . . exists when a court possesses personal jurisdiction over a defendant for one claim, lacks an independent basis for personal jurisdiction over the defendant for another claim that arises out of the same nucleus of operative fact, and then, because it possesses personal jurisdiction over the first claim, asserts personal jurisdiction over the second claim."  *United States v. Botefuhr*, 309 F.3d 1263, 1272 (10th Cir. 2002); *see Oetiker v. Jurid Werke, G.m.b.H.*, 556 F.2d 1, 4-5 (D.C. Cir. 1977) (recognizing the doctrine).

Once a court dismisses the federal claims on which a plaintiff bases his assertion of pendent personal jurisdiction – in this case, Aljabri's TVPA and ATS claims – then the court cannot exercise personal jurisdiction over the claims that remain.  *See*, *e.g.*, *Botefuhr*, 309 F.3d at 1274 (holding that district court abused its discretion by retaining personal jurisdiction over the non-anchor claim after its pretrial dismissal of the anchor claim); *D'Addario v. Geller*, 264 F. Supp. 2d 367, 387-88 (E.D. Va. 2003) ("[I]f the court were to later determine that the federal claim(s) should be dismissed against a defendant, the state claims against that defendant would also have to be dismissed, unless another basis for asserting personal jurisdiction exists."); *Olin Corp. v. Fisons PLC*, 47 F. Supp. 2d 151, 155 (D. Mass. 1999) (same).  Therefore, Aljabri's failure to state claims under the TVPA and the ATS is also fatal to his attempt to assert personal jurisdiction over the Crown Prince for his claim of intentional infliction of emotional distress.

### 4. Alternatively, the Court Should Decline To Exercise Supplemental Subject-Matter Jurisdiction over Aljabri's Claim

The only basis identified by Aljabri for the Court to exercise subject-matter jurisdiction over his claim for intentional infliction of emotional distress is 28 U.S.C. § 1367, the supplemental jurisdiction statute.  That statute directs a district court to exercise supplemental jurisdiction over claims "so related" to claims with the court's original jurisdiction that the "supplemental" claims and "original" claims "form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  However, the same statute permits district courts to "decline to exercise supplemental jurisdiction over a claim" if, *inter alia*, "the district court has dismissed all claims over which it has original jurisdiction."  *Id.* § 1367(c)(3); *see Shekoyan v. Sibley Int'l*, 409 F.3d 414, 423 (D.C. Cir. 2005) ("A district court may choose to . . . dismiss[ ] pendent state law claims after federal claims are dismissed.") (citing 28 U.S.C. § 1367(c)(3)).

Courts in this Circuit routinely decline to exercise supplemental jurisdiction over claims outside the court's original jurisdiction where the court concludes, "at an early stage procedurally," that claims over which it has original jurisdiction "must be dismissed."  *Lattisaw v. District of Columbia*, 118 F. Supp. 3d 142, 163 (D.D.C. 2015), *aff'd*, 672 F. App'x 22 (D.C. Cir. 2016) (per curiam); *see also, e.g.*, *FiberLight, LLC v. National R.R. Passenger Corp.*, 81 F. Supp. 3d 93, 117 (D.D.C. 2015) (same); *Artis v. District of Columbia*, 51 F. Supp. 3d 135, 141-42 (D.D.C. 2014) (same).  Indeed, "[t]he Supreme Court has long held that '"[i]n the usual case in which all federal-law claims are dismissed before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."'"  *Lattisaw*,

118 F. Supp. 3d at 163 (quoting *Shekoyan*, 409 F.3d at 424) (applying 28 U.S.C. § 1367) (second alteration in original).

Thus, "[i]n keeping with the principle that '[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties,'" *Araya v. JPMorgan Chase Bank, N.A.*, 775 F.3d 409, 417 (D.C. Cir. 2014) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)) (second alteration in original), dismissal of Aljabri's common-law claim for intentional infliction of emotional distress is the appropriate course. The international character of the parties and the alleged events underlying the claim make dismissal all the more proper. *See Ali Shafi v. Palestinian Auth.*, 642 F.3d 1088, 1097 (D.C. Cir. 2011) (affirming district court's decision to decline to hear a negligence claim that "arose from events in another nation" and involved parties that "are citizens of other nations and have no connection with the United States or specifically, with the District of Columbia").

## CONCLUSION

For the foregoing reasons, the Court should dismiss all of Aljabri's claims against the Crown Prince.

Dated:   December 7, 2020                     Respectfully submitted,

                                             /s/ *Michael K. Kellogg*

                                             Michael K. Kellogg (DC 372049)
                                             Gregory G. Rapawy (DC 493973)
                                             Andrew C. Shen (DC 500071)
                                             **KELLOGG, HANSEN, TODD, FIGEL**
                                             **& FREDERICK, P.L.L.C.**
                                             1615 M Street, N.W., Suite 400
                                             Washington, D.C. 20036
                                             (202) 326-7900

                                             *Attorneys for Defendant*
                                             *Mohammed bin Salman bin Abdulaziz Al Saud*

## **CERTIFICATE OF SERVICE**

I certify that on December 7, 2020, I electronically filed the foregoing DEFENDANT

MOHAMMED BIN SALMAN BIN ABDULAZIZ AL SAUD'S MOTION TO DISMISS,

using the ECF system, which sent notice of filing in this matter to all counsel of record.


*/s/ Michael K. Kellogg*
Michael K. Kellogg
*Attorney for Defendant*
*Mohammed bin Salman bin Abdulaziz Al Saud*