**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| _____ | ) | |
| **DR. SAAD ALJABRI,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:20-cv-02146-TJK |
| | ) | |
| **MOHAMMED BIN SALMAN BIN** | ) | |
| **ABDULAZIZ AL SAUD,** *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MOTION TO DISMISS OF DEFENDANTS YOUSSEF ALRAJHI,**
**MOHAMMED ALHAMED, AND LAYLA ABULJADAYEL**

Defendants Youssef Alrajhi, Mohammed Alhamed, and Layla Abuljadayel, through and by undersigned counsel, move to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) and, as to Defendant Alrajhi, Fed. R. Civ. P. 12(b)(2).

Dated: December 7, 2020
Washington, D.C.

*/s/Mitchell R. Berger*
Mitchell R. Berger (DC 385467)
Alan T. Dickey (DC 496403)
Benjamin D. Wood (DC 487799)
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, N.W.
Washington, D.C. 20037
Phone: 202-457-6000
Fax:    202-457-6315
mitchell.berger@squirepb.com
alan.dickey@squirepb.com
benjamin.wood@squirepb.com

*Attorneys for Defendants*
*Youssef Alrajhi, Mohammed Alhamed, and*
*Layla Abuljadayel*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **DR. SAAD ALJABRI,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:20-cv-02146-TJK |
| | ) | |
| **MOHAMMED BIN SALMAN BIN** | ) | |
| **ABDULAZIZ AL SAUD,** *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OF LAW OF YOUSSEF ALRAJHI, MOHAMMED ALHAMED, AND LAYLA ABULJADAYEL IN SUPPORT OF THEIR MOTION TO DISMISS

Dated: December 7, 2020
     Washington, D.C.

Mitchell R. Berger (DC 385467)
Alan T. Dickey (DC 496403)
Benjamin D. Wood (DC 487799)
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, N.W.
Washington, D.C. 20037
Phone: 202-457-6000
Fax:    202-457-6315
mitchell.berger@squirepb.com
alan.dickey@squirepb.com
benjamin.wood@squirepb.com

*Attorneys for Defendants*
*Youssef Alrajhi, Mohammed Alhamed, and*
*Layla Abuljadayel*

# <u>TABLE OF CONTENTS</u>

**Page**

I.    SUMMARY. ............................................................................................ 1

II.   SUMMARY OF PLAINTIFF'S ALLEGATIONS CONCERNING THE
      STUDENT-DEFENDANTS. ................................................................... 2

III.  LEGAL STANDARDS. .......................................................................... 3

IV.   THE COURT LACKS JURISDICTION OVER THE ATS CLAIM AGAINST
      THE STUDENT-DEFENDANTS BECAUSE PLAINTIFF DOES NOT PLEAD
      ANY VIOLATION OF INTERNATIONAL LAW BY THEM. ...................... 4

      A.    PLAINTIFF ALLEGES NO INTENT TO COMMIT, OR KNOWLEDGE
            OF, A VIOLATION OF INTERNATIONAL LAW. ............................. 5

      B.    PLAINTIFF ALLEGES NO VIOLATION OF INTERNATIONAL LAW. ........ 7

V.    THE COMPLAINT DOES NOT STATE A CLAIM UNDER THE TVPA. .................. 9

      A.    PLAINTIFF MERELY ALLEGES A NONACTIONABLE
            UNSUCCESSFUL ATTEMPT. ...................................................... 9

      B.    PLAINTIFF ALLEGES NO DELIBERATED INTENT TO HARM HIM. ....... 13

      C.    PLAINTIFF CLAIMS ONLY EMOTIONAL, AND NOT PHYSICAL,
            INJURY. ................................................................................ 155

VI.   PLAINTIFF FAILS TO STATE A CLAIM FOR INTENTIONAL INFLICTION
      OF EMOTIONAL DISTRESS. ................................................................. 16

VII.  THE COMPLAINT DOES NOT STATE A CLAIM FOR LIABILITY OF THE
      STUDENT-DEFENDANTS UNDER THEORIES OF AIDING AND
      ABETTING OR CONSPIRACY. ............................................................... 16

      A.    OTHER DEFENDANTS DID NOT PHYSICALLY INJURE PLAINTIFF
            OR COMMIT A PRIMARY VIOLATION OF THE ATS OR TVPA. ........... 18

      B.    THERE IS NO ALLEGATION THAT THE STUDENT-DEFENDANTS
            COMMITTED AN UNLAWFUL ACT CAUSING INJURY. ..................... 20

      C.    THE STUDENT-DEFENDANTS ARE NOT ALLEGED TO HAVE
            HAD KNOWLEDGE OF ANYONE ELSE'S ATTEMPT TO HARM
            PLAINTIFF OR TO HAVE AGREED WITH THEM TO DO SO. ................ 21

      D.    THE ALLEGED PLOT TO HARM PLAINTIFF DID NOT DEPEND ON
            THE STUDENT-DEFENDANTS' FAILURE TO LOCATE PLAINTIFF
            OR HIS WIFE. .......................................................................... 22

VIII. THE COURT LACKS SUBJECT-MATTER JURISDICTION DUE TO
      FOREIGN-OFFICIAL IMMUNITY. .......................................................... 23

      A.    THE ESTABLISHED POLICY OF THE STATE DEPARTMENT
            GOVERNS FOREIGN-OFFICIAL IMMUNITY. ................................. 23

B.  THE STUDENT-DEFENDANTS ARE IMMUNE BECAUSE THEY
WERE ALLEGEDLY AGENTS OF A FOREIGN STATE ACTING IN
THEIR OFFICIAL CAPACITIES....................................................................... 25

C.  THE STUDENT-DEFENDANTS ARE IMMUNE EVEN UNDER THE
SECOND RESTATEMENT TEST. ..................................................................... 30

D.  THERE IS NO APPLICABLE EXCEPTION TO CONDUCT-BASED
IMMUNITY......................................................................................................... 30

E.  THE STUDENT-DEFENDANTS ARE ENTITLED TO DERIVATIVE
IMMUNITY BASED ON THE IMMUNITY OF THE CROWN PRINCE. ...... 36

IX.  THE ACT OF STATE DOCTRINE BARS THE COURT FROM
ADJUDICATING PLAINTIFF'S CLAIMS. .................................................................. 39

X.   THE COURT HAS NO PERSONAL JURISDICTION OVER ALRAJHI. ................... 39

CONCLUSION...................................................................................................................... 41

## **TABLE OF AUTHORITIES**

**Page(s)**

**CASES:**

*Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81 (D.D.C. 2010)..........................................22

*Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1 (D.D.C. 2010)....................................................7

*Al Shimari v. CACI Premier Tech., Inc.*, 324 F. Supp. 3d 668 (E.D. Va. 2018) ...........................5

*Alicog v. Kingdom of Saudi Arabia*, 860 F. Supp. 379 (S.D. Tex. 1994)......................................38

*American Justice Center et al. v. Modi*, 4-7780 (AT),
    2015 U.S. Dist. LEXIS 177427 (S.D.N.Y. Jan. 14, 2015).....................................................32

\* *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).......................................................4, 6, 14, 22

*Baker Botts LLP v. ASARCO LLC*, 576 U.S. 121 (2015) ...........................................35

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964) ......................................39

\* *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................................4, 22

*Belhas v. Ya'alon*, 515 F.3d 1279 (D.C. Cir. 2008).........................................................31

\* *Bernhardt v. Islamic Republic of Iran*, No. 18-2739 (TJK), 2020 U.S. Dist. LEXIS
    214185 (D.D.C. Nov. 16, 2020)..............................................................4, 16, 19, 39

*Berwyn Fuel, Inc. v. Hogan*, 399 A.2d 79 (D.C. 1979) ..............................................41

*Bieregu v. Ashcroft*, 259 F. Supp. 2d 342 (D.N.J. 2003) ..............................................9

*Boniface v. Viliena*, 338 F. Supp. 3d 50 (D. Mass. 2018).........................................12, 13

*Burma Task Force v. Sein*, No. 15-7772 (LGS), 2016 U.S. Dist. LEXIS 42326
    (S.D.N.Y. Mar. 30, 2016) ...........................................................................31, 32

\* *Butters v. Vance Int'l, Inc.*, 225 F.3d 462 (4th Cir. 2000) ...........................................36, 37, 38

*Cabello v. Fernandez-Larios*, 402 F.3d 1148 (11th Cir. 2005) ......................................17

*Carswell v. Air Line Pilots Ass'n Int'l*, 540 F. Supp. 2d 107 (D.D.C. 2008) ...............................23

*Cohen v. Islamic Republic of Iran*, No. 17-1214 (JEB), 2019 U.S. Dist. LEXIS 115278
    (D.D.C. July 11, 2019)...............................................................................11, 12

*Devi v. Rajapaksa*, 2013 U.S. App. LEXIS 11011 (2d Cir. Jan. 30, 2013)..................................34

*\* Authorities upon which we chiefly rely are marked with an asterisk.*

* *Doe v. Buratai*, 318 F. Supp. 3d 218 (D.D.C. 2018), *aff'd*, 792 F. App'x. 6 (D.C. Cir. 2019) ................................................................................................. *passim*

*Doe v. Buratai*, No. 17-1033 (DLF), 2018 U.S. Dist. LEXIS 186101 (D.D.C. Oct. 31, 2018) ....................................................................................................25

*Doe v. Constant*, No. 04-10108 (SHS), 2006 U.S. Dist. LEXIS 101961 (S.D.N.Y. Oct. 24, 2006), *aff'd*, 354 F. App'x 543 (2d Cir. 2009) ................................13

*Doe v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20 (D.D.C. 2005) ("*Exxon I*") ................................4

* *Doe v. Exxon Mobil Corp.*, 654 F.3d 11 (D.C. Cir. 2011) ("*Exxon II*") ................6, 8, 16, 20, 21

*Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1 (D.D.C. 2011)....................................11, 12, 13

*Dogan v. Barak*, No. 2:15-08130 (ODW), 2016 U.S. Dist. LEXIS 142055 (C.D. Cal. Oct. 13, 2016) ......................................................................................................31

* *Dogan v. Barak*, 932 F.3d 888 (9th Cir. 2019) ............................................................25, 31, 33

*Everett v. Nissan Motor Corp.*, 628 A.2d 106 (D.C. 1993) .....................................................40

*Ex parte Republic of Peru*, 318 U.S. 578 (1943) ...................................................................24

*FC Inv. Group LC v. IFX Mkts., Ltd.*, 479 F. Supp. 2d 30 (D.D.C. 2007), *aff'd*, 529 F.3d 1087 (D.C. Cir. 2008)......................................................................................40

*Filarsky v. Delia*, 566 U.S. 377 (2012)................................................................................33

* *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323 (D.D.C. May 31, 2020) ..........12, 15, 16

*Foremost-McKesson, Inc. v. Iran*, 905 F.2d 438 (D.C. Cir. 1990)...........................................31

*G&G Closed Circuit Events, LLC v. 19th & K, Inc.*, No. 19-1422 (DLF), 2020 U.S. Dist. LEXIS 25921 (D.D.C. Feb. 14, 2020) ..............................................................7

*Gang v. Zhizhen*, No. 3:04-1146 (RNC), 2017 U.S. Dist. LEXIS 162344 (D. Conn. Sept. 30, 2017) ...............................................................................................20, 22

*Gang v. Zhizhen*, No. 3:04-1146 (RNC), 2018 U.S. Dist. LEXIS 168600 (D. Conn. Sept. 30, 2018) ......................................................................................................21

*Garcia v. Chapman*, 911 F. Supp. 2d 1222 (S.D. Fla. 2012).......................................................17

*Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88 (D.D.C. 2017) ...............................10, 11, 13

*Giraldo v. Drummond Co., Inc.*, 808 F. Supp. 2d 247 (D.D.C. 2011), *aff'd*, 493 F. App'x. 106 (D.C. Cir. 2012).................................................................................31

*Gore v. Wilkie*, No. 19-1134 (RDM), 2020 U.S. Dist. LEXIS 94792 (D.D.C. May 31, 2020) .................................................................................................................3

*Haim v. Islamic Republic of Iran*, 784 F. Supp. 2d 1 (D.D.C. 2011) ......................................12, 13

* *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ........................................ *passim*

*Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23 (D.D.C. 2017) ............................................10

*Heaney v. Gov't of Spain*, 445 F.2d 501 (2d Cir. 1971) ................................................30

* *Hourani v. Mirtchev*, 796 F.3d 1 (D.C. Cir. 2015) ......................................................39

*IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95 (D.D.C. 2018)................................4

*Imbler v. Pachtman*, 424 U.S. 409 (1976) ..................................................................33

*In re Chiquita Brands Int'l, Inc.*, 792 F. Supp. 2d 1301 (S.D. Fla. 2011) .....................................17

*In re Ross Sys. Sec. Litig.*, No. 94-0017 (DLJ), 1994 U.S. Dist. LEXIS 21263 (N.D. Cal. July 21, 1994) ........................................................................................19

* *In re Terrorist Attacks on Sept. 11, 2001*, 122 F. Supp. 3d 181 (S.D.N.Y. 2015)...............25, 26

* *Ivey v. Lynch*, No. 1:17-439 (NCT), 2018 U.S. Dist. LEXIS 133656 (M.D.N.C. Aug. 8, 2018) .................................................................................................37, 38

*J & J Sports Prods. v. Micherie, LLC*, No. 17-1150 (KBJ), 2018 U.S. Dist. LEXIS 166328 (D.D.C. Sept. 27, 2018) ................................................................................7

*Jam v. International Fin. Corp.*, 139 S. Ct. 759 (2019)...........................................27, 28

*Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386 (2018) ....................................................5

*Joe Hand Promotions, Inc. v. Yakubets*, 3 F. Supp. 3d 261 (E.D. Pa. 2014)..................................7

*Johns v. Daniel*, No. 13-2666 (GHM), 2014 U.S. Dist. LEXIS 64848 (S.D. Tex. May 12, 2014) .................................................................................................19

*Kaplan v. Cent. Bank of Islamic Republic of Iran*, 896 F.3d 501 (D.C. Cir. 2018).......................4

*Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12 (D.D.C. 2019)...............................11, 12

*Khulumani v. Barclay National Bank Ltd.*, 504 F.3d 254 (2d Cir. 2007).....................................20

*La Brier v. A.H. Robins Co.*, 551 F. Supp. 53 (D.D.C. 1982) ......................................40

*Lewis v. Mutond*, 918 F.3d 142 (D.C. Cir. 2019), *cert. denied*, 2020 U.S. LEXIS 3396 (U.S. June 29, 2020) ...................................................................23, 24, 26, 35, 36

*Livnat v. Palestinian Auth.*, 851 F.3d 45 (D.C. Cir. 2017) ............................................................4

*Malley v. Briggs*, 475 U.S. 335 (1986) ............................................................................34

\* *Manoharan v. Rajapaksa*, 711 F.3d 178 (D.C. Cir. 2013) ...........................................33, 34, 35

*Mastafa v. Chevron Corp.*, 770 F.3d 170 (2d Cir. 2014) ....................................................4, 5

*Matar v. Dichter*, 500 F. Supp. 2d 284 (S.D.N.Y. 2007) ...............................28, 29, 30, 31, 34

\* *Moriah v. Bank of China Ltd.*, 107 F. Supp. 3d 272 (S.D.N.Y. 2015) ....................25, 29, 30, 38

*Morrow v. U.S.*, 723 F. Supp. 2d 71 (D.D.C. 2010) .........................................................14

*Muchira v. Al-Rawaf*, No. 14-770 (AJT-JFA), 2015 U.S. Dist. LEXIS 49806 (E.D. Va. April 15, 2015)..........................................................................................................19

*Mwani v. bin Laden*, 417 F.3d 1 (D.C. Cir. 2005) .........................................................40

*Nahl v. Jaoude*, No. 15-9755 (LGS), 2018 U.S. Dist. LEXIS 100056 (S.D.N.Y. June 14, 2018) ...........................................................................................................9

\* *Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84 (D.D.C. 2017).............................6, 8, 18, 20, 21

\* *Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017) ...........................................10

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244 (2d Cir. 2009) ................5

*Republic of Mexico v. Hoffman*, 324 U.S. 30 (1945) .......................................25, 26, 29

*Rehberg v. Paulk*, 566 U.S. 356 (2012) .......................................................................33

*Rishikof v. Mortada*, 70 F. Supp. 3d 8 (D.D.C. 2014) ...............................25, 29, 30, 38

*Rosenberg v. Lashkar-e-Taiba*, 980 F. Supp. 2d 336 (E.D.N.Y. 2013), *aff'd*, 577 F. App'x 22 (2d Cir. 2014)...........................................................................................28

*Ross v. Product Dev. Corp.*, 736 F. Supp. 285 (D.D.C. 1989) ..........................................40, 41

*Salzman v. Islamic Republic of Iran*, No. 17-2475 (RDM), 2019 U.S. Dist. LEXIS 163632 (D.D.C. Sept. 25, 2019) .................................................................................11, 12

*Samantar v. Yousuf*, 560 U.S. 305 (2010)............................................................... *passim*

*The Schooner Exchange*, 11 U.S. (7 Cranch) 116 (1812)...............................................34

*Second Amendment Found. v. U.S. Conf. of Mayors*, 274 F.3d 521 (D.C. Cir. 2001) ...................4

*Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598 (S.D.N.Y. 2012)......................................17

*\* Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) ..................................................5, 7, 8

*Spence v. Wolf*, No. 19-2919 (TJK), 2020 U.S. Dist. LEXIS 190943 (D.D.C. Oct. 15, 2020) ......................................................................................................................3, 4

*State v. Hamlet*, 321 S.E.2d 837 (N.C. 1984) ......................................................13, 14

*Sussman v. Wells Fargo Bank, N.A.*, No. 2:16-01094 (JNP-PMW), 2017 U.S. Dist. LEXIS 152433 (D. Utah Aug. 31, 2017) ...............................................................8

*Stutts v. De Dietrich Grp.*, No. 03-4058 (ILG), 2006 U.S. Dist. LEXIS 47638 (E.D.N.Y. June 30, 2006) ..................................................................................18, 19

*Tawfik v. Al-Sabah*, No. 11-6455 (ALC-JCF), 2012 U.S. Dist. LEXIS 115957 (S.D.N.Y. Apr. 27, 2012), *report and recommendation adopted*, 2012 U.S. Dist. LEXIS 115946 (S.D.N.Y. Aug. 16, 2012) ...........................................................31

*Tawfik v. al-Sabah*, No. 11-6455, 2012 U.S. Dist. LEXIS 115946 (S.D.N.Y. Aug. 16, 2012) ......................................................................................................................31, 32

*Tyler v. D.C. Hous. Auth.*, 113 F. Supp. 3d 88 (D.D.C. 2015) ......................................4

*U.S. v. Texas*, 507 U.S. 529 (1993) ......................................................................32, 33

*Van Beneden v. Al Sanusi*, 709 F.3d 1165 (D.C. Cir. 2013) ........................................12

*Victory Transp. Inc. v. Comisaria Gen. de Abastecimientos y Transportes*, 336 F.2d 354 (2d Cir. 1964) ..........................................................................................25

*Warfaa v. Ali*, 33 F. Supp. 3d 653 (E.D. Va. 2014), *aff'd*, 811 F.3d 653 (4th Cir. 2016) .............13

*Weixum v. Xilai*, 568 F. Supp. 2d 35 (D.D.C. 2008) ....................................................31

*Wickrematunge v. Rajapaksa*, No. 2:19-02577 (RGK), 2019 U.S. Dist. LEXIS 226607 (C.D. Cal. Oct. 17, 2019) ...................................................................................28

*Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18 (1940) ..............................................38

*Yousuf v. Samantar*, 699 F.3d 763 (4th Cir. 2012) ....................................................29

*Zelaya v. UNICCO Serv. Co.*, 587 F. Supp. 2d 277 (D.D.C. 2008) ..............................7

## STATUTES:

\* The Alien Tort Statute, 28 U.S.C. § 1350 ("ATS") ............................................................ *passim*

\* D.C. Code § 13-423 (1983)............................................................................2, 40, 41

D.C. Code § 16-2701 (2001)...........................................................................11

\* The Torture Victim Protection Act of 1991 (Pub. L. No. 102-256, 106 Stat. 73 (1992),
reprinted in 28 U.S.C. § 1350 note ("TVPA")................................................ *passim*

\* The Foreign Sovereign Immunities Act of 1976,
28 U.S.C. §§ 1602-1611 ("FSIA") ................................................................ *passim*

42 U.S.C. § 1983 ......................................................................................33, 34

## OTHER AUTHORITIES:

\* Fed. R. Civ. P. 4 ................................................................................2, 39, 40

\* Fed. R. Civ. P. 12 ...............................................................................................3

International Criminal Court, Elements of Crimes (2011) ...................................6

Hazel Fox, *The Law of State Immunity* (2d. ed. 2008) ...................................38

Office of the Legal Advisor, U.S. Dep't of State, *Digest of United States Practice in
International Law* (Carrielyn D. Guymon, ed. 2015) ("2015 State Dep't Digest") ...............27

Restatement (Second) of Agency § 14 (1958).............................................23

Restatement (Third) of Agency § 1.01 (2006)............................................23

Restatement (Second) of Foreign Relations Law § 66(f) (1965) ("Second
Restatement")......................................................................23, 24, 26, 30

Restatement (Third) of Foreign Relations Law § 702 ...................................6

U.S. Amicus Brief, *Mutond v. Lewis*, 2020 U.S. S. CT. BRIEFS LEXIS 5337 (May
26, 2020) .........................................................................................24, 27

William L. Prosser on the Law of Torts § 46 (4th ed. 1971).........................18

## <u>MEMORANDUM OF LAW OF YOUSSEF ALRAJHI, MOHAMMED ALHAMED, AND LAYLA ABULJADAYEL IN SUPPORT OF THEIR MOTION TO DISMISS</u>

### I.    <u>SUMMARY</u>

At the time of all relevant alleged events, defendants Youssef Alrajhi ("Alrajhi"), Mohammed Alhamed ("Alhamed"), and Layla Abuljadayel ("Abuljadayel") (collectively, the "Student-Defendants") were Saudi students pursuing graduate degrees or other studies in the United States.  Compl. ¶¶ 57, 60, 68.  Through no fault of their own, these Student-Defendants have been swept up in a political slugfest initiated by an ousted Saudi government official against the Kingdom's Crown Prince and other senior Saudi officials.  Plaintiff's own allegations depict these Student-Defendants as bit players who did nothing more than: pursue failed inquiries about the location of Plaintiff's wife (*id*. ¶¶ 60, 64, 68, 167, 170-71); without any intent to harm Plaintiff or anyone else, or any knowledge of what Plaintiff claims was a <u>subsequent</u> plot to harm Plaintiff (*id.* ¶¶ 174, 187, 220); and, at all events, acting "at the direction" and as "agents" of the Crown Prince or other Saudi officials (*id*. ¶¶ 60-69, 167, 170-71).  Plaintiff portrays these Student-Defendants as pawns of the Saudi government, but in reality it is Plaintiff who is misusing them—bestowing on them the hyperbolic title "U.S.-Based Covert Agent[s]" (*id*. ¶¶ 62, 66, 69)—to manufacture a U.S.-nexus for his claims (*id*. ¶¶ 86, 90, 92, 97), which otherwise allege actions entirely in Saudi Arabia or Canada.  Plaintiff's claims against the Student-Defendants accordingly should be dismissed because: (i) the non-conclusory allegations against them demonstrate that they did not engage in any activity that was tortious or in violation of domestic or international law, and did not cause any harm to Plaintiff; and, (ii) even accepting Plaintiff's conclusory characterization of them as the Crown Prince's agents, they are entitled to conduct-based foreign official immunity, negating subject matter jurisdiction over all of Plaintiff's claims.  Plaintiff's failure to demonstrate a violation of international law independently negates jurisdiction over his

Alien Tort Statute claim.  Finally, Defendant Alrajhi is not subject to personal jurisdiction in this Court: (1) under Fed. R. Civ. P. 4(k)(2) as alleged, because he resides in Virginia and is subject to the general jurisdiction of its courts; or (2) under D.C. Code § 13-423(a)(1), because his alleged acts of transacting business in the District could not have caused Plaintiff's alleged injury.

## II.   SUMMARY OF PLAINTIFF'S ALLEGATIONS CONCERNING THE STUDENT-DEFENDANTS

Plaintiff does not allege that any of the Student-Defendants intended to cause any type of harm, knew of any alleged intent to cause any harm by others, or indeed caused any type of harm to Plaintiff.  The only allegations concerning the Student-Defendants that relate to Plaintiff in any manner are that they all allegedly were asked, but failed, to locate the address of Plaintiff's wife, and that Alrajhi also failed in an alleged attempt to locate Plaintiff's address.  *See* Compl. ¶¶ 60, 64, 68, 167, 170, 171.  Although these allegations are in fact false, even if accepted as true, they are insufficient because responding to a request to locate someone is not tortious, much less criminal.

Nothing in the Complaint alleges that any of the Student-Defendants ever actually located Plaintiff or his wife or did anything that harmed Plaintiff or anyone else.  The Complaint does not allege that any inquiries by any of the Student-Defendants in the United States yielded information that assisted anyone in locating, much less harming, Plaintiff.  Instead, the Complaint alleges that Plaintiff later was found in Canada through the independent efforts of others (*id.* ¶¶ 174, 187), and that a plot to kill Plaintiff in Canada subsequently was developed by others, long after the Student-Defendants had finished their unsuccessful inquiries.  *Id.* ¶ 220.  Plaintiff does not allege that the Student-Defendants knew about that alleged plot, or about any other effort to harm Plaintiff.

There is no allegation that the Student-Defendants were involved in, or aware of, in any way, the alleged efforts of the "Tiger Squad" in Canada.  To the contrary, the Student-Defendants

are alleged to have undertaken all of their actions in 2016 and 2017 (*id*. ¶¶ 57, 162, 167-72) well in advance of the alleged "Tiger Squad's October 2018 travel to Canada."  *Id*. ¶ 57.

Plaintiff alleges that the acts of these Student-Defendants and all other "Defendants' acts were committed under actual or apparent authority, or color of law, of the government of Saudi Arabia." *Id*. ¶¶ 239, 260.  Plaintiff also alleges that the Student-Defendants, when each purportedly was attempting to locate Plaintiff's wife and/or Plaintiff in the U.S., were all: (1) "[a]cting at the direction of Defendants bin Salman and Alasaker" (*id*. ¶¶ 60, 64, 68); and (2) acting as an "agent of Defendant bin Salman."  *Id*. ¶¶ 97, 167, 170, 171.  However, the Complaint fails to allege any facts that, if true, would establish an agency relationship between the Student-Defendants and the Crown Prince, any other Saudi official, or the Saudi government.

The Student-Defendants adopt and incorporate by reference the "Summary of Allegations and Materials Cited in the Complaint" in the Motion to Dismiss of Mohammed Bin Salman Bin Abdulaziz Al Saud ("Crown Prince's Motion to Dismiss"), ECF No. 58, at 4-10.

## III.   LEGAL STANDARDS

The Student-Defendants make a facial challenge both to subject matter jurisdiction and to the legal sufficiency of the claims against them.  "A motion to dismiss under Rule 12(b)(1) challenges the court's jurisdiction to hear a claim and may raise a 'facial' or a 'factual' challenge to the court's jurisdiction . . . . A facial challenge asks whether the plaintiff has alleged facts sufficient to establish the court's jurisdiction . . . "  *Gore v. Wilkie*, No. 19-1134 (RDM), 2020 U.S. Dist. LEXIS 94792, at *7-*8 (D.D.C. May 31, 2020) (internal quotations omitted).

Concerning Plaintiff's failure to state a claim, this Court recently held:

To survive a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." . . . . A claim is facially plausible when the pleading "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." . . . A court must construe the complaint in the light most favorable to the plaintiff,

but the plaintiff "must furnish 'more than labels and conclusions' or a 'formulaic recitation of the elements of a cause of action.'"

*Spence v. Wolf*, No. 19-2919 (TJK), 2020 U.S. Dist. LEXIS 190943, at *6 (D.D.C. Oct. 15, 2020)

(quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

555, 570 (2007); *Tyler v. D.C. Hous. Auth.*, 113 F. Supp. 3d 88, 90 (D.D.C. 2015)).

Finally, as to Alrajhi's motion to dismiss for lack of personal jurisdiction, Plaintiff "bears

the burden of making 'a *prima facie* showing of the pertinent jurisdictional facts' . . .. A plaintiff

'must allege specific acts connecting [each] defendant with the forum' . . . . Factual disputes must

be resolved in favor of the plaintiff, but the Court need not accept unsupported inferences."

*Bernhardt v. Islamic Republic of Iran*, No. 18-2739 (TJK), 2020 U.S. Dist. LEXIS 214185, at *6-

*7 (D.D.C. Nov. 16, 2020) (quoting *Livnat v. Palestinian Auth.*, 851 F.3d 45, 56-57 (D.C. Cir.

2017); *IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 108 (D.D.C. 2018); *Second Amendment

Found. v. U.S. Conf. of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001)).

## IV. THE COURT LACKS JURISDICTION OVER THE ATS CLAIM AGAINST THE STUDENT-DEFENDANTS BECAUSE PLAINTIFF DOES NOT PLEAD ANY VIOLATION OF INTERNATIONAL LAW BY THEM.

Plaintiff's claim under the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS"), does not state a

principal violation of the ATS by the Student-Defendants or provide jurisdiction over the claims

against them[1], because the ATS provides no cause of action for conduct, as alleged here, that: (1)

does not identify <u>any</u> intent to violate, or knowledge regarding a violation of, international law;

---

[1] In an ATS case, a failure to plead a violation of international law is both a failure to establish subject-matter jurisdiction and a failure to state a claim.  *See Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 515 (D.C. Cir. 2018); *Doe v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 28 (D.D.C. 2005) ("*Exxon I*"), *aff'd in part, rev'd in part on other grounds*, 654 F.3d 11 (D.C. Cir. 2011); *Mastafa v. Chevron Corp.*, 770 F.3d 170, 186 (2d Cir. 2014).

(2) does not violate international law; and (3) constitutes, in the most generous reading, a tangential involvement in a non-actionable "attempt" to violate international law.

The ATS grants federal courts jurisdiction only over "'a relatively modest set of actions alleging violations of the law of nations.'" *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1397 (2018) (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 720 (2004)). The ATS creates jurisdiction only for the violation of "a narrow class of international norms" that are "specific, universal, and obligatory" and have "definite content and acceptance among civilized nations." *Sosa*, 542 U.S. at 729, 732.

### A.  PLAINTIFF ALLEGES NO INTENT TO COMMIT, OR KNOWLEDGE OF, A VIOLATION OF INTERNATIONAL LAW.

Plaintiff does not establish jurisdiction under the ATS because he does not allege that the Student-Defendants sought to harm, sought to help anyone else harm, or even knew of anyone's alleged intent to harm Plaintiff. Accordingly, Plaintiff's allegations state no violation of international law. "[T]he ATS, unlike traditional tort law, only recognizes a small number of particularly egregious intentional torts—those committed in violation of the law of nations." *Al Shimari v. CACI Premier Tech., Inc.*, 324 F. Supp. 3d 668, 700 (E.D. Va. 2018) (emphasis added); *see also Mastafa*, 770 F.3d at 191-92, 194 (noting "the lack of a sufficient international consensus 'for imposing liability on individuals who *knowingly* (but not purposefully) aid and abet a violation of international law,'" and the same is true for "conspiracy liability"; and holding that "[b]ecause the complaint fails plausibly to plead that defendants' conduct related to aiding and abetting the alleged violations of customary international law was intentional, that conduct cannot form the basis for our jurisdiction,[under the ATS]") (quoting *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009)). Violations of international law thus require an element missing here—intent. For example:

As stated in article 30, unless otherwise provided, a person shall be criminally responsible and liable for punishment for a crime within the jurisdiction of the Court only if the material elements are committed <u>with intent and knowledge</u>. Where no reference is made in the Elements of Crimes to a mental element for any particular conduct, consequence or circumstance listed, it is understood that the relevant mental element, i.e., <u>intent, knowledge or both</u>, set out in article 30 applies.

INTERNATIONAL CRIMINAL COURT, ELEMENTS OF CRIMES (2011) (emphasis added).[2]   The Complaint also fails to allege any facts that would plausibly establish that any of the Student-Defendants' alleged conduct was done with "knowledge that [it would] assist" an attempt on Plaintiff's life.  *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 34 (D.C. Cir. 2011) ("*Exxon II*"), *overruled in part on other grounds*.  None of the Student-Defendants is alleged to have known about the alleged attempt to kill Plaintiff in Canada.  And if Plaintiff were to argue that the Student-Defendants should have known that their conduct was part of an alleged murder plot, that "w[ould] not suffice in this context" because "actual knowledge" is required.  *Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84, 109 (D.D.C. 2017), *vacated in part on other grounds*, 285 F. Supp. 3d 240 (D.D.C. 2018).[3]

---

[2] This can be found at: https://www.icc-cpi.int/NR/rdonlyres/336923D8-A6AD-40EC-AD7B-45BF9DE73D56/0/ElementsOfCrimesEng.pdf.  *See also id.* at Article 7(1)(f) (the crime against humanity of torture requires that "[t]he perpetrator <u>knew</u> that the conduct was part of or intended the conduct to be part of a widespread or systematic attack directed against a civilian population." (emphasis added)); *id.* at Article 7(1)(i) (the crime against humanity of enforced disappearance of persons requires that "[t]he perpetrator knew that the conduct was part of or intended the conduct to be part of a widespread or systematic attack directed against a civilian population").  *See also* Restatement (Third) of Foreign Relations Law § 702 ("Torture has been defined as 'any act by which severe pain or suffering, whether physical or mental, is <u>intentionally</u> inflicted by or at the instigation of a public official on a person for such purposes as obtaining from him or a third person information or confession, punishing him for an act he has committed or is suspected of having committed, or intimidating him or other persons . . . . ") (emphasis added) (internal quotation omitted).

[3] The Complaint makes conclusory allegations "[o]n information and belief" that every U.S.-based defendant "was aware of the harm that would result to [Aljabri] should their efforts to locate him be successful."  Compl. ¶ 164.  But these are "mere conclusory statements," not "factual content," and so must be disregarded on a motion to dismiss.  *See Iqbal*, 556 U.S. at 678.  The Complaint fails to allege such knowledge because it does not allege any facts from which the Court could

**B.    PLAINTIFF ALLEGES NO VIOLATION OF INTERNATIONAL LAW.**

Plaintiff's ATS claim also fails because the ATS does not recognize "attempted" violations of international law, and the only purported violation of international law alleged in the Complaint is an "attempted extrajudicial killing."  *See* Compl. ¶ 268.  Accordingly, Plaintiff's unsupported allegations of "attempted" murder do not state a claim or establish jurisdiction under the ATS.  *See Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 36-37 (D.D.C. 2010) (holding that one of "two features of plaintiff's ATS claim—that it is based on a threat of a future extrajudicial killing, not an actual extrajudicial killing, . . . render[s] plaintiff's ATS claim fundamentally distinct from all extrajudicial killing claims that courts have previously held cognizable under the ATS"; and also that "there is no basis for the assertion that the threat of a future state-sponsored extrajudicial killing—as opposed to the commission of a past state-sponsored extrajudicial killing—constitutes a tort in violation of the 'law of nations.'").

The ATS provides jurisdiction exclusively "for a <u>tort only</u>, committed in violation of the law of nations or a treaty of the United States," 28 U.S.C. § 1350 (emphasis added), that fits within "a very limited category defined by the law of nations and recognized at common law."  *Sosa*, 542

---

conclude that any of the Student-Defendants knew of any plan of any of the other Defendants to harm Plaintiff—and any such allegation would be implausible in any event because Plaintiff alleges that the plan to harm Plaintiff was formulated long after the Student-Defendants had completed all of their alleged actions, (Compl. ¶ 220).  *See G&G Closed Cir. Events, LLC v. 19th & K, Inc.*, No. 19-1422 (DLF), 2020 U.S. Dist. LEXIS 25921, at *11 (D.D.C. Feb. 14, 2020) ("Allegations made on information and belief will generally not be enough, even at the default judgment stage, to allow the imposition of vicarious liability.") (internal citation omitted); *J & J Sports Prods. v. Micherie, LLC*, No. 17-1150 (KBJ), 2018 U.S. Dist. LEXIS 166328, at *15 (D.D.C. Sept. 27, 2018) ("'[C]onclusory allegations on information and belief' like those cited above from the Complaint 'will generally not be enough, even at the default judgment stage' to support liability.") (quoting *Joe Hand Promotions, Inc. v. Yakubets*, 3 F. Supp. 3d 261, 301 (E.D. Pa. 2014)); *Zelaya v. UNICCO Serv. Co.*, 587 F. Supp. 2d 277, 287-88 (D.D.C. 2008) (finding pleadings insufficient where "plaintiff fail[ed] to offer any information or facts—such as who spoke to Cavalier, when, and what was said—to inform this belief aside from rank speculation that the only explanation for" the alleged conduct was an intent to defame).

U.S. at 712.  However, attempted murder is not a tort of any kind.  "[N]o court has ever found that the threat of a future extrajudicial killing is a recognized tort, much less one that violates the present-day law of nations." *Al-Aulaqi*, 727 F. Supp. 2d at 38; *see also Sussman v. Wells Fargo Bank, N.A.*, No. 2:16-01094 (JNP-PMW), 2017 U.S. Dist. LEXIS 152433, at *12 (D. Utah Aug. 31, 2017) ("Attempted murder is a crime, not a tort.  Consequently, this 'claim' must fail as a matter of law and should be dismissed.").  Plaintiff's ATS claim, which is based entirely on an unsuccessful attempt, is legally deficient and should be dismissed.

Plaintiff's ATS claim also fails because the Student-Defendants' alleged inquiries about the location of Plaintiff's wife, and Alrajhi's supposed inquiries about Plaintiff's location, bear no causal relationship to Plaintiff's purported injury.  Plaintiff's legal claims are based on an alleged 2018 attempt to kill him in Canada.  *See* Compl. ¶¶ 255, 268, 275.  Plaintiff does not, and could not plausibly, allege that the Student-Defendants' failed 2016-2017 search efforts in the U.S. (*id.* ¶¶ 167, 169-71, 173) injured him in any way, or facilitated an alleged subsequent attempt to kill him in Canada.  Instead, Plaintiff alleges that other defendants later located him in Canada through one defendant's trip to Toronto, and through an electronic message sent from Saudi Arabia to Canada that planted malware on Plaintiff's phone.  *Id.* ¶¶ 174, 221.  Even taking Plaintiff's allegations as true, the alleged attempt on Plaintiff's life in Canada would have proceeded in the same way without any alleged failed inquiries by these Student-Defendants in the U.S. Accordingly, none of the Student-Defendants' alleged conduct could have had a "substantial effect" on the alleged primary tort—the attempted killing—required to bring it within the ambit of the ATS.  *Exxon II*, 654 F.3d at 34.  Nor is there any plausible basis to infer that the alleged attempt on Plaintiff's life in Canada "probably would not have occurred absent [the Student-Defendants'] conduct." *Ofisi*, 278 F. Supp. 3d at 109.  Accordingly, Plaintiff's ATS claim also fails because the

Student-Defendants' alleged conduct cannot have <u>caused</u> the alleged subsequent attempt to kill him. *See Nahl v. Jaoude*, No. 15-9755 (LGS), 2018 U.S. Dist. LEXIS 100056, at *13-14 (S.D.N.Y. June 14, 2018) (rejecting the argument that "liability for aiding and abetting under the ATS" does not include "causation and injury," which are "necessary predicates to any tort liability"); *Bieregu v. Ashcroft*, 259 F. Supp. 2d 342, 353 (D.N.J. 2003) (holding that "[t]he AT[S] requires the commission of a tort in order to impose liability"; and that the plaintiff "cannot state a tort claim in the absence of a showing of 'causation' and 'damages,' necessary elements of any tort claim").[4]

## V.   THE COMPLAINT DOES NOT STATE A CLAIM UNDER THE TVPA.

Plaintiff's allegations that the Student-Defendants were involved in an unsuccessful "attempt" to kill Plaintiff, without causing physical injury and without their intending to do so, all independently fail to state a violation of the Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992), reprinted in 28 U.S.C. § 1350 note ("TVPA"). Plaintiff fails to state a claim for violation of the TVPA for three independent reasons: (1) he alleges only an unsuccessful attempt to kill him; (2) he does not allege that the Student-Defendants had a deliberate intent to harm him; and (3) he claims only emotional, and not physical, injury.

### A.   PLAINTIFF MERELY ALLEGES A NONACTIONABLE UNSUCCESSFUL ATTEMPT.

Plaintiff's TVPA claim, which is based solely on the alleged "attempted extrajudicial killing of" Plaintiff (Compl. ¶¶ 255-66), does not state a claim for violation of the TVPA because it does not allege an actual "extrajudicial killing," as required by the statute. *See* TVPA § 3(a). The TVPA itself makes that critical distinction:

---

[4] The Student-Defendants also adopt and incorporate by reference the ATS arguments made by the Crown Prince in Crown Prince's Mot. to Dismiss, ECF No. 58, Section III.B.

> [T]he term "extrajudicial killing" means <u>a deliberated killing</u> not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

*Id.* (emphasis added).

The plain language of the statute thus establishes that a failed attempt to kill obviously is not an "extrajudicial killing." *Id.* As the D.C. Circuit has explained, the definition of "extrajudicial killing" "contains three elements: (1) <u>a killing</u>; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." *Owens v. Republic of Sudan*, 864 F.3d 751, 770 (D.C. Cir. 2017) (emphasis added) (construing the "killing" element of the TVPA to mean action that "caused the death" of a person), *vacated on other grounds* (damages), 140 S. Ct. 1601 (2020); *see also Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 26 (D.D.C. 2017) (plaintiffs were "former sailors who were injured while on the Cole" when it was bombed; "plaintiffs in this case do not allege torture or extrajudicial killing").

Decisions that have permitted claims for unsuccessful attempted murder based on the TVPA definition of "extrajudicial killing" all are readily distinguishable. First, the only decisions from this District allowing a remedy for personal injuries arising from an attempted "extrajudicial killing" arose under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1602-1611 ("FSIA"). While the FSIA incorporates the TVPA's definition of "extrajudicial killing,"[5] the FSIA allows recovery broadly for "personal injury," whereas the TVPA allows recovery only for "wrongful death" in connection with an "extrajudicial killing." *See* TVPA § 2(a)(2) (providing that a person who "subjects an individual to extrajudicial killing shall . . . be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action <u>for</u>

---

[5] *See*, *e.g.*, *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 97 (D.D.C. 2017) ("Congress . . . define[d] the terms 'torture' and 'extrajudicial killing' for purposes of [the FSIA] as they are defined in the [TVPA]." (quoting 28 U.S.C. § 1605A(h)(7)).

<u>wrongful death</u>") (emphasis added).  A "wrongful death" requires an actual death to occur, and a decedent cannot bring a wrongful death action in his own name.  *See*, *e.g.*, D.C. Code § 16-2701 (2001).

Decisions in this District that allowed recovery for attempted killings under the TVPA's definition of "extrajudicial killing" thus exclusively did so under a statute (the FSIA) that expressly allows recovery for personal injuries, unlike the TVPA, which is applicable here.  *See Gill*, 249 F. Supp. 3d at 100 (noting that the FSIA allows recovery "for <u>personal injury</u> caused by an extrajudicial killing") (emphasis added); *see also Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 100 (D.D.C. 2019) (holding that the FSIA "provides a private right of action against a state sponsor of terrorism for <u>personal injury</u> caused by an extrajudicial killing") (emphasis added); *Salzman v. Islamic Republic of Iran*, No. 17-2475 (RDM), 2019 U.S. Dist. LEXIS 163632, at *46 (D.D.C. Sept. 25, 2019) ("[T]he [FSIA] state-sponsored terrorism exception applies because Iran provided material support for the 'act' of 'extrajudicial killing,' 28 U.S.C. § 1605A(a)(1), but none of the . . . plaintiffs were, in fact, killed . . . . [T]hat does not defeat jurisdiction because the [FSIA] exception applies to claims for '<u>personal injury</u> or death . . . caused by an act of . . . extrajudicial killing'") (emphasis added); *Cohen v. Islamic Republic of Iran*, No. 17-1214 (JEB), 2019 U.S. Dist. LEXIS 115278, at *6 (D.D.C. July 11, 2019) ("FSIA provides federal courts with subject-matter jurisdiction over suits against a foreign state . . . for 'personal injury or death that' . . . 'was caused' . . . 'by an act of . . . extrajudicial killing'"; "this district's prior rulings hold that the <u>FSIA terrorism exception</u> encompasses attempted extrajudicial killings") (emphasis added) (citing *Gill* and a prior decision in *Cohen*); *Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1, 14 (D.D.C. 2011) ("The FSIA . . . strips immunity 'in any case . . . in which money damages are sought against a foreign state for <u>personal injury</u> or death that was caused by an act of . . . extrajudicial killing.'")

(emphasis added); *Haim v. Islamic Republic of Iran*, 784 F. Supp. 2d 1, 11 (D.D.C. 2011) (same); *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 360 (D.D.C. 2020) (citing cases and noting that "[s]everal decisions from this district have held that individuals who are injured but not killed in an attack that results in the death of others may recover for their injuries under [FSIA] § 1605A").

Moreover, unlike under the TVPA, "ambiguities" in the FSIA's terrorism exception are interpreted "flexibly and capaciously." *Van Beneden v. Al Sanusi*, 709 F.3d 1165, 1167 (D.C. Cir. 2013). Courts in this District allowing claims under the FSIA for "attempted extrajudicial killings" have cited this interpretive flexibility when permitting such claims. *See, e.g.*, *Karcher*, 396 F. Supp. 3d at 57-58 ("The FSIA's ambiguities should be 'interpret[ed] . . . flexibly and capaciously' to fulfill Congress's solicitude for those injured in terrorist attacks.") (quoting *Van Beneden*, 709 F.3d at 1167).

Further, the only decisions that appear to have allowed claims of an attempted extrajudicial killing to proceed under either the TVPA or the FSIA have involved a direct physical injury to the plaintiffs or actual deaths of others, which are not alleged here. *See Karcher*, 396 F. Supp. 3d at 17, 58 (allowing an attempted extrajudicial killing case to proceed under the FSIA where "Plaintiffs . . . were injured in the . . . attacks"); *Salzman*, 2019 U.S. Dist. LEXIS 163632, at *46 (noting in an FSIA case that "there is no doubt that the Ben Yehuda Street attack was an 'act of extrajudicial killing'—five people died"); *Cohen*, 2019 U.S. Dist. LEXIS 115278, at *2 (noting in an FSIA case that one plaintiff "was hit by shrapnel"; and three other plaintiffs "were struck by glass and thrown around the bus"); *Boniface v. Viliena*, 338 F. Supp. 3d 50, 67-69 (D. Mass. 2018) (allowing an attempted extrajudicial killing claim to go forward in a TVPA case where the defendants "pistol-whipped" a plaintiff, "multiple individuals beat him on his sides and chest and

threw him on the floor, and . . . one individual restrained [another plaintiff] while three others beat

him on his head and the sides of his body"); *Gill*, 249 F. Supp. 3d at 91 (noting in an FSIA case

that "plaintiff was shot and injured"); *Warfaa v. Ali*, 33 F. Supp. 3d 653, 666 (E.D. Va. 2014)

(noting in a TVPA case that the "defendant personally participated in [the] plaintiff's torture and

further attempted to kill him by shooting him five times"), *aff'd*, 811 F.3d 653 (4th Cir. 2016);

*Doe*, 808 F. Supp. 2d at 14 (noting in an FSIA case that the subject bombings "killed and attempted

to kill individuals on site"); *Haim*, 784 F. Supp. 2d at 7 (noting in an FSIA case that the attack

"kill[ed] a U.S. citizen and seven Israelis," and plaintiff's "body and skull were punctured by

shrapnel in several locations, and other parts of his body were cut and bleeding"); *Doe v. Constant*,

No. 04-10108 (SHS), 2006 U.S. Dist. LEXIS 101961, at *8-9, *13 n.3 (S.D.N.Y. Oct. 24, 2006)

(noting in a TVPA case one plaintiff "was the victim of a brutal stabbing" and "suffered un-

sutured, nearly fatal stab wounds to her breast, neck and cheek"; the other plaintiff "was raped . .

. in front of [her] children"; "attacked by masked men carrying guns and was shot in the leg";

"beaten, blindfolded"; and "left at . . . a location allegedly used as a dumping ground . . . for

bodies"), *aff'd*, 354 F. App'x 543 (2d Cir. 2009).  Plaintiff alleges no such type of physical injury,

and, in any event, the TVPA, unlike the FSIA, does not allow recovery for personal injuries.[6]

### B.   PLAINTIFF ALLEGES NO DELIBERATED INTENT TO HARM HIM.

Additionally, Plaintiff's TVPA claim fails because it fails to allege, and could not plausibly

allege, that the Student-Defendants had a "deliberated" intent to cause harm to Plaintiff as required

by TVPA section 3(a).  "Deliberation means an intent to kill carried out by the defendant in a cool

state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose

---

[6] The Student-Defendants also adopt and incorporate by reference the arguments of the Crown Prince with respect to Plaintiff's TVPA claim.  *See* Crown Prince's Mot. to Dismiss, ECF No. 58, Section III.A.

and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation." *State v. Hamlet*, 321 S.E.2d 837, 842-43 (N.C. 1984).  Plaintiff's TVPA claim fails because the Complaint does not allege any "intent to kill" by these Student-Defendants, it merely alleges that they attempted to locate Plaintiff or his wife, but failed to do so.

These Student-Defendants have been dragged into Plaintiff's tale solely to try to show some conduct occurring within the U.S., with complete disregard of the obvious temporal inconsistency and without alleging any actual facts plausibly suggesting they did anything unlawful or intended any harm.  Plaintiff's wild accusations and bizarre labels already have caused the Student-Defendants and their families severe reputational, financial, and emotional injury.  The Court should not allow Plaintiff to prolong and compound that injury by indulging Plaintiff's entirely conclusory allegations that address-inquiries by the Student-Defendants were part of a government-sponsored murder plot.  *See Morrow v. U.S.*, 723 F. Supp. 2d 71, 77 (D.D.C. 2010) (holding that, when "'more likely explanations' than those alleged by the plaintiff exist, the Court should be wary of finding that the plaintiff's allegations have sufficiently nudged the claims into the realm of plausibility") (quoting *Iqbal*, 556 U.S. at 681).  Even crediting Plaintiff's allegations that the Student-Defendants sought contact information for Plaintiff's wife or Plaintiff himself, there are far more likely explanations for why they would do so that have nothing to do with a government plot to kill him, including explanations that Plaintiff himself pleads.  *E.g.*, Compl. ¶¶ 167, 169-71 (alleging that the Student-Defendants sought contact information to discuss a marriage).  There simply are no factual allegations anywhere in the Complaint that the Student-Defendants had a deliberated intent to harm the Plaintiff.

### C.   PLAINTIFF CLAIMS ONLY EMOTIONAL, AND NOT PHYSICAL, INJURY.

On the fundamental issue of lack of physical harm to Plaintiff, the recent decision in *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323 (D.D.C. May 31, 2020), is particularly instructive. Similar to Plaintiff's allegations here, a subset of the plaintiffs there (the "Parneses") alleged that a "rocket attack . . . resulted in emotional injury to" the Parneses.  *Id.* at 337.  In that case, the Plaintiff's home was actually hit by the rocket attack, which caused "heavy damage" to it.  *Id.* at 353.  Like Plaintiff here, the Parneses suffered no physical injuries, but instead sought recovery for emotional injuries.  *Id.*; Compl. ¶¶ 149, 243.  As in the present case, the plaintiffs in *Force* alleged that they were experiencing "'symptoms of depression, anxiety and PTSD following the shock and stress' of the incident."  *Force*, 464 F. Supp. 3d at 353; *see* Compl. ¶ 277 (alleging the Plaintiff "has suffered from anxiety, insomnia, increased hypertension, fatigue, and headaches as a result of Defendants' conduct").

Applying the TVPA's definition of "extrajudicial killing," the court held that "<u>because the Parneses' claims are for emotional harms arising out of an attempted extrajudicial killing in which no one was injured (and none of the Parneses were even placed [in] physical peril), they cannot state a claim for recovery for their injuries</u>."  *Force*, 464 F. Supp. 3d at 358 (emphasis added). Scrutinizing the plaintiffs' allegations, the court held that:

> The Court is . . . unpersuaded on the current record and briefing that the FSIA's terrorism exception [adopting the TVPA's definition of "extrajudicial killing"] should be construed to encompass attempted extrajudicial killings in which <u>no one suffered physical injuries and no one was even placed in imminent apprehension of physical harm</u>.  Permitting recovery under such circumstances would open the door to a cascade of claims for emotional distress that are unmoored to the types of grievous injury, death, or imminent, life-altering peril resulting from the uniquely heinous acts that Congress elected to redress: torture, extrajudicial killing, aircraft sabotage, and hostage taking.

*Id.* at 363 (emphasis added) (citing 28 U.S.C. 1605A(a)(1)).  Because Plaintiff here similarly alleges only emotional, and not physical, harm, Plaintiff fails to state a claim under the TVPA.

## VI.   PLAINTIFF FAILS TO STATE A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

The Student-Defendants adopt and incorporate by reference the arguments made at Crown Prince's Motion to Dismiss, ECF No. 58, Sections III.C.1, 2, & 4, concerning: (1) Plaintiff's failure to state a claim for Intentional Infliction of Emotional Distress under either Saudi Arabian or D.C. law; and (2) the lack of a basis for the Court to exercise supplemental jurisdiction over Plaintiff's Intentional Infliction of Emotional Distress claim.  The Student-Defendants also adopt and incorporate by reference the arguments made at the MiSK Foundation's Motion to Dismiss, Section IV concerning Plaintiff's failure to state a claim for Intentional Infliction of Emotional Distress.

## VII.   THE COMPLAINT DOES NOT STATE A CLAIM FOR LIABILITY OF THE STUDENT-DEFENDANTS UNDER THEORIES OF AIDING AND ABETTING OR CONSPIRACY.

The limited allegations against the Student-Defendants do not provide a legally sufficient basis for secondary-liability claims against them under theories of conspiracy or aiding and abetting.  As this Court has recognized, *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) provides "the proper legal framework for how . . . Federal civil aiding and abetting and conspiracy liability claims should function."  *Bernhardt v. Islamic Republic of Iran*, No. 18-2739 (TJK), 2020 U.S. Dist. LEXIS 214185, at *14-*15 (D.D.C. Nov. 16, 2020) (internal quotations omitted).  Thus, *Halberstam* applies to any aiding and abetting or conspiracy theories under either the ATS or the TVPA.

There is no liability for aiding and abetting under the TVPA in this Circuit.  *See Exxon II*, 654 F.3d at 33-34 (noting that, while "Congress can provide for aiding and abetting liability absent

direct liability," there is no "support [for] the inference that Congress so provided in the TVPA"; and there is "no . . . provision in the TVPA that colorably provides for such liability"); *see also Sikhs for Just. v. Nath*, 893 F. Supp. 2d 598, 618 (S.D.N.Y. 2012) ("The text of the TVPA is silent as to aiding and abetting, and such silence should not be interpreted as granting and authorizing that liability.").  As to the ATS claim, "[a]iding-abetting includes the following elements: (1) the party whom the defendant aids must perform <u>a wrongful act that causes an injury</u>; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) <u>the defendant must knowingly and substantially assist the principal violation</u>." *Halberstam*, 705 F.2d at 477 (emphasis added) (citations omitted).

Similarly, for a civil conspiracy, unlike for criminal conspiracy, the plaintiff "must prove that <u>an unlawful overt act produced an injury</u> and damages." *Id*. (emphasis added).  "[A] conspiracy requires: an agreement to do an unlawful act or a lawful act in an unlawful manner; an overt act in furtherance of the agreement by someone participating in it; and <u>injury caused by the act</u>." *Id*. at 487 (emphasis added).

The standards for conspiracy liability are the same under the ATS and TVPA.  Thus, if Plaintiff's conspiracy theory fails under either statute, it must fail under both statutes.  *See Garcia v. Chapman*, 911 F. Supp. 2d 1222, 1240 (S.D. Fla. 2012) ("The elements of conspiracy . . . under the TVPA are the same as under the ATS . . . . For the same reasons that Plaintiffs state a claim of conspiracy under the ATS, Plaintiffs also state a claim of conspiracy under the TVPA.") (citing *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1158-59 (11th Cir. 2005); *In re Chiquita Brands Int'l, Inc.*, 792 F. Supp. 2d 1301, 1354 (S.D. Fla. 2011) (rejecting identical arguments made under the ATS and TVPA)).

Even assuming the availability of secondary-liability under the ATS and TVPA, no such claim can be stated against the Student-Defendants when there is no plausible allegation that they facilitated any other Defendant in an unlawful act that injured Plaintiff. First, the other Defendants did not cause physical injury to Plaintiff, and did not commit a primary violation of the ATS or the TVPA through an alleged "attempt" to kill Plaintiff. Second, the Student-Defendants allegedly did nothing more than unsuccessfully seek location information for Plaintiff's wife or for Plaintiff himself. Third, Plaintiff does not plausibly allege that the Student-Defendants entered an "agreement" with anyone else to harm Plaintiff. Fourth, there is no plausible allegation that a plot to harm Plaintiff depended heavily on the Student-Defendants' failed efforts to locate Plaintiff or his wife.

### A.    OTHER DEFENDANTS DID NOT PHYSICALLY INJURE PLAINTIFF OR COMMIT A PRIMARY VIOLATION OF THE ATS OR TVPA.

Plaintiff has not pleaded a claim for aiding and abetting a violation of the ATS or for conspiring to violate the ATS or TVPA because Plaintiff has not pleaded a primary violation of either the ATS or TVPA. *See supra* at Sections IV & V. Secondary liability for aiding and abetting only attaches if Plaintiff has adequately pleaded a primary violation of established international norms. *See Ofisi*, 278 F. Supp. 3d at 103 (to allege "secondary liability" under ATS, "the complaint must contain," *inter alia*, "a well-pled allegation of a primary violation of the law of nations"). For secondary liability, such as aiding and abetting, agency, or conspiracy, to attach, a primary tortfeasor must have committed a substantive underlying tort, not merely an attempted tort. "It is only where means are employed, or purposes are accomplished, which are themselves tortious, that the conspirators who have not acted but have promoted the act will be held liable." *Halberstam*, 705 F.2d at 477 (quoting WILLIAM L. PROSSER ON THE LAW OF TORTS § 46, at 293 (4th ed. 1971)); *Stutts v. De Dietrich Grp.*, No. 03-4058 (ILG), 2006 U.S. Dist. LEXIS 47638, at

*47 (E.D.N.Y. June 30, 2006) ("The required elements of a cause of action for aiding and abetting a tortfeasor under . . . federal common law" include "substantial assistance by the aider and abettor in the achievement of the primary violation.").  Here, the supposed purpose of killing Plaintiff is not alleged to have been "accomplished."  *See id.*  Thus, the Complaint with respect to the Student-Defendants improperly seeks to premise secondary liability on an attempted tort.  Because secondary liability requires a primary tortfeasor to commit a completed substantive tort, which is not alleged here, the Student-Defendants cannot be liable for aiding and abetting or conspiracy.  This principle, derived from *Halberstam*, precludes any "Federal civil aiding and abetting and conspiracy liability claims" against the Student-Defendants.  *See Bernhardt*, 2020 U.S. Dist. LEXIS 214185, at *14-15; *see also In re Ross Sys. Sec. Litig.*, No. 94-0017 (DLJ), 1994 U.S. Dist. LEXIS 21263, at *12 (N.D. Cal. July 21, 1994) ("The crime of conspiracy may be inchoate, but there is no corollary inchoate tort of conspiracy.  In civil cases conspiracy is a theory of liability available only when a completed tort exists.").

In short, Plaintiff's failure to state a claim for a principal violation of the TVPA cannot be overcome by an allegation of conspiracy.  *See Muchira v. Al-Rawaf*, No. 14-770 (AJT-JFA), 2015 U.S. Dist. LEXIS 49806, at *41 (E.D. Va. Apr. 15, 2015) ("Having concluded that Plaintiff's TVPA claims should be dismissed as a matter of law, Plaintiff's civil conspiracy claim predicated on the TVPA violations is, therefore, also dismissed."); *Johns v. Daniel*, No. 13-2666 (GHM), 2014 U.S. Dist. LEXIS 64848, at *8 (S.D. Tex. May 12, 2014) ("Because plaintiffs do not set forth facts giving rise to civil liability under the TVPA, it follows that they have not set forth facts giving rise to a criminal conspiracy to violate the TVPA.").

## B.   THERE IS NO ALLEGATION THAT THE STUDENT-DEFENDANTS COMMITTED AN UNLAWFUL ACT CAUSING INJURY.

Independent of Plaintiff's failure to allege a primary ATS or TVPA violation, his ATS and TVPA claims are legally insufficient because the Student-Defendants' alleged conduct plainly did not "'ha[ve] a substantial effect on the perpetration of the crime.'"  *Exxon II*, 654 F.3d at 33-34 (quoting *Halberstam*, 705 F.2d at 477; *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 277 (2d Cir. 2007)).  This element requires a "link or connection between the [alleged facilitative conduct] and the underlying crime" and a showing that the alleged violation "probably would not have occurred absent [that] conduct."  *Ofisi*, 278 F. Supp. 3d at 108-09.  No such things are alleged here.  There is no "link or connection between" the Student-Defendants' alleged failed efforts to locate Plaintiff or his family members in the U.S. and the alleged attempt on his life in Canada years later.  Further, it is implausible to suggest that the alleged attempt in Canada could not have happened without the Student-Defendants' <u>failure</u> to locate Plaintiff.  *See also Gang v. Zhizhen*, No. 3:04-1146 (RNC), 2017 U.S. Dist. LEXIS 162344, at *2 (D. Conn. Sept. 30, 2017) ("Plaintiffs' TVPA claims of aiding and abetting, agency and conspiracy fail to allege facts giving rise to a plausible claim even drawing all reasonable inferences in their favor.  Plaintiffs' allegations do not plausibly allege a connection between defendant's alleged misconduct and plaintiffs' injuries.").

Plaintiff's legal claims are all based on the alleged attempted killing, which occurred in Canada years after the Student-Defendants' failed inquiries.  *See*, *e.g.*, Compl. ¶¶ 255, 268, 275.  There is no allegation that Plaintiff suffered any injury in connection with the Student-Defendants' alleged limited and failed efforts to locate him in the U.S., much less that these limited efforts were a "but for" cause of any purported injury.  To the contrary, his allegations concede that the efforts to locate him in the United States were unsuccessful and unrelated to the malware that allegedly later found him in Canada.  *See id*. ¶¶ 167-171, 174, 221.  Even if an attempted extrajudicial killing

were actionable under the ATS or TVPA (it is not), the Complaint does not allege any conduct by the Student-Defendants that plausibly aided or abetted such an attempt because they did not <u>cause</u> it in any manner.

### C. THE STUDENT-DEFENDANTS ARE NOT ALLEGED TO HAVE HAD KNOWLEDGE OF ANYONE ELSE'S ATTEMPT TO HARM PLAINTIFF OR TO HAVE AGREED WITH THEM TO DO SO.

Plaintiff's ATS and TVPA claims also fail because conduct only aids and abets a violation of international law if done with "knowledge that [it] will assist the perpetrator in the commission of the crime." *Exxon II*, 654 F.3d at 33-34. This requires that the U.S.-based actor "actually knew" both (1) "the intent of the principal perpetrator" and (2) that his or her conduct would help the primary perpetrator commit the violation. *Ofisi*, 278 F. Supp. 3d at 109. The Complaint fails to allege any facts that would plausibly establish that any of the alleged Student-Defendants' conduct was done with "knowledge that [it] w[ould] assist" an attempt on Plaintiff's life. *Exxon II*, 654 F.3d at 34. None of the Student-Defendants is alleged to have known about the alleged attempt to kill Plaintiff in Canada. Plaintiff also does not allege that they should have known that their alleged conduct was part of an alleged murder plot, but even that "w[ould] not suffice in this context" because "actual knowledge" is required. *Ofisi*, 278 F. Supp. 3d at 109.

Moreover, there are no plausible allegations of conspiracy against the Student-Defendants because the Complaint does not allege "an agreement to do an unlawful act" between the Student-Defendants and anyone else, as is required for a conspiracy claim. *Halberstam*, 705 F.2d at 487; *see also Gang v. Zhizhen*, No. 3:04-1146 (RNC), 2018 U.S. Dist. LEXIS 168600, at *8-*9 (D. Conn. Sept. 30, 2018) (holding that where allegations "do not show that the defendant agreed, tacitly or otherwise, to" violate the TVPA, "plaintiffs have failed to sufficiently allege that the defendant is liable for violating the TVPA under a conspiracy theory"). The only alleged conduct by the Student-Defendants is that they attempted to identify (collectively) two addresses.

Plaintiff's secondary-liability theory fails because the Complaint does not allege, even generically, any "agreement" (by that or any other similar term) between any of the Defendants in the lawsuit, much less one into which the Student-Defendants entered that connected their alleged address inquiries to any plot to harm Plaintiff.  *Id*.  Plaintiff's secondary-liability theory further fails because the Complaint falls far short of "provid[ing] any indication of when or how such an agreement was brokered, or how the [Student-]Defendants specifically, as opposed to all the named defendants generally, were parties to an agreement."  *Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 113 (D.D.C. 2010); *see also Gang*, 2017 U.S. Dist. LEXIS 162344, at *3 ("Lacking is factual content that allows the reasonable inference that the defendant entered into an agreement to commit . . . acts made illegal by the TVPA.  The standard for alleging a conspiracy requires more than mere assertion of an agreement and actions in line with that agreement.") (citing *Iqbal*, 556 U.S. at 680; *Twombly*, 550 U.S. at 565 ("Although in form a few stray statements speak directly of agreement, on fair reading these are merely legal conclusions . . . . ")).

### D. THE ALLEGED PLOT TO HARM PLAINTIFF DID NOT DEPEND ON THE STUDENT-DEFENDANTS' FAILURE TO LOCATE PLAINTIFF OR HIS WIFE.

The alleged plot to kill Plaintiff was not in any manner dependent, much less "heavily dependent" (*Halberstam*, 705 F.2d at 488), on the Student-Defendants' alleged efforts.  There is no allegation that the alleged (and nonactionable) attempt to kill Plaintiff by other Defendants depended on, or benefited from, in the slightest manner, any action taken by the Student-Defendants.  Instead, the Complaint alleges that Plaintiff was later found in Canada, through means completely unrelated to the Student-Defendants' alleged earlier failed efforts in the United States (Compl. ¶¶ 174, 187), and that a plot to kill Plaintiff in Canada subsequently was planned by others without any alleged involvement of the Student-Defendants.  *Id*. ¶ 220.

## VIII.  THE COURT LACKS SUBJECT-MATTER JURISDICTION DUE TO FOREIGN-OFFICIAL IMMUNITY.

The Complaint fails to allege any specific facts that, if true, would establish an agency relationship between the Student-Defendants and the Crown Prince, other Saudi government officials, or the Saudi government.[7]  However, if the Court credits Plaintiff's allegations that the Student-Defendants were agents of the Crown Prince, other Saudi government officials, or the Saudi government, then the Student-Defendants are entitled to conduct-based official immunity.[8] Plaintiff alleges that all of the Student-Defendants' alleged conduct occurred while each of them was an agent of, and working at the direction of, senior foreign government officials, acting under the authority of the Saudi government.  Compl. ¶¶ 60, 64, 68, 97, 167, 170, 171, 239, 260.

### A.  THE ESTABLISHED POLICY OF THE STATE DEPARTMENT GOVERNS FOREIGN-OFFICIAL IMMUNITY.

The Student-Defendants' entitlement to immunity should be assessed under the elements required by "the established policy of the [State Department]," as prescribed by the Supreme Court in *Samantar v. Yousuf*, 560 U.S. 305, 312 (2010).[9]  Under the State Department test, foreign

---

[7] "[A]n agency relationship arises only where the principal 'has the right to control the conduct of the agent with respect to matters entrusted to him.'"  *Carswell v. Air Line Pilots Ass'n Int'l*, 540 F. Supp. 2d 107, 122 (D.D.C. 2008) (quoting Restatement (Second) of Agency § 14 (1958)); *see also* Restatement (Third) of Agency § 1.01 (2006) (an agency relationship is the "fiduciary relationship that arises when [a principal] manifests assent to [an agent] that the agent shall act on the principal's behalf and subject to the principal's control").  Plaintiff alleges no facts that plausibly suggest that the Student-Defendants manifested an assent to form an agency relationship with the Crown Prince.

[8] The Student-Defendants adopt and incorporate by reference the arguments of the Crown Prince concerning the conduct-based foreign official immunity.  ECF No. 58, Section II.A.2.

[9] Some decisions have applied the Restatement (Second) of Foreign Relations Law § 66(f) (1965) ("Second Restatement") to require, as a foundation for immunity, a finding that the lawsuit seeks to enforce a rule of law against the foreign state principal.  *See, e.g.*, *Lewis v. Mutond*, 918 F.3d 142, 145 (D.C. Cir. 2019), *cert. denied*, 207 L. Ed. 2d 1096 (2020).  Under this formulation, "[c]onduct-based immunity is afforded to 'any [p]ublic minister, official, or agent of the state with respect to acts performed in his official capacity if the effect of exercising jurisdiction would be to

official immunity turns on the nature of the alleged acts of the foreign officials or agents, not on the remedies sought by plaintiffs.  "The Executive Branch has repeatedly suggested immunity in suits filed against foreign officials in their personal capacities. . . .  None of those filings has hinted that conduct-based immunity might turn on a pleading distinction between personal- and official-capacity suits."  *Mutond*, U.S. Amicus Brief, at *14-15 (May 26, 2020) (citing examples).

The Executive Branch has numerous reasons for insisting on the State Department test, including that "personal damages actions against foreign officials could unduly chill the performance of their duties, trigger concerns about the treatment of United States officials abroad, and interfere with the Executive's conduct of foreign affairs—even when a foreign state itself could be sued."  *Id.* at *23.  However, under either the *Samantar/*State Department test or the Second Restatement test, this Court should dismiss the Student-Defendants on conduct-based immunity grounds.

No prior determination by the State Department is required.  *Samantar*, 560 U.S. at 311-12 (absent "recognition of the immunity by the Department of State," a district court has the "authority to decide for itself whether all the requisites for such immunity exist[]") (quoting *Ex parte Republic of Peru*, 318 U.S. 578 (1943)).  "In making that decision, a district court inquire[s]

---

enforce a rule of law against the state.'"  *Id.* (quoting the Second Restatement).  The Restatement test was applied in *Lewis* only because both parties "assume[d]" that the Second Restatement applied to foreign-official immunity, and the court "proceed[ed] on that understanding <u>without deciding the issue</u>."  *Id.* at 146 (emphasis added).  The Second Restatement test is inconsistent with "the established policy of the State Department" on foreign-official immunity determinations.  *Samantar*, 560 U.S. at 312.  Indeed, the Executive Branch recently expressly rejected the application of the Second Restatement to foreign-official immunity.  It is the formally-articulated policy of the Executive Branch that "<u>[r]eliance on the Second Restatement's provisions on foreign-official immunity as a conclusive statement of current law is misplaced</u>."  U.S. Amicus Brief, *Mutond v. Lewis*, 2020 U.S. S. CT. BRIEFS LEXIS 5337, at *20 (May 26, 2020) ("*Mutond*, U.S. Amicus Brief") (emphasis added).

'whether the ground of immunity is one which it is the established policy of the [State Department] to recognize.'" *Id.* at 312 (quoting *Republic of Mexico v. Hoffman*, 324 U.S. 30, 36 (1945)).  That rule holds true in cases in which the Executive Branch has not filed a suggestion of immunity, where courts must decide for themselves whether conduct-based immunity applies.[10]

### B.   THE STUDENT-DEFENDANTS ARE IMMUNE BECAUSE THEY WERE ALLEGEDLY AGENTS OF A FOREIGN STATE ACTING IN THEIR OFFICIAL CAPACITIES.

Accepting Plaintiff's conclusory allegations on their face, all of the Student-Defendants' alleged actions were taken "under actual or apparent authority, or color of law, of the government of Saudi Arabia" (Compl. ¶¶ 239, 260); as "agent[s] of" the Saudi Crown Prince (Compl. ¶¶ 97,

---

[10] *See Doe v. Buratai*, 318 F. Supp. 3d 218, 234 (D.D.C. 2018, *aff'd*, 792 F. App'x 6 (D.C. Cir. 2019) ("According to the common law, courts determine foreign-official immunity . . . 'in the absence of recognition of the immunity by the Department of State,'" by "inquir[ing] whether the ground of immunity is one which it is the established policy of the State Department to recognize.") (quoting *Samantar*, 560 U.S. at 312); *Doe v. Buratai*, No. 17-1033 (DLF), 2018 U.S. Dist. LEXIS 186101, at *8 (D.D.C. Oct. 31, 2018) (rejecting a request to alter the court's prior dismissal of a TVPA claim against foreign-government officials alleged to have "brutally tortured and killed peaceful protesters" after "consider[ing] the informed and long-standing views of the executive branch and its lawyers—and the compelling reasons for those views"); *Rishikof v. Mortada*, 70 F. Supp. 3d 8, 12 (D.D.C. 2014) ("Here, there is no indication that [defendant] or the Swiss Confederation requested a suggestion of immunity from the State Department.  Accordingly, this Court must determine whether 'all the requisites for immunity exist.'") (quoting *Samantar*, 560 U.S. at 312); *see also Dogan v. Barak*, 932 F.3d 888, 893 (9th Cir. 2019) ("'[I]n the absence of recognition of the immunity by the Department of State,' . . . [t]he court grants immunity . . . if it determines that 'the ground of immunity is one which it is the established policy of the [State Department] to recognize.'") (quoting *Samantar*, 560 U.S. at 312); *In re Terrorist Attacks on Sept. 11, 2001*, 122 F. Supp. 3d 181, 187 (S.D.N.Y. 2015) ("Neither [the foreign-official defendant] nor Saudi Arabia has sought a suggestion of immunity from the State Department, and the Executive Branch has not indicated a desire to weigh in.  Therefore, this Court 'must decide for itself whether it is the established policy of the State Department to recognize claims of immunity of this type.'") (quoting *Victory Transp. Inc. v. Comisaria General de Abastecimientos y Transportes*, 336 F.2d 354, 359 (2d Cir. 1964)); *Moriah v. Bank of China Ltd.*, 107 F. Supp. 3d 272, 278 n.42 (S.D.N.Y. 2015) (explaining that, because "[t]here is no indication that [the former official] or the State of Israel requested a Suggestion of Immunity from the State Department," the court "must  determine 'whether the ground of immunity is one which it is the established policy of the State Department to recognize'") (quoting *Samantar*, 560 U.S. at 312; citing *Hoffman*, 324 U.S. at 36).

167, 170, 171); and "at [his] direction."  Compl. ¶¶ 60, 64, 68.  Except for the "rule of law" requirement in the Second Restatement (addressed *infra* at VIII.C), neither the *Samantar* test, nor the Second Restatement test, requires anything more for an agent of a foreign official to receive conduct-based immunity.

The Student-Defendants are entitled to conduct-based immunity as foreign agents under the *Samantar* test, and under the first two prongs of the Second Restatement test, because Plaintiff alleges that: (1) each of them "is a public minister, official, or agent of" the Kingdom; and (2) their "acts were performed in [their] official capacity."  *Lewis*, 918 F.3d at 146 (citing Second Restatement; *Buratai*, 318 F. Supp. 3d at 230-31 & n.5).  "The State Department has consistently recommended conduct-based sovereign immunity when . . . the defendant acted in his official capacity on behalf of a recognized foreign government."  *In re Terrorist Attacks on Sept. 11, 2001*, 122 F. Supp. 3d 181, 187-89 (S.D.N.Y. 2015) (granting foreign-official immunity where "[n]either [the defendant] nor Saudi Arabia has sought a suggestion of immunity from the State Department, and the Executive Branch has not indicated a desire to weigh in" was "consistent with State Department policy" because "[t]he only non-conclusory allegation, regarding [defendant's conduct], is an action taken in his official—not his personal—capacity").

In *Samantar*, the Supreme Court held that the FSIA left undisturbed the Executive Branch's historical authority to determine the common-law immunity of foreign officials, including agents.  *See* 560 U.S. at 321-25.  The Supreme Court held that courts must follow the principles recognized by "the established policy of the State Department" governing conduct-based immunity.  *Id*. at 312 (quoting *Hoffman*, 324 U.S. at 36).  Continuously for more than two centuries up to the present, the Executive Branch has been very clear that its "established policy" is that the courts should only

consider whether defendants took the acts at issue in an official capacity for a recognized foreign nation.  The Executive Branch recently reiterated this principle:

> [C]onduct-based foreign-official immunity generally turns on whether the challenged action was taken in an official capacity.  That common-sense rule has a long pedigree in the Executive Branch . . . . And the official-capacity standard has remained consistent in the Executive Branch's numerous filings in lawsuits against foreign officials.

*Mutond*, U.S. Amicus Brief at *15 (citing examples dating from 1794 to 2019).

As the Executive Branch recently stated, "[t]he State Department's adherence to that principle is also reflected in its annual Digest of United States Practice in International Law."  *Id.* at *16 (citing Office of the Legal Advisor, U.S. Dep't of State, *Digest of United States Practice in International Law* (Carrielyn D. Guymon, ed. 2015) ("2015 State Dep't Digest"), Ch. 10, § B(3), at 426).[11]  That Digest includes the Executive Branch's statement that:

> As a general matter, under principles of customary international law accepted by the Executive Branch, a foreign official enjoys immunity from suit based upon acts taken in an official capacity . . . . [T]he Department of State could determine that a foreign official is not immune.  That would occur, for example, should the Department of State conclude that the conduct alleged was not taken in an official capacity, as might be the case in a suit challenging an official's purely private acts, such as personal financial dealings.

2015 State Dep't Digest, Ch. 10, § B(3), at 427 (excerpting U.S. suggestion of immunity in *Ben-Haim v. Edri*, No. L-3502-15 (Sup. Ct. N.J.)).  Here, Plaintiff alleges no act by the Student-Defendants that was in their personal capacities, as opposed to their alleged capacity as foreign agents.

The Executive Branch's articulation of conduct-based immunity principles historically has been adhered to in judicial proceedings, including in cases in which the Executive Branch expresses no view about a particular defendant's immunity.  *See supra* at 25 & n.10; *see also Jam*

---

[11] https://2009-2017.state.gov/documents/organization/258160.pdf

*v. Int'l Fin. Corp.*, 139 S. Ct. 759, 765-766 (2019) (noting that, under the common law of immunity, "[i]f the [State] Department did not make a recommendation, courts decided for themselves whether to grant immunity, although they did so by reference to State Department policy").

In *Rosenberg v. Lashkar-e-Taiba*, 980 F. Supp. 2d 336 (E.D.N.Y. 2013), *aff'd*, 577 F. App'x 22, 23 (2d Cir. 2014), for example, the court found that "[i]t is the position of the Executive Branch that defendants . . . , former Directors General of the [Pakistan government's intelligence agency], are entitled to foreign sovereign immunity under the common law as foreign officials who were sued in their official capacity for acts conducted in their official capacity.  Under the common law on sovereign immunity, the Court's inquiry ends here." *Id*. at 343 (emphasis added).

Similarly, in *Wickrematunge v. Rajapaksa*, the court held that: (1)"The State Department has not filed an SOI in this case; thus, the Court must determine whether Defendant is entitled to foreign official immunity . . ."; (2) "Plaintiff does not dispute that Defendant acted in his official capacity on behalf of the Sri Lankan government . . ."; (3) "This is the type of action by a foreign government official "which it is the established policy of the State Department to recognize" as a basis for immunity . . ."; and (4) "The fact that the State Department has not issued an SOI here does not change this analysis . . . Defendant is entitled to common law foreign official immunity." No. 2:19-02577 (RGK), 2019 U.S. Dist. LEXIS 226607, at *6-*8 (C.D. Cal. Oct. 17, 2019) (quoting *Matar v. Dichter*, 500 F. Supp. 2d 284, 287 (S.D.N.Y. 2007)) (emphasis added), *vacated on other grounds* (due to the intervening event of the defendant's accession to the Sri Lankan presidency), 2020 U.S. Dist. LEXIS 61930 (C.D. Cal. Apr. 8, 2020).  Accordingly, the actions of the Student-Defendants, as alleged agents of a foreign government acting in their official

capacities, are precisely the type of actions "which it is the established policy of the [State Department] to recognize.'"  *Samantar*, 560 U.S. at 312 (quoting *Hoffman*, 324 U.S. at 36).

The claims against the Student-Defendants must be dismissed on conduct-based immunity grounds regardless of their alleged rank or status, if the allegations that they were agents of the Crown Prince acting in his official capacity, or on behalf of the Kingdom, are credited.  For conduct-based immunity to apply: (1) "high-level decision-making authority is not . . . required"; (2) the courts have "not focused on the degree of an official's 'authority' to act on behalf of the foreign state because conduct-based immunity may extend to an agent of a foreign state"; (3) "the rank of the agent who performed the act" also is "not the determining factor"; and  (4) the courts focus instead on whether the alleged act itself "was performed on behalf of the foreign state and thus attributable to the [foreign] state."  *Buratai*, 318 F. Supp. 3d at 231 (quoting *Rishikof v. Mortada*, 70 F. Supp. 3d 8, 13 (D.D.C. 2014); citing *Samantar*, 560 U.S. at 321); *see also Yousuf*, 699 F.3d at 774 (conduct-based immunity "stands on the foreign official's actions, not his or her status"); *Matar*, 563 F.3d at 14 ("An immunity based on acts—rather than status—does not depend on tenure in office.").

As the federal courts have made clear, conduct-based immunity:

> stands on the foreign official's actions, not his or her status, and therefore applies whether the individual is currently a government official or not."  This immunity also extends beyond current and former government officials to individuals acting as an agent for the government.  It is "well-settled law that contractors and common law agents acting within the scope of their employment . . . have derivative sovereign immunity."  Conduct-based immunity depends on "the act itself and whether the act was performed on behalf of the foreign state and [is] thus attributable to the state."  Therefore, to determine the scope of a foreign official's immunity, the relevant inquiry focuses on the official's acts, and not the official's status.

*Moriah v. Bank of China, Ltd.*, 107 F. Supp. 3d 272, 277 (S.D.N.Y. 2015) (quoting *Yousuf v. Samantar*, 699 F.3d 763, 774 (4th Cir. 2012); *Rishikof*, 70 F. Supp. 3d at 13; citing *Heaney v. Gov't of Spain*, 445 F.2d 501, 504 (2d Cir. 1971); *Matar*, 563 F.3d at 14).

Accordingly, because the Student-Defendants are alleged to be agents of the Crown Prince or of the Kingdom, and their purported acts are alleged to have been "committed under actual or apparent authority, or color of law, of the government of Saudi Arabia," they are entitled to conduct-based immunity, regardless of their alleged rank or status.

### C.   THE STUDENT-DEFENDANTS ARE IMMUNE EVEN UNDER THE SECOND RESTATEMENT TEST.

Even if the Court evaluates Plaintiff's claims under the inapplicable Second Restatement test, the Student-Defendants are entitled to conduct-based immunity because the Complaint seeks to impose a "rule of law" on the Kingdom.  That is because Plaintiff seeks a declaration that the Student-Defendants acted unlawfully and on behalf of the Kingdom of Saudi Arabia.  Compl. ¶¶ 266, 272.  Such a declaration would impose a "rule of law" on Saudi Arabia by judging the conduct of "agents" of the Kingdom.  *See* Compl. ¶¶ 59, 89, 239, 260.

The Student-Defendants adopt and incorporate by reference the arguments made at Crown Prince's Motion to Dismiss, ECF No. 58, Section II.A.2.b concerning immunity from Plaintiff's claims under the Second Restatement.

### D.   THERE IS NO APPLICABLE EXCEPTION TO CONDUCT-BASED IMMUNITY.

As noted above, Plaintiff has failed to state a claim that the Student-Defendants have violated international law.  *See supra* at Section IV.  But even if he had, that would not negate conduct-based immunity, because alleged violations of *jus cogens* and other international criminal

laws do not negate such immunity from TVPA and ATS claims.[12]  As another judge of this Court

recently explained:

> [A] *jus cogens* exception would "eviscerate any protection that foreign official
> immunity affords" because an exception "'merges the merits of the underlying
> claim with the issue of immunity . . . .'  That is:
>
>> As soon as a party alleged a violation of a jus cogens norm, a court would
>> have to determine whether such a norm was indeed violated in order to
>> determine immunity—i.e., the merits would be reached.  When the foreign
>> official is the defendant, there will effectively be no immunity—a civil
>> action by definition challenges the legality of the official's acts.  But as the
>> D.C. Circuit has explained, "sovereign immunity is an immunity from trial
>> and the attendant burdens of litigation, and not just a defense to liability on
>> the merits."
>
> And "merging the question of immunity with the merits also undermines the
> original purpose of foreign official immunity: to avoid affronting the sovereignty
> of a foreign nation by passing judgment on their official government acts, which
> would inevitably happen if courts had to reach the merits to resolve immunity."

*Buratai*, 318 F. Supp. 3d at 234-35 (quoting *Giraldo*, 808 F. Supp. 2d at 250); *Belhas*, 515 F.3d at

1292-93; *Foremost-McKesson, Inc. v. Iran*, 905 F.2d 438, 443 (D.C. Cir. 1990); *Dogan v. Barak*,

No. 2:15-08130 (ODW), 2016 U.S. Dist. LEXIS 142055, at *32-33 (C.D. Cal. Oct. 13, 2016)); *see

also Dogan*, 2016 U.S. Dist. LEXIS 142055, at *33 ("[T]he Executive has made clear that it does

not recognize a *jus cogens* exception to immunity . . . .  Because the common law immunity inquiry

centers on what conduct the Executive has seen fit to immunize, . . . courts are not free to carve

out such an exception on their own.").

---

[12] *See Buratai*, 318 F. Supp. 3d at 234; *Belhas v. Ya'alon*, 515 F.3d 1279, 1281, 1287 (D.C. Cir.
2008)); *Giraldo v. Drummond Co., Inc.*, 808 F. Supp. 2d 247, 249-52 (D.D.C. 2011), *aff'd*, 493 F.
App'x. 106 (D.C. Cir. 2012); *Weixum v. Xilai*, 568 F. Supp. 2d 35, 36-39 (D.D.C. 2008); *Dogan*,
932 F.3d at 895-97; *Burma Task Force v. Sein*, No. 15-7772 (LGS), 2016 U.S. Dist. LEXIS 42326,
at *2-8 (S.D.N.Y. Mar. 30, 2016); *Tawfik v. Al-Sabah*, No. 11-6455 (ALC-JCF), 2012 U.S. Dist.
LEXIS 115957 (S.D.N.Y. Apr. 27, 2012), *report and recommendation adopted*, 2012 U.S. Dist.
LEXIS 115946 (S.D.N.Y. Aug. 16, 2012); *Matar*, 563 F.3d at 15.

Moreover, the TVPA did not generally abrogate common-law conduct-based immunity. "Courts routinely dismiss on grounds of immunity cases against . . . foreign officials who faced similar claims as those in this case." *Burma Task Force v. Sein*, 2016 U.S. Dist. LEXIS 42326, at *6-7 (dismissing a TVPA claim against the Foreign Minister of Myanmar based on alleged acts of genocide, torture, and arbitrary detention of plaintiffs) (citing *Am. Just. Ctr., Inc. v. Modi*, 4-7780 (AT), 2015 U.S. Dist. LEXIS 177427 (S.D.N.Y. Jan. 14, 2015); *Tawfik v. al-Sabah*, No. 11-6455 (ALC-JCF), 2012 U.S. Dist. LEXIS 115946 (S.D.N.Y. Aug. 16, 2012)).

"[T]he [TVPA] imposes liability on true outlaws, . . . but not individuals whose conduct is authorized" by the foreign sovereign, *Buratai*, 318 F. Supp. 3d at 237-38, as alleged here of the Student-Defendants. *See*, *e.g.*, Compl. ¶¶ 60, 64, 68, 239, 260. And it "leaves in place conduct-based immunity." *Buratai*, 318 F. Supp. 3d at 237-38. The court in *Buratai* held that the TVPA does not abrogate common-law immunity because "the [TVPA] does not 'speak directly' or make 'evident' that it abrogates common law foreign-official immunity." *Id*. at 237. The court observed that "[t]he Act evinces no decision to transform federal courts into a forum for adjudicating . . . disputes" that would "embroil[] the Judiciary in sensitive foreign policy matters." *Id*.

The TVPA did not abrogate the long-standing common-law immunity of foreign officials and agents because it is completely silent on the matter. The TVPA created a cause of action against "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation," "subjects an individual" to "torture" or "extrajudicial killing." TVPA § 2(a). The statute creates a cause of action only, and says nothing about immunities. It is a "longstanding . . . principle that '[s]tatutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles." *U.S. v. Texas*, 507 U.S. 529, 534 (1993). Thus, a "statute must 'speak directly' to the question addressed by the common law"

if it is to "abrogate a common-law principle." *Id.* That rule is particularly clear for common-law immunities, as the Supreme Court held: "[W]e 'proceed[] on the assumption that common-law principles of . . . immunity were incorporated into our judicial system and that they should not be abrogated absent clear legislative intent to do so.'" *Filarsky v. Delia*, 566 U.S. 377, 389 (2012).

Because the TVPA does not "speak directly to the question addressed by the common law" concerning conduct-based immunity for foreign officials and agents, the statute does not abrogate that doctrine. *See Texas*, 507 U.S. at 534. In *Dogan v. Barak*, 932 F.3d 888 (9th Cir. 2019), the Ninth Circuit accordingly rejected the argument that the TVPA abrogates common-law foreign-official immunity because the TVPA does not expressly address immunity, and thus, the principles of immunity "'were incorporated' into the TVPA." *Id.* at 895 (quoting *Filarsky*, 566 U.S. at 389).

It is well-established in American law that statutory causes of action, materially the same as those in the TVPA, coexist with common-law immunities. The best example is Section 1983, which—much like the TVPA—creates a right of action against "[e]very person who, under color of [law]," who deprives another of his or her legal rights. 42 U.S.C. 1983. Like the TVPA, Section 1983 "creates a species of tort liability that on its face admits of no immunities." *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976). But, because common-law immunity principles are "an entrenched feature" of American law, "'well grounded in history and reason,'" the Supreme Court repeatedly has held that they "were not somehow eliminated 'by covert inclusion in the general language' of § 1983." *Rehberg v. Paulk*, 566 U.S. 356, 361-62 (2012) (collecting cases).

The D.C. Circuit recognized this principle when it held, in *Manoharan v. Rajapaksa*, that Section 1983 is "the most analogous statute" to the TVPA, as it also "provides a cause of action against '[e]very person'" who engages in the proscribed conduct. *See* 711 F.3d 178, 180 (D.C. Cir. 2013) (quoting 42 U.S.C. § 1983). The D.C. Circuit noted that the Supreme Court "has held

that Congress did not intend that language to abrogate the preexisting common law of immunity applicable to executive officials." *Id.* (emphasis added) (citing *Malley v. Briggs*, 475 U.S. 335, 339-40 (1986)). The D.C. Circuit "likewise conclude[d] that the common law of head of state immunity survived enactment of the TVPA." *Id.* (citing *Matar*, 563 F.3d at 15; *Devi v. Rajapaksa*, 2013 U.S. App. LEXIS 11011 (2d Cir. Jan. 30, 2013)). The D.C. Circuit's reliance, in *Manoharan*, on *Matar v. Dichter* is instructive because, in that case, the Second Circuit rejected the argument that "any immunity [the foreign official defendant] might enjoy is overridden by his alleged violations of the TVPA" and held that "we need not decide whether the FSIA applies to a former official of a foreign government . . . , because if the FSIA does not apply, a former official may still be immune under common-law principles that pre-date, and survive, the enactment of the FSIA." 563 F.3d at 15. Accordingly, the Second Circuit in *Matar* held that common-law foreign-official immunity, as well as FSIA immunity, survived the TVPA, *id.*, and the D.C. Circuit adopted that holding in determining that "head of state immunity survived enactment of the TVPA." *Manoharan*, 711 F.3d at 180.

There is no reason to interpret conduct-based immunity differently than head of state immunity under the TVPA. And there is no reason to treat the TVPA differently from Section 1983, as the D.C. Circuit held in *Manoharan*. If anything, the fact that TVPA litigation necessarily involves foreign officials and foreign interests should counsel additional hesitation before concluding that Congress silently dispensed with a long-established immunity doctrine. *Cf. The Schooner Exchange*, 11 U.S. (7 Cranch) 116, 146 (1812) (stating that the Court would understand the government to have rescinded a foreign sovereign's immunity only if it so indicates "in a manner not to be misunderstood"). Moreover, if the TVPA's text were sufficient to abrogate conduct-based immunity, it likewise would abrogate head-of-state and diplomatic immunity,

because both heads of state and diplomats may be "individual[s] who, under actual or apparent authority, or color of law, of any foreign nation" commit torture or extrajudicial killings.  TVPA § 2(a).  Treating foreign-official immunity, but not head of state immunity, as preempted by the TVPA is contrary to the logic and holding of the D.C. Circuit in *Manoharan*, 711 F.3d at 180.

*Samantar* itself involved a TVPA claim against a foreign official in his personal capacity, seeking "damages from his own pockets."  560 U.S. at 325.  The Supreme Court nevertheless held that immunity to such a suit is "properly governed by the common law."  *Id*.  That statement would be meaningless if foreign officials and agents were categorically barred from asserting immunity in TVPA cases.

In a concurring opinion in *Lewis,* which the majority adopted as "an alternative holding," Judge Randolph stated that immunity for foreign officials in TVPA cases does not "turn[] on the common law."  *Lewis*, 918 F.3d at 144; *id*. at 148 (Randolph, J., concurring).  This Court need not follow that holding because it hinged on two case-limited circumstances that do not exist here.  First, Judge Randolph's reasoning turned on the posited existence of a "clear conflict" between the TVPA (which explicitly provides for liability for torture) and common law immunity (which immunized against liability for torture).  *Id*. at 150 (Randolph, J., concurring).  But there is no such conflict with respect to common law immunity for an "attempted extrajudicial killing" as alleged here, because the TVPA does not establish any liability for an attempted extrajudicial killing.  *See supra* at Section V.A.  Because Congress is presumed to retain established common law principles unless a statute says explicitly otherwise, any abrogation of common law immunity should not extend beyond liability conferred by the text of the TVPA.  *See supra* at 32-35; *see also Baker Botts LLP v. ASARCO LLC*, 576 U.S. 121, 126 (2015).

Moreover, the "conflict" that concerned Judge Randolph was "between the Torture Act's basis for liability and the Restatement's basis for immunity from liability." *Lewis*, 918 F.3d at 150 Randolph, J., concurring) ("I agree with the court that if the Restatement did apply, the defendants were not immune.") (emphasis added).  Because the Second Restatement is inapplicable in this case (*see supra* at 23-24 & n.9) that conflict does not exist here.  The majority in *Lewis* acknowledged this limitation by stating that this was an "alternative holding that the TVPA displaces conduct-based immunity in this context." *Id*. at 144 (emphasis added).  This case is in a different "context"—where the application of the Second Restatement properly is disputed.  *See* Crown Prince's Mot. to Dismiss, ECF No. 58, Section II.A.2 ("The better view is that the Court should take guidance from the established policy of the State Department, not the Second Restatement.") (quotations omitted).  Accordingly, Judge Randolph's statement concerning the TVPA's abrogation of conduct-based immunity does not govern here because it depended both on the case-specific application of the TVPA to alleged torture, rather than "attempted extrajudicial killing," and the case-specific application of the Second Restatement to conduct-based immunity.

### E.   THE STUDENT-DEFENDANTS ARE ENTITLED TO DERIVATIVE IMMUNITY BASED ON THE IMMUNITY OF THE CROWN PRINCE.

The Student-Defendants also enjoy derivative official immunity because they are alleged to be the private, domestic agents of an immune foreign official.  As in another case, where the defendant was alleged to be a private agent of a foreign government, the Student-Defendants here similarly are alleged to have been "following Saudi Arabia's orders" and thus are "entitled to derivative immunity under the FSIA." *Butters v. Vance Int'l, Inc.*, 225 F.3d 462, 466 (4th Cir. 2000).  The court in *Butters* held that it is "well-settled law that contractors and common law agents acting within the scope of their employment for the United States have derivative sovereign immunity." *Id*. (emphasis added).  The court further held:

- 36 -

> It is but a small step to extend this privilege to the private agents of foreign governments.  All sovereigns need flexibility to hire private agents to aid them in conducting their governmental functions.  This is especially true for foreign sovereigns given their lack of human resources while operating within the United States.  To abrogate immunity would discourage American companies from entering lawful agreements with foreign governments and from respecting their wishes even as to sovereign acts.

*Id.* (emphasis added).  Accordingly, the Student-Defendants, as alleged private agents of an immune foreign head of state, also are entitled to derivative official immunity.  That conclusion is unaffected by *Samantar's* holding that official immunity of individuals is governed by the common law, not by the FSIA.

One post-*Samantar* decision, *Ivey v. Lynch*, No. 1:17-439 (NCT), 2018 U.S. Dist. LEXIS 133656 (M.D.N.C. Aug. 8, 2018), is particularly instructive here.  In *Ivey*, the court held that because a nonparty (Willmer) was "found to be protected by foreign official immunity, so, too, [was defendant] Lynch, as his agent in the United States, whose conduct relevant to this action was at the direction of [the nonparty] Willmer and against whom any decision would have the effect of enforcing a rule of law against" a foreign nation.  *Id.* at *20-21.

In *Ivey*, an Insolvency Court in Germany commenced an insolvency proceeding over the assets of a German resident (Boex) and appointed Willmer (a German citizen) as the permanent insolvency administrator.  Willmer, in turn, engaged defendant Lynch (a U.S. attorney) to represent and aid Willmer with respect to Boex's estate located in the U.S.  *Id.* at *3-*4.  The Trustee (plaintiff Ivey) brought claims against Lynch of unjust enrichment, fraud, and breach of fiduciary duty related to Lynch's role, at the direction of Willmer, in closing the sale of Boex's golf-development company.  *Id.* at *6-7.  The court found that: (1) "Willmer [was] an official or agent of Germany"; (2) "Willmer's conduct . . . was part of his official duties as insolvency administrator" when he "retained Lynch . . . as is the usual practice of a German insolvency

administrator tasked with the sale of assets outside of Germany." *Id*. at *14-*17.  The court also found that Lynch, in executing the closing documents, was "acting at the direction of . . . Willmer." *Id*. at *20.  Finally, the court held that:

> denying Lynch immunity and ultimately determining the merits of the claims against him would have the effect of enforcing a rule of law against Germany.  Its insolvency proceedings are governed by the Insolvency fCode according to which Willmer was appointed insolvency administrator, the Insolvency Court delegated authority to him, and Willmer pursued the assets of Boex's insolvency estate which the creditors' committee oversaw and apparently approved.  A decision that Lynch acted without proper authority necessarily, under these facts, means that Willmer did the same.  In turn, such a determination calls into question the actions of the [German] Insolvency Court and its creditors' committee.

*Id*.  Accordingly, the *Ivey* court, relying on the Fourth Circuit decision in *Butters*, held that, "because Willmer is found to be protected by foreign official immunity, so, too, is Lynch, as his agent in the United States, whose conduct relevant to this action was at the direction of Willmer and against whom any decision would have the effect of enforcing a rule of law against Germany." *Id*. at *20-*21.  Similarly, if the allegations that the Student-Defendants were acting as the agents of the Crown Prince (Compl. ¶¶ 97, 167, 170, 171) are credited, the Student-Defendants are derivatively entitled to any immunity enjoyed by the Crown Prince.[13]

---

[13] *See also Rishikof*, 70 F. Supp. 3d at 13 ("'The doctrine of the imputability of the acts of the individual to the State . . . in classical law . . . imputes the act solely to the state, who alone is responsible for its consequence.  [Therefore] any act performed by the individual as an act of the State enjoys the immunity which the State enjoys.'") (quoting Hazel Fox, *The Law of State Immunity* at 455 (2d. ed. 2008)); *Moriah*, 107 F. Supp. 3d at 277 & n.34 ("It is 'well-settled law that contractors and common law agents acting within the scope of their employment . . . have derivative sovereign immunity.'") (quoting *Butters*, 225 F.3d at 466; citing *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 21-22 (1940)); *Alicog v. Kingdom of Saudi Arabia*, 860 F. Supp. 379, 384 (S.D. Tex. 1994) ("When both a government official and a private citizen order government employees to perform the same function, the private citizen cannot be held liable at the same time the official and employees are immune.  Even if the government official just mimics the private citizen, the ordered acts are still a government's when governmental agents perform functions that are both within the scope of their employment and are sanctioned by their superior.")).

The Student-Defendants adopt and incorporate by reference the arguments made at Crown Prince's Motion to Dismiss, ECF No. 58, Section II.B that the case must be dismissed because Saudi Arabia is a necessary and indispensable party that is immune from suit.

## IX.    THE ACT OF STATE DOCTRINE BARS THE COURT FROM ADJUDICATING PLAINTIFF'S CLAIMS.

The Student-Defendants adopt and incorporate by reference the arguments made at Crown Prince's Motion to Dismiss, ECF No. 58, Section II.C that the Act of State doctrine bars Plaintiff's claims.  Although the conduct alleged of the Student-Defendants all occurred in the U.S., that alleged conduct falls within the Act of State doctrine because it all was alleged to be part of a law-enforcement effort directed exclusively from Saudi Arabia.  As the D.C. Circuit has held, "[i]t is certainly true that, as a general rule, the Act of State doctrine applies to foreign government activities undertaken 'within its own territory,' although that factor is not so inflexible as to overlook the quintessentially sovereign nature of foreign governmental action . . .  rooted, in all relevant respects, within foreign sovereign territory" where, as here, the conduct was "formulated and directed from" the foreign government's territory.  *Hourani v. Mirtchev*, 796 F.3d 1, 12-13 (D.C. Cir. 2015) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423 (1964); citing cases).  Accordingly, for the reasons stated in the Crown Prince's brief, the Act of State doctrine bars the adjudication of Plaintiff's claims.

## X.    THE COURT HAS NO PERSONAL JURISDICTION OVER ALRAJHI.

Plaintiff alleges that Defendant Alrajhi is subject to personal jurisdiction pursuant to Federal Rule of Civil Procedure 4(k)(2).  Compl. ¶ 86.  As this Court recently held, Rule 4(k)(2) . . . permits a federal court to exercise jurisdiction over (1) a claim arising under federal law, (2) against a defendant served by a summons, (3) that is not subject to the jurisdiction of any single state court . . . . "  *Bernhardt* 2020 U.S. Dist. LEXIS 214185, at *7-8 (emphasis added) (citing

*Mwani v. bin Laden*, 417 F.3d 1, 101 (D.C. Cir. 2005)).  However, Alrajhi was served by Plaintiff with process at his residence in Virginia.  *See* ECF No. 13.  Accordingly, Plaintiff's Rule 4(k)(2) theory of jurisdiction fails because Alrajhi clearly was "subject to the jurisdiction of [a] state court"—in Virginia.  *Id*.

Plaintiff also claims that "the exercise of personal jurisdiction over [Alrajhi] is proper under D.C. Code § 13-423(a)(1) because [he] purposefully availed [himself] of this forum by transacting business in Washington, D.C., and [Plaintiff's] claims rise out of those contacts."  Compl. ¶ 97. Plaintiff's examples of alleged transactions of business are: "purchas[ing] a plane ticket in Washington, D.C."; "travel[ing] from Washington, D.C. to Boston, Massachusetts for the purpose of hunting down [Plaintiff's] location"; being "active in Saudi-sponsored programming in the District of Columbia"; and "attending various events aimed at developing a network of covert agents."  *Id*.  However, Plaintiff's D.C.-based jurisdictional theory fails at the outset because Plaintiff was in no way injured by, nor do his claims arise from, Alrajhi's alleged buying a plane ticket; flying to Boston; being "active"; or "attending various events."  *See FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 479 F. Supp. 2d 30, 38 (D.D.C. 2007), *aff'd*, 529 F.3d 1087 (D.C. Cir. 2008) ("To establish personal jurisdiction under [D.C. Code § 13-423(a)(1)], a plaintiff must demonstrate that . . . the claim arose from the business transacted in the District."); *La Brier v. A.H. Robins Co.*, 551 F. Supp. 53, 56 (D.D.C. 1982) ("[S]ince plaintiff does not allege that the conduct of [defendant] which gave rise to her injury was related to its contacts with the District of Columbia this Court may not assert longarm jurisdiction pursuant to § 13-423(a)(1)."); *Everett v. Nissan Motor Corp.*, 628 A.2d 106, 107 (D.C. 1993) ("'Courts have uniformly held that subsection (a)(1) confers personal jurisdiction over a defendant only if the plaintiff's claim arises from the defendant's contact with the District.'") (quoting *Ross v. Prod. Dev. Corp.*, 736 F. Supp. 285, 289 (D.D.C.

1989)); *Berwyn Fuel, Inc. v. Hogan*, 399 A.2d 79, 80 (D.C. 1979) (rejecting personal jurisdiction under D.C. Code § 13-423(a)(1) where defendant's "business was making fuel deliveries, some of which were made in the District.  However, [plaintiff's] claim for relief from the accident did not arise from any of these District of Columbia-related acts, *viz.*, deliveries to the District, but from an activity which occurred completely within Maryland, *viz.*, delivery of fuel by the truck striking his auto.").  Because Plaintiff could not have been injured by Alrajhi's domestic air travel or attending "various events," these alleged activities cannot support personal jurisdiction over Alrajhi.

## CONCLUSION

For the foregoing reasons, the Student-Defendants' Motion to Dismiss should be granted.

Dated: December 7, 2020
Washington, D.C.

/s/Mitchell R. Berger

Mitchell R. Berger (DC 385467)
Alan T. Dickey (DC 496403)
Benjamin D. Wood (DC 487799)
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, N.W.
Washington, D.C. 20037
Phone: 202-457-6000
Fax:    202-457-6315
mitchell.berger@squirepb.com
alan.dickey@squirepb.com
benjamin.wood@squirepb.com

*Attorneys for Defendants*
*Youssef Alrajhi, Mohammed Alhamed, and*
*Layla Abuljadayel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 7, 2020, I caused a true and correct copy of the foregoing

Motion to Dismiss and Memorandum of Law of Youssef Alrajhi, Mohammed Alhamed, and Layla

Abuljadayel in Support of Their Motion to Dismiss to be served through the Court's CM/ECF

System on all counsel of record in this action, including the following counsel of record for

Plaintiff:

David Pressman
(admitted *Pro Hac Vice*)
Jenner & Block LLP
919 Third Avenue New York, NY 10022
Telephone:  (212) 891-1654
Fax: (212) 891-1699
dpressman@jenner.com

Lindsay Harrison
Jenner & Block LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
Telephone:  (202) 639-6865
Fax:  (202) 639-6066
lharrison@jenner.com

*/s/Mitchell R. Berger*
Mitchell R. Berger (DC 385467)
Alan T. Dickey (DC 496403)
Benjamin D. Wood (DC 487799)
Squire Patton Boggs (US) LLP
2550 M Street, NW
Washington, D.C.  20037
Telephone:  (202) 457-6000
Facsimile:  (202) 457-6315
mitchell.berger@squirepb.com
alan.dickey@squirepb.com
benjamin.wood@squirepb.com

*Attorneys for Defendants*
*Youssef Alrajhi, Mohammed Alhamed, and*
*Layla Abuljadayel*