IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

SAAD ALJABRI §
§
Plaintiff, §
§
v. § Case No. 1:20-cv-02146-TJK
MOHAMMED BIN SALMAN BIN §
ABDULAZIZ AL SAUD, et al. §
§
Defendants. §

---

## BADER ALASAKER'S MOTION TO DISMISS

Defendant Bader Alasaker, by and through undersigned counsel, hereby moves this Court, before the Honorable Timothy J. Kelly, at E. Barrett Prettyman U.S. Courthouse, 333 Constitution Ave., N.W., Washington, DC 20001, for an Order dismissing the Complaint in its entirety as to Bader Alasaker under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, under Rule 12(b)(2) for lack of personal jurisdiction, under Rule 12(b)(7) for failure to join an essential party and under Rule 12(b)(6) for failure to state a claim. The grounds for this Motion are set forth in Bader Alasaker's Memorandum in Support of his Motion to Dismiss.

Dated: December 7, 2020

Respectfully submitted,

ZUCKERMAN SPAEDER LLP

By: */s/ William W. Taylor, III*
William W. Taylor, III (D.C. Bar No. 84194)
Margarita K. O'Donnell (D.C. Bar No. 1005972)
ZUCKERMAN SPAEDER LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036
Tel: (202) 778-1800
Fax: (202) 822-8106
E-mail: wtaylor@zuckerman.com
E-mail: modonnell@zuckerman.com

Telephone: (202) 778-1800
Facsimile: (202) 822-8106

*Attorneys for Defendant Bader Alasaker*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAAD ALJABRI | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 1:20-cv-02146-TJK |
| MOHAMMED BIN SALMAN BIN | § | |
| ABDULAZIZ AL SAUD, et al. | § | |
| | § | |
| Defendants. | § | |

**BADER ALASAKER'S MEMORANDUM IN SUPPORT OF HIS MOTION TO DISMISS**

# TABLE OF CONTENTS

                                                                                          Page

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION ...................................................................................................... 1

ARGUMENT .............................................................................................................. 3

I.    THIS COURT DOES NOT HAVE PERSONAL JURISDICTION OVER MR.
      ALASAKER. ..................................................................................................... 3

      A.    Aljabri's Conclusory Allegations Cannot Establish Personal Jurisdiction............. 5

      B.    The Complaint Does Not Allege a Causal Connection Between Mr.
            Alasaker's Contacts in the United States and the Claims. ................................... 10

      C.    Mr. Alasaker Has Not Purposefully Directed His Acts Toward the United
            States. ..................................................................................................... 13

      D.    Exercising Jurisdiction Would Offend Notions of Fair Play and Substantial
            Justice....................................................................................................... 15

II.   THE COURT DOES NOT HAVE JURISDICTION OVER THE CLAIMS
      AGAINST MR. ALASAKER BECAUSE HE IS IMMUNE........................................... 16

      A.    Mr. Alasaker is Immune Under the State Department Test................................ 18

      B.    Mr. Alasaker is Immune Under the Restatement Test. ..................................... 20

III.  PLAINTIFF'S CLAIMS ARE PRECLUDED BY THE ACT OF STATE
      DOCTRINE. ..................................................................................................... 22

IV.   THE COURT MUST DISMISS THE CLAIMS AGAINST MR. ALASAKER
      BECAUSE SAUDI ARABIA IS A NECESSARY PARTY THAT CANNOT BE
      JOINED............................................................................................................ 22

V.    PLAINTIFF FAILS TO STATE A CLAIM UNDER THE TVPA AND ATS.................. 23

      A.    The TVPA Does Not Provide A Cause Of Action For Plaintiff's
            Allegations. ............................................................................................... 23

      B.    The ATS Does Not Provide A Cause Of Action For Plaintiff's Allegations.
            ................................................................................................................ 26

      C.    Plaintiff Has Proffered Only Conclusory Allegations To Support The TVPA
            And ATS Claims.......................................................................................... 27

            1.    Plaintiff's Conclusory Allegations Regarding Mr. Alasaker's
                  Alleged Involvement Do Not State a Claim for Direct Liability.............. 28
            2.    Plaintiff's Conclusory Allegations Also Fail to State a Claim for
                  Secondary Liability ...................................................................... 32

VI.   IF THE COURT DISMISSES THE FEDERAL LAW CLAIMS, THE COURT
      LACKS PERSONAL JURISDICTION OVER MR. ALASAKER AND SHOULD

DECLINE SUBJECT MATTER JURISDICTION OVER THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM. .................................................... 36

VII.   PLAINTIFF FAILS TO STATE A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS. ....................................................................... 37

    A.   The Intentional Infliction Of Emotional Distress Claim Is Governed By Saudi Arabian Law And Must Be Dismissed. ....................................... 37

    B.   Plaintiff Has Failed To State A Claim For Intentional Infliction Of Emotional Distress Under D.C. Law. .................................................. 37

CONCLUSION ...................................................................................................................... 39

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Acosta Orellana v. CropLife Intern.*,
    711 F. Supp. 2d 81 (D.D.C. 2010) ...................................................................... 30, 33

*Asahi Metal Indus. Co. v. Superior Ct. of Cal.*,
    480 U.S. 102 (1987) ........................................................................................... 15, 16

*\*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................. passim

Atchley v. AstraZeneca UK Ltd.,
    2020 WL 4040345 (D.D.C. July 17, 2020) ............................................................. 12

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................. passim

*Bernhardt v. Islamic Republic of Iran*,
    2020 WL 6743066 (D.D.C. Nov. 16, 2020) ............................................... 13, 35, 36

*Boucher v. Wal-Mart Canada Corp.*,
    2014 ONCA 419 ........................................................................................................ 38

*Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*,
    137 S. Ct. 1773 (2017) ............................................................................................. 11

*Broidy Capital Mgmt. LLC v. Muzin*,
    2020 WL 1536350 (D.D.C. Mar. 31, 2020) ....................................................... 17, 18

*Bundy v. Sessions*,
    812 F. App'x 1 (D.C. Cir. 2020) ....................................................................... 29–30

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985) ............................................................................................... 4, 14

*Cabello v. Fernandez-Larios*,
    402 F.3d 1148 (11th Cir. 2005) ............................................................................... 33

*Carswell v. Air Line Pilots Ass'n Int'l*,
    540 F. Supp. 2d 107 (D.D.C. 2008) ........................................................................... 9

_____

\*Authorities upon which we chiefly rely are marked with an asterisk.

-iii-

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,
    511 U.S. 164 (1994) .......................................................................................... 25, 26

Corsi v. Caputo,
    2020 WL 1703934 (D.D.C. Apr. 7, 2020) .............................................................. 4

Corsi v. Mueller,
    422 F. Supp. 3d 51 (D.D.C. 2019) ....................................................................... 30

Daimler AG v. Bauman,
    571 U.S. 117 (2014) ............................................................................................. 15

Devorah v. Royal Bank of Canada,
    115 F. Supp. 3d 35 (D.D.C. 2015) ......................................................................... 6

Doe 1 v. Buratai,
    318 F. Supp. 3d 218 (D.D.C. 2018) ................................................................ 19, 22

Doe v. Exxon Mobil Corp.,
    654 F.3d 11 (D.C. Cir. 2011) ......................................................................... 26, 27

Dogan v. Barak,
    932 F.3d 888 (9th Cir. 2019) .............................................................................. 20

First Chicago Int'l v. United Exch. Co.,
    836 F.2d 1375 (D.C. Cir. 1988) ............................................................................. 6

Halberstam v. Welch,
    705 F.2d 472 (D.C. Cir. 1983) ...................................................................... 33, 35

IMAPizza, LLC v. At Pizza Ltd.,
    334 F. Supp. 3d 95 (D.D.C. 2018) ...................................................................... 15

In re Terrorist Attacks on Sept. 11, 2001,
    122 F. Supp. 3d 181 (S.D.N.Y. 2015) ............................................................. 18–19

Jesner v. Arab Bank, PLC,
    138 S. Ct. 1386 (2018) ........................................................................................ 27

Klayman v. Judicial Watch, Inc.,
    296 F. Supp. 3d 208 (D.D.C. 2018) ..................................................................... 38

Klieman v. Palestinian Authority,
    923 F.3d 1115 (D.C. Cir. 2019) ....................................................................... 5, 12

Kuenzle v. HTM Sport-Und Freizeitgerate AG,
    102 F.3d 453 (10th Cir. 1996) ....................................................................... 11, 13

*Lewis v. Mutond*,
    918 F.3d 142 (D.C. Cir. 2019) ................................................................... 16, 17, 20

*Livnat v. Palestinian Auth.*,
    851 F.3d 45 (D.C. Cir. 2017) ........................................................................ passim

*Mamani v. Berzain*,
    654 F.3d 1148 (11th Cir. 2011) .............................................................................. 31

*Mastafa v. Chevron Corp.*,
    770 F.3d 170 (2d Cir. 2014) ................................................................................... 27

*Md. Digital Copier v. Litig. Logistics, Inc.*,
    394 F. Supp. 3d 80 (D.D.C. 2019) ................................................................... 11, 12

*Miango v. Democratic Republic of Congo*,
    2020 WL 3498586 (D.D.C. June 29, 2020) ........................................................... 20

*Muhammad v. United States*,
    300 F. Supp. 3d 257 (D.D.C. 2018) ....................................................................... 28

*Mwani v. bin Laden*,
    417 F.3d 1 (D.C. Cir. 2005) ............................................................................. 4, 13

*Nuevos Destinos, LLC v. Peck*,
    2019 WL 78780 (D.D.C. Jan. 2, 2019) .................................................................. 14

*O'Connor v. Sandy Lane Hotel Co.*,
    496 F.3d 312 (3d Cir. 2007) ................................................................................... 11

*Ofisi v. Al Shamal Islamic Bank*,
    2019 WL 1255096 (D.D.C. Mar. 19, 2019) .................................................... 6–7, 8

*Ofisi v. BNP Paribas, S.A.*,
    2018 WL 396234 (D.D.C. Jan. 11, 2018) .............................................................. 34

*Ofisi v. BNP Paribas, S.A.*,
    278 F. Supp. 3d 84 (D.D.C. 2017) .................................................................. 34–35

*Ortberg v. Goldman Sachs Grp.*,
    64 A.3d 158 (D.C. 2013) ........................................................................................ 37

*Owens v. BNP Paribas S.A.*,
    897 F.3d 266 (D.C. Cir. 2018) ........................................................................ 25, 26

*Parhat v. Gates*,
    532 F.3d 834 (D.C. Cir. 2008) ............................................................................... 29

*Republic of Philippines v. Pimentel*,
   553 U.S. 851 (2008) .................................................................. 22

*Republic of Sudan v. Owens*,
   194 A.3d 38 (D.C. 2018) ........................................................... 39

*Samantar v. Yousuf*,
   560 U.S. 305 (2010) ............................................................ 17, 18

*Shatsky v. Palestine Liberation Org.*,
   955 F.3d 1016 (D.C. Cir. 2020) ................................................. 4

*Sikhs for Justice v. Nath*,
   893 F. Supp. 2d 598 (S.D.N.Y. 2012) ..................................... 25

*TJGEM LLC v. Republic of Ghana*,
   26 F. Supp. 3d 1 (D.D.C. 2013), *aff'd*,
   2015 WL 3653187 (D.C. Cir. June 9, 2015) ........................ 22–23

*Walden v. Fiore*,
   571 U.S. 277 (2014) ............................................................. 4, 14

*Yousuf v. Samantar*,
   699 F.3d 763 (4th Cir. 2012) .............................................. 16–17

**STATUTES AND LEGISLATIVE HISTORY**

28 U.S.C. § 1350 .......................................................................... 26–27

28 U.S.C. § 1367 .......................................................................... 36–37

S. Rep. No. 102–249 (1991) ............................................................ 26

TVPA, Pub. L. No. 102-256 § 2(a)(2), 106 Stat. 73,
   *reprinted in* 28 U.S.C. § 1350 note (1992) ............................ 23

**OTHER MATERIALS**

Br. for United States as Amicus Curiae Supporting Petitioners,
   *Nestlé USA, Inc. v. Doe I*, Nos. 19-1416 and 19-453 (U.S. Sept. 8, 2020) ............... 27

Br. for United States as Amicus Curiae Supporting Petitioners,
   *Mutond v. Lewis*, No. 19-185, 2020 WL 2866592 (U.S.) ........... 18

Hazel Fox, *The Law of State Immunity* 455 (2d ed. 2008) ........... 17

Lewis Carroll, *The Hunting of the Snark* 3 (1876) ...................... 29

Office of the Legal Advisor, U.S. Dep't of State,
   *Digest of United States Practice in International Law*
   (Carrielyn D. Guymon, ed. 2015), Ch. 10, § B(3) ................... 18

Restatement (Second) of Agency § 14....................................................................... 9

Restatement (Second) of Foreign Relations Law § 66 ............................................ 17

Restatement (Second) of Torts § 46....................................................................... 39

*Saudi Arabia Wants Its Fugitive Spymaster Back*, WSJ (July 17, 2020) .................................... 20

## INTRODUCTION

In this Complaint, Saad Aljabri, a former high-level Saudi government official who is currently a fugitive living in Canada, brings claims against Mr. Bader Alasaker for violations of the Torture Victim Protection Act (TVPA) and the Alien Tort Statute (ATS), as well as a common law claim of intentional inflection of emotional distress. The allegations against Mr. Alasaker are that, months before an alleged plot to kill Aljabri was conceived, Mr. Alasaker was involved in "recruiting" three other Saudi citizens to search for Aljabri in the United States, that Mr. Alasaker inquired about arranging a private plane for Aljabri to travel to Saudi Arabia, and that later, Mr. Alasaker "supported" a subsequent plot to kill him in Canada. We demonstrate in this Memorandum that the Court must dismiss the claims against Mr. Alasaker.[1]

First, the allegations supporting personal jurisdiction in the Complaint do not meet the requirements for allegations of fact required by the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and its progeny. The Complaint's jurisdictional theory is premised on allegations that Mr. Alasaker "recruited," "cultivated," and "directed" three other defendants to search for Aljabri in the United States, but it does not allege a fact describing how Mr. Alasaker did so—either in the United States or elsewhere. Thus, personal jurisdiction over Mr. Alasaker is based upon his alleged appearances at a handful of events in the United States primarily organized and hosted by the nonprofit foundation of which he is the Secretary General. None of these events has a causal relationship to the alleged plan to kill, supposedly conceived in Saudi Arabia and carried out in Canada, and they are insufficient to establish the contacts required for personal

---

[1] This motion to dismiss and memorandum in support thereof is filed on behalf of defendant Bader Alasaker. As set forth below, for efficiency and to minimize duplicating arguments for the Court, Mr. Alasaker joins and incorporates by reference the arguments made by several other defendants.

jurisdiction. Moreover, the apparent argument that the alleged scheme against Plaintiff was an effort to eliminate his use to the U.S. intelligence community, thus having an effect here, has been soundly rejected and would turn the requirement for personal contacts on its head. In short, there is no theory under which this Court has personal jurisdiction over Mr. Alasaker, even if the allegations met the *Iqbal* test for facts.

Second, Mr. Alasaker is immune from suit under the common law of conduct-based sovereign immunity. The Complaint alleges that "all acts" at issue "were carried out under actual or apparent authority or color of law of the government of Saudi Arabia." Compl. ¶ 239. That allegation demonstrates that the claims, if assumed to be true, depend upon attacking Saudi government policies and official acts and are therefore barred. Moreover, the claims as to Mr. Alasaker specifically are that he was carrying out Saudi policy in his capacity as a government official and, for the same reasons as the general allegations, entitle him to immunity.

Third, the Act of State Doctrine bars Aljabri's action because adjudicating his claims would require this Court to inquire into the validity of the public acts a foreign sovereign committed within its own territory.

Fourth, the Complaint must be dismissed under Rule 12(b)(7) because Saudi Arabia is a necessary and indispensable party that cannot be joined in this suit because it is immune.

Fifth, Aljabri's federal law claims for "attempted" killing under the TVPA and ATS fail under Rule 12(b)(6). The TVPA created a cause of action for "extrajudicial killing" and "torture," not for a planned or attempted extrajudicial killing. Indeed, Congress made its intent clear by providing that only the victim's legal representative or a wrongful death claimant, not a live victim, could recover for an "extrajudicial killing." Congress also did not provide for any secondary liability under the TVPA, which precludes Aljabri's conspiracy and aiding and abetting theories.

As to the ATS, that statute has no application to this case, where no relevant conduct occurred in the United States, and cannot provide a cause of action for attempted killing because it does not violate any specific universal and obligatory international norm. And even assuming the TVPA and ATS offered a legal remedy for attempted killing, Aljabri's conclusory allegations are insufficient, as they were with personal jurisdiction, to state a claim against Mr. Alasaker.

Sixth, to the extent the Court dismisses the federal law claims, it lacks pendent personal jurisdiction over Mr. Alasaker for the intentional infliction of emotional distress claim, and should also decline to exercise supplemental subject matter jurisdiction over that claim.

Finally, Plaintiff fails to state a common law claim for intentional infliction of emotional distress. The law of Saudi Arabia applies to that claim, and requires dismissal because Saudi Arabia does not recognize such a claim. And even if D.C. law applied to this case involving a Saudi plaintiff living in Canada suing Saudi defendants over a dispute originating in Saudi Arabia, the Court should dismiss the claim because Plaintiff's conclusory allegations fail to state a claim under D.C. law.

## ARGUMENT[2]

## I.     THIS COURT DOES NOT HAVE PERSONAL JURISDICTION OVER MR. ALASAKER.

Aljabri bears the burden of establishing that the Court has personal jurisdiction over Mr. Alasaker. *See Livnat v. Palestinian Auth.*, 851 F.3d 45, 57 (D.C. Cir. 2017). He must "allege specific acts connecting [the] defendant with the forum and may not rely on bare allegations or

---

[2] Aljabri contends that he served Mr. Alasaker through mail and WhatsApp. *See* ECF Nos. 35, 38. For the reasons described in the motion to dismiss by Defendant Mohammed bin Salman bin Abdulaziz Al Saud ("Crown Prince's Brief"), those methods of service violate Saudi law. Mr. Alasaker adopts and incorporates by reference the arguments in the Crown Prince's Brief concerning service. *See* Crown Prince Br. at 11.

conclusory statements." *Corsi v. Caputo*, 2020 WL 1703934, at *2 (D.D.C. Apr. 7, 2020) (Kelly, J.) (alteration in original). Although the Court must "resolve factual disputes in favor of the plaintiff[,] . . . it need not accept inferences drawn by [the] plaintiff[] if such inferences are unsupported by the facts." *Id.* (quoting *Livnat*, 851 F.3d at 57). Accordingly, a court lacks jurisdiction where a plaintiff relies only on conclusory allegations of jurisdiction. *Livnat*, 851 F.3d at 57.

As to Mr. Alasaker, Aljabri asserts jurisdiction under Federal Rule of Civil Procedure 4(k)(2), which "permits a federal court to exercise personal jurisdiction over a defendant (1) for a claim arising under federal law, (2) where a summons has been served, (3) if the defendant is not subject to the jurisdiction of any single state court, (4) provided that the exercise of federal jurisdiction is consistent with the Constitution (and laws) of the United States." *Mwani v. bin Laden*, 417 F.3d 1, 10 (D.C. Cir. 2005). The contested issue here is the fourth factor, because jurisdiction over Mr. Alasaker would not be consistent with the Constitution.

"Whether the exercise of jurisdiction is consistent with the Constitution turns on whether a defendant has sufficient contacts with the nation as a whole to satisfy due process." *Id.* at 11. Under the Due Process Clause, "the defendant's suit-related conduct must create a substantial connection with the forum" in order for a court to have specific jurisdiction over the defendant. *Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016, 1036 (D.C. Cir. 2020) (quoting *Walden v. Fiore*, 571 U.S. 277, 291 (2014)). The defendant must also have "purposefully directed" his activities at the forum. *Mwani*, 417 F.3d at 12. Finally, courts cannot exercise jurisdiction if it would not "comport with fair play and substantial justice." *Id.* at 14 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)).

-4-

In this case, Plaintiff has failed to establish that this Court has personal jurisdiction over Mr. Alasaker for four fundamental reasons: (1) the allegations relevant to jurisdiction are entirely conclusory and are therefore insufficient; (2) the required causal relationship between Mr. Alasaker's alleged United States conduct and the federal claims is absent; (3) Mr. Alasaker has not purposefully directed conduct at the United States; and (4) exercising jurisdiction would not comport with fair play and substantial justice. Each of these reasons alone requires dismissal of the entire Complaint as to Mr. Alasaker.

### A.      Aljabri's Conclusory Allegations Cannot Establish Personal Jurisdiction.

Aljabri's allegations for personal jurisdiction over Mr. Alasaker, a Saudi national who resides in the Kingdom of Saudi Arabia,[3] rest on repeated conclusory assertions that Mr. Alasaker "recruited," "cultivated," and "directed" three other defendants in the United States who over a period of several months in late 2017 searched for Aljabri's wife in the United States. They do not satisfy Aljabri's burden to plead facts.

The Supreme Court in *Ashcroft v. Iqbal* illustrated, in the Rule 12(b)(6) context, the types of allegations that are conclusory and must be disregarded. 556 U.S. 662 (2009); *see also Klieman v. Palestinian Authority*, 923 F.3d 1115, 1125 (D.C. Cir. 2019), *cert. granted, vacated, and remanded*, 140 S. Ct. 2713 (2020) (applying *Iqbal* to personal jurisdiction analysis). "Naked assertions devoid of further factual enhancement" could not satisfy a plaintiff's burden. 556 U.S. at 678. A complaint that offered only "labels and conclusions" would also fail on the pleadings. *Id.* The application of those principles in *Iqbal* led to dismissal, as they should here.

In *Iqbal*, the plaintiff alleged that former Attorney General John Ashcroft and then-FBI Director Robert Mueller were, respectively, the "principal architect" of an allegedly discriminatory

---

[3] The Complaint lists Mr. Alasaker's address as "Kingdom of Saudi Arabia."

policy and "instrumental" in implementing the policy. 556 U.S. at 680–81. Those "bare assertions," the Court held, were "conclusory and not entitled to be assumed true." *Id.* at 681. Likewise, in *Bell Atlantic Corp. v. Twombly*, the Supreme Court explained that a complaint "requires more than labels and conclusions." 550 U.S. 544, 555 (2007). In this respect, bare assertions of "conspiracy" or a "conclusory allegation of agreement at some unidentified point" are insufficient at the pleadings stage. *Id.* at 557. A plaintiff's allegations must provide sufficient *factual* assertions to cross from the conclusory to the factual. *Id.* at 555, 557.

This standard applies to allegations relating to personal jurisdiction. Conclusory allegations are insufficient to establish jurisdiction in a U.S. court. *See Devorah v. Royal Bank of Canada*, 115 F. Supp. 3d 35, 38 (D.D.C. 2015) ("To survive a motion to dismiss for lack of personal jurisdiction, the plaintiff may not rely on conclusory allegations, but instead must make a showing of the facts necessary to connect each defendant to the forum.") (citing *First Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378 (D.C. Cir. 1988)). In this respect, the D.C. Circuit has held, consistent with *Twombly*, that "[c]onclusory statements" or a "bare allegation of conspiracy or agency" do not satisfy a plaintiff's burden to plead jurisdictional facts. *Livnat*, 851 F.3d at 57.

In *Ofisi v. Al Shamal Islamic Bank*, Judge Bates rejected a plaintiff's attempt to obtain personal jurisdiction based on such bare assertions. 2019 WL 1255096, at *6 (D.D.C. Mar. 19, 2019). The plaintiff alleged that the defendant, a bank, had "direct involvement in planning, orchestrating, or otherwise participating in the 1998 embassy bombings" by Al Qaeda and that the bank "supported" and "directed" the attack. *Id.* The plaintiff also alleged that the bank was "affiliated with, and invested in by Osama bin Laden and [a]l Qaeda," and that funds were withdrawn from the bank to support the attack. *Id.* Despite that affiliation, there was no personal jurisdiction because the only factual allegations concerned Al Qaeda, not the bank. And the "broad

pronouncements that [the bank] 'directed' the attacks" was "not enough" for personal jurisdiction because "[s]uch conclusory allegations 'merely state the plaintiffs' theory of specific jurisdiction,' rather than set forth the required jurisdictional facts." *Id.* (quoting *Livnat*, 851 F.3d at 57).

Applying those principles here, the Court must dismiss the claims against Mr. Alasker because they are based only on the types of conclusory statements the Supreme Court rejected in *Iqbal* and *Twombly*. The thrust of Plaintiff's jurisdictional theory as to Mr. Alasaker is that he, "through the MiSK Foundation," "recruited," "cultivated" and "directed" three defendants in the United States—Youssef Alrajhi, *id.* ¶ 60, Layla Abuljadayel, *id.* ¶ 68, and Mohammed Alhamed, *id.* ¶ 63—for a "hunt" for Aljabri in the United States. *Id.* ¶ 163. The Complaint also alleges that "each of the U.S.-Based Covert Agent Defendants was aware that their orders came from Defendant Alasaker," *id.* ¶ 164.[4]

---

[4] Plaintiff uses the term "U.S.-Based Covert Agent Defendants" to refer to Defendant Alrajhi, Defendant Alhamed, Defendant Abuljadayel, Defendant John Doe 1, and Defendant Alharbi. *See* Compl. ¶¶ 59–71. At one point, the Complaint alleges that "[a]cting at the direction of Defendant bin Salman and relying largely on Defendant MiSK Foundation as a front, Defendant Alasaker recruited and organized a network of agents in the United States and deployed these individuals (the 'U.S.-Based Covert Agent Defendants') . . . ." *Id.* ¶ 59. Elsewhere, the Complaint states that the U.S.-Based Covert Agent Defendants were "aware that their orders came from Defendant Alasaker." *Id.* ¶ 164; *see also id.* ¶ 163 (stating that the U.S.-Based Covert Agent Defendants were "recruited and cultivated" by Defendant Alasaker and the MiSK Foundation). But the Complaint contains no additional information (much less any factual support) regarding Mr. Alasaker's alleged connection to "Defendant John Doe 1" or Defendant Alharbi. *See, e.g.*, *id.* ¶ 70 (describing John Doe's role in the alleged conduct and failing to mention any connection to Mr. Alasaker); *id.* ¶ 71 (describing Alharbi's role in the alleged conduct and failing to mention Mr. Alasaker but stating that Alharbi was "acting at the direction" of the Crown Prince). These types of broad and unfounded allegations, which attempt to group defendants together but are not corroborated by factual detail or are later contradicted in other allegations, are endemic to the Complaint. Thus, under *Iqbal*, the Court should set aside altogether any allegation that rests on a connection between Mr. Alasaker, "Defendant John Doe 1," and Defendant Alharbi. Those simply cannot be the basis for jurisdiction or a substantive claim against Mr. Alasaker.

The Complaint does not contain any "factual matter," *see Twombly*, 550 U.S. at 556, to connect Mr. Alasaker to the actions of these three defendants. The Complaint does not identify any "order" received by a U.S. defendant from Mr. Alasaker or explain how they received orders, where they received those orders, from whom, or what those orders said. Nor does the Complaint provide any other factual detail about why these defendants believed that Mr. Alasaker was "order[ing]" them. *See Ofisi*, 2019 WL 1255096, at *6.

Similarly, the Complaint does not identify a fact about "recruiting," "cultivating," or "directing" Alrajhi, Abuljadayel, and Alhamed. Aljabri does not allege what "direction" Mr. Alasaker provided, how or where he gave such direction, or when it occurred. Indeed, the Complaint contains no information about any relevant communications between these three defendants and Mr. Alasaker. Nor does it provide an instance of "recruiting" by Mr. Alasaker.

Aljabri alleges that Alhamed and Abuljadayel were "tapped" to be "covert agents *after*" attending "'a leadership preparation' program" organized by the Prince Mohammed Bin Salman bin Abdulaziz Foundation (the "MiSK Foundation" or the "Foundation") "in 2016 and 2017." Compl. ¶ 57 (emphasis added). However, Aljabri does not allege the identity of the person or persons who "tapped" them or how or whether the Foundation events had any causal relationship to their purported recruitment. And hidden at the end of a nearly 20-line footnote, Aljabri alleges that Mr. Alasaker met Alhamed at two MiSK Foundation events in 2017, where "Alasaker further cultivated Defendant Alhamed for the hunt for Aljabri in the United States." *Id.* ¶ 66 n.32. But again, the Complaint does not specify what this "cultivation" meant (a word Plaintiff relies on repeatedly throughout the Complaint), much less whether Mr. Alasaker and Alhamed had any discussion about Aljabri. Merely alleging that Mr. Alasaker and Alhamed were at the same MiSK Foundation event does not make it plausible that Mr. Alasaker "cultivated" Alhamed at that event.

*See Twombly*, 550 U.S. at 557 ("The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement . . . that the 'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to relief.'").[5] If that theory were true, Plaintiff could assert jurisdiction over every person who attended a MiSK Foundation event at which Mr. Alasaker was present.

To the extent Plaintiff seeks to use these same conclusory allegations to establish an "agency" relationship between the three defendants and Mr. Alasaker, they fail to do so. *Carswell v. Air Line Pilots Ass'n Int'l*, 540 F. Supp. 2d 107, 122 (D.D.C. 2008) ("[A]n agency relationship arises only where the principal 'has the right to control the conduct of the agent with respect to matters entrusted to him.'" (quoting Restatement (Second) of Agency § 14 (1958))). Because the allegations lack any factual support, they constitute "bare allegations of agency" that cannot support personal jurisdiction. *See Livnat*, 851 F.3d at 57.

In summary, allegations that Mr. Alasaker "ordered," "recruited," "cultivated," and "directed," these three other defendants for their (failed) search for Aljabri in the United States are not sufficient to establish personal jurisdiction over him, and we request the Court dismiss the Complaint for this reason alone.

---

[5] As support for the allegation regarding Mr. Alasaker and Alhamed, the Complaint includes two Twitter posts showing photographs of Mr. Alasaker and Alhamed together, Compl. ¶ 66 n.32, but that establishes nothing more than the fact that Mr. Alasaker and Alhamed met at those events. Indeed, the Complaint's tenuous connections between Mr. Alasaker and Alrajhi, Alhamed, and Abuljadayel rest on one-way social-media interactions: it alleges that the three U.S. defendants have retweeted, replied to, and mentioned other defendants, including Mr. Alasaker, on Twitter. *Id.* ¶ 62 (Alrajhi), ¶ 66 (Alhamed), ¶ 69 (Abuljadayel). Aljabri does not allege that Mr. Alasaker—who currently has 1.8 million followers on Twitter—responded to a single tweet from the other defendants, or sent a tweet to those defendants. *See* @Badermasaker, https://twitter.com/Badermasaker.

**B.     The Complaint Does Not Allege a Causal Connection Between Mr. Alasaker's Contacts in the United States and the Claims.**

The Complaint also fails to establish the necessary causal connection between Mr. Alasaker's contacts with the forum and the alleged attempted killing. Plaintiff identifies a series of events and transactions that Mr. Alasaker allegedly attended in the United States, all of which were related to the Foundation's cultural mission or to Mr. Alasaker's role with the private office of the Crown Prince.[6] *See id.* ¶ 56. Plaintiff also alleges, in a conclusory manner, that Mr. Alasaker was involved in recruiting or directing the three other defendants in the search for Aljabri in the United States. *See supra* § I.A. However, even on the face of the Complaint, the efforts by Alrajhi, Abuljadayel, and Alhamed to search for Aljabri were unsuccessful and unrelated to the subsequent "specific plot" to kill Aljabri that supposedly developed in May 2018. *See* Compl. ¶ 220. Those events thus lack a causal connection to the alleged attempted killing.

These three defendants are alleged to have searched for Aljabri from September 2017 "at least through" December 2017. *Id.* ¶ 162. Despite relying heavily on allegations that there was a "search" in the United States, the Complaint is noticeably silent about whether Aljabri was ever actually in the United States during that time period. And the purported "hunt" for Aljabri consisted of the three defendants allegedly asking about the location of Aljabri's wife, with the purpose of arranging a marriage with Aljabri's daughter. *Id.* ¶¶ 162–71. There are no allegations in the

---

[6] Those events included "two MiSK Talks, modeled off of Ted Talks" held in 2018, an art panel discussion and tour of the Newseum held in March 2018, an exhibit of Saudi art at the Kennedy Center held in March 2018, a leadership training program that "included a partnership with Uber to provide rides" held in April 2018, and a "training workshop" conducted "in cooperation with Bloomberg and LinkedIn and hosted at Bloomberg's Washington D.C. offices" in June 2018. Compl. ¶ 93 n.51. The Complaint also alleges that Mr. Alasaker "executed" a "June 2016 agreement with Babson College and Lockheed Martin, which established the Prince Mohammad bin Salman College of Business and Entrepreneurship" in Saudi Arabia, with the signing ceremony occurring in Washington, D.C. *Id.* ¶ 94.

Complaint that Alrajhi, Abuljadayel, and Alhamed ever contacted Aljabri, whether in person, through email, or over the phone, or even specifically asked about Aljabri's whereabouts, as opposed to his wife's. *Id.* ¶ 162. The Complaint also does not allege that they, or Mr. Alasaker, learned that Aljabri resided in Canada. Instead, Aljabri was allegedly located in Toronto, Canada by another defendant after malware was planted on Aljabri's phone. *Id.* ¶¶ 71, 221. The Complaint does not allege any facts connecting that defendant to Mr. Alasaker. *See id.* and *supra* n.4. It was after Aljabri was located in Toronto that "the specific plot to kill Aljabri" was developed around May 2018. *See* Compl. ¶ 220.

The Due Process Clause requires "a causal relationship between the defendant's contacts with the forum and the plaintiff's claims." *Md. Digital Copier v. Litig. Logistics, Inc.*, 394 F. Supp. 3d 80, 93-94 (D.D.C. 2019) (Kelly, J.); *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 137 S. Ct. 1773, 1780 (2017) (explaining that "the *suit*" must "aris[e] out of or relat[e] to the defendant's contacts with the *forum*") (citation omitted). Although the D.C. Circuit has not yet decided the appropriate level of causation, this Court identified two possibilities: a more permissive "but-for" test or a stricter "proximate cause" test. *See Md. Digital Copier*, 394 F. Supp. 3d at 93–94. The but-for "standard is satisfied when the plaintiff's claim would not have arisen in the absence of the defendant's contacts." *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 319 (3d Cir. 2007). Put another way, the "requirement that the claim arises out of or results from the forum-related activities, is . . . not satisfied when the plaintiff would have suffered the same injury even if none of the [defendant's forum] contacts had taken place." *Kuenzle v. HTM Sport-Und Freizeitgerate AG*, 102 F.3d 453, 456–57 (10th Cir. 1996) (citation omitted). For proximate cause, courts "examine[] whether any of the defendant's contacts with the forum are relevant to the merits of the plaintiff's claim." *O'Connor*, 496 F.3d at 319.

As in *Digital Copier*, the Court need not resolve the question of what causality standard applies to decide the Due Process inquiry. 394 F. Supp. 3d at 94 (the "Court need not answer that question for purposes of this case [because] Plaintiff has alleged *no* causal relationship between Defendant's contacts with the District of Columbia and [the claim]"). The federal claims assert an "attempted extrajudicial killing" of Aljabri. *See* Compl. ¶¶ 255, 268. That purported attempted extrajudicial killing is what the case is "really about" for purposes of assessing personal jurisdiction. *Atchley v. AstraZeneca UK Ltd.*, 2020 WL 4040345, at *5 (D.D.C. July 17, 2020) (citation omitted). Under either standard, the necessary causal relationship between Mr. Alasaker's U.S. conduct and Aljabri's claims is absent.

*First*, the events attended by Mr. Alasaker in the United States cannot support jurisdiction. *See* Compl. ¶ 90.a. Those events had nothing to do with the alleged attempted extrajudicial killing of Aljabri. Indeed, Aljabri highlights functions that took place while he still lived in Saudi Arabia and years before any defendant purportedly developed the plot against him. *See, e.g.*, *id.* ¶ 40 (listing events Mr. Alasaker attended in June 2014 through March 2017). Other events that Mr. Alasaker supposedly attended, such as those in Washington, D.C., are not alleged to have been attended by anyone else in this case. *See id.* ¶ 93 n.51. Accordingly, nothing in the Complaint suggests that Mr. Alasaker's attendance at events in the United States was a "but-for" cause of Aljabri's claim of attempted extrajudicial killing.

*Second*, even if Aljabri had factual support for his conclusory allegations that Mr. Alasaker "recruited," "cultivated," and "directed" individuals in the United States, jurisdiction is still lacking because those acts have no relationship to the alleged attempted killing. *See id.* ¶ 163; *see also Estate of Klieman*, 923 F.3d at 1124 (explaining that due process "requires tangible allegations relating the attack that cost Esther Klieman's life to defendants' contacts with the forum");

*Bernhardt v. Islamic Republic of Iran*, 2020 WL 6743066, at *3 (D.D.C. Nov. 16, 2020) (Kelly, J.) (holding plaintiffs failed to establish personal jurisdiction where they "d[id] not show that their injuries, caused by the tragic suicide attack at Camp Chapman, 'arose out of' or 'relate[d] to' [defendants'] contacts with the United States"). Abuljadayel, Alhamed, and Alrajhi never came in contact with Aljabri, whether in person, through email, or over the phone. Compl. ¶¶ 169–71. None of those defendants or Mr. Alasaker learned the location of Aljabri. *Id.* None of those defendants is alleged to have had a role in the development or execution of the alleged "specific plot to kill Aljabri" which was initiated in May 2018. *Id.* ¶ 220; *see also id.* at 33 (chart). As a result, even if Mr. Alasaker's U.S.-related conduct had never taken place—including his purported recruitment, cultivation, and direction of Abuljadayel, Alhamed, and Alrajhi—Aljabri would still have suffered the same injury. *See Kuenzle*, 102 F.3d at 456–57.

### C.   Mr. Alasaker Has Not Purposefully Directed His Acts Toward the United States.

As a last resort, Aljabri attempts to create jurisdiction by alleging that all defendants "engaged in . . . conduct directed at the United States." Compl. ¶ 86. According to Aljabri, the "Defendants acted in concert . . to achieve" the Crown Prince's alleged objective to "eliminate the U.S. Intelligence Community's access to a deeply knowledgeable source." *Id.* ¶¶ 87, 90. The D.C. Circuit and other courts have recognized in limited circumstances that conduct that occurred outside the United States but was directed at the United States may give rise to jurisdiction in the United States, but those circumstances are not satisfied by Aljabri's tenuous allegations about his value to the U.S. intelligence community. *See Mwani*, 417 F.3d at 13–14.

As an initial matter, Mr. Alasaker adopts and incorporates by reference the arguments in the Crown Prince's Brief that Aljabri's allegations concerning Aljabri's purported connections to the U.S. intelligence community are not sufficient to demonstrate that the defendants purposefully

directed their activities at the United States. Crown Prince Br. § I.A.2. Second, as to Mr. Alasaker, that theory is insufficient for an independent reason: there are no allegations that show that Mr. Alasaker shared that alleged objective. Thus, this theory does not justify personal jurisdiction over Mr. Alasaker.

Due process requires specific jurisdiction to rest on "contacts that the 'defendant himself' creates with the forum." *Walden*, 571 U.S. at 284 (quoting *Rudzewicz*, 471 U.S. at 475). Consequently, "the Court cannot assert jurisdiction over individual defendants based on another defendant's actions." *Nuevos Destinos, LLC v. Peck*, 2019 WL 78780, at *8 (D.D.C. Jan. 2, 2019). Because the focus of jurisdiction is on the defendant's own conduct, a defendant's "knowledge" of someone else's "strong forum connections" does not create personal jurisdiction. *Walden*, 571 U.S. at 289.

Yet that is what Aljabri seeks to do here by imputing the Crown Prince's purported motivations to Mr. Alasaker. *See* Compl. ¶ 89. Aljabri offers no specific factual allegations as to Mr. Alasaker's intentions regarding the United States, instead alleging that "each Defendant" was "aware of" or "knew" what Defendant bin Salman "viewed" or "desire[d]" concerning Aljabri. *Id.*[7] But Aljabri fails to plead any *facts* raising a plausible inference that Mr. Alasaker acted with the same supposed intent as the Crown Prince. *See Nuevos Destinos, LLC*, 2019 WL 78780, at *8 (finding no personal jurisdiction where "the thrust of [plaintiffs'] argument is that the nine defendants are subject to the jurisdiction of this Court based on other defendants' actions").

---

[7] In discussing the unrelated Khashoggi killing, Plaintiff alleges that Mr. Alasaker was the Crown Prince's "right-hand man." Compl. ¶ 202. There are no facts supporting that allegation, which has nothing to do with Aljabri's allegations of personal jurisdiction here and does not suggest that Mr. Alasaker shared the Crown Prince's alleged motivations as to Aljabri.

Accordingly, the purported intentions of the Crown Prince cannot establish personal jurisdiction over Mr. Alasaker.

### D.     Exercising Jurisdiction Would Offend Notions of Fair Play and Substantial Justice.

Finally, forcing Mr. Alasaker to defend himself in this jurisdiction would not comport with fair play and substantial justice. *See Mwani*, 417 F.3d at 15. In this analysis, courts consider "the burden on the defendant, the interests of the forum State, the plaintiff's interest in obtaining relief in the forum State, and the interests of other sovereigns in resolving the dispute." *IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 115–16 (D.D.C. 2018) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 145 (2014) (Sotomayor, J., concurring)). All those factors weigh heavily against exercising jurisdiction here, and present the "compelling case" that jurisdiction is "unreasonable." *Id.* at 116 (citation omitted).

*First*, the burden on Mr. Alasaker would be "severe" if he were required to "submit its dispute . . . to a foreign nation's judicial system." *See Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. 102, 114 (1987). Indeed, the Supreme Court instructs that "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Id. Second*, the interests of the forum state—the United States—are minimal because neither Aljabri nor Mr. Alasaker is a U.S. citizen or resident, both are Saudi nationals, and the dispute involves the highest levels of the Saudi Arabian government and the official actions of the Saudi government. This case has no connection to the United States.

*Third*, any interest of the Plaintiff is also lessened here. Aljabri has not chosen to bring suit in the forum in which he resides and where he alleges the group was dispatched to kill him, Canada, or the forum in which he is a citizen, Saudi Arabia. Although he alleges that Saudi Arabia lacks

adequate remedies, Compl. ¶ 253, he provides no factual support for that claim, and makes no such argument as to Canada. Aljabri has not explained why this foreign forum is more convenient for him, and accordingly his interest should be accorded little weight. *See Asahi*, 480 U.S. at 114 ("Cheng Shin has not demonstrated that it is more convenient for it to litigate its indemnification claim against Asahi in California rather than in Taiwan or Japan."). *Finally*, both Canada and Saudi Arabia have a stronger connection to this suit than the United States. Canada is where Aljabri resides, and Saudi Arabia is where Aljabri is a citizen, where Mr. Alasaker resides, and where the relationships that give rise to Aljabri's claims are based. In addition, it is the law of Saudi Arabia (or Canada), that applies to the common law claim.

Accordingly, asserting jurisdiction over Mr. Alasaker would not comport with due process, and the Court should dismiss the claims against him. *See id.* at 115 (emphasizing that courts should be "unwilling[] to find the serious burdens on an alien defendant outweighed by minimal interests on the part of the plaintiff or the forum State").

## II.   THE COURT DOES NOT HAVE JURISDICTION OVER THE CLAIMS AGAINST MR. ALASAKER BECAUSE HE IS IMMUNE.

Aljabri's claims against Mr. Alasaker fail on a second threshold ground—the Court lacks subject matter jurisdiction because Mr. Alasaker is entitled to common law conduct-based immunity, and therefore the Complaint should be dismissed pursuant to Rule 12(b)(1).

Conduct-based immunity is afforded to "any [] [p]ublic minister, official, or agent of the state with respect to acts performed in his official capacity if the effect of exercising jurisdiction would be to enforce a rule of law against the state." *Lewis v. Mutond*, 918 F.3d 142, 145 (D.C. Cir. 2019) (citation omitted); *see Yousuf v. Samantar*, 699 F.3d 763, 769 (4th Cir. 2012) (noting that conduct-based immunity "applies to current and former foreign officials"). Conduct-based immunity "derives from the immunity of the State" and is based on the " 'classical' " theory that

"'any act performed by the individual as an act of the State enjoys the immunity which the State enjoys.'" *Yousuf*, 699 F.3d at 774 (quoting Hazel Fox, *The Law of State Immunity* 455 (2d ed. 2008)); *see Samantar v. Yousuf*, 560 U.S. 305, 322 (2010) ("[W]e do not doubt that in some circumstances the immunity of the foreign state extends to an individual for acts taken in his official capacity."). Mr. Alasaker adopts and incorporates by reference the arguments in the Crown Prince's Brief about the availability of conduct-based immunity to these circumstances, including the argument that conduct-based immunity is available even where the allegation at issue is a *jus cogens* norm, and that the TVPA does not abrogate common law conduct-based immunity. Crown Prince Br. § II.A.3.

Because Mr. Alasaker has not requested a suggestion of immunity from the U.S. Department of State at this time, "the District Court is authorized to decide whether all the requisites for foreign-official immunity exist." *Lewis*, 918 F.3d at 145–46.[8] Mr. Alasaker bears the burden to demonstrate his entitlement to immunity, and although the Court must assume the truth of Plaintiff's factual allegations, it "need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions." *Broidy Capital Mgmt. LLC v. Muzin*, 2020 WL 1536350, at *4 (D.D.C. Mar. 31, 2020) (citation omitted).

D.C. courts have applied two tests to determine whether a defendant is entitled to conduct-based immunity, the "State Department" test, *see Broidy*, 2020 WL 1536350, at *4, and a three-part test set forth in the Restatement (Second) of Foreign Relations Law § 66(f), *Lewis*, 918 F.3d at 146. Mr. Alasaker agrees that, for the reasons set forth in the other defendants' briefs, this Court

---

[8] The Crown Prince has requested a suggestion of immunity from the Department of State which is still pending, *see* Crown Prince Br. § II.A.

should apply the State Department test in this case, and adopts and incorporates by reference the arguments made therein. Crown Prince Br. § II.A.2; Mem. of Law of Youssef Alrajhi, Mohammed Alhamed, and Layla Abuljadayel in Support of their Mot'n to Dismiss ("Student-Defendants Br.") § VIII.A. However, regardless of what test this Court applies, Mr. Alasaker is entitled to conduct-based immunity.

### A.     Mr. Alasaker is Immune Under the State Department Test.

The "State Department" test assesses "whether it is 'the established policy of the State Department to recognize' the asserted 'ground of immunity.'" *Broidy*, 2020 WL 1536350, at * 5 (quoting *Samantar*, 560 U.S. at 312). In *Samantar*, the Supreme Court confirmed that the Foreign Sovereign Immunities Act did not interfere with the Executive Branch's authority to determine the common-law immunity of foreign officials, *see* 560 U.S. at 321–25, which the Executive Branch does by applying the policies of the State Department. For centuries, the essential question in the Executive Branch's application of immunity is whether the foreign-official defendants took the acts at issue in an official capacity for a recognized foreign nation. The United States has recently explained to the Supreme Court that "conduct-based foreign-official immunity generally turns on whether the challenged action was taken in an official capacity." Br. for United States as Amicus Curiae Supporting Petitioners, *Mutond v. Lewis*, No. 19-185, 2020 WL 2866592, at *10 (U.S.) (citing examples dating from 1794 to 2019). And "the State Department's adherence to that principle is . . . reflected in its annual Digest of United States Practice in International Law." *Id.* at *10–11 (citing Office of the Legal Advisor, U.S. Dep't of State, *Digest of United States Practice in International Law* (Carrielyn D. Guymon, ed. 2015), Ch. 10, § B(3), at 426); *see also In re Terrorist Attacks on Sept. 11, 2001*, 122 F. Supp. 3d 181, 188 (S.D.N.Y. 2015) ("The State

Department has consistently recommended conduct-based sovereign immunity when . . . the defendant acted in his official capacity on behalf of a recognized foreign government.").

Recognizing that Mr. Alasaker is entitled to conduct-based immunity is consistent with the State Department's policies. Aljabri alleges that all "[t]he acts" described in Complaint—including those taken by Mr. Alasaker—"were carried out under actual or apparent authority or color of law of the government of Saudi Arabia." Compl. ¶ 239. Aljabri alleges that Mr. Alasaker is the "head" of the Crown Prince's private office, *id.* ¶ 38.3, which, given Plaintiff's allegations, would be a government position by virtue of the Crown Prince's official position as the heir to the throne. Aljabri has also alleged that Mr. Alasaker was the "right-hand" of the Crown Prince of Saudi Arabia, who accompanied an "official delegation" from Saudi Arabia to Washington, D.C. *Id.* ¶¶ 40 n.9, 202. Moreover, the Complaint alleges that Mr. Alasaker had the "*legal* authority" to "exert control over" other defendants. *Id.* ¶ 251 (emphasis added); *see also id.* ¶ 250 ("Alasaker possessed and exercised command and operational control over the U.S.-Based Covert Agent Defendants."). And the only allegation that resembles a factual allegation as opposed to a conclusory assertion is that Mr. Alasaker sought to assist the Crown Prince in coordinating the logistics of Aljabri's return to Saudi Arabia—an act consistent with the allegations that Mr. Alasaker heads the Crown Prince's private office, a government position. *See id.* ¶ 135. Thus, according to Plaintiff's theory of the case, Mr. Alasaker was both an agent of Saudi Arabia and acting in an official capacity. As a result, he is entitled to conduct-based immunity pursuant to the policies of the State Department. *See, e.g., Doe 1 v. Buratai*, 318 F. Supp. 3d 218, 232 (D.D.C. 2018) (holding that defendants acted in official capacity where complaint alleged that they "'exercised effective command and operational control' over the [] military and police forces and the State Security Service or 'exercised command authority and control over the perpetrators' of

the attacks"); *In re Terrorist Attacks on Sept. 11, 2001*, 122 F. Supp. 3d at 187–89 (granting foreign-official immunity because "[t]he only non-conclusory allegation, regarding [defendant's conduct], is an action taken in his official—not his personal—capacity").

###### B.    Mr. Alasaker is Immune Under the Restatement Test.

As described in the Crown Prince's Brief, there are important reasons why this Court should not apply the Restatement (Second) test here, including that the subsequent Restatements of Foreign Relations Law have not adopted the "conduct-based" immunity test set forth in the Restatement (Second) in 1966. *See* Crown Prince Br. § II.A.2. However, even if the Court were to apply the Restatement (Second), Mr. Alasaker would be entitled to conduct-based immunity. The Restatement (Second) of Foreign Relations Law § 66(f) evaluates the following three elements: "[f]irst, whether the actor is a public minister, official, or agent of the foreign state. Second, whether the acts were performed in her official capacity. And third, whether exercising jurisdiction would serve to enforce a rule of law against the foreign state." *Lewis*, 918 F.3d at 146 (citations omitted). All three are satisfied here.

The first and second elements are satisfied from the face of the Complaint because, as described above, Plaintiff's own theory is that Mr. Alasaker was both an agent of Saudi Arabia and acting in an official capacity. *See Dogan v. Barak*, 932 F.3d 888, 894 (9th Cir. 2019) (holding that immunity applied where "[t]he Complaint's claims for relief state—several times—that Barak's actions were done under 'actual or apparent authority, or color of law, of the Israeli [government]'"); *Miango v. Democratic Republic of Congo*, 2020 WL 3498586, at *6 (D.D.C. June 29, 2020) (holding immunity applied where "defendants' assertions are entirely consistent with plaintiffs' own allegations in this case, as plaintiffs have consistently maintained throughout this litigation that the individual defendants were acting in their official capacities").

This case also satisfies the third prong of the Restatement (Second). As the Complaint demonstrates, Aljabri is currently sought by Saudi Arabian authorities for potential crimes committed in Saudi Arabia. *See Saudi Arabia Wants Its Fugitive Spymaster Back*, WSJ (July 17, 2020) (cited Compl. ¶ 180 n.95) (explaining that Aljabri "is on the run from Saudi Arabia," for misusing billions in government money and "[t]he Saudi government issued extradition requests and Interpol notices"). Many of the actions that Aljabri complains of, such as the "freezing" of his bank account, the submission of a notice to INTERPOL, and various immigration issues encountered by Aljabri's family, are acts that are tied up with the policies and actions of the Saudi government. *See* Crown Prince Br. § II.A.2.b. With regard to Mr. Alasaker specifically, his actions, including his phone calls and text messages to Aljabri to "coordinate the time and place of a private jet," were allegedly taken to bring Aljabri back to Saudi Arabia. Compl. ¶ 135. And during the time of the purported search for him, Aljabri was subject to an INTERPOL diffusion notice, *id.* ¶ 176, and Saudi Arabia had asked Turkey to formally extradite him, *id.* ¶ 137. *See also* Crown Prince Br. § II.A.2.b. Moreover, according to *Plaintiff*, the scheme against him arose out of a political power struggle in Saudi Arabia and efforts by the Crown Prince to consolidate his standing. *See* Compl. ¶¶ 108, 184. Based on the narrative alleged by Aljabri, his claims are deeply intertwined with the politics and policies of a foreign state, including its relationship with the United States.

Therefore, a holding from this court that Mr. Alasaker's actions were unlawful would be equivalent to enforcing a rule of law against Saudi Arabia. *See* Crown Prince Br. § II.A.2.b. It would call on this Court to pass judgment on any number of actions taken by the Saudi government and its officials. In addition, as to Mr. Alasaker, Plaintiff seeks not only financial remedies, but the imposition of a "declaratory judgment" stating that he and the other Defendants "have violated

the TVPA by attempting to extrajudicially kill Aljabri" and "have violated the law of nations by attempting to extrajudicially kill Aljabri," as well as any "further relief" the Court deems proper. *See* Compl. ¶¶ 266, 271, p. 106. Any ruling by this Court against Mr. Alasaker or pertaining to the events underlying the Complaint would therefore effectively be dictating to Saudi Arabia that it lacks the authority to seek to hold one of its own officials responsible for crimes committed in Saudi Arabia and imposing liability on the Kingdom for its official actions. *See Buratai*, 318 F. Supp. 3d at 233 ("By interfering with Nigeria's government, a decision would effectively enforce a rule of law against Nigeria.").[9]

## III.   PLAINTIFF'S CLAIMS ARE PRECLUDED BY THE ACT OF STATE DOCTRINE.

Even if the Court were to find that Plaintiff had overcome the jurisdictional issues described above, the Complaint should be dismissed because adjudicating this case would require this Court to inquire into the validity of the public acts a foreign sovereign committed within its own territory, thereby violating the act of state doctrine. In this respect, Mr. Alasaker adopts and incorporates by reference the arguments made in the Crown Prince's brief. Crown Prince Br. § II.C.

## IV.   THE COURT MUST DISMISS THE CLAIMS AGAINST MR. ALASAKER BECAUSE SAUDI ARABIA IS A NECESSARY PARTY THAT CANNOT BE JOINED.

The case must also be dismissed because Saudi Arabia is a necessary party to this litigation under Federal Rule of Civil Procedure 19(a)(1), but joinder is not feasible because this suit against Saudi Arabia is barred by sovereign immunity. *See TJGEM LLC v. Republic of Ghana*, 26 F. Supp.

---

[9] Mr. Alasaker is also entitled to derivative immunity to the extent that Aljabri has plead that Mr. Alasaker was passing along orders from the Crown Prince, Compl. ¶ 164. Mr. Alasaker adopts and incorporates by reference the derivate-immunity arguments made in the Student-Defendants' Brief. Student-Defendants Br. § VIII.E.

3d 1, 13 (D.D.C. 2013), *aff'd*, 2015 WL 3653187 (D.C. Cir. June 9, 2015). Where, as here, the absent party is entitled to sovereign immunity, the inability to join that necessary requires dismissal of the suit under Rule 12(b)(7). *Republic of Philippines v. Pimentel*, 553 U.S. 851, 867 (2008). In this respect, Mr. Alasaker adopts by reference the arguments in the Crown Prince's Brief. Crown Prince Br. § II.B.

## V.   PLAINTIFF FAILS TO STATE A CLAIM UNDER THE TVPA AND ATS

The claims against Mr. Alasaker under the TVPA and ATS should also be dismissed for failure to state a claim under Rule 12(b)(6). As an initial matter, neither the TVPA nor the ATS provides a cause of action for Plaintiff's allegations of "attempted killing." Moreover, even if they did, the same deficiency that doomed Plaintiff's jurisdictional efforts—his reliance on conclusory allegations—dooms his substantive claims.

### A.   The TVPA Does Not Provide A Cause Of Action For Plaintiff's Allegations.

Plaintiff cannot bring a claim of "attempted killing" against Mr. Alasaker under the TVPA for three reasons: (1) the statute prohibits "extrajudicial killing[s]," not attempted extrajudicial killings; (2) Plaintiff failed to exhaust local remedies; and (3) the statute does not provide for secondary liability.

*First*, the TVPA did not create a cause of action for an "attempted" extrajudicial killing. In that statute, Congress chose to create a limited private right of action for certain claims. As relevant here, the TVPA states that an "individual who, under actual or apparent authority, or color of law, of any foreign nation . . . subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death." TVPA, Pub. L. No. 102-256 § 2(a)(2), 106 Stat. 73, *reprinted in* 28 U.S.C. § 1350 note (1992). The statute's limitation to "extrajudicial killing" does not provide relief to a person who was the object of an incomplete or unsuccessful plan to harm him. The claim

-23-

is given only to the legal representative or claimant in an action for wrongful death. *See id.* Congress could of course have created a broader claim, including relief for the victim of a plan or an unsuccessful attempt at homicide, but it chose to limit the claim to those entitled to sue for another's wrongful death. That category does not include Aljabri.

Similarly, Aljabri's allegations fails to state a claim because they are based on the theory that Mr. Alasaker engaged in an *attempted tort* where that tort (the alleged extrajudicial killing) came nowhere near occurring. As described in the other defendants' briefs, liability for "attempted" torts is circumscribed, particularly where no actual tort was committed. *See* Crown Prince Br. § III.A.1; Student-Defendants' Br. § V.A; Mot'n by Messrs. Alqahtani, Alassiri, Alsayed, Algasem, Alsaleh, Alhaqbani, and Alhomid to Dismiss the Complaint § V.D.1.[10] This is also true where the attempted tort is what is alleged here—an inchoate attempt to commit an extrajudicial killing. *See* Crown Prince Br. § III.A.1; Student-Defendants' Br. § V.A; Mot'n by Messrs. Alqahtani, et al. § V.D.1. The defendants that were allegedly sent to Canada for the purposes of killing Aljabri never came close to Aljabri, did not cause him any physical injury, and are not alleged to have had any interaction with him. (And Mr. Alasaker's alleged role in that sequence of events is limited to a conclusory allegation of "support"). Not only do these allegations not amount to an *actual* killing, as required by the statute, but they do not give rise to a viable tort theory.

*Second*, Plaintiff fails to state a claim under the TVPA because the statute requires that a putative plaintiff exhaust his local remedies "in the place in which the conduct giving rise to the claim occurred." TVPA § 2(b). Aljabri has failed to exhaust remedies in Canada and Saudi Arabia,

---

[10] In this respect, Mr. Alasaker adopts and incorporates by reference the arguments set forth in the other defendants' briefs about liability for an attempted tort.

and Mr. Alasaker adopts and incorporates by reference the arguments on this issue set forth in the Crown Prince's Brief. Crown Prince Br. § III.A.2.

*Third*, Plaintiff fails to state a claim under the TVPA pursuant to the secondary lability theories set forth in the Complaint. The Court should dismiss claims based on conspiracy and aiding and abetting theories because the TVPA does not provide for such liability. *See Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 618 (S.D.N.Y. 2012) ("The text of the TVPA is silent as to aiding and abetting, and such silence should not be interpreted as granting and authorizing that liability."). Supreme Court and D.C. Circuit precedent confirm that, in the absence of an express mention of aiding and abetting or conspiracy in civil statutes, courts should not such infer such liability.

The Supreme Court in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994) declined to extend statutory liability under section 10(b) of the Securities Exchange Act of 1934 to include aiding and abetting. The Supreme Court explained that "[i]f . . . Congress intended to impose aiding and abetting liability, we presume it would have used the words 'aid' and 'abet' in the statutory text." *Id.* at 177. Therefore, "[b]ecause the text of [the statute] does not prohibit aiding and abetting," the Court held that "a private plaintiff may not maintain an aiding and abetting suit." *Id.* at 191. Similarly, relying on *Central Bank*, the D.C. Circuit held in an on-point decision that the pre-2016 version of the Anti-Terrorism Act does not include aiding and abetting or conspiracy liability. *Owens v. BNP Paribas S.A.*, 897 F.3d 266 (D.C. Cir. 2018). The court concluded that "[t]he key takeaway from *Central Bank* is that when Congress creates a private cause of action, aiding and abetting liability is not included in that cause of action unless Congress speaks to it explicitly." *Id.* at 277. Under *Central Bank*, "the statutory text controls the definition of conduct covered" by the statute, and "when the statutory text is silent there simply

is no congressional intent to impose aiding and abetting liability." *Id.* at 279 (citation omitted). Leaving no doubt as to its holding, the Court reiterated: "when Congress is silent as to aiding and abetting liability, it has *unambiguously* foreclosed that theory of recovery." *Id.* (emphasis added). The court applied the same reasoning in holding that there was no conspiracy liability under the Act. *Id.* at n.12.

*Central Bank* and *Owens* apply with full force to the TVPA. It is undisputed that the TVPA does not mention aiding and abetting or conspiracy liability. Under *Owens* and *Central Bank*, that statutory silence means Congress has "unambiguously foreclosed" those vicarious forms of liability. *Id.* at 279. "Because the [TVPA] does not expressly provide for aiding and abetting liability, such liability is unavailable." *See id.*[11]

**B.     The ATS Does Not Provide A Cause Of Action For Plaintiff's Allegations.**

Plaintiff's claims under the ATS similarly fail to state a claim for three reasons.

*First*, as described in the Crown Prince's Brief, an inchoate attempted killing does not violate the norms of international law that are the sole subject of the ATS. *See* 28 U.S.C. § 1350

---

[11] The D.C. Circuit's footnote in *Doe v. Exxon Mobil Corp.*, 654 F.3d 11 (D.C. Cir. 2011) regarding the absence of vicarious liability in the TVPA does not bind this Court. *See* 654 F.3d at 58 n.49. The *Exxon* court was not confronted with whether TVPA included vicarious liability for natural persons, but rather a separate issue of whether corporations could be held liable as aiders and abettors under the TVPA. Indeed, the court only "assum[ed] *arguendo* that aiding and abetting liability is available under the TVPA," in holding that corporations could not be liable as aiders and abettors. *Id.* at 58. In a footnote, it responded to then-Judge Kavanaugh's dissent, which, in the majority's view, made the "unnecessar[y]" point that the TVPA did not provide for vicarious liability for natural persons. The majority stated that this position was "inconsistent with the Senate Judiciary Committee report, which states that the statute permits 'lawsuits against persons who ordered, abetted, or assisted in . . . torture.' " *Id.* at 58 n.49 (quoting S. Rep. No. 102–249, at 8 (1991))). Because the issue of natural-person vicarious liability was not at issue in the case, the footnote is dicta. Furthermore, that dicta cannot be reconciled with *Owens*, which rejected reliance on legislative history in determining aiding and abetting liability where the statutory text is silent. Accordingly, the Court should follow the D.C. Circuit's holding in *Owens* and the Supreme Court's holding in *Central Bank*, and conclude that the TVPA does not provide for aiding-and-abetting or conspiracy liability.

(granting "jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States"). In this regard, Mr. Alasaker adopts and incorporates by reference the arguments made by the Crown Prince. Crown Prince Br. § III.B.1.

*Second*, Plaintiff's ATS claim fails because Plaintiff has failed to allege conduct *in the United States* that violated these universal norms (or aided and abetted that violation) and therefore he has not met the jurisdictional requirements of the statute. *See Mastafa v. Chevron Corp.*, 770 F.3d 170, 187 (2d Cir. 2014) (domestic conduct must constitute "a violation of the law of nations or aiding and abetting another's violation of the law of nations"). In this respect, Mr. Alasaker also adopts and incorporates by reference the arguments made by the Crown Prince. Crown Prince Br. § III.B.2.

*Lastly*, Plaintiff's ATS claim fails because the statute does not authorize aiding and abetting liability and binding precedent in this Circuit on this issue should be overturned. The D.C. Circuit has held that aiding and abetting liability is part of the ATS. *Exxon*, 654 F.3d at 28–32. However, the question of whether the ATS allows aiding and abetting liability is currently before the Supreme Court. As the United States has recently argued in its briefing in the pending case, "[u]nder *Jesner*'s application of *Sosa*'s second step, permitting aiding-and-abetting claims 'to proceed' would not represent 'a proper exercise of judicial discretion.'" Br. for United States as Amicus Curiae Supporting Petitioners at 23, *Nestlé USA, Inc. v. Doe I*, Nos. 19-1416 and 19-453 (U.S. Sept. 8, 2020) (quoting *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1399 (2018) (plurality op.)). Accordingly, Mr. Alasaker preserves this issue for review.

## C.   Plaintiff Has Proffered Only Conclusory Allegations To Support The TVPA And ATS Claims.

Thus, even without considering the factual sufficiency of Aljabri's allegations against Mr. Alasaker, the Court should dismiss the TVPA and ATS claims against him because there is no

interpretation of the allegations which would bring them within the critical statutes. But were the Court to examine those allegations, it would see that Aljabri has come nowhere near satisfying the pleading requirements set forth in Rule 12(b)(6) and *Iqbal*, and it should dismiss the Complaint as to Mr. Alasaker altogether.

"To survive a motion to dismiss, the complaint must plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged, and must suggest a plausible scenario that shows that the pleader is entitled to relief." *Muhammad v. United States*, 300 F. Supp. 3d 257, 262 (D.D.C. 2018) (Kelly, J.) (citation omitted). But "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (citation omitted). As the Supreme Court instructed in *Iqbal*, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. Following that procedure here demonstrates that there are no "well-pleaded factual allegations" that "plausibly give rise to an entitlement of relief" against Mr. Alasaker. *Id.*

### 1.    Plaintiff's Conclusory Allegations Regarding Mr. Alasaker's Alleged Involvement Do Not State a Claim for Direct Liability.

Each federal cause of action asserts that Mr. Alasaker is responsible, either directly or vicariously, for the alleged attempted killing of Aljabri in Canada. Compl. ¶¶ 254–78. But, as with the allegations concerning personal jurisdiction, Aljabri has relied on "naked assertions devoid of further factual enhancement," which the Court should ignore in resolving the motion to dismiss. *See Iqbal*, 556 U.S. at 679 (citation omitted).

Like Plaintiff's jurisdictional theory, the substantive claims against Mr. Alasaker hinge on Plaintiff's allegations that Mr. Alasaker "recruited," "cultivated," and "directed" three other defendants to conduct an unsuccessful search for Aljabri from September 2017 through December 2017 for Aljabri in the United States. *See supra* § I.A. For the reasons already discussed, those allegations have no factual support, and, as a result, should not be taken as true. Plaintiff's additional allegations about Mr. Alasaker's involvement in the alleged killing fares no better under the *Iqbal* standard. Aljabri fails to buttress those conclusory assertions with a thrice-repeated allegation that Mr. Alasaker "support[ed]" the purported subsequent plot to kill Aljabri developed around May 2018, months after the search for Aljabri in the United States ended. Compl. ¶¶ 18, 72, 75. Critically, the Complaint offers *no factual allegations* explaining what "support" Mr. Alasaker provided, when he gave it, or how he did so. And the section of the Complaint dedicated to outlining the plot to assassinate Aljabri contain no allegations about Mr. Alasaker's involvement. *Id.* ¶¶ 73–82, 213–33. Mere "naked assertions devoid of further factual enhancement" do not state claim. *Iqbal*, 556 U.S. at 678 (citation omitted). And "the fact that [Aljabri] has 'said it thrice' does not make an allegation true." *Parhat v. Gates*, 532 F.3d 834, 848 (D.C. Cir. 2008) (quoting Lewis Carroll, *The Hunting of the Snark* 3 (1876)).

Indeed, these types of broad allegations of supervisory conduct are just like those the Supreme Court rejected in *Iqbal*, where the plaintiff alleged that Ashcroft and Mueller were, respectively, the "principal architect" of an allegedly discriminatory policy and "instrumental" in implementing the policy. 556 U.S. at 680–81. Those allegations, the Court held, were "not entitled to be assumed true" because they were nothing more than a "formulaic recitation of the elements" of the discrimination claim at issue. *See id.* at 681 (citation omitted); *see also Bundy v. Sessions*, 812 F. App'x 1, 2 (D.C. Cir. 2020) (refusing to accept as true "conclusory allegations that federal

agents acted 'upon orders' from Comey and Kornze"). In line with *Iqbal*, courts in this district have held that "to show that . . . action was taken at the direction of another requires more than just the conclusion that this is what occurred." *Corsi v. Mueller*, 422 F. Supp. 3d 51, 65 (D.D.C. 2019) (quoting *Acosta Orellana v. CropLife Intern.*, 711 F. Supp. 2d 81, 112 (D.D.C. 2010)). Aljabri has not provided anything "more" than conclusory assertions that Mr. Alasaker "recruited," "cultivated," and "directed" others or that he "supported" the alleged May 2018 scheme to kill Aljabri.

Once the Court disregards these conclusory allegations, the only allegations that contain any factual detail as required under Rule 8(a) are that, in September 2017, Mr. Alasaker "repeatedly phoned and sent WhatsApp messages to Aljabri, attempting to coordinate the time and place of a private jet that would bring Aljabri back to Saudi Arabia." Compl. ¶ 135. These messages allegedly followed a message from Crown Prince bin Salman asking Aljabri "where should we dispatch the airplane to fetch you?" *Id.* The Complaint contains no factual assertions showing that Mr. Alasaker knew of the alleged scheme to kill Aljabri. The administrative task of making a few phone calls and text messages seeking to coordinate transportation does not give rise to a plausible inference that Mr. Alasaker was involved in an alleged attempted killing a year later.

Finally, according to Aljabri, Mr. Alasaker is liable for his "direct or indirect participation, including committing certain acts" himself or "directing or ordering [his] subordinates to commit certain acts, including the U.S.-Based Covert Agent Defendants and the Tiger Squad Defendants." Compl. ¶ 240; *see also id.* ¶ 257 (stating that Mr. Alasaker "personally committed, or exercised command responsibility over, the U.S.-Based Covert Agent Defendants and the Tiger Squad Defendants to commit the attempted extrajudicial killing of Aljabri"). But nowhere does the Complaint allege any facts plausibly showing that Mr. Alasaker personally executed the attempted

killing, gave an order for anyone to kill Aljabri, or had any command authority over other defendants. Indeed, Aljabri does not identify *a single connection* between Mr. Alasaker and the "Tiger Squad Defendants" in support of this unfounded accusation. Phrases like "personally committed" and "exercised command responsibility" or had the "legal authority and practical ability to exert control" (Compl. ¶ 251) are essentially "threadbare recitals of the elements of a cause of action" which are insufficient to state a claim. *Iqbal*, 556 U.S. at 678; *see also Mamani v. Berzain*, 654 F.3d 1148, 1153 (11th Cir. 2011) (identifying as conclusory the allegations that defendants "exercised command responsibility over, conspired with, ratified, and/or aided and abetted subordinates in the Armed Forces . . . to commit acts of extrajudicial killing").

The absence of the requisite specific allegations regarding Mr. Alasaker are underscored by two other features of the Complaint. First, the subsequent allegations concerning the alleged "plot" further demonstrate the baseless nature of Aljabri's claim against Mr. Alasaker. According to Aljabri, other defendants—not Mr. Alasaker—allegedly "hatched this specific plot to kill Aljabri no later than May 2018." Compl. ¶ 220 ("On information and belief, . . . Defendant bin Salman and his agents hatched this specific plot to kill Aljabri no later than May 2018, when the Tiger Squad Defendants obtained visas to enter Canada for the purposes of 'tourism.'"). Following the development of the plot, other individuals—again, not Mr. Alasaker—supposedly remotely planted malware in Aljabri's personal phones." *Id.* ¶ 221. Then, in October 2018, "a team consisting of some of the Tiger Squad Defendants"—not Mr. Alasaker—allegedly "planned to enter [Canada] for the purpose of killing Aljabri." *Id.* ¶ 222. At no point from the inception to the execution of this purported plot does Aljabri identify a role for Mr. Alasaker with any factual support. *See id.* ¶¶ 213–33.

Second, in an attempt to cover up these deficiencies, the Complaint also adds on gratuitous allegations that do not involve Aljabri, including that Mr. Alasaker received several phone calls from an unidentified "member of the Tiger Squad" during the attack on Jamal Khashoggi. *Id.* ¶ 202. In addition, Aljabri references an indictment in the Northern District of California concerning a "scheme" from about 2014 to 2016 "to infiltrate Twitter via U.S.-based employees," who were allegedly "tasked with obtaining personal information about critics of Defendant bin Salman." *Id.* ¶ 163. In a footnote, the Complaint alleges that Mr. Alasaker used a "variety of means in both" this Complaint and the Twitter indictment to "recruit" individuals for Defendant bin Salman. *Id.* ¶ 163 n.86. But, as with his earlier conclusory allegations, the Complaint does not provide any facts about how those allegations demonstrate that Mr. Alasaker recruited Alrajhi, Alhamed, or Abuljadayel in *this case* for the purpose of killing Aljabri. Such muckraking does not lend Plaintiff's allegations the factual detail that they lack.

### 2. Plaintiff's Conclusory Allegations Also Fail to State a Claim for Secondary Liability.

Plaintiff's secondary theories of liability, which are premised on conspiracy and aiding and abetting principles, suffer from these same defects. Plaintiff relies on the term "conspiracy" or statements that defendants conspired together or that one defendant aided and abetted another in his attempt to state a claim for conspiracy and aiding and abetting. *See* Compl. ¶ 258 (stating that "[a]lternatively . . . Alasaker conspired with or aided and abetted subordinates" including the "U.S.-Based Covert Agent Defendants and the Tiger Squad Defendants"); *id.* ¶ 241 (stating that Alasaker is liable because "he conspired with, or aided and abetted, subordinates, including the Tiger Squad Defendants and the U.S.-Based Covert Agent Defendants"). A plaintiff asserting aiding and abetting or conspiracy theories must do more than make these types of conclusory allegations. *Twombly*, 550 U.S. at 557 (terms like "conspiracy or even agreement" require factual

support and "might well be sufficient in conjunction with a more specific allegation—for example, identifying a written agreement or even a basis for inferring a tacit agreement, . . . but a court is not required to accept such terms as a sufficient basis for a complaint" (citation omitted)). Instead, a plaintiff must, consistent with the pleading principles set forth in *Iqbal* and elsewhere, sufficiently allege the *details* of the conspiracy or aider/abettor relationship. Aljabri does not do so here.

The Complaint makes no real effort to allege the elements of a conspiracy, which are: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983); *see also Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1159 (11th Cir. 2005) (applying *Halberstam* to Alien Tort Statute claim).

The Complaint contains *no* facts plausibly showing a meeting of the minds—such as identifying a single individual with whom Alasaker allegedly agreed. *See Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 113 (D.D.C. 2010) ("Fatal then to the plaintiffs' conspiracy theory claim is the failure of their amended complaint to provide any indication of when or how such an agreement was brokered, or how the . . . Defendants specifically, as opposed to all the named defendants generally, were parties to an agreement."). Nor does the Complaint identify when or how the conspiracy arose. Instead, the Complaint's support for an agreement is the bald statement that "Defendants had ample opportunity to and in fact did agree to commit unlawful acts." Compl. ¶ 243. That conclusory allegation parrots the legal standard and should be rejected

outright. *See Iqbal*, 556 U.S. at 678 ("[A] formulaic recitation of the elements of a cause of action will not do.") (citation omitted).

The conspiracy claim fails for another reason—it does not adequately allege Mr. Alasaker's knowledge of the existence or purpose of the conspiracy. Where, as here, the "conspirators are not all directly connected, the critical question is whether each conspirator knows of the existence of the larger conspiracy and of the necessity for the other participants, even if he or she does not know their identities." *Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84, 110 (D.D.C. 2017) (citation omitted). Aljabri does not allege facts raising a plausible inference that Mr. Alasaker had any knowledge that others purportedly concocted a plan in May 2018 to kill Aljabri in Canada. As Aljabri's own chart alleges, Compl. at 33, Mr. Alasaker's role in the Complaint is confined to the purported search for Aljabri in the United States from September to December 2017. Moreover, the Complaint does not allege that Mr. Alasaker knew that Aljabri had been found, or that anyone kept Mr. Alasaker abreast of the various alleged developments over time. *See Ofisi*, 278 F. Supp. 3d at 110 (dismissing conspiracy claim where "complaint does not plausibly allege that BNPP knew of the existence of any conspiracy between Sudan and al Qaeda to carry out the embassy bombings").

For similar reasons, Aljabri's aiding and abetting theory also fails. The inquiries under the TVPA—assessed under the common law—and the ATS—assessed under international law— "overlap." *See Ofisi v. BNP Paribas, S.A.*, 2018 WL 396234, at *4 n.7 (D.D.C. Jan. 11, 2018). Under international law, aiding and abetting liability has two elements, *actus reus* and *mens rea*. *Ofisi*, 278 F. Supp. 3d at 108. The *actus reus* requires showing "practical assistance, encouragement, or moral support which has a substantial effect on the perpetration of the crime," such that the "underlying crime probably would not have occurred in the same way had not

-34-

someone acted in the role that the accused [aider and abettor] in fact assumed." *Id.* (citation omitted). For *mens rea*, a defendant is only liable for aiding and abetting if he or she "know[s] that their acts assist the commission of the principal offense." *Id.* at 108–09. Under the common law, aiding and abetting liability "includes the following elements: (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation." *Halberstam*, 705 F.2d at 477.

Whether under common law or international law, Aljabri has failed to plausibly show that Mr. Alasaker provided any substantial assistance or acted with the requisite knowledge. Even assuming there was some factual support underlying the allegations of "recruiting," "cultivating," and "directing," Mr. Alasaker's conduct could not constitute "substantial assistance" because it had *no impact* on the later, separate "specific plot to kill Aljabri." *See supra* § I.B. As a result, Mr. Alasaker's conduct did not make "a significant difference to the commission of the criminal act by the principal." *Ofisi*, 278 F. Supp.3d at 108 (citation omitted); *see also Halberstam*, 705 F.2d at 482 (explaining that act "could constitute 'substantial assistance'" where it was "indispensable prerequisite" to underlying tort).

The Complaint also fails to adequately plead Mr. Alasaker's state of mind, which requires showing that Mr. Alasaker "knowingly" assisted "the principal violation" while being "generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance." *Halberstam*, 705 F.2d at 477, 487–88. The Complaint's support for this element is solely a formulaic recitation of the legal standard: that "[e]ach defendant was aware of his, her or its role in the overall scheme." Compl. ¶ 248. That allegation is not entitled to an assumption of

truth. *See Bernhardt*, 2020 WL 6743066, at *5 (holding that plaintiff failed to plausibly allege knowledge for aiding and abetting where "the[] allegations do not contain facts that plausibly suggest that [defendants] knew they had assumed a role in terrorism"); *Twombly*, 550 U.S. at 555 (formulaic recitation of the elements of a cause of action are insufficient to state a claim). Apart from that conclusory allegation, the Complaint lacks any factual detail regarding Mr. Alasaker's knowledge of other defendants' supposed intent to kill Aljabri and "come[s] up well short of th[e] high bar" to plead aiding and abetting liability." *Bernhardt*, 2020 WL 6743066, at *5.

For these reasons, Plaintiff has failed to establish any liability theory supporting his ATS and TVPA claims, and those claims should be dismissed.

**VI.   IF THE COURT DISMISSES THE FEDERAL LAW CLAIMS, THE COURT LACKS PERSONAL JURISDICTION OVER MR. ALASAKER AND SHOULD DECLINE SUBJECT MATTER JURISDICTION OVER THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM.**

If the Court dismisses the federal law claims, the intentional infliction of emotional distress (IIED) claim should be dismissed for two initial reasons.

*First*, the Court would lack personal jurisdiction over Mr. Alasaker. Aljabri relies on Federal Rule 4(k)(2) for jurisdiction, which applies only to claims "under federal law" and, as a result, does not apply to the IIED claim. To assert jurisdiction for the IIED claim, Aljabri invokes the doctrine of pendent personal jurisdiction. Compl. ¶ 92. For the reasons explained in the Crown Prince's brief, which Mr. Alasaker adopts and incorporates by reference, once the Court dismisses the federal law causes of action, it no longer has the power to exercise personal jurisdiction over the IIED claim and should dismiss that claim. *See* Crown Prince Br. § III.C.3.

*Second*, the Court should decline to exercise jurisdiction over the IIED claim if the Court dismisses the TVPA and ATS causes of action. Because Aljabri's sole basis for jurisdiction over this claim is 28 U.S.C. § 1367, *see* Compl. ¶ 84, the district court may "decline to exercise

supplemental jurisdiction over a claim if," *inter alia*, "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). In this respect, Mr. Alasaker adopts and incorporates by reference the arguments in the Crown Prince brief regarding the unavailability of supplemental jurisdiction over this claim. *See* Crown Prince Br. § III.C.4.

## VII.   PLAINTIFF FAILS TO STATE A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

The common law IIED claim must also be dismissed for failure to state a claim under Rule 12(b)(6).

### A.   The Intentional Infliction Of Emotional Distress Claim Is Governed By Saudi Arabian Law And Must Be Dismissed.

As section III.C.1 of the Crown Prince's Brief shows (which Mr. Alasaker incorporates and adopts by reference), both Saudi Arabia and Canada have potential interests in having their law applied to Aljabri's claim for IIED. However, the IIED claim is ultimately governed by Saudi Arabian law, which does not recognize a cause of action for IIED. *See* Crown Prince Br. § III.C.1. Thus, the IIED claim must be dismissed.

### B.   Plaintiff Has Failed To State A Claim For Intentional Infliction Of Emotional Distress Under D.C. Law.

Even assuming D.C. law applies, the Court should dismiss the IIED claim as to Mr. Alasaker for the reasons set forth below. In D.C., a claim for intentional infliction of emotional distress requires "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff [to suffer] severe emotional distress." *Ortberg v. Goldman Sachs Grp.*, 64 A.3d 158, 163 (D.C. 2013) (citation omitted). Plaintiff is unable to meet this "strict test." *Id.*

*First*, as described above, *Iqbal* requires that Plaintiff advance more than conclusory allegations to support his claim. Aljabri's IIED claim is premised on the same conclusory

allegations that doom Plaintiff's allegations against Mr. Alasaker as a whole, and thus the IIED claim should be dismissed for that reason.[12]

*Second*, Aljabri's efforts to sustain the IIED claim based on theories of conspiracy and aiding and abetting liability fail for the same reasons as in section V.C.2, *supra*.

*Third*, Aljabri has not alleged any specific, non-conclusory facts supporting an inference that *Mr. Alasaker's* conduct caused him distress. The allegations in the Complaint identifying the *timing* and *cause* of Aljabri's distress suggest that Aljabri suffered this alleged emotional distress in response to learning that his adult children had been "disappeared" in Saudi Arabia—which occurred in March 2020—years after any allegations of any involvement by Mr. Alasaker in the underlying events. *See* Compl. ¶¶ 149–50. The Complaint does not specifically allege that Aljabri's emotional distressed was caused by other events. *See Klayman v. Judicial Watch, Inc.*, 296 F. Supp. 3d 208, 216 (D.D.C. 2018) (explaining that to adequately plead intentional infliction of emotional distress claim "with respect to his allegation that Defendants' non-payment of insurance contributed to his alleged emotional distress, Plaintiff could be expected to show, for example, '[h]ow emotional distress arose from the non-payment of insurance'").

*Fourth*, to the extent Plaintiff's IIED claim as to Mr. Alasaker rests on the allegations regarding the "kidnapping" of his adult children, that claim must fail for two separate reasons. For one, the Complaint has no allegations that Mr. Alasaker had any involvement in this alleged

---

[12] The conclusory allegations also require dismissal if Canadian law were to apply. Canada's analogous tort is intentional infliction of mental suffering, which requires showing that "the defendant's conduct was flagrant and outrageous; the defendant's conduct was calculated to harm the plaintiff; [and] the defendant's conduct caused the plaintiff to suffer a visible and provable illness." *Boucher v. Wal-Mart Canada Corp.*, 2014 ONCA 419, ¶ 41. Naked assertions of "recruiting," "cultivating," and "directing" do not plead any "flagrant and outrageous conduct" or demonstrate that Mr. Alasaker caused any harm to Aljabri. The Complaint also does not allege that such actions were "calculated" to harm Aljabri.

"kidnapping." Compl. ¶¶ 139–48. Thus, there is no factual basis for finding him liable for those actions. In addition, D.C. law provides that where conduct is "directed at a third person," (here Aljabri's adult children), a member of that person's family will have a claim for intentional infliction of emotional distress only if the family member was "present at the time." Restatement (Second) of Torts § 46(2)(a); *Republic of Sudan v. Owens*, 194 A.3d 38, 41–42 (D.C. 2018). Here, as discussed in the Crown Prince's Brief (which Mr. Alasaker adopts and incorporates by reference), Aljabri does not allege that he was present for that kidnapping, Compl. ¶ 149. *See* Crown Prince Br. § III.C.2. Those events cannot serve as a basis for this claim.

*Fifth*, Aljabri cannot state a claim based on Mr. Alasaker's alleged role in directing individuals for the "hunt" in the United States, *see* Compl. ¶ 275, because that conduct does not amount to "extreme or outrageous conduct." The act of those defendants asking *other individuals* about the location of Aljabri's wife is not extreme or outrageous conduct as to *Aljabri*. Alrajhi, Abuljadayel, and Alhamed never came in contact with Aljabri, whether in person, through emails, or by telephone.

Finally, for the reasons stated in the Crown Prince's Brief, Aljabri cannot state a claim because under the law, an *attempt* to commit bodily harm that results *only* in emotional distress is not actionable as an intentional infliction of emotional distress claim. *See* Crown Prince Br. § III.C.2.

## CONCLUSION

For all the foregoing reasons, the Court should dismiss the claims against Mr. Alasaker.

Respectfully submitted,

*/s/ William W. Taylor, III*
By: William W. Taylor, III (D.C. Bar No. 84194)

-39-

Margarita K. O'Donnell (D.C. Bar No. 1005972)
ZUCKERMAN SPAEDER LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036
Tel: (202) 778-1800
Fax: (202) 822-8106
E-mail: wtaylor@zuckerman.com
E-mail: modonnell@zuckerman.com
Telephone: (202) 778-1800
Facsimile: (202) 822-8106

*Attorneys for Defendant Bader Alasaker*

**CERTIFICATE OF SERVICE**

I certify that on December 7, 2020, I electronically filed the foregoing Bader Alasaker's

Motion to Dismiss and Memorandum in Support of His Motion to Dismiss, using the ECF

system, which sent notice of filing in this matter to all counsel of record.

*/s/ William W. Taylor, III*

William W. Taylor, III
*Attorney for Defendant Bader*
*Alasaker*