**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| SAAD ALJABRI,<br><br>*Plaintiff*,<br><br>v.<br><br>MOHAMMED BIN SALMAN BIN<br>ABDULAZIZ AL SAUD, *et al*.,<br><br>*Defendants*. | Civil Action No. 20-2146 (TJK) |

---

**DEFENDANT MOHAMMED BIN SALMAN BIN ABDULAZIZ AL SAUD'S**
**MOTION TO DISMISS AMENDED COMPLAINT**

---

Michael K. Kellogg (DC 372049)
Gregory G. Rapawy (DC 493973)
Andrew C. Shen (DC 500071)
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900

*Attorneys for Defendant*
*Mohammed bin Salman bin Abdulaziz Al Saud*

April 5, 2021

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................... iv

INTRODUCTION ......................................................................................1

SUMMARY OF RELEVANT ALLEGATIONS AND MATERIALS CITED IN
    THE AMENDED COMPLAINT OR SUBJECT TO NOTICE ................................5

ALJABRI'S PURPORTED SERVICE ON THE CROWN PRINCE ..........................13

STANDARD OF REVIEW .........................................................................13

ARGUMENT ..........................................................................................14

I.    Aljabri Fails To Establish Personal Jurisdiction over the Crown Prince ..........................14

    A.    The Amended Complaint Fails To Allege Suit-Related Contacts
        Between the Crown Prince and the United States ...................................15

        1.    Other Defendants' Alleged Actions in the United States Do
            Not Support Personal Jurisdiction over the Crown Prince ......................15

            a.    There Is No Basis To Attribute the Alleged
                Contacts to the Crown Prince .........................................16

            b.    There Is No Strong Relationship Between the
                Alleged Contacts and Aljabri's Claims............................19

        2.    Aljabri's Own Alleged Contacts with the United States Do
            Not Support Personal Jurisdiction ..............................................20

        3.    Allegations of Other Contacts Do Not Support Personal
            Jurisdiction .................................................................22

    B.    Exercising Jurisdiction Would Offend Notions of Fair Play and
        Substantial Justice ................................................................23

    C.    Jurisdictional Discovery Is Unwarranted................................................24

II.    Aljabri's Claims Are Barred by Official Immunity, Because Saudi Arabia
    Cannot Be Joined, and by the Act of State Doctrine .......................................25

    A.    The Crown Prince Is Immune from Suit................................................25

        1.    The Crown Prince Is Entitled to Head-of-State Immunity .......................27

        2.    The Crown Prince Is Entitled to Conduct-Based Immunity ....................31

|  |  | a. | Aljabri's Claims Are Barred Under the State Department's Policy.................................................32 |
|  |  | b. | Aljabri's Claims Are Barred Under the Second Restatement......................................................37 |
|  | 3. | No Exception to the Crown Prince's Immunity Exists or Applies....................................................38 |
| B. | Saudi Arabia Is Necessary, Indispensable, and Immune from Suit......................41 |
| C. | The Act of State Doctrine Bars Aljabri's Claims ....................................47 |
| III. | Aljabri Fails To State a Claim Under Statutory or Common Law .......................51 |
| A. | Aljbari Fails To State a Claim Under the TVPA ....................................51 |
|  | 1. | The Amended Complaint Fails To Allege an "Extrajudicial Killing" .....................................................51 |
|  | 2. | Aljabri Has Not Exhausted Adequate, Available Remedies.....................54 |
|  |  | a. | Aljabri Has Not Exhausted Remedies in Canada ..........................55 |
|  |  | b. | Aljabri Has Not Exhausted Remedies in Saudi Arabia........................................................56 |
| B. | Aljabri Fails To Establish Jurisdiction or State a Claim Under the ATS .................................................................56 |
|  | 1. | An Attempted Extrajudicial Killing Does Not Violate Any Specific, Universal, and Obligatory Norm of International Law ....................................................................58 |
|  | 2. | The Domestic Conduct Alleged in the Amended Complaint Did Not Plausibly Aid or Abet a Primary Violation of the Law of Nations...........................................................60 |
| C. | The Court Should Dismiss Aljabri's Claim for Intentional Infliction of Emotional Distress..........................................63 |
|  | 1. | Applicable Saudi Arabian Law Does Not Recognize Intentional Infliction of Emotional Distress as a Cause of Action ............................................................63 |
|  | 2. | Aljabri Also Fails To State a Claim Under D.C. Law ..............................67 |
|  | 3. | If the Court Dismisses Aljabri's Federal Claims, It Lacks Personal Jurisdiction over the Crown Prince ...............................68 |

4.    Alternatively, the Court Should Decline To Exercise
      Supplemental Subject-Matter Jurisdiction over Aljabri's
      Claim.................................................................................................69

CONCLUSION...................................................................................................70

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES[*]

Page

CASES

*Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81 (D.D.C. 2010)............................................68

*Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184 (5th Cir. 2017) ......................................57

\* *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1 (D.D.C. 2010)...............................................................58, 59

*Ali Shafi v. Palestinian Auth.*, 642 F.3d 1088 (D.C. Cir. 2011)....................................................70

*Aluminum Warehousing Antitrust Litig.*, In re, 90 F. Supp. 3d 219
    (S.D.N.Y. 2015)........................................................................................................................19

*APA Assessment Fee Litig.*, In re, 766 F.3d 39 (D.C. Cir. 2014) ......................................64, 65, 66

*Araya v. JPMorgan Chase Bank, N.A.*, 775 F.3d 409 (D.C. Cir. 2014) ....................................70

*Artis v. District of Columbia*, 51 F. Supp. 3d 135 (D.D.C. 2014) ...............................................70

*Asahi Metal Indus. Co. v. Superior Ct. of California*, 480 U.S. 102 (1987) ..........................23, 24

\* *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...............................................................................13, 17, 35

*Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34 (D.D.C. 2003).......................................16

*Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121 (2015) .........................................................40

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964) ................................................47, 48

*Belhas v. Ya'alon*, 515 F.3d 1279 (D.C. Cir. 2008)......................................................................39

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..............................................................13, 18, 63

*Bernhardt v. Islamic Republic of Iran*, 2020 WL 6743066 (D.D.C. Nov. 16, 2020) ...................13

*Boles v. Greeneville Hous. Auth.*, 468 F.2d 476 (6th Cir. 1972) ...............................................45

*Boniface v. Viliena*, 338 F. Supp. 3d 50 (D. Mass. 2018)............................................................55

*Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020) .........................................................................52

*Bristol-Myers Squibb Co. v. Superior Ct. of California*, 137 S. Ct. 1773 (2017) .........................14

*Brit UW, Ltd. v. Manhattan Beachwear, LLC*, 235 F. Supp. 3d 48 (D.D.C. 2017).....................25

---

[*] Authorities principally relied upon are marked with an asterisk.

*Broidy Cap. Mgmt. LLC v. Muzin*, 2020 WL 1536350 (D.D.C. Mar. 31, 2020),
    *appeal pending*, No. 20-7040 (D.C. Cir. argued Feb. 26, 2021) ................................31, 32

*Byrd v. Corporacion Forestal y Indus. de Olancho S.A.*, 182 F.3d 380
    (5th Cir. 1999)...............................................................................................36

*Carazani v. Zegarra*, 972 F. Supp. 2d 1 (D.D.C. 2013) ..............................................53

*Carswell v. Air Line Pilots Ass'n, Int'l*, 540 F. Supp. 2d 107 (D.D.C. 2008) ..............................16

*Celgard, LLC v. SK Innovation Co.*, 792 F.3d 1373 (Fed. Cir. 2015)............................................17

*Cheyenne Arapaho Tribes of Oklahoma v. United States*, 558 F.3d 592
    (D.C. Cir. 2009) ..............................................................................................25

*Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095 (9th Cir. 1990)...............................................36

*Comcast Corp. v. National Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009
    (2020)...............................................................................................................53

*Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019 (W.D. Wash. 2005), *aff'd*,
    503 F.3d 974 (9th Cir. 2007) ............................................................................55

*Covad Commc'ns Co. v. Bell Atl. Corp.*, 407 F.3d 1220 (D.C. Cir. 2005).....................................1

*D'Addario v. Geller*, 264 F. Supp. 2d 367 (E.D. Va. 2003) ..........................................69

*Daimler AG v. Bauman*, 571 U.S. 117 (2014)....................................................14, 23

*Davenport v. International Bhd. of Teamsters, AFL-CIO*, 166 F.3d 356
    (D.C. Cir. 1999) ..............................................................................................41

*de Csepel v. Republic of Hungary*, --- F. Supp. 3d ---, 2020 WL 2343405
    (D.D.C. May 11, 2020), *interlocutory appeal pending*, No. 20-7047
    (D.C. Cir.) .......................................................................................................45

*Doe v. Exxon Mobil Corp.*:

    393 F. Supp. 2d 20 (D.D.C. 2005) ("*Exxon I*"), *appeal dismissed*,
    473 F.3d 345 (D.C. Cir. 2007)....................................................................53, 55

    654 F.3d 11 (D.C. Cir. 2011) ("*Exxon II*"), *vacated*, 527 F. App'x 7
    (D.C. Cir. 2013) ...............................................................................57, 61, 62, 63

    527 F. App'x 7 (D.C. Cir. 2013)......................................................................61

    2015 WL 5042118 (D.D.C. July 6, 2015) ("*Exxon III*")......................................52, 57, 61

*Doe v. Federal Democratic Republic of Ethiopia*, 851 F.3d 7 (D.C. Cir. 2017)....................45, 46

*Doe 1 v. Buratai*, 318 F. Supp. 3d 218 (D.D.C. 2018), *aff'd*, 2019 WL 668339
(D.C. Cir. Feb. 15, 2019), and *aff'd*, 792 F. App'x 6 (D.C. Cir. 2019).......................38, 39

*Doe I v. State of Israel*, 400 F. Supp. 2d 86 (D.D.C. 2005)..........................................................48

*Doğan v. Barak*, 932 F.3d 888 (9th Cir. 2019) ...............................................................37, 39, 40

*Duarte v. Nolan*, 190 F. Supp. 3d 8 (D.D.C. 2016), *aff'd*, 2017 WL 7736939
(D.C. Cir. Apr. 18, 2017) ...........................................................................................16

*Enterprise Mgmt. Consultants, Inc. v. United States ex rel. Hodel*, 883 F.2d 890
(10th Cir. 1989)...........................................................................................................44

*Estate of Domingo v. Marcos*, 1983 WL 482332 (W.D. Wash. July 14, 1983) ...........................28

*Estate of Klieman v. Palestinian Auth.*, 923 F.3d 1115 (D.C. Cir. 2019),
*cert. granted, vacated, and remanded*, 140 S. Ct. 2713 (2020)................................15, 21

*Farhang v. Indian Inst. of Tech.*, 655 F. App'x 569 (9th Cir. 2016) ...........................................36

*FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087 (D.C. Cir. 2008) ........................................25

*FiberLight, LLC v. National R.R. Passenger Corp.*, 81 F. Supp. 3d 93
(D.D.C. 2015) .............................................................................................................70

*First Chicago Int'l v. United Exchange Co.*, 836 F.2d 1375 (D.C. Cir. 1988)...........................16

* *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323 (D.D.C. 2020) .........................53, 54, 68

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, No. 19-368
(U.S. Mar. 25, 2021) ..........................................................................................14, 19

*Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*,
582 F.3d 393 (2d Cir. 2009)........................................................................................31

*GEICO v. Fetisoff*, 958 F.2d 1137 (D.C. Cir. 1992)....................................................................64

*Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88 (D.D.C. 2017) ........................................54

*Giraldo v. Drummond Co.*, 808 F. Supp. 2d 247 (D.D.C. 2011), *aff'd*,
493 F. App'x 106 (D.C. Cir. 2012)..............................................................................39

*Grand Jury Proceedings, Doe No. 700, In re*, 817 F.2d 1108 (4th Cir. 1987)...........................26

*Gregorio v. Gordon*, 215 F. Supp. 3d 1 (D.D.C. 2015).........................................................16, 22

*Habyarimana v. Kagame*, 696 F.3d 1029 (10th Cir. 2012) ........................................................39

*Haim v. Neeman*, 2013 WL 12157279 (D.N.J. Jan. 23, 2013), *aff'd*,
543 F. App'x 152 (3d Cir. 2013) ..................................................56

*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) ..................................................60

*Harbury v. Hayden*, 444 F. Supp. 2d 19 (D.D.C. 2006), *aff'd*, 522 F.3d 413
(D.C. Cir. 2008) ..................................................55

*Heath v. Alabama*, 474 U.S. 82 (1985) ..................................................38, 48

*Heck v. Humphrey*, 512 U.S. 477 (1994) ..................................................53

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984) ..................................................14

\*   *Hourani v. Mirtchev*, 796 F.3d 1 (D.C. Cir. 2015) ..................................................47, 48, 49, 50

*Howard Univ. v. Best*, 484 A.2d 958 (D.C. 1984) ..................................................66

*Hungerstation LLC v. Fast Choice LLC*, 2020 WL 137160 (N.D. Cal. Jan. 13,
2020), *appeal pending*, No. 20-15090 (9th Cir.) ..................................................23

*IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95 (D.D.C. 2018) ..................................................23, 25

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) ..................................................14

*Jerez v. Republic of Cuba*, 775 F.3d 419 (D.C. Cir. 2014) ..................................................46

*Jones v. United States*, 318 F. Supp. 3d 15 (D.D.C. 2018) ..................................................13

*Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020 (D.C. Cir. 1997) ..................................................36

*Kaplan v. Central Bank of Islamic Republic of Iran*, 896 F.3d 501
(D.C. Cir. 2018) ..................................................60

*Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12 (D.D.C. 2019) ..................................................54

*Karem v. Trump*, 404 F. Supp. 3d 203 (D.D.C. 2019), *aff'd as modified*,
960 F.3d 656 (D.C. Cir. 2020) ..................................................40

*Khatib v. Alliance Bankshares Corp.*, 846 F. Supp. 2d 18 (D.D.C. 2012) ..................................................16

\*   *Kickapoo Tribe of Indians of Kickapoo Reservation in Kansas v. Babbitt*,
43 F.3d 1491 (D.C. Cir. 1995) ..................................................42, 47

*Kilroy v. Windsor*, 1978 U.S. Dist. LEXIS 20419 (N.D. Ohio, Dec. 7, 1978) ..................................................28

*Kiobel v. Royal Dutch Petroleum Co*., 569 U.S. 108 (2013) ..................................................56, 57

*Klayman v. Obama*, 125 F. Supp. 3d 67 (D.D.C. 2015) ..................................................1

*Kline v. Kaneko*, 535 N.Y.S.2d 303 (Sup. Ct., N.Y. Cty., 1988), *aff'd sub nom.*
   *Kline v. Cordero De La Madrid*, 154 A.D.2d 959 (N.Y. App. Div. 1989).................26, 28

*Knapp Med. Ctr. v. Hargan*, 875 F.3d 1125 (D.C. Cir. 2017).........................................13

*Lattisaw v. District of Columbia*, 118 F. Supp. 3d 142 (D.D.C. 2015), *aff'd*,
   672 F. App'x 22 (D.C. Cir. 2016)........................................................................70

\* *Lewis v. Mutond*, 918 F.3d 142 (D.C. Cir. 2019), *cert. denied*, 141 S. Ct. 156
   (2020) .....................................................................................................26, 27, 31,
                               32, 37, 38, 40, 41

\* *Livnat v. Palestinian Auth.*, 851 F.3d 45 (D.C. Cir. 2017)...................................13, 14, 15, 18, 21

*Manoharan v. Rajapaksa*, 711 F.3d 178 (D.C. Cir. 2013) .......................................27, 39

*Margolis v. U-Haul Int'l, Inc.*, 818 F. Supp. 2d 91 (D.D.C. 2011) ...............................65

*Mastafa v. Chevron Corp.*, 770 F.3d 170 (2d Cir. 2014)..............................................57

*Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843 (D.C. Cir. 2006) .....................63-64

*Matar v. Dichter*, 563 F.3d 9 (2d Cir. 2009)...........................................26, 37, 39, 40

*McGhee v. Arabian Am. Oil Co.*, 871 F.2d 1412 (9th Cir. 1989)............................64, 65

*McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066 (D.C. Cir. 2012) ......47, 51

*Mezerhane v. Republica Bolivariana de Venezuela*, 785 F.3d 545 (11th Cir. 2015) ...................47

*Miango v. Democratic Republic of Congo*, 2020 WL 3498586 (D.D.C. June 29,
   2020), *appeals pending*, Nos. 20-5244 *et al.* (D.C. Cir.)........................27, 32, 37

*Mwani v. bin Laden*, 417 F.3d 1 (D.C. Cir. 2005) .......................................................23

*Nnaka v. Federal Republic of Nigeria*:

     238 F. Supp. 3d 17 (D.D.C. 2017), *aff'd*, 756 F. App'x 16 (D.C. Cir. 2019)............... 47-48

     756 F. App'x 16 (D.C. Cir. 2019).......................................................38, 45, 48

*Oetiker v. Jurid Werke, G.m.b.H.*, 556 F.2d 1 (D.C. Cir. 1977)....................................69

*Ofisi v. Al Shamal Islamic Bank*, 2019 WL 1255096 (D.D.C. Mar. 19, 2019) ......16, 19

*Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84 (D.D.C. 2017)....................60, 61, 62, 63

*Olin Corp. v. Fisons PLC*, 47 F. Supp. 2d 151 (D. Mass. 1999)....................................69

*Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017), *vacated in part sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020) ...................................51-52

*Papasan v. Allain*, 478 U.S. 265 (1986) ...........................................................63

*Papst Licensing GMBH & Co. KG Litig.*, *In re*, 590 F. Supp. 2d 94 (D.D.C. 2008) ..................25

*Petersen v. Boeing Co.*, 2015 WL 12090213 (D. Ariz. Feb. 18, 2015)..........................................65

*Philippine Nat'l Bank*, *In re*, 397 F.3d 768 (9th Cir. 2005)..................................................49

*Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*, 68 A.3d 697 (D.C. 2013) ..........................................................66

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981).......................................................55

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244 (2d Cir. 2009)...........................................................60

*Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82 (D.C. Cir. 2002) ...................15

*Rehberg v. Paulk*, 566 U.S. 356 (2012) ..........................................................40

* *Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008)...................................37, 42, 43, 44, 47

*Republic of Sudan v. Owens*, 194 A.3d 38 (D.C. 2018) ..........................................................67, 68

*Riggs Nat'l Corp. & Subsidiaries v. Commissioner*, 163 F.3d 1363 (D.C. Cir. 1999) ..........................................................48

*RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090 (2016)..........................................................57

*Rojas Mamani v. Sanchez Berzain*, 636 F. Supp. 2d 1326 (S.D. Fla. 2009) ..........................................................55

*Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018)..........................................................46

*Rush v. Savchuk*, 444 U.S. 320 (1980)..........................................................20

*Salman v. Saudi Arabian Cultural Mission*, 2017 WL 176576 (E.D. Va. Jan. 17, 2017)..........................................................8

* *Samantar v. Yousuf*, 560 U.S. 305 (2010) ...............................25, 26, 27, 31, 32, 36, 45

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993)..........................................................38

*Schermerhorn v. State of Israel*, 876 F.3d 351 (D.C. Cir. 2017)..........................................................46

*Schertzman Cohen v. Islamic Republic of Iran*, 2019 WL 3037868 (D.D.C. July 11, 2019)..........................................................54

*Search of Info. Assoc. with [redacted]@gmail.com that is Stored at Premises Controlled by Google, Inc.*, In re, 2017 WL 3445634 (D.D.C. July 31, 2017) ................................................................................................................ 62-63

*Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016 (D.C. Cir. 2020) .................................. 15, 21

*Shekoyan v. Sibley Int'l*, 409 F.3d 414 (D.C. Cir. 2005) ................................................ 70

*Sikhs for Justice v. Singh*, 64 F. Supp. 3d 190 (D.D.C. 2014) ........................................ 26

*Society of Lloyd's v. Siemon-Netto*, 457 F.3d 94 (D.C. Cir. 2006) ................................... 48

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) ................................................ 56, 57, 58, 59, 60

*Spanski Enters., Inc. v. Telewizja Polska, S.A.*, 883 F.3d 904 (D.C. Cir. 2018) ......................... 57

*Stand Up for California! v. U.S. Dep't of the Interior*, 204 F. Supp. 3d 212 (D.D.C. 2016), *aff'd*, 879 F.3d 1177 (D.C. Cir. 2018), *cert. denied*, 139 S. Ct. 786 (2019) ............................................................................... 41, 42

*Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300 (2d Cir. 1981) ................................................................................. 31

* *TJGEM LLC v. Republic of Ghana*, 26 F. Supp. 3d 1 (D.D.C. 2013), *aff'd*, 2015 WL 3653187 (D.C. Cir. June 9, 2015) ......................................... 42, 43, 44, 45, 47

*Two Shields v. Wilkinson*, 790 F.3d 791 (8th Cir. 2015) ............................................. 45

*United Mine Workers of Am. v. Gibbs*, 383 U.S. 715 (1966) .......................................... 70

*United States v. Ali*, 885 F. Supp. 2d 17 (D.D.C. 2012), *aff'd in relevant part*, 718 F.3d 929 (D.C. Cir. 2013) ........................................................... 59

*United States v. Botefuhr*, 309 F.3d 1263 (10th Cir. 2002) ........................................... 69

*United States v. Texas*, 507 U.S. 529 (1993) ........................................................ 40

*University of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013) ................................... 53

*Van Beneden v. Al-Sanusi*, 709 F.3d 1165 (D.C. Cir. 2013) ........................................... 54

*Viray v. FDIC*, 2010 WL 11538694 (D.D.C. July 19, 2010), *aff'd*, 418 F. App'x 1 (D.C. Cir. 2011) ...................................................................... 1

*W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., Int'l*, 493 U.S. 400 (1990) ............................................................................................ 47

* *Walden v. Fiore*, 571 U.S. 277 (2014) ......................................................... 14, 15, 20, 25

*Washkoviak v. Student Loan Mktg. Ass'n*, 900 A.2d 168 (D.C. 2006) ....................................64, 66

*Weinstein v. Islamic Republic of Iran*, 831 F.3d 470 (D.C. Cir. 2016) ................................. 45-46

*Western Assocs. Ltd. P'ship, ex rel. Ave. Assocs. Ltd. P'ship v. Market Square Assocs.*, 235 F.3d 629 (D.C. Cir. 2001) .............................................................................1

*WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129 (2018) ......................................57

*Williams v. District of Columbia*, 9 A.3d 484 (D.C. 2010) ........................................................66

*Williams v. Yamaha Motor Co.*, 851 F.3d 1015 (9th Cir. 2017)...................................................17

*World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154 (D.C. Cir. 2002) ...........................................................................................................47, 48

*Ye v. Zemin*, 383 F.3d 620 (7th Cir. 2004)...................................................................................39

*Yousuf v. Samantar*, 699 F.3d 763 (4th Cir. 2012) ....................................................26, 27, 28, 36

INTERNATIONAL CASES

*Apex Global Mgmt. Ltd. v. Fi Call Ltd.*, [2013] EWHC 587 (Ch) ..........................................30, 31

*Application for Arrest Warrant Against General Shaul Mofaz* (Bow St. Mag. Ct. Feb. 12, 2004) (Eng.) (Pratt, Dist. J.), *reprinted in Current Developments: Public International Law*, 53 Int'l & Comp. L.Q. 769 (July 2004)..................................31

*Boucher v. Wal-Mart Canada Corp.*, 2014 ONCA 419 (Can.) ....................................................65

*Nevsun Res. Ltd. v. Araya*, 2020 SCC 5 (Can.) ..........................................................................55

*Prosecutor v. Perišić*, Case No. IT-04-81-T, Judgement (Feb. 28, 2013), https://www.icty.org/x/cases/perisic/acjug/en/130228_judgement.pdf...........................61

*Re Bo Xilai* (Bow St. Mag. Ct. Nov. 8, 2005) (Eng.) (Workman, Sr. Dist. J.), *available at Weixum v. Xilai*, No. 1:04-cv-00649-RJL, ECF No. 16-7 (D.D.C. July 24, 2006).........................................................................................31

TREATIES, STATUTES, AND RULES

Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, Aug. 12, 1949, 6 U.S.T. 3114..............................52, 53

\* Alien Tort Statute, 28 U.S.C. § 1350 ................................................................................ *passim*

Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891
(codified as amended at, *inter alia*, 28 U.S.C. §§ 1602-1611) ................36, 45, 46, 53, 54

28 U.S.C. § 1604 ........................................................................................45

28 U.S.C. § 1605(a)(5) ...............................................................................46

28 U.S.C. § 1605A ................................................................................46, 54

28 U.S.C. § 1605A(a)(2)(A)(i) ...................................................................46

28 U.S.C. § 1605A(a)(2)(A)(ii) ..................................................................46

28 U.S.C. § 1605B .....................................................................................46

28 U.S.C. § 1605B(b) ............................................................................46-47

\* Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992),
*reprinted in* 28 U.S.C. § 1350 note ................................................. *passim*

§ 2(a), 106 Stat. 73 ....................................................................................51

§ 2(a)(2), 106 Stat. 73 ...........................................................................51, 52

§ 2(b), 106 Stat. 73 ....................................................................................54

§ 3(a), 106 Stat. 73 ....................................................................................51

28 U.S.C. § 1367 ...................................................................................69, 70

28 U.S.C. § 1367(a) ...................................................................................69

28 U.S.C. § 1367(c)(3) ...............................................................................69

42 U.S.C. § 1983 ........................................................................................40

State Immunity Act 1978, c. 33 (U.K.) ......................................................31

Fed. R. Civ. P.:

Rule 4(k)(2) ..................................................................................14, 18, 68

Rule 12(b)(7) .............................................................................................41

Rule 19 .....................................................................................................3, 41

Rule 19(a) ..............................................................................................41, 44

Rule 19(a)(1)(B) .........................................................................................45

Rule 19(a)(1)(B)(i) ................................................................................41, 44

Rule 19(b) ...............................................................................................42, 47


## LEGISLATIVE MATERIALS

H.R. Rep. No. 102-367, pt. 1 (1991), *reprinted in* 1992 U.S.C.C.A.N. 84 ................................52

S. Rep. No. 102-249 (1991) ................................................................................52


## ADMINISTRATIVE MATERIALS

Br. for the United States as Amicus Curiae, *Mutond v. Lewis*, No. 19-185
    (U.S. May 26, 2020), 2020 WL 2866592 ............................................32, 33, 40

Br. for the United States as Amicus Curiae Supporting Petitioners, *Nestlé USA,*
    *Inc. v. Doe I*, Nos. 19-416 & 19-453 (U.S. Sept. 8, 2020), 2020 WL
    5498509................................................................................57, 58

Br. for the United States in Opp., *Bahlul v. United States*, No. 16-1307
    (U.S. Sept. 6, 2017), 2017 WL 3948468 ............................................60

Br. for the United States of America as Amicus Curiae in Support of Affirmance,
    *Mahar v. Dichter*, No. 07-2579-cv (2d Cir. Dec. 19, 2007), 2007 WL
    6931924................................................................................59

Central Intelligence Agency, *The World Factbook:  Saudi Arabia*,
    https://www.cia.gov/the-world-factbook/countries/saudi-arabia/
    #government (last visited Mar. 24, 2021) ............................................30

Ltr. from Harold Hongju Koh, Legal Adviser, U.S. Dep't of State, to Stuart F.
    Delery, Acting Ass't Att'y Gen., Civil Div., U.S. Dep't of Justice (Sept. 7,
    2012), *docketed at Doe v. Zedillo*, No. 3:11-cv-01433-AWT, ECF No.
    38-1 (D. Conn. Sept. 7, 2012) ............................................33

Ltr. from Harold Hongju Koh, Legal Adviser, U.S. Dep't of State, to Stuart F.
    Delery, Principal Dep. Ass't Att'y Gen., Civil Div., U.S. Dep't of Justice
    (Dec. 17, 2012), *docketed at Ragsdale v. Lashkar-E-Taiba*, No. 1:11-cv-
    03893-DLI-CLP, ECF No. 19-1 (E.D.N.Y. Dec. 17, 2012) ......................... 32-33

Press Release, U.S. Dep't of State, *Crown Prince Mohammed bin Salman* (June
    21, 2017), https://2017-2021.state.gov/crown-prince-mohammed-bin-
    salman/index.html ................................................................................7

Readout, *Secretary Pompeo's Meeting with Saudi Crown Prince Mohammed bin Salman*, Office of the Spokesperson, U.S. Dep't of State (Feb. 21, 2020), https://2017-2021.state.gov/secretary-pompeos-meeting-with-saudi-crown-prince-mohammed-bin-salman-2/index.html .......................................................29

*Readout of President Donald J. Trump's Meeting with Crown Prince Mohammed Bin Salman of Saudi Arabia*, The White House (Mar. 21, 2018), https://trumpwhitehouse.archives.gov/briefings-statements/readout-president-donald-j-trumps-meeting-crown-prince-mohammed-bin-salman-saudi-arabia/ ...............................................................................................29

U.S. Dep't of State, *Digest of United States Practice in International Law* (CarrieLyn D. Guymon ed., 2015), *available at* https://2009-2017. state.gov/documents/organization/258206.pdf ................................................33

## OTHER MATERIALS

Basic Law of Governance, https://www.saudiembassy.net/basic-law-governance ................28, 29

John B. Bellinger III, *The Dog that Caught the Car:  Observations on the Past, Present, and Future Approaches of the Office of the Legal Adviser to Official Acts Immunities*, 44 Vand. J. Transnat'l L. 819 (2011) .......................................27

Commission for the Control of INTERPOL's Files, *Request Concerning Saad Aljabri* (Ref. CCF/R960.17): Decision of the Commission (105th session, July 2-5, 2018) (July 4, 2018) .......................................................................7, 8

Hazel Fox, *The Law of State Immunity* (2d ed. 2008) ................................................26

Bradley Hope, Justin Scheck & Warren P. Strobel, *Saudi Arabia Wants Its Fugitive Spymaster Back*, Wall St. J. (July 17, 2020, 12:47 pm), https://www.wsj.com/articles/a-spymaster-ran-off-after-saudis-say-billions-went-missing-they-want-him-back-11595004443 ................................................1

Chimène I. Keitner, *The Common Law of Foreign Official Immunity*, 14 Green Bag 2d 61 (2010) ................................................................................26

*Mohammed bin Salman Named Saudi Arabia's Crown Prince*, Al Jazeera (June 21, 2017), https://www.aljazeera.com/news/2017/06/21/mohammed-bin-salman-named-saudi-arabias-crown-prince/ ........................................................7

4 James W. Moore, *Moore's Federal Practice* (3d ed. 1998) ......................................41

Press Release, *Readout of PM's Call with Mohammed bin Salman:  2 September 2020*, Prime Minister's Office, 10 Downing Street (Sept. 2, 2020), https://www.gov.uk/government/news/readout-of-pms-call-with-mohammed-bin-salman-2-september-2020 ........................................................30

Restatement (Second) of Agency (1958) ........................................................................16

Restatement (Second) of Conflict of Laws (1971) ....................................................65, 66

Restatement (Second) of Foreign Relations Law of the United States (1965) ..............31, 32, 37

Restatement (Second) of Torts (1965) ....................................................................54, 67, 68

Restatement (Third) of Agency (2006) ..........................................................................15

Restatement (Third) of Foreign Relations Law of the United States (1987) ................................32

Royal Order A/226, issued 1440/06/18 AH (02/23/2019 AD) ......................................28

Royal Order A/229, issued 1440/06/18 AH (02/23/2019 AD) ......................................29

Royal Order A/292, issued 1436/04/03 AH (07/21/2017 AD) ......................................29

Royal Order A/313, issued 1438/11/01 AH (07/24/2017 AD) ......................................28

Royal Order A/352, issued 1441/05/18 AH (01/13/2020 AD) ......................................28

SACM, *About SACM*, https://www.sacm.org/about (last visited Mar. 22, 2021) ..........................8

*Saudi Crown Prince Mohammed bin Salman Arrives in Pakistan*, Al Jazeera
   (Feb. 17, 2019), https://www.aljazeera.com/news/2019/02/saudi-crown-
   prince-mohammed-bin-salman-arrives-pakistan-190217061720354.html .......................30

*Transcript:  ABC News' George Stephanopoulous Interviews President Joe
   Biden*, ABC News (Mar. 17, 2021), https://abcnews.go.com/Politics/
   transcript-abc-news-george-stephanopoulos-interviews-president-
   joe/story?id=76509669 ..................................................................................30

*Webster's Third New International Dictionary* (2002) ..............................................52

Kim Willsher, *French President and Saudi Crown Prince Vow Partnerships
   on Syria and Economic Issues*, L.A. Times (Apr. 10, 2018),
   https://www.latimes.com/world/europe/la-fg-france-saudi-arabia-
   20180410-story.html ..................................................................................30

Lewis S. Yelin, *Head of State Immunity as Sole Executive Lawmaking*,
   44 Vand. J. Transnat'l L. 911 (2011) ..................................................................26, 27

# INTRODUCTION[1]

Plaintiff Saad Aljabri ("Aljabri") was once a high-ranking official in the Kingdom of Saudi Arabia's ("Saudi Arabia") Ministry of Interior. From 2001 to 2015, Saudi Arabia entrusted him with managing a counterterrorism fund created in the wake of the terrorist attacks of September 11, 2001. During that time, Saudi Arabia allocated $19.7 billion to the fund to finance anti-terrorism efforts. More than half – a staggering $11 billion – was misspent or outright stolen by Aljabri and his associates, causing incalculable harm to public safety and government integrity.[2] Aljabri involved his adult children in the scheme, funneling vast amounts of money through their accounts and out of Saudi Arabia. Since 2017, Aljabri has lived as an "international fugitive" in Canada, Am. Compl. ¶ 131(r), delaying accountability for his crimes.

The Canadian courts have recognized Aljabri's extraordinary fraud. On January 22, 2021, the Superior Court of Justice in Ontario, Canada, issued a series of orders freezing all of Aljabri's personal assets worldwide.[3] The Canadian court reviewed "alleg[ations] . . . of a

---

[1] The Court previously allowed the Crown Prince to file a motion to dismiss that shall not exceed 70 pages. *See* November 24, 2020 Minute Order.

[2] *See* Bradley Hope, Justin Scheck & Warren P. Strobel, *Saudi Arabia Wants Its Fugitive Spymaster Back*, Wall St. J. (July 17, 2020, 12:47 pm), https://www.wsj.com/articles/a-spymaster-ran-off-after-saudis-say-billions-went-missing-they-want-him-back-11595004443. Aljabri cited the July 17 *Wall Street Journal* article in his original Complaint (¶¶ 90(n) & n.46, 180 & n.95), placing it in the record as context for this motion to dismiss. *See Klayman v. Obama*, 125 F. Supp. 3d 67, 74 n.7 (D.D.C. 2015) ("The Court may consider this [news] article on a motion to dismiss because it is incorporated by reference into the Complaint."). Although Aljabri deleted the citation to the article when he amended, that does not remove it from the record. *See Western Assocs. Ltd. P'ship, ex rel. Ave. Assocs. Ltd. P'ship v. Market Square Assocs.*, 235 F.3d 629, 634 (D.C. Cir. 2001) ("[I]t is appropriate for [a] court to look beyond [an] amended complaint to the record, which includes the original complaint.").

[3] "A court may take judicial notice of facts on the public record, including 'relevant opinions' and records in relevant proceedings in considering a motion to dismiss." *Viray v. FDIC*, 2010 WL 11538694, at *3 (D.D.C. July 19, 2010) (quoting *Covad Commc'ns Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005)), *aff'd*, 418 F. App'x 1 (D.C. Cir. 2011) (per curiam).

massive international fraud . . . through which at least USD 3.5 billion has been brazenly stolen, misdirected and misappropriated."  Ex. A, ¶ 1.  It found that the plaintiffs – the originally government-funded companies from which Aljabri had stolen – had made a "strong *prima facie* case" and had produced "compelling evidence." *Id.* ¶¶ 24, 31.  The court described Aljabri as "bold in his schemes" and found he had "transferr[ed] large amounts of money to himself and other Persons of Interest even after he was relieved of his duties with the government of" Saudi Arabia. *Id.* ¶ 29.  On March 11, 2021, after hearing a number of preliminary challenges, the Canadian court rejected Aljabri's attempt to set aside its order.  Ex. B at 28.

Saudi Arabia intends to prosecute Aljabri for his "massive international fraud," Ex. A, ¶ 1, and is seeking to extradite him to face criminal charges.  In a transparent attempt to change the public narrative, Aljabri has brought this remarkable lawsuit, alleging that His Royal Highness Mohammed bin Salman bin Abdulaziz Al Saud, the Crown Prince of Saudi Arabia ("the Crown Prince" or "Prince Mohammed bin Salman"), orchestrated a failed attempt to kill him in Canada. He asserts claims under the Torture Victim Protection Act of 1991 ("TVPA") and the Alien Tort Statute ("ATS"), as well as a common-law claim for intentional infliction of emotional distress.

Aljabri's Amended Complaint is steeped in drama, including an introduction that likens the Crown Prince to one of Shakespeare's greatest villains.  *See* Am. Compl. ¶¶ 1-3.  But, regardless of its merits as literature, the Amended Complaint fails as a legal pleading.  Aljabri's lead claim invokes a provision of the TVPA that authorizes suit by the "legal representative" of the victim of an "extrajudicial killing" or by an appropriate "claimant . . . for wrongful death."  It creates no claim for Aljabri, who is very much alive and suing in his own name.  As for the ATS, that statute requires domestic conduct, and even then grants jurisdiction over "a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.

An alleged attempted killing in Canada is not domestic, is not a tort, and does not violate the law of nations.

The flaws in the Amended Complaint are so apparent and run so deep that it can only be regarded as an attempt to divert attention from the charges against Aljabri – charges he has largely (but not entirely) stopped labeling "baseless" or "bogus" since the Canadian court issued its orders against him. *See* Am. Compl. ¶¶ 16, 131(o), 131(q), 178, 257, 261.  Plaintiff can say whatever he wants to the newspapers.  But this case does not belong in federal court.  Aljabri cannot establish personal jurisdiction over the Crown Prince.  He cannot establish subject-matter jurisdiction in this Court.  And he cannot state a single claim on the merits.

**I.**     This Court lacks personal jurisdiction over the Crown Prince.  Aljabri alleges an attempt to kill him in Canada, directed from Saudi Arabia.  None of the scant allegations pertaining to the United States establishes the contacts between the Crown Prince, the United States, and Aljabri's legal claims that are necessary for specific jurisdiction.

**II.**    Aljabri's claims are barred by three related doctrines that prevent litigation from interfering with the sovereignty of foreign nations and harming foreign relations.

**A.**     The Court lacks subject-matter jurisdiction over Aljabri's claims under the doctrine of foreign official immunity.  The Crown Prince is the King's son and designated successor.  Together with the King, he sits at the apex of Saudi Arabia's government.  He is entitled to status-based immunity from any suit in U.S. court.  He is also entitled to conduct-based immunity because Aljabri's claims arise from the Crown Prince's alleged official acts.

**B.**     Although Aljabri strains to depict the alleged actions of the Crown Prince as personal, he asks the Court to decide the propriety and validity of official acts with great domestic significance to Saudi Arabia, including Saudi Arabia's criminal investigation into Aljabri's corruption and its ongoing attempts to bring him and his co-conspirators to justice.

3

Saudi Arabia is thus a necessary party under Rule 19 of the Federal Rules of Civil Procedure –

and, where an immune sovereign is a necessary party, no part of the case can proceed.

C.      Aljabri asks this Court to declare unlawful Saudi Arabia's official acts committed

within, or rooted in, its own territory, including the Crown Prince's appointment (Aljabri calls it

a "coup"), the Saudi government's pursuit of corruption charges against Aljabri (Aljabri calls

them "false" and "baseless"), and the arrest of Aljabri's adult children for participation in his

theft (Aljabri calls it a "kidnapping").  The act of state doctrine requires the Court to presume

that Saudi Arabia's official acts are valid – and dismiss claims that seek a contrary ruling.

III.     Aljabri fails to state a claim on any of the counts in his Amended Complaint.

A.      In relevant part, the TVPA creates a cause of action for an extrajudicial killing.

Aljabri is alive and, according to the Amended Complaint, has never been so much as touched.

By its plain terms, the TVPA does not reach an attempt at an extrajudicial killing.  The TVPA

also requires exhaustion of remedies in the place where the alleged conduct occurred, but Aljabri

fails to allege he has done anything to seek remedies in either Canada or Saudi Arabia.

B.      Aljabri fails to allege jurisdiction or state a claim under the ATS, which

encompasses violations of only a limited class of universal and obligatory international norms.

The conduct alleged in the Amended Complaint – which is, at most, an unsuccessful attempt to

carry out an extrajudicial killing – does not violate any such norms.  Independently, the ATS

does not apply because the relevant conduct occurred outside the United States.

C.      Aljabri also fails to state a claim for intentional infliction of emotional distress.

Saudi Arabian law, which governs his non-statutory claims, recognizes no stand-alone action for

emotional harm.  Even if D.C. law applies, Aljabri fails to state a claim.  Alternatively, if the

Court dismisses the ATS and TVPA claims, it should dismiss Aljabri's emotional-distress claim

for lack of personal jurisdiction or should decline to exercise supplemental jurisdiction.

4

## SUMMARY OF RELEVANT ALLEGATIONS AND MATERIALS
## CITED IN THE AMENDED COMPLAINT OR SUBJECT TO NOTICE

Saad Aljabri is a Saudi and Maltese national, and permanent Canadian resident.  Am. Compl. ¶ 34.  Until September 2015, he was a senior official of Saudi Arabia's Ministry of Interior, a "trusted advisor" of the former Minister of Interior (and former Crown Prince), His Royal Highness Mohammed bin Nayef bin Abdulaziz Al Saud ("Prince Mohammed bin Nayef"), *id.* ¶ 32, and, allegedly, a "trusted partner" of U.S. intelligence, *id.* ¶ 5.  In September 2015, His Majesty King Salman bin Abdulaziz Al Saud ("King Salman") removed Aljabri from his position for "unauthorized meetings" with then-CIA Director John Brennan.  *Id.* ¶ 153.

According to the Amended Complaint, Aljabri warned Brennan that Prince Mohammed bin Salman, who then served as Deputy Crown Prince, was allegedly "encouraging Russian intervention in Syria."  *Id.* ¶ 151.  Aljabri also informed Brennan of his "disagreement[s]" with other policy decisions of the Deputy Crown Prince.  *Id.* ¶ 152.  At that time, Prince Mohammed bin Nayef was the Crown Prince and Aljabri's direct superior.  *Id.* ¶ 33.  Aljabri nevertheless alleges (without factual support) that King Salman terminated Aljabri "at the behest of" Prince Mohammed bin Salman, who had no direct oversight of Aljabri.  *Id.* ¶ 153.

The Amended Complaint alleges that Prince Mohammed bin Salman viewed Aljabri as an "urgent," even "existential," threat.  *Id.* ¶ 154.  Despite that supposed urgency, it does not allege that Prince Mohammed bin Salman took any actions against Aljabri from September 2015 until early 2017.  During that time, Aljabri was free from any state-imposed restraints.  Aljabri alleges that, as of late 2016, representatives of Prince Mohammed bin Salman were in contact with then-President-elect Donald Trump's transition team, *see id.* ¶¶ 155-157; those discussions led to a May 2017 visit by President Trump to Saudi Arabia and an "agreement" that "Saudi Arabia would invest more than $350 billion in U.S. defense manufacturers," *id.* ¶¶ 160, 162, 166.

On May 17, 2017, a few days before President Trump's visit, Aljabri fled Saudi Arabia for Turkey. *See id.* ¶ 164. The Amended Complaint alleges that he did so in response to fears that Prince Mohammed bin Salman would assume that Aljabri was involved in a contract signed between the Ministry of Interior – from which Aljabri had been dismissed nearly two years before – and a "lobbying firm with ties to the Trump administration." *Id.* ¶¶ 163-164. The Amended Complaint admits that Saudi Arabia has charged Aljabri with corruption, but alleges that the charges are a "false" and "baseless" pretext to "lure" him back to Saudi Arabia and/or to "trap[ ]" him in Canada, so that he can be "hunt[ed] down" and killed. *Id.* ¶¶ 9, 16, 372. Aljabri alleges that the Crown Prince "wants [him] dead" because Aljabri knows (and threatens to publicize to U.S. authorities) "sensitive, humiliating, and damning information" about the Crown Prince, *id.* ¶¶ 6, 8, which purportedly poses a "threat" to the Crown Prince's "chances of U.S. support for his ascension" to the Saudi throne, *id*. ¶ 25.[4] In other words, Aljabri asks this Court to accept the implausible premise that the United States controls the selection and appointment of the next King of Saudi Arabia – a premise that itself affronts Saudi Arabia's sovereign dignity.

Aljabri alleges that, from June to September 2017, the Crown Prince attempted to convince him to return to Saudi Arabia. *See id.* ¶¶ 169-185. For example, he alleges that the Crown Prince stated to Aljabri that Aljabri has been "involved in many large cases of corruption that have been proven" and that, if he did not voluntarily return, Saudi Arabia would "pursue" him legally, and by "using all available means." *Id.* ¶ 178. He alleges that the Crown Prince offered to send an airplane to facilitate Aljabri's return. *Id.* ¶ 177. Aljabri alleges that the Crown Prince attempted to pressure him to return from Turkey by imposing a travel ban on two of

---

[4] Aljabri seeks to make good on this threat by filling his Amended Complaint with an array of allegations against the Crown Prince that have nothing to do with this case. *See*, *e.g.*, Am. Compl. ¶¶ 272-316.

Aljabri's children, *id.* ¶ 182, and arranging to cancel a scholarship that the Ministry of Interior had awarded to a third, *id.* ¶¶ 221-222.  During this same period, on June 20, 2017, Prince Mohammed bin Salman assumed his current position as Crown Prince by order of King Salman. *See id.* ¶ 171.  Aljabri alleges that Prince Mohammed bin Salman "staged a coup that ousted [Aljabri's] close ally, then-Crown Prince Mohammed bin Nayef."  *Id.* ¶ 24; *see also*, *e.g.*, ¶¶ 38, 170 (more "coup" allegations).  The description of the Crown Prince's appointment as a "coup," like so much else in the Amended Complaint, is without any basis.[5]

On September 12, 2017, after allegedly learning that the Crown Prince "was pressuring the Government of Turkey to forcibly return" him, Aljabri secretly fled to Canada.  *Id.* ¶¶ 179-180.  At that same time, the Crown Prince "arranged for the filing of a notice about [Aljabri] and his family with INTERPOL."  *Id.* ¶ 257; *see* Ex. C.  That notice concerned Aljabri's misappropriation of billions of dollars in counterterrorism funds that the Saudi government had entrusted Aljabri to oversee.  INTERPOL concluded that there was "extensive information and sufficient elements of the possible concrete and effective participation of [Aljabri] to the offences of which he is accused."  Ex. D, Commission for the Control of INTERPOL's Files, *Request Concerning Saad Aljabri* (Ref. CCF/R960.17): Decision of the Commission (105th session, July 2-5, 2018), ¶ 60 (July 4, 2018) (*cited in* Am. Compl. ¶ 259 & nn.194-195). INTERPOL nonetheless rescinded the notice at Aljabri's behest "on the basis of Article 3" of

---

[5] The Court may take notice that King Salman, who was and remains the King, issued a Royal Decree appointing the Crown Prince to his current position.  *See Mohammed bin Salman Named Saudi Arabia's Crown Prince*, Al Jazeera (June 21, 2017), https://www.aljazeera.com/ news/2017/06/21/mohammed-bin-salman-named-saudi-arabias-crown-prince/.  The United States has recognized the appointment.  *See* Press Release, U.S. Dep't of State, *Crown Prince Mohammed bin Salman* (June 21, 2017) (congratulating the Crown Prince), https://2017- 2021.state.gov/crown-prince-mohammed-bin-salman/index.html.

INTERPOL's Constitution, *id.* ¶ 84, which states that it is "strictly forbidden for the Organization to undertake any intervention or activities of a political . . . character," *see id.* ¶ 14.

Aljabri alleges that the Crown Prince, apparently under the impression that Aljabri fled to the United States, then "orchestrated a hunt" to locate Aljabri there, from September 2017 through December 2017, Am. Compl. ¶ 225, with the Crown Prince's private foundation – co-Defendant MiSK Foundation (the "Foundation") – serving as a "front" for the operation, *id.* ¶ 71. He alleges that co-Defendant Bader Alasaker ("Alasaker") – the Secretary-General of the Foundation and a Saudi national, *id.* ¶ 40 – "facilitated by his repeated physical presence in the United States," oversaw "the development of a network of Saudi students in the United States." *Id.* ¶¶ 42, 44.

Aljabri alleges that these students are nominally supervised by the Saudi Arabian Cultural Mission ("SACM"), *id.* ¶ 44, a part of the Saudi Embassy,[6] which is not named as a Defendant. According to Aljabri, however, "SACM operates as an extension of Defendant MiSK." *Id.* Specifically, Aljabri alleges that Alasaker recruited three U.S.-based students through MiSK and "directed" the activities of these "agents." *Id.* ¶ 226. Although Aljabri makes the rhetorical allegation that these students "can be and have been weaponized at a moment's notice," *id.* ¶ 44, and that they "hunt[ed]" Aljabri, *id.* ¶ 43, the only actions that Aljabri describes students taking involve speaking with Aljabri's family members and acquaintances, and asking about his wife:

- Co-Defendant Youssef Alrajhi ("Alrajhi") allegedly spoke with an Aljabri family acquaintance and met one of Aljabri's sons, Khalid Aljabri, in Boston. Alrajhi is alleged to have asked not about Aljabri's location, but about that of Aljabri's wife. He allegedly learned that Aljabri's wife was not in Saudi Arabia, that unspecified Aljabri family members were residing in London, and that Khalid Aljabri was not a U.S. citizen. *Id.* ¶¶ 240-243.

---

[6] *See generally* SACM, *About SACM*, https://www.sacm.org/about (last visited Mar. 22, 2021); *Salman v. Saudi Arabian Cultural Mission*, 2017 WL 176576, at *2 (E.D. Va. Jan. 17, 2017) (according sovereign immunity to SACM as a conceded "diplomatic and cultural mission of Saudi Arabia recognized by the U.S. Department of State").

- Co-Defendant Mohammed Alhamed ("Alhamed") allegedly attempted to convince a family acquaintance to meet with Alrajhi in person, and also asked that acquaintance about the whereabouts of Aljabri's wife. *Id.* ¶¶ 240-241. Alhamed allegedly learned that Aljabri's wife was not in Saudi Arabia. *Id.* ¶ 240.

- Co-Defendant Layla Abuljadayel ("Abuljadayel") allegedly sent WhatsApp messages to Khalid Aljabri's wife while Abuljadayel was in London and Khalid Aljabri's wife was in Boston. Abuljadayel allegedly "attempted to extract the whereabouts and contact information of [Aljabri's] wife." *Id.* ¶ 244. Aljabri does not allege that Abuljadayel asked about Aljabri's location or obtained information about Aljabri's family. *See id.*[7]

Aljabri alleges that another co-Defendant, Bijad Alharbi ("Alharbi"), is a "long-time former associate" of Aljabri who "had worked for many years in Saudi Arabia in close cooperation with [Aljabri] and Mr. bin Nayef." *Id.* ¶¶ 249, 251. Alharbi allegedly met with one of Aljabri's sons, Mohammed Aljabri, in Boston in October 2017 and asked about Aljabri's location, but Aljabri alleges that Mohammed Aljabri was "suspicious" of Alharbi's questions, and does not allege that Alharbi obtained any information. *Id.* ¶¶ 249-250.

Finally, on November 27, 2018, co-Defendant Hani Fakri Hamed ("Hamed") allegedly went to the Mandarin Oriental in Boston, where the Aljabri family owned an apartment (among the assets recently frozen in the Canadian case), and asked to visit Aljabri. The concierge connected Hamed with Khalid Aljabri, who said Aljabri was not there. *Id.* ¶ 245. Building personnel purportedly later "observed Defendant Hamed surveilling the hotel." *Id.* Aljabri does not allege that Hamed learned anything that aided in locating Aljabri.

The Amended Complaint does not allege that any inquiries by any Defendant in the United States yielded information that assisted in locating Aljabri in Canada. Rather, Aljabri alleges that, in December 2017, Alharbi traveled to Toronto, Canada, "unexpectedly appeared at

---

[7] Aljabri also alleges that, in September 2017, the head of SACM asked "a close acquaintance of [Aljabri's] family" about Aljabri's son's U.S. immigration status, Am. Compl. ¶ 238, and that Alhamed and Alrajhi later contacted this same acquaintance about the same issue, *id.* ¶ 240. He does not allege that those questions yielded any information about his location.

[Aljabri's] office," and "arranged several meetings with" Aljabri.  *Id.* ¶ 251.  Aljabri does not allege that Alharbi learned that Aljabri was in Toronto, or the location of his office, from any of the alleged "hunting" activities in the United States.  At Alharbi's meetings with Aljabri in Toronto, Alharbi allegedly "tried to convince" Aljabri to "visit his family" in Turkey, but Aljabri refused to do so.  *Id.* ¶ 252.  Aljabri further alleges that, in or around July 2018 (eight months later), the Crown Prince or his agents "remotely planted [malware] in [Aljabri's] personal phones" in Canada, which allowed them to learn Aljabri's "precise location" in Canada.  *Id.* ¶ 333.

The Crown Prince also allegedly used "additional sources of leverage" over Aljabri.  *Id.* ¶ 196.  According to the Amended Complaint, the Crown Prince directed the freezing of Saudi-based bank accounts belonging to Aljabri and two of his adult children.  *Id.* ¶ 268.  Aljabri also alleges that individuals not named as Defendants, but described as aides or agents of the Crown Prince, first arrested his son-in-law in Dubai, and then detained and tortured him in Saudi Arabia.  *Id.* ¶¶ 197-205.  Aljabri further alleges that Saudi officials attempted to persuade Aljabri's daughter to renew her passport at the Saudi consulate in Istanbul.  *Id.* ¶ 186.  Aljabri implies (but does not, and has no basis to, allege) that his daughter would have been killed had she entered the consulate.  *Id.*  Aljabri alleges no facts to support an inference that the Crown Prince or any other Saudi officials intended harm to his daughter.

On October 15, 2018, six Saudi government officials allegedly operating as "personal" agents of the Crown Prince and labeled as part of the "Tiger Squad" in the Amended Complaint[8] – are alleged to have arrived at Ottawa International Airport on October 15, 2018, and attempted to enter Canada.  *Id.* ¶ 334.  The Amended Complaint makes a conclusory allegation that the

---

[8] The Amended Complaint alleges that these Saudi officials were Defendants Algasem, Alsayed, Alhomid, Alhaqbani, Albawardi, and Bader Alqahtani.  Aljabri alleges that two other Defendants – Saud Alqahtani and Ahmed Alassiri – oversaw the Tiger Squad.  *Id.* ¶¶ 51, 63.

intended purpose of this trip was to kill Aljabri in Canada.  *Id.*  Canada Border Services Agency discovered a photograph showing some of the Tiger Squad members together, after they had purportedly denied knowing each other.  *See id.* ¶¶ 344-348.  The six Defendants who attempted to enter Canada through Ottawa, with the exception of Alhomid (who was admitted with a diplomatic passport), were not admitted into the country.  *Id.* ¶ 348.  Aljabri alleges that the next day, October 16, 2018, eight "additional Tiger Squad members arrived in Montreal" and "successfully entered Canada."  *Id.* ¶ 349.  These individuals are identified as John Does 1-8.  *Id.* There are no allegations that any of these members of the "Tiger Squad" ever approached Aljabri or even attempted to make contact with him.  There are no allegations that he was confronted, assaulted, or physically harmed.  Indeed, he remains unharmed to this day.

Since October 2018, the Crown Prince and his agents allegedly have taken other actions targeting Aljabri and his family.  Aljabri claims that unnamed individuals, whom he labels as the Crown Prince's "henchmen," have detained various family, friends, and business associates – all outside of the United States.  *Id.* ¶¶ 206-217.  He alleges that other unnamed individuals, whom he labels as the Crown Prince's agents, have disclosed information to the media about Aljabri's corruption and theft (the same activity that resulted in a Canadian court freezing his assets).  *Id.* ¶ 261.  He also alleges "on information and belief" that the Crown Prince sought the closure of his U.S.-based bank accounts and those of his sons.  *Id.* ¶ 271.  Saudi officials have arrested two of Aljabri's adult children in Saudi Arabia.  They were subsequently convicted in a Saudi court of laundering the funds obtained from Aljabri's theft.  Aljabri characterizes the arrest as a "kidnapping," *id.* ¶ 187, and claims that the Saudi criminal proceedings against his adult children were "pretextual," a "sham," and "inconsistent with Saudi law," *id.* ¶ 190.

Finally, Aljabri alleges that, in May 2020, the Crown Prince made statements to "close advisors" who were "overheard" by unspecified sources that "he had obtained a *fatwa*," or

"ruling by religious authorities," authorizing "the killing" of Aljabri. *Id.* ¶ 354. The Amended Complaint alleges that the Crown Prince "and his agents were . . . overheard saying that they planned to send men to kill [Aljabri] in Canada 'by land' this time—that is, by dispatching agents from the United States to travel across the border into Canada to complete the job." *Id.* ¶ 355; *see also id.* ¶ 20 (similar).[9] The Amended Complaint does not allege that any individual has entered either the United States or Canada since then with the intent of harming Aljabri.

Aljabri further alleges that various individuals, whom Aljabri labels as the Crown Prince's "agents," have continued efforts to locate Aljabri, *id.* ¶¶ 357-362, but not that any of these efforts have been successful. Aljabri also alleges that, since May 2020, the Crown Prince's "agents have repeatedly made credible attempts on [Aljabri's] life," *id.* ¶ 362, but makes no factual allegations regarding any such attempt.[10] The entire Amended Complaint lacks any allegation that Aljabri has been confronted by any Saudi officials or physically harmed in any way.

On January 22, 2021, the Ontario Superior Court of Justice entered a worldwide injunction "restraining" Aljabri and anyone else acting on his behalf from "selling, removing, disposing of, dissipating, alienating, transferring, assigning, encumbering, or similarly dealing with any of [Aljabri]'s assets, or any assets in which he has any type of interest," other than to pay "ordinary living expenses and legal advice and representation." *See* Ex. E at 2-4. The court explained that there was a "strong *prima facie* case" that "Al Jabri used fraudulent means to divert funds," which had allegedly been meant for "counter-terrorism activities." Ex. A, ¶¶ 16, 24. On March 11, 2021, the same court rejected Aljabri's attempt to set aside the asset freeze. Ex. B at 28.

---

[9] The Amended Complaint further alleges that the Crown Prince's "agents" directed others in Canada to attempt to locate Aljabri in Canada. Am. Compl. ¶¶ 358-361. None of these actions is alleged to have taken place in the United States.

[10] Aljabri also includes irrelevant allegations concerning operations by other alleged members of the "Tiger Squad," including the killing of Jamal Khashoggi. *See id.* ¶¶ 272-316. Aljabri does not allege that these operations caused him any harm or injury.

### ALJABRI'S PURPORTED SERVICE ON THE CROWN PRINCE

Aljabri claims to have served his Complaint on the Crown Prince by mail and by the messaging software WhatsApp. *See* ECF No. 36, ¶¶ 3-4. Contrary to his *ex parte* motion for alternative service and supporting declaration, *see* ECF No. 14, Ex. A at 9 & Ex. E, these methods of service violate Saudi law. In civil actions initiated in the United States, service on Saudi Arabian residents must use diplomatic channels and must go to the appropriate general court in Saudi Arabia. *See* Ex. F, Declaration of Fahad Nasser Alarfaj ¶ 19. Saudi Arabia is not a party to any treaties that permit service by mail or by WhatsApp. *Id.* ¶ 18. Nonetheless, to expedite the dismissal of this case, the Crown Prince has chosen not to challenge service.

### STANDARD OF REVIEW

On a "motion to dismiss for lack of personal jurisdiction, [the] plaintiff bears the burden of making 'a *prima facie* showing of the pertinent jurisdictional facts.'" *Bernhardt v. Islamic Republic of Iran*, 2020 WL 6743066, at *2 (D.D.C. Nov. 16, 2020) (Kelly, J.) (quoting *Livnat v. Palestinian Auth.*, 851 F.3d 45, 56-57 (D.C. Cir. 2017)). "Factual disputes must be resolved in favor of the plaintiff, but the Court need not accept unsupported inferences." *Id.* Similarly, "[o]n a motion to dismiss for lack of subject matter jurisdiction . . . , 'plaintiffs bear the burden of establishing jurisdiction.'" *Jones v. United States*, 318 F. Supp. 3d 15, 19 (D.D.C. 2018) (Kelly, J.) (quoting *Knapp Med. Ctr. v. Hargan*, 875 F.3d 1125, 1128 (D.C. Cir. 2017)). Such a motion may be resolved on the face of the complaint, taking the allegations of the complaint as true. *See id.* A motion to dismiss for failure to state a claim tests whether "a complaint . . . contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand such a motion. *Id.*

**ARGUMENT**

**I.     Aljabri Fails To Establish Personal Jurisdiction over the Crown Prince**

The Amended Complaint fails to establish personal jurisdiction over the Crown Prince because it does not allege sufficient well-pleaded facts to show the minimum contacts required by due process.  "'[D]ue process requires'" that a "defendant must 'have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."'"  *Livnat v. Palestinian Auth.*, 851 F.3d 45, 48 (D.C. Cir. 2017) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  Where, as here, a plaintiff asserts personal jurisdiction under Federal Rule of Civil Procedure 4(k)(2), *see* Am. Compl. ¶ 127, the forum is the United States as a whole.  *See Livnat*, 851 F.3d at 55.

The federal courts recognize two categories of personal jurisdiction:  general and specific.  General jurisdiction "'permits . . . jurisdiction over a defendant based on a forum connection unrelated to the underlying suit,'" *id.* at 56 (quoting *Walden v. Fiore*, 571 U.S. 277, 283 n.6 (2014)), but is limited to "'only a limited set of affiliations with a forum,' all analogous to an individual's domicile," *id.* (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014)).  The Crown Prince's domicile is in Saudi Arabia, *see* Am. Compl. ¶ 37, not the United States.

For a forum "to exercise specific jurisdiction, 'the *suit*' must 'aris[e] out of or relat[e] to the defendant's contacts with the *forum*.'"  *Bristol-Myers Squibb Co. v. Superior Ct. of California*, 137 S. Ct. 1773, 1780 (2017) (quoting *Daimler*, 571 U.S. at 127) (brackets in original).  A plaintiff must show "a strong 'relationship among the defendant, the forum, and the litigation,'" which the Supreme Court has described as "the 'essential foundation' of specific jurisdiction."  *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, No. 19-368, slip op. 12 (U.S. Mar. 25, 2021) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)).  That is, "'the defendant's *suit-related conduct* must create a *substantial connection*

14

with the forum.'" *Estate of Klieman v. Palestinian Auth.*, 923 F.3d 1115, 1120 (D.C. Cir. 2019)

(quoting *Walden*, 571 U.S. at 284) (emphases in *Klieman*), *cert. granted, vacated, and remanded*

*on other grounds*, 140 S. Ct. 2713 (2020).  Contacts between the plaintiff and the forum, or

between the defendant and forum residents, are not enough.  *See Walden*, 571 U.S. at 284-85.

A.     **The Amended Complaint Fails To Allege Suit-Related Contacts Between the Crown Prince and the United States**

This is a lawsuit by a dual Saudi and Maltese citizen and permanent resident of Canada,

Aljabri, Am. Compl. ¶ 34, against a Saudi citizen and resident, the Crown Prince, *id.* ¶ 37,

alleging that the Crown Prince orchestrated a plot from Saudi Arabia to attempt to kill Aljabri in

Canada, purportedly to obtain an "unencumbered" claim to the "throne of the Kingdom of Saudi

Arabia," *id.* ¶ 3.  The D.C. Circuit has repeatedly rejected personal jurisdiction over foreign

individuals and organizations for legal claims arising from alleged attacks on foreign soil.  *See*,

*e.g.*, *Livnat*, 851 F.3d at 56-58 (no personal jurisdiction over claims of alleged victims of attacks

by Palestinian governmental organizations against American citizens in West Bank); *Klieman*,

923 F.3d at 1124-25 (same); *Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016, 1037 (D.C.

Cir. 2020) (same); *cf. Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 95

(D.C. Cir. 2002) (rejecting as "insufficient to satisfy . . . 'minimum contacts'" claims that the

government of Libya "tortured two American citizens in Libya").  The basis for specific

jurisdiction is even weaker here, where no attack occurred and no American was targeted.

1.     **Other Defendants' Alleged Actions in the United States Do Not Support Personal Jurisdiction over the Crown Prince**

Aljabri alleges that three Defendants asked in the United States about his wife's location,

one asked about Aljabri's own location, and one unsuccessfully attempted to find Aljabri at a

residence where he did not live.  Am. Compl. ¶¶ 239-247.  But he fails to allege facts showing

that these individuals were the Crown Prince's agents or that their actions gave rise or relate to his claims.

### a.  There Is No Basis To Attribute the Alleged Contacts to the Crown Prince

Aljabri has established no basis to impute other Defendants' contacts to the Crown Prince for purposes of personal jurisdiction.  Aljabri alleges only that other individuals, not the Crown Prince himself, took actions in the United States to attempt to locate Aljabri.  But "a plaintiff 'cannot aggregate factual allegations concerning multiple defendants in order to demonstrate personal jurisdiction over any individual defendant.'"  *Duarte v. Nolan*, 190 F. Supp. 3d 8, 11 (D.D.C. 2016) (quoting *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 42 (D.D.C. 2003)), *aff'd*, 2017 WL 7736939 (D.C. Cir. Apr. 18, 2017) (per curiam).  Instead, such contacts support jurisdiction over the Crown Prince only if "an agency relationship" existed between the Crown Prince and those third parties.  *Gregorio v. Gordon*, 215 F. Supp. 3d 1, 6 (D.D.C. 2015). Although Aljabri refers to those third parties as the "U.S.-Based Covert Agent Defendants," *e.g.*, Am. Compl. ¶ 15, "a 'bare allegation of . . . agency is insufficient to establish personal jurisdiction.'"  *Khatib v. Alliance Bankshares Corp.*, 846 F. Supp. 2d 18, 33 (D.D.C. 2012) (quoting *First Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378-79 (D.C. Cir. 1988)) (alteration in original).  Similarly, mere allegations that a defendant "plann[ed]" or "orchestrat[ed]" actions directed at the United States are conclusory and insufficient.  *Ofisi v. Al Shamal Islamic Bank*, 2019 WL 1255096, at *6 (D.D.C. Mar. 19, 2019).

"[A]n agency relationship arises only where the principal 'has the right to control the conduct of the agent with respect to matters entrusted to him.'"  *Carswell v. Air Line Pilots Ass'n, Int'l*, 540 F. Supp. 107, 122 (D.D.C. 2008) (quoting Restatement (Second) of Agency § 14 (1958)); *see also* Restatement (Third) of Agency § 1.01 (2006) (stating that an agency

relationship is "the fiduciary relationship that arises when [a principal] manifests assent to [an agent] that the agent shall act on the principal's behalf and subject to the principal's control"). Aljabri does not allege facts plausibly suggesting that the purported agents or the Crown Prince manifested assent to form an agency relationship.  Although the Amended Complaint makes broad statements that the Crown Prince "exercised command and operational control" and "exercised command responsibility" over the purported agents in the United States, Am. Compl. ¶¶ 377, 386, those are "no more than conclusions" and are "not entitled to the assumption of truth," *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  The Amended Complaint alleges no action the Crown Prince took to exercise control, no mechanism of control, and no manifestation of intent to control.[11]  Indeed, there is no allegation that the Crown Prince ever met or spoke with the purported U.S.-based agents, or even knew who they were.[12]

For the three student Defendants (Alrajhi, Alhamed, and Abuljadayel), Aljabri attempts to bolster his agency claims by alleging that they participated in a MiSK leadership program, Am. Compl. ¶ 74, led Saudi student clubs, *id.* ¶¶ 86, 96, 98, 106, have posted messages on social media expressing political support for the Crown Prince, *id.* ¶¶ 78, 312, and spoke at a retirement party for the leader of the Saudi diplomatic mission that funds scholarships for Saudi students and visited him in the hospital, *id.* ¶¶ 86, 92, 239.  These innocuous allegations cannot plausibly support the allegation that these students were agents of the Crown Prince in an attempted murder.

---

[11] Although the Amended Complaint alleges that Defendant Alasaker "recruit[ed]" or "direct[ed]" other Defendants to search for Aljabri, *e.g.*, Am. Compl. ¶ 43, those allegations are themselves conclusory and insufficient to impute the so-called agents' conduct to either Alasaker or the Crown Prince.  *See* Bader Alasaker Mem. in Support of Mot. To Dismiss at 11-16.

[12] *See*, *e.g.*, *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1024-25 (9th Cir. 2017) (rejecting agency theory on the pleadings for lack of any "alleg[ation]" or "show[ing]" that the alleged principal "had the right to control [the agent's] activities in any manner at all"); *Celgard, LLC v. SK Innovation Co.*, 792 F.3d 1373, 1379 (Fed. Cir. 2015) (same for lack of any "attempt" by the alleged principal "to purposefully direct or control the activities of" the agents).

*See* Yousef Alrajhi Mem. in Support of Mot. To Dismiss at 4-9.  At bottom, Aljabri's assertion that the Crown Prince had "control and authority" over these three students is based on nothing more than "information and belief," and on the implausible blanket assertion that every Saudi student in the United States is under the Crown Prince's personal control.  Am. Compl. ¶¶ 82-86.

Nor does the actual conduct of any Defendants in the United States support an inference that they were acting as agents of the Crown Prince.  Those Defendants allegedly asked about the location of Aljabri's wife, including for the purpose of arranging a marriage with Aljabri's daughter, *see id.* ¶¶ 240, 244 – an "obvious alternative explanation," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007), for their questions that does not imply wrongdoing.  Alharbi, who allegedly inquired about Aljabri's location in the United States, had a "longstanding professional relationship with" Aljabri.  Am. Compl. ¶ 248.  The allegation that Alharbi tried to reconnect with his "long-time former associate," *id.* ¶ 251, does not "nudge[] . . . across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570, the claim that he was acting as the Crown Prince's agent.  Further, the Amended Complaint also alleges an unsuccessful attempt to locate Aljabri by Hamed, Am. Compl. ¶ 245, but no facts tying Hamed to the Crown Prince or any other Defendant, much less facts to show direction or control.

For similar reasons, Aljabri's allegations of a conspiracy between the Crown Prince and U.S.-based actors do not support personal jurisdiction.  "Conclusory statements or a bare allegation of conspiracy" are insufficient for personal jurisdiction.  *Livnat*, 851 F.3d at 57.  Aljabri's allegations of conspiracy are just as conclusory as his allegations of agency.  *See* Am. Compl. ¶¶ 368, 371 (alleging, without support, that the Crown Prince "conspired with" other Defendants).  Further, even well-pleaded allegations of conspiracy (which are not present here) do not support jurisdiction under Rule 4(k)(2).  As another court in this District recently observed, "as far as the Court is aware, no court to have considered the question has permitted the assertion

of conspiracy jurisdiction under Rule 4(k)(2)." *Ofisi*, 2019 WL 1255096, at *5 n.8 (citing *In re Aluminum Warehousing Antitrust Litig.*, 90 F. Supp. 3d 219, 226-27 (S.D.N.Y. 2015)).

Aljabri's Amended Complaint adds an allegation that, in May 2020, the Crown Prince "directed a hit squad to travel from Saudi Arabia to the United States and thereafter to Canada in an intensified effort to kill" Aljabri.  Am. Compl. ¶ 131(p).  That too is conclusory; and there are no allegations, even conclusory ones, that anyone (in response to the alleged direction or otherwise) has ever entered the United States with the intent of killing Aljabri.

> **b.    There Is No Strong Relationship Between the Alleged Contacts and Aljabri's Claims**

Mere inquiries into Aljabri's location also do not support personal jurisdiction because they are disconnected from Aljabri's claims.  Allegations that a defendant has forum contacts do not alone establish specific jurisdiction.  The forum contacts must have a "strong relationship" to her claims that due process requires as an "essential foundation" for personal jurisdiction.  *Ford Motor*, slip op. 12 (internal quotation marks omitted).

Aljabri seeks relief for an alleged attempted killing in Canada.  *See, e.g.*, Am. Compl. ¶¶ 384, 404.  No "strong relationship" exists between efforts to locate Aljabri in the United States in 2017 and an alleged attempt to kill Aljabri in Canada in October 2018.  To the contrary, his allegations admit that any such location efforts did not succeed.  *See id.* ¶¶ 243, 244 (Defendants "attempted to extract" information); *id.* ¶ 242 (Aljabri's son "misdirect[ed] Defendant Alrajhi and the larger ongoing hunt"); *id.* ¶ 250 (Alharbi's questions "caused Mohammed [Aljabri] to be suspicious"); *id.* ¶ 245 (Hamed attempted to locate Aljabri where he did not live and was informed that Aljabri was not present).

Aljabri alleges that Alharbi located Aljabri in Toronto by visiting his office there.  *Id.* ¶ 251.  But there are no allegations Alharbi learned the location of Aljabri's office through any

efforts in the United States.  To the contrary, Defendants allegedly tracked Aljabri's "precise location" by planting malware on Aljabri's phone through an electronic message from Saudi Arabia to Canada.  *Id.* ¶ 333.  Thus, even taking Aljabri's allegations as true, the supposed attempt on his life in Canada was entirely disconnected from the alleged earlier unsuccessful efforts to locate him in the United States.[13]

### 2. Aljabri's Own Alleged Contacts with the United States Do Not Support Personal Jurisdiction

Aljabri fills his Amended Complaint with self-aggrandizing claims that he has been an asset to the U.S. intelligence community.  *E.g.*, Am. Compl. ¶¶ 5, 24, 30-31, 35, 146-149.  But contacts between *Aljabri* and the United States cannot create personal jurisdiction over the Crown Prince.  "Put simply, however significant the plaintiff's contacts with the forum may be, those contacts cannot be 'decisive in determining whether the defendant's due process rights are violated.'"  *Walden*, 571 U.S. at 285 (quoting *Rush v. Savchuk*, 444 U.S. 320, 332 (1980)).  Courts, including the Supreme Court, "have consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State."  *Id.* at 284.

Aljabri contends that, due to his relationship with the intelligence community, the alleged attempt to kill him should be considered conduct aimed at the United States because the Crown Prince allegedly "wants [Aljabri] dead" to protect the Crown Prince's "standing with the U.S. government."  Am. Compl. ¶ 5.  This attempt to recast an alleged attempted killing in Canada as

---

[13] Aljabri's Amended Complaint adds an allegation that the United States efforts produced "valuable information about [Aljabri's] 'pattern-of-life.'"  Am. Compl. ¶ 77; *see also id.* ¶ 236 ("Alhamed, Alrajhi, and Abuljadayel each learned specific, valuable information").  But Aljabri does not and cannot point to any particular information Defendants learned through the alleged efforts in the United States that assisted in locating Aljabri.  His conclusory assertion that unspecified information was "specific" and "valuable" does not make it so.

U.S.-directed conduct is implausible.  The Crown Prince is the second-highest-ranking official in Saudi Arabia and heir to the throne.  On his own version of events, Aljabri is a former senior Saudi official and a close ally of the Crown Prince's predecessor, who has sought to attack the Crown Prince by spreading "sensitive, humiliating, and damning information" about him.  *See id.* ¶¶ 6, 32-33, 145.  Even taking it as true (which it is not) that the Crown Prince attempted to silence Aljabri in seeking "the unencumbered throne of the Kingdom of Saudi Arabia," *id.* ¶ 3, that allegation describes conduct directed at Saudi Arabia, not at the United States.

A far closer connection to the United States is needed to conclude that alleged attacks on foreign soil were directed at the United States.  In a series of cases against the Palestinian Authority, the D.C. Circuit has rejected arguments that terrorist attacks in the West Bank were directed at the United States, even though American citizens were injured or killed in the attacks and even though the plaintiffs proffered evidence that Palestinian groups engaged in terrorism in efforts to affect U.S. policy.  *See Livnat*, 851 F.3d at 57 ("The Livnats and Safras presented a declaration from a professor asserting that the Palestinian Authority encourages terrorism against Jews and Israelis in order to influence U.S. policy in the Palestinian Authority's favor.  Even if true, that evidence establishes no link between that practice and the Joseph's Tomb attack."); *Klieman*, 923 F.3d at 1124 ("Even if some terrorist acts carried out in Israel or the West Bank were used by defendants to influence U.S. policy, nothing in the record indicates that *this* attack fills that bill."); *Shatsky*, 955 F.3d at 1037 ("The Families do not identify any evidence in the record connecting the Karnei Shomron bombing to the alleged public relations campaign."). Here, Aljabiri's own theory of the case shows that Saudi Arabia generally and the Crown Prince specifically had reasons to pursue him (though, in reality, that pursuit has been conducted through lawful means such as the INTERPOL notice) wholly unrelated to the United States.

### 3.       Allegations of Other Contacts Do Not Support Personal Jurisdiction

The Amended Complaint's other scattered allegations regarding the United States cannot give rise to specific jurisdiction over the Crown Prince.  *First*, Aljabri alleges that the MiSK Foundation and certain individual Defendants (but not the Crown Prince) participated in leadership development programs, art festivals, lectures, and other cultural events in the United States.  Am. Compl. ¶ 131(a).  But he alleges neither any personal involvement of the Crown Prince in those events nor any link between those events and the alleged attempted killing.

*Second*, Aljabri alleges that the Crown Prince "suspended Saudi Arabian government services to the Aljabri family in the United States, including denying a request by [Aljabri's] son to renew his Saudi Arabian passport in New York, New York."  *Id.* ¶ 131(n).  The allegation that the Crown Prince personally presided over passport renewals in New York is implausible; and Aljabri again alleges no link between this passport denial and the alleged attempted killing.

*Third*, Aljabri alleges that the Crown Prince arranged to file a notice with INTERPOL of corruption charges against Aljabri and notes that INTERPOL is "an intergovernmental law enforcement agency of which the United States is a member."  *Id.* ¶¶ 131(o), 257.  The United States' membership does not make the filing of notices with INTERPOL a contact with the United States.  Further, the allegation of the Crown Prince's personal involvement is again conclusory; and Aljabri again alleges no link between the INTERPOL notice and the alleged attempted killing.  To the contrary, the Amended Complaint admits that the INTERPOL notice did not restrict Aljabri's movements, as he successfully asked INTERPOL to rescind it.  *Id.* ¶ 259.

*Fourth*, Aljabri alleges that the Crown Prince's "agents made misleading statements to journalists in the United States" about Aljabri's theft and corruption.  *Id.* ¶ 131(q).  But those allegations rest on another "bare allegation of agency," *Gregorio*, 215 F. Supp. 3d at 6; and, once more, there is no link to the alleged attempted killing.

*Fifth*, Aljabri alleges that the Crown Prince has directed agents "to conduct online disinformation and smear campaigns" on Twitter, insulting Aljabri by featuring his face alongside Hillary Clinton's face.  Am. Compl. ¶¶ 47, 131(s).  But even if the Court were to credit Aljabri's conclusory allegation that the Crown Prince directed insulting tweets (which it should not), he still alleges no link between such tweets and his legal claims.

*Sixth*, and finally, Aljabri alleges that the Crown Prince "transmitted threatening text messages to [Aljabri] over WhatsApp's U.S.-based servers."  *Id.* ¶ 131(t).  But "the mere location of a third party or its servers is insufficient to give rise to personal jurisdiction." *Hungerstation LLC v. Fast Choice LLC*, 2020 WL 137160, at *5 (N.D. Cal. Jan. 13, 2020) (collecting cases), *appeal pending*, No. 20-15090 (9th Cir.).  Further, Aljabri again fails to link the WhatsApp messages to the alleged attempted killing.  He instead alleges that he ignored the messages, refused to return to Saudi Arabia, and traveled to Canada.  Am. Compl. ¶¶ 176, 180.

## B.   Exercising Jurisdiction Would Offend Notions of Fair Play and Substantial Justice

Jurisdiction is also inappropriate over the Crown Prince because the exercise of jurisdiction would not comport with fair play and substantial justice.  *See Mwani v. bin Laden*, 417 F.3d 1, 15 (D.C. Cir. 2005).  In this analysis, courts consider "'the burden on the defendant, the interests of the forum State, the plaintiff's interest in obtaining relief in the forum State, and the interests of other sovereigns in resolving the dispute.'"  *IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 115-16 (D.D.C. 2018) (Kelly, J.) (quoting *Daimler*, 571 U.S. at 145 (Sotomayor, J., concurring in the judgment)).  All those factors weigh heavily against exercising jurisdiction here and present a "compelling case" that jurisdiction is "unreasonable."  *Id.* at 116.

*First*, the burden on the Crown Prince would be "severe" if he were required "to submit [this] dispute . . . to a foreign nation's judicial system."  *Asahi Metal Indus. Co. v. Superior Ct. of*

*California*, 480 U.S. 102, 114 (1987) (teaching that "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight").

*Second*, the interests of the forum – the United States – are minimal because neither Aljabri nor the Crown Prince is a U.S. citizen or resident and because the alleged conduct giving rise to the claim occurred in Saudi Arabia and Canada, not the United States

*Third*, Aljabri has no special interest in obtaining relief here.  He has not chosen to sue in the forum where he currently resides and where he alleges an attempt to kill him, Canada; or where he is a citizen, Saudi Arabia.  Although he alleges that Saudi Arabia lacks adequate remedies, Am. Compl. ¶ 382, he provides no factual support for that claim and makes no such argument as to Canada.  *See infra* Part III.A.2.  The Court should give his interest little weight.  *Cf. Asahi*, 480 U.S. at 114 ("Cheng Shin has not demonstrated that it is more convenient for it to litigate its indemnification claim against Asahi in California rather than in Taiwan or Japan.").

*Fourth*, both Canada, where Aljabri resides, and Saudi Arabia, where he is a citizen, have stronger connections to this suit than the United States.  The Crown Prince also resides in Saudi Arabia, where he is a high-ranking official.  The relevant relationships all began there.  In addition, Saudi (or alternatively Canadian) law governs Aljabri's non-statutory claim.

Accordingly, asserting jurisdiction over the Crown Prince would violate due process, and the Court should dismiss the claims against him.  *See id.* at 115 (emphasizing that courts should be "unwilling[] to find the serious burdens on an alien defendant outweighed by minimal interests on the part of the plaintiff or the forum State").

### C.    Jurisdictional Discovery Is Unwarranted

If Aljabri seeks jurisdictional discovery to cure his insufficient jurisdictional allegations, the Court should deny it.  A district court "has discretion to order" jurisdictional discovery "when presented with ' "a good faith belief that such discovery will enable [the plaintiff] to show

that the court has personal jurisdiction over the defendant,"' as opposed to 'mere conjecture or speculation.'" *IMAPizza*, 334 F. Supp. 3d at 108 (Kelly, J.) (quoting *FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1093-94 (D.C. Cir. 2008)) (alteration in original).  Here, the Amended Complaint's assertions that Defendants such as Alrajhi, Alhamed, Abuljadayel, or Alharbi acted as the Crown Prince's personal agents are speculative and generic.  *See supra* Part I.A.1.a.  Discovery to explore such vague contentions would amount to "a fishing expedition in the hopes of discovering some basis of jurisdiction," *In re Papst Licensing GMBH & Co. KG Litig.*, 590 F. Supp. 2d 94, 101 (D.D.C. 2008), which this Court need not and should not permit.

Further, jurisdictional discovery is inappropriate where additional facts "would not change the . . . jurisdictional analysis." *Cheyenne Arapaho Tribes of Oklahoma v. United States*, 558 F.3d 592, 597 (D.C. Cir. 2009).  That principle forecloses discovery related to Aljabri's alleged contacts with the United States (irrelevant under *Walden v. Fiore*) or the Crown Prince's various alleged miscellaneous connections with the United States, none of which could establish jurisdiction even if proved in detail.  *See supra* Parts I.A.2, I.A.3.  Indeed, as Aljabri alleges that his location was established through contacts with Canada rather than with the United States, *see supra* Part I.A.1.b, even allegations that agents sought him in the United States are legally insufficient as well as threadbare and conclusory.  *See Brit UW, Ltd. v. Manhattan Beachwear, LLC*, 235 F. Supp. 3d 48, 63 (D.D.C. 2017) (denying jurisdictional discovery as "futile").

## II. Aljabri's Claims Are Barred by Official Immunity, Because Saudi Arabia Cannot Be Joined, and by the Act of State Doctrine

### A. The Crown Prince Is Immune from Suit

The immunity of foreign officials from suit in the United States is governed by the doctrine of common-law foreign sovereign immunity.  *See Samantar v. Yousuf*, 560 U.S. 305, 325 (2010).  "The doctrine of common law foreign immunity distinguishes between two types of

immunity:  status-based and conduct-based immunity."  *Lewis v. Mutond*, 918 F.3d 142, 145

(D.C. Cir. 2019), *cert. denied*, 141 S. Ct. 156 (2020).

Status-based immunity includes head-of-state immunity, which "attach[es] whenever an

individual is a sitting head of state," *Sikhs for Justice v. Singh*, 64 F. Supp. 3d 190, 193 (D.D.C.

2014), and also protects other "'"holders of high-ranking office" . . . such as "the Head of

Government and Minister of Foreign Affairs,"'" *Yousuf v. Samantar*, 699 F.3d 763, 769 n.2

(4th Cir. 2012) (quoting Lewis S. Yelin, *Head of State Immunity as Sole Executive Lawmaking*,

44 Vand. J. Transnat'l L. 911, 921 n.42 (2011)), and "immediate members of their families,"

*Kline v. Kaneko*, 535 N.Y.S.2d 303, 304 (Sup. Ct., N.Y. Cty., 1988), *aff'd sub nom. Kline v.*

*Cordero De La Madrid*, 154 A.D.2d 959 (N.Y. App. Div. 1989).  "[D]uring their time in office,"

such individuals "are absolutely immune from suit," *Sikhs for Justice*, 64 F. Supp. 3d at 193,

"'regardless of the substance of the claim,'" *Lewis*, 918 F.3d at 145 (quoting Chimène I. Keitner,

*The Common Law of Foreign Official Immunity*, 14 Green Bag 2d 61, 64 (2010)).  "[H]ead-of-

state immunity . . . promote[s] comity among nations by ensuring that leaders can perform their

duties without being subject to detention, arrest or embarrassment in a foreign country's legal

system."  *In re Grand Jury Proceedings, Doe No. 700*, 817 F.2d 1108, 1110 (4th Cir. 1987).

Conduct-based immunity, by contrast, "does not depend on tenure in office."  *Matar v.*

*Dichter*, 563 F.3d 9, 14 (2d Cir. 2009); *see Yousuf*, 699 F.3d at 769 (noting that conduct-based

immunity "applies to current and former foreign officials").  This immunity for "foreign

official[s] derives from the immunity of the State" and is based on the "'classical'" theory that

"'any act performed by the individual as an act of the State enjoys the immunity which the State

enjoys.'"  *Id.* at 774 (quoting Hazel Fox, *The Law of State Immunity* 455 (2d ed. 2008)); *see*

*Samantar*, 560 U.S. at 322 ("[W]e do not doubt that in some circumstances the immunity of the

foreign state extends to an individual for acts taken in his official capacity.").

Courts employ a "two-step procedure" to determine whether a defendant is entitled to common-law foreign sovereign immunity.  *Lewis*, 918 F.3d at 145 (discussing *Samantar*, 560 U.S. at 311-12).  "At the first step, a foreign official requests a 'suggestion of immunity' from the State Department."  *Id.* (quoting *Samantar*, 560 U.S. at 311).  If the State Department suggests immunity, "the District Court is divested of its jurisdiction."  *Id.* (case involving conduct-based immunity); *see Manoharan v. Rajapaksa*, 711 F.3d 178, 179 (D.C. Cir. 2013) (per curiam) (same result in case involving status-based immunity).  At the second step, "[i]f the State Department does not grant a suggestion of immunity, the District Court is authorized to decide whether all the requisites for foreign-official immunity exist."  *Lewis*, 918 F.3d at 145-46 (emphasis removed); *see Miango v. Democratic Republic of Congo*, 2020 WL 3498586, at *5-7 (D.D.C. June 29, 2020) (finding the "requisites for conduct-based immunity" met as to members of the President of the Democratic Republic of Congo's entourage, though the State Department suggested immunity only for the President), *appeals pending*, Nos. 20-5244 *et al.* (D.C. Cir.).

Here, Saudi Arabia's Embassy has already requested a suggestion of immunity from the State Department with respect to the Crown Prince.  This request was sent on October 8, 2020, and remains under consideration.  Regardless of whether or how the State Department acts, this Court can and should rule that the Crown Prince is immune from Aljabri's suit.

### 1.    The Crown Prince Is Entitled to Head-of-State Immunity

"'Under customary international law, head of state immunity encompasses the immunity of not only the heads of state but also of other "holders of high-ranking office in a State" such as "the Head of Government and Minister of Foreign Affairs."'"  *Yousuf*, 699 F.3d at 769 n.2 (quoting Yelin, 44 Vand. J. Transnat'l L. at 921 n.42); *see* John B. Bellinger III, *The Dog that Caught the Car:  Observations on the Past, Present, and Future Approaches of the Office of the Legal Adviser to Official Acts Immunities*, 44 Vand. J. Transnat'l L. 819, 830 (2011) (describing

immunity as "absolute for sitting heads of state, heads of government, foreign ministers, and other high-ranking officials"). This immunity also protects members of the head of state's immediate family, including a son or daughter who is the head of state's designated successor. *See*, *e.g.*, *Kilroy v. Windsor*, 1978 U.S. Dist. LEXIS 20419, at *3 (N.D. Ohio Dec. 7, 1978) (dismissing a lawsuit against the Prince of Wales; observing that, when a defendant is "the Heir Apparent to the throne of the possibly offended nation, the foreign policy ramifications are extraordinary"); *see also Kline*, 535 N.Y.S.2d at 304 (wife of the President of Mexico); *Estate of Domingo v. Marcos*, 1983 WL 482332 (W.D. Wash. July 14, 1983) (wife of the President of the Philippines).

The Crown Prince is the son of, and designated successor to, the King of Saudi Arabia. He has immunity based not only on his immediate familial relationship to the King, but also on his own "high-ranking office," *Yousuf*, 699 F.3d at 769 n.2 (citation omitted), as set out in Saudi Arabia's Basic Law of Governance (the "Basic Law").[14] Under the Basic Law, the Crown Prince is the only individual who exercises sovereign power alongside or on behalf of the King. *See* Basic Law art. 65 ("The King may delegate some powers of authority to the Crown Prince by Royal Decree."). Moreover, "[s]hould the King happen to travel abroad, he shall issue a Royal Decree to deputize the Crown Prince to manage the affairs of state and look after the interests of the people." *Id.* art. 66. That has happened several times since the Crown Prince assumed his current position.[15] In his capacity as "Acting King," the Crown Prince himself has issued a number of Royal Decrees, including one appointing Saudi Arabia's current Ambassador

---

[14] An English-language version of the Basic Law is available on the Embassy's website. *See* Basic Law of Governance, https://www.saudiembassy.net/basic-law-governance.

[15] *See*, *e.g.*, Royal Order A/352, issued 1441/05/18 AH (01/13/2020 AD) (instructing the Crown Prince "to manage state affairs, and to look after the interests of the people during [the King's] travel outside the Kingdom"); Royal Order A/226, issued 1440/06/18 AH (02/23/2019 AD) (same); Royal Order A/313, issued 1438/11/01 AH (07/24/2017 AD) (same).

to the United States.[16]  Aljabri's retained experts in the Canadian proceeding have asserted that "it is a 'universally averred reality that [the Crown Prince] runs the daily affairs of the Kingdom, including its international relations.' "  *See* Ex. B at 11 (¶ 61).

Upon the King's death, "the Crown Prince shall assume the Royal powers until a pledge of allegiance (bay'a) is given," at which point he would formally become the King.  Basic Law art. 5.  The Crown Prince occupies numerous high-ranking positions in Saudi Arabia's government, now serving as its Deputy Prime Minister, Minister of Defense, Chairman of the Council for Economic and Development Affairs, and Chairman of the Council of Political and Security Affairs; he was Chairman of the Supreme Anti-Corruption Committee during the period of many allegations in the Amended Complaint, until that Committee was dissolved in February 2019; and he exercises other authorities by Royal Order as well.[17]

Consistent with his high-ranking status, the Crown Prince has engaged directly with the U.S. government's most senior officials, including the President[18] and the Secretary of State.[19]

---

[16] Royal Order A/229, issued 1440/06/18 AH (02/23/2019 AD).

[17] *See* Ex. G (press release on Royal Orders "[s]electing Prince Mohammed bin Salman bin Abdulaziz Al Saud as Crown Prince, appointing him as Deputy Premier, and continuing as Minister of Defense"); Ex. H (press release on Royal Decree "appointing Prince Mohammed bin Salman bin Abdulaziz Al Saud as the Minister of Defense"); Ex. I (Royal Order A/292, issued 1436/04/03 AH (07/21/2017 AD), appointing the Crown Prince as Chairman of the Council of Political and Security Affairs); Ex. J (press release on Royal Orders creating the Supreme Anti-Corruption Committee and appointing the Crown Prince as Chairman); Ex. K (Royal Order No. 44935, issued 1438/09/28 AH (06/23/2017 AD), granting various oversight authorities).

[18] *See, e.g.*, *Readout of President Donald J. Trump's Meeting with Crown Prince Mohammed Bin Salman of Saudi Arabia*, The White House (Mar. 21, 2018), https://trumpwhitehouse.archives.gov/briefings-statements/readout-president-donald-j-trumps-meeting-crown-prince-mohammed-bin-salman-saudi-arabia/.

[19] *See, e.g.*, Readout, *Secretary Pompeo's Meeting with Saudi Crown Prince Mohammed bin Salman*, Office of the Spokesperson, U.S. Dep't of State (Feb. 21, 2020), https://2017-2021. state.gov/secretary-pompeos-meeting-with-saudi-crown-prince-mohammed-bin-salman-2/.

Indeed, his interactions at this level are repeatedly emphasized – and criticized – in the Amended

Complaint, *see* Am. Compl. ¶¶ 155-167, 270, which insinuates that President Trump's expressions

of goodwill and support for the Crown Prince are evidence of improper conduct.  These types of

allegations underscore that this case presents the potential for embarrassment and disruption of

foreign relations that form the foundation for head-of-state immunity.  President Biden has not

met personally with the Crown Prince, but has described him as an "acting head of state" in

public remarks.[20]  Other agencies of the United States have also recognized that the Crown

Prince, although second to the King, is properly described as a "chief of state" and "head of

government."[21]  Other countries have also received him as a visiting head of state.[22]

The practice of other states confirms that the position of Crown Prince of Saudi Arabia is

entitled to status-based immunity.  In *Apex Global Management Ltd. v. Fi Call Ltd.*, [2013]

EWHC 587 (Ch), the High Court of Justice of England and Wales observed that, under

"customary international law," an "heir to the throne . . . undertaking the offices of state on

---

[20] *See Transcript:  ABC News' George Stephanopoulous Interviews President Joe Biden*, ABC News (Mar. 17, 2021), https://abcnews.go.com/Politics/transcript-abc-news-george-stephanopoulos-interviews-president-joe/story?id=76509669.

[21] *See* Central Intelligence Agency, *The World Factbook:  Saudi Arabia* (identifying both the King and the Crown Prince as Saudi Arabia's "chief of state" and "head of government"), https://www.cia.gov/the-world-factbook/countries/saudi-arabia/#government (last visited Mar. 24, 2021).

[22] *See* Press Release, *Readout of PM's Call with Mohammed bin Salman:  2 September 2020*, Prime Minister's Office, 10 Downing Street (Sept. 2, 2020), https://www.gov.uk/government/news/readout-of-pms-call-with-mohammed-bin-salman-2-september-2020; *Saudi Crown Prince Mohammed bin Salman Arrives in Pakistan*, Al Jazeera (Feb. 17, 2019), https://www.aljazeera.com/news/2019/02/saudi-crown-prince-mohammed-bin-salman-arrives-pakistan-190217061720354.html; Kim Willsher, *French President and Saudi Crown Prince Vow Partnerships on Syria and Economic Issues*, L.A. Times (Apr. 10, 2018), https://www.latimes.com/world/europe/la-fg-france-saudi-arabia-20180410-story.html.

behalf of the sovereign or head of State" would be entitled to "immunity" from suit.  *Id.* ¶ 107.[23]
Although *Apex Global* held that two other members of Saudi Arabia's royal family were not
entitled to status-based immunity, the English court indicated that it would have reached a
different result with respect to the Crown Prince at the time, who "can officially exercise power
in Saudi Arabia alongside or on behalf of the King" under the "Basic Law."  *Id.* ¶ 122.  English
courts have also extended immunity under customary international law to Israel's Defense
Minister and China's Minister for Commerce and International Trade – each of whom is less
senior with respect to their governments than the Crown Prince is with respect to Saudi Arabia.[24]

### 2.     The Crown Prince Is Entitled to Conduct-Based Immunity

"To date, neither the D.C. Circuit nor the Supreme Court has identified precisely how a
court should determine whether the defendants have satisfied the[] requisites" for conduct-based
immunity.  *Broidy Cap. Mgmt. LLC v. Muzin*, 2020 WL 1536350, at *5 (D.D.C. Mar. 31, 2020),
*appeal pending*, No. 20-7040 (D.C. Cir. argued Feb. 26, 2021).  Some authorities point to "'the
established policy of the State Department.'"  *Id.* (quoting *Samantar*, 560 U.S. at 312).  Others
point to § 66(f) of the Restatement (Second) of Foreign Relations Law of the United States
(1965) ("Second Restatement").  *Id.* at *6; *see Lewis*, 918 F.3d at 146 (applying § 66(f) because
the parties assumed it should apply).  Conduct-based immunity under § 66(f) requires that

---

[23] *Apex Global* was interpreting the United Kingdom's State Immunity Act, but explained
that the Act was "intended to reflect the common law and customary international law position."
[2013] EWHC 587, ¶ 107.  Federal courts have looked to the Act, and judicial interpretations of
it, as indicative of international law.  *See, e.g.*, *Texas Trading & Milling Corp. v. Federal
Republic of Nigeria*, 647 F.2d 300, 310 (2d Cir. 1981), *overruled on other grounds by Frontera
Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393 (2d Cir. 2009).

[24] *See Application for Arrest Warrant Against General Shaul Mofaz* (Bow St. Mag. Ct.
Feb. 12, 2004) (Eng.) (Pratt, Dist. J.), *reprinted in Current Developments: Public International
Law*, 53 Int'l & Comp. L.Q. 769, 771-73 (July 2004); *Re Bo Xilai* (Bow St. Mag. Ct. Nov. 8,
2005) (Eng.) (Workman, Sr. Dist. J.), *available at Weixum v. Xilai*, No. 1:04-cv-00649-RJL,
ECF No. 16-7 (D.D.C. July 24, 2006).

(1) the actor must be a "public minister, official, or agent of the foreign state";
(2) the act must have been performed in the actor's "official capacity"; and
(3) "exercising jurisdiction" would have the effect of "enforc[ing] a rule of law against the [foreign] state."

*Miango*, 2020 WL 3498586, at *5 (quoting *Lewis*, 918 F.3d at 146) (alterations in original).

The better view is that the Court should take guidance from "'the established policy of the State Department,'" not the Second Restatement.  *Broidy*, 2020 WL 1536350, at *5 (quoting *Samantar*, 560 U.S. at 312); *see* Br. for the United States as Amicus Curiae at 14-17, *Mutond v. Lewis*, No. 19-185 (U.S. May 26, 2020) ("U.S. *Mutond* Br."), 2020 WL 2866592.  The Second Restatement's drafters conceded "[t]he paucity of adjudicated decisions in the international field," Restatement (Second) § 1 cmt. c, and "admitted their reliance on less conventional sources to divine the principles of foreign-relations law," U.S. *Mutond* Br. 14.  Foreign-relations law has also "changed substantially" since publication of that document.  Restatement (Third) of Foreign Relations Law of the United States Intro. (1987).  Neither the Third nor the Fourth Restatement repeats the test for conduct-based immunity outlined in § 66(f).  Moreover, on its face, § 66(f) "is not written in terms that address the circumstances in which foreign officials may enjoy common law conduct-based immunity independently of their sovereigns."  U.S. *Mutond* Br. 16.

Nevertheless, whether the Court applies the State Department's established policy or the Second Restatement, the result is the same:  the Crown Prince is immune.

### a.   Aljabri's Claims Are Barred Under the State Department's Policy

The settled policy of the State Department is that "acts of defendant foreign officials who are sued for exercising the powers of their office are treated as acts taken in an official capacity," so that such officials are entitled to conduct-based immunity.  Ltr. from Harold Hongju Koh, Legal Adviser, U.S. Dep't of State, to Stuart F. Delery, Principal Dep. Ass't Att'y Gen., Civil Div., U.S. Dep't of Justice, at 2 (Dec. 17, 2012), *docketed at Ragsdale v. Lashkar-E-Taiba*,

No. 1:11-cv-03893-DLI-CLP, ECF No. 19-1 (E.D.N.Y. Dec. 17, 2012).[25]  That policy applies to the Amended Complaint.

As Deputy Prime Minister, Minister of Defense, Chairman of the Council of Political and Security Affairs, and (at the relevant time) Chairman of the Supreme Anti-Corruption Committee, the Crown Prince had authority to oversee criminal prosecutions, protecting national security, and investigating and prosecuting corruption.  His responsibilities encompass pursuing massive thefts and any threats to national security.[26]  *See supra* pp. 28-29 & nn.15-17.  As Chairman of the Supreme Anti-Corruption Committee, the Crown Prince operated under a mandate directly from the King granting the Committee an "[e]xemption from laws, regulations, instructions, orders and decisions" when performing its assigned "tasks."  Ex. J.  Those tasks included: (1) "identify[ing] offenses, crimes, persons and entities involved in cases of public corruption"; and (2) undertaking the "investigation, issuance of arrest warrants, travel ban, disclosure and freezing of accounts and portfolios, tracking of funds, assets and preventing their remittance or transfer by persons and entities, whatever they might be."  *Id.*; *see also* Ex. K (Royal Order granting authority over "Public Prosecution" and other "oversight entities").

The same mandate included authority to "take[ ] whatever measures deemed necessary to

---

[25] *See also* Ltr. from Harold Hongju Koh, Legal Adviser, U.S. Dep't of State, to Stuart F. Delery, Acting Ass't Att'y Gen., Civil Div., U.S. Dep't of Justice, at 1 (Sept. 7, 2012) ("In a case involving conduct-based immunity, . . . the Department of State generally presumes that actions taken by a foreign official exercising the powers of his office were taken in his official capacity."), *docketed at Doe v. Zedillo*, No. 3:11-cv-01433-AWT, ECF No. 38-1 (D. Conn. Sept. 7, 2012); U.S. *Mutond* Br. 10-11 (citing examples dating from 1794 to 2019); U.S. Dep't of State, *Digest of United States Practice in International Law* ch. 10, § B(3), at 426 (CarrieLyn D. Guymon ed., 2015), *available at* https://2009-2017.state.gov/documents/organization/258206.pdf.

[26] By Aljabri's own account, he is a former senior official of Saudi Arabia's government terminated for having unauthorized meetings with intelligence officials of another government, *see* Am. Compl. ¶ 153; who possesses sensitive information that he repeatedly threatens to reveal, *see id.* ¶¶ 6, 115, 145; and who repeatedly describes himself as a "threat" to the Crown Prince's relationship with senior officials of the U.S. government, *e.g.*, *id.* ¶¶ 5, 25, 154.

deal with those involved in public corruption cases and take what [the Committee] considers to be the right of persons, entities, funds, fixed and movable assets, at home and abroad," *id.*; and to "seek the assistance of those [the Committee] deems necessary and [to] set up teams for investigation, prosecution, etc.," *id.*  In addition, the Committee has discretion to "delegate some or all of its powers to these teams."  *Id.*  Aljabri's own experts in the Canadian proceeding concede that the "Crown Prince . . . has authority over . . . the criminal justice system," including official authority to "initiate a criminal investigation into anyone in [Saudi Arabia]" and even to "order extra-judicial detention."  *See* Ex. B at 12 (¶ 67).

All of the specific acts that the Amended Complaint alleges and attributes to the Crown Prince fall within his authority – or would if he had directed them, which he does not admit. Those alleged acts include investigating criminally Aljabri's embezzlement of counterterrorism funds, including the 2017 filing of a notice with INTERPOL concerning Aljabri and seeking Aljabri's arrest and extradition,[27] *see* Am. Compl. ¶¶ 178, 257, 261; the 2017 prohibitions on members of Aljabri's family from leaving Saudi Arabia, *id.* ¶¶ 182, 204; and the 2017 and 2019 attempts to freeze or seek to close Aljabri's bank accounts and the accounts of members of his family, *id.* ¶¶ 268, 271.  They also include the alleged March 2020 exercise of state executive powers to arrest and prosecute two of Aljabri's adult children – alleged as a basis for Aljabri's claim for intentional infliction of emotional distress, *id.* ¶ 194 – as well as the arrest, detainment, interrogation, prosecution, and monitoring at various times of other relatives and associates, *id.* ¶¶ 196-217; the alleged attempted or actual entry into Canada in October 2018 of "an interagency group of employees" from across the Saudi government, *id.* ¶¶ 334, 336-349; and alleged attempts to surveil Aljabri in Canada during the second half of 2020, *id.* ¶¶ 357-361.  To be sure,

---

[27] In his Amended Complaint, Aljabri has changed "formally extradite" to "forcibly return."  *Id.* ¶ 179.  The substance of the allegation remains the same.

the allegations of the Crown Prince's personal involvement in those actions are largely

conclusory; but, whether attributable to the Crown Prince or not, these and other alleged acts are

clearly acts of the government of Saudi Arabia.

The Court should disregard the Amended Complaint's wholly irrelevant allegations

regarding purported assaults on various individuals unconnected to the case, *id.* ¶¶ 55, 113,

274-276, 279, 281-294; purported mistreatment of or threats to members of Aljabri's family, *id.*

¶¶ 186, 198-217, 224; alleged errors in the legal proceedings against Aljabri's son and daughter,

*id.* ¶¶ 190, 193;[28] and alleged online harassment, *id.* ¶¶ 263-265.  None of those allegations gives

rise to any of the claims asserted in the Amended Complaint.  They are mere appeals to emotion

– efforts to obscure the Amended Complaint's legal defects by inviting unwarranted sympathy

for Aljabri and maligning the Crown Prince.

Likewise, the Court should disregard Aljabri's repetitive, conclusory allegations that the

Crown Prince has taken actions against Aljabri based on personal or private *motives*, or using

personal or private *means*.[29]  As an initial matter, mere assertions that an action was taken for

personal reasons rather than governmental ones are "no more than conclusions" not "entitled to

the assumption of truth."  *Iqbal*, 556 U.S. at 679.  Aljabri cannot convert a conclusion into a fact

---

[28] Aljabri asserts that the criminal prosecution and conviction of his son (Omar) and daughter (Sarah) was "pretextual" and "conducted in a manner wholly inconsistent with Saudi law," and that "all Ministry of Justice court records regarding the case have been deleted."  *Id.* ¶ 190.  He proffers no basis for these conclusory statements.  As discussed *infra* pp. 47-48, the act of state doctrine bars this Court from adjudicating the validity of a foreign sovereign's criminal prosecution.  In any event, attached as Exhibit L is a statement from Saudi Arabia's Public Prosecution's Office setting forth the charged offenses and convictions, including dates and case numbers for the judgments and appeals.

[29] *See, e.g.*, Am. Compl. ¶¶ 6, 282, 287 ("personal interests"); *id.* ¶¶ 42, 44, 49, 69, 74, 78, 85, 96, 138-139 ("personal objective" or "objectives"); *id.* ¶ 43 ("personal power and influence"); *id.* ¶ 44 ("private vendettas"); *id.* ¶ 79 ("personal mission"); *id.* ¶¶ 81, 219 ("private objective" or "objectives"); *id.* ¶¶ 81, 272, 276 ("personal vendetta" or "vendettas"); *id.* ¶ 231 ("personal ends"); *id.* ¶ 278 ("personal goals").

however many times he repeats it.  The same is true with respect to the Amended Complaint's

conclusory assertions that other Defendants who allegedly acted at the direction of the Crown

Prince did so in a "personal" or "private" capacity.[30]

In any event, even well-pleaded attacks on motive could not defeat conduct-based

immunity.  "[T]he relevant inquiry in determining whether an individual was acting in an official

capacity focuses on the nature of the individual's alleged actions, rather than the alleged motives

underlying them." *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1028

(D.C. Cir. 1997); *accord Byrd v. Corporacion Forestal y Indus. de Olancho S.A.*, 182 F.3d 380,

389 (5th Cir. 1999) (holding that allegations that defendants "acted out of personal gain and . . .

subverted their official positions to advance their personal objectives" were "not legally

sufficient to strip FSIA immunity from" them), *abrogated in part on other grounds by Samantar

v. Yousuf*, 560 U.S. 305 (2010); *Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1107 (9th

Cir. 1990) (rejecting a "conten[tion] that [a] personal motive renders . . . actions ultra vires even

though the actions themselves were fully authorized"), *abrogated in part on other grounds by

Samantar v. Yousuf*, 560 U.S. 305 (2010).[31]

The Court should also disregard Aljabri's allegations that security or intelligence officials

of the Saudi government once conducted surveillance on the Crown Prince.  *See* Am. Compl.

¶¶ 273-295.  None of those allegations is remotely relevant to the present case.  In any event,

---

[30] *See, e.g.*, *id.* ¶¶ 10, 17, 19, 26, 46, 145, 272-295 (alleging that some Defendants acted as a "personal" or "private" "squad" or "team" for the Crown Prince); *id.* ¶ 16 ("personal agents"); *id.* ¶ 26 ("personal loyalists"); *id.* ¶ 53 ("personal mercenaries").

[31] *Junguist*, *Byrd*, and *Chuidian* were all decided before *Samantar v. Yousuf*, 560 U.S. 305 (2010), and considered immunity under the Foreign Sovereign Immunities Act of 1976 ("FSIA") rather than under federal common law.  But those cases remain persuasive authority on the scope of a foreign official's duties.  *See, e.g.*, *Yousuf*, 699 F.3d at 774 (citing *Chuidian* as "instructive for post-*Samantar* questions of common law immunity"); *Farhang v. Indian Inst. of Tech.*, 655 F. App'x 569, 571 (9th Cir. 2016) (post-*Samantar* case applying *Chuidian*'s holding as to the scope of official duties).

allegations concerning internal matters of a sovereign nation cannot be adjudicated in a U.S. court.  *See Republic of Philippines v. Pimentel*, 553 U.S. 851, 866 (2008) (recognizing that, where a foreign state has a "unique interest in resolving" a dispute in its own courts, "comity" and "dignity" interests prevent U.S. courts from intervening).  Bedrock principles of mutual respect among sovereign nations foreclose any such inquiry.

### b.    Aljabri's Claims Are Barred Under the Second Restatement

The Crown Prince also satisfies the test outlined in § 66(f) of the Second Restatement. *First*, the Crown Prince is a "'public minister, official, or agent'" of Saudi Arabia.  *Miango*, 2020 WL 3498586, at *5 (quoting *Lewis*, 918 F.3d at 146).

*Second*, as set forth above, Aljabri's allegations against the Crown Prince arise from "'acts performed [by the Crown Prince] in his official capacity.'"  *Matar*, 563 F.3d at 14 (quoting § 66(f)); *see Miango*, 2020 WL 3498586, at *5 (conduct-based immunity is available when an act was "performed in the actor's 'official capacity'") (quoting *Lewis*, 918 F.3d at 146).

*Third*, a judgment in Aljabri's favor would have the practical effect of "'enforc[ing] a rule of law against'" Saudi Arabia.  *Miango*, 2020 WL 3498586, at *5 (quoting *Lewis*, 918 F.3d at 146) (alteration in original); *see Doğan v. Barak*, 932 F.3d 888, 894 (9th Cir. 2019) (concluding that exercising jurisdiction over claims against the former Israeli Defense Minister "would be to enforce a rule of law against the sovereign state of Israel," where the allegations concerned the Defense Minister's exercise of his official powers).

The conduct challenged by Aljabri goes to the heart of Saudi Arabia's ongoing efforts to investigate Aljabri's corruption and to extradite Aljabri to face criminal prosecution – efforts undertaken pursuant to a Royal Order.  *See* Ex. J.  For example, the alleged "hunt" for Aljabri in the United States purportedly occurred between September and December 2017, Am. Compl. ¶ 225, the same period during which Saudi Arabia filed a notice with INTERPOL concerning

Aljabri and was seeking Aljabri's arrest and extradition, *id.* ¶¶ 178, 257, 261.  The Amended

Complaint challenges investigative and prosecutorial measures taken by Saudi Arabia,

particularly the arrest and prosecution of Aljabri's adult children as complicit in his

embezzlement scheme.  *Id.* ¶ 194.  It also challenges other executive and prosecutorial state

actions such as the prohibition on Aljabri's family members leaving Saudi Arabia, *id.* ¶¶ 182,

204; arrest, detention, interrogation, prosecution, and monitoring of his relatives and associates,

*id.* ¶¶ 189-190, 196-217; and freezing of his bank accounts and those of his family members, *id.*

¶¶ 268, 271.

Aljabri seeks to "force [Saudi Arabia] to take specific action," *Lewis*, 918 F.3d at 147 –

namely, to cease criminal and administrative investigation of Aljabri's wrongdoing, including its

efforts to extradite Aljabri, to prosecute his adult family members, and to reclaim the property he

stole.  Indeed, Aljabri asks the Court for a "declaratory judgment" stating that Saudi Arabia's

investigation violated the TVPA and the law of nations.  *See* Am. Compl. ¶¶ 395, 408.  Any such

judgment by this Court would substantially interfere with Saudi Arabia's investigation and

prosecution of its own former senior official, even though "an executive decision to conduct a

criminal investigation . . . ranks '[f]oremost among the prerogatives of sovereignty.'"  *Nnaka v.*

*Federal Republic of Nigeria*, 756 F. App'x 16, 18 (D.C. Cir. 2019) (per curiam) (quoting *Heath*

*v. Alabama*, 474 U.S. 82, 93 (1985)) (brackets in original).[32]

### 3.    No Exception to the Crown Prince's Immunity Exists or Applies

Aljabri may contend that his allegations against the Crown Prince are so grave that

---

[32] *See also Saudi Arabia v. Nelson*, 507 U.S. 349, 361 (1993) (describing prosecutorial
and police powers as "peculiarly sovereign in nature"); *Doe 1 v. Buratai*, 318 F. Supp. 3d 218,
233 (D.D.C. 2018) (determining that a decision interfering with the Nigerian government "would
effectively enforce a rule of law against Nigeria"), *aff'd*, 2019 WL 668339 (D.C. Cir. Feb. 15,
2019) (per curiam), and *aff'd*, 792 F. App'x 6 (D.C. Cir. 2019) (per curiam).

foreign official immunity cannot stand in their way.  The Court should reject any such argument.

As an initial matter, although some have urged an exception to foreign official immunity for *jus cogens* violations of international law,[33] a category that would include actual extrajudicial killings, such arguments have failed to persuade the Second and Ninth Circuits,[34] courts in this District,[35] and the Executive Branch.  As the Department of Justice has explained:

> [T]he Executive does not recognize any exception to a foreign official's immunity for civil suits alleging *jus cogens* violations. . . . [T]he recognition of such an exception by the United States would be out of step with international law and could prompt reciprocal limitations by foreign jurisdictions, exposing U.S. officials to suit abroad on that basis.

Br. for the United States of America as Amicus Curiae in Support of Affirmance at 4, *Mahar v. Dichter*, No. 07-2579-cv (2d Cir. Dec. 19, 2007), 2007 WL 6931924 (brief signed by the Legal Adviser of the State Department).

Nor does the TVPA's statutory cause of action overcome foreign official immunity.  The D.C. Circuit has held that the TVPA does not abrogate status-based immunity.  *See Manoharan*, 711 F.3d at 179 (President of Sri Lanka); *accord Habyarimana v. Kagame*, 696 F.3d 1029, 1030-32 (10th Cir. 2012) (President of Rwanda); *Ye v. Zemin*, 383 F.3d 620, 622, 625-26 (7th Cir. 2004) (President of China).

---

[33] *Jus cogens* norms are those " ' 'accepted and recognized by the international community of states as a whole as . . . norm[s] from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character.' " *Giraldo v. Drummond Co.*, 808 F. Supp. 2d 247, 250 n.1 (D.D.C. 2011) (quoting *Belhas v. Ya'alon*, 515 F.3d 1279, 1286 (D.C. Cir. 2008)), *aff'd*, 493 F. App'x 106 (D.C. Cir. 2012) (per curiam).

[34] *See, e.g., Doğan*, 932 F.3d at 896-97 (declining to recognize an exception from official immunity for *jus cogens* violations); *Matar*, 563 F.3d at 15 ("A claim premised on the violation of *jus cogens* does not withstand foreign sovereign immunity.").

[35] *See Doe 1*, 318 F. Supp. 3d at 236 ("[T]he Court—following courts in this circuit and other circuits—declines to adopt and apply a *jus cogens* exception."); *Giraldo*, 808 F. Supp. 2d at 251 ("[P]laintiffs' allegations of *jus cogens* violations do not defeat . . . immunity.").

In cases involving conduct-based immunity, the Second and Ninth Circuits have correctly held that "the TVPA does not abrogate foreign official immunity." *Doğan*, 932 F.3d at 896; *see Matar*, 563 F.3d at 15 (rejecting as "incorrect" the argument that foreign official immunity "is overridden by . . . alleged violations of the TVPA"). As the Solicitor General has explained on behalf of the United States, "[b]ecause the TVPA does not 'speak directly to the question addressed by the common law' concerning conduct-based immunity for foreign officials, the statute does not abrogate that doctrine." U.S. *Mutond* Br. 18 (quoting *United States v. Texas*, 507 U.S. 529, 534 (1993)); *see also Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 126 (2015) (applying presumption in favor of retaining common-law principles). Indeed, the TVPA does not speak at all – directly or indirectly – to the question of official immunity. Accordingly, just as common-law domestic official immunity coexists with the remedy created by 42 U.S.C. § 1983, *see* U.S. *Mutond* Br. 19-20 (citing, *inter alia*, *Rehberg v. Paulk*, 566 U.S. 356, 361 (2012)), foreign official immunity can and should coexist with the remedy created by the TVPA.

The D.C. Circuit's recent decision in *Lewis v. Mutond* is not to the contrary. In that case, two judges expressed the view that the TVPA does abrogate conduct-based (but not status-based) immunity. *See* 918 F.3d at 150 (Randolph, J., concurring in the judgment); *id.* at 148 (Srinavasan, J., concurring) (joining Judge Randolph's opinion in relevant part). Judge Wilkins, writing for the court of appeals, described Judge Randolph's reasoning as an "alternative holding," *id.* at 144, language that ordinarily indicates "binding precedent," *e.g.*, *Karem v. Trump*, 404 F. Supp. 3d 203, 211 (D.D.C. 2019), *aff'd as modified*, 960 F.3d 656 (D.C. Cir. 2020). Judge Randolph, however, stated merely that he found the "assumption[ ]" that common-law immunity would apply to be "dubious" and that it had not been "tested in an adversary proceeding." *Lewis*, 918 F.3d at 148 (Randolph, J., concurring in the judgment); *see also id.* at 150 ("The conflict between the [TVPA]'s basis for liability and the Restatement's basis for

40

immunity from liability was neither briefed nor argued, although it should have been.").  That

opinion is therefore best read to leave the question open for another day, not to resolve it finally.

In any event, Judge Randolph's opinion does not cut against immunity here.  As set forth

in Part III.A, *infra*, the TVPA creates a cause of action for an "extrajudicial killing," to be

brought by a "legal representative" or other claimant for "wrongful death."  It does not create a

cause of action for an attempted, unsuccessful extrajudicial killing, which is the most that

Aljabri, who is alive and suing in his own name, can possibly allege.  At a minimum, there is no

"clear conflict," *Lewis*, 918 F.3d at 150 (Randolph, J., concurring in the judgment), between the

TVPA and the doctrine of foreign official immunity on the facts alleged here, because the TVPA

does not clearly create the cause of action that Aljabri seeks to assert against the Crown Prince.

Accordingly, no statutory abrogation of immunity applies on the facts alleged.

## B.   Saudi Arabia Is Necessary, Indispensable, and Immune from Suit

Under Federal Rule of Civil Procedure 12(b)(7), a party may move to dismiss a

complaint for "failure to join a party under Rule 19."  Rule 19 governs the " 'procedural

propriety of joinder.' "  *Davenport v. International Bhd. of Teamsters, AFL-CIO*, 166 F.3d 356,

366 (D.C. Cir. 1999) (Garland, J.) (quoting 4 James W. Moore, *Moore's Federal Practice*

§ 19.04(1)(a) (3d ed. 1998)) (emphasis removed).

Under Rule 19(a), "the Court must determine if the absent party is required (or, necessary)

for a just adjudication."  *Stand Up for California! v. U.S. Dep't of the Interior*, 204 F. Supp. 3d

212, 251 (D.D.C. 2016), *aff'd*, 879 F.3d 1177 (D.C. Cir. 2018), *cert. denied*, 139 S. Ct. 786 (2019).

An absent party is necessary if it "claims an interest relating to the subject of the action and is so

situated that disposing of the action in the person's absence may . . . as a practical matter impair

or impede the person's ability to protect the interest."  Fed. R. Civ. P. 19(a)(1)(B)(i).  Where a

case involves a "matter of significant importance to the people" of a foreign state, that state is

necessary.  *TJGEM LLC v. Republic of Ghana*, 26 F. Supp. 3d 1, 13 (D.D.C. 2013), *aff'd*, 2015 WL 3653187 (D.C. Cir. June 9, 2015) (per curiam).  The presence of other parties who may be aligned with the sovereign is irrelevant.  *See id.* at 11-12 (concluding that the Republic of Ghana and the Accra Metropolitan Assembly were necessary to a suit that already involved Ghana's Minister of Finance and the Metropolitan Chief Executive of the Accra Metropolitan District).

Once the court determines that the absent party is necessary, it then "determine[s] whether the person's joinder is feasible."  *Stand Up for California!*, 204 F. Supp. 3d at 251. "[J]oinder may be infeasible [because] the absent party enjoys sovereign immunity."  *Kickapoo Tribe of Indians of Kickapoo Reservation in Kansas v. Babbitt*, 43 F.3d 1491, 1495 (D.C. Cir. 1995) ("*Kickapoo II*").  Where a sovereign is necessary but immune, the case should be dismissed.  *See Pimentel*, 553 U.S. at 867 ("A case may not proceed when a required-entity sovereign is not amenable to suit."); *see TJGEM*, 26 F. Supp. 3d at 13 ("*Pimentel* holds unambiguously that . . . , where a sovereign is a required party for the purposes of Rule 19, the case must be dismissed."); *see also Kickapoo II*, 43 F.3d at 1496 (explaining before *Pimentel* that a district court had "'very little room'" to hear a case involving a required-entity sovereign because of the sovereign's "compelling" interest in "immunity").[36]

Saudi Arabia is a required party to this suit.  Aljabri asks this Court to adjudicate, and rule unlawful, specific acts undertaken by the Crown Prince, and other Saudi government officials, employees, and institutions, that are alleged to have been taken in an official governmental

---

[36] In cases that are not subject to *Pimentel*'s rule, the district court determines whether to dismiss after considering four factors:  "(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided by:  (A) protective provisions in the judgment; (B) shaping the relief; or (C) other measures; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder."  Fed. R. Civ. P. 19(b).

capacity.  *See supra* Part II.A.2.  These include numerous acts of great "significance" to Saudi Arabia, *TJGEM*, 26 F. Supp. 3d at 13, such as:  (1) Saudi Arabia's criminal investigation into Aljabri's years-long theft of monies originating from public funds appropriated to combat terrorism and accompanying corruption charges, which Aljabri continues to decry as "false," "baseless," and "deceptive," Am. Compl. ¶¶ 9, 260, 372; (2) Saudi Arabia's investigation, detention, and prosecution of Aljabri's co-conspirators, including members of his family, which Aljabri labels "kidnappings" and "shams," *see id.* ¶¶ 189-190, 196-217; and (3) Saudi Arabia's ongoing efforts to bring an "international fugitive," *id.* ¶ 131(r), to justice, which Aljabri alleges are steps in a plot to "trap," *id.* ¶ 14, and then extrajudicially kill him.[37]  Aljabri even challenges the legitimacy of the Crown Prince's appointment, which he repeatedly labels a "coup."  *Id.* ¶¶ 24, 38, 78, 155, 170-171.

In addition, Aljabri now alleges that SACM, which is part of the Saudi Arabian Embassy in Washington, D.C., operated as an "extension of Defendant MiSK – and, in turn," the Crown Prince.  *Id.* ¶ 44.  He further describes SACM as a "U.S.-based intelligence front[]."  *Id.*  Thus, he asks this Court to condemn not only the actions of Saudi Arabia's government on its own soil, but also those of its diplomatic mission to the United States.

For this Court to entertain claims that Saudi Arabia's governmental and diplomatic actions were illegitimate and criminal would infringe Saudi Arabia's "dignity interests" as a sovereign.  *Pimentel*, 553 U.S. at 866.  As in *Pimentel*, the issues in dispute arise from "events of historical and political significance for [Saudi Arabia] and its people," and Saudi Arabia has a "unique interest" in resolving these issues.  *Id.*  It is an "affront" to Saudi Arabia's sovereignty,

---

[37] *See* Am. Compl. ¶¶ 225-255 (alleged searches for Aljabri in the United States), 256-260 (filing of a notice with INTERPOL), 268 (freezing Saudi-based bank accounts held by Aljabri and members of his family), 271 (attempting to close U.S.-based bank accounts).

as well as a strain on its long-standing alliance with the United States, to have a federal district court adjudicate the propriety of Saudi Arabia's sovereign acts. *Id.* The Supreme Court's observation in *Pimentel* that "[t]here is a comity interest in allowing a foreign state to use its own courts for a dispute if it has a right to do so," *id.*, applies with particular force to Aljabri's attempt to litigate in the United States the legitimacy of his and his family members' investigation, prosecution, and detention in Saudi Arabia.

*TJGEM* is instructive. That case involved an assortment of tort claims arising from its unsuccessful attempt to win a contract with the Ghanaian government to reconstruct the sewer system in Accra, Ghana. *See* 26 F. Supp. 3d at 4-6. The court found that, at their core, those claims were asking the U.S. court to "examin[e] . . . the reasons for, and propriety of, a foreign sovereign's decision to award a contract for a construction project in a foreign state." *Id.* at 12. "Such an examination," the court explained, "is prohibited by *Pimentel*." *Id.* The court further found, applying *Pimentel*, that the plaintiff's allegation that a Ghanaian official engaged in "corrupt practices" were "claims based on alleged public corruption [that] implicate 'important comity concerns,'" requiring the court to "'accord proper weight to the compelling claim of sovereign immunity.'" *Id.* at 13 (quoting *Pimentel*, 553 U.S. at 869).

Given that sovereign interest, and because adjudication of the case without Ghana risked "'imped[ing]'" Ghana's "'ability to protect th[at] interest,'" the court held that Ghana was required under Rule 19(a). *Id.* (quoting Fed. R. Civ. P. 19(a)(1)(B)(i)) (alterations in original). And, because Ghana had sovereign immunity, the court concluded that the case "must be dismissed." *Id.*; *see Pimentel*, 553 U.S. at 867; *cf. Enterprise Mgmt. Consultants, Inc. v. United States ex rel. Hodel*, 883 F.2d 890, 894 (10th Cir. 1989) (in tribal immunity context, holding that

a "Tribe's interest . . . in its sovereign right not to have its legal duties judicially determined

without consent is an interest which the United States' presence in this suit cannot protect").[38]

This case threatens sovereign interests even more substantial than those in *TJGEM*.

Those interests include Saudi Arabia's criminal investigation and prosecution of a former

high-level Saudi official and his co-conspirators for corruption, its efforts to locate that former

official – now an international fugitive – and bring him to justice, and the legitimacy of its

diplomatic mission to the United States.[39]   Aljabri even challenges the legitimacy of Saudi

Arabia's line of succession.  Saudi Arabia thus "has 'an interest relating to the subject of the

action' and 'disposing of the action in [Saudi Arabia's] absence may . . . as a practical matter

impair or impede [Saudi Arabia's] ability to protect the interest.'"  *Samantar*, 560 U.S. at 324

(quoting Fed. R. Civ. P. 19(a)(1)(B)) (ellipsis in original).  It is therefore a required party.

It is also clear that Saudi Arabia is immune from suit.  The FSIA "is 'the "sole basis for

obtaining jurisdiction over a foreign state in our courts."'"  *Doe v. Federal Democratic Republic

of Ethiopia*, 851 F.3d 7, 9 (D.C. Cir. 2017) (quoting *Weinstein v. Islamic Republic of Iran*, 831

---

[38] *De Csepel v. Republic of Hungary*, --- F. Supp. 3d ---, 2020 WL 2343405 (D.D.C. May 11, 2020), *interlocutory appeal pending*, No. 20-7047 (D.C. Cir.), is not to the contrary.  In that case, the court concluded that the Republic of Hungary was not an indispensable party.  *Id.* at *17.  In the process, the court determined that the interests of Hungary could be adequately protected by the non-immune parties in the case.  *Id.* at *15.  But *de Csepel* did not involve a challenge to core sovereign interests, such as "an executive decision to conduct a criminal investigation," *Nnaka*, 756 F. App'x at 18, or the legitimacy of a current government.  Also, *de Csepel* addressed the possibility of prejudice to Hungary by limiting the plaintiffs' claims to monetary relief, *see* 2020 WL 2343405, at *15, while Aljabri expressly seeks declaratory relief, *see* Am. Compl. ¶¶ 395, 408, to prevent Saudi Arabia from taking future actions against him through its officials.

[39] *See Nnaka*, 756 F. App'x at 18 (recognizing a sovereign's interest in "an executive decision to conduct a criminal investigation"); *see also Two Shields v. Wilkinson*, 790 F.3d 791, 796 (8th Cir. 2015) (same for actions that "'indirectly attack' . . . administrative decisions") (quoting *Boles v. Greeneville Hous. Auth.*, 468 F.2d 476, 479 (6th Cir. 1972)).

F.3d 470, 478 (D.C. Cir. 2016), *abrogated on other grounds by Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018)).  "Unless an exception applies, 'a foreign state shall be immune from the jurisdiction of the courts of the United States.'"  *Id.* (quoting 28 U.S.C. § 1604). This case does not come close to falling within any FSIA exception.  For example, the non-commercial-tort exception, 28 U.S.C. § 1605(a)(5),[40] requires that "'the entire tort' – including not only the injury but also the act precipitating that injury – must occur in the United States."  *Jerez v. Republic of Cuba*, 775 F.3d 419, 424 (D.C. Cir. 2014).  The alleged injury to Aljabri occurred in Canada, where Aljabri resides.  Am. Compl. ¶ 34.  The vast majority of the acts that allegedly led to injury occurred in either Saudi Arabia, *e.g.*, *id.* ¶¶ 189-192 (arrest and conviction of two of Aljabri's adult children), or Canada, *e.g.*, *id.* ¶¶ 344-349 (attempts to enter or successful entry into Canada).

The two FSIA exceptions for acts of terrorism, § 1605A and § 1605B, likewise do not apply.  Section 1605A is unavailable to Aljabri because, among other things, it applies only to foreign states that have been designated as state sponsors of terrorism, *see* 28 U.S.C. § 1605A(a)(2)(A)(i), and can be invoked only by U.S. nationals or government employees, *see id.* § 1605A(a)(2)(A)(ii).  *See Schermerhorn v. State of Israel*, 876 F.3d 351, 359 (D.C. Cir. 2017) (discussing § 1605A's "state-sponsor and U.S.-national requirements").  Section 1605B is unavailable because it covers only "case[s] in which money damages are sought against a foreign state for physical injury to person or property or death *occurring in the United States*," 28 U.S.C.

---

[40] That exception abrogates immunity, with exceptions, in actions involving "personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of [a] foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment."  28 U.S.C. § 1605(a)(5).

§ 1605B(b) (emphasis added), which Aljabri does not allege.  Thus, as in *Pimentel* and *TJGEM*, this case should be dismissed.  *See Pimentel*, 553 U.S. at 867; *TJGEM*, 26 F. Supp. 3d at 13.[41]

### C.      The Act of State Doctrine Bars Aljabri's Claims

"The act of state doctrine in its traditional formulation precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964).  "It applies when 'the relief sought or the defense interposed would [require] a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory.'" *McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066, 1073 (D.C. Cir. 2012) (quoting *W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990)) (alteration in original); *cf. Hourani v. Mirtchev*, 796 F.3d 1, 15 (D.C. Cir. 2015) (explaining that the doctrine did not apply in *Kirkpatrick* "because the case could be decided without directly adjudicating the lawfulness of the Nigerian government's conduct").

"[T]he doctrine serves as a rule of decision for the courts of this country, which requires that, in the process of deciding [a case], the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid." *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1165 (D.C. Cir. 2002) (citation omitted; first alteration added); *see Mezerhane v. Republica Bolivariana de Venezuela*, 785 F.3d 545, 552 (11th Cir. 2015) (applying the doctrine to affirm the dismissal of TVPA and ATS claims); *Nnaka v. Federal Republic of Nigeria*, 238 F.

---

[41] Although an examination of the Rule 19(b) factors is unneeded where a sovereign is a necessary party, those factors would simply reinforce that Saudi Arabia is an indispensable party to this case.  *See, e.g.*, *Kickapoo II*, 43 F.3d at 1497 n.9 ("The inquiry as to prejudice under Rule 19(b) is the same as the inquiry under Rule 19(a)(2)(i) regarding whether continuing the action will impair the absent party's ability to protect its interest.").

Supp. 3d 17, 33 (D.D.C. 2017) (applying the doctrine to dismiss a claim for intentional infliction of emotional distress), *aff'd*, 756 F. App'x 16 (D.C. Cir. 2019) (per curiam).

For instance, "an executive decision to conduct a criminal investigation, which ranks '[f]oremost among the prerogatives of sovereignty,'" is clearly an "official act." *Nnaka*, 756 F. App'x at 18 (quoting *Heath*, 474 U.S. at 93). The doctrine also has been applied in cases that would have required a court to assess the validity of: (i) a letter from the Nigerian Attorney General to the U.S. Department of Justice "regarding who had authority to represent the Nigerian government in an asset-forfeiture action," *id.*; (ii) an order by the Brazilian Minister of Finance to the Central Bank of Brazil "to withhold and pay the income tax on the interest paid to the Bank," *Riggs Nat'l Corp. & Subsidiaries v. Commissioner*, 163 F.3d 1363, 1368 (D.C. Cir. 1999); (iii) a decision not to issue an export license for a natural resource, *World Wide Minerals*, 296 F.3d at 1165; (iv) the "transfer and alleged conversion" of corporate shares to a state entity "pursuant to an official decree," *id.* at 1166; (v) an English statute, *Society of Lloyd's v. Siemon-Netto*, 457 F.3d 94, 102-03 (D.C. Cir. 2006); (vi) detentions by military officials "during a political revolution," *Doe I v. State of Israel*, 400 F. Supp. 2d 86, 113 (D.D.C. 2005); and (vii) the taking of land or possessions, *id.* at 114.

To qualify as an official act of a foreign government "within its own territory," *Banco Nacional*, 376 U.S. at 401, it is enough that the act "is rooted, in all relevant respects, within foreign sovereign territory," *Hourani*, 796 F.3d at 13. This occurs when an act performed beyond a foreign government's borders is "necessarily official governmental [conduct] formulated and directed" by the foreign government. *Id.* at 13-14 (applying the act of state doctrine to allegedly defamatory statements by the Kazakh Embassy in the United States, because, "once the statements appeared on the official Embassy website with the active approval and support of the Ambassador, they became the official speech of the Kazakh government

sitting in Astana, Kazakhstan"); *see also In re Philippine Nat'l Bank*, 397 F.3d 768, 773 (9th Cir. 2005) (act of state doctrine applies to "governmental" acts beyond sovereign's borders).

All of Aljabri's claims should be dismissed under the act of state doctrine.  Those claims are premised on numerous alleged official acts that Saudi Arabia undertook within its own territory or that are "rooted, in all relevant respects," within that territory.  *Hourani*, 796 F.3d at 13.  Those acts include Saudi Arabia's criminal investigation into Aljabri's corruption and filing of a notice with INTERPOL, *see* Am. Compl. ¶¶ 178, 257, 261; the dismissal of Aljabri from his government position, *id.* ¶¶ 150-154; the appointment of then-Deputy Crown Prince Mohammed bin Salman to the position of Crown Prince and the removal of Prince Mohammed bin Nayef (which Aljabri characterizes as a "coup"), *id.* ¶¶ 24, 38, 78, 155, 170-171; the alleged travel ban on members of Aljabri's family in Saudi Arabia, *id.* ¶¶ 182, 204; the alleged arrest, detention, interrogation, prosecution, and monitoring in Saudi Arabia of Aljabri's relatives, including his adult children (who Aljabri alleges were "kidnapped" and convicted in "sham proceedings"), *id.* ¶¶ 189-190, 196-217; and the alleged freezing of his bank accounts and those of his children in Saudi Arabia, *id.* ¶ 268.

Aljabri's allegations cannot be resolved without "inqui[ring] into the legal validity or tortiousness" of those acts.  *Hourani*, 796 F.3d at 15.  Treating Saudi Arabia's governmental acts as valid and lawful would require the Court to assume that Saudi Arabia has good reasons for investigating, charging, and seeking to extradite Aljabri; that the Crown Prince holds his position legitimately; that Saudi Arabia's prosecutions and enforcement activities directed towards Aljabri's adult children and other relatives are also legitimate; and that Aljabri's criminal conduct gave Saudi Arabia good cause to freeze his assets and those of his adult children.  None of that can be squared with Aljabri's theory of the case, under which all of those acts are steps in a purported conspiracy to silence him.  The lawfulness of Saudi Arabia's "government[] activities," *id.*, is

thus at the heart of this dispute – and, under the act of state doctrine, is beyond this Court's role to determine.

Aljabri's allegations concerning the alleged attempted extrajudicial killing in Canada are likewise barred by the act of state doctrine.  If the Court assumes as true the allegation that "an interagency group of employees" from across the Saudi government, Am. Compl. ¶ 337, traveled to Canada from Saudi Arabia, *id.* ¶¶ 348-349 (some were "deport[ed] back to Saudi Arabia," while others were permitted entry), one using a diplomatic passport, *id.* ¶ 348, many receiving advice and assistance from Saudi Arabia's Canadian embassy, *id.*, and all acting within the scope of "their positions in the Saudi government," *id.* ¶ 347, it would be considering the lawfulness of alleged conduct "rooted, in all relevant respects," in Saudi Arabia and "formulated and directed" from Riyadh.  *Hourani*, 796 F.3d at 13; *see also* Am. Compl. ¶ 381 (alleging that the conduct was "orchestrated . . . from Saudi Arabia").

The Crown Prince was charged at the relevant time with "tak[ing] whatever measures deemed necessary" to protect national security and root out corruption, which includes pursuing criminal prosecutions arising out of massive thefts of money originating from an antiterrorism fund.  *See supra* pp. 33-34.  Those measures could include "set[ting] up teams for investigation[ ] [and] prosecution" of corruption offenders, with the authority to "delegate . . . powers to these teams."  *See id.*  Thus, even if the Court were to credit Plaintiff's conclusory allegations (which it should not do), any purported directions given by the Crown Prince would have fallen within the scope of his official authority, which he would have used to give the alleged directions to these individuals.[42]  Aljabri thus asks the Court to adjudicate conduct "orchestrated . . . from

---

[42] The original Complaint conceded this point by alleging that "only Defendant bin Salman would have had the *authority* to assemble such an interagency team."  Compl. ¶ 204 (emphasis added).  Aljabri deleted the concession that the Crown Prince had such authority from his Amended Complaint.  *See* Am. Compl. ¶ 308.

Saudi Arabia," Am. Compl. ¶ 381, that falls squarely within the Crown Prince's authority granted to him by Saudi Arabia:  an "official act of a foreign sovereign performed within its own territory."  *McKesson*, 672 F.3d at 1073.  Settled law prevents the courts of the United States from ruling such an act invalid.

## III.   Aljabri Fails To State a Claim Under Statutory or Common Law

### A.   Aljbari Fails To State a Claim Under the TVPA

The Torture Victim Protection Act of 1991 imposes liability on any "individual who, under actual or apparent authority, or color of law, of any foreign nation," "subjects an individual to" either "torture" or "extrajudicial killing."  Pub. L. No. 102-256, § 2(a), 106 Stat. 73, 73 (1992), *reprinted in* 28 U.S.C. § 1350 note.  Accordingly, the statute contemplates liability based only on completed acts of "torture" or "extrajudicial killing."  *Id*.  Aljabri's TVPA claim is legally deficient because the Amended Complaint fails to allege an "extrajudicial killing" and because he has not exhausted adequate remedies available to him in Canada and Saudi Arabia.

### 1.   The Amended Complaint Fails To Allege an "Extrajudicial Killing"

The TVPA defines an "extrajudicial killing" as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples."  TVPA § 3(a), 106 Stat. 73, *reprinted in* 28 U.S.C. § 1350 note.  It provides that, if an individual "subjects an[other] individual to extrajudicial killing," he "shall . . . be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death."  *Id.* § 2(a)(2), 106 Stat. 73.  As a matter of plain language, an inchoate attempt to kill someone is not an "extrajudicial killing" actionable under the TVPA.  Congress could not have been clearer in defining "extrajudicial killing" as a "killing," *id.* § 3(a), 106 Stat. 73, a word the D.C. Circuit has interpreted to mean an action that "caused the death" of a person.  *Owens v. Republic of Sudan*,

864 F.3d 751, 770 (D.C. Cir. 2017), *vacated in part on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020); *accord, e.g., Webster's Third New International Dictionary* 1242 (2002) (defining "kill" as "to deprive of life", "put to death", or "cause the death of"). The plain meaning of the word "killing" is dispositive. *See Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1738 (2020) ("[O]nly the words on the page constitute the law adopted by Congress and approved by the President.").

The TVPA's structure and purpose confirm that the statutory phrase "extrajudicial killing" does not encompass inchoate attempts. The statute imposes liability for an "extrajudicial killing" only in favor of third parties who are not themselves the "individual" who was "subject[ed] . . . to extrajudicial killing": "the individual's legal representative, or to any person who may be a claimant in an action for wrongful death." TVPA § 2(a)(2), 106 Stat. 73, *reprinted in* 28 U.S.C. § 1350 note. This structure shows Congress's understanding that anyone "subject[ed] . . . to extrajudicial killing" would be dead and that a cause of action could not be brought in the victim's own name. The TVPA's legislative history further confirms that Congress understood that, "[i]n cases of extrajudicial killing, . . . the victim will not be alive to bring suit." H.R. Rep. No. 102-367, pt. 1, at 4 (1991), *reprinted in* 1992 U.S.C.C.A.N. 84, 87.

The declared purpose of the TVPA is to "codif[y] a norm of customary international law" against extrajudicial killing. *Doe v. Exxon Mobil Corp.*, 2015 WL 5042118, at *5 (D.D.C. July 6, 2015) ("*Exxon III*"); *see also* S. Rep. No. 102-249, at 6 (1991) ("The TVPA incorporates . . . the definition of extrajudicial killing found in customary international law."). But as discussed *infra* pp. 58-60, there is no "norm of customary international law" that prohibits an inchoate attempt to commit extrajudicial killing. Further, the legislative history indicates that Congress understood the international law prohibition to "conform[ ] with that found in the [First] Geneva Convention," S. Rep. No. 102-249, at 6 & n.7 (citing Geneva Convention for the Amelioration of

the Condition of the Wounded and Sick in Armed Forces in the Field, Aug. 12, 1949, art. 3, 6

U.S.T. 3114), which prohibits "murder of all kinds" and "the carrying out of executions without

previous judgment pronounced by a regularly constituted court," art. 3(1)(a), (d), 6 U.S.T. 3116,

3118. Neither prohibition applies by its terms to a mere attempt.

In addition, "Congress legislates against the backdrop of the common law." *Comcast*

*Corp. v. National Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1016 (2020). Thus,

when Congress creates "tort liability," its "starting point" is "the common law of torts." *Heck v.*

*Humphrey*, 512 U.S. 477, 483 (1994). That interpretive rule applies to the TVPA, which

"create[s] an action that sound[s] in tort." *Carazani v. Zegarra*, 972 F. Supp. 2d 1, 26 (D.D.C.

2013). Accordingly, Congress "is presumed to have incorporated," *University of Texas Sw. Med.*

*Ctr. v. Nassar*, 570 U.S. 338, 347 (2013), the tort principle that "[a]n attempt to commit a tort . . .

is not actionable when no harm results," *Doe v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 24 n.3

(D.D.C. 2005) ("*Exxon I*"), *appeal dismissed*, 473 F.3d 345 (D.C. Cir. 2007). That principle

further confirms that an unsuccessful attempt to kill – and certainly one that results in no bodily

injury or immediate threat of physical harm – is not an "extrajudicial killing" under the TVPA.

Despite the TVPA's language, structure, and purpose, some courts have interpreted the

phrase "extrajudicial killing," and the same words in the terrorism exception of the FSIA, to

include "attacks in which no one died." *E.g.*, *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d

323, 360-63 (D.D.C. 2020) (collecting cases). Those cases do not support recovery here. In

*Force*, Judge Moss surveyed those cases and concluded that they support (1) recovery by

"individuals who are injured but not killed in an attack that results in the death of others,"

because their injuries are caused by an extrajudicial killing, *id.* at 360; (2) as a "closer question,"

recovery for "attempted extrajudicial killings that result in serious physical injuries, even if no

one is killed," *id.*; but *not* (3) recovery for "failed attempts to inflict bodily harm" that may have

caused "emotional distress," but "in which no one suffered physical injuries and no one was even placed in imminent apprehension of physical harm," *id.* at 361, 363.

*Force* reasoned that extending recovery to this third category would be too "substantial [an] expansion on the law" and would "threaten[] to open the door to a broad array of claims that Congress never contemplated." *Id.* at 361.[43]  In reaching that conclusion, it relied on principles of tort law that require a plaintiff seeking damages for a "failed attempt[] to inflict bodily harm" to establish that he experienced "'an apprehension of the immediate infliction of an intended harmful or offensive contact.'" *Id.* at 363 (quoting Restatement (Second) of Torts § 47 cmt. a (1965)).[44]  Aljabri does not and cannot allege that he suffered such an apprehension here.  Thus, although the text of the TVPA – which requires a "killing" – is and should be controlling, Aljabri's claims also extend beyond the most flexible interpretations adopted by any court.

## 2.    Aljabri Has Not Exhausted Adequate, Available Remedies

The TVPA provides that "[a] court shall decline to hear a [TVPA] claim . . . if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred."  TVPA § 2(b), 106 Stat. 73, *reprinted in* 28 U.S.C. § 1350 note.  Here, Aljabri alleges that the attempt on his life occurred in Canada and was directed from Saudi Arabia.  *See* Am. Compl. ¶¶ 323, 334-352.  Thus "the conduct giving rise to the claim

---

[43] *Force* and other "attempt" cases also relied on guidance that when applying § 1605A, the FSIA's terrorism exception, "courts resolve statutory 'ambiguities flexibly and capaciously'" to serve the statute's "remedial purpose."  464 F. Supp. 3d at 360 (citing *Van Beneden v. Al-Sanusi*, 709 F.3d 1165, 1167 & n.4 (D.C. Cir. 2013)).  Thus, although the FSIA and the TVPA definitions are theoretically the same, *see id.* at 359, the analysis in *Force* was colored by the particular context of § 1605A.  No comparable rule of interpretation applies here.

[44] Consistent with *Force*'s analysis, either actual physical harm or the immediate apprehension of physical harm has consistently been present in other cases where courts have allowed claims for attempted extrajudicial killings under the FSIA or the TVPA.  *See*, *e.g.*, *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 58 (D.D.C. 2019); *Schertzman Cohen v. Islamic Republic of Iran*, 2019 WL 3037868, at *5 (D.D.C. July 11, 2019); *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 93, 101-02 (D.D.C. 2017).

occurred" either in Canada or, alternatively, in Saudi Arabia.  Adequate remedies are available to Aljabri in both countries, yet he "has neither alleged nor established that [he] has ever pursued and/or exhausted" those remedies.  *Harbury v. Hayden*, 444 F. Supp. 2d 19, 41 (D.D.C. 2006), *aff'd*, 522 F.3d 413 (D.C. Cir. 2008).  His failure to exhaust adequate and available local remedies is an independent basis to dismiss his TVPA claim.  *See id*.

"A foreign remedy is adequate even if not identical to remedies available in the United States."  *Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019, 1025 (W.D. Wash. 2005), *aff'd*, 503 F.3d 974 (9th Cir. 2007).  Rather, "[c]ourts usually find a foreign remedy adequate unless it 'is no remedy at all.'"  *Id*. at 1025-26 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 (1981)).  For example, a recovery smaller than what the plaintiff "might be able to recover in an American court . . . does not mean the remedy is so inadequate so as to excuse exhaustion."  *Rojas Mamani v. Sanchez Berzain*, 636 F. Supp. 2d 1326, 1331 (S.D. Fla. 2009).  Remedies are considered "available" unless "it is apparent that" pursuing them "would be futile," *Exxon I*, 393 F. Supp. 2d at 25, or they are "unobtainable" because, *e.g.*, the "country's judicial system is corrupt or ineffective," *Boniface v. Viliena*, 338 F. Supp. 3d 50, 65, 66 (D. Mass. 2018).

### a.    Aljabri Has Not Exhausted Remedies in Canada

Canada's judiciary recognizes a common-law civil "remedy for breaches of customary international law norms," the purpose of which is "to ensure an effective remedy to victims of [such] violations."  *Nevsun Res. Ltd. v. Araya*, 2020 SCC 5 ¶¶ 119, 128 (Can.) (recognizing damages claim based on alleged torture, slavery, and other human-rights violations).  As explained in the Declaration of Sujit Choudhry submitted in support of this motion (Exhibit M), the *Nevsun Resources* case would permit a plaintiff to bring a claim seeking money damages for an extrajudicial killing committed in a province of Canada.  *See* Ex. M, ¶¶ 9-10.  Conduct in Canada that would give rise to a claim for extrajudicial killing could also give rise to claims for

other common-law torts including assault and battery.  *See id.* ¶¶ 12-13.  The Amended

Complaint does not address Aljabri's access to remedies in Canada or allege that Canada's legal

system is less than fair and impartial.  That is fatal to his claim under the TVPA.

### b.      Aljabri Has Not Exhausted Remedies in Saudi Arabia

Saudi Arabia's judiciary also recognizes remedies for extrajudicial killing.  As explained

in the Declaration of Fahad Nasser Alarfaj submitted in support of this motion, such remedies are

based on principles of Islamic or Shariah law, which recognize "the right to be free from

unjustified deprivation of life."  Ex. F, ¶ 9.  Saudi law recognizes extrajudicial killing as a crime

and as a civil wrong for which damages are an available remedy.  *See id.* ¶ 12.  In addition, the

legal representative of the victim of an alleged extrajudicial killing could bring administrative

claims to the independent Saudi Arabian Human Rights Commission or to the quasi-

governmental Saudi Arabian National Society for Human Rights.  *See id.* ¶¶ 10-11.

Aljabri's assertion that he "does not have access to a fair and impartial legal system in

Saudi Arabia," Am. Compl. ¶ 382, is conclusory.  At most, that claim reflects his subjective

perception of bias, which does not make a remedy futile or unobtainable under the TVPA.  *See*,

*e.g.*, *Haim v. Neeman*, 2013 WL 12157279, at *5 (D.N.J. Jan. 23, 2013) (TVPA claim that Israeli

laws discriminated against men must first be pursued in Israel, despite plaintiff's assertion that

doing so "would be an exercise in futility"), *aff'd*, 543 F. App'x 152 (3d Cir. 2013) (per curiam).

### B.      Aljabri Fails To Establish Jurisdiction or State a Claim Under the ATS

The Alien Tort Statute grants federal courts "jurisdiction of any civil action by an alien

for a tort only, committed in violation of the law of nations or a treaty of the United States."

28 U.S.C. § 1350.  It "creat[es] no new causes of action," *Sosa v. Alvarez-Machain*, 542 U.S.

692, 724 (2004), but instead creates jurisdiction to adjudicate "a cause of action under U.S. law

to enforce [those] norm[s] of international law," *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S.

108, 119 (2013), which are "specific, universal, and obligatory" and have "definite content and acceptance among civilized nations," *Sosa*, 542 U.S. at 729, 732.

Like many federal statutes, the ATS only applies domestically, *see Kiobel*, 569 U.S. at 124, so that "the conduct relevant to the statute's focus" must "occur[ ] in the United States," *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016).  "[T]he conduct relevant to [a] statute's focus," *id.*, is "[t]he conduct that [the statute] regulates," *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2138 (2018); *accord Spanski Enters., Inc. v. Telewizja Polska, S.A.*, 883 F.3d 904, 914 (D.C. Cir. 2018) ("[W]e identity the 'conduct relevant to the [statute's] focus' by asking precisely what it is that the [statute] regulates.") (citation omitted).

The "conduct that [the ATS] regulates," *WesternGeco*, 138 S. Ct. at 2138, are violations of "specific, universal, and obligatory" norms of international law, *Sosa*, 542 U.S. at 732, and aiding and abetting such violations, *see Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 20 (D.C. Cir. 2011) ("*Exxon II*"), *vacated on other grounds*, 527 F. App'x 7 (D.C. Cir. 2013); *see also, e.g.*, *Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 197 (5th Cir. 2017) (ATS's "focus is conduct that violates international law"); *Exxon III*, 2015 WL 5042118, at *6 (ATS's "primary focus" is "the prohibition of violations of customary international law"); Br. for the United States as Amicus Curiae Supporting Petitioners at 27, *Nestlé USA, Inc. v. Doe I*, Nos. 19-416 & 19-453 (U.S. Sept. 8, 2020) ("U.S. *Nestlé* Br."), 2020 WL 5498509 ("[T]he focus of the ATS is the tortious conduct.").  Therefore, an ATS claim is extraterritorial and should be dismissed unless the plaintiff alleges domestic conduct that either violated universal norms of international law or aided and abetted such a violation.  *See Mastafa v. Chevron Corp.*, 770 F.3d 170, 187 (2d Cir. 2014) (domestic conduct must constitute "a violation of the law of nations or aiding and abetting another's violation of the law of nations"); *see also Exxon III*, 2015 WL 5042118, at *6 ("part of

a course of conduct constituting a violation of customary international law").[45]

Here, Aljabri cannot establish ATS jurisdiction because (1) the Amended Complaint does not allege any predicate violation of a specific, universal, and obligatory norm of international law, and (2) the alleged domestic conduct did not plausibly aid or abet the "attempted extrajudicial killing" that purportedly violated international law.

### 1. An Attempted Extrajudicial Killing Does Not Violate Any Specific, Universal, and Obligatory Norm of International Law

Courts set "a high bar for new private causes of action for violating international law" because "attempts by federal courts to craft remedies for the violation of new norms of international law would raise risks of adverse foreign policy consequences." *Sosa*, 542 U.S. at 727-28. The only violation of international law alleged in the Amended Complaint is an "attempted extrajudicial killing." *E.g.*, Am. Compl. ¶ 404. An inchoate attempt to commit an extrajudicial killing is not actionable under the ATS because it does not violate any "specific, universal, and obligatory" norm of international law. *Sosa*, 542 U.S. at 732.

Judge Bates' decision in *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1 (D.D.C. 2010), is on point. In that case, the father of Anwar Al-Aulaqi, an American citizen with ties to Al Qaeda, alleged that government officials (including the President) had placed his son on "kill lists" and "had already ordered 'almost a dozen' unsuccessful drone and air-strikes targeting Anwar Al-Aulaqi in Yemen," and as a result that his son was "in hiding under threat of death." *Id*. at 11-12. The plaintiff asserted a claim under the ATS premised on these allegations of attempted extrajudicial

---

[45] In two cases currently pending before the Supreme Court, the United States has asked that Court to hold "that aiding and abetting is not cognizable under the ATS" because "there are numerous 'sound reasons to think Congress might doubt the efficacy or necessity' of aiding-and-abetting liability in ATS suits." U.S. *Nestlé* Br. 8, 22-26. If the Supreme Court holds that the ATS regulates only primary violations of international law, that would further reinforce the conclusion that Aljabri's ATS claim based on an attempted killing in Canada is extraterritorial.

killing, but the court dismissed that claim because "there is no basis for the assertion that the threat of a future state-sponsored extrajudicial killing—as opposed to the commission of a past state-sponsored extrajudicial killing—constitutes a tort in violation of the law of nations." *Id*. at 37.  "[N]o court has ever found that the threat of a future extrajudicial killing is a recognized tort, much less one that violates the present-day law of nations," and Judge Bates declined to be the first, concluding that, if such a claim were recognized, "federal courts could be flooded with ATS suits from persons across the globe who alleged that they were somehow placed in fear of danger as a result of contemplated government action."  *Id*. at 37-38.

The allegations underlying the law-of-nations claim in this case closely resemble those in *Al-Aulaqi*.  Both the Amended Complaint here and the complaint in *Al-Aulaqi* allege unsuccessful attempted extrajudicial killings, *compare* Am. Compl. ¶ 9 ("attempted extrajudicial killing") *with Al-Aulaqi*, 727 F. Supp. 2d at 11 ("'almost a dozen' unsuccessful drone and air-strikes targeting Anwar Al-Aulaqi"); and an ongoing plan to carry out such a killing, *compare* Am. Compl. ¶ 9 ("an attempt that remains ongoing to this day") *and id*. ¶ 27 ("a still-ongoing attempted extrajudicial killing") *with Al-Aulaqi*, 727 F. Supp. 2d at 12 ("in hiding under threat of death"), *and id*. at 11 ("subject to a standing order that permits the CIA and JSOC to kill him"). This Court should follow *Al-Aulaqi*'s persuasive reasoning and dismiss Aljabri's claim.

*Al-Aulaqi* is in line with other authority holding that an unsuccessful effort to violate international norms does not itself violate such norms, with narrow exceptions that do not apply here.  For example, although piracy is at the core of ATS jurisdiction because it was among the three violations of the law of nations universally recognized when the First Congress enacted the ATS in 1789, *see Sosa*, 542 U.S. at 724, neither attempted piracy nor an inchoate conspiracy to commit piracy violates international law, *see United States v. Ali*, 885 F. Supp. 2d 17, 33 & n.21 (D.D.C. 2012), *aff'd in relevant part*, 718 F.3d 929 (D.C. Cir. 2013).  Similarly, "conspiracy as

an inchoate offense" is only recognized in international law for " 'conspiracy to commit genocide and common plan to wage aggressive war.' " *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 260 (2d Cir. 2009) (quoting *Hamdan v. Rumsfeld*, 548 U.S. 557, 610 (2006) (plurality)).  That is the long-held position of the United States.  *See* Br. for the United States in Opp. at 26 n.6, *Bahlul v. United States*, No. 16-1307 (U.S. Sept. 6, 2017), 2017 WL 3948468.

In addition, the ATS provides jurisdiction only for "tort[s]," 28 U.S.C. § 1350, that fit within "a very limited category defined by the law of nations *and* recognized at common law," *Sosa*, 542 U.S. at 712 (emphasis added).  That an unsuccessful attempt to commit a tort is not "recognized" as a tort "at common law," *see supra* pp. 52-53, is a further reason the Court should not expand the law of nations to include the concept of "attempted extrajudicial killing."  *See Sosa*, 542 U.S. at 727-28 ("[C]raft[ing] remedies for the violation of new norms of international law . . . should be undertaken, if at all, with great caution.").  Aljabri's law-of-nations claim, based entirely on an unsuccessful attempt, is legally deficient and should be dismissed.[46]

### 2.     The Domestic Conduct Alleged in the Amended Complaint Did Not Plausibly Aid or Abet a Primary Violation of the Law of Nations

Secondary liability for aiding and abetting attaches only if Plaintiff has adequately pleaded a primary violation of established international norms.  *See Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84, 103 (D.D.C. 2017) (to allege "secondary liability" under ATS, "the complaint must contain," *inter alia*, "a well-pled allegation of a primary violation of the law of nations").  Because an unsuccessful attempted killing does not violate the law of nations, aiding and abetting such an attempt cannot give rise to jurisdiction or liability under the ATS.

Even if the Court were to find a primary violation, conduct aids and abets a violation of

---

[46] In an ATS case, a failure to adequately plead a violation of international law is both a failure to establish subject-matter jurisdiction and a failure to state a claim.  *See, e.g.*, *Kaplan v. Central Bank of Islamic Republic of Iran*, 896 F.3d 501, 515 (D.C. Cir. 2018).

international law only if it (1) "has a substantial effect on the perpetration of the crime," and (2) was done with "knowledge that [it] will assist the perpetrator in the commission of the crime." *Exxon II*, 654 F.3d at 33-34 (citation omitted).[47]   The first element requires "a link or connection between the [U.S.-based conduct] and the underlying crime" such that the violation "probably would not have occurred absent [that] conduct." *Ofisi*, 278 F. Supp. 3d at 108-09. The second element requires that the U.S.-based actor "actually knew" (1) "the intent of the principal perpetrator" and (2) that its conduct would help commit the violation. *Id*. at 109.

The Amended Complaint does not allege any U.S.-based conduct that plausibly aided or abetted the purported attempted extrajudicial killing.  As set forth above, the only conduct alleged in the United States is (1) hosting events allegedly aimed at "cultivating a network of covert agents to hunt down" Aljabri, (2) a handful of attempts to obtain meetings and unsuccessful attempts to "extract information" from Aljabri's friends and family in the United States, (3) surveillance of Aljabri's family at a hotel in Boston, and (4) disseminating allegedly false and misleading statements about Aljabri to journalists in the United States.  Am. Compl. ¶ 131.[48]  None of this alleged conduct satisfies either required element.

---

[47] The D.C. Circuit partially vacated *Exxon II* "in light of intervening changes in governing law regarding . . . the standard to be applied for aiding and abetting liability." *Doe v. Exxon Mobil Corp.*, 527 F. App'x 7, 7 (D.C. Cir. 2013) (citing *Prosecutor v. Perišić*, Case No. IT-04-81-T, Judgement (Feb. 28, 2013), https://www.icty.org/x/cases/perisic/acjug/en/130228_ judgement.pdf).  *Perišić* appeared to articulate an additional "specific direction" element for aiding and abetting, but the International Criminal Tribunal for the former Yugoslavia later "repudiated the *Perišić* decision." *Exxon III*, 2015 WL 5042118, at *11.  The aiding-and-abetting standard set forth in *Exxon II* thus "remains unchanged." *Id*.

[48] Aljabri also purports to allege four other examples of "physical conduct within the United States," Am. Compl. ¶ 131, but each falls short.  *First*, he claims that the Crown Prince "transmitted threatening text messages to [Aljabri] over WhatsApp's U.S.-based servers," *id.* ¶ 131(t), and directed "an online campaign to smear and threaten [Aljabri]," *id.* ¶ 131(s), but the WhatsApp messages were sent and received outside the United States, *see id.* ¶¶ 127-137, and Aljabri does not allege that any part of the purported Twitter "smear" occurred in the United

The only U.S.-based conduct that the Amended Complaint tries to connect directly to the alleged attempt to kill Aljabri consists of the alleged attempts in the United States to ascertain his whereabouts. *Id.* ¶¶ 391, 403, 411. But as set forth above: (1) the alleged efforts in the United States to learn Aljabri's location were unsuccessful;[49] (2) nearly all of the alleged inquiries in the United States were about Aljabri's family members, not Aljabri himself;[50] and (3) the conduct that allegedly ascertained Aljabri's location consisted of alleged trips by one Defendant to Toronto and alleged remote planting of malware on Aljabri's phone in Canada, *id.* ¶¶ 251-255, 318, 333 – none of which occurred in the United States.

Accordingly, none of the Defendants' U.S.-based conduct is properly alleged to have had a "substantial effect," *Exxon II*, 654 F.3d at 34, on the alleged attempted killing. Nor is there any plausible basis to infer that the alleged attempt on Aljabri's life in Canada "probably would not have occurred absent [the U.S.-based] conduct." *Ofisi*, 278 F. Supp. 3d at 109. At most, the alleged U.S.-based conduct was "preparatory or ancillary" to the events in Canada, which is not enough. *In re Search of Info. Assoc. with [redacted]@gmail.com that is Stored at Premises*

---

States. In any event, those alleged online communications lacked any substantial connection to the alleged attempted killing. *Second*, Aljabri alleges that the Crown Prince "arranged for the filing of a notice about [Aljabri] and his family with INTERPOL," *id.* ¶ 257, but INTERPOL is headquartered in Europe, and the Amended Complaint does not allege that any filing took place in the United States. *Third*, Aljabri alleges that "Alassiri coordinated operations . . . on at least three occasions," *id.* ¶ 131(b), but does not allege any facts about the purported "coordinat[ion]."

[49] *See id.* ¶¶ 102, 105 ("sought to extract"); *id.* ¶ 240 ("seeking to extract information"); *id.* ¶¶ 131, 243-244 ("attempted to extract" information); *id.* ¶¶ 131(g), 253 ("try to extract information"); *id.* ¶ 242 (Aljabiri's son "misdirect[ed] Defendant Alrajhi and the larger ongoing hunt for [Aljabri]"); *id.* ¶ 250 ("asked highly intrusive and unusual questions about [Aljabri] . . . caus[ing] [his son] to be suspicious").

[50] *See id.* ¶ 238 (son's "immigration status"); *id.* ¶ 240 (son's "visa status" and wife's "location and contact information"); *id.* ¶ 242 (Boston "family[] residence"); *id.* ¶ 243 (son's "immigration status" and wife's "contact information"); *id.* ¶ 244 (wife's "whereabouts and contact information"); *id.* ¶ 358 (son's "contact information").

*Controlled by Google, Inc.*, 2017 WL 3445634, at *25 (D.D.C. July 31, 2017).[51]

Aljabri's separate allegation that, in May 2020, the Crown Prince "directed a hit squad to travel from Saudi Arabia to the United States . . . to kill [Aljabri]," Am. Compl. ¶ 131(p), also cannot satisfy the domestic-conduct requirement because Aljabri does not allege that anyone ever acted on this purported instruction or traveled through the United States in an attempt to kill Aljabri.

The Amended Complaint also fails to allege any facts that would plausibly establish that any alleged U.S.-based conduct was done with "knowledge that [it] w[ould] assist" an attempt on Aljabri's life. *Exxon II*, 654 F.3d at 34. The alleged U.S.-based attempts to locate Aljabri were purportedly conducted by five Defendants (Abduljadayel, Alhamed, Alrajhi, Alharbi, Hamed). *See* Am. Compl. ¶ 131. None is sufficiently alleged to have known about the alleged attempt to kill Aljabri in Canada.[52] And, even if Aljabri argues that those Defendants should have known that their conduct was part of an alleged murder plot, that "w[ould] not suffice in this context" because "actual knowledge" is required. *Ofisi*, 278 F. Supp. 3d at 109.

### C.     The Court Should Dismiss Aljabri's Claim for Intentional Infliction of Emotional Distress

#### 1.     Applicable Saudi Arabian Law Does Not Recognize Intentional Infliction of Emotional Distress as a Cause of Action

To determine the substantive law that governs Aljabri's claim for intentional infliction of emotional distress, the Court should apply District of Columbia choice-of-law rules. *See Mastro v.*

---

[51] The remaining alleged U.S.-based conduct, discussed *supra* pp. 22-23, has no meaningful "link or connection," *Ofisi*, 278 F. Supp. 3d at 108, to the alleged attempt to kill.

[52] The Amended Complaint alleges "[o]n information and belief" that each U.S.-based Defendant had "unusual visibility into the machinations of" the Crown Prince and was "privy to sensitive information about the mission they were tasked with undertaking." Am. Compl. ¶ 235. Such "'legal conclusion[s] couched as . . . factual allegation[s],'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)), should not be presumed true.

*Potomac Elec. Power Co.*, 447 F.3d 843, 857 (D.C. Cir. 2006). "D.C. law employs 'a modified governmental interests analysis which seeks to identify the jurisdiction with the most significant relationship to the dispute.'" *In re APA Assessment Fee Litig.*, 766 F.3d 39, 51 (D.C. Cir. 2014) (quoting *Washkoviak v. Student Loan Mktg. Ass'n*, 900 A.2d 168, 180 (D.C. 2006)). *First*, a court "'determine[s] whether a "true conflict" exists'" – "'that is, whether more than one jurisdiction has a potential interest in having its law applied and, if so, whether the law of the competing jurisdictions is different.'" *Id.* at 51-52 (quoting *GEICO v. Fetisoff*, 958 F.2d 1137, 1141 (D.C. Cir. 1992)). *Second*, if a conflict exists, the court "evaluat[es] 'the two jurisdictions' respective relationships to the complaint.'" *Id.* at 53 (quoting *Washkoviak*, 900 A.2d at 181).

In this case, Saudi Arabia and Canada have potential interests in having their law applied to Aljabri's claim for intentional infliction of emotional distress. Aljabri bases that claim on allegations that Saudi nationals took actions in Saudi Arabia and Canada that caused Aljabri, a Saudi and Maltese citizen and Canadian resident, to suffer emotional distress in Canada. *See* Am. Compl. ¶ 194 (identifying the alleged arrest and detention of two of Aljabri's children in Saudi Arabia as a cause of emotional distress); *id.* ¶ 365 (same for the alleged attempted extrajudicial killing in Canada). The District of Columbia has no significant interest in applying its law to Aljabri's claim, which involves no D.C. resident and no significant conduct in D.C.

A "true conflict" exists between Saudi Arabian and Canadian law. Although Canadian law recognizes a claim analogous to intentional infliction of emotional distress, *see Boucher v. Wal-Mart Canada Corp.*, 2014 ONCA 419, ¶ 41 (Can.) (describing the "tort of intentional infliction of mental suffering"),[53] Saudi Arabian law does not, *see McGhee v. Arabian Am. Oil*

---

[53] If Canadian law were to apply to Aljabri's emotional-distress claim, then the Court would apply Ontario law, as Ontario was the site of the relevant events in Canada. *See* Am. Compl. ¶¶ 334, 344-349 (alleging that members of the "Tiger Squad" traveled to the Ottawa

*Co.*, 871 F.2d 1412, 1422 (9th Cir. 1989) (explaining, in the context of discussing intentional

infliction of emotional distress, that "Saudi law . . . does not allow money damages for injuries of

this nature"); *Petersen v. Boeing Co.*, 2015 WL 12090213, at *2 (D. Ariz. Feb. 18, 2015) (noting

that intentional infliction of emotional distress is not "cognizable under Saudi law").  In addition

to U.S. decisions such as *McGhee* and *Petersen*, this conclusion is supported by the expert

Declaration of Fahad Nasser Alarfaj.  *See* Ex. F, ¶¶ 14-15 ("Saudi Arabian law does not

recognize a cause of action for intentional infliction of emotional distress . . . .  In fact, recently

the Supreme Court . . . refused to award intangible or moral damages on the basis that damages

cannot be proven and Muslim Scholars have resolved that moral or intangible damages shall not

be awarded since they cannot be precisely or accurately quantified.").

 A "conflict may be found when two jurisdictions have different applicable laws, which

would result in different outcomes."  *Margolis v. U-Haul Int'l, Inc.*, 818 F. Supp. 2d 91, 101

(D.D.C. 2011).  Further, "'in the choice-of-law process,'" a "rule of non-liability is owed 'the

same consideration . . . as is a rule which imposes liability.'"  *APA Assessment Fee Litig.*, 766

F.3d at 53 (quoting Restatement (Second) of Conflict of Laws § 145 cmt. c (1971)).  Because

Canada would apply a rule of (potential) liability, but Saudi Arabia would apply a rule of

non-liability, the relevant laws of Saudi Arabia and Canada are "'in conflict.'"  *Id.* (quoting

---

International Airport in Ontario); *see also id.* ¶¶ 180, 247, 251-252, 255, 318 (identifying
Toronto as Aljabri's residence).  Under Ontario law, the "tort of intentional infliction of mental
suffering has three elements":  (1) "flagrant and outrageous" conduct that was (2) "calculated to
harm the plaintiff" and that (3) "caused the plaintiff to suffer a visible and provable illness."
*Boucher*, 2014 ONCA 419, ¶ 41.  For the second element, "[t]he defendant must have intended
to produce the kind of harm that occurred or have known that it was almost certain to occur."
*Id.* ¶ 44.  For the third element, the "stress" caused by the defendant's conduct must "cause[]
physical symptoms," *e.g.*, "abdominal pain, constipation and weight loss."  *Id.* ¶ 52.

*Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*, 68 A.3d 697, 714 (D.C. 2013)).[54]

Because a true conflict is present, the Court should "evaluat[e] 'the two jurisdictions' respective relationships to the complaint' under the factors set forth in the Restatement (Second) of Conflict of Laws." *Id.* (quoting *Washkoviak*, 900 A.2d at 181). "D.C. courts follow § 145 of the Restatement, which provides four factors to identify the jurisdiction with the 'most significant relationship to the occurrence and the parties' in tort cases." *Id.* (quoting § 145(1)). Those four factors are "'(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.'" *Id.* (quoting § 145(2)). "'These contacts are to be evaluated according to their relative importance with respect to the particular issue.'" *Id.* (same).

Saudi Arabia has the most significant relationship to the parties and to the alleged events. Although Aljabri resides in Canada, he is a citizen of Saudi Arabia, *see* Am. Compl. ¶ 34, as are all of the individual Defendants whose nationalities are identified in the Amended Complaint, *see id.* ¶¶ 37, 40, 48, 62, 88, 93, 105, 110, 116-123. The Crown Prince is the son of the King of Saudi Arabia and the heir to its throne. *See supra* Part II.A.1. The Amended Complaint alleges that many Defendants are or have been employed by the government of Saudi Arabia, *see* Am. Compl. ¶¶ 62, 116-122, and relies on some Defendants' "positions in the Saudi government," *id.* ¶ 347, to support its allegations. The one entity Defendant – the MiSK Foundation – is a Saudi

---

[54] To the extent the Court considers applying D.C. law to Aljabri's claim for intentional infliction of emotional distress, that law conflicts with both Canadian and Saudi Arabian law. Unlike Saudi Arabian law, D.C. law recognizes intentional infliction of emotional distress as a cognizable claim. *See Williams v. District of Columbia*, 9 A.3d 484, 493-94 (D.C. 2010). And unlike Canadian law, which requires a plaintiff to show "a visible and provable illness" to establish liability, *Boucher*, 2014 ONCA 419, ¶ 41, D.C. law does not, *see Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984) (declining to require "actual physical injury").

Arabian non-profit organization established by the Crown Prince to work towards "a better future in Saudi Arabia." *Id.* ¶¶ 68, 71. Another Defendant, Bader Alasaker, serves as the MiSK Foundation's "Secretary-General," as well as the "head" of the Crown Prince's "private office." *Id.* ¶ 40. Moreover, the alleged arrest and detention of two of Aljabri's children, which Aljabri claims has caused him "severe and intense emotional distress," *id.* ¶ 194, occurred in Saudi Arabia, *id.* ¶¶ 187-189. Likewise, although members of the "Tiger Squad" purportedly attempted to or did enter Canada for the alleged purpose of killing Aljabri, *id.* ¶¶ 344-349, Aljabri alleges that the Crown Prince "orchestrated th[at] conduct . . . from Saudi Arabia," *id.* ¶ 381.

Saudi Arabia is also the center of the relationship between the parties. Aljabri is a former high-ranking official with Saudi Arabia's Ministry of Interior, where at various times he served as "State Minister" and "Chief of Staff." *Id.* ¶ 144. In the Amended Complaint, Aljabri alleges that Saudi Arabia's criminal investigation into Aljabri's theft of counterterrorism funds is a façade for a plot to "trap" Aljabri, *id.* ¶¶ 257, 267, purportedly because the Crown Prince fears that Aljabri threatens his position in the Saudi Arabian government, *id.* ¶¶ 154, 167.

Taking all of these factors into account, the Court should apply Saudi Arabian law to Aljabri's claim for intentional infliction of emotional distress. Because such a claim is not cognizable under Saudi Arabian law, that claim should be dismissed.

## 2. Aljabri Also Fails To State a Claim Under D.C. Law

Even if the law of the District of Columbia applies, Aljabri still fails to state a claim for intentional infliction of emotional distress ("IIED"). To determine liability for intentional infliction of emotional distress, D.C. courts follow the Restatement (Second) of Torts. *See Republic of Sudan v. Owens*, 194 A.3d 38, 41 (D.C. 2018) ("[T]his court has embraced the Restatement Second's approach to IIED liability."). The Restatement includes two limitations on liability for intentional infliction of emotional distress that preclude Aljabri's claim.

*First*, where conduct "is directed at a third person," a member of that person's family will have a claim for intentional infliction of emotional distress only if the family member was "present at the time" of the conduct.  Restatement (Second) of Torts § 46(2)(a); *see Owens*, 194 A.3d at 42 (relying on § 46(2)(a) to "hold that, as a general matter, to recover for IIED, a plaintiff whose emotional distress arises from harm suffered by a member of his or her immediate family must be 'present' when the harm" is inflicted).  Here, Aljabri was not present during the arrest of his adult children, but "learned about" it after the fact.  Am. Compl. ¶ 194.

*Second*, "conduct which is tortious because intended to result in bodily harm to another . . . does not make the actor liable for an emotional distress which is the only legal consequence of his conduct."  Restatement (Second) of Torts § 47.  "Victims of failed attempts to inflict bodily harm do have a remedy under tort law . . . , but it is under an assault (rather than intentional infliction of emotional distress) theory."  *Force*, 464 F. Supp. 3d at 363.  Aljabri does not and cannot assert an assault claim.  His emotional-distress claim therefore fails.[55]

### 3.    If the Court Dismisses Aljabri's Federal Claims, It Lacks Personal Jurisdiction over the Crown Prince

Aljabri relies on Federal Rule of Civil Procedure 4(k)(2) in his attempt to establish personal jurisdiction over the Crown Prince.  *See* Am. Compl. ¶ 127.  That rule is available only for a "claim that arises under federal law," Fed. R. Civ. P. 4(k)(2), which Aljabri's emotional-distress claim does not.  Thus, Aljabri relies on the doctrine of pendent personal jurisdiction for that claim.  *See* Am. Compl. ¶ 133.  Under that doctrine,

> [A] court possesses personal jurisdiction over a defendant for one claim, lacks an independent basis for personal jurisdiction over the defendant for another claim that arises out of the same nucleus of operative fact, and then, because it possesses

---

[55] Because Aljabri cannot state a claim for relief as to an underlying tort, his attempt to hold the Crown Prince secondarily liable also fails.  *See Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 106 (D.D.C. 2010) (noting that, under D.C. law, liability for aiding and abetting, agency, and conspiracy "must be premised on some underlying tort").

personal jurisdiction over the first claim, asserts personal jurisdiction over the
second claim.

*United States v. Botefuhr*, 309 F.3d 1263, 1272 (10th Cir. 2002); *see Oetiker v. Jurid Werke,*

*G.m.b.H.*, 556 F.2d 1, 4-5 (D.C. Cir. 1977) (recognizing the doctrine).

Once a court dismisses the federal claims on which a plaintiff bases his assertion of

pendent personal jurisdiction – in this case, Aljabri's TVPA and ATS claims – then the court

cannot exercise personal jurisdiction over the claims that remain.  *See*, *e.g.*, *Botefuhr*, 309 F.3d at

1274 (holding that district court abused its discretion by retaining personal jurisdiction over the

non-anchor claim after its pretrial dismissal of the anchor claim); *D'Addario v. Geller*, 264 F.

Supp. 2d 367, 387-88 (E.D. Va. 2003) ("[I]f the court were to later determine that the federal

claim(s) should be dismissed against a defendant, the state claims against that defendant would

also have to be dismissed, unless another basis for asserting personal jurisdiction exists."); *Olin*

*Corp. v. Fisons PLC*, 47 F. Supp. 2d 151, 155 (D. Mass. 1999) (same).  Therefore, Aljabri's

failure to state claims under the TVPA and the ATS is also fatal to his attempt to assert personal

jurisdiction over the Crown Prince for his claim of intentional infliction of emotional distress.

## 4.     Alternatively, the Court Should Decline To Exercise Supplemental Subject-Matter Jurisdiction over Aljabri's Claim

The only basis identified by Aljabri for the Court to exercise subject-matter jurisdiction

over his claim for intentional infliction of emotional distress is 28 U.S.C. § 1367, the

supplemental jurisdiction statute.  That statute directs a district court to exercise supplemental

jurisdiction over claims "so related" to claims with the court's original jurisdiction that the

"supplemental" claims and "original" claims "form part of the same case or controversy under

Article III of the United States Constitution."  28 U.S.C. § 1367(a).  However, the same statute

permits district courts to "decline to exercise supplemental jurisdiction" if, *inter alia*, "the district

court has dismissed all claims over which it has original jurisdiction."  *Id.* § 1367(c)(3); *see*

*Shekoyan v. Sibley Int'l*, 409 F.3d 414, 423 (D.C. Cir. 2005).

Courts in this Circuit routinely decline supplemental jurisdiction where the court concludes, "at an early stage procedurally," that claims over which it has original jurisdiction "must be dismissed." *Lattisaw v. District of Columbia*, 118 F. Supp. 3d 142, 163 (D.D.C. 2015), *aff'd*, 672 F. App'x 22 (D.C. Cir. 2016) (per curiam).[56]  Indeed,

> [t]he Supreme Court has long held that "'[i]n the usual case in which all federal-law claims are dismissed before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.'"

*Id.* (quoting *Shekoyan*, 409 F.3d at 424) (applying § 1367) (second alteration in original).

Thus, "[i]n keeping with the principle that '[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties,'" *Araya v. JPMorgan Chase Bank, N.A.*, 775 F.3d 409, 417 (D.C. Cir. 2014) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)) (second alteration in original), dismissal of Aljabri's common-law claim for intentional infliction of emotional distress is the appropriate course.  The international character of the parties and the alleged events underlying the claim make dismissal all the more proper.  *See Ali Shafi v. Palestinian Auth.*, 642 F.3d 1088, 1097 (D.C. Cir. 2011) (affirming district court's decision to decline to hear a negligence claim that "arose from events in another nation" and involved parties that "are citizens of other nations and have no connection with the United States or specifically, with the District of Columbia").

## CONCLUSION

For the foregoing reasons, the Court should dismiss all of Aljabri's claims against the Crown Prince.

---

[56] *See also*, *e.g.*, *FiberLight, LLC v. National R.R. Passenger Corp.*, 81 F. Supp. 3d 93, 117 (D.D.C. 2015); *Artis v. District of Columbia*, 51 F. Supp. 3d 135, 141-42 (D.D.C. 2014).

Dated:   April 5, 2021                    Respectfully submitted,

                                          /s/ *Michael K. Kellogg*

                                          Michael K. Kellogg (DC 372049)
                                          Gregory G. Rapawy (DC 493973)
                                          Andrew C. Shen (DC 500071)
                                          **KELLOGG, HANSEN, TODD, FIGEL**
                                            **& FREDERICK, P.L.L.C.**
                                          1615 M Street, N.W., Suite 400
                                          Washington, D.C. 20036
                                          (202) 326-7900

                                          *Attorneys for Defendant*
                                          *Mohammed bin Salman bin Abdulaziz Al Saud*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 5, 2021, I electronically filed the foregoing DEFENDANT

MOHAMMED BIN SALMAN BIN ABDULAZIZ AL SAUD'S MOTION TO DISMISS

AMENDED COMPLAINT, using the ECF system, which sent notice of filing in this matter to

all counsel of record.


/s/ *Michael K. Kellogg*
Michael K. Kellogg
*Attorney for Defendant*
*Mohammed bin Salman bin Abdulaziz Al Saud*