# Exhibit A

COURT FILE NO.: CV-21-00655418-00CL
DATE: 20210127

## ONTARIO

## SUPERIOR COURT OF JUSTICE

| | | |
|---|---|---|
| **BETWEEN:** | ) | |
| | ) | |
| SAKAB SAUDI HOLDING COMPANY, ALPHA STAR AVIATION SERVICES COMPANY, ENMA AL ARED REAL ESTATE INVESTMENT AND DEVELOPMENT COMPANY, KAFA'AT BUSINESS SOLUTIONS COMPANY, SECURITY CONTROL COMPANY, ARMOUR SECURITY INDUSTRIAL MANUFACTURING COMPANY, SAUDI TECHNOLOGY & SECURITY COMPREHENSIVE CONTROL COMPANY, TECHNOLOGY CONTROL COMPANY, NEW DAWN CONTRACTING COMPANY AND SKY PRIME INVESTMENT COMPANY | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | *Munaf Mohamed Q.C., Amanda C. McLachlan* and *Jonathan Bell*, for the Plaintiffs |
| | ) | |
| Plaintiffs | ) | |
| **- and –** | ) | |
| | ) | |
| SAAD KHALID S AL JABRI, DREAMS INTERNATIONAL ADVISORY SERVICES LTD., 1147848 B.C. LTD., NEW EAST (US) INC., NEW EAST 804 805 LLC, NEW EAST BACK BAY LLC, NEW EAST DC LLC, JAALIK CONTRACTING LTD., NADYAH SULAIMAN A AL JABBARI, KHALID SAAD KHALID AL JABRI, MOHAMMED SAAD KH AL JABRI, NAIF SAAD KH AL JABRI, SULAIMAN SAAD KHALID AL JABRI, HISSAH SAAD KH AL JABRI, SALEH SAAD KHALID AL JABRI, CANADIAN GROWTH INVESTMENTS LIMITED, GRYPHON SECURE INC., INFOSEC GLOBAL INC. and QFIVE GLOBAL INVESTMENT INC. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| | ) | **HEARD:** January 22, 2021 |

**C. GILMORE, J.**

### REASONS ON *EX-PARTE* ORDERS

**OVERVIEW AND RELIEF SOUGHT**

[1]   The Plaintiffs allege they are victims of a massive international fraud, orchestrated by a former high-ranking government official in the Kingdom of Saudi Arabia ("**KSA**"), through which at least USD 3.5 billion has been brazenly stolen, misdirected and misappropriated (the "**Fraudulent Scheme**").

[2]   The former Saudi cabinet minister behind the Fraudulent Scheme, the Defendant Saad Khalid Al Jabri ("**Al Jabri**"), has now relocated to Toronto in an attempt to avoid investigation. Each of the other Defendants, led by Al Jabri, has allegedly participated in or benefited from the Fraudulent Scheme to defraud the Plaintiffs.

[3]   The Plaintiffs allege that Al Jabri orchestrated the Fraudulent Scheme by leveraging and abusing his high-ranking government position in the KSA to:

(a)   establish corporations intended ostensibly to perform anti-terrorism activities in accordance with a government directive;

(b)   ensure those corporations were funded by the KSA; and

(c)   then unlawfully and fraudulently direct and misappropriate billions of dollars from those companies to himself, the other Defendants, and other friends, family members and co-conspirators.

[4]   On this motion, the Plaintiffs seek the following relief:

(a)   A worldwide *Mareva* injunction against Al Jabri in respect of his worldwide assets, including bank accounts, corporations and properties of which he is the ultimate beneficial owner and directing mind.

(b)   A *Mareva* injunction against the defendant QFive Global Investment Inc. ("**QFive**"), an Ontario corporation, only in respect of the shares it holds in Canadian Growth Investments Limited ("**Canadian Growth**") on the basis that funds allegedly stolen from the Plaintiffs have been traced to the purchase of those specific shares.

(c)   A certificate of pending litigation over the property located at 14 The Bridle Path, Toronto (the "**Bridle Path Property**"), over which the Plaintiffs assert a constructive trust.

(d)   The appointment of a Receiver under section 101 of the *Courts of Justice Act,* for purposes of preserving the relevant assets, in respect of (i) the New East Companies (as defined below) and their properties, subject to foreign recognition, and (ii) QFive, solely in respect of the shares it holds in Canadian Growth.

(e)     A Disclosure (Norwich) Order, against the persons and for the documents and materials particularized in the proposed Norwich Order, as required in order to continue tracing the funds misappropriated from the Plaintiffs and to quantify and discover the full extent of the Fraudulent Scheme.

[5]     I heard the *ex-parte* motion on January 22, 2021 and was satisfied that the record contained sufficient evidence to meet the tests for the Orders sought. A copy of the signed Orders was sent to counsel on that date for filing and for service on the Defendants as required. My endorsement of January 22, 2021 indicated that I would provide reasons in relation to my decision to grant those Orders. These are those reasons.

[6]     This case has been a massive undertaking for the Plaintiffs. The Deloitte report alone was 156 pages long with seven Appendices and multiple Exhibits. The Motion Record was 6,900 pages long which included a 135 page affidavit from Abdulaziz Alnowaiser, the CEO of the Plaintiffs' parent company Tahakom Investments Company ("**TIC**"), affidavits from various translators, and a lengthy legal opinion from Abdulaziz Al Fahad. Mr. Al Fahad is a Saudi Arabian lawyer fluent in Arabic and English who provided background on the KSA legal system and in particular civil fraud claims and corporate structures, the legal effect of certain key documents, and restrictions on the receipt of compensation from outside sources for government employees and their friends and family. These reasons will be brief in comparison to the vast factual landscape of this case and in consideration of the fact that this is only the beginning of a very complex case.

**FACTUAL BACKGROUND**

[7]     The particulars of the factual background in this case are provided mostly in the affidavit of Abdulaziz Alnowaiser sworn January 18, 2021 ("**the affidavit**"), the lengthy Report of Deloitte Middle East dated January 18, 2021dated January 18, 2021 ("**the Report**") and the legal expert report of Abudulaziz H. Al Fahad dated January 17, 2021 ("**the Expert Report**").

[8]     Al Jabri is a former Director of the Department of Officers and Personnel Affairs and Security Advisor to the Ministry of Interior of the KSA. After rising through the ranks of the Saudi government to be appointed Minister of State and to the Council of Ministers, Al Jabri was relieved of his titles and position on September 10, 2015. Since fleeing the KSA in 2017 after the investigation against him commenced, Al Jabri has lived in Toronto, Ontario with his wife and several members of his family.

[9]     1147848 B.C. Ltd ("**114**") is a corporation registered in British Columbia. The director of 114 is a a New York attorney, involved in setting up the U.S. entities through which Al Jabri purchased nine properties in the U.S. A certificate of pending litigation is being sought in respect of the Bridle Path Property which has 114 as its registered owner. The registered office of 114 is a law firm in Vancouver.

[10]     Relief is also being sought in respect of various "New East" entities created by Al Jabri and the real property held by these entities in the United States: New East (US) Inc., New East 804 805 LLC, New East Back Bay LLC and New East DC LLC (collectively, the "**New East Companies**"). As further explained below, the Plaintiffs submit that Al Jabri indirectly controls and is the beneficial owner of the New East Companies.

[11]   Canadian Growth, QFive, Gryphon Secure Inc. ("**Gryphon**") and Infosec Global Inc. ("**Infosec**") are Ontario corporations that received funds which the Plaintiffs allege were misappropriated from them. *Mareva* and Receivership relief is being sought against QFive on this motion because funds have been directly traced from the Plaintiffs into QFive that were utilized to purchase 400,000 shares of Canadian Growth.

[12]   Dreams International Advisory Services Ltd. ("**Dreams International**") is a corporation registered in the British Virgin Islands, which Al Jabri uses as his alter ego. The Plaintiffs have obtained a copy of a document titled "Establishment of the Beneficial Owner's Identity" for Dreams International (which was located in the records of the Group Companies) confirming that Al Jabri is the ultimate beneficial owner of Dreams International.

[13]   The Defendant Jaalik Contracting Ltd. ("**Jaalik**") is a corporation incorporated pursuant to the laws of the KSA. The Plaintiffs submit that Al Jabri indirectly controls and is the beneficial owner of Jaalik.

[14]   The other Defendants listed below are family members of Al Jabri, including his spouse and children, who allegedly participated in the Fraudulent Scheme including serving as nominee shareholders and directors of various corporations and by receiving misappropriated funds (often when still minors): Nadyah Sulaiman A Aljabbari, Khalid Saad Khalid Al Jabri, Mohammed Saad KH Al Jabri, Naif Saad KH Al Jabri, Sulaiman Saad Khalid Al Jabri, Hissah Saad KH Al Jabri, and Saleh Saad Khalid Al Jabri.

[15]   The Statement of Claim and the Affidavit also make reference to various co-conspirators and third parties who, while not Defendants, have participated in and acquiesced in the Fraudulent Scheme.

[16]   The Plaintiffs allege that Al Jabri received unauthorized payments and/or profits when he was prohibited from doing so as a government employee. Al Jabri, in concert with others, established the Plaintiff companies ostensibly to further counter-terrorism activities allegedly in the public interest. Thereafter, he installed his close friends and family members as "nominee shareholders" who received profits from the companies. According to the Plaintiffs' legal expert, family members of Al Jabri were also prohibited from receiving profits or compensation as a result of Al Jabri's government position.

[17]   In December 2019 after a forensic review by Deloitte, it was discovered that over 2.6B USD had been transferred from the Plaintiffs to Al Jabri and other Defendants and co-conspirators. Based on these findings the Plaintiffs engaged Deloitte to perform further analysis and tracing. Using the results of that analysis, Sakab obtained a Norwich Order from this court on December 18, 2020 with respect to information related to funds transferred and bank accounts.

[18]   The Deloitte investigation is still ongoing, but the report produced by Deloitte dated December 18, 2020, which is relied upon in this motion, revealed direct and indirect payments to El Jabri, Dreams International or Jaalik of 480M USD. This does not include funds traced to Al Jabri's co-conspirators and other fraudulent transactions set out in the Plaintiffs' claim. In total the Plaintiffs claim 3.47B USD as a result of the alleged Fraudulent Scheme.

[19]   The types of alleged fraud include but are not limited to;

    (a)   illegitimate and double counted profit;

    (b)   transfers of profit that had no relation to the company's actual profit;

    (c)   off-book transactions;

    (d)   inflated, handwritten and uncorroborated "valuations" of the Plaintiff companies which Deloitte described as "bearing no resemblance to reality" which were used as the basis to pay "rewards" from Sakab to Al Jabri;

    (e)   selling property owned by Al Jabri and his co-conspirators at grossly inflated prices to Enma Al Ared or KSA government agencies including substantial brokerage fees;

    (f)   the acquisition of significant real estate holding including;

        (i)   26 properties in the KSA many of which were gifted to El Jabri's children;

        (ii)   The purchase of nine luxury properties in the U.S. through corporations;

        (iii)   The purchase of two properties in Canada for cash; one for $13M and the other purchased by El Jabri's son Khalid for $4.465M.

        (iv)   Properties purchased in Geneva and Vienna which can be traced to Al Jabri.

    (g)   Holdings in Canadian companies including QFive which are alleged to have been purchases with funds originating from Sakab.

[20]   The Plaintiffs allege Al Jabri could never have accumulated the assets traced to him on his government salary. All of Al Jabri's assets were purchased with funds traceable to him which in turn can be traced back to the Fraudulent Scheme.

### The Worldwide Mareva Injunction Against Al Jabri and the QFive Mareva

[21]   In order to obtain the injunction sought, the Plaintiffs must establish a strong *prima facie* case of fraud, a genuine risk that the Defendant will put his assets beyond his creditors or out of the reach of the court and, that if not granted, the moving party will suffer irreparable harm.

[22]   The Plaintiffs need not prove their case at this point, they need only show that they would likely succeed based on the record before the court. The substantive law governing this case is the law of KSA (Shari'a law) and in the alternative, Ontario law.

[23]   Plaintiffs' counsel took the court through only one example of the elaborate manner in which El Jabri is alleged to have misappropriated funds. In one case, one of the Plaintiff companies ("SCC") was "valued" at 1.3B Saudi Riyal ("SAR") but made profits of only 2.2M SAR. Deloitte noted at para 5.35.2 of their report that this was 595 times its net income. 50% of the "valuation"

was then allocated as profit to El Jabri and another Person of Interest. The same profit was paid out to them again two years later based on exactly the same valuation. Deloitte notes that the alleged valuation was handwritten on a page without letterhead and unsigned. Deloitte concludes that such valuations did not relate in any way to the actual financial statements of SCC.

[24]    I am satisfied that the Plaintiffs' expert legal report establishes that a strong *prima facie* case has been established based on the equivalent or corresponding test in Shari'a law or based on well-established Ontario law. That is, the Deloitte report and the affidavits and exhibits filed demonstrate that Al Jabri used fraudulent means to divert funds that rightfully belonged to the Plaintiffs and the Plaintiffs suffered a loss from that conduct.

[25]    The documents filed establish on their face that Al Jabri was in a position of trust and confidence in relation the Plaintiffs. He breached his duties to the Plaintiffs by preferring his own interests and those of his family, friends and co-conspirators over those of the Plaintiffs.

[26]    With respect to the requirement of establishing assets *ex juris*, the Deloitte report has uncovered significant assets *ex juris* as further explained below with respect to the Norwich Order.

[27]    Turning to the issue of irreparable harm, the Plaintiffs must establish that there is a real risk that the Defendants will remove assets from the jurisdiction or dispose of or dissipate assets outside of the ordinary course.

[28]    It is clear from the Deloitte report that Al Jabri is adept at moving money around the world including establishing corporations (such as the New East companies) to permit him to hold property indirectly. In 2017 Al Jabri made a large payment to Identity Malta Agency. He and his family are now citizens of Malta. The conditions of obtaining citizenship required Al Jabri to make a large investment in Malta. The Plaintiffs are concerned that Al Jabri will move there with his family or use it as another place to shield assets.

[29]    I agree that, in accordance with the principles set out in *Sibley & Associates LP v. Ross*, 2011 ONSC 2951 at para 64, that "a pattern of prior fraudulent conduct may support a reasonable inference that there is a real risk the pattern will continue." Al Jabri has been bold in his schemes including transferring large amounts of money to himself and other Persons of Interest even after he was relieved of his duties with the government of KSA. I therefore conclude that the risk of removal or dissipation may be established by inference given Al Jabri's sophisticated, international, and multi-layered means of moving money and assets.

[30]    With respect to the balance of convenience I am satisfied that a refusal of the *Mareva* sought in light of the substantial and comprehensive financial tracing provided by Deloitte (which is still ongoing) would be harmful to the Plaintiffs' chance of recovery. Indeed, the tracing reveals that there may well be funds that form part of the Fraudulent Scheme which are well in excess of what has been uncovered thus far. Further, the usual protections can be put into place with respect to living expenses and variations of the Order as needed.

[31]    I am further satisfied that the Plaintiffs have made full and frank disclosure and have taken significant time and effort to put together a comprehensive record with compelling evidence of the alleged Fraudulent Scheme.

[32]     With respect to the *Mareva* sought against QFive, the tests are the same as above and need not be repeated. The evidence establishes a *prima facie* case as direct payments were made from Sakab to QFive and $8M USD of those funds were used to make an equity investment in Canadian Growth in exchange for 400,000 shares. I accept that the Plaintiffs may suffer irreparable harm if those shares are disposed of.

[33]     The Plaintiffs and their parent company TIC have provided an undertaking as to damages with respect to both *Mareva* Orders sought. TIC's 2019 income was almost $1B CDN and they are therefore well able to stand behind their undertaking.

### *The Certificate of Pending Litigation*

[34]     The Bridle Path property was purchased on February 28, 2018 for $13M CDN cash. It was purchased by 114 whose sole director is Mr. Wainright, a U.S. lawyer frequently used by Al Jabri as a nominee in various entities to hold real estate assets in the U.S. Mr. Wainright's involvement in Al Jabri's real estate holdings is more fully set out in relation to the grounds for granting the Norwich Order.

[35]     I find there is a triable issue with respect to a constructive trust claimed in relation to the Bridle Path Property in that there is a strong inference it was purchased using misappropriated funds. The equities favour granting the CPL.

### *The Appointment of a Receiver*

[36]     The Plaintiffs seek a Receivership Order over the New East Companies in the U.S. (being entities beneficially owned by Al Jabri) and over the Canadian Growth Shares in order to obtain the books and records of QFive.

[37]     The Plaintiffs do not intend to sell assets by way of the Receivership, only preserve assets into which the Plaintiffs have traced funds in the Fraudulent Scheme.

[38]     As a Receivership is intrusive and thus to be used sparingly, the threshold for an appointment is high one. In this case the *prima facie* case of fraud, along with the possibility of the Plaintiffs' right of recovery being put in jeopardy are important considerations. However, under the *Courts of Justice Act,* the Court must consider whether the appointment is just and convenient based on the factual circumstances of the case.

[39]     In this case assets owned by the New East Companies are only beneficially owned by Al Jabri and are therefore at greater risk of dissipation. The same risk of dissipation applies to the Canadian Growth shares. A Receivership would also ensure that the substantial rental payments in relation to the luxury properties are also protected. The rents are significant with total rents being in the range of $71,500 USD per month.

[40]     Finally, the cost of the Receiver is being borne entirely by the Plaintiffs at this point.  This is not a traditional Receivership in which the Receiver pays itself out of the assets of the estate, nor does the Receiver seek to dispose of any assets. The Receiver seeks to preserve assets and obtain financial records in order to complete the necessary tracing.

*The Norwich Order*

[41]     The Plaintiffs seek a Norwich Order over the third parties, documents and materials as set out in the Order dated January 22, 2021.

[42]     The factors for the court to consider with respect to whether to grant such relief are:

(a)     Whether there is evidence provided by the Plaintiffs sufficient to raise a valid, reasonable or *bona fide* claim;

(b)     Whether the evidence establishes that the third parties are involved in the acts complained of;

(c)     Whether the third party is the only practicable source for the information;

(d)     Whether the third party can be indemnified for costs to which it may become exposed due to the disclosure, and;

(e)     Whether granting such an Order would be in the interests of justice.

[43]     As I have already found that the Plaintiffs have met the threshold of a *prima facie* case, there is no question that they are able to meet the lower threshold of raising a *bona fide* claim.

[44]     With respect to the second branch of the test, fraudulent schemes necessarily involve innocent parties such as banks, law firms and accounting firms through which money and transactions are processed. As set out in *Isofoton SA v. Toronto Dominion Bank,* 2007 CarswellOnt 2741 (Sup Ct) at para 40, innocent parties who become mixed up in tortious acts so as to facilitate the wrongdoing of others owe a duty to the person wronged to provide information and the identity of the wrongdoer.

[45]     With respect to the law firms involved, the Plaintiffs are seeking only non-privileged information, understanding that payments in and out of a law firm's trust account are not privileged.

[46]     Given the above, I am satisfied that the second branch of the test is met and that the innocent third parties named in the Order have a duty to provide the information sought.

[47]     With respect to the third branch of the test, this is not a situation in which the information can be requested from the impugned parties. Indeed, I have already found that Al Jabri was likely to dissipate assets. There is no reason to believe that the other Defendants would not do the same given their connection or subordination to Al Jabri.

[48]     Finally, the Plaintiffs have agreed to indemnify the Respondents for their reasonable costs in relation to the Norwich Order. The interests of justice favour granting the Order to permit Deloitte to continue with its tracing exercise. Persons who engage in fraud cannot hide behind the confidentiality of banking and lawyers' records in order to shield their wrongdoing.

[49]     Given all of the above, I find that the Order sought meets the required test and the Norwich Order shall issue.

[50]     The parties shall return before me on February 1, 2021 at 2:00 p.m. for a scheduling appointment.

_____<br>C. Gilmore, J.

**Released:** January 27, 2021

COURT FILE NO.: CV-21-00655418-00CL
DATE: 20210127

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**BETWEEN:**

SAKAB SAUDI HOLDING COMPANY, ALPHA STAR AVIATION SERVICES COMPANY, ENMA AL ARED REAL ESTATE INVESTMENT AND DEVELOPMENT COMPANY, KAFA'AT BUSINESS SOLUTIONS COMPANY, SECURITY CONTROL COMPANY, ARMOUR SECURITY INDUSTRIAL MANUFACTURING COMPANY, SAUDI TECHNOLOGY & SECURITY COMPREHENSIVE CONTROL COMPANY, TECHNOLOGY CONTROL COMPANY, TECHNOLOGY CONTROL COMPANY, NEW DAWN CONTRACTING COMPANY AND SKY PRIME INVESTMENT COMPANY

Plaintiffs

**- and -**

SAAD KHALID S AL JABRI, DREAMS INTERNATIONAL ADVISORY SERVICES LTD., 1147848 B.C. LTD., NEW EAST (US) INC., NEW EAST 804 805 LLC, NEW EAST BACK BAY LLC, NEW EAST DC LLC, JAALIK CONTRACTING LTD., NADYAH SULAIMAN A AL JABBARI, KHALID SAAD KHALID AL JABRI, MOHAMMED SAAD KH AL JABRI, NAIF SAAD KH AL JABRI, SULAIMAN SAAD KHALID AL JABRI, HISSAH SAAD KH AL JABRI, SALEH SAAD KHALID AL JABRI, CANADIAN GROWTH INVESTMENTS LIMITED, GRYPHON SECURE INC., INFOSEC GLOBAL INC. and QFIVE GLOBAL INVESTMENT INC.

Defendants

**REASONS ON *EX PARTE* ORDERS**

C. Gilmore, J.

**Released:** January 27, 2021