# Exhibit B

**CITATION:** Sakab Saudi Holding Company v. Al Jabri, 2021 ONSC 1772
**COURT FILE NO.:** CV-21-00655418-00CL
**DATE:** 20210311

## ONTARIO

## SUPERIOR COURT OF JUSTICE

| | | |
|---|---|---|
| **BETWEEN:** | ) | |
| | ) | |
| SAKAB SAUDI HOLDING COMPANY, ALPHA STAR AVIATION SERVICES COMPANY, ENMA AL ARED REAL ESTATE INVESTMENT AND DEVELOPMENT COMPANY, KAFA'AT BUSINESS SOLUTIONS COMPANY, SECURITY CONTROL COMPANY, ARMOUR SECURITY INDUSTRIAL MANUFACTURING COMPANY, SAUDI TECHNOLOGY & SECURITY COMPREHENSIVE CONTROL COMPANY, TECHNOLOGY CONTROL COMPANY, NEW DAWN CONTRACTING COMPANY AND SKY PRIME INVESTMENT COMPANY | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | *Munaf Mohamed Q.C., Amanda C. McLachlan* and *Jonathan Bell*, for the Plaintiffs |
| Plaintiffs | ) ) | |
| **– and –** | ) ) ) | |
| SAAD KHALID S AL JABRI, DREAMS INTERNATIONAL ADVISORY SERVICES LTD., 1147848 B.C. LTD., NEW EAST (US) INC., NEW EAST 804 805 LLC, NEW EAST BACK BAY LLC, NEW EAST DC LLC, JAALIK CONTRACTING LTD., NADYAH SULAIMAN A AL JABBARI, KHALID SAAD KHALID AL JABRI, MOHAMMED SAAD KH AL JABRI, NAIF SAAD KH AL JABRI, SULAIMAN SAAD KHALID AL JABRI, HISSAH SAAD KH AL JABRI, SALEH SAAD KHALID AL JABRI, CANADIAN GROWTH INVESTMENTS LIMITED, GRYPHON SECURE INC., INFOSEC GLOBAL INC. and QFIVE GLOBAL INVESTMENT INC. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | *Paul Le Vay, Nader Hasan, Stephen Aylward, and Luisa Ritacca for the Defendant Saad Khalid S Al Jabri*  <br><br> *J. Thomas Curry, Andrew Moeser, Scott Azzopardi and Sahar Talebi for the Defendants Canadian Growth Investment Limited, Gryphon Secure Inc. and Infosec Global Inc.* |
| Defendants | ) ) ) | |
| | ) | **HEARD:** February 19, 2021 |
| **C. GILMORE, J.** | ) | |

## RULING ON SET ASIDE MOTIONS

## OVERVIEW

[1]     In the motions before the court, the Defendant Saad Khalid Al Jabri ("Dr. Saad") and the Corporate Defendants Canadian Growth Investments Limited, Gryphon Secure Inc., and Infosec Global Inc. (the "Canadian Companies") seek to set aside certain Orders made by this court on an *ex-parte* basis, on January 22, 2021 and continued on February 1 and 19, 2021.

[2]     These motions are but one initial step in what will likely be lengthy and complex litigation. The court is not being asked in these motions to make any findings at to whether or not a fraud was perpetrated on the Plaintiffs. Rather, the court is being asked whether assets and documents alleged to be part of that fraud should be frozen and/or disclosed pending discovery and trial. As will be set out below, it is this court's view that some of the current Orders should stay in place but with various modifications.

[3]     Those Orders (referred to herein as the "Orders") granted detailed and wide-ranging relief on a without notice basis. The Orders may be summarized as follows:

    a.  A *Mareva* injunction against Dr. Saad restraining him from dissipating any worldwide assets he owns in his own name or jointly, or over which he has power or control. The Orders also required Dr. Saad to prepare a sworn statement of all of his worldwide assets within 10 days and to submit to an examination on that declaration.

    b.  A *Norwich* Order requiring certain banking, legal and accounting firms worldwide to provide various listed disclosure from certain listed Defendants for tracing purposes and requesting judicial assistance in the enforcement of the Order.

    c.  A *Mareva* Order restraining the Defendant QFive from dissipating or encumbering 400,000 common shares of the Defendant Canadian Growth Investments Ltd. ("CGI") and requiring that any banks served with the Order prevent any removal or transfer of the shares held in any account on behalf of QFive.

    d.  A Receivership Order limited to certain properties located in Boston and Washington, D.C., as well as the 400,000 common shares in CGI.

    e.  A Certificate of Pending Litigation over the property municipally known as 14 The Bridle Path, Toronto, Ontario.

[4]     The specific motions, argued before the court on February 19, 2021, are as follows:

*Dr. Saad's Motion:*

    a.  Dr. Saad seeks to set aside the *ex-parte* Orders on the grounds that

    i.    the Plaintiffs misled the court respecting material facts or failed to disclose material facts;

    ii.    they should be set aside pending a determination of the Plaintiffs' motion to continue the Orders on an interlocutory basis; or

    iii.    they should be varied to stay enforcement pending the Plaintiffs' motion to continue as set out above.

*The Motion of the Canadian Companies:*

    a.    An Order setting aside the *Norwich* Order as it relates to the Canadian Companies or, in the alternative, an Order varying the *Norwich* Order to remove any disclosure obligations relating to the Canadian Companies and affected subsidiaries or to stay the enforcement of those obligations;

    b.    An Order varying the *Norwich* Order of Hainey J. dated December 18, 2020, to remove any disclosure obligations related to the Canadian Companies and affected subsidiaries or stay the enforcement of those obligations;

    c.    An Order setting aside the Receivership Order or to stay the enforcement of the Receivership Order with respect to any CGI shares;

    d.    A Sealing Order and/or Confidentiality Order sealing or restricting the disclosure of any information obtained by the *Norwich* Order with respect to the Canadian Companies and any affected subsidiaries, including provision of a Counsels' Eyes Only designation to protect the information from being used for any purpose other than this proceeding;

    e.    Further relief related to relieving the Canadian Companies, their affected subsidiaries and certain banking institutions of their obligations under the *Norwich* Order; and/or

    f.    Restraining the Plaintiffs from taking steps to obtain aid and recognition of the *Norwich* Order outside of Ontario until there is a final determination of this matter.

*The Plaintiffs' Motion:*

    a.    An Order extending the three *ex-parte* Orders made on January 22, 2021 and extended on February 1 and 19, 2021;

    b.    An Order varying the *Mareva* Order to include the Defendant Mohammed Saad KH Al Jabri ("Mohammed Al Jabri");

    c.    An Order requesting the court to sign letters of request to the relevant judicial authorities of the British Virgin Islands ("BVI"), the United Kingdom ("U.K.") and

Guernsey for judicial assistance to compel authorities to comply with the January 22, 2021 *Norwich* Order;

d.  A declaration that the deemed undertaking rule does not apply to documents obtained through the *Norwich* Order and to Dr. Saad's Declaration of Assets and Supplementary Statement of Assets; and

e.  An Order that the confidentiality provisions of paragraph 4 of the Extension Order no longer apply.

[5]     It should be noted that the motion to vary the *Mareva* Order to include Mohammed Al Jabri did not proceed on February 19, 2021. Mohammed Al Jabri's counsel appeared and sought an adjournment as Mohammed Al Jabri intends to challenge the jurisdiction of this court to make any order that is binding on him. Mohammed Al Jabri's counsel submitted that his client resides in the U.K. and has no connection to Ontario. This is contested by the Plaintiffs.

[6]     By way of my endorsement dated February 20, 2021, I adjourned that motion and will deal with it in my reasons herein.

## BACKGROUND FACTS

[7]     In addition to the background facts set out below, the court relies on background facts set out in my reasons dated January 27, 2021 and the endorsement dated February 1, 2021.

[8]     The Plaintiff companies (the "Group Companies") were established between 2007 and 2015 and operate in strategic industries, such as aerospace and cybersecurity. They also funded covert operations and served as commercial fronts for counterterrorism operations. The Group Companies operated legitimate businesses to provide plausible public cover for these activities.

[9]     Dr. Saad is a highly educated individual and served for decades as a senior civil servant in the security and intelligence agencies of the Kingdom of Saudi Arabia (the "KSA"). He served as a Minister of State and as a Special Advisor to Mohammed Bin Nayef ("MBN"), the former Crown Prince and Minister of the Interior.

[10]    In 2015, MBN was named Minister of the Interior and King Salman acceded to the throne on King Abdullah's death. On January 23, 2015, the current Crown Prince, Mohammed Bin Salman ("MBS") (King Salman's son and MBN's cousin), was appointed Minister of Defence at age 29.

[11]    On April 29, 2015, MBN was named Crown Prince and MBS was named Deputy Crown Prince. In September 2015 Dr. Saad was removed from office at the instance of MBS. The reason for the removal is in dispute. The Plaintiffs' position is that the removal was related to the discovery of Dr. Saad's fraudulent activity. Dr. Saad submits that it was because he met with the CIA Director at that time in the U.S. and did not report that meeting to MBS. Apparently, MBS felt that Dr. Saad had exceeded his authority in meeting with the CIA Director.

[12]    In late 2015, Dr. Saad applied for Maltese citizenship and left the KSA for Turkey in May 2017. He received Maltese citizenship in August 2017.

[13]    In June 2017, MBS texted Dr. Saad and requested that he return to the KSA. Dr. Saad did not return citing health reasons.

[14]    In June 2017, there was a palace coup in which MBN was deposed as Crown Prince and MBS was named as Crown Prince. MBN was placed under house arrest and texted Dr. Saad shortly thereafter warning him not to return to the KSA. MBN was arrested about a year ago on charges of treason and has not been seen since.

[15]    On June 21, 2017, Dr. Saad's children Omar and Sarah were prevented from leaving the KSA. In September 2017, Dr. Saad texted MBS requesting that he allow Omar and Sarah to leave the KSA in order to return to school in the U.S. MBS refused and advised Dr. Saad that he must return to the KSA to answer questions related to corruption, failing which MBS would file a complaint with Interpol. In September 2020, Sarah and Omar were charged with international money laundering and attempting to flee the KSA unlawfully. In November 2020, they were convicted and commenced appeals of the convictions immediately thereafter.

[16]    In August 2017, MBS as Chair of the KSA Public Investment Fund ("PIF") retained Ernst & Young ("EY") to provide a valuation report on the Group Companies.

[17]    In September 2017, the KSA Public Prosecution issued a warrant for the arrest of Dr. Saad. It was alleged that Dr. Saad received profits from the Group Companies by way of an abuse of power for personal financial gain and by placing the companies in the name of his nephew Majid Almuzaini and his friend Abdullah Alswelam. These allegations are different from the ones originally made by MBS for the removal of Dr. Saad from his government position in 2015. Two weeks after the arrest warrant for Dr. Saad was issued, EY published a draft report dated September 25, 2017 highlighting financial irregularities within the Group Companies.

[18]    In September 2017, Dr. Saad relocated to Toronto. The Plaintiffs submit this was because Dr. Saad was attempting to avoid the fraud allegations. Dr. Saad submits that he relocated to Toronto believing it would be safer for him and his family.

[19]    In November 2017, MBS created the Supreme Anti-Corruption Committee ("SACC") of which he is the Chair. The purpose of the committee is to investigate, freeze assets or take any other necessary measures to deal with corruption. In that same month, the bank accounts of Dr. Saad and his family in the KSA were frozen and Dr. Saad's investigation was placed under the purview of the SACC.

[20]    On December 24, 2017, MBS ordered the transfer of the ownership of the Group Companies to the PIF and Tahakom Investment Company ("TIC") was created. The Group Companies were then transferred to TIC, which is owned by PIF.

[21]    On January 9, 2018, Saudi Arabia issued an Interpol "Red Notice" against Dr. Saad citing allegations of corruption. Upon Dr. Saad's application, the Red Notice was removed on the grounds that it was politically motivated.

[22]    In May 2018, PIF retained Deloitte to conduct a forensic examination of the Group Companies. Deloitte reports were released in October 2018 and December 2019. In September 2020, Deloitte was retained by Bennett Jones (the Plaintiffs' counsel) on behalf of TIC to conduct a further analysis. In October 2020, the CEO of TIC sought access to the criminal investigation files from the KSA Public Prosecution Office ("the PPO") to assist in the fraud investigation.  The PPO required a Court Order. On December 18, 2020 the Plaintiffs received a *Norwich* Order from this court requiring the PPO to produce its investigation file to the Plaintiffs. On December 24, 2020, the PPO produced its investigative file. On January 18, 2021, Deloitte produced the report that is before this court. The Plaintiffs moved for injunctive relief immediately, following the delivery of the Deloitte report.

[23]    In October 2018, Jamal Khashoggi was killed at the Saudi consulate in Istanbul, Turkey, while trying to obtain documents for his upcoming marriage. The investigation is ongoing, but sources claim that MBS was behind the murder because Khashoggi was a prominent critic of the Saudi regime. The Saudi government described the event as a "rogue operation" and MBS has denied involvement. In that same month, certain individuals whom Dr. Saad claims were members of the "Tiger Squad," who had allegedly assassinated Mr. Khashoggi, were turned away at the Ottawa airport. Dr. Saad claims they were sent to assassinate him. In December 2020, RCMP agents met with Dr. Saad in Toronto to advise of a high threat level against his life.

[24]    The Canadian Companies and QFive are Ontario corporations that allegedly received funds misappropriated from the Plaintiffs. Relief was sought against QFive because funds traced directly from the Plaintiffs into QFive were used to purchase 400,000 shares of CGI.

[25]    The Defendant Dreams International Advisory Services Ltd. ("Dreams International") is a BVI corporation. The Plaintiffs contend that Dr. Saad is the ultimate beneficial owner of Dreams International.

[26]    The Defendant Jaalik Contracting Ltd. is a corporation incorporated pursuant to the laws of KSA. The Plaintiffs allege that Dr. Saad is Jaalik Contracting Ltd.'s beneficial owner.

[27]    The other defendants are family members of Dr. Saad, including his spouse and children. They are alleged to have participated in the alleged fraud by serving as nominee shareholders and directors of various corporations and by allegedly receiving misappropriated funds (often when still minors).

[28]    The Group Companies are ten Plaintiff companies who are members of a group of 17 KSA companies. Each of them claims to have suffered a loss due to the Defendants' alleged fraud.

[29]    On February 1, 2021, Dr. Saad delivered a declaration of assets to the Plaintiffs in accordance with the January 22, 2021 *Mareva* Order. Dr. Saad delivered a supplementary declaration of assets on February 11, 2021 and was examined on those declarations on February 11, 2021.

**THE SET ASIDE MOTION ON THE MAREVA AND NORWICH ORDERS—THE DEFENDANT DR. SAAD**

***Positions of the Parties***

*The Defendant Dr. Saad*

[30]    Dr. Saad's position is that the Plaintiffs' motions were entirely inappropriate in the context of *ex-parte* proceedings and that the Plaintiffs failed to make the necessary full and frank disclosure. Such disclosure includes advising the court of facts explaining Dr. Saad's position as well as any legal defences he may have raised. Dr. Saad submits that the Plaintiffs completely failed in this regard and the Orders should be set aside.

[31]    Dr. Saad submits that the Plaintiffs have breached the duty of full and fair disclosure by failing to present the case in a balanced and forthright manner and bring to the attention of the court certain key information which may have made a difference in the outcome. Even if such information would not have made a difference in the outcome, the fact that it was not raised by the Plaintiffs at the *ex parte* hearing is fatal and sufficient to have the Orders set aside.

[32]    According to Dr. Saad, this is not a commercial dispute at all. It is a politically driven attack, masterminded by MBS through state-owned companies that he directly or indirectly controls. Dr. Saad's children Omar and Sarah have been arrested, detained and tried without due legal process, and he has been the subject of assassination attempts in Ontario. The court did not mention any of this in its Reasons with respect to granting the subject Orders because the court was not made aware of these allegations.

[33]    Counsel for Dr. Saad urges the Court to take judicial notice of the political situation in the KSA and cites authorities for this. Where the court is unable to take judicial notice, counsel urges the court to rely on Dr. Saad's experts' reports.

[34]    Dr. Saad agrees that as a highly placed civil servant he received large patronage gifts from the Royal Family. However, he maintains that this is an accepted custom in the KSA, despite civil servant salary limits. The patronage gifts were considered rewards for his loyalty and as a sign of favour from the King.

[35]    Dr. Saad denies that he was removed from office because of any wrongdoing. Rather, he was removed because of a meeting with the CIA, which King Salman viewed as exceeding his authority and believed should have been reported.

[36]    Counsel for Dr. Saad emphasized that the Plaintiffs failed to present to the court key facts relating to the transfer of the Group Companies to PIF by MBS in February 2018 and MBS's ultimate control over PIF. The nexus between MBS and the Group Companies was not sufficiently highlighted by the Plaintiffs and the events of February 2018 (re the transfer of the companies to PIF) was not part of the analysis provided by the Plaintiffs' expert.

[37]    Further, it is alleged that the court was not given full details about the SACC, its extensive powers and how the SACC, under the control of MBS, ordered the transfer of the Group Companies to PIF. The Plaintiffs' expert does not deal with the evidence presented by Dr. Saad head-on and does not address what is actually transpiring in the KSA. What should have been highlighted to the court was MBS's *de facto* control of the Plaintiff companies and that he was behind the seizure of the PIF.

[38]    Dr. Saad relies on three main areas of non-disclosure: the failure to disclose the involvement of MBS in this proceeding, the failure to disclose the Interpol decision and the failure to disclose the U.S. litigation.

[39]    In this motion, Dr. Saad relies on three sources of evidence: an affidavit from his son Dr. Khalid Al Jabri ("Dr. Al Jabri"), a cardiologist who resides in the U.S.; an affidavit/expert's report from Joseph Black, a former Director of the CIA's Counterterrorism Center; and the expert report of Chibli Mallat (Mr. Mallat"), a Libyan lawyer and law professor who provides an expert opinion on MBS's role in the government and state-owned entities and the likelihood that MBS was involved in the commencement of the Ontario litigation.

###### 1.    *The Affidavit of Dr. Al Jabri*

[40]    Dr. Al Jabri explained that he provided his affidavit on behalf of his father because of his father's fear of pursuit from agents of MBS who will attempt to assassinate him in Canada. He deposes that it is his view, as well as that of his father, that this proceeding is being used by MBS to obtain information about Dr. Saad in order facilitate his assassination.

[41]    Dr. Al Jabri explained that as a senior member of the Royal Court, his father received patronage gifts from the Royal Family as a sign of favour and as a reward for his loyalty. These included gifts of approximately $14.7M USD in 2015 alone.

[42]    Dr. Al Jabri further deposed that that he believes MBS views his father as a threat to U.S. support for his ascension to the throne due to sensitive information that Dr. Saad has about MBS and Dr. Saad's close ties to the U.S. Intelligence community.

[43]    After Dr. Saad left the KSA for Turkey in May 2017, MBS sent him several text messages, only days before he ousted MBN, requesting that he return to the KSA. Dr. Al Jabri speculates that MBS wanted his father to return to the KSA to coincide with his assumption of power as Crown Prince, meaning his father would be subject to MBS's control. It was around this same time that Dr. Saad received a text message from MBN warning him not to return.

[44]    Further, according to texts sent to Dr. Saad, MBS refused to deal with the issue of Sarah and Omar's return to the U.S. for school unless Dr. Saad returned to the KSA.  Dr. Al Jabri deposed that Sarah and Omar were being used as bargaining chips to entice his father to return to the KSA.

[45]    Dr. Al Jabri excerpted a certain text message sent to his father which threatened legal action if his father did not return to the KSA:

> Doctor, you are involved in many large cases of corruption that have been proven. You know what they are. There are also other cases. The legal complaint is ready. There is no state in the world that would refuse to turn you over.
>
> Don't force me to escalate things and take legal measures, as well as other measures that would be harmful to you. I am trying to save the state's reputation, as well as the reputations of its previous officials, especially insofar as you were among [MBN] close associates.
>
> You have two choices. The first is to return to the Kingdom, where you will be placed under house arrest until you answer some questions that relate to issues of corruption, after which you will be released and will be free to go wherever you want inside the Kingdom. The other choice is for us to pursue you legally, and by using all available means. We shall certainly reach you, because justice is with us. The choice is yours.
>
> I have promised you and offered you something that is unimaginably generous. Do not waste this opportunity. I am being completely transparent with you. You have one hour to decide. After that, the official document will be lodged with Interpol and be communicated to all states of the world.

[46]    According to Dr. Al Jabri, his father later learned that Interpol had issued a Red Notice on January 9, 2018, at the request of the National Central Bureau of Interpol of Saudi Arabia. Dr. Saad applied to the Commission for the Control of Interpol's Files ("CCF") to have the Red Notice removed. Ultimately the Red Notice was removed.

[47]    Dr. Al Jabri specified that the corruption allegations, reviewed in the CCF decision, bear a striking resemblance to the allegations in these proceedings:

> In Riyadh in 2015-2016, Saad ALJABRI held a position of authority in the Kingdom of Saudi Arabia, during which he committed an abuse of power, embezzlement of public funds, and money laundering. He was able to flee the country prior to his arrest. Investigations into auditing papers related to public funds revealed strong elements of the involvement of the individual, with a number of public employees entrusted with public funds, in illegitimate financial gain. Investigations into these financial transactions show the embezzlement of large sums of public funds by him with these employees.

[48]    In the end, the CCF determined, in a decision released on July 20, 2018, that the Red Notice be removed. It observed in its findings that anti-corruption proceedings in the KSA had been the source of criticism and used "as part of a political strategy by MBS to target any potential political rival or opposition…and further consolidate his already existing political and economic power." The CCF also remarked on the restrictive measures taken against Dr. Saad's family members, asserting that the case against Dr. Saad was "politically motivated rather than strictly juridical."

[49]    Dr. Al Jabri also gave evidence about ongoing safety concerns related to his family. He deposed that he had been taken aside at Boston Logan International Airport by FBI agents who warned him of risks to his safety and that of his father and family, related to MBS, and that the FBI was taking measures to protect his family.

[50]    Dr. Al Jabri mentioned the killing of Jamal Khashoggi on October 2, 2018, and the CIA's conclusion in November 2018 that MBS ordered Khashoggi's assassination. Dr. Saad told his son that within days of the news of Khashoggi's murder, he learned that agents of MBS had been dispatched to kill him in Canada. The agents were stopped by Canada Border Services Control but the RCMP is continuing its investigation. Dr. Al Jabri was interviewed as recently as December 1, 2020, by the RCMP about this matter. Dr. Saad has had 24-hour physical security at his home since July 2020, when he was advised that the threat level to his life remained high.

[51]    It is Dr. Al Jabri and Dr. Saad's belief that Omar and Sarah are being kept in the KSA to punish Dr. Saad for refusing to return to the KSA when MBS demanded that he do so.

[52]    In August 2020, Dr. Saad commenced a complaint in the U.S. District Court of Columbia (the "Complaint") seeking relief under the *Torture Victim Protection Act* and the *Alien Tort Statute*, alleging that MBS had made death threats against Dr. Saad, unlawfully detained his family members in the KSA and has dispatched agents to collect information about Dr. Saad in order to assassinate him.

[53]    On October 8, 2020, MBS submitted a request for a Suggestion of Immunity to the Department of State and on December 7, 2020, MBS filed a motion to dismiss the Complaint on the grounds that the U.S. lacks jurisdiction over him. A hearing date for the Motion to Dismiss has not yet been set.

[54]    Dr. Al Jabri submits that this litigation is not an actual commercial dispute but is simply another of MBS's attempts to persecute and punish his perceived opponents, in this case, Dr. Saad and his family. For example, it is important for the court to understand that TIC is wholly owned by PIF, and PIF is controlled by MBS. Further, the Plaintiff companies were formerly controlled by MBN who did not "leave his positions" in 2017 as claimed by the Plaintiffs. Rather, MBN was forcibly removed from his position in government and as Crown Prince by MBS. He was arrested by MBS in March 2020 and has not been seen since.

[55]    Dr. Al Jabri alleges that the Plaintiffs did not properly explain to the court at the *ex-parte* hearing that PIF was not "transferred" to TIC, it was expropriated by MBS pursuant to a Royal Directive. Further, the assertion by the Plaintiffs that PIF is an independent sovereign wealth fund is simply false. Dr. Al Jabri cites a 2019 report from the German Institute for International and Security Affairs which states that MBS "exerts massive influence on the day-to-day business of the PIF" whose board members are appointed by MBS based on "their personal proximity to the crown prince."

[56]     Dr. Al Jabri attempts to clarify in his court material why his father left the KSA and certain actions he has taken with respect to his property. These actions were not motivated by attempts to cover up any fraud as alleged by the Plaintiffs. Rather, they were intended by Dr. Saad to protect himself and his family.

[57]     It is not the case, as alleged by the Plaintiffs, that Dr. Saad left the KSA to avoid an investigation. The court was not provided with the alternative explanation in the Complaint which is that Dr. Saad fled the KSA for reasons related to his personal safety.

[58]     Dr. Saad did not attempt to conceal ownership of the Bridle Path property because it was purchased with misappropriated funds. The court was not provided with the actual explanation which was that Dr. Saad put the property in the name of a corporation to avoid detection through public search again to protect himself and his family from MBS.

[59]     Dr. Saad did not become a Maltese citizen in order to evade creditors or relocate as needed, as alleged by the Plaintiffs. The Plaintiffs were obliged to tell the court that many Saudis of high net worth are Maltese citizens. Malta provides a program whereby citizenship is granted in exchange for an investment in the jurisdiction. Similar programs exist in other countries in the world, even in the Province of Quebec. In Dr. Saad's case, it was important for him and his children to have alternative travel documents (*i.e.* a Maltese passport) given the restrictions put on Dr. Saad's family's Saudi travel documents.

### 2.  The Expert Report of Mr. Mallat

[60]     Mr. Mallat was retained by Dr. Saad and provided an expert's report along with the required Acknowledgement of Expert's Duty. Mr. Mallat is a lawyer and law professor who has taught and practiced Middle Eastern law for 40 years. In preparing his report, Mr. Mallat reviewed the Plaintiffs' Statement of Claim and factum dated January 18, 2021, the affidavit of Abdulaziz Alnowaiser sworn January 18, 2021, the expert report of Abdulaziz Hamad Al Fahad dated January 17, 2021, the Orders made on January 22, 2021 and the July 4, 2018 Interpol decision.

[61]     Mr. Mallat was asked to describe MBS's role in the KSA government. Mr. Mallat described MBS as the most powerful man in the KSA and it is a "universally averred reality that MBS runs the daily affairs of the Kingdom, including its international relations." He is the head of the Council of Economic and Development Affairs ("CEDA") which includes an assembly of over 20 ministers. CEDA was established by MBS in 2015 by Royal Order.

[62]     Mr. Mallat was asked to what extent "anti-corruption" was used as a cover by MBS for politically driven prosecutions. In 2017 a Royal Order appointed MBS as head of the Anti-Corruption Committee. The Committee was tasked with identifying corruption related violations and was given significant powers. The Committee began in November 2017 by arresting 160 prominent Saudi citizens, including 11 members of the Royal Family and confining them to the Ritz-Carlton Hotel in Riyadh. Bank accounts were frozen, arrest warrants issued and travel bans imposed. According to Mr. Mallat, the accused persons were forced into recanting and paying unknown penalties.

[63]    Mr. Mallat opined about MBS's approach to MBN and his allies since 2017. Mr. Mallat stated that in his view, MBN was removed from his positions as Crown Prince and Minister of the Interior. He relied on an article written by David Rundell in the publication *Vision or Mirage* in 2020, in which the author described that MBN was presented with a letter of resignation to sign and was then immediately greeted by the new Crown Prince, his replacement. MBN was detained without charge in March 2020 and has been denied visits by his family or doctor.

[64]    In terms of state involvement in PIF, Mr. Mallat explained that PIF must report to CEDA. MBS is the Chairman of CEDA as well as PIF. Board members of PIF are appointed by Royal Order. The majority of PIF board members are from the CEDA Board. CEDA exercises the "broadest powers and authorities" over PIF. Mr. Mallett opined that this means that control by CEDA over PIF may take any form and may concern any matter, including daily operations. In summary, any decision taken by MBS cannot be opposed by PIF or CEDA, except by way of being overruled by the King.

[65]    Finally, Mr. Mallat stated that it is clear that companies owned by PIF (such as the Group Companies) could not bring an action of this significance inside or outside Saudi Arabia "without the active involvement of the Crown Prince."

### 3.   The Affidavit of Joseph Black

[66]    Joseph Black ("Mr. Black") provided an expert opinion by way of an affidavit sworn on February 1, 2021. He does so based on his expertise as a former CIA officer.

[67]    Mr. Black stated that the ascent by MBS to the role of Crown Prince in 2017 has resulted in KSA becoming subject to one-man rule. Since MBS's father is in poor health, nothing occurs in any branch of Saudi government without MBS's authority. In his role as Crown Prince, he has authority over all state-owned entities, including PIF as well as the criminal justice system. As head of the criminal justice system, he can appoint and remove judges at will, initiate a criminal investigation into anyone in the KSA and order extra-judicial detention.

[68]    Mr. Black worked with MBN and Dr. Saad on joint U.S.-Saudi counterterrorism initiatives. His opinion is that Dr. Saad was highly regarded in the U.S. as being responsible for thwarting several terrorist plots in the Middle East and the U.S. This role meant that Dr. Saad had access to significant security and sensitive information, which made him a target for MBS. MBN is a target of MBS for similar reasons. Mr. Black was aware of the Interpol Red Notice issued in relation to Dr. Saad and sent a letter to Interpol in support of its removal.

[69]    Like Mr. Mallat, Mr. Black opines that PIF would not make significant decisions without MBS's knowledge and that MBS likely had direct involvement in the commencement of this action.

### The Position of the Plaintiffs

[70]    The evidence of the Plaintiffs comes primarily from Mr. Abdulaziz H. Al Fahad ("Mr. Fahad") and Mr. Abdulaziz Alnowaiser. Mr. Fahad is an expert retained by the Plaintiffs' counsel for the *ex-parte* motion and who delivered an expert's report dated January 17, 2021 and an

affidavit in response to Mr. Mallat's report. Mr. Abdulaziz Alnowaiser is the CEO of TIC. He provided an affidavit sworn January 18, 2021 for the *ex parte* hearing and a supplementary affidavit in response to the John Lever affidavit (on the Canadian Companies' motion) and in response to Dr. Al Jabri's affidavit.

[71]     The position of the Plaintiffs is that all of the Orders granted on January 22, 2021 should continue. All material facts and defences were disclosed. The fact remains that there is substantial evidence of fraud before the court. The political backdrop to this litigation is just that, a part of the factual matrix but not a basis to set aside the Orders. Dr. Saad has failed to put any real focus on the merits of the allegations but instead wants the court to focus on a now dated Interpol complaint, unrelated U.S. litigation and the politically negative aspects of the MBS regime.

[72]     The Plaintiffs urge the court to focus on the corporate fraud complaints and to question Dr. Saad's complaints about fear for his safety and well-being. Dr. Saad's factum confirms that he currently retains 24/7 private security. Various affidavits from process servers reveal that when attempting service, the gate at the Bridle Path residence was opened for them and the front door was answered. The Plaintiffs also take issue with Dr. Saad's insistence that his home at the Bridle Path is registered to a corporation in order to disguise his home address when bank records obtained from TD Bank, Scotiabank and a New York bank clearly show the Bridle Path address as Dr. Saad's home address.

[73]     The Plaintiffs' position is that much of Dr. Saad's supporting evidence is made up of newspaper clippings and unreliable experts. It is not a material non-disclosure to omit the fact that Dr. Saad is allegedly being persecuted by the current Saudi regime. That is a political issue and not a material fact related to the fraud claims.

[74]     The Plaintiffs urge the court to reject Mr. Black's evidence entirely. He last worked in intelligence 17 years ago but assured the court that he 'keeps up to date.' Mr. Black does not state what his expertise is, does not provide a copy of any engagement letter, was not given a copy of the Deloitte report and was not given any factual assumptions. The sources of much of the information in his affidavit are simply unknown.

[75]     Contrary to Dr. Saad's position, the court was made aware of both the Interpol Red Notice and its withdrawal, as well as the U.S. litigation. The Plaintiffs should not be held to a standard where they are required to engage in a rhetorical discussion of possible defence positions. Further, the Plaintiffs always made it clear to the court that they do not represent the KSA or MBS. Even if MBS is the controlling mind of either or both of PIF and TIC, the Plaintiffs query whether this is legally relevant as they are legitimate businesses in their own right and should not be precluded from pursuing recovery from frauds perpetrated against them.

[76]     The Plaintiffs also urge the court to be wary of accepting Mr. Mallat's evidence, which they submit is in large part compiled from sources such as the BBC's website and news articles. The Plaintiffs argue that Mr. Mallat's opinion is a political piece dressed up as a legal opinion.

[77]     The Plaintiffs remind the court that Dr. Saad continues to avoid dealing with the allegations against him head-on.  Apart from the fact that he has not filed an affidavit, unreasonable restraints were placed on the Plaintiffs' counsel when attempting to examine Dr. Saad on what the Plaintiffs describe as "generic" declarations of assets which fail to provide the detail envisioned by the *Mareva* Order.

[78]     Dr. Saad's supplementary declaration of assets was delivered a mere 30 minutes before his examination was set to begin. The main admission received during the examination was that Dr. Saad has gifted hundreds of millions of dollars in assets, bank accounts and shares to his son Mohammed Al Jabri. Where those assets are is not known. Dr. Saad admitted that he began transferring assets to Mohammed Al Jabri in 2017 and that, but for the *Mareva* Order, he would have continued to transfer assets to his son. Without the continuation of the *Mareva* Order, the Plaintiffs argue there is a real risk of further dissipation of assets by Dr. Saad.

[79]     Dr. Saad refused to answer any questions about what assets had been transferred to Mohammed Al Jabri (or any of Dr. Saad's other children) or the circumstances of those transfers, and would only answer questions related to the assets he owned as of the date he received the *Mareva* Order.

[80]     As the court was told during the *ex-parte* hearing, Mohammed Al Jabri was named by his father as a 50% nominee shareholder of the Plaintiff companies Enma Al Ared and New Dawn Contracting while he was a student.  He received 1% of the annual net profits from those companies despite having no actual interest in them. Mohammed El Jabri received $3,680,000 USD by way of those profits. It is not known if he retained those profits or paid them to his father.

[81]     Mohammed Al Jabri also manages one of Dr. Saad's U.S. corporations which owns five luxury condominiums in Boston, Massachusetts. It is alleged that that corporation also received misappropriated funds. The Deloitte report, referred to extensively in this Court's January 27, 2021 Reasons, shows transfers from Dr. Saad to Mohammed Al Jabri of $4.8M USD. He has received potentially another $480M USD by way of the deed of gift revealed at Dr. Saad's examination. Mohammed Al Jabri may be liable for breach of fiduciary duty, conspiracy, fraud and other related claims if his father has transferred large amounts of misappropriated funds to him as part of the fraudulent scheme.

[82]     The Plaintiffs seek an Order that the *Mareva* Order apply to Mohammed Al Jabri on the basis that the *Mareva* Order specifically includes assets owned by Dr. Saad but which may not be in his name. Mohammed Al Jabri submits this court has no jurisdiction to make Orders against him as he does not live in Canada, has no connection to Ontario and has not attorned to the jurisdiction.

[83]     The Plaintiffs seek to continue the current Orders but cannot enforce them outside of Canada without letters of request to the relevant judicial authorities in other jurisdictions. The Plaintiffs have provided drafts of those letters of request for consideration by the court.

*1.  The Evidence of Mr. Fahad*

[84]    Mr. Fahad, the Plaintiffs' legal expert did not agree with Mr. Mallat's report. Specifically, he commented on Mr. Mallat's opinion as to the structure and control of TIC and PIF. Mr. Fahad's evidence was that TIC is the sole shareholder of each of the Group Companies. TIC is governed by its own board of directors and is the sole shareholder of PIF. Each has a separate legal personality.

[85]    PIF has had a separate legal personality since April 2019 when a Royal Decree removed it from the control of the Ministry of Finance and granted it independence. PIF is free to invest and dispose of assets both within and outside the KSA and to enter into contracts in its own name. The Chair of PIF's Board of Directors is MBS but the Chair has no authority and no casting vote. The Board of Directors of PIF has authority to manage PIF's affairs without approval from the government.

[86]    Mr. Fahad disagrees with Mr. Mallat on the authority of CEDA with respect to PIF. According to Mr. Fahad, CEDA has no authority to issue any decisions except in the form of recommendations to the full Council of Ministers. All such recommendations are subject to the King's approval. While it is true that MBS chairs CEDA and PIF he has no authority to impose decisions on those entities. In summary, CEDA does not exert control of PIF or the companies it owns. Mr. Mallat's contrary conclusion in this regard is not supported by the relevant law in the KSA.

### Legal Analysis on the Set Aside Motions Brought by Dr. Saad

*The Governing Legal Principles*

[87]    The law is clear that a party who seeks extraordinary relief in the form of an *ex parte* injunction (including a *Norwich* Order) must make full and frank disclosure. The reason for this is clear. The judge hearing the *ex parte* motion must have all of the factual and legal contentions which would be advanced by the opposing party available or an injustice is likely to be done to the absent party.

[88]    As Sharpe J. (as he then was) set out in *United States v. Friedland*, [1996] O.J. No. 4399 (Gen. Div.), at para. 27 [*Friedland*]:

> …the law imposes an exceptional duty on the party who seeks *ex parte* relief. That party is not entitled to present only its side of the case in the best possible light, as it would if the other side were present.  Rather, it is incumbent on the moving party to make a balanced presentation of the facts in law.  The moving party must state its own case fairly and must inform the court of any points of fact or law known to it which favour the other side.  The duty of full and frank disclosure is required to mitigate the obvious risk of injustice inherent in any situation where a Judge is asked to grant an order without hearing from the other side.

[89]     However, the duty of full and frank disclosure cannot be interpreted in a forced or stilted manner. In addressing the manner of interpreting the test, Sharpe J. went on in *Friedland* to say:

> The duty of full and frank disclosure is, however, not to be imposed in a formal or mechanical manner… A plaintiff should not be deprived of a remedy because there are mere imperfections in the affidavit or because inconsequential facts have not been disclosed. There must be some latitude and the defects complained of must be relevant and material to the discretion to be exercised by the court.

[90]     It is also a well-formed part of the law in this area that Dr. Saad and the Canadian Companies are not required to show that the outcome of the *ex parte* motion would have been different if the additional material had been disclosed: see *Bennett Estate v. Iran*, 2013 ONSC 6832, 368 D.L.R. (4th) 500 [*Bennett Estate*]. In *Bennett Estate*, at para. 18, citing *Euro United Corp. (Interim Receiver of) v. Rehani*, [2003] O.J. No. 2426 (S.C.), at para. 11, set out the duties of a moving party on an *ex parte* motion:

(i)      Material facts are those of which the court must be made aware in arriving at a decision, non-disclosure of which may have affected the court's approach to the motion, made the decision doubtful, or affected the outcome of the motion;

(ii)     This duty of a balanced presentation of facts and law extends not only to absent parties, but also to those who may be affected by the order;

(iii)    In making full and frank disclosure of the relevant facts, the plaintiff must include facts which may explain the defendant's position, if known to the plaintiff. The onus on the plaintiff to make full and complete disclosure is not discharged by disclosing only what is the most limited basis of information that may be relevant. Full disclosure may and often will require a plaintiff to advise the court of matters of both fact and of law which form the position of the other side;

(iv)    It is insufficient for a plaintiff to simply append a document as an exhibit without highlighting in the body of the affidavit itself any important clauses or portions of the exhibits;

(v)     The test of materiality is an objective one. In the *United States of America v. Friedland* the court quoted the following passage from the English text, Gee, *Mareva Injunctions and Anton Piller Relief* (3d Edition 1995 at p. 97):

> ... The duty extends to placing before the court all matters which are relevant to the court's assessment of the application, and it is no answer to a complaint of non-disclosure that if the relevant matters had been placed before the court, the decision would have been the same. The test as to materiality is an objective one, and it is not for the applicant or his advisers to decide the question; hence it is no excuse for the applicant subsequently to say that he was genuinely unaware, or did not believe, that the facts were relevant or important. All matters which are relevant to the 'weighing

> operation' that the court has to make in deciding whether or not to grant the order must be disclosed.

(vi)    If a finding is made of material misrepresentation or material non-disclosure the court is not stripped of all of its discretion but, generally speaking, the *ex parte* order will be set aside.

*Analysis*

[91]    This court must determine whether, in applying the above principles, the Plaintiffs fairly presented their case. The fact that they alluded to the U.S. litigation and the Interpol Red Notice is not enough according Dr. Saad. The Plaintiffs were obliged to highlight that information and present a balanced case. While I find that the Plaintiffs did not make extensive reference to some of the documents and areas of complaints referred to by Dr. Saad, the deficiencies are either immaterial or not sufficient to have breached the requirement of full and frank disclosure.

[92]    Addressing Dr. Saad's complaints in turn, I reference the following.

### 1.   Alleged Mischaracterization of the Group Companies

[93]    Dr. Saad complains that the Plaintiffs have mischaracterized the purpose of the Group Companies. They were not established to further counterterrorism activities. They were intended to engage in actual commercial activity as a cover for counterterrorism.  This is why the Group Companies were not owned by the KSA and why funds for the companies were paid to MBN personally who then paid the Group Companies. There was deliberate "murkiness" in the financial arrangements of the Group Companies to ensure concealment of the Royal Family's involvement.

[94]    For example, the use of nominee shareholders was necessary as Saudi government officials could not hold roles in the Group Companies without revealing the involvement of the Royal Family. The top-secret nature of the operations of the Group Companies explained the poor record keeping practices and the accounting irregularities. The court was not directed to these important facts as the Plaintiffs failed to highlight that Dr. Saad was not involved in the Group Companies in a commercial context.

[95]    The problem with this position is the evidence provided by the Plaintiffs that some $194M USD was transferred to Dr. Saad after he left the government in September 2015. Table 5.0 in the Deloitte report dated January 18, 2021 (page 21) clearly traces only 180M Saudi Riyal ("SAR") to Dr. Saad while he was working for the Saudi government.

[96]    At page 109 of the Deloitte report, tracing of Dr. Saad's account statements also showed that he received over 114,000,000 SAR directly from MBN between March and May 2017—almost two years after he had left the Saudi government and while living in Turkey.

[97]    I agree with the Plaintiffs' submission that any argument related to murkiness or poor record keeping on the part of Dr. Saad is hard to reconcile when a large part of the traced funds were removed after Dr. Saad was asked to leave his position in the KSA government.

[98]     I also agree with the Plaintiffs that the affidavits of Dr. Al Jabri do not adequately explain any of the alleged fraudulent activities. While not required to respond to the merits of the case, Dr. Saad (through his son's affidavit) has merely glossed over the Deloitte report. Without an affidavit from Dr. Saad, the Plaintiffs were left without a means to fully explore the issues raised by his counsel.

[99]     Further, and contrary to Dr. Saad's assertions, the court was made aware of the fact that the Group Companies were established pursuant to a Royal Instruction and that funds were allocated to them by the KSA Ministry of the Interior for counterterrorism activities. This is clearly set out in the Plaintiffs' factum which was before the court on the *ex parte* motion.

[100]    While nominee shareholders may have been necessary to ensure that the Group Companies were distanced from the KSA government, it remains a question as to why Dr. Saad's spouse, children, relatives and friends were named as such nominee shareholders, especially where the nominee shareholders received profits from the Group Companies without performing any services for them.

[101]    Finally, with respect to the murkiness and poor recording keeping as an explanation for the secrecy required for the counterterrorism activities, there is a limit to such disorder when dealing with the large amounts of money that flowed through the Group Companies. For example, payments made to Dr. Saad, his family and friends from Sakab, totalling over $848M USD, were accounted for by handwritten notes or undated and unsigned Excel tables without explanations for the payments. "Rewards" for board members of Alpha Star, Security Control Company and Technology Control Company ("TCC") were recorded in handwritten notes, and profits were paid out based on "valuations" which appeared to bear no relationship to reality or based on the company's actual net profit. These are only some of the examples. Many more appear in the Deloitte report. Poor record keeping might have been a way of covering up counterterrorism expenditures while MBN and Dr. Saad were working in the government, but this cannot explain the large amounts paid out to them and Dr. Saad's family and friends after they left.

   *2.   Failure to Disclose the Expropriation of the Group Companies by PIF*

[102]    Dr. Saad highlights that the Plaintiffs allege that MBN was a co-conspirator and even that Dr. Saad was acting on his direction, yet they have not named MBN as a defendant nor sought to freeze his bank accounts. And further, that the "transfer" of the Group Companies from MBN's control to PIF is simply glossed over by the Plaintiffs and the involvement of the SACC in that expropriation is not mentioned. Dr. Saad submits that if there was a fraud, which he denies, the victim of the fraud is the KSA, not the Plaintiffs.

[103]    The involvement of MBS with respect to the change of control of the Group Companies has been overstated in terms of a defence which ought to have been highlighted by the Plaintiffs in the context of this motion for following reasons:

   a.   The evidence of Mr. Fahad, the Plaintiffs' legal expert, confirms the right of the Plaintiff companies to bring this action, if they allege that they have suffered

damages. The companies allege that they have been defrauded. Neither MBS nor PIF is making such an allegation.

b. Mr. Black opines that he does not have direct knowledge of the workings of the PIF but states he is aware that the PIF is controlled by CEDA which is led by MBS. He then, remarkably, concludes that it would be unlikely that the PIF would make significant decisions without MBS's knowledge. He also is able to conclude (without reference to any materials or expertise) that this action could not have been commenced without MBS's involvement. I cannot give significant weight to Mr. Black's evidence. He did not provide a statement setting out his actual expertise or provide a proper expert's report. He has not been working at the CIA since 2004 and claims to have gained his knowledge about the contemporary internal workings of the Saudi government by simply keeping up with the news. I agree with the Plaintiffs that these facts, and the fact that Mr. Black was apparently not given a copy of the Deloitte report, seriously detract from any weight this court should give his evidence.

c. Mr. Alnowaiser's affidavit of January 18, 2021 clearly sets out that the Group Companies have been operated by a holding company (TIC) since February 2018 and that he is the CEO of TIC. It was never hidden from the court that TIC was owned by PIF. Whether PIF is a sovereign wealth fund (as the Plaintiffs contend) or an entity controlled at the whim of MBS remains in issue. That, however, does not derogate from the right of the Group Companies to bring an action in their own right.

d. The Plaintiffs have always made it clear to the court they do not represent either the KSA or MBS.

3. *The Alleged Failure to State Alternative Positions Advanced by Dr. Saad in the U.S. Litigation*

[104]   Dr. Saad complains that there was minimal reference to his Complaint in the U.S. litigation. His Complaint sets out alternative positions on many issues which should have fairly been put before the court on the *ex parte* motion.

[105]   First, it should be made clear that the U.S. Complaint was adverted to at the *ex parte* hearing, as well as allegations that Dr. Saad had been the subject of political persecution, that there had been an attempt on his life, and that his children Sarah and Omar were detained in the KSA.

[106]   With respect to why Dr. Saad left the KSA, he submits that his U.S. Complaint states he fled the KSA for his own safety, while this court accepted the information given by the Plaintiffs at the *ex parte* hearing that he fled the KSA to avoid investigation. Both statements are true. The texts from MBS produced at the *ex parte* hearing make it clear that if Dr. Saad had returned to the KSA when he was in Turkey, he would certainly have become the subject of investigation by MBS and his government.

[107]   Dr. Saad complains that the Plaintiffs told the court that the Bridle Path property was not put in his name for nefarious reasons and failed to highlight the reasons behind the title holding as set out in his U.S. Complaint. The court had accepted the Plaintiffs' information as set out in the January 27, 2021 reasons.

[108]   First, the Plaintiffs' factum, which was before the court on January 22, 2021, simply recites that the Bridle Path property was purchased by a numbered company for cash. The January 27, 2021 Reasons recite the same facts and go on to find that there were proper grounds for granting a CPL due to an inference that the property was purchased with misappropriated funds. That is different from finding that Dr. Saad held title by way of a numbered company for nefarious reasons.

[109]   Dr. Saad submits that the Plaintiffs alleged that Dr. Saad obtained Maltese citizenship in order to hide assets and possibly relocate, if needed. He does not hide this fact in the U.S. Complaint and provides an explanation that he obtained this citizenship for him and his family due to arbitrary travel restrictions put on him and his family by the KSA.

[110]   Dr. Saad is correct that the court was not provided with this alternate explanation for Maltese citizenship at the *ex parte* motion. Dr. Saad is also correct that this fact was presented by the Plaintiffs in such a way as to infer that Dr. Saad was a flight risk and easily able to move assets to another country. With respect to his ability to move assets, Dr. Saad already has real property and investments all over the world. The fact is he could have moved assets anywhere (not just Malta) at any time. With respect to the possibility of relocation, it is true that a reference to the U.S. Complaint explanation likely should have been made.

[111]   However, as per *Friedland,* the test of materiality cannot be applied mechanically. There was a massive amount of information presented to the court on January 22, 2021, over most of a day. The real reasons for Dr. Saad obtaining Maltese citizenship are not sufficiently material to reach the threshold of a breach of the duty of full and frank disclosure. In any event, Dr. Saad remains in Canada and has lived here for almost four years. He could have relocated to Malta at any time during the four years but did not.

    *4.   The Alleged Failure to Disclose Interpol's Decision that the Corruption Charges were Politically Motivated*

[112]   Dr. Saad insists that the court's attention should have been drawn to three things in relation to the CCF's decision to remove the Red Notice:

    a.   That the charges against Dr. Saad in the CCF decision are strikingly similar to the allegations made by the Plaintiffs in this case,

    b.   That the CCF accepted that Dr. Saad was of political interest to MBS, and

    c.   That the charges against Dr. Saad were politically motivated.

[113]   While the CCF decision was contained in the Plaintiffs' Motion Record on January 22, 2021, it was at page 6777 and not drawn to the attention of the court. Dr. Saad submits it was imperative for the court to be advised that the prosecution was overseen by the SACC and part of MBS's strategy to target all political rivals.

[114]   It is quite true that there is no reference at all to the Interpol decision in the Reasons dated January 27, 2021. While it was mentioned at the *ex parte* hearing, it was a passing reference in the context of a significant amount of other material. In the end, however, this court fails to see the significance of the CCF decision with respect to the issues on this motion.

[115]   Reports of the political persecution of Dr. Saad were referred to in both the materials and oral submissions at the *ex parte* motion. The palace coup in 2017 and subsequent actions of MBS have been widely reported in the press. However, this is a case about an alleged fraud perpetrated by Dr. Saad while he was working in the KSA up to 2015 (and an allegation of funds continuing to be funnelled to him and others until 2017). The Interpol decision related to criminal charges being pursued against Dr. Saad by the KSA. Further, the CCF did not deal with any evidence but mentions in passing a reference to there being serious evidence of fraud (paras 60). The conclusion of the CCF decision is related to the politics behind the Interpol Red Notice, an issue which assists Dr. Saad.

[116]   I agree with the Plaintiffs with respect to the Interpol matter. The court was advised at the *ex parte* hearing of the Interpol complaint and the fact that the CCF removed it. The court was made aware, in general, of the political landscape in the KSA and Dr. Saad's treatment by MBS. While the reasons for the removal were not highlighted to the court, I do not find that to be objectively material with respect to the test for full and frank disclosure.

### 5.   The Alleged Failure to Disclose MBS's Control of this Litigation

[117]   Dr. Saad's main complaint is that the case was presented to the court on January 22, 2021 as a commercial dispute when in fact the PIF (which owns TIC and indirectly the Group Companies) is chaired and controlled by MBS. MBS's pursuit of Dr. Saad continues with a highly publicized motion in the U.S. in which he is attempting to dismiss Dr. Saad's Complaint. Both of Dr. Saad's experts conclude that it is inconceivable that MBS is not behind this lawsuit.

[118]   Mr. Mallat's conclusion that MBS runs the daily affairs of the KSA, given the King's poor health, the movement of PIF into MBS's direct control and MBS's exercise of political control of his enemies via the SACC, was critical evidence that should have been placed before the court in the course of the *ex parte* proceeding.

[119]   Dr. Saad submits that the evidence of his experts is unchallenged and must stand. However, I have already rejected the evidence of Mr. Black as set out above. With respect to Mr. Mallat, he is clearly not objective about the KSA or MBS. He supports his opinions with excerpts from the BBC and *The New York Times.* Despite his sources, Mr. Mallat's conclusions about MBS's involvement in the PIF and his overall control of the KSA government may well be true. But even if they are, what is the consequence in the context of this motion?

[120]   The answer lies, in part, with the decision of Penny, J. in *Petrochemical Commercial Company International Ltd. v. Nexus Management Group SDN BHD,* 2019 ONSC 1142. In that case, the court issued an *ex parte Mareva* Order over the holdings of the corporate Respondents. On the return motion, the Canadian Respondents attempted to set aside the Order on two grounds, one of which was the non-disclosure of material facts at the *Mareva* hearing.

[121]   That case also involved an alleged fraud. The Respondents complained that the true nature of the Applicant company had not been disclosed: the company was actually controlled by the government of Iran or a clandestine branch of the government which facilitates international terrorist operations and was on a U.S. sanctions list. The Respondents argued this serious non-disclosure was sufficient to set aside the *Mareva* Order.

[122]   The court disagreed. It held, at para. 17, that:

> Even if PCCI was owned or controlled, or acted for or on behalf of, the Iranian government, I would not regard this, standing alone, as the omission of a relevant fact…Further, government owned entities are as exposed to fraudulent activity as non-government entities and, absent other factors, are equally entitled to the protection of the civil law in the face of such activities.

[123]   In this case, neither party disputes that the Group Companies engage in legitimate business activities (even if a cover for other activities). As Mr. Fahad has stated, they have a right under the civil law to pursue their claims against Dr. Saad. Whether the Group Companies are controlled by MBS does not affect that right as per the *Petrochemical* decision above.

*Summary*

[124]   In summary, I find that Dr. Saad has not proven any non-disclosure that is objectively and sufficiently material to displace the current *Mareva* and *Norwich* Orders as they relate to him.

## THE SET ASIDE MOTION OF THE CANADIAN COMPANIES

### *Background*

*The Canadian Companies*

[125]   The Defendant Canadian Companies (CGI, Gryphon and Infosec, referred to in this section as "the Canadian Companies") seek to set aside the *Norwich* Order and the Receivership Order granted on January 22, 2021 and continued on February 1 and 19, 2021, as well as Hainey J.'s *Norwich* Order granted in December 2020.

[126]   Mr. John Lever ("Mr. Lever") provided evidence on behalf of the Canadian Companies. He has been the COO of CGI and Gryphon since 2017 and is familiar with the operations of the Canadian Companies.

[127]   CGI was founded in 1997 by Nagy Moustafa ("Mr. Moustafa"). It is headquartered in Toronto. CGI acquires companies in the cybersecurity market, helps them grow and then sells them. Mr. Moustafa is the CEO and majority shareholder of CGI.

[128]   Infosec was founded in 2009 by Mr. Moustafa. It provides its clients with support and management of their secure communications systems. Gryphon was founded in 2014 and has an office in Toronto. Gryphon provides hardware for cybersecurity issues in tandem with Infosec.

[129]   Mr. Lever's evidence is that the Companies "operate in markets that involve highly confidential and sensitive information concerning cybersecurity solutions and security risks for clients nationally and around the world." The Companies have various subsidiaries which are also affected by the relevant Orders.

[130]   In 2007, the Companies identified international opportunities, including in the Middle East and Saudi Arabia, for cybersecurity technology. According to Mr. Lever, in 2012 Infosec and TCC entered into an agreement to present a bid to the KSA Ministry of the Interior ("MOI") for what became to be known as the Atlas project. That project was intended to result in the building of a countrywide infrastructure for wireless, voice and radio encrypted transmission. An initial payment of $300,000 USD was required to be paid to Infosec.

[131]   As work continued through 2015, Infosec issued invoices to TCC and was paid. In 2016 TCC stopped paying Infosec's invoices. By August 2017, Infosec was owed $3.8M USD for invoices rendered and completed work. Infosec commenced a claim in this court which was settled in February 2018. Infosec's claim was discontinued.

[132]   In December 2015, Gryphon entered into an agreement with the Plaintiff company Saudi MAKSAB Holding Co. ("MAKSAB") to prepare a bid to the KSA MOI to provide secure mobile communication infrastructure. Gryphon received funds from MAKSAB for the infrastructure provided pursuant to their agreement.

[133]   In 2016, Gryphon entered into a contract with the Plaintiff company Sky Prime Investment Company ("Sky Prime") to provide certain secure mobile communications solutions and in 2017, Gryphon also entered into an agreement with the Plaintiff company Tawari Information Technology Company for certain products and services. Gryphon rendered invoices and was paid for its services.

[134]   Certain subsidiaries of the Companies also entered into agreements with TCC and received payments for their services.

*QFive*

[135]   According to Mr. Lever, in August 2013, QFive invested $8M USD into CGI in exchange for 400,000 shares and a 29% ownership stake. On July 20, 2020, 2767143 Ontario Inc., a company wholly owned and controlled by Mr. Moustafa, purchased QFive's shares in CGI for $8M USD. Therefore, QFive no longer owns any shares in CGI or any of the Canadian Companies and their subsidiaries.

[136]   In 2017, Dr. Saad, through one of his companies, loaned funds to Gryphon based on what he saw was good development potential for Gryphon in the KSA. Mohammed Al Jabri was appointed as Director of Gryphon and Dr. Saad was employed as their Executive Vice-President of Infosec. Infosec assisted Dr. Saad with his Visa request to Canada under the temporary foreign worker program. Mohammed Al Jabri resigned as a Director of Gryphon in November 2019 and the loan to Gryphon is now held by Golden Valley Management Ltd.

*The Plaintiffs' Incorrect Allegations and Confidentiality Issues*

[137]   Mr. Lever deposed that Mr. Alnowaiser, on behalf of the Plaintiffs, is incorrect in his affidavit when he states that there was no legitimate reason for payments made to "corporations of interest." The Companies had legitimate contracts with the KSA for which they were paid.  Mr. Lever was surprised that Mr. Alnowaiser was not aware of this or the fact that Infosec sued TCC when he was the General Manager of the Plaintiff companies, which included TCC.

[138]   The allegation that Dr. Saad is "behind" the Companies is also false. As stated above, the Companies were all founded by Mr. Moustafa and have never been controlled in any way by Dr. Saad.

[139]   The Canadian Companies and their subsidiaries work for large enterprises, including state governments. Such clients require robust cybersecurity systems to defend against debilitating attacks on essential services. The disclosure of the names of individuals who do work for the Companies and have valuable information could pose an unacceptable security and reputational risk to their government clients. The clients must be able to be assured that their highly confidential information is kept secure.

[140]   The banking records from Canadian and Swiss banks, which are required to be disclosed pursuant to the *Norwich* Order dated January 22, 2021, could be used to identify both individuals and transactions. This will cause national and personal security concerns for the clients of the Canadian Companies. Further, the disclosure of such information risks reputational damage and competitive business concerns for the Companies.

**The Positions of the Parties**

*The Canadian Companies*

[141]   The Canadian Companies seek to set aside the *Norwich* and Receivership Orders as well as the *Norwich* Order granted by Hainey J. on December 18, 2020. Dr. Saad also seeks to set aside the Receivership Order on the grounds that the relevant shares are no longer held by QFive.

[142]   As will be detailed below, the Canadian Companies make two main arguments. The first is that the disclosure of the significant material covered by the *Norwich* Order creates significant security and competitive business concerns.

[143]   Second, the Plaintiffs did not fairly disclose all relevant information to the court as they were required to do. Specifically, it is inconceivable that Mr. Alnowaiser, as the CEO of TIC, could not have been aware of legitimate, contract-based payments to the Canadian Companies.

Claiming that there was no legitimate reason for such payments is simply disingenuous. This information should have been disclosed to both Hainey J. and Gilmore J. for their consideration in relation to the *Norwich* Order.

[144]   It is only in his reply affidavit that Mr. Alnowaiser sets out that he spoke to the current CEO of TCC and learned about the litigation between TCC and Infosec, invoices from subsidiaries of the Canadian Companies and invoices from Gryphon to Sky Prime. Dr. Saad's position is that Mr. Alnowaiser was not in a position to swear, as he did in his affidavit of January 18, 2021, at para 356, that he had made full disclosure when he had failed to make simple enquiries about transactions between the Canadian Companies and TCC. The non-disclosure is material and significant. The *Norwich* Order should be set aside, and the documents disclosed to date returned.

[145]   As well, the Canadian Companies seek a sealing Order and a confidentiality or Counsels' Eyes Only Order for the material that has already been disclosed (if not set aside) or the material that will be disclosed if they are not successful in having the relevant Orders set aside.

[146]   The Canadian Companies have serious concerns that disclosed bank records contain sensitive information that could be used to subvert security measures and could affect fair competition by the disclosure of customer names and pricing to competitors. They contend that the requirements under the test from *Sierra Club of Canada v. Canada (Minister of Finance)*, 2002 SCC 41, [2002] 2 SCR 522, at para. 53, are met and a sealing order should be granted.

[147]   The Canadian Companies submit that a Counsels' Eyes Only or a Confidentiality Order is also required because the Plaintiffs and the Canadian Companies are competitors. According to the Plaintiffs, the documents are required for tracing purposes, as such there is no need for the clients to be involved in that exercise. No evidence was produced with respect to why the Plaintiffs need to see these documents or how such an Order might impair the solicitor-client relationship.

*The Plaintiffs*

[148]   The Plaintiffs submit that the Canadian Companies mischaracterize themselves as innocent parties caught in the crossfire of this litigation. In fact, the majority of funds invested in the Canadian Companies came from either Sakab or through a company owned by Dr. Saad.

[149]   The relationship between the Canadian Companies, Sakab and QFive bears closer examination. 90% of the capitalization of CGI came from the $8M share purchase by QFive with money from Sakab.

[150]   QFive no longer owns the shares in CGI because they were transferred to a numbered company owned by Mr. Moustafa. The purchase agreement relevant to that transaction shows that the consideration for the transfer was an interest free unsecured promissory note. That is, no actual funds were transferred to complete the transaction. Mr. Lever, in cross-examination, advised that no valuation was done in relation to the transaction. Counsel for the Plaintiffs submits the Receivership Order should not be set aside as the transfer of the shares from QFive to the numbered company was a sham without consideration.

[151]   Mr. Moustafa was the CEO of QFive at the time of transfer of shares to the numbered company. He then resigned. There are no documents in relation to his resignation nor is there an affidavit from Mr. Moustafa about any of the transactions.

[152]   $10M USD was invested in Gryphon by a company controlled by Dr. Saad. There is a convertible loan agreement related to this transaction dated, February 13, 2017, which is able to be converted to a 45% interest in Gryphon. The loan is now held by Golden Valley Management Ltd., a Cayman Islands company. Dr. Al Jabri is on the board of directors of that company. On his cross-examination Mr. Lever refused to answer questions about the beneficial ownership of Golden Valley. In summary, 90% of the funds that went into CGI and 100% of the funds that went into Gryphon came from Sakab.

[153]   It should not be ignored, as well, that Dr. Saad was employed by Infosec who in turn helped him obtain his Canadian residency.

[154]   In response to Dr. Saad's position that Mr. Alnowaiser did not make full and frank disclosure about payments made by TCC to Infosec, the Plaintiffs submit that the basis for the *Norwich* Order against the Canadian Companies was the $8M payment. The Plaintiffs have always maintained that the Canadian Companies received funds misappropriated from the Plaintiffs.

[155]   Finally, Dr. Saad has conflated the required test for a *Mareva* and a *Norwich* Orders. The test for a *Norwich* Order is less stringent than the test for a *Mareva* Order.

[156]   The Plaintiffs require a continuation of both the *Norwich* and the Receivership Orders to fully trace the $8M USD payment. The information which Dr. Saad submits was not disclosed was neither material nor relevant and should not be used as a basis to set aside the Order.

*Analysis*

[157]   The Canadian Companies seek to set aside the *Norwich* and Receivership Orders as well as the Order of Hainey J. from December 2020 on the grounds that the Plaintiffs have failed to make full and frank disclosure relating to the true commercial relationship between the Plaintiffs and the Canadian Companies.

[158]   The main argument put forward by the Canadian Companies is that there were legitimate contracts between the companies and the Plaintiffs explaining why certain payments were made to them. Further, the Plaintiffs' main affiant did not refer to the contracts or the settlement agreement between TCC and Infosec at the *ex-parte* motion.

[159]   Counsel on behalf of the Canadian Companies submit that Mr. Alnowaiser could have made enquiries into both the Plaintiffs' documents and through the Plaintiffs' employees but failed to do so. Mr. Alnowaiser admitted to his failure to make such enquiries at his cross-examination, claiming that the approach taken was a specific one in order to avoid tipping off the Defendants about the investigation.

[160]   The Canadian Companies refer to and rely on the affidavit of Mr. Lever with respect to an explanation for a legitimate basis for the payments to the companies, the type of work done and the agreements made in relation to that work and the subsequent payment for the work.

[161]   Therefore, Mr. Alnowaiser's failure to make enquiries is fatal and material, as the court was unable to fairly assess the propriety of the *Norwich* Orders. As it stands, the *Norwich* and Receivership Orders are inappropriately being used to expedite discovery.

[162]   Further, the shares of CGI are no longer held by QFive and the Canadian Companies allege that the Receivership Order is simply being used as a tool to improperly investigate them.

*Should the Norwich Order and the Receivership Order Continue to Apply to the Canadian Companies?*

[163]   The question this court must ask is whether the Canadian Companies are, as they contend, innocently caught in the crossfire of litigation that should not involve them or whether there is some logical and supportable connection to Dr. Saad.

[164]   The Deloitte report (page 127, at paragraphs 12.36 and 12.38) clearly traces a payment of $8M USD from Sakab to QFive which in turn was used to buy the 400,000 shares in CGI. The $8M USD payment was the majority of CGI's capitalization. There is no mention of this in the Canadian Companies' factum. Those shares have now been transferred to a numbered company for a promissory note without interest, without security and without a valuation.

[165]   There is also the $10M USD that was invested in Gryphon, allegedly by Dr. Saad. The convertible loan in relation to that investment is now held by Golden Valley Management Ltd., a company on which Al Jabri family members sit on the board of directors.

[166]   It is clear that the funds traceable to QFive, CGI and Gryphon are now removed from the Canadian Companies. As the Plaintiffs suggest, this may well be another manner of subverting misappropriated funds by transferring them to yet another "layer", but that is an issue for the hearing on the merits.

[167]   I find that the Companies have legitimate business and security concerns with respect to the effects of the *Norwich* and Receivership Orders on their businesses, as they set out in their factum and as is summarized above.

[168]   With respect to their claims of a breach of a duty of full and frank disclosure, I find that the while the non-disclosure by Mr. Alnowaiser was not material, it changed the factual landscape. Given the facts as currently known by the court, the *Norwich* Order and the Receivership Order are overly broad and must be refashioned.

*Miscellaneous Issues*

[169]   The Plaintiffs seeks an Order that the deemed undertaking rule not apply to any document obtained from the *Norwich* Order. This is a broad and far reaching request. I will, however, grant the alternative relief sought by the Plaintiffs that the deemed undertaking rule should not apply to

documents obtained through the *Norwich* Order to pursue recognition and enforcement proceedings in other jurisdictions. Without such an Order, it will be impossible for the *Norwich* Order to be executed outside of Canada.

[170]   With respect to any of Dr. Saad's Canadian assets, I do not see why the deemed undertaking rule should not apply as there are no special circumstances with respect to those assets.

## **ORDERS**

[171]   Given all of the above, I make the following Order:

a. The *Mareva* Order dated January 22, 2021 as it relates to Dr. Saad shall be continued until further variation or order of the court.

b. The *Norwich* Order and the Receivership Order dated January 22, 2021 and the Norwich Order dated December 18, 2020 shall be set aside as against CGI, Gryphon and Infosec. Any documents already obtained by the Plaintiffs under the *Norwich* or Receivership Order in relation to GCI, Gryphon and Infosec shall be treated as confidential and shall be returned or destroyed as instructed by counsel for CGI, Gryphon and Infosec.

c. The court is prepared to entertain a motion on proper notice to extend the *Norwich* Order to include Golden Valley Management Ltd. and 2767143 Ontario Inc.

d. The QFive *Mareva* Order dated January 22, 2021 is maintained as there was no request made to the court to set it aside or vary it.

e. The *Norwich* Order dated January 22, 2021 shall be amended to include the Plaintiffs' right to trace and seek production of any documents related to gifts from Dr. Saad to his son Mohammed Al Jabri by way of Deed of Gift or any other means.

f. In the event the Plaintiffs seek the additional Orders against Mohammed Al Jabri in their Motion to Vary dated February 16, 2021, a motion on notice with respect to whether this court has jurisdiction to make those Orders shall be scheduled by the Plaintiffs in consultation with Mohammed El Jabri's Canadian counsel.

g. The CPL Order registered against the Bridle Path property shall remain on title.

h. The letters of request directed to the relevant judicial authorities of the British Virgin Islands, the United Kingdom and Guernsey for judicial assistance shall issue.

i. The deemed undertaking rule shall not apply to any documents obtained through the *Norwich* Order in foreign jurisdictions.

Page: 29

    j.    The deemed undertaking rule shall apply to Canadian assets owned by Dr. Saad. He may apply for further Orders in relation to those assets if required and the *Sierra Club* test is met.

    k.    A Case Conference shall be scheduled to determine next steps in this proceeding.

## COSTS

[172]   If the parties cannot agree on costs, I will receive written submissions of no more than 10 pages (double spaced) in length, exclusive of any Bill of Costs or Offer to Settle. All case law, transcript or other references in the submissions must be hyperlinked. Costs submissions are due on a seven-day turnaround, starting with the Plaintiffs and starting seven days from the release of this decision. All costs submissions are to be sent electronically to my assistant at Therese.Navrotski@ontario.ca.

C. Gilmore, J.

**Released:** March 11, 2021

**CITATION:** Sakab Saudi Holding Company v. Al Jabri, 2021 ONSC 1772
**COURT FILE NO.:** CV-21-00655418-00CL
**DATE:** 20210311

# ONTARIO

# SUPERIOR COURT OF JUSTICE

**BETWEEN:**

SAKAB SAUDI HOLDING COMPANY, ALPHA STAR
AVIATION SERVICES COMPANY, ENMA AL ARED
REAL ESTATE INVESTMENT AND DEVELOPMENT
COMPANY, KAFA'AT BUSINESS SOLUTIONS
COMPANY, SECURITY CONTROL COMPANY,
ARMOUR SECURITY INDUSTRIAL
MANUFACTURING COMPANY, SAUDI TECHNOLOGY
& SECURITY COMPREHENSIVE CONTROL
COMPANY, TECHNOLOGY CONTROL COMPANY,
NEW DAWN CONTRACTING COMPANY AND SKY
PRIME INVESTMENT COMPANY

Plaintiffs

– and –

SAAD KHALID S AL JABRI, DREAMS
INTERNATIONAL ADVISORY SERVICES LTD.,
1147848 B.C. LTD., NEW EAST (US) INC., NEW EAST
804 805 LLC, NEW EAST BACK BAY LLC, NEW EAST
DC LLC, JAALIK CONTRACTING LTD., NADYAH
SULAIMAN A AL JABBARI, KHALID SAAD KHALID
AL JABRI, MOHAMMED SAAD KH AL JABRI, NAIF
SAAD KH AL JABRI, SULAIMAN SAAD KHALID AL
JABRI, HISSAH SAAD KH AL JABRI, SALEH SAAD
KHALID AL JABRI, CANADIAN GROWTH
INVESTMENTS LIMITED, GRYPHON SECURE INC.,
INFOSEC GLOBAL INC. and QFIVE GLOBAL
INVESTMENT INC.

Defendants

---

**RULING ON SET ASIDE MOTIONS**

---

C. Gilmore, J.

**Released:** March 11, 2021