# Exhibit D



# Request concerning Saad ALJABRI
(Ref. CCF/R960.17)

## DECISION OF THE COMMISSION
(105th session, 2-5 July 2018)

The Commission for the Control of INTERPOL's Files (the Commission), sitting as the Requests Chamber, composed of:

Vitalie PIRLOG, Chairperson
Petr GORODOV,
Sanna PALO, Vice-Chairperson
Isaias TRINDADE,
Members,

Having deliberated in camera during its 105th session, on 4 July 2018, delivered the following Decision.

## I. PROCEDURE

1. In December 2017, Mr Saad ALJABRI (the Applicant) lodged a complaint addressed to the Commission. Following the submission of all the required documents in accordance with Rule 30 of the Operating Rules of the Commission, the request was found admissible, and the Applicant was informed thereof.

2. In accordance with Article 34(1) of the Statute of the Commission (CCF Statute), the National Central Bureau of INTERPOL (NCB) of the Kingdom of Saudi Arabia was consulted on the arguments set forth in the complaint.

3. On 3 May 2018, the NCB of Saudi Arabia confirmed the validity of the proceedings and of the arrest warrant, and provided answers to the questions raised by the Commission. The Commission further consulted the NCB of Saudi Arabia, which replied to the inquiries addressed.

4. During the study of the Applicant's case, the Commission consulted the NCBs of Canada and the United States in accordance with Article 34(2) of the CCF Statute, on claims set forth in the complaint.

5. Both the Applicant and the NCB source of the data challenged were informed of the fact that the Commission would study the case during its 105th session.

## II. FACTS

6. The Applicant is a national of Saudi Arabia. Between 1976 and September 2015, he occupied numerous public positions within and due to his career at the Ministry of Interior, including State Minister and Chief of Staff. Most notably, the Applicant is known for having been the top Advisor to former Crown Prince and Minister of Interior Mohammad bin Nayef (MBN). He furthermore was member of the Council of Political and Security Affairs (CPSA) and the Council of Economic and Development Affairs (CEDA) from January to September 2015.

7. The Applicant is subject to data registered in INTERPOL's files. A red notice was issued on 9 January 2018 at the request of the NCB of Saudi Arabia for the embezzlement of public funds, abuse of power and money laundering, on the basis of an arrest warrant issued on 12 September 2017 by the Public Prosecution.

8. The summary of the facts, as recorded in the Red Notice in Arabic, is the following: *"In Riyadh in 2015-2016, Saad ALJABRI held a position of authority in the Kingdom of Saudi Arabia, during which he committed an abuse of power, embezzlement of public funds, and money laundering. He was able to flee the country prior to his arrest. Investigations into auditing papers related to public funds revealed*

**NOT INTENDED FOR PUBLIC DISSEMINATION**

*strong elements of the involvement of the individual, with a number of public employees entrusted with public funds, in illegitimate financial gain. Investigations into these financial transactions show the embezzlement of large sums of public funds by him with these employees. Corroborated testimonies were gathered from a number of individuals involved in cases of embezzlement of public funds that worked alongside the individual. They testified that they gained these funds at his direction and planning in an illegitimate manner, in return for facilitating his embezzlement of large funds during his public employment. Investigations proved that they repeatedly and consecutively embezzled funds. After reviewing registers of his property, it was shown that he owns many expensive vehicles and real estate whose value do not correspond to his monthly income. It was revealed that his wealth was derived from his financial embezzlement and abuse of power."*

9. The additional summary of facts, as recorded in the Red Notice in Arabic and verbatim from the arrest warrant, included the following: *"The amount embezzled is in the billions of Saudi riyal, and its exact number has not been established [...]"*

## III. THE APPLICANT'S REQUEST

10. The Applicant requested the deletion of the data concerning him, as well as access to any existing data concerning his immediate family members.

11. He contends in essence that:
    a) the case is of a predominantly political character,
    b) the politicized proceedings to which he would be subject do not respect the principles of due process and human rights, and
    c) the case constitutes a misuse of INTERPOL's channels.

## IV. APPLICABLE LEGAL FRAMEWORK

12. Field of competence of the Commission:

    - Article 36 of INTERPOL's Constitution states that the Commission shall ensure that the processing of personal data by the Organization is in compliance with the regulations the Organization establishes in this matter.

    - Article 3(1)(a) and Article 33(3) of the CCF Statute establish that the powers of the Commission are limited to controlling whether the processing of data in INTERPOL's files meets INTERPOL's applicable legal requirements.

13. Restrictions on communication of information:

    - Article 35(1) of the Statute states that "the information connected with a request shall be accessible to the Applicant and the source of the data, subject to the restrictions, conditions and procedures set out in this article."

    - Article 35(3) of the Statute exhaustively lists the grounds on which the communication of information may be restricted at the request of one of the parties, or on the own initiative of the Commission.

    - Article 35(4) of the Statute states that restrictions on the communication of information must be properly justified and the party requesting the restriction must indicate whether some information such as summaries may be provided instead. Moreover, if the improper justification of a restriction may not lead to the disclosure of the information by the Commission, it may be taken into account while analyzing a request.

14. Matters of political character:

    - Article 3 of INTERPOL's Constitution states that it is "strictly forbidden for the Organization to undertake any intervention or activities of a political [...] character."

- Article 34 of the Rules on the Processing of Data (hereinafter "RPD") states the following:
    - 34(2): "[...] prior to any recording of data in a police database, the National Central Bureau, national entity or international entity shall ensure that the data are in compliance with Article 3 of the Organization's Constitution."
    - 34(3): "To determine whether data comply with Article 3 of the Constitution, all relevant elements shall be examined, such as:
      (a) nature of the offence, namely the charges and underlying facts;
      (b) status of the persons concerned;
      (c) identity of the source of the data;
      (d) the position expressed by another National Central Bureau or another international entity;
      (e) obligations under international law;
      (f) implications for the neutrality of the Organization; and
      (g) the general context of the case."

- Resolution ref. AGN/20/RES/11 (1951) requires applying the predominance test. It states, "[...] no request for information, notice of persons wanted and, above all, no request for provisional arrest for offences of a predominantly political [...] character is ever sent to the International Bureau or the NCBs, even if - in the requesting country - the facts amount to an offence against the ordinary law."

- The INTERPOL Repository of Practice on Article 3 provides guidance on the application of Article 3 of INTERPOL's Constitution in a variety of circumstances.

15. Effective participation of an individual in the acts of which they are accused:

- Article 83.2(b)(i) of the RPD stipulates, "Red notices may be published only when sufficient judicial data has been provided. Sufficient judicial data will be considered to include at least summary of facts of the case, which shall provide a succinct and clear description of the criminal activities of the wanted person, including the time and location of the alleged criminal activity."

- The diffusion addressed by INTERPOL General Secretariat to the NCBs on 5 April 2012 states, "[...] For red notice requests and diffusions seeking the arrest of a person, it is important to provide sufficient facts that link the wanted individual to the charges against him/her. Providing such facts is crucial for facilitating international police cooperation."

16. Lack of due process:

- Article 2(1) of INTERPOL's Constitution states that the Organisation should "ensure and promote the widest possible mutual assistance between all criminal police authorities within the limits of the laws existing in the different countries and in the spirit of the Universal Declaration of Human Rights."

- Article 11(1) of the RPD provides that "data processing in the INTERPOL Information System should be authorized with due regard for the law applicable to the NCB, national entity or international entity and should respect the basic rights of the persons who are the subject of the cooperation, in accordance with Article 2 of the Organization's Constitution and the Universal Declaration of Human Rights to which the said Article refers."

- Article 34 of the RPD requires that "the National Central Bureau [...] shall ensure that the data are in compliance with Article 2 of the Organization's Constitution, and also that it is authorized to record such data pursuant to applicable national laws and international conventions and to the fundamental human rights enshrined in the Universal Declaration of Human Rights."

## V. FINDINGS

17. In reviewing the issues raised, the Commission based its findings on information provided by the Applicant, the NCBs concerned and INTERPOL's General Secretariat.

18. The Commission treats the Applicant's contentions in the order in which they are described in paragraph 11 above. In addition, the Commission decided to study concurrently the issues raised by the Applicant under point B below.

## A. Communication of information

### a) The NCB of Saudi Arabia (NCB source of the data)

19. The NCB of Saudi Arabia requested the Commission neither communicate the existence of a Red Notice against the Applicant nor any other details included in its submissions. Citing Article 35(3)(a) of the Commission's Statute, the NCB grounded its request for non-disclosure on the argument that such information will endanger the ongoing investigations and attempts to apprehend the Applicant. The NCB noted that, were the Applicant to learn of the existence of a Notice against him, it would allow him to avoid travelling to INTERPOL Member Countries, thus lessening the likelihood of his extradition.

### b) Findings of the Commission

20. The Commission underlined that Article 36 of INTERPOL's Constitution, and Article 3(1) of its Statute, make provision for the access to data. It recalled that Article 35(1) of the Statute affirms the principle that "the information connected with a request shall be accessible to the Applicant and the source of the data, subject to the restrictions, conditions and procedures set out in this article."

21. In this connection, paragraph 3 of the same Article provides that the communication of information may be restricted by the Commission at the request of a party to the case, for one or more of the following reasons:
    a) to protect public or national security or to prevent crime,
    b) to protect the confidentiality of an investigation or prosecution,
    c) to protect the rights and freedoms of the Applicant or third parties, or
    d) to enable the Commission or the Organization to properly discharge their duties.

22. Moreover, pursuant to paragraph 4 of the same Article, any restriction on the communication of information must be properly justified and the party requesting the restriction must indicate whether some information, such as summaries, may be provided instead. In addition, if the improper justification of a restriction may not lead to the disclosure of the information by the Commission, it may be taken into account while assessing and deciding on a request.

23. The Commission reaffirmed that, in analyzing the justification of requested restrictions, it tries on the one hand to protect the interests of the parties, while preserving at the same time the essence of an adversarial procedure in order to provide an effective remedy. In doing so, the Commission takes into account, *inter alia*, the general context of the case, the other avenues available to the Applicant to obtain access to the information at the national level, the potential violation of other rules or international obligations, and the possible risks for INTERPOL.

24. The Commission recalled that restrictions under Article 35(3) of the Statute are an exception to the general principle of communication of information, bearing consequences on the rights of the parties, and which must therefore be interpreted strictly. Such restrictions to the communication of information by one party to the other must be necessary and proportionate to their stated purpose, and the Commission itself must be allowed unlimited access to the information concerned in order to make an effective determination. In addition, in order for a decision not to be based solely or decisively on non-disclosed information, counter-balancing measures can be undertaken to compensate, up to the extent possible, the interferences with the rights of the parties.

25. In the present case, the Applicant knows of the existence of data concerning him in INTERPOL's files; however, he does not know their content, which prevents him from fully providing any submission on the specific charges and facts underlying the Red Notice.

26. It considered that the argument presented by the NCB of Saudi Arabia for non-disclosure of any information to be at odds with the commitment of INTERPOL to providing an effective remedy. Indeed, the argument presented by the NCB does not explain how, in a case-tailored manner, it corresponds

to the justification allowed under Article 35(3)(a) of the Statute, and the NCB did not demonstrate the necessity and proportionality of a blanket non-disclosure in the context of this case.

27. It established, further to Article 35(4), that such improper justification would not lead to the disclosure of the data concerned without the consent of the NCB of Saudi Arabia. However, the Commission will take such restrictions into account in its further assessment of the case.

## B. Political character of the case

### a) The Applicant

28. The Applicant explains that the criminal proceedings against him are political insofar as they are tied to the recent 2017 changes in government within Saudi Arabia, and specifically the interests of the son of King Salman, Defence Minister and Crown Prince Mohammed bin Salman (MBS). He claims the proceedings are grounded in two primary objectives of MBS: (a) to silence him as an influential figure within the political spectrum of Saudi Arabia and the Western intelligence community, and (b) to further solidify his *de facto* position as head of the Saudi monarchy.

### Reasons for political targeting

29. The Applicant argues that MBS is pursuing him because of his close association to MBN and perceived political opposition *[RESTRICTED INFORMATION]*

30. Firstly, the Applicant claims that he and MBN were in political conflict with MBS following their appointments to a number of high-level positions with the succession of the late King Abdullah by King Salman in January 2015. Between January and April 2015, the Applicant was appointed State Minister and member to the CPSA and CEDA; MBN, who held the position of Interior Minister since November 2012, was appointed the head of CPSA and Crown Prince, while MBS was appointed Defence Minister, head of CEDA and Deputy Crown Prince.[1]

31. Within their respective roles in government, the Applicant states that there was a palpable dispute where he and MBN disagreed with MBS on a number of foreign policy issues. In particular, the Applicant opposed MBS's policy as Defence Minister to intervene in the Yemen conflict. He claims that his removal from his public positions in September 2015 by King Salman was at the behest of MBS and without the consultation of MBN. Specifically, he claims that his removal was motivated by MBS viewing his policy disagreements as a form of disloyalty, and by MBS wishing to weaken MBN's influence.

32. The Applicant states the criminal proceedings against him were launched in the aftermath of MBS ousting MBN from power, removing him from the royal line of succession by replacing him as Crown Prince, and placing him under house arrest, in June 2017. News reports provided by the Applicant make claims of a contentious relationship between MBN and MBS prior to this change of power.

33. Secondly, the Applicant claims *[RESTRICTED INFORMATION]* In support of this, the Applicant provided excerpts of international and local coverage on his prominent role in security affairs, and a letter from a former Director of Counterterrorism in the United States Central Intelligence Agency, appraising his role in counter-terrorism efforts.

### Means of political targeting

34. The Applicant positions the criminal proceedings against him within the context of what he refers to is a wide-reaching campaign by MBS to silence political opposition under the facade of anti-corruption.

35. The Applicant makes strong reference to the Supreme Anti-Corruption Committee (SACC), created in early November 2017 and headed by MBS. He highlights that SACC holds extensive powers in its official function of combatting corruption, and received international spotlight for arresting dozens of high-level individuals, including princes, ministers, and businessmen within an hour of its establishment. He claims that, since its initiation, SACC carried out its role by freezing over 2,000 bank accounts,

---

[1] In early 2015, King Salman replaced dozens of public bodies with two sub-cabinets, the CPSA and CEDA.

NOT INTENDED FOR PUBLIC DISSEMINATION

detaining at least 500 individuals, and seizing nearly $107 billion from its subjects in financial settlements, a process of which MBN was also subject.

36. The Applicant ties the activities of SACC to his proceedings, arguing that the pretext and modus operandi of the crackdown are shared, with one example of such is that his and his family bank accounts were only frozen after the formation of SACC. He further submits that SACC highlights the context within which his proceedings were launched, specifically in light of how MBS presumably planned in advance for the concurrent detention of dozens of individuals by SACC.

37. The Applicant claims his family has faced various restrictive and extrajudicial measures as forms of undue pressure to bring him under MBS' political control. Specifically, the Applicant outlines that his family members were subject to the following:

    37.1. Since 21 June 2017, his children Sarah and Omar have been prevented from leaving Saudi Arabia,
    37.2. In September 2017, his son-in-law Salem Almuzaini was abducted in Dubai and extrajudicially extradited to Saudi Arabia, where he was held in detention,
    37.3. *[RESTRICTED INFORMATION]*,[2]
    37.4. On 7 and 27 November 2017, the bank accounts belonging to him and his family members were frozen,
    37.5. *[RESTRICTED INFORMATION]*,
    37.6. *[RESTRICTED INFORMATION]*,
    37.7. *[RESTRICTED INFORMATION]*, and
    37.8. At an undefined time, his children Sarah and Mohammed were denied passport renewal service from the Saudi government.

*Misuse of INTERPOL's Channels*

38. The Applicant contextualizes the above in support of his claim that MBS has directed the criminal proceedings against him. *[RESTRICTED INFORMATION]*

39. *[RESTRICTED INFORMATION]* [3]

40. *[RESTRICTED INFORMATION]*

41. *[RESTRICTED INFORMATION]*

42. *[RESTRICTED INFORMATION]*

43. *[RESTRICTED INFORMATION]*

b) *The NCB of Saudi Arabia*

*Evidentiary basis for the charges*

44. In its reply, the NCB of Saudi Arabia explained that the criminal proceedings against the Applicant initiated following the gathering of concrete and effective elements characterizing his participation in the crimes of which he is accused. In conformity with the issued arrest warrant, the NCB stated that such elements include an investigation into his personal wealth, which does not correspond to his government salary, and testimonies from previous work subordinates. The NCB specified that the criminal acts attributed to the Applicant which have been evidenced in their proceedings include:
    - From 2008 to 2015, the Applicant recommended to then Interior Minister MBN to create companies whose profits would proceed to the Ministry, after which he received large funds for their establishment. He then, in conspiracy with the Ministry's deputy for financial and administrative affairs, placed the companies under the name of his nephew Majid Almuzaini and friend Abdullah

---

[2] *[RESTRICTED INFORMATION]*
[3] *[RESTRICTED INFORMATION]*

- Alswelam, in breach of MBN's orders, and in violation of provisions in Royal Decree No. 43 of 1958 on abuse of power.
- From 2010 to 2015, the Applicant exploited his position to have the two aforementioned individuals, as owners of the companies, transfer company funds to his personal bank accounts, which amounts to a violation of provisions in Royal Decree No. 43 of 1958 on embezzlement of public funds.
- Since 2010, the Applicant started laundering money, which is evidenced in a review of his bank statements that show he transferred large sums of the embezzled money to foreign accounts, in particular from 2014 to 2017, in violation of provisions in Royal Decree M/31 of 2012 on corruption.

45. The NCB provided an extensive list of the evidentiary bases for the charges, including:
    - Interior Ministry papers documenting the Applicant's official salary,
    - Testimonies of four accomplices to the Applicant's offence concerning financial corruption,
    - Testimony of the head of investigations in the Public Prosecution,
    - Examination of the Applicant's bank records and the network of bank accounts involved in his embezzlement and money laundering of public funds,
    - Official papers documenting the Applicant's establishment of several companies under the name of the aforementioned individuals, and
    - Interior Ministry contracts and receipts signed by the Applicant for services at prices lower than their value or for services that were never executed.

46. Concerning the exact amount embezzled by the Applicant, the NCB replied that the investigation is ongoing where more information continues to be uncovered that disallow the statement of an exact amount. The NCB added that, thus far, the investigation indicates the Applicant was able to transfer 3,525,017,453.09[4] Saudi riyal to his and his family members' bank accounts between 14 March 2005 and 7 November 2017, and 802,000,000 Saudi riyal to his and his family members' bank accounts in Switzerland, Turkey, Canada and the United States between 2000 to 2017.

### Non-political nature of the case

47. As a preliminary reply to the Applicant's claims, the NCB stated that cases of corruption, and particularly for embezzlement and money laundering, cannot be considered political offences and are subjects of extradition as per international law, citing Article 44(4) of the United Nations Convention against Corruption. It explained that the crime of embezzling public funds necessarily demands that the defendant had political relations, such as that between the Applicant and MBN, and should therefore not protect him from accountability for crimes he committed within his official capacity. The NCB stated the Applicant is "attempting to obstruct justice" and there are no political elements to his case, which is solely driven by the protection of public interest.

48. With regards to the Applicant's relationship to MBN, the NCB clarified that the criminal investigations against him neither included nor were guided by any information concerning his association to MBN, and were initiated prior to the removal of MBN from his public positions.

49. With regards to the Applicant's claims concerning interference from MBS, the NCB claimed that the proceedings are being conducted in accordance with ordinary Saudi law by the relevant juridical officers and the Public Prosecution. It added that such bodies by law have independence from any political authority, and there is no convincing reason to link the criminal proceedings against the Applicant with a political figure.

### Context surrounding the case and SACC jurisdiction

50. The Commission's queried the NCB of Saudi Arabia concerning the contextual period of the initiation of the criminal proceedings, as they were launched two years following the Applicant's removal from office, and several months around MBN's removal from office. In its reply, the NCB explained:
    - the Applicant was removed from his public positions while MBN remained in power, which confirms that there is no link between the procedures against the former with the status of the latter,
    - the Applicant was removed from his public positions after information was gathered by the relevant audit office of his abuse of power for personal financial gain, and

---

[4] This is the equivalent to approximately 939,963,528 USD.

NOT INTENDED FOR PUBLIC DISSEMINATION

- the two-year delay was due to the process of evidence-gathering, including the verification of information that led to his removal, before charges could be officially levied against him.

51. In response to the Applicant's claims concerning SACC, the NCB explained that the Public Prosecution initiated the criminal proceedings against him, including the issuance of the arrest warrant, prior to the establishment of SACC. It added the Public Prosecution made the request for the publication of the INTERPOL Red Notice. It explained that according to Article 2 of the royal decree establishing SACC, any individual involved in a corruption case may be subject to its purview as it finds appropriate. The NCB emphasized this indicates that it cannot know whether the Applicant will have the opportunity to make a financial settlement as others accused in corruption cases before SACC. It furthermore questioned the basis and mandate for the Commission's query in the possibility of the Applicant being subject to SACC, or making a financial settlement, as the relevant information is that he is wanted for a serious crime and will be treated according to Saudi and international laws.

52. In response to the Applicant's claims concerning his family members being subject to collateral restrictive measures, the NCB firstly refuted that any such actions were taken toward them. The NCB in particular highlighted that:
    - His wife and seven of his children are outside Saudi Arabia, in reply to the claim that there is a travel ban against them; and
    - His son-in-law Salem Almuzaini was held in custody for his personal involvement in a separate criminal activity, and he is no longer in custody.

53. Upon further inquiry by the Commission, particularly with regards to any travel ban on the Applicant's children Sarah and Omar, the NCB stated that any such measure would be in accordance with national law. It furthermore added that this issue is irrelevant to the study of the case.

54. Upon further inquiry by the Commission with regards to the freezing of bank accounts of the Applicant's family members, the NCB stated that such are precautionary measures as per the Anti-Money Laundering Law. It stated that the investigations showed the Applicant has 18, and his family members in total have 56, bank accounts inside Saudi Arabia, with credible information that they have been used in facilitating the Applicant's offences. It furthermore questioned the basis and mandate for the Commission's query in the freezing of the bank accounts of the Applicant's family members, stating it is irrelevant to the study of the case.

   c) The NCB of Canada

55. [RESTRICTED INFORMATION] [5]

   d) The NCB of the United States

56. [RESTRICTED INFORMATION]

   e) Findings of the Commission

57. With respect to the assertion that the matter is of a political character, in contravention to Article 3 of INTERPOL's Constitution, the Organization applies the predominance test by evaluating all relevant information and pertinent elements, as provided for by the rules, to determine whether the offense is of a predominantly political character.

58. To that end, Article 34(3) of the RPD provides for the examination of the following key factors which appear to the Commission to be relevant in the present case:
    - the nature of the offense, namely the charges and underlying facts;
    - the general context of the case; and
    - the status of the person concerned.

---

[5] [RESTRICTED INFORMATION]

NOT INTENDED FOR PUBLIC DISSEMINATION

59. The Commission furthermore referred to Article 83.2(b)(i) of the RPD, which conditions that the publication of a Red Notice must be accompanied by "a succinct and clear description of the criminal activities" of the wanted individual. In that regard, the Commission is not in a position to re-examine evidence and make a judgment on the guilt or innocence of a subject of a national court. The Commission, however, it must act within its functions as per Articles 3(1)(a) and 33(3) of its Statute to assess whether the data in INTERPOL's files was processed in conformity with the Organization's rules.

60. In reviewing the applicable criteria under the predominance test, the Commission firstly established that the offences are of an ordinary law nature and punishable under the penal law of Saudi Arabia. In that regard, it agreed with the assessment made by the NCB, in its reference to the UN Convention against Corruption, that the nature of the offence itself is apolitical. The Commission underlined that the charges correspond to the underlying facts as presented by the NCB. It added that the NCB provided extensive information and sufficient elements of the possible concrete and effective participation of the Applicant to the offences of which he is accused, which meet the criteria established in Article 83.2(b)(i) of the RPD.

61. The Commission recalled that the pre-dominance test requires the further evaluation of other elements to determine whether there are indications that the case, overall, is of a predominantly political character. Indeed, it emphasized that this question of political motivation demands that it studies elements beyond whether the offence is of a criminal nature and whether there is sufficient data linking the Applicant to it. In relation to the objection made by the NCB regarding the relevance of its queries to the case, the Commission highlighted that, as per Article 34(3) of the RPD, various other elements, including context, are fundamental to the Commission's ability to assess any political character to a case. This comprehensive assessment is particularly significant in light of how the Commission does not concern itself with the examination, and adjudication on the basis, of evidence.

62. The Commission proceeded to examine the general context underlying the case to study the circumstances and implementation of current anti-corruption efforts within Saudi Arabia in relation to the case of the Applicant.

63. Firstly, the Commission observed that combatting corruption is reported to be a priority within Saudi Arabia, noting a number of international reports that highlight the issue of corruption within the government.[6] The Commission herein recalled that it does not rely on general statements except when they are directly relevant to the case.

64. Secondly, the Commission noted that the Saudi authorities' most recent campaign against this criminal activity is SACC, established in November 2017.[7] The Commission observed that SACC has discretionary jurisdiction over cases of corruption. Specifically, it observed that the body holds extensive powers with regards to such cases; its establishing decree exempts it from "all regulations, legislation, instructions, orders and decisions" and empowers it to investigate, issue arrest warrants and travel bans, freeze assets, take any restrictive measure, or refer cases for criminal proceedings as it finds appropriate. The Commission gathered that, in practice and officially, SACC investigates and detains individuals that are then given a choice for a form of plea bargaining: make a financial settlement or proceed to trial.[8]

65. Preliminarily, the Commission assessed the relevance of SACC to the present case. It recalled that the NCB emphasized it was uncertain whether the Applicant will be offered the opportunity to make a financial settlement before the body. The NCB argued that SACC is irrelevant to the study of the case, given that the Public Prosecution initiated the Applicant's proceedings prior to its establishment.

66. The Commission, however, considered that the operations of SACC are relevant to its overall study of the context underlying the case. The Commission observed that such relevance is apparent in the link between SACC as an entity created in the same period as the proceedings against the Applicant, with

---

[6] A Saudi government official noted that 5 to 10 percent of the annual expenditure of the government, amounting to 10-20 billion USD, was lost on corruption. 60 Minutes, "Saudi Arabia's Heir to the Throne Talks to 60 Minutes," 19 March 2018: <https://www.cbsnews.com/news/saudi-crown-prince-talks-to-60-minutes/>.

[7] SACC officially operates in conjunction with other reforms under the direction of MBS, including a large-scale social and economic program, Vision 2030, that prerequisites a campaign against corruption.

[8] Statement by the Kingdom of Saudi Arabia's Attorney General on the Proceedings of the Supreme Anti-Corruption Committee, 5 December 2017: <https://www.saudiembassy.net/news/statement-kingdom-saudi-arabias-attorney-general-proceedings-supreme-anti-corruption-committee>.

jurisdiction over the same criminal activity attributed to the Applicant, and headed by the same political figure whom the Applicant claims is motivating the criminal charges against him. Further to this, the Commission noted that the Public Prosecutor is a member of SACC and therefore subordinate to its head, MBS, highlighting to the Commission that the proceedings against the Applicant are clearly part of this wider, and therefore relevant, context of a campaign on corruption cases.

67. The Commission underlined that SACC has been the subject of criticism, with reference to the apparent involvement of MBS in its activities. The Commission mapped the available information on SACC as pertaining to three interlinked features of its operations: the selectivity of its subjects, the political nature of its motives, and the lack of due process and human rights guarantees in its procedure.

68. With regards to the selectivity of its subjects, the Commission preliminarily noted the lack of comprehensive data identifying the individuals and reasons why they have been targeted by SACC, which has in turn justified this lack of transparency with reference to privacy laws.[9] From the available information, the Commission observed that subjects thus far have been described as "with a reputation for self-enrichment and those representing rival power centers within the kingdom."[10] The Commission underlined the subjects include leaders within the security, governance and business sectors, and key figures within prominent divisions of the ruling family.[11]

69. With regards to the political nature of its motives, the Commission studied reports on the work of SACC that have linked it to political change and dynamics in Saudi Arabia. Primarily, the Commission noted a view that SACC operates as part of a political strategy by MBS to target any potential political rival or opposition. On the one hand, the Commission considered the official objectives of SACC in its efforts against corruption and statement to establish rule of law. It has furthermore noted that Saudi Arabian authorities declared SACC, following its 2017 targeting of such business and political elite, will eventually reach lower-level cases.[12] On the other hand, it studied analyses signaling that SACC has allowed MBS to further consolidate his already existing political and economic power.[13] It observed that reports have reflected on the selectivity of SACC's subjects thus far as relating to such political motives.[14]

70. The Commission furthermore studied the wider context within which SACC initiated and observed there are elements pointing to major political change. This included the royal decrees removing Interior Minister MBN and restructuring the public prosecution in June 2017;[15] the transfer of security and intelligence responsibilities to a newly created state security body under the direct supervision of the King in July 2017;[16] arrests of over 60 prominent activists, journalists, religious scholars, writers and

---

[9] The New York Times, "Saudis said to use coercion and abuse to seize billions," 11 March 2018: <https://www.nytimes.com/2018/03/11/world/middleeast/saudi-arabia-corruption-mohammed-bin-salman.html>.

[10] The New York Times, "Saudi Crown Prince's mass purge upends a longstanding system," 5 November 2017: <https://www.nytimes.com/2017/11/05/world/middleeast/saudi-crown-prince-purge.html>.

[11] In particular, the Commission examined that the subjects include: Miteb bin Abdullah, former head of the National Guard, son of the late King Abullah and potential heir to the throne; Admiral Abdullah bin Sultan, former commander of the Naval Forces; Adel Fakeih, former economy and planning minister; Princes Alwaleed bin Talal, Saleh Kamel, Waleed Al Ibrahim, billionaires and owners of leading media companies; Mohammad al-Tobaishi, former head of royal court protocol; Khalid al-Tuwaijri, former chief of the royal court; Amr al-Dabbagh, chairman of a major conglomerate; and Bakr bin Laden, head of the country's largest construction company. It was noted that several figures targeted by SACC were perceived allies of MBS, including Adel Fakeih.
The Washington Post, "Why did Saudi Arabia target billionaire media tycoons in its purge," 16 November 2017: <https://www.washingtonpost.com/news/monkey-cage/wp/2017/11/16/why-did-saudi-arabia-target-billionaire-media-tycoons-in-its-purge/?utm_term=.e378a41f8b66>.
The New York Times, "In Saudi Arabia, where family and state are one, arrests may be selective," 7 November 2017: <https://www.nytimes.com/2017/11/07/world/middleeast/saudi-arabia-royal-family-corruption.html>.

[12] Reuters, "Saudi anti-corruption sweep will reach low-level cases: official," 3 April 2018: <https://www.reuters.com/article/us-saudi-arrests/saudi-anti-corruption-sweep-will-reach-low-level-cases-official-idUSKCN1HA2B1>.

[13] Reuters, "A house divided: How Saudi Crown Prince purged royal family rivals," 10 November 2017: <https://www.reuters.com/article/us-saudi-arrests-crownprince-insight/a-house-divided-how-saudi-crown-prince-purged-royal-family-rivals-idUSKBN1DA23M>. Carnegie Endowment for International Peace, "Saudi Defense and Security Reform," 31 May 2018: <http://carnegie-mec.org/sada/76487>.

[14] Ibid, 11. Carnegie Endowment for International Peace, "Saudi Arabia's Convenient Attorney General," 27 February 2018: <http://carnegieendowment.org/sada/75658>.

[15] Ibid.

[16] Reuters, "Saudi king overhauls security services following royal shakeup," 20 July 2017: <https://www.reuters.com/article/us-saudi-decrees/saudi-king-overhauls-security-services-following-royal-shakeup-

**NOT INTENDED FOR PUBLIC DISSEMINATION**

academics that were reportedly proponents of political reform since September 2017;[17] and the arrest of Miteb bin Abdullah by SACC in November 2017 and his removal as head of the National Guard.[18]

71. With regards to the lack of due process and human rights guarantees in its procedure, the Commission noted that SACC has been criticized for certain irregularities – specifically concerning oversight and transparency.[19] The Commission emphasized that, contrary to usual plea-bargaining as part of prosecutorial proceedings, SACC did not clarify the guilt or innocence of many released following a financial settlement, and most of whom reportedly continued to be barred from travel and access to their financial accounts.[20] The Commission furthermore gathered information that several detainees of SACC were subject to torture and severe ill-treatment, which in one case reportedly led to a death.[21] The Commission underlined that there could be a lack of judicial oversight for such treatment of detainees, in part in view of SACC's use of unofficial and makeshift detention centers.[22]

72. The Commission observed that such reports of abuse and due process violations make the proceedings concerning corruption cases antithetical to a fair and transparent judicial process. Considering this lack of judicial oversight and the direct involvement of MBS, the Commission observed that the context underlying the case with regards to such anti-corruption efforts is indicative of political elements. The Commission did not find it satisfactory to dismiss this context on the basis that the Public Prosecution has initiated the criminal proceedings against the Applicant, given that the former nonetheless operates within the same context as SACC and its campaign on the same criminal activity underlying the present case.

73. Lastly, the Commission examined the status of the Applicant to assess his claim that he is of political interest, in particular to MBS. The Commission firstly established that the information he provided regarding his status and position within the political landscape in Saudi Arabia are credible. Most relevantly, the Commission in its study of the case weighed the following elements:
    73.1. The Applicant was the closest advisor to MBN, the heir to the throne prior to his replacement as Crown Prince by MBS,[23]
    73.2. The Applicant, as well as MBN, have a strong reputation, influence, and network of connections within the Western intelligence and diplomatic community,[24]

---

idUSKBN1A52N9?il=0>. Carnegie Endowment for International Peace, "Saudi Defense and Security Reform," 31 May 2018: <http://carnegie-mec.org/sada/76487>.
[17] Amnesty International. Annual Report 2017/2018. the Kingdom of Saudi Arabia: <https://www.amnesty.org/en/latest/research/2018/02/annual-report-201718/>. United Nations Office of the High Commissioner for Human Rights, UN experts decry Saudi Arabia's persistent use of anti-terror laws to persecute peaceful activists, 2 January 2018: <http://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=22570&LangID=E>. Americans for Democracy and Human Rights in Bahrain (ADHRB), HRC Written Statement: Under the guise of countering corruption, Saudi Arabia suppresses rights and freedoms, 3 February 2018: <http://www.adhrb.org/2018/02/under-the-guise-of-countering-corruption-saudi-arabia-suppresses-rights-and-freedoms/>.
[18] Ibid, 13. Reuters, "Saudi prince, relieved from National Guard, once seen as throne contender," 4 November 2017: <https://www.reuters.com/article/us-saudi-government-defence-newsmaker/saudi-prince-relieved-from-national-guard-once-seen-as-throne-contender-idUSKBN1D40VG>.
[19] Ibid, 9 and 17. According to ADHRB report, "Many have not been officially charged or brought before a judge, held for several months without formal charges… some secured their release by paying a fee." This is confirmed in an interview given to Reuters by former detainee Prince Alwaleed bin Talal during his detainment, where he stated: "There are no charges. There are just some discussions between me and the government […] many people left here with no charges at all – zero." Reuters, "Transcript of Reuters interview with Saudi Arabia's Prince Alwaleed bin Talal," 27 January 2018: <https://www.reuters.com/article/us-saudi-arrests-alwaleed-transcript/transcript-of-reuters-interview-with-saudi-arabias-prince-alwaleed-bin-talal-idUSKBN1FG0X9>. Human Rights Watch, "Saudi Arabia: Allegations of Abuse, Death in Custody," 14 March 2018: <https://www.hrw.org/news/2018/03/14/saudi-arabia-allegations-abuse-death-custody>.
[20] Ibid.
[21] Ibid.
[22] Ibid. Human Rights Watch, "Saudi Arabia: Corruption Arrests Raise Due Process Concerns," 8 November 2017: <https://www.hrw.org/news/2017/11/08/saudi-arabia-corruption-arrests-raise-due-process-concerns>.
[23] The Washington Post, "A 30-year-old Saudi prince could jump-state the kingdom – or drive it off a cliff," 28 June 2016: <https://www.washingtonpost.com/opinions/global-opinions/a-30-year-old-saudi-prince-could-jump-start-the-kingdom-or-drive-it-off-a-cliff/2016/06/28/ce669a3e-3c69-11e6-a66f-aa6c1883b6b1_story.html?utm_term=.27c9e26a045f>. Reuters, "Addiction and intrigue: inside the Saudi palace coup," 19 July 2017: <https://www.reuters.com/article/us-saudi-palace-coup-idUSKBN1A41IS>.
[24] Reuters, "Powerful Saudi royal heirs will define kingdom's future," 17 September 2015: <https://www.reuters.com/article/us-saudi-politics-idUSKCN0RH1O920150917>. NCB News, "Royal pains: two princes

73.3. MBN and MBS had a strained relationship from the time of their respective appointments as Crown Prince and Deputy Crown Prince in April 2015, until MBN's removal in June 2017,[25]

73.4. The Applicant opposed the policy of MBS as Defence Minister for Saudi Arabia's involvement in Yemen,[26]

73.5. The Applicant was removed from all of his public positions in September 2015, and [27] [28]

73.6. MBN was removed and put under house arrest in June 2017, and subsequently subject to the freezing of his bank accounts and a financial settlement on corruption charges.[29]

74. In light of this, the Commission studied whether there are sufficient elements to suggest that the criminal proceedings against the Applicant are motivated by the above outlined political dynamics. It recalled that the NCB, in its submission on this matter, contended there is no link between the proceedings taken against the Applicant with the removal and replacement of MBN. In particular, the NCB reminded the Commission that MBN had remained in power for nearly two years after the removal of the Applicant.

75. However, the Commission examined that reportedly the removal of the Applicant was without the consultation of MBN, and that it had an impact on his professional behavior.[30] The Commission furthermore considered that symptoms of the strained relationship between MBN and MBS from 2015 to 2017, according to news reports, were that the former was side-lined within Saudi Arabian leadership, that the former's personal royal court was disbanded in 2015, and that MBS interfered in his affairs by appointing, removing and firing officers without informing him.[31]

76. [RESTRICTED INFORMATION]

77. [RESTRICTED INFORMATION]

78. Subsequently, the Commission studied the claims made by the Applicant, and rejected by the NCB of Saudi Arabia, concerning any collateral restrictive measures taken against his immediate family members.

79. The Commission preliminarily recalled that the NCB objected to the relevance of such matters for its study of the case. The Commission emphasizes, as the independent authority that is the recipient of information from all parties to a case, it reserves the right to decide on whether an element is relevant to its own study in light of its functions defined in its Statute. The Commission furthermore underlined that such information would be pertinent, given that unjustified restrictive measures on his family members suggest the case is politically motivated rather than strictly juridical.

80. The Commission thus consulted the NCB of Saudi Arabia on these claims and it refuted the existence of any such measures. The NCB informed the Commission that most of the Applicant's immediate family members currently reside outside the country, and therefore cannot possibly face any such restrictions.

---

view for power in Saudi Arabia, make a mess," 23 January 2016: <https://www.nbcnews.com/news/world/royal-pains-two-princes-vie-power-saudi-arabia-make-mess-n502271>.

[25] Ibid. The Washington Post, "A cyclone brews over Saudi Arabia," 13 October 2015: <https://www.washingtonpost.com/opinions/a-storm-brews-in-saudi-arabia/2015/10/13/886328c0-71e1-11e5-9cbb-790369643cf9_story.html?utm_term=.4434a7e2addc>.

[26] Ibid.

[27] There are various reports on the reason behind the Applicant's removal. The Commission in particular noted the following: "The international tension [over the war on Yemen] has increased over the past month. Days after returning from Washington, Salman (at his son's urging) fired Saad al-Jabri, a minister who was Mohammed bin Nayef's top advisor [...] al-Jabri is said to have questioned Mohammed bin Salman's tactics in Yemen, fearing that al-Qaeda was growing stronger there," Ibid. According to another report, "A decisive blow [to MBN] came in early September when Salman, at his son's urging, fired Saad al-Jabri, who for years had been MBN's closest advisor. A U.S. source explains what happened: Jabri was coming to the United States on a personal visit, and he decided to see his old friend John Brennan, the CIA director. He didn't report this meeting to Salman, and when the king learned what had happened, Jabri was removed." Ibid, 23.

[28] [RESTRICTED INFORMATION]

[29] The New York Times, "Deposed Saudi Prince is said to be confined to palace," 28 June 2017: <https://www.nytimes.com/2017/06/28/world/middleeast/deposed-saudi-prince-mohammed-bin-nayef.html>.

[30] Ibid, 23.

[31] Ibid, 25. Business Insider, "Inside the Saudi palace coup: How the new prince reportedly became first in line for the crown," 20 July 2017: <https://www.businessinsider.sg/inside-the-saudi-palace-coup-how-the-new-prince-reportedly-became-first-in-line-for-the-crown/>.

In its first exchange, the Commission noted that the NCB excluded the name of the Applicant's daughter Sarah from its list of family members that have left Saudi Arabia. The Commission in reply requested further information from the NCB concerning whether Sarah is free to leave the country, and confirmation that Omar is indeed outside Saudi Arabia, to which the NCB responded that "travel bans are regulated by Saudi law [...] and that we do not see the link between the question concerning Omar and Sarah with the Red Notice." The NCB had initially dismissed the claim that the bank accounts of his family members are frozen, before clarifying in a subsequent message to the Commission that their bank accounts were frozen for their connection to the case against the Applicant.

81. *[RESTRICTED INFORMATION]*

82. The Commission further observed that according to open-source information, the daughters of MBN as well as the immediate family members of others charged with corruption were subject to such collateral restrictive measures on their freedom of movement.[32] It took into consideration a copy provided by the Applicant of an official message from the Saudi Arabian Embassy in New York denying, without stated reason, passport renewal service to his son Mohamed.

83. The Commission noted the above elements support the Applicant's claims. It considered that the information provided by the NCB, and in particular its argument that any such travel ban measure had been taken in accordance with Saudi law without further clarification, to be an inadequate reply. The Commission underlined this exacerbates its already existing doubts that the case is of a predominantly political character.

84. In view of the above, the Commission underlined that on the balance — having considered the supported information concerning the possible criminal behavior of the Applicant, as well as the total restriction on communication of information from the NCB — its overall study of the case raises strong doubts that prevent it from concluding the data concerning the Applicant are compliant with Article 3 of INTERPOL's Constitution. The Commission therefore decided to refrain from studying the additional claims presented by the Applicant, given that it concludes in his favor on the basis of Article 3.

## FOR THESE REASONS, THE COMMISSION

1. <u>Decides</u> that the data concerning the Applicant are not compliant with INTERPOL's rules applicable to the processing of personal data, and that they shall be deleted from INTERPOL's files.

----------------

---

[32] Ibid, 9 and 29.