## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| -------------------------------------------------- | |
| SAAD ALJABRI | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | § Case No. 1:20-cv-02146-TJK |
| MOHAMMED BIN SALMAN BIN | § |
| ABDULAZIZ AL SAUD, et al. | § |
| | § |
| Defendants. | § |
| -------------------------------------------------- | |

## BADER ALASAKER'S MOTION TO DISMISS

Defendant Bader Alasaker, by and through undersigned counsel, hereby moves this Court, before the Honorable Timothy J. Kelly, at E. Barrett Prettyman U.S. Courthouse, 333 Constitution Ave., N.W., Washington, DC 20001, for an Order dismissing the Amended Complaint in its entirety as to Bader Alasaker under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, under Rule 12(b)(1) for lack of subject matter jurisdiction, under Rule 12(b)(7) for failure to join an essential party and under Rule 12(b)(6) for failure to state a claim. The grounds for this Motion are set forth in Bader Alasaker's Memorandum in Support of his Motion to Dismiss.

Dated: April 5, 2021

Respectfully submitted,

ZUCKERMAN SPAEDER LLP

By: */s/ William W. Taylor, III*
William W. Taylor, III (D.C. Bar No. 84194)
Margarita K. O'Donnell (D.C. Bar No. 1005972)
ZUCKERMAN SPAEDER LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036
Tel: (202) 778-1800

Fax: (202) 822-8106
E-mail: wtaylor@zuckerman.com
E-mail: modonnell@zuckerman.com
Telephone: (202) 778-1800
Facsimile: (202) 822-8106

*Attorneys for Defendant Bader Alasaker*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAAD ALJABRI | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | §   Case No. 1:20-cv-02146-TJK |
| MOHAMMED BIN SALMAN BIN | § |
| ABDULAZIZ AL SAUD, et al. | § |
| | § |
| Defendants. | § |

**BADER ALASAKER'S MEMORANDUM IN SUPPORT OF HIS MOTION TO DISMISS**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 4

I.     THIS COURT DOES NOT HAVE PERSONAL JURISDICTION OVER MR.
       ALASAKER. ............................................................................................................ 4

       A.     Aljabri's Conclusory Allegations Cannot Establish Personal Jurisdiction. ........... 6

              1.     Plaintiff's Allegation That Mr. Alasaker's Conduct Was "Aimed at
                     the United States" Is Conclusory. ............................................................ 7

              2.     The Allegations Of Mr. Alasaker's Recruitment, Cultivation, And
                     Direction Of Individuals In The United States Are Conclusory. ............... 11

       B.     The Amended Complaint Does Not Allege A Substantial Connection
              Between Mr. Alasaker's Contacts In The United States And The Federal
              Law Claims. ................................................................................................... 16

       C.     Exercising Jurisdiction Would Offend Notions of Fair Play and Substantial
              Justice. ........................................................................................................... 20

II.    THE COURT DOES NOT HAVE JURISDICTION OVER THE CLAIMS
       AGAINST MR. ALASAKER BECAUSE HE IS IMMUNE. ........................................... 22

       A.     Mr. Alasaker Is Immune Under The State Department Test. .............................. 24

       B.     Mr. Alasaker Is Immune Under The Restatement Test. ...................................... 25

III.   PLAINTIFF'S CLAIMS ARE PRECLUDED BY THE ACT OF STATE
       DOCTRINE. ............................................................................................................ 28

IV.    THE COURT MUST DISMISS THE CLAIMS AGAINST MR. ALASAKER
       BECAUSE SAUDI ARABIA IS A NECESSARY PARTY THAT CANNOT BE
       JOINED. ................................................................................................................. 28

V.     PLAINTIFF FAILS TO STATE A CLAIM UNDER THE TVPA AND ATS. ............... 29

       A.     The TVPA Does Not Provide A Cause Of Action For Plaintiff's
              Allegations. .................................................................................................... 29

       B.     The ATS Does Not Provide A Cause Of Action For Plaintiff's Allegations.
              ...................................................................................................................... 33

       C.     Plaintiff Has Proffered Only Conclusory Allegations To Support The TVPA
              And ATS Claims Against Mr. Alasaker. ........................................................... 34

              1.     Plaintiff's Conclusory Allegations Do Not State A Claim For Mr.
                     Alasaker's Direct Liability For Attempted Killing. ................................. 35

              2.     Plaintiff's Conclusory Allegations Also Fail To State A Claim For
                     Secondary Liability. ............................................................................. 37

VI.    DISMISSAL OF THE FEDERAL LAW CLAIMS REQUIRES DISMISSAL OF
       THE REMAINING INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
       CLAIM..................................................................................................................... 42

VII.   PLAINTIFF FAILS TO STATE A CLAIM FOR INTENTIONAL INFLICTION
       OF EMOTIONAL DISTRESS. ...................................................................... 42

       A.    The IIED Claim Is Governed By Saudi Arabian Law And Must Be
             Dismissed. ................................................................................................. 42

       B.    Plaintiff Has Failed To State An IIED Claim Under D.C. Law. .......................... 43

CONCLUSION....................................................................................................................... 45

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Acosta Orellana v. CropLife Int'l*,
  711 F. Supp. 2d 81 (D.D.C. 2010) ...................................................................... 19, 38

*Asahi Metal Indus. Co. v. Superior Court of Cal.*,
  480 U.S. 102 (1987) ........................................................................................ 21, 22

*\*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .......................................................................................... *passim*

*Associated Producers, LTD v. Vanderbilt Univ.*,
  76 F. Supp. 3d 154 (D.D.C. 2014) ........................................................................ 12

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) .................................................................................... 7, 11, 37

*\*Bernhardt v. Islamic Republic of Iran*,
  2020 WL 6743066 (D.D.C. Nov. 16, 2020) ............................................... 18, 40–41

*Boim v. Holy Land Found. for Relief & Dev.*,
  549 F.3d 685 (7th Cir. 2008) ............................................................................... 30

*Boucher v. Wal-Mart Canada Corp.*,
  2014 ONCA 419 ................................................................................................. 43

*Bristol-Myers Squibb Co. v. Superior Court of Cal.*,
  137 S. Ct. 1773 (2017) .................................................................................... 17, 20

*Broidy Capital Mgmt. LLC v. Muzin*,
  2020 WL 1536350 (D.D.C. Mar. 31, 2020) ...................................................... 23, 24

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) ............................................................................................. 6

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
  511 U.S. 164 (1994) ........................................................................................ 31, 32

*Corsi v. Caputo*,
  2020 WL 1703934 (D.D.C. Apr. 7, 2020) ............................................................... 6

*Corsi v. Mueller*,
  422 F. Supp. 3d 51 (D.D.C. 2019) ....................................................................... 13

———

\* Authorities upon which we chiefly rely are marked with an asterisk.

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014) ............................................................................................ 20–21

*Doe 1 v. Buratai*,
   318 F. Supp. 3d 218 (D.D.C. 2018) ................................................................ 25, 27–28

*Doe v. Exxon Mobil Corp.*,
   654 F.3d 11 (D.C. Cir. 2011) .............................................................................. 32, 33

*Dogan v. Barak*,
   932 F.3d 888 (9th Cir. 2019) ..................................................................................... 26

*Driever v. United States*,
   2020 WL 6135036 (D.D.C. Oct. 19, 2020) .................................................................. 6

*Estate of Klieman v. Palestinian Auth.*,
   923 F.3d 1115 (D.C. Cir. 2019) .................................................................... 6–7, 18

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*,
   141 S. Ct. 1017 (2021) ........................................................................................ 16, 17

*Gregorio v. Gordon*,
   215 F. Supp. 3d 1 (D.D.C. 2015) ........................................................................ 13–14

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983) .................................................................... 38, 40, 41

*IMAPizza, LLC v. At Pizza Ltd.*,
   334 F. Supp. 3d 95 (D.D.C. 2018) .............................................................................. 20

*Jesner v. Arab Bank, PLC*,
   138 S. Ct. 1386 (2018) ............................................................................................... 33

*Kareem v. Haspel*,
   986 F.3d 859 (D.C. Cir. 2021) ................................................................................... 14

*Lewis v. Mutond*,
   918 F.3d 142  (D.C. Cir. 2019) ..................................................................... 22, 23, 26

*Livnat v. Palestinian Auth.*,
   851 F.3d 45 (D.C. Cir. 2017) ............................................................................. *passim*

*Mamani v. Berzain*,
   654 F.3d 1148 (11th Cir. 2011) ............................................................................ 35, 36

*Mastafa v. Chevron Corp.*,
   770 F.3d 170 (2d Cir. 2014) ....................................................................................... 33

*Miango v. Democratic Republic of Congo*,
  2020 WL 3498586 (D.D.C. June 29, 2020) ........................................................................ 26

*Muhammad v. United States*,
  300 F. Supp. 3d 257 (D.D.C. 2018) ................................................................................... 34

*Mwani v. bin Laden*,
  417 F.3d 1 (D.C. Cir. 2005) ........................................................................................ 5–6, 20

*Nuevos Destinos, LLC v. Peck*,
  2019 WL 78780 (D.D.C. Jan. 2, 2019) ............................................................................. 10

*Ofisi v. Al Shamal Islamic Bank*,
  2019 WL 1255096 (D.D.C. Mar. 19, 2019) ...................................................................... 14

*Ofisi v. BNP Paribas, S.A.*,
  2018 WL 396234 (D.D.C. Jan. 11, 2018) ......................................................................... 40

*Ofisi v. BNP Paribas, S.A.*,
  278 F. Supp. 3d 84 (D.D.C. 2017) ..................................................................... 38, 39, 40, 41

*Ortberg v. Goldman Sachs Grp.*,
  64 A.3d 158 (D.C. 2013) ................................................................................................... 43

*Owens v. BNP Paribas, S.A.*,
  897 F.3d 266 (D.C. Cir. 2018) ..................................................................................... 31, 32

*Owens v. Republic of Sudan*,
  864 F.3d 751 (D.C. Cir. 2017) .......................................................................................... 36

*Parhat v. Gates*,
  532 F.3d 834 (D.C. Cir. 2008) .......................................................................................... 35

*PetEdge, Inc. v. Garg*,
  234 F. Supp. 3d 477 (S.D.N.Y. 2017) .............................................................................. 13

*Republic of Philippines v. Pimentel*,
  553 U.S. 851 (2008) .......................................................................................................... 28

*Republic of Sudan v. Owens*,
  194 A.3d 38 (D.C. 2018) ................................................................................................... 44

*Samantar v. Yousuf*,
  560 U.S. 305 (2010) ..................................................................................................... 22, 24

*Shatsky v. Palestine Liberation Org.*,
  955 F.3d 1016 (D.C. Cir. 2020) .......................................................................................... 5

*Sikhs for Justice v. Nath*,
  893 F. Supp. 2d 598 (S.D.N.Y. 2012) .................................................. 32

*TJGEM LLC v. Republic of Ghana*,
  26 F. Supp. 3d 1 (D.D.C. 2013) ............................................................ 28

*Walden v. Fiore*,
  571 U.S. 277 (2014) ................................................................ 5, 10, 16

*Weisskopf v. United Jewish Appeal-Fed'n of Jewish Philanthropies of N.Y., Inc.*,
  889 F. Supp. 2d 912 (S.D. Tex. 2012) ................................................. 32

*Yousuf v. Samantar*,
  699 F.3d 763 (4th Cir. 2012) .............................................................. 22

**STATUTES**
Pub. L. No. 102-256 § 2(a)(2), 106 Stat. 73, *codified at* 28 U.S.C. § 1350 (1992) .............. *passim*

28 U.S.C. § 1367 ........................................................................ 42

**RULES**
Federal Rule of Civil Procedure 12 .............................................. 3, 28, 29, 42

Federal Rule of Civil Procedure 4 ..................................................... 5

Federal Rule of Civil Procedure 19 ................................................. 28

**TREATISES**
Restatement (Second) of Foreign Relations Law § 66 ......................... 23, 26

Restatement (Second) of Torts § 46 ................................................. 44

**OTHER AUTHORITIES**
Br. for U.S. as Amicus Curiae Supporting Pet'rs,
  *Nestlé USA, Inc. v. Doe I*, Nos. 19-1416 and 19-453 (U.S. Sept. 1, 2020) ............. 33

Br. for U.S. as Amicus Curiae Supporting Pet'rs,
  *Mutond v. Lewis*, No. 19-185, 2020 WL 2866592 (U.S. May 2020) ..................... 24

Hazel Fox, *The Law of State Immunity* 455 (2d ed. 2008) ......................... 22

Lewis Carroll, *The Hunting of the Snark* 3 (1876) ..................................... 35

Office of the Legal Advisor, U.S. Dep't of State, *Digest of United States Practice in Int'l Law*
  (Carrielyn D. Guymon, ed. 2015), Ch. 10, § B(3) ................................... 24

S. Rep. No. 102–249 (1991) ............................................................. 32

## INTRODUCTION

In this Amended Complaint, Saad Aljabri, a former high-level Saudi government official who is currently a fugitive living in Canada, continues to assert claims against Mr. Bader Alasaker, a Saudi national, for violations of the Torture Victim Protection Act (TVPA) and the Alien Tort Statute (ATS), as well as a common law claim of intentional inflection of emotional distress. As to Mr. Alasaker, Aljabri alleges that Mr. Alasaker's involvement in this alleged conspiracy consists of directing four individuals in a failed search for Aljabri in the United States in the fall of 2017, inquiring about arranging a private plane for Aljabri to travel to Saudi Arabia in September 2017, and providing unidentified "support" for a subsequent plot to kill Aljabri in Canada in October 2018. Aljabri alleges that this entire alleged plot was undertaken pursuant to the authority and under the color of law of the Saudi government. Yet despite adding seventy pages to this iteration of his complaint, Aljabri has not remedied the deficiencies that doomed his first effort to assert a claim against Mr. Alasaker. As we demonstrate in this Memorandum, the Court must dismiss the claims against Mr. Alasaker for seven separate reasons.[1]

First, Plaintiff cannot establish that this Court has jurisdiction under Federal Rule of Civil Procedure 4(k)(2), the only basis of jurisdiction he proffers for Mr. Alasaker. As an initial matter, the allegations supporting personal jurisdiction in the Amended Complaint do not meet the requirements for allegations of fact required by the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and its progeny. Thus, Mr. Alasaker should be dismissed from the Amended Complaint under Federal Rule of Civil Procedure 12(b)(2). As alleged by Aljabri, Mr. Alasaker is

---

[1] This motion to dismiss and memorandum in support thereof is filed on behalf of Defendant Bader Alasaker. As set forth below, for efficiency and to minimize duplicating arguments for the Court, Mr. Alasaker joins and incorporates by reference the arguments made by several other Defendants.

a Saudi national who resides in the Kingdom of Saudi Arabia and has limited physical contact in the United States. Aljabri also alleges that Mr. Alasaker holds an official position in the Saudi government as "the head of Defendant bin Salman's private office." *See* Am. Compl. ¶ 40. The Amended Complaint's jurisdictional theory is premised on allegations that Mr. Alasaker aimed his conduct at the United States because he supposedly shared the Crown Prince's alleged objective to kill Aljabri due to his purported value to the "U.S. Intelligence Community," and that Mr. Alasaker directed four Defendants to search for Aljabri in the United States. But the Amended Complaint does not allege facts supporting these allegations. There are no facts connecting Mr. Alasaker to any plot to kill Aljabri, or to any objective of the Crown Prince regarding "U.S. Intelligence." The only factual allegation connecting Mr. Alasaker and Aljabri has nothing to do with the United States (as would be required for personal jurisdiction) and concerns the administrative task of arranging a flight for Aljabri more than one year *before* the alleged attempted killing. Likewise, Aljabri fails to allege facts supporting Mr. Alasaker's direction of four individuals in the United States who primarily asked questions about Aljabri's family.

Moreover, the Amended Complaint should be dismissed for lack of personal jurisdiction because, in addition to proffering only conclusory allegations, the Amended Complaint does not allege a substantial connection between Mr. Alasaker's contacts in the United States and the federal law claims against him. The allegations of Mr. Alasaker's appearances at a handful of events in the United States primarily organized and hosted by the nonprofit foundation of which he is the Secretary General cannot support personal jurisdiction. None of these events has a relationship to the alleged plan to kill, supposedly conceived in Saudi Arabia and carried out in Canada. And, given the paucity of connections between Mr. Alasaker and the United States, exercising jurisdiction would offend traditional notions of fair play and substantial justice. In short,

there is no theory under which this Court has personal jurisdiction over Mr. Alasaker, even if the allegations met the *Iqbal* test for facts.

Second, Mr. Alasaker is immune from suit under the common law of conduct-based sovereign immunity, a rule of law which divests the Court of subject matter jurisdiction and requires dismissal of the Amended Complaint under Rule 12(b)(1). Plaintiff's claims hinge on allegations that Mr. Alasaker was carrying out Saudi policy in his capacity as a government official, including by allegedly controlling a Saudi Arabian government entity, and that all "acts" at issue were "under apparent authority or color of law of the government of Saudi Arabia." Am. Compl. ¶ 366. These conclusory allegations should be disregarded by the Court. But, even if they are credited, then Mr. Alasaker would have been acting in his official capacity and is entitled to immunity.

Third, the Act of State doctrine bars Aljabri's action because adjudicating his claims would require this Court to inquire into the validity of the public acts a foreign sovereign committed within its own territory.

Fourth, the Amended Complaint must be dismissed under Rule 12(b)(7) because Saudi Arabia is a necessary and indispensable party that cannot be joined in this suit because it is immune.

Fifth, Aljabri's federal law claims for "attempted" killing under the TVPA and ATS fail under Rule 12(b)(6). The TVPA created a cause of action for "extrajudicial killing" and "torture," not for a planned or attempted extrajudicial killing. Congress made its intent clear by providing that only the victim's legal representative or a wrongful death claimant, not a living victim, could recover for an "extrajudicial killing." Congress also did not provide for conspiracy or aiding and abetting liability under the TVPA, which precludes those theories here. As to the ATS, that statute

has no application to this case, where no relevant conduct occurred in the United States, and cannot

provide a cause of action for attempted killing because it does not violate any specific universal

and obligatory international norm. And even assuming the TVPA and ATS offered a legal remedy

for attempted killing, Aljabri's conclusory allegations are insufficient, as they were with personal

jurisdiction, to state a claim against Mr. Alasaker.

Sixth, to the extent the Court dismisses the federal law claims, it lacks pendent personal

jurisdiction over Mr. Alasaker for the intentional infliction of emotional distress claim, and should

also decline to exercise supplemental subject matter jurisdiction over that claim.

Finally, Plaintiff fails to state a common law claim for intentional infliction of emotional

distress. The law of Saudi Arabia applies to that claim, and requires dismissal because Saudi

Arabia does not recognize such a claim. And even if D.C. law applied to this case involving a

Saudi plaintiff living in Canada suing Saudi defendants over a dispute originating in Saudi Arabia,

the Court should dismiss the claim because Plaintiff's conclusory allegations fail to state a claim

under D.C. law under any theory of liability.

## ARGUMENT[2]

## I.     THIS COURT DOES NOT HAVE PERSONAL JURISDICTION OVER MR. ALASAKER.

Mr. Alasaker is a Saudi national, residing in Saudi Arabia. Am. Compl. ¶ 40. As Aljabri

alleges, Mr. Alasaker works for the office of the Crown Prince and is the Secretary General of the

MiSK Foundation, a nonprofit foundation in Saudi Arabia. *Id.* In support of personal jurisdiction

---

[2] Aljabri contends that he served Mr. Alasaker through mail and WhatsApp. *See* ECF Nos. 35, 38. For the reasons described in the motion to dismiss by Defendant Mohammed bin Salman bin Abdulaziz Al Saud ("Crown Prince's Brief"), those methods of service violate Saudi law. Mr. Alasaker adopts and incorporates by reference the arguments in the Crown Prince's Brief concerning service. *See* Crown Prince Br. at 13.

under Rule 4(k)(2), Aljabri alleges only a handful of physical contacts between Mr. Alasaker and the United States from 2014 to 2018, including Mr. Alasaker's attending MiSK Foundation events and accompanying an official delegation from Saudi Arabia. Am. Compl. ¶ 41 & n.16. Aljabri also alleges, without factual support, that Mr. Alasaker recruited, directed, or controlled a group of individuals who failed in a purported search for Aljabri in the United States. *Id.* ¶¶ 233–45. Aljabri further alleges, in conclusory fashion, that all "Defendants acted in concert, at the direction of Defendant bin Salman" to kill Aljabri to eliminate a U.S. Intelligence asset, a purported "objective aimed at the United States" *Id.* ¶ 130.

Aljabri bears the burden of "mak[ing] a prima facie showing of the pertinent jurisdictional facts" demonstrating that the Court has personal jurisdiction over Mr. Alasaker. *See Livnat v. Palestinian Auth.*, 851 F.3d 45, 56–57 (D.C. Cir. 2017) (citation omitted). Rule 4(k)(2) permits a federal court to exercise personal jurisdiction over a defendant "(1) for a claim arising under federal law, (2) where a summons has been served, (3) if the defendant is not subject to the jurisdiction of any single state court, (4) provided that the exercise of federal jurisdiction is consistent with the Constitution (and laws) of the United States." *Mwani v. bin Laden*, 417 F.3d 1, 10 (D.C. Cir. 2005). The Amended Complaint does not meet the fourth factor: jurisdiction over Mr. Alasaker would not be consistent with the Constitution.

"Whether the exercise of jurisdiction is consistent with the Constitution turns on whether a defendant has sufficient contacts with the nation as a whole to satisfy due process." *Id.* at 11. Under the Due Process Clause, "the defendant's suit-related conduct must create a substantial connection with the forum." *Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016, 1036 (D.C. Cir. 2020) (quoting *Walden v. Fiore*, 571 U.S. 277, 291 (2014)). The defendant must also have "purposefully directed" his activities at the forum. *Mwani*, 417 F.3d at 12. Finally, courts cannot

exercise jurisdiction if it would not "comport with fair play and substantial justice." *Id.* at 14 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)).

In this case, Plaintiff has failed to make a prima facie showing that this Court has personal jurisdiction over Mr. Alasaker for three fundamental reasons: (1) the allegations relevant to jurisdiction are conclusory; (2) the required substantial connection between Mr. Alasaker's alleged United States conduct and the federal claims is absent; and (3) exercising jurisdiction would not comport with fair play and substantial justice. Each of these reasons alone requires dismissal of the entire Amended Complaint as to Mr. Alasaker.

### A.    Aljabri's Conclusory Allegations Cannot Establish Personal Jurisdiction.

Plaintiff's grounds for personal jurisdiction fall into two categories: (1) a broad allegation that all "[t]he Defendants acted in concert, at the direction of Defendant bin Salman, to achieve this objective [of attempting to kill Aljabri to end his cooperation with U.S. Intelligence] aimed at the United States," Am. Compl. ¶ 130, and (2) allegations that Mr. Alasaker directed four "U.S.-Based Covert Agent Defendants" to purportedly "search" for Aljabri in the United States, *id.* ¶¶ 236–45. Both theories are based only on allegations of conclusions rejected by the Supreme Court and D.C. Circuit.

 "Conclusory statements" or a "bare allegation of conspiracy or agency" do not satisfy a plaintiff's burden to plead jurisdictional facts. *Livnat*, 851 F.3d at 57; *see also Driever v. United States*, 2020 WL 6135036, at *5 n.5 (D.D.C. Oct. 19, 2020) (Kelly, J.) (same). Accordingly, Aljabri must "allege specific acts connecting [the] defendant with the forum and may not rely on bare allegations or conclusory statements." *Corsi v. Caputo*, 2020 WL 1703934, at *2 (D.D.C. Apr. 7, 2020) (Kelly, J.) (alteration in original) (citation omitted).

The Supreme Court in *Ashcroft v. Iqbal* illustrated, in the Rule 12(b)(6) context, the types of allegations that are conclusory and must be disregarded. 556 U.S. 662 (2009); *see also Estate*

of *Klieman v. Palestinian Auth.*, 923 F.3d 1115, 1125 (D.C. Cir. 2019), *cert. granted, vacated and remanded*, 140 S. Ct. 2713 (2020) (applying *Iqbal* to personal jurisdiction analysis). "Naked assertions devoid of further factual enhancement" could not satisfy a plaintiff's burden. *Iqbal*, 556 U.S. at 678 (citation omitted). A complaint that offered only "labels and conclusions" would also fail on the pleadings. *Id.* The application of those principles in *Iqbal* led to dismissal, as they should here. In *Iqbal*, the plaintiff alleged that former Attorney General John Ashcroft and then-FBI Director Robert Mueller were, respectively, the "principal architect" of an allegedly discriminatory policy and "instrumental" in implementing the policy. *Id.* at 680–81. Those "bare assertions," the Court held, were "conclusory and not entitled to be assumed true." *Id.* at 681. Likewise, in *Bell Atlantic Corp. v. Twombly*,  the Supreme Court explained that a complaint "requires more than labels and conclusions." 550 U.S. 544, 555 (2007). In this respect, bare assertions of "conspiracy" or a "conclusory allegation of agreement at some unidentified point" are insufficient at the pleadings stage. *Id.* at 557. A plaintiff's allegations must provide sufficient *factual* assertions to cross from the conclusory to the factual. *Id.* at 555, 557.

Applying those principles here, the Court must dismiss the claims against Mr. Alasaker because the Court lacks personal jurisdiction.

### 1. Plaintiff's Allegation That Mr. Alasaker's Conduct Was "Aimed at the United States" Is Conclusory.

Plaintiff's first jurisdictional theory is that "[t]he Defendants acted in concert, at the direction of Defendant bin Salman, to achieve this objective [of attempting to kill Aljabri to end his cooperation with U.S. Intelligence] aimed at the United States." Am. Compl. ¶ 130. As an initial matter, Mr. Alasaker adopts and incorporates by reference the arguments in the Crown Prince's Brief that Aljabri's purported connections to the U.S. Intelligence community are not sufficient to demonstrate that any Defendants purposefully directed their activities at the United

States. Crown Prince Br. § I.A.2. In addition, Aljabri's jurisdictional theory is conclusory and cannot sustain personal jurisdiction as to Mr. Alasaker.

Aljabri does not allege any facts showing that Mr. Alasaker specifically—as opposed to all Defendants generally—shared the "objective" of killing Aljabri to end his alleged cooperation with U.S. Intelligence. The only specific mentions of Mr. Alasaker's intent are conclusory, and fail to allege any intent to impact the United States. *See* Am. Compl. ¶ 390 ("Defendants bin Salman, Alasaker, Alqahtani, Alassiri, and the Tiger Squad Defendants acted with specific intent to kill Dr. Saad."). Those allegations do not claim that Mr. Alasaker had any knowledge of Aljabri's alleged importance to U.S. Intelligence or that Aljabri had a relationship with the U.S. government.

Moreover, based on Plaintiff's theory of the case, to allege that Mr. Alasaker participated in conduct "aimed at the United States," Plaintiff would have to properly allege that Mr. Alasaker participated in the relevant conduct—the alleged attempted killing of Aljabri. The Amended Complaint contains no factual allegations showing that Mr. Alasaker agreed to be involved, or was involved, in the alleged attempted killing. *See id.* ¶ 124 (chart); *id.* ¶¶ 317–65.[3] Aljabri alleges only that "Defendants bin Salman, Alqahtani, and Alassiri"—not Mr. Alasaker—"directed another Tiger Squad team to meet Dr. Saad wherever he could be found." *Id.* ¶ 329; *see also id.* ¶ 334 (Tiger Squad was "acting at the [d]irection of Defendants bin Salman, Alqahtani, and Alassiri"), *id.* ¶ 338 ("the Tiger Squad Defendants who Defendants bin Salman, Alqahtani, and Alassiri dispatched to Canada"). Aljabri stretches to include Mr. Alasaker in the plot through the conclusory assertion that he "support[ed]" the attempted killing. *See id.* ¶¶ 19, 111, 114. But there are no allegations explaining what "support" Mr. Alasaker provided, when he gave it, or how he

---

[3] The only mention of Mr. Alasaker in those paragraphs is a footnote reference to a separate complaint concerning an alleged phone hacking of a Qatari journalist. Am. Compl. ¶ 333 n.296. That case has no relevance here.

did so.[4] The absence of any factual allegations linking Mr. Alasaker to the alleged attempted killing—the heart of the federal law claims—demonstrates that he did not share any "objective" of killing Aljabri to remove a U.S. Intelligence partner.

Aljabri alleges that the attempted killings included, not just the alleged acts surrounding the attempted killing in October 2018, but also a "luring" phase and a "hunting" phase. *See* Am. Compl. ¶ 10 ("Defendant bin Salman's ongoing attempted extrajudicial killing has involved three basic steps: (i) luring Dr. Saad back to Saudi Arabia; (ii) hunting Dr. Saad in the United States and elsewhere to locate him; and (iii) sending a personal hit squad to kill him"). But Plaintiff's recitation of these two "phases" contains no facts regarding Mr. Alasaker's intent, much less his intent to participate in conduct aimed at the United States. Mr. Alasaker lacks any meaningful role in the alleged "luring" of Aljabri back to Saudi Arabia. *See id.* ¶¶ 163–223. There are no allegations connecting Mr. Alasaker to the purported kidnapping of Aljabri's adult children or any of the other alleged acts concerning Aljabri's family members. *Id.* ¶¶ 181–222. The Amended Complaint alleges no role for Mr. Alasaker in the freezing of Aljabri's bank account, the INTERPOL notice, or the online "smear campaign." *Id.* ¶¶ 256–71. Mr. Alasaker appears once in passing when he allegedly corresponded with Aljabri seeking to arrange Aljabri's private-jet transportation in September 2017, around the same time that the Crown Prince was allegedly messaging Aljabri

---

[4] Lacking any factual allegations connecting Mr. Alasaker to the case at bar, Aljabri relies on irrelevant allegations about other alleged conduct. He asserts that four phone calls were made to Mr. Alasaker by an unidentified individual during the attack of Jamal Khashoggi and that Mr. Alasaker allegedly directed Twitter employees to obtain information about a Twitter user. Am. Compl. ¶¶ 227 n.179, 306. Those allegations do not concern Aljabri or the purported plot to kill him.

about his return to Saudi Arabia, more than a year before any alleged attempted killing.[5] *Id.* ¶ 176–77. Nothing about that correspondence suggests that Mr. Alasaker shared an objective to kill Aljabri due to his purported influence with U.S. Intelligence. Aljabri does not allege that Mr. Alasaker ever stated why Aljabri should return to Saudi Arabia. And, as described below, *infra* § I.B, Aljabri's attempt to link Mr. Alasaker to the purported "hunt" for Aljabri in the United States is based on conclusory allegations.

Without any specific factual allegations as to Mr. Alasaker's intent, Aljabri's theory of jurisdiction fails because it relies on the *Crown Prince*'s alleged intent, not Mr. Alasaker's. *See* Am. Compl. ¶ 130. Aljabri alleges that "each Defendant" was "aware of" or "knew" what Defendant bin Salman "viewed" or "desire[d]" concerning Aljabri. *Id.* But even if Mr. Alasaker "knew" the Crown Prince's desires, Aljabri cannot plead jurisdiction against Mr. Alasaker based on the Crown Prince's alleged intent or Mr. Alasaker's purported knowledge of such intent. Due process requires specific jurisdiction to rest on "contacts that the 'defendant himself' creates with the forum," and a defendant's "knowledge" of someone else's "strong forum connections" does not create personal jurisdiction. *Walden*, 571 U.S. at 284, 289 (citation omitted). Consequently, the Crown Prince's intent cannot provide a factual basis for jurisdiction over Mr. Alasaker. *See Nuevos Destinos, LLC v. Peck*, 2019 WL 78780, at *8 (D.D.C. Jan. 2, 2019) ("[T]he Court cannot assert jurisdiction over individual defendants based on another defendant's actions.").

---

[5] A footnote in the Amended Complaint seeks to justify Aljabri's speculative assertions regarding Mr. Alasaker's role by identifying "one occasion" at some unidentified time in which "Defendant bin Salman explicitly directed Dr. Saad to communicate with Defendant bin Salman by delivering a message to Defendant Alasaker." Am. Compl. ¶ 177 n.163. This vague allegation provides no information as to the subject matter of the "message" and does not allege that it was factually related to any part of the alleged targeted effort against Aljabri.

Finally, to the extent Aljabri intends to assert a theory of conspiracy jurisdiction, that theory also fails. As a threshold matter, Mr. Alasaker adopts and incorporates by reference the argument by the Crown Prince that conspiracy jurisdiction is not available under Rule 4(k)(2). *See* Crown Prince Br. § I.A.1.b. In addition, those allegations are conclusory as they contain no details about how or when Mr. Alasaker allegedly joined that conspiracy. The allegation that "[t]he Defendants acted in concert," Am. Compl. ¶ 130, is a "bare allegation of conspiracy" that cannot establish jurisdiction as to Mr. Alasaker. *See Livnat*, 851 F.3d at 57. And as set forth above, there are no factual assertions that would support the existence of a conspiracy involving Mr. Alasaker.

### 2. The Allegations Of Mr. Alasaker's Recruitment, Cultivation, And Direction Of Individuals In The United States Are Conclusory.

Plaintiff's second jurisdictional theory is that Mr. Alasaker directed the alleged "search" for Aljabri in the United States undertaken by four other individuals. The Amended Complaint employs a wide-range of conclusory allegations that Mr. Alasaker, often "through" the MiSK Foundation, "recruited," "cultivated," "ordered," "deployed," "supervised," "incentivized," and "tasked" individuals to search for Aljabri. But none of these allegations contain any "factual matter," *see Twombly*, 550 U.S. at 556, connecting Mr. Alasaker to the United States.

The vast majority of these allegations relate to Mr. Alasaker's alleged recruiting of an amorphous "network" of "agents" and "operatives." *See, e.g.*, Am. Compl. ¶ 40 ("Defendant Alasaker has cultivated a network of covert agents whom he has deployed to target individuals who undermine Defendant bin Salman in the United States."); ¶ 42 ("Defendant Alasaker led Defendant bin Salman's U.S.-based effort to cultivate and consolidate control over a network of operatives in the United States."). Not only do such vague allegations fail to specify who Mr. Alasaker cultivated, deployed, recruited, or directed (or any of the other verbs used by Aljabri), but they also do not include any factual support as to how, when, or through which individuals Mr.

Alasaker took these actions. Indeed, some of the allegations do not assert that the recruiting was for the purpose of finding Aljabri. *See, e.g.*, *id.* ¶ 40. These conclusory allegations of directing, cultivating, recruiting, or otherwise controlling undefined groups of individuals in the United States are insufficient for personal jurisdiction.

The scattered allegations in which Aljabri seeks to connect the "U.S.-Based" Defendants who allegedly searched for Aljabri in the United States with Mr. Alasaker fare no better.[6] As to Defendant Hamed, Aljabri musters only a "bare allegation of . . . agency." *See Livnat*, 851 F.3d at 57. The Amended Complaint alleges, with no factual support, that Defendant Hamed "acted as an agent of Defendants bin Salman and Alasaker." Am. Compl. ¶ 109; *see also id.* ¶ 245 ("Defendant bin Salman and Defendant Alasaker orchestrated a surveillance mission . . . using agent Defendant Hani Hamed."). Aljabri makes no attempt to allege the elements of an agency relationship, which is present when "one person authorizes another to act on his behalf subject to his control, and the other person consents to do so." *Associated Producers, LTD v. Vanderbilt Univ.*, 76 F. Supp. 3d 154, 166 (D.D.C. 2014). Accordingly, Hamed's purported actions must be disregarded in the jurisdictional analysis.

As to the three Defendants, who were students at the time ("Student-Defendants"), Aljabri alleges that the "hunt" consisted of asking for the location of Aljabri's wife—to propose marriage to Aljabri's daughter—or asking about the immigration status of Aljabri's son (which would not provide any information as to Aljabri's location). *See, e.g.*, Am. Compl. ¶¶ 239–41 (Alhamed),

---

[6] The Amended Complaint alleges that Mr. Alasaker "directed" the "activities" of "the U.S.-Based Covert Agent Defendants," which Plaintiff defines as Defendants Alrajhi, Alhamed, Abuljadayel, Hamed, and Alharbi. Am. Compl. ¶¶ 76–110, 226. Further demonstrating the general pleading approach taken by Plaintiff, there are no allegations connecting Mr. Alasaker to Alharbi. *See id.* ¶¶ 110, 247–55 (describing Alharbi's role and failing to mention Mr. Alasaker). As a result, Alharbi's acts cannot be the basis for jurisdiction over Mr. Alasaker.

¶¶ 239–43 (Alrajhi), ¶ 244 (Abuljadayel). According to the Amended Complaint, none of the Student-Defendants contacted, communicated, or spoke with Aljabri, or asked about his whereabouts.

To establish jurisdiction, Aljabri repeats the same conclusory allegation that each Defendant was "[a]cting at the direction of Defendants bin Salman and Alasaker." *See* Am. Compl. ¶¶ 88, 102, 105. That statement is as abstract as the ones in *Iqbal* that defendants were "architects" of a plan and helped implement it. Aljabri provides no *facts* upon which to conclude that the conclusion is more than theory. He does not say any more about this purported "direction" by Mr. Alasaker, or what direction he provided as opposed to the Crown Prince. For instance, Aljabri alleges that Alhamed "takes orders from Defendant Alasaker," *id*. ¶ 94, but Aljabri does not identify any *facts* showing an "order" or directive received by Alhamed from Mr. Alasaker, how he received orders, what the orders said, or whether they had any relationship to this case. These allegations are insufficient because, as courts in this district recognize, "show[ing] that . . . action was taken at the direction of another requires more than just the conclusion that this is what occurred." *Corsi v. Mueller*, 422 F. Supp. 3d 51, 65 (D.D.C. 2019) (quoting *Acosta Orellana v. CropLife Intern.*, 711 F. Supp. 2d 81, 112 (D.D.C. 2010)); *see also PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 493 (S.D.N.Y. 2017) (holding that plaintiff could not "merely tack[] on conclusory assertions that [acts] were done 'at [defendant]'s direction'" and collecting cases holding same).

Aljabri does not provide anything "more."[7] *See Gregorio v. Gordon*, 215 F. Supp. 3d 1, 6 (D.D.C. 2015) (holding no personal jurisdiction where plaintiff did "not sufficiently allege that the conduct of the co-defendants, or even Mr. Reese, was at the behest of defendant Atherton").These allegations are similar to those rejected by Judge Bates in *Ofisi v. Al Shamal Islamic Bank*, 2019 WL 1255096, at *6 (D.D.C. Mar. 19, 2019). The *Ofisi* plaintiff alleged that the defendant, a bank, had "direct involvement in planning, orchestrating, or otherwise participating in the 1998 embassy bombings" by Al Qaeda and that the bank "supported" and "directed" the attack. *Id.* The plaintiff also alleged that the bank was "affiliated with, and invested in by Osama bin Laden and [a]l Qaeda," and that funds were withdrawn from the bank to support the attack. *Id.* Despite that affiliation, there was no personal jurisdiction because the only factual allegations concerned Al Qaeda, not the bank. And the "broad pronouncements that [the bank] 'directed' the attacks" was "not enough" for personal jurisdiction because "[s]uch conclusory allegations 'merely state the plaintiffs' theory of specific jurisdiction,' rather than set forth the required jurisdictional facts." *Id.* (quoting *Livnat*, 851 F.3d at 57).

The same holds true here. Aljabri's repeated invocation of conclusory phrases of directing and recruiting, among others, restate his theory of personal jurisdiction, without providing the necessary factual allegations. None of these allegations are sufficient to establish contacts with the United States supporting jurisdiction.

---

[7] Other allegations are even more tenuous. For example, Aljabri asserts that Alhamed and Alrajhi called an unidentified "Friend 1" about Aljabri's son's immigration status and Aljabri's wife's location. Aljabri says that they were "directed to do so by Defendant Alasaker, *or* by Mr. Alessa *or* one of his close associates acting at the behest of Defendant Alasaker." Am. Compl. ¶ 239 (emphasis added). This equivocal allegation—which itself rests on conclusory assertions of "direct[ion]"—is not entitled to any truth. *Kareem v. Haspel*, 986 F.3d 859, 868 (D.C. Cir. 2021) ("allegation . . . made on an equivocal factual basis . . . is . . . afforded little, if any, weight in the plausibility analysis").

In an effort to shore up the connections between the three students and Mr. Alasaker, and therefore to establish a connection to the United States, Plaintiff alleges that "these operatives . . . regularly interacted with . . . Defendant Alasaker," Am. Compl. ¶ 227. Again, this allegation of a conclusion is not supported by facts. Aljabri alleges that the three students were involved in the MiSK Foundation, *id.* ¶ 234, of which Mr. Alasaker is the Secretary-General. But, at best, Aljabri has photos of Alhamed and Mr. Alasaker at two MiSK Foundation events and a conclusory assertion, buried at the end of a lengthy footnote, that Mr. Alasaker "cultivated' Alhamed "for the hunt for Dr. Saad in the United States" at those events, with no explanation as to what that means. *Id.* ¶ 104 n.96. The only fact to be derived from the allegations is that Mr. Alasaker and other Defendants were present at the same event, and, apart from the photos, there is no allegation that Mr. Alasaker met any of the other Student-Defendants at a MiSK Foundation event or that Mr. Alasaker discussed Aljabri with any of the three Student-Defendants, whether at a Foundation event or elsewhere. Aljabri also identifies a series of one-way Twitter interactions between the student-defendants and Mr. Alasaker, *id.* ¶¶ 91, 104, 107. But Aljabri never alleges that Mr. Alasaker, who has 1.8 million Twitter followers,[8] responded to or interacted with the student-defendants on Twitter. The facts in the Amended Complaint do not suggest any "regular[]" interaction between Mr. Alasaker and the Student-Defendants, and no such interactions concerning this case.[9]

---

[8] *See* @Badermasaker, https://twitter.com/Badermasaker.

[9] Aljabri also alleges that Mr. Alasaker sat at the same table as Mohammed Alessa (who is not a defendant), when Alessa asked "Friend 1" about Aljabri's son immigration status. Am. Compl. ¶ 239. There is no allegation that Alasaker directed such questioning. *See id.* ¶ 131.d ("Mohammed Alessa, acting at the direction of Defendant bin Salman, attempted to extract information regarding Dr. Saad's location from an Aljabri family friend at a MiSK-sponsored event in New York, New York."). The Amended Complaint contains only a conclusory allegation that the Crown Prince and Mr. Alasaker "deployed" Alessa "to continue the hunt." *Id.* ¶ 238.

Finally, Aljabri tries to mask the absence of facts by asserting that Mr. Alasaker, along with the Crown Prince, controls *all* Saudi students in the United States, including the three Student-Defendants. *See, e.g.*, *id.* ¶ 86 ("On information and belief, like other Saudi students in the United States, Defendants Alrajhi, Alhamed, and Abuljadayel were subject to Defendants bin Salman's and Alasaker's ultimate control and authority."). According to Aljabri, Mr. Alasaker controls the MiSK Foundation, which in turn controls a Saudi government entity, the Saudi Arabian Cultural Mission ("SACM"), which itself controls Saudi student groups in the United States. *See id.* ¶¶ 80, 228. This theory is implausible on its face. Accepting it requires adopting a series of far-fetched inferences, including disregarding the Foundation's corporate form and assuming Mr. Alasaker controls it; assuming that Mr. Alasaker, through the Foundation, controls SACM, a government entity; and agreeing that SACM in fact controls all students, including the three here. None of those allegations is supported by facts, and none can support the assertion that Mr. Alasaker directed any of the Student-Defendants to search for Aljabri.

Accordingly, the repeated assertions of recruiting, cultivating, ordering, directing, tasking, deploying, and supervising the four U.S.-based Defendants are insufficient to establish personal jurisdiction over Mr. Alasaker.

**B.     The Amended Complaint Does Not Allege A Substantial Connection Between Mr. Alasaker's Contacts In The United States And The Federal Law Claims.**

Even assuming Aljabri's allegations about Mr. Alasaker's U.S. contacts contained some factual matter, which they do not, the Amended Complaint fails to establish the necessary "substantial connection" between those U.S. contacts and the alleged attempted killing in Canada. *See Walden*, 571 U.S. at 284. As the Supreme Court recently explained, jurisdiction is appropriate only where there is a "strong relationship among the defendant, the forum, and the litigation." *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 141 S. Ct. 1017, 1030 (2021) (citation omitted);

*see also Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 137 S. Ct. 1773, 1780 (2017) (explaining that "the *suit*" must "aris[e] out of or relat[e] to the defendant's contacts with the *forum*") (citation omitted). But, where "the forum State, and the defendant's activities there, lack[ ] any connection to the plaintiffs' claims," then personal jurisdiction is improper. *Ford*, 141 S. Ct. at 1031. Mr. Alasaker's limited activities in the United States have no connection to Plaintiff's federal claims of an extrajudicial killing in Canada.

*First*, the events attended by Mr. Alasaker in the United States had nothing to do with the alleged attempted extrajudicial killing of Aljabri.[10] MiSK Foundation Br. § I.B. Indeed, Aljabri highlights functions that took place while he still lived in Saudi Arabia and years before the purported plot against him. *See, e.g.*, Am. Compl. ¶ 41 (listing events Mr. Alasaker attended in June 2014 through March 2017). Other events that Mr. Alasaker supposedly attended, such as those in Washington, D.C., are not alleged to have been attended by anyone else in this case. *See id.* ¶ 134 n.121. Aljabri does not allege that Mr. Alasaker directed anyone at those specific events, much less any of the Defendants in this case, to do anything concerning Aljabri. Aljabri instead alleges only that Mr. Alasaker "further cultivated Defendant Alhamed for the hunt for Dr. Saad in the United States" at two events. *Id.* ¶ 104 n.96. That allegation is conclusory, *see supra* § I.B, and fails to allege that Mr. Alasaker discussed Aljabri with Alhamed or directed him to take any actions. Accordingly, nothing in the Amended Complaint suggests that Mr. Alasaker's attendance

---

[10] Those events included "two MiSK Talks, modeled off of Ted Talks" held in 2018, an art panel discussion and tour of the Newseum held in March 2018, an exhibit of Saudi art at the Kennedy Center held in March 2018, a leadership training program that "included a partnership with Uber to provide rides" held in April 2018, and a "training workshop" conducted "in cooperation with Bloomberg and LinkedIn and hosted at Bloomberg's Washington D.C. offices" in June 2018. Am. Compl. ¶ 134 n.121. The Amended Complaint also alleges that Mr. Alasaker "executed" a "June 2016 agreement with Babson College and Lockheed Martin, which established the Prince Mohammad bin Salman College of Business and Entrepreneurship" in Saudi Arabia, with the signing ceremony occurring in Washington, D.C. *Id.* ¶ 135.

at events in the United States had a strong relationship to Aljabri's claims of an attempted extrajudicial killing in Canada.

*Second*, even if Aljabri had factual support for his conclusory allegations that Mr. Alasaker directed or recruited four individuals in the United States, jurisdiction is still lacking because those acts have no relationship to the alleged attempted killings. *See Klieman*, 923 F.3d at 1124 (explaining that due process "requires tangible allegations relating the attack that cost Esther Klieman's life to defendants' contacts with the forum"); *Bernhardt v. Islamic Republic of Iran*, 2020 WL 6743066, at *3 (D.D.C. Nov. 16, 2020) (Kelly, J.) (holding plaintiffs failed to establish personal jurisdiction where they "d[id] not show that their injuries, caused by the tragic suicide attack at Camp Chapman, 'arose out of' or 'relate[d] to' [defendants'] contacts with the United States").

Three of the Defendants allegedly asked about the location of Aljabri's wife, with the purpose of arranging a marriage with Aljabri's daughter, and the immigration status of Aljabri's son. Am. Compl. ¶¶ 238–44. The fourth allegedly sought Aljabri for purposes of financing a surgery. *Id.* ¶ 245. However, none of those individuals came in contact with Aljabri, whether in person, through email, or over the phone. *Id.* ¶¶ 238–45. Neither they nor Mr. Alasaker learned the location of Aljabri. *Id.* Indeed, despite relying heavily on allegations that there was a "search" in the United States, the Amended Complaint is noticeably silent about whether Aljabri was ever

actually in the United States during that time period.[11] Instead, Aljabri was allegedly located in Toronto, Canada by another Defendant, who was a close associate of *Aljabri's. See id.* ¶ 249 ("Aljabri family trusted Defendant Alharbi because he had worked for many years in Saudi Arabia in close cooperation with Dr. Saad and Mr. bin Nayef."). Aljabri also alleges the Crown Prince sought his residential address from a financial institution in April 2018, *id.* ¶ 330, and that malware planted on his phone in July 2018—months after the alleged U.S. search—could have confirmed his location, *id.* ¶ 333. The Amended Complaint does not allege any facts connecting Mr. Alasaker to Alharbi, the request to a financial institution, or the malware. However, it is those events that are alleged to have resulted in the discovery of Aljabri in Canada.

In an attempt to do an end-run around his own allegations, Aljabri now asserts that the Student-Defendants "learned specific, valuable information," *id.* ¶ 236. None of this supposedly "valuable" information—such as the location of Aljabri's son's wife in London, *id.* ¶ 244—led to

---

[11] Although Aljabri asserts that the Crown Prince believed Aljabri to be in the United States based on a June 2017 message in which Aljabri said he was going to Boston, Am. Compl. ¶ 172, Aljabri's complaint undermines that speculative allegation. In September 2017, when the purported search for Aljabri in the United States began, *see id.* ¶ 237, the Crown Prince allegedly was pressuring *Turkey* to "return Dr. Saad to Saudi Arabia," *id.* ¶ 179. Aljabri's own allegations contradict any suggestion that the Crown Prince—or Mr. Alasaker—thought Aljabri was in the United States in the fall of 2017. *See Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 109 (D.D.C. 2010) ("where some allegations in the complaint contradict other allegations, the conflicting allegations become naked assertions devoid of further factual enhancement . . . , which therefore cannot be presumed true" (citations omitted)). Aljabri also concedes that he was not living in the Mandarin Oriental Hotel, where his family owned an apartment, when two Defendants allegedly visited the building. *See* Am. Compl. ¶ 242.

the discovery of Aljabri in Canada.[12] In short, the purported acts of the U.S.-based Defendants lack the strong relationship necessary for jurisdiction.

*Third*, the required relationship is lacking because Aljabri does not reside in the United States or claim to have suffered harm in the United States. The Supreme Court has emphasized that any purported "connection between the nonresidents' claims and the forum is even weaker [where] [t]he relevant plaintiffs are not [forum] residents and do not claim to have suffered harm in that [forum]." *Bristol-Myers*, 137 S. Ct. at 1782. Not only is Aljabri a Canadian resident, with Saudi and Maltese citizenship, who alleges injury only in Canada, but he also does not allege that he was ever in the United States during the relevant time period. The absence of any connection between Aljabri's claims, the United States, and Mr. Alasaker demonstrates that personal jurisdiction is lacking over Mr. Alasaker.

## C. Exercising Jurisdiction Would Offend Notions of Fair Play and Substantial Justice.

Finally, forcing Mr. Alasaker to defend himself in this jurisdiction would not comport with fair play and substantial justice. *See Mwani*, 417 F.3d at 15. In this analysis, courts consider "the burden on the defendant, the interests of the forum State, the plaintiff's interest in obtaining relief in the forum State, and the interests of other sovereigns in resolving the dispute." *IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 115–16 (D.D.C. 2018) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 145 (2014) (Sotomayor, J., concurring)). All those factors weigh heavily against

---

[12] The Amended Complaint again contradicts itself regarding this information. It alleges that information, obtained by Alessa, that Aljabri's son was a permanent U.S. resident "removed an avenue for Defendant bin Salman to coerce Khalid back to Saudi Arabia," Am. Compl. ¶ 238, but then later alleges that the fact that the same son was not a U.S. citizen was "significant for purposes of the hunt for Dr. Saad insofar as it meant that Defendant bin Salman could control Khalid's legal status," *id.* ¶ 243. Such contradictory allegations cannot be taken as true.

exercising jurisdiction here, and present the "compelling case" that jurisdiction is "unreasonable." *Bauman*, 571 U.S. at 116 (citation omitted).

*First*, the burden on Mr. Alasaker would be "severe" if he were required to "submit its dispute . . . to a foreign nation's judicial system." *See Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 114 (1987). Indeed, the Supreme Court instructs that "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Id. Second*, the interests of the forum state—the United States—are minimal because neither Aljabri nor Mr. Alasaker is a U.S. citizen or resident, both are Saudi nationals, and the dispute involves the highest levels of the Saudi Arabian government and the official actions of the Saudi government.

*Third*, any interest of the Plaintiff is also lessened here. Aljabri has not chosen to bring suit in the forum in which he resides and where he alleges the group was dispatched to kill him, Canada, or the forum in which he is a citizen, Saudi Arabia. Although he alleges that Saudi Arabia lacks adequate remedies, Am. Compl. ¶ 382, he provides no factual support for that claim. Moreover, he still does not explain why Canada would not provide adequate remedies for his claim, despite Mr. Alasaker raising this issue in his original motion to dismiss and adopting a declaration from Canadian law expert Sujit Choudhry regarding the availability of Canada as a forum. ECF No. 61 (Alasaker MTD); ECF No. 58-9 (Ex. H, Choudhry Decl.). Aljabri has not explained why this foreign forum is more convenient for him, and accordingly his interest should be accorded little weight. *See Asahi*, 480 U.S. at 114 ("Cheng Shin has not demonstrated that it is more convenient for it to litigate its indemnification claim against Asahi in California rather than in Taiwan or Japan."). *Finally*, both Canada and Saudi Arabia have a stronger connection to this suit than the

United States. Canada is where Aljabri resides, and Saudi Arabia is where Aljabri is a citizen, where Mr. Alasaker resides, and where the relationships that give rise to Aljabri's claims are based. In addition, it is the law of Saudi Arabia (or Canada), that applies to the common law claim.

Accordingly, asserting jurisdiction over Mr. Alasaker would not comport with due process, and the Court should dismiss the claims against him. *See id.* at 115 (emphasizing that courts should be "unwilling[] to find the serious burdens on an alien defendant outweighed by minimal interests on the part of the plaintiff or the forum State").

## II.   THE COURT DOES NOT HAVE JURISDICTION OVER THE CLAIMS AGAINST MR. ALASAKER BECAUSE HE IS IMMUNE.

Aljabri's claims against Mr. Alasaker fail on a second threshold ground—the Court lacks subject matter jurisdiction because Mr. Alasaker is entitled to common law conduct-based immunity, and therefore the Amended Complaint should be dismissed pursuant to Rule 12(b)(1).

Conduct-based immunity is afforded to "any [] [p]ublic minister, official, or agent of the state with respect to acts performed in his official capacity if the effect of exercising jurisdiction would be to enforce a rule of law against the state." *Lewis v. Mutond*, 918 F.3d 142, 145 (D.C. Cir. 2019) (citation omitted); *see Yousuf v. Samantar*, 699 F.3d 763, 769 (4th Cir. 2012) (noting that conduct-based immunity "applies to current and former foreign officials"). Conduct-based immunity "derives from the immunity of the State" and is based on the "'classical'" theory that "'any act performed by the individual as an act of the State enjoys the immunity which the State enjoys.'" *Yousuf*, 699 F.3d at 774 (quoting Hazel Fox, *The Law of State Immunity* 455 (2d ed. 2008)); *see Samantar v. Yousuf*, 560 U.S. 305, 322 (2010) ("[W]e do not doubt that in some circumstances the immunity of the foreign state extends to an individual for acts taken in his official capacity."). Mr. Alasaker adopts and incorporates by reference the arguments in the Crown Prince's Brief about the availability of conduct-based immunity to these circumstances, including

the argument that conduct-based immunity is available even where the allegation at issue is a *jus cogens* norm, and that the TVPA does not abrogate common law conduct-based immunity. Crown Prince Br. § II.A.3.

Because Mr. Alasaker has not requested a suggestion of immunity from the U.S. Department of State at this time, "the District Court is authorized to decide whether all the requisites for foreign-official immunity exist." *Lewis*, 918 F.3d at 145–46.[13] Mr. Alasaker bears the burden to demonstrate his entitlement to immunity, and although the Court must assume the truth of Plaintiff's factual allegations, it "need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions." *Broidy Capital Mgmt. LLC v. Muzin*, 2020 WL 1536350, at *4 (D.D.C. Mar. 31, 2020) (citation omitted).

D.C. courts have applied two tests to determine whether a defendant is entitled to conduct-based immunity, the "State Department" test, *see id.* at *5, and a three-part test set forth in the Restatement (Second) of Foreign Relations Law § 66(f), *Lewis*, 918 F.3d at 146. Mr. Alasaker agrees that, for the reasons set forth in the other Defendants' briefs, this Court should apply the State Department test in this case, and adopts and incorporates by reference the arguments made therein. Crown Prince Br. § II.A.2; Mem. of Law of Youssef Alrajhi, Mohammed Alhamed, and Layla Abuljadayel in Supp. of their Mot. to Dismiss ("Student-Defendants Br.") § VIII.A. However, regardless of what test this Court applies, Mr. Alasaker is entitled to conduct-based immunity.

---

[13] The Crown Prince has requested a suggestion of immunity from the Department of State which is still pending, *see* Crown Prince Br. § II.A.

### A.      Mr. Alasaker Is Immune Under The State Department Test.

The State Department test assesses "whether it is 'the established policy of the State Department to recognize' the asserted 'ground of immunity.'" *Broidy*, 2020 WL 1536350, at * 5 (quoting *Samantar*, 560 U.S. at 312). The United States has recently explained to the Supreme Court that "conduct-based foreign-official immunity generally turns on whether the challenged action was taken in an official capacity." Br. for U.S. as Amicus Curiae Supporting Pet'rs, *Mutond v. Lewis*, No. 19-185, 2020 WL 2866592, at *10 (U.S. May 2020) (citing examples dating from 1794 to 2019). And "the State Department's adherence to that principle is . . . reflected in its annual Digest of United States Practice in International Law." *Id.* at *10–11 (citing Office of the Legal Advisor, U.S. Dep't of State, *Digest of United States Practice in Int'l Law* (Carrielyn D. Guymon, ed. 2015), Ch. 10, § B(3), at 426).

Recognizing that Mr. Alasaker is entitled to conduct-based immunity is consistent with the State Department's policies. To the extent that Aljabri is alleging that Mr. Alasaker is acting as an extension of the Crown Prince and pursuant to his official position with the Saudi government, then he is entitled to immunity. Aljabri alleges that Mr. Alasaker "acted under apparent authority or color of law of the government of Saudi Arabia." Am. Compl. ¶ 366. Aljabri alleges that Mr. Alasaker is the "head" of the Crown Prince's private office, *id.* ¶ 40, which, given Plaintiff's allegations, would be a government position by virtue of the Crown Prince's official position as the heir to the throne.[14] Aljabri has also alleged that Mr. Alasaker was the "right-hand" and

---

[14]    *See FaceOf: Bader Al-Asaker, secretary-general of Misk Foundation*, https://www.arabnews.com/node/1310756/saudi-arabia (May 28, 2018) ("Al-Asaker is also head of the private office for Crown Prince Mohammed bin Salman with the rank of minister since he was appointed by a royal decree in July 2017.").

"invisible hand" of the Crown Prince of Saudi Arabia, who accompanied an "official delegation" from Saudi Arabia to Washington, D.C. *Id.* ¶¶ 41 n.16, 228.

Moreover, the Amended Complaint offers for the first time a series of allegations relating to Mr. Alasaker's alleged control over *all* Saudi students in the United States, which as pled by Aljabri, rests on control over SACM, a Saudi Arabian government entity. *See id.* ¶ 228 ("Defendant Alasaker . . . assert[ed] control over the Saudi Arabian Cultural Mission."). These allegations confirm that Aljabri's theory regarding Mr. Alasaker's involvement concerns official actions. Likewise, the Amended Complaint alleges that Mr. Alasaker had the "*legal* authority" to "exert control over" other Defendants. *Id.* ¶ 378 (emphasis added); *see also id.* ¶ 377 ("Alasaker possessed and exercised command and operational control over the U.S.-Based Covert Agent Defendants."). And the only allegation that resembles a factual allegation as opposed to a conclusory assertion is that Mr. Alasaker sought to assist the Crown Prince in coordinating the logistics of Aljabri's return to Saudi Arabia—an act consistent with the allegation that Mr. Alasaker heads the Crown Prince's private office, a government position. *See id.* ¶ 177.

According to Plaintiff's own theory of the case, Mr. Alasaker was both an agent of Saudi Arabia and acting in an official capacity. As a result, he is entitled to conduct-based immunity pursuant to the policies of the State Department. *See, e.g.*, *Doe 1 v. Buratai*, 318 F. Supp. 3d 218, 232 (D.D.C. 2018) (holding that defendants acted in official capacity where complaint alleged that they "'exercised effective command and operational control' over the [] military and police forces and the State Security Service or 'exercised command authority and control over the perpetrators' of the attacks").

**B.      Mr. Alasaker Is Immune Under The Restatement Test.**

As described in the Crown Prince's Brief, there are important reasons why this Court should not apply the Restatement (Second) test here, including that the subsequent Restatements

of Foreign Relations Law have not adopted the "conduct-based" immunity test set forth in the Restatement (Second) in 1966. *See* Crown Prince Br. § II.A.2. However, even if the Court were to apply the Restatement (Second), Mr. Alasaker would be entitled to conduct-based immunity. The Restatement (Second) of Foreign Relations Law § 66(f) evaluates the following three elements: "[f]irst, whether the actor is a public minister, official, or agent of the foreign state. Second, whether the acts were performed in her official capacity. And third, whether exercising jurisdiction would serve to enforce a rule of law against the foreign state." *Lewis*, 918 F.3d at 146 (citations omitted). All three are satisfied here.

The first and second elements are satisfied from the face of the Amended Complaint because, as described above, Plaintiff's own theory is that Mr. Alasaker was both an agent of Saudi Arabia and acting in an official capacity. *See Dogan v. Barak*, 932 F.3d 888, 894 (9th Cir. 2019) (holding that immunity applied where "[t]he Complaint's claims for relief state—several times— that Barak's actions were done under 'actual or apparent authority, or color of law, of the Israeli [government]'"); *Miango v. Democratic Republic of Congo*, 2020 WL 3498586, at *6 (D.D.C. June 29, 2020) (holding immunity applied where "defendants' assertions are entirely consistent with plaintiffs' own allegations in this case, as plaintiffs have consistently maintained throughout this litigation that the individual defendants were acting in their official capacities").

This case also satisfies the third prong of the Restatement (Second). As the Amended Complaint demonstrates, Aljabri is currently sought by Saudi Arabian authorities for potential crimes committed in Saudi Arabia. *See* Am. Compl. ¶¶ 260–61. Many of the actions that Aljabri complains of, such as the "freezing" of his bank account, the submission of a notice to INTERPOL, and various immigration issues encountered by Aljabri's family, are acts tied up with the policies and actions of the Saudi government. *See* Crown Prince Br. § II.A.2.b; *see also* Am. Compl. ¶ 332

(INTERPOL notice involved "official government channels"). With regard to Mr. Alasaker specifically, his actions, including his phone calls and text messages to Aljabri to "coordinate the time and place of a private jet," were allegedly taken to bring Aljabri back to Saudi Arabia. Am. Compl. ¶ 177. And during the time of the purported search for him, Aljabri was subject to an INTERPOL diffusion notice, *id.* ¶ 257, and Saudi Arabia had asked Turkey to "forcibly return Dr. Saad," *id.* ¶ 179. *See also* Crown Prince Br. § II.A.2.b. Moreover, according to *Plaintiff*, the scheme against him arose out of a political power struggle in Saudi Arabia and efforts by the Crown Prince to consolidate his standing. *See* Am. Compl. ¶¶ 150, 269. Based on the narrative alleged by Aljabri, his claims are deeply intertwined with the politics and policies of a foreign state.

Therefore, a holding from this Court that Mr. Alasaker's actions were unlawful would be equivalent to enforcing a rule of law against Saudi Arabia. *See* Crown Prince Br. § II.A.2.b. It would call on this Court to pass judgment on any number of actions taken by the Saudi government and its officials. In addition, as to Mr. Alasaker, Plaintiff seeks not only financial remedies, but the imposition of a "declaratory judgment" stating that he and the other Defendants "have violated the TVPA by attempting to extrajudicially kill" Aljabri and "have violated the law of nations by attempting to extrajudicially kill" Aljabri, as well as any "further relief" the Court deems proper. *See* Am. Compl. ¶¶ 395, 408, p. 180. Any ruling by this Court against Mr. Alasaker or pertaining to the events underlying the Amended Complaint would therefore effectively be dictating to Saudi Arabia that it lacks the authority to seek to hold one of its own officials responsible for crimes committed in Saudi Arabia and imposing liability on the Kingdom for its official actions. *See*

*Buratai*, 318 F. Supp. 3d at 233 ("By interfering with Nigeria's government, a decision would effectively enforce a rule of law against Nigeria.").[15]

## III.   PLAINTIFF'S CLAIMS ARE PRECLUDED BY THE ACT OF STATE DOCTRINE.

Even if the Court were to find that Plaintiff had overcome the jurisdictional issues described above, the Amended Complaint should be dismissed because adjudicating this case would require this Court to inquire into the validity of the public acts a foreign sovereign committed within its own territory, thereby violating the act of state doctrine. In this respect, Mr. Alasaker adopts and incorporates by reference the arguments made in the Crown Prince's Brief. Crown Prince Br. § II.C.

## IV.   THE COURT MUST DISMISS THE CLAIMS AGAINST MR. ALASAKER BECAUSE SAUDI ARABIA IS A NECESSARY PARTY THAT CANNOT BE JOINED.

The case must also be dismissed because Saudi Arabia is a necessary party to this litigation under Federal Rule of Civil Procedure 19(a)(1), but joinder is not feasible because this suit against Saudi Arabia is barred by sovereign immunity. *See TJGEM LLC v. Republic of Ghana*, 26 F. Supp. 3d 1, 13 (D.D.C. 2013), *aff'd*, 2015 WL 3653187 (D.C. Cir. June 9, 2015). Where, as here, the absent party is entitled to sovereign immunity, the inability to join that necessary party requires dismissal of the suit under Rule 12(b)(7). *Republic of Philippines v. Pimentel*, 553 U.S. 851, 867 (2008). In this respect, Mr. Alasaker adopts by reference the arguments in the Crown Prince's Brief. Crown Prince Br. § II.B.

---

[15] Mr. Alasaker is also entitled to derivative immunity to the extent that Aljabri has plead that Mr. Alasaker was passing along orders from the Crown Prince, Am. Compl. ¶ 15. Mr. Alasaker adopts and incorporates by reference the derivate immunity arguments made in the Student-Defendants' Brief. Student-Defendants Br. § VII.E.

## V.     **PLAINTIFF FAILS TO STATE A CLAIM UNDER THE TVPA AND ATS.**

The claims against Mr. Alasaker under the TVPA and ATS should also be dismissed for failure to state a claim under Rule 12(b)(6). As an initial matter, neither the TVPA nor the ATS provides a cause of action for Plaintiff's allegations of "attempted killing." And, even if they did, the same deficiency that doomed Plaintiff's jurisdictional efforts—his reliance on conclusory allegations—dooms his substantive claims as to Mr. Alasaker.

### A.     **The TVPA Does Not Provide A Cause Of Action For Plaintiff's Allegations.**

Plaintiff cannot bring a claim of "attempted killing" against Mr. Alasaker under the TVPA for three reasons: (1) the statute prohibits "extrajudicial killing[s]," not attempted extrajudicial killings; (2) Plaintiff failed to exhaust local remedies; and (3) the statute does not provide for secondary liability.

*First*, the TVPA did not create a cause of action for an "attempted" extrajudicial killing. In that statute, Congress chose to create a limited private right of action for certain claims. As relevant here, the TVPA states that an "individual who, under actual or apparent authority, or color of law, of any foreign nation . . . subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death." TVPA, Pub. L. No. 102-256 § 2(a)(2), 106 Stat. 73, *codified at* 28 U.S.C. § 1350 note (1992). The statute's limitation to "extrajudicial killing" does not provide relief to a person who was the object of an incomplete or unsuccessful plan to harm him. The claim is given only to the legal representative or claimant in an action for wrongful death. *See id.* Congress could of course have created a broader claim, including relief for the victim of a plan or an unsuccessful attempt at homicide, but it chose to limit the claim to those entitled to sue for another's wrongful death. That category does not include Aljabri.

Similarly, Aljabri's allegations fail to state a claim because they are based on the theory that Mr. Alasaker engaged in an *attempted tort* where that tort (the alleged extrajudicial killing) came nowhere near occurring. As described in the other Defendants' briefs, liability for "attempted" torts is circumscribed, particularly where no actual tort was committed. *See* Crown Prince Br. § III.A.1; Student-Defendants' Br. § V.A; Mot'n by Messrs. Alqahtani, Alassiri, Alsayed, Algasem, Alsaleh, Alhaqbani, and Alhomid to Dismiss the Complaint § V.D.1.[16] This is also true where the attempted tort is what is alleged here—an inchoate attempt to commit an extrajudicial killing. *See* Crown Prince Br. § III.A.1; Student-Defendants' Br. § V.A; Mot. by Messrs. Alqahtani, et al. § V.D.1. The Defendants that were allegedly sent to Canada for the purposes of killing Aljabri never came close to Aljabri, did not cause him any physical injury, and are not alleged to have had any interaction with him. (And Mr. Alasaker's alleged role in that sequence of events is limited to a conclusory allegation of "support."). Not only do these allegations not amount to an *actual* killing, as required by the statute, but they do not give rise to a viable tort theory. *See Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 692 (7th Cir. 2008) (en banc) ("The law of attempt has no counterpart in tort law, because there is no tort without an injury." (citation omitted)).

*Second*, Plaintiff fails to state a claim under the TVPA because the statute requires that a putative plaintiff exhaust his local remedies "in the place in which the conduct giving rise to the claim occurred." TVPA § 2(b). Aljabri has failed to exhaust remedies in Canada and Saudi Arabia, and Mr. Alasaker adopts and incorporates by reference the arguments and expert declarations on this issue set forth in the Crown Prince's Brief. Crown Prince Br. § III.A.2.

---

[16] In this respect, Mr. Alasaker adopts and incorporates by reference the arguments set forth in the other Defendants' briefs about liability for an attempted tort.

*Third*, Plaintiff fails to state a claim under the TVPA pursuant to the secondary liability theories set forth in the Amended Complaint. The Court should dismiss claims based on conspiracy and aiding and abetting theories because the TVPA does not provide for such liability. Supreme Court and D.C. Circuit precedent confirm that, in the absence of an express mention of aiding and abetting or conspiracy in civil statutes, courts should not such infer such liability.

The Supreme Court in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994) declined to extend statutory liability under section 10(b) of the Securities Exchange Act of 1934 to include aiding and abetting. The Supreme Court explained that "[i]f . . . Congress intended to impose aiding and abetting liability, we presume it would have used the words 'aid' and 'abet' in the statutory text." *Id.* at 177. Therefore, "[b]ecause the text of [the statute] does not prohibit aiding and abetting," the Court held that "a private plaintiff may not maintain an aiding and abetting suit." *Id.* at 191. Similarly, relying on *Central Bank*, the D.C. Circuit held that the pre-2016 version of the Anti-Terrorism Act does not include aiding and abetting or conspiracy liability. *Owens v. BNP Paribas, S.A.*, 897 F.3d 266 (D.C. Cir. 2018). The court concluded that "[t]he key takeaway from *Central Bank* is that when Congress creates a private cause of action, aiding and abetting liability is not included in that cause of action unless Congress speaks to it explicitly." *Id.* at 277. Under *Central Bank*, "the statutory text controls the definition of conduct covered" by the statute, and "when the statutory text is silent there simply is no congressional intent to impose . . . aiding and abetting liability." *Id.* at 279 (citation omitted). Leaving no doubt as to its holding, the Court reiterated: "when Congress is silent as to aiding and abetting liability, it has *unambiguously* foreclosed that theory of recovery." *Id.* (emphasis added). The court applied the same reasoning in holding that there was no conspiracy liability under the Act. *Id.* at n.12.

*Central Bank* and *Owens* apply with full force to the TVPA. The TVPA does not mention aiding and abetting or conspiracy liability. *See* 28 U.S.C. § 1350 note. Under *Owens* and *Central Bank*, that statutory silence means Congress has "unambiguously foreclosed" those secondary forms of liability. 879 F.3d at 279. Because the TVPA "does not expressly provide for aiding and abetting liability, such liability is unavailable." *See id.*; *see also Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 618 (S.D.N.Y. 2012) ("The text of the TVPA is silent as to aiding and abetting, and such silence should not be interpreted as granting and authorizing that liability."); *Weisskopf v. United Jewish Appeal-Fed'n of Jewish Philanthropies of N.Y., Inc.*, 889 F. Supp. 2d 912, 924 (S.D. Tex. 2012) (TVPA "does not permit liability for aiding and abetting a primary violator.")[17]

Accordingly, the Court should dismiss Aljabri's aiding and abetting and conspiracy liability allegations under the TVPA.

---

[17] The D.C. Circuit's footnote in *Doe v. Exxon Mobil Corp.*, 654 F.3d 11 (D.C. Cir. 2011) regarding the absence of vicarious liability in the TVPA does not bind this Court. *See id.* at 58 n.49. The *Exxon* court was not confronted with whether the TVPA included vicarious liability for natural persons, but rather a separate issue of whether corporations could be held liable as aiders and abettors under the TVPA. Indeed, the court only "assum[ed] *arguendo* that aiding and abetting liability is available under the TVPA," in holding that corporations could not be liable as aiders and abettors. *Id.* at 58. In a footnote, it responded to then-Judge Kavanaugh's dissent, which, in the majority's view, made the "unnecessar[y]" point that the TVPA did not provide for vicarious liability for natural persons. The majority stated that this position was "inconsistent with the Senate Judiciary Committee report, which states that the statute permits 'lawsuits against persons who ordered, abetted, or assisted in . . . torture.' " *Id.* at 58 n.49 (quoting S. Rep. No. 102–249, at 8 (1991)). Because the issue of natural-person vicarious liability was not at issue in the case, the footnote is dicta. Furthermore, that dicta cannot be reconciled with *Owens*, which rejected reliance on legislative history in determining aiding and abetting liability where the statutory text is silent. Accordingly, the Court should follow the D.C. Circuit's holding in *Owens* and the Supreme Court's holding in *Central Bank*, and conclude that the TVPA does not provide for aiding-and-abetting or conspiracy liability.

**B.      The ATS Does Not Provide A Cause Of Action For Plaintiff's Allegations.**

Plaintiff's claims under the ATS similarly fail to state a claim for three reasons.

*First*, as described in the Crown Prince's Brief, an inchoate attempted killing does not violate the norms of international law that are the sole subject of the ATS. *See* 28 U.S.C. § 1350 (granting "jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States"). In this regard, Mr. Alasaker adopts and incorporates by reference the arguments made by the Crown Prince. Crown Prince Br. § III.B.1.

*Second*, Plaintiff's ATS claim fails because Plaintiff has failed to allege conduct *in the United States* that violated these universal norms (or aided and abetted that violation) and therefore he has not met the jurisdictional requirements of the statute. *See Mastafa v. Chevron Corp.*, 770 F.3d 170, 187 (2d Cir. 2014) (domestic conduct must constitute "a violation of the law of nations or aiding and abetting another's violation of the law of nations"). In this respect, Mr. Alasaker also adopts and incorporates by reference the arguments made by the Crown Prince. Crown Prince Br. § III.B.2.

*Lastly*, Plaintiff's ATS claim fails because the statute does not authorize aiding and abetting liability and binding precedent in this Circuit on this issue should be overturned. The D.C. Circuit has held that aiding and abetting liability is part of the ATS. *Exxon*, 654 F.3d at 28–32. However, the question of whether the ATS allows aiding and abetting liability is currently before the Supreme Court. As the United States has recently argued in its briefing in the pending case, "[u]nder *Jesner*'s application of *Sosa*'s second step, permitting aiding-and-abetting claims 'to proceed' would not represent 'a proper exercise of judicial discretion.'" Br. for U.S. as Amicus Curiae Supporting Pet'rs at 23, *Nestlé USA, Inc. v. Doe I*, Nos. 19-1416 and 19-453 (U.S. Sept. 1, 2020) (quoting *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1399 (2018) (plurality op.)). Accordingly, Mr. Alasaker preserves this issue for review.

**C.      Plaintiff Has Proffered Only Conclusory Allegations To Support The TVPA And ATS Claims Against Mr. Alasaker.**

Thus, even without considering the factual sufficiency of Aljabri's allegations against Mr. Alasaker, the Court should dismiss the TVPA and ATS claims against him because there is no interpretation of the allegations which would bring them within those statutes. Each federal cause of action asserts that Mr. Alasaker "personally committed, or exercised command responsibility over, the U.S.-Based Covert Agent Defendants and the Tiger Squad Defendants to commit the attempted extrajudicial killing of Dr. Saad," or conspired with, or aided and abetted, others in the attempted killing. Am. Compl. ¶¶ 386–87, 398–99. Were the Court to examine those allegations, it would see that Aljabri has not satisfied the pleading requirements of *Iqbal*, and it should dismiss those two counts (and subsequently, the entire complaint) as to Mr. Alasaker.

"To survive a motion to dismiss, the complaint must plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged, and must suggest a plausible scenario that shows that the pleader is entitled to relief." *Muhammad v. United States*, 300 F. Supp. 3d 257, 262 (D.D.C. 2018) (Kelly, J.) (citations omitted). But "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (citation omitted). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (citation omitted). As the Supreme Court instructed in *Iqbal*, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. Following that procedure here demonstrates that there are no "well-pleaded factual allegations" that "plausibly give rise to an entitlement of relief" against Mr. Alasaker. *Id.*

### 1.     Plaintiff's Conclusory Allegations Do Not State A Claim For Mr. Alasaker's Direct Liability For Attempted Killing.

There are *no* factual allegations supporting Aljabri's direct liability theory. Aljabri never alleges that Mr. Alasaker participated in, or directed anyone who participated in, the attempted killing. *See supra* § I.A.1. The sections of the Amended Complaint dedicated to outlining the attempted killing plots contain no allegations about Mr. Alasaker's involvement. *See* Am. Compl. ¶¶ 319–65. Indeed, Aljabri does not identify *a single connection* between Mr. Alasaker and the "Tiger Squad Defendants," *see supra* § I.A.1, undermining his allegation that Mr. Alasaker "exercised command responsibility" over those individuals. The repeated phrases of "personally committed" and "exercised command responsibility" or had the "legal authority and practical ability to exert control" that litter the Amended Complaint (Am. Compl. ¶¶ 378, 386) are "threadbare recitals of the elements of a cause of action," which are insufficient to state a claim. *Iqbal*, 556 U.S. at 678; *see also Mamani v. Berzain*, 654 F.3d 1148, 1153 (11th Cir. 2011) (identifying as conclusory the allegations that defendants "exercised command responsibility over, conspired with, ratified, and/or aided and abetted subordinates in the Armed Forces . . . to commit acts of extrajudicial killing").

Nor can Aljabri rely on his thrice-repeated allegation that Mr. Alasaker "support[ed]" the plot to kill Aljabri to establish his direct liability. Am. Compl. ¶¶ 19, 111, 114. Critically, the Amended Complaint offers *no factual allegations* explaining what "support" Mr. Alasaker provided, when he gave it, or how he did so. *See supra* § I.A1. Mere "naked assertions devoid of further factual enhancement" do not state a claim. *Iqbal*, 556 U.S. at 678 (citation omitted). And "the fact that [Aljabri] has 'said it thrice' does not make an allegation true." *Parhat v. Gates*, 532 F.3d 834, 848 (D.C. Cir. 2008) (quoting Lewis Carroll, *The Hunting of the Snark* 3 (1876)).

The allegations that Mr. Alasaker directed four other Defendants to conduct an unsuccessful search for Aljabri from September 2017 through December 2017 in the United States cannot establish *direct liability* for a subsequent attempted killing in Canada. Aljabri does not allege that the four Defendants sought to kill Aljabri or that Mr. Alasaker instructed them to do so. And, for the reasons already discussed, those allegations have no factual support, and should not be taken as true. *See supra* § I.A.2.

Once the Court disregards the conclusory allegations, the only allegation that contains any factual detail as required under Rule 8(a) is that, in September 2017, Mr. Alasaker "repeatedly phoned and sent WhatsApp messages to [Aljabri], attempting to coordinate the time and place of a private jet that would bring [Aljabri] back to Saudi Arabia." Am. Compl. ¶ 177. But this single allegation, concerning the administrative task of coordinating transportation, does not give rise to a plausible inference that Mr. Alasaker is directly liable for an alleged attempted killing that Aljabri asserts is still "ongoing." *Id.* ¶ 322.

Not only does the Amended Complaint lack any facts connecting Mr. Alasaker to the attempted killing, but it is also silent on any facts showing that Mr. Alasaker had an intent to kill Aljabri. Intent is a necessary element of Aljabri's claim. *See, e.g.*, *Owens v. Republic of Sudan*, 864 F.3d 751, 770 (D.C. Cir. 2017), *vacated in part on other grounds by Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020) (explaining that "deliberated" under the TVPA means "being undertaken with studied consideration and purpose" (quoting *Berzain*, 654 F.3d at 1155)). The Amended Complaint alleges only that Mr. Alasaker, along with other Defendants, had the "specific intent" to kill Aljabri, Am. Compl. ¶¶ 390, 402, with no facts supporting that conclusory allegation. *See also supra* § I.A.1.

Accordingly, Aljabri has not pled any facts plausibly showing that Mr. Alasaker is directly liable for an attempted killing.

> **2.      Plaintiff's Conclusory Allegations Also Fail To State A Claim For Secondary Liability.**

Plaintiff's secondary theories of liability, which are premised on conspiracy and aiding and abetting principles, suffer from these same defects. Plaintiff relies on the term "conspiracy" and "joint criminal enterprise," with conclusory statements that defendants conspired together or that one defendant aided and abetted another, in his attempt to state a claim. *See, e.g.*, Am. Compl. ¶ 387 (stating that "[a]lternatively . . . Alasaker conspired with, or aided and abetted subordinates, including the U.S.-Based Covert Agent Defendants and the Tiger Squad Defendants"); *id.* ¶ 399 (same with additional allegation of "engag[ing] in a joint criminal enterprise").[18] A plaintiff asserting aiding and abetting or conspiracy theories must do more than make these types of conclusory allegations. *Twombly*, 550 U.S. at 557 (terms like "conspiracy or even agreement" require factual support and "might well be sufficient in conjunction with a more specific allegation—for example, identifying a written agreement or even a basis for inferring a tacit agreement, . . . but a court is not required to accept such terms as a sufficient basis for a complaint" (citation omitted)). Instead, a plaintiff must, consistent with the pleading principles set forth in *Iqbal* and elsewhere, allege facts supporting the conspiracy or aider/abettor relationship. Aljabri does not do so here.

---

[18] "The analog to a conspiracy as a completed offense in international law is the concept of a 'joint criminal enterprise.'" *Presbyterian Church Of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 260 (2d Cir. 2009).

The Amended Complaint makes no real effort to allege the elements of a conspiracy, which are:

> (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme.

*Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983).

The Amended Complaint contains *no* facts plausibly showing a meeting of the minds—such as identifying a single individual with whom Alasaker allegedly agreed. *See Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 113 (D.D.C. 2010) ("Fatal then to the plaintiffs' conspiracy theory claim is the failure of their amended complaint to provide any indication of when or how such an agreement was brokered, or how the . . . Defendants specifically, as opposed to all the named defendants generally, were parties to an agreement."). Nor does the Amended Complaint identify when or how the conspiracy arose. Instead, the Amended Complaint's support for an agreement is the bald statement that "Defendants had ample opportunity to and in fact did agree to commit unlawful acts." Am. Compl. ¶ 370. That conclusory allegation parrots the legal standard and should be rejected outright. *See Iqbal*, 556 U.S. at 678 ("[A] formulaic recitation of the elements of a cause of action will not do." (citation omitted)).

The conspiracy claim fails for another reason—it does not adequately allege Mr. Alasaker's knowledge of the existence or purpose of the conspiracy. Where, as here, the "conspirators are not all directly connected, the critical question is whether each conspirator knows of the existence of the larger conspiracy and of the necessity for the other participants, even if he or she does not know their identities." *Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84, 110 (D.D.C. 2017) (citation omitted). Aljabri does not allege facts raising a plausible inference that Mr. Alasaker had any knowledge that others purportedly concocted a plan to kill Aljabri in Canada in 2018 or in 2020.

As Aljabri's own chart alleges, Am. Compl. ¶ 124, Mr. Alasaker's role is confined to the purported search for Aljabri in the United States from September to December 2017. The Amended Complaint does not allege that any of the individual defendants in the United States reported any information back to Mr. Alasaker, that Mr. Alasaker knew that Aljabri had been found in Canada, or that anyone informed Mr. Alasaker about the various alleged developments and plots from 2017 through 2020. *See Ofisi*, 278 F. Supp. 3d at 110 (dismissing conspiracy claim where "complaint does not plausibly allege that BNPP knew of the existence of any conspiracy between Sudan and al Qaeda to carry out the embassy bombings").

The Amended Complaint's gratuitous allegations that do not involve the alleged attempted killing are irrelevant to Mr. Alasaker's intent or involvement with a conspiracy here. Aljabri alleges that Mr. Alasaker received several phone calls from an unidentified "member of the Tiger Squad"—who is not alleged to be a "Tiger Squad Defendant" here—during the attack on Jamal Khashoggi. Am. Compl. ¶ 306. Aljabri also references an unrelated indictment, in which Mr. Alasaker is not a defendant, concerning a "scheme" from about 2014 to 2016 "to infiltrate Twitter via U.S.-based employees," who were allegedly "tasked with obtaining personal information about critics of Defendant bin Salman." *Id.* ¶ 226. In a footnote, the Amended Complaint alleges that Mr. Alasaker used a "variety of means in both" this case and the Twitter indictment to "recruit" individuals for Defendant bin Salman. *Id.* ¶ 226 n.179. Aljabri also alleges that Mr. Alasaker was part of a "smear" campaign against him, *id.* ¶ 47, but the specific paragraphs describing that purported effort fail to mention Mr. Alasaker, *see id.* ¶¶ 261–66. The Amended Complaint does not provide any facts showing how these unrelated allegations raise a plausible inference that Mr. Alasaker had any involvement in the alleged attempted killing of Aljabri. Such muckraking does not lend Plaintiff's allegations the factual detail that they lack.

For similar reasons, Aljabri's aiding and abetting theory also fails. The inquiries under the TVPA—assessed under the common law—and the ATS—assessed under international law—"overlap." *See Ofisi v. BNP Paribas, S.A.*, 2018 WL 396234, at *4 n.7 (D.D.C. Jan. 11, 2018). Under international law, aiding and abetting liability has two elements, *actus reus* and *mens rea*. *Ofisi*, 278 F. Supp. 3d at 108. The *actus reus* requires showing "practical assistance, encouragement, or moral support which has a substantial effect on the perpetration of the crime," such that the "underlying crime probably would not have occurred in the same way had not someone acted in the role that the accused [aider and abettor] in fact assumed." *Id.* (citations omitted). For *mens rea*, a defendant is only liable for aiding and abetting if he or she "know[s] that their acts assist the commission of the principal offense." *Id.* at 108–09 (citation omitted). Under the common law, aiding and abetting liability

> includes the following elements: (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation.

*Halberstam*, 705 F.2d at 477.

Whether under common law or international law, Aljabri has failed to plausibly show that Mr. Alasaker provided any substantial assistance or acted with the requisite knowledge. Even assuming there were some factual support underlying the allegations of his control over the four U.S. Defendants, Mr. Alasaker's conduct could not constitute "substantial assistance" because it had *no impact* on the later "plot to travel to Canada with the express purpose of murdering Dr. Saad." Am. Compl. ¶ 391; *see supra* § I.B. No one allegedly directed by Mr. Alasaker located Aljabri, who was found by a defendant with strong connections to Aljabri, but who had no connections to Mr. Alasaker. *See supra* § I.B. As a result, Mr. Alasaker's conduct did not "cause[]

Plaintiff[']s injuries," *Bernhardt*, 2020 WL 6743066, at *6, or make "a significant difference to the commission of the criminal act by the principal," *Ofisi*, 278 F. Supp. 3d at 108 (citation omitted); *see also Halberstam*, 705 F.2d at 482 (explaining that act "could constitute 'substantial assistance'" where it was "indispensable prerequisite" to underlying tort).

The Amended Complaint also fails to adequately plead Mr. Alasaker's state of mind, which requires showing that Mr. Alasaker "knowingly" assisted "the principal violation" while being "generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance." *Halberstam*, 705 F.2d at 477, 487–88. Apart from a formulaic recitation of the standard, *see* Am. Compl. ¶¶ 372, 375, Aljabri's support is that Mr. Alasaker, and others "planned, oversaw, and coordinated the hunting of Dr. Saad in the United States as well as the mission to kill Dr. Saad in Canada." *Id.* ¶ 372. Those allegations do not satisfy Aljabri's burden.

Aljabri has not alleged any facts showing that Mr. Alasaker had any knowledge about the attempted killing. *See Bernhardt*, 2020 WL 6743066, at *5 (holding that plaintiff failed to plausibly allege knowledge for aiding and abetting where "the[] allegations do not contain facts that plausibly suggest that [defendants] knew they had assumed a role in terrorism"). Mr. Alasaker's role in the "hunt" is conclusory and irrelevant, because Aljabri must allege his knowing assistance of the *attempted killings*. *See id.* at *6 (plaintiff must allege that defendant "knowingly assisted in this attack"). But there are *no facts* that Mr. Alasaker "planned, oversaw, and coordinated . . . the mission to kill." Am. Compl. ¶ 372. And the Amended Complaint lacks any factual detail regarding Mr. Alasaker's knowledge of other Defendants' supposed intent to kill Aljabri. Accordingly, Aljabri "come[s] up well short of th[e] high bar" to plead aiding and abetting liability." *Bernhardt*, 2020 WL 6743066, at *5.

For these reasons, Plaintiff has failed to establish any liability theory supporting his ATS and TVPA claims, and those claims should be dismissed.

## VI.   DISMISSAL OF THE FEDERAL LAW CLAIMS REQUIRES DISMISSAL OF THE REMAINING INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM.

If the Court dismisses the federal law claims, the intentional infliction of emotional distress (IIED) claim should be dismissed for two initial reasons. *First*, for the reasons explained in the Crown Prince's Brief, which Mr. Alasaker adopts and incorporates by reference, once the Court dismisses the federal law causes of action, it no longer has the power to exercise personal jurisdiction over the IIED claim and should dismiss that claim. *See* Crown Prince Br. § III.C.3.

*Second*, the Court should decline to exercise supplemental jurisdiction, *see* 28 U.S.C. § 1367(c)(3) over the IIED claim if the Court dismisses the TVPA and ATS causes of action. Mr. Alasaker adopts and incorporates by reference the arguments in the Crown Prince brief regarding the unavailability of supplemental jurisdiction over this claim. *See* Crown Prince Br. § III.C.4.

## VII.   PLAINTIFF FAILS TO STATE A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

The common law IIED claim must also be dismissed for failure to state a claim under Rule 12(b)(6). The IIED claim is governed by Saudi law, which does not recognize a claim for IIED. However, even if D.C. law applies, the Amended Complaint does not allege facts sufficient to establish a claim for IIED and cannot overcome other legal deficiencies.

### A.   The IIED Claim Is Governed By Saudi Arabian Law And Must Be Dismissed.

As section III.C.1 of the Crown Prince's Brief shows (which Mr. Alasaker incorporates and adopts by reference), both Saudi Arabia and Canada have potential interests in having their law applied to Aljabri's claim for IIED. However, the IIED claim is ultimately governed by Saudi

Arabian law, which does not recognize a cause of action for IIED. *See* Crown Prince Br. § III.C.1. Thus, the IIED claim must be dismissed.

### B.   Plaintiff Has Failed To State An IIED Claim Under D.C. Law.

Even assuming D.C. law applies, the Court should dismiss the IIED claim as to Mr. Alasaker for the reasons set forth below. In D.C., a claim for intentional infliction of emotional distress requires "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff [to suffer] severe emotional distress." *Ortberg v. Goldman Sachs Grp.*, 64 A.3d 158, 163 (D.C. 2013) (citation omitted). Plaintiff is unable to meet these "strict tests." *Id.*

*First*, as described above, *Iqbal* requires that Plaintiff advance more than conclusory allegations to support his claim. Aljabri's IIED claim is premised on the same conclusory allegations that doom Plaintiff's allegations against Mr. Alasaker as a whole, and thus the IIED claim should be dismissed for that reason.[19]

*Second*, Aljabri's efforts to sustain the IIED claim based on theories of conspiracy and aiding and abetting liability fail for the same reasons as in section V.C.2, *supra*.

*Third*, Aljabri has not alleged any specific, non-conclusory facts supporting an inference that *Mr. Alasaker's* conduct caused him distress. The allegations in the Amended Complaint identifying the *timing* and *cause* of Aljabri's distress allege, at best, that Aljabri suffered this

---

[19] The conclusory allegations also require dismissal if Canadian law were to apply. Canada's analogous tort is intentional infliction of mental suffering, which requires showing that "the defendant's conduct was flagrant and outrageous; the defendant's conduct was calculated to harm the plaintiff; [and] the defendant's conduct caused the plaintiff to suffer a visible and provable illness." *Boucher v. Wal-Mart Canada Corp.*, 2014 ONCA 419, ¶ 41. Naked assertions of directing other individuals do not plead any "flagrant and outrageous conduct" or demonstrate that Mr. Alasaker caused any harm to Aljabri. The Amended Complaint also does not allege that such actions were "calculated" to harm Aljabri.

alleged emotional distress in response to learning that his adult children had been "disappeared" in Saudi Arabia—which occurred in March 2020—years after any allegations of any involvement by Mr. Alasaker in the underlying events. *See* Am. Compl. ¶ 194. Rather, Aljabri alleges that the kidnapping was undertaken by 50 armed men and supervised by another individual, none of whom are named as Defendants in this case. *Id.* ¶ 189. Aljabri alleges that he now "lives in a state of extreme fear and anxiety, with insomnia and other physical effects." *Id.* ¶ 365. That allegation is also unconnected to any acts by Mr. Alasaker. *See id.* ¶¶ 353–64.

*Fourth*, to the extent Plaintiff's IIED claim as to Mr. Alasaker rests on the allegations regarding the "kidnapping" of his adult children, D.C. law provides that where conduct is "directed at a third person," (here, Aljabri's adult children), a member of that person's family will have a claim for intentional infliction of emotional distress only if the family member was "present at the time." Restatement (Second) of Torts § 46(2)(a); *Republic of Sudan v. Owens*, 194 A.3d 38, 41–42 (D.C. 2018). As discussed in the Crown Prince's Brief (which Mr. Alasaker adopts and incorporates by reference), Aljabri does not allege that he was present for that kidnapping, Am. Compl. ¶ 189. *See* Crown Prince Br. § III.C.2. That event cannot serve as a basis for this claim.

*Fifth*, Aljabri cannot state a claim based on Mr. Alasaker's alleged role in directing individuals searching for Aljabri in the United States, *see* Am. Compl. ¶ 411, because that conduct does not amount to "extreme or outrageous conduct." The three Student-Defendants asking *other individuals* about the location of Aljabri's wife, or the immigration status of Aljabri's son, is not extreme or outrageous conduct as to *Aljabri*. Similarly insufficient is Hamed asking Aljabri's son to connect with Aljabri to help pay for a surgery. Am. Compl. ¶ 245. These Defendants never came in contact with Aljabri, whether in person, through emails, or by telephone.

Finally, for the reasons stated in the Crown Prince's Brief, Aljabri cannot state a claim because under the law, an *attempt* to commit bodily harm is not actionable as an intentional infliction of emotional distress claim. *See* Crown Prince Br. § III.C.2.

## CONCLUSION

For all the foregoing reasons, the Court should dismiss the claims against Mr. Alasaker.

Respectfully submitted,

*/s/ William W. Taylor, III*
By: William W. Taylor, III (D.C. Bar No. 84194)
Margarita K. O'Donnell (D.C. Bar No. 1005972)
ZUCKERMAN SPAEDER LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036
Tel: (202) 778-1800
Fax: (202) 822-8106
E-mail: wtaylor@zuckerman.com
E-mail: modonnell@zuckerman.com
Telephone: (202) 778-1800
Facsimile: (202) 822-8106

*Attorneys for Defendant Bader Alasaker*

**CERTIFICATE OF SERVICE**

I certify that on April 5, 2021, I electronically filed the foregoing Bader Alasaker's Motion to Dismiss and Memorandum in Support of His Motion to Dismiss, using the ECF system, which sent notice of filing in this matter to all counsel of record.

*/s/ William W. Taylor, III*

William W. Taylor, III
*Attorney for Defendant Bader Alasaker*