IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAAD ALJABRI | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 1:20-cv-02146-TJK |
| MOHAMMED BIN SALMAN BIN | § | |
| ABDULAZIZ AL SAUD, et al. | § | |
| | § | |
| Defendants. | § | |

**PRINCE MOHAMMED BIN SALMAN ABDULAZIZ FOUNDATION'S MOTION TO DISMISS**

Defendant Prince Mohammed Bin Salman Abdulaziz Foundation, by and through undersigned counsel, hereby moves this Court, before the Honorable Timothy J. Kelly, at E. Barrett Prettyman U.S. Courthouse, 333 Constitution Ave., N.W., Washington, DC 20001, for an Order dismissing the Amended Complaint in its entirety as to Prince Mohammed Bin Salman Abdulaziz Foundation under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, under Rule 12(b)(1) for lack of subject matter jurisdiction, under Rule 12(b)(7) for failure to join an essential party and under Rule 12(b)(6) for failure to state a claim. The grounds for this Motion are set forth in Prince Mohammed Bin Salman Abdulaziz Foundation's Memorandum in Support of its Motion to Dismiss.

Dated: April 5, 2021                              Respectfully submitted,

                                                  ZUCKERMAN SPAEDER LLP

                                                  By:   */s William W. Taylor, III*
                                                  William W. Taylor, III (D.C. Bar No. 84194)
                                                  Margarita K. O'Donnell (D.C. Bar No. 1005972)
                                                  ZUCKERMAN SPAEDER LLP
                                                  1800 M Street, NW, Suite 1000
                                                  Washington, DC 20036
                                                  Tel: (202) 778-1800
                                                  Fax: (202) 822-8106
                                                  E-mail: wtaylor@zuckerman.com
                                                  E-mail: modonnell@zuckerman.com
                                                  Telephone: (202) 778-1800
                                                  Facsimile: (202) 822-8106

                                                  *Attorneys for Defendant Prince Mohammed Bin*
                                                  *Salman Abdulaziz Foundation*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DR. SAAD ALJABRI | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 1:20-cv-02146-TJK |
| | § | |
| MOHAMMED BIN SALMAN BIN | § | |
| ABDULAZIZ AL SAUD, et al., | § | |
| | § | |
| Defendants. | | |

**PRINCE MOHAMMED BIN SALMAN ABDULAZIZ FOUNDATION'S
MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S
AMENDED COMPLAINT**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................. 1

ARGUMENT ..................................................................................................................... 3

I.     THE COURT LACKS PERSONAL JURISDICTION OVER THE MISK FOUNDATION UNDER RULE 12(B)(2). ...................................................................... 3

     A.    Aljabri Cannot Rely on Conclusory Allegations that Events and Activities In Washington D.C. Were for "Recruiting." ............................................. 5

     B.    There Is No Connection Between The Sole Claim Against The MiSK Foundation and the Foundation's Events in D.C. .................................................. 10

     C.    Asserting Jurisdiction Over the MiSK Foundation Would Offend Constitutional Notions of Fair Play and Substantial Justice. ............................... 15

II.    THE COURT DOES NOT HAVE JURISDICTION OVER THE CLAIM AGAINST THE FOUNDATION BECAUSE IT IS IMMUNE. ..................................... 17

     A.    The MiSK Foundation Is Immune Under the State Department Test. ................. 18

     B.    The MiSK Foundation Is Immune Under the Restatement Test. .......................... 20

III.   PLAINTIFF'S CLAIMS ARE PRECLUDED BY THE ACT OF STATE DOCTRINE. ..................................................................................................................... 23

IV.   THE COURT MUST DISMISS THE CLAIM AGAINST THE MISK FOUNDATION BECAUSE SAUDI ARABIA IS A NECESSARY PARTY THAT CANNOT BE JOINED. .................................................................................................... 23

V.    THE ALLEGATIONS AGAINST THE MISK FOUNDATION FAIL TO STATE A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS. .......... 24

     A.    The Intentional Infliction of Emotional Distress Claim is Governed by Saudi Arabian Law and Must be Dismissed. ....................................................... 24

     B.    Plaintiff Has Failed to State a Claim for Intentional Infliction of Emotional Distress under D.C. Law. ................................................................... 24

          1.    Plaintiff's Direct Liability Theory Fails. ................................................. 25

          2.    Plaintiff's Conclusory Allegations of Conspiracy, Aiding and Abetting, and Alter Ego Liability Do Not Salvage His Claim. ............... 27

VI.   THE COURT SHOULD EXERCISE ITS DISCRETION TO DISMISS THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM IF IT DISMISSES THE OTHER DEFENDANTS AND CLAIMS. ........................................... 36

CONCLUSION ................................................................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alkanani v. Aegis Def. Servs., LLC*,
976 F. Supp. 2d 1 (D.D.C. 2013) ......................................................... 35

*Asahi Metal Indus. Co. v. Superior Court of Cal.*,
480 U.S. 102 (1987) ............................................................ 15, 16–17

*\*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................ 24–25

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ......................................................... 33

*\*Bernhardt v. Islamic Republic of Iran*,
2020 WL 6743066 (D.D.C. Nov. 16, 2020) ............................... 30, 32

*Bigelow v. Garrett*,
299 F. Supp. 3d 34 (D.D.C. 2018) ...................................... 13

*Bristol-Myers Squibb Co. v. Superior Court of Cal.*,
137 S. Ct. 1773 (2017) ....................................................... 11, 14

*Broidy Capital Mgmt. LLC v. Muzin*,
2020 WL 1536350 (D.D.C. Mar. 31, 2020) .......................... 18

*Brunson v. Kalil & Co.*,
404 F. Supp. 2d 221 (D.D.C. 2005) .................................... 16

*Bush v. Butler*,
521 F. Supp. 2d 63 (D.D.C. 2007) .................................. 29–30

*Cockrum v. Donald J. Trump for President, Inc.*,
319 F. Supp. 3d 158 (D.D.C. 2018) .................................. 8, 13

*Corsi v. Caputo*,
2020 WL 1703934 (D.D.C. Apr. 7, 2020) ................................ 5

*Daimler AG v. Bauman*,
571 U.S. 117 (2014) ...................................................... 15

*Doe 1 v. Buratai*,
318 F. Supp. 3d 218 (D.D.C. 2018) ................................... 22

_____

*Authorities upon which we chiefly rely are marked with an asterisk.

*Dogan v. Barak*, 932 F.3d 888 (9th Cir. 2019) ........................................................ 21

*Estate of Klieman v. Palestinian Auth.*, 923 F.3d 1115 (D.C. Cir. 2019) ...................... 4

*Estate of Raleigh v. Mitchell*,
   947 A.2d 464 (D.C. 2008) ...................................................................................... 33

*First Chi. Int'l v. United Exch. Co.*,
   836 F.2d 1375 (D.C. Cir. 1988) ............................................................................... 6

*\*Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*,
   141 S. Ct. 1017 (2021) ...................................................................................... 11, 12

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
   564 U.S. 915 (2011) ............................................................................................... 11

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983) ...................................................................... 28, 31–32

*Heath v. Alabama*,
   474 U.S. 82 (1985) ................................................................................................ 23

*IMAPizza, LLC v. At Pizza Ltd.*,
   334 F. Supp. 3d 95 (D.D.C. 2018) ......................................................................... 15

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310 (1945) ............................................................................................... 4

*Johnson v. Metro. Direct Prop. & Cas. Ins. Co.*,
   2019 WL 176851 (D.D.C. Jan. 11, 2019) ......................................................... 28, 29

*Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*,
   115 F.3d 1020 (D.C. Cir. 1997) ............................................................................. 13

*Lewis v. Mutond*,
   918 F.3d 142 (D.C. Cir. 2019) .......................................................... 17–19, 20–21

*\*Livnat v. Palestinian Auth.*,
   851 F.3d 45 (D.C. Cir. 2017) ......................................................................... 4–5, 6

*Mattiaccio v. DHA Grp., Inc.*,
   20 F. Supp. 3d 220 (D.D.C. 2014) ......................................................................... 29

*Md. Digital Copier v. Litig. Logistics, Inc.*,
   394 F. Supp. 3d 80 (D.D.C. 2019) ........................................................................... 4

*Miango v. Democratic Republic of Congo*,
   2020 WL 3498586 (D.D.C June 29, 2020) ............................................................. 21

*Moriah v. Bank of China Ltd.*,
  107 F. Supp. 3d 272 (S.D.N.Y. 2015) ......................................................... 20

*Motir Servs., Inc. v. Ekwuno*,
  191 F. Supp. 3d 98 (D.D.C. 2016) ......................................................... 34–35

*Muhammad v. United States*,
  300 F. Supp. 3d 257 (D.D.C. 2018) ......................................................... 24

*Nat'l Resident Matching Program v. Elec. Residency LLC*,
  720 F. Supp. 2d 92 (D.D.C. 2010) ......................................................... 6

*Nnaka v. Fed. Republic of Nigeria*,
  756 F. App'x 16 (D.C. Cir. 2019) ......................................................... 22–23

*Ofisi v. BNP Paribas, S.A.*,
  278 F. Supp. 3d 84 (D.D.C. 2017) ......................................................... 30, 32

*Omari v. Ras Al Khaimah Free Trade Zone Auth.*,
  2017 WL 3896399 (S.D.N.Y. Aug. 18, 2017) ......................................................... 19

*Ortberg v. Goldman Sachs Grp.*,
  64 A.3d 158, 163 (D.C. 2013) ......................................................... 25

*Republic of Philippines v. Pimentel*,
  553 U.S. 851 (2008) ......................................................... 23

*Republic of Sudan v. Owens*,
  194 A.3d 38 (D.C. 2018) ......................................................... 27

*Samantar v. Yousuf*,
  560 U.S. 305 (2010) ......................................................... 17, 18

*Second Amendment Found. v. U.S. Conference of Mayors*,
  274 F.3d 521 (D.C. Cir. 2001) ......................................................... 14

*Thompson Hine, LLP v. Taieb*,
  734 F.3d 1187 (D.C. Cir. 2013) ......................................................... 4

*TJGEM LLC v. Republic of Ghana*,
  26 F. Supp. 3d 1 (D.D.C. 2013) ......................................................... 23

*U.S. ex rel Jenkins v. Sanford Capital*,
  2020 WL 5440551 (D.D.C. Sept. 10, 2020) ......................................................... 35

*United States ex rel. Landis v. Tailwind Sports Corp.*,
  51 F. Supp. 3d 9 (D.D.C. 2014) ......................................................... 33–34

*United States v. Emor*,
   850 F. Supp. 2d 176 (D.D.C. 2012) ........................................................ 34

*United States v. TDC Mgmt. Corp.*,
   263 F. Supp. 3d 257 (D.D.C. 2017) ........................................................ 33

*Vuitch v. Furr*,
   482 A.2d 811 (D.C. 1984) ...................................................................... 34

*Walden v. Fiore*,
   571 U.S. 277 (2014) ................................................................................ 4

*Willis v. Willis*,
   655 F.2d 1333 (D.C. Cir. 1981) .............................................................. 16

*Yousuf v. Samantar*,
   699 F.3d 763 (4th Cir. 2012) ................................................................. 17

**STATUTES**
28 U.S.C. § 1367 .......................................................................................... 36

D.C. Code § 13-423 ................................................................................... 1, 4

**RULES**
Federal Rule of Civil Procedure 12 .................................................. 2, 17, 24

Federal Rule of Civil Procedure 19 ........................................................... 23

**TREATISES**
Restatement (Second) of Foreign Relations Law § 66 ......................... 18, 21

Restatement (Second) of Torts § 46 ........................................................... 27

**OTHER AUTHORITIES**
Br. for U.S. as Amicus Curiae Supporting Pet'rs, *Mutond v. Lewis*,
   No. 19-185, 2020 WL 2866592 (U.S. May 2020) .................................. 19

Hazel Fox, *The Law of State Immunity* (2d ed. 2008) ............................... 17

Letter from Harold Hongju Koh, Legal Adviser, U.S. Dep't of State, to Stuart F. Delery,
   Principal Dep. Ass't Att'y Gen., DOJ, *Ragsdale v. Lashkar-E-Taiba*,
   No. 1:11-cv-03893-DLI-CLP (E.D.N.Y. Dec. 17, 2012), ECF No. 19-1 ............................... 19

Office of the Legal Advisor, Dep't of State, *Digest of United States Practice in Int'l Law*
   (Carrielyn D. Guymon, ed. 2015) .......................................................... 19

## INTRODUCTION

Plaintiff Saad Aljabri has not cured the deficiencies from his original complaint in bringing a single claim of intentional infliction of emotional distress against the Prince Mohammed Bin Salman bin Abdulaziz Foundation (the "MiSK Foundation" or the "Foundation"). Now running at nearly 200 pages, with over 400 paragraphs and 306 footnotes, the Amended Complaint still offers only conclusory allegations as to the Foundation's involvement in a purported "ongoing" plot to kill Aljabri. The facts in the Amended Complaint, as in the original complaint, show only that the Foundation hosted charitable and educational events, consistent with its mission. Accordingly, we demonstrate in this Memorandum that the Court must dismiss the claim for six reasons, each of which is sufficient and all of which are meritorious.[1]

First, the allegations in the Amended Complaint, fairly read, do not state facts sufficient to confer personal jurisdiction over the Foundation. Plaintiff's theory of personal jurisdiction is apparently that the Foundation held events in the District of Columbia *in 2018* at which people were "recruited" to search for the Plaintiff *in 2017*, Am. Compl. ¶ 134 & n.121, and that the Foundation is therefore subject to suit here under the District of Columbia long arm statute, D.C. Code § 13-423(a)(1). As matter of chronology, his allegations fail. Moreover, the Amended Complaint does not identify a single event in the District of Columbia at which anyone in this case was recruited or at which the so-called plot was even discussed, or connect any of these events to the intentional infliction of emotional distress claim. Conclusory allegations like these do not satisfy Plaintiff's obligation under *Iqbal* and its progeny to plead facts establishing jurisdiction.

---

[1] This motion to dismiss and memorandum in support thereof is filed on behalf of Defendant MiSK Foundation. As set forth below, for efficiency and to minimize duplicating arguments for the Court, the Foundation joins and incorporates by reference the arguments made by several other Defendants.

But even if the allegations had some factual support, the hosting of events in the District of Columbia in furtherance of a foundation's purposes does not subject the Foundation to personal jurisdiction here for intentional infliction of emotional distress elsewhere.

Second, the Court lacks subject matter jurisdiction over the MiSK Foundation because it is immune from suit under the common law of conduct-based immunity. The Amended Complaint, on its face, establishes the MiSK Foundation's entitlement to immunity because it includes the allegation that "Defendants' acts were committed under apparent authority or color of law of the government of Saudi Arabia." Am. Compl. ¶¶ 389, 401. It further claims that the MiSK Foundation is actually a "front" for the Crown Prince of Saudi Arabia and that the Saudi Arabian Cultural Mission, a government entity, was an "extension" of the Foundation. *Id.* ¶¶ 44, 56. The Amended Complaint itself thus demonstrates that the Foundation is immune from suit.

Third, the Act of State doctrine bars Aljabri's action because adjudicating his claims would require this Court to inquire into the validity of the public acts a foreign sovereign committed within its own territory.

Fourth, the Amended Complaint must be dismissed under Rule 12(b)(7) because Saudi Arabia is a necessary and indispensable party that cannot be joined in this suit because it is subject to sovereign state immunity.

Fifth, the Amended Complaint does not allege a plausible cause of action against the MiSK Foundation. The intentional infliction of emotional distress claim, which is governed by Saudi law, is not a cognizable claim under Saudi law and should be dismissed for that reason alone. But even if the Court considered the claim under District of Columbia law, it must be dismissed. Aljabri's assertions of direct, aiding and abetting, and conspiracy liability against the MiSK Foundation rest on conclusory allegations of "recruiting" others, with no allegations of actual facts in support.

Furthermore, none of the MiSK Foundation's actions constituted "extreme and outrageous" conduct necessary to state a claim nor did they cause any harm to Aljabri.

Finally, to the extent the Court dismisses the federal claims brought against the other Defendants, the Court should not exercise supplemental jurisdiction over the intentional infliction of emotional distress claim.

## ARGUMENT[2]

### I.   THE COURT LACKS PERSONAL JURISDICTION OVER THE MISK FOUNDATION UNDER RULE 12(B)(2).

Aljabri has chosen to file suit against 25 named and unnamed Defendants, and must allege personal jurisdiction as to each Defendant, including the MiSK Foundation. The MiSK Foundation is a nonprofit foundation based in Saudi Arabia. Am. Compl. ¶ 68. As stated in the Amended Complaint, the Foundation's mission is "cultivat[ing] and encourag[ing] learning and leadership in youth for a better future in Saudi Arabia." *Id.* ¶ 71. The Foundation holds educational and cultural events throughout the United States, frequently in partnership with major cultural, educational, private sector, and international organizations, including the United Nations, the Kennedy Center, Harvard University, and Bloomberg. *Id.* ¶¶ 69 n.53, 134 n.121. Those events include several in Washington, D.C. in the spring and summer of 2018, which, along with a contract signed in 2016 establishing a university in Saudi Arabia, and a donation in 2017, form the basis of Aljabri's jurisdictional argument. *See id.* ¶¶ 134 & n.121, 135.

---

[2] Aljabri contends that he served the MiSK Foundation through mail and WhatsApp. *See* ECF Nos. 35, 42. For the reasons described in the motion to dismiss by Defendant Mohammed bin Salman bin Abdulaziz Al Saud ("Crown Prince's Brief"), those methods of service violate Saudi law. The Foundation adopts and incorporates by reference the arguments in the Crown Prince's Brief concerning service. *See* Crown Prince Br. at 13.

To persuade this Court to exercise personal jurisdiction over the MiSK Foundation, Aljabri relies on the District of Columbia's long-arm statute, D.C. Code § 13-423(a)(1). Section 13-423(a)(1) provides that a court in the District of Columbia "may exercise personal jurisdiction over a person . . . as to a claim for relief arising from the person's . . . transacting any business in the District of Columbia." *See* Am. Compl. ¶ 134 (alleging that the MiSK Foundation has "purposefully availed itself of this forum by transacting business in Washington, D.C. and Dr. Saad's claims against it arise out of those contacts"). That provision is subject to D.C. Code § 13-423(b), which states that "[w]hen jurisdiction over a person is based solely upon this section, only a claim for relief arising from acts enumerated in this section may be asserted against him."

Because Section 13-423(a)(1) and (b) provide "jurisdiction to the full extent allowed by the Due Process Clause," the jurisdictional analysis is governed by the limitations of the Due Process Clause. *Thompson Hine, LLP v. Taieb*, 734 F.3d 1187, 1189 (D.C. Cir. 2013) (citation omitted). The Due Process Clause requires that a defendant have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Md. Digital Copier v. Litig. Logistics, Inc.*, 394 F. Supp. 3d 80, 90 (D.D.C. 2019) (Kelly, J.) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Importantly, for a court "to exercise [specific] jurisdiction consistent with due process, the defendant's *suit-related conduct* must create a *substantial connection* with the forum." *Estate of Klieman v. Palestinian Auth.*, 923 F.3d 1115, 1120 (D.C. Cir. 2019) (quoting *Walden v. Fiore*, 571 U.S. 277, 291 (2014)), *cert. granted, vacated and remanded*, 140 S. Ct. 2713 (2020).

In deciding whether Aljabri has met this standard, this Court is guided by two fundamental pleading principles. First, it is Aljabri who bears the burden to make a "prima facie showing" that the Court has personal jurisdiction over the Foundation. *See Livnat v. Palestinian Auth.*, 851 F.3d

45, 56-57 (D.C. Cir. 2017). Second, Aljabri must "allege specific acts connecting [the] defendant with the forum and may not rely on bare allegations or conclusory statements." *Corsi v. Caputo*, 2020 WL 1703934, at *2 (D.D.C. Apr. 7, 2020) (Kelly, J.) (alteration in original) (citation omitted). Although the Court must "resolve factual disputes in favor of the plaintiff[,] . . . it need not accept inferences drawn by [the] plaintiff[] if such inferences are unsupported by the facts." *Id.* (quoting *Livnat*, 851 F.3d at 57).

The application of these principles here shows that Plaintiff has not met his burden to make a prima facie showing that this Court has jurisdiction over the MiSK Foundation. First, Aljabri's jurisdictional allegations rest on conclusory assertions that the Foundation's handful of charitable events and activities in D.C. were recruiting events for this case; second, Plaintiff has not established that his claim against the Foundation has a strong relationship to the Foundation's activities in D.C.; and third, forcing the Foundation into a court in this jurisdiction would offend notions of fair play and substantial justice.

### A.   Aljabri Cannot Rely on Conclusory Allegations that Events and Activities In Washington D.C. Were for "Recruiting."

Aljabri bases his jurisdictional theory on two conclusory allegations. Aljabri first relies on the remarkable allegation that "*all*" of the MiSK Foundation's events were "designed and executed" to "recruit, develop, fund, and legitimize a network of agents in the United States to carry out acts in furtherance of Defendant bin Salman's objectives," and "[a] substantial portion of these recruiting events occurred in the District of Columbia." Am. Compl. ¶ 134 (emphasis added). In this respect, Aljabri identifies several events held by the Foundation in Washington, D.C., all of which occurred in 2018. *Id.* at n.121. Similarly, Aljabri states that the Foundation's signing of a contract in Washington, D.C. in 2016 to establish a business college in Saudi Arabia and a 2017 donation to an intergovernmental women's financial development project were part of

an effort to legitimize the Foundation's activities in the United States, enabling the Foundation to recruit "Saudi agents" "to pursue Defendant bin Salman's objectives, including the hunt for Dr. Saad" or, respectively, an effort to "influence senior U.S. government officials to support Defendant bin Salman and undermine Dr. Saad." *Id.* ¶¶ 135–36.

These efforts to malign the Foundation's activities fail to address the fundamental jurisdictional weakness in Aljabri's jurisdictional theory: to establish jurisdiction in *the District of Columbia*, Aljabri must proffer *facts* showing that his IIED claim against the Foundation is related to the Foundation's activities *in the District of Columbia*. The conclusory allegations he asserts fail to establish a prima facie case for personal jurisdiction over the Foundation.

When faced with conclusory assertions for jurisdiction, the D.C. Circuit instructs that district courts should dismiss for lack of jurisdiction. *See Livnat*, 851 F.3d at 57; *see also First Chi. Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378 (D.C. Cir. 1988) (conclusory statements "[do] not constitute the *prima facie* showing necessary to carry the burden of establishing personal jurisdiction" under D.C.'s long-arm statute (citation omitted)). In *Livnat*, the plaintiffs' jurisdictional theory asserted that an attack in the West Bank was "part of" a "policy and practice" of the defendant to "us[e] terrorism to influence United States public opinion and policy." 851 F.3d at 56. The D.C. Circuit held that those allegations, which were supported by an expert declaration, "failed to make a *prima facie* showing of the pertinent jurisdictional facts." *Id.* at 56–57 (citation omitted). The plaintiffs' allegations were "conclusory" because they "merely state[d] the plaintiffs' theory of specific jurisdiction," without presenting any underlying facts. *Id.* at 57; *see also Nat'l Resident Matching Program v. Elec. Residency LLC*, 720 F. Supp. 2d 92, 99 (D.D.C. 2010) ("[V]ague and conclusory allegations do not suffice to demonstrate that a defendant is subject to personal jurisdiction in a particular forum."). The Foundation also incorporates by

reference the discussion in Defendant Bader Alasaker's Brief regarding the Supreme Court's case law on conclusory allegations. Alasaker Br. § I.A. Those principles guide the Court's jurisdictional analysis in this case.

The assertion that the Foundation's events in D.C. are "recruiting" events is a conclusory allegation. The Amended Complaint does not identify a single person recruited at a single Foundation event anywhere, much less in Washington, D.C. There are no allegations as to how the Foundation's events served as "recruiting" events. Also absent from the Amended Complaint is an allegation that anyone purportedly "recruit[ed], develop[ed], fund[ed], or legitimiz[ed]" by the Foundation for the alleged search for Aljabri even *attended* the D.C. events identified by Aljabri. *See* Am. Compl. ¶ 134 & n.121. Aljabri offers the bare assertion that two of the five individuals who allegedly searched for Aljabri were "recruited" "through" the Foundation at some unknown point by unidentified individuals. *See id.* ¶ 90 (Alrajhi); *id.* ¶ 106 (Abuljadayel).[3] The Amended Complaint does not state when or how Alrajhi and Abuljadayel were recruited, at which event, or by whom. Nor does the Amended Complaint allege that Abuljadayel and Alrajhi were recruited in Washington, D.C.[4] *See id.* ¶ 134. Aljabri does allege that Mr. Alasaker "[a]s the 'Secretary-General' . . . planned and coordinated . . . programs" in Washington, D.C., Am. Compl. ¶ 134, but Aljabri does not allege that any other Defendant attended those events, or that

---

[3] Aljabri alleges, in vague and conclusory fashion, that Defendant Alhamed "regularly participated in events hosted by Defendant MiSK in Washington, D.C. and Boston, Massachusetts from at least May 2015 through September 2017." Am. Compl. ¶ 104. There is no allegation that Alhamed was "recruited" by or through the Foundation, or what specific event "hosted" by the Foundation he attended in Washington, D.C. between 2015 and 2017.

[4] The Amended Complaint asserts that Alrajhi and Abuljadayel participated in certain MiSK Foundation events or otherwise had a relationship with the Foundation, including being paid for certain work with the Foundation and tweeting about the Foundation. Am. Compl. ¶¶ 90, 91, 106, 107. However, none of the Foundation events that Alrajhi and Abuljadayel were alleged to have attended occurred in the District of Columbia.

Mr. Alasaker recruited anyone in Washington, D.C. to search for Aljabri on behalf of the Foundation.[5]

As the Foundation pointed out in its original Motion to Dismiss, the original complaint did not identify a single MiSK Foundation "recruiting" event held in Washington, D.C. prior to the alleged "search" for Aljabri in the United States, which occurred from September to December 2017. ECF No. 62 at 5–8. The Amended Complaint did not remedy this deficiency. Thus, the Amended Complaint itself undermines the assertion that the Foundation's Washington, D.C. events were for "recruiting" Defendants to search for Aljabri. As pled by Aljabri, *every event* listed as a purported "recruiting event" in D.C. took place in 2018 *after* the alleged "hunt" for Aljabri was *over. See* Am. Compl. ¶ 134 n.121.[6] *See Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158, 182 (D.D.C. 2018) ("Activities that occur after the injury occurred . . . do not constitute in-forum contacts for purposes of establishing specific jurisdiction."). The new allegation that Alrajhi and Abuljadayel have connections with the Foundation that "predate" their alleged search for Aljabri in late 2017, *see* Am. Compl. ¶¶ 90, 107, does not generate the requisite contact with D.C.

---

[5] Aljabri alleges that, in a criminal case about obtaining confidential Twitter information and in which the Foundation is not a defendant, "Defendants bin Salman and Alasaker recruited . . . agents through a shell company . . . which was financed through Defendant MiSK." Am. Compl. ¶ 45. That case has no relevance here and, in any event, Aljabri does not allege that the Foundation recruited anyone in that case either or that the Foundation used others to recruit anyone.

[6] Aljabri cites a Bloomberg article from 2016 touting the partnership between Bloomberg and the MiSK Foundation. *See* Am. Compl. ¶ 134 n.121 (citing Press Release, Bloomberg, *Bloomberg and the MiSK Foundation To Explore Multi-Year Financial Education and Business Journalism Training Initiative for Young Saudis* (Nov. 15, 2016), https://www.bloomberg.com/company/press/bloomberg-misk-foundation-journalism-training). That article does not mention an event in Washington, D.C., but a tweet cited by Aljabri shows that a Bloomberg D.C. event occurred in 2018. *See id.* (citing @MiSKinitiatives, Twitter (June 28, 2018, 11:53 AM), https://twitter.com/MiSKinitiatives/status/1012363258236456963).

In an effort to give more substance to his "recruiting" theory, Aljabri now alleges a sprawling web of control between Saudi student organizations at U.S. colleges, the Saudi Arabian Cultural Mission (SACM), which is a government entity, the MiSK Foundation, the Crown Prince, and Bader Alasaker. Am. Compl. ¶¶ 44, 228–31. As described in the briefs of the Crown Prince and Mr. Alasaker, these allegations are conclusory. *See* Crown Prince Br. § I.A.1.a; Alasaker Br. § I.A.2. The purported link to the Foundation is that SACM "operate[d] as an extension" of the Foundation, Am. Compl. ¶ 44, which is a cursory allegation based on an agreement that says nothing of the sort and was signed in 2018, after the search for Aljabri was over, *id.* & n.18.[7] Furthermore, these allegations of control over Saudi students do not concern any Foundation events in Washington, D.C.

Second, Plaintiff identifies two events in Washington, D.C. that purportedly establish jurisdiction over the Foundation under the long-arm statute. Plaintiff alleges that the MiSK Foundation donated to the Women Entrepreneur's Finance Initiative around May 2017[8] and signed a contract in D.C. in June 2016 for the establishment of a business school in Saudi Arabia.

---

[7] Aljabri does not cite to the actual agreement, instead relying on a tweet and a brief article from Saudiusa.com. Am. Compl. ¶ 44 nn.17–18. A translation of the article says only that "the agreement aims to increase the number of student activities to 2000 yearly activities, a 100% increase compared to the previous level. It also aims to empower student clubs in the United States of America and strengthen their cultural and social exchange within American society." https://saudiusa.com/index.php?option=com_tz_portfolio&view=article&id=14214:2018-04-10-14-11-&lang=ar (last accessed Apr. 5, 2021).

[8] Plaintiff describes this as a "Washington-D.C.-headquartered initiative that is a project of Ivanka Trump." Am. Compl. ¶ 136. However, the website of the Women's Entrepreneur's Finance Initiative states that the Initiative is "a collaborative partnership among 14 governments, eight multilateral development banks (MDBs), and other public and private sector stakeholders, hosted by the World Bank Group" which was launched at the 2017 G20 Summit in Germany. *See* https://we-fi.org/governance-structure/; https://we-fi.org/fact-sheet/ (last accessed Apr. 3, 2021).

*Id.* ¶¶ 135–36.[9] These events, he claims, were part of an effort to legitimize the Foundation's activities in the United States, which enabled the Foundation to recruit "Saudi agents" "to pursue Defendant bin Salman's objectives, including the hunt for Dr. Saad" or reflected an effort to "influence senior U.S. government officials to support Defendant bin Salman and undermine Dr. Saad." *Id.* But there are no factual details substantiating Plaintiff's far flung theory about the purpose of these events. There are no factual allegations about how the signing of this contract (which was signed while Aljabri still lived in Saudi Arabia, *see id.* ¶¶ 163–64 (alleging that Aljabri left Saudi Arabia on May 17, 2017)), or donating to a group headquartered in the District of Columbia were related to the "hunt for Dr. Saad" specifically. For example, there are no facts about which "U.S. government officials" the Foundation hoped to "influence" or how that "influence" impacted the search for Aljabri (again, who was still living in Saudi Arabia at the time). There are no facts about how the signing of the contract events allowed the Foundation to "recruit" "Saudi agents," or which agents were recruited. Aljabri does not allege that any Defendant who searched for Aljabri participated in either transaction, much less that they were recruited in connection with those events.

Because Plaintiff has not alleged anything other than conclusory allegations to establish jurisdiction, the Court should dismiss the IIED claim under Rule 12(b)(2).

## B. There Is No Connection Between The Sole Claim Against The MiSK Foundation and the Foundation's Events in D.C.

Even if the Court found that the allegations relating to jurisdiction had some support, Aljabri has failed to establish jurisdiction for a second fundamental reason: he has not identified

---

[9] The Amended Complaint suggests that the Foundation signed other contracts in the District of Columbia, *id.* ¶ 135 but does not identify them or how they would have been related to the IIED claim.

the necessary connection between the IIED claim, the Foundation, and the District of Columbia. As this Supreme Court has explained, personal jurisdiction is proper where there is a "strong relationship among the defendant, the forum, and the litigation." *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 141 S. Ct. 1017, 1030 (2021) (citation omitted); *see also Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) ("specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction" (citation omitted)). Thus, where the "forum State, and the defendant's activities there, lack[ ] any connection to the plaintiffs' claims," jurisdiction is improper. *Ford*, 141 S. Ct. at 1031; *see also Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 137 S. Ct. 1773, 1781 (2017) ("When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State.").

A closer look at the Foundation's alleged activity in the District of Columbia confirms Plaintiff's failure to establish a jurisdictional nexus between the IIED claim against the Foundation and the District of Columbia. The Amended Complaint identifies several events held in Washington, D.C. *See* Am. Compl. ¶¶ 134 n.121, 137. These events included "MiSK Talks" in March 2018, which were attended by the Head of Global Public Policy at Paypal, the Director of the Albright Stonebridge Group (a consulting firm chaired by former Secretary of State Madeleine Albright), as well as students from Georgetown, George Mason, and other universities.[10] Other events were a March 2018 "'MiSK Art' panel discussion and tour of the Newseum; the sponsorship

_____

[10] *The Misk Foundation - the Saudi Arabian Youth Empowerment Nonprofit Established by H.R.H. Crown Prince Mohammed bin Salman - Announces Events in Six U.S. Cities in Conjunction With Royal Visit*, https://www.prnewswire.com/news-releases/the-misk-foundation--the-saudi-arabian-youth-empowerment-nonprofit-established-by-hrh-crown-prince-mohammed-bin-salman--announces-events-in-six-us-cities-in-conjunction-with-royal-visit-300617789.html (cited Compl. ¶ 134 n.121) (hereinafter "*The MiSK Foundation*").

of a March 2018 exhibit of Saudi art at the Kennedy Center; a 'Leadership Bootcamp' designed to facilitate networks of Saudi national students . . . [and] included a partnership with Uber to provide rides in Washington, D.C.; and a training workshop in cooperation with Bloomberg and LinkedIn" hosted by Bloomberg. *Id*. ¶ 134 n.121.[11] Several of those events were organized and held in connection with the Crown Prince's official visit to the United States in March 2018.[12] And as described above, the Amended Complaint also relies on a June 2016 contract signing for establishing a business college in Saudi Arabia and a May 2017 donation to the Women Entrepreneur's Finance Initiative. *Id*. ¶¶ 136–37. The handful of events, one donation, and a contract signing in the District of Columbia bear no relationship to the alleged wrongdoing that is the subject of Plaintiff's tort claim against the Foundation.

Because Plaintiff must show a strong relationship between the Foundation, the District of Columbia, and his single tort claim, the analysis demands an understanding of the conduct underlying the claim. *See Ford*, 141 S. Ct. at 1028 (evaluating how the "[forum-]based conduct relates to the claims in these cases"). With regard to his IIED claim, which incorporates 382 paragraphs with 306 footnotes over 174 pages, Aljabri alleges a non-exhaustive list that "include[s], ***inter alia***, hunting him down in the United States, traveling to Canada with the materials necessary to clean up the crime, directing a plot to travel through the United States to kill Dr. Saad, and kidnapping his [adult] children . . . ." Am. Compl. ¶ 411 (emphasis added). The use of "inter alia" to identify the basis of the IIED claim confuses the issue of what acts over four

---

[11] The event at the Newseum, titled "Changing Landscapes," was moderated by CNN Diplomatic Correspondent Michelle Kosinski and included National Public Radio reporter Deborah Amos. *See The MiSK Foundation.*

[12] *See supra* n.10.

years are the actual basis of Plaintiff's IIED claim. *See infra* § V.A (explaining that, as alleged by Plaintiff, the IIED claim arises from the kidnapping of his children in March 2020).

But none of these events have a strong relationship to the Foundation's handful of events or transactions in Washington, D.C. as required for personal jurisdiction. The majority of the acts underlying the IIED claim occurred in foreign countries and do not include even a conclusory allegation of the Foundation's involvement. *See* Am. Compl. ¶¶ 189–95 (detention of adult children); ¶¶ 323–52 (2018 attempted killing), ¶¶ 353–65 (2020 plot). Because Aljabri does not allege that those acts involved the MiSK Foundation, let alone the Foundation's events in the District of Columbia, they cannot form the basis for personal jurisdiction over the Foundation. *See Cockrum*, 319 F. Supp. 3d at 175 ("Specific jurisdiction is tied to each defendant and to each claim."); *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020 (D.C. Cir. 1997) (no personal jurisdiction under D.C. Code 14-423(a)(1) over tort claim arising from accident outside of the United States where contacts in the District of Columbia were unrelated to incident).

The only allegation listed in the IIED count with a possible connection to the Foundation is the "hunt for Dr. Saad." But the Foundation played no role in searching for Aljabri, and Aljabri does not allege that anyone searching for him was acting on behalf of the Foundation. Even assuming that "recruiting" of individuals to search for Aljabri, standing alone, is included in the IIED count, the allegations that "all" the Foundation's events, including those in the District of Columbia were for the purpose of "recruiting" is insufficient to establish a jurisdictional nexus to the District of Columbia. As described above, the allegations regarding the Foundation's involvement in recruiting are conclusory and entitled to no weight. Moreover, Plaintiff does not identify a single person recruited at one of the events in the District of Columbia, let alone any person who was part of the alleged search for Aljabri in 2017. And, because all of the D.C. events

occurred *after* the search for Aljabri was complete, they lack any connection to Aljabri's IIED claim. *See Bigelow v. Garrett*, 299 F. Supp. 3d 34, 45 (D.D.C. 2018) (no personal jurisdiction where "[plaintiff] has not sufficiently connected his copyright infringement claim to the business activities that the defendants allegedly conducted within the District"). Furthermore, Aljabri never claims that he suffered any injury in Washington, D.C., which further weakens his personal jurisdiction argument. *See Bristol-Meyers*, 137 S. Ct. at 1782 (holding that any "connection between the nonresidents' claims and the forum is even weaker" where "[t]he relevant plaintiffs are not [forum] residents and do not claim to have suffered harm in that State").

At bottom, Aljabri asks this Court to credit that all the events held by the Foundation were recruiting events for *any of the Crown Prince's "objectives"*, which apparently "includ[ed] hunting, trapping, and undertaking to kill Dr. Saad." *See* Am. Compl. ¶ 134 (emphasis added). If this conclusory allegation were sufficient to establish jurisdiction, it would mean that *every single* event held by the Foundation anywhere in the United States (or elsewhere), would create a jurisdictional nexus sufficient to hale the Foundation into court in that state for any alleged "objective" of the Crown Prince, even where the plaintiff and his claims had no connection to the forum.[13] This broad construction of personal jurisdiction is untenable and decimates the statutory and constitutional need for a strong relationship between the Foundation's contacts in the District of Columbia and the Plaintiff's IIED claim against the Foundation.

Because the "transacting any business" prong of the D.C. long-arm statute is the only statutory ground on which Plaintiff asserts personal jurisdiction over this Defendant, *see id.* ¶ 134,

---

[13] Accepting Aljabri's position would mean that "people would be unable to meet in the nation's capital to discuss issues of concern without subjecting themselves to the jurisdiction of D.C. courts." *Second Amendment Found. v. U.S. Conference of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001).

the Court lacks personal jurisdiction over the MiSK Foundation and should dismiss the claim against it.[14]

### C.     Asserting Jurisdiction Over the MiSK Foundation Would Offend Constitutional Notions of Fair Play and Substantial Justice.

Finally, to subject the MiSK Foundation—a Saudi charitable foundation sued by a Saudi national living in Canada—to a Washington, D.C. court's jurisdiction would not comport with notions of fair play and substantial justice. In this analysis, courts consider "the burden on the defendant, the interests of the forum State, the plaintiff's interest in obtaining relief in the forum State, and the interests of other sovereigns in resolving the dispute." *IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 115 (D.D.C. 2018) (Kelly, J.) (quoting *Bauman*, 571 U.S. at 145 (Sotomayor, J., concurring)). All those factors weigh heavily against exercising jurisdiction here.

*First*, the burden on the MiSK Foundation would be "severe" if it were required to "submit its dispute . . . to a foreign nation's judicial system." *See Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 114 (1987). Indeed, the Supreme Court instructs that "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Id.*

*Second*, the interests of the forum state are minimal. D.C. courts have little interest in a dispute between a Saudi plaintiff living in Canada and a Saudi charitable foundation, particularly

---

[14] In outlining Plaintiff's jurisdictional theory as to Defendant *Hamed*, Plaintiff claims that the Foundation "maintained a continuous presence" in the District of Columbia. Am. Compl. ¶ 139. But Plaintiff does not contend that this Court has general jurisdiction over the MiSK Foundation. *Id.* ¶¶ 134, 139 (relying on the D.C. long arm statute). The assertion that the Foundation had a "continuous presence" in the District of Columbia is a legal conclusion and conclusory allegation insufficient to sustain general jurisdiction, which applies only where a "corporation is fairly regarded as at home," such as its "place of incorporation and principal place of business." *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). The Foundation is not "at home" in Washington, D.C.

where there are no factual connections between the alleged wrongdoing and the District of Columbia. *See Willis v. Willis*, 655 F.2d 1333, 1338 (D.C. Cir. 1981) ("The District of Columbia has little interest in providing a forum to a nonresident plaintiff."); *Brunson v. Kalil & Co.*, 404 F. Supp. 2d 221, 238 (D.D.C. 2005) ("[W]here the parties are both non-residents, the District's legitimate interests in the dispute have considerably diminished." (citation omitted)). Moreover, based on the allegations in the Amended Complaint, the "documents, records, and witnesses" that are relevant to the IIED claim are all located outside Washington, D.C. *See Brunson*, 404 F. Supp. 2d at 238.

*Third*, any interest of the Plaintiff is also lessened here. Aljabri has not chosen to bring suit in the forum in which he currently resides, Canada, or the forum in which he is a citizen, Saudi Arabia. Although he alleges that Saudi Arabia lacks adequate remedies, Am. Compl. ¶ 382, he makes no such claim as to Canada and is silent about his failure to bring this suit in Canada. Aljabri has not explained why this foreign forum is more convenient for him, and accordingly his interest should be accorded little weight. *See Asahi*, 480 U.S. at 114 ("Cheng Shin has not demonstrated that it is more convenient for it to litigate its indemnification claim against Asahi in California rather than in Taiwan or Japan.").

*Finally*, both Canada and Saudi Arabia have a stronger connection to this suit than Washington, D.C. Canada is where Aljabri resides, and Saudi Arabia is where Aljabri is a citizen, where the MiSK Foundation is located, and where the relationships that give rise to Aljabri's claim are based.

Accordingly, asserting jurisdiction over the MiSK Foundation would not comport with due process, and the Court should dismiss the claim against the Foundation. *See id.* at 115 (emphasizing

that courts should be "unwilling[] to find the serious burdens on an alien defendant outweighed by minimal interests on the part of the plaintiff or the forum State").

## II.     THE COURT DOES NOT HAVE JURISDICTION OVER THE CLAIM AGAINST THE FOUNDATION BECAUSE IT IS IMMUNE.

Under Rule 12(b)(2), the Court should dismiss the single claim against the Foundation for failure to establish specific jurisdiction over the Foundation. But there is another threshold reason that requires dismissal: the MiSK Foundation is entitled to common law conduct-based immunity, and therefore the Amended Complaint should be dismissed pursuant to Rule 12(b)(1). Plaintiff's revisions to the Amended Complaint only serve to reinforce that the Foundation should be granted immunity.

Conduct-based immunity is afforded to "any . . . public minister, official, or agent of the state with respect to acts performed in his official capacity if the effect of exercising jurisdiction would be to enforce a rule of law against the state." *Lewis v. Mutond*, 918 F.3d 142, 145 (D.C. Cir. 2019); *see Yousuf v. Samantar*, 699 F.3d 763, 769 (4th Cir. 2012) (noting that conduct-based immunity "applies to current and former foreign officials"). Conduct-based immunity "derives from the immunity of the State" and is based on the "'classical'" theory that "'any act performed by the individual as an act of the State enjoys the immunity which the State enjoys.'" *Yousuf*, 699 F.3d at 774 (quoting Hazel Fox, *The Law of State Immunity* at 455 (2d ed. 2008)); *see Samantar v. Yousuf*, 560 U.S. 305, 322 (2010) ("[W]e do not doubt that in some circumstances the immunity of the foreign state extends to an individual for acts taken in his official capacity."). The MiSK Foundation adopts and incorporates by reference the arguments in the Crown Prince's Brief about the applicability of conduct-based immunity to these circumstances. *See* Crown Prince Br. § II.A.2.

"[T]he District Court is authorized to decide whether all the requisites for foreign-official immunity exist" because the Foundation has not requested a suggestion of immunity from the U.S.

Department of State at this time. *Lewis*, 918 F.3d at 145–46. In making this determination, the MiSK Foundation bears the burden to demonstrate its entitlement to immunity, and although the Court must assume the truth of the plaintiff's factual allegations, it "need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions." *Broidy Capital Mgmt. LLC v. Muzin*, 2020 WL 1536350, at \*4 (D.D.C. Mar. 31, 2020) (citation omitted) (evaluating common-law immunity as applied to an entity).

D.C. courts have applied two tests to determine whether a defendant is entitled to conduct-based immunity, the "State Department" test, *see id.* at \*\*6–8, and a three-part test set forth in the Restatement (Second) of Foreign Relations Law § 66(f), *Lewis*, 918 F.3d at 146. The MiSK Foundation agrees that, for the reasons set forth in the other Defendants' briefs, this Court should apply the State Department test in this case, and adopts and incorporates by reference the arguments made therein. *See* Crown Prince Br. § II.A.2; Mem. of Law of Youssef Alrajhi, Mohammed Alhamed, and Layla Abuljadayel in Support of their Mot'n to Dismiss ("Student-Defendants Br.") § VII.A. Ultimately, regardless of what test this Court applies, the Foundation is entitled to conduct-based immunity.

**A.**     **The MiSK Foundation Is Immune Under the State Department Test.**

The State Department test assesses "whether it is 'the established policy of the State Department to recognize' the asserted 'ground of immunity.'" *Broidy*, 2020 WL 1536350, at \*5 (quoting *Samantar*, 560 U.S. at 312). In this case, immunity is clearly appropriate under the State Department test, as the United States has recently explained to the Supreme Court that "conduct-based foreign-official immunity generally turns on whether the challenged action was taken in an official capacity." Br. for U.S. as Amicus Curiae Supporting Pet'rs, *Mutond v. Lewis*, No. 19-185, 2020 WL 2866592, at \*10 (U.S. May 2020). And "the State Department's adherence to that

principle is . . . reflected in its annual Digest of United States Practice in International Law." *Id.* at **10–11 (citing Office of the Legal Advisor, Dep't of State, *Digest of United States Practice in Int'l Law* (Carrielyn D. Guymon, ed. 2015), Ch. 10, § B(3), at 426); *see also* Letter from Harold Hongju Koh, Legal Adviser, U.S. Dep't of State, to Stuart F. Delery, Principal Dep. Ass't Att'y Gen., DOJ, at 2, *Ragsdale v. Lashkar-E-Taiba*, No. 1:11-cv-03893-DLI-CLP (E.D.N.Y. Dec. 17, 2012), ECF No. 19-1 ("acts of defendant foreign officials who are sued for exercising the powers of their office are treated as acts taken in an official capacity").

The State Department test is satisfied here. Plaintiff has alleged that the Foundation operated as a "front" for the Crown Prince of Saudi Arabia. Am. Compl. ¶¶ 71, 81, 134, 219. And although the Complaint asserts that the Foundation is the Crown Prince's "personal" foundation, *id.* ¶ 79, he alleges that all of the actions at issue were "under apparent authority or color of law." *See id.* ¶¶ 389, 401. Here, the "actions at issue" in the Amended Complaint do not "concern[] these private positions or interests rather than . . . governmental interests," namely the prosecution of Aljabri for corruption. *Omari v. Ras Al Khaimah Free Trade Zone Auth.*, 2017 WL 3896399, at *10 n.8 (S.D.N.Y. Aug. 18, 2017).

Moreover, the new allegations in the Amended Complaint only reinforce that the relevant conduct, as alleged by Plaintiff, involves "official action." According to Aljabri, the Foundation is part of a complicated web of several entities that allegedly supervise Saudi student organizations in the United States. *See* Am. Compl. ¶¶ 15, 80, 228. And as alleged by the Amended Complaint, the students are controlled by "the government under Crown Prince Mohammed bin Salman," or "the embassy" of Saudi Arabia in the United States. *See id.* ¶¶ 82, 227–31. According to Aljabri, this "control" includes a relationship between the Foundation and the Saudi Arabian Cultural Mission, which is a government entity previously headed by Cultural Attaché Mohammed Alessa.

*See id.* ¶ 228. These students are granted scholarships to study in the United States through the Saudi Ministry of Interior, *see id.* ¶¶ 221, 230, 239 n.191. Aljabri alleges that the Crown Prince controls theses students using "passport freezes" and "retraction of scholarships," *id.* ¶ 230, which are additional forms of government action. And as to the attempted killing of Aljabri, the Amended Complaint alleges that Saudi Arabia's primary intelligence agency "concluded that [it], rather than [the Crown Prince's] Tiger Squad, should carry out any future overseas covert operations." *Id.* ¶ 351. All that conduct involves official action, as alleged by Plaintiff.

A recent decision from the District Court for the Southern District of New York is instructive. That court held that a non-party was immune from deposition testimony as an agent of the Israeli government where the individual was "contacted by the National Security Advisor, a high-ranking official in the Prime Minister's office, and asked to undertake a task" which he performed and "then reported back." *Moriah v. Bank of China Ltd.*, 107 F. Supp. 3d 272, 278 (S.D.N.Y. 2015). The court concluded that the individual "did not undertake this task in his capacity as a private individual—he performed it solely because the National Security Advisor made a request. As such, he acted as an agent of the Israeli government." *Id.* The same holds true here, where the Plaintiff alleges that the Foundation was a "front" through which the Crown Prince "act[ed]." Am. Compl. ¶ 39. As a result, those allegations show that, based on Plaintiff's theory, the MiSK Foundation is entitled to immunity.

**B.    The MiSK Foundation Is Immune Under the Restatement Test.**

As described in the Crown Prince's Brief, this Court should not apply the Restatement (Second) test here. *See* Crown Prince Br. § II.A.2. However, even if the Court were to apply the Restatement (Second), the Foundation would be entitled to conduct-based immunity. The Restatement (Second) of Foreign Relations Law § 66(f) evaluates the following three elements: "[f]irst, whether the actor is a public minister, official, or agent of the foreign state. Second,

whether the acts were performed in her official capacity. And third, whether exercising jurisdiction would serve to enforce a rule of law against the foreign state." *Lewis*, 918 F.3d at 146 (citations omitted).

As above, the first and second elements are satisfied from the face of the Amended Complaint because Plaintiff has alleged that the MiSK Foundation operated as a "front" for the Crown Prince of Saudi Arabia, *see, e.g.*, Am. Compl. ¶ 71, and because Plaintiff alleges that all "[t]he acts" described in the Complaint—including those taken by the MiSK Foundation—"were committed under apparent authority or color of law of the government of Saudi Arabia," *id.* ¶¶ 389, 401. *See Dogan v. Barak*, 932 F.3d 888, 894 (9th Cir. 2019) (holding that immunity applied where "[t]he Complaint's claims for relief state—several times—that Barak's actions were done under 'actual or apparent authority, or color of law, of the Israeli [government]'"); *Miango v. Democratic Republic of Congo*, 2020 WL 3498586, at *6 (D.D.C June 29, 2020) (holding immunity applied where "defendants' assertions are entirely consistent with plaintiffs' own allegations in this case, as plaintiffs have consistently maintained throughout this litigation that the individual defendants were acting in their official capacities").

This case also satisfies the third prong of the Restatement (Second). As the Amended Complaint demonstrates, Aljabri is currently sought by Saudi Arabian authorities for potential crimes committed in Saudi Arabia. *See* Crown Prince Br. § II.A.2.b. Many of the actions that Aljabri complains of, such as the "freezing" of his bank account, the submission of a notice to INTERPOL, and various immigration issues encountered by Aljabri's family, are acts that are tied up with the policies and actions of the Saudi government. *See id*. The only direct claim against the MiSK Foundation—concerning the supposed "hunt" for Plaintiff in the United States—is allegedly a part of that endeavor. During the time of the purported "hunt," Aljabri was subject to

an INTERPOL diffusion notice, Am. Compl. ¶ 257, and Saudi Arabia had asked Turkey to formally extradite him, *id.* ¶ 179. *See also* Crown Prince Br. § II.A.2.b. Moreover, Aljabri alleges that the Foundation's "recruiting" of Saudi students in the United States is also intertwined with efforts by the Crown Prince to control or monitor Saudi students through official Saudi government action. *See supra* § I.A.

A holding from this Court that the Foundation's actions were unlawful would be equivalent to enforcing a rule of law against Saudi Arabia. *See* Crown Prince Br. § II.A.2.b. While Plaintiff's characterization of the actions that underlie his IIED claim ("inter alia," the "hunt" for him in the United States, the "travel[] to Canada with the materials necessary to clean up the crime," and "kidnapping his children in an attempt to lure him back to Saudi Arabia," Am. Compl. ¶ 411) underscore Plaintiff's desire to use this Amended Complaint as a public relations effort, the allegations in his Amended Complaint show that all of these actions are intimately tied up with acts of a foreign government. For example, the IIED claim asserts that the detention of Aljabri's adult children for their crimes is unlawful. *Id.* But, as the Crown Prince's Brief explains, that action is part of Saudi Arabia's executive authority to arrest and prosecute individuals for corruption. *See* Crown Prince Br. § II.A.2.a. Any ruling by this Court would effectively impose liability on the Kingdom for its official actions and dictate that the Kingdom lacks the power to seek to hold individuals responsible for crimes committed in Saudi Arabia. *See Doe 1 v. Buratai*, 318 F. Supp. 3d 218, 233 (D.D.C. 2018) ("By interfering with Nigeria's government, a decision would effectively enforce a rule of law against Nigeria."); *Nnaka v. Fed. Republic of Nigeria*, 756 F. App'x 16, 18 (D.C. Cir. 2019) ("an executive decision to conduct a criminal

investigation . . . ranks '[f]oremost among the prerogatives of sovereignty" (quoting *Heath v. Alabama*, 474 U.S. 82, 93 (1985))).[15]

## III.   PLAINTIFF'S CLAIMS ARE PRECLUDED BY THE ACT OF STATE DOCTRINE.

The Court should also dismiss this Amended Complaint because adjudicating this case would require it to inquire into the validity of the public acts a foreign sovereign committed within its own territory, thereby violating the Act of State doctrine. In this respect, the MiSK Foundation adopts and incorporates by reference the arguments made in the Crown Prince's Brief. Crown Prince Br. § II.C.

## IV.   THE COURT MUST DISMISS THE CLAIM AGAINST THE MISK FOUNDATION BECAUSE SAUDI ARABIA IS A NECESSARY PARTY THAT CANNOT BE JOINED.

The case must also be dismissed because Saudi Arabia is a necessary party to this litigation under Federal Rule of Civil Procedure 19(a)(1), but joinder is not feasible because this suit against Saudi Arabia is barred by sovereign immunity. *See TJGEM LLC v. Republic of Ghana*, 26 F. Supp. 3d 1, 13 (D.D.C. 2013), *aff'd*, 2015 WL 3653187 (D.C. Cir. June 9, 2015); *Republic of Philippines v. Pimentel*, 553 U.S. 851, 867 (2008). As to this issue, the Foundation also adopts and incorporates by reference the arguments made in the Crown Prince's Brief. Crown Prince Br. § II.B.

---

[15] To the extent that the Court grants immunity to the Crown Prince or Mr. Alasaker, the Foundation is entitled to derivative immunity because of allegations in the Amended Complaint that the MiSK Foundation was a "front" for the Crown Prince and that the Crown Prince "act[ed] through" the Foundation, Am. Compl. ¶ 71, and that Alasaker "operat[ed] through" the Foundation, *id.* ¶ 45. In this respect, the Foundation adopts and incorporates by reference the arguments made in the Student-Defendants' Brief. *See* Student-Defendants Br. § VII.E.

## V.      THE ALLEGATIONS AGAINST THE MISK FOUNDATION FAIL TO STATE A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

To the extent the Court considers the merits of the intentional infliction of emotional distress claim against the Foundation, the Court should dismiss that claim under Rule 12(b)(6) for two reasons. First, the claim is governed by Saudi law, which does not recognize a claim for IIED. Second, even assuming D.C. law applied, Plaintiff fails to state a claim because he relies on conclusory allegations about the Foundation, and because he fails to establish several legal elements of this claim.

### A.      The Intentional Infliction of Emotional Distress Claim is Governed by Saudi Arabian Law and Must be Dismissed.

First, as the motion to dismiss by the Crown Prince shows, the IIED claim is governed by Saudi Arabian law, which does not recognize a cause of action for IIED. Crown Prince Br. § III.C.1. For the reasons set forth therein (which the Foundation incorporates and adopts by reference), the IIED claim must be dismissed under Saudi Arabian law. *Id.*

### B.      Plaintiff Has Failed to State a Claim for Intentional Infliction of Emotional Distress under D.C. Law.

Even assuming that D.C. law applies, the Amended Complaint fails to state a claim of intentional infliction of emotional distress against the *Foundation*. Am. Compl. ¶¶ 409–14. Under Rule 12(b)(6), "[t]o survive a motion to dismiss, the complaint must plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged, and must suggest a plausible scenario that shows that the pleader is entitled to relief." *Muhammad v. United States*, 300 F. Supp. 3d 257, 262 (D.D.C. 2018) (Kelly, J.) (citations omitted). But "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation

omitted). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (citation omitted).

Under D.C. law, to state a claim for IIED, Aljabri must satisfy a "strict test," by alleging "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff [to suffer] severe emotional distress." *Ortberg v. Goldman Sachs Grp.*, 64 A.3d 158, 163 (D.C. 2013) (citation omitted). To sustain the IIED cause of action, the Amended Complaint alleges that all 25 defendants, including the MiSK Foundation, are liable for IIED because "Defendants . . . engaged in, conspired to commit, and/or aided and abetted the commission of extreme and outrageous conduct that intentionally or recklessly caused [Plaintiff] severe emotional distress." Am. Compl. ¶ 410. However, Plaintiff has not alleged sufficient facts to sustain these direct or secondary liability theories as to the Foundation, nor do his allegations satisfy the elements of an IIED claim under D.C. law.

### 1.     Plaintiff's Direct Liability Theory Fails.

Plaintiff does not provide factual allegations sustaining his theory that the MiSK Foundation itself "engaged in" "extreme and outrageous conduct." *Id.* As the Supreme Court instructed in *Iqbal*, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." 556 U.S. at 679. Following that procedure here demonstrates that there are no "well-pleaded factual allegations" that "plausibly give rise to an entitlement of relief." *Id.*

*First*, to plead extreme or outrageous conduct, Aljabri must plausibly allege "conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Ortberg*, 64 A.3d at 163 (citation omitted). The Amended Complaint does not allege any such conduct by the *MiSK Foundation*. As stated above, *see supra* § I.B, several of the acts underlying the IIED claim—

"traveling to Canada with the materials necessary to clean up the crime, directing a plot to travel through the United States to kill Dr. Saad, and kidnapping his children," Am. Compl. ¶ 411—do not involve the MiSK Foundation and, accordingly, the Foundation cannot be directly liable for such acts. And although Aljabri alleges that two individuals were "recruited" through the Foundation to search for him, this allegation is conclusory, *see supra* § I.A, and Aljabri does not allege that recruitment, standing alone, could somehow be extreme or outrageous. *See* Am. Compl. ¶ 411. Accordingly, Aljabri has failed to allege any extreme or outrageous conduct by the MiSK Foundation to support this claim.

*Second*, the Amended Complaint has failed to sufficiently allege causation. Aljabri has not alleged any specific, non-conclusory facts supporting an inference that the conduct of the MiSK Foundation caused him distress. The Amended Complaint does not allege for example, that Aljabri suffered distress upon learning that individuals were searching for him in the United States. Notably, the Amended Complaint does not allege that Aljabri learned that Alrajhi or Abuljadayel—the only two individuals allegedly recruited through the Foundation—were searching for him in the United States. In addition, the Amended Complaint does not allege that Aljabri was in the United States at the time that others were searching for him here.

Instead, Plaintiff explicitly ties the beginning of his emotional distress to the March 16, 2020 alleged kidnapping of his adult children:

> As soon as Dr. Saad learned about the kidnapping [of his children] on March 16, 2020—and recognized that [the Crown Prince] may torture or kill his children unless he returns to Saudi Arabia or is himself killed—he suffered severe and intense emotional distress. Haunted, Dr. Saad could not sleep. He met with his primary care physician and obtained prescription medication. Dr. Saad's hypertension and glucose levels became out of control, requiring additional medication, and he experienced severe headaches and fatigue. Dr. Saad's wife could not stop crying. Dr. Saad was and remains tormented by what is happening to his young son and

> daughter and his fear that [the Crown Prince] will not relent until
> Dr. Saad is dead.

Am. Compl. ¶ 194. Elsewhere the Amended Complaint attempts to broaden the foundation of the

IIED claim by alleging in a conclusory fashion that other events caused Plaintiff's distress. *Id.* ¶ 365

("Defendants attempted extrajudicial killing of Dr. Saad caused indescribable pain to Dr. Saad.");

*id.* ¶ 370 (stating all the "overt acts," "directly and proximately caused injury to Dr. Saad in the

form of severe emotional distress and physical manifestations of that harm"); *id.* ¶ 411 (stating

series of events which, "inter alia," constituted the IIED conduct). These generalized and

conclusory statements attempting to link Plaintiff's alleged emotional distress to other events,

should be disregarded. The only factual allegations in the Amended Complaint regarding when

Plaintiff suffered emotional distress state that his emotional distress began on March 16, 2020.

Because the Foundation had no role in that alleged kidnapping, it cannot be liable for IIED.

    *Third*, several of the specific acts identified in Plaintiff's IIED count cannot form the basis

of his claim. As discussed in the Crown Prince's Brief (which the Foundation adopts and

incorporates by reference), Crown Prince Br. § III.C.2, the alleged kidnapping claim fails because

Aljabri does not allege that he was present for that kidnapping, Am. Compl. ¶ 149, as is required

under D.C. law, *see* Restatement (Second) of Torts § 46(2)(a); *Republic of Sudan v. Owens*, 194

A.3d 38, 41–42 (D.C. 2018). And Aljabri cannot state a claim for the attempted killing in 2018

and a plot in 2020, because under D.C. law, an *attempt* to commit bodily harm is not actionable as

an IIED claim. In this respect, the Foundation adopts and incorporates by reference the arguments

made in the Crown Prince's Brief. *See* Crown Prince Br. § III.C.2.

        **2.**    **Plaintiff's Conclusory Allegations of Conspiracy, Aiding and Abetting,
and Alter Ego Liability Do Not Salvage His Claim.**

    Having failed to establish the Foundation's direct involvement in the conduct underlying

his IIED claim, Plaintiff must rely on theories of conspiracy, aiding and abetting, and alter ego

liability. Yet all of these secondary liability theories fail in the absence of individualized, factual allegations about the conduct and state of mind of the Foundation and the relationship between the Foundation and alleged co-conspirators.

**Conspiracy and Aiding and Abetting.** To plead conspiracy, Aljabri must plausibly allege: "(1) an agreement between two or more persons (2) to participate in an unlawful act, and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement pursuant to, and in furtherance of, the common scheme." *Johnson v. Metro. Direct Prop. & Cas. Ins. Co.*, 2019 WL 176851, at *4 (D.D.C. Jan. 11, 2019) (citation omitted).

To plead aiding and abetting liability, Aljabri must plausibly allege: "(1) the party the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time he provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation." *Halberstam v. Welch*, 705 F.2d 472, 487–88 (D.C. Cir. 1983). The principal distinction between these two theories "is that a conspiracy involves an agreement to participate in a wrongful activity" whereas aiding and abetting "focuses on whether a defendant knowingly gave 'substantial assistance' to someone who performed wrongful conduct, not on whether the defendant agreed to join the wrongful conduct." *Id.* at 478.

As pled in the Amended Complaint, the alleged conspiracy consisted of "locating and extrajudicially killing Dr. Saad." Am. Compl. ¶ 139. Aljabri alleges that this far-ranging conspiracy began in early 2017, occurred over several years, is still ongoing, covers multiple continents, and includes events as far ranging as an unsuccessful search for him in the United States in late 2017, the abduction of his son-in-law in late 2017 in Dubai, the dispatch of a group of individuals to Canada in October 2018, the arrest of his children in Saudi Arabia in March 2020,

and a purported plot against him in 2020. *Id.* ¶¶ 189–95, 197, 225–45, 323–65. The Foundation's only alleged role in this conspiracy was to serve as a tool for "recruiting" two other defendants who participated in the search for Aljabri in the United States from September to December 2017. *Id.* ¶¶ 90, 106.

The Amended Complaint does not adequately plead the existence of an *agreement* between the Foundation and any other defendants. *See Mattiaccio v. DHA Grp., Inc.*, 20 F. Supp. 3d 220, 230 (D.D.C. 2014) (dismissing conspiracy claim where "[p]laintiff alleges defendant entered into an agreement, but provides no indication of when or how such an agreement was brokered" (citation omitted)); *Johnson*, 2019 WL 176851, at *4 (dismissing conspiracy claim where plaintiff alleged three times that "Defendants 'conspired' or 'agreed' to defame him"). Instead, Plaintiff relies on conclusory statements about "conspiracy," claiming that Defendants "conspired" or were "conspirators." *See* Am. Compl. ¶ 371 (stating that the Crown Prince and Mr. Alasaker "conspired"); *id.* ¶ 139 (stating that Hamed is a "co-conspirator" of the Foundation). Elsewhere, the Amended Complaint parrots the legal elements of a conspiracy claim that also groups the Defendants together. *See, e.g.*, *id.* ¶ 369 (stating that the Foundation and other Defendants were "personally liable" "by virtue of their direct or indirect participation, and because they conspired with, or aided and abetted the commission of these acts "); *id.* ¶ 370 (stating that the "relationships between and coordination among each of the Defendants demonstrates that Defendants had ample opportunity to and in fact did agree to commit unlawful acts"). These conclusory assertions will not suffice.

None of the remaining allegations about the Foundation raise a plausible inference that it entered into a global conspiracy. There are no specific factual allegations that the Foundation knew about or agreed to the alleged plan to engage in an extrajudicial killing of Aljabri. *See Bush v.*

*Butler*, 521 F. Supp. 2d 63, 68 (D.D.C. 2007) ("To state sufficient facts to support an agreement, plaintiff should allege the existence of any events, conversations, or documents indicating there was an agreement between the defendants to violate his rights."). There are no allegations that the Foundation—which was allegedly used to recruit Alrajhi and Abuljadayel—knew that those two defendants were participating in the search for Aljabri that was allegedly part of that scheme to commit an extrajudicial killing. Nothing in the Amended Complaint suggests that the Foundation was aware of, or agreed to, a specific plan to commit an extrajudicial killing of Aljabri. *See Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84, 110 (D.D.C. 2017), *order vacated in part on other grounds*, 285 F. Supp. 3d 240 (D.D.C. 2018) ("To demonstrate the existence of a 'chain' conspiracy in which conspirators are not all directly connected, the critical question is whether each conspirator knows of the existence of the larger conspiracy and of the necessity for the other participants, even if he or she does not know their identities." (citation omitted)). Accordingly, Plaintiff cannot avail himself of conspiracy liability to maintain the IIED claim against the Foundation.

Similarly, Aljabri has not alleged any specific facts supporting aiding and abetting liability. First, the Amended Complaint does not adequately plead that the Foundation provided "substantial assistance" to the alleged plot to commit an extrajudicial killing of Aljabri. In determining whether a plaintiff has adequately pled this element, "the Court considers (1) the nature of the act encouraged, (2) the amount and kind of assistance given, (3) the defendant's absence or presence at the time of the tort, (4) the defendant's relation to the tortious actor, (5) the defendant's state of mind, and the (6) duration of the assistance provided." *Bernhardt v. Islamic Republic of Iran*, 2020 WL 6743066, at *6 (D.D.C. Nov. 16, 2020) (Kelly, J.).

The Amended Complaint's allegations are deficient in this regard. The Amended Complaint alleges—parroting *Halberstam*—that "Defendant MiSK knowingly provided substantial assistance through its actions to recruit individuals who served as covert agents and helped to hunt Dr. Saad in the United States" and that the Foundation was "aware" of its role in the plan because it is a "mere instrumentality of Defendants bin Salman and Alasaker." Am. Compl. ¶ 373. These are legal conclusions not entitled to a presumption of truth. *See also supra* § I.A.

The Amended Complaint does not contain allegations showing that the brief—and unsuccessful—"search" for Aljabri in the United States provided "substantial assistance" for the subsequent effort to kill him in October 2018. On the contrary, the alleged "search" for Aljabri in late 2017 in the United States had no impact on the subsequent discovery of Aljabri in Toronto and the dispatching of a group of individuals to allegedly kill him in October 2018. *See supra* § I.A. Although the Amended Complaint now alleges, in conclusory fashion, that Alrajhi and Abuljadayel obtained "valuable information," it does not allege that, without the "information" provided by these two defendants, Aljabri would not have been located. *See supra* § I.B. And the Amended Complaint does not allege that the Foundation's own activities led Aljabri to be located in Canada. Nobody associated with the Foundation was alleged to be part of the group sent to Canada to kill Aljabri, and the Foundation is not alleged to have directed any of the actions of that group.

In short, the absence of allegations sustaining a substantive, temporal, and causal relationship between the Foundation's activities and the subsequent plot against Aljabri in October 2018 means that Aljabri has not stated a claim for aiding and abetting. *See Halberstam*, 705 F.2d at 488 (allegations should show that tort was "heavily dependent" on the actions of the aider and

abettor or that its assistance was "indisputably important," or an "essential part of" the act); *Ofisi*, 278 F. Supp. 3d at 11 ("[P]laintiffs are required to plead a link between the aid rendered and the principal violation (or violations) alleged." (citation omitted)).

In addition to failing to plead "substantial assistance," the Amended Complaint contains no facts plausibly showing that the MiSK Foundation had any knowledge of the alleged plot to kill Aljabri in Canada and therefore that the Foundation was "generally aware of [its] role" in the plan or that any assistance it provided was "knowing." *Halberstam*, 705 F.3d at 477. As described *supra* § I.B, the allegations regarding the Foundation's awareness of the alleged scheme to commit an extrajudicial killing are deficient. *See Bernhardt*, 2020 WL 6743066, at *5 (holding that plaintiff failed to plausibly allege knowledge for aiding and abetting where "the[] allegations do not contain facts that plausibly suggest that [defendants] knew they had assumed a role in terrorism"). Therefore, Aljabri's "allegations . . . come up well short of th[e] high bar" to plead aiding and abetting liability. *Id.*

**Alter Ego**. Plaintiff also cannot rely on his "alter ego" theory to establish the Foundation's liability or bootstrap the conspiracy and aiding and abetting liability theories. The Amended Complaint for the first time alleges that the Foundation is the "alter ego" of Defendants bin Salman and Alasaker, "insofar as Defendant MiSK operated as a front" for those individuals, and therefore is "liable for their conduct." Am. Compl. ¶¶ 371, 58 ("Defendant MiSK—acting as an alter ego of

[the Crown Prince] and Alasaker—was used to deploy covert agents to hunt Dr. Saad in the United States.").[16]

As a default principle, "a corporation is regarded as an entity separate and distinct from its shareholders." *Estate of Raleigh v. Mitchell*, 947 A.2d 464, 469 (D.C. 2008) (citations omitted). "Courts apply the 'alter ego' theory to cast aside the corporate shield and fasten liability on the *individual shareholder*, . . . when substantial ownership of corporate stock is concentrated in one person or a few persons and other factors support disregarding the corporate entity in the interest of equity and fairness." *Id.* at 470 (emphasis added) (citations omitted). In unique situations, commonly in the tax context, courts may "reverse veil pierce," in order to, for example, allow a creditor to obtain a corporation's assets in satisfying a judgment against a dominant shareholder. *United States v. TDC Mgmt. Corp.*, 263 F. Supp. 3d 257, 266 n.7 (D.D.C. 2017) ("The reverse veil-piercing doctrine commonly is used by the federal government to seize corporate assets to satisfy delinquent tax obligations of a dominant shareholder."). It appears that Aljabri is relying on a "reverse veil piercing" theory here, by asserting that the Foundation is liable for the conduct of the Crown Prince and Mr. Alasaker. Even assuming reverse veil-piercing is appropriate here, Aljabri does not satisfy his burden.

A plaintiff seeking to establish alter ego liability must advance sufficient factual allegations to make a prima facie case for piercing the corporate veil. *United States ex rel. Landis v. Tailwind*

---

[16] Moreover, the conclusory allegation that the Foundation is an "alter ego" for two other individuals fails to provide notice to the Foundation as to what exactly it is liable for – it is unclear if Aljabri is alleging that the MiSK Foundation is liable for *all* the conduct attributed to Defendants bin Salman and Alasaker, or just a portion. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (explaining that plaintiff must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." (citation omitted)). As described in the briefs of the Crown Prince and Alasaker, Aljabri's allegations against them are conclusory and fail to state a claim. *See* Crown Prince Br. § I.A; Alasaker Br. § I.A.

*Sports Corp.*, 51 F. Supp. 3d 9, 63 (D.D.C. 2014) ("These allegations are not sufficiently substantive, and the Court finds that the relator has not satisfied the high burden required to pierce Ross Investments' corporate veil."). To pierce the corporate veil, Aljabri must show "that there is (1) unity of ownership and interest, and (2) [either] use of the corporate form to perpetrate fraud or wrong,' " or that "considerations of justice and equity . . . justify piercing the corporate veil." *Motir Servs., Inc. v. Ekwuno*, 191 F. Supp. 3d 98, 108 (D.D.C. 2016) (citations omitted); *United States v. Emor*, 850 F. Supp. 2d 176, 206 (D.D.C. 2012) ("Put another way, the test is: (1) have the shareholder and the corporation failed to maintain separate identities? and (2) would adherence to the corporate structure sanction a fraud, promote injustice, or lead to an evasion of legal obligations?" (citation omitted)). In making this determination, the court may consider "various factors," including "whether corporate formalities have been observed; whether there has been commingling of corporate and shareholder funds, staff and property; whether a single shareholder dominates the corporation; whether the corporation is adequately capitalized; and, especially, whether the corporate form has been used to effectuate a fraud." *Ekwuno*, 191 F. Supp. 3d at 108 (citation omitted). Ultimately, the plaintiff must establish that "the corporation is not only controlled by those persons [alleged to be alter egos of the corporation], but also that the separateness of the persons and the corporation has ceased and . . . an adherence to the fiction of the separate existence of the corporation would sanction a fraud or promote injustice." *Vuitch v. Furr*, 482 A.2d 811, 815 (D.C. 1984) (citation omitted).

Aljabri has failed to proffer facts showing that there is a basis for piercing the corporate veil in this case. Aljabri's conclusory statements that the Foundation is the "alter ego" of Alasaker and the Crown Prince should be disregarded altogether. *Ekwuno*, 191 F. Supp. 3d at 109 (allegations that entity served as the "alter ego" was a conclusory allegation "about an ultimate

legal question [that] need not be accepted as true and correct in evaluating a motion to dismiss"). Aljabri also repeats elements of the doctrine, asserting that the Foundation is "controlled and dominated by, and is a mere instrumentality of, Defendants bin Salman and Alasaker." Am. Compl. ¶ 69. Such a formulaic recitation cannot satisfy Rule 12. *See U.S. ex rel Jenkins v. Sanford Capital*, 2020 WL 5440551, at \*9–10 (D.D.C. Sept. 10, 2020) (conclusory allegations insufficient for alleging alter ego liability); *Ekwuno*, 191 F. Supp. 3d at 109 (reliance on legal conclusions regarding alter ego identity insufficient to withstand motion to dismiss).

Plaintiff's allegation that the Crown Prince "is personally responsible for substantially funding Defendant MiSK's operations," Am. Compl. ¶ 70, is also insufficient. This single allegation does not plausibly state a claim for alter-ego liability. For instance, "[d]ominant stock ownership alone does not create an identity of interest as an alter ego." *Alkanani v. Aegis Def. Servs., LLC*, 976 F. Supp. 2d 1, 9 (D.D.C. 2013) (holding that even though "Aegis UK as the parent owned 99% of the shares of Aegis LLC" "Aegis UK is not automatically liable for Aegis LLC's activities"); *see also Ekwuno*, 191 F. Supp. 3d at 109 (stating that individual defendant was the "sole owner" of corporate defendant and suggesting that communications between parties went through individual defendant was insufficient to state a claim for alter ego liability).

The Amended Complaint also lacks any factual allegations that "corporate formalities were disregarded, that the corporate defendant was purposely undercapitalized, or that the corporate defendant's funds and assets were mingled with [the individual defendant's] or diverted for non-corporate or personal uses." *See Ekwuno*, 191 F. Supp. 3d at 109. On the contrary, the Amended Complaint's descriptions of the various events held by the Foundation in the United States, its extensive educational portfolio for Saudi students, and its robust investment in foreign initiatives,

Am. Compl. ¶¶ 134 & n.121, 70 & n.54, undermine Plaintiff's anemic effort to assert an alter ego theory for Mr. Alasaker and the Crown Prince.

In sum, Plaintiff's failure to adequately allege a theory of either direct or secondary liability against the Foundation requires dismissal of the IIED claim against the MiSK Foundation.

## VI.    THE COURT SHOULD EXERCISE ITS DISCRETION TO DISMISS THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM IF IT DISMISSES THE OTHER DEFENDANTS AND CLAIMS.

The other Defendants, who are the subject of both the IIED claim and the federal claims, have raised multiple arguments counseling dismissal of Plaintiff's Amended Complaint in its entirety. In the event that the Court dismisses the remaining Defendants or the federal claims against those Defendants, the Court should decline to exercise jurisdiction over the only claim against the MiSK Foundation, the common-law claim for IIED. Because Aljabri's basis for jurisdiction over this claim is 28 U.S.C. § 1367, *see* Am. Compl. ¶ 125, the district court may "decline to exercise supplemental jurisdiction over a claim . . . if," *inter alia*, "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). In this respect, the MiSK Foundation incorporates by reference the arguments in the Crown Prince's Brief. *See* Crown Prince Br. § III.C.4.

## CONCLUSION

For all of these reasons, the Court should dismiss the intentional infliction of emotional distress claim as to the MiSK Foundation.

Respectfully submitted,


___*William W. Taylor, III*_____
By: William W. Taylor, III (D.C. Bar No. 84194)
Margarita K. O'Donnell (D.C. Bar No. 1005972)
ZUCKERMAN SPAEDER LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036
Tel: (202) 778-1800
Fax: (202) 822-8106
E-mail: wtaylor@zuckerman.com
E-mail: modonnell@zuckerman.com
*Attorneys for Defendant Prince Mohammed Bin Salman Abdulaziz Foundation*

**CERTIFICATE OF SERVICE**

I certify that on April 5, 2021, I electronically filed the foregoing Prince Mohammed Bin Salman Abdulaziz Foundation's Motion to Dismiss and Memorandum In Support Of Its Motion To Dismiss, using the ECF system, which sent notice of filing in this matter to all counsel of record.

_William W. Taylor, III_

William W. Taylor, III
*Attorney for Defendant Prince Mohammed Bin Salman Abdulaziz Foundation*