## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **DR. SAAD ALJABRI,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:20-cv-02146-TJK |
| | ) | |
| **MOHAMMED BIN SALMAN BIN** | ) | |
| **ABDULAZIZ AL SAUD,** *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MOTION TO DISMISS THE AMENDED COMPLAINT OF DEFENDANTS YOUSEF ALRAJHI, MOHAMMED ALHAMED, LAYLA ABULJADAYEL, AND HANI FAKRI HAMED

Defendants Yousef Alrajhi, Mohammed Alhamed, Layla Abuljadayel, and Hani Fakri Hamed, through and by undersigned counsel, move to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) and, as to Defendants Alrajhi and Hamed, Fed. R. Civ. P. 12(b)(2).

Dated: April 5, 2021
Washington, D.C.

/s/ *Mitchell R. Berger*
Mitchell R. Berger (DC 385467)
Benjamin D. Wood (DC 478799)
Alexandra E. Chopin (DC 490736)

SQUIRE PATTON BOGGS (US) LLP
2550 M Street, N.W.
Washington, D.C. 20037
Phone: 202-457-6000
Fax:    202-457-6315
mitchell.berger@squirepb.com
benjamin.wood@squirepb.com
alexandra.chopin@squirepb.com

*Attorneys for Defendants*
*Yousef Alrajhi, Mohammed Alhamed,*
*Layla Abuljadayel, and Hani Fakri Hamed*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DR. SAAD ALJABRI,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 1:20-cv-02146-TJK |
| | ) |
| **MOHAMMED BIN SALMAN BIN** | ) |
| **ABDULAZIZ AL SAUD,** *et al.* | ) |
| | ) |
| Defendants. | ) |
| | ) |

<u>**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE AMENDED COMPLAINT OF DEFENDANTS YOUSEF ALRAJHI, MOHAMMED ALHAMED, LAYLA ABULJADAYEL, AND HANI FAKRI HAMED**</u>

Dated: April 5, 2021
Washington, D.C.

Mitchell R. Berger (DC 385467)
Benjamin D. Wood (DC 478799)
Alexandra E. Chopin (DC 490736)

SQUIRE PATTON BOGGS (US) LLP
2550 M Street, N.W.
Washington, D.C. 20037
Phone: 202-457-6000
Fax:     202-457-6315
mitchell.berger@squirepb.com
benjamin.wood@squirepb.com
alexandra.chopin@squirepb.com

*Attorneys for Defendants*
*Yousef Alrajhi, Mohammed Alhamed,*
*Layla Abuljadayel, and Hani Fakri Hamed*

## Table Of Contents

Table Of Authorities ............................................................................................. iii

I.    Introduction. ................................................................................................ 1

II.   Applicable Legal Standards. ....................................................................... 2

III.  The AC Repeats The Pleading Defects Of The Original Complaint. ............................... 4

IV.   There Is No Plausible ATS Claim Because Plaintiff's Farfetched Allegations Do
      Not Plead A Violation Of International Law, Or Any Intent Or Knowledge Of
      Intent To Violate International Law. .......................................................... 9

      A.    Plaintiff Alleges No Violation Of International Law. ........................... 10

      B.    Plaintiff Alleges No Intent To Commit, Or Knowledge Of, A Violation Of
            International Law. .................................................................... 13

V.    The Complaint Does Not State A Claim Under The TVPA. ........................................ 16

      A.    A Non-Actionable Attempted Killing Does Not Create A TVPA Claim. ........... 16

      B.    No Allegations Of Deliberate Intent To Harm Plaintiff. ..................... 20

      C.    No TVPA Claim Without Physical Injury. ..................................... 22

VI.   The Complaint Does Not State A Claim For Liability Of The Student-Defendants
      Or Mr. Hamed Under Theories Of Aiding And Abetting Or Conspiracy. ..................... 23

      A.    No Defendants Physically Injured Plaintiff Or Committed A Primary
            Violation Of The ATS Or TVPA. ................................................ 25

      B.    No Allegations That The Acts of the Student-Defendants Or Mr. Hamed
            Had a Substantial Effect on An Unlawful Act Causing Injury. .............. 27

      C.    No Plausible Allegations That The Student-Defendants And Mr. Hamed
            "Actually Knew" "The Intent Of The Principal Perpetrator" And Agreed
            To Assist The Perpetrator In The Commission Of The Crime. ................ 28

      D.    The Alleged Plot To Harm Plaintiff Did Not Depend On The Student-
            Defendants' Or Hamed's Failure To Locate Plaintiff Or His Wife. ......... 30

VII.  The Court Lacks Subject-Matter Jurisdiction Due To Foreign-Official Immunity ......... 30

      A.    The Established Policy Of The State Department Governs Foreign-Official
            Immunity. .................................................................... 31

      B.    The Student-Defendants And Mr. Hamed Are Immune From Suit; Plaintiff
            Alleges That They Were Agents Of A Foreign State Acting In Their
            Official Capacities. ......................................................... 34

      C.    The Student-Defendants And Mr. Hamed Are Immune Even Under The
            Second Restatement Test. .................................................... 36

      D.    There Is No Applicable Exception To Conduct-Based Immunity. ............... 37

E.      The Student-Defendants And Hamed Are Entitled To Derivative
Immunity Based On The Immunity Of The Crown Prince.................................. 41

VIII.   The Act Of State Doctrine Bars The Court From Adjudicating Plaintiff's Claims......... 42

IX.     This Court Has No Personal Jurisdiction Over The U.S. Resident Defendants. ............. 43

X.      Plaintiff Fails To State A Claim For Intentional Infliction Of Emotional Distress. ........ 45

XI.     Conclusion. ..................................................................................................... 45

## Table Of Authorities

**CASES**

*Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81 (D.D.C. 2010)..........................................29

*Al Shimari v. CACI Premier Tech., Inc.*, 324 F. Supp. 3d 668 (E.D. Va. 2018) .........................13

*Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1 (D.D.C. 2010).........................................................10, 11

*Alkanani v. Aegis Def. Servs. LLC,* 976 F. Supp. 2d 13 (D.D.C. 2014) .......................................44

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...............................................................................passim

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964) ......................................................43

*Barnes v. Mayor Stephanie Rawlings-Blake*, Civil Action No. RDB-10-2525, ............................
   2011 U.S. Dist. LEXIS 69458 (D. Md. June 28, 2011)............................................................11

*Bashe Abdi Yousuf v. Mohamed Ali Samantar*, 699 F.3d 763 (4th Cir. 2012) ............................35

*Belhas v. Ya'Alon*, 466 F. Supp. 2d 127 (D.D.C. 2006) ..............................................................34

*Bieregu v. Ashcroft*, 259 F. Supp. 2d 342 (D.N.J. 2003) ............................................................13

*Blue v. Dist. of Columbia*, 850 F. Supp. 2d 16 (D.D.C. 2012) ......................................................9

*Boniface v. Viliena*, 338 F. Supp. 3d 50 (D. Mass. 2018)...........................................................19

*Burma Task Force v. Sein*, No. 15 Civ. 7772,  2016 U.S. Dist. LEXIS 42326 ............................
   (S.D.N.Y. Mar. 30, 2016) ........................................................................................................40

*Butters v. Vance Int'l, Inc.*. 225 F.3d 462 (4th Cir. 2000) ...........................................................41

*Carswell v. Air Line Pilots Ass'n Int'l*, 540 F. Supp. 2d 107 (D.D.C. 2008) ..............................30

*Cohen v. Islamic Republic of Iran*, No. 17-1214 (JEB), 2019 U.S. Dist. LEXIS 115278 ............
   (D.D.C. July 11, 2019)......................................................................................................18, 19

*Doe v. Constant*, No. 04-10108 (SHS), 2006 U.S. Dist. LEXIS 101961  .....................................
   (S.D.N.Y. Oct. 24, 2006), *aff'd*, 354 F. App'x 543 (2d Cir. 2009) .........................................20

*Doe v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20 (D.D.C. 2005), *aff'd in part,* ............................
   *rev'd in part on other grounds*, 654 F.3d 11 (D.C. Cir. 2011) ("*Exxon I*")...........10, 12, 23, 28

*Doe v. Exxon Mobil Corp.*, 527 F. App'x 7 (D.C. Cir. 2013) ("*Exxon II*")...................................12

*Doe v. Exxon Mobil Corp.*, No. 01-1357 (RCL), 2015 U.S. Dist. LEXIS 91107 ...........................
   (D.D.C. Jul. 6, 2015) ("*Exxon III*")........................................................................................12

*Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1 (D.D.C. 2011).............................................18

*Dogan v. Barak*, 932 F.3d 888 (9th Cir. 2019)....................................................................32, 38

*Ex parte Republic of Peru*, 318 U.S. 578 (1943) .......................................................................31

*Filarsky v. Delia*, 566 U.S. 377 (2012)......................................................................................38

*First Chi. Int'l v. United Exch. Co.*, 836 F.2d 1375 (D.C. Cir. 1988) ........................................... 4

\*Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323 (D.D.C. 2020) .............................. 18, 22

*Foremost-McKesson, Inc. v. Iran*, 905 F.2d 438 (D.C. Cir. 1990) ............................................... 37

\*G&G Closed Cir. Events, LLC v. 19th & K, Inc.*, No. 19-1422 (DLF), .......................................
2020 U.S. Dist. LEXIS 25921 (D.D.C. Feb. 14, 2020) ....................................................... 9, 15

\*Gang v. Zhizhen*, No. 3:04-1146 (RNC), 2017 U.S. Dist. LEXIS 162344 .................................
(D. Conn. Sept. 30, 2017) ............................................................................................. 27, 29

*Gore v. Wilkie*, No. 19-1134 (RDM), 2020 U.S. Dist. LEXIS 94792 (D.D.C. May 31, 2020) ...... 3

*Haim v. Islamic Republic of Iran*, 784 F. Supp. 2d 1 (D.D.C. 2011) .......................................... 18

\*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ....................................................... passim

*Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23 (D.D.C. 2017) ........................................... 17

*Hourani v. Mirtchev*, 796 F.3d 1 (D.C. Cir. 2015) ..................................................................... 43

*Imbler v. Pachtman*, 424 U.S. 409 (1976) ................................................................................. 38

*In re Ross Sys. Sec. Litig.*, No. 94-0017 (DLJ), 1994 U.S. Dist. LEXIS 21263 ...........................
(N.D. Cal. July 21, 1994) .............................................................................................. 26

\*In re Terrorist Attacks on Sept. 11, 2001*, 122 F. Supp. 3d 181 (S.D.N.Y. 2015) .......... 31, 32, 35

*Ivey v. Lynch*, No. 1:17-439 (NCT), 2018 U.S. Dist. LEXIS 133656 ........................................
(M.D.N.C. Aug. 8, 2018) ............................................................................................... 42

\*J & J Sports Prods. v. Micherie, LLC*, No. 17-1150 (KBJ), 2018 U.S. Dist. LEXIS 166328
(D.D.C. Sept. 27, 2018) ................................................................................................ 9, 15

*Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1397 (2018) ........................................................ 10

*Johns v. Daniel*, No. 13-2666 (GHM), 2014 U.S. Dist. LEXIS 64848 .......................................
(S.D. Tex. May 12, 2014) .............................................................................................. 27

\*Jungguist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020 (D.C. Cir. 1997) .......... 34, 44

*Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501 (D.C. Cir. 2018) ................ 9

\*Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12 (D.D.C. 2019) .............................. 18, 19

*Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254 (2d Cir. 2007) ......................................... 27

*Lewis v. Mutond*, 918 F.3d 142 (D.C. Cir. 2019), *cert. denied*, 207 L. Ed. 2d 1096 (2020) ........ 32

*Livnat v. Palestinian Auth.*, 851 F.3d 45 (D.C. Cir. 2017) ......................................................... 4

*Manoharan v. Rajapaksa*, 711 F.3d 178, 180 (D.C. Cir. 2013) ................................................. 39

*Manouchehr Mohammadi v. Islamic Republic of Iran*, 947 F. Supp. 2d 48 (D.D.C. 2013) ......... 34

\*Mastafa v. Chevron Corp.*, 770 F.3d 170 (2d Cir. 2014) ..................................................... 10, 13

*Matar v. Dichter*, 563 F.3d 9 (2d Cir. 2009) ............................................................................ 39

*MetLife, Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661 (D.C Cir. 2017) ........................ 38

*Moriah v. Bank of China Ltd.*, 107 F. Supp. 3d 272 (S.D.N.Y. 2015) ......................................... 32

*Muchira v. Al-Rawaf*, No. 14-770 (AJT-JFA), 2015 U.S. Dist. LEXIS 49806 .............................
   (E.D. Va. Apr. 15, 2015) ............................................................................................. 26

*Nahl v. Jaoude*, No. 15-9755 (LGS), 2018 U.S. Dist. LEXIS 100056 .........................................
   (S.D.N.Y. June 14, 2018) ............................................................................................ 13

*Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017) ..................................................... 17

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244 (2d Cir. 2009) ............. 14

*Prosecutor v. Perišić*, Case No. IT-04-81-T, Judgement (Feb. 28, 2013), https://www.icty.org/x/
   cases/perisic/acjug/en/130228_judgement.pdf ....................................................... 12

*Rehberg v. Paulk*, 566 U.S. 356 (2012) ....................................................................................... 39

*Republic of Mexico v. Hoffman*, 324 U.S. 30 (1945) .................................................................... 31

*Rishikof v. Mortada*, 70 F. Supp. 3d 8 (D.D.C. 2014) ................................................................. 35

*Roman v. City of Chi. Dep't of Police*, No. 94 C 6906, 1995 U.S. Dist. LEXIS 1537 ...................
   (N.D. Ill. Feb. 9, 1995) ................................................................................................. 11

*\*Salzman v. Islamic Republic of Iran*, No. 17-2475 (RDM), 2019 U.S. Dist. LEXIS 163632
   (D.D.C. Sept. 25, 2019) ........................................................................................... 18, 19

*\*Samantar v. Yousuf*, 560 U.S. 305 (2010) ............................................................................ 31, 32

*\*Second Amendment Found. v. U.S. Conf. of Mayors*, 274 F.3d 521 (D.C. Cir. 2001) ........... 4, 44

*Sosa v. Alvarez-Machain*, 542 U.S. 692, 720 (2004) ............................................................ 10, 11

*Spence v. Wolf*, Civil Action No. 19-2919 (TJK), 2020 U.S. Dist. LEXIS 190943 .......................
   (D.D.C. Oct. 15, 2020) ................................................................................................... 3

*Stutts v. De Dietrich Grp.*, No. 03-4058 (ILG), 2006 U.S. Dist. LEXIS 47638 ............................
   (E.D.N.Y. June 30, 2006) .............................................................................................. 26

*Sussman v. Wells Fargo Bank, N.A.*, No. 2:16-01094 (JNP-PMW), .............................................
   2017 U.S. Dist. LEXIS 152433 (D. Utah Aug. 31, 2017) ............................................ 11

*Tawfik v. al-Sabah*, No. 11-6455 (ALC-JCF), 2012 U.S. Dist. LEXIS 115946 ............................
   (S.D.N.Y. Aug. 16, 2012) ............................................................................................. 40

*The Schooner Exchange*, 11 U.S. (7 Cranch) 116 (1812) ........................................................... 40

*Tyler v. D.C. Hous. Auth.*, 113 F. Supp. 3d 88 (D.D.C. 2015) ..................................................... 3

*Van Beneden v. Al-Sanusi*, 709 F.3d 1165 (D.C. Cir. 2013) ....................................................... 18

*Warfaa v. Ali*, 33 F. Supp. 3d 653 (E.D. Va. 2014) ............................................................... 12, 20

*Xiangyuan Zhu v. Fed. Hous. Fin. Bd.*, No. 03-5297, 2004 U.S. App. 11284 ..............................

(D.C. Cir. Jun. 7, 2004)........................................................................................ 44

*Zelaya v. UNICCO Serv. Co.*, 587 F. Supp. 2d 277 (D.D.C. 2008) ............................ 15

**STATUTES**

*28 U.S.C. § 1605......................................................................................................... 17

*28 U.S.C. § 1350........................................................................................................... 1

D.C. Code § 16-2701 (2001)......................................................................................... 18

D.C. Code § 13-423 ....................................................................................................... 44

*Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992), ....................

*reprinted in* 28 U.S.C. § 1350 note ......................................................................... 1


**OTHER AUTHORITIES**

"Oath of Citizenship", https://en.wikipedia.org/wiki/Oath_of_citizenship................................... 6

Abuljadayel, L., *The Perception of Smile Attractiveness Among Saudi Population*, Journal of Clinical, Cosmetic and Investigational Dentistry, *available at* U.S. National Library Of Medicine, PubMed (nih.gov) (2015), https://pubmed.ncbi.nlm.nih.gov/25653558/#affiliation-1 (last visited April 5, 2021) ...................................................................................................... 4

Alrajhi, Y., *Establishing Human Identification by Short Tandem Repeat (STR) and Mitochondrial DNA (mtDNA)*, 4 Int'l J. of Bioinformatics & Biomedical Engineering 1 (2018), *available at* http://files.aiscience.org/journal/article/pdf/70070117.pdf ...................... 5

Dr. Abuljadayel, LinkedIn, *available at* https://www.linkedin.com/in/layla-abuljadayel-94859162/ ................................................................................................................... 4

Mohammed Alhamed, LinkedIn, *available at* https://www.linkedin.com/in/ mohammed-alhamed-930279140................................................................................................. 5

Restatement (Second) of Foreign Relations Law § 66(f) (1965)................................... 32

Restatement (Third) of Agency § 1.01 (2006)............................................................... 30

Restatement (Third) of Foreign Relations Law § 702 ................................................... 14


**RULES**

Federal Rule of Civil Procedure 4(k)(2) ....................................................................... 43


**TREATISES**

International Criminal Court, *Elements of Crimes* (2011), *available at* https://www.icc-cpi.int/NR/rdonlyres/336923D8A6AD40ECAD7B45BF9DE73D56/0/ElementsOfCrimesEng.pdf ............................................................................................................................. 14

William L. Prosser on the Law of Torts § 46 (4th ed. 1971)......................................... 26

## MEDIA SOURCES

"'Al-Issa' Extends Thanks to the Saudi Ambassador for Inquiring About his Health", *Sabq Online Newspaper* (Apr. 11, 2015), https://sabq.org/KG3gde ................................................... 6

"All You Need To Know About The Pledge Of Allegiance And The Allegiance Council", *Al Arabiya* (June 21, 2017).......................................................................................................... 6

"Language initiative connects Saudi youth with world cultures", *Arab News*, *available at* https://www.arabnews.com/node/ 1709536/saudi-arabia (July 25, 2020)................................. 5

"Outgoing Saudi cultural attaché in Washington honored", *Arab News*, https://www.arabnews.com/node/1591976/saudi-arabia (Nov. 30, 2019)................................. 6

"Saudis Flock to Pledge Loyalty In a Ritual Fit for a New King", *LA Times* (Aug. 4, 2005)........ 6

"Tips for BU's Newest International Students: Abdulraheem Alwafi & Layla Abuljadayel", https://youtu.be/3DvwdyA2X0s (Aug. 20, 2014)...................................................................... 5

# I.    Introduction.

Plaintiff's case against Defendants Yousef Alrajhi, Mohammed Alhamed, Layla Abuljadayel, and Hani Fakri Hamed fundamentally is that they searched for Plaintiff (or his family) in the United States, failed to locate him, and caused no physical injury to Plaintiff or others.[1]  Plaintiff also alleges that entirely separate means were used to later locate Plaintiff in Canada, again with no resulting physical injury to Plaintiff or others.[2]  Even crediting the allegations in the Amended Complaint as true, these Defendants' alleged U.S. search efforts (failed or otherwise) are not tortious, and do not violate the Torture Victim Protection Act of 1991 ("TVPA"), or international law incorporated into the Alien Tort Statute ("ATS").[3]

Equally undermining his claims are Plaintiff's own allegations that depict these Defendants—three of whom were students at the time—as bit players who undertook their alleged inquiries without any intent to harm, without actual knowledge of any plot to harm, and in fact without causing any physical or other harm to Plaintiff, or anyone else.  Putting aside for a moment the implausibility of these allegations (generally all of which are pled on a shaky "information and belief" foundation), without a tort, without knowledge and intent, and without physical or other harm, Plaintiff's claims against these Defendants fail on their face as a matter of law.

Plaintiff persists in suing Defendants Alrajhi, Alhamed, and Abuljadayel (the "Student-Defendants"), and Hamed on these legally impossible claims, however, because Plaintiff has another agenda.  Without these Defendants, Plaintiff has no means to establish a U.S. nexus for his claims.  As a result, these Defendants have been drawn into a political slugfest between an

---

[1] ECF No. 66 (Amended Compl.) ("AC") ¶¶ 88, 102, 105, 109, 240, 244-45.

[2] *Id*. ¶¶ 17, 252-55, 330-31.

[3] Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992), *reprinted in* 28 U.S.C. § 1350 note; Alien Tort Statute, 28 U.S.C. § 1350.

ousted Saudi government official,[4] and the Kingdom's Crown Prince and other senior officials, concerning alleged events in Saudi Arabia and Canada.  The ATS and TVPA are narrowly worded and strictly construed, and prevent the importation of Plaintiff's political grievances, rooted in overseas events, into a U.S. court.

Any further amendment of the complaint would be futile, necessarily.  The TVPA and the ATS require a completed extrajudicial killing—not an attempt, and Plaintiff's emotional distress claim requires tortious behavior—not a mere search.  Further, even if the Court accepts Plaintiff's unsupported characterization of these Defendants as the Crown Prince's "agents", who were acting "at the direction" of the Crown Prince or other Saudi officials, then these Defendants are entitled to conduct-based foreign official immunity, negating subject matter jurisdiction over all of Plaintiff's claims against them.

Plaintiff's failure to demonstrate a violation of international law independently negates jurisdiction over his ATS claim against these Defendants.  Also dispositive is that Defendants Alrajhi and Hamed are not subject to personal jurisdiction in this Court: first, under Fed. R. Civ. P. 4(k)(2), because they are subject to the general jurisdiction of the courts of Virginia and Massachusetts, where they reside, respectively; and/or second, because under D.C. Code § 13-423(a)(1), their alleged acts of transacting business in the District, directly or through others, could not have caused Plaintiff's alleged injury.

## II.    Applicable Legal Standards.

The Student-Defendants and Mr. Hamed make a facial challenge both to subject matter jurisdiction and to the legal sufficiency of the claims against them.  "A motion to dismiss under

---

[4] *See* ECF No. 92 (Motion to Dismiss AC of Def. Mohammed bin Salman bin Abdulaziz Al Saud (the "Crown Prince's Motion to Dismiss")), at 1.

Rule 12(b)(1) challenges the court's jurisdiction to hear a claim and may raise a 'facial' or a 'factual' challenge to the court's jurisdiction . . . . A facial challenge asks whether the plaintiff has alleged facts sufficient to establish the court's jurisdiction . . . ." *Gore v. Wilkie*, No. 19-1134 (RDM), 2020 U.S. Dist. LEXIS 94792, at **7-8 (D.D.C. May 31, 2020) (internal quotations omitted).

The AC must be dismissed under Federal Rule 12(b)(6) if Plaintiff has failed to adhere to pleading mandates in place since *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the pleading "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Spence v. Wolf*, Civil Action No. 19-2919 (TJK), 2020 U.S. Dist. LEXIS 190943, at *6 (D.D.C. Oct. 15, 2020) (quoting *Iqbal*, 556 U.S. at 678 , and *Twombly*, 550 U.S. at 555, 570). In considering the Motion, this "court must construe the complaint in the light most favorable to the plaintiff, but the plaintiff 'must furnish "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action.'" (quoting *Tyler v. D.C. Hous. Auth.*, 113 F. Supp. 3d 88, 90 (D.D.C. 2015) (in turn, quoting *Twombly*, 550 U.S. at 555)).

Finally, as to Defendants Alrajhi's and Hamed's motion to dismiss for lack of personal jurisdiction, Plaintiff "bears the burden of making 'a *prima facie* showing of the pertinent jurisdictional facts' . . . . A plaintiff 'must allege specific acts connecting [each] defendant with the forum' . . . . Factual disputes must be resolved in favor of the plaintiff, but the Court need not accept unsupported inferences." *Bernhardt v. Islamic Republic of Iran*, No. 18-2739 (TJK), 2020

U.S. Dist. LEXIS 214185, at **6-7 (D.D.C. Nov. 16, 2020) (quoting *Livnat v. Palestinian Auth.*, 851 F.3d 45, 56-57 (D.C. Cir. 2017)); *see also Second Amendment Found. v. U.S. Conf. of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001) ("'Since the bare allegation of conspiracy or agency is insufficient to establish personal jurisdiction, a plaintiff must allege specific acts connecting the defendant with the forum.'" (quoting *First Chi. Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378-79 (D.C. Cir. 1988) (internal quotation marks and citations omitted)).

### III.   The AC Repeats The Pleading Defects Of The Original Complaint.

The AC fails to cure the Complaint's pleading defects as to the Student-Defendants, and repeats them with respect to Mr. Hamed.  Not only does Plaintiff not make any plausible allegations to demonstrate that, when not in class, these students took on duties for the Crown Prince in pursuit of an extrajudicial killing, by all accounts these students excelled in school and participated in numerous school- and academic field-related activities.  Very little is alleged about Mr. Hamed, and none of the limited allegations attempt to connect Mr. Hamed with a plot to kill Plaintiff.

During 2014-18, the relevant period, the three Student-Defendants, all Saudi Arabian nationals, were pursuing university degrees in the United States.  AC ¶¶ 93, 105.  Dr. Abuljadayel was awarded her doctorate in dental public health from Boston University in 2017, and had been published in her field by 2015.  *Id.* ¶ 105.[5]  Mr. Alrajhi is a Ph.D. candidate and researcher in the Microbiology Department of the College of Medicine at Howard University, a member of the

---

[5] *See* Abuljadayel, L., *The Perception of Smile Attractiveness Among Saudi Population*, Journal of Clinical, Cosmetic and Investigational Dentistry, *available at* U.S. National Library Of Medicine, PubMed (nih.gov) (2015), https://pubmed.ncbi.nlm.nih.gov/25653558/#affiliation-1 (last visited April 5, 2021); Dr. Abuljadayel, LinkedIn, *available at* https://www.linkedin.com/in/layla-abuljadayel-94859162/ (last visited April 5, 2021).

American Society of Microbiology, and has been published in his field.[6]  *Id.* ¶¶ 88, 138.  Mr. Alhamed obtained a bachelor's degree in public relations, advertising, and applied communications from Lasell University in 2019.  *Id.* ¶ 93.[7]  Consistent with his studies in the U.S., Mr. Alhamed founded the Saudi Elite Group, a public relations firm that promotes, among other things, the internationalization of Saudi youth through language initiatives.[8]  *See id.* ¶ 96.

In addition to demonstrating academic excellence, the Student-Defendants were active within the Saudi Arabian expatriate student community, and planned and led student events in various student clubs.  For example, Dr. Abuljadayel was the president of the Boston University Saudi Cultural Club from 2014 to 2016, *id.* ¶ 106,[9] and was nominated by the Boston University administration to make statements and give other support to Arab international students new to campus.[10]  She and Mr. Alhamed also were active in groups for Saudi Arabian students living in the United States.  AC ¶¶ 98, 106.

In doing so, the three Student-Defendants interacted from time to time with Mohammed Alessa, the Saudi Cultural Attaché superintending Saudi expatriate student clubs.[11]  *See id.* ¶ 92,

---

[6] *See, e.g.*, Alrajhi, Y., *Establishing Human Identification by Short Tandem Repeat (STR) and Mitochondrial DNA (mtDNA)*, 4 Int'l J. of Bioinformatics & Biomedical Engineering 1 (2018), *available at* http://files.aiscience.org/journal/article/pdf/70070117.pdf.

[7] *See also* Mohammed Alhamed, LinkedIn, *available at* https://www.linkedin.com/in/mohammed -alhamed-930279140 (last visited March 31, 2021).

[8] *See also supra* n.2; "Language initiative connects Saudi youth with world cultures", *Arab News*, *available at* https://www.arabnews.com/node/ 1709536/saudi-arabia (July 25, 2020) (last visited March 31, 2021).

[9] *See also supra* n.1.

[10] For example, Dr. Abuljadayel was one of two students asked to appear in a video that the university produced providing advice and support to international students.  *See* "Tips for BU's Newest International Students: Abdulraheem Alwafi & Layla Abuljadayel", https://youtu.be/3DvwdyA2X0s (Aug. 20, 2014) (last visited March 31, 2021).

[11] Plaintiff alleges conclusorily "[o]n information and belief" that the Student-Defendants also interacted with Defendant Alasaker, the Secretary-General/Executive Director of the MiSK Foundation, a main sponsor of these student clubs and events.  *Id.* ¶¶ 40, 86; *see also infra* at 16.

228.   The Student-Defendants each visited Mr. Alessa in 2015 during his hospitalization for an accident, *see id.* ¶ 90, among the many other students "from all states" who went to visit Mr. Alessa in the hospital, according to Plaintiff's own sources.[12]  These students had known him a long time when, in 2019, Messrs. Alrajhi and Alhamed were asked to speak at one of Mr. Alessa's retirement celebrations.[13]

The Student Defendants' alleged statements pledging "loyalty" or "allegiance" to the Crown Prince or other high-ranking Saudi officials are similarly unremarkable.  AC ¶¶ 78, 102. Such pledges are mandated by Saudi Arabian laws and customs, and were made in person prior to the advent of social media.[14]  Indeed, loyalty pledges are a common requirement in many political systems, including the United States.[15]

The AC also adds a new defendant, Hani Fakri Hamed, about whom very little is actually alleged.  According to Plaintiff, Mr. Hamed resides in Boston, Massachusetts and "acted as an agent of Defendants bin Salman and Alasaker in connection with the hunt for Dr. Saad."  *Id.* ¶ 109.

---

[12] *See id.* n.72 (citing "'Al-Issa' Extends Thanks to the Saudi Ambassador for Inquiring About his Health"*, Sabq Online Newspaper* (Apr. 11, 2015), https://sabq.org/KG3gde (last visited March 31, 2021) ("Muhammad bin Abdullah Al-Issa, extended his thanks and appreciation to the ambassador of the Custodian of the Two Holy Mosques to Washington, Adel bin Ahmed Al-Jubeir, and to all, especially the students, who came to him from all states to check on him after he had a fall accident.") (emphasis added).

[13] *Id.* ¶¶ 86, 92; *see also* "Outgoing Saudi cultural attaché in Washington honored", *Arab News*, https://www.arabnews.com/node/1591976/saudi-arabia (Nov. 30, 2019) (describing another of his retirement celebrations) (last visited 3/31/21).

[14] *See* "All You Need To Know About The Pledge Of Allegiance And The Allegiance Council", *Al Arabiya* (June 21, 2017), https://english.alarabiya.net/News/gulf/2017/06/21/All-you-need-to-know-about-the-pledge-of-allegiance-and-the-allegiance-council (last visited Apr. 1, 2021); *see also* "Saudis Flock to Pledge Loyalty In a Ritual Fit for a New King", *LA Times* (Aug. 4, 2005), https://www.latimes.com/archives/la-xpm-2005-aug-04-fg-abdullah4-story.html (last visited Apr. 2, 2021).

[15] *See also* "Oath of Citizenship", https://en.wikipedia.org/wiki/Oath_of_citizenship (last visited March 27, 2021) (listing 23 countries, including the U.S.).

Plaintiff alleges that "Defendant bin Salman and Defendant Alasaker orchestrated a surveillance mission" of the Aljabri family's Boston residence at the Mandarin Oriental that was carried out by Mr. Hamed (during a time when Plaintiff did not reside there).  *Id.* ¶ 245.  There are no other allegations that connect Mr. Hamed to Defendants bin Salman or Alasaker.  In fact, Mr. Hamed is only alleged to have communicated with one other defendant, Student-Defendant Alrajhi, a communication that is pled "on information and belief" and preceded Mr. Hamed's purported surveillance activity.  AC ¶¶ 87, 109.  The AC does not otherwise identify any other communications or interactions that Mr. Hamed had with other Defendants, thus creating obvious causation problems when it comes to the claims against Mr. Hamed.  Furthermore, Plaintiff does not allege that Mr. Hamed shared the confirmation of "Dr. Saad's affiliation with the [Mandarin Oriental] apartment"—the only information Mr. Hamed is alleged to have obtained from his purported efforts—with any Defendants.  *Id.*  ¶ 245.  The AC also makes clear that other Defendants, using other means, later located Aljabri in Canada.  *See id.* ¶¶ 17, 252-55, 330-31.

Just as with Mr. Hamed, the AC fails to plausibly plead any causal link between the alleged actions of the Student-Defendants and the alleged October 2018 plot by others to kill Aljabri.  The only allegations concerning the Student-Defendants that relate to Plaintiff in any manner are that they contacted certain family and acquaintances of Plaintiff in an effort to locate the addresses of Plaintiff and his wife, and that those efforts were unsuccessful.  *See id.* ¶¶ 88, 102, 105, 240-44.

The AC does not allege that any of the Student-Defendants ever located Plaintiff or his wife, or physically harmed Plaintiff or anyone else.  As with Mr. Hamed, the AC fails to adequately allege that what little information the Student-Defendants purportedly acquired from their conversations—that the Aljabri family had a residence at the Mandarin Oriental at which Plaintiff did not reside, that Aljabri's wife was not in Saudi Arabia, and that Plaintiff's son Khalid was not

a U.S. citizen—assisted anyone in locating, much less harming, Plaintiff.  *See id.* ¶¶ 240, 242-43.

Instead, the AC alleges that Plaintiff was later found in Canada through the independent efforts of

others (*id.* ¶¶ 252, 255, 318), and that a plot to kill Plaintiff in Canada was developed and attempted

by others, long after the Student-Defendants had finished their equally unsuccessful inquiries in

2016 and 2017.  *Id.* ¶ 331.

These causation problems are further compounded by the fact that the AC concedes that

the actions of the Student-Defendants and Mr. Hamed, whatever their purpose, were "parallel" to,

and therefore disconnected from, the conduct by the "Tiger Squad" and other Defendants that

forms the basis of Plaintiff's actual claims.  *Id.* ¶ 224 (tracking measures in the U.S. were "parallel"

to attempts to coerce Aljabri to return to Saudi Arabia), ¶ 233 (activities of the Student-Defendants

were "parallel" to efforts of the Tiger Squad), ¶ 362 (tracking activities were "parallel" to actual

attempts on Aljabri's life).

Plaintiff has no means of substantiating any of these allegations, moreover.  He says as

much this to the Court in his second attempt to plead his case, just as he did in the original

complaint:   The AC almost exclusively relies upon facts pled "on information and belief"

regarding Mr. Hamed and the Student-Defendants' alleged actions and knowledge or intent.[16]  The

---

[16] *See, e.g.*, *id.* ¶ 109 (alleging, on information and belief, that Mr. Alrajhi informed Mr. Hamed that "the Aljabris maintained an apartment in the Mandarin Oriental in Boston, Massachusetts"), ¶ 245 ("on information and belief, the only way Defendant Hamed could have learned that [Aljabri] or his family resided there was through the efforts of his co-agent, Defendant Alrajhi"), ¶ 245 ("On information and belief, Defendant Hamed's activities have been a subject of interest for the FBI."); ¶ 235 (alleging "[o]n information and belief" the Student-Defendants "enjoyed unusual visibility into the machinations of Defendants bin Salman and Alasaker and were privy to sensitive information about the mission they were tasked with undertaking"); ¶ 239 ("On information and belief, [Messrs. Alhamed and Alrajhi] were directed to [make certain inquiries] by Defendant Alasaker, … Mr. Alessa or one of his close associates acting at the behest of Defendant Alasaker."), ¶ 74 (alleging, on information and belief that Mr. Alrajhi and Ms. Abuljadayel were compensation by MiSK and "were involved in the hunt for Dr. Saad in the United States prior to the Tiger Squad's October 2018 travel to Canada."); *id.* at 3 ("Dr. Saad . . .

law of this Circuit will not permit Plaintiff to use "information and belief" to cloak the implausibility of his allegations, however—especially in this case, where <u>91 allegations in 70 paragraphs are pled on "information and belief."</u>

Federal courts in this District routinely reject plaintiffs' reliance on "information and belief" pleading, holding that "[a]llegations made on information and belief will generally not be enough, <u>even at the default judgment stage</u>, to allow the imposition of vicarious liability." *G&G Closed Cir. Events, LLC v. 19th & K, Inc.*, No. 19-1422 (DLF), 2020 U.S. Dist. LEXIS 25921, at *11 (D.D.C. Feb. 14, 2020) (emphasis added) (internal quotation marks and citation omitted); *J & J Sports Prods. v. Micherie, LLC*, No. 17-1150 (KBJ), 2018 U.S. Dist. LEXIS 166328, at *15 (D.D.C. Sept. 27, 2018) (same); *see also Blue v. Dist. of Columbia*, 850 F. Supp. 2d 16, 27 (D.D.C. 2012) (rejecting claim pled entirely on "information and belief" because it was lacking "factual content that allows the court to draw [a] reasonable inference that defendant is liable for the misconduct alleged") (quoting *Iqbal,* 556 U.S. at 678)).[17]

## IV. There Is No Plausible ATS Claim Because Plaintiff's Farfetched Allegations Do Not Plead A Violation Of International Law, Or Any Intent Or Knowledge Of Intent To Violate International Law.

The AC fails to state a claim against the Student-Defendants and Mr. Hamed under the ATS, or establish that the Court has jurisdiction over the ATS claims against them[18], because the

---

alleges upon knowledge as to himself and his own actions and <u>upon information and belief as to all other matters</u>") (emphasis added) and additional allegations as to the Students-Defendants and/or Mr. Hamed pleaded on information and belief, *id.* ¶¶ 67, 75, 86-88, 90, 96, 103, 105, 108, 131, 134, 138, 233, 238, 240, 242, n.101.

[17] The Student-Defendants and Mr. Hamed adopt and incorporate by reference the "Summary of Allegations and Materials Cited in the Amended Complaint" in the Crown Prince's Motion to Dismiss, ECF No. 92, at 5-12.

[18] In an ATS case, a failure to plead a violation of international law is both a failure to establish subject matter jurisdiction and a failure to state a claim. *See Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 515 (D.C. Cir. 2018); *Doe v. Exxon Mobil Corp.*, 393 F. Supp. 2d

ATS does not allow a cause of action for conduct that: (1) does not violate international law; (2) was not undertaken with intent, or actual knowledge of participation in an effort, to violate international law; and, 3) amounts at most to a failed "attempt" to violate international law.

The ATS grants federal courts jurisdiction over "'a relatively modest set of actions alleging violations of the law of nations.'"  *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1397 (2018) (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 720 (2004)).  The ATS creates jurisdiction only for the violation of "a narrow class of international norms" that are "specific, universal, and obligatory" and have "definite content and acceptance among civilized nations."  *Sosa*, 542 U.S. at 729, 732.

A.    Plaintiff Alleges No Violation Of International Law.

At the outset, Plaintiff's ATS claim fails because the ATS does not recognize "attempted" violations of international law, and the only purported violation of international law alleged in the AC is an "attempted extrajudicial killing."  *See* AC ¶ 404.  Accordingly, Plaintiff's unsupported allegations of "attempted" murder do not state a claim or establish jurisdiction under the ATS.  *See Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 36-37 (D.D.C. 2010) (holding that one of "two features of plaintiff's ATS claim—that it is based on a threat of a future extrajudicial killing, not an actual extrajudicial killing, . . . render[s] plaintiff's ATS claim fundamentally distinct from all extrajudicial killing claims that courts have previously held cognizable under the ATS"; and also that "there is no basis for the assertion that the threat of a future state-sponsored extrajudicial killing—as opposed to the commission of a past state-sponsored extrajudicial killing—constitutes a tort in violation of the 'law of nations.'").

---

20, 28 (D.D.C. 2005), *aff'd in part, rev'd in part on other grounds*, 654 F.3d 11 (D.C. Cir. 2011) ("*Exxon I*"); *Mastafa v. Chevron Corp.*, 770 F.3d 170, 186 (2d Cir. 2014).

The ATS provides jurisdiction exclusively "for a <u>tort only</u>, committed in violation of the law of nations or a treaty of the United States," 28 U.S.C. § 1350 (emphasis added), that fits within "a very limited category defined by the law of nations and recognized at common law." *Sosa*, 542 U.S. at 712.  However, attempted murder is not a tort of any kind.  "[N]o court has ever found that the threat of a future extrajudicial killing is a recognized tort, much less one that violates the present-day law of nations."  *Al-Aulaqi*, 727 F. Supp. 2d at 38; *see also Sussman v. Wells Fargo Bank, N.A.*, No. 2:16-01094 (JNP-PMW), 2017 U.S. Dist. LEXIS 152433, at *12 (D. Utah Aug. 31, 2017) ("Attempted murder is a crime, not a tort.  Consequently, this 'claim' must fail as a matter of law and should be dismissed."); *Barnes v. Mayor Stephanie Rawlings-Blake*, Civil Action No. RDB-10-2525, 2011 U.S. Dist. LEXIS 69458, at *7 (D. Md. June 28, 2011) (dismissing tort claim for "attempted murder" as "there is no cognizable cause of action for attempted murder"); *Roman v. City of Chi. Dep't of Police*, No. 94 C 6906, 1995 U.S. Dist. LEXIS 1537, at *5 (N.D. Ill. Feb. 9, 1995) (dismissing tort claim after all parties acknowledged "there is no tort remedy for attempted murder").  Plaintiff's ATS claim, which is based entirely on an unsuccessful attempt, is legally deficient and should be dismissed.

Plaintiff's ATS claim also fails because the Student-Defendants' alleged inquiries about the location of Plaintiff's wife, Mr. Alrajhi's supposed inquiries about Plaintiff's location, and Mr. Hamed's alleged surveillance activities bear no causal relationship to Plaintiff's purported injury. Plaintiff's legal claims are based on an alleged 2018 attempt to kill him in Canada.[19]  *See* AC ¶¶

---

[19] Although Plaintiff is explicit that his legal claims are based <u>only</u> on the alleged 2018 attempt on his life in Canada, s*ee* AC ¶¶ 384, 404, 411, the AC also includes allegations that certain Defendants participated in and oversaw the detention and torture of Plaintiff's children and others in Saudi Arabia and elsewhere.  *See id.* ¶¶ 189-217.  The AC does not allege that the Student-Defendants or Mr. Hamed participated in or were aware at any time of these alleged incidents of detention and torture.  Such claims would fail in any event, because these Defendants did not participate in those alleged incidents.  *See* Crown Prince's Motion to Dismiss, ECF No. 92, at 35;

384, 404, 411.  Plaintiff does not, and could not plausibly, allege that the Student-Defendants' and

Mr. Hamed's failed 2016-2017 search efforts in the U.S. (*id.* ¶¶ 88, 102, 105, 239-44, 245) injured

him in any way, or facilitated an alleged subsequent attempt to kill him in Canada.  Instead,

Plaintiff alleges that other defendants later located him in Canada in connection with a different

Defendant's trip to Toronto, and through an electronic message sent from Saudi Arabia to Canada

that planted malware on Plaintiff's phone, all of which was parallel and separate from the Student-

Defendant and Mr. Hamed's alleged actions.  *Id.* ¶¶ 251-55, 333.  Even accepting Plaintiff's

allegations at face value, the alleged attempt on Plaintiff's life in Canada would have proceeded

the same way without any alleged failed inquiries by these Student-Defendants or Mr. Hamed in

the United States.

None of the Student-Defendants' or Mr. Hamed's alleged conduct could have had a

"substantial effect" on the alleged primary tort—the attempted killing, which is required to bring

it within the ambit of the ATS.  *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 34 (D.C. Cir. 2011)

("*Exxon I*"), *overruled in part on other grounds*.[20]  Nor is there any plausible basis to infer that the

alleged attempt on Plaintiff's life in Canada "probably would not have occurred absent [the

Student-Defendants' or Mr. Hamid's] conduct."  *Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84,

---

*Warfaa v. Ali*, 33 F. Supp. 3d at 666 (E.D. Va. 2014) (permitting TVPA liability given the "defendant <u>personally participated</u> in [the] plaintiff's torture and further attempted to kill him by shooting him five times"), *aff'd*, 811 F.3d 653 (4th Cir. 2016)) (emphasis added).

[20] The D.C. Circuit partially vacated *Exxon II* "in light of intervening changes in governing law regarding . . . the standard to be applied for aiding and abetting liability." *Doe v. Exxon Mobil Corp.*, 527 F. App'x 7, 7 (D.C. Cir. 2013) ("*Exxon II*") (citing *Prosecutor v. Perišić*, Case No. IT-04-81-T, Judgement (Feb. 28, 2013), https://www.icty.org/x/cases/perisic/acjug/en/130228_judgement.pdf). *Perišić* appeared to articulate an additional "specific direction" element for aiding and abetting, but the International Criminal Tribunal for the former Yugoslavia later "repudiated the *Perišić* decision." *Doe v. Exxon Mobil Corp.*, No. 01-1357 (RCL), 2015 U.S. Dist. LEXIS 91107, at *33-34 (D.D.C. Jul. 6, 2015) ("*Exxon III*"). The aiding-and-abetting standard set forth in *Exxon II* thus "remains unchanged." *Id.*

109 (D.D.C. 2017), *vacated in part on other grounds*, 285 F. Supp. 3d 240 (D.D.C. 2018).

Accordingly, Plaintiff's ATS claim also fails because the Student-Defendants' and Mr. Hamed's

alleged conduct cannot have <u>caused</u> the alleged subsequent attempt to kill him.  *See Nahl v. Jaoude*,

No. 15-9755 (LGS), 2018 U.S. Dist. LEXIS 100056, at **13-14 (S.D.N.Y. June 14, 2018)

("liability for aiding and abetting under the ATS" requires "causation and injury," which are

"necessary predicates to any tort liability"); *Bieregu v. Ashcroft*, 259 F. Supp. 2d 342, 353 (D.N.J.

2003) (holding that "[t]he AT[S] requires the commission of a tort in order to impose liability";

and that the plaintiff "cannot state a tort claim in  the absence of a showing of 'causation' and

'damages,' necessary elements of any tort claim").[21]

> **B.** **Plaintiff Alleges No Intent To Commit, Or Knowledge Of, A Violation Of International Law.**

The only intent that Plaintiff plausibly alleges is an intent to locate Plaintiff, not any intent

to injure or otherwise harm Plaintiff.  Plaintiff does not establish jurisdiction under the ATS

because he does not allege that the Student-Defendants or Mr. Hamed sought to harm, sought to

help anyone else harm, or even knew of anyone's alleged intent to harm Plaintiff.  Accordingly,

Plaintiff's allegations state no violation of international law.  "[T]he ATS, unlike traditional tort

law, only recognizes a small number of particularly egregious <u>intentional torts</u>—those committed

in violation of the law of nations."  *Al Shimari v. CACI Premier Tech., Inc.*, 324 F. Supp. 3d 668,

700 (E.D. Va. 2018) (emphasis added); *see also Mastafa*, 770 F.3d at 191-92, 194 (noting "the

lack of a sufficient international consensus 'for imposing liability on individuals who *knowingly*

(but not purposefully) aid and abet a violation of international law,'" and the same is true for

"conspiracy liability"; and holding that "[b]ecause the complaint fails plausibly to plead that

---

[21] The Student-Defendants and Mr. Hamed also adopt and incorporate by reference the ATS arguments in the Crown Prince's Motion to Dismiss, ECF No. 92, Section III(B).

defendants' conduct related to aiding and abetting the alleged violations of customary international law was intentional, that conduct cannot form the basis for our jurisdiction,[under the ATS]") (quoting *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009)).   Violations of international law thus require an element missing here—intent.   The International Criminal Court has explained:

> As stated in article 30, unless otherwise provided, a person shall be criminally responsible and liable for punishment for a crime within the jurisdiction of the Court only if the material elements are committed <u>with intent and knowledge</u>. Where no reference is made in the Elements of Crimes to a mental element for any particular conduct, consequence or circumstance listed, it is understood that the relevant mental element, i.e., <u>intent, knowledge or both</u>, set out in article 30 applies.

International Criminal Court, *Elements of Crimes* (2011) (emphasis added).[22]

In addition to its failure to show that the Student-Defendants and Mr. Hamed had intent to harm Plaintiff, the AC also fails to allege any facts that would plausibly establish that any of the Student-Defendants' or Mr. Hamed's alleged conduct was done with "knowledge that [it would] assist" an attempt on Plaintiff's life.   *Exxon Mobil II*, 654 F.3d at 34.   None of the Student-Defendants or Mr. Hamed is alleged to have known about the purported attempt to kill Plaintiff in

---

[22]International Criminal Court, *Elements of Crimes* (2011), *available at* https://www.icc-cpi.int/NR/rdonlyres/336923D8A6AD40ECAD7B45BF9DE73D56/0/ElementsOfCrimesEng.pdf at 1 ¶ 2 (last visited April 5, 2021); *see also id.* at Art. 7(1)(f)(5) ("crime against humanity of torture" requires that "[t]he perpetrator <u>knew</u> that the conduct was part of or intended the conduct to be part of a widespread or systematic attack directed against a civilian population." (emphasis added)); *id.* at Art. 7(1)(i)(8) ("crime against humanity of enforced disappearance of persons" requires that "[t]he perpetrator knew that the conduct was part of or intended the conduct to be part of a widespread or systematic attack directed against a civilian population"). *See also* Restatement (Third) of Foreign Relations Law § 702 ("Torture has been defined as 'any act by which severe pain or suffering, whether physical or mental, is <u>intentionally</u> inflicted by or at the instigation of a public official on a person for such purposes as obtaining from him or a third person information or confession, punishing him for an act he has committed or is suspected of having committed, or intimidating him or other persons . . . . ") (emphasis added) (internal quotation omitted).

Canada.  Indeed, the AC contains no allegations whatsoever as to Mr. Hamed's specific knowledge or intent.

As for the three Student-Defendants, the AC makes conclusory allegations "[o]n information and belief" that they "enjoyed unusual visibility into the machinations of Defendants bin Salman and Alasaker and were privy to sensitive information about the mission they were tasked with undertaking" given their "roles in key student clubs and publics relations organizations." AC ¶ 235.  But these are "mere conclusory statements," not "factual content," and so must be disregarded on a motion to dismiss.  *See Iqbal*, 556 U.S. at 678.  It is not unreasonable to imagine that the Student-Defendants interacted with those who oversaw or supported the Saudi student organizations in which the Student-Defendants were involved—allegedly including other Defendants named here.  But Plaintiff expects this Court to make an unsupportable, speculative leap based only "on information and belief" that the Student-Defendants knew (because they purportedly were active in student clubs) that other Defendants here allegedly had a plan to harm Plaintiff, and further, that the Student-Defendants allegedly had the intent to assist with any such plan.  *See G&G Closed Cir. Events, LLC*, 2020 U.S. Dist. LEXIS 25921, at *11; *J & J Sports Prods.*, 2018 U.S. Dist. LEXIS 166328, at *15; *Zelaya v. UNICCO Serv. Co.*, 587 F. Supp. 2d 277, 287-88 (D.D.C. 2008) (holding that pleadings were insufficient for "rank speculation").

Any such allegations regarding the Student-Defendants and Mr. Hamed are all the more implausible because Plaintiff concedes that their actions, regardless of their purpose, were "parallel" to, and therefore disconnected from, the later conduct outside the United States that forms the basis of Plaintiff's actual claims.  AC ¶ 224 (tracking measure in the U.S. were "parallel" to attempts to coerce Aljabri to return), ¶ 233 (activities of the Student-Defendants were "parallel"

to efforts of the Tiger Squad), ¶ 362 (tracking activities were "parallel" to actual attempts on Aljabri's life).

Finally, Plaintiff further alleges that all U.S.-based Defendants "would have known that an investigation by Defendant bin Salman into the whereabouts of Dr. Saad . . . was intended to locate and harm him, and that Defendant bin Salman had previously done the same to others who stood in the way of his path to power."  AC ¶ 235.  In other words, the AC alleges that the Student-Defendants and Mr. Hamed *should* have known that their conduct was part of an alleged murder plot; however, such allegations "will not suffice in this context" because "actual knowledge" is required.  *Ofisi*, 278 F. Supp. 3d at 109.

## V.    The Complaint Does Not State A Claim Under The TVPA.

Plaintiff's allegations that the Student-Defendants and Mr. Hamed were involved in an unsuccessful "attempt" to kill Plaintiff, without causing physical injury and without their intending to do so, all independently fail to state a violation of the TVPA.  Plaintiff fails to state a claim for violation of the TVPA for three independent reasons: (1) he alleges only an unsuccessful attempt to kill him; (2) he does not allege that the Student-Defendants or Mr. Hamed had a deliberate intent to harm him; and (3) he claims only emotional, and not physical, injury.

### A.    A Non-Actionable Attempted Killing Does Not Create A TVPA Claim.

Plaintiff's TVPA claim, which is based solely on the alleged "attempted extrajudicial killing" of Plaintiff (AC ¶¶ 384-95), does not state a claim for violation of the TVPA because it does not allege an actual "extrajudicial killing," as required by Section 3(a) of the statute.  *See* TVPA § 3(a) ("[T]he term 'extrajudicial killing' means a deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.") (emphasis added).

A failed <u>attempt</u> to kill is not an "extrajudicial killing" under the plain language of the statute. *Id.*  As the D.C. Circuit has explained, the definition of "extrajudicial killing" "contains three elements: (1) <u>a killing</u>; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." *Owens v. Republic of Sudan*, 864 F.3d 751, 770 (D.C. Cir. 2017) (emphasis added) (construing the "killing" element of the TVPA to mean action that "caused the death" of a person), *vacated on other grounds* (damages), 140 S. Ct. 1601 (2020); *see also Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 26 (D.D.C. 2017) (holding "former sailors who were <u>injured</u> while on the Cole … do not allege torture or extrajudicial killing") (emphasis added).

This Court has never permitted recovery under the TVPA for personal injuries arising from an attempted "extrajudicial killing"; the only decisions from this Circuit allowing recovery for personal injuries arising from an attempted "extrajudicial killing" arose under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1602-11 ("FSIA").  A few courts have allowed TVPA claims for unsuccessful attempted murder under Section 3(a), but those cases are so factually different as to be irrelevant here.

While the FSIA incorporates the TVPA's definition of "extrajudicial killing,"[23] the statutory language for the two statutes differs in materially significant ways.  The FSIA allows recovery more broadly for "personal injury," whereas the TVPA allows recovery only for "wrongful death" in connection with an "extrajudicial killing."  *Compare* FSIA*, 28 U.S.C. § 1605(a) *with* TVPA, § 2(a)(2) (providing that a person who "subjects an individual to extrajudicial killing shall . . . be liable for damages to the individual's legal representative, or to any person who

---

[23] *See* FSIA, 28 U.S.C. § 1605A(h)(7) ("[T]he terms 'torture' and 'extrajudicial killing' have the meaning given those terms in section 3 of the [TVPA].").

may be a claimant in an action <u>for wrongful death</u>") (emphasis added).  A "wrongful death" requires an actual death to occur, and a decedent cannot bring a wrongful death action in his own name.  *See*, *e.g.*, D.C. Code § 16-2701 (2001).

Given that that FSIA expressly allows recovery for personal injuries while the TVPA does not, this District has only allowed recovery for attempted killings under the TVPA's definition of "extrajudicial killing" when the claim is brought under the FSIA.  *See, e.g., Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 100 (D.D.C. 2019) (holding that the FSIA "provides a private right of action against a state sponsor of terrorism for <u>personal injury</u> caused by an extrajudicial killing") (emphasis added); *Salzman v. Islamic Republic of Iran*, No. 17-2475 (RDM), 2019 U.S. Dist. LEXIS 163632, at *46 (D.D.C. Sept. 25, 2019) (finding the lack of an actual death "does not defeat jurisdiction because the [FSIA] exception applies to claims for '<u>personal injury</u> or death . . . caused by an act of . . . extrajudicial killing'") (emphasis added); *Cohen v. Islamic Republic of Iran*, No. 17-1214 (JEB), 2019 U.S. Dist. LEXIS 115278, at *6 (D.D.C. July 11, 2019) (same) (citing *Gill*); *Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1, 14 (D.D.C. 2011) ("The FSIA . . . strips immunity 'in any case . . . in which money damages are sought against a foreign state for <u>personal injury</u> or death that was caused by an act of . . . extrajudicial killing.'") (emphasis added); *Haim v. Islamic Republic of Iran*, 784 F. Supp. 2d 1, 11 (D.D.C. 2011) (same); *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 360 (D.D.C. 2020) (citing cases and observing that "[s]everal decisions from this district have held that individuals who are injured but not killed in an attack that results in the death of others may recover for their injuries under [FSIA] § 1605A").[24]

---

[24] Moreover, this District has allowed claims under the FSIA for "attempted extrajudicial killings" when applying the FSIA's terrorism exception under Section 1605A, but "courts resolve statutory 'ambiguities flexibly and capaciously'" to serve the statute's "remedial purpose . . . to compensate those injured in terrorist attacks."  *See, e.g., Force*, 464 F. Supp. 3d at 360 (citing *Van Beneden v. Al-Sanusi*, 709 F.3d 1165, 1167 & n.4 (D.C. Cir. 2013)); *see also, e.g., Karcher*, 396 F. Supp. 3d

Finally, all of this District's federal court decisions that have allowed claims of an attempted extrajudicial killing to proceed under the FSIA have involved at least a direct physical injury to the plaintiff or the actual death of another, neither of which are alleged here.  *See Karcher*, 396 F. Supp. 3d at 17, 58 (allowing an attempted extrajudicial killing case to proceed under the FSIA where "Plaintiffs . . . were injured in the . . . attacks"); *Salzman*, 2019 U.S. Dist. LEXIS 163632, at *46 (holding state-sponsored terrorism exception under the FSIA applied because "there is no doubt that the Ben Yehuda Street attack was an 'act of extrajudicial killing'—five people died"); *Cohen*, 2019 U.S. Dist. LEXIS 115278, at *2 (allowing claim of attempted extrajudicial killing to proceed under the FSIA where one plaintiff "was hit by shrapnel"; and three other plaintiffs "were struck by glass and thrown around the bus"); *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 91 (D.D.C. 2017)  (holding under the FSIA that "plaintiff was shot and injured"); *Doe*, 808 F. Supp. 2d at 14 (holding under the FSIA that the subject bombings "killed and attempted to kill individuals on site"); *Haim*, 784 F. Supp. 2d at 7 (holding under the FSIA that the attack physically injured or killed eight people).

The same is true of the few cases outside this District that have permitted TVPA claims based on an attempted extrajudicial killing.  *See Boniface v. Viliena*, 338 F. Supp. 3d 50, 67-69 (D. Mass. 2018) (allowing an attempted extrajudicial killing claim to go forward in a TVPA case where the defendants "pistol-whipped" a plaintiff, "multiple individuals beat him on his sides and chest and threw him on the floor, and . . . one individual restrained [another plaintiff] while three others beat him on his head and the sides of his body"); *Warfaa v. Ali*, 33 F. Supp. 3d 653, 666

---

at 57 (same).  Thus, although the FSIA and the TVPA definitions are the same, *see Force*, 464 F. Supp. 3d at 359, the analysis in the FSIA cases was influenced by Section 1605A's unique statutory context.

(E.D. Va. 2014) (noting in a TVPA case that the "defendant personally participated in [the] plaintiff's torture and further attempted to kill him <u>by shooting him five times</u>") (emphasis added), *aff'd*, 811 F.3d 653 (4th Cir. 2016); *Doe v. Constant*, No. 04-10108 (SHS), 2006 U.S. Dist. LEXIS 101961, at *8-9, *13 n.3 (S.D.N.Y. Oct. 24, 2006), *aff'd*, 354 F. App'x 543 (2d Cir. 2009) (noting in a TVPA case one plaintiff "was the victim of a brutal stabbing" and "suffered un-sutured, nearly fatal stab wounds to her breast, neck and cheek"; the other plaintiff "was raped . . . in front of [her] children"; "attacked by masked men carrying guns and was shot in the leg"; "beaten, blindfolded"; and "left at . . . a location allegedly used as a dumping ground . . . for bodies").

Here, Plaintiff alleges <u>no physical injury</u>.  In any event, the TVPA, unlike the FSIA, does not allow recovery for personal injuries.[25]

### B.    No Allegations Of Deliberate Intent To Harm Plaintiff.

Additionally, Plaintiff's TVPA claim collapses because it does not (and could not) plausibly allege that the Student-Defendants or Mr. Hamed had a "deliberated" intent to cause harm to Plaintiff as required by TVPA Section 3(a).   "A 'deliberated' killing is simply one undertaken with careful consideration, not on a sudden impulse.'"  *Owens v. Republic of Sudan*, 174 F. Supp. 3d 242, 263 (D.D.C. 2016), *aff'd*, 864 F.3d 751 (D.C. Cir. 2017) (citations omitted); *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 83 (D.D.C. 2018) (same).  "Deliberation . . . 'requires that there was the reflection and turning over in the mind of the accused concerning his existing design and purpose to kill. . . . '[T]he evidence must demonstrate that the accused did not kill impulsively, in the heat of passion, or in an orgy of frenzied activity.'"  *Kitt v. United States*, 904 A.2d 348, 353 (D.C. Cir. 2006) (citations omitted).  Plaintiff's TVPA claim fails because the

---

[25] The Student-Defendants and Mr. Hamed also adopt and incorporate by reference the arguments of the Crown Prince with respect to Plaintiff's TVPA claim.  *See* Crown Prince's Mot. to Dismiss, ECF No. 92, Section III.A.

AC does not allege any "intent to kill" by the Student-Defendants or Mr. Hamed; rather, it merely alleges that they attempted to locate Plaintiff or his wife, but failed to do so.

None of the elements of these causes of action are plausibly pled (or pled at all) for these Defendants, begging the question: Why has Plaintiff named these particular Defendants?  Because Plaintiff needs a U.S. hook to establish jurisdiction here, given that the claims themselves are rooted entirely in Saudi Arabia and Canada.   Putting aside the implausibility of Plaintiff's allegations, moreover, Plaintiff cannot explain the glaring inconsistencies between the Student-Defendants' and Mr. Hamed's alleged unsuccessful searches in 2016 and 2017, and the alleged October 2018 plot to kill Plaintiff in Canada.

Nor does Plaintiff  plead any plausible facts suggesting these Defendants intended that their alleged searches would cause or facilitate any harm to Plaintiff or others.  The Court thus cannot indulge the AC's entirely conclusory allegations that the Student-Defendants and Mr. Hamed were part of a government-sponsored murder plot.  *See Morrow v. U.S.*, 723 F. Supp. 2d 71, 77 (D.D.C. 2010) (holding that, when "'more likely explanations' than those alleged by the plaintiff exist, the Court should be wary of finding that the plaintiff's allegations have sufficiently nudged the claims into the realm of plausibility") (quoting *Iqbal*, 556 U.S. at 681).   Even crediting Plaintiff's allegations that the Student-Defendants and Mr. Hamed sought out contact information for Plaintiff's wife or Plaintiff himself, there are far more likely explanations for why they would do so that have nothing to do with a government plot to kill him, including explanations that Plaintiff himself pleads.  *See, e.g.*, AC ¶¶ 240, 243 (alleging that two Student-Defendants sought contact information to discuss a potential marriage match), ¶ 243 (alleging that Mr. Alrajhi wanted to discuss a medical conference he was organizing).   Ultimately, there are no non-conclusory

allegations in the AC that the Student-Defendants or Mr. Hamed had a deliberate intent to harm the Plaintiff.

C.     No TVPA Claim Without Physical Injury.

The lack of any physical harm to Plaintiff equally forecloses Plaintiff's TVPA claim. *Force* is particularly instructive on this issue.  Similar to Plaintiff's allegations here, a subset of the plaintiffs in *Force* (the "Parneses") alleged that a "rocket attack . . . resulted in [their] emotional injury."  464 F. Supp. 3d at 337.  In that case, the Plaintiff's home was actually hit by the rocket attack, which caused "heavy damage" to it.  *Id*. at 353.  The Parneses suffered no physical injuries, and instead sued for their alleged emotional injuries.  *Id*.; AC ¶¶ 194, 370.  As here, the *Force* plaintiffs alleged that they were experiencing "'symptoms of depression, anxiety and PTSD following the shock and stress' of the incident."  *Force*, 464 F. Supp. 3d at 353; *see* AC ¶ 413 (alleging the Plaintiff "has suffered from anxiety, insomnia, increased hypertension, fatigue, and headaches as a result of Defendants' conduct").

Applying the TVPA's definition of "extrajudicial killing," the *Force* court held that "because the Parneses' claims are for emotional harms arising out of an attempted extrajudicial killing in which no one was injured (and none of the Parneses were even placed [in] physical peril), they cannot state a claim for recovery for their injuries."  464 F. Supp. 3d at 358 (emphasis added). Scrutinizing the *Force* plaintiffs' allegations, the court held that "permitting recovery" in circumstances such as these, where "no one suffered physical injuries and no one was even placed in imminent apprehension of physical harm" would improperly "open the door to a cascade of claims for emotional distress that are unmoored to the types of grievous injury, death, or imminent, life altering peril resulting from the uniquely heinous acts that Congress elected to redress [through the TVPA]."  *Id*. at 363 (emphasis added) (citing 28 U.S.C. 1605A(a)(1)).  Because Plaintiff here

similarly alleges only emotional, and not physical, harm, Plaintiff fails to state a claim under the TVPA.

## VI.   The Complaint Does Not State A Claim For Liability Of The Student-Defendants Or Mr. Hamed Under Theories Of Aiding And Abetting Or Conspiracy.

The limited allegations against the Student-Defendants and Mr. Hamed do not provide a legally sufficient basis for secondary-liability claims against them under theories of conspiracy or aiding and abetting.  First, the plain language of the TVPA contains no express language permitting liability for aiding and abetting.  "Congress knew how to impose aiding and abetting liability when it chose to do so"; if "Congress intended to impose aiding and abetting liability, we presume it would have used the words 'aid' and 'abet' in the statutory text."  *Cent. Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164, 176-77 (1994).  Federal courts consistently agree with regard to the TVPA.  *See Mastafa v. Chevron Corp.*, 759 F.Supp.2d 297, 300 (S.D.N.Y.2010) (dismissing TVPA claims because the "plain language" of the statute "does not permit aiding-and-abetting liability" as it "limits liability to those 'individual [s] ... who subject [] [other] individual[s] to torture'"); *see also Sikhs for Justice v. Nath,* 893 F. Supp. 2d 598, 618 (S.D.N.Y. 2012) ("The text of the TVPA is silent as to aiding and abetting, and such silence should not be interpreted as granting and authorizing that liability.") (citing *Central Bank, N.A.*, 511 U.S. at 177); *Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019, 1027 (W.D. Wash. 2005) (holding that "an aiding and abetting claim is inconsistent with the TVPA's explicit requirement that a defendant must have acted under 'color of law'"), *aff'd*, 503 F.3d 974 (9th Cir. 2007).  This Circuit in *Exxon I* ruled out corporate aiding-and-abetting liability under the TVPA, but did not resolve whether the TVPA allows claims for individual aiding-and-abetting liability.  *See Exxon I*, 654 F.3d at 33-34 (holding that, while "Congress can provide for aiding and abetting liability absent direct liability," there is

no "support [for] the inference that Congress so provided in the TVPA"; and there is "no . . . provision in the TVPA that colorably provides for such liability").

Hypothetically, even if the TVPA did provide for aiding and abetting liability, Plaintiff could not state a TVPA claim against the Student-Defendants and Mr. Hamed.  In that event, *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), would provide "the proper legal framework for how . . . [f]ederal civil aiding and abetting and conspiracy liability claims should function." *Bernhardt*, 2020 U.S. Dist. LEXIS 214185, at **14-15 (internal quotations omitted).  "Aiding-abetting includes the following elements: (1) the party whom the defendant aids must perform <u>a wrongful act that causes an injury</u>; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) <u>the defendant must knowingly and substantially assist the principal violation</u>." *Halberstam*, 705 F.2d at 477 (emphasis added) (citations omitted).  Further, the plaintiff "must prove that an unlawful overt act produced an injury and damages." *Id.*

While aiding and abetting under the ATS within this Circuit is assessed under international law, "[a]s a practical matter, the standards for aiding and abetting under common law [articulated in *Halberstam*] and international law overlap." *Ofisi v. BNP Paribas*, S.A., No. 15-2010 (JDB), 2018 U.S. Dist. LEXIS 4859, at *10 n.7 (D.D.C. Jan. 11, 2018) (citing *Exxon I*, 654 F.3d at 39, and *Halberstam*, 705 F.2d at 477).[26]

---

[26] Aiding and abetting liability under international law requires both an *actus reus* and the correct *mens rea*.  *See Ofisi*, 278 F. Supp. 3d at 108.  The *actus reus* must amount to "practical assistance, encouragement, or moral support which has a substantial effect on the perpetration of the crime," *i.e.,* the "underlying crime probably would not have occurred in the same way had not  someone acted in the role that the accused [aider and abettor] in fact assumed." *Id.* (citation omitted).  As to *mens rea*, to be liable for aiding and abetting, the defendant must "<u>know</u> that their acts assist the commission of the principal offense." *Id.* at 108–09.

"[I]n the District of Columbia a conspiracy requires: an agreement to do an unlawful act or a lawful act in an unlawful manner; an overt act in furtherance of the agreement by someone participating in it; and injury caused by the act." *Halberstam*, 705 F.2d at 487. The standards for conspiracy liability are the same under the ATS and TVPA.

Even assuming the availability of secondary liability under the ATS and TVPA, no such claim can be stated against the Student-Defendants or Mr. Hamed when there is no plausible allegation that they facilitated any other Defendant in an unlawful act that injured Plaintiff. First, the other Defendants did not cause physical injury to Plaintiff, and did not commit a primary violation of the ATS or the TVPA through an alleged "attempt" to kill Plaintiff. Second, the Student-Defendants and Mr. Hamed allegedly did nothing more than unsuccessfully seek location information concerning the Plaintiff and his wife. Third, Plaintiff does not plausibly allege that the Student-Defendants or Mr. Hamed entered an "agreement" with anyone else to harm Plaintiff. Fourth, there is no plausible allegation that a plot to harm Plaintiff depended heavily on the Student-Defendants' and Mr. Hamed's failed efforts to locate Plaintiff or his wife. We address each of these further below.

A.   No Defendants Physically Injured Plaintiff Or Committed A Primary Violation Of The ATS Or TVPA.

Plaintiff has not pled a claim for aiding and abetting a violation of the ATS or for conspiring to violate the ATS or TVPA because Plaintiff has not pled a primary violation of either the ATS or the TVPA. *See supra* at Sections IV & V; Crown Prince's Motion to Dismiss, ECF No. 92, Sections III.A (TVPA claim) & III.B (ATS claim).

Secondary liability for aiding and abetting only attaches if Plaintiff has adequately pled a primary violation of established international norms. *See Ofisi*, 278 F. Supp. 3d at 103 (to allege "secondary liability" under ATS, "the complaint must contain," *inter alia*, "a well-pled allegation

of a primary violation of the law of nations").  For secondary liability, such as aiding and abetting, agency, or conspiracy, to attach, a primary tortfeasor must have committed a substantive underlying tort, not merely an attempted tort.  "It is only where means are employed, or purposes are accomplished, which are themselves tortious, that the conspirators who have not acted but have promoted the act will be held liable."  *Halberstam*, 705 F.2d at 477 (quoting William L. Prosser on the Law of Torts § 46, at 293 (4th ed. 1971)); *Stutts v. De Dietrich Grp.*, No. 03-4058 (ILG), 2006 U.S. Dist. LEXIS 47638, at *47 (E.D.N.Y. June 30, 2006) ("The required elements of a cause of action for aiding and abetting a tortfeasor under . . . federal common law" include "substantial assistance by the aider and abettor in the achievement of the primary violation.").  Here, the supposed purpose of killing Plaintiff is not alleged to have been "accomplished."  *Id*.  The AC accordingly improperly seeks to premise secondary liability as to the Student Defendants and Mr. Hamed on an attempted tort.

Because secondary liability requires a primary tortfeasor to commit a completed substantive tort, which is not alleged here, the Student-Defendants and Mr. Hamed cannot be liable for aiding and abetting or conspiracy.  This requirement of a completed tort, derived from *Halberstam*, precludes any "[f]ederal civil aiding and abetting and conspiracy liability claims" against the Student-Defendants or Mr. Hamed.  *See Bernhardt*, 2020 U.S. Dist. LEXIS 214185, at *14-15; *see also In re Ross Sys. Sec. Litig.*, No. 94-0017 (DLJ), 1994 U.S. Dist. LEXIS 21263, at *12 (N.D. Cal. July 21, 1994) ("The crime of conspiracy may be inchoate, but there is no corollary inchoate tort of conspiracy.  In civil cases conspiracy is a theory of liability available only when a completed tort exists.").  In short, Plaintiff's failure to state a claim for a completed principal violation of the TVPA cannot be overcome by an allegation of conspiracy.  *See Muchira v. Al-Rawaf*, No. 14-770 (AJT-JFA), 2015 U.S. Dist. LEXIS 49806, at *41 (E.D. Va. Apr. 15, 2015)

("Having concluded that Plaintiff's TVPA claims should be dismissed as a matter of law, Plaintiff's civil conspiracy claim predicated on the TVPA violations is, therefore, also dismissed."); *Johns v. Daniel*, No. 13-2666 (GHM), 2014 U.S. Dist. LEXIS 64848, at *8 (S.D. Tex. May 12, 2014) ("Because plaintiffs do not set forth facts giving rise to civil liability under the TVPA, it follows that they have not set forth facts giving rise to a criminal conspiracy to violate the TVPA.").

B.   No Allegations That The Acts of the Student-Defendants Or Mr. Hamed Had a Substantial Effect on An Unlawful Act Causing Injury.

Independent of Plaintiff's failure to allege a primary ATS or TVPA violation, Plaintiff's ATS and TVPA claims are legally insufficient because the Student-Defendants' and Mr. Hamed's alleged conduct plainly did not "'ha[ve] a substantial effect on the perpetration of the crime.'" *Exxon I*, 654 F.3d at 33-34 (quoting *Halberstam*, 705 F.2d at 477; *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 277 (2d Cir. 2007)). This element requires a "link or connection between the [alleged facilitative conduct] and the underlying crime" and a showing that the alleged violation "probably would not have occurred absent [that] conduct." *Ofisi*, 278 F. Supp. 3d at 108-09. No such things are alleged here. There is no "link or connection between" the Student-Defendants' or Mr. Hamed's alleged failed efforts to locate Plaintiff or his family members in the U.S. and the alleged attempt on his life in Canada years later. Further, it is implausible to suggest that the alleged attempt in Canada could not have happened without the Student-Defendants' or Mr. Hamed's <u>failure</u> to locate Plaintiff, given that Plaintiff was found in Canada by other means unrelated to Mr. Hamed or the Student Defendants. *See Gang v. Zhizhen*, No. 3:04-1146 (RNC), 2017 U.S. Dist. LEXIS 162344, at *2 (D. Conn. Sept. 30, 2017) ("Plaintiffs' TVPA claims of aiding and abetting, agency and conspiracy fail to allege facts giving rise to a plausible claim even

drawing all reasonable inferences in their favor.  Plaintiffs' allegations do not plausibly allege a connection between defendant's alleged misconduct and plaintiffs' injuries.").

Plaintiff's legal claims are all based on an alleged (and failed) attempted killing in Canada years after the Student-Defendants' and Mr. Hamed's alleged failed inquiries in the United States concerning Aljabri's whereabouts.  *See*, *e.g.*, AC ¶¶ 384, 404, 411.  There is no allegation that Plaintiff suffered any injury in connection with the Student-Defendants' and Mr. Hamed's alleged limited and failed efforts to locate him in the U.S., much less that these unsuccessful efforts were a "but for" cause of any purported injury.  To the contrary, Plaintiff's allegations concede that the efforts to locate him in the United States were unsuccessful and unrelated to the malware that allegedly later found him in Canada.  *See id*. ¶¶ 240-45, 251-52, 333.  Even if an attempted extrajudicial killing were actionable under the ATS or TVPA (it is not), the AC does not allege any conduct by the Student-Defendants or Mr. Hamed that plausibly aided or abetted such an attempt because they did not <u>cause</u> it in any manner.  *See supra* at 11-12.

C.    No Plausible Allegations That The Student-Defendants And Mr. Hamed "Actually Knew" "The Intent Of The Principal Perpetrator" And Agreed To Assist The Perpetrator In The Commission Of The Crime.

Plaintiff's ATS and TVPA claims also fail because conduct only aids and abets a violation of international law if done with "knowledge that [it] will assist the perpetrator in the commission of the crime."  *Exxon I*, 654 F.3d at 33-34.  This requires that the U.S.-based actor "actually knew" both (1) "the intent of the principal perpetrator" and (2) that his or her conduct would help the primary perpetrator commit the violation.  *Ofisi*, 278 F. Supp. 3d at 109.  The AC fails to allege any facts that would plausibly establish that any of the alleged Student-Defendants' or Mr. Hamed's conduct was done with actual "knowledge that [it] w[ould] assist" an attempt on Plaintiff's life.  *Exxon I*, 654 F.3d at 34.  None of the Student-Defendants is alleged to have known about the alleged attempt to kill Plaintiff in Canada.  Although Plaintiff now alleges in conclusory

fashion that all U.S. based Defendants "would have known that an investigation by Defendant bin Salman into the whereabouts of Dr. Saad … was intended to locate and harm him," AC ¶ 235, that does "not suffice in this context," because "actual knowledge" is required.  *Ofisi*, 278 F. Supp. 3d at 109.

Moreover, there are no plausible allegations of conspiracy against the Student-Defendants or Mr. Hamed because the AC does not allege "an agreement to do an unlawful act" between the Student-Defendants and anyone else, as is required for a conspiracy claim.  *Halberstam*, 705 F.2d at 487; *see also Gang*, 2018 U.S. Dist. LEXIS 168600, at **8-9 (holding that where allegations "do not show that the defendant agreed, tacitly or otherwise, to" violate the TVPA, "plaintiffs have failed to sufficiently allege that the defendant is liable for violating the TVPA under a conspiracy theory").  The only alleged conduct by the Student-Defendants and Mr. Hamed is that they attempted to identify and confirm (collectively) two addresses for Plaintiff.

Plaintiff's secondary-liability theory fails because the AC does not allege, even generically, any "agreement" (by that or any other similar term) between any of the Defendants in the lawsuit, much less one into which the Student-Defendants or Mr. Hamed entered that connected their alleged inquiries to any plot to harm Plaintiff.  *Id.*  The AC does not "provid[e] any indication of when or how such an agreement was brokered, or how the [Student-]Defendants [and Mr. Hamed] specifically, as opposed to all the named defendants generally, were parties to an agreement." *Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 113 (D.D.C. 2010); *see also Gang*, 2017 U.S. Dist. LEXIS 162344, at *3 ("Lacking is factual content that allows the reasonable inference that the defendant entered into an agreement to commit . . . acts made illegal by the TVPA.  The standard for alleging a conspiracy requires more than mere assertion of an agreement and actions in line with that agreement.") (citing *Iqbal*, 556 U.S. at 680; *Twombly*, 550 U.S. at 565 ("Although

in form a few stray statements speak directly of agreement, on fair reading these are merely legal conclusions . . . . ")).

      D.      <u>The Alleged Plot To Harm Plaintiff Did Not Depend On The Student-Defendants' Or Hamed's Failure To Locate Plaintiff Or His Wife.</u>

The alleged plot to kill Plaintiff was not in any manner dependent, much less "heavily dependent" (*Halberstam*, 705 F.2d at 488), on the Student-Defendants' or Mr. Hamed's alleged efforts. There is no allegation that the alleged (and nonactionable) attempt to kill Plaintiff by other Defendants depended on, or benefited from, in the slightest manner, any action taken by the Student-Defendants or Mr. Hamed. Instead, the Complaint alleges that Plaintiff was later found in Canada, through means completely unrelated to the Student-Defendants' and Mr. Hamed's alleged earlier failed efforts in the United States (AC ¶¶ 250-55, 329-33), and that a plot to kill Plaintiff in Canada subsequently was planned by others without any alleged involvement of the Student-Defendants. *Id*; *see also* AC ¶¶ 224, 233, 362 (conceding "parallel" nature of the Student Defendants and Mr. Hamed's efforts).

## VII.   <u>The Court Lacks Subject-Matter Jurisdiction Due To Foreign-Official Immunity</u>

The AC fails to allege any specific facts that, if true, would establish an agency relationship between the Student-Defendants and Mr. Hamed and the Crown Prince, other Saudi government officials, or the Saudi government.[27] However, if the Court credits Plaintiff's allegations that the Student-Defendants and Mr. Hamed were agents of the Crown Prince, other Saudi government

---

[27] "It is a fundamental principle … that an agency relationship arises only where the principal 'has the right to control the conduct of the agent with respect to matters entrusted to him." *Carswell v. Air Line Pilots Ass'n Int'l*, 540 F. Supp. 2d 107, 122 (D.D.C. 2008) (quoting Restatement (Second) of Agency § 14 (1958)); *see also* Restatement (Third) of Agency § 1.01 (2006) (an agency relationship is the "fiduciary relationship that arises when [a principal] manifests assent to [an agent] that the agent shall act on the principal's behalf and subject to the principal's control"). Plaintiff alleges no facts that plausibly suggest that the Student-Defendants and the Crown Prince manifested their assent to form an agency relationship with each other.

officials, or the Saudi government, then the Student-Defendants and Mr. Hamed are entitled to conduct-based official immunity.[28]  Plaintiff alleges that all of the Student-Defendants' and Mr. Hamed's conduct occurred while each of them was an agent of, and working at the direction of, senior foreign government officials, acting under the authority of the Saudi government.  *See* AC ¶¶ 9, 10, 13, 15, 76, 92, 95, 104, 107, 109, 130, 227, 239, 244, 245, 328, 367, 374, 377-79, 386, 401.

A.    <u>The Established Policy Of The State Department Governs Foreign-Official Immunity.</u>

Defendants' entitlement to immunity should be assessed under the elements required by "the established policy of the [State Department]".  *Samantar v. Yousuf*, 560 U.S. 305, 312 (2010). "The State Department has consistently recommended conduct-based sovereign immunity" where, as here, "the defendant [allegedly] acted in his official capacity on behalf of a recognized foreign government."  *In re Terrorist Attacks on Sept. 11, 2001*, 122 F. Supp. 3d 181, 187-89 (S.D.N.Y. 2015).  It is irrelevant that the State Department has not explicitly determined the immunity of the Student Defendants or Mr. Hamed, because a district court has the "authority to decide for itself whether all the requisites for such immunity exist[]" based on the character of the defendant's alleged activities.  *Samantar*, 560 U.S. at 311-12 (quoting *Ex parte Republic of Peru*, 318 U.S. 578 (1943)).  "In making that decision, a district court simply inquire[s] 'whether the ground of immunity is one which it is the established policy of the [State Department] to recognize.'"  *Id.* at 312 (quoting *Republic of Mexico v. Hoffman*, 324 U.S. 30, 36 (1945)).

---

[28] The Student-Defendants adopt and incorporate by reference the arguments of the Crown Prince concerning conduct-based foreign official immunity.  ECF No. 92, § II.A.2.

While the State Department test is widely applied,[29] this Circuit recently applied the

Restatement (Second) of Foreign Relations Law § 66(f) (1965) ("Second Restatement") to require

a court to determine that the lawsuit seeks to enforce a rule of law against the foreign state

principal, in addition to actions by a defendant in an official capacity. *See Lewis v. Mutond*, 918

F.3d 142, 145 (D.C. Cir. 2019), *cert. denied*, 141 S. Ct. 156 (2020).   Under this formulation,

"[c]onduct-based immunity is afforded to 'any [p]ublic minister, official, or agent of the state with

respect to acts performed in his official capacity if the effect of exercising jurisdiction would be to

enforce a rule of law against the state.'" *Id*. (quoting the Second Restatement).  *Mutond* concluded

that adjudicating a suit against a foreign official would have the effect of enforcing a rule of law

against a foreign state if the "judgment against the official would bind (or be enforceable against)

the foreign state." *Id.* at 146.

Critically, *Mutond* did not hold that the Second Restatement test is the correct test for

foreign official immunity, but rather "proceed[ed] on that understanding without deciding the

issue" because both parties "assume[d]" that the Second Restatement was the correct test. *Id.* at

146.  Further, the Executive Branch has formally articulated its policy that "[r]eliance on the

---

[29] *See Doe v. Buratai*, No. 17-1033 (DLF), 2018 U.S. Dist. LEXIS 186101, at *8 (D.D.C. Oct. 31, 2018) (rejecting a request to alter the court's prior dismissal of a TVPA claim against foreign-government officials alleged to have "brutally tortured and killed peaceful protesters" after "consider[ing] the informed and long-standing views of the executive branch and its lawyers— and the compelling reasons for those views"); *see also Dogan v. Barak*, 932 F.3d 888, 893 (9th Cir. 2019) ("'[I]n the absence of recognition of the immunity by the Department of State,' . . . [t]he court grants immunity . . . if it determines that 'the ground of immunity is one which it is the established policy of the [State Department] to recognize.'") (quoting *Samantar*, 560 U.S. at 312); *In re Terrorist Attacks on Sept. 11, 2001*, 122 F. Supp. 3d 181, 188 (S.D.N.Y. 2015) ("Affording … common law sovereign immunity is consistent with State Department policy"); *Moriah v. Bank of China Ltd.*, 107 F. Supp. 3d 272, 278 n.42 (S.D.N.Y. 2015) (explaining that, because "[t]here is no indication that [the former official] or the State of Israel requested a Suggestion of Immunity from the State Department," the court "must  determine 'whether the ground of immunity is one which it is the established policy of the State Department to recognize'") (quoting *Samantar*, 560 U.S. at 312)).

Second Restatement's provisions on foreign-official immunity as a conclusive statement of current law is misplaced."  U.S. Amicus Brief, *Mutond v. Lewis*, 2020 U.S. S. CT. BRIEFS LEXIS 5337, at \*20 (May 26, 2020) ("*Mutond* Amicus Brief").[30]  For more than two centuries, "conduct-based foreign-official immunity" has "turn[ed] on whether the challenged *action* was taken in an official capacity." *Id.* at \*15.  The "official-capacity standard has remained consistent in the Executive Branch's numerous filings in lawsuits against foreign officials" across that time period.  *Id.* at \*\*15-16 (citing examples dating from 1794 to 2019, including from the Office of the Legal Advisor, U.S. Dep't of State); *see also id.* at \*16 ("As a general matter, under principles of customary international law accepted by the Executive Branch, a foreign official enjoys immunity from suit based upon acts taken in an official capacity.").

The Executive Branch explained in its *Mutond* Amicus Brief that there are numerous reasons not to limit the immunity of foreign officials to situations in which the foreign state could also be held liable, including that "personal damages actions against foreign officials could unduly chill the performance of their duties, trigger concerns about the treatment of United States officials abroad, and interfere with the Executive's conduct of foreign affairs—even when a foreign state itself could be sued." *Id.* at \*23; *see also id.* at \*\*14-15 (citing historical examples where "the Executive Branch … repeatedly suggested immunity in suits filed against foreign officials in their personal capacities … [n]one of those filings has hinted that conduct-based immunity might turn on a pleading distinction between personal-and-official-capacity suits.")

---

[30] *See also* Crown Prince's Mot. to Dismiss, ECF No. 92, § II.A.2 ("The better view is that the Court should take guidance from the established policy of the State Department, not the Second Restatement.") (quotation marks and citations omitted).

This court should accordingly follow longstanding practice of courts and the Executive Branch and apply the State Department test, not the Second Restatement test articulated in *Mutond*.

      B.    <u>The Student-Defendants And Mr. Hamed Are Immune From Suit; Plaintiff Alleges That They Were Agents Of A Foreign State Acting In Their Official Capacities.</u>

Dismissal on conduct-based immunity grounds, however, is appropriate under either the State Department test or under the Second Restatement test.  Even accepting Plaintiff's conclusory allegations on their face, all of the Student-Defendants' and Mr. Hamed's alleged actions were taken "under apparent authority or color of law of the government of Saudi Arabia" (AC ¶¶ 366, 389, 401); under the "ultimate control and authority" of the Saudi Crown Prince, (AC ¶ 86), as "agent[s] of" the Saudi Crown Prince (AC ¶¶ 92, 95, 107, 109); and "at [his] direction," (AC ¶¶ 86, 102, 105).  Except for the "rule of law" requirement in the Second Restatement (addressed *infra* at VIII.C), neither the *Samantar* test nor the Second Restatement test, requires anything more for an agent of a foreign official to receive conduct-based immunity.

 "[T]he relevant inquiry in determining whether an individual was acting in an official capacity focuses on the nature of the individual's alleged actions, rather than the alleged motives underlying them." *Jungguist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1028 (D.C. Cir. 1997).  The key is whether "an individual was authorized in his official capacity" to act in a particular manner.  *Id.*  Here, Plaintiffs own allegations that Defendants' actions were "under apparent authority or color of law of the government of Saudi Arabia" (AC ¶¶ 366, 389, 401) clearly demonstrate, if credited, that Defendants were acting in an official capacity.  *See Belhas v. Ya'Alon*, 466 F. Supp. 2d 127, 129 (D.D.C. 2006) ("Plaintiffs allege that '[a]t all times relevant hereto, Defendant was acting under color of Israeli law'… [i]t therefore is undisputed that General Ya'alon was acting in his official capacity with respect to the events underlying this lawsuit"); *Manouchehr Mohammadi v. Islamic Republic of Iran*, 947 F. Supp. 2d 48, 72 (D.D.C. 2013)

(dismissing on basis of official immunity where "[t]he plaintiffs make clear, both in their Third Amended Complaint and in their briefing, that they are suing defendants Khamenei and Ahmadinejad in their official, as opposed to their personal capacities"); *see also In re Terrorist Attacks on Sept. 11, 2001*, 122 F. Supp. 3d at 187-89 (granting foreign-official immunity where "[t]he only non-conclusory allegation, regarding [defendant's conduct], is an action taken in his official—not his personal—capacity").

The claims against the Student-Defendants and Mr. Hamed must be dismissed on conduct-based immunity grounds regardless of their alleged rank or status, if the allegations that they were agents of the Crown Prince acting in his official capacity, or on behalf of the Kingdom, are credited. For conduct-based immunity to apply: (1) "high-level decision-making authority is not . . . required"; (2) the courts have "not focused on the degree of an official's 'authority' to act on behalf of the foreign state because conduct-based immunity may extend to an 'agent' of a foreign state"; (3) "the rank of the agent who performed the act" also is "not the determining factor"; and (4) the courts focus instead on whether the alleged act itself "was performed on behalf of the foreign state and thus attributable to the [foreign] state." *Doe v. Buratai*, 318 F. Supp. 3d 218, 231 (D.D.C. 2018) (quoting *Rishikof v. Mortada*, 70 F. Supp. 3d 8, 13 (D.D.C. 2014), and citing *Samantar*, 560 U.S. at 321; *see also Bashe Abdi Yousuf v. Mohamed Ali Samantar*, 699 F.3d 763, 774 (4th Cir. 2012) (conduct-based immunity "stands on the foreign official's actions, not his or her status"). Because the Student-Defendants and Mr. Hamed are alleged to be agents of the Crown Prince or of the Kingdom, and their purported acts were allegedly "committed under actual or apparent authority, or color of law, of the government of Saudi Arabia," they are entitled to conduct-based immunity, regardless of their alleged rank or status. TVPA § 2(a).

C.    The Student-Defendants And Mr. Hamed Are Immune Even Under The Second Restatement Test.

Even if the Court evaluates Plaintiff's claims under the Second Restatement test, the Student-Defendants and Mr. Hamed are entitled to conduct-based immunity.   First, because Plaintiff alleges that: (1) each Student Defendant and Mr. Hamed "is a public minister, official, or agent of" the Kingdom; and, (2) their "acts were performed in [their] official capacity," the first and second prongs of the Second Restatement test have been met.  *Mutond*, 918 F.3d at 146 (citing Second Restatement); *see also Miango v. Democratic Republic of Congo*, No. 15-1265, 2020 U.S. Dist. LEXIS 113722, at *15 (D.D.C. June 29, 2020) (concluding first two prongs of Second Restatement test were met where "plaintiffs have consistently maintained … that the individual defendants were acting in their official capacities").

Second, "exercising jurisdiction would have the effect of enforcing a rule of law" on Saudi Arabia. [31]   *Buratai*, 318 F. Supp. 3d at 233 ("A decision by this Court … would affect how Nigeria's government, military and police function, regardless whether the damages come from the defendant's own wallets or Nigeria's coffers"); *see also* Crown Prince's Motion to Dismiss, ECF No. 92, at 37-38 (explaining how "[t]he conduct challenged by Aljabri goes to the heart of Saudia Arabia's efforts.")   The AC seeks to impose a "rule of law" on the Kingdom, because Plaintiff seeks a declaration that the Student-Defendants and Mr. Hamed acted unlawfully and on behalf of the Kingdom.  AC ¶¶ 395, 408.  Such a declaration would impose a "rule of law" on Saudi Arabia by judging the conduct of "agents" of the Kingdom.  *See* AC ¶¶ 78, 130, 366, 389.

---

[31] The Student-Defendants and Mr. Hamed adopt and incorporate by reference the arguments made in Section II.A.2.(b) of the Crown Prince's Motion to Dismiss, ECF No. 92, concerning immunity from Plaintiff's claims under the Second Restatement.

D.     There Is No Applicable Exception To Conduct-Based Immunity.

Plaintiff has failed to state a claim that the Student-Defendants or Mr. Hamed have violated international law.  *See supra* at Section IV.  But even if Plaintiff had done so, the Student-Defendants and Mr. Hamed would be entitled to conduct-based immunity.  Alleged violations of *jus cogens* and other international criminal laws do not negate immunity from TVPA and ATS claims.[32]  *See Buratai*, 318 F. Supp. 3d at 234 ("the [D.C.] circuit's case law indicates that *jus cogens* allegations do not defeat foreign-official immunity under the common law.") (collecting cases).

Reading a *jus cogens* exception into official immunity would "eviscerate any protection that foreign official immunity affords" because an exception "merges the merits of the underlying claim with the issue of immunity." *Id.* at 234-35 (internal citation omitted).  "As soon as a party alleged a violation of a *jus cogens* norm, a court would have to determine whether such a norm was indeed violated in order to determine immunity—i.e., the merits would be reached." *Id.* (internal citation omitted).  This is contrary to the guidance of the D.C. Circuit that "sovereign immunity is an immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits." *Foremost-McKesson, Inc. v. Iran*, 905 F.2d 438, 443 (D.C. Cir. 1990); *see also Buratai*, 318 F. Supp. 3d at 234-25 ("merging the question of immunity with the merits also undermines the original purpose of foreign official immunity: to avoid affronting the sovereignty of a foreign nation by passing judgment on their official government acts, which would inevitably happen if courts had to reach the merits to resolve immunity").

---

[32] The Student-Defendants and Mr. Hamed adopt and incorporate by reference the arguments of the Crown Prince concerning the conduct-based foreign official immunity.  ECF No. 92, § II.A.2.

Nor does the TVPA generally abrogate common-law conduct-based immunity. "[C]ommon-law principles of . . . immunity were incorporated into our judicial system and [] they should not be abrogated absent clear legislative intent to do so." *Filarsky v. Delia*, 566 U.S. 377, 389 (2012); *accord MetLife, Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661, 674 (D.C Cir. 2017) ("Statutes which invade the common law are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident.").

Although the TVPA does "make liable individuals who act with 'actual authority' or 'under color' of foreign law," the TVPA evinces no intent to operate jurisdictionally. *Buratai*, 318 F.3d at 237. The "critical provision … addresses liability only. It says nothing about jurisdiction generally, nor about the specific jurisdictional issue of foreign-official immunity." *Id.* (rejecting argument that the TVPA abrogates official immunity because "the Act does not 'speak directly' or make 'evident' that it abrogates common law foreign-official immunity"). Because the TVPA does not "speak directly to the question addressed by the common law" concerning conduct-based immunity for foreign officials and agents, the statute does not abrogate that doctrine. *Id.* at 236; *accord Dogan*, 932 F.3d at 894 (holding principles of immunity "were incorporated" into the TVPA because the TVPA "does not expressly abrogate any common law immunities").

Further, it is well-established in American law that statutory causes of action, materially the same as those in the TVPA, coexist with common-law immunities. An analogous statute is the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("Section 1983"), which, like the TVPA, creates a right of action against "[e]very person who, under color of [law]," deprives another of his or her legal rights. Section 1983 "creates a species of tort liability that on its face admits of no immunities." *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976). But, because common-law immunity

principles are "an entrenched feature" of American law, "'well grounded in history and reason,'"
the Supreme Court repeatedly has held that they "were not somehow eliminated 'by covert
inclusion in the general language' of § 1983." *Rehberg v. Paulk*, 566 U.S. 356, 361-62 (2012)
(internal quotation marks and citation omitted) (collecting cases).

The D.C. Circuit recognized this principle when it held, in *Manoharan v. Rajapaksa*, 711
F.3d 178, 180 (D.C. Cir. 2013), that Section 1983 is "the most analogous statute" to the TVPA,
because it also "provides a cause of action against '[*e*]very person'" who engages in the proscribed
conduct. *Id.* (quoting 42 U.S.C. § 1983). Relying on the Supreme Court's holding "that Congress
did not intend th[e] language [in 42 U.S.C. § 1983] to abrogate the preexisting common law of
immunity applicable to executive officials," the D.C. Circuit "likewise conclude[d] that the
common law of head of state immunity survived enactment of the TVPA." *Id.* (relying on *Matar
v. Dichter*, 563 F.3d 9, 15 (2d Cir. 2009)) (internal quotation marks and citations omitted).

The D.C. Circuit's reliance in *Manoharan* on the Second Circuit's decision in *Matar v.
Dichter* is important because the Second Circuit rejected the argument that "any immunity [the
foreign official defendant] might enjoy is overridden by his alleged violations of the TVPA" and
held that "we need not decide whether the FSIA applies to a former official of a foreign
government . . . , because if the FSIA does not apply, a former official <u>may still be immune under
common-law principles that pre-date, and survive, the enactment of the FSIA</u>." 563 F.3d at 15
(emphasis added). Accordingly, the *Matar* court held that common-law foreign-official immunity,
as well as FSIA immunity, survived the TVPA, *id.*, and the D.C. Circuit adopted that holding in
determining that "head of state immunity survived enactment of the TVPA." *Manoharan*, 711
F.3d at 180.

There is no reason to interpret conduct-based immunity differently than head of state immunity under the TVPA.  And there is no reason to treat the TVPA differently from Section 1983, as the D.C. Circuit held in *Manoharan*.  If anything, the fact that TVPA litigation necessarily involves foreign officials and foreign interests should counsel additional hesitation before concluding that Congress silently dispensed with a long-established immunity doctrine.  *Cf. The Schooner Exchange*, 11 U.S. (7 Cranch) 116, 146 (1812) (stating that the Court would understand the government to have rescinded a foreign sovereign's immunity only if it so indicates "in a manner not to be misunderstood").  Moreover, if the TVPA's text were sufficient to abrogate conduct-based immunity, it likewise would abrogate head-of-state and diplomatic immunity, because both heads of state and diplomats may be "individual[s] who, under actual or apparent authority, or color of law, of any foreign nation" commit torture or extrajudicial killings.  TVPA § 2(a).  Treating foreign-official immunity, but not head of state immunity, as preempted by the TVPA is contrary to the logic and holding of the D.C. Circuit in *Manoharan*, 711 F.3d at 180.

*Samantar* itself involved a TVPA claim against a foreign official in his personal capacity, seeking "damages from his own pockets."  560 U.S. at 325.  The Supreme Court nevertheless held that immunity to such a suit is "properly governed by the common law."  *Id*.  That statement would be meaningless if foreign officials and agents were categorically barred from asserting immunity in TVPA cases.  In fact, "[c]ourts routinely dismiss on grounds of immunity cases against . . . foreign officials who face[] [TVPA] claims."  *Burma Task Force v. Sein*, No. 15 Civ. 7772,  2016 U.S. Dist. LEXIS 42326, at *6-7 (S.D.N.Y. Mar. 30, 2016) (dismissing a TVPA claim against the Foreign Minister of Myanmar based on alleged acts of genocide, torture, and arbitrary detention of plaintiffs) (collecting cases).  Ultimately, "the [TVPA] imposes liability on true outlaws, . . . but not individuals whose conduct is authorized" by the foreign sovereign, *Buratai*, 318 F. Supp.

3d at 237-38, as alleged here of the Student-Defendants, *see*, *e.g.*, AC ¶¶ 78, 130, 366, 389.  The TVPA "evinces no decision to transform federal courts into a forum for adjudicating . . . disputes" that would "embroil[] the Judiciary in sensitive foreign policy matters."  *Buratai*, 318 F. Supp. 3d at 237.

E.  The Student-Defendants And Hamed Are Entitled To Derivative Immunity Based On The Immunity Of The Crown Prince.

The Student-Defendants and Mr. Hamed also enjoy derivative official immunity because they are alleged to be the private, domestic agents of an immune foreign official.[33]  The Fourth Circuit granted "derivative immunity under the FSIA" to private agents alleged to be "following Saudi Arabia's orders" in *Butters v. Vance Int'l, Inc.* 225 F.3d 462, 466 (4th Cir. 2000).  *Butters* held that it is "well-settled law that contractors and common law agents acting within the scope of their employment for the United States have derivative sovereign immunity."  *Id*.  This is because "all sovereigns need flexibility to hire private agents to aid them in conducting their governmental functions.  This is especially true for foreign sovereigns given their lack of human resources while operating within the United States." *Id*.  Therefore, "it is but a small step to extend this privilege to the private agents of foreign governments." *Id*.  The Student-Defendants and Mr. Hamed, as alleged private agents of an immune foreign head of state, are entitled to derivative official immunity.

Further, Defendants' derivative sovereign immunity is unaffected by *Samantar's* holding that official immunity of individuals is governed by the common law, not by the FSIA.  One post-*Samantar* decision, *Ivey v. Lynch*, No. 1:17-439 (NCT), 2018 U.S. Dist. LEXIS 133656 (M.D.N.C.

---

[33] The Student-Defendants adopt and incorporate by reference the arguments made at the Crown Prince's Motion to Dismiss, ECF No. 92, Section II.B that the case must be dismissed because Saudi Arabia is a necessary and indispensable party that is immune from suit.

Aug. 8, 2018), is instructive in this regard.  The *Ivey* district court held that, because a nonparty

(Willmer) was "found to be protected by foreign official immunity, so, too, [was defendant] Lynch,

as his agent in the United States, whose conduct relevant to this action was at the direction of [the

nonparty] Willmer and against whom any decision would have the effect of enforcing a rule of

law against" a foreign nation.  *Id*. at **20-21.  *Ivey* emphasized that, because the defendant was

acting as an agent of the German Court, "[a] decision that [Defendant] acted without proper

authority necessarily" and impermissibly "call[ed] into question the actions of the [German]

Insolvency Court and its creditors' committee." *Id*.  Accordingly, the *Ivey* court, relying on the

Fourth Circuit decision in *Butters*, held that, "because Willmer is found to be protected by foreign

official immunity, so, too, is Lynch, as his agent in the United States, whose conduct relevant to

this action was at the direction of Willmer and against whom any decision would have the effect

of enforcing a rule of law against Germany." *Id*.  Similarly, if the allegations that the Student-

Defendants and Mr. Hamed were acting as the agents of the Crown Prince (AC ¶¶ 9, 10, 13, 15,

76, 92, 95, 104, 107, 109, 130, 227, 239, 244, 245, 328, 367, 374, 377-79, 386, 401) are credited,

they are derivatively entitled to any immunity enjoyed by the Crown Prince.

## VIII.   The Act Of State Doctrine Bars The Court From Adjudicating Plaintiff's Claims

The Student-Defendants and Mr. Hamed adopt and incorporate by reference the arguments

made at Crown Prince's Motion to Dismiss, ECF No. 92, Section II.C, that the Act of State doctrine

bars Plaintiff's claims.  Although the conduct alleged of the Student-Defendants and Mr. Hamed

all occurred in the U.S., that alleged conduct falls within the Act of State doctrine because it all

was alleged to be part of a law-enforcement effort directed exclusively from Saudi Arabia.  As the

D.C. Circuit has held, "as a general rule, the Act of State doctrine applies to foreign government

activities undertaken 'within its own territory,' although that factor is not so inflexible as to

overlook the quintessentially sovereign nature of foreign governmental action . . .  rooted, in all

relevant respects, within foreign sovereign territory" where, as here, the conduct was "formulated and directed from" the foreign government's territory. *Hourani v. Mirtchev*, 796 F.3d 1, 12-13 (D.C. Cir. 2015) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423 (1964)). Accordingly, for the reasons stated in the Crown Prince's brief, the Act of State doctrine bars the adjudication of Plaintiff's claims.

## IX.    This Court Has No Personal Jurisdiction Over The U.S. Resident Defendants.

Federal Rule of Civil Procedure 4(k)(2) does not apply to Defendants Alrajhi and Hamed, because they are U.S. residents subject to the general jurisdiction of the courts of the States in which they live.

Plaintiff asserts that "[t]he exercise of personal jurisdiction over Defendant Alrajhi is proper under D.C. Code § 13-423(a)(1) because he purposefully availed himself of this forum by transacting business in Washington, D.C., and [Plaintiff]'s claims rise out of those contacts." AC ¶ 138. Plaintiff's examples of alleged transactions of business are: "regular[] travel[] to the District of Columbia," "actively attend[ing] programming in the District of Columbia," "purchas[ing] a plane ticket in Washington, D.C."; "travel[ing] from Washington, D.C. to Boston, Massachusetts for the purpose of hunting down [Plaintiff's] location" and his "affiliation with Howard University." *Id.* ¶¶ 89, 138.

Plaintiff's D.C.-based jurisdictional theory fails at the outset because Plaintiff was in no way injured by, nor do his claims arise from, Mr. Alrajhi allegedly buying a plane ticket, flying to Boston, orbeing "active" and "attending various events." In this Circuit, "[t]o establish personal jurisdiction under [D.C. Code § 13-423(a)(1)], a plaintiff must demonstrate that . . . the claim arose from the business transacted in the District." *FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 479 F. Supp. 2d 30, 38 (D.D.C. 2007), *aff'd*, 529 F.3d 1087 (D.C. Cir. 2008). Because Plaintiff could not have been injured by Mr. Alrajhi's domestic air travel or attending "various events," these alleged

- 43 -

activities cannot support personal jurisdiction over him. *See Xiangyuan Zhu v. Fed. Hous. Fin.
Bd.*, No. 03-5297, 2004 U.S. App. 11284, at *7 (D.C. Cir. Jun. 7, 2004) ("As appellant did not
allege any facts showing her injuries arose out of … Appellees' conduct in the District of
Columbia, the district court correctly dismissed her claims against them for lack of personal
jurisdiction") ; *see also Alkanani v. Aegis Def. Servs. LLC,* 976 F. Supp. 2d 13 (D.D.C. 2014)
("Courts have appropriately concluded that an injury sounding in tort does not 'arise from' [general
business contacts with the District of Columbia] for the purpose of specific jurisdiction.").

As personal jurisdiction under D.C. Code § 13-423 is lacking over Mr. Alrajhi, personal
jurisdiction under D.C. Code § 13-423 is likewise lacking over Mr. Hamed.  The AC references
<u>no</u> direct alleged connection between Mr. Hamed and the District of Columbia, but rather depends
entirely on the "overt acts of [Mr. Hamed's] co-conspirators undertaken within the District of
Columbia," specifically, those of "Defendant[] Alrajhi." AC ¶ 139.  Mr. Alrajhi's actions in the
District of Columbia do not establish jurisdiction over him under DC Code § 13-423; his actions
cannot possibly establish jurisdiction over Mr. Hamed.  *FC Inv. Group LC*, 479 F. Supp. 2d at 41
("Because plaintiffs have failed to demonstrate that this Court may exercise jurisdiction over IFX's
co-conspirator, the Court may not exercise jurisdiction over IFX under the doctrine of conspiracy
jurisdiction.")

Further, establishing personal jurisdiction under a conspiracy theory requires that "the
plaintiff … plead with particularity "the conspiracy as well as the overt acts within the forum taken
in furtherance of the conspiracy." *Jungguist*, 115 F.3d at 1031; *see also Second Amendment
Found.*, 274 F.3d at 524 ("The allegation that the mayors conspired together represents nothing
more than a legal conclusion, which we have held does not constitute the prima facie showing
necessary to carry the burden of establishing personal jurisdiction") (internal quotation marks and

citation omitted).  But the only characterization of Defendants' actions as a conspiracy in the AC appears in the paragraph asserting conspiracy jurisdiction over Mr. Hamed.  *See* AC ¶ 139.  This does not establish "the conspiracy" in addition to "overt acts within the forum" that is required to satisfy conspiracy jurisdiction under DC Code § 13-423.  *See Jungguist*, 115 F.3d at 1031 (dismissing for lack of personal jurisdiction where defendants "were never physically present in the District of Columbia during the relevant time period … [and] did not perform any acts [in the District of Columbia" because [b]ald speculation' or a 'conclusory statement' that individuals are co-conspirators is insufficient to establish personal jurisdiction under a conspiracy theory").

**X.**     **Plaintiff Fails To State A Claim For Intentional Infliction Of Emotional Distress.**

The Student-Defendants adopt and incorporate by reference the arguments made in the Crown Prince's Motion to Dismiss, ECF No. 92, Sections III.C.1, 2, & 4, concerning: (1) Plaintiff's failure to state a claim for intentional infliction of emotional distress ("IIED") under either Saudi Arabian or D.C. law; and, (2) no basis for the Court to exercise supplemental jurisdiction over Plaintiff's IIED claim.  The Student-Defendants also adopt and incorporate by reference the arguments made at the MiSK Foundation's Motion to Dismiss, Sections V-VI, concerning Plaintiff's failure to state a claim for IIED.

**XI.**     **Conclusion.**

For the foregoing reasons, the Student-Defendants' and Defendant Hamed's Motion to Dismiss should be granted.


Dated: April 5, 2021                    */s/Mitchell R. Berger*
Washington, D.C.                        Mitchell R. Berger (DC 385467)
                                        Benjamin D. Wood (DC 478799)
                                        Alexandra E. Chopin (DC 490736)

                                        SQUIRE PATTON BOGGS (US) LLP
                                        2550 M Street, N.W.
                                        Washington, D.C. 20037

Phone: 202-457-6000
Fax:     202-457-6315
mitchell.berger@squirepb.com
benjamin.wood@squirepb.com
alexandra.chopin@squirepb.com

*Attorneys for Defendants*
*Yousef Alrajhi, Mohammed Alhamed,*
*Layla Abuljadayel, and Hani Fakri Hamed*

## CERTIFICATE OF SERVICE

I hereby certify that on April 5, 2021, I caused a true and correct copy of the foregoing Motion To Dismiss The Amended Complaint Of Defendants Yousef Alrajhi, Mohammed Alhamed, Layla Abuljadayel, and Hani Fakri Hamed, to be served through the Court's CM/ECF System on all counsel of record in this action, including the following counsel of record for Plaintiff:

David Pressman
(admitted *Pro Hac Vice*)
Jenner & Block LLP
919 Third Avenue New York, NY 10022
Telephone:  (212) 891-1654
Fax: (212) 891-1699
dpressman@jenner.com

Lindsay Harrison
Jenner & Block LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
Telephone:  (202) 639-6865
Fax:  (202) 639-6066
lharrison@jenner.com

/s/Mitchell R. Berger
Mitchell R. Berger (DC 385467)
Benjamin D. Wood (DC 478799)
Alexandra E. Chopin (DC 490736)

SQUIRE PATTON BOGGS (US) LLP
2550 M Street, N.W.
Washington, D.C. 20037
Phone:         202-457-6000
Fax:   202-457-6315
mitchell.berger@squirepb.com
benjamin.wood@squirepb.com
alexandra.chopin@squirepb.com

*Attorneys for Defendants*
*Yousef Alrajhi, Mohammed Alhamed,*
*Layla Abuljadayel, and Hani Fakri Hamed*