**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DR. SAAD ALJABRI,

     Plaintiff,

     v.

MOHAMMED BIN SALMAN BIN
ABDULAZIZ AL SAUD, *et al*.

     Defendants.

**ORAL ARGUMENT REQUESTED**
Civil Action No. 1:20-cv-02146-TJK

**DR. SAAD ALJABRI'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS**

JENNER & BLOCK LLP

David Pressman
D.C. Bar No. 1013431
Jason P. Hipp (DDC No. NY0397)
919 Third Avenue
New York, NY 10022
Telephone:  (212) 891-1654
Fax: (212) 891-1699
dpressman@jenner.com
jhipp@jenner.com

Lindsay Harrison
D.C. Bar No. 977407
Zachary C. Schauf
D.C. Bar No. 1021638
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
Telephone:  (202) 639-6865
Fax:  (202) 639-6066
lharrison@jenner.com
zschauf@jenner.com

*Counsel for Plaintiff
Dr. Saad Aljabri*

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

BACKGROUND ...................................................................................................5

STANDARD OF REVIEW ...................................................................................20

ARGUMENT .......................................................................................................22

I.  Dr. Saad's Claims Are Not Barred By Immunity Or The Act Of State Doctrine, And Saudi Arabia Is Not A Necessary And Indispensable Party..........................................22

    A.  Head-of-State Immunity Does Not Apply.........................................................22

        1.  Bin Salman Is Not Entitled To Head-of-State Immunity.................................22

        2.  Bin Salman's Contrary Arguments Lack Merit. ..............................................24

    B.  Official-Act Immunity Does Not Apply. ..........................................................26

        1.  The TVPA Overrides Official-Act Immunity. ...................................................26

        2.  Bin Salman Is Not Entitled To Official-Act Immunity As To Any Of Dr. Saad's Claims. ...............................................27

            i.  Bin Salman Did Not Act In His Official Capacity When He Sent A Hit Squad To Kill Dr. Saad. ..............................................28

            ii.  Additional Factors Under The Restatement and State Department Tests Underscore That Bin Salman Is Not Immune. ..............................33

                a.  Restatement Test: This Suit Does Not Seek To Enforce A Rule Of Law Against Saudi Arabia. .............................................33

                b.  State Department Test: Immunity Does Not Apply Given Significant U.S. Conduct. .............................................35

        3.  The Other Defendants Are Not Entitled To Immunity. ....................................36

        4.  Official-Act Immunity Is Unavailable Because The Amended Complaint Alleges *Jus Cogens* Violations........................................43

    C.  Saudi Arabia Is Not A Necessary Or Indispensable Party. ...........................................44

        1.  Saudi Arabia Has "No Interest Relating To The Subject Of" This Action That This Suit Will Impair. ....................................44

        2.  This Case Can, "In Equity And Good Conscience," Proceed..........................46

D.   The Act of State Doctrine Does Not Bar Dr. Saad's Claims. .....................................46

II.   This Court Has Personal Jurisdiction Over Each Defendant. ...............................................51

A.   Personal Jurisdiction Lies Over The Federal Long-Arm Defendants. ......................51

1.   Exercising Jurisdiction Over Bin Salman Comports With Due Process. .........52

i.   Because Bin Salman Purposefully Targeted The United States,
He Is Subject To Personal Jurisdiction. .....................................................53

ii.   Exercising Personal Jurisdiction Is Also Appropriate Because Bin
Salman Directed Significant U.S. Conduct. ..............................................55

iii.   Bin Salman's Contrary Arguments Lack Merit. ......................................57

a.   Bin Salman Has No Answer To *Mwani*. ........................................57

b.   Bin Salman Fails With His Attempts To Dismiss The
Significant U.S. Conduct. .............................................................59

2.   Exercising Jurisdiction Over Alasaker Comports With Due Process. ..............63

3.   Exercising Jurisdiction Over Alqahtani And Alassiri Comports With
Due Process .......................................................................................................66

4.   Exercising Jurisdiction Over The Tiger Squad Defendants Comports
With Due Process. .............................................................................................68

5.   Alhamed And Abuljadayel Have Waived Any Objection To
Jurisdiction. .......................................................................................................70

B.   This Court Has Jurisdiction Over MiSK, Alrajhi, And Hamed Under The
D.C. Long-Arm Statute. ..........................................................................................70

1.   Exercising Jurisdiction Over MiSK Is Proper Because Dr. Saad's
Claims Arise Out Of Business MiSK Transacted In The District. ...................71

2.   Exercising Jurisdiction Over Alrajhi Is Proper Because He Availed
Himself Of The District To Further The Hunt For Dr. Saad. ..........................74

3.   Exercising Jurisdiction Over Hamed Is Proper Because He Participated
In A Conspiracy With Overt Acts Inside the District. .....................................75

C.   Exercising Jurisdiction Is Consistent With Fair Play And Substantial Justice. ..........76

D.   At Minimum, Jurisdictional Discovery Is Appropriate. ............................................78

III.  The Amended Complaint Alleges A Claim Under The Torture Victim Protection
      Act. ...............................................................................................................79

      A.   The TVPA Provides A Remedy For Extrajudicial Killings That Do Not
           Succeed In Taking Life.............................................................................80

      B.   Dr. Saad's Claim Is Not Barred By The TVPA's Exhaustion Requirement. ............86

      C.   Dr. Saad Has Alleged A TVPA Claim Against Each Defendant. ..............92

           1.   Command Responsibility, Agency, Aiding And Abetting, And
                Conspiracy Theories Of Liability Are Available Under The TVPA. ..............92

           2.   Bin Salman, Alasaker, Alqahtani, And Alassiri Are Liable As
                Principals And Commanders Who Directed The Attempted
                Extrajudicial Killing, And For Aiding And Abetting And Conspiring
                To Commit An Extrajudicial Killing. ...............................................95

           3.   The Tiger Squad Defendants Are Directly Liable For Their Personal
                Participation In The Attempted Extrajudicial Killing And As
                Conspirators In The Scheme To Extrajudicially Kill Dr. Saad......................101

           4.   The U.S.-Based Covert Agent Defendants Aided And Abetted And
                Conspired To Commit An Extrajudicial Killing.............................................103

IV.   The Amended Complaint Establishes Jurisdiction And States A Claim Under The
      Alien Tort Statute. ......................................................................................107

      A.   An Attempted Extrajudicial Killing Is Actionable Under The ATS. ......108

           1.   An Attempted Extrajudicial Killing Violates A Specific, Universal,
                And Obligatory Norm Of International Law. ..................................108

           2.   Defendants' Contrary Arguments Lack Merit. ...............................112

      B.   Dr. Saad's Claims Sufficiently "Touch and Concern" The United States To
           Displace The Presumption Against Extraterritoriality. ...........................115

           1.   Dr. Saad's Claims "Touch And Concern" The United States........................116

           2.   Defendants' Contrary Arguments Lack Merit. ...............................120

      C.   Defendants May Be Held Liable Under Secondary Theories Of Liability. .............124

           1.   The ATS Imposes Aiding-And-Abetting Liability. .........................125

           2.   Defendants May Be Held Liable Based On Joint Criminal Enterprise..........125

      D.   Dr. Saad Has Pled ATS Claims Against Each Defendant. ......................126

V.    The Amended Complaint Alleges Intentional Infliction Of Emotional Distress. ..............127

      A.    District Of Columbia Law Applies, And The Law Of The Kingdom Of Saudi
            Arabia Does Not. ......................................................................................128

      B.    Even If The Law Of Saudi Arabia Applies, Dr. Saad's Claim May Proceed...........130

      C.    Dr. Saad Has Stated A Claim Against Bin Salman. ..................................................130

      D.    Dr. Saad Has Stated A Claim Against The Other Defendants. ...............................133

      E.    Dr. Saad Has Stated A Claim Against MiSK. ........................................................135

      F.    The Court Should Exercise Supplemental Jurisdiction. ...........................................139

CONCLUSION....................................................................................................................140

# TABLE OF AUTHORITIES[1]

**Page(s)**

**U.S. CASES**

*16th & K Hotel, LP v. Commonwealth Land Title Ins. Co.*,
    276 F.R.D. 8 (D.D.C. 2011) ................................................................................45

*Abiola v. Abubakar*,
    435 F. Supp. 2d 830 (N.D. Ill. 2006) ...............................................................87

*ABN AMRO, Inc. v. Cap. Int'l Ltd.*,
    595 F. Supp. 2d 805 (N.D. Ill. 2008) ...............................................................63

*Acosta Orellana v. CropLife Int'l*,
    711 F. Supp. 2d 81 (D.D.C. 2010) ................................................................107

*Adhikari v. Kellogg Brown & Root, Inc.*,
    845 F.3d 184 (5th Cir. 2017) ..........................................................................125

*Agudas Chasidei Chabad of U.S. v. Russian Fed'n*,
    528 F.3d 934 (D.C. Cir. 2008) ..........................................................................45

\* *Al Shimari v. CACI Premier Tech., Inc.*,
    758 F.3d 516 (4th Cir. 2014) ...................................................................*passim*

*Al-Aulaqi v. Obama*,
    727 F. Supp. 2d 1 (D.D.C. 2010) ................................................112, 113, 115

*Al-Quraishi v. Nakhla*,
    728 F. Supp. 2d 702 (D. Md. 2010), *rev'd on other grounds*, 657 F.3d 201
    (4th Cir. 2011) ..................................................................................................39

*Al-Suyid v. Hifter*,
    No. 1:20cv170, 2020 WL 8211457 (E.D. Va. June 17, 2020) .........................87

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*,
    416 F.3d 1242 (11th Cir. 2005) .......................................................................93

*Aldossari v. Ripp*,
    Civ. No. 20-3187, 2021 WL 1819699 (E.D. Pa. Feb. 26, 2021), *appeal filed*,
    ECF No. 102 (3d Cir. June 3, 2021) ...........................................................32, 33

---

[1] *Authorities principally relied upon are marked with an asterisk.

*Alfred Dunhill of London, Inc. v. Republic of Cuba*,
   425 U.S. 682 (1976)..................................................................................47

*Alkanani v. Aegis Def. Servs., LLC*,
   976 F. Supp. 2d 13 (D.D.C. 2014) ..................................................71, 75

*Am. Trucking Ass'n, Inc. v. N.Y. State Thruway Auth.*,
   795 F.3d 351 (2d Cir. 201)........................................................................46

*Arias v. DynCorp*,
   No. 1:01CV01908, 2016 WL 6496214 (D.D.C. Nov. 2, 2016)..............131

*Armenian Genocide Museum & Mem'l, Inc. v. Cafesjian Family Found., Inc.*,
   607 F. Supp. 2d 185 (D.D.C. 2009) ................................................71, 72

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..................................................................................21

*Askew v. Sheriff of Cook Cty.*,
   568 F.3d 632 (7th Cir. 2009) ....................................................................44

*Ass'n of Battery Recyclers, Inc. v. E.P.A.*,
   716 F.3d 667 (D.C. Cir. 2013) ..................................................................27

*Associated Producers, Ltd. v. Vanderbilt Univ.*,
   76 F. Supp. 3d 154 (D.D.C. 2014) ............................................................68

*Atlantigas Corp. v. Nisource, Inc.*,
   290 F. Supp. 2d 34 (D.D.C. 2003) ............................................................62

*Atrium of Princeton, LLC v. NLRB*,
   684 F.3d 1310 (D.C. Cir. 2012) ................................................................62

*Azadeh v. Islamic Republic of Iran*,
   No. 1:16-CV-1467, 2018 WL 4232913 (D.D.C. Sept. 5, 2018)............129

*Azar v. Allina Health Servs.*,
   139 S. Ct. 1804 (2019)..............................................................................83

*Aziz v. Alcolac, Inc.*,
   658 F.3d 388 (4th Cir. 2011) ..................................................................125

*Bahlul v. United States*,
   840 F.3d 757 (D.C. Cir. 2016) ................................................................114

*Baloco ex rel. Tapia v. Drummond Co., Inc.*,
   640 F.3d 1338 (11th Cir. 2011) ................................................................85

*Banco Nacional de Cuba v. Sabbatino,*
   376 U.S. 398 (1964) ...................................................................................................49

*Bancroft Glob. Dev. v. United States,*
   330 F. Supp. 3d 82 (D.D.C. 2018) ............................................................................21

*Banneker Ventures, LLC v. Graham,*
   798 F.3d 1119 (D.C. Cir. 2015) ................................................................................58

*Beer v. Islamic Republic of Iran,*
   574 F. Supp. 2d 1 (D.D.C. 2008) ............................................................................136

*Belhas v.Ya'alon ,*
   515 F.3d 1279 (D.C. Cir. 2008) ................................................................................33

*Belkin v. Islamic Republic of Iran,*
   667 F. Supp. 2d 8 (D.D.C. 2009) ..............................................................................93

*Ben-Rafael v. Islamic Republic of Iran,*
   540 F. Supp. 2d 39 (D.D.C. 2008) ..........................................................................128

*Bender v. Bender,*
   869 N.E.2d 632 (Mass. App. Ct. 2007) ....................................................................84

*Bernhardt v. Islamic Republic of Iran,*
   Civ. No. 18-2739, 2020 WL 6743066 (D.D.C. Nov. 16, 2020) ....................98, 137

*Blackman v. Dist. of Columbia,*
   633 F.3d 1088 (D.C. Cir. 2011) ................................................................................88

*Bodoff v. Islamic Republic of Iran,*
   424 F. Supp. 2d 74 (D.D.C. 2006) ...........................................127, 130, 136, 138

*Boniface v. Viliena,*
   338 F. Supp. 3d 50 (D. Mass. 2018) ....................................................................80, 81

*Bowoto v. Chevron Corp.,*
   557 F. Supp. 2d 1080 (N.D. Cal. 2008), *aff'd*, 621 F.3d 1116 (9th Cir. 2010) .........79, 89, 125

*Broidy Cap. Mgmt. LLC v. Muzin,*
   No. 19-CV-0150 (DLF), 2020 WL 1536350 (D.D.C. Mar. 31, 2020) ............................41, 42

*Buonocore v. Great Socialist People's Libyan Arab Jamahiriya,*
   Civ. No. 06-727, 2013 WL 351546 (D.D.C. Jan. 29, 2013)................................134

*Burlington Ins. Co. v. Okie Dokie, Inc.,*
   439 F. Supp. 2d 124 (D.D.C. 2006) .......................................................................136

*Burma Task Force v. Sein*,
    No. 15 Civ. 7772, ECF No. 14 (S.D.N.Y. Feb. 12, 2016) ...................................................23

*Burnett v. Al Baraka Inv. And Dev. Corp.*,
    274 F. Supp. 2d 86 (D.D.C. 2003) ...................................................................................107

*Burnett v. Am. Fed'n of Gov't Emps.*,
    102 F. Supp. 3d 183 (D.D.C. 2015) .........................................................................133, 136

*Bush v. Butler*,
    521 F. Supp. 2d 65 (D.D.C. 2007) ...................................................................................138

*Butters v. Vance Int'l, Inc.*,
    225 F.3d 462 (4th Cir. 2000) .............................................................................................41

*Byrd v. Corporacion Forestal y Indus. de Olancho S.A.*,
    182 F.3d 380 (5th Cir. 1999) .............................................................................................32

*Cabello Barrueto v. Fernandez Larios*:

    205 F. Supp. 2d 1325 (S.D. Fla. 2002) .......................................................................84, 85

    402 F.3d 1148 (11th Cir. 2005) ......................................................................93, 94, 107

*Calder v. Jones*,
    465 U.S. 783 (1984) ...........................................................................................................53

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994) ......................................................................................................94, 95

*Chin-Teh Hsu v. New Mighty U.S. Tr.*,
    Civ. No. 10-1743, 2020 WL 588322 (D.D.C. Feb. 6, 2020) ...........................................129

*Chowdhury v. Worldtel Bangladesh Holding, Ltd.*,
    746 F.3d 42 (2d Cir. 2014)...............................................................................................93

*Chuidian v. Philippine Nat'l Bank*,
    912 F.2d 1095 (9th Cir. 1990) ...........................................................................................32

*Citadel Inv. Grp., L.L.C. v. Citadel Cap. Co.*,
    699 F. Supp. 2d 303 (D.D.C. 2010).............................................................................57, 60

*Cockrum v. Donald J. Trump for President, Inc.*,
    319 F. Supp. 3d 158 (D.D.C. 2018).................................................................................70

*Collett v. Socialist Peoples' Libyan Arab Jamahiriya*,
    362 F. Supp. 2d 230 (D.D.C. 2005)..........................................................................22, 87, 90

*ConnTech Dev. Co. v. Univ. of Conn. Educ. Properties, Inc.*,
  102 F.3d 677 (2d Cir. 1996)............................................................................46

*CopyWatch, Inc. v. American Nat'l Red Cross*,
  299 F. Supp. 2d 189 (D.D.C. 2018) .............................................................20

*COR Sec. Holdings Inc v. Banc of Cal., N.A.*,
  No. SA CV 17-1403, 2018 WL 4860032 (C.D. Cal. Feb. 12, 2018)..................100

*Cronin v. Adam A. Weschler & Son, Inc.*,
  904 F. Supp. 2d 37 (D.D.C. 2012) ...............................................................45

*CTS Corp. v. Waldburger*,
  573 U.S. 1 (2014)..........................................................................................88

*Daeche v. United States*,
  250 F. 566 (2d Cir. 1918)............................................................................113

*Daliberti v. Republic of Iraq*,
  97 F. Supp. 2d 38 (D.D.C. 2000) .................................................................54

*In the Matter of: Darcy Lynn Shawver William Jesse Roberts John Holer Marine
  Wonderland and Animal Park, Ltd. (carl Millard) (millardair, Ltd.)*,
  2 O.R.W. 649, 653, 1982 WL 42982 (Feb. 12, 1982) ............................70

*Davis v. Monroe Cty. Bd. of Educ.*,
  526 U.S. 629 (1999).....................................................................................83

*Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*,
  290 F.3d 42 (1st Cir. 2002)..........................................................................61

*de Csepel v. Republic of Hungary*,
  No. 1:10-cv-01261, 2020 WL 2343405 (D.D.C. May 11, 2020) ..........46

*Derensis v. Coopers & Lybrand Chartered Accountants*,
  930 F. Supp. 1003 (D.N.J. 1996) .................................................................66

*Devorah v. Royal Bank of Canada*,
  115 F. Supp. 3d 35 (D.D.C. 2015) ...............................................................21

*Doe I v. Buratai*:

  318 F. Supp. 3d 218 (D.D.C. 2018) .................................................. *passim*

  792 F. App'x 6 (D.C. Cir 2019) ...................................................................59

*Doe I v. Nestle USA, Inc.*,
  766 F.3d 1013 (9th Cir. 2014) ...................................................................125

*Doe I v. State of Israel*,
   400 F. Supp. 2d 86 (D.D.C. 2005) ........................................................51

*Doe v. Bolkiah*,
   74 F. Supp. 2d 969 (D. Haw. 1998) ...............................................31, 37

*Doe v. Constant*:

   No. 10108cv04, 2006 WL 3490503 (S.D.N.Y. Oct. 24, 2006) ...................80, 108

   354 F. App'x 543 (2d Cir. 2009) .........................................................39

*Doe v. Drummond Co., Inc.*,
   782 F.3d 576 (11th Cir. 2015) .............................................93, 116, 125

*Doe v. Exxon Mobil Corp.*:

   393 F. Supp. 2d 20 (D.D.C. 2005) ("*Exxon I*"), *appeal dismissed,* 473 F.3d
   345 (D.C. Cir. 2007) .......................................................................114

   527 F. App'x 7 (D.C. Cir. 2013)..........................................................109

*   654 F.3d 11 (D.C. Cir. 2011) ("*Exxon II*"), *vacated*, 527 F. App'x 7 (D.C. Cir.
   2013) ...............................................................................*passim*

   69 F. Supp. 3d 75 (D.D.C. 2014) ..................................................*passim*

*   No. CV 01-1357(RCL), 2015 WL 5042118 (D.D.C. July 6, 2015) ("*Exxon
   III*") ................................................................................*passim*

*Doe v. Qi*,
   349 F. Supp. 2d 1258 (N.D. Cal. 2004) .........................................39, 93

*Doe v. Rafael Saravia*,
   348 F. Supp. 2d 1112 (E.D. Cal. 2004)...................................................93

*Doe v. Syrian Arab Republic*,
   No. 18-cv-0066 (KBJ), 2020 WL 5422844 (D.D.C. Sept. 10, 2020)....................132

*Dogan v. Barak*,
   932 F.3d 888 (9th Cir. 2019) ..............................................................39

*Duarte v. Nolan*,
   190 F. Supp. 3d 8 (D.D.C. 2016) ........................................................62

*E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*,
   575 U.S. 768 (2015)........................................................................82

*Ellis v. Jackson*,
   319 F. Supp. 3d 23 (D.D.C. 2018) ......................................................................20

*Enahoro v. Abubakar*,
   408 F.3d 877 (7th Cir. 2005) ...........................................................................108

*Estate of Domingo v. Marcos*,
   No. C82-1055V, 1983 WL 482332 (W.D. Wash. July 14, 1983) .........................25

*Estate of Klieman by & through Kesner v. Palestinian Auth.*,
   923 F.3d 1115 (D.C. Cir. 2019) ............................................................58, 59, 72

*Evangelou v. Dist. of Columbia*,
   901 F. Supp. 2d 159 (D.D.C. 2012) ..........................................................21, 63, 105

*Filartiga v. Pena-Irala*,
   630 F.2d 876 (2d Cir. 1980) .............................................................................119

*First Am. Corp. v. Al-Nahyan*,
   948 F. Supp. 1107 (D.D.C. 1996) .......................................................................24

*Flatow v. Islamic Republic of Iran*,
   999 F. Supp. 1 (D.D.C. 1998) ...........................................................................136

*Force v. Islamic Republic of Iran*,
   464 F. Supp. 3d 323 (D.D.C. 2020) ...................................................................83

* *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
   141 S. Ct. 1017 (2021) ...............................................................................52, 60

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*,
   905 F.2d 438 (D.C. Cir. 1990) ...........................................................................70

*Fullwood v. Sivley*,
   517 S.E.2d 511 (Ga. 1999) ................................................................................84

*Garcia v. Chapman*,
   911 F. Supp. 2d 1222 (S.D. Fla. 2012) .............................................................93

*Garcia v. Cnty. of Spokane*,
   No. 10-CV-00349-TOR, 2012 WL 12918364 (E.D. Wash., Apr. 2, 2012).................84

*Garus v. Rose Acre Farms, Inc.*,
   839 F. Supp. 563 (N.D. Ind. 1993) ..................................................................133

*Gasho v. United States*,
   39 F.3d 1420 (9th Cir. 1994) ...........................................................................133

*Geier v. Conway, Homer & Chin-Caplan, P.C.*,
    983 F. Supp. 2d 22 (D.D.C. 2013) ......................................................................52

*Gill v. Islamic Republic of Iran*,
    249 F. Supp. 3d 88 (D.D.C. 2017) ...........................................................81, 128

*Giraldo v. Drummond Co.*,
    808 F. Supp. 2d 247 (D.D.C. 2011), *aff'd*, 493 F. App'x 106 (D.C. Cir. 2012) ....................43

*Goldberg v. UBS AG*,
    660 F. Supp. 2d 410 (E.D.N.Y. 2013) .............................................................104

*Grace v. MacArthur*,
    170 F. Supp. 442 (E.D. Ark. 1959) ..................................................................70

*Grainger v. Ensley,*
    No. 1:18-cv-1093, 2019 WL 4044323, (D. Or. July 26, 2019), *report and
    recommendation adopted*, No. 1:18-CV-01093-CL, 2019 WL 4046538 (D.
    Or. Aug. 27, 2019) .......................................................................................140

*Greenspan v. Crosbie*,
    No. 74 CIV. 4734 (GLG), 1976 WL 841 (S.D.N.Y. Nov. 23, 1976) ....................34

*Gregorio v. Gordon*,
    215 F. Supp. 3d 1 (D.D.C. 2015) .....................................................................61

*Griva v. Davison*,
    637 A.2d 830 (D.C. 1994) ............................................................................134

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
    527 U.S. 308 (1999) .........................................................................................5

*Haim v. Islamic Republic of Iran*,
    425 F. Supp. 2d 56 (D.D.C. 2006) .................................................................129

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) .............................................................. *passim*

*Hamdan v. Rumsfeld*,
    548 U.S. 557 (2006) .....................................................................................125

*Haralson v. Mgmt. & Training Corp.*,
    724 F. Supp. 2d 82 (D.D.C. 2010) ..........................................................96, 103

*Harris v. U.S. Dep't of Veterans Affairs*,
    776 F.3d 907 (D.C. Cir. 2015) ......................................................................128

*Hassen v. Nahyan*,
  No. CV 09-01106 DMG MANX, 2010 WL 9538408 (C.D. Cal. Sept. 17,
  2010) ............................................................................................... 53-54, 55

*Haywood v. Massage Envy Franchising, LLC*,
  No. 316CV01087DRHSCW, 2017 WL 2546568 (S.D. Ill. June 12, 2017),
  *aff'd*, 887 F.3d 329 (7th Cir. 2018) ........................................................ 20

*Heaney v. Gov't of Spain*,
  445 F.2d 501 (2d Cir. 1971) .................................................................. 34

*Helmer v. Doletskaya*,
  393 F.3d 201 (D.C. Cir. 2004) ............................................................... 71

*Hernandez v. Dist. of Columbia*,
  845 F. Supp. 2d 112 (D.D.C. 2012) ........................................................ 21

*Heroes, Inc. v. Heroes Found.*,
  958 F. Supp. 1 (D.D.C. 1996) ............................................................... 72

*Hilao v. Estate of Marcos*,
  103 F.3d 767 (9th Cir. 1996) ................................................................. 93

*Hitchcock v. United States*,
  665 F.2d 354 (D.C. Cir. 1981) ............................................................... 88

*Hourani v. Mirtchey*,
  796 F.3d 1 (D.C. Cir. 2015) ............................................................... 49-50

*Hurd v. Dist. of Columbia Gov't*,
  864 F.3d 671 (D.C. Cir. 2017) ............................................................... 19

\* *IMAPizza, LLC v. At Pizza Ltd.*,
  334 F. Supp. 3d 95 (D.D.C. 2018) ................................................... *passim*

*Ivey v. Lynch*,
  No. 1:17-439, 2018 U.S. Dist. LEXIS 133656 (M.D.N.C. Aug. 8, 2018) .............................. 41

*Jamison v. Olin Corp.*,
  No. 03-1036, 2004 WL 1098940 (D. Or. May 14, 2004) ................................... 69

*Jane W. v. Thomas*,
  354 F. Supp. 3d 630 (E.D. Pa. 2018) ............................................ 116, 117, 119

*Jaramillo v. Naranjo*,
  No. 10-21951-CIV, 2014 U.S. Dist. LEXIS 138887 (S.D. Fla. Sep. 30, 2014) .................... 119

*Jean v. Dorelien*,
　431 F.3d 776 (11th Cir. 2005) .........................................................................87

*Jefferson v. Collins*,
　905 F. Supp. 2d 269 (D.D.C. 2012) .................................................................62

*Joy v. Bell Helicopter Textron, Inc.*,
　999 F.2d 549 (D.C. Cir. 1993) .........................................................................84

*Jungquist v. Nahyan*,
　940 F. Supp. 312 (D.D.C. 1996), *rev'd in part on other grounds*, 115 F.3d
　1020 (D.C. Cir. 1997) ......................................................................................47

\*　*Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*,
　115 F.3d 1020 (D.C. Cir. 1997) .............................................................. *passim*

*Karcher v. Islamic Republic of Iran*,
　396 F. Supp. 3d 12 (D.D.C. 2019) ..............................................................81, 82

*Kashef v. BNP Paribas S.A.*,
　925 F.3d 53 (2d Cir. 2019) ...............................................................................50

*Kenley v. D.C.*,
　83 F. Supp. 3d 20 (D.D.C. 2015) ...................................................................134

*Khatib v. Alliance Bankshares Corp.*,
　846 F. Supp. 2d 18 (D.D.C. 2012) ...................................................................61

*Khulumani v. Barclay Nat. Bank Ltd.*,
　504 F.3d 254 (2d Cir. 2007) ...........................................................................115

*Kilroy v. Windsor*,
　No. C 78-291, 1978 U.S. Dist. LEXIS 20419 (N.D. Ohio Dec. 7, 1978) ..............24

\*　*Kiobel v. Royal Dutch Petroleum Co.*,
　569 U.S. 108 (2013) ................................................................................ *passim*

*Kirschenbaum v. Islamic Republic of Iran*,
　572 F. Supp. 2d 200 (D.D.C. 2008) .........................................................136, 137

*Kiwanuka v. Bakilana*,
　844 F. Supp. 2d 107 (D.D.C. 2012) ..................................................................74

*Klayman v. Jud. Watch, Inc.*,
　314 F. Supp. 3d 308 (D.D.C. 2018) ..................................................................91

*Kline v. Kaneko*,
　535 N.Y.S.2d 303 (N.Y. Sup. Ct. 1988) ...........................................................25

*Krishanti v. Rajaratnam*,
  No. 2:09-CV-05395, 2014 WL 1669873 (D.N.J. Apr. 28, 2014)........................117, 118, 119

*Kurd v. Republic of Turkey*,
  374 F. Supp. 3d 37 (D.D.C. 2019) ......................................................................132, 134, 135

*Lafontant v. Aristide*,
  844 F. Supp. 128 (E.D.N.Y. 1994) .........................................................................................24

*Lagayan v. Odeh*,
  199 F. Supp. 3d 21 (D.D.C. 2016) ..................................................................................97, 138

*Lagor v. Eli Lilly & Co.*,
  No. CV 06-1967, 2007 WL 1748888 (D.D.C. June 18, 2007) .............................................88

*U.S. ex rel. Landis v. Tailwind Sports Corp.*,
  324 F. Supp. 3d 67 (D.D.C. 2018) ......................................................................................136

*Landry v. Price Waterhouse Chartered Accountants*,
  715 F. Supp. 98 (S.D.N.Y. 1989) ..........................................................................................66

*Letelier v. Republic of Chile*,
  488 F. Supp. 665 (D.D.C. 1980) ......................................................................................31, 36

*Levert v. Martinez*,
  939 So. 2d 615 (La. App. 5th Cir. Sept. 26, 2006) ...............................................................84

*Levinson v. Islamic Republic of Iran*,
  443 F. Supp. 3d 158 (D.D.C. 2020) .......................................................................................67

\*  *Lewis v. Mutond*,
  918 F.3d 142 (D.C. Cir. 2019) ......................................................................................*passim*

*Liu v. Republic of China*,
  892 F.2d 1419 (9th Cir. 1989) ...............................................................................................31

*Livnat v. Palestinian Auth.*,
  851 F.3d 45 (D.C. Cir. 2017) .................................................................................................58

*Lizarbe v. Rondon*,
  642 F. Supp. 2d 473 (D. Md. 2009), *aff'd in part, appeal dismissed in part sub
  nom.*, *Ochoa Lizarbe v. Rivera Rondon*, 402 F. App'x 834 (4th Cir. 2010) .......87, 92, 93, 126

*Lyders v. Lund*,
  32 F.2d 308 (N.D. Cal. 1929) ................................................................................................33

*Mamani v. Berzain*,
  309 F. Supp. 3d 1274 (S.D. Fla. 2018) .................................................................................93

*Mann v. Bahi*,
    242 F. Supp. 3d 6 (D.D.C. 2017) ................................................................................134

*Mastafa v. Chevron Corp.*,
    770 F.3d 170 (2d Cir. 2014) ..................................................................................122

*McGhee v. Arabian Am. Oil Co.*,
    871 F.2d 1412 (9th Cir. 1989) ...............................................................................130

*McKesson Corp. v. Islamic Republic of Iran*,
    672 F.3d 1066 (D.C. Cir. 2012) ...............................................................................47

*Miango v. Democratic Republic of Congo*,
    No. 15-1265, 2020 WL 3498586 (D.D.C. June 29, 2020)......................................47

*Milliken & Co. v. CNA Holdings, Inc.*,
    No. 3:08-CV-578, 2011 WL 3444013 (W.D.N.C. Aug. 8, 2011) .........................102

\*   *Mwani v. bin Laden:*

    417 F.3d 1 (D.C. Cir. 2005) ............................................................................. *passim*

    947 F. Supp. 2d 1 (D.D.C. 2013) ............................................................116, 117, 118

*Mohamad v. Palestinian Auth.*,
    566 U.S. 449 (2012)................................................................................................92

*Moriah v. Bank of China Ltd.*,
    107 F. Supp. 3d 272 (S.D.N.Y. 2015)....................................................................41

*Morris v. Khadr*,
    415 F. Supp. 2d 1323 (D. Utah 2006) ...............................................................61, 65

*Morrison v. Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010)...........................................................................120, 121, 122

*Motir Servs., Inc. v. Ekwuno*,
    191 F. Supp. 3d 98 (D.D.C. 2016) .............................................................138, 139

*Mourat v. Common Pleas Ct. of Lehigh Cty.*,
    515 F. Supp. 1074 (E.D. Pa. 1981) ........................................................................84

*Mujica v. Occidental Petroleum Corp.*,
    381 F. Supp. 2d 1164 (C.D. Cal. 2005) .................................................................95

*Nahno-Lopez v. Houser*,
    627 F. Supp. 2d 1269 (W.D. Okla. 2009), *aff'd*, 625 F.3d 1279 (10th Cir.
    2010) .......................................................................................................................44

*In re Nahyan*,
  485 F. App'x 859 (9th Cir. 2012) ..................................................................54

*Nanko Shipping, USA v. Alcoa, Inc.*,
  850 F.3d 461 (D.C. Cir. 2017) ....................................................................46

*Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.*,
  791 F. Supp. 2d 33 (D.D.C. 2011) .............................................................103

*Niz-Chavez v. Garland*,
  141 S. Ct. 1474 (2021) ................................................................................87

*Nnaka v. Federal Republic of Nigeria*,
  756 F. App'x 16, 18 (D.C. Cir. 2019) .........................................................35

*Ofisi v. Al Shamal Islamic Bank*,
  No. CV 15-2010 (JDB), 2019 WL 1255096 (D.D.C. Mar. 19, 2019) ........................53, 61, 78

*Ofisi v. BNP Paribas, S.A.*,
  278 F. Supp. 3d 84 (D.D.C. 2017), *vacated in part*, 285 F. Supp. 3d 240
  (D.D.C. 2018) ..............................................................................................98, 99

*Oliner v. Canadian Pac. Ry. Co.*,
  34 A.D.2d 310 (N.Y. App. Div. 1970), *aff'd* 267 N.E.2d 480..............................34

*Omari v. Ras Al Khaimah Free Trade Zone Auth.*,
  No. 16 Civ. 3895, 2017 WL 3896399 (Aug. 18, 2017) ..............................40

*Orellana v. CropLife Int'l*,
  740 F. Supp. 2d 33 (D.D.C. 2010) .............................................................75

*Osborn v. Haley*,
  549 U.S. 225 (2007)...................................................................................139

*Oveissi v. Islamic Republic of Iran*,
  573 F.3d 835 (D.C. Cir. 2009) ...........................................................128, 129

*Owens v. BNP Paribas, S.A.*,
  897 F.3d 266 (D.C. Cir. 2018) ..............................................................94, 95

*Owens v. Republic of Sudan*:

  826 F. Supp. 2d 128 (D.D.C. 2011) ("*Owens I*")........................................128, 129

  864 F.3d 751 (D.C. Cir. 2017) ("*Owens II*") .........................................83, 86, 132

  194 A.3d 38 (D.C. 2018) (*Owens III*)...................................................132, 133

*Penaloza v. Drummond Co., Inc.*,
    384 F. Supp. 3d 1328 (N.D. Ala. 2019)................................................................93, 94

*Pencheng Si v. Laogai Research Foundation*,
    71 F. Supp. 3d 73 (2014) ...............................................................................................139

*PetEdge, Inc. v. Garg*,
    234 F. Supp. 3d 477 (S.D.N.Y. 2017)..............................................................................65

*Petersen v. Boeing Co.*,
    No. CV-10-00999, 2014 WL 12516257 (D. Ariz. July 1, 2014)..........................................130

*Policemen's Annuity & Ben. Fund of City of Chicago v. Bank of Am., NA*,
    943 F. Supp. 2d 428 (S.D.N.Y. 2013), *abrogated on other grounds by Ret. Bd.*
    *of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of*
    *New York Mellon*, 775 F.3d 154 (2d Cir. 2014)................................................................105

*Powell v. Saint Joseph's Univ.*,
    Civ. No. 17-4438, 2018 WL 994478 (E.D. Pa. Feb. 20, 2018) ............................................140

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
    582 F.3d 244 (2d Cir. 2009)...........................................................................................125

*Price v. Pelka*,
    690 F.2d 98 (6th Cir. 1982) ............................................................................................84

*Price v. Socialist People's Libyan Arab Jamahiriya*,
    294 F.3d 82 (D.C. Cir. 2002)..........................................................................................59

*Pro-Choice Network of W. New York v. Project Rescue W. New York*,
    828 F. Supp. 1018 (W.D.N.Y. 1993) ...............................................................................140

*Pugh v. Socialist People's Libyan Arab Jamahiriya*,
    290 F. Supp. 2d 54 (D.D.C. 2003)...................................................................................54

*Quality Air Servs., L.L.C. v. Milwaukee Valve Co.*,
    567 F. Supp. 2d 96 (D.D.C. 2008)...............................................................................71, 73

*Ramos v. Uber Techs., Inc.*,
    No. SA-14-CA-502-XR, 2015 WL 758087 (W.D. Tex. Feb. 20, 2015) ...............................104

*Renchard v. Humphreys & Harding, Inc.*,
    381 F. Supp. 382 (D.D.C. 1974).....................................................................................36

*Republic of Philippines v. Pimentel*,
    553 U.S. 851 (2008)......................................................................................................46

*Republic of the Philippines v. Marcos*,
    862 F.2d 1355 (9th Cir. 1988) ................................................................50

*Rimkus v. Islamic Republic of Iran*,
    575 F. Supp. 2d 181 (D.D.C. 2008) ......................................................134

*RJR Nabisco, Inc. v. European Cmty.*,
    136 S. Ct. 2090 (2016) .............................................................120, 121, 124

*Rojas Mamani v. Sanchez Berzain*,
    636 F. Supp. 2d 1326 (S.D. Fla. 2009) ...................................................88

*Rossley v. Drake Univ.*,
    958 F.3d 679 (8th Cir. 2020) ..................................................................84

*Royal Park Invs. SA/NV v. HSBC Bank USA, Nat'l Ass'n*,
    109 F. Supp. 3d 587 (S.D.N.Y. 2015).....................................................105

*Russello v. United States*,
    464 U.S. 16 (1983) ...................................................................................85

*SEC v. Lines Overseas Mgmt., Ltd.*,
    No. 04-302, 2005 WL 3579139 (D.D.C. Jan. 4, 2006)...........................70

*SEC v. LovesLines Overseas Mgmt., Ltd.*,
    Misc. No. 04-302, 2007 WL 581909 (D.D.C. Feb. 21, 2007) .................76

*Salazar v. Islamic Republic of Iran*,
    370 F. Supp. 2d 105 (D.D.C. 2005) .......................................................133

*Salu v. Generational Equity of Cal., LLC*,
    No. SA CV 12-1436, 2013 WL 4522510 (C.D. Cal. Aug. 26, 2013).......58

*Samantar v. Yousuf*,
    560 U.S. 305 (2010)..................................................................27, 33, 42

*Sarei v. Rio Tinto, PLC:*

    487 F.3d 1193 (9th Cir. 2007) ...............................................................43

    671 F.3d 736 (9th Cir. 2011) ..................................................................51

*Schertzman Cohen v. Islamic Republic of Iran*,
    No. 17 Civ. 1214, 2019 WL 3037868 (D.D.C. July 11, 2019).................81

*Schuler v. PricewaterhouseCoopers, LLP*,
    595 F.3d 370 (D.C. Cir. 2010) ...............................................................139

*Schwartz v. Islamic Republic of Iran,*
   Civ. No. 18-1349, 2020 WL 7042842 (D.D.C. Nov. 30, 2020) ............................82

*In re Scrap Metal Antitrust Litig.,*
   No. 1:02CV0844, 2004 WL 7340436 (N.D. Ohio Mar. 31, 2004), *aff'd*, 527
   F.3d 517 (6th Cir. 2008) ................................................................................96

*In re Search of Info. Associated with [redacted]@gmail.com that is Stored at
   Premises Controlled by Google, Inc.,*
   No. 16-MJ-00757 (BAH), 2017 WL 3445634 (D.D.C. July 31, 2017)................124

*Second Amendment Found. v. U.S. Conf. of Mayors,*
   274 F.3d 521 (D.C. Cir. 2001) ......................................................................73

*Shatsky v. Palestine Liberation Org.,*
   955 F.3d 1016 (D.C. Cir. 2020) ....................................................................58

*Sheikh v. Republic of Sudan,*
   485 F. Supp. 3d 255 (D.D.C. 2020) .......................................................132, 133

*Shimono v. Harbor Freight Tools USA, Inc.,*
   No. EDCV 16-1052, 2016 WL 6238483 (C.D. Cal. Oct. 24, 2016).....................100

*Siderman de Blake v. Republic of Argentina,*
   965 F.2d 699 (9th Cir. 1992) ........................................................................43

*Sikhs for Justice v. Singh,*
   64 F. Supp. 3d 190 (D.D.C. 2014) .............................................................23-24

*Sisso v. Islamic Republic of Iran,*
   448 F. Supp. 2d 76 (D.D.C. 2006) ........................................................53, 56, 68

*Smith v. Clinton,*
   886 F.3d 122 (D.C. Cir. 2018) ....................................................................130

* *Sosa v. Alvarez-Machain,*
   542 U.S. 692 (2004)............................................................................ *passim*

*Sotloff et al. v. Syrian Arab Republic,*
   Civ. No. 18-1625, 2021 WL 965882 (D.D.C. Mar. 15, 2021)............................82

*Strange v. Islamic Republic of Iran,*
   Civ. No. 14-435, 2016 WL 10770678 (D.D.C. May 6, 2016).............................61

*Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com de Equip. Medico,*
   563 F.3d 1285 (Fed. Cir. 2009).................................................................56, 57

*In re Terrorist Attacks on Sept. 11, 2001*:

    392 F. Supp. 2d 539 (S.D.N.Y. 2005), *aff'd*, 538 F.3d 71 (2d Cir. 2008) ..............................61

    122 F. Supp. 3d 181 (S.D.N.Y. 2015) ......................................................................................40

    349 F. Supp. 2d 765 (S.D.N.Y. 2005) ......................................................................................79

    714 F.3d 659 (2d Cir. 2013) ...................................................................................56, 63, 64, 65

*Thomas v. Doyle,*
    187 F.2d 207 (D.C. Cir. 1950) ................................................................................................84

*Thomas v. Powell,*
    247 F.3d 260 (D.C. Cir. 2001) ..............................................................................................114

*TJGEM LLC v. Republic of Ghana,*
    26 F. Supp. 3d 1 (D.D.C. 2013) ..............................................................................................45

*Toumazou v. Turkish Republic of N. Cyprus,*
    71 F. Supp. 3d 7 (D.D.C. 2014) ..............................................................................................79

*TRW Inc. v. Andrews,*
    534 U.S. 19 (2001) ..................................................................................................................82

*Ungar v. Islamic Republic of Iran,*
    211 F. Supp. 2d 91 (D.D.C. 2002) ..........................................................................................97

*Union Com. Servs. Ltd. v. FCA Int'l Operations, LLC,*
    785 F. App'x 309 (6th Cir. 2019) ..................................................................................67, 100

*United States v. Ali,*
    885 F. Supp. 2d 17 (D.D.C. 2012) ........................................................................................113

*United States v. August,*
    835 F.2d 76 (5th Cir. 1987) ..........................................................................................102, 103

*United States v. Dire,*
    680 F.3d 446 (4th Cir. 2012) ................................................................................................113

*United States v. Garrett,*
    545 F. Supp. 129 (D.D.C. 1982), *aff'd*, 720 F.2d 705 (D.C. Cir. 1983) ...............................103

*United States v. Gladish,*
    536 F.3d 646 (7th Cir. 2008) ........................................................................................102, 115

*United States v. Gooding,*
    25 U.S. 460 (1827) ................................................................................................................124

*United States v. Hayes,*
    555 U.S. 415 (2009)........................................................................88

*United States v. Irving,*
    665 F.3d 1184 (10th Cir. 2011) ......................................................96

*United States v. Lester,*
    363 F.2d 68 (6th Cir. 1966) ..........................................................124

*United States v. McPherson,*
    587 F. App'x 556 (11th Cir. 2014) .............................................82, 83

*United States v. Mohammad,*
    398 F. Supp. 3d 1233 (U.S.C.M.C.R. 2019)................................111

*United States v. Myers,*
    575 F.3d 801 (8th Cir. 2009) ........................................................102

*United States v. Ruffin,*
    613 F.2d 408 (2d Cir. 1979)..........................................................124

*United States v. Said,*
    798 F.3d 182 (4th Cir. 2015) ........................................................113

*United States v. Salahuddin,*
    765 F.3d 329 (3d Cir. 2014)..........................................................114

*United States v. Santos,*
    553 U.S. 507 (2008)........................................................................81

*United States v. Soto-Barraza,*
    947 F.3d 1111 (9th Cir.) ...............................................................103

*United States v. Sum of $70,990,605*:

    234 F. Supp. 3d 212 (D.D.C. 2017) ...............................................48

    4 F. Supp. 3d 189 (D.D.C. 2014) ...................................................47

*United States v. Washington,*
    653 F.3d 1251 (10th Cir. 2011) ....................................................102

*United States v. Williams,*
    536 F.2d 810 (9th Cir. 1976) ..........................................................70

*United States v. Yousef,*
    327 F.3d 56 (2d Cir. 2003).............................................................111

*Urquhart-Bradley v. Mobley*,
    964 F.3d 36 (D.C. Cir. 2020) ...........................................................................76, 78

*W.A. v. Islamic Republic of Iran*,
    427 F. Supp. 3d 117 (D.D.C. 2019) ..........................................................129, 130

*Wachsman ex rel. Wachsman v. Islamic Republic of Iran*,
    603 F. Supp. 2d 148 (D.D.C. 2009) ..........................................................134, 136

*Warfaa v. Ali*,
    33 F. Supp. 3d 653 (E.D. Va. 2014), *aff'd*, 811 F.3d 653 (4th Cir. 2016) .................51, 80, 82

*Washkoviak v. Student Loan Mktg. Ass'n*,
    900 A.2d 168 (D.C. 2006) ...................................................................................128

*In re Watkins*,
    No. ADV. 04-90006, 2008 WL 8462958 (B.A.P. 9th Cir. Feb. 28, 2008) .............................84

*Weisskopf v. Neeman*,
    No. 11-cv-665, 2013 U.S. Dist. LEXIS 201309 (W.D. Wis. Mar. 20, 2013) ..........................40

*West v. Atkins*,
    487 U.S. 42 (1988) ...............................................................................................39

*WesternGeco LLC v. ION Geophysical Corp.*,
    138 S. Ct. 2129 (2018) .......................................................................................120

*Wilson v. Thornton*,
    416 A.2d 228 (D.C. 1980) ....................................................................................84

*Wiwa v. Royal Dutch Petroleum Co.*:

    626 F. Supp. 2d 377 (S.D.N.Y. 2009) ...............................................................108

    No. 96 CIV. 8386 (KMW), 2002 WL 319887 (S.D.N.Y. Feb. 28, 2002) ......................*passim*

*W.S. Kirkpatrick & Co., Inc. v. Env't Tectonics Corp., Int'l*,
    493 U.S. 400 (1990) ..............................................................................46, 47, 48, 49

*Wultz v. Islamic Republic of Iran*,
    755 F. Supp. 2d 1 (D.D.C. 2010) ...................................................................65, 69

*Wyatt v. Syrian Arab Republic*:

    362 F. Supp. 2d 103 (D.D.C. 2005) ....................................................................22

    908 F. Supp. 2d 216 (D.D.C. 2012), *aff'd*, 554 F. App'x 16 (D.C. Cir. 2014)...............*passim*

*In re XE Servs. Alien Tort Litig.*,
  665 F. Supp. 2d 569 (E.D. Va. 2009) ..................................................................91

*Xuncax v. Gramajo*,
  886 F. Supp. 162 (D. Mass. 1995) ................................................................30, 87

*Youming Jin v. Ministry of State Sec.*,
  335 F. Supp. 2d 72 (D.D.C. 2004) ......................................................................76

*Yousuf v. Samantar:*

  699 F.3d 763 (4th Cir. 2012) ...........................................................42, 43, 44, 108

  No. 1:04CV1360 LMB/JFA, 2012 WL 3730617 (E.D. Va. Aug. 28, 2012) ..................81, 108

*Zoelsch v. Arthur Andersen & Co.*,
  824 F.2d 27 (D.C. Cir. 1987), *abrogated on other grounds by Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010) .......................................................98

**INTERNATIONAL CASES**

*Mobutu v. SA Cotoni*, [Civ.] [Civil Court of Brussels], Dec. 29, 1988,
  Jurisprudence de Liège, Mons et Bruxelles [JLMB] 1989, 169 (Belg.),
  reprinted in 91 I.L.R. 259 (1993) .........................................................................26

*Piresferreira v. Ayotte*,
  2008 CarswellOnt 7733, par. 169, 172 (Can.), rev'd in part on other grounds,
  2010 ONCA 384 .................................................................................................128

*Prosecutor v. Blaškić*,
  Case No. IT–95–14–A, Appeal Judgement (Int'l Crim. Trib. for the Former
  Yugoslavia July 29, 2004) ..................................................................................123

*Prosecutor v. Blé Goudé*,
  ICC-02/11-02/11-186, Decision on the Confirmation of Charges against
  Charles Blé Goudé (Dec. 11, 2014) ....................................................................110

*Prosecutor v. Furundžija*,
  Case No. IT-95-17/1-T, Judgement (Int'l Crim. Trib. for the Former
  Yugoslavia Dec. 10, 1998) .................................................................................110

*Prosecutor v. Gbagbo*,
  ICC-02/11-01/11-656-Red, Decision on the Confirmation of Charges against
  Laurent Gbagbo (June 12, 2014) ........................................................................110

*Prosecutor v. Germain Katanga and Mathieu Ngudjolo Chui*,
  ICC–01/14/01/07, Decision on the Confirmation of Charges (Sept. 30, 2008) ....................110

*Prosecutor v. Katanga et al.*,
ICC-01/04-01/07-717, Decision on the Confirmation of Charges (Sept. 30, 2008) ...............................................................................................................110

*Prosecutor v. Kvočka*,
Case No. IT-98-30/1-A, Appeal Judgment (Int'l Crim. Trib. for the Former Yugoslavia Feb. 28, 2005) ..............................................................................126

*Prosecutor v. Mrđa*,
Case No. IT-02-59-S, Sentencing Judgment (Int'l Crim. Trib. for the Former Yugoslavia Mar. 31, 2004) .............................................................................109

*Prosecutor v. Ntaganda*,
ICC-01/04-02/06-309, Decision Pursuant to Article 61(7)(a) and (b) (June 9, 2014) ................................................................................................................110

*Prosecutor v. Perišić*
Case No. IT-04-81-T, Judgement (Int'l Crim. Trib. for the Former Yugoslavia Feb. 28, 2013) ..............................................................................................109

*Prosecutor v. Tadic,*
Case No. IT-94-1-T, Trial Chamber Opinion & Judgement (Int'l Crim. Trib. for the Former Yugoslavia May 7, 1997) ..............................................109

## TREATIES, STATUTES AND RULES

1 U.S.C. § 1 .......................................................................................................87

28 U.S.C. § 1350 ...............................................................................................79

28 U.S.C. § 1367(a) .........................................................................................139

28 U.S.C. § 1603(b)(2) ......................................................................................42

28 U.S.C. § 1605A ...........................................................................81, 83, 133

28 U.S.C. § 1605A(a)(1) .............................................................................81, 83

28 U.S.C. § 1605A(h)(7) ..................................................................................81

28 U.S.C. § 1651 .............................................................................................113

42 U.S.C. § 1983 ...............................................................................................39

Australian Foreign States Immunities Act of 1985, pt. V, § 36(1),
https://bit.ly/3cgjoEN ...................................................................................26

Congress' Act of April 30, 1790, Chapter 9 § 12, 1 Stat. 114 (1790) .........114

D.C. Code § 13-423 ............................................................................................51, 70, 71, 76, 77

Geneva Convention for the Amelioration of the Condition of the Wounded and
   Sick in Armed Forces in the Field art. 12, Aug. 12, 1949, 6 U.S.T. 3114.............................86

Model Penal Code § 5.01(2) .......................................................................................................102

Regulations on the Establishment of Panels with Exclusive Jurisdiction over
   Serious Criminal Offences, art. 14.3(f), U.N. Doc. UNTAET/REG/2000/15
   (June 6, 2000)...........................................................................................................................110

Rome Statute of the Int'l Crim. Ct. art. 25(3)(f), opened for signature July 17,
   1998, 2187 U.N.T.S. 90 ..........................................................................................................110

Statute of the Iraqi Special Trib. art. 15(b)(2) (Dec. 10, 2003) ..................................................110

Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992),
   reprinted in 28 U.S.C. § 1350 ......................................................................................... *passim*

U.K. State Immunity Act of 1978, Chapter 33, pt. III, § 20(1) .....................................................25

Fed. R. Civ. P.:

     Rule 4(k)(2).........................................................................................................................51

     Rule 8 ..................................................................................................................................21

     Rule 9(b) .............................................................................................................................65

     Rule 12(b)(1).......................................................................................................................20

     Rule 12(b)(2).......................................................................................................................21

     Rule 12(b)(6).......................................................................................................................21

     Rule 12(b)(7).......................................................................................................................45

     Rule 19......................................................................................................................44, 46, 48

     Rule 19(b) ...........................................................................................................................46

**LEGISLATIVE MATERIALS**

133 CONG. REC. S3900-02 (statement of Sen. Leahy)..................................................................85

135 CONG. REC. H6424 (statement of Rep. Fascell)....................................................................92

137 CONG. REC. H11244-45 (daily ed. Nov. 25, 1991) (statement of Rep.
   Broomfield)..............................................................................................................................120

H.R. Rep. No. 102-367................................................................................................85

H.R. 1417, 100th Cong. 108 n.96 (1988)....................................................................86

H.R. Rep. No. 102-367(I),1992 U.S.C.C.A.N. 84........................................................39

S. Rep. No. 102-249 (1991) ................................................................................. *passim*

## Other Authorities

A Critical Pronouncing Dictionary and Expositor of the English Language (John
    Walker ed., 1803)............................................................................................122

*A Saudi Judge Speaks: How MBS Slaughtered the Kingdom's Justice System*,
    Democracy for the Arab World Now (Oct. 1, 2020),
    https://bit.ly/3pFKfjo/ ....................................................................................89

Adel Aljubeir (@AdelAljubeir), Twitter (Dec. 1, 2020), https://bit.ly/3gjqLgc........................30

Andrea Gonzalez-Ramirez, *Ivanka Trump Helps Launch Project Aimed At
    Helping Female Entrepreneurs Globally*, Refinery29 (July 8, 2017),
    https://r29.co/2RE6lGd ....................................................................................72

Andrew England, *Saudi Arabia's Leadership Puts Crown Prince's Flagship
    Charity Under Review*, Fin. Times (Sept. 8, 2020), https://on.ft.com/3zh20tu ................14, 30

Antonio Cassese, *Black Letter Lawyering v. Constructive Interpretation—The
    Vasiljević Case*, 2(1) J. Int'l Crim. Just. 265, 267 (2004) ..................................110

Antonio Cassese, *The Proper Limits of Individual Responsibility under the
    Doctrine of Joint Criminal Enterprise*, 5 J. Int'l Crim. Just. 109, 111 (2007) .................126

Attach. to Statement of Interest, *Miango v. Democratic Republic of the Congo*,
    No. 15-cv-01265 (D.D.C. May 1, 2019), ECF No. 151-1 .................................31, 36

Beth Stephens, *The Modern Common Law of Foreign Official Immunity*, 79
    Fordham L. Rev. 2669 (2011)...........................................................................33

Bill Bostock, *MBS is Stamping Out the Final Threat to His Rule, Bringing an End
    to His 3-Year Coup Marked by Power Grabs, Forced Disappearances, and
    Assassinations,* Bus. Insider, (Aug. 12, 2020), https://bit.ly/2RuZuPh .................8

Bill Browder, *Why I Never Fly over Russian Airspace*, Fin. Times (May 30, 2021)
    https://bit.ly/3z3ThuP......................................................................................70

Black's Law Dictionary (9th ed. 2009)...............................................................116, 122

Br. for the United States as Amicus Curiae Supporting Petitioners, *Nestlé USA,
    Inc. v. Doe I*, Nos. 19-146 & 19-453, 2020 WL 5498509 (U.S. Sept. 8, 2020) ..................121

Charles Doyle, Cong. Rsch. Serv., R420001, ATTEMPT: AN OVERVIEW OF FED.
CRIM. L. 6 (2020)..................................................................................103

CIA's *World Factbook,* https://bit.ly/3uQiG7E .........................................24

Compendious Law Dictionary (Thomas Potts ed., 1803) .........................122

Council for Pol. and Security Affs., Saudi-US Rels. Info. Serv. (Feb. 11, 2015),
https://bit.ly/2T0c75d.............................................................................69

David Ignatius, *MBS's Lawsuit Against a Saudi Spy Threatens to Spill Secrets.*
*The U.S. Should Intervene*, WASH. POST (May 20, 2021),
https://wapo.st/2QC0II6..........................................................................19

Dexter Filkins, *A Saudi Prince's Quest to Remake the Middle East*, NEW YORKER
(Apr. 2, 2018) https://bit.ly/3gswWi6....................................................104

2 Foreign Affairs Manual, § 232.5(a)  ......................................................23

G.A. Res. 260 (III) A, Convention on the Prevention and Punishment of the
Crime of Genocide, art. 3(d) (Dec. 9, 1948)........................................111

Gov't of Can., Check Processing Times, https://bit.ly/2TN0hvT................60

Guy Taylor, *Mohammed bin Salman, Saudi Arabia Crown Prince, Rumored to*
*Ascend to Throne*, THE WASH. TIMES (Sept. 18, 2017), https://bit.ly/3g86FXp ..................104

Hannah Lucinda Smith*, Saudi Hit Squad Leader 'Called Crown Prince's Office'*
*After Khashoggi Death,* TIMES (Oct. 23, 2018), https://bit.ly/3cw4kDk/ ...............................97

Int'l Law Comm'n, Rep. on the Work of Its Seventy-first Session, arts. 6, 12(3),
U.N. Doc. A/74/10 (2019) ....................................................................111

*Is This the World's Most Dangerous Man? Hot-Head Saudi Prince Has West*
*Very Worried*, SUN (Apr. 6, 2016), https://bit.ly/3wds5b1 ....................104

Jackie Northam, '*To Protect Myself and My Family': Saudi Critics Abroad Fear*
*Long Reach of the Crown*, NPR (Oct. 8, 2020), https://n.pr/3g5ry5q ......................7

Jérôme de Hemptinne, *Attempt,* Modes of Liability in International Criminal Law
346 (Jérôme de Hemptinne, Robert Roth & Elies van Sliedregt, eds. 2019). ......................112

Julia Ioffe, TWITTER (May 24, 2021, 8:14 PM), https://bit.ly/2Seb8P7 ......................70

Julian Borger et al., *Trump Announces Jamal Khashoggi Investigation But Says*
*He Won't Halt Saudi Arms Sales*, GUARDIAN (Oct. 11, 2020),
https://bit.ly/3pI2HYp............................................................................16

*Khashoggi Case: All Previous Updates,* AL JAZEERA (Nov. 22, 2018),
https://bit.ly/3w9SCpI ................................................................................................97

*Khashoggi Death: Saudi Arabia Says Journalist was Murdered*, BBC NEWS (Oct.
22, 2018), https://bbc.in/357rUCh ...............................................................................11

Layla Quran, *Saudi Students in U.S. Say Their Government Watches Their Every
Move,* PBS NEWS HOUR (Mar. 19, 2019), https://to.pbs.org/3v62JKY ...................................13

Ltr. from Harold Hongju Koh, Legal Adviser, U.S. Dep't of State, to Stuart F.
Delery, Principal Dep. Ass't Att'y Gen., Civil Div., U.S. Dep't of Justice
(Dec. 17, 2012), *docketed at Ragsdale v. Lashkar-E-Taiba*, No. 1:11-cv-
03893-DLI-CLP, ECF No. 19-1 (E.D.N.Y. Dec. 17, 2012) ......................................27

Ltr. from William H. Taft, IV, Statement of Interest at 7-8, *Doe v. Qi*, No. 4:02-
cv-672 (Sept. 25, 2002), ECF No. 85. ..................................................................35

Margherita Stancati & Summer Said, *Saudi Arabia Clamps Down as Crown
Prince Consolidates Power*, WALL ST. J. (Sept. 13, 2017),
https://on.wsj.com/3g9I5VU ......................................................................................104

Martin Chulov, *'Night of the beating': details emerge of Riyadh Ritz-Carlton
purge,* THE GUARDIAN (Nov. 19, 2020), https://bit.ly/353X7WV ............................................89

Marwa Rashad & Raya Jalabi, *Saudi Arabia Jails Eight Over Khashoggi Murder*,
REUTERS (Sept 7, 2020), https://bit.ly/3cu0ESG .....................................................11

*Muhammad bin Salman Cracks Down on His Perceive Opponents*, ECONOMIST
(Sept. 23, 2017), https://econ.st/3ctgsou ...................................................................104

Office of the Dir. of Nat'l Intelligence, *Assessing the Saudi Government's Role in
the Killing of Jamal Khashoggi* (Feb. 11, 2021), https://bit.ly/3g5IW9X ..........................11

Oxford English Dictionary (2020) ...................................................................................82

Patricia M. Wald, *International Criminal Courts-A Stormy Adolescence*, 46 VA. J.
INT'L L. 319 (2006) ........................................................................................................111

Paul LeBlanc, *White House to Communicate with Saudi King Instead of Crown
Prince as US Reassesses Relationship*, CNN (Feb. 16, 2021),
https://cnn.it/3wlFazj ................................................................................................23

Random House Webster's College Dictionary (1999) ...................................................82

Reda El Mawy, *Saudi Arabia's Missing Princes*, BBC NEWS (Aug. 15, 2017),
https://bbc.in/3zch7V8 ..............................................................................................104

Restatement (Second) of Conflict of Laws (1971) ........................................................129

Restatement (Second) of Foreign Relations Law of the United States (1965) ............................23

Restatement (Second) of Torts (1965) .................................................................................130, 133

Restatement (Third) of Agency (2006) .....................................................................................62

Restatement (Third) of Foreign Relations Law of the United States (1987) ................23, 108, 111

S.C. Res. 808, UN Doc. S/RES/808 (Feb. 22, 1993) ...................................................................109

S.C. Res. 827, UN Doc. S/RES/827 (May 25, 1993) ...................................................................109

Statement by President Bush upon Signing H.R. 2092, 28 Weekly Compilation of
   Presidential Documents 465 (1992), *reprinted in* 1992 U.S.C.C.A.N. 91 ............................85

Statement of Interest, *Cole v. Heidtman* (S.D.N.Y. 1968), *in Sovereign Immunity
   Decisions of the Department of State – May 1952 to January 1977* (M.
   Sandler, D. Vagts, & B. Ristau, eds.), in 1977 DIG. U.S. PRAC. INT'L L. 1017,
   1062-63 (No. 62) ..........................................................................................................34, 43

Statement of Interest, *Kendall v. Kingdom of Saudi Arabia* (S.D.N.Y. 1965), *in
   Sovereign Immunity Decisions of the Department of State – May 1952 to
   January 1977* (M. Sandler, D. Vagts, & B. Ristau, eds.), in 1977 DIG. U.S.
   PRAC. INT'L L. 1017, 1053-54 (No. 49). ..............................................................................23

Statement of Interest, *Miango v. Democratic Republic of the Congo*, No. 15-cv-
   01265, ECF No. 151 .....................................................................................................31, 36

Statement of Interest, *Pruitt v. M/V Patignies* (E.D. Mich. July 18, 1968), *in
   Sovereign Immunity Decisions of the Department of State – May 1952 to
   January 1977* (M. Sandler, D. Vagts, & B. Ristau, eds.), in 1977 DIG. U.S.
   PRAC. INT'L L. 1017, 1060-61 (No. 60). ............................................................................35, 36

Stephen Kalin, *Nephew Replaces Veteran Saudi Security Chief in Targeting
   Militants*, REUTERS (June 21, 2017), https://reut.rs/3wTyxnu ...............................................69

Suggestion of Immunity, *Dogan v. Barak*, No. 2:15-cv-08130 (C.D. Cal. June 10,
   2016), ECF No. 48 ............................................................................................................23

*The Government of the Kingdom of Saudi Arabia Completely Rejects the
   Assessment in the Report Submitted to US' Congress Regarding Murder of
   Saudi Citizen Jamal Khashoggi*, SAUDI PRESS AGENCY (Feb. 26, 2021),
   https://bit.ly/3cvWGbV .....................................................................................................11

*TVPA of 1989: Hrg. on S. 1629 and H.R. 1662 Before the Subcomm. on
   Immigration & Refugee Affairs of the S. Comm. on the Judiciary*, 101st Cong.
   25-26 (1990) (S. Hrg. 101-1284) ..........................................................................................93

*U.N. Human Rights Council, Annex to the Report of the Special Rapporteur on extrajudicial, summary or arbitrary executions: Investigation into the unlawful death of Mr. Jamal Khashoggi*, U.N. Doc. A/HRC/41/CRP.1 (June 19, 2019) .................................................................................................................44

U.S. Dep't of State, *Digest of United States Practice in International Law* 571 (Sally J. Cummins & David P. Stewart eds., 2003), https://2009-2017.state.gov/documents/organization/139602.pdf ..............................................24

U.S. Dep't of State, *Saudi Arabia 2020 Human Rights Report* (March 30, 2021), https://www.state.gov/reports/2020-country-reports-on-human-rights-practices/saudi-arabia/..........................................................................................23, 89

U.S. Dep't of Treasury, *Treasury Sanctions the Saudi Rapid Intervention Force and Former Deputy Head of Saudi Arabia's General Intelligence Presidency for Roles in the Murder of Journalist Jamal Khashoggi* (Feb. 26, 2021), https://home.treasury.gov/news/press-releases/jy0038....................................11, 66

U.S. Dep't of Treasury, *Treasury Sanctions 17 Individuals for Their Roles in the Killing of Jamal Khashoggi* (Nov. 15, 2018), https://bit.ly/3cu3siG.....................................66

U.S. Dep't of State, *Accountability for the Murder of Jamal Khashoggi* (Feb. 26, 2021), https://bit.ly/3g8f6Se .................................................................................120

**CITATION LEGEND**

| Abbreviation | Description |
|---|---|
| AC | The Amended Complaint filed by Dr. Saad on February 4, 2021 at Dkt. 66. |
| Alarfaj Decl. | The Declaration of Fahad Nasser Alarfaj in Support of Defendants' Motions to Dismiss dated April 1, 2021, filed at Dkt. 92-7 as Exhibit F to the Declaration of Andrew C. Shen (Dkt. 92-1). |
| Alasaker Br. | Bader Alasaker's Motion to Dismiss, filed on April 5, 2021 at Dkt. 94. |
| Choudhry Decl. | The Declaration of Sujit Choudhry in Support of Defendants' Motions to Dismiss dated December 7, 2020, filed at Dkt. 92-14 as Exhibit M to the Declaration of Andrew C. Shen (Dkt. 92-1). |
| Doe Decl. | The Declaration of "Expert Doe" dated June 10, 2021. On June 11, 2021, Dr. Saad filed an *ex parte* motion seeking to seal, to disclose on an attorneys' eyes only basis, and to treat as Highly Sensitive Documents identifying portions of the Declaration of Expert Doe to protect the life and safety of the witness. |
| Hipp Decl. | The Declaration of Jason P. Hipp dated June 10, 2021, filed herewith. |
| Larocque Decl. | The Declaration of François Larocque dated June 10, 2021, filed herewith as Exhibit A to the Declaration of Jason P. Hipp. |
| Mallat Report | The Report of Chibli W. Mallat dated June 9, 2021, filed herewith as Exhibit B to the Declaration of Jason P. Hipp. |
| MBS Br. | Defendant Mohammed bin Salman bin Abdulaziz Al Saud's Motion to Dismiss Amended Complaint filed on April 5, 2021 at Dkt. 92. |
| MiSK Br. | Prince Mohammed bin Salman Abdulaziz Foundation's Motion to Dismiss, filed on April 5, 2021 at Dkt. 95. |
| Mudd Decl. | The Declaration of John Philip Mudd dated June 9, 2021, filed herewith as Exhibit D to the Declaration of Jason P. Hipp. |
| Tiger Squad Br. | The Motion of Messrs. Saud Alqahtani, Ahmed Alassiri, Khalid Ibrahim Abdulaziz Algasem, Mishal Fahad Alsayed, Bandar Saeed Alhaqbani, Ibrahim Hamad Abdulrahman Alhomid, Saud Abdulaziz Alsaleh, Ahmed Abdullah Fahad Albawardi, and Bader Mueedh Saif Alqahtani to Dismiss the Complaint, filed on April 5, 2021 at Dkt. 93. |
| U.S. Agents' Br. | The Motion to Dismiss the Amended Complaint of Defendants Youssef Alrajhi, Mohammed Alhamed, Layla Abuljadayel, and Hani Fakri Hamed, filed on April 5, 2021 at Dkt. 96. |
| Van Schaack Decl. | The Declaration of Beth Van Schaack dated June 9, 2021, filed herewith as Exhibit C to the Declaration of Jason P. Hipp. |

Plaintiff Dr. Saad Aljabri ("Dr. Saad") submits this memorandum of law opposing the motions to dismiss the Amended Complaint filed by Defendants Mohammed bin Salman bin Abdulaziz Al Saud, Prince Mohammed bin Salman Abdulaziz Foundation d/b/a MiSK Foundation, Bader Alasaker, Saud Alqahtani, Ahmed Alassiri, Khalid Ibrahim Abdulaziz Algasem, Mishal Fahad Alsayed, Bandar Saeed Alhaqbani, Ibrahim Hamad Abdulrahman Alhomid, Saud Abdulaziz Alsaleh, Ahmed Abdullah Fahad Albawardi, Bader Mueedh Saif Alqahtani, Youssef Alrajhi, Mohammed Alhamed, Layla Abuljadayel, and Hani Fakri Hamed.

## INTRODUCTION

The world learned about Mohammed bin Salman's use of personal hit squads from his October 2018 murder and dismemberment of *Washington Post* journalist Jamal Khashoggi. That, however, was neither the first nor the last time bin Salman unleashed murder and torment on personal enemies. He has had many such enemies, like the Saudi prince living in France who criticized his purchase of a $500 million yacht as corrupt and the religious pilgrim who called him a "reckless" child. When the Saudi government refused to allow bin Salman to use official channels to carry out vendettas, he formed the Tiger Squad. With its help, bin Salman murdered the Saudi prince and kidnapped and sodomized the pilgrim. When the Khashoggi murder shined a light on these abuses, Saudi Arabia made clear they had nothing to do with any official act.

This case is about another attempted extrajudicial killing by bin Salman and the Tiger Squad, this one carried out through the United States and targeting U.S. interests. Plaintiff Dr. Saad Aljabri—the longtime head of Saudi intelligence during the peak of its counterterrorism partnership with the United States—has a relationship with U.S. intelligence that is closer and more trusted than virtually anyone's. Hundreds, if not thousands, of Americans are alive because Dr. Saad helped disrupt terrorist attacks on U.S. soil. Bin Salman, however, came to view Dr. Saad's U.S. relationships as a threat—because he regarded them as a barrier to winning the

U.S. intelligence community's support for himself (particularly given the damning information Dr. Saad knows about bin Salman). So Dr. Saad had to die. Via WhatsApp, bin Salman threatened to take "measures that would be harmful to you" and use "all available means" to do so.

Dr. Saad, however, is hard to kill. To carry out his threats, bin Salman had to hunt Dr. Saad down in the United States—where bin Salman believed Dr. Saad had fled, where Dr. Saad's family lived and owned property, and where valuable information about Dr. Saad's patterns of behavior and vulnerabilities resided. So even as bin Salman and the Tiger Squad were torturing and disappearing Dr. Saad's family and friends in Saudi Arabia, bin Salman deployed a network of operatives inside the United States to track Dr. Saad in Boston. And when bin Salman believed he had Dr. Saad cornered, he dispatched another Tiger Squad unit—13 days after the Khashoggi murder—to assassinate Dr. Saad, equipped with forensic tools and forensic experts who knew how to kill and cover their tracks. The attempt failed only because border agents smelled a rat.

Today, Dr. Saad lives in fear and anguish, and for good reason. Bin Salman has procured a *fatwa* to endorse Dr. Saad's murder and, in May 2020, again directed agents to kill Dr. Saad by traveling through the United States and entering Canada "by land." AC ¶¶ 354-55. The FBI has warned Dr. Saad and his family that bin Salman's U.S. manhunt presents a credible risk to their safety. *Id.* ¶ 320. And in Canada, law enforcement is investigating a "conspiracy to commit murder or other mayhem" and, in July 2020, deployed an Emergency Response Team outside Dr. Saad's home and directed him to not leave until further notice. *Id.* ¶¶ 20, 352, 363. In November 2020, Dr. Saad again was warned that his death "remain[s] one of . . . bin Salman's top priorities" and that he needs round-the-clock security. *Id.* ¶¶ 364-65. Meanwhile, in March 2020, 50 armed men—driving unmarked cars and dressed in civilian clothes—disappeared Dr. Saad's children Omar (age 22) and Sarah (age 21). *Id.* ¶¶ 12, 189. Dr. Saad has not seen them since and

does not know whether they are safe or whether they too have been tortured.  *Id.* ¶¶ 189, 191.  But to bin Salman, the anguish Dr. Saad suffers is the point.  Until Dr. Saad is dead, bin Salman will try to torment Dr. Saad into returning to Saudi Arabia, where a killing would be easier.

Congress has authorized remedies for exactly the type of outrageous conduct bin Salman and his henchmen undertook.  Because neither the law nor the facts favor bin Salman, he changes the subject and tries to smear Dr. Saad—a man recognized by the State Department as a "valued partner to the U.S. Government" who has worked to "keep[] our citizens safe," *id.* ¶¶ 22, 143—with allegations of corruption.  Such allegations are one of bin Salman's go-to moves against those he perceives as threats.  But regardless, bin Salman will have a chance to tell his story (which appears to be that he dispatched the Tiger Squad, complete with an expert in collecting "dead bodies and body parts from disasters" and carrying forensic tools, *id.* ¶ 116, to arrest Dr. Saad rather than murder him).  A motion to dismiss, however, is not that chance.  The Amended Complaint is not just vastly more detailed than the pleadings this Court typically receives.  It is unusually well-supported by *evidence*.  Public reporting and public statements by the U.S. government and former U.S. government officials corroborate many of Dr. Saad's allegations, and Dr. Saad has specific personal knowledge about facts supporting his claims.

Defendants' motion-to-dismiss arguments are numerous but meritless.

Defendants demand **official immunity** and dismissal on **act of state** grounds.  But tellingly, the State Department has not acted on bin Salman's request—lodged in October 2020—to file a suggestion of immunity.  For good reason.  Bin Salman is not entitled to *head-of-state immunity* because he is not the Kingdom's head of state.  And *official-act immunity* is no help to Defendants because they did not (and could not) undertake the core wrongs alleged here—dispatching a hit squad to find and kill Dr. Saad—as official acts in their official capacities.

Defendants argue that **personal jurisdiction** is absent because this case has nothing to do with the United States.  The truth, however, is the opposite.  Bin Salman deployed his personal foundation and a network of U.S. operatives to hunt down Dr. Saad *in the United States* and dispatched a hit squad to kill Dr. Saad by travelling *through the United States.*  Bin Salman did so, moreover, in order to *target the United States*:  He wanted to disrupt the relationships between Dr. Saad and U.S. intelligence, sought to deprive U.S. intelligence of the information Dr. Saad could provide, and aimed to affect the U.S. intelligence community's approach to bin Salman.  Defendants can fairly be required to answer for their U.S.-focused abuses in U.S. courts.

Defendants assert legal barriers under the **Torture Victim Protection Act, Alien Tort Statute**, and **common law**.  They say that Dr. Saad cannot pursue his claims until bin Salman kills him, or that Dr. Saad's claims do not sufficiently relate to the United States.  Congress, however, has authorized U.S. courts to provide redress for exactly the type of conscience-shocking conduct at issue here.  Nor is there anything to the argument that Dr. Saad's allegations are conclusory or implausible.  Not only are Dr. Saad's allegations unusually detailed, but bin Salman here followed the same pattern he has habitually used (with help from Defendants Alqahtani, Alassiri, and Alasaker) to target and kill personal enemies (including Khashoggi) and silence critics (including infiltrating Twitter using U.S. operatives recruited as students via his personal foundation).

With no sound arguments on the facts or law, bin Salman has undertaken a series of retaliatory actions against Dr. Saad after this lawsuit was filed—and now asks the Court to dismiss this suit *based on that very retaliation*.  In the wake of this lawsuit's filing, Dr. Saad's children, long held hostage in Saudi Arabia, were suddenly subjected to a pretextual criminal prosecution that the U.S. government has condemned; Dr. Saad's son-in-law (who already endured brutal torture as a proxy for Dr. Saad) was disappeared; many other family members and associates have

been disappeared and detained; and bin Salman sought out a foreign forum to obtain an *ex parte* asset freeze—an order viewed in the United States as a wholly unenforceable "nuclear weapon," *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 329 (1999)—premised on contrived allegations of "corruption" (none proven).  Now, remarkably, bin Salman invites this Court to bless his retaliatory measures by invoking them in support of dismissal.  Bin Salman, however, cannot so easily conscript U.S. courts to carry out his vendettas.  Indeed, this retaliation only underscores that bin Salman and his henchmen will not stop until Dr. Saad is dead.  Defendants' arguments are uniformly meritless.  They attempted a killing that was aimed at, and conducted through, the United States.  Their motions to dismiss should be denied.

## **BACKGROUND**

The attempted murder of Dr. Saad involves these key perpetrators:

- Mohammed **bin Salman** is the son of King Salman and has, since June 2017, served as Crown Prince.  AC ¶¶ 37-39.

- Bader **Alasaker**, Saud **Alqahtani**, and Ahmed **Alassiri** are three of bin Salman's senior henchmen.  **Alasaker**—known as bin Salman's "invisible hand"—is the head of his private office and the Executive Director of his private foundation, the Prince Mohammed bin Salman Abdulaziz Foundation (or "MiSK").  *Id*. ¶¶ 40-47.  He is a key participant in a criminal plot to locate and silence bin Salman's critics that is the subject of an ongoing criminal prosecution in federal court.  **Alqahtani** and **Alassiri** are two top aides whom bin Salman has frequently deployed to lead Tiger Squad operations against personal enemies (including Khashoggi).  *Id*. ¶¶ 48-67.

- The **U.S.-Based Covert Agent Defendants** (Youssef **Alrajhi**, Mohammed **Alhamed**, Layla **Abuljadayel**, and Hani **Hamed**) were U.S. residents recruited by Alasaker in the United States to carry out bin Salman's plot by hunting down Dr. Saad in the United States so that he could be killed.  *Id*. ¶¶ 76-110.

- The **Tiger Squad Defendants** (Khalid **Algasem**, Mishal **Alsayed**, Bandar **Alhaqbani**, Ibrahim **Alhomid**, Ahmed **Albawardi**, Bader **Alqahtani**, and Saud **Alsaleh**) were dispatched to kill Dr. Saad once he had been located.  *Id*. ¶¶ 116-22.

### A.   Bin Salman's Decision To Kill Dr. Saad Based On His U.S. Intelligence Ties.

Dr. Saad is a key U.S. intelligence partner.  *Id*. ¶¶ 31, 141-54.  After the 9/11 attacks, the United States needed to develop strategic partnerships with trusted allies who could learn things U.S. intelligence could not learn and go places U.S. intelligence could not go.  *Id*. ¶ 129.  No country was more important than Saudi Arabia, home to many 9/11 terrorists.  Mudd Decl. ¶ 12. And no partners were more important or trusted than former Crown Prince Mohammed bin Nayef and his close advisor, Dr. Saad.  AC ¶¶ 148-49; Mudd Decl. ¶¶ 13, 16-25.  Bin Nayef was "the darling of America's counterterrorism and intelligence services," AC ¶ 156 & n.139, and the U.S. intelligence community calls Dr. Saad a "hero."  *Id*. ¶ 142.  In 2010, Dr. Saad thwarted an al-Qaeda plot to bomb two U.S.-bound planes and avoided hundreds or thousands of deaths.  *Id.* ¶ 147. Former Acting Director of the CIA Michael Morell emphasized that Dr. Saad's "work saved Saudi and American lives."  *Id*. ¶ 143.  And the State Department described Dr. Saad as "a valued partner to the U.S. Government" who worked "around the clock" to "keep[] our citizens safe."  *Id.*

Bin Salman, however, came to view Dr. Saad's deep U.S. ties as a threat.  He knew his personal goals—including becoming Crown Prince and ultimately King—required U.S. support. *Id.* ¶¶ 155-61.  But he also knew he *lacked* support in the U.S. intelligence community.  *Id.* ¶¶ 158-59, 161.  That weakness threatened to become an Achilles' heel: Security cooperation through the U.S. intelligence community—which his chief rival bin Nayef led—is the sinew of the U.S.-Saudi partnership.  *Id.* ¶ 129, 148.  Meanwhile, Dr. Saad was strong where bin Salman was weak.  His U.S. intelligence relationships were deep, trusting, and battle-hardened.  *Id.* ¶¶ 7, 142-43, 149-52; Mudd Decl. ¶¶ 5-6, 13, 16-25.  And he possessed damning knowledge about bin Salman, including his personal misconduct, corrupt financial dealings, and creation of a personal hit squad.  AC ¶¶ 128, 145, 154.  As former CIA Director John Brennan observed, "bin Salman is very concerned about what Saad may do in terms of exposing some of the activities that are going on inside of

Saudi Arabia."[2]

Bin Salman thus viewed Dr. Saad as an "existential threat," *id.* ¶ 154, which he has attempted to snuff out.  In July and August 2015, Dr. Saad had two official meetings with then-CIA Director Brennan where he expressed concerns that bin Salman's actions, including his communications with Vladimir Putin, could threaten the U.S.-Saudi partnership.  *Id.* ¶¶ 151-52. In September, bin Salman effected Dr. Saad's ouster from his government positions.  *Id.* ¶ 153.

In 2017, bin Salman's desire to neutralize Dr. Saad grew.  He was preparing to oust bin Nayef and seize the position of Crown Prince.  *Id.* ¶¶ 155-57.  And key to that campaign was his effort to cultivate personal White House support.  *Id.*  On May 17, 2017, however, *Politico* reported that the bin Nayef-led Ministry of the Interior had contracted with a D.C. lobbying firm with Trump administration ties.  *Id.* ¶ 163.  Bin Salman perceived that contract as a direct challenge.  At bin Salman's behest, Alqahtani detained and interrogated the contract's signatory—and asked, in particular, about Dr. Saad, whom bin Salman associated with the contract.  *Id.* ¶ 165.  Dr. Saad recognized that bin Salman would likely tie him to the contract and feared for his life.  *Id.* ¶ 164. So, the same day as the *Politico* article, Dr. Saad fled to Turkey.  *Id.*  A senior Saudi intelligence official later told Dr. Saad that bin Salman had been "very eager" to get Dr. Saad.  *Id.* ¶ 165.

Bin Salman launched an increasingly brutal effort to get Dr. Saad.  He began by sending personal WhatsApp messages to Dr. Saad.  *Id.* ¶ 170.  To buy time, Dr. Saad said he intended to return to Saudi Arabia on June 24, 2017.  Bin Salman responded that "it would be very convenient" if Dr. Saad "could come a few days earlier."  *Id.*  The reason soon became clear.  On June 20, bin Salman ousted bin Nayef, seized his position as Crown Prince, and placed bin Nayef under house

---

[2] Jackie Northam, *'To Protect Myself and My Family': Saudi Critics Abroad Fear Long Reach of the Crown*, NPR (Oct. 8, 2020), https://n.pr/3g5ry5q.

arrest.  *Id.* ¶ 171.  *Compare* MBS Br. 7 (assertion that calling events a "coup" is "without any basis"), *with* AC ¶ 155 n.138 (Reuters describing "Palace Coup").  Bin Nayef's associates were disappeared, detained, or worse, under the pretext of fighting "corruption." AC ¶¶ 54, 165, 269.[3]

Meanwhile, bin Salman dispatched, via his personal WhatsApp account, escalating threats. *Id.* ¶¶ 173-78.  He demanded Dr. Saad return within "24 hours!"—and shortly after, Alasaker repeatedly contacted Dr. Saad to coordinate a private jet.  *Id.* ¶¶ 175-77.  Dr. Saad resisted, knowing that bin Salman had repeatedly used this same method to render his targets back to Saudi Arabia. *Id.*  Bin Salman, however, warned that he would use "all available means" to get Dr. Saad, including "tak[ing] legal measures, as well as other measures that would be harmful to you." *Id.* ¶ 178.  "[W]e shall certainly reach you," bin Salman promised.  *Id.*

Bin Salman and his henchmen also targeted Dr. Saad's family.  He prohibited Dr. Saad's children—Sarah (then 17) and Omar (then 18)—from leaving the country to study in the United States.  *Id.* ¶¶ 182-85.  He forcibly rendered Dr. Saad's son-in-law, Salem Almuzaini, to Saudi Arabia, interrogated him about Dr. Saad, and directed the Tiger Squad to physically torture him— telling Salem he was tortured as a proxy for Dr. Saad.  *Id.* ¶¶ 197-202.  Bin Salman tried to lure Dr. Saad's daughter Hissah to the Saudi consulate in Istanbul (where, weeks later, Khashoggi was killed and dismembered).  *Id.* ¶ 186; *compare* MBS Br. 10 ("no basis" to believe Hissah would have been harmed), *with* AC ¶ 205 (bin Salman disappeared Hissah's husband two weeks after this suit was filed).  Bin Salman also cut off the scholarship of Dr. Saad's son, trying to disrupt his U.S. legal status.  AC ¶¶ 218-22.

Bin Salman left no doubt that Dr. Saad was his target.  Via WhatsApp, he professed that "I

---

[3] *See* Bill Bostock, *MBS is Stamping Out the Final Threat to His Rule, Bringing an End to His 3-Year Coup Marked by Power Grabs, Forced Disappearances, and Assassinations*, Bus. Insider (Aug. 12, 2020), https://bit.ly/2RuZuPh.

want to resolve this problem of your son and daughter"—but only after Dr. Saad returned.  *Id.* ¶ 184.  Bin Salman even offered to "exchange" Sarah and Omar for Dr. Saad's two older children (so long as he kept hold of *some* children as leverage).  Doe Decl. ¶ 14.  In March 2020, one of bin Salman's henchmen admitted to Sarah and Omar that they would be allowed to leave once Dr. Saad returned and pressured them to persuade their father.  AC ¶ 188.  When that failed, bin Salman on March 16, 2020 sent 50 armed men to raid the Aljabri residence at dawn, drag Omar and Sarah from their beds, and disappear them.  *Id.* ¶¶ 187-91.

Meanwhile, bin Salman tried to enlist the law to trap Dr. Saad.  In September 2017, he caused the filing of an INTERPOL red notice—which would have restricted Dr. Saad's travel—based on allegations of "corruption."  *Id.* ¶¶ 256-57.  But INTERPOL's governing body concluded that bin Salman's "direct involvement" and the "unjustified restrictive measures on [Dr. Saad's] family members suggest the case is politically motivated rather than strictly juridical."  *Id.* ¶ 259.

INTERPOL cancelled the notice.  With the "legal measures" thwarted, bin Salman turned to the second half of his threat—to take "other measures . . . harmful to you."  *Id.* ¶ 178.

### B.   Bin Salman's Creation Of A Personal Hit Squad.

Dr. Saad is not the first person to find himself in bin Salman's crosshairs.  To the contrary, bin Salman created a personal hit squad—the Tiger Squad—to carry out his personal vendettas. Dr. Saad knows this to be true because he was *the person* who "refused . . . bin Salman's request to deploy" Saudi intelligence "in an extrajudicial operation of retribution."  *Id.* ¶ 274.  In September 2015, a Saudi prince living in France, Saud bin Saif al Nasr, posted tweets about bin Salman's corruption.  *Id.*  Bin Salman asked Dr. Saad to deploy Saudi intelligence to kidnap the prince.  *Id.* But Dr. Saad declined—and two other government agencies also refused.  *Id.* ¶¶ 275, 278.

Denied access to official government channels, bin Salman created a team of loyal operatives answerable only to him, which became known as the "Tiger Squad."  *Id.* ¶ 276.  Its first

mission was to kidnap Prince Saud via private jet and return him to Saudi Arabia, where he was killed. *Id.* ¶¶ 276-77. Indeed, bin Salman and Alqahtani bragged to Dr. Saad that they were able to do so without government support. *Id.*

That was just the start. The Tiger Squad carried out extrajudicial operations in France, Norway, Germany, Turkey, and Canada (and Saudi Arabia). *Id.* ¶ 284. They followed a familiar pattern: They targeted individuals who threatened bin Salman's personal interests; tried to lure them to Saudi Arabia; disappeared and tortured family; and ultimately kidnapped or killed the targets. *Id.* ¶¶ 287-92. They did not hide whom they served. They told one dissident that "[w]e have come to you with a message from Mohammed bin Salman." *Id.* ¶ 293. Alqahtani even participated personally—posing as a pilot to forcibly render a target to Saudi Arabia. *Id.* ¶ 294.

The world learned about the Tiger Squad when bin Salman dispatched the team to assassinate *Washington Post* journalist Jamal Khashoggi. Like with Dr. Saad, bin Salman perceived Khashoggi as a threat due to his U.S. connections (though Khashoggi's connections to D.C. circles and think tanks were far less threatening than Dr. Saad's U.S. intelligence partnerships and insider knowledge). *Id.* ¶ 297. Like with Dr. Saad, bin Salman worked with Alqahtani and Alasaker to lure Khashoggi back to Saudi Arabia, threatened to use INTERPOL against him, and prohibited his children from traveling. *Id.* ¶¶ 291, 299, 303.

Unlike Dr. Saad, however, Khashoggi succumbed to pressure to return to a place the Tiger Squad could easily reach—the Saudi consulate in Istanbul. *Id.* ¶ 290. He never left. *Id.* A Tiger Squad detachment had travelled to Istanbul. *Id.* ¶ 302. And when Khashoggi entered the consulate, they killed and dismembered him. *Id.* ¶ 304. A forensic expert, Dr. Tubaigy, turned on music to drown out the sounds of his work—but recordings captured sounds of a bone saw. *Id.* While they worked, the team placed four calls to Alasaker. *Id.* ¶ 306. Many of those who tortured Dr. Saad's

son-in-law also helped kill Khashoggi.  *Id.* ¶ 301.

These facts are not in doubt.  The U.S. Office of the Director of National Intelligence ("ODNI") concluded "with high confidence," that bin Salman approved the killing, based partly on his "support for using violent measures to silence dissidents abroad": The Tiger Squad, ODNI explained, "answers only to" bin Salman and "directly participated in earlier . . . operations . . . at [his] direction."[4]  The United States also found that Alqahtani and Alassiri organized the killing.[5]

It is also clear that the Tiger Squad's acts are not government acts.  The Saudi government never claimed it carried out or approved the Tiger Squad's acts.  Indeed, the Tiger Squad "became a top surveillance target of the Saudi government," *id.* ¶ 279, and Saudi intelligence "tap[ped] into . . . bin Salman's personal mobile," *id.* ¶ 281.  Even when bin Salman became Crown Prince, the Saudi government's position remained unchanged.  After Khashoggi's October 2018 killing, it stated that the members who participated "acted outside the scope of their authority" and prosecuted some (albeit without accountability for the leaders), and it recently reiterated that the killing was "an abhorrent crime and a flagrant violation of the Kingdom's laws."[6]  *Id.* ¶ 280.

Khashoggi's murder, and the urgent U.S. investigation it immediately prompted, only increased bin Salman's desire to kill Dr. Saad: He knew, in October 2018, that U.S. intelligence

---

[4] ODNI, *Assessing the Saudi Government's Role in the Killing of Jamal Khashoggi* (Feb. 11, 2021), https://bit.ly/3g5IW9X.

[5] AC ¶ 315; *see* U.S. Dep't of Treasury, *Treasury Sanctions the Saudi Rapid Intervention Force and Former Deputy Head of Saudi Arabia's General Intelligence Presidency for Roles in the Murder of Journalist Jamal Khashoggi* (Feb. 26, 2021), https://bit.ly/3wXFeoy.

[6] *Khashoggi Death: Saudi Arabia Says Journalist was Murdered*, BBC NEWS (Oct. 22, 2018), https://bbc.in/357rUCh (statement from then-Minister of Foreign Affairs Adel Aljubeir); Marwa Rashad & Raya Jalabi, *Saudi Arabia Jails Eight Over Khashoggi Murder*, REUTERS (Sept 7, 2020), https://bit.ly/3cu0ESG; *The Government of the Kingdom of Saudi Arabia Completely Rejects the Assessment in the Report Submitted to US' Congress Regarding Murder of Saudi Citizen Jamal Khashoggi*, SAUDI PRESS AGENCY (Feb. 26, 2021), https://bit.ly/3cvWGbV.

wanted the information Dr. Saad knew.  *Id.* ¶ 314.  And bin Salman blamed Dr. Saad for the conclusion that U.S intelligence ultimately reached.  *Id.*[7]

### C.   The Hunt For Dr. Saad In The United States.

Thirteen days after the Khashoggi murder, bin Salman would deploy another team to kill Dr. Saad.  But first, they had to find him.  And to do so, bin Salman had to hunt Dr. Saad in the United States.  Dr. Saad had told bin Salman that he had left Turkey for Boston, where his family owned apartments.  *Id.* ¶¶ 172, 225.  Bin Salman also believed that, given Dr. Saad's deep U.S. connections—including four family members residing in Boston—valuable information about Dr. Saad's habits and vulnerabilities resided in the United States.  *Id.* ¶ 36.  So even as Alqahtani and the Tiger Squad were torturing Salem Almuzaini in Saudi Arabia seeking Dr. Saad's location, bin Salman and Alasaker activated a network of U.S.-based agents—the U.S.-Based Covert Agent Defendants—to locate and gather information about Dr. Saad.  *Id.* ¶¶ 225-50.

Bin Salman and Alasaker had created their U.S. network by leveraging bin Salman's foundation, MiSK.  MiSK is a "non-government organization" bin Salman established in his personal capacity and funded with $1 billion.  *Id.* ¶¶ 68-70, 72.  In part, MiSK is a public-relations exercise: Bin Salman can deploy MiSK's assets to boost his public standing and deepen his ties to elite U.S. business and government circles, such as by hosting events like "MiSK Talks" and "Leadership Bootcamp" events for Saudi students.  *Id.* ¶¶ 69-73; *id.* ¶ 131(a) & n.116; *id.* ¶ 134 & n.121; *id.* ¶¶ 135-37.  Bin Salman, however, also relies on MiSK to recruit and cultivate U.S. operatives who covertly further his objectives in the United States.  *Id.* ¶¶ 39, 41-42; *id.* ¶¶ 73-75.

---

[7] *Compare* AC ¶ 128 (bin Salman targeted Dr. Saad in part based on his knowledge that bin Salman created the Tiger Squad and carried out "extrajudicial killings"), *with* ODNI, *supra* n.4 (concluding that the Tiger Squad "directly participated in earlier dissident suppression operations in the Kingdom and abroad at [bin Salman's] direction"); *see also* AC ¶¶ 274-75, 313-14.

To ensure MiSK would carry out these goals, bin Salman installed Alasaker—his "invisible hand"—as Executive Director. *Id.* ¶ 40. As MiSK's head, Alasaker oversaw the many events MiSK used to boost bin Salman's U.S. profile. *Id.* ¶¶ 40-45, 69-75. So, too, Alasaker carried out MiSK's more clandestine functions of convening and deploying U.S. operatives (including via many of the same events). *Id.* ¶¶ 71, 74-75, 79-87, 225-46. To do so, Alasaker travelled to the United States at least eight times between 2014 and 2018. *Id.* ¶¶ 41-42. One set of operatives that Alasaker recruited and deployed on the trips is already the subject of a federal prosecution. An indictment and U.S. government filings reveal that, while Alasaker was in the United States (including in the District), he used MiSK's resources to "secretly recruit[]" a covert agent within Twitter and requested that the agent delete accounts posting "critical or embarrassing information" about bin Salman and "locate the individuals behind the accounts."[8]

MiSK was key to the efforts to recruit and deploy a network of U.S.-based Saudi students. Public reporting recounts the tight controls customarily imposed on such students. Those who step out of line face "death threats, intimidation, retraction of scholarships, and attempts to lure them back to the country"; likewise, Saudi student "clubs" each have "spies" who report on "everything that happen[s]" and "everything that [is] said."[9] But if those are the sticks, MiSK provides the carrots: The covert agents recruited and cultivated by Alasaker receive invitations to lavish MiSK events, obtain prominent roles, and enjoy freedoms not typically afforded to Saudi students. *Id.* ¶ 227. MiSK's U.S. activities targeting Dr. Saad and others, often centered in the District, have

---

[8] AC ¶ 45; U.S. Opp. to Defs.' Mot. to Suppress at 2, 9, *United States v. Abouammo*, No. 3:19-cr-621 (N.D. Cal. May 19, 2021), ECF No. 133; Superseding Indictment ¶ 26(n)-(o), *Abouammo*, No. 3:19-cr-621 (N.D. Cal. July 28, 2020), ECF No. 53.

[9] Layla Quran, *Saudi Students in U.S. Say Their Government Watches Their Every Move*, PBS NEWS HOUR (Mar. 19, 2019), https://to.pbs.org/3v62JKY (quoted at AC ¶ 230).

sparked an FBI investigation and a Saudi government "review."  *Id.* ¶¶ 109, 245.[10]

Defendants Alhamed, Alrajhi, and Abuljadayel were three agents bin Salman and Alasaker cultivated and deployed through MiSK.  They fit the profile to a tee: They were deeply involved with MiSK (including receiving paid positions and attending "leadership preparation" programs), rubbed shoulders with Alasaker and the head of the Saudi Arabian Cultural Mission ("SACM," with which MiSK collaborated); enjoyed unusual freedoms and gave media interviews; publicly declared allegiance to bin Salman (even in the wake of the Khashoggi murder); and were rewarded with key positions in organizations bin Salman controls.  *Id.* ¶¶ 74, 78, 86, 88-108, 312; *see, e.g.*, *id.* ¶ 105-06 (Abuljadayel, a dental student, was "Head of International Communications").

Alasaker deployed Alhamed, Alrajhi, and Abuljadayel to hunt Dr. Saad in Boston.  *Id.* ¶ 225.  Working together, this trio questioned different individuals about the location and contact information of Dr. Saad's wife, in a thinly concealed effort to find Dr. Saad.  *Id.* ¶¶ 239-41, 243-44.  Alrajhi also obtained the location and contact information of Dr. Saad's U.S. resident son, Khalid, and interrogated others about Khalid's U.S. visa and citizenship status.  *Id.* ¶¶ 241-43.  Alrajhi then traveled from Washington, D.C. to Boston to interrogate Khalid at a face-to-face meeting at the Mandarin Oriental, where the family's apartment was located.  *Id.*

The trio's coordinated U.S. interrogations yielded valuable information.  They learned that Dr. Saad's wife was not in Saudi Arabia; that Dr. Saad's son Khalid was a U.S. permanent resident but not a citizen; that Khalid's family resided in London; and most important, that the Aljabri family had a residence at the Mandarin Oriental (which Alrajhi learned when he noticed Khalid entering the building using an entrance reserved for residents).  *Id.* ¶¶ 238-45.  Then, this trio

---

[10] Andrew England, *Saudi Arabia's Leadership Puts Crown Prince's Flagship Charity Under Review*, FIN. TIMES (Sept. 8, 2020), https://on.ft.com/3zh20tu.

shared their findings with others to act on what they found.  *Id.*

One of those individuals was Defendant Hani Hamed, who sought to physically access Dr. Saad at the Mandarin Oriental.  *Id.* ¶ 245.  He could have learned about this residence—which public information did not disclose—only from Alrajhi's efforts.  *Id.* ¶¶ 242, 245.  And armed with this information, Hamed showed up at the front desk and said he was there for Dr. Saad.  *Id.*  The concierge connected Hamed with Khalid, who disclosed that Dr. Saad was *not* at the hotel.  *Id.*  Security observed Hamed surveilling the hotel on many occasions, and the FBI took an interest in him.  *Id.* ¶¶ 109, 245.  Meanwhile, Defendant Bijad Alharbi interrogated another son of Dr. Saad in Boston, where he asked intrusive and unusual questions about Dr. Saad and collected information about his appointments, children, and travel.  *Id.* ¶ 250.  So concerned was the FBI that agents warned Khalid of credible risks to the safety of Dr. Saad and his family.  *Id.* ¶ 320.

**D.   Bin Salman Deploys The Tiger Squad To Extrajudicially Kill Dr. Saad.**

The information acquired by the U.S.-Based Covert Agent Defendants was key to bin Salman's plot to target and kill Dr. Saad.  Because Dr. Saad had told bin Salman he was headed to Boston, bin Salman focused elsewhere only after ruling Boston out.  *Id.* ¶¶ 172, 245.  Indeed, Defendant Alharbi first travelled to Canada just *seven days* after Hamed's unsuccessful attempt to access Dr. Saad in Boston.  *Id.* ¶ 251.  The hunt also yielded valuable "pattern of life" information about the habits, movements, and location of Dr. Saad and his family.  *Id.* ¶¶ 236, 238, 240, 242-45, 250.  So, when bin Salman's henchmen continued the search, they were well-armed.  On four trips from December 2017 through July 2018, Alharbi traveled to Canada to scout for additional details.  *Id.* ¶¶ 250-51, 255.  He gathered further intelligence about Dr. Saad—including identifying places he regularly visited—and suspiciously pursued his home address.  *Id.* ¶¶ 251-55.

On October 15, 2018, just 13 days after one Tiger Squad team murdered Khashoggi (and while U.S. intelligence was investigating that crime), another detachment—including Defendants

Khalid Algasem, Mishal Alsayed, Ibrahim Alhomid, Bander Alhaqbani, Ahmed Albawardi, and Bader Alqahtani—traveled to kill Dr. Saad.  *Id.* ¶¶ 323, 334.  Other team members (including Defendant Saud Alsaleh) supported the operation.  *Id.* ¶ 118.  The team, mirroring the design of the Khashoggi detachment, was designed to carry out and cover up a murder: Algasem and Alsayed are forensic DNA experts who collect crime-scene evidence.  *Id.* ¶¶ 338-39.  Alsayed is an expert in working with "dead bodies and body parts from disasters" and has taught alongside Dr. Tubaigy, who dismembered Khashoggi.  *Id.* ¶ 339.  Others are experts in criminal investigations and intelligence, likely included because the team intended to interrogate Dr. Saad (including about what he had told U.S. intelligence) before killing him.  *Id.* ¶¶ 337, 340-42; *see id*. ¶¶ 54, 200-03, 246, 301 (Tiger Squad interrogated Dr. Saad's son-in-law and others before harming them).

As with the Khashoggi murder, the team carried forensic tools.  *Id.* ¶ 347.  As with the Khashoggi murder, Alqahtani and Alassiri directed the operation at bin Salman's behest.  *Id.* ¶¶ 329, 331, 334, 337-38, 343.  As with the Khashoggi murder, the team did not purport to travel for an official purpose and used tourist visas.[11]  And as with the Khashoggi murder, the team arrived in two groups.  *Id.* ¶¶ 302, 334, 344, 348-49.  At least five members arrived on Air Canada Flight 839, which travelled from Germany through the United States and arrived at Ottawa International Airport—a smaller airport with less sophisticated security.  *Id.* ¶ 334; Hipp Decl. ¶¶ 3-4.

Border agents, however, thwarted the plot.  The team tried to avert detection by entering through separate kiosks, AC ¶ 344, and when questioned, claimed they did not know each other, *id.* ¶ 346.  But the agents found photos of them together and discovered forensic tools in their

---

[11] AC ¶ 331; *cf.* Julian Borger et al., *Trump Announces Jamal Khashoggi Investigation But Says He Won't Halt Saudi Arms Sales*, GUARDIAN (Oct. 11, 2020) (claim by Saudi-owned network Al Arabiya that the squad sent to kill Khashoggi were "tourists.").

luggage (though the team kept up the lie that they were tourists). *Id.* ¶ 346-47. The agents did not allow the team to enter (except Alhomid, who had a diplomatic passport). *Id.* ¶ 348.

Law enforcement had no doubt about the Tiger Squad's intent. Canada opened a criminal investigation into a "conspiracy to commit murder or other mayhem" by foreign actors. *Id.* ¶ 352. In response to this lawsuit, Canada's Minister for Public Safety said that the government is "aware of incidents in which foreign actors have attempted to monitor, intimidate or threaten Canadians and those living in Canada" and denounced foreign threats to "the safety of our citizens and residents." *Id.* ¶ 350. The attempts to kill Dr. Saad have also been the subject of law enforcement activity in the United States, Germany, and France. *Id.* ¶ 352.

**E. Bin Salman's Ongoing Efforts To Kill Dr. Saad Through The United States.**

Bin Salman has not stopped trying to kill Dr. Saad. *Id.* ¶ 353. During a meeting in Neom, Saudi Arabia, bin Salman disclosed to advisors that he had a *fatwa* endorsing the murder. *Id.* ¶ 354. They discussed a plan to send men "by land" on U.S. soil to kill Dr. Saad. *Id.* ¶ 355. The next months witnessed at least four attempts to collect information about Dr. Saad's location, movements, and security, including a Saudi national trying to obtain private contact information for Dr. Saad's son and efforts to hack his mobile phone. *Id.* ¶¶ 357-61. In July 2020, Canada warned Dr. Saad of a credible and imminent threat to his life and stationed an Emergency Response Team—a special unit prepared for "high-risk situations"—outside his home. *Id.* ¶ 363. In November 2020, Dr. Saad learned of new credible threats, even as law enforcement reported that threats to his life remained "high" and recommended 24/7 physical security. *Id.* ¶ 364.

Defendants also deployed the internet as a tool for murder. Alqahtani, at bin Salman's direction, targeted Dr. Saad with smear campaigns. *Id.* ¶¶ 261-66. On the eve of the 2020 U.S. presidential election, Alqahtani coordinated a Twitter campaign suggesting there was explosive information about Dr. Saad in former Secretary of State Hillary Clinton's emails. *Id.* ¶ 131(s). In

January 2021, bin Salman and Alqahtani launched a coordinated Twitter campaign amplifying tweets threatening to behead Dr. Saad with a sword. *Id.* ¶ 265. These threats, again, parallel those Khashoggi faced just before his murder. *Id.* ¶ 266.

Bin Salman's plot has aimed not just at killing Dr. Saad but at tormenting him, in hopes Dr. Saad will succumb and return to Saudi Arabia so he could be killed. Just as bin Salman intended, Dr. Saad lives in fear and anguish, due to the repeated attempts on his life, the 24/7 security stationed at his house, and the kidnapping and torture of his children, family, and friends. *Id.* ¶¶ 189-217, 363-365. He cannot work, sleep, or move freely. *Id.* ¶ 365. And he suffers from severe headaches and fatigue and requires medication for blood pressure spikes so dramatic they could kill him. *Id.* ¶¶ 194, 365. On June 4, 2021, he was rushed to the emergency room due to the physical effects of this torment.

### F.   Defendants' Attempts To Change The Subject.

Defendants' motions to dismiss tell a very different story. In their telling, bin Salman dispatched the Tiger Squad to Canada—13 days after it murdered Khashoggi, carrying forensic tools and accompanied by an expert in "dead bodies," *id.* ¶ 339—not to *kill* Dr. Saad but because they wanted "to extradite him," MBS Br. 18. In support, Defendants attach a slew of documents to their motions. Most are not admissible—and none entitles Defendants to dismissal.[12]

For example, bin Salman asks the Court to take judicial notice of several preliminary orders of an Ontario court issued after bin Salman–controlled entities sought *ex parte* relief against

---

[12] Bin Salman incorrectly says that "Saudi Arabia has charged Aljabri with corruption." MBS Br. 6. While bin Salman has certainly lobbed *allegations* of corruption, he has not identified any *charges* filed in Saudi Arabia—and Dr. Saad certainly does not "admit" such charges have been filed. *Id.* Indeed, even though bin Salman relies heavily on his authority as the Chairman of the Supreme Anti-Corruption Committee, he does not claim this authority encompassed extrajudicially killing Dr. Saad—and this authority ended in February 2019. *Id.* at 29.

Dr. Saad and his family in retaliation for this lawsuit.  MBS Br. 1-2.  These orders, he suggests,

show his allegations of "corruption" are *true*.  But even if these orders—issued at "the beginning

of a very complex case" that has reached no merits conclusions, Dkt. 92-2 at 4—were relevant,

they are not noticeable for their truth.[13]  Meanwhile, bin Salman does not mention the litigation an

entity he controls has brought in Massachusetts, where he has sought (without success) to enforce

the Canadian orders.  Bin Salman's papers here have denigrated Dr. Saad's descriptions of his U.S.

intelligence relationships as "self-aggrandizing."  MBS Br. 20.  In Massachusetts, however, the

United States has taken the unusual step of filing a Statement of Interest based on the risk that bin

Salman's litigation against Dr. Saad may implicate the "foreign relations and national security of

the United States."[14]  Acknowledging that the "United States has had extensive dealings with the

Kingdom of Saudi Arabia over many years, working closely with Saudi authorities on a wide range

of shared interests, including counterterrorism and regional security," the United States is now

"carefully assessing what . . .  actions are necessary to protect overall U.S. Government interests"

in the wake of bin Salman's lawsuits.[15]

Even worse is bin Salman's request that this Court consider a document dated April 1, 2021

that purports to be a record from the Saudi Public Prosecution Office showing that Saudi Arabia

convicted Dr. Saad's children, Omar and Sarah, on November 4, 2020.  Dkt. 92-13.  He submits

---

[13] *Hurd v. Dist.of Columbia Gov't*, 864 F.3d 671, 687 (D.C. Cir. 2017) ("[A] movant may not . . . support a 12(b)(6) motion by pointing to the content of evidence in other cases.").

[14] Statement of Interest of the United States at 3, *Sakab Saudi Holding Co. v. Al Jabri*, No. 21-cv-10529 (D. Mass. May 26, 2021), ECF No. 33.

[15] *Id.*; *see* David Ignatius, *MBS's Lawsuit Against a Saudi Spy Threatens to Spill Secrets. The U.S. Should Intervene*, WASH. POST (May 20, 2021), https://wapo.st/2QC0II6.  Tellingly, while bin Salman has sought (without success) the aid of U.S. courts in *enforcing* the *ex parte* relief he received in Canada, an entity he controls has said it has "no intention and no desire to litigate its claims on the merits" in U.S. courts.  Mot. To Remand at 4, *Sakab*, No. 1:21-cv-10529 (D. Mass. Apr. 9, 2021), ECF No. 18.

this document to suggest that his attempts to lure Dr. Saad back to Saudi Arabia by holding Omar and Sarah hostage constitute legitimate law-enforcement activity. Even on its face, this document does not show that: The supposed prosecution occurred long after bin Salman targeted Sarah and Omar in 2017 (when they were 17 and 18 years old), and long after bin Salman detained and disappeared them in March 2020 (though only five weeks after this suit was filed). AC ¶¶ 182-90. But regardless, bin Salman's document is not subject to judicial notice. It is dated *four days* before his answering deadline in this suit, is not consistent with documents normally issued by Saudi authorities, and is not publicly available in Saudi Arabia (where court records about Sarah and Omar have vanished). Doe Decl. ¶ 5, 7, 12. There is nothing judicially noticeable about this document,[16] which bin Salman appears to have procured for this litigation. It only underscores the lengths to which bin Salman will go to slap a veneer of legitimacy on what Senators Leahy, Rubio, Kaine, and Van Hollen have called a "hostage-taking" targeted at Dr. Saad. AC ¶ 181.

Nor are Omar and Sarah the only victims of bin Salman's retaliation for the accountability Dr. Saad has sought in this Court. After Dr. Saad filed this suit, bin Salman's henchmen kidnapped or detained at least nine family members, friends, and associates (including Dr. Saad's son-in-law, whom the Tiger Squad already tortured in 2017 and 2018, who was disappeared just 18 days after this suit's filing). *Id.* ¶¶ 206, 197-203, 212-17.

## STANDARD OF REVIEW

Under Rule 12(b)(1), the court "construes the [complaint's] allegations . . . in the plaintiff's

---

[16] *Haywood v. Massage Envy Franchising, LLC*, No. 3:16-cv-01087, 2017 WL 2546568, at *3 (S.D. Ill. June 12, 2017) (declining to take notice of documents not "currently publically available"), *aff'd*, 887 F.3d 329 (7th Cir. 2018); *see Ellis v. Jackson*, 319 F. Supp. 3d 23, 35 (D.D.C. 2018). Bin Salman also improperly seeks notice of a news article on the ground that the *original* complaint cited it. MBS Br. 17 n.2. An "amended complaint supersedes the [original] and renders it of no legal effect." *CopyWatch, Inc. v. Am. Nat'l Red Cross*, 299 F. Supp. 2d 189, 197 (D.D.C. 2018).

favor" to determine whether they establish subject-matter jurisdiction.  *Devorah v. Royal Bank of Canada*, 115 F. Supp. 3d 35, 38 (D.D.C. 2015).  While the court may consider extra-pleading materials, "factual discrepancies are resolved in favor of the plaintiff."  *Id.*  Under Rule 12(b)(2), plaintiffs need only "make a prima facie showing" of personal jurisdiction, and "may rest . . . on their pleadings, bolstered by . . . affidavits and other written materials."  *IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 107-08 (D.D.C. 2018).  Where no "evidentiary hearing" has been held, the court, as with "other motions under Rule 12(b), . . . take[s] as true the [complaint's] allegations . . . and resolve[s] all factual disputes in [the nonmoving party's] favor."  *Id.* at 108 & n.2.

Under Rule 12(b)(6), a complaint need only plead "sufficient factual matter, accepted as true, to 'state a claim . . . that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Rule 8 "does not require 'detailed factual allegations'" but simply "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555).  The "complaint is construed liberally in plaintiff's favor, and the Court should grant plaintiff 'the benefit of all inferences.'"  *Hernandez v. Dist. of Columbia*, 845 F. Supp. 2d 112, 115 (D.D.C. 2012).[17]

---

[17] Defendants repeatedly suggest, and the U.S.-Based Covert Agent Defendants expressly argue (at 8-9), that the Court should disregard any allegation made on "information and belief."  That is not the law.  Such allegations "can be sufficient to survive a motion to dismiss."  *Bancroft Glob. Dev. v. United States*, 330 F. Supp. 3d 82, 102 (D.D.C. 2018).  "*Twombly* . . . does not prevent a plaintiff from pleading . . . upon information and belief where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible."  *Evangelou v. Dist. of Columbia*, 901 F. Supp. 2d 159, 170 (D.D.C. 2012).  Here, Dr. Saad has pled facts yielding a plausible inference of culpability—and he is entitled to include allegations made on information and belief given that some details at the core of this case are "within [Defendants'] possession and control."  *Id.*

**ARGUMENT**

I.   **Dr. Saad's Claims Are Not Barred By Immunity Or The Act Of State Doctrine, And Saudi Arabia Is Not A Necessary And Indispensable Party.**

Bin Salman has implored the U.S. government to suggest immunity.  MBS Br. 27.  His requests have met silence.  For good reason: Neither bin Salman nor the other Defendants are entitled to immunity.  First, bin Salman cannot claim head-of-state immunity because he is not the Kingdom's *head of state*.  The King is.  Such immunity extends only to a few other officials, and bin Salman is not one.  Second, the D.C. Circuit has held that the Torture Victims Protection Act ("TVPA") abrogates official-act immunity.  And as to all Dr. Saad's claims, immunity does not apply because the core wrong he alleges—dispatching a team to find and kill him—is not an act Defendants could or did carry out in their official capacities.[18]

A.   **Head-of-State Immunity Does Not Apply.**

1.   **Bin Salman Is Not Entitled To Head-of-State Immunity.**

This is an easy head-of-state immunity case: bin Salman is not the head of state or one of the few other officials who receive such immunity.  Such immunity is distinctively powerful, applying "regardless of the substance of the claim."  *Lewis v. Mutond*, 918 F.3d 142, 145 (D.C. Cir. 2019).  But for just that reason, it is narrow.  It "is enjoyed by heads of state, heads of

---

[18] A defendant invoking immunity may take two approaches.  First, he may "challenge[] the legal sufficiency of the plaintiff's allegations," in which case "the court should accept the plaintiff's factual allegations as true and determine whether such facts" trigger immunity.  *Collett v. Socialist Peoples' Libyan Arab Jamahiriya*, 362 F. Supp. 2d 230, 236 (D.D.C. 2005).  Second, a defendant may "challenge[] the factual basis of the court's jurisdiction"—but then, the court "must give the plaintiff 'ample opportunity'" for discovery.  *Id.*; *see Wyatt v. Syrian Arab Republic*, 362 F. Supp. 2d 103, 109-10 (D.D.C. 2005).  Here, Defendants take the first approach.  They purport to accept Dr. Saad's well-pled allegations and argue that they are immune.  MBS Br. 32-37; Alasaker Br. 24-25; Tiger Squad Br. 12, 14-17; U.S. Agents' Br. 34-35, 41-42; MiSK Br. 19-20.  The only relevant evidence they attach are a few documents discussing the scope of bin Salman's official authorities in general.  Dkt. Nos. 92-8–12.  Presumably, Defendants made this choice because otherwise Dr. Saad would be entitled to discovery before this Court could rule.

government, and foreign ministers." Suggestion of Immunity at 4, *Burma Task Force v. Sein*, No. 15 Civ. 7772 (S.D.N.Y. Feb. 12, 2016), ECF No. 14 (citing Restatement (Second) of Foreign Relations Law of the United States §§ 65, 66 (1965)); *see* 2 Foreign Affairs Manual § 232.5(a) ("Foreign heads of state, heads of government, and foreign ministers enjoy immunity . . . during their terms of office.").

Bin Salman is not the head of state, head of government, or minister of foreign affairs. Although he stresses his significant *de facto* power, *see* MBS Br. 29-30, the United States' position is clear: Saudi Arabia "is a monarchy ruled by King Salman bin Abdulaziz Al Saud, who is both head of state and head of government."[19] Hence, the United States has suggested immunity for (and only for) the King as the Saudi head of state.[20] And it has emphasized that the "[U.S.] President's counterpart is King Salman"—and bin Salman's counterpart is Secretary of Defense Austin, a position the United States has not afforded status-based immunity.[21]

Bin Salman's request for immunity is unprecedented not just in substance, but in procedure. He cites no case according head-of-state immunity without the State Department suggesting it. This is not the case to start. Expanding head-of-state immunity beyond the limited set of positions that have received it would "lead courts into the murky waters of foreign policy, implicating

---

[19] U.S. Dep't of State, *Saudi Arabia 2020 Human Rights Report*, at 1, https://bit.ly/3wcnTYY.

[20] Suggestion of Immunity, *Al Fassi v. King Fahd Bin Abdulaziz*, No. 03-3841 (C.D. Cal Aug. 4, 2003), ECF No. 49; Suggestion of Immunity at 1, *Alicog v. Kingdom of Saudi Arabia*, No. H-93-4169 (S.D. Tex. May 23, 1994), ECF No. 23; Statement of Interest, *Kendall v. Kingdom of Saudi Arabia* (S.D.N.Y 1965), *Sovereign Immunity Decisions of the Department of State – May 1952 to January 1977* (M. Sandler, D. Vagts & B. Ristau, eds.), in 1977 Dig. U.S. Prac. Int'l L. 1017, 1053-54 (No. 49).

[21] *See* Paul LeBlanc, *White House to Communicate with Saudi King Instead of Crown Prince as US Reassesses Relationship*, CNN (Feb. 16, 2021), https://cnn.it/3wlFazj; *see* Suggestion of Immunity at 9, *Dogan v. Barak*, No. 2:15-cv-08130 (C.D. Cal. June 10, 2016), ECF No. 48 (granting Israel's Minister of Defense conduct-based, not head-of-state, immunity).

complex problems that the judiciary is ill equipped to handle."  *Sikhs for Justice v. Singh*, 64 F. Supp. 3d 190, 194 (D.D.C. 2014); *see Lafontant v. Aristide*, 844 F. Supp. 128, 133 (E.D.N.Y. 1994); *cf. First Am. Corp. v. Al-Nahyan*, 948 F. Supp. 1107, 1121 (D.D.C. 1996) (rejecting head-of-state immunity for UAE royal family because State Department did not suggest it).  Indeed, the State Department has *rejected* requests for immunity from other "crown princes" who claimed to exercise substantial de facto powers: It declined to suggest immunity for Sheikh Mohamed Bin Zayed Al Nahyan—Crown Prince of Abu Dhabi and Deputy Supreme Commander of UAE's armed forces—even though it granted head-of-state immunity to the King.[22]

### 2.    Bin Salman's Contrary Arguments Lack Merit.

Bin Salman raises three meritless counterarguments.  First, he cites three unpublished decisions he claims extend head-of-state immunity to some vague set of "high-ranking officials" and "the head of state's immediate family, including [his] designated successor."  MBS Br. 28.  None of those cases, however, support him.  The one case about the adult child of a head of state, *Kilroy v. Windsor*, involved *diplomatic* immunity.  1978 U.S. Dist. LEXIS 20419, at *1-3 (N.D. Ohio Dec. 7, 1978).  Indeed, the State Department elsewhere has *declined* to suggest immunity for a head-of-state's adult child.[23]  In the other two cases, the courts treated as conclusive the State

---

[22] Suggestion of Immunity, *Hassen v. Nahyan*, No. 2:09-cv-1106 (C.D. Cal. July 26, 2010), ECF No. 51.  Bin Salman points to the CIA's *World Factbook*, which has been inconsistent in identifying Saudi Arabia's head-of-state and government.  *Compare* MBS Br. 30 n.21, *with World Factbook: Saudi Arabia*, https://bit.ly/3uQiG7E (identifying only King and Prime Minister Salman bin Abd al-Aziz al Saud as "Chief of State" and "Head of Government").  Those inconsistencies, however, only underscore the error in bin Salman's argument that this Court should accord him immunity even though the United Sates has declined to suggest it.

[23] Suggestion of Immunity, *Daventree Ltd. v. Republic of Azerbaijan*, No. 02 Civ. 6356 (S.D.N.Y. Oct. 3, 2003), ECF No. 31; U.S. Dep't of State, *Digest of United States Practice in International Law* 571 (Sally J. Cummins & David P. Stewart eds., 2003), https://2009-2017.state.gov/documents/organization/139602.pdf (suggestion filed for the Azeri President's son only after the son became Prime Minister).

Department's suggestions as to the *wives* of heads of state. *Kline v. Kaneko*, 535 N.Y.S.2d 303 (N.Y. Sup. Ct. 1988); *Estate of Domingo v. Marcos*, No. C82-1055V, 1983 WL 482332 (W.D. Wash. July 14, 1983). Those cases—which say nothing about the grounds for the suggestions—provide no support for according immunity to an adult child where the State Department has been silent.

Second, bin Salman avers that he should receive immunity because he has a *distinctively* "high-ranking position[]" including as "Deputy Prime Minister" and "Minister of Defense." MBS Br. 28-29. The one thing that all bin Salman's positions share, however, is that they do *not* make him head of state, head of government, or foreign minister. Indeed, as noted, the United States does not accord immunity to defense ministers. *Supra* at 23 & n.21. Nor does it matter that the King "may delegate some powers . . . to the Crown Prince" or that he may "deputize" for the King when he travels. MBS Br. 28. Many U.S. cabinet officials exercise delegated Presidential powers—but that does not make them heads of state or government.

Third, bin Salman purports to find support in the "practice of other states" and "customary international law." MBS Br. 30. But the question for this Court is U.S. practice, which—as explained—contradicts bin Salman's position. And *Apex Global*, which he cites, underscores how irrelevant English practice is. That case applied the U.K. State Immunities Act, which differs from U.S. immunity law in both directions. On the one hand, it defines the individuals entitled to immunity broadly to include "members of [the head of state's] family forming part of his household[] and his private servants." U.K. State Immunity Act of 1978, ch. 33, pt. III, § 20(1). But on the other, it subjects head-of-state immunity to many more carve-outs, including for commercial activity, employment contracts, and personal injury or death in the United Kingdom, *id.* pt. I, §§ 1-11, as well as actions not taken in a "public capacity," *id.* pt. I, § 14(1). English law

says nothing about whether bin Salman is entitled to immunity under U.S. law.[24]

### B.      Official-Act Immunity Does Not Apply.

Defendants also are not entitled to immunity based on their conduct.  The D.C. Circuit has held that the TVPA abrogates official-act immunity (also known as "conduct-based" immunity). And even setting aside that Circuit law, official-act immunity does not apply to any of Dr. Saad's claims because the Defendants did not undertake their attempted killing in their official capacities.

### 1.      The TVPA Overrides Official-Act Immunity.

As to the TVPA claim, Defendants' immunity claims must fail because circuit precedent forecloses them.  *Lewis v. Mutond* held, first, that certain senior officials could not assert official-act immunity from TVPA claims because such immunity does not apply when "the plaintiff pursues an individual-capacity claim seeking relief against an official in a personal capacity."  918 F.3d at 147.  Second, the Court reached an "alternative holding," in an "opinion by Senior Judge Randolph, which is joined in relevant part by Judge Srinivasan . . . that the TVPA displaces conduct-based immunity."  *Id.* at 144; *see id.* at 149-50 (Randolph, J., concurring in the judgment); *id.* at 148 (Srinivasan, J., concurring).  That holding is circuit precedent that controls here.

Defendants cannot gain by recharacterizing *Lewis* as just reflecting the "view" of "two judges" and inviting this Court to follow conflicting decisions from the Second and Ninth Circuits. MBS Br. 40.  Judge Wilkins, who did not himself join Judge Randolph, recognized in his opinion *for the Court* that the panel reached two "alternative holding[s]."  918 F.3d at 144.  He did so

---

[24] Other states have recognized that a crown prince is not entitled to head-of-state immunity.  The Civil Court of Brussels refused to extend immunity to the children of the former President of Zaire because head-of-state immunity "can only benefit [the former President] as the . . . Head of State." *Mobutu v. SA Cotoni*, [Civ.] [Civil Court of Brussels], Dec. 29, 1988, Jurisprudence de Liège, Mons et Bruxelles [JLMB] 1989, 169 (Belg.), *reprinted in* 91 I.L.R. 259, 260 (1993); *see* Australian Foreign States Immunities Act of 1985, pt. V, § 36(1), https://bit.ly/3cgjoEN (immunity for "head of a foreign State" and "spouse").

because settled law provides that when "there are two grounds, upon either of which an appellate court may rest its decision, and it adopts both, '. . . each is the judgment of the court, and of equal validity.'" *Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 673 (D.C. Cir. 2013).

Nor is there anything to the claim that Judge Randolph was tentative.  MBS Br. 40.  Again, neither Judge Wilkins nor Chief Judge Srinivasan understood the opinion that way.  For good reason: Judge Randolph found a "clear conflict" between the TVPA and "judge-made common law" and found that the "common law must give way."  918 F.3d at 149-50.  Hence, Chief Judge Srinivasan "agree[d] with the portion of Judge Randolph's concurrence . . . explaining that [the TVPA] subjects foreign officials to liability for acts undertaken in an official capacity and thus displaces . . . conduct-based immunity." *Id.* at 148.  The D.C. Circuit could not have been clearer.

## 2.    Bin Salman Is Not Entitled To Official-Act Immunity As To Any Of Dr. Saad's Claims.

Defendants in any event are not entitled to official-act immunity.  Courts have used two tests to weigh such immunity.  Under the Restatement test, immunity applies if (1) "the actor is a public minister, official, or agent"; (2) the "acts were performed in her official capacity"; and (3) "exercising jurisdiction would serve to enforce a rule of law against the foreign state." *Id.* at 146.  The State Department test looks to the State Department's "established policy." *Samantar v. Yousuf*, 560 U.S. 305, 312 (2010).  Although the Restatement test should apply, this Court need not resolve that question.  Under both tests, immunity "extends only to acts that [an] individual took in an official capacity."  Ltr. from Harold Hongju Koh, Legal Adviser, U.S. Dep't of State, to Stuart F. Delery, Principal Dep. Ass't Att'y Gen., Civil Div., U.S. Dep't of Justice, at 1 (Dec. 17, 2012), *docketed at Ragsdale v. Lashkar-E-Taiba*, No. 1:11-cv-3893 (E.D.N.Y. Dec. 17, 2012), ECF No. 19-1.  Because Defendants did not undertake the core wrong alleged in the Amended Complaint—attempting to kill Dr. Saad—in their official capacities, they are not immune.

### i.     Bin Salman Did Not Act In His Official Capacity When He Sent A Hit Squad To Kill Dr. Saad.

Had Saudi Arabia directed officials to use their official positions to locate and return an "international fugitive" to face genuine criminal charges, MBS Br. 1, it would have looked very different.  To track the fugitive, the officials would deploy Saudi Arabia's official intelligence agency, the Mabahith, or submit requests pursuant to Mutual Legal Assistance Treaties or letters rogatory.  AC ¶¶ 33, 112.  They would not rely on a motley group of U.S. students recruited through bin Salman's personal foundation.  *Id.* ¶¶ 225-46.  Once these officials located the fugitive, they would use diplomatic cables and foreign courts to request extradition.  They would not use the Crown Prince's personal WhatsApp account to threaten to "use all available means" to "take measures . . . harmful to you."  *Id.* ¶ 173.  And to retrieve the fugitive, the officials would dispatch regular law-enforcement officers who would travel on diplomatic or official passports and announce themselves to local authorities.  They would not cobble together a band of hitmen—including an expert in collecting "dead bodies," *id.* ¶ 339—to travel secretly on tourist visas and lie when confronted.  *Id.* ¶¶ 323-52.

The reason why bin Salman's plot does not look like an official act is he did not undertake it as an official act.  He tried to kill Dr. Saad as a personal act, after Saudi Arabia denied him use of state channels to carry out personal vendettas.  *Id.* ¶¶ 274-78.  Indeed, when he tried to use one official channel—a red notice—to further his scheme, INTERPOL refused precisely because the request was not "strictly juridical" but pursued a personal grudge.  *Id.* ¶ 259.  Bin Salman receives no immunity for conduct undertaken in his personal capacity for personal ends.  *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1028 (D.C. Cir. 1997).

The gist of bin Salman's contrary argument is that he is entitled to immunity because he has many official powers, MBS Br. 33, and used some of them in carrying out his plot.  But on

both the facts and the law, that argument fails.  On the facts, one item is tellingly absent from bin Salman's list of "specific acts that the Amended Complaint alleges" he undertook "within his [official] authority," *id.* at 34—deploying teams of operatives into the United States and Canada to locate and kill Dr. Saad.  That, however, is what this case is *about*.  And neither bin Salman nor the other Defendants claim they could have taken those actions in their official capacities.[25]  Nor do Defendants proffer any evidence (as opposed to vague assertions) that they acted in their official capacities in directing the Tiger Squad's "proxy" torture of Dr. Saad's son-in-law or in taking Dr. Saad's children hostage.  *Cf. infra* at 49 (discussing purported 2020 prosecution).  Meanwhile, on the law, even if Defendants used *some* government resources to effect their scheme, the D.C. Circuit in *Jungquist* rejected an identical argument.  *Infra* at 30-31.

First, on the facts, Dr. Saad details how bin Salman created and deployed the Tiger Squad precisely because the Kingdom would not allow him to use government channels.  In 2015, bin Salman approached Dr. Saad about deploying the Mabahith (which Dr. Saad controlled) to seek retribution "against a Saudi prince living in Europe."  AC ¶ 112.  And when Dr. Saad declined, bin Salman "created the so-called 'Tiger Squad'" so he could pursue revenge "without the support of official ministries."  *Id.*  The team cut its teeth "carry[ing] out [an] extrajudicial rendition from France" and "kidnap[ping] a religious pilgrim in Mecca in 2016" to "sodomize him," among other operations against bin Salman's personal targets.  AC ¶ 19; *see id.* ¶¶ 272-95.  Then, it lured Khashoggi to the Saudi consulate in Istanbul and murdered him.  *Id.* ¶¶ 296-316.  Finally, the team travelled, days later, to Canada to inflict the same fate upon Dr. Saad—principally traveling on tourist visas in their personal capacities.  *Id.* ¶¶ 317-18, 323-52.

---

[25] In *Cengiz v. Bin Salman*, the Defendants have not asserted conduct-based immunity for the Khashoggi murder.  Bin Salman Mot. to Dismiss, No. 1:20-cv-3009 (D.D.C. June 4, 2021), ECF No. 21; Alqahtani Mot. to Dismiss, No. 1:20-cv-3009 (D.D.C. June 4, 2021), ECF No. 22.

Defendants do not claim they could have taken these actions in their official capacities—and the Saudi government has not claimed the actions either.  To the contrary, the Tiger Squad's actions "troubled the Saudi government's security and spy agencies so much that . . . [the] Tiger Squad itself . . . became a top surveillance target of the Saudi government."  *Id.* ¶ 279.  After the Tiger Squad's extrajudicial killing of Khashoggi, Saudi Arabia prosecuted and jailed several members, *id.* ¶ 311, and fired Alqahtani and Alassiri, *id.* ¶¶ 59, 66.  Meanwhile, after the filing of this suit, the Saudi government "ordered a review" of MiSK's U.S. conduct and reaffirmed that "[i]t is not [Saudi] policy . . . to engage in assasinations [sic]."[26]  *See supra* at 11 (Saudi statement that extrajudicial killing is "a flagrant violation of the Kingdom's laws and values").

Defendants dismiss these points as "conclusory" and "irrelevant."  MBS Br. 34-35; *see* Alasaker Br. 24-25; U.S. Agents' Br. 34.  But Dr. Saad's allegations are specific, are based on his personal knowledge as a former head of Saudi intelligence, and are corroborated by government sources and press accounts.  AC ¶¶ 20, 26, 145, 263, 274-83, 319-22, 350-64.  And it is eminently relevant that Saudi Arabia in the key period itself declined to allow bin Salman to pursue vendettas using its *actual* intelligence agencies and instead turned those agencies on *surveilling* him.  Even where (unlike here) conduct was "technically performed in an official capacity," immunity does not apply when conduct is not "condoned by the foreign sovereign."  *Doe I v. Buratai*, 318 F. Supp. 3d 218, 237 (D.D.C. 2018).  That conclusion applies with double-force here, where bin Salman's counsel just asserts in legal papers that he was acting in his official capacity.[27]

Second, even if bin Salman leveraged official powers to carry out some parts of his scheme,

---

[26]  England, *supra* n.10; Adel Aljubeir (@AdelAljubeir), Twitter (Dec. 1, 2020), https://bit.ly/3gjqLgc.

[27]  *See Xuncax v. Gramajo*, 886 F. Supp. 162, 176 n.10 (D. Mass. 1995) (no immunity for arbitrary killing because "[t]here [was] no suggestion that either the past or present governments of Guatemala characterizes the actions . . . as 'officially' authorized").

the D.C. Circuit held in *Jungquist* that the "fact that there was some convergence between [an individual's] official and unofficial conduct does not cloak his unofficial actions with immunity." 115 F.3d at 1028.  There, Sheikh Sultan, the son of Abu Dhabi's Crown Prince and the President of the Crown Prince Court, entered into a "corrupt bargain" to further his personal interests by agreeing to provide medical treatment and compensation to the plaintiff, whom he injured in a drunken boating accident.  *Id.*  Like here, the defendants claimed they had acted in their official capacities—because they had provided medical treatment via "the Abu Dhabi government's official medical treatment program" and their actions "were consistent with their duties in managing and implementing that program."  *Id.* at 1027.  The D.C. Circuit rejected that argument and explained that the defendants also made "personal promise[s]" to the plaintiffs and acted "not in furtherance of the interests of the sovereign but [in] a personal and private action."  *Id.* at 1028.[28]

This case is *Jungquist* through and through.  Like there, the Amended Complaint alleges that bin Salman pursued a "corrupt" scheme, outside of official channels, and in "furtherance of . . . a personal and private" interest.  *Id.*  And like there, it is irrelevant that bin Salman claims "some convergence" between his "official and unofficial conduct."  *Id.* at 1028.[29]

Bin Salman attacks a strawman, arguing that assertions of "personal or private *motives*"

---

[28] *Accord Doe v. Bolkiah,* 74 F. Supp. 2d 969, 974 (D. Haw. 1998) (applying *Jungquist* to reject immunity for the Minister of Finance and "member of the privy counsel" of Brunei—an absolute monarchy, like Saudi Arabia—for running a "prostitution ring" because his "illicit acts . . . would fall outside the scope of any of his official duties"); Statement of Interest, *Miango v. Democratic Republic of the Congo*, No. 15-cv-01265 (D.D.C. May 1, 2019), ECF No. 151, at 4, 8 & No. 151-1 (no immunity to extent foreign officials launched an "unprovoked attack on peaceful protestors" because doing so was not "reasonably connected to carrying out [official] functions").

[29] Even if (counterfactually) Saudi Arabia itself conducted the attempted extrajudicial killing, it would not be entitled to immunity.  *See Letelier v. Republic of Chile,* 488 F. Supp. 665, 673 (D.D.C. 1980) (foreign state not immune under FSIA for undertaking acts in the United States "to order or to aid in an assassination"); *Liu v. Republic of China*, 892 F.2d 1419, 1424-31 (9th Cir. 1989) (foreign state not immune for recruiting assassins in the United States).

cannot alone defeat immunity.  MBS Br. 35; *see* Tiger Squad Br. 16-17 & n.5; U.S. Agents' Br. 34.  That, however, is not Dr. Saad's argument.  Dr. Saad has detailed bin Salman's substantial nonofficial *conduct*—not just creating and deploying a private hit squad, but using his private WhatsApp account and foundation to pressure and hunt Dr. Saad.  *E.g.*, AC ¶¶ 11, 50, 53, 131(t), 170, 172-78, 183-84, 195, 225-46, 237, 256, 289, 293, 318, 372.

True, Dr. Saad also details bin Salman's personal *objectives*, including his desire to snuff out the threat Dr. Saad poses to his standing with the U.S. government.  *Id.* ¶¶ 141-67.  As in *Jungquist*, this reinforces that bin Salman was not acting in "furtherance of the interests of the sovereign."  115 F.3d at 1028.  But this is not a case, like those bin Salman cites, where a plaintiff relies on personal motives for conduct concededly within official duties.  In *Chuidian v. Philippine National Bank,* 912 F.2d 1095, 1007 (9th Cir. 1990), the plaintiff argued only that a defendant's "personal motive render[ed] his actions ultra vires even though the actions . . . were fully authorized."  In *Byrd v. Corporacion Forestal y Indus. de Olancho S.A.,* 182 F.3d 380, 389 (5th Cir. 1999), the plaintiff again relied only on the defendant's "personal objectives."

Bin Salman also gains no support from *Aldossari v. Ripp*, No. CV 20-3187, 2021 WL 1819699 (E.D. Pa. May 6, 2021), *appeal filed*, ECF No. 102 (3d Cir. June 3, 2021), which Dr. Saad expects him to cite.  The plaintiff there claimed that his father had a 1995 oral contract with former Crown Prince Mohammed bin Nayef and alleged that bin Salman tortiously interfered with this contract 22 years later by "plac[ing] [bin Nayef] under house arrest" and "preventing [him] from distributing proceeds."  *Id.* at *14.  The plaintiff's "sole claim" against bin Salman concerned the "arrest" of bin Nayef, which the plaintiff "appear[ed] to concede" was an "exercise of [bin Salman's] official powers."  *Id.*  After deciding the plaintiff lacked standing, the court also found bin Salman immune.  *Id.* at *16.  That is no help to bin Salman: He cannot claim that the core

wrong alleged here—dispatching operatives into the United States and a hit squad to kill a personal

enemy—"can only be [undertaken] by one acting with official authority."  *Id.* at \*15.[30]

ii.    **Additional Factors Under The Restatement and State Department Tests Underscore That Bin Salman Is Not Immune.**

Under both the Restatement and State Department tests, Bin Salman is not immune.

a.    **Restatement Test: This Suit Does Not Seek To Enforce A Rule Of Law Against Saudi Arabia.**

The Court should apply the Restatement test, which requires an official to show that

"exercising jurisdiction would serve to enforce a rule of law against the" foreign state. *Lewis*, 918

F.3d at 146.  While the D.C. Circuit has not decided which test should apply, courts routinely look

to Restatement § 66(f).  The Supreme Court in *Samantar* emphasized that the Restatement was

"instructive."  560 U.S. at 321.  *Belhas v. Ya'alon* identified Restatement § 66(f) as reflecting "well

settled" principles of the "common law."  515 F.3d 1279, 1285 (D.C. Cir. 2008).  And a leading

academic history confirms that, as to the question at issue here, the Restatement reflects the

common law: The "[t]wo early twentieth century cases" that considered foreign-official immunity

held that officials lack immunity for "unlawful acts . . . in excess of . . . authority."[31]  Then, courts

decided "only four cases against foreign officials" between 1952 and the FSIA's 1976 enactment—

and of them, "one case declined to afford immunity," two granted immunity only because the suits

sought relief against the state (one because an "absent government agency was a real party in

interest" and the other because it "sought to enforce a contract against the foreign state"), and "one

---

[30] The *Aldossari* court also incorrectly stated that only state officials can "order[] arrest and direct[] an asset seizure."  2021 WL 1819699, at \*15.  Mobsters can order enemies held incommunicado and their assets seized.  Anyway, murder is certainly not the exclusive domain of state officials.

[31] Beth Stephens, *The Modern Common Law of Foreign Official Immunity*, 79 FORDHAM L. REV. 2669, 2676 (2011) (citing *Pilger v. U.S. Steel Corp.*, 130 A. 523 (N.J. 1925); *Lyders v. Lund*, 32 F.2d 308 (N.D. Cal. 1929)); *see also Lewis*, 918 F.3d at 149 (citing Stephens).

granted immunity without explanation."[32]  Critically, none "indicated that foreign officials were automatically entitled to immunity for all acts committed in the course of their employment."[33] Defendants cite no case rejecting the Restatement.

Here, "exercising jurisdiction would [not] serve to enforce a rule of law against the" Kingdom. *Lewis*, 918 F.3d at 146.  As *Lewis* held, immunity applies only "when a judgment . . . would bind (or be enforceable against) the foreign state," meaning that the plaintiff seeks to "draw on the [state's] treasury or force the state to take specific action."  *Id.* at 146-47.  The flip side is that where "the plaintiff pursues an individual-capacity claim seeking relief against an official in a personal capacity," the suit "does not enforce a rule against the foreign state."  *Id.* at 147.

*Lewis* controls.  This suit does not seek to invade the Kingdom's treasury or compel it to take any action.  It pursues individual-capacity claims for personal-capacity actions.  Bin Salman asserts (at 37-38) that this case would force the Kingdom to, for example, cease investigating the "corruption" allegations he has raised.  But that is false.  In effect, bin Salman claims he is immune just because his plot made some use of detentions, property seizures, and travel restrictions.  None of that, however, relates to whether a judgment will "enforce a rule of law against" Saudi Arabia— and mere "collateral effects are too attenuated."  *Lewis*, 918 F.3d at 146-47.

Bin Salman makes much of Dr. Saad's request for a declaratory judgment.  MBS Br. 38; *see* Alasaker Br. 27-28; U.S. Agents' Br. 36.  A declaratory judgment, however, is the *opposite* of the type of coercive relief *Lewis* contemplates.  And to be clear, Dr. Saad has not sought a

---

[32] Stephens, *supra* n.31, at 2677 (discussing Statement of Interest, *Cole v. Heidtman* (S.D.N.Y. 1968), *in Sovereign Immunity Decisions of the Department of State – May 1952 to January 1977* (M. Sandler, D. Vagts & B. Ristau, eds.), in 1977 Dig. U.S. Prac. Int'l L. 1017, 1062-63 (No. 62); *Oliner v. Canadian Pac. Ry.*, 34 A.D.2d 310, 315 (N.Y. App. Div. 1970); *Heaney v. Spain*, 445 F.2d 501, 503 (2d Cir. 1971); *Greenspan v. Crosbie*, No. 74 Civ. 4734, 1976 WL 841 (S.D.N.Y. Nov. 23, 1976)).

[33] *Id.*

declaration that "Saudi Arabia's investigation violated the TVPA and the law of nations."  MBS Br. 38.  He seeks a declaration that bin Salman's dispatching of hit squads through the United States *to kill* Dr. Saad did so.  This declaration would not touch any government investigation.

No case cited by Defendants supports them.  *Nnaka v. Federal Republic of Nigeria* did not involve conduct-based immunity: It was an act-of-state case concerning an attempt to impose tort liability based on a "criminal prosecution" (which, as just explained, Dr. Saad does not seek to do).  756 F. App'x 16, 18 (D.C. Cir. 2019).  In *Miango v. Democratic Republic of Congo*, the plaintiff sought to impose joint-and-several liability on the foreign state.  Civ. No. 15-1265, 2020 WL 3498586, at *6 (D.D.C. June 29, 2020).  And in *Buratai*, the foreign state "claimed the defendants' actions as [its] own."  318 F. Supp. 3d at 233.  *Buratai* also held that the suit satisfied the Restatement test even though damages may not "come from . . . Nigeria's coffers," 318 F. Supp. 3d at 233—but *Lewis* abrogated that aspect of *Buratai*.  *See* 918 F.3d at 147.

### b. State Department Test: Immunity Does Not Apply Given Significant U.S. Conduct.

Under the State Department test, immunity also does not apply because this case involves extensive physical conduct in the United States—including hunting Dr. Saad in the United States and twice dispatching hit squads to kill Dr. Saad via U.S. territory.  Where "none of the operative acts are alleged to have taken place in the United States," the State Department is more likely to recommend immunity.  Ltr. from William H. Taft, IV, Statement of Interest at 7-8, *Doe v. Qi*, No. 4:02-cv-672 (Sept. 25, 2002), ECF No. 85.  But where some conduct occurs in the United States, the State Department has indicated that immunity is generally inappropriate.  In *Pruitt v. M/V Patignies*, it declined to suggest immunity to Canadian ship pilots based on an accident that may have happened in Canada, explaining that "where the activities of Canadian pilots are carried out both in [U.S.] and Canadian territorial waters, the Department of State does not believe that the

question of sovereign immunity should turn on the fortuity that the accident may have occurred in Canada."[34]   And in *Miango*, the State Department declined to suggest immunity for foreign security forces accused of attacking peaceful protestors outside a D.C. hotel, explaining that if the "attack was an entirely unprovoked attack on peaceful protesters exercising their First Amendment rights" in the District, "it would not constitute an official act for which conduct-based immunity would be available."  Statement of Interest at 9, *Miango*, Civ. No. 15-1265 (D.D.C. May 1, 2019), ECF No. 151; *see also* Attach. to Statement of Interest at 2, *Miango*, Civ. No. 15-1265 (D.D.C. May 1, 2019), ECF No. 151-1.  That decision appropriately recognized that foreign officials cannot invade U.S. territory, target U.S. interests, and use immunity as a shield.  So, too, here.[35]

### 3.    The Other Defendants Are Not Entitled To Immunity.

The other Defendants argue that "[t]o the extent that [Dr. Saad] is alleging that [Defendants are] acting as an extension of the Crown Prince and pursuant to his official position with the Saudi government," Defendants are also "entitled to immunity."  Alasaker Br. 24-25; *accord* MiSK Br. 19-20; Tiger Squad Br. 14-17; U.S. Agents' Br. 35.  But as Dr. Saad has just shown, bin Salman was *not* acting in his official capacity.  Indeed, if anything, the other Defendants' immunity claims are weaker.  Dr. Saad discusses each Defendant group in turn.

---

[34] Statement of Interest, *Pruitt v. M/V Patignies* (E.D. Mich. July 18, 1968), *in Sovereign Immunity Decisions of the Department of State – May 1952 to January 1977* (M. Sandler, D. Vagts, & B. Ristau, eds.), in 1977 DIG. U.S. PRAC. INT'L L. 1017, 1060-61 (No. 60)).

[35] Ultimately, the *Miango* plaintiffs declined to embrace the State Department's suggestion to litigate whether the defendants acted in their official capacities and conceded in the district court that "the individual defendants were acting in their official capacities."  *Miango*, 2020 WL 3498586, at *6.  The court accepted that concession and deemed the defendants immune.  *Id.*  That aspect of *Miango* is irrelevant here, where Dr. Saad makes no such concession.  *Cf. Letelier*, 488 F. Supp. at 673 (no immunity for recruiting assassins in the United States); *Renchard v. Humphreys & Harding, Inc.*, 381 F. Supp. 382, 382-83 (D.D.C. 1974) (declining to grant immunity to the Brazilian government, based on a suggestion of non-immunity by the State Department, for claim alleging property damage based on construction of the Brazilian embassy in Washington, D.C.).

*Alasaker.*  As bin Salman's "invisible hand," Alasaker cultivated and deployed a network of covert student agents to hunt Dr. Saad in the United States (as well as sending WhatsApp messages to try to lure Dr. Saad back to Saudi Arabia by plane).  AC ¶¶ 15, 40-45, 75, 79-81, 85, 177, 230 & 223-28.  In so doing, he leveraged a pair of private positions—as the Executive Director of MiSK and head of bin Salman's "private office."  *Id.* ¶ 40.  Like bin Salman, Alasaker is not immune for carrying out private vendettas outside official channels.

Alasaker's main argument (at 24) is that *one* of his positions (heading bin Salman's private office) was a "government position" and thus he is immune.  To begin, this factual claim is dubious: Alasaker cites no official sources but only a 2018 news profile that does not actually *say* that his position as head of bin Salman's private office was a government job (only that Alasaker, in some capacity, had the "rank of minister").  *Id.* at 24 n.14.  Regardless, this argument fails for the same reason as bin Salman's similar argument: The key conduct—deploying a motley group of Saudi students in order to *hunt and kill* Dr. Saad—was not conduct that Alasaker could or did undertake in an official capacity.  That "there was some convergence between [his] official and unofficial conduct does not cloak his unofficial actions with immunity."  *Jungquist*, 115 F.3d at 1028.  Nor does the fact that Alasaker was "acting as an extension of" bin Salman, Alasaker Br. 24, help him when bin Salman *himself* acted outside official channels.  *See Doe v. Bolkiah,* 74 F. Supp. 2d 969, 974 (D. Haw. 1998) (applying *Jungquist* to reject immunity for "member of the privy counsel" of the Brunei, an absolute monarchy like Saudi Arabia, for running a "prostitution ring" because his "illicit acts . . . would fall outside the scope of any of his official duties").

That conclusion applies with special force because Alasaker carried out much of this conduct via his position at MiSK, a non-governmental organization.  AC ¶ 68-69.  While he (at 25) dismisses the MiSK allegations as "conclusory" and implausible, the Department of Justice

has filed an indictment alleging that Alasaker acted via MiSK to recruit U.S.-based Saudi employees at Twitter, who came to the United States as students, to serve as covert agents for bin Salman.  AC ¶¶ 40-41, 45, 132.  Dr. Saad has plausibly pled that Alasaker and MiSK followed the same playbook here.  Indeed, Dr. Saad has pled in detail the close association among Alasaker, MiSK, and the U.S.-Based Covert Agent Defendants.  *Id.* ¶¶ 225-46; *supra* at 12-15; *infra* at 55-56, 64, 106-07, 137-38.[36]

Alasaker's other arguments fail.  He says he used his "control over SACM," a "government entity" based in Virginia, to further bin Salman's scheme.  Alasaker Br. 25.  Again, however, *Jungquist* forecloses this argument: just as those defendants were not immune simply because they leveraged positions as "administrators of a government program" to further their private scheme, 115 F.3d at 127, it is irrelevant that Alasaker exploited a government entity too.

Alasaker also claims (at 24-25, 27) that he was acting in a "government" capacity when in September 2017 he tried to lure Dr. Saad to Saudi Arabia via "private jet," AC ¶¶ 177, 306.  But this claim rewrites Dr. Saad's allegations—which, because Alasaker has not submitted evidence to contradict them, must be accepted as true, *supra* n.18—that Alasaker attempted this attempted "extrajudicial rendition" in his non-official capacity to serve bin Salman's private vendettas.  AC ¶ 177.  Those allegations are well-supported by Alasaker's involvement in the Tiger Squad's killing of Khashoggi, during which the Tiger Squad "made four calls" to him.  *Id.* ¶ 46.

---

[36] *Jungquist* accorded immunity to "the UAE Embassy's Medical Attache in the District of Columbia," who was just "responsible for overseeing the administration of the Abu Dhabi foreign medical treatment program," and the "Director of Patient Relations," who "took care of logistical matters such as booking hotel accommodations, flights, and taxis."  115 F.3d at 1025, 1029-30.  The court indicated that even those ministerial officials would *not* have immunity for actions taken to further Sheikh Sultan's "personal promise" but found they had "no knowledge" of it.  *Id.*  That is no help to Defendants: Their duties were not so prosaic, and Dr. Saad has plausibly alleged that they knew bin Salman sought to hunt and kill Dr. Saad outside of official channels.

Defendants also argue that because Dr. Saad alleges that they were acting "under color of law," they must also have been acting in their official capacities. Alasaker Br. 24; *see* Tiger Squad Br. 13-17; U.S. Agents' Br. 35. That is wrong. The question of whether conduct occurs "under color of law" differs from whether it is committed in an "official capacity." As Congress has recognized, "the phrase '. . . under color of law' . . . denote[s] torture and extrajudicial killings committed by officials both within and outside the scope of their authority." S. REP. 102-249, at 6. So long as there is "some governmental involvement," conduct is "under color of law." H.R. REP. 102-367(I), at 4, 1992 U.S.C.C.A.N. 84, 87. By contrast, the "official capacity" question turns on whether defendants acted within their authority. *Supra* at 31. Congress contemplated scenarios, like this one, in which the defendants acted under color of law but outside their official authority. *Accord Doe v. Qi*, 349 F. Supp. 2d 1258, 1282 (N.D. Cal. 2004) ("The mere fact that acts were conducted under color of law or authority, which may form the basis of state liability by attribution, is not sufficient to clothe the [foreign] official with sovereign immunity.").[37]

*Alqahtani, Alassiri, and the Tiger Squad Defendants*. Alqahtani, Alassiri, and the Tiger Squad Defendants are not immune because they acted outside their official capacities when they directed and participated in a private hit squad. AC ¶¶ 273-83, 317-18, 323-52. They rest their

_____

[37] In *Dogan v. Barak*, 932 F.3d 888 (9th Cir. 2019) (cited at Tiger Squad Br. 17), the key fact was not that the plaintiff alleged that the defendant (Israel's Defense Minister) acted under "color of law" but that he acted in his official capacity to "plan, order, and control [a military] operation." *Id.* at 894. Distinguishing between "color of law" and "official capacity" also accords with law under 42 U.S.C. § 1983. Courts construing the TVPA's "color of law" requirement "look to . . . § 1983." *Doe v. Constant*, 354 F. App'x 543, 546 (2d Cir. 2009); *see Buratai*, 318 F. Supp. 3d at 237. Under § 1983, defendants act under color of law whenever they "exercise[] power possessed by virtue of" their government job "and made possible only because [they were] clothed with the authority of state law." *West v. Atkins*, 487 U.S. 42, 49 (1988). By contrast, the "official capacity" test is narrower. *See Al-Quraishi v. Nakhla*, 728 F. Supp. 2d 702, 752 (D. Md. 2010) (under ATS, "[a] person may have acted under color of law, yet still not . . . in an official capacity"), *rev'd on other grounds*, 657 F.3d 201 (4th Cir. 2011), *on reh'g en banc*, 679 F.3d 205 (4th Cir. 2012).

contrary arguments on the claim that they gave or received orders through "official channels" and "[n]one of the Defendants is alleged to have taken rogue action." Tiger Squad Br. 14-16. That claim, however, is false. Dr. Saad alleges in detail that the Tiger Squad was created outside of official channels—because the official Saudi intelligence services refused to "undertak[e] rogue operations in pursuit of the personal goals of . . . bin Salman," AC ¶ 278—and that Saudi Arabia has repudiated the Tiger Squad's extrajudicial killings as rogue actions. *Supra* at 9-11. Alqahtani knows this well: He participated in the Tiger Squad's first operation and bragged, with bin Salman, that he was able to accomplish it without government resources. AC ¶ 277. That distinguishes the cases Defendants invoke, which concerned actions taken in defendants' official capacities.[38]

***U.S.-Based Covert Agent Defendants.*** The U.S.-Based Covert Agent Defendants do not hold *any* government positions. They thus cannot satisfy the threshold requirement of the Restatement or State Department tests. *Lewis*, 918 F.3d at 146.

These Defendants argue that, as bin Salman's "agents," they are entitled to "derivative official immunity." U.S. Agents' Br. 41-42; *see* MiSK Br. 23 n.15. That argument fails, first, because bin Salman was acting in his personal capacity. *Supra* § I.B.2.i. So any claim of

---

[38]     In *Buratai* and *In re Terrorist Attacks*, the foreign states explicitly told the court that the defendants acted in official capacities. *Buratai*, 318 F. Supp. 3d at 232 ("Nigeria *clearly and emphatically* stated that this suit challenges the defendants' '*authorized* official actions,' which the defendants 'performed in an official capacity,' and which 'are *attributable* to the Government . . . .'" (emphases added)); *In re Terrorist Attacks on Sept. 11, 2001*, 122 F. Supp. 3d 181, 188-89 (S.D.N.Y. 2015) (ambassador affirmed that defendant "acted at all relevant times as an official of the Saudi government"). *Matar* followed the State Department's suggestion of immunity. 563 F.3d at 14. And in *Omari* and *Weisskopf*, the plaintiffs were indisputably suing for conduct taken in the defendants' official capacities. *Weisskopf v. Neeman*, No. 11-cv-665, 2013 U.S. Dist. LEXIS 201309 (W.D. Wis. Mar. 20, 2013); *Omari v. Ras Al Khaimah Free Trade Zone Auth.*, No. 16 Civ. 3895, 2017 WL 3896399 (Aug. 18, 2017); *accord Omari v. Ras Al Khaimah Free Trade Zone Auth.*, No. 16 Civ. 3895, 2017 WL 3896399, at *10 & n.8 (S.D.N.Y. Aug. 18, 2017) (no allegations that actions were undertaken to further the "Sheikh's . . . private positions or interests rather than . . . governmental interests"), *aff'd*, 735 F. App'x 30 (2d Cir. 2018).

"derivative" immunity must fail.  This argument also fails because "derivative" foreign-official immunity does not exist, as Judge Friedrich held in *Broidy Cap. Mgmt. LLC v. Muzin*, No. 19-CV-0150, 2020 WL 1536350, at *7 (D.D.C. Mar. 31, 2020).  As *Broidy* explains, "the D.C. Circuit has never adopted foreign derivative immunity."  *Id.*  That is because, for defendants to invoke immunity, they must show that the common law or State Department practice *already* recognizes an immunity; courts do not extend it on their own.  *Id.*  The U.S.-Based Covert Agent Defendants cite no common-law or State Department decision recognizing derivative immunity.  They rely solely on *Butters v. Vance Int'l, Inc.*, 225 F.3d 462 (4th Cir. 2000), and *Ivey v. Lynch*, No. 1:17-439, 2018 U.S. Dist. LEXIS 133656 (M.D.N.C. Aug. 8, 2018), which *Broidy* correctly rejected.[39]

As *Broidy* explains, *Butters* reflexively extended the "'privilege' of *domestic* derivative sovereign immunity . . . 'to the private agents of foreign governments.'"  2020 WL 1536350, at *6.  But domestic and foreign immunity are different.  At home, courts have recognized derivative immunity on the theory that the United States and its agents share the "same interest in getting the Government's work done."  *Id.* at *7.  But that rationale does not translate to foreign-official immunity, as this case illustrates: The U.S. government shares no interests with U.S.-based agents of bin Salman who are part of a scheme to surveil, hunt, and kill a valued U.S. intelligence partner.

The State Department's policy underscores this conclusion.  Its policy is to *not* suggest immunity for U.S. residents.  Instead, when U.S. residents "enjoy the protections of U.S. law," they "should be subject to the jurisdiction of [U.S.] courts."  Statement of Interest at 7, *Ahmed v.*

---

[39] Defendants also cite *Moriah v. Bank of China Ltd.*, 107 F. Supp. 3d 272, 274, 278 (S.D.N.Y. 2015).  But *Moriah* relies on *Butters*, 107 F. Supp. 3d at 277 & n.34, and is unpersuasive for the same reasons.  *Moriah*'s facts were also nearly the opposite of this case: There, a senior foreign official asked the defendant to perform a task, and the *Moriah* court found nothing more than "pure conjecture" to suggest that he was acting outside of his official capacity.  *Id.* at 278.  Here, Dr. Saad has amply shown that bin Salman was not acting in his official capacity.

*Magan*, No. 2:10-cv-00342 (S.D. Ohio 2011), ECF No. 45. Hence, on remand from *Samantar*, the State Department cited as a "major basis" for its view that the defendant was not immune his "status as a permanent legal resident." *Yousuf v. Samantar*, 699 F.3d 763, 777 (4th Cir. 2012); *see Broidy*, 2020 WL 1536350, at *6. The U.S.-Based Covert Agent Defendants were all U.S. residents during the relevant periods, have enjoyed the protections of U.S. law, and should not be immune in U.S. courts. AC ¶¶ 15, 76-110.

*MiSK.* Because MiSK is a Saudi non-governmental organization, *id.* ¶¶ 68-69, the FSIA—not the common law—applies. *Samantar* held that the FSIA did not govern the immunity of "individual officials" and that the common law governs. 560 U.S. at 316 & n.9. But it distinguished suits against "a corporation, association, foundation, or any other entity" that was created under the foreign sovereign's law, which it recognized the FSIA covers. *Id.*

MiSK has not argued that it would qualify for immunity under the FSIA. Any such argument would fail. The FSIA extends immunity to corporations and foundations only if they are "an organ of a foreign state or political subdivision" or "a majority of [the] ownership interest is owned by a foreign state." 28 U.S.C. § 1603(b)(2). Here, neither is true. MiSK is "non-government organization," as Defendants do not dispute. AC ¶¶ 68-69.

Even if MiSK could assert common-law immunity, MiSK would not be entitled to it—for the reasons explained above. This private entity certainly was not acting in an official capacity when it facilitated recruitment of U.S. operatives to pursue bin Salman's private vendetta. To the extent MiSK argues that it is immune because it carried out those vendettas in part by coordinating with SACM, "a government entity," MiSK Br. 19, *Jungquist* forecloses that argument for the same reasons explained above. *Supra* at 30-31. Nor is MiSK entitled to "derivative immunity," MiSK Br. 22-23 & n.15—also for the same reasons explained above. *Supra* at 40-42. Indeed, it is telling

that MiSK asks this Court to follow the State Department's "established policy," MiSK Br. 18, but cites no example of the State Department *ever* according conduct-based immunity to a private non-governmental organization.  In fact, the State Department has declined to do so.  Statement of Interest, *Cole v. Heidtman* (S.D.N.Y. 1968), *in Sovereign Immunity Decisions of the Department of State – May 1952 to January 1977* (M. Sandler, D. Vagts, & B. Ristau, eds.), in 1977 DIG. U.S. PRAC. INT'L L. 1017, 1062-63 (No. 62) (no immunity for "non-profit" funded by foreign government and "inspired by an important governmental purpose" because acts were "private").

### 4. Official-Act Immunity Is Unavailable Because The Amended Complaint Alleges *Jus Cogens* Violations.

Defendants' conduct-based immunity arguments also fail because violations of *jus cogens* norms override such immunity.  *Jus cogens* norms are nonderogable.  Hence, acts that violate *jus cogens* norms can never be official sovereign acts—because international law prohibits states from approving of or conducting such acts.  *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 718 (9th Cir. 1992) ("International law does not recognize an act that violates *jus cogens* as a sovereign act."); *see Sarei v. Rio Tinto, PLC*, 487 F.3d 1193, 1210 (9th Cir. 2007).

None of Defendants' cases are to the contrary.  *Doğan* relied on the fact that the "foreign sovereign . . . ratified the defendant's conduct and the State Department file[d] a Suggestion of Immunity," neither of which is true here.  932 F.3d at 897; *see Giraldo v. Drummond Co.*, 808 F. Supp. 2d 247, 249, 251 (D.D.C. 2011), *aff'd*, 493 F. App'x 106 (D.C. Cir. 2012) (similar); *Buratai*, 318 F. Supp. 3d at 232 (sovereign "emphatically" claimed alleged actions).  In *Matar*, too, the State Department filed a suggestion of immunity—and the Second Circuit asked whether *jus cogens* violations overrode the FSIA's *statutory* immunity.  563 F.3d at 14-15.  Indeed, in *Samantar*, the Fourth Circuit concluded that "under international and domestic law, officials from other countries are not entitled to foreign official immunity for *jus cogens* violations, even if the

acts were performed in [an] official capacity."  699 F.3d at 777.  Here, Defendants' conduct constituted (and aided and abetted) *jus cogens* violations that cannot be sovereign acts.[40]

### C.    Saudi Arabia Is Not A Necessary Or Indispensable Party.

Repurposing their immunity arguments, Defendants claim Saudi Arabia is a necessary party under Rule 19 because this suit supposedly asks the Court to "adjudicate, and rule unlawful, specific acts undertaken by" Saudi officials "in an official governmental capacity."  MBS Br. 42-43.  This argument fails for the same reasons Defendants' immunity arguments fail: This suit seeks individual relief against the individual Defendants for conduct taken in their individual capacities.

### 1.    Saudi Arabia Has "No Interest Relating To The Subject Of" This Action That This Suit Will Impair.

The law is clear that an absent sovereign does not have an "interest relating to the subject" of an action that challenges its officials' individual-capacity conduct and seeks only individual, personal-capacity relief.[41]  In particular, under this clear law, Saudi Arabia does not become a necessary party just because some Defendants carried out the plot while holding government posts.

Defendants rest their Rule 19 argument on the same false premise as their immunity arguments.  They claim again that Dr. Saad is asking "this Court to . . . rule unlawful" acts "alleged to have been untaken in an official governmental capacity"—listing, for example, the "detention" of "members of [Dr. Saad's] family."  MBS Br. 42-43.  But to begin, Defendants are not entitled

---

[40] *Accord* U.N. Human Rights Council, *Annex to the Report of the Special Rapporteur on extrajudicial, summary or arbitrary executions: Investigation into the unlawful death of Mr. Jamal Khashoggi*, ¶¶ 21, 193, 433-34, U.N. Doc. A/HRC/41/CRP.1 (June 19, 2019) (concluding that bin Salman's extrajudicial killing of Khashoggi violated *jus cogens* norms).

[41] *E.g.*, *Askew v. Sheriff of Cook Cty.*, 568 F.3d 632, 636-37 (7th Cir. 2009) (in a case brought "against [a state employee] in his individual capacity," the state not a required party because "[a]ny judgment entered would be against" employee alone); *Nahno-Lopez v. Houser*, 627 F. Supp. 2d 1269, 1285-86 (W.D. Okla. 2009), *aff'd*, 625 F.3d 1279 (10th Cir. 2010) ("no reason" absent sovereigns "would be required" in action seeking "damages from the individual defendants").

to their own facts on a Rule 12(b)(7) motion.  A court "must accept the complaint's allegations as true for the purposes of a Rule 12(b)(7) motion." *Cronin v. Adam A. Weschler & Son, Inc.*, 904 F. Supp. 2d 37, 41 (D.D.C. 2012).  "[E]xtrinsic evidence" is permitted only "[i]n evaluating the need for the absent person" (and even then, not to contradict well-pled allegations).  *16th & K Hotel, LP v. Commonwealth Land Title Ins. Co.*, 276 F.R.D. 8, 12 (D.D.C. 2011).  Here, Dr. Saad has pled that when Defendants tortured his son-in-law, disappeared other family and associates, and barred his children from leaving the country when they were 17 and 18 (as a few examples), bin Salman acted in his personal capacity and outside official channels.  Certainly, Defendants have not introduced *evidence* that (for example) torturing Salem Almuzaini was an official act.

The more fundamental point, however, is the same one that disposed of Defendants' immunity claim: This case is about Defendants' plot to torment and kill Dr. Saad on foreign soil— which they all but concede could not have constituted official conduct—and does not require this Court to adjudicate any of the acts Defendants baselessly attribute to Saudi Arabia.  The same is true of the Amended Complaint's allegations about bin Salman's accession to the status of Crown Prince or MiSK's use of SACM.  MBS Br. 43.  Resolving Dr. Saad's claims would not require this Court to decide the legality of either.  Defendants thus have not met their burden of proving that this suit requires this Court to "examine the validity" of any acts of state.  *See Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 951 (D.C. Cir. 2008).

Defendants incorrectly say that a sovereign state is a necessary party whenever a case "involves a 'matter of significant importance'" to the sovereign.  MBS Br. 41-42 (quoting *TJGEM LLC v. Republic of Ghana*, 26 F. Supp. 3d 1, 13 (D.D.C. 2013)).  That is not true.  The sole case Defendants cite, *TJGEM*, was at bottom a bid-protest case concerning a contract award by Ghana—which the plaintiffs claimed was unlawfully denied to them via "rambling . . . allegations

of corruption and bribery." 26 F. Supp. 3d at 4. Indeed, the *TJGEM* plaintiffs "conceded" that

Ghana was a necessary party. *Id.* at 12. *TJGEM*'s unlitigated holding does not establish a new

test triggering dismissal of any case that vaguely implicates "important" state interests. Instead,

Rule 19(a) applies to sovereigns in the same way it applies to all other absent parties.[42]

### 2.    This Case Can, "In Equity And Good Conscience," Proceed.

Even where, unlike here, an absent sovereign has a protected interest, Rule 19 does not

require dismissal unless "equity and good conscience" compel as much. Fed. R. Civ. P. 19(b).

That inquiry turns on whether "there is a potential for injury to the interests of the absent

sovereign." *Republic of Philippines v. Pimentel*, 553 U.S. 851, 867 (2008). *Pimentel* and

*TJGEM*—on which Defendants rely—underscore why no such risk exists here. Both cases

concerned the sovereign's own contracts or property. *TJGEM* was about a government contract.

And *Pimentel* was an action to decide ownership of property in which the Philippines claimed an

interest. 553 U.S. at 866. By contrast, Dr. Saad's individual-capacity claims cannot touch any

property or contractual interest of Saudi Arabia.

### D.    The Act of State Doctrine Does Not Bar Dr. Saad's Claims.

Defendants fare no better with their similar arguments based on the act-of-state doctrine.

That doctrine prevents courts from "declar[ing] invalid . . . the official act of a foreign sovereign

performed within its own territory." *W.S. Kirkpatrick & Co., Inc. v. Env't Tectonics Corp., Int'l*,

---

[42] *See de Csepel v. Republic of Hungary*, No. 1:10-cv-01261, 2020 WL 2343405, at *12 (D.D.C. May 11, 2020); *accord Am. Trucking Ass'n, Inc. v. N.Y. State Thruway Auth.*, 795 F.3d 351, 357-58 (2d Cir. 2015) (New York not a necessary party in a suit against the New York Thruway Authority because any adverse judgment would not require New York to dispose of any property interest); *Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 463, 465 (D.C. Cir. 2017) (Republic of Guinea not a necessary party in a case concerning its rights under a contract that it had assigned); *ConnTech Dev. Co. v. Univ. of Conn. Educ. Properties, Inc.,* 102 F.3d 677, 682-83 (2d Cir. 1996) (Connecticut not a necessary party in a breach-of-contract suit against a state-founded corporation; corporation was legally distinct from the State and State was not liable for debts).

493 U.S. 400, 405 (1990).  An "official act" is conduct that is "distinctly sovereign," meaning it "cannot be undertaken by a private individual." *McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066, 1073 (D.C. Cir. 2012).  An act is not "official" merely because it is performed by a government official; the official must show that he or she was "invested with sovereign authority" to perform the act, via a "statute, decree, order, or resolution." *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 691-95 (1976).  Moreover, "[a]s a substantive rather than a jurisdictional defense," the doctrine "is more appropriately raised in a motion for summary judgment." *United States v. Sum of $70,990,605*, 4 F. Supp. 3d 189, 204 (D.D.C. 2014).  So long as a "potential rejoinder" is not "foreclosed by" the complaint, dismissal "is improper." *Id.*

Here, Defendants' arguments do not satisfy this exacting standard.  If Saudi law enforcement had arrested Dr. Saad in Saudi Arabia and charged him with corruption, the officers might have an act-of-state defense to a suit challenging the charges as invalid.  But what happened here was nearly the opposite: bin Salman enlisted a group of U.S. students to hunt down Dr. Saad before dispatching his personal hit squad on tourist visas to North America to kill and dismember him.  As before, Defendants cannot transform those egregious abuses into an act of state.  Indeed, although Defendants bear the burden of showing the doctrine applies, *Doe v. Exxon Mobil Corp.*, 69 F. Supp. 3d 75, 88 (D.D.C. 2014), no Defendant claims the Saudi government has ordered that Dr. Saad be killed, extrajudicially or otherwise.  "The Act of State doctrine does not apply [when] . . . the actions complained of were not taken by a foreign sovereign," but by defendants "acting in their individual capacities to advance their personal interests." *Jungquist v. Nahyan*, 940 F. Supp. 312, 319 (D.D.C. 1996), *rev'd in part on other grounds*, 115 F.3d 1020.

Defendants suggest that the act-of-state doctrine applies because aspects of Dr. Saad's claims implicate, in some vague way, actions they attribute to the Saudi government.  MBS Br.

49-50.  But this is the same failing argument Defendants make under the law of immunity and Rule 19, which fares no better when dressed in act-of-state garb.  Indeed, the act-of-state doctrine "is not implicated merely because one possible outcome would logically imply that a foreign official act was invalid, unless that implication is . . . itself a component of the reasoning underlying the result."  *United States v. Sum of $70,990,605*, 234 F. Supp. 3d 212, 238 (D.D.C. 2017).  That is because the doctrine is not an "exception for cases and controversies that may embarrass foreign governments."  *W.S. Kirkpatrick & Co.*, 493 U.S. at 409.  Here, Defendants ask this Court to apply the doctrine in just the way these cases uniformly hold is impermissible.

Straining to invoke the act-of-state doctrine, Defendants insist that Dr. Saad's claims "are premised on numerous alleged official acts that Saudi Arabia undertook."  MBS Br. 49.  But to begin, that claim is false for the same reasons Dr. Saad has explained: His claims are not premised on (say) his "dismissal . . . from his government position," the "removal of . . . bin Nayef" as Crown Prince, or any supposed "criminal investigation" into Dr. Saad.  *Id.*  And in all events, no Saudi government action would be *invalidated* by any judgment here.  Whether Saudi Arabia has "good reasons" to "investigat[e]" Dr. Saad, *id.*, is not at issue.  Whether bin Salman "holds his position legitimately," *id.*, is similarly irrelevant.  The Court need not decide whether bin Salman is the Crown Prince to hold that bin Salman cannot send a hit squad to kill Dr. Saad.

The same is true of the miscellaneous actions against Dr. Saad, his family, and his associates that Defendants invoke, including travel prohibitions on his children, "prosecutions and enforcement activities directed" at his family and associates,[43] or the seizure of his and his family's assets.  *Id.*  To begin, bin Salman plays it fast and loose with his claim that these actions *actually*

---

[43] To be clear, Dr. Saad does not allege that Dr. Saad's associates or relatives other than Omar and Sarah have been prosecuted or subjected to "enforcement activities."  *Contra* MBS Br. 49.  He alleges that they have been kidnapped, disappeared, and in some cases, tortured.  AC ¶¶ 196-217.

reflect government acts.  He would like the Court to believe that all his actions against Omar and Sarah were steps in a criminal prosecution, based solely on an irregular document dated April 1, 2021 (four days before his motion to dismiss) memorializing a supposed conviction on November 4, 2020 (after the Complaint was filed)—when bin Salman's detention and forced disappearance of Omar and Sarah occurred long before.  *Supra* at 8-9, 20.  Indeed, in 2018, bin Salman even offered to "exchange" Sarah and Omar for Dr. Saad's two older children, so long as he kept hold of *some* of Dr. Saad's children as leverage—hardly the hallmark of a criminal prosecution.  Doe Decl. ¶ 14; *see* AC ¶ 188.  Meanwhile, bin Salman has submitted no documents showing that his *torture* of Salem Almuzaini was an official act.  AC ¶¶ 196-205.

In any event, this Court may hold Defendants liable without determining the validity of any act that could plausibly be attributed to the Saudi government.  And as Dr. Saad has explained, for the act-of-state doctrine to apply, "[i]t is not sufficient . . . that a court's factual findings would 'impugn' the foreign state's actions; the claims must call for the invalidation of those actions." *Exxon*, 69 F. Supp. 3d at 88.  This Court could find Defendants liable for attempting to kill Dr. Saad, and could even find that bin Salman's personal objectives played a role in what the State Department has described as the "persecution" of his children, AC ¶ 193 & n.175, without declaring invalid any conviction.  At most, the allegations Defendants invoke may *embarrass* Saudi Arabia—which is irrelevant to the act-of-state doctrine.  *W.S. Kirkpatrick*, 493 U.S. at 409.

The doctrine is also inapplicable because this suit does not concern acts taken in a sovereign's "own territory."  *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964).  It centers on bin Salman's attempts to extrajudicially kill Dr. Saad through acts taken in the United States and Canada.  Extraterritorial acts can trigger the doctrine only in narrow circumstances absent here.  *Hourani v. Mirtchey*, 796 F.3d 1, 12-14 (D.C. Cir. 2015).  In *Hourani*, the doctrine

barred a challenge to an ambassador's speech on his embassy's website, which "formally communicated the foreign government's official view of domestic events occurring within its own territory, involving its own nationals" and "its own national security." *Id.* at 13-14. Because the speech gave "voice to the foreign government speaking from within its own territory," it was a "quintessentially sovereign" act of state even though the embassy and website were U.S.-based. *Id.* By contrast, the attempt to murder Dr. Saad was not quintessentially sovereign.

Nor can Defendants gain by pointing to a royal order purporting to authorize bin Salman "'with taking whatever measures deemed necessary' to protect national security and root out corruption." MBS Br. 50 (alterations omitted). Although Defendants gesture at this broad language, they do not actually *claim* it authorized an extrajudicial killing. Indeed, bin Salman formed the Tiger Squad *precisely because* Saudi Arabia would not let him carry out personal vendettas via official channels. *Supra* at 9-10. Courts have "no difficulty in distinguishing the legal acts of a . . . ruler from his acts for personal profit," *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1361 (9th Cir. 1988). Because Defendants' attempt to extrajudicially kill Dr. Saad "flagrantly violat[ed]" Saudi law, it cannot "constitute [an] official act[]." *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 61 (2d Cir. 2019); *see Exxon*, 69 F. Supp. 3d at 88.[44]

Indeed, even if (counterfactually) bin Salman's attempted extrajudicial killing of Dr. Saad had been an official Saudi government act that was legal under Saudi law, Defendants would still

---

[44] Defendants incorrectly assert that Dr. Saad has conceded that, when the Tiger Squad travelled to kill Dr. Saad, they were "acting within the scope of 'their positions in the Saudi government.'" MBS Br. 50 (quoting AC ¶ 347). Dr. Saad has conceded no such thing. Defendants rely heavily on Dr. Saad's allegation that the Tiger Squad "consisted of an interagency group of employees." *Id.* (quoting AC ¶ 337). But the word "interagency" just means that bin Salman *plucked* these individuals from assorted agencies—because he needed the distinctive skills each possessed and viewed them as personally loyal—and assembled them to "conduct[ ] operations outside the official channels of the Saudi government." AC ¶¶ 277-78, 280, 284, 337. Defendants cannot cherry-pick the word "interagency" and ignore Dr. Saad's other allegations.

lose.  Violations of "*jus cogens* norms are exempt from the [Act of State] doctrine, since they constitute norms 'from which no derogation is permitted.'" *Sarei v. Rio Tinto, PLC*, 671 F.3d 736, 757 (9th Cir. 2011) (en banc), *vacated*, 569 U.S. 945 (2013).  Dr. Saad's allegations of an attempted extrajudicial killing, "which must be accepted as true . . ., constitute *jus cogens* violations and therefore are not recognized as official sovereign acts." *Warfaa v. Ali*, 33 F. Supp. 3d 653, 662 (E.D. Va. 2014), *aff'd*, 811 F.3d 653 (4th Cir. 2016).[45]

## II.    This Court Has Personal Jurisdiction Over Each Defendant.

The Amended Complaint alleges that Defendants directed a hit squad to kill a valued U.S intelligence partner, targeted him precisely because of his U.S. intelligence relationships, and carried out their plot on U.S. soil.  They can be required to answer for their abuses in U.S. courts. This Court has personal jurisdiction over bin Salman, Alasaker, Alqahtani, Alassiri, Alhamed, Abuljadayel, and the Tiger Squad Defendants under Rule 4(k)(2) (the "Federal Long-Arm Defendants") and MiSK, Alrajhi, and Hamed under D.C. Code § 13-423(a)(1) (the "D.C. Long-Arm Defendants").

### A.    Personal Jurisdiction Lies Over The Federal Long-Arm Defendants.

Rule 4(k)(2) provides jurisdiction where (1) a claim arises under federal law, (2) the defendant is not subject to jurisdiction in any state, (3) service is proper, and (4) jurisdiction accords with due process, measured by contacts with the United States as a whole.  *Mwani v. bin*

---

[45] In *Doe I v. State of Israel*, 400 F. Supp. 2d 86 (D.D.C. 2005), the plaintiffs claimed that "Israeli policy regarding the . . . Israeli-Palestinian conflict violate[s] *jus cogens* principles," and the court summarily declined to recognize an exception from the act-of-state doctrine based on this alleged *jus cogens* violation.  *Id.* at 114.  By contrast, when Judge Brinkema considered an attempted extrajudicial killing claim, she readily concluded that the act-of-state doctrine "is inapplicable." *Warfaa*, 33 F. Supp. 3d at 661-62.  That result, she explained, followed from the act-of-state doctrine's rationale: That doctrine limits inquiry into sovereign acts of foreign states—but because *jus cogens* violations cannot be "authorized by any foreign sovereigns," it "follows" that such violations "cannot serve as a basis for the act of state doctrine." *Id.*; *see Sarei*, 671 F.3d at 757.

*Laden*, 417 F.3d 1, 10 (D.C. Cir. 2005).  Defendants only dispute the last requirement.  MBS Br. 13-24; *see* Tiger Squad Br. 20-29; Alasaker Br. 4 n.2; MiSK Br. 3 n.2; US Agents' Br. 43-45. Hence, Dr. Saad need only make a prima facie showing that due process permits jurisdiction.  It does.  Dr. Saad first addresses bin Salman and then the other Federal Long-Arm Defendants.[46]

### 1.   Exercising Jurisdiction Over Bin Salman Comports With Due Process.

Due process permits personal jurisdiction so long as defendants have sufficient forum "contacts" and the suit "does not offend traditional notions of fair play and substantial justice." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) (quoting *Int'l Shoe Co. v. Wash. Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316-17 (1945)).  When a defendant "purposefully direct[s] . . . activities" at the forum, he "should reasonably anticipate being haled into court" there.  *Mwani*, 417 F.3d at 4, 12, 14.  Due process requires a "'connection' between a plaintiff's suit and a defendant's activities," and the suit must "'arise out of *or relate to* the defendant's [forum] contacts.'"  *Ford*, 141 S. Ct. at 1026.  It does not require a "strict causal relationship" or that a claim "came about because of the defendant's [forum] conduct."  *Id.*[47]

This Court has personal jurisdiction over bin Salman for two independent reasons.  First, his plot targeted the *United States*:  He sought to kill Dr. Saad in order to disrupt an important U.S intelligence partnership, to limit the U.S. intelligence community's access to valuable information, and to alter the U.S. intelligence community's behavior.  Second, bin Salman carried out his plot on *U.S. soil*.

---

[46] Because Rule 4(k)(2) provides jurisdiction for the federal claims, pendent jurisdiction lies for the claim for intentional infliction of emotional distress.  *See Geier v. Conway, Homer & Chin-Caplan, P.C.*, 983 F. Supp. 2d 22, 31 (D.D.C. 2013).

[47] The Supreme Court has said that it is *sufficient* to show a "strong 'relationship between the defendant, the forum, and the litigation,'" without holding that a "strong relationship" is *necessary*. *Ford*, 141 S. Ct. at 1026 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)).  In any event, Dr. Saad's claims satisfy a "strong relationship" standard.

i.      **Because Bin Salman Purposefully Targeted The United States, He Is Subject To Personal Jurisdiction.**

Defendants cannot engage in "wrongdoing intentionally directed at" a forum yet hide behind due process when plaintiffs seek to hold them to account in that forum.  *Calder v. Jones*, 465 U.S. 783, 790 (1984).  *Mwani* held that personal jurisdiction is proper where a foreign defendant "engage[s] in unabashedly malignant actions directed at [and] felt in this country," "regardless of the plaintiff['s] nationality." 417 F.3d at 4 (second alternation in original).  Kenyans injured in a bombing in Kenya sued al Qaeda and Osama bin Laden for orchestrating the attack.  *Id.*  The district court dismissed because the attack occurred abroad, the plaintiffs were Kenyan, and the defendants lacked "physical contacts [with] the forum."  *Id.* at 12.  The D.C. Circuit reversed.  It explained that jurisdiction "may not be avoided merely because the defendant did not physically enter the forum."  *Id.*  Jurisdiction "attach[es] if . . . conduct is aimed at or has an effect in the forum."  *Id.* at 13.  And because the defendants "purposefully direct[ed] their terror at the United States," they were subject to jurisdiction.  *Id.* at 14.  That "injured Kenyans . . . [we]re the plaintiffs" did "not deny the court personal jurisdiction."  *Id.* at 13.

Courts have repeatedly applied *Mwani* to exercise personal jurisdiction over defendants who target U.S. interests.  In *Sisso v. Islamic Republic of Iran*, Judge Bates found personal jurisdiction proper because a terrorist attack in Israel "targeted U.S. . . . interests."  448 F. Supp. 2d 76, 90 (D.D.C. 2006).  In *Ofisi v. Al Shamal Islamic Bank*, he found that jurisdiction would be proper if the defendant was "involved in planning, executing, or otherwise knowingly facilitating or carrying out" attacks abroad targeting U.S. interests.  Civ. No. 15-2010, 2019 WL 1255096, at *8 (D.D.C. Mar. 19, 2019).  And in *Hassen v. Nahyan*, the court exercised jurisdiction over defendants (including Abu Dhabi's Crown Prince Mohamed bin Zayed) because they "abducted [the plaintiff] in part because they suspected that he worked for the CIA" and were interested in

his access to "state secrets." No. CV 09-01106, 2010 WL 9538408, at *8-*10 (C.D. Cal. Sept. 17, 2010). This conduct, the court explained, was "expressly aimed . . . at the United States." *Id.* at *10; *see In re Nahyan*, 485 F. App'x 859, 861 (9th Cir. 2012) (denying the Crown Prince mandamus, citing *Mwani*).[48] As these cases recognize, *Mwani* turned on the defendants' targeting of U.S. interests, not on "physical contacts" with U.S. soil or property. *Compare* 417 F.3d at 13 (emphasizing that defendants intended "to cause pain . . . in . . . the United States"), *with id.* at 12 (emphasizing that "physical contacts" are unnecessary).

That principle compels the same result here. Bin Salman targeted Dr. Saad to disrupt the U.S. intelligence community's relationship with Dr. Saad, to deprive the intelligence community of information Dr. Saad held, and to alter the intelligence community's approach to bin Salman. AC ¶¶ 141-54, 159-61. That is why bin Salman caused Dr. Saad's termination after Dr. Saad met with CIA Director Brennan. *Id.* ¶¶ 151-53. That is also why bin Salman escalated his attempts to catch and kill Dr. Saad—and, per Saudi intelligence, became "very eager" to get Dr. Saad, *id.* ¶ 165—after he was associated with a U.S. lobbying effort by then-Crown Prince bin Nayef, who possessed the same close U.S. intelligence connections. *Id.* ¶¶ 150-53; 163-65; 313-14; 353-55.[49]

---

[48] *Accord Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F. Supp. 2d 54, 59-60 (D.D.C. 2003) (finding jurisdiction over Libyan president and intelligence personnel for attack abroad based on "intentional targeting of foreign nationals at the risk of killing Americans among them"); *Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38, 54 (D.D.C. 2000) (exercising personal jurisdiction for detentions and torture in Kuwait and Iraq because it "had a direct effect in the United States and was consciously designed to affect United States policy").

[49] Bin Salman's assertion that it is "implausible" to believe that U.S. support is important to Saudi Arabia's leaders, MBS Br. 6, is just an attempt—and one of many—to impermissibly "controvert[]" the facts alleged in the Amended Complaint at this preliminary stage. *IMAPizza*, 334 F. Supp. at 108 n.2. Dr. Saad has explained at length how both bin Salman and bin Nayef's conduct showed the opposite: they launched aggressive lobbying campaigns in order to win the U.S. support that they believed important. AC ¶¶ 155-67. As this competition reflects, "political support from a global superpower like the United States" is essential to the Kingdom's royal family and political leaders. Mudd Decl. ¶¶ 13-14.

And that is why bin Salman became even more desperate to disrupt U.S. intelligence's access to Dr. Saad after Khashoggi's killing, knowing the information Dr. Saad possessed was just the information U.S. intelligence sought.  *Supra* at 11-12 & n.7.  Because bin Salman's attempt to kill a U.S. intelligence partner was "aimed at or ha[d] an effect in" the United States, this Court has personal jurisdiction.  *Mwani*, 417 F.3d at 13; *Hassen*, 2010 WL 9538408, at *10.

### ii.   Exercising Personal Jurisdiction Is Also Appropriate Because Bin Salman Directed Significant U.S. Conduct.

This case is easier than *Mwani* because it involves "overt acts occurring within this country's borders" that furthered the attempted killing.  *Cf. Mwani*, 417 F.3d at 13 (conduct on U.S. soil supported jurisdiction even though it did not relate to attacks at issue).  Bin Salman deployed operatives into the United States, to find and kill a target closely connected with the United States.  Now, bin Salman may be called on to answer for his conduct in U.S. courts.

In order to unleash the Tiger Squad on Dr. Saad, bin Salman had to *find him*—and learn all the information about Dr. Saad's habits and vulnerabilities necessary to kill such a difficult target. Bin Salman did all that in the United States.  Believing Dr. Saad had fled to Boston, where four members of the Aljabri family lived and where the family had property, bin Salman activated a network of operatives—via his "invisible hand" Alasaker and his personal foundation, MiSK—to hunt down Dr. Saad.  AC ¶¶ 15, 36, 40, 172.  Defendants Alhamed, Alrajhi, Abuljadayel, Alharbi, and Hamed interrogated Dr. Saad's family and acquaintances and surveilled locations associated with the family.  *Id.* ¶¶ 15, 172, 225-46.  So insistent and invasive were the interrogations that targets became suspicious—and indeed, the hunt triggered an FBI investigation and warning.  *Id.* ¶ 250 (Alharbi's "visibly uncomfortable" demeanor aroused suspicion); *id.* ¶ 253 (target "disturbed" by repeated questions about Dr. Saad); *see id.* ¶¶ 109, 245, 319-320.

This U.S. hunt also built on years of U.S. conduct.  Bin Salman and Alasaker activated bin

Salman's personal foundation, MiSK, and the network of agents developed through MiSK (including via 2015, 2016, and 2017 MiSK events in the Boston area that Alasaker, Alrajhi, Abuljadayel, Alhamed attended, including as MiSK employees).  *Id.* ¶¶ 41-44, 90, 104, 107. Indeed, bin Salman and Alasaker leveraged MiSK events *specifically* to hunt down Dr. Saad.  In September 2017, Alasaker and Alhamed attended a MiSK event in New York where, *at Alasaker's table*, their associate interrogated a close friend of Dr. Saad's family about Dr. Saad's son, Khalid. *Id.* ¶ 238.  This event occurred at the same time as Tiger Squad members were torturing Dr. Saad's son-in-law in Saudi Arabia to locate Dr. Saad, *supra* at 12, and it kicked off the operatives' weeks-long effort to interrogate and access Dr. Saad's family and friends in Boston, AC ¶ 238.  Courts have repeatedly held that such "financial and operational contacts with the United States" support personal jurisdiction even when attacks occur abroad.  *Sisso*, 448 F. Supp. 2d at 90 (jurisdiction based on U.S.-based "recruitment, propaganda, [and] public relations"); *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 678 (2d Cir. 2013) (defendants used charities to support al Qaeda when al Qaeda was targeting U.S. interests).

The U.S. conduct does not stop there.  Twice, bin Salman directed his hit squads *through the United States* to kill Dr. Saad.  He did so in October 2018, when the flight carrying five Tiger Squad members flew into and through the United States en route to Dr. Saad.  *Supra* at 15-16. And he did so again in May 2020, when—after obtaining a *fatwa* calling for Dr. Saad's death— bin Salman ordered henchmen to travel through the United States by land to reach Dr. Saad.  AC ¶¶ 354-55; *cf. Mwani*, 417 F.3d at 13 n.12 (similar *fatwa*).  So again: Because bin Salman dispatched his hit squads in and through the United States, he cannot complain that he must answer here.  *See Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com de Equip. Medico*, 563 F.3d 1285, 1299-1300 (Fed. Cir. 2009) (exercising jurisdiction over corporation that directed its employees to travel

to the United States even though corporation did not sell products here); *Citadel Inv. Grp., L.L.C. v. Citadel Cap. Co*., 699 F. Supp. 2d 303, 314-15 (D.D.C. 2010) (exercising jurisdiction over Egyptian company based on attempts to enter the U.S. financial market despite lack of success).

### iii.  Bin Salman's Contrary Arguments Lack Merit.

#### a.  Bin Salman Has No Answer To *Mwani.*

Bin Salman does not acknowledge *Mwani*'s key holding that U.S. courts may exercise jurisdiction over defendants who "purposefully direct" activities targeting U.S. interests. *Mwani*, 417 F.3d at 4, 14.  And his attempts to evade that holding fail.

*First*, bin Salman recasts Dr. Saad's connections "to the U.S. intelligence community" as an attempt to ground personal jurisdiction on Dr. Saad's own "contacts with the United States," which bin Salman says "cannot be 'decisive.'"  MBS Br. 20.  That, however, is not Dr. Saad's theory.  The point is not that Dr. Saad has extensive U.S. connections (though he does) or even that bin Salman knew about them (though that is true too).  It is that bin Salman targeted Dr. Saad precisely to *disrupt* those contacts, to limit the U.S. intelligence community's access to Dr. Saad's information, and to alter the U.S. intelligence community's behavior.  This targeting of U.S. interests puts this case foursquare within *Mwani*.

*Second*, bin Salman suggests that Dr. Saad's theory is implausible because he had reason to kill Dr. Saad based solely on Dr. Saad's *Saudi* connections—which, per bin Salman, means that his conduct was "directed at Saudi Arabia."  MBS Br. 21.  But this argument rewrites both personal-jurisdiction law and basic pleading standards.  If bin Salman "purposefully directed" conduct at the United States, then exercising personal jurisdiction comports with due process even if he *also* targeted Saudi Arabia.  *Mwani*, 417 F.3d at 4, 14.  *Mwani* did not ask whether bin Laden had targeted Kenya *more than* the United States.  *Id.*  Indeed, had that been the question, the D.C. Circuit might not have exercised jurisdiction over a suit by Kenyan plaintiffs based on an attack

by al Qaeda in Kenya.  *Accord IMAPizza*, 334 F. Supp. 3d at 115 (that "the main events underlying

the claim occurred abroad does not diminish Defendants' contacts with this forum").

Nor, in any event, can bin Salman procure dismissal by asking this Court to credit his story

for why he wanted Dr. Saad dead.  In undertaking a "prima facie review, federal courts . . ., as

[with] other motions under Rule 12(b), take as true the allegations of the nonmoving party" and

do not "weigh the controverting assertions of the party seeking dismissal." *Id.* at 108 n.2.  Hence,

offering an "alternative explanation . . . does not defeat personal jurisdiction." *Salu v.

Generational Equity of Cal., LLC*, No. SA CV 12-1436, 2013 WL 4522510, at *4 (C.D. Cal. Aug.

26, 2013); *see Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (where

there are "two alternative explanations, one advanced by the defendant and the other advanced by

the plaintiff, both . . . plausible," courts cannot dismiss by accepting the defendant's story).

**Third**, bin Salman cites three post-*Mwani* decisions that decline to apply *Mwani* to find

personal jurisdiction in cases arising out of terrorist attacks abroad.  MBS Br. 21.  Each decision,

however, lacks the critical fact that conferred jurisdiction in *Mwani*, which also yields jurisdiction

here: intentional targeting of the United States.  Instead, the attacks intended to sow terror

indiscriminately, on targets disconnected from the United States, and it was only "fortuitous" that

U.S. citizens were killed.  These cases involved an attack on an Israeli bus,[50] worshippers at a West

Bank site,[51] and a bombing of an Israeli pizzeria.[52]  In none did the plaintiffs plausibly allege that

---

[50] *Estate of Klieman by & through Kesner v. Palestinian Auth.*, 923 F.3d 1115, 1123 (D.C. Cir. 2019) ("random, fortuitous, or attenuated contact[]" does not establish "*intentional* conduct by the defendant" directed to the United States).

[51] *Livnat v. Palestinian Auth.*, 851 F.3d 45, 59 (D.C. Cir. 2017) (no allegations connecting the specific terrorist attack with the defendants' "general practice" of trying to influence the United States).

[52] *Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016, 1037 (D.C. Cir. 2020) ("no evidence" of defendant's "intentional conduct" targeting the United States).

those specific attacks targeted U.S. national security.  And none involved conduct on U.S. soil. *E.g.*, *Estate of Klieman by & through Kesner v. Palestinian Auth.*, 923 F.3d 1115, 1125 (D.C. Cir. 2019) (no "steps in the U.S. to aid and abet this particular attack *before* it occurred").  D.C. courts apply *Mwani* where, as here, the alleged acts were "specifically aimed at harming" the United States.  *Doe v. Buratai*, 792 F. App'x 6, 10 (D.C. Cir 2019).[53]

### b. Bin Salman Fails With His Attempts To Dismiss The Significant U.S. Conduct.

Bin Salman also fails with his attempts to shrug off the significant U.S. conduct.

*Causation*.  Bin Salman contends that the attempts to kill Dr. Saad's were "entirely disconnected" from the U.S. hunt because the hunt "did not succeed" and bin Salman learned Dr. Saad's location via "malware" planted on Dr. Saad's phones.  MBS Br. 10, 19-20.  This claim, however, mangles both the Amended Complaint and the legal standard.  To be clear, Dr. Saad *has not* alleged that the malware hack is what yielded his location.[54]  And Dr. Saad *has* alleged that the U.S. hunt was an essential step in the attempted killing—because bin Salman believed that Dr. Saad was in Boston and focused elsewhere only after ruling Boston out, and because the information the U.S. hunt gathered helped identify the vulnerabilities and habits necessary to trap and kill Dr. Saad.  AC ¶¶ 236, 238, 240, 242-43, 245, 250-51.  Having directed a manhunt aimed at finding Dr. Saad in the United States, bin Salman cannot procure dismissal by asking this Court to accept his story that a phone hack was the *one thing* that located Dr. Saad and enabled the killing.

---

[53] Defendants also cite *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 95 (D.C. Cir. 2002), which said in passing that Libya's torture of two U.S. citizens abroad would not yield personal jurisdiction in the United States.  In *Price*, however, Libya did not torture in order to influence the United States; it allegedly did so to show its "support of . . . Iran."  *Id*. at 86.

[54] *Compare* AC ¶ 333 (malware allowed "access [to] information on Dr. Saad's phone, and *potentially even* Dr. Saad's precise location" (emphasis added)), *with* MBS Br. 10 (bin Salman's mischaracterization of the Amended Complaint as alleging that the "'malware' . . . allowed [Defendants] to learn [Dr. Saad's] 'precise location' in Canada").

Bin Salman also rewrites the Due Process Clause to require but-for causation.  But as explained, the Supreme Court has not "requir[ed] proof of causation—*i.e.*, proof that the plaintiff's claim came about because of the defendant's in-[forum] conduct." *Ford*, 141 S. Ct. at 1026.  The question is whether the claims sufficiently "relate to" the defendant's forum contacts. *Id.*  And *searching* for Dr. Saad is certainly related to—indeed, "strong[ly]" related to— trying to *kill him*. *Id*. at 1028.  That is especially true given the "close timing" connecting the U.S. conduct and other actions bin Salman took to further Dr. Saad's murder.  *IMAPizza*, 334 F. Supp. 3d at 115.  The U.S. hunt began *five days* after bin Salman threatened "harmful" measures against Dr. Saad, occurred during the *same week* as the Tiger Squad began to torture Dr. Saad's son-in-law, and concluded *seven days* before Alharbi travelled to Canada to continue the hunt.  AC ¶¶ 178, 197-203, 247-55.  Just months later, the Tiger Squad Defendants obtained their visas.  *Id.* ¶ 331.[55]

*Attribution*.  Bin Salman also claims that the U.S. hunt is irrelevant because he did not undertake it personally and because (he claims) the U.S.-based hunters were not his "agents."  *But see* U.S. Agents' Br. 41-42 ("The Student Defendants and Mr. Hamed, as alleged private agents of [bin Salman], are entitled to derivative official immunity.").

This argument fails, first, because Dr. Saad need not establish common-law agency.  The due process question is whether a defendant "purposefully directed" actions at the forum.  *Mwani*, 417 F.3d at 4, 14.  Employing a common-law agent may be sufficient.  *E.g.*, *Daimler*, 571 U.S. at

---

[55] To the extent Defendants argue that efforts to locate Dr. Saad are insufficiently related to the killing itself because they preceded the killing by *too long*, MBS Br. 19; Alasaker Br. 17, that argument fails.  It takes time and planning to dispatch a team of foreign nationals overseas to kill and dismember the former head of Saudi intelligence—particularly where, as here, the killers must obtain visas before they travel.  *Compare* Gov't of Canada, Check Processing Times, https://bit.ly/2TN0hvT, *with* AC ¶ 331 (visas obtained by May 2018).  In any event, courts do not set timers that exclude relevant activities from the personal-jurisdiction inquiry.  *See Citadel*, 699 F. Supp. 2d at 318 n.8 ("timing and location" of particular activities "is of no moment" to personal jurisdiction because the court "consider[s] all [relevant] activities").

135 ("[a]gency relationships . . . may be relevant to the existence of specific jurisdiction").  But it is not *necessary*.  *Mwani*, for example, found personal jurisdiction in part because bin Laden "exhorted" unnamed "followers" to act in the United States.  417 F.3d at 13 n.12.  It did not ask whether he had formal agents.  Many decisions are in accord.[56]  Here, Dr. Saad has pled (and it is reasonable to infer) that bin Salman and his right hand, Alasaker, pulled the strings behind the operatives who were employed by his personal foundation and who began asking invasive questions of Dr. Saad's family and friends just five days after bin Salman promised that "we shall certainly reach you" and at the same time Alqahtani and the Tiger Squad were torturing Dr. Saad's son-in-law in pursuit of the same goal.  AC ¶¶ 178, 197-203, 225, 233, 238-45.[57]

Bin Salman cites no case holding that due process cares only about forum conduct by common-law agents.  Instead, he cites agency cases construing the D.C. long-arm statute—which provides for jurisdiction if a person does business in the District "directly or by an agent," D.C. Code. § 13-423.  *See* MBS Br. 16 (citing *Gregorio v. Gordon*, 215 F. Supp. 3d 1 (D.D.C. 2015); *Khatib v. Alliance Bankshares Corp.*, 846 F. Supp. 2d 18 (D.D.C. 2012)).  Also irrelevant are cases

---

[56] *Strange v. Islamic Republic of Iran*, Civ. No. 14-435, 2016 WL 10770678, at *8-*9 (D.D.C. May 6, 2016) (jurisdiction over president of Afghanistan based on directing the ambush of a U.S. military helicopter, without addressing agency); *Morris*, 415 F. Supp. 2d at 1327, 1336 (personal jurisdiction over father of a terrorist who merely "encouraged his son" to join al Qaeda); *In re Terrorist Attacks on Sept. 11, 2001*, 392 F. Supp. 2d 539, 561 (S.D.N.Y. 2005) (jurisdiction over a defendant who was the "head of various non-government organizations providing financial and logistical support to the al-Qaʻida network," without addressing agency), *aff'd*, 538 F.3d 71 (2d Cir. 2008); *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 56-57 (1st Cir. 2002) (the question "is whether a sufficient relationship exists under the Due Process Clause," "not whether a[n] . . . agency relationship . . . exists").

[57] Bin Salman incorrectly suggests that *Ofisi* holds that personal jurisdiction cannot be based on "allegations that a defendant 'plann[ed]' or 'orchestrat[ed]' actions directed at the United States." MBS Br. 16 (citing *Ofisi*, 2019 WL 1255096, at *6).  In *Ofisi*, however, the plaintiffs sought to hold a bank responsible for a terrorist attack without alleging that the bank was "directly involved." 2019 WL 1255096, at *6.  *Ofisi* does not apply a legal rule that well-pled allegations about "orchestrating" attacks are insufficient.

holding that courts "cannot aggregate factual allegations concerning multiple defendants." *Duarte v. Nolan*, 190 F. Supp. 3d 8, 11 (D.D.C. 2016); *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 42 (D.D.C. 2003).  Those cases hold only that there must be *some basis* for attributing one person's contacts to another.  They do not address what bases plaintiffs may invoke.

In any event, Dr. Saad has pled the elements of agency.  Agency exists where the principal has the "right to control" the agent.  *Atrium of Princeton, LLC v. NLRB*, 684 F.3d 1310, 1315 (D.C. Cir. 2012).  At the pleading stage, a plaintiff need only "plead facts that plausibly support an inference that" the agent is "subject to the principal's control." *Jefferson v. Collins*, 905 F. Supp. 2d 269, 285 (D.D.C. 2012).  The principal and agent need not even have *spoken*, much less have an express agreement.  *Compare* Restatement (Third) of Agency § 1.01 cmt. c (2006) (agency may exist "without any communication from the agent to the principal"), *with* MBS Br. 17 (arguing no agency exists because bin Salman supposedly never "met or spoke with the . . . agents").

Here, bin Salman had control over the U.S.-Based Covert Agent Defendants who carried out the U.S. hunt.  He directed his "invisible hand," Alasaker, to track down Dr. Saad, and Alasaker in turn tasked the U.S.-Based Covert Agent Defendants.  The Amended Complaint pleads myriad specific facts showing that bin Salman and Alasaker deployed such agents—and that here, the U.S.-Based Covert Agent Defendants were such agents.  Those facts include:

- The Department of Justice has filed indictments disclosing that bin Salman and Alasaker used Saudi former students in the United States—and leveraged Defendant MiSK's resources—to achieve similar objectives by infiltrating Twitter. *Supra* at 13 & n.8, 38; *infra* at 64 & n.58; AC ¶¶ 45 & nn.19-21, 132, 226 n.179.

- Public reporting discloses that Saudi student groups contain "spies" who receive special privileges (and exemptions from the tight restrictions that normally apply to Saudi students) in return for carrying out covert tasks. *Supra* at 13 & n.9; AC ¶¶ 229-32.

- The U.S.-Based Covert Agent Defendants fit to a tee the profile of these agents: They rubbed shoulders with senior Saudi leaders, received patronage positions that had little to do with their fields of study, and were outspoken publicly in support of bin Salman.

*Supra* at 14; *infra* at 105-06; AC ¶¶ 90-92, 94-104, 106-07, 233-35.

- The U.S.-Based Covert Agent Defendants embarked on their questioning and surveillance of Dr. Saad's family and acquaintances just when bin Salman and Alasaker needed them to do so: Days after bin Salman had threatened Dr. Saad, and days after Alasaker sought to convince Dr. Saad to return to Saudi Arabia at bin Salman's behest—and during the same period when bin Salman's henchmen in Saudi Arabia were torturing Dr. Saad's son-in-law to learn Dr. Saad's location. *Supra* at 8, 12-15, 56; AC ¶¶ 177-78, 197-203, 225, 233, 238-45.

- The U.S.-Based Covert Agent Defendants acted alongside Alasaker: In September 2017, Alasaker attended with Defendant Alhamed a MiSK event where more attempts were made to learn the whereabouts of Dr. Saad's family. *Supra* at 56; AC ¶ 238.

- Defendant Hamed attempted to surveil and physically access Dr. Saad at a residence in Boston that he could have only learned about through the efforts of other U.S-Based Covert Agent Defendants. *Supra* at 14-15; AC ¶ 245.

These "forum-related activities of an agent and . . . subagent[s] are imputable to the principal." *ABN AMRO, Inc. v. Cap. Int'l Ltd.*, 595 F. Supp. 2d 805, 821 (N.D. Ill. 2008). Defendants will have their chance to tell their story that the invasive and suspicion-arousing queries that prompted FBI action had innocent purposes, such as "arranging a marriage," and were disconnected from the murderous plot bin Salman was simultaneously executing. MBS Br. 18. A motion to dismiss is not that chance. *Evangelou v. Dist. of Columbia*, 901 F. Supp. 2d 159, 170 (D.D.C. 2012) ("*Twombly* and *Iqbal* do not require an inference of culpability to be the only inference that could be drawn."); *accord IMAPizza*, 334 F. Supp. 3d at 108 n.2.

## 2.  Exercising Jurisdiction Over Alasaker Comports With Due Process.

Bin Salman carried out his plot to kill a U.S. intelligence partner by directing Alasaker to hunt down Dr. Saad in the United States.  Just as personal jurisdiction is proper over bin Salman because he "purposefully directed" the killing of a U.S. intelligence partner, and did so by acting on U.S. soil, jurisdiction is proper over Alasaker for doing the same thing. *Mwani*, 417 F.3d at 13; *cf. In re Terrorist Attacks*, 714 F.3d at 678 (permitting jurisdictional discovery into foundation officials who sent "financial and other material support *directly* to al Qaeda when al Qaeda . . .

was . . . targeting the United States").

Alasaker's arguments echo bin Salman's and fail for the same reasons.  He claims that his actions cultivating and deploying the U.S. agents who hunted down Dr. Saad have no "substantial connection" with the "attempted killing," Alasaker Br. 16, which is wrong for the reasons explained above.  *Supra* at 55-56, 59-63.  He also asserts (at 11-16) that Dr. Saad's allegations are "conclusory" or "implausible."   But specific facts show that Alasaker knowingly executed bin Salman's plot:

- We know that Alasaker is bin Salman's "invisible hand," the head of bin Salman's private office, and the head of his personal foundation.  AC ¶ 40; *supra* at 5, 13.

- We know (because the Department of Justice has told us) that Alasaker carried out a similar scheme to use former Saudi students to infiltrate Twitter in order to silence bin Salman's enemies, exploiting his U.S. travel to do so.[58]  *Supra* at 13 & n.8.

- We know Alasaker participated in the Tiger Squad's prior missions to kill (because he received four phone calls during the Khashoggi murder).  AC ¶ 306.  *Supra* at 10.

- We know that the covert agents who carried out the hunt in the United States met with and declared their loyalty to Alasaker in the months leading up to the U.S. hunt.  AC ¶ 102 (Alhamed declared loyalty to Alasaker in August 2017); *id.* ¶ 104 n.96 (Alhamed met with Alasaker in August and September 2017); *id.* ¶ 107 (Abuljadayel's communication to Alasaker in July 2017).

- We know that Alasaker *personally* participated in the hunt for Dr. Saad: After bin Salman sent Dr. Saad a WhatsApp message on September 10, 2017 asking "where should we dispatch [an] airplane to fetch you"—and on the same day that bin Salman threatened to take "harmful" measures against Dr. Saad, *id.* ¶ 178—Alasaker repeatedly contacted Dr. Saad to coordinate the plane that bin Salman had mentioned.  *Id.* ¶ 177; *supra* at 8.  Then, five days later, Alasaker participated in a MiSK event in New York while his close associate interrogated an Aljabri family friend about Dr. Saad's family at Alasaker's table (at an event Alhamed also attended).  AC ¶ 238.

---

[58] Superseding Indictment ¶¶ 22, 26(k), *United States v. Abouammo*, No. 3:19-cr-621 (N.D. Cal. July 28, 2020), ECF No. 53; U.S. Opp. to Def.'s Mot. to Suppress at 2, 9, *Abouammo*, No. 3:19-cr-621 (N.D. Cal. May 19, 2021), ECF No. 133 (U.S. government filing describing Alasaker as someone "closely associated with" and who "performed work for" bin Salman, "secretly recruited" a covert agent while he was in the United States, and was a "key figure" in a U.S.-based criminal scheme such that there was probable cause that Alasaker himself "committed a crime").

Personal jurisdiction thus does not rest on Alasaker's "'knowledge' of someone else's 'strong forum connections,'" Alasaker Br. 10, but on his own actions carrying out bin Salman's directive to hunt Dr. Saad in the United States.  The insistence of Alasaker—bin Salman's invisible hand—that he had *no idea* why bin Salman wanted Dr. Saad dead, *id.* at 6-10, is just an attempt to litigate facts on a motion to dismiss.  Indeed, it is telling that he relies on cases applying Rule 9(b)'s heightened standard for *fraud*.  *Id.* at 13 (citing *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 493 (S.D.N.Y. 2017)).  Meanwhile, if Dr. Saad had to show that the U.S.-Based Covert Agent Defendants served as Alasaker's common-law agents, the above allegations make out a prima facie case of just that.

Exercising personal jurisdiction is especially straightforward because Alasaker took many of these actions while in *the United States*.  U.S. courts hear suits not only against the mastermind who orchestrates attacks targeting U.S. interests from abroad but against henchmen like Alasaker who provide "knowing support" from this country.[59]  Alasaker furthered bin Salman's plot through regular travel to the United States—including eight trips in four years—that allowed him to coordinate MiSK's overt and covert U.S. activities, including related to Dr. Saad.  AC ¶¶ 41, 45, 104 n.96 (meeting with Alhamed in the United States in August 2017); *id.* ¶ 238 (September 2017 MiSK event in New York used to initiate U.S. hunt for Dr. Saad); *see In re Terrorist Attacks*, 714 F.3d at 679 (foundation official's "travels to the United States" "raise[d] a plausible inference" he intended "to cause injury in the United States"); *cf.* U.S. Opp. to Mot. to Suppress at 8 n.4, *United States v. Abouammo*, No. 3:19-cr-621 (N.D. Cal. May 19, 2021), ECF No. 133 (U.S. government

---

[59] *E.g.*, *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 35 (D.D.C. 2010) (applying *Mwani* to find personal jurisdiction based on U.S. financial support for plot that "enhanced the [terrorist group's] ability to plan, prepare for and carry out" attacks); *Morris v. Khadr*, 415 F. Supp. 2d 1323, 1336 (D. Utah 2006) (applying *Mwani* to exercise jurisdiction based on participation in the "financing, planning, and coordinating" for an attack against U.S. interests).

filing indicating that Alasaker's D.C. presence during a key meeting "underscores the important role that [Alasaker] played in the scheme" to infiltrate Twitter).

### 3. Exercising Jurisdiction Over Alqahtani And Alassiri Comports With Due Process

Exercising personal jurisdiction over Alqahtani and Alassiri comports with due process because, as bin Salman's senior henchmen, they also "purposefully directed" the killing of a U.S. intelligence partner based on significant U.S. conduct.  *Mwani*, 417 F.3d at 13; *see Derensis v. Coopers & Lybrand Chartered Accts.*, 930 F. Supp. 1003, 1014 (D.N.J. 1996) (jurisdiction over foreign defendants who "approved and disseminated" activities with knowledge that conduct would have "influence" in the United States); *Landry v. Price Waterhouse Chartered Accts.*, 715 F. Supp. 98, 101-02 (S.D.N.Y. 1989) (jurisdiction over foreign "behind the scenes player" because he "knew, or should have known" his conduct would impact the United States).

Dr. Saad has pled many facts making out a prima facie case that Alqahtani and Alassiri knowingly participated in the plot to hunt and kill Dr. Saad.  Like Alasaker, these men serve as bin Salman's most trusted henchmen.  *Supra* at 5, 9-10; AC ¶¶ 48-59, 62-65.  And like Alasaker, these henchmen also led bin Salman's *other* plots against personal enemies.  AC ¶¶ 48-55, 62-65.  When the U.S. government identified the Tiger Squad as Khashoggi's killers, it explained that the Tiger Squad was "controlled by, or . . . acted or purported to act for or on behalf of, directly or indirectly, al-Qahtani," who "coordinated with" the operation's "ringleader," Alassiri, to "organize and dispatch" the team to Turkey.[60]  That murder is only the most well-known of the many violent

---

[60] U.S. Dep't of Treasury, *Treasury Sanctions the Saudi Rapid Intervention Force and Former Deputy Head of Saudi Arabia's General Intelligence Presidency for Roles in the Murder of Journalist Jamal Khashoggi* (Feb. 26, 2021), https://bit.ly/3gmzAFV; Press Release, U.S. Dep't of Treasury, *Treasury Sanctions 17 Individuals for Their Roles in the Killing of Jamal Khashoggi* (Nov. 15, 2018), https://bit.ly/3cu3siG.

crimes Alqahtani and Alassiri executed for bin Salman. *Supra* at 1, 9-10; AC ¶¶ 197-203, 274-77, 279-316; *id.* ¶ 56 (Alqahtani calling himself bin Salman's "faithful executioner").

Given that Alqahtani and Alassiri "ha[ve] been involved previously" in "similar . . . scheme[s]," Dr. Saad has plausibly pled that they played the same roles in the Tiger Squad's similar attempt to kill Dr. Saad. *Union Com. Servs. Ltd. v. FCA Int'l Ops., LLC*, 785 F. App'x 309, 319 (6th Cir. 2019); *cf. Levinson v. Islamic Republic of Iran*, 443 F. Supp. 3d 158, 172 n.19 (D.D.C. 2020) (relying on evidence of "a common modus operandi"). Dr. Saad's claims are particularly plausible given the close parallels between the Khashoggi murder and the killing here. *Supra* at 9-12, 15-17. And they are even more plausible because Alqahtani *personally* participated in torturing Dr. Saad's son-in-law. AC ¶¶ 198-203. Indeed, it would beggar belief if Alqahtani and Alassiri led the Khashoggi murder, tortured Dr. Saad's son-in-law to collect information about Dr. Saad, and participated in the hunt for Dr. Saad—but had no idea why bin Salman wanted to kill Dr. Saad, knew nothing of the U.S. hunt, and were uninvolved when bin Salman dispatched the Tiger Squad to kill. Dr. Saad has made a prima facie showing that they, like bin Salman, targeted U.S. interests based on significant U.S. conduct.[61]

Jurisdiction is especially proper given the array of support Alqahtani and Alassiri provided to bin Salman's actions targeting the United States. Alqahtani personally executed contracts with U.S. public relations firms to further bin Salman's campaign to win U.S. government support. *Id.* ¶ 57. Alqahtani also served as a director of MiSK, which Defendants used to cultivate U.S. covert agents. *Id.* ¶ 58. Alassiri visited the United States to further bin Salman's operations—and while

---

[61] For these same reasons, even if Dr. Saad had to show that the Tiger Squad Defendants and the U.S.-Based Covert Agent Defendants acted as common-law agents for Alqahtani and Alassiri, he has plausibly pled that Alqahtani and Alassiri directed and controlled the Tiger Squad when the team moved to kill again. *Supra* at 9-12; *cf.* Tiger Squad Br. 20-23.

here, received support from Defendant Alhamed, who has conceded jurisdiction in the United States. *Id.* ¶ 67. Alqahtani also led online disinformation campaigns against Dr. Saad directed at the United States. *Id.* ¶¶ 263-66. Such U.S. "operational contacts," including "recruitment" and "public relations," support jurisdiction. *Sisso*, 448 F. Supp. 2d at 90.

Alqahtani and Alassiri fare no better with their attempts to litigate factual disputes about Dr. Saad's allegations. Alassiri downplays his three U.S. trips by claiming they were for lobbying. Tiger Squad Br. 24. But travel can have multiple purposes. And Alassiri received support from Alhamed—who was supposedly a student but who in fact interrogated Aljabri family and friends during the hunt for Dr. Saad, working with Alasaker and Alrajhi. AC ¶¶ 238, 240-41. Any "factual discrepancies" about what Alassiri was *actually* doing must be resolved "in favor of the plaintiff." *Associated Producers, Ltd. v. Vanderbilt Univ.*, 76 F. Supp. 3d 154, 161 (D.D.C. 2014).

### 4. Exercising Jurisdiction Over The Tiger Squad Defendants Comports With Due Process.

The Tiger Squad Defendants were the *instruments* of bin Salman's attempt to kill a key U.S. intelligence partner based on a hunt carried out on U.S. soil. Just like Alqahtani and Alassiri, who commanded the Tiger Squad, they are subject to personal jurisdiction based on the conduct they "purposefully directed" at the United States. *Mwani*, 417 F.3d at 13.

To the extent the Tiger Squad Defendants mount a personal jurisdiction challenge, their argument appears to recycle that of Alqahtani and Alassiri—that they had no idea why bin Salman wanted Dr. Saad dead or about the U.S. hunt. Tiger Squad Br. 26-27. The Amended Complaint, however, plausibly pleads that the Tiger Squad Defendants were not so blind:

- The Tiger Squad Defendants' official positions were in the Saudi security services. Three (Alsayed, Algasem, and Alhaqbani) worked in the Ministry of Interior. AC ¶¶ 116-17, 119. Two (Albawardi and Bader Alqahtani) worked for an associated agency (the National Information Center) that worked in "close partnership" with the Ministry of Interior. *Id.* ¶¶ 121-22, 342. The other two worked in the Ministries of Defense (Alsaleh) and Foreign Affairs (Alhomid). *Id.* ¶¶ 118, 120.

68

- Dr. Saad and his U.S. connections were well known to these men: Dr. Saad's patron, then-Crown Prince bin Nayef, formerly controlled all the ministries where they worked.[62] And Dr. Saad himself spent four decades working at the highest levels of the Ministry of Interior. *Id.* ¶¶ 144-48. The Tiger Squad Defendants would have "closely identified" bin Nayef and Dr. Saad with the Saudi "security structure" and their "close ties to the U.S. intelligence community."[63]

- As members of the security services, the Tiger Squad Defendants "knew that Dr. Saad was a significant partner of the U.S. Intelligence Community and that he possessed highly sensitive information about" bin Salman, *id.* ¶ 115—and that bin Salman hoped to eliminate the threat posed by bin Nayef and Dr. Saad's U.S. relationships, *id.* ¶ 171.

- The team's composition (including several members who specialized in intelligence and criminal investigations, *id.* ¶¶ 116-22) and its interrogations before harming other victims, *id.* ¶¶ 54, 200-203, 246, 301, suggest that the Tiger Squad Defendants intended to interrogate Dr. Saad before they killed him—including to determine what he had told U.S. intelligence about bin Salman. *Supra* at 6-7, 11-12. To do so, the Tiger Squad Defendants had to know why bin Salman wanted Dr. Saad dead.

These facts establish a prima facie case that the Tiger Squad Defendants dispatched to interrogate and kill Dr. Saad "knew or had reason to" know how and why bin Salman targeted Dr. Saad.[64]

The Tiger Squad Defendants falsely claim that "the thrust of [Dr. Saad's] argument" is that they "are subject to the jurisdiction . . . based on other defendants' actions." Tiger Squad Br. 25. But it is the Tiger Squad Defendants' *own* actions that subject them to U.S. jurisdiction. They themselves attempted to kill a U.S. intelligence partner. They themselves relied on a hunt on U.S soil.[65] And they themselves leveraged U.S. territory when Algasem, Alsayed, Alhomid,

---

[62] Council for Pol. & Security Affs., Saudi-US Rels. Info. Serv. (Feb. 11, 2015), https://bit.ly/2T0c75d.

[63] Stephen Kalin, *Nephew Replaces Veteran Saudi Security Chief in Targeting Militants*, REUTERS (June 21, 2017), https://reut.rs/3wTyxnu.

[64] *Wultz*, 755 F. Supp. 2d at 34 (jurisdiction based on allegation that bank "knew or had reason to believe that the monies it was processing through the bank would be used to carry our terrorist attacks on civilian targets"); *Jamison v. Olin Corp.*, No. 03-1036, 2004 WL 1098940, at *4 (D. Or. May 14, 2004) ("close collaboration between all of the [] defendants" indicated that one "had reason to know" that its activities supported co-defendant's forum-directed activities).

[65] Defendants' conspiracy reinforces that this Court has jurisdiction. As explained below, Defendants conspired to kill Dr. Saad. *Infra* § III.C. And when some members of a conspiracy

Albawardi, and Bader Alqahtani physically entered the United States as their flight to Ottawa crossed U.S. airspace.  *See supra* at 16; AC ¶ 334; Hipp Decl. ¶ 4.  "[P]hysical presence . . . no matter how temporary," supports personal jurisdiction.[66]  Having relied on the United States to deliver them, the Tiger Squad Defendants can be required to answer in U.S. court for an attack seeking to disrupt a U.S. intelligence relationship.[67]

### 5. Alhamed And Abuljadayel Have Waived Any Objection To Jurisdiction.

Alhamed and Abuljadayel do not contest jurisdiction and have waived any objection.

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 453 (D.C. Cir. 1990).

### B. This Court Has Jurisdiction Over MiSK, Alrajhi, And Hamed Under The D.C. Long-Arm Statute.

Personal jurisdiction is proper over MiSK, Alrajhi, and Hamed under the District's long-arm statute.  Under D.C. Code § 13-423(a)(1), D.C. courts have jurisdiction over any "person, who

---

commit overt acts within a forum, those acts can support jurisdiction over *all* members, particularly those who knew about the forum contacts.  *Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158, 186 (D.D.C. 2018) (jurisdiction may rest on conspiracy when "defendant knew of the co-conspirator's [forum] acts").  Here, Alasaker, the U.S.-Based Covert Agent Defendants, and MiSK all committed overt acts within the United States, and each Defendant knew about them.

[66] *SEC v. Lines Overseas Mgmt., Ltd.*, No. 04-302, 2005 WL 3579139, at *4 (D.D.C. Jan. 4, 2006); *see Grace v. MacArthur*, 170 F. Supp. 442, 443 (E.D. Ark. 1959) ("a person moving in interstate commerce across the [forum] in a regular commercial aircraft, flying in the regular navigable airspace above the [forum], is within the 'territorial limits' of the [forum]"); *In the Matter of: Darcy Lynn Shawver William Jesse Roberts John Holer Marine Wonderland and Animal Park, Ltd. (carl Millard) (millardair, Ltd.)*, 2 O.R.W. 649, 653, 1982 WL 42982 (Feb. 12, 1982) (considering U.S. overflight *en route* to Canada as relevant jurisdictional contact); *United States v. Williams*, 536 F.2d 810, 812 (9th Cir. 1976) (venue proper where defendant flew over district because "the navigable airspace above a district is as much a part of it as a highway").

[67] *See* Julia Ioffe, TWITTER (May 24, 2021, 8:14 PM), https://bit.ly/2Seb8P7 ("[B]allet dancer who defected from the USSR to the U.S., apparently always checked the flight path before buying plane tickets: he never took a flight if it flew over Soviet territory."); *accord* Bill Browder, *Why I Never Fly over Russian Airspace*, FIN. TIMES (May 30, 2021), https://bit.ly/3z3ThuP.  A group of trained killers can be expected to know their flightpath.

acts directly or by an agent, as to a claim for relief arising from the person's . . . transacting any business in the District."  The "arising from" requirement is "not a particularly high threshold." *Armenian Genocide Museum & Mem'l, Inc. v. Cafesjian Family Found., Inc*., 607 F. Supp. 2d 185, 189 (D.D.C. 2009).  It receives an "an expansive interpretation" "coextensive with" due process. *Helmer v. Doletskaya*, 393 F.3d 201, 205 (D.C. Cir. 2004).  Like the Due Process Clause, the D.C. long-arm statute does not require but-for cause and is "to be interpreted flexibly and synonymously with 'relate to' or having a 'substantial connection with'" and requires only "a discernable relationship' to the" claim.  *Alkanani v. Aegis Def. Servs., LLC*, 976 F. Supp. 2d 13, 22 (D.D.C. 2014).  Indeed, the claim need only relate to the same "type of activity" conducted in the District. *Quality Air Servs., L.L.C. v. Milwaukee Valve Co*., 567 F. Supp. 2d 96, 101 n.4 (D.D.C. 2008).

### 1. Exercising Jurisdiction Over MiSK Is Proper Because Dr. Saad's Claims Arise Out Of Business MiSK Transacted In The District.

This Court has jurisdiction over MiSK because it conducted business in the District that recruited, developed, funded, and legitimized a network of U.S. agents to further the personal goals of its founder, bin Salman, and this activity relates to Dr. Saad's claim.  Again, we know that bin Salman and Alasaker used MiSK to recruit and deploy U.S. students as operatives, including through meetings in the District (because the Department of Justice has said as much in an indictment and related filings).  *Supra* at 13 & n.8, 38, 64 & n.58.  And MiSK used D.C. conduct to cultivate, supervise, and task these student operatives, and to provide a veneer of legitimacy to MiSK.  For example, in June 2016, Alasaker signed (on behalf of MiSK) contracts at an event in the District attended by bin Salman.  AC ¶ 135.  In May 2017—the same month Dr. Saad's association with a competing U.S. lobbying effort put his life at risk—MiSK furthered bin Salman's objectives in the United States by donating substantial sums to a D.C.-headquartered

project of which Ivanka Trump was an "architect" and the White House was supporting.[68]   AC

¶ 136.  And in March 2018, MiSK hosted an event at the District's Willard Intercontinental Hotel

featuring Saudi students who would be deployed to further bin Salman's goals.  *Id.* ¶ 137.  When

a foundation advertises to D.C. residents and receives "substantial contributions" as a result, it is

subject to jurisdiction in the District.  *Heroes, Inc. v. Heroes Found.*, 958 F. Supp. 1, 4 (D.D.C.

1996).  Likewise here, because MiSK used D.C. events to promote itself to students and the public,

it is subject to jurisdiction for claims related to those activities.  *IMAPizza*, 334 F. Supp. 3d at 111

("advertising in the District" and "holding board meetings in the District" satisfies D.C. long-arm).

Dr. Saad's claim for intentional infliction of emotional distress arises out these activities

because there is a "discernable relationship" between these activities and Dr. Saad's claim.

*Armenian Genocide*, 607 F. Supp. 2d at 189.  Dr. Saad seeks to hold MiSK liable for (among other

things) "hunting him down in the United States" by recruiting and cultivating covert U.S. agents—

which is just what MiSK used its D.C. contacts to do.  AC ¶ 411.  And to carry out covert operations

like the one targeting Dr. Saad, MiSK needed public-facing activities that projected an image of

legitimacy—which, again, MiSK's D.C. activities created.  Its "suit-related conduct" thus created

a "substantial connection with the forum."  *Klieman*, 923 F.3d at 1120.

MiSK raises two contrary arguments.  First, it says its D.C. activities were legitimate,

pointing to "MiSK Talks" attended by senior officials at "Paypal," a tour of the Newseum, and the

like.  MiSK Br. 11.  But Dr. Saad need not gainsay that bin Salman's billion-dollar endowment

allowed MiSK to conduct legitimate activities.  The point is that MiSK used *legitimate* activities

to avoid scrutiny of *covert* activities that also furthered bin Salman's objectives (including the hunt

---

[68] Andrea Gonzalez-Ramirez, *Ivanka Trump Helps Launch Project Aimed At Helping Female Entrepreneurs Globally*, REFINERY29 (July 8, 2017), https://r29.co/2RE6lGd.

for Dr. Saad).  That is precisely why Saudi Arabia itself has now placed MiSK "under review": Its U.S. activities brought too many scandals.  *Supra* n.10.  And it is why the Department of Justice has accused MiSK's leader, Alasaker, of having "secretly recruited" a covert agent in the United States to silence dissidents, including via meetings in the District.  *Supra* at 13 & n.8, 64 & n.58; *infra* at 74 & n.70.  A September 15, 2017 event illustrates how legitimate MiSK events furthered these illegitimate ends: That event allowed Alasaker and his recruit Alhamed to rub shoulders with well-connected Saudis, and they used the chance to collect information about Dr. Saad.  AC ¶ 238.

Second, MiSK contends that its D.C. activities are not closely enough related to Dr. Saad's claims because Dr. Saad has not identified a *particular* U.S.-Based Covert Agent Defendant recruited through MiSK's D.C. events or the exact information obtained at a D.C. event.  MiSK Br. 13.  That argument, however, again rewrites the personal-jurisdiction test to require but-for causation.  The *actual* law is that a claim need only relate to the same "type of activity" conducted in the forum and need not arise out of a specific D.C. incident.  *Quality Air*, 567 F. Supp. 2d at 101 n.4.  That is especially true given this case's preliminary posture.  Discovery will show that D.C. events facilitated the recruitment and deployment of the U.S.-Based Covert Agent Defendants in the months before the hunt for Dr. Saad.  Meanwhile, MiSK and Dr. Saad were both associated with the dueling U.S. lobbying efforts in May 2017 that made bin Salman "very eager" to get Dr. Saad and flamed his desire to kill.  AC ¶ 165.  Again, discovery will illuminate that connection. For now, Dr. Saad has sufficiently pled a prima facie case.[69]

---

[69] There is nothing to MiSK's suggestion that, if jurisdiction lies here, MiSK would be subject to jurisdiction "anywhere in the United States" it held a "single event" or that people would be unable to meet "in the nation's capital . . . without subjecting themselves to the jurisdiction of D.C. courts."  MiSK Br. 14 n.13, 22 (quoting *Second Amendment Found. v. U.S. Conf. of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001)).  MiSK holds *many* events in the District, which is particularly important to MiSK's work supporting bin Salman's U.S. ambitions.  *See supra* at 12-14, 71-73.

### 2. Exercising Jurisdiction Over Alrajhi Is Proper Because He Availed Himself Of The District To Further The Hunt For Dr. Saad.

Exercising personal jurisdiction over Alrajhi is likewise proper under the transacting business prong of the District's long-arm statute. That is so for three reasons.

First, Alrajhi used his D.C. conduct to set up an important meeting that directly furthered the U.S. hunt: an interrogation of Dr. Saad's son Khalid on September 30, 2017. AC ¶¶ 242-43; *supra* at 14-15. And to arrange it, Alrajhi leveraged his status as a graduate microbiology student at Howard University: He told Khalid (also in the medical field) that he wanted to discuss a medical conference and used this pretext to extract information about the Aljabri family residence and Khalid's family and U.S. status. AC ¶¶ 88-89, 242-43. Alrajhi's D.C. conduct provided the basis for the pretext—just like other covert agents for bin Salman and Alasaker who used students as a pretext to further covert objectives in the District. Def. Abouammo's Mot. to Compel Disc. at 11, *United States v. Abouammo*, No. 3:19-cr-621 (N.D. Cal. April 15, 2021), ECF No. 117;[70] *supra* at 13, 38, 62-63. Courts have found jurisdiction where graduate school attendance in the District laid the foundation for the defendant's wrongdoing. *Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107, 121-22 (D.D.C. 2012) (attendance at D.C. graduate school was "sufficient for . . . personal jurisdiction" for federal statutory and IIED claims even though defendant resided in Virginia and claims did not arise out of attendance); *cf. Zurich Cap. Markets, Inc. v. Coglianese*, 388 F. Supp. 2d 847, 858 (N.D. Ill. 2004) (college attendance and regular visits to forum supported jurisdiction).

Second, to conduct the interrogation of Dr. Saad's son, Alrajhi purchased a plane ticket in

---

[70] Additional details regarding the District activities of bin Salman and Alasaker—including their use of a student pretext for covert activities—can be found in ECF No. 117 in the *Abouammo* case. While previously publicly available, this document is now under seal. At the Court's request, Dr. Saad will make the original unsealed document available for review. But out of respect for U.S. government equities, Dr. Saad is not filing that document publicly and is describing the document only in general terms.

the District and travelled from the District to Boston to interrogate Dr. Saad's son and collect valuable, nonpublic information only obtainable from first-hand observation. AC ¶ 242. That in-District purchase has a "discernable relationship" to Dr. Saad's claim, which arises directly from Alrajhi's activities during that trip. *Alkanani*, 976 F. Supp. 2d at 22.

Third, Alrajhi leveraged ties formed in the District with top associates of bin Salman and Alasaker to hunt Dr. Saad. AC ¶¶ 91-92, 138. Alrajhi exploited his status as a D.C. student to regularly access key associates of bin Salman at the Saudi Embassy in the District and SACM in Virginia. *Id*. Alrajhi then used those contacts to position himself at the top of Alasaker's network of trusted operatives, which was created for missions just like this one. *Id.* ¶¶ 86, 92. And Alrajhi visited the Saudi Embassy in the District on June 25 and September 1, 2017—shortly before he interrogated Khalid Aljabri—and repeatedly in the months after this lawsuit's filing. *Id.* ¶ 92. It is reasonable to infer that the D.C. visits related to Alrajhi's covert activities.

### 3. Exercising Jurisdiction Over Hamed Is Proper Because He Participated In A Conspiracy With Overt Acts Inside the District.

Hamed is subject to personal jurisdiction based on his participation in a conspiracy to kill Dr. Saad. Conspiracy supports personal jurisdiction where the plaintiff makes a prima facie showing of "(1) the existence of a civil conspiracy . . . (2) the defendant's participation in [it], and (3) an overt act by a co-conspirator within the forum . . . in furtherance of the conspiracy." *Orellana v. CropLife Int'l*, 740 F. Supp. 2d 33, 39 (D.D.C. 2010).

Those requirements are met here. First, Hamed participated in a conspiracy aimed at locating and extrajudicially killing Dr. Saad. *Infra* § III.C.4. Second, as a conspirator deployed to find Dr. Saad in the United States, Hamed obtained from co-conspirator Alrajhi nonpublic information suggesting that Dr. Saad resided at the Mandarin Oriental. AC ¶ 245. There was *no other way* for Hamed to obtain that information except through Alrajhi's efforts. *Id*. And as a

result, Hamed repeatedly surveilled the Mandarin Oriental and tried to physically access Dr. Saad

there using a false pretext. *Id*. ¶¶ 109, 245. When Hamed learned that Dr. Saad was not there, he

reported that information to his co-conspirators, prompting (just seven days later) another covert

agent's travel to Canada to continue the hunt. *Id*. ¶¶ 242, 251. Third, Alrajhi and MiSK took overt

acts to further the same conspiracy within the District. *Supra* §§ II.B.1-2. Hence, Hamed is subject

to personal jurisdiction under D.C. Code § 13-423—and at minimum, Dr. Saad has alleged enough

to obtain discovery to probe Hamed's connections to Alrajhi's D.C. contacts.[71]

### C.   Exercising Jurisdiction Is Consistent With Fair Play And Substantial Justice.

Exercising jurisdiction over each Defendant also accords with fair play and substantial

justice. Where due process is satisfied, defendants "must present a compelling case that . . . other

considerations would render jurisdiction unreasonable." *Mwani*, 417 F.3d at 14; *see IMAPizza*,

334 F. Supp. 3d at 115-16. Defendants bear the burden of establishing unreasonableness. *Id*. at

116. Here, Defendants identify no "compelling" circumstances. *Id.* Their boilerplate objections,

if accepted, would eliminate jurisdiction in most cases involving foreign defendants.

First, Defendants complain that some reside abroad. MBS Br. 23-24; Tiger Squad Br. 28.

But as *Mwani* explains, defendants cannot "purposefully . . . direct" conduct at a forum yet

complain they must defend there.[72] Indeed, as bin Salman trumpets, he has initiated litigation in

both the United States and Canada related to his pretextual claims of "corruption."

---

[71] *See Urquhart-Bradley v. Mobley*, 964 F.3d 36, 48-49 (D.C. Cir. 2020) (permitting discovery to flesh out a defendant's "suit-related contacts with and impact on the forum" where plaintiff demonstrated "that it can supplement its jurisdictional allegations through discovery"); *Youming Jin v. Ministry of State Sec.*, 335 F. Supp. 2d 72, 83-84 (D.D.C. 2004) (similar).

[72] 417 F.3d. at 14; *see SEC v. LovesLines Overseas Mgmt., Ltd.*, Misc. No. 04-302, 2007 WL 581909, at *4 (D.D.C. Feb. 21, 2007) (where "evidence support[ed] a conclusion that [the defendants] were purposefully directing activities toward the United States securities market . . . they could reasonably expect to be haled into court in the United States").

The same principle disposes of the other Defendants' similar arguments. Alasaker claims he will face "severe" burdens if required to appear in the United States, a legal system he says is "foreign" to him. Alasaker Br. 21. Alqahtani says that because he has been deemed ineligible for entry into the United States due to his "gross violations of human rights," AC ¶ 61, he would be "uniquely burdened" from having to defend here. Tiger Squad Br. 28. The main answer to both arguments is the one *Mwani* gave: Defendants should have thought about these burdens before they tried to kill a U.S. intelligence partner via a manhunt on U.S. soil. 417 F.3d at 14. Alasaker, moreover, is no stranger to U.S. courts: His U.S. activities are so substantial that his e-mail accounts and phone records have been the target of multiple search warrants by U.S. law enforcement because of the probable cause he committed a crime here. *Supra* at 64 n.58. And while Alqahtani cannot set foot on U.S. soil, he has had no trouble finding U.S. lawyers. Litigators have overcome bigger challenges than a party who cannot attend court in the forum absent a waiver from the U.S. government. Indeed, in *Mwani*, Osama bin Laden presumably would have had grave difficulty showing up in a U.S. court. When the State Department punished Alqahtani for human rights abuses, it did not mean to immunize him from accountability for such abuses.

Second, Defendants claim the United States' interests here are minimal. That argument fails: Defendants sought to kill Dr. Saad in order to disrupt a key U.S. intelligence relationship, to deprive U.S. intelligence of information, and to alter U.S. intelligence's approach to bin Salman— and carried out their plot on U.S. soil. *Supra* at 52-57. Nor must the Court rely on Dr. Saad's word. The State Department considers Dr. Saad a "valued partner," has expressed "concern" about the activities leading to his "exile," and has "repeatedly" questioned the detention of Dr. Saad's children. *Supra* at 6; AC ¶ 22 n.7; *see* Mudd Decl. ¶¶ 5-6, 16-25.

Third, Defendants suggest that Dr. Saad has no interest in suing here. MBS Br. 24. They

could not be more wrong.  Dr. Saad finds himself marked *for murder* because of his long and loyal work with the U.S. government, and bin Salman tried to kill him in order to shut off U.S. access to Dr. Saad.  Dr. Saad has every interest in seeking, and the United States has every interest in providing, a U.S. forum that can ensure redress for a plot carried out against a close U.S. intelligence partner targeted precisely because of that U.S. partnership.

### D.     At Minimum, Jurisdictional Discovery Is Appropriate.

In no event should the Court dismiss without jurisdictional discovery.  In the D.C. Circuit, the standard is "quite liberal."  *Ofisi*, 2019 WL 1255096, at *8.  A plaintiff is entitled to discovery so long as he establishes its "likely utility" to allow him to "supplement [his] jurisdictional allegations."  *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 48-49 (D.C. Cir. 2020); *see Ofisi*, 2019 WL 1255096, at *8 (discovery permitted to extent to which defendant "acted in concert with, or at the direction of, al Qaeda to facilitate, plan, or execute the attacks").

Here, Dr. Saad would seek jurisdictional discovery (via documents and depositions) as to:

1)    Communications between and among bin Salman, Alasaker, Alqahtani, Alassiri, MiSK, and the U.S.-Based Covert Agent Defendants in connection with the planning and execution of the 2017 hunt to locate Dr. Saad in the United States, which Dr. Saad expects will underscore the involvement of and control exercised by bin Salman, Alasaker, Alqahtani, Alassiri, and MiSK over the U.S.-Based Covert Agent Defendants in the United States;

2)    Communications between and among bin Salman, Alasaker, Alqahtani, Alassiri, and the Tiger Squad Defendants leading up to or concerning the October 2018's Tiger Squad operation, which Dr. Saad expects to confirm that the Tiger Squad Defendants acted in concert with and at the direction of the other defendants and targeted U.S. interests;

3)    Information about the Tiger Squad Defendants' travel related to this suit, which will provide additional evidence of contacts with the United States during their efforts to kill Dr. Saad.

4)    The Washington, D.C.-based suit-related contacts of MiSK, Alrajhi, and Hamed (including related to Dr. Saad, the recruitment of operatives, MiSK's efforts to foster a legitimate image, the exploitation of Alrajhi's forum ties, and Hamed's connections to Alrajhi), which Dr. Saad expects to reinforce the connection

between those forum activities and Dr. Saad's claims;[73]

5)      Bin Salman's May 2020 directive to send a hit squad through the United States to kill Dr. Saad, including efforts to carry it out, which Dr. Saad expects will reinforce the evidence that bin Salman (and others) purposefully directed conduct at the United States when trying to kill Dr. Saad.

For each of these topics, Dr. Saad has already demonstrated "plausible factual support" that discovery will uncover "sufficient evidence" of jurisdiction. *Toumazou v. Turkish Republic of N. Cyprus*, 71 F. Supp. 3d 7, 18 (D.D.C. 2014).  Discovery will allow Dr. Saad to elaborate on his already detailed allegations.  *See In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 822 (S.D.N.Y. 2005) (permitting discovery into entity's material support for bin Laden).

## III.    The Amended Complaint Alleges A Claim Under The Torture Victim Protection Act.

Congress enacted the TVPA "to create an unambiguous cause of action . . .  over claims of torture and extrajudicial killings," which "violate standards accepted by virtually every nation" and a "universal consensus condemn[s]." *Bowoto v. Chevron Corp.*, 557 F. Supp. 2d 1080, 1091 (N.D. Cal. 2008) (cleaned up), *aff'd*, 621 F.3d 1116 (9th Cir. 2010).  Here, Defendants undertook exactly the type of heinous conduct the TVPA targets.  They hunted Dr. Saad in order to extrajudicially kill him, seeking not just to end his life but to "terrorize and oppress" him.  S. REP. 102-249, at 3 (1991).  Defendants thus violated the TVPA's ban on "subject[ing] an individual to extrajudicial killing," which is defined to include any "deliberated" killing undertaken with substantial preparation.  Pub. L. No. 102-256, §§ 2(a), 3(a), 106 Stat. 73 (1992), *reprinted in* 28 U.S.C. § 1350 note.  Defendants fail with their attempts to evade accountability.  First, Congress

---

[73] To the extent MiSK complains that the Amended Complaint does not identify specific attendees at specific MiSK events; exactly how Alhamed, Alrajhi, and Abuljadayel came to be recruited and cultivated as active participants in MiSK; or the precise recruiting methods that Alasaker used within the District, MiSK Br. 15, this information is exclusively in the possession of MiSK and other Defendants, which supports Dr. Saad's request for discovery.

did not give a free pass to killers whose first shot does not take a life.  Second, Dr. Saad has no

remedies to exhaust.  Third, Dr. Saad has stated claims against each Defendant.[74]

### A.    The TVPA Provides A Remedy For Extrajudicial Killings That Do Not Succeed In Taking Life.

The TVPA would be a craven sentinel if it immunized defendants whose extrajudicial

killings do not succeed in taking life.  It is no surprise, then, that Defendants can cite no case—not

one, not ever—accepting their argument that they cannot be liable just because border agents

interceded before they killed Dr. Saad.  MBS Br. 51-53; Tiger Squad Br. 35-36; Alasaker Br. 29;

U.S. Agents' Br. 16-19.  In fact, an unbroken wall of cases contradicts Defendants' position.  For

example, *Doe v. Constant*, No. 10108cv04, 2006 WL 3490503 (S.D.N.Y. Oct. 24, 2006), imposed

TVPA liability based on "attempted killings" of three pro-democracy advocates, which the Second

Circuit affirmed.  354 F. App'x 543, 544 (2d Cir. 2009).   In *Warfaa v. Ali*, Judge Brinkema

declined to dismiss TVPA claims based on an "attempted extrajudicial killing," explaining that the

plaintiff had described "in graphic detail the . . . defendant's 'deliberated' attempt to kill."  33 F.

Supp. 3d. at 657, 666.  Indeed, those claims went to trial, and the jury was instructed on the

elements of an attempted extrajudicial killing under the TVPA.[75]  Likewise, *Boniface v. Viliena*,

---

[74] Dr. Saad has not asserted a TVPA or ATS claim against MiSK.  When Dr. Saad refers to "Defendants" in these sections, he does not include MiSK.

[75] The jury instructions provided:

> The plaintiff contends that he suffered an attempted extrajudicial killing. To establish this claim, the plaintiff must prove by a preponderance of the evidence the following four facts: 1. That a person or persons attempted to deliberately kill the plaintiff; 2. This person or persons attempted to kill plaintiff while acting under the actual or apparent authority or color of law of Somalia; 3. That the person or persons intended to carry out a deliberate killing of plaintiff and there was a substantial step made towards commission of the deliberate killing; and 4. The attempted killing was not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized people.

Trial Tr. at III-205, *Warfaa*, 33 F. Supp. 3d 653 (No. 1:05-cv-701), ECF No. 294.

338 F. Supp. 3d 50 (D. Mass. 2018), rejected the argument that "the TVPA does not contemplate liability for an 'attempted' extrajudicial killing" and emphasized that it was "not aware of any cases determining that [such] a claim . . . is not actionable."  *Id.* at 67-68; *accord Yousuf v. Samantar*, No. 1:04cv1360, 2012 WL 3730617, at *2, *12-13 (E.D. Va. Aug. 28, 2012).

These decisions are the tip of the iceberg.  The FSIA's state-sponsored terrorism exception incorporates the TVPA's definition of "extrajudicial killing."  28 U.S.C. § 1605A(a)(1), (h)(7). Applying that definition, courts have uniformly held that attempts are actionable.  In *Schertzman Cohen v. Islamic Republic of Iran*, Civ. No. 17-1214, 2019 WL 3037868 (D.D.C. July 11, 2019), Judge Boasberg held that an "attack constituted an 'extrajudicial killing'" because the TVPA's definition "encompasses *attempted* extrajudicial killings."  *Id.* at *3.  Judge Walton reached the same result in *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88 (D.D.C. 2017), where he was "persuaded by the *Warfaa* and *Constant* rulings that the [TVPA's] definition of extrajudicial killing allows plaintiffs to assert liability for a defendant's attempted extrajudicial killing, even if no one died."  *Id.* at 99.  In *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12 (D.D.C. 2019), Judge Kollar-Kotelly followed a "plain-text reading" and held that "'deliberated' attempts to kill fall within the scope of" the TVPA's definition even if "no one was killed."  *Id.* at 58.[76]

The reason why Defendants can cite no case immunizing attempts is that the TVPA's text does not support their position.  Congress *could have* limited the definition of "extrajudicial killing" to completed killings.  Indeed, Congress *did* exclude some killings.  TVPA § 3(a) (excluding killings "lawfully carried out under the authority of a foreign nation").  Courts,

---

[76] To the extent the U.S-Based Covert Agent Defendants try (at 18 n.24) to dismiss these cases because they arose under the FSIA, that argument violates settled principles of statutory interpretation.  It "'would render every statute a chameleon,' and 'would establish within our jurisprudence . . . the dangerous principle that judges can give the same statutory text different meanings in different cases.'" *United States v. Santos*, 553 U.S. 507, 522 (2008).

however, may not "add words to the law" Congress enacted, *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015), nor recognize "additional exceptions" beyond those "Congress explicitly enumerate[d]," *TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001). And far from creating any attempt exception, the TVPA defines "extrajudicial killing" based on whether it was "deliberated." TVPA § 3(a). The word "deliberated" requires that the defendant have acted "with studied consideration and purpose," as by undertaking "substantial preparation."[77] It does not require that extrajudicial killing *have succeeded*. Hence, *Karcher* analyzed whether the use of a particular weapon—an "explosively formed penetrator" designed to "cause[] exceptional damage to armored personnel carriers and their occupants"—manifested the required "deliberat[ion]." 396 F. Supp. 3d at 14, 58. And finding that it did, *Karcher* concluded that the plaintiff stated a claim based on an "attempted extrajudicial killing," whether or not the attempt succeeded. *Id.* at 58.

Reinforcing this conclusion is that the TVPA imposes liability whenever a defendant has "subject[ed]" another to an "extrajudicial killing." TVPA § 2(a)(2). The word "subject" "expands . . . the reach of the statute." *Wiwa v. Royal Dutch Petroleum Co.*, No. 96 CIV. 8386, 2002 WL 319887, at *15 (S.D.N.Y. Feb. 28, 2002). It reaches any action that "expose[s]" someone to, or "make[s someone] liable or vulnerable" to, an extrajudicial killing. *Id.* (quoting Random House Webster's College Dictionary (1999)); *see Subject*, Oxford English Dictionary (2020) ("expose to"). In ordinary usage, attempting to kill someone "exposes" them, and makes them "vulnerable to," an extrajudicial killing. In *United States v. McPherson*, 587 F. App'x 556 (11th Cir. 2014), for example, the Eleventh Circuit held that a defendant violated a statute criminalizing

---

[77] *Sotloff et al. v. Syrian Arab Republic*, Civ. No. 18-1625, 2021 WL 965882, at *11 (D.D.C. Mar. 15, 2021); *see Schwartz v. Islamic Republic of Iran*, Civ. No. 18-1349, 2020 WL 7042842, at *12 (D.D.C. Nov. 30, 2020) (evidence that the perpetrator "prepared himself for the attack" with "intelligence gathering, by selecting the site; with logistics, by purchasing the gun and ammunition; and operationally, by training to commit the attack" showed deliberation).

"'subject[ing]' a minor to sexual contact" when he "attempted to persuade [a minor] to engage in sexual contact." *Id.* at 560; *cf. Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 644-45 (1999) (defendant liable where "deliberate indifference 'subject[ed]' . . . students to harassment," *i.e.*, "cause[d] students to undergo harassment or ma[d]e them liable or vulnerable" (cleaned up)).[78]

Bin Salman concedes that "courts have interpreted the phrase 'extrajudicial killing' . . . to include 'attacks in which no one died.'" MBS Br. 53. Even so, he asks this Court to limit the TVPA to attempted killings that directly inflict "serious physical injuries" and contends that *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 360-63 (D.D.C. 2020), recognizes such a limit. *See* U.S. Agents' Br. 19. *Force*, however, was a FSIA case that turned on the FSIA's distinctive features. The FSIA limits its abrogation of sovereign immunity to claims where "personal injury or death" resulted. 28 U.S.C. § 1605A(a)(1). *Force* interpreted that limit to require that an attack have directly inflicted a "serious physical injur[y]" and to exclude from the FSIA attempt cases where the plaintiff suffered "emotional distress" without direct physical injury. 464 F. Supp. 3d at 360-62. That holding—whether or not correct under the FSIA—is irrelevant because the TVPA includes no similar limit. Indeed, "Congress's choice to include" this limit in the FSIA but not the TVPA "suggests it acted 'intentionally and purposefully.'" *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1813 (2019) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). The TVPA narrowly targets two international-law violations but does not otherwise restrict its remedy.

Defendants fare no better with their reliance on the provision extending the TVPA's cause of action to an "individual's legal representative" or "any person who may be a claimant in an

---

[78] There is nothing to the contrary in *Owens v. Republic of Sudan*, which found that "bombings [that] caused the death of more than 200 people" were "extrajudicial killings." 864 F.3d 751, 770 (D.C. Cir. 2017), *vacated in part on other grounds*, 140 S. Ct. 1601 (2020). It did not suggest that the TVPA covers *only* actions "caus[ing] death." MBS Br. 48-49; U.S. Agents' Br. 17.

action for wrongful death." TVPA § 2(a). In their telling, what the TVPA elsewhere gives, it takes away here by cutting off its cause of action unless and until the plaintiff dies. MBS Br. 52. But there is a good reason no court has ever agreed. This provision takes a belt-and-suspenders approach to ensure even deceased victims can have claims brought on their behalf. It does not shut the courthouse doors on survivors. *Cf. Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 565 (D.C. Cir. 1993) (common-law rule that "a personal right of action dies with the person"). By contrast, Defendants' reading would yield the absurdity that Dr. Saad could sue if, tomorrow, he were hit by a car—in which case their argument would disappear even on its own terms—but not otherwise. Indeed, the "term 'legal representative' does not possess a fixed and narrow meaning in the law." *Thomas v. Doyle*, 187 F.2d 207, 209 (D.C. Cir. 1950) (contrasting narrower term "personal representative"); *accord Wilson v. Thornton*, 416 A.2d 228, 232 (D.C. 1980). It includes not just a decedent's "personal representative," *id.*, but representatives for individuals with "incapacity or youthful age," S. REP. 102-249, at 7—and, as relevant here, the victim. Many cases testify to the settled law that individuals can act as their own "legal representative."[79]

In fact, courts have rejected an argument that is closely analogous to the one Defendants press. In *Cabello Barrueto v. Fernandez Larios*, 205 F. Supp. 2d 1325 (S.D. Fla. 2002), *aff'd*, 402 F.3d 1148 (11th Cir. 2005), the defendants argued that the legal representative of a deceased victim lacked standing to sue for torture. They observed that the TVPA's *extrajudicial killing* provision

---

[79] *E.g.*, *Garcia v. Cnty. of Spokane*, No. 10-cv-00349, 2012 WL 12918364, at *1 (E.D. Wash., Apr. 2, 2012) (recognizing litigant's ability to "choose[] himself as his own legal representative"); *Bender v. Bender*, 869 N.E.2d 632 (Table), 2007 WL 1953387, at *2 (Mass. App. Ct. 2007) (individual served as "own legal representative"); *accord Mourat v. Common Pleas Ct. of Lehigh Cty.*, 515 F. Supp. 1074, 1075 (E.D. Pa. 1981); *Rossley v. Drake Univ.*, 958 F.3d 679, 685 (8th Cir. 2020); *Price v. Pelka*, 690 F.2d 98, 102 (6th Cir. 1982); *In re Watkins*, No. ADV. 04-90006, 2008 WL 8462958, at *2 (B.A.P. 9th Cir. Feb. 28, 2008); *Levert v. Martinez*, 939 So. 2d 615, 622 (La. App. 2006); *Fullwood v. Sivley*, 517 S.E.2d 511, 516 (Ga. 1999).

expressly permits claims by an "individual's legal representative, or . . . any person who may be a claimant in an action for wrongful death," but that the *torture* provision expressly mentions only the "individual." *Id.* at 1334 & n.8.  If Defendants were correct and those words limited the cause of action, the *Cabello* defendants would have had a good argument.  After all, "when Congress includes particular language in one section of a statute but omits it in another section . . . , it is generally presumed that Congress acts intentionally and purposely in" doing so.  *Russello*, 464 U.S. at 23.  *Cabello*, however, rejected that argument as "overly restrictive" and recognized that Congress included those words to expand, not limit, the TVPA.  205 F. Supp. 2d at 1334.  The same logic shows why Defendants' similar arguments are wrong.  Indeed, accepting Defendants' hyper-narrow reading would mean that an individual who was tortured (deliberately) in a way that led *to death* (unintentionally) would lose any remedy against his torturers.  That is not a plausible reading of Congress's intent in the "Torture Victim Protection Act."

Defendants' position also undermines the TVPA's purpose.  Recognizing that torture and extrajudicial killing "violate standards accepted by virtually every nation," S. REP. 102-249, at 3, and "are the most insidious forms of human rights violations," 133 CONG. REC. S3900-02 (statement of Sen. Leahy), Congress established "a clear and specific remedy" in "a statute expressly addressed to those practices," H. REP. 102-367, at 3-4.  This remedy aims to "deter [the] tortious conduct" of "the torturer and the extrajudicial killer," *Baloco ex rel. Tapia v. Drummond Co., Inc.*, 640 F.3d 1338, 1347 (11th Cir. 2011), and—as then-President Bush emphasized—to further the "fundamental goal[]" of ending "torture and other gross abuses of human rights . . . wherever they occur," Statement by President Bush upon Signing H.R. 2092, *reprinted in* 1992 U.S.C.C.A.N. 91, 91.  It would frustrate those purposes to forbid suit simply because an extrajudicial killing, on its first attempt, did not succeed.

Defendants observe that the TVPA intended to "codif[y] a norm of customary international law." *Doe v. Exxon Mobil Corp.*, No. CV 01-1357(RCL), 2015 WL 5042118, at *5 (D.D.C. July 6, 2015) ("*Exxon III*"); MBS Br. 52; *see* S. REP. 102-249, at 7.  But that does not help them because, as explained below, international law proscribes attempted extrajudicial killings.  *Infra* § IV.A.

Defendants also cite the Geneva Convention, which they say does not prohibit attempted killings.  MBS Br. 52-53.  But to begin, the D.C. Circuit has squarely held that "the TVPA reach[es] a broader range of conduct" than the Geneva Convention.  *Owens v. Republic of Sudan*, 864 F.3d 751, 772 (D.C. Cir. 2017) ("*Owens II*").  That is because the TVPA does not *only* implement the Geneva Convention.  It vindicates "the principles of a number of multilateral agreements" prohibiting torture and extrajudicial killings (including attempts).  *The Torture Victim Protection Act: Hrg. and Markup on H.R. 1417 Before the H. Comm. on Foreign Affs. and its Subcomm. on Human Rts. and Int'l Orgs.*, 100th Cong. 108 n.96 (1988); *see* Van Schaack Decl. ¶¶ 11-13 (many treaties prohibiting attempt).

In any event, the Geneva Convention bars attempted killings.  Article 12 provides that "[a]ny attempts upon the[] lives" of protected persons "shall be strictly prohibited."  Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field art. 12, Aug. 12, 1949, 6 U.S.T. 3114.  And Article 3, which Defendants misleadingly excerpt, prohibits any "violence to life and person," including "murder of all kinds, . . . [and] cruel treatment" as well as "the carrying out of executions" absent a valid judgment.  *Id.* art. 3(1)(a), (d). Those broad provisions encompass attempt.  Indeed, the International Criminal Tribunal for the former Yugoslavia—which the United States championed—has adjudicated attempted murders under a similar residual provision for "inhumane acts."  *Infra* at 109.

## B.      Dr. Saad's Claim Is Not Barred By The TVPA's Exhaustion Requirement.

The TVPA's exhaustion requirement also does not bar this suit.  This requirement "was

not intended to create a prohibitively stringent condition." *Xuncax v. Gramajo*, 886 F. Supp. 162,

178 (D. Mass. 1995).[80]  Hence, defendants must carry a "substantial" burden to obtain dismissal,

*Jean v. Dorelien*, 431 F.3d 776, 781 (11th Cir. 2005), by "prov[ing] the availability of effective,

non-futile remedies," *Exxon*, 69 F. Supp. 3d at 90.[81]  If remedies are uncertain, or unreliable, they

will not do.  S. REP. 102-249, at 9 (exhaustion a bar only if "adequate and available remedies *can

be assured*" (emphasis added)).  Hence, "[v]ery few cases . . . have been dismissed based on"

exhaustion.  *Lizarbe v. Rondon*, 642 F. Supp. 2d 473, 485 (D. Md. 2009), *aff'd in part, appeal

dismissed in part*, 402 F. App'x 834 (4th Cir. 2010).

 This is not one of those rare cases.

 ***First***, because "conduct giving rise to the claim occurred" in both the United States and

other jurisdictions, exhaustion elsewhere is not required.  The TVPA bars suits when "the claimant

has not exhausted adequate and available remedies in *the place* in which the conduct giving rise

to the claim occurred."   TVPA § 2(b) (emphasis added).  The use of "a definite article with a

singular noun" indicates that exhaustion is required only when the "conduct" occurred in a single

nation ("the place").  *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1483 (2021).  When conduct occurs

in *multiple* countries, the predicate for the exhaustion bar—a single "place" where the relevant

conduct occurred—is absent.[82]  And that is especially true where, as here, key "conduct" occurred

---

[80] *Accord Abiola v. Abubakar*, 435 F. Supp. 2d 830, 837 (N.D. Ill. 2006) (same); *see also Lizarbe v. Rondon*, 642 F. Supp. 2d 473, 485 (D. Md. 2009), *aff'd in part, appeal dismissed in part*, 402 F. App'x 834 (4th Cir. 2010).

[81] *Accord al-Suyid v. Hifter*, No. 1:20cv170, 2020 WL 8211457, at *4 (E.D. Va. June 17, 2020) ("any doubt surrounding" exhaustion should "be resolved in favor of the plaintiffs."); *Collett*, 362 F. Supp. 2d at 243 (defendant "has the burden of raising the nonexhaustion of remedies as an affirmative defense and must show that domestic remedies exist that the claimant did not use" (quoting S. REP. 102–249, at 10)).

[82] There is nothing to the contrary in the Dictionary Act, which provides that "unless the context indicates otherwise . . . words importing the singular include and apply to several" items.  1 U.S.C. § 1.  The Supreme Court and the D.C. Circuit have construed this provision narrowly, explaining

*in the United States*. Congress did not require plaintiffs to sue abroad when significant misconduct occurred here. The exhaustion requirement limits "suits [that] have nothing to do with the United States." *Rojas Mamani v. Sanchez Berzain*, 636 F. Supp. 2d 1326, 1332 (S.D. Fla. 2009).

**Second**, if the TVPA requires exhaustion elsewhere, it is only in Saudi Arabia (where Dr. Saad would be killed and has no remedies). Again, the TVPA requires exhaustion only in a single place ("the place") and cannot be read to require exhaustion in *multiple* places. And here, as bin Salman emphasizes, Dr. Saad alleges that bin Salman "orchestrated" the extrajudicial killing "from Saudi Arabia." MBS Br. 67 (quoting AC ¶ 381); *see id.* at 66 (asserting that "Saudi Arabia has the most significant relationship" with the events). It was mere happenstance that bin Salman found Dr. Saad in Canada. Hence, Canada cannot be the single place where exhaustion was required. *Cf. Hitchcock v. United States*, 665 F.2d 354, 360 (D.C. Cir. 1981) ("fortuitous" residency did not control choice of law); *Lagor v. Eli Lilly & Co.*, Civ. No. 06-1967, 2007 WL 1748888, at *5 (D.D.C. June 18, 2007) ("mere fortuity" that "the last act necessary to cause plaintiff's injuries" occurred in one jurisdiction did not control choice-of-law).

If this case were not so deadly serious, it would be comical that Defendants claim Dr. Saad has adequate and available remedies in Saudi Arabia against *the Crown Prince*—the same person who seized power by detaining former Crown Prince bin Nayef and "nearly 400 of Saudi Arabia's most powerful people" in a "purge" involving the "torture and coercion" of detainees based on

---

that it applies only in "rare occasions" where "necessary to carry out the [statute's] evident intent." *United States v. Hayes*, 555 U.S. 415, 422 n.5 (2009) (quoting *First Nat'l Bank in St. Louis v. Missouri*, 263 U.S. 640, 657 (1924)); *see CTS Corp. v. Waldburger*, 573 U.S. 1, 15 (2014); *Blackman v. Dist. of Columbia*, 633 F.3d 1088, 1092 (D.C. Cir. 2011). This is not such a case. Here, as in *Niz Chavez*, Dr. Saad's argument relies not just on the singular noun but on the "definite article." 141 S. Ct. at 1483. Meanwhile, Defendants' argument would rewrite the TVPA to require exhaustion in "*any* place in which" relevant conduct occurred. Thus here, "context indicates otherwise," 1 U.S.C. § 1—and reading "the place" to include multiple places is not "necessary to carry out [Congress's] evident intent." *Hayes*, 555 U.S. at 422 n.5.

pretextual "corruption" charges.[83]   A Saudi judge has described the Saudi judicial system as "a system of blackmail that is entirely at the behest of" bin Salman.[84]   Vividly underscoring the point is what happened to the individuals held responsible for the Khashoggi killing.   The verdicts in those cases were characterized as a "parody of justice," as the officials "who organized and embraced the execution . . . walked free from the start."[85]   That parody occurred because, as the State Department has explained, the Saudi "judiciary . . . [is] not . . . independent."[86]   Instead, it is "subject to influence" and is "required to coordinate [its] decisions with executive authorities, with the king and crown prince as arbiters."[87]   Indeed, that explains how bin Salman was able to procure non-public "records" concerning Dr. Saad's children dated four days before his motion-to-dismiss deadline to bolster his U.S. legal arguments.[88]   *Supra* at 19-20, 49; *accord* Mallat Report ¶¶ 10-30

---

[83] Martin Chulov, *'Night of the beating': details emerge of Riyadh Ritz-Carlton purge*, GUARDIAN (Nov. 19, 2020), https://bit.ly/353X7WV (describing how detained individuals—none of whom knew why they were there—were "beaten" and "tied to the walls, in stress positions" in order to "soften them up" before "the interrogators arrived").

[84] *A Saudi Judge Speaks: How MBS Slaughtered the Kingdom's Justice System*, DEMOCRACY FOR THE ARAB WORLD NOW (Oct. 1, 2020), https://bit.ly/3pFKfjo.

[85] *Saudi Arabia 2020 Human Rights Report*, *supra* n.19, at 4; *see Bowoto*, 557 F. Supp. 2d at 1097 (noting that "[f]ederal courts regularly rely upon these reports as evidence of a country's human rights situation" and considering report in assessing exhaustion).

[86] *Saudi Arabia 2020 Human Rights Report*, *supra* n.19, at 15.

[87] *Id.*

[88] Bin Salman's remarkable ability to produce new "facts" has been on display in other U.S. courts as well.   Press reports recount how, when a court ordered bin Salman to help locate and serve former Crown Prince Mohamed bin Nayef, "multiple lawyers from Squire Patton Boggs . . . registered to represent [bin Nayef] in the case."   Anuj Chopra & Paul Handley, *US Lawsuit Casts Spotlight On 'Disappeared' Saudi Royal*, INT'L BUS. TIMES (June 8, 2021), https://bit.ly/3cy5Qow.   Those are the *same lawyers* representing the U.S.-Based Covert Agent Defendants here—and bin Nayef's longstanding "legal team" remarked that Squire Patton Boggs "have never represented [bin Nayef] before" and that it "is unclear how they would get access to him . . . when he has been denied access to his long-standing lawyers, due process, or any kind of communication with the outside world."   *Id.*   Meanwhile, in the lawsuit seeking to hold him accountable for Jamal Khashoggi's death, bin Salman has procured a declaration from Khashoggi's own son—who, no coincidence, is in Saudi Arabia—supporting his motion to

(expert report elaborating on why Dr. Saad has no remedies in Saudi Arabia).

*Third*, even were Canada's remedies relevant, Defendants cannot carry their burden to show that Dr. Saad had adequate and available remedies.  They cite no case in which a Canadian court has awarded damages to a plaintiff for a violation of customary international law, much less for an extrajudicial killing.  That is because Canada has no cause of action remotely like the TVPA—which both creates a cause of action against those who "subject[] an individual to extrajudicial killing" and abrogates immunity for such claims, TVPA § 2—or even any meaningful precedent about conscience-shocking human-rights violations like Defendants' here.

For two reasons, Defendants cannot prevail by pointing to the Supreme Court of Canada's decision last year in *Nevsun Resources Ltd. v. Araya*.  MBS Br. 55.

One, *Nevsun* falls miles short of showing that Dr. Saad would even have a cause of action. Again, defendants cannot just "allude to the possibility of remedies," *Collett v. Socialist Peoples' Libyan Arab Jamahiriya*, 362 F. Supp. 2d 230, 243 (D.D.C. 2005); they must "*prove*" such remedies exist, *Exxon*, 69 F. Supp. 3d at 90.  Here, *Nevsun* merely denied a "motion to strike" (*i.e.*, dismiss) a complaint alleging that a *Canadian corporation* committed *forced labor and slavery* abroad.  Larocque Decl. ¶ 16.  The case then ended when the parties settled.  *Id.*  The novel *Nevsun* decision—the first time the Supreme Court of Canada addressed the possibility of common-law civil actions for violations of customary international law—does not prove that Canadian courts would award meaningful relief to Dr. Saad, who is pursuing different claims (attempted extrajudicial killing, not forced labor) against different defendants (foreign individuals, not a domestic corporation).  *See Wiwa*, 2002 WL 319887, at *17 (no exhaustion bar because defendant

---

dismiss.  Decl. of Salah Khashoggi in Supp. of Defs.' Mots. to Dismiss, *Cengiz*, No. 20-cv-3009 (D.D.C. June 4, 2021), ECF No. 21-2.

failed to establish "that a Nigerian court would be amenable to a suit for violations of international law, brought against a non-citizen, non-resident").

Two, Defendants ignore immunity, which *Nevsun* did not implicate and is broader in Canada than here. Indeed, even though Defendants bear the burden, their opening papers do not mention Canadian immunity law—which is reason enough to reject their exhaustion argument. *Cf. Klayman v. Jud. Watch, Inc.*, 314 F. Supp. 3d 308, 314 (D.D.C. 2018) (courts "will not entertain new arguments first raised in a reply brief"). In any event, a Canadian lawsuit would be unlikely to avoid Canada's sweeping State Immunity Act, which is subject to a few narrowly construed exceptions. Larocque Decl. ¶ 32. Defendants have not proved that any exception would apply here. And the Larocque Declaration explains that unless one of those exceptions applies, Canadian courts have uniformly accorded immunity to foreign officials so long as they made some use of the resources, powers and opportunities afforded by their office. *Id.* ¶ 31; *see id.* ¶ 28 (noting that Act's coverage presumptively extends to those acting "at the direction of State officials"). Unlike in the United States, Canadian courts have no tradition of carefully parsing official and unofficial acts. *Id.* ¶¶ 29-31. Hence, cases like *Jungquist*—involving "some convergence" of "official and unofficial conduct," 115 F.3d at 1028—would likely come out the other way in Canada. That risk means Defendants cannot "prove" that "effective, non-futile remedies" are available. *Exxon*, 69 F. Supp. 3d at 90; *see In re XE Servs. Alien Tort Litig.*, 665 F. Supp. 2d 569, 595 (E.D. Va. 2009) (no exhaustion bar where the defendants were "shield[ed] . . . from liability" abroad).

Nor can Defendants prove non-exhaustion by admitting that an extrajudicial killing could give rise to Canadian tort claims. Choudhry Decl. ¶¶ 12-13. First, Defendants again ignore the State Immunity Act. Larocque Decl. ¶¶ 9, 25, 27-37. Second, tort relief for assault or battery is not adequate to redress the wrongs Dr. Saad suffered. As explained, Congress passed the TVPA

to remedy the *distinctive* harms caused by certain types of egregious conduct.  *Supra* at 85-86.  It

recognized that the TVPA "will not only provide tangible relief to victims, but will also be of

symbolic value," 135 CONG. REC. H6424 (statement of Rep. Fascell), and passed the TVPA over

objections that "[e]xisting U.S. law already establishes [sufficient] private rights . . . through a

common law tort"—precisely because Congress believed that those causes of action fall short.[89]

Common law tort causes of action do not provide the accountability that Congress intended.

### C.     Dr. Saad Has Alleged A TVPA Claim Against Each Defendant.

The Amended Complaint plausibly alleges that each Defendant violated the TVPA via their

involvement in the extrajudicial killing of Dr. Saad.  Specifically:

- Bin Salman, Alasaker, Alqahtani, and Alassiri are liable as commanders and principals for directing the extrajudicial killing, for participating in a conspiracy to extrajudicially kill Dr. Saad, and for aiding and abetting the extrajudicial killing.

- The Tiger Squad Defendants are directly liable for their personal participation in the attempted extrajudicial killing and based on conspiracy.

- The U.S.-Based Covert Agent Defendants are liable for conspiring to commit an extrajudicial killing and for aiding and abetting the killing.

### 1.     Command Responsibility, Agency, Aiding And Abetting, And Conspiracy Theories Of Liability Are Available Under The TVPA.

"[T]he TVPA contemplates liability against officers who do not personally execute"

extrajudicial killings.  *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 458 (2012).  Those who

---

[89] *TVPA of 1989: Hrg. on S. 1629 and H.R. 1662 Before the Subcomm. on Immigr. & Refugee Affs. of the S. Comm. on the Jud.*, 101st Cong. 25-26 (1990) (S. Hrg. 101-1284); *cf. Lizarbe*, 642 F. Supp. 2d at 485 (exhaustion no bar because defendants failed to show "what items of damages are compensable under Peruvian law" or prove that damages "could begin to approach the level" available under TVPA).

command and oversee such killings,[90] who act through agents,[91] and who aid and abet or conspire to kill—all are liable.[92]  Defendants dispute only whether the TVPA permits aiding-and-abetting and conspiracy liability.  Alasaker Br. 31-32; U.S. Agents' Br. 23-24.  Their arguments lack merit.

Courts have repeatedly held that the TVPA imposes liability on those who aid and abet extrajudicial killings and who conspire to carry them out.[93]  They have done so because the TVPA's text invites such liability and its legislative history confirms that Congress intended such liability.  The TVPA, again, imposes liability on anyone who "subject[s]" another to an extrajudicial killing.  TVPA § 2(a).  This word "expands . . . the reach of the statute" and encompasses any action that "'cause[s] someone to undergo' . . . extrajudicial killing, as well as . . . the deed [itself]."  *Wiwa*, 2002 WL 319887 at *15.  That includes those who aid-and-abet or conspire.  *Doe v. Drummond Co.*, 782 F.3d 576, 603 (11th Cir. 2015) ("By its terms, the TVPA supports . . . indirect liability."); *see Penaloza v. Drummond Co., Inc.,* 384 F. Supp. 3d 1328, 1344

---

[90] *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005) (TVPA liability "reaches those who ordered" wrongful act); *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1157 (11th Cir. 2005) (recognizing "command responsibility" liability); *accord Hilao v. Estate of Marcos*, 103 F.3d 767, 779 (9th Cir. 1996) (liability extends to "anyone with higher authority who authorized, tolerated or knowingly ignored" acts) (quoting S. REP. 102-249, at 9); *Qi*, 349 F. Supp. 2d at 1334 ("command responsibility" may be imposed).

[91] *Chowdhury v. Worldtel Bangladesh Holding, Ltd.*, 746 F.3d 42, 53 (2d Cir. 2014) ("an individual can be liable . . . for 'subject[ing]' the victim to torture even if his agent administers the torture"); *Penaloza v. Drummond Co.,* 384 F. Supp. 3d 1328, 1344 (N.D. Ala. 2019) (agency liability is available under TVPA); *Mamani v. Berzain*, 309 F. Supp. 3d 1274, 1310 (S.D. Fla. 2018) (same).

[92] *Cabello*, 402 F.3d at 1158; *Garcia v. Chapman*, 911 F. Supp. 2d 1222, 1240 (S.D. Fla. 2012) (recognizing TVPA claims based on conspiracy and aiding and abetting); *Lizarbe*, 642 F. Supp. 2d at 491 (same); *Doe v. Rafael Saravia*, 348 F. Supp. 2d 1112, 1148 (E.D. Cal. 2004) (same); *Qi*, 349 F. Supp. 2d at 1332 ("doctrine of aiding and abetting . . . presumably" applies "under the TVPA, which was intended to supplement and enhance remedies under the ATCA"); *Wiwa*, 2002 WL 319887, at *16 ("[T]he language and legislative history of the TVPA supports liability for aiders and abettors of . . . extrajudicial killings.").

[93] *See, e.g.*, *Cabello*, 402 F.3d at 1158; *Garcia*, 911 F. Supp. 2d at 1240; *Penaloza*, 384 F. Supp. 3d at 1346-47; *Lizarbe*, 642 F. Supp. 2d at 491; *Rafael Saravia*, 348 F. Supp. 2d at 1148; *accord Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 21 (D.D.C. 2009).

(N.D. Ala. 2019).   Indeed, the legislative history expressly *says* the TVPA permits "lawsuits against persons who ordered, abetted, or assisted in" unlawful conduct.   S. REP. 102-249, at 8. Hence, the D.C. Circuit has emphasized that Defendants' position—that there is no aiding-and-abetting liability under the TVPA—is "inconsistent with the Senate Judiciary Committee report." *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 58 n.49 (D.C. Cir. 2011) ("*Exxon II*"); *see Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1157 (11th Cir. 2005) (legislative history shows "the TVPA was intended to reach . . . those ordering, abetting, or assisting in [a] violation").

Defendants do not engage with Congress's clear intent in the TVPA.   Instead, they rely on *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994) (which concerned the Securities Exchange Act), and *Owens v. BNP Paribas, S.A.*, 897 F.3d 266 (D.C. Cir. 2018) (which concerned the Antiterrorism Act).   Alasaker Br. 31-32; U.S. Agents' Br. 23-24. Defendants gloss these cases to create a magic-words requirement precluding aiding-and-abetting or conspiracy liability under any statute that does not use the words "aid and abet" or "conspiracy." No such rule exists.   While those cases *do* recognize a "presumption against . . . aiding and abetting liability," *Owens*, 897 F.3d at 277-78, they do not require magic words or limit how a statute may overcome the presumption.   *Cf. Exxon II*, 654 F.3d at 28 (While *Central Bank* "instructed that . . . there is no presumption *in favor*" of aiding-and-abetting liability, "[o]ur conclusion that there is [such] liability under the ATS is not based on [such] a presumption").

Here, unlike in *Central Bank* or *Owens*, the TVPA's text—via the word "subject"—invites secondary liability.   That is why courts have interpreted the TVPA to provide such liability. *Wiwa*, 2002 WL 319887, at *15 (use of "subject" means that "individuals who 'cause someone to undergo' torture or extrajudicial killing . . . could be held liable"); *cf. Central Bank*, 511 U.S. at 175-76 (by limiting liability to those who "directly or indirectly" violate the statute, statute

impliedly precluded aiding-and-abetting).   And here, unlike in *Central Bank* or *Owens*, the legislative history is express: the TVPA applies "to lawsuits against persons who ordered, abetted, or assisted in the torture."   *Compare* S. REP. 102-249, at 8, *with Central Bank*, 511 U.S. at 183 ("nothing in the . . . history of § 10(b) . . . implies that aiding and abetting was covered").

Incorrectly, Defendants claim that *Owens* categorically rejected "reliance on legislative history."  Alasaker Br. 32 n.17.  In *Owens*, however, the legislative history consisted only of vague statements about the statute's general purpose that did not "clarify the meaning of any words" in the statute.  897 F.3d at 279.  Here, the legislative history speaks directly to aiding-and-abetting liability and supports the broad ordinary meaning that "subjects" carries. Underscoring this conclusion is that "the closest analogue to the TVPA"—the ATS—"provides for aiding and abetting liability." *Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1173 (C.D. Cal. 2005); *infra* § IV.C.1.  By contrast, *Central Bank* stressed that none of the closely analogous statutes "imposes [such] liability."  511 U.S. at 179.[94]

> **2.    Bin Salman, Alasaker, Alqahtani, And Alassiri Are Liable As Principals And Commanders Who Directed The Attempted Extrajudicial Killing, And For Aiding And Abetting And Conspiring To Commit An Extrajudicial Killing.**

Bin Salman does not dispute that Dr. Saad has pled a TVPA claim (aside from his legal arguments based on attempt and exhaustion).  MBS Br. 51-56.  He thus requires no discussion. And while his henchmen *do* dispute that point, their arguments fail.  Dr. Saad plausibly pleads that

---

[94] Defendants also argue that they cannot be held liable based on aiding and abetting or conspiracy because there was no "primary" violation.  Tiger Squad Br. 40-42; U.S. Agents' Br. 25-27.  This argument is derivative of their argument that an attempted extrajudicial killing does not violate the TVPA.   For the reasons described above, that argument is wrong.   Because an attempted extrajudicial killing is a "tortious result" on the facts here, it is sufficient to anchor a claim for aiding and abetting or conspiracy. *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983); *see infra* at 114-15 (addressing arguments that an attempted extrajudicial killing is not a tort).

they are liable as principals and commanders and based on aiding-and-abetting and conspiracy.

*Alasaker* is liable because he led the hunt for Dr. Saad so that Dr. Saad could be extrajudicially killed.  Alasaker is "one of . . . bin Salman's closest aides" and is "known as . . . bin Salman's 'invisible hand.'"  AC ¶ 40 (quoting news reports).  He is the head of "bin Salman's private office" and is the "Executive Director" of bin Salman's private foundation.  *Id.*  Leveraging "those two roles," Alasaker recruited and deployed a cadre of operatives to hunt down Dr. Saad in the United States, where bin Salman believed Dr. Saad to be living and where bin Salman believed he would learn key information necessary to kill Dr. Saad.  *Id.* ¶¶ 15, 40; *supra* at 12-15, 55, 59.

Dr. Saad has already addressed Alasaker's argument that these allegations are "conclusory."  *Supra* at 64.  Alasaker also argues that he cannot be liable because he just commanded the U.S.-Based Covert Agent Defendants who hunted for Dr. Saad, not the Tiger Squad Defendants who carried forensic tools and tried to kill him.  Alasaker Br. 35-36.  The hunt and the killing, however, were not two separate things.[95]  Alasaker hunted down Dr. Saad *so that* he could be killed.  Alasaker thus "subject[ed]" Dr. Saad to the attempted extrajudicial killing.

Dr. Saad has also pled that Alasaker knew *why* he was hunting down Dr. Saad, particularly given that "intent and knowledge may be alleged generally." *Haralson v. Mgmt. & Training Corp.*, 724 F. Supp. 2d 82, 84 (D.D.C. 2010).  No one is closer to bin Salman's schemes than the head of his private office and personal foundation; Alasaker knew bin Salman had deployed the Tiger Squad to kill and torture other enemies; and Alasaker even received "four . . . calls to [his] mobile

---

[95] *See In re Scrap Metal Antitrust Litig.*, No. 1:02CV0844, 2004 WL 7340436, at *9 (N.D. Ohio Mar. 31, 2004) (rejecting "Defendants' attempt to separate Plaintiffs' allegations in order to portray them as involving multiple, individual conspiracies rather than one unified scheme" because the "central focus of the Plaintiffs' claim" was "overarching conduct," not "any one particular act"), *aff'd*, 527 F.3d 517 (6th Cir. 2008); *cf. United States v. Irving*, 665 F.3d 1184, 1200 (10th Cir. 2011) (solicitation of others and agreement to commit murder, along with "concrete actions to facilitate" that result, "*viewed in the aggregate*, constitute a substantial step").

phone" from the Tiger Squad team murdering Khashoggi.  AC ¶¶ 15, 46 & n.22, 228.  The additional fact Alasaker cherrypicks—that he "repeatedly phoned and sent WhatsApp messages to [Aljabri], . . . to coordinate . . . a private jet [to] bring [Aljabri] back," Alasaker Br. 36 (quoting AC ¶ 177)—reinforces that Alasaker was privy to bin Salman's plot but does not stand alone.

Alasaker also conspired to commit the killing by leading the hunt knowing the Tiger Squad would use the information to kill Dr. Saad.  Alasaker argues that Dr. Saad does not allege a "meeting of the minds."  Alasaker Br. 38.  Conspiracy, however, does not require a formal or express agreement.  "In fact, in most civil conspiracy cases, courts . . . infer an agreement from indirect evidence," *Lagayan v. Odeh*, 199 F. Supp. 3d 21, 30 (D.D.C. 2016) (cleaned up), such as "whether the parties share a common goal, the degree of interdependence between the alleged participants, and any overlap between participants among the various operations alleged to comprise a single conspiracy," *Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91, 100 (D.D.C. 2002); *see also Halberstam v. Welch*, 705 F.2d 472, 486 (D.C. Cir. 1983).

Here, Dr. Saad alleges specific facts showing Alasaker, as bin Salman's "invisible hand," agreed to help bin Salman carry out an extrajudicial killing by recruiting, controlling, and directing the U.S.-Based Covert Agent Defendants tasked with hunting Dr. Saad (just as he worked with bin Salman to infiltrate Twitter and played a key role in the Khashoggi murder).  *Supra* at 12-15, 37-38, 64-66.  Alasaker's insistence that he did not know the "purpose of the conspiracy," Alasaker Br. 38, crumbles when set against the reporting confirming that the Tiger Squad members who killed Khashoggi made calls to Alasaker the very day.  AC ¶¶ 46, 306.[96]  In this case, as in many others, bin Salman's invisible hand knew just what the Tiger Squad was dispatched to do.  *Id.*

---

[96] *See Khashoggi Case: All Previous Updates,* Aʟ Jᴀᴢᴇᴇʀᴀ (Nov. 22, 2018), https://bit.ly/3w9SCpI; Hannah Lucinda Smith, *Saudi Hit Squad Leader 'Called Crown Prince's Office' After Khashoggi Death,* Tɪᴍᴇs (Oct. 23, 2018), https://bit.ly/3cw4kDk.

¶¶ 177, 306, 380.  Unlike the defendants in the case Alasaker cites (at 38-39), Alasaker knew of "the larger conspiracy and  . . . the necessity for the other participants." *Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84, 110 (D.D.C. 2017), *vacated in part*, 285 F. Supp. 3d 240 (D.D.C. 2018).

For much the same reasons, Dr. Saad adequately alleges that Alasaker aided and abetted the attempted extrajudicial killing.  Mostly, Alasaker claims his assistance was not "substantial" because the manhunt he led did not find Dr. Saad in the United States.  Alasaker Br. 40-41.  This claim fails, first, because, as explained, Dr. Saad has plausibly pled that the U.S. manhunt was key to bin Salman's attempt to corner and kill the former head of Saudi intelligence.  *Supra* at 59-60.

Second, Alasaker gets the law wrong:  To show "substantial assistance," a plaintiff need not show a "cause-effect relationship." *Exxon III*, 2015 WL 5042118, at *9.  A defendant need only have "in some [way] associate[d] himself with the [primary violator's] venture" and "participate[d] in it as something that he wishe[d] to bring about, that he [sought] by his action to make it succeed." *Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27, 36 (D.C. Cir. 1987), *abrogated on other grounds by Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010).  Dr. Saad has pled that bin Salman's "invisible hand" had "in some [way] associated himself" with bin Salman's murderous scheme.  And to the extent Alasaker argues (at 2) that his direction of the U.S.-Based Covert Agent Defendants did not assist the scheme because their questions were "primarily" about Dr. Saad's family, that argument is nonserious.  They asked about Dr. Saad's family *in order to* obtain information about Dr. Saad (and avoid the suspicion from asking about Dr. Saad).  AC ¶ 240.  Alasaker cannot procure dismissal by asking this Court to accept his version of the facts.[97]

---

[97] The cases Alasaker cites (at 40-41) only underscore why his arguments lack merit.  In *Bernhardt v. Islamic Republic of Iran*, this Court declined to hold two banks liable based on aiding and abetting because the plaintiffs "fail[ed] to point to *any* 'assistance' that [the banks] gave."  Civ. No. 18-2739, 2020 WL 6743066, at *6 (D.D.C. Nov. 16, 2020) (emphasis added).  In *Ofisi*, the court deemed allegations of aiding and abetting insufficient because the plaintiff alleged *only* that

*Alqahtani and Alassiri* are liable because they commanded the Tiger Squad members who attempted to extrajudicially kill Dr. Saad.  Alqahtani has long served as a "chief enforcer[]" for bin Salman and has boasted that he does not act at his "own whim" but as a "faithful executioner of the orders of the . . . Crown Prince."  AC ¶¶ 49, 56.  Alassiri is another close confidant and advisor.  *Id.* ¶ 62.  The U.S. and U.K. governments have concluded that Alqahtani and Alassiri supervised the Khashoggi extrajudicial killing—and the Amended Complaint alleges that they played the same role in the attempted extrajudicial killing of Dr. Saad.  *Id.* ¶¶ 49, 52-53, 65, 294; *see supra* at 66 (quoting U.S. government conclusion that Alqahtani and Alasirri "controlled" and "coordinated with" the Tiger Squad team that killed Khashoggi).

Alqahtani and Alassiri argue that Dr. Saad's allegations are insufficiently "plausibl[e]" or detailed to support an inference that they "had the authority to control [the] . . . Tiger Squad," "knew about the . . . mission . . . to kill" Dr. Saad," or made any contribution.  Tiger Squad Br. 31-32.  This argument is hard to take seriously from two internationally condemned murderers, but in any case, Dr. Saad's allegations are plausible and specific.  Whenever bin Salman sought to deploy the Tiger Squad, he turned to these men.  AC ¶¶ 272, 284, 293-94.  For example, when bin Salman wanted to kill the Saudi prince who criticized him from France, "Alqahtani posed as [a] pilot" and "rendered the prince and . . . three U.S. citizens back to Saudi Arabia."  *Id.* ¶ 53.  Alqahtani also supervised some of the same Tiger Squad individuals in connection with other violent missions directed by bin Salman (including torturing Dr. Saad's son-in-law), *id.* ¶ 335, and bragged about coordinating another operation to render a prince to Saudi Arabia for bin Salman, *id.* ¶ 294.  Meanwhile, Alqahtani and Alassiri selected the team sent to kill Dr. Saad, *id.* ¶ 337; directed the

the defendant "provi[ded] banking services to a state sponsor of terrorism and its commercial banks" and had not alleged that "any funds processed by [the defendant] were used to carry out the attack at issue.  278 F. Supp. 3d at 109.

Tiger Squad to obtain tourist visas so bin Salman could maintain plausible deniability, *id.* ¶ 331; and directed the Tiger Squad to travel to Ottawa in order to enter Canada, find Dr. Saad, and kill him. *Id.* ¶ 334.   Given that Alqahtani and Alassiri were *caught* supervising the Tiger Squad members who killed Khashoggi, *id.* ¶¶ 52, 60-61, 64-66, they cannot claim it *implausible* that they played a similar role in the similar killing the Tiger Squad tried days later.[98]

Alqahtani and Alassiri's argument on conspiracy—that Dr. Saad does not allege an agreement, Tiger Squad Br. 32—fails for the reasons explained above.   An agreement may be inferred from circumstantial evidence.   *Supra* at 97.   And here, the evidence powerfully supports the inference that Alqahtani and Alassiri worked with the other Defendants to hunt and murder Dr. Saad, just as with other enemies of bin Salman.   AC ¶¶ 111, 272, 276-77, 284, 301, 315; *supra* at 1, 9-12, 14-15, 17-20, 66-67.

Their arguments on aiding and abetting, Tiger Squad Br. 32, fail for much the same reasons.   Alqahtani and Alassiri knew what they sent the Tiger Squad Defendants to Canada to do (which was the same thing they sent the Tiger Squad to Istanbul to do).   *Supra* at 10-12, 66-67.   And they provided "substantial assistance" by organizing and directing that effort.[99]

---

[98] *See Union Com. Servs. Ltd.*, 785 F. App'x at 319 (allegations that defendant "had been involved previously in a similar bribery scheme in the past" supported plausibility of plaintiff's claim for bribery); *COR Sec. Holdings Inc v. Banc of Cal., N.A.*, No. SA CV 17-1403, 2018 WL 4860032, at *7 (C.D. Cal. Feb. 12, 2018) (plaintiff plausibly stated a claim against the defendant based on "a history of similar behavior"); *Shimono v. Harbor Freight Tools USA, Inc.*, No. EDCV 16-1052, 2016 WL 6238483, at *6 (C.D. Cal. Oct. 24, 2016) (allegations that defendant "had a practice" or "modus operandi" and that the conduct against the plaintiff conformed with that practice were sufficient to "state[] a plausible claim").

[99] The argument of Alqahtani and Alassiri that they cannot be held liable as aiders and abettors because there is no "principal tortfeasor," Tiger Squad Br. 40-42, fails for the same reason explained elsewhere: Attempted torts are inactionable only when they do not *cause harm*.   And here, Defendants' conduct both caused harm and constituted a tort.   *Supra* at 18; *infra* at 114-15 & § V.

**3.     The Tiger Squad Defendants Are Directly Liable For Their Personal Participation In The Attempted Extrajudicial Killing And As Conspirators In The Scheme To Extrajudicially Kill Dr. Saad.**

The Tiger Squad Defendants violated the TVPA by carrying out, and conspiring to carry out, the attempted extrajudicial killing of Dr. Saad.  Defendants Algasem, Alsayed, Alhaqbani, Alhomid, Albawardi, and Bader Alqahtani *personally* traveled to carry out the killing, and Defendant Alsaleh coordinated the trip and obtained a tourist visa to join.  AC ¶¶ 116-122.

The Tiger Squad Defendants' argument—that Dr. Saad's allegations are "purely conclusory" and do not "plausibly" show that they intended to carry out "an extrajudicial killing," Tiger Squad Br. 34—beggars belief.  The Amended Complaint identifies the *exact flight* many of the Tiger Squad Defendants took to kill Dr. Saad (AC839).  AC ¶ 334.  They did so 13 days after another detachment travelled to Istanbul to extrajudicially kill Khashoggi, as part of a team with identical specialties—including an expert in "identifying 'dead bodies and body parts,'" who was a colleague of the forensic expert who dismembered Khashoggi—and carrying "two bags of forensic tools."  *Id.* ¶¶ 17, 116, 296-316, 323-326, 334; *see id.* ¶ 307 ("little plausible explanation" for expert's role "other than the role he filled—dismembering and disposing of the body" (quoting Special Rapporteur's report)).  And they travelled on tourist visas, not official visas (except one), and, once there, lied to authorities.  *Id.* ¶¶ 334-46.  Certainly, when Canadian law enforcement opened an investigation into a "conspiracy to commit murder or other mayhem" based on Dr. Saad's allegations, it did not regard as *implausible* that the Tiger Squad came to kill.  *Id.* ¶ 352.

The specific allegations concerning the October 2018 plot are only the start.  The Amended Complaint explains that, far from a one-off occurrence, the plot to extrajudicially kill Dr. Saad was part of an pattern of extraterritorial operations targeting bin Salman's personal enemies and carried out by the Tiger Squad at the direction of Alqahtani and Alassiri.  AC ¶¶ 284-295.  Each time bin Salman identified a threat to his personal interests, the story played out the same way: (a) the target

fled Saudi Arabia, (b) bin Salman and his henchmen attempted to lure the target back to Saudi

Arabia so he could be more easily killed, (c) bin Salman and his henchmen disappeared the target's

family and associates in Saudi Arabia, and (d) bin Salman took measures to locate, detain, and kill

the target wherever he could be found. *Id.* ¶¶ 287-295. When the Tiger Squad Defendants travelled

to Canada with forensic tools in hand, they were the final piece of a very recognizable puzzle.[100]

To the extent the Tiger Squad Defendants argue that they did not get *close enough* for their

actions to constitute attempt or inflict harm, *cf.* Tiger Squad Br. 39-40, that argument fails too. As

the Model Penal Code explains, actions such as "lying in wait, searching for or following

the . . . victim," "reconnoitering the place contemplated for the commission of the crime," and

"possession of materials to be employed in the commission of the crime" are all hallmarks of

attempt. Model Penal Code § 5.01(2). Courts routinely hold that travel constitutes a "substantial

step" triggering attempt liability.[101] Indeed, "[t]he greater the harm of the completed offense, the

---

[100] Except for Defendant Alsaleh, the Tiger Squad Defendants only argue that they are not *directly* liable. They do not challenge the sufficiency of the Amended Complaint's conspiracy allegations. Alsaleh's argument that those allegations are inadequately pled, Tiger Squad Br. 33, lacks merit. Dr. Saad alleges that Alsaleh was employed as a senior military intelligence officer in the Intelligence Department of the Ministry of Defense, that (despite his role in government) he obtained a tourist visa to travel to Canada with the other Tiger Squad Defendants, and that, although he did not travel, he served as a coordinator for the other Tiger Squad Defendants. AC ¶ 118. It also alleges that members of the team that carried out the similar scheme to kill Khashoggi just days earlier included intelligence officers with the same type of background and experience as Alsaleh. *Id.* ¶ 308. Given the many parallels and close proximity between the Khashoggi killing and the attempted killing of Dr. Saad, Dr. Saad has plausibly pled that Alsaleh was slated to travel to Canada to kill Dr. Saad and that he played a similar role in the attempt on Dr. Saad's life that others with analogous positions played in the Khashoggi murder. *Cf. Milliken & Co. v. CNA Holdings*, *Inc.*, No. 3:08-CV-578, 2011 WL 3444013, at *11-12 (W.D.N.C. Aug. 8, 2011) (conspiracy allegation "more plausible" where plaintiff alleged "similar . . . conduct" that was "close in time, geographic area, and involved several of the same" defendants).

[101] *United States v. Washington*, 653 F.3d 1251, 1265-66 (10th Cir. 2011) (attempt conviction based on travel "in close temporal proximity to the planned crime" with others who agreed to "facilitate" crime); *United States v. Myers*, 575 F.3d 801, 809 (8th Cir. 2009) ("driving two hours" to rendezvous constituted attempt); *United States v. Gladish*, 536 F.3d 646, 649 (7th Cir. 2008) (travel to site of intended crime "enough"); *United States v. August,* 835 F.2d 76, 78 (5th Cir.

farther from completion a substantial step will first be seen."  Charles Doyle, Cong. Rsch. Serv., R420001, ATTEMPT: AN OVERVIEW OF FEDERAL CRIMINAL LAW 6 (2020).  Meanwhile, Dr. Saad has suffered grievous harm from Defendants' relentless attempt to end his life.  *Supra* at 18; *infra* at 115, 131.

<blockquote>

**4.**     **The U.S.-Based Covert Agent Defendants Aided And Abetted And Conspired To Commit An Extrajudicial Killing.**

</blockquote>

The U.S.-Based Covert Agent Defendants aided and abetted, and conspired to complete, the extrajudicial killing by conducting the manhunt that facilitated it.  Their arguments lack merit.

**First**, the U.S.-Based Covert Agent Defendants argue that Dr. Saad has not alleged that they carried out their hunt with knowledge it would assist "an attempt on [Dr. Saad's] life."  U.S. Agents' Br. 28.  This, however, ignores both the law and the reasonable inferences to which Dr. Saad is entitled.  Again, "intent and knowledge may be alleged generally." *Haralson*, 724 F. Supp. 2d at 84.  And an aider and abettor "does not need to know every detail of the crime that was eventually committed." *Exxon III*, 2015 WL 5042118, at *10; *see United States v. Garrett*, 545 F. Supp. 129, 136-37 (D.D.C. 1982), *aff'd*, 720 F.2d 705 (D.C. Cir. 1983).  Defendants may "be liable so long as they are aware that one of a number of crimes will probably be committed, and one of th[em] is." *Exxon III*, 2015 WL 5042118, at *10; *Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.*, 791 F. Supp. 2d 33, 52 (D.D.C. 2011) ("general awareness of wrongdoing . . . is sufficient").

Dr. Saad has plausibly pled that the U.S.-Based Covert Agent Defendants knew "something illegal was afoot." *Halberstam*, 705 F.2d at 486.  They knew that by the time bin

---

1987) ("one who travels over three hundred miles to a pre-arranged rendezvous, bearing the agreed cash . . ., has taken a substantial step."); *cf. United States v. Soto-Barraza*, 947 F.3d 1111, 1121-22 (9th Cir.) (the "inquiry is whether . . . defendants will carry through with the offense unless interrupted" and "there is no requirement" that actions "have a particular geographic proximity").

Salman "grew into adulthood," he had been dubbed the "father of the bullet" after he threatened a noncompliant official by sending "an envelope with a single bullet inside."[102]  And by September 2017, the press had branded bin Salman "the most dangerous man in the world;"[103] reported that he had violently deposed and detained then-Crown Prince bin Nayef in a palace coup and proceeded to arrest Mr. bin Nayef's close advisors; recounted how multiple high-ranking Saudi nationals who ran afoul of the Royal Court had been kidnapped and returned to Saudi Arabia (including the prince whom the Tiger Squad had kidnapped from France at bin Salman's direction);[104] and highlighted that bin Salman had directed the arrest of critics to "stamp[] out . . . dissent" and "consolidate power."[105]  Given these "similar actions in the past by the principal perpetrator," *Exxon III*, 2015 WL 5042118, at *10—including actions that specifically targeted bin Nayef and individuals, like Dr. Saad, closely associated with him, AC ¶¶ 145, 248—Dr. Saad has plausibly pled that the U.S.-Based Covert Agent Defendants knew bin Salman was up to illegality.[106]

---

[102] Dexter Filkins, *A Saudi Prince's Quest to Remake the Middle East*, NEW YORKER (Apr. 2, 2018), https://bit.ly/3gswWi6.

[103] *Is This the World's Most Dangerous Man? Hot-Head Saudi Prince Has West Very Worried*, SUN (Apr. 6, 2016), https://bit.ly/3wds5b1.

[104] *See* Reda El Mawy, *Saudi Arabia's Missing Princes*, BBC NEWS (Aug. 15, 2017), https://bbc.in/3zch7V8; *see* AC ¶¶ 53 & n.33; 112 & n.104.

[105] Margherita Stancati & Summer Said, *Saudi Arabia Clamps Down as Crown Prince Consolidates Power*, WALL ST. J. (Sept. 13, 2017), https://on.wsj.com/3g9I5VU; *see also Muhammad bin Salman Cracks Down on His Perceive Opponents*, ECONOMIST (Sept. 23, 2017), https://econ.st/3ctgsou; Guy Taylor, *Mohammed bin Salman, Saudi Arabia Crown Prince, Rumored to Ascend to Throne*, WASH. TIMES (Sept. 18, 2017), https://bit.ly/3g86FXp.

[106] *Accord Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 433-34 (E.D.N.Y. 2013) (plaintiffs plausibly alleged knowledge because "public sources . . . plausibly could have informed UBS" that it was providing services to Hamas, and "[p]roviding funds to an organization known to be engaged in violent acts of terrorism is sufficient to establish defendant's knowledge that the funds provided would be used . . . for terroris[m]"); *Ramos v. Uber Techs., Inc.*, No. SA-14-CA-502-XR, 2015

The U.S.-Based Covert Agent Defendants, moreover, were not ordinary members of the public.  Alrajhi, Abuljadayel, and Alhamed were loyal followers of bin Salman, AC ¶ 78, who held leadership positions at Saudi organizations funded and overseen by MiSK and Alasaker, *id.* ¶¶ 80, 86, 97, 106-107.  Abuljadayel and Alrajhi were directly employed by MiSK and paid for their work.  *Id.* ¶¶ 90, 106.  Alrajhi and Alhamed were "exposed to high-ranking Saudi officials by virtue of [their] status as [] loyal and trusted agent[s] of . . . bin Salman and Alasaker" and received access that would be granted only to trusted and well-connected operatives.  *Id.* ¶ 95; *see id.* ¶¶ 92, 94 (Alrjahi and Alhamed have made frequent visits to the Saudi Embassy); *id.* ¶ 101 (Alhamed assisted with visit by Alassiri to Washington D.C. and handled sensitive matters for bin Salman's brother, Khalid).   And they were rewarded with plum positions in organizations associated with bin Salman.  *Id.* ¶¶ 77, 86, 103.  When such trusted operatives received instructions to secretly investigate and surveil Dr. Saad and his family outside of official channels, they knew it was not for a lawful and legitimate end—and certainly, Dr. Saad is entitled to that reasonable inference on a motion to dismiss.  *See Evangelou*, 901 F. Supp. 2d at 170; *cf. Halberstam*, 705 F.2d at 487 (fact that aider and abettor acted "in an unusual way under unusual circumstances" supported inference that she "knew she was assisting [another's] . . . wrongful acts").[107]

WL 758087, at *9 (W.D. Tex. Feb. 20, 2015) (plaintiffs pled "actual knowledge" by "stating that [defendants' non-compliance with the ADA] was reported in news articles").

[107] Dr. Saad's allegations suffice to support an inference that Defendants had *actual* knowledge, not just constructive knowledge.  Defendants' contrary argument "confuses the standard of proof with the plausibility requirement at the pleading stage."  *Royal Park Invs. SA/NV v. HSBC Bank USA, Nat'l Ass'n*, 109 F. Supp. 3d 587, 602–03 (S.D.N.Y. 2015).  At this stage, the question is "not whether *in fact* [Defendants] had actual [knowledge]"—"a factual determination left for trial"—but whether Dr. Saad has "pled plausible facts supporting allegations of actual [knowledge]."  *Policemen's Annuity & Ben. Fund of City of Chicago v. Bank of Am., NA*, 943 F. Supp. 2d 428, 442-43 (S.D.N.Y. 2013), *abrogated on other grounds by Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of New York Mellon*, 775 F.3d 154 (2d Cir. 2014).

**Second**, the U.S.-Based Covert Agent Defendants argue that they did not provide substantial assistance because their efforts to find Dr. Saad were "unsuccessful" and were not "a 'but for' cause of" the attempted killing. U.S. Agents' Br. 27. This argument fails for the same reasons as Alasaker's identical argument. It misstates the legal standard by demanding but-for causation. *See Exxon III*, 2015 WL 5042118, at *9. And the argument flips on its head the motion-to-dismiss standard. As Dr. Saad has explained, *supra* at 59-60, he has plausibly pled that the U.S. manhunt was key to the attempted extrajudicial killing. Again, the U.S.-Based Covert Agent Defendants cannot procure dismissal by asking this Court to credit their story over Dr. Saad's.

**Third**, the U.S.-Based Covert Agent Defendants argue Dr. Saad has not adequately pled an agreement or conspiracy. U.S. Agents' Br. 29. But again, conspiracy may be inferred from conduct. *Supra* at 97. And again, Dr. Saad has pled facts showing that the U.S.-Based Covert Agent Defendants acted under orders from Alasaker and bin Salman and coordinated with each other:

- The U.S.-Based Covert Agent Defendants matched exactly the *profile* of covert agents Alasaker and Bin Salman deployed before (including their association with MiSK, patronage positions, connections with senior leaders, and public support for Alasaker and bin Salman). *Supra* at 14, 62-63.

- The U.S.-Based Covert Agent Defendants began interrogating Dr. Saad's family and friends *at the same time* as bin Salman launched his global hunt: Interrogations occurred on September 15, 2017 (MiSK event with Alasaker and Alhamed); September 25 and 28-30 (Alhamed and Alrajhi phone calls), September 30 (Alrajhi interrogation of Khalid Aljabri), and October 2 (Abuljadayel interrogation of Khalid's wife). AC ¶¶ 238-44. This was just after bin Salman threatened to use "all available means" to get Dr. Saad and Alasaker tried to arrange Dr. Saad's return (September 10, 2017), *id.* ¶¶ 177-78, and just as the Tiger Squad was torturing Dr. Saad's son-in-law to learn Dr. Saad's location (September 26), *id.* ¶¶ 197, 200.

- The U.S.-Based Covert Agent Defendants acted *together* with other conspirators: Alhamed and Alasaker attended together the September 15 MiSK event where one interrogation occurred, *id.* ¶ 238; Alrajhi and Alhamed made multiple, coordinated calls to the same family friend on the same days, *id.* ¶ 241; the calls yielded contact information for Khalid Aljabri, whom Alrajhi interrogated the next day, *id.* ¶ 242; and when Hamed surveilled the Mandarin Oriental and tried to access Dr. Saad, he relied

on information he could *only* have learned from the other U.S.-Based Covert Agent Defendants (because no public records associated the Aljabris with the hotel), *id.* ¶ 245.

- Those who observed the hunt *viewed* the conduct of the U.S.-Based Covert Agent Defendants as suspicious—and it triggered an FBI warning. *Id.* ¶¶ 242, 250, 320.

In short, this case is the very opposite of those the U.S.-Based Covert Agent Defendants cite, U.S. Agents' Br. 29-30, where "plaintiffs allege[d] the existence of an agreement" without "any factual support." *Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 113 (D.D.C. 2010).[108]

## IV.   The Amended Complaint Establishes Jurisdiction And States A Claim Under The Alien Tort Statute.

The Alien Tort Statute ("ATS") supplies jurisdiction and authorizes causes of action for a "narrow set of violations of the law of nations, admitting of a judicial remedy and at the same time threatening serious consequences in international affairs." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 715 (2004). Although the Supreme Court has exercised "caution" in applying the ATS, *id.* at 725, claims are available (1) for violations of "international law norm[s]" that are "specific, universal, and obligatory," *id.* at 732; (2) where "the claims touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial[ity]," *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 12-25 (2013).

---

[108] The U.S.-Based Covert Agent Defendants argue (at 20-22) that Dr. Saad must plead that they acted with a "deliberated" intent to kill. That is wrong. Dr. Saad seeks to hold these Defendants liable based on aiding-and-abetting and conspiracy. So, Dr. Saad need only plead that they had the required mental states for *those* theories. Indeed, the D.C. Circuit has rejected the notion that "the aider and abettor [must] share[] the *mens rea* of the perpetrator"; instead, he must only have "knowledge" of the violation. *Exxon II*, 654 F.3d at 34. And conspiracy requires only an agreement that *someone* commit an unlawful act. *See, e.g.*, *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 105 (D.D.C. 2003). In *Cabello*, for example, a defendant aided-and-abetted a TVPA violation because he had "knowledge that he was assisting in wrongful activity"—and conspired to commit such a violation because "it was foreseeable" that the plaintiff "would be tortured and killed by his co-conspirators." 402 F.3d at 1159. Here, Dr. Saad has pled the U.S.-Based Covert Agent Defendants' knowledge and their agreement.

Dr. Saad's claims satisfy both requirements.   First, they seek to vindicate specific and obligatory international norms: Few norms are more fundamental than the prohibition on extrajudicial killings, and attempt liability is equally well-established.   Second, few ATS cases so closely "touch and concern" the United States: Defendants carried out their plot to kill Dr. Saad *inside the United States* and *in order* to disrupt a U.S. intelligence partnership, to deny the United States information Dr. Saad holds, and to alter the U.S. intelligence community's behavior.

### A.      An Attempted Extrajudicial Killing Is Actionable Under The ATS.

#### 1.      An Attempted Extrajudicial Killing Violates A Specific, Universal, And Obligatory Norm Of International Law.

Bin Salman concedes that if his plot to extrajudicially kill Dr. Saad *succeeded*, it would violate the "specific, universal, and obligatory" norm barring such killings.  *Sosa*, 542 U.S. at 732; *see* MBS Br. 52.[109]  But he says that because border agents thwarted his plot, his "inchoate attempt" is "not actionable."  MBS Br. 58; *see* Alasaker Br. 33; U.S. Agents' Br. 10; Tiger Squad Br. 36.

This argument lacks merit.   Many cases have recognized ATS causes of action for attempted extrajudicial killings.[110]  Defendants cite no case genuinely to the contrary.  They cannot because, as the Declaration of Dr. Beth Van Schaack explains, attempt liability is firmly embedded in customary international law.   To ascertain international law, *Sosa* directs courts to look to "the customs and usages of civilized nations; and, as evidence of these, to the works of jurists and commentators."   542 U.S. at 734 (quoting *The Paquete Habana*, 175 U.S. 677, 700 (1900)).   In *Exxon II*, the D.C. Circuit looked to these sources to reject a similar argument that the ATS does

---

[109] *Wiwa v. Royal Dutch Petroleum Co.*, 626 F. Supp. 2d 377, 382 n.4 (S.D.N.Y. 2009); *Samantar*, 699 F.3d at 777; *Enahoro v. Abubakar,* 408 F.3d 877, 884 (7th Cir. 2005); *see* Restatement (Third) of Foreign Relations Law § 702 cmt. f (1987).

[110] *Samantar*, 2012 WL 3730617 at *13; *Constant*, 2006 WL 3490503.

not recognize another form of "inchoate" liability (aiding and abetting).[111]   654 F.3d at 390-91. The same sources compel the same result here.

**First**, as in *Exxon II*, international criminal tribunals provide "an authoritative source of customary international law" confirming that attempts are actionable.   654 F.3d at 30; *accord* Van Schaack Decl. ¶¶ 14-19.   In *Exxon II*, the D.C. Circuit placed particular weight on the decisions of the International Criminal Tribunal for the former Yugoslavia ("ICTY").   654 F.3d at 31.   The United States spearheaded the ICTY's creation,[112] and it "is only empowered to apply international humanitarian law that is 'beyond any doubt customary law.'" *Prosecutor v. Tadic,* Case No. IT-94-1-T, Trial Chamber Opinion & Judgement, ¶ 662 (ICTY May 7, 1997); *see Exxon II,* 654 F.3d at 391.   Here, the ICTY's caselaw is on-point and decisive: So embedded in customary international law is attempt liability that the ICTY has not hesitated to adjudicate attempted murders *even though* its charter does not expressly mention attempt liability.   *Prosecutor v. Vasiljević*, Judgment, Case No. IT-98-32-T, ¶¶ 234, 239 (ICTY Nov. 29, 2002) (deeming "attempted murders" actionable under residual prohibition on "other inhumane acts"); *Prosecutor v. Mrđa*, Sentencing Judgment, Case No. IT-02-59-S, ¶ 31 (ICTY Mar. 31, 2004) (similar).

Other international criminal tribunals are in accord.   For example, the Rome Statute establishing the International Criminal Court ("ICC") provides for "attempt" liability for crimes

---

[111] As bin Salman notes, the D.C. Circuit partially vacated *Exxon II* in light of a decision from an international criminal tribunal that appeared to change international law.   MBS Br. 61 n.47; *see Doe. v. Exxon Mobil Corp.*, 527 F. App'x 7, 7 (D.C. Cir. 2013) (citing *Prosecutor v. Perišić*, Case No. IT-04-81-T, Judgement (Feb. 28, 2013)).   That tribunal's decision, however, was itself later vacated.   As a result, bin Salman correctly acknowledges that *Exxon II* remains good law.   *See* MBS Br. 61 n.47 ("The aiding-and-abetting standard set forth *in Exxon II* thus 'remains unchanged.'" (quoting *Exxon III*, 2015 WL 5042118, at *11)).

[112] S.C. Res. 827, UN Doc. S/RES/827 (May 25, 1993) (ICTY Charter); S.C. Res. 808, UN Doc. S/RES/808 (Feb. 22, 1993); *see* Patricia M. Wald, *International Criminal Courts-A Stormy Adolescence*, 46 Va. J. Int'l L. 319, 321 (2006).

within the ICC's jurisdiction.[113]  "[N]ational case law" bears out the conclusion that this provision is "declaratory of customary international law." Antonio Cassese, *Black Letter Lawyering v. Constructive Interpretation—The Vasiljević Case*, 2(1) J. INT'L CRIM. JUST. 265, 267 (2004); *accord* Van Schaack Decl. ¶ 18.[114]  Like the ICTY, the ICC has adjudicated several attempted killings.[115]  The Iraqi High Tribunal and East Timor Special Panels also criminalize attempt.[116]

> **Second**, the international community has reinforced this understanding by constructing a web of multilateral treaties encompassing attempt.  States have continued to enter such agreements

---

[113] Rome Statute of the International Criminal Court art. 25(3)(f), opened for signature July 17, 1998, 2187 U.N.T.S. 90 (imposing liability for "[a]ttempts to commit such a crime by taking action that commences its execution by means of a substantial step, but the crime does not occur because of circumstances independent of the person's intentions").

[114] The D.C. Circuit has observed that the Rome Statute does not always "represent customary international law."  *Exxon II*, 654 F.3d at 37 (citing *Prosecutor v. Germain Katanga and Mathieu Ngudjolo Chui*, Case No. ICC–01/14/01/07, Decision on the Confirmation of Charges, ¶¶ 507–08 (Sept. 30, 2008)).  In *Exxon II*, the D.C. Circuit thus derived the mens rea standard for aiding-and-abetting liability from the law of the ICTY (which employed a knowledge standard) instead of the ICC (which required purpose).  *Id.* at 39.  This case does not implicate those concerns because the Rome Statute often *does* reflect customary international law—and here, the ICC and ICTY agree. *Prosecutor v. Furundžija*, Judgement, Case No.: IT-95-17/1-T, ¶ 227 (ICTY Dec. 10, 1998) ("Depending on the matter at issue, the Rome Statute may be taken to restate, reflect or clarify customary rules or crystallise them, whereas in some areas it creates new law or modifies existing law. At any event, the Rome Statute by and large may be taken as constituting an authoritative expression of the legal views of a great number of States.").

[115] *See Prosecutor v. Ntaganda*, Decision Pursuant to Article 61(7)(a) and (b) of the Rome Statute on the Charges of the Prosecutor Against Bosco Ntaganda, Case No. ICC-01/04-02/06-309, ¶¶ 97, 175 (June 9, 2014); *Prosecutor v. Gbagbo*, Decision on the Confirmation of Charges against Laurent Gbagbo, Case No. ICC-02/11-01/11-656-Red, ¶¶ 201-02 (June 12, 2014); *Prosecutor v. Blé Goudé*, Decision on the Confirmation of Charges against Charles Blé Goudé, Case No. ICC-02/11-02/11-186, ¶ 121 (Dec. 11, 2014); *Prosecutor v. Katanga et al.*, Decision on the Confirmation of Charges, Case No. ICC-01/04-01/07-717, ¶ 458 (Sept. 30, 2008).

[116] *See* Iraqi Special Tribunal Statute art. 15(2)(F); Regulations on the Establishment of Panels with Exclusive Jurisdiction over Serious Criminal Offences, art. 14.3(f), U.N. Doc. UNTAET/REG/2000/15 (June 6, 2000).

from the beginning of the modern era[117] to today,[118] and these agreements address topics ranging from trafficking of narcotics and humans, to the financing and commission of terrorism, to enforced disappearances, torture, organized crime, and corruption.  Van Schaack Decl. ¶ 11.  As Dr. Van Schaack explains, these agreements crystallize *opinio juris* and state practice—the two pillars of customary international law, *Sosa*, 542 U.S. at 734—confirming attempts are actionable. Van Schaack Decl. ¶ 13; *see* Restatement (Third) of Foreign Relations Law § 102 cmt. i (1987) ("International agreements constitute practice of states and as such can contribute to the growth of customary law . . . .").  This consensus carries particular weight because it includes a broad range of states from different regions and legal traditions.  Van Schaack Decl. ¶ 13.

   ***Third***, general principles of law underscore that attempts are actionable.  As Dr. Van Schaack explains, attempt liability is a ubiquitous feature of domestic legal systems.  *Id.* ¶ 20.  That unanimity matters because the "general principles of law recognized by civilized nations" constitute an independent source of international law.[119]  That unanimity also matters because it reinforces state practice.  *Id.*  Simply put, if states universally prohibit attempt, that is strong evidence that the prohibition on attempt is "specific, universal, and obligatory."  *Sosa*, 542 U.S. at 732.  And here, that consensus is both wide and deep.  Van Schaack Decl. ¶ 20.

---

[117] *See* G.A. Res. 260 (III) A, Convention on the Prevention and Punishment of the Crime of Genocide, art. 3(d) (Dec. 9, 1948) (punishing the attempt to commit genocide).

[118] Int'l Law Comm'n, Rep. on the Work of Its Seventy-first Session, arts. 6, 12(3), U.N. Doc. A/74/10 (2019) (contemplating states taking "the necessary measures to ensure that . . . ordering, soliciting, inducing, aiding, abetting or otherwise assisting in or contributing to the commission or attempted commission of" crimes against humanity are actionable within domestic law, including by guaranteeing victims "the right to obtain reparation for material and moral damages").

[119] Statute of the International Court of Justice, June 26, 1945, art. 38, 59 Stat. 1031,U.S.T.S. 993; *see* Restatement (Third) of Foreign Relations Law § 102 (Am. L. Inst. 1987); *see also United States v. Yousef*, 327 F.3d 56, 100-01 (2d Cir. 2003) (looking to Article 38 as an authoritative statement of the sources of customary international law); *United States v. Mohammad*, 398 F. Supp. 3d 1233, 1242 (U.S.C.M.C.R. 2019) (same).

International law is also sufficiently "definite" as to what conduct *constitutes* attempt. *Sosa*, 542 U.S. at 732.  An individual is liable for attempted murder if he or she has the intent to commit murder and takes a "substantial step toward the killing" but the killing does not occur "because of circumstances independent of the perpetrator's intent"—for example, the attempt fails or a third party intervenes.  *Katanga*, Case No. ICC-01/04-01/07, ¶¶ 458, 460; *accord* Jérôme de Hemptinne, *Attempt*, *in* MODES OF LIABILITY IN INTERNATIONAL CRIMINAL LAW 346 (Jérôme de Hemptinne, Robert Roth & Elies van Sliedregt, eds. 2019).

Defendants violated that norm.  After the U.S.-Based Covert Agents hunted Dr. Saad in the United States, bin Salman, Alasaker, Alqahtani and Alassiri directed the Tiger Squad Defendants to travel halfway across the globe to extrajudicially kill Dr. Saad.  AC ¶ 17.  The Tiger Squad Defendants arrived at the airport—"[c]arrying two bags of forensic tools," with "forensic personnel experienced with the cleanup of crime scenes"—and failed only because authorities intervened.  *Id.* ¶¶ 17, 344-38.  This is a "substantial step."  *Supra* 102-03 & n.101 (citing cases).

## 2.     Defendants' Contrary Arguments Lack Merit.

Although *Sosa* directs courts to look to "international law," 542 U.S. at 732, Defendants do not engage with international law and cite no international-law source rejecting attempt liability.  They rely almost entirely on *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1 (D.D.C. 2010).  *Al-Aulaqi*, however, did not involve an attempt claim.  It was a "unique and extraordinary case" in which the father of international terrorist Anwar Al-Aulaqi invoked the ATS to "challeng[e] his son's alleged unlawful inclusion on . . . 'kill lists'" created by the CIA and military.  *Id.* at 11.  He sought a remarkable "injunction against the President, the Secretary of Defense, and the Director of the CIA preventing them from" killing Al-Aulaqi.  *Id.* at 37.  And he grounded this unprecedented request on the claim that this "*threatened* . . . future extrajudicial killing" violated the ATS.  *Id.* at 36.  That attempt to enjoin a threatened future killing was the only ATS claim

Judge Bates considered.  And he rejected it because the father cited "no case in which a court has ever recognized a 'customary international law norm' against a *threatened* future" killing.  *Id.*

Al-Aulaqi's conclusion has nothing to do with this case.  Dr. Saad seeks relief based on a *past* attempted extrajudicial killing.  And as explained, a solid wall of authoritative international-law sources recognizes such attempted killings as actionable.  Bin Salman tries to make *Al-Aulaqi* sound like this case by observing that "the complaint in *Al-Aulaqi* allege[d] unsuccessful attempted extrajudicial killings."  MBS Br. 59.  It did so, however, to support a suit based on a threatened *future* killing, not on a past attempted killing.  *See Al-Aulaqi*, 727 F. Supp. 2d at 11.

Nor do Defendants cite any "other authority holding that an unsuccessful effort to violate international norms" is inactionable.  MBS Br. 59.  The only case they cite that even touches attempt is *United States v. Ali*, 885 F. Supp. 2d 17 (D.D.C. 2012).  *Ali* relied on the definition of "piracy" in the UN Convention on the Law of the Sea ("UNCLOS") to decline to recognize an action for conspiracy to commit piracy and opined in dicta that the UNCLOS did not render attempted piracy actionable.  *Id.* at 33-35.  But even if *Ali*'s treaty-specific dicta were correct, it says nothing about whether the law of nations otherwise recognizes attempt.  And in fact, many decisions hold that attempted piracy *does* violate the law of nations.[120]  As Judge Learned Hand emphasized, "[i]f a pirate . . . had chased a ship and made active, but uniformly bad, practice . . ., there would be no doubt that he had attacked and set upon this ship, though he never broke her skin."  *Daeche v. United States*, 250 F. 566, 569 (2d Cir. 1918).  That is consistent with a Founding-

---

[120] *United States v. Said*, 798 F.3d 182, 193 (4th Cir. 2015) (upholding conviction for attempted piracy under to 28 U.S.C. § 1651, which prohibits "piracy as defined by the law of nations"); *United States v. Dire*, 680 F.3d 446, 450-69  (4th Cir. 2012) (a "frustrated attempt to commit a piratical robbery is equally piracy" under the law of nations); *The Mary Ann*, 16 F. Cas. 949, 951 (S.D.N.Y. 1848) (even seamen, "who are not a class of men whose prudence or discretion could be trusted with the exercise of [ ] delicate and extraordinary powers . . . may arrest and confine the officer who attempted to perpetrate a piracy or felony.").

era statute, passed a year after the ATS, criminalizing attempted piracy.[121]

Bin Salman fares no better with his claim that "'conspiracy as an inchoate offense' is only recognized in international law for 'conspiracy to commit genocide and common plan to wage aggressive war.'"  MBS Br. 59-60 (quoting *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 260 (2d Cir. 2009)); *see id.* at 60 (citing U.S. Br. in Opp. at 26 n.6, *Bahlul v. United States*, No. 16-1307 (U.S. Sept. 6, 2017), 2017 WL 3948468 for same proposition). Attempt and conspiracy "address different conduct" that sits in different places "along the continuum of . . . criminal activity" (with attempt focusing on "substantial step[s] towards the commission of [a] crime" and conspiracy focusing on "agreement").  *United States v. Salahuddin*, 765 F.3d 329, 349 (3d Cir. 2014); *accord Bahlul v. United States*, 840 F.3d 757, 800-01 (D.C. Cir. 2016) ("[U]nlike . . . attempt," conspiracy punishable "even before a substantial step").

Equally meritless are Defendants' arguments based on the ATS's requirement of a "tort." They aver that "an unsuccessful attempt to commit a tort is not 'recognized' as a tort 'at common law'" and say that this supposed rule "is a further reason" not to recognize attempt liability.  MBS Br. 60; *see* Tiger Squad Br. 38-39; U.S. Agents' Br. 11.  But as Defendants elsewhere admit, the relevant rule is that "[a]n attempt to commit a tort . . . is not actionable *when no harm results*." *Doe v. Exxon Mobil Corp.*, 393 F. Supp. 2d 20, 24 n.3 (D.D.C. 2005) ("*Exxon I*") (emphasis added), *appeal dismissed,* 473 F.3d 345 (D.C. Cir. 2007).  This harm requirement simply reflects blackletter law that "any tort action . . . is predicated on a[n] . . . injury."  *Thomas v. Powell*, 247 F.3d 260, 264 (D.C. Cir. 2001).[122]  Here, the Amended Complaint plausibly alleges that Dr. Saad

---

[121] Congress' Act of April 30, 1790, ch. 9  § 12, 1 Stat. 114 (1790); *see Exxon II*, 654 F.3d at 19, 25 (relying on the Crimes Act of 1790 as persuasive evidence of the scope of ATS liability).

[122] If Defendants mean to say that only tort-law sources are relevant to the ATS, they are wrong. Because violations of international law frequently implicate both criminal and tort law, courts routinely utilize international criminal law sources to assess the under the ATS.  *See Exxon II*, 654

suffered significant injury—and indeed, *a tort*.  *Infra* § V; *cf. United States v. Gladish*, 536 F.3d 646, 648 (7th Cir. 2008) (case cited by Alqahtani contemplating that attempts are actionable when they cause harm).  Defendants targeted Dr. Saad not just to kill him but to make him *suffer* until he was killed, hoping that they could torment him into submission.

Suffer Dr. Saad has: Tortured by the ceaseless efforts to murder him and harm his loved ones, and confined by the round-the-clock security Defendants' threats have made necessary, Dr. Saad is tormented.  AC ¶ 194.  He cannot sleep.  *Id.*  His head pounds with insufferable headaches.  *Id.*  His body is weighted with incurable fatigue.  *Id.*  His blood pressure spikes are so dramatic that, absent treatment, they would be lethal.  *Id.*  And a week before this filing, the physical effects from the torment were so overwhelming that he was rushed to the emergency room.  Defendants cannot gain by relying on the principle that attempted torts are not actionable absent harm.[123]

### B. Dr. Saad's Claims Sufficiently "Touch and Concern" The United States To Displace The Presumption Against Extraterritoriality.

Dr. Saad's claim also satisfies *Kiobel*'s "touch and concern" test.  Defendants tried to kill Dr. Saad by recruiting and deploying operatives inside the United States to hunt him down and did so because of his U.S. intelligence ties.  Defendants' contrary arguments lack merit.

---

F.3d at 31-32; *see also Khulumani v. Barclay Nat. Bank Ltd.*, 504 F.3d 254, 270 n.5 (2d Cir. 2007) (Katzmann, J., concurring) (citing *Sosa*, 542 U.S. at 762-63 (Breyer, J., concurring)), *aff'd sub nom. Am. Isuzu Motors, Inc. v. Ntsebeza*, 553 U.S. 1028, 1028 (2008)).

[123] In *Al-Aulaqi*, Judge Bates declined to recognize an ATS cause of action for a "threatened extrajudicial killing" based on the domestic tort of intentional infliction of emotional distress. 727 F. Supp. 2d at 37.  But again, *Al-Aulaqi* considered claims for a threatened future extrajudicial killing, not a past attempt.  Judge Bates worried about courts being "flooded with ATS suits from persons across the globe who alleged that they were somehow placed in fear of danger as a result of contemplated government action." *Id.*  Dr. Saad's claims implicate no such concerns.  Dr. Saad bases his claims on Defendants' *actual* attempt to kill him, which few plaintiffs can plead.

1.     **Dr. Saad's Claims "Touch And Concern" The United States.**

*Kiobel* held that courts may entertain ATS "claims [that] touch and concern the territory of the United States with sufficient force to displace the presumption against extraterritorial[ity]." *Id.*; *see Jesner*, 138 S. Ct. at 1398.  *Kiobel* observed that the presumption "typically appli[es] . . . to discern whether [a statute] regulating conduct applies abroad" whereas the ATS is "'strictly jurisdictional.'"  *Id.* at 116.  Even so, *Kiobel* held that "the principles underlying [that] canon . . . constrain courts considering causes of action . . . under the ATS."  *Id.*  *Kiobel* then applied that presumption to hold that the ATS did not provide jurisdiction in the case before it—because "[o]n these facts, all the relevant conduct took place outside the United States."  *Id.* at 124-25.

As courts have recognized, *Kiobel*'s "touch and concern" test "contemplates . . . a fact-based analysis" to determine whether a plaintiff's claims have a sufficient U.S. nexus.  *Al Shimari v. CACI Premier Tech., Inc.*, 758 F.3d 516, 527 (4th Cir. 2014); *see Exxon III*, 2015 WL 5042118 at *6.  After all, *Kiobel* contrasted "claims [that] touch and concern . . . the United States" with "the[] facts" of the case before it and where "the relevant conduct took place."  569 U.S. at 124-25.  And *Kiobel* related its "touch and concern" test to a plaintiff's entire "claim"—which means the "aggregate of operative facts giving rise to a right enforceable by a court."  *Claim*, Black's Law Dictionary (9th ed. 2009).  This word choice makes clear that "courts must consider all the facts that give rise to ATS claims, including the parties' identities and their relationship to the cause of action."  *Al Shimari*, 758 F.3d at 528; *see Exxon III*, 2015 WL 5042118, at *6 (similar).

Courts applying *Kiobel* have thus looked to a host of "relevant conduct," 569 U.S. at 124, including (1) the extent to which conduct giving rise to a claim "is tied . . . closely to our national interests," *Mwani v. bin Laden*, 947 F. Supp. 2d 1, 5 (D.D.C. 2013); (2) the presence of "adequate relevant conduct . . . within the United States," *Drummond Co.*, 782 F.3d at 592; (3) the legal relationship between defendants and the United States, including "a defendant's residence" or

presence here, *e.g.*, *Jane W. v. Thomas*, 354 F. Supp. 3d 630, 638-39 (E.D. Pa. 2018); and (4) the presence of an analogous cause of action under the TVPA, *Al Shimari*, 758 F.3d at 530.  In *Mwani*, for example, the district court found that the plaintiffs' claims "touche[d] and concern[ed] the United States" largely for the same reasons that the D.C. Circuit found personal jurisdiction: The underlying conduct was "directed at the [U.S.] government," and the plaintiffs "presented evidence that the attackers were involved in an ongoing conspiracy to attack the United States, and [that] overt acts . . . took place within the United States."  *Id.* at 5; *see Exxon III*, 2015 WL 5042118 at *8 (asking whether presumption against extraterritoriality is displaced via "some combination" of "important national interests," "substantial and specific domestic conduct relevant to the ATS claims," and "United States citizenship or corporate status").

This Court should reach the same result here.  ***First***, Defendants violated international law in order to eliminate a key U.S. intelligence partner, to deprive U.S. intelligence agencies of information, and to alter the U.S. intelligence community's behavior toward bin Salman.  *Supra* at 6-9, 54-55.  This violation was thus tied "closely to our national interests" and "directed at the [U.S.] government."  *Mwani*, 947 F. Supp. 2d at 5.  As Judge Lamberth observed, this "factor heightens the U.S. interest in policing international law violations to a much greater degree than the mere U.S. citizenship of the defendants."  *Exxon III*, 2015 WL 5042118, at *8.  In *Al Shimari*, the Fourth Circuit found that claims touched and concerned the United States in part because they arose out of "the performance of a contract" related to U.S. intelligence activities.  758 F.3d at 528-29.  And in *Krishanti v. Rajaratnam*, No. 2:09-cv-05395, 2014 WL 1669873 (D.N.J. Apr. 28, 2014), the court placed weight on the fact that the defendants provided "money used to bribe United States officials" in order to facilitate human-rights abuses abroad.  *Id.* at *10; *accord Jane W.*, 354 F. Supp. 3d at 639 (claim touched and concerned United States because defendants carried

out massacres abroad in part by harming a U.S. agency and sought to evade responsibility via "allegedly fraudulent participation in a U.S. visa and immigration program").  Here, the U.S. interests are far greater, for the reasons Dr. Saad has explained.[124]

*Second*, Defendants undertook "overt acts in furtherance of" their plot "within the United States."  *Mwani*, 947 F. Supp. 2d at 5.  Bin Salman and Alasaker directed a U.S. hunt seeking to locate Dr. Saad, including repeated efforts by Defendants Alrajhi, Alhamed, Abuljadayel, and Alharbi to extract information about Dr. Saad's location and vulnerabilities and Defendant Hamed's surveillance of and attempt to access the Aljabri family's residence at the Mandarin Oriental (all leveraging MiSK and the substantial funding bin Salman had provided to recruit and cultivate loyal U.S. operatives).  *Supra* at 12-15, 55-57, 62-63, 106-07.  Then, with Dr. Saad found and seemingly cornered, bin Salman directed the Tiger Squad to travel through the United States to kill him (first in October 2018 and again in May 2020).  *Supra* at 15-18.  Meanwhile, Defendants furthered their plot by trying to manipulate the legal status of Dr. Saad's family members in the United States, AC ¶ 131(n); disseminating false statements to U.S. journalists, *id.* ¶¶ 131(q)-(r), 261; and orchestrating a smear campaign on Twitter—which bin Salman and Alasaker infiltrated from within the United States using U.S. agents—identifying Dr. Saad as "conspir[ing]" with Secretary Clinton.  *Id.* ¶ 131(s).

This U.S. conduct is again far *more* significant than what other cases have found sufficient.  In *Krishanti*, the defendant "hosted . . . fundraisers" and donated money to an entity in the United States, which funneled the money to a terrorist group that eventually used it to "carry[] out  . . .

---

[124] Indeed, while the United States has not taken up bin Salman's invitation to suggest immunity in this litigation, it has interceded in the Massachusetts litigation where bin Salman is pursuing his allegations of "corruption."  There, the United States has taken the extraordinary step of filing a "Statement of Interest" and emphasized it is "carefully assessing what . . . actions are necessary to protect overall U.S. Government interests."  *Supra* at 19.

attacks" in Sri Lanka.  2014 WL 1669873, at \*2, \*10.  In *Al Shimari*, a contract was "issued in the United States" and "managers in the United States gave tacit approval to . . . acts of torture" and "attempted to 'cover up' the misconduct."  758 F.3d at 531.  And in *Exxon III*, it sufficed that "executives in the United States received reports" about human-rights violations in Indonesia, engaged in "decision making" relevant to the violations, and provided "supplies" that assisted. 2015 WL 5042118, at \*13-14.  Dr. Saad's case is not about passive financial support (*Krishanti*), a contract signed in the United States (*Al Shimari*), or even decisionmaking and supplies (*Al Shimari*, *Doe*).  Defendants *carried out their plot* on U.S. soil.  *Supra* at 12-18, 55-57.[125]

**Third**, it was U.S. residents who undertook much of the U.S. conduct to carry out this plot—including Abuljadayel, Alhamed, Alrajhi, and Hamed, who exploited their U.S. residence to further the plot from within the United States.  Other defendants routinely traveled to the United States to support the plot.  *E.g.*, AC ¶¶ 41, 238 (Alasaker); 247-250 (Alharbi); 67 (Alassiri). Because all Defendants purposefully exploited these U.S. connections, they reinforce the conclusion that the claims against all Defendants "touch and concern" the United States.  *E.g.*, *Jane W.*, 354 F. Supp. 3d at 638; *cf. In re Estate of Marcos Human Rights Litig.*, 25 F.3d 1467, 1469 (9th Cir. 1994); *Filartiga v. Pena-Irala*, 630 F.2d 876, 878 (2d Cir. 1980).  Indeed, in specific response to bin Salman's extrajudicial killings—and to reduce the danger that he would seek to carry out such killings via operatives on U.S. soil—the State Department has taken action to prevent "perpetrators targeting perceived dissidents" from "reach[ing] American soil," including

---

[125] This case is not like *Jaramillo v. Naranjo*, No. 10-21951-CIV, 2014 U.S. Dist. LEXIS 138887, at \*22 (S.D. Fla. Sep. 30, 2014) (cited at Tiger Squad Br. 37-38).  There, the plaintiffs alleged no domestic conduct *at all* and the only U.S. connection was that the defendant's conduct had "some connection to the importation of drugs into the United States."  *Id.* at \*20-21.

perpetrators who "surveil" the "families or other close associates" of their victims.[126]

**Fourth**, the presence of an analogous cause of action under the TVPA supports recognizing an ATS claim.  In *Al Shimari*, the plaintiffs could not satisfy the TVPA's requirements—but even so, the Fourth Circuit emphasized that the TVPA "reflects Congress's recognition of a 'distinct interest'" in combatting torture and extrajudicial killings wherever they occur. 758 F.3d at 530 (quoting *Kiobel*, 569 U.S. at 127 (Breyer, J., concurring in the judgment)).  The same is true here. Even if (counterfactually) Defendants were correct that the TVPA does not provide for attempt liability, the fact would remain that Congress has authorized U.S. courts to hear cases concerning extrajudicial killings like the one Defendants attempted.  That renders hollow Defendants' claim that "risks of adverse foreign policy consequences" militates against allowing this case to proceed. MBS Br. 58.  Congress decided it would be worse to allow extrajudicial killings to go unremedied. *Al Shimari*, 758 F.3d at 530; *see* 137 Cong. Rec. H11244-45 (daily ed. Nov. 25, 1991) (statement of Rep. Broomfield ) ("[S]ituations in which application of this statute could create difficulties in our relations . . . is a small price to pay in order to see that justice is done").

## 2.  Defendants' Contrary Arguments Lack Merit.

Although *Kiobel* adopted "touch and concern" as the ATS's extraterritoriality test, Defendants do not mention that test.  They invite this Court to apply the "focus" test the Supreme Court applied to non-ATS conduct-regulating statutes in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 266–67 (2010), *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2101 (2016), and *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2138 (2018).  Bin Salman avers that the ATS's focus is "violations of 'specific, universal, and obligatory' norms of

---

[126] U.S. Dep't of State, *Accountability for the Murder of Jamal Khashoggi* (Feb. 26, 2021), https://bit.ly/3g8f6Se.

international law . . . and aiding and abetting such violations." MBS Br. 57. And under the "focus" test, bin Salman says, a claim only "touches and concerns" the United States if the domestic conduct, standing alone, "violated universal norms of international law or aided and abetted such a violation." *Id.* In three respects, however, these arguments lack merit.

**First**, bin Salman is wrong about the test. *Kiobel* declined to embrace such a test and instead looked to whether, based "on the[] facts" of the "relevant conduct," the "claims touch and concern . . . the United States." *Id.* at 124-25. Indeed, *Jesner* reaffirmed *Kiobel*'s "touch and concern" test after *RJR Nabisco*. *Jesner*, 138 S. Ct. at 1398, 1406. It did so because the "focus" test—which the Court developed to weigh the extraterritoriality of statutes that "regulat[e] conduct"—does not fit the ATS, which "does not directly regulate conduct or afford relief" but "instead allows federal courts to recognize certain causes of action based on sufficiently definite norms of international law." *Kiobel*, 569 U.S. at 116. Indeed, the Solicitor General has acknowledged that this fact "makes it difficult to conduct the focus inquiry" in the ATS context. *See* Br. for the United States as Amicus Curiae Supporting Petitioners at 26, *Nestlé USA, Inc. v. Doe I*, Nos. 19-146 & 19-453 (U.S. Sept. 8, 2020), 2020 WL 5498509. That is exactly why *Kiobel* crafted the "touch and concern" test for ATS claims.[127]

**Second**, even if the "focus" test applied, bin Salman gets the ATS's "focus" wrong. As *Sosa* explained, "probably on [the] minds of th[ose] who drafted the ATS" was the "narrow set of violations of the law of nations" that "admit[] of a judicial remedy and at the same time threaten[] serious consequences in international affairs." 542 U.S. at 715. So the question under the "focus"

---

[127] In *RJR Nabisco*, the Court reaffirmed *Kiobel*'s holding that the presumption against extraterritoriality applies even to actions under a "strictly jurisdictional statute" like the ATS. 136 S. Ct. at 2106 (quotation marks omitted). It did not waver from *Kiobel*'s statement that the *test* differs as between conduct-regulating and strictly jurisdictional statutes.

test is whether "domestic transactions" threaten those consequences.  *Morrison*, 561 U.S. at 268.

Here, they do: Defendants carried out their plot on U.S. soil—undermining the United States'

territorial integrity—and they turned to murder in order to eliminate a key U.S. intelligence partner,

to deprive U.S. intelligence agencies of information, and to alter the U.S. intelligence community's

behavior.  In short, that plot "threaten[ed] serious consequences in international affairs," *Sosa*, 542

U.S. at 715, due to its effect on "the territory of the United States," *Kiobel*, 569 U.S. at 120.  By

contrast, one of bin Salman's cases emphasizes that the plaintiffs there did not assert that the

violations "were directed at, or felt in, the United States" and reserved "whether and how that fact

might affect the . . . analysis." *Mastafa v. Chevron Corp.*, 770 F.3d 170, 189 n. 15 (2d Cir. 2014).

Indeed, the ATS's text reinforces that Congress viewed the statute's "focus" as

encompassing all the conduct relevant to an international-law violation.  The ATS confers

jurisdiction over qualifying "civil action[s]" involving a tort "committed in violation of the law of

nations."  The term "civil action," at the Founding and today, refers to the entire "civil . . .

proceeding." *Action*, Black's Law Dictionary; *see Action*, Compendious Law Dictionary (Thomas

Potts ed., 1803) (entire "suit till judgment").  And the word "committed" refers, as relevant, to how

the tort was "perpetrate[d]" (in violation of the "law of nations"). *Commit*, A Critical Pronouncing

Dictionary and Expositor of the English Language (John Walker ed., 1803).  So long as the "civil

action" will encompass U.S. conduct that is significant enough to the tort "perpetrated," it fits the

ATS's focus. *See Exxon III*, 2015 WL 5042118, at *6 (applying "focus" test and asking whether

plaintiff alleged "specific domestic conduct relevant to a[n ATS] violation").

***Third***, even if bin Salman were correct that the "focus" test requires showing "domestic

conduct that either violated universal norms of international law or aided and abetted such a

violation," MBS Br. 57, Dr. Saad has pled just that.  The U.S. hunt directed by Alasaker and carried

out by the U.S.-Based Covert Agent Defendants provided support that had a "substantial effect on," and aided and abetted, Defendants' attempted extrajudicial killing.  *Exxon II*, 654 F.3d at 33-34; *Exxon III*, 2015 WL 5042118, at *9.   Defendants do not dispute that so long as *some* Defendant's conduct satisfies their test, the ATS claim may proceed against all.  MBS Br. 60-63 (conceding that a cause of action is available if the Amended Complaint alleges "U.S.-based conduct that plausibly aided or abetted the purported attempted extrajudicial killing"); *accord* Tiger Squad Br. 36–38; Alasaker Br. 33; U.S. Agents' Br. 13-16.

Nor do Defendants have any answer to Dr. Saad's well-pled allegations concerning the U.S. conduct of Alasaker and the U.S.-Based Covert Agent Defendants.  Their arguments fail here for the same reasons explained above.  They first argue that the U.S. conduct did not have a "substantial effect" because the U.S. "efforts . . . to learn [Dr. Saad's] location were unsuccessful" and because Defendants claim they learned Dr. Saad's location via other means.  MBS Br. 62.  But as under the TVPA, aiding-and-abetting does not require "a 'cause-effect relationship' between the defendant's conduct and the primary violation" and "the aider and abettor's conduct need not be a 'condition precedent' to the primary crime."  *Exxon III*, 2015 WL 5042118, at *9 (quoting *Ndahimana v. Prosecutor*, Case No. ICTR–01–68–A, Appeal Judgement, ¶¶ 147, 149 (ICTR Dec. 16, 2013); *Prosecutor v. Blaškić*, Case No. IT–95–14–A, Appeal Judgement, ¶ 48 (ICTY July 29, 2004)).  Instead, there need only be "some sort of direct relationship."  *Id.*[128]  Here, the U.S. hunt

---

[128] Bin Salman incorrectly says that aiding-and-abetting requires showing that "the violation 'probably would not have occurred absent [the] conduct."  MBS Br. 61 (quoting *Ofisi*, 278 F. Supp. 3d at 109).  Making that showing is sufficient but not necessary.  The *Exxon III* decision, on which *Ofisi* relied, stated that "assistance is substantial when"—not *only when*—"the underlying crime 'probably would not have occurred in the same way had not someone acted in the role that the accused [aider and abettor] in fact assumed.'"  *Exxon III*, 2015 WL 5042118, at *9.  It then explained that "[f]acilitating the commission of a[] . . . violation *may also* satisfy" the substantial-assistance requirement.  *Id.* (emphasis added).

led by Alasaker was key to finding and killing Dr. Saad.  *Supra* at 14-15, 59-60.[129]

Defendants also dispute whether Alasaker and the U.S.-Based Covert Agent Defendants had the requisite *mens rea*.  MBS Br. 63; Alasaker Br. 33; Tiger Squad Br. 36-38; U.S. Agents' Br. 13-16.  For the reasons explained above, however, Dr. Saad's allegations suffice—and the question of what Defendants *actually knew* is a factual one.  *Supra* at 64, 96-98, 103-05.  But as to the ATS claim, Defendants' scienter argument is also irrelevant.  By Defendants' own lights, the ATS confers jurisdiction so long as the "domestic *conduct*" suffices.  MBS Br. 57 (emphasis added).  If (counterfactually) bin Salman and his henchmen had managed to carry out the U.S. manhunt using unwitting operatives, that would be no reason to insulate them from ATS liability for a plot that gained substantial assistance from U.S. conduct.[130]

## C.   Defendants May Be Held Liable Under Secondary Theories Of Liability.

The ATS permits courts to recognize causes of action against not just those who directly

---

[129] Bin Salman claims the U.S. conduct here cannot overcome the presumption against extraterritoriality because it was only "preparatory or ancillary."  MBS Br. 62 (citing *In re Search of Info. Associated with [redacted]@gmail.com that is Stored at Premises Controlled by Google, Inc.*, No. 16-mj-00757, 2017 WL 3445634, at *25 (D.D.C. July 31, 2017)).  But again, that argument fails on both the facts and the law.  First, on the facts, Dr. Saad has plausibly alleged that the U.S. hunt was integral to the plot.  Second, on the law, *In re Search* does not hold that "preparatory" conduct cannot overcome the presumption against extraterritoriality.  It holds only that, when conduct relevant to a statute's focus occurs in the United States, defendants cannot procure dismissal by pointing to "preparatory or ancillary acts . . . outside the United States."  2017 WL 3445634 at *25.  Indeed, bin Salman elsewhere concedes that "preparatory or ancillary" U.S. conduct would sustain an ATS cause of action if it constituted aiding and abetting.  MBS Br. 62.

[130] *See RJR Nabisco*, 136 S. Ct. at 2101 ("If the *conduct* relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application . . . ." (emphasis added)); *cf. United States v. Ruffin*, 613 F.2d 408, 413 (2d Cir. 1979) ("The guilt or innocence of the intermediary, therefore, becomes irrelevant in determining whether a person charged as a co-principal . . . may be found guilty."); *United States v. Lester*, 363 F.2d 68, 72 (6th Cir. 1966) (a principal's liability for the conduct of an innocent agent is "an outgrowth of principles . . . of civil responsibility established, by force of the maxim qui facit per alium facit per se, at least as early as the 14th century"); *United States v. Gooding*, 25 U.S. 460, 472 (1827) (Story, J.) ("If done by others under the command and direction of the owner, with his approbation and for his benefit, it is just as much in contemplation of law his own act, as if done by himself.").

violate customary international law but those who aid and abet such violations or who engage in a joint criminal enterprise. *Exxon II*, 654 F.3d at 39. Dr. Saad has pled each type of liability.

### 1.     The ATS Imposes Aiding-And-Abetting Liability.

Most Defendants do not dispute that the ATS imposes aiding-and-abetting liability. That is because the D.C. Circuit has so held.[131] And while Alasaker and the Tiger Squad Defendants *do* dispute whether aiding-and-abetting liability is available, *see* Alasaker Br. 33; Tiger Squad Br. 40-42, circuit law forecloses that argument. The aiding-and-abetting standard for an ATS claim is the same as for a TVPA claim, which Dr. Saad discussed and applied above. *Supra* § III.C; *see Exxon II*, 654 F.3d at 39; *Ofisi*, 2018 WL 396234, at *4. In particular, an individual is liable under the ATS for aiding and abetting if he provides "knowing assistance that has a substantial effect on the commission of the human rights violation." *Exxon II*, 654 F.3d at 32.

### 2.     Defendants May Be Held Liable Based On Joint Criminal Enterprise.

Defendants are also liable under a joint criminal enterprise theory. AC ¶¶ 399-400. This theory flows from the Nuremberg trials and is "firmly established in customary international law." *Prosecutor v. Tadíc,* Appeal Judgment, Case No. IT–94–1–A, ¶ 220 (ICTY App. Chamber, July 15, 1999). It is a "species of liability for [a] substantive offense (akin to aiding and abetting), not a crime on its own." *Hamdan v. Rumsfeld*, 548 U.S. 557, 611 n.40 (2006); *see Bowoto*, 2006 WL 2455752 at *8 & n.13 (accepting joint criminal enterprise theory in ATS/TVPA cases).

Liability accrues where there is (1) a plurality of persons; (2) a common objective, which amounts to or involves the commission of a crime; and (3) the defendant's participation in

---

[131] *Exxon II*, 654 F.3d at 32; *accord Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184 (5th Cir. 2017); *Doe v. Drummond Co.*, 782 F.3d 576 (11th Cir. 2015); *Doe I v. Nestle USA, Inc.*, 766 F.3d 1013 (9th Cir. 2014); *Aziz v. Alcolac, Inc.*, 658 F.3d 388 (4th Cir. 2011); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244 (2d Cir. 2009).

executing the common plan.  *Tadíc*, Appeal Judgment ¶ 227.[132]  The "plurality" need not be

organized in a formal structure, *Prosecutor v. Vasiljević,* Case No. IT-98-32-A, Appeal Judgment,

¶ 100 (Feb. 25*,* 2004), nor must a person "cause" the offense's commission to liable, *Prosecutor*

*v. Kvočka,* Case No. IT-98-30/1-A, Appeal Judgment, ¶¶ 97-99, 112 (Feb. 28, 2005) (*Kvočka*

Appeal).  It suffices "for the participant to perform acts that in some way are directed to the

furthering of the common plan." *Tadić*, Appeal Judgment ¶ 229.  Intent may be inferred "from

knowledge of the crimes being perpetrated" and continued participation. *Kvočka* Appeal, ¶ 243.

As *Lizarbe v. Rondon* correctly observed, these "elements sound a great deal like those for

conspiracy."  642 F. Supp. 2d at 490-91.  Hence, because Dr. Saad has pled conspiracy claims (as

detailed above, *supra* § III.C), he has also pled a joint criminal enterprise.  In particular, Defendants

(an organized "plurality of persons") collectively pursued a "common objective" (an extrajudicial

killing).  This conduct constituted the "commission of crime" (an attempted extrajudicial killing),

and each Defendant personally participated.  Meanwhile, each Defendant intended to further their

common goal: Each either personally committed the attempted killing (the Tiger Squad

Defendants), ordered and supervised the killing (bin Salman, Alasaker, Alassiri, and Alqahtani),

or hunted for Dr. Saad to enable the killing (U.S.-Based Covert Agent Defendants).

### D.      Dr. Saad Has Pled ATS Claims Against Each Defendant.

Dr. Saad has pled claims against each Defendant, largely for the same reasons explained

above concerning the TVPA.  Several of the Defendants combine their pleading challenges to the

TVPA and ATS claims, Alasker Br. 34-41; Tiger Squad Br. 37-42, and Dr. Saad does so too.

---

[132] Antonio Cassese, *The Proper Limits of Individual Responsibility under the Doctrine of Joint Criminal Enterprise,* 5 J. INT'L CRIM. JUST. 109, 111 (2007) ("[I]t is now widely accepted by international criminal courts that in the case of collective criminality where several persons engage in the pursuit of a common criminal plan or design, all participants in this common plan or design may be held liable for the perpetration of the criminal act . . . .").

*Bin Salman* is directly liable for the attempted extrajudicial killing, aided-and-abetted the attempt, and participated in a joint criminal enterprise.  He does not challenge whether Dr. Saad's ATS claim is adequately pled, aside from his extraterritoriality arguments (which Dr. Saad addresses above).  MBS Br. 60-63.  *Alasaker*, *Alqahtani*, and *Alassiri* are directly liable for the attempted extrajudicial killing, aided-and-abetted it, and participated in a joint criminal enterprise.  They raise the same pleading arguments under the ATS as under the TVPA, Alasaker Br. 34-41; Tiger Squad Br. 37-42, which lack merit for the reasons explained above, *supra* § III.C.2.

The *Tiger Squad Defendants* are directly liable for their attempt to extrajudicially kill Dr. Saad and for participating in a joint criminal enterprise.  They also raise (at 37-42) the same pleading arguments under the ATS as under the TVPA.  Those arguments lack merit for the reasons explained above.  *Supra* § III.C.3.

The *U.S.-Based Covert Agent Defendants* are liable under the ATS for aiding and abetting an attempted extrajudicial killing and for participating in a joint criminal enterprise.  They also raise (at 13-16, 23-30) the same pleading arguments under the ATS as under the TVPA.  Those arguments lack merit for the reasons explained above.  *Supra* § III.C.4.

## V.  The Amended Complaint Alleges Intentional Infliction Of Emotional Distress.

Because Dr. Saad's ties to U.S. intelligence threatened bin Salman, Defendants sought to torment and kill him.  They threatened his life and his children; disappeared and tortured his family and associates; restricted his movements; kidnapped his children; hunted him in the United States; and sent hit squads to kill him.  The campaign continues today.  Courts routinely hold that "terrorist attack[s]" constitute intentional infliction of emotional distress ("IIED") because they aim not just to end life but to inflict anguish.  *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 229 (D.D.C. 2012), *aff'd*, 554 F. App'x 16 (D.C. Cir. 2014); *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 85 (D.D.C. 2006).  The same is true of the attempts to terrorize Dr. Saad into submission.

### A.     District Of Columbia Law Applies, And The Law Of The Kingdom Of Saudi Arabia Does Not.

D.C. law applies to the IIED claim—but the more important point is that Saudi law *does not*. Under D.C. choice-of-law rules, D.C. law applies absent a "true conflict." *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 154 (D.D.C. 2011) ("*Owens I*"). Here, D.C. and Canadian law do not conflict: Canada recognizes "intentional infliction of nervous shock," which is identical to IIED.[133] Indeed, *even if* Saudi law applied, Dr. Saad has a claim.

D.C. choice-of-law rules point against applying Saudi law and in favor of U.S. law. D.C. law looks to "the governmental policies underlying the applicable laws and determine[s] which jurisdiction's policy would be more advanced"—examining the relevant "governmental interests" and which jurisdiction has the "most significant relationship," as measured by factors set out in the Restatement (Second) of Conflict of Laws. *Washkoviak v. Student Loan Mktg. Ass'n*, 900 A.2d 168, 180 (D.C. 2006). "[C]ertain patterns," however, "have developed" to "guide the inquiry." *Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 842 (D.C. Cir. 2009).

This case concerns one such "pattern." D.C. courts have long recognized that, in terrorism-type and national-security cases, the United States has a "unique interest" in applying its own law. *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 54 (D.D.C. 2008); *cf. Gill*, 249 F. Supp. 3d at 99 ("attempted extrajudicial killing" constituted terrorism). *Ben-Rafael*, for instance, applied D.C. law to an IIED claim in a suit based on a suicide bombing in Argentina by Iran— because "[t]he United States has a unique interest in [applying] its domestic law, rather than the

---

[133] Bin Salman incorrectly asserts that there is a conflict because Canadian law requires a physical injury. MBS Br. 66 n.54. In fact, Canadian law only requires an injury that is *visible*, which need not be physical. *See Piresferreira v. Ayotte*, 2008 CarswellOnt 7733, par. 169, 172 (Can.), *rev'd in part on other grounds*, 2010 ONCA 384 (plaintiff's claims of PTSD and major depressive disorder, without more, satisfied requirement of a "visible and provable illness"). That accords with D.C. law. *See Harris v. U.S. Dep't of Veterans Affairs*, 776 F.3d 907, 917 (D.C. Cir. 2015).

law of a foreign nation." *Id.* at 54 (quoting *Dammarell v. Islamic Republic of Iran*, No. CIV.A. 01-2224, 2005 WL 756090, at *20 (D.D.C. Mar. 29, 2005)).  Many similar cases have reached that same result, even where (unlike here) no conduct or injuries occurred in the United States.[134]

This case calls for the same result.  Defendants targeted Dr. Saad to disrupt his U.S. intelligence relationships, to deprive U.S. intelligence of information, and to alter the U.S. intelligence community's behavior.  And because this case involves significant U.S. conduct, it is *easier* than those discussed above.  Not only do the relevant "governmental interests" point decisively in favor of the United States, but so do several Restatement factors: Defendants sought to inflict an "injury occurr[ing]" in the United States, Restatement (Second) of Conflict of Laws § 145(2)(a) (AM L. INST. 1971), via "conduct . . . occurr[ing]" in the United States, *id.* § 145(2)(b), to influence a "relationship . . . centered" in the United States, *id.* § 145(2)(d).[135]

By contrast, Defendants' position—that the Court should decide this U.S. national-security case based on the law of a foreign nation whose nationals tried to carry out an extrajudicial killing in order to influence the U.S. intelligence community—contradicts this long line of cases. Defendants have not cited, and Dr. Saad has not found, any decision applying foreign law in such a case.  Indeed, their argument—that Saudi law must apply because this case concerns foreign citizens and an attack abroad, *see* MBS Br. 65-66—is the same argument D.C. courts routinely reject.  "In cases such as this, where the victim was targeted because of his or her relationship to

---

[134] *Oveissi*, 573 F.3d at 843 ("United States has a strong interest in applying its . . . law" where terrorism "intended to affect the United States"); *see Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 69 (D.D.C. 2006); *Owens I*, 826 F. Supp. 2d at 154-55; *Azadeh v. Islamic Republic of Iran*, No. 1:16-CV-1467, 2018 WL 4232913, at *17 (D.D.C. Sept. 5, 2018).

[135] In any event, given the overwhelming U.S. governmental interests here, it is irrelevant where these factors might otherwise point. *See Chin-Teh Hsu v. New Mighty U.S. Tr.*, Civ. No. 10-1743, 2020 WL 588322, at *10 (D.D.C. Feb. 6, 2020) (where "the four Restatement factors . . . point in different directions," but "D.C.'s substantial interest in this dispute [is] established," "the Court's analysis points toward the application of District law").

the United States government, the Court should apply the 'law of the seat of the federal government.'" *W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117, 139 (D.D.C. 2019) (quoting *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 91 (D.D.C. 2018)).

**B.      Even If The Law Of Saudi Arabia Applies, Dr. Saad's Claim May Proceed.**

Even if Saudi law applied, Defendants would not be entitled to dismissal.  As Professor Mallat explains, Saudi Arabia has a cause of action analogous to IIED.  Mallat Report ¶¶ 24-26.  Islamic law recognizes torts under a general theory of harm, *darar*—and under this theory, "moral harm" is compensable. *Id.* ¶ 27.  Several cases have awarded damages for "moral harm" alone, without physical injury, *id.* ¶ 27-28, and the elements are analogous to D.C. law, *id.* ¶ 29.

Bin Salman's arguments fail.  He points to two decisions where the plaintiffs did not *dispute* the claim that Saudi law does not recognize IIED.  *McGhee v. Arabian Am. Oil Co.*, 871 F.2d 1412, 1422 (9th Cir. 1989); *Petersen v. Boeing Co.*, No. CV-10-999, 2014 WL 12516257, at *7 (D. Ariz. July 1, 2014).  Bin Salman's expert report relies on two *criminal* cases, which do not address civil liability.  Mallat Report ¶ 30.  He also cites a Saudi Supreme Court case supposedly "refus[ing]" to award moral damages.  MBS Br. 65.  But there, the King intervened to reverse a judgment against a prominent government official—and there was no suggestion that damages for moral harm (which lower courts awarded) are generally unavailable.  Mallat Report ¶ 30.

**C.      Dr. Saad Has Stated A Claim Against Bin Salman.**

Bin Salman correctly does not contest that Dr. Saad has pled a prima facie case.  IIED requires (1) extreme and outrageous conduct that (2) intentionally or recklessly; (3) causes the plaintiff severe emotional distress.  Restatement (Second) of Torts § 46(1) (AM. L. INST. 1965); *Smith v. Clinton*, 886 F.3d 122, 129 (D.C. Cir. 2018).  Like others who sow terror and death, bin Salman is liable for IIED.  *Wyatt*, 908 F. Supp. 2d at 229; *Bodoff*, 424 F. Supp. 2d at 85.

First, the conduct here is "extreme and outrageous conduct."  After threatening Dr. Saad—

including to "use all available means" to hunt him and "take measures that would be harmful," AC ¶ 173—bin Salman hunted him in the United States, sent a hit squad to kill him, directed *another* plot on his life, forcibly abducted and disappeared his children Omar and Sarah, and tortured his son-in-law and other associates. *Supra* at 8-9, 12-20; AC ¶¶ 168, 190-92, 196-203, 411. "[A]cts . . . such as hostage taking, torture, and extrajudicial killing . . . are by their very definition extreme and outrageous." *W.A.*, 427 F. Supp. 3d at 140 (quotation marks omitted).

Second, the conduct was intentional. Defendants did not dispatch hit squads to kill Dr. Saad or kidnap his children *by accident*. AC ¶¶ 15, 114-15, 127, 131(p), 132, 134, 138, 236, 410.

Third, Dr. Saad has experienced severe distress from the repeated attempts on his life, from the around-the-clock security that must be stationed at his door, and from his children's abduction: He cannot sleep, lives with pounding headings, suffers from debilitating fatigue, and faces blood-pressure spikes so dramatic that, if untreated, would kill him. AC ¶ 194; *supra* at 18, 115. Indeed, Dr. Saad has "require[ed] medical treatment as a result." AC ¶ 413; *see Arias v. DynCorp*, No. 1:01CV01908, 2016 WL 6496214, at *10 (D.D.C. Nov. 2, 2016) (it suffices that "emotional shock permanently alters [plaintiffs'] daily activities, changes their personality, destroys their ability to live or sleep comfortably, or overwhelms the person with stress or depression").

The two legal arguments raised by bin Salman (and others) lack merit. First, Defendants argue that because Dr. Saad was not present for his children's kidnapping, he cannot base an IIED claim on this conduct. MBS Br. 68; Alasaker Br. 44; Tiger Squad Br. 42; MiSK Br. 27; U.S. Agents' Br. 45. This argument both misconstrues Dr. Saad's claim and misstates the law.

To begin, Dr. Saad does not base his claim only on the abduction. The kidnapping was just one part of Defendants' campaign against Dr. Saad, which was intended to—and did (and

does)—torment Dr. Saad.  MiSK tries to artificially limit the IIED claim by observing that Dr. Saad has pled his emotional distress with particular *detail* after the kidnapping.  MiSK Br. 27. But Dr. Saad has never limited his IIED claim to the kidnapping.  AC ¶¶ 370, 411.  And courts assessing IIED claims consider the entire course of conduct, not one cherry-picked event.[136]  Here, that conduct includes not just the kidnapping but years of threats, a coordinated manhunt targeting Dr. Saad's family and friends with terrifying interrogations, multiple attempts to kill Dr. Saad, and a campaign of torture and forced disappearances of Dr. Saad's family and associates (including telling Dr. Saad's son-in-law he was being tortured as a "proxy" for Dr. Saad).  *Supra* at 8-9, 12-20.

It is also irrelevant whether Dr. Saad was physically present for his children's kidnapping—because Defendants kidnapped Omar and Sarah *in order to* harm Dr. Saad.  In IIED claims involving terrorism and hostage-taking, courts do not require physical presence.  Such acts "direct[ly] target" third persons and it "should come as no surprise that the[se] acts . . . caused severe emotional distress to persons . . . not present."  *Republic of Sudan v. Owens*, 194 A.3d 38, 43 (D.C. 2018) ("*Owens III*"); *Owens II*, 864 F.3d at 810-11.  So it is here, where bin Salman orchestrated the disappearance of Dr. Saad's children and relatives as "a crude form of human bait."  AC ¶¶ 168, 190, 370.  By contrast, the rationale for requiring physical presence in other cases—that the defendant usually does not intend impacts on absent parties—does not apply.[137]

---

[136] *Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 53 (D.D.C. 2019) (chiding defendants for "failing to consider the specific context in which the conduct took place"); *see Burnett v. Am. Fed'n of Gov't Emps.*, 102 F. Supp. 3d 183, 191 (D.D.C. 2015) (denying motion to dismiss because "[d]efendant's reading of the complaint [was] far too restricted").

[137] *E.g.*, *Sheikh v. Republic of Sudan*, 485 F. Supp. 3d 255, 266 (D.D.C. 2020) ("Courts have uniformly held that a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families. Hence, . . . [plaintiffs] need not independently satisfy the presence requirement.") (cleaned up); *accord Doe v. Syrian Arab Republic*, No. 18-cv-0066 (KBJ), 2020 WL 5422844, at *14 (D.D.C. Sept. 10, 2020).  In litigation arising out of Khashoggi's murder, bin

132

Alternatively, Defendants argue that their conduct cannot constitute IIED because they simply engaged in an unsuccessful attempt to inflict physical harm, which (they say) is only actionable as assault.  MBS Br. 68.  But Section 47 of the Restatement (Second) of Torts, on which Defendants rely, shows why they are wrong.  The Restatement explains that if "conduct is tortious *solely* because it involves a risk of invading an interest other than the interest in freedom from emotional distress," it does not constitute IIED—because the defendant only intended to inflict bodily injury, not emotional distress.  Restatement (Second) of Torts § 47 cmt. a (emphasis added).  That rule is irrelevant here because Dr. Saad has alleged that Defendants sought to inflict emotional distress on him (as well as to harm him physically).  *E.g.*, AC ¶ 412 (Defendants' "conduct was deliberately calculated to cause Dr. Saad extreme suffering").  Because Defendants "intend[ed] to invade [Dr. Saad's] interest in freedom from severe emotional distress," he has an IIED claim.[138]

### D.     Dr. Saad Has Stated A Claim Against The Other Defendants.

Some Defendants argue they cannot be liable because their *individual* actions do not independently constitute IIED.  For example, Alasaker argues that his "directing individuals

---

Salman has argued that *Owens III* is limited to actions under 28 U.S.C. § 1605A.  The D.C. Court of Appeals, however, applied general principles of tort law to reject a "presence" requirement in terrorism-type cases.  194 A.3d at 43 (discussing Restatement (Second) of Torts § 46)).  Its reasoning is not limited to cases arising under the FSIA's state-sponsored terrorism exception.

[138] Restatement (Second) of Torts § 47 cmt. a; *accord Gasho v. United States*, 39 F.3d 1420, 1434 (9th Cir. 1994) ("[t]he Restatement only says that *consequential* mental anguish from a separate tort does not establish a claim for [IIED].  If the [plaintiff] can prove that the [defendants acted] with the *intent* of inflicting emotional distress, the [plaintiff] may assert both false arrest *and* emotional distress claims."); *Garus v. Rose Acre Farms, Inc.*, 839 F. Supp. 563, 569-70 (N.D. Ind. 1993) (rejecting argument that IIED under the Restatement requires a "host tort"); *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005) (refusing to dismiss IIED claim because "defendant's campaign of attacks . . . was intended not only to harm the victims, but to instill terror"); *cf. Sheikh*, 485 F. Supp. 3d at 267 (imposing IIED liability in part based on plaintiffs' "suffer[ing] significantly from their loved ones' psychological [and] emotional" injuries); *Heiser*, 659 F. Supp. 2d at 27 ("[T]he intent to create maximum emotional impact, particularly on third parties, is terrorism's *raison d'etre*.").

searching for" Dr. Saad "is not extreme or outrageous."  Alasaker Br. 44; *see* MiSK Br. 26-27.
Dr. Saad, however, has plausibly pled that their actions were *not* independent.  Each knowingly
participated in a campaign by bin Salman and his henchmen to torment Dr. Saad by threatening
his life and his children; disappearing and torturing relatives and associates; restricting his
movements; hunting him; and kidnapping his children and trying to kill Dr. Saad.

Defendants cannot escape liability by chopping up their outrageous conduct and ignoring
the campaign of which it is a part.  The law is clear that "context matters" in evaluating IIED
claims. *Mann v. Bahi*, 242 F. Supp. 3d 6, 11 (D.D.C. 2017).  And in "context," Defendants' actions
were outrageous.  *Id.*; *see Burnett v. Am. Fed'n of Govt' Emps.*, 102 F. Supp. 3d 183, 191 (D.D.C.
2015).   Indeed, courts in this District have recognized that when defendants "bankroll[] and
otherwise support[] a terrorist organization," they "act recklessly to cause severe emotional
distress" to victims of that organization.  *Wyatt*, 908 F. Supp. 2d at 229; *Rimkus v. Islamic Republic
of Iran*, 575 F. Supp. 2d 181, 197 (D.D.C. 2008) ("facilitating, financing, and providing material
support" to a bombing "was intentional, extreme, and outrageous conduct" that "proximately
caused plaintiff's emotional distress.").  The same is true of Defendants' knowing support for bin
Salman's campaign of terror.

Defendants are also secondarily liable based on their conspiracy and aiding and abetting.
The D.C. Court of Appeals has expressly permitted IIED claims based on conspiracy.[139]   And
while that court has never passed upon an aiding-and-abetting IIED claim, Judge Kollar-Kotelly
correctly "conclude[d] that [she was] bound by the law of this Circuit to recognize aiding and

---

[139] *Griva v. Davison*, 637 A.2d 830, 848 (D.C. 1994); *see, e.g.*, *Kenley v. D.C.*, 83 F. Supp. 3d 20,
31 (D.D.C. 2015); *Buonocore v. Great Socialist People's Libyan Arab Jamahiriya*, Civ. No. 06-
727, 2013 WL 351546, at *25 (D.D.C. Jan. 29, 2013); *Wachsman ex rel. Wachsman v. Islamic
Republic of Iran*, 603 F. Supp. 2d 148, 156 (D.D.C. 2009).

abetting liability for common law torts under [D.C.] law." *Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 49 (D.D.C. 2019).  That is because the D.C. Circuit in "*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) . . . predicted that the existence of the civil conspiracy action [in the District of Columbia] suggests a high probability that the legal rationale underlying aiding-abetting would also be accepted." *Kurd*, 374 F. Supp. 3d at 49.

For the same reasons explained above, Dr. Saad has adequately alleged both aiding-and-abetting and conspiracy (in particular, bin Salman, Alasaker, Alqahtani, and Alassiri conspired to commit and aided and abetted IIED; the Tiger Squad Defendants conspired to commit IIED; and the U.S.-Based Covert Agent Defendants conspired to commit and aided and abetted IIED).  *Supra* §§ III.C, IV.D.   Their campaign was directed not only toward murdering Dr. Saad, but also at tormenting him until he was dead.  The campaign has included the brutal torture of his son-in-law (who was expressly told that he was tortured as a proxy for Dr. Saad); the kidnapping and disappearance of two of his youngest children; an attempt to lure other children to their deaths; the disappearance of approximately twenty other relatives and associates (including his brother); the dispatching of covert agents to the United States and Canada (whose missions sent a clear a message that he would never be safe); and coordinating an online campaign threatening to behead Dr. Saad with a sword and warning of "the end."  AC ¶¶ 9, 12, 15, 47, 59, 76-81, 131(s), 168, 187, 194, 197-98, 261-65, 370.  In short, bin Salman meant it when he said he would use "all available means" to harm Dr. Saad—and he has done so through Defendants' relentless efforts.

### E.     Dr. Saad Has Stated A Claim Against MiSK.

Because Dr. Saad's sole claim against MiSK is IIED, he addresses its conduct here.

***Direct liability.***  MiSK is directly liable for "act[ing] recklessly to cause severe emotional distress" to bin Salman's victims.  *Wyatt*, 908 F. Supp. 2d at 229.  MiSK insists its role in "recrut[ing]' the U.S.-Based Covert Agent Defendants was not "extreme or outrageous."  MiSK

Br. 26.  The same could have been said in *Wyatt*, where giving money to the "Kurdistan Workers Party ('PKK')" *standing alone* was not outrageous.  908 F. Supp. 2d at 218.  Judge Lamberth, however, held the defendant directly liable because it gave "with full knowledge of the violent tactics the group employed," which made its conduct extreme and outrageous.  *Id.* at 228.

The same is true here.  Bin Salman established MiSK and endowed it with $1 billion partly to serve as a focal point for recruiting and deploying loyal U.S. operatives to do his bidding.  AC ¶ 70.  That is why he installed his "invisible hand," Alasaker, as MiSK's Executive Director, who leveraged MiSK to recruit and deploy the U.S.-Based Covert Agent Defendants who interrogated Dr. Saad's family and acquaintances.  *Id.* ¶¶ 40, 68.  Nor can MiSK evade accountability by denying that it *knew* about bin Salman's plots.  Alasaker, as MiSK's Executive Director, knew the purpose of the assistance he leveraged MiSK to provide.  *Supra* at 64, 96-98.  Indeed, when Alasaker used MiSK to recruit and deploy the U.S.-Based Covert Agent Defendants, he was using MiSK to play exactly the role bin Salman *intended* when he established MiSK (much like Alasaker leveraged MiSK to infiltrate Twitter).  "[A]n agent's knowledge"—here, Alasaker's—"is imputed to a principal."  *Burlington Ins. Co. v. Okie Dokie, Inc.*, 439 F. Supp. 2d 124, 130 (D.D.C. 2006); *see U.S. ex rel. Landis v. Tailwind Sports Corp.*, 324 F. Supp. 3d 67, 73 (D.D.C. 2018).

***Conspiracy and aiding-and-abetting***.  Courts in this District routinely hold that organizations that knowingly provide "material support" to terrorist organizations are liable for conspiring to inflict IIED.[140]  Here, too, MiSK is liable based on conspiracy and aiding-and-

---

[140] *Kirschenbaum v. Islamic Republic of Iran*, 572 F. Supp. 2d 200, 211 (D.D.C. 2008) (organization provided "funding, training, and safe haven"); *Wachsman*, 603 F. Supp. 2d at 156 ("training . . ., financing, coordinating objectives . . . and encouraging politically subversive goals"); *Beer v. Islamic Republic of Iran*, 574 F. Supp. 2d 1, 11 (D.D.C. 2008) (similar); *Bodoff*, 424 F. Supp. 2d at 84 ("Sponsorship of terrorist activities inherently involves a conspiracy to commit terrorist attacks." (quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 27 (D.D.C. 1998))).  While these cases arise under the FSIA's "material support" exception—which permits

abetting given the material support it provided.

MiSK principally argues that Dr. Saad has not plausibly alleged that it entered an agreement with the other Defendants (as to conspiracy) or that it "was aware of . . . a specific plan to commit an extrajudicial killing of Aljabri" (as to aiding-and-abetting). MiSK Br. 30, 32. This argument, to begin, misstates the legal standard. When courts in this District have held organizations liable based on their material support, they have not required knowledge of the *specific attacks* that inflicted injury but only of a group's "violent tactics" in general. *Wyatt*, 908 F. Supp. 2d at 228; *accord Bernhardt*, 2020 WL 6743066, at \*5 (defendants need only have been "'generally aware'" of "playing a 'role' in . . . violent or life-endangering activities").

In any event, Dr. Saad has alleged both agreement and knowledge. MiSK, as just explained, is chargeable with the knowledge and conduct of Alasaker—whom bin Salman installed as MiSK's Executive Director precisely so that MiSK would help bin Salman achieve his personal ambitions. *Supra* at 12-14, 64, 71-73, 97-98. And as Dr. Saad has shown, Alasaker knew about bin Salman's plot to torment and kill Dr. Saad and agreed to use MiSK's resources to carry out that plot (just as he did with bin Salman's Twitter plot). Indeed, Alasaker sat *at the table* where a friend of Dr. Saad was interrogated *at a MiSK* event that Defendant Alhamed also attended. AC ¶ 238. Meanwhile, the U.S.-Based Covert Agents Defendants who hunted for Dr. Saad were deeply involved with MiSK: They were identified as leaders by MiSK, were at times paid for their work with MiSK, and attended many MiSK events (and met other Defendants) there. *Id.* ¶¶ 76–

---

suits arising out of "material support" for terrorism, 28 U.S.C. § 1605(a)(7)—they also address substantive liability for IIED. That is because the FSIA "does not . . . provide a cause of action" but only functions as a "pass-through" to allow causes of action "that may exist in federal, state or international law," including IIED. *Kirschenbaum*, 572 F. Supp. 2d at 210; *see Wachsman*, 603 F. Supp. 2d at 156 ("the act of engaging in terrorism by means of material support and civil conspiracy is extreme, and . . . deliberately outrageous," constituting IIED).

110; *see id.* ¶¶ 87, 91 & n.77, 104 & n.96, 107 & n.101, 312.  Again, a conspiracy can be inferred

from conduct.  *See Lagayan*, 199 F. Supp. 3d at 30; *Bodoff*, 424 F. Supp. 2d at 84; *see also Bush*

*v. Butler*, 521 F. Supp. 2d 65, 68 (D.D.C. 2007) (case cited by MiSK recognizing that an agreement

can be inferred from "events").  Here, Dr. Saad has plausibly pled that bin Salman give MiSK $1

billion, and installed his right-hand man as its chief, to ensure that MiSK would do exactly what it

did and help carry out his personal schemes.[141]

Because MiSK knew about bin Salman's plot, provided substantial assistance to it, and

agreed to further it, MiSK is liable based on both aiding-and-abetting and conspiracy.[142]

***Alter Ego***.  MiSK is also liable under an alter-ego theory.  An alter-ego theory requires

showing "that there is (1) unity of ownership and interest, and (2) either use of the corporate form

to perpetrate fraud or wrong, or that considerations of justice and equity justify piercing the

corporate veil."  *Motir Servs., Inc. v. Ekwuno*, 191 F. Supp. 3d 98, 108 (D.D.C. 2016) (quoting

---

[141] MiSK also entered express agreements to memorialize these longstanding arrangements.  One method MiSK used to control students in the United States was "formalized in a 2018 cooperation agreement executed by . . . Alasaker" on behalf of MiSK at bin Salman's direction, with SACM.  AC ¶¶ 75, 228; *see id.* ¶ 44 & nn.17, 18, 75.  The agreement memorialized that MiSK (using bin Salman's money) would provide funding to SACM, which oversaw the Saudi "student clubs" that served as fronts for the student operatives who hunted Dr. Saad, including Alrajhi, Alhamed, and Abuljadayel—formalizing a direct mechanism for Alasaker and bin Salman to "pull[] the strings" when desired.  *Id.* ¶ 80.  MiSK attacks a strawman with its claim (at 9) that the 2018 agreement could not have affected the recruitment of the U.S.-Based Covert Agent Defendants (which occurred before 2018).  Dr. Saad's point is that the 2018 written agreement formalized an arrangement that began no later than 2015.  *See, e.g.*, *id.* ¶¶ 74-86, 88-108, 226-235.  Indeed, with bin Salman looking on, Alasaker also executed an agreement in June 2016 focused on solidifying their control, via MiSK, over Saudi students.  *Id.* ¶ 135.

[142] MiSK's argument that its assistance was not "substantial" because the U.S. hunt was "unsuccessful," MiSK Br. 31, fails for the same reasons explained above.  *Supra* at 59-60.  MiSK also mischaracterizes *Halberstam* as requiring that the tort have been "heavily dependent" on the aider-and-abettor's help and that the help have been "essential."  MiSK Br. 31-32.  *Halberstam* simply used those phrases to describe conduct that it found *sufficient* to constitute aiding-and-abetting.  705 F.2d at 488.  *Halberstam* did not suggest that those adjectives form any part of the *test*.

*Bingham v. Goldberg. Marchesano. Kohlman. Inc.*, 637 A.2d 81, 93 (D.C. 1994)) (cleaned up).

Dr. Saad has amply pled that MiSK is an alter ego of bin Salman and Alasaker.  In arguing otherwise, MiSK Br. 34-35, MiSK ignores the entire thrust of Dr. Saad's well-pled allegations: Bin Salman and Alasaker treated MiSK as their personal tool and used it to facilitate personal ends that had nothing to do with MiSK's stated purpose as a private charitable foundation.  AC ¶¶ 15, 39, 42, 45, 68-75, 79, 81, 219, 226 & n. 179, 228, 230, 371.  That is evident not just in how they leveraged MiSK to hunt for Dr. Saad, but in their exploitation of MiSK to infiltrate Twitter.  *Id.* ¶ 132.  The ability to misuse MiSK in this manner is why bin Salman gave MiSk $1 billion, why he installed his "invisible hand" to head MiSK, and why Saudi Arabia is now conducting a "review" of MiSK's U.S. activities given MiSK's many illegal entanglements.  AC ¶¶ 40, 70; *supra* at 12-14, 71-73.  All of this is also why MiSK can be held liable as the alter ego of bin Salman and Alasaker, based on the "unity of ownership and interest" present here and based on their "use of the corporate form to perpetrate fraud or wrong."  *Motir*, 191 F. Supp. 3d at 108; *see Pencheng Si v. Laogai Rsch. Found.*, 71 F. Supp. 3d 73, 103 (D.D.C. 2014) (complaint stated alter ego claim based on "de facto control" and "regular[] use[ of] corporate funds for personal" ends).

## F.    The Court Should Exercise Supplemental Jurisdiction.

Even if this Court dismisses Dr. Saad's federal claims, it should exercise supplemental jurisdiction over his IIED claims against MiSK, Alrajhi, and Hamed.  28 U.S.C. § 1367(a).  "[C]onsiderations of judicial economy, convenience and fairness to litigants . . . make it reasonable and proper for a federal court to proceed to final judgment, once it has invested time and resources" in the case.  *Osborn v. Haley*, 549 U.S. 225, 245 (2007).  In such cases, the D.C. Circuit approves of retaining jurisdiction over state-law claims.  *Schuler v. PricewaterhouseCoopers, LLP*, 595 F.3d 370, 378 (D.C. Cir. 2010).  This is the rare case where doing so would be appropriate even at the motion-to-dismiss stage.  By the time the Court issues a decision, it will have developed a deep

familiarity with the case by studying two detailed complaints, 500 pages of briefing, many expert reports and declarations, and sensitive sealing issues.  Sending the IIED claim to D.C. court would be less "econom[ical], convenien[t] and fair[]" than proceeding here.  *Id.*[143]

Defendants mainly argue that the Court should not exercise jurisdiction because of "the international character of the parties and . . . events."  MBS Br. 69-70; US Agents' Br. 45.  But Alrajhi and Hamed are U.S. residents, and Dr. Saad's claim against each defendant relates to conduct in the United States.  AC ¶¶ 72-75, 88, 109, 225-46.

## CONCLUSION

A trusted partner of the United States—who has saved hundreds, if not thousands, of American lives—has been subjected to murder and torment carried out through the United Sates because of his service to the United States.  He now invokes the protection of U.S. courts. Defendants, many already condemned by the United States and the international community for eerily similar murders, argue that that Dr. Saad's detailed allegations are implausible.  The ghost of Jamal Khashoggi warns otherwise.  The Court should deny the motions to dismiss.[144]

---

[143] *Powell v. Saint Joseph's Univ.*, Civ. No. 17-4438, 2018 WL 994478, at *10 (E.D. Pa. Feb. 20, 2018) (retaining jurisdiction over state law claim, where no discovery had taken place, because "substantial [motion to dismiss] briefing . . . allow[ed] [the Court] to become familiar with the issues in the case"); *Pro-Choice Network of W. New York v. Project Rescue W. New York*, 828 F. Supp. 1018, 1028 (W.D.N.Y. 1993) (retaining jurisdiction over state law claim after dismissing federal claims because, when substantial "resources are expended without a trial, the essential purpose of the doctrine of pendent jurisdiction may be served by retaining the case," and courts should not allow "defendants[] . . . to minimize and trivialize the nature and extent of [a] Court's involvement"), *vacated in part on other grounds*, 67 F.3d 359 (2d Cir. 1994); *Grainger v. Ensley*, No. 1:18-cv-1093, 2019 WL 4044323, at *2 (D. Or. July 26, 2019) (retaining jurisdiction where court, "having reviewed two rounds of motions to dismiss, [was] quite familiar with the parties and the facts"), *report and recommendation adopted*, 2019 WL 4046538 (D. Or. Aug. 27, 2019).

[144] Alternatively, the Court should grant leave for Dr. Saad to conduct jurisdictional discovery or to amend his complaint.

Dated: June 11, 2021

Respectfully submitted,

JENNER & BLOCK LLP

/s/ David Pressman
David Pressman
D.C. Bar No. 1013431
Jason P. Hipp (DDC No. NY0397)
919 Third Avenue
New York, NY 10022
Telephone:  (212) 891-1654
Fax: (212) 891-1699
dpressman@jenner.com
jhipp@jenner.com

Lindsay Harrison
D.C. Bar No. 977407
Zachary C. Schauf
D.C. Bar No. 1021638
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
Telephone:  (202) 639-6865
Fax:  (202) 639-6066
lharrison@jenner.com
zschauf@jenner.com

*Counsel for Plaintiff*
*Dr. Saad Aljabri*