# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DR. SAAD ALJABRI,<br><br>    Plaintiff,<br><br>    v.<br><br>MOHAMMED BIN SALMAN BIN ABDULAZIZ AL SAUD, *et al.*<br><br>    Defendants. | Civil Action No. 1:20-cv-02146-TJK |

## DECLARATION OF FRANÇOIS LAROCQUE

I, François Larocque, declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

### I. Expert Qualifications & Previous Testimony

1. My name is François Larocque, and I am writing this declaration in support of the Plaintiff's opposition to the Defendants' motions to dismiss the above-captioned litigation.

2. In this declaration, I give my opinion on the availability of an adequate remedy in Canadian courts for the conduct alleged by the Plaintiff in this matter, namely subjecting the Plaintiff to an attempted extrajudicial killing carried out by foreign officials acting under color of law, and other individuals acting at their direction. I specifically give this opinion in response to the one provided by Mr. Sujit Choudhry.

3. I hold law degrees from the University of Ottawa (J.D.) and the University of Cambridge (Ph.D.). In 2000-2001, I served as a law clerk to the Honorable Justices, Louise Charron (as she then was), Stephen Goudge, Stephen Borins and Jean-Marc Labrosse at the Court

1

of Appeal for Ontario. In 2001-2002, I clerked at the Supreme Court of Canada for the Honorable Justice Louise Arbour.

4.  I am a tenured Professor at the University of Ottawa Faculty of Law, where I teach and research in the areas of Tort Law and Canadian Language Rights. I am the author of a book entitled *Civil Actions for Uncivilized Acts: The Adjudicative Jurisdiction of Common Law Courts in Transnational Human Rights Proceedings* (Toronto: Irwin Law, 2010), and of several articles in this area of law. My publications on the topic of transnational human rights litigation have been cited by the Supreme Court of Canada, namely in *Kuwait Airways Corp. v. Iraq*, 2010 SCC 40 (Can.), and *Kazemi Estate v. Islamic Republic of Iran*, 2014 SCC 62 (Can.).

5.  I also work as a lawyer. I was admitted to the Law Society of Ontario in 2002 and I practice mainly in the areas of transnational human rights litigation and minority language rights. I have appeared as counsel before the Supreme Court of Canada, and before several Canadian provincial appellate courts. Most relevantly to the present declaration, I have served as counsel for intervening parties in *Club Resorts Ltd. v. Van Breda*, 2012 SCC 17 (Can.), on Canadian tort jurisdiction over extraterritorial events and injuries, and in *Kazemi*, on State immunity in civil proceedings for extraterritorial torture. I also advised counsel for the interveners in *Nevsun Resources Ltd. v. Araya*, 2020 SCC 5 (Can.), a case in which the Supreme Court of Canada addressed for the first time the possibility of grounding civil actions for violations of customary international law in the common law.

II. **Overview**

6.  In my opinion, the Canadian legal system does not offer the Plaintiff adequate available remedies for the attempted extrajudicial killing he alleges. I come to this conclusion for three reasons.

7.     First, there exists no statutory civil cause of action in Canada for extrajudicial killing or attempted extrajudicial killing by foreign State officials like those available in US law.

8.     Second, common law causes of action for the alleged conduct are speculative at best. In *Nevsun Resources*, the Supreme Court of Canada addressed the theoretical possibility of developing novel causes of action at common law for violations of customary international norms and did so with respect to crimes against humanity, slavery, forced labour and cruel, inhuman and degrading treatment. 2020 SCC 5, ¶ 100-03. No Canadian court has ever recognized a cause of action with respect to extrajudicial killing, and no Canadian court has ever awarded relief at common law for any violation of customary international law.

9.     Third, even if a common law cause of action were found to apply, either through the novel category derived from customary international law or on the basis of existing domestic torts, in my opinion, in the absence of a statute akin to the Torture Victim Protection Act, 28 U.S.C. § 1350 note ("TVPA"), in the United States, the Canadian State Immunity Act, R.S.C. 1985, c S-18 ("SIA"), operates as a complete procedural barrier to the adjudication of the Plaintiff's claim. Therefore, in my view, Canadian courts would likely have no jurisdiction to adjudicate or grant any relief to the Plaintiff with respect to the alleged conduct, and accordingly they would dismiss the Plaintiff's claims on this basis.

### III.    Canada Has No Statutory Cause of Action for Extrajudicial Killing

10.     Canada does not have legislation like the United States' TVPA, *supra*, or the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS"), that would grant courts subject-matter jurisdiction in proceedings like the above-captioned litigation. While draft legislation resembling the TVPA was introduced in the Canadian Parliament in 2009, it was never enacted. *See* Bill C-483: Redress for

Victims of International Crimes Act (First reading: November 26th, 2009. Sponsored by Member of Parliament Irwin Cotler).

11.     The Canadian statutes most analogous to the TVPA and ATS are the Yukon Territory's Torture Prohibition Act, R.S.Y. 2002, c 220 (Can.) ("YTPA"), and the federal Justice for Victims of Terrorism Act, S.C. 2012, c 1, s 2 (Can.) ("JVTA"). Neither applies to the present litigation.

12.     The YTPA creates a civil cause of action in relation to torture committed by a public official in the service of the Yukon Territory. That statute clearly has no bearing on the present litigation as none of the events alleged in the Plaintiff's Amended Complaint occurred in the Yukon or involved Yukon officials.

13.     For its part, the JVTA creates a civil cause of action against "any listed entity, or foreign state whose immunity is lifted under section 6.1 of the *State Immunity Act*, or other person" that committed an act of terrorism as defined in the Part II.1 of Criminal Code, R.S.C. 1985, c C-46 (Can.) ("Criminal Code"). JVTA, s 4. It is my opinion that the JVTA would not be available to the Plaintiff because the Defendants are not members of a listed terrorist entity in Canada, nor is Saudi Arabia a designated State sponsor of terrorism whose immunity is lifted, *see* Order Establishing a List of Foreign State Supporters of Terrorism, SOR/2012-170 (Can.).

IV.     **Speculative Remedies at Common Law**

14.     In the absence of legislation like the United States' TVPA or ATS, the only potentially available causes of action in Canada for the wrongful conduct alleged in this litigation are at common law, either on the basis of the theoretical possibility of recognizing a novel cause of action derived from the customary international law prohibition against extrajudicial killings or, alternatively, on the basis of existing domestic torts. These causes of action are speculative at best.

### *Customary International Law*

15. In my opinion, the Plaintiff's claim against the Defendants has no precedent whatsoever in Canada, whether such claim is grounded in customary international law or statute. As far as I can ascertain, no Canadian court has ever recognized a cause of action or granted a civil remedy against a foreign State or foreign State officials for an alleged extrajudicial killing or attempted extrajudicial killing. Indeed, no Canadian court has ever granted a remedy for any alleged violation of customary international law.

16. The Supreme Court of Canada recently addressed in *Nevsun Resources* the theoretical possibility of deriving novel causes of action at common law for violations of customary international law. *See generally* 2020 SCC 5. On the specific facts of that case, the Court held that a Canadian mining corporation could be sued in Canada for crimes against humanity, slavery, forced labour and cruel, inhuman and degrading treatment allegedly committed in Eritrea. *Id.* ¶¶ 100-03. The Supreme Court did not award damages or any other legal remedy in *Nevsun Resources*; it merely held that the plaintiff's claims against the Canadian corporation survived the motion to strike (which is the equivalent of a motion to dismiss in the United States) and should be allowed to proceed to trial. *Id.* ¶ 132. The litigation was subsequently settled in late 2020. As far as I know, since *Nevsun Resources*, no Canadian court has recognized a cause of action based on customary international law.

17. In *Nevsun Resources*, three Eritrean workers claimed that they were indefinitely conscripted through Eritrea's military service into a forced labour regime in a mine owned by Nevsun Resources Ltd., a Canadian corporation. 2020 SCC 5, ¶ 9-11. The Eritrean plaintiffs sued Nevsun in British Columbia for breaches of customary international law norms, namely the prohibitions against forced labour, slavery, cruel, inhuman or degrading treatment, and crimes

5

against humanity. *Id.* ¶ 4. They also sought damages for the domestic torts of conversion, battery, unlawful confinement, conspiracy and negligence. *Id.*

18. Nevsun brought a motion to strike on the basis, *inter alia*, that the claims for alleged violations of customary international law have no reasonable prospect of success. *Id.* ¶ 16. The motion to strike was dismissed by the motions judge, *id.* ¶ 19, and Nevsun's appeal was dismissed by the British Columbia Court of Appeal, *id.* ¶ 24-25.

19. In dismissing Nevsun's final appeal, the Supreme Court of Canada agreed that Nevsun had not demonstrated that the Eritrean workers' claims based on alleged breaches of customary international law should be struck at the preliminary stages of the lawsuit. *Id.* ¶ 113. Since the specific customary international law norms explicitly raised by the Eritrean plaintiffs (forced labour, slavery, cruel, inhuman or degrading treatment, and crimes against humanity) form part of the Canadian common law, and since Nevsun is a Canadian corporation bound by Canadian law, the claims of the Eritrean workers for breaches of customary international law were allowed to proceed. *Id.* In short, the Supreme Court of Canada held that a Canadian corporation can be sued in Canada for alleged violations of the customary international norms banning crimes against humanity, slavery, forced labour and cruel, inhuman and degrading treatment. *Id.* ¶¶ 100-103.

20. It bears emphasizing that the Supreme Court of Canada in *Nevsun Resources* did not establish a cause of action for extrajudicial killing. I am unaware of any Canadian precedent in which a court granted civil remedies of any kind against foreign defendants for acts that amount to an actual or attempted extrajudicial killing. It also bears emphasizing that the defendant in *Nevsun Resources* was a private Canadian corporation, *id.* ¶ 4, and not, as in the present litigation, a foreign State official, or persons acting at the direction of foreign State officials. In my view, these distinctions significantly limit the applicability of *Nevsun Resources* to the present litigation.

21. A plaintiff seeking civil redress in Canadian courts against foreign State officials for an actual or attempted extrajudicial killing would almost certainly face a motion to strike. In the context of such a motion, a plaintiff would bear the onus of satisfying a court that (1) the alleged attempted extrajudicial killing amounts to a breach of an adopted international customary norm and (2) that recovery is not barred by overriding Canadian legislation. *Id.* ¶ 73.

22. The first issue is uncontroversial. Canadian courts would likely acknowledge that the prohibition against extrajudicial killing is a customary international norm. *See, e.g.*, International Covenant on Civil and Political Rights art. 6(1), Dec. 16, 1966, Can. T.S. No. 1947/47, 999 U.N.T.S. 171 ("No one shall be arbitrarily deprived of his life."); Geneva Convention (IV) Relative to the Protection of Civilian Persons in Time of War art. 3(1)(d), Aug. 12, 1949, Can. T.S. No. 1965/20, 75 U.N.T.S. 287 (prohibiting "the carrying out of executions without previous judgment pronounced by a regularly constituted court, affording all the judicial guarantees which are recognized as indispensable by civilized peoples"); Geneva Convention (I) for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field art. 12, Aug. 12, 1949, Can. T.S. No. 1965/20, 75 U.N.T.S. 31 ("Any attempts upon the[] lives" of protected persons "shall be strictly prohibited."). On the authority of *Nevsun Resources*, a Canadian court could take judicial notice of the content of that customary international norm as part of the common law. 2020 SCC 5, ¶¶ 98-99.

23. But the inquiry does not end there. In a motion to strike, a Canadian court would ask whether "a civil remedy for a breach of this part of [Canadian] common law [is] available? Put another way, can [Canadian] domestic common law develop appropriate remedies for breaches of adopted customary international law norms?" *Id.* ¶ 117.

24. This issue requires courts to determine whether there are any procedural barriers to civil redress for the alleged violation of customary international law. In Canada, the SIA constitutes such a barrier. In *Kazemi*, the Supreme Court of Canada "concluded that the *State Immunity Act* was the kind of express legislation that prevented a remedy against the State of Iran for the breach of the *jus cogens* prohibition against torture, which it agreed was part of domestic Canadian law. LeBel J. for the majority noted that '[w]hile rights would be illusory if there was never a way to remedy their violation, the reality is that certain rights do exist even though remedies for their violation may be limited by procedural bars.' In effect, the majority in *Kazemi* held that the general right to a remedy was overridden by Parliament's enactment of the *State Immunity Act*." *Nevsun Resources*, 2020 SCC 5, ¶ 121 (quoting *Kazemi*, 2014 SCC 62, ¶ 159).

### *Domestic Torts*

25. The conduct alleged in the Plaintiff's Amended Complaint could potentially ground a civil claim for domestic torts. However, for the reasons I set out below, these putative tort claims would be barred by Canada's SIA.

26. Moreover, as the Supreme Court of Canada noted in *Nevsun Resources*, the remedies for domestic torts are limited and may not constitute an adequate response to the public nature and importance of the violations alleged in cases like the present litigation. *Id.* ¶¶ 125-130. Recognizing the powerful accountability that comes with findings of violations of international human rights, the Supreme Court of Canada highlighted the conceptual distinctions between customary international human rights norms and domestic torts. In the Court's view, "reliance on existing domestic torts may not 'do justice to the specific principles that already are, or should be, in place with respect to the human rights norm.'" *Id.* ¶ 126 (quoting Craig Scott, *Translating Torture into Transnational Tort: Conceptual Divides in the Debate on Corporate Accountability*

*for Human Rights Harms, in* TORTURE AS TORT: COMPARATIVE PERSPECTIVES ON THE DEVELOPMENT OF TRANSNATIONAL HUMAN RIGHTS LITIGATION 45, 62 n.4 (Craig Scott, ed., 2001).

## V. The State Immunity Act (SIA) Bars the Plaintiff's Claim

27. In my opinion, in the absence of legislation like the United States' TVPA, the Canadian SIA likely constitutes an insurmountable barrier to the Plaintiff's lawsuit. The SIA is "a complete codification of Canadian law as it relates to foreign State immunity from civil proceedings." *Kazemi,* 2014 SCC 62, ¶ 54. Canadian courts must proactively give effect to the SIA, "notwithstanding that the state has failed to take any step in the proceedings." SIA, R.S.C. 1985, c S-18, s 3(2). Under that statute, a foreign State—which includes any sovereign, head of State, or government "acting in a public capacity" and "any agency of the foreign state," *id.* s 2— is immune from the jurisdiction of any court in Canada," *id.* s 3(1).

28. While State officials are not explicitly mentioned in the definition of "foreign State" in the SIA, the Supreme Court of Canada has held that "public officials, being necessary instruments of the state, are included in the term 'government' as used in the SIA." *Kazemi,* 2014 SCC 62, ¶ 93; *see also Jaffe v. Miller* [1993] O.J. No. 1377, ¶¶ 31-33 (Can. Ont. C.A.). Since the individual Defendants are all State officials of Saudi Arabia, or persons acting under the color of law or at the direction of State officials, they would presumptively benefit from the immunity provided by the SIA.

29. The SIA applies when public officials are "acting in their official capacity." *Kazemi,* 2014 SCC 62, ¶ 93. The standard governing whether conduct is deemed "official" for SIA purposes is whether it could not have been done without the resources, powers and opportunities afforded by the office in question. *See Brown v. Spagnuolo*, 2013 ONSC 5178, ¶ 35

(Can.). Allegations that the official acted maliciously or abused their power in pursuit of a personal, rather than state, objective do not move the actions of State officials outside the scope the SIA. So long as their conduct involved the use of resources, powers and opportunities afforded by their office, state officials are immune from suit for harmful acts done while acting as employees or functionaries of the State, even in the face of allegations that "they individually and collectively acted illegally, and maliciously, in the abuse of, indeed, in clear excess of, their respective power." *Jaffe*, [1993] O.J. No. 1377, ¶ 8. Even foreign State officials that commit heinous crimes such as torture are considered to be "acting . . . in a public capacity" for SIA purposes. *See Kazemi,* 2014 SCC 62, ¶¶ 94-98.

30. Accordingly, the acts of laying false criminal charges for malicious and conspiratory motives, *Jaffe*, [1993] O.J. No. 1377, ¶ 8; of abusively requesting the freezing of assets under a Mutual Legal Assistance Treaty and the issuing of excessive subpoenas, *Ritter v. Donnell*, 2005 ABQB 197, ¶¶ 29-30 (Can.); of issuing and planting false cheques in government files, *Brown*, 2013 ONSC 5178, ¶ 35; and of committing torture in a State prison and military hospital, *Kazemi*, 2014 SCC 62, ¶ 94-98, were all deemed official acts because they were carried out by State functionaries and the conduct involved the use of resources, powers and opportunities afforded by their office.

31. I know of no Canadian precedent in which courts did not apply immunity to foreign State officials who in some way used the powers and resources of their office (even if they acted outside the scope of their official duties, outside of official channels, or acted deliberately, maliciously, or in pursuit of personal objectives). Indeed, although the SIA applies only to acts undertaken in an official capacity, I am not aware of a single Canadian case in which foreign State officials were found to be acting in a personal capacity and therefore not entitled to the protection

10

of the SIA. Instead, to my knowledge, every time a court has found that immunity did not apply in given case, it was because the matter fell within the legislated exceptions described below.

32. The SIA provides an exhaustive list of exceptions to State immunity, which do not include civil suits for extrajudicial killing or attempted extrajudicial killing. The only legislated exceptions to State immunity in Canada are waiver (s 4); commercial activity (s 5); local torts (s 6); support of terrorism (s 6.1); maritime matters (s 7); foreign State property (s 8) and criminal matters (s 18). *See* SIA, R.S.C. 1985, c S-18. The rule of immunity at section 3 is construed broadly, while the exceptions are narrowly applied.

33. It is my opinion that the Plaintiff's injuries would likely not trigger the local torts exception at section 6 of the SIA. That section reads as follows:

| **Death and property damage** | **Dommages** |
|---|---|
| **6.** A foreign state is not immune from the jurisdiction of a court in any proceedings that relate to<br>(a) any death or personal or bodily injury, or<br>(b) any damage to or loss of property that occurs in Canada. | **6.** L'État étranger ne bénéficie pas de l'immunité de juridiction dans les actions découlant :<br>a) des décès ou dommages corporels survenus au Canada;<br>b) des dommages aux biens ou perte de ceux-ci survenus au Canada. |

34. In *Schreiber v. Canada (AG)*, 2002 SCC 62 (Can.), the Supreme Court of Canada held that the local torts exception at section 6 is "restricted to a class of claims arising out of a physical breach of personal integrity." *Id.* ¶ 80. The Court held that "the scope of the exception

11

in s. 6(a) is limited to instances where mental distress and emotional upset were linked to a physical injury." *Id.* ¶ 42. Only when psychological distress manifests itself <u>after</u> a physical injury will the exception to state immunity be triggered. In other words, "some form of a breach of physical integrity must be made out." *Id.* ¶ 62. While Justice LeBel opined in passing in *Schreiber* that "psychological distress may fall within the exception [at s. 6(a) of the SIA] where such distress is manifested physically, such as in the case of nervous shock," *id.* ¶ 42, that comment was not dispositive and, in any event, runs contrary to the bulk of the Canadian cases that have consistently held that section 6(a) extends to mental and emotional distress only insofar as such harm arises from a sequentially prior physical injury occurring in Canada. *Id.* ¶ 62; *Kazemi*, 2014 SCC 62, ¶ 78; *United States of America et al. v Friedland*, [1999] 46 O.R. 3d 321, ¶ 25 (Can. Ont. C.A.); *Greco v. Holy See (State of Vatican City)*, [2000] O.J. No. 5293, ¶ 8 (Can. Ont. Sup. Ct. J.); *R.P. et al. v. Westwood*, 2003 BCSC 1279, ¶ 22 (Can.); *Ritter*, 2005 ABQB 197, ¶ 27; *New Jersey (Dep't of the Treasury of the State of), Div. of Investment v. Trudel*, 2009 QCCA 86, ¶ 45-46 (Can.); *Szocik v. England & Wales (Att'y Gen.)*, 2012 BCSC 1480, ¶ 36 (Can.), *aff'd* 2013 BCCA 443 (Can.), leave to appeal to SCC denied.

35. Following *Schreiber*, the Supreme Court of Canada held in *Kazemi* that section 6(a) of the SIA barred a lawsuit for psychological and emotional distress suffered in Canada by the son of a woman who was tortured to death in Iran. *Kazemi*, 2014 SCC 62, ¶ 78. The Court held that "the 'personal or bodily injury' exception to state immunity does not apply where the alleged injury does not stem from a physical breach of personal integrity." *Id.* ¶ 74.

36. Under this rule, in my view, a civil action for the tort of intentional infliction of mental suffering that does not involve injuries stemming from "a physical breach of personal integrity," *id.*, is not likely to trigger the exception at section 6(a) of the SIA.

37. Thus, to the extent the attempted extrajudicial killing did not result in the Plaintiff's death or cause a "physical breach of personal integrity," *id.*, it is my opinion that, in the absence of a statutory cause of action like the ATS or TVPA in the United States, the SIA likely constitutes an insurmountable procedural barrier to redress the injuries he alleges.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 10th day of June 2021 in North Bay, Ontario, Canada.

François Larocque