# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| DR. SAAD ALJABRI,<br><br>        Plaintiff,<br><br>        v.<br><br>MOHAMMED BIN SALMAN BIN<br>ABDULAZIZ AL SAUD, *et al*.<br><br>        Defendants. | **Civil Action No. 1:20-cv-02146-TJK** |

**EXPERT REPORT OF PROFESSOR CHIBLI MALLAT**

## I.    INTRODUCTION

1.      In this report, I offer the following opinions, in response to the expert opinion of Fahad Nasser Alarfaj on Saudi law, filed in support of Defendants' motions to dismiss.

2.      In section IV.A, I explain that no civil remedy for an attempted extrajudicial killing exists against Defendant Mohammed bin Salman bin Abdulaziz Al Saud ("Defendant bin Salman") or his agents, whether in the Saudi courts or through the Saudi Human Right Commission ("HRC") or the Saudi National Society for Human Rights ("NSHR").

3.      In section IV.B, I explain that Saudi courts have compensated "emotional" or "moral" harm without a showing of physical injury, and that Islamic law and Saudi case law include principles analogous to the U.S. common law cause of action for "intentional infliction of emotional distress" ("IIED").

## II.    SCOPE OF REPORT

4.      At the request of counsel, I have offered an opinion on the following questions: (1) whether any legal remedy is available in Saudi Arabia against Defendant bin Salman, and/or individuals acting at his instruction, for attempting to extrajudicially kill an individual outside of

Saudi Arabia; and (2) whether Saudi law recognizes a standalone cause of action analogous to the U.S. common-law cause of action for IIED.

5. My opinions are informed by my review of and expertise in Saudi and Islamic law, as well as my review of (1) the Amended Complaint in this case, ECF No. 66; (2) the expert opinion of Fahad Nasser Alarfaj, filed on April 1, 2021 in support of Defendants' motions to dismiss, ECF No. 92-7; and (3) Defendant bin Salman's motion to dismiss, ECF No. 92.

## III.   QUALIFICATIONS

6. I am Principal of Mallat Law Offices in Beirut, Lebanon, and Emeritus Presidential Professor of Law at the University of Utah. I have studied, taught, and practiced Middle Eastern law over the past forty years as a law professor, litigator, and legal expert.

7. I have written numerous articles and books on Middle Eastern and Islamic law, and completed a book-length manuscript on Saudi law, which will be published in October 2021 by Oxford University Press. I have also published several articles on Saudi law in scholarly journals.

8. Over the past decade, I have also served as a legal expert on Saudi law in cases litigated in the United States, the Cayman Islands, and England.

9. My curriculum vitae is appended to this opinion.

## IV.   DISCUSSION

### A.   Remedies in Saudi Arabia for an Attempted Extrajudicial Killing against Defendant bin Salman and His Agents

10. As the Crown Prince, Deputy Prime Minister, and Minister of Defense of Saudi Arabia, Defendant bin Salman cannot be held liable in Saudi Arabia for directing an attempted extrajudicial killing.  Legally, Defendant bin Salman could not be held liable in Saudi courts absent a Royal Order from the King specifically authorizing such relief, and practically, neither he—the King's son—nor others acting at his direction, would be held liable.

11.     Under the Basic Law of Governance,[1] the central authority of Saudi Arabia is the King, who is the country's Prime Minister (also referred to as President of the Council of Ministers).[2]   In a constitutional formulation unique to Saudi Arabia, the King is the "final authority" for all three legislative, judicial, and executive powers.[3]

12.     The Basic Law of Governance and Royal Orders issued by the King establish the official authorities of the Crown Prince in Saudi Arabia.  From this, two relevant principles follow. First, as the Crown Prince, bin Salman assumes all the duties assigned to him by the King under the Basic Law of Governance or Royal Orders.[4]   Second, as Deputy Prime Minister and Minister of Defence, Defendant bin Salman is a member of the Saudi Council of Ministers, which is, under the Basic Law of Governance, "collectively responsible to the King for the implementation of the Sharia, and the general policy of the State."[5]

13.     As a practical consequence of the King's absolute authority over all branches of Saudi government, and his ultimate authority over the Crown Prince, Defendant bin Salman and those acting at his direction would be insulated from liability in Saudi Arabia for attempting an extrajudicial killing.

---

[1] Saudi Arabia has a hybrid legal system—it comprises Islamic common law, derived from the Qur'an and the *Sunna* or *hadith* (or the sayings and actions of the Prophet Muhammad), and a statutory system.  The Basic Law of Governance, the Law on the Consultative Assembly, and the Law on Provinces—all of which were decreed by King Fahd in 1992—form part of the statutory system.  Courts accord Islamic law a high degree of deference, and all Saudis are formally bound to observe it.

[2] Arts. 44, 56-57 of the Basic Law of Governance.

[3] *Id.* at Art. 44.

[4] *See* Art. 5 of the Basic Law of Governance ("The Crown Prince shall devote himself exclusively to his duties as Crown Prince and shall perform any other duties delegated to him by the King.").

[5] Art. 57 of the Basic Law of Governance.

14. To start, the King's authority over the judicial branch means that Saudi courts lack independence, a political reality that the U.S. State Department has confirmed in recognizing that Saudi Arabia's "judiciary . . . [is] not [an] independent entit[y]"; rather, it is "subject to influence" and is "required to coordinate [its] decisions with executive authorities, with the king and crown prince as arbiters."[6]

15. One illustration of the impunity held by Defendant bin Salman and his agents in Saudi Arabia is the aftermath of Jamal Khashoggi's killing. The United States has concluded that Defendant bin Salman ordered Khashoggi's killing, and that his agents carried out the execution.[7] The Saudi Public Prosecution Office brought charges against some unnamed individuals involved with the crime—but did not bring any charges against Defendant bin Salman.[8] I have been unable to access official Saudi court documents associated with the prosecution of Khashoggi's killers,

---

[6] U.S. State Dep't, *Saudi Arabia 2020 Human Rights Report* 15 (2020), https://www.state.gov/wp-content/uploads/2021/03/SAUDI-ARABIA-2020-HUMAN-RIGHTS-REPORT.pdf.

[7] *See* Office of the Dir. of Nat'l Intelligence, *Assessing the Saudi Government's Role in the Killing of Jamal Khashoggi* 3 (Feb. 11, 2021), https://www.dni.gov/files/ODNI/documents/assessments/Assessment-Saudi-Gov-Role-in-JK-Death-20210226v2.pdf. An investigation of the killing conducted by the United Nations' Special Rapporteur on extrajudicial, summary or arbitrary executions also found credible evidence of Defendant bin Salman's involvement in Khashoggi's killing. *See* U.N. Human Rights Council, *Annex to the Report of the Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions: Investigation into the Unlawful Death of Mr. Jamal Khashoggi*, ¶¶ 4, 250, U.N. Doc. A/HRC/41/CRP.1 (June 19, 2019).

[8] Marwa Rashad & Mark Hosenball, *Saudi Arabia Sentences Five to Death Over Khashoggi Murder, U.N. Official Decries 'Mockery,'* Reuters (Dec. 23, 2019), https://www.reuters.com/article/us-saudi-khashoggi/saudi-arabia-sentences-five-to-death-over-khashoggi-murder-u-n-official-decries-mockery-idUSKBN1YR0SY. Although those convicted were initially sentenced to death, their sentences were later commuted to 20-year prison terms. *Jamal Khashoggi Murder: Saudi Court Commutes Death Sentences*, BBC News (Sept. 7, 2020), https://www.bbc.com/news/world-europe-54061597.

likely because their trials were not open to the public;[9] however, public sources report that the Public Prosecution acquitted three senior Saudi officials—including two advisors to Defendant bin Salman, Defendants Saud Alqahtani and Ahmed Alassiri—who helped mastermind the killing.[10]

16.     Mr. Alarfaj's expert report notes that Saudi Arabia's HRC and NSHR are "government agencies specifically tasked with investigating and remedying violations of human rights, which would include extrajudicial killings."[11]  These agencies are irrelevant to the question of whether a remedy exists under Saudi law against Defendant bin Salman or his agents for attempting an extrajudicial killing.

17.     The HRC's role is restricted to ensuring that Saudi criminal defendants' rights under the Saudi Law of Criminal Procedure are enforced.[12]  It does not provide civil remedies against Defendant bin Salman or anyone else for attempting an extrajudicial killing.  The chairman of the HRC, moreover, is appointed by and reports directly to the King.[13]  As a consequence, even if a complaint could be brought before the HRC against Defendant bin Salman or his agents for an

---

[9] Tim Lister, *Saudi Death Sentence Wipes MBS's Fingerprints in Khashoggi Killing*, CNN (Dec. 23, 2019), https://www.cnn.com/2019/12/23/middleeast/saudi-khashoggi-verdict-analysis-intl/index.html.

[10] *See* Rhasad & Hosenball, *supra* note 8.

[11] ECF No. 92-7 ¶ 10.

[12] \*Al-taqrir al-sanawi* [HRC's Report for the Year 1440/1441], at 49 (2019), https://www.hrc.gov.sa/ar-sa/Documents/%D8%A7%D9%84%D8%AA%D9%82%D8%B1%D9%8A%D8%B1%20%D8%A7%D9%84%D8%B3%D9%86%D9%88%D9%8A%20%D9%84%D9%84%D9%87%D9%8A%D8%A6%D8%A9%202019.pdf.

[13] Arts. 3 and 5(5), Council of Ministers' Decision 207 dated 08/08/1426H (Sept. 12, 2005) (establishing the HRC); Kingdom of Saudi Arabia, Human Rights Commission, Statute of Human Rights Commission Arts. 1, 3, 4.1, 5.5, https://www.hrc.gov.sa/en-us/aboutHRC/AboutHRC/Pages/HRCLAW.aspx (last accessed June 7, 2021).

attempted extrajudicial killing, the HRC could, at most, report the complaint to the King.  It is not independent and has no power to hold Defendant bin Salman accountable for anything.

18.     The NSHR likewise does not provide for a civil remedy against Defendant bin Salman for an attempted extrajudicial killing.  The NSHR can only "receive complaints and grievances, follow them up with competent entities, and . . . verify claims regarding violations and abuses of human rights."[14]  It has no investigative powers, and thus has even less authority than the HRC to help correct human rights abuses.

19.     In addition, in its public statements, the NSHR shows complete loyalty to the King's royal orders, Defendant bin Salman, and all actions of Saudi authorities.[15]  Although one of the NSHR's objectives is to cooperate with the United Nations and other international organizations in protecting human rights, it routinely dismisses reports from organizations that criticize the Kingdom and its officials.  For instance, the NSHR dismissed "the report of the UN Special Rapporteur on Extrajudicial Executions regarding the death of Jamal Khashoggi," describing it as "a biased and incredible report."[16]  The NSHR also demanded that more attention and credit be given to the investigations of the Saudi authorities into Khashoggi's killing—which,

---

[14]     Constitution    of    the    National    Society    for    Human    Rights    art.    3(3), http://nshr.org.sa/en/?page_id=130.

[15] For the NSHR statements, see Public Statements, Nat'l Society for Human Rights, Statements Issued by the Society, https://nshr.org.sa/en/?post_type=statement, which include several statements praising the Saudi authorities.

[16] See Public Statement, Nat'l Society for Human Rights, The National Society for Human Rights' Statement Regarding the Report Issued by the UN Special Rapporteur on the Killing of Jamal Khashoggi, http://nshr.org.sa/en/?post_type=statement [hereinafter "NSHR Khashoggi Public Statement"].  This "report" appears to be the June 19, 2019 "Annex to the Report of the Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions: Investigation into the Unlawful Death of Mr. Jamal Khashoggi," from the U.N. Human Rights Council.  See U.N. Human Rights Council, supra note 7.

as noted above, did not investigate or hold liable Defendant bin Salman or his top aides—and that everyone, including the United Nations Special Rapporteurs, respect the independence and sovereignty of the Saudi judiciary.[17]   Accordingly, the NSHR has no power to take any action against Defendant bin Salman or his agents for an attempted extrajudicial killing, and likely would not even issue a statement against them.

**B.  Cause of Action for IIED in Saudi Arabia**

20.    The U.S. common law of torts recognizes a cause of action for "intentional infliction of emotional distress," which comprises three elements:  (1) extreme or outrageous conduct by the defendant, (2) that is intentional or reckless, and (3) causes severe emotional distress to the plaintiff.[18]

21.    Mr. Alarfaj states that "Saudi Arabian law does not recognize a cause of action" for IIED, and that "courts in Saudi Arabia that fall under the general judiciary have ruled consistently over the years that one cannot recover moral damages."[19]  This is incorrect.

---

[17] NSHR Khashoggi Public Statement, *supra* note 16.

[18] Restatement (Third) of Torts: Phys. & Emot. Harm § 46 (2012) ("An actor who by extreme and outrageous conduct intentionally or recklessly causes severe emotional harm to another is subject to liability for that emotional harm and, if the emotional harm causes bodily harm, also for the bodily harm.").

[19] ECF No. 92-7 ¶ 14.  Mr. Alarfaj also wrongly focuses solely on courts in the "general judiciary." Throughout the second half of the twentieth century, the most important court in Saudi Arabia was the Diwan al-Mazalem ("DM")—which was also the only Saudi court to publish decisions. Until 2007, and effectively until 2017, the DM had competence to hear commercial disputes.  In 2007, Saudi Arabia bifurcated its judiciary into a three-tiered system for "general" courts, which have jurisdiction over criminal, commercial, labor, and other matters, and a three-tiered system for the DM court.  Law of the Judiciary ("LJ"), Nizam al-qada' dated 19/09/1428H (Oct. 1, 2007); Law of DM, Nizam Diwan al-Mazalem dated 19/09/1428H (Oct. 1, 2007).  Although Saudi Arabian courts do not have a system of formal precedent, general court decisions are also influenced by the decisions of other courts, including the respected DM.

22.     An analogous cause of action for IIED exists under classical Islamic law, as interpreted by modern scholars and Saudi judges deciding disputes that arise in tort.

23.     In classical Islamic law, all obligations arising from torts and contracts are governed by a general theory of harm, *darar*, which corresponds to a unified concept of remedy, *daman*.[20] The cardinal principle of *darar* and *daman* is that all harm must be compensated.[21]

24.     Islamic law, as interpreted by Saudi courts and legal scholars—including the Saudi Minister of Justice and President of the Supreme Judicial Council, Walid al-Sam'ani—recognizes a distinction between "emotional" or "moral" harm, and bodily harm, as well as the right to monetary compensation for moral harm.[22]   "Moral harm" is "the harm which affects a non-

---

[20] *See, e.g.*, Wahbeh al-Zuhayli, *Nazariyyat al-daman aw aḥkam al-mas'uliyya al-madaniyya wal-jina'iyya fil-fiqh al-islami* [Theory of Liability or the Rules of Civil and Criminal Responsibility in Islamic Law] (1970) (introduction to the classical law of torts in Arabic); Chibli Mallat, *Introduction to Middle Eastern Law* 244-99 & 288-94 (2007) (English language introduction on the law of obligations and on tort); Joseph Schacht, *Introduction to Islamic law* 144-51, 160 (1983).

[21] *See, e.g.*, A1.1.130-33, General court of Mecca dated 10/06/1434H (Apr. 21, 2013), *aff'd*, 15/08/1434H (June 24, 2013), *La darar wa la dirar* at 132 (finding that breach of contract was harm under the aforementioned formula); A1.6.13-17, General Court of Rijal Alma' dated 12/06/1434H (Apr. 23, 2013), *aff'd*, 20/07/1434H (May 30, 2013), at 13, 16 (finding that closing road to plaintiff's property was tort harm under aforementioned formula). In the decisions cited *infra* at nn. 30 and 33, the courts make extensive references to classical law.  When determining that moral harm must be compensated, as discussed *infra*, Saudi courts also cite the hadith and scholarly treatises in classical Islamic law (*fiqh*).

Note: There is no common citation system for Saudi case law, either in English or in Arabic. In this report, reference to the general courts, is A1 (for *Ahkam*, first collection), followed by the type of report, the volume number and date of the decision, and the page numbers.  Reference to the collection of cases from the DM court is: DM, followed by the type of collection, volume number and date of the decision, and the page numbers.

[22] Walid al-Sam'ani, *Al-sulta al-taqdiriyya lil-qadi al-idari* [The Discretionary Power of the Administrative Judge] (2015).

monetary interest, so that a human being is hurt in his feelings, or his emotion, or his pride, or his reputation."[23]

25.    Contrary to Mr. Alarfaj's assertion, some courts "that fall under the general judiciary"[24] in Saudi Arabia have granted plaintiffs compensation for intentional conduct that causes them "moral harm" alone.  In one case adjudicated by the commercial court of Jeddah, which is part of the general judiciary, a former company board member brought a claim for compensation for his dismissal from the Board without justification.[25]  The plaintiff sought 30 million riyals as compensation for his impaired reputation, arguing that the dismissal socially demeaned him and hurt his long-established reputation as a prominent former minister and leading businessperson.  The commercial court of Jeddah found in favor of the plaintiff, and granted him 500,000 riyals in compensation, a sum meant to compensate for the moral harm the defendant caused.[26]  In doing so, the court explained that it was entitled, under its discretionary power, to order compensation for moral harm: "What the plaintiff mentioned of moral injuries . . . is sufficient and conforms with the court's conviction."[27]

26.    In addition, as Mr. Alarfaj acknowledges, the DM—or the "Administrative Court"—has granted compensation for moral harm, but he is wrong that compensation for moral harm can be awarded "only as a consequence" of a physical harm.[28]  The DM, which has developed much of the substantive law in Saudi Arabia on moral harm, has found that "Islamic shari'a

---

[23] *Id.* at 273.

[24] *See* ECF No. 92-7 ¶ 14.

[25] Commercial Court of Jeddah, 7298 dated 17/03/1440H (Nov. 26, 2018).

[26] *Id.*

[27] *Id.* at 4.

[28] ECF No. 92-7 ¶ 16.

accounts for the defamation of the reputation of a man *or inflicting moral harm even if not inflicting physical harm. . . .* [In light of this,] *moral harm can be compensated with money.*"[29]

27.     In one case, the DM reviewed a parent's claim for emotional distress—in the decision, referred to as *darar nafsi*, or psychological harm, and *ma'nawi*, or spiritual/moral harm—against an airline, for providing an unclean seat on the airplane that stained his daughter's clothing.[30]   The court found that the treatment of the passengers in this way was reckless "irrespective of the motive for the averred fault."[31] The court then granted the parents and their daughter compensation for the "psychological and moral harm" they experienced from being separated from one another, when the daughter had to change seats on the plane, in the form of worry, embarrassment, and fear—a result that suggests that the court found the airline's provision of an unclean seat to be outrageous conduct.[32]

28.     In another case, the DM reviewed a family's claim for both physical and emotional harm inflicted on them when their young daughter fell into an open tank.[33]   The child recovered, and at trial, the plaintiffs admitted that they had not incurred any financial loss for their daughter's physical injury.   The plaintiffs, however, produced evidence of the family's experience of moral harm, in the form of fear, panic, and psychological distress the parents and their daughter experienced, including the father's and his wife's severe psychological depression.[34]   The court did not grant the plaintiffs compensation for their daughter's physical harm, but granted the family

---

[29] DM, Majmu'a jaza'i 1437 dated 24/03/1437H (Jan. 5, 2016), at 432-34 (emphases added).

[30] DM Majmu'a idari 1435, vol. 6 dated 23/10/1435H (Aug. 19, 2014), at 3341-45.

[31] *Id.* at 3343.

[32] *Id.*

[33] DM Majmu'a idari 1433, vol.6 dated 26/01/1433H (Dec. 22, 2011), at 2269-76.

[34] *Id.*

compensation for their emotional distress, observing that, "all scholars are in agreement on this principle as one of the great rules in Islamic law [that] for harm to be removed, [compensation] must not be restricted to one type of harm as against another, but must extend to all harm, whether it is material or moral."[35]

29.     Accordingly, Saudi judicial decisions awarding compensation for moral harm have recognized elements analogous to those required to establish IIED. These cases involve a defendant's outrageous conduct,[36] which is intentional or reckless,[37] and causes severe emotional distress to the plaintiff or the plaintiff's family.[38]

30.     The two cases Mr. Alarfaj cites in support of his claim that Saudi courts do not permit recovery of moral damages involve criminal judgments and are not persuasive outside of the criminal courts.[39] The Supreme Court case he cites is furthermore unique: the King personally intervened to have the Supreme Court reverse a lower court decision that had granted the plaintiff compensation—including compensation for moral harm—against the Kingdom's Public Prosecutor.[40]

---

[35] *Id.*

[36] See, for example, DM Majmu'a idari 1436 dated 20/10/1436H (Aug. 6, 2015), at 2892-98, 2896, in which the court granted compensation to an old man who had been wrongfully arrested for his humiliation. In so doing, the court defined "moral compensation as compensation for any harm in a non-material way, like honor and unlawful scare."

[37] *See id.*; DM Majmu'a idari 1435, vol. 6 dated 23/10/1435H (Aug. 19, 2014), at 3343.

[38] DM Majmu'a idari 1433, vol.6 dated 26/01/1433H (Dec. 22, 2011), 2269-76; DM Majmu'a idari 1435, vol. 6, at 3341-5.

[39]  *See* ECF No. 92-7 ¶¶ 14-15 nn.15, 20.

[40] *See id.* ¶ 15 n.20 (citing Supreme Court Decision No. 429183 dated 10/02/1442H (Sept. 27, 2020)). Translation of the relevant passage shows that the judges were responding to "the wish of the Custodian of the Two Holy Mosques [the King] - may God protect him - for the Supreme Court to review this case and its decisions in this regard." The Supreme Court decision does not appear to have been reported yet, making it impossible to see the lower court decisions. However, from

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 9th day of June 2021.

_____

Professor Chibli Mallat

---

the text of the Supreme Court's decision, it is clear that the Court of Appeal found for the plaintiff, and that the King personally requested that the Supreme Court reverse the Court of Appeal to protect the "discretionary power" of the Prosecutor to make arrests.

# APPENDIX 1

**Chibli MALLAT**

**CAREER**

*Legal Practice*

**Principal, Mallat Law Offices (MLO)**, Beirut, 1995-2005, 2016- ; of counsel 2007-16. Member of Lebanese Bar since 1983. Avocat à la Cour d'Appel, Beirut, since 1991.

*Litigation*

Ad hoc/*pro hac vice* litigator and advocate in federal and national courts in Washington DC, in Amman, and in Brussels.

Associate member of the American Bar Association since 2008. Elected fellow of the International Academy of Comparative Law in 2014.

*International legal advocacy, consultancy and expertise*

Over three decades of teaching at major world universities include Harvard and Yale law schools, Princeton's Woodrow Wilson School, the University of Utah, The Ecole des Hautes Etudes in Paris, the school of law at the University of Lyon, the law department of the School of Oriental and African Studies at the University of London, Saint Joseph's University and the Islamic University in Lebanon.

Advisor to public institutions including the Foreign and Commonwealth Office, Middle East governments, the World Bank, UNHCR, the Bureau International du Travail. International counselling included work with the US State Department and the Department of Justice on constitutional and other legal reforms in Iraq, and work with the US State Department on a new draft constitution for Bahrain.

Expertise before the courts worldwide covers a large array of Middle Eastern and Islamic law issues as practitioner, consultant and expert. A sample of dozens of cases includes:

- Oil contracts dispute in Afghanistan (US)
- Foreign investment in Iran for a major British oil company (England)
- International criminal law (Iraq, Lebanon, Libya, Belgium)
- Jordanian criminal law (US)
- Jordanian legal system (US)
- Syrian family law (England)
- Arab and Lebanese Immigration laws (England, Canada)
- Libyan contract law (England)
- Qatari dispute over constitutional and budgetary prerogatives of the Emir (England)
- Qatari family and civil law (Canada)
- Bahrain court system and arbitral procedures (New Zealand)
- Saudi insolvency, trusts and securities (Cayman Islands)

- Iraqi oil contracts (US)
- Saudi banking and securities (England)
- Saudi PIF (England)
- Qatari judicial independence (Canada)
- Iraqi defense contracts (US)
- Moroccan criminal law, extradition (US)

Expertise in Islamic finance, including organizing curriculum on Islamic law and banking for the Central Bank of Malaysia, and intensive courses to *shari'a* banking experts in Kuala Lumpur.

MLO is also associated with the establishment in 1999 of the Middle East office for Amnesty International, and has since acted as its legal advisor.

### *Academic*

### *Tenured positions and centre directorships*

**USA**

**Presidential Professor of Law Emeritus,** 2019-
**Presidential Professor of Middle Eastern Law and Politics,** 2009-19
**Professor of Law and Politics of the Middle East,** 2007-09

S.J. Quinney College of Law,
University of Utah
383 South University St E
Salt Lake City, UT 84112
United States

**Lebanon**

**EU Jean Monnet Professor in European Law**
**Director, Centre for European Studies,** 2001-17

website: www.cjm.usj.edu.lb (several courses introduced at undergraduate and postgraduate levels on European law: institutional, fundamental rights, contracts; book series 'Horizons européens', four books published with Bruylant) The Jean Monnet Chair in Lebanon was awarded the label 'Centre of Excellence' by the European Commission in 2004. The Chair was recognized as a 'Success Story' in 2007.

**Professor of law**, Faculté de Droit et des Sciences Politiques, Université Saint-Joseph, Beirut, Visiting 1996-9, *tenured 2000*. (Teaching at doctoral level in public and private law, Courses taught: Anglo-American contracts; Comparative constitutional law) website: www.fdsp.usj.edu.lb

**United Kingdom**

**Director**, Centre of Islamic and Middle Eastern Law (CIMEL), School of Oriental and African Studies (S.O.A.S.), University of London, October 1992 - September 1996. (Work with half a dozen Research Associates, several part-time Research assistants, Council and Executive Committee Meetings, seminar and conference organization, fundraising. Research output includes some fifteen collective and individual books)

**Lecturer in Islamic Law,** S.O.A.S., Law Department, 1988- September 1996, *tenured 1991.* Subjects taught: Islamic law at undergraduate and postgraduate level; Public international law, postgraduate level; English and European laws, undergraduate level. Supervision of several graduate dissertations, including 6 PhDs completed.)

*Teaching and research positions*

**Visiting positions**

Visiting Professor (Professeur invité), Ecole des Hautes Etudes en Sciences Sociales, Paris, April-May 2015. (Lectures and seminars on Islamic law, nonviolence)

Visiting Professor of Law and Oscar M. Ruebhausen Distinguished Senior Fellow, Yale Law School, Fall 2012 (Courses: Islamic and Middle Eastern Law; War and Human Rights: Rethinking Kant's *Perpetual Peace*)

The Custodian of the Two Holy Mosques Visiting Professor of Islamic Legal Studies, Harvard Law School, 2011 (Courses taught: Spring 2011- Middle Eastern law; Law and war; Fall 2011 - Public International Law; The 2011 Middle East Revolution)

Senior legal advisor, Global Justice Project: Iraq, 2008-10, legal think-tank established in Baghdad with two major grants from the US State Department, including forty legal experts worldwide and over a hundred participants. Work with Iraqi government on constitutional, legislative, judicial, electoral and anti-corruption issues.

Visiting Professor, University of Virginia School of Law, November 2006, November 2008 (Short, intensive courses on Islamic and Middle Eastern law)

Faculty, Salzburg Global Seminar, *An International Rule of Law: Balancing Security, Democracy, and Human Rights in an Age of* Terrorism, 1-6 September 2007; Faculty, Salzburg Global Seminar, *The Rule of Law in a Globalized World: Why it Matters*, 23-28 August 2011.

Visiting Professor, Law and Public Affairs Fellow, Princeton, Woodrow Wilson School, Visiting Senior Research Scholar, Princeton University, 2006-2007, Fellow, Law and Public Affairs Program, Fellow, University Center for Human Values, Fellow, Program in International and Regional Studies, Distinguished Visitor in the Bobst Center for Peace and Justice, (Course taught: Middle East politics)

Senior Fellow, Schell Center for International Human Rights, Yale law school, 2005-2006 (Completion of *Introduction to Middle Eastern law*, convenor 'Mideast conversations')

Director, Administrative Reform Project in Lebanon, with European Public Law Centre (Athens), 2005 (seminars with government on administrative reform)

Kluge Scholar, Library of Congress, Washington DC, September 2002.

Visiting Professor of law, Law and *shari'a* department, the Islamic University, Beirut, December 1996- February 1997 (postgraduate teaching in comparative legal texts)

Visiting Professor, Faculté de Droit et des Sciences Politiques, Université Saint-Joseph, Beirut, January-October 1996. (Courses on comparative constitutional law, contracts)

Japanese Ministry of Foreign Affairs' distinguished guest, November 1995, talks at the Ministry and lectures at Tokyo University and other venues. (Book: *The Middle East into the 21st Century*, *The Japan lectures*)

Visiting Scholar, University of California at Berkeley, School of Law (Boalt Hall), 1984-1986. (Research in contemporary Islamic Law: constitutional and economic issues, banking laws, law of contract, and inheritance).

### *Selection of recent public lectures*

Ritsumeikan University, Kyoto, 15 November 2018, 'Special Lecture: Damascus in the Eye of the Storm: How Human Rights Lost the Agenda in Syria'.

Tokyo University, Institute for Advanced Studies on Asia, 3 November 2017, 'Law and equality in the Middle East from a gender perspective: a post-2011 view'.

Yale law school, 7-8 March 2017, Kamel Center for Islamic law, public lecture and full day seminar on draft book on Saudi law.

Pro-Chancellor Lecture, USIM, Malaysia, 'Introducing Nonviolence from An Arab-Muslim Perspective', 27 May 2015.

University of Zurich, '2011 and the Middle East challenge to world constitutionalism', 17 March 2015.

American University of Beirut, 'What is Arab/Middle Eastern in a philosophy of nonviolence?', 13 February 2015.

Book launch panel discussion on *Philosophy of Nonviolence*, Yale law school, Middle East Legal Studies Seminar, Venice, 11 January 2015.

Presidential lecture at University of Kufa, Iraq, '*Masarat al-tajdid fi fiqh madrasat al-najaf*/ paths of renewal in the jurisprudence of the school of Najaf', 27 November 2014.

***International academic and literary collaboration***

Tokyo University, workshop around *Philosophy of Nonviolence*, 17 November 2018.

Founder, Board member and book commissioner, *Bada'e'* press, 2015 (11 books published).

Member, Yale Law School, Middle East Legal Studies Seminar, Organizing committee, 2000-12. Annual participation in the Seminar, since 1999.

Participation in, and active coordination of various international research programs, inter al. Individual and Society in the Muslim Mediterranean, European Science Foundation (1995-2001), Master in Euro-Med studies (EU, 2001-, with thirty universities); Master in European law (2003-, with eight European law schools)

Joint convenor, the USJ-AUB Joint Academic Lectures Series 1997-98.

Joint editor, Global Justice Project: Iraq series, Baghdad (four books published)

Joint editor, EU Jean Monnet Chair at USJ series (with Bruylant, four books published)

Joint general editor and founder, *Yearbook of Islamic and Middle Eastern law*, the Hague-London-Boston. (Five books published, series continues to date.)

Joint editor-in-chief, CIMEL book series at Kluwer Law International, the Hague-London-Boston. (Six books published)

Joint convenor, SOAS and Institute of Advanced Legal Studies, London, Middle East Legal Practitioners' Forum, 1990-1995.

Founder and convenor, SOAS Middle East Forum 1989-1995, Centre for Near and Middle Eastern Studies, SOAS. Member, CNMES Advisory Board.

## Other public service

Amnesty International, Middle East and North Africa Regional Advisory Group, Amnesty International, 2016-19; Board member, Amnesty International Lebanon, 2001-

NGO work in Lebanon and the Middle East: Chairperson, Right to Nonviolence (righttononviolence.org), 2009; Joint founder, Humanist Lebanon, 2016.

Board member, Sri Lanka Campaign for Peace and Justice, 2009-11

Honorary President, Lebanese Association for the Philosophy of Law, 2006-12

'Leading human right defender', Carter Center, 2005

Board member, Minority Rights Group, 2002-2004

Advisor, Indict, London 1996- (Legal and networking NGO for the establishment of criminal responsibility in Iraq)

International Coordinator and Founding Patron, International Committee for a Free Iraq, June 1991-. Organiser of largest foreign group invited for election monitoring in Northern Iraq (Kurdistan), May 1992. Observer and advisor, Iraqi National Congress Founding Meeting in Vienna, June 1992.

'Success Story', EU Jean Monnet Program, 2007.

Addresses for democracy and human rights in the European Parliament, the British Parliament, the US Senate, the UK Foreign and Commonwealth Office, the Japanese Ministry of Foreign Affairs, the Arab League Headquarters, the United Nations Journalists' Association.

Lectures and addresses at major universities and research institutions in the world, including Harvard Law School, Yale Law School, MIT, Council on Foreign Relations (New York), Harvard Middle East Center, Tokyo University, Freie Universität Berlin, Princeton, University of California at Berkeley, University of Washington at Seattle, Georgetown Law Center, The Royal Institute of International Affairs (Chatham House), Centre d'Etudes et de Recherches Internationales, Institut d'Etudes Politiques (Paris and Menton), Stanford Law School, University of California at Santa Cruz, Cambridge University, the Arab Organization of Human Rights, the International Institute for Strategic Studies, etc. Participant, Ditchley Foundation and Wilton Park meetings.

Profiles in *Le Monde* (2002, 2005*)*, *The Financial Times*, *The Scottish Herald*, *al-Majalla*, *The Jerusalem Report*, Danish Radio...

### *Journalism*

**Columnist***, Boussole*, weekly for Lebanese French daily L'Orient-Le Jour (2016-17)

**Law editor,** *The Daily Star Law Page*, monthly page, November 1996-1998; weekly/fortnightly page, July 2009-October 2010. Law editor and op-ed consultant, *The Daily Star*, Beirut, 1996-2001 (several dozen columns. Management of op-ed contributions of several international scholars.)

**Regular columns** in *al-Nahar* (Beirut, Arabic), *al-Hayat* (London, Arabic), *The Daily Star* (Beirut, English), *Al-Ahram (*Cairo, English*)*, L'Orient-Le Jour (Beirut, French*)*, ***op-eds*** in *New York Times* (guest columnist, July-Aug. 2006)*,The Washington Post, Le Monde,* the *London Times*, *The Financial Times*, *The Independent, The Guardian,* etc*.*

**Media** Regular television and radio interviews on international media, including BBC World radio and television (Hardtalk), CNN (Larry King), leading European and Arab television and radio channels.

## ACADEMIC PUBLICATIONS

**Books**

**1. Monographs**

*The Normalization of Saudi law* (230,000 words, Oxford University Press, in press)

*Boussole et autres journalismes*, Dar al-Bada'e', Beirut, 2019, 406 pp.

 *'An Kamal Junblat wa min-wahyih* (On Kamal Joumblat), Dar al-Bada'e', Beirut, 2018, 222 pp.

*Philosophy of nonviolence: Revolution, constitutionalism, and justice beyond the Middle East,* Oxford University Press, New York 2015, 400 pp

*Introduction to Middle Eastern law*, Oxford University Press, Oxford 2007, paperback edition with new preface, Oxford 2009, 500 pp. New expanded edition in preparation.

*Iraq: Guide to law and policy,* Aspen/Kluwer Law International, Austin, 2009, 490pp

*March 2221. Lebanon's Cedar Revolution- An essay on justice and non-violence,* [Lir], Beirut, 2007, 135 pp

*Democracy in fin-de-siècle America*, Beirut, Dar al-Bada'e', 2016, 240 pp. Translated and revised English version of *Al-Dimuqratiyya fi amirka*, introduction by Ghassan Tueni, Dar al-Nahar (in Arabic), Beirut, Dar al-Nahar, 2001, 200 pp

*Presidential choices,* Beirut 1998, published in Arabic at Dar al-Nahar (*Al-ri'asa al-lubnaniyya bayn al-ams wal-ghad*), 110pp, French (*Défis présidentiels*), and English.

*The Middle East into the 21st Century*, Garnet, June 1996, 270pp (paperback published in 1997; US edition in 1998; serialised in part in Arabic dailies).

*The renewal of Islamic law: Muhammad Baqer as-Sadr, Najaf, and the Shi'i International*, Cambridge University Press (Middle East Library), 1993, paperback 2004. 245pp. (Co-winner of the Middle East Studies Association Albert Hourani Prize, 1994). Arabic translation at Dar an-Nahar, Beirut published in 1998 as *Tajdid al-fiqh al-islami* (315 + 48 pp.), with an introduction to the Arab reader (pp.9-30) and an unpublished text of Sadr (*Usul al-dustur al-islami*, principles of an Islamic constitution). Second Arabic edition, with introduction by Muhammad Jaafar al-Sadr, Dar al-Bada'e', Beirut, November 2015. Also published in Bahasa Indonesian and Turkish.

*Aventures à Beyrouth*, (Children's story illustrated by Tamer Mallat), Beirut, 1997. 70pp

**2. Edited**

*Al-manahej al-qanuniyya li-huquq al-insan fil-'iraq* (The legal curricula for human rights in Iraq), Beirut, Université Saint-Joseph, in *Proche Orient Etudes Juridiques*, 71, 2013, 5-135.

*Law in Iraq: A Document companion,* (with Hiram Chodosh), Oxford University Press, 2012, 2 vols. 1066 pp.

*Mukafahat al-fasad fil-'iraq: Tahaddiyat al-shafafiyya wal-musa'ala* (Anti-corruption in Iraq: Challenges for transparency and accountability (Global Justice Project: Iraq, Baghdad 2010, in Arabic), 110 pp.

*Tamer Mallat: Majmu'at qasa'ed wa-ash'ar* (Collection of poems), presented by Wajdi Mallat, Facsimile edition of 19th century manuscript, Beirut 2009, 70 pp.

*Dalil al-dustur al-'iraqi* (Guide to the Iraqi Constitution), Baghdad 2009, 170 pp.

*Aux antipodes de l'Union Européenne: l'Islande et le Liban* (with David Thor Bjorgvinsson), Beirut and Brussels, Bruylant, 2008, 190pp.

*From Baghdad to Beirut: Festschrift in honor of John Donohue* (with Leslie Tramontini), German Orient Institute, Beirut 2007, 502pp.

*Dossier de philosophie du droit*, Beirut, Université Saint-Joseph, in *Travaux et Jours*, 2007, 121-224. Also separate publication, Beirut 2008.

Wajdi Mallat, *Positions/Mawaqef*, Dar an-Nahar, Beirut 2005, 350pp.

*L'Union Européenne et le Moyen-Orient: Etat des lieux,* Beirut, Presses de l'Université Saint Joseph, 2004, 250 pp

*Dossier sur l'abolition de la peine de mort,* Beirut, Université Saint-Joseph, 2003, 102 pp

Tamer Mallat*, Ahkam,* Facsimile edition of 19th century judgments, Beirut, 1999, 550 pp

*Yearbook of Islamic and Middle Eastern law Vol.5: 1997-98* (with E. Cotran), Kluwer Law International, December 1998, 597 pp

*Yearbook of Islamic and Middle Eastern law Vol.4: 1997-98* (with E. Cotran), Kluwer Law International, December 1998, 660 pp

*Yearbook of Islamic and Middle Eastern law Vol.3: 1996* (with E. Cotran), Kluwer Law International, January 1998, 566pp

*Yearbook of Islamic and Middle Eastern law Vol.2: 1995* (with E. Cotran), Kluwer Law International, December 1996, 660pp

*The Arab-Israeli accords: Legal perspectives* (with E. Cotran), Kluwer Law International (CIMEL Series 1), May 1996, 302pp

*Yearbook of Islamic and Middle Eastern law Vol.1: 1994* (with E. Cotran), Kluwer Law International, December 1995, 600pp

*Commercial law in the Middle East* (with H. Lewis Ruttley), Graham and Trotman for Kluwer Law International, July 1995. 393pp

*Water in the Middle East: Legal, political and commercial implications* (with J.A. Allan), I.B. Tauris, July 1995. 358pp (Arabic translation, Damascus 1998)

*Islam and public law*, Graham and Trotman, London, 1993. 282pp

*Islamic family law* (with Jane Connors), Graham and Trotman, London, 1990. 395pp

*Islamic law and finance*, Centre of Near and Middle Eastern Studies, S.O.A.S., April 1988; new enlarged edition, Graham and Trotman, London, September 1988. 196pp

## Articles

### 1. In journals and serials

'Mapping Saudi criminal law', *American Journal of Comparative Law*, 69:1, 2021, 1-57, in press.

'The Limits of authoritarian international law', *American Journal of International Law*, 114, 2020, 247-51.

'Exercice de style : Le Habermas nouveau va arriver', *Politique* (Belgium), 12 September 2019.

'Saudi law coming of age', *al-Abhath* (American University of Beirut), 65-6, 2017-8, 131-59.

'Property law in Saudi Arabia: A reconstruction,' *Yearbook of Islamic and Middle Eastern Law*, 19, 2018, 300-33.

'Federalist Dreams for the Middle East', *Lawfare*, 16 August 2018.

'"Riyadhology' and Muhammad bin Salman's telltale Succession", *Lawfare*, 8 June 2018.

https://www.lawfareblog.com/federalist-dreams-middle-east

'The normalization of Saudi family law', *Electronic Journal of Islamic and Middle Eastern Law* (EJIMEL, University of Zurich), 2017, 1-27.

'Building an intellectual monument, The Yearbook in Eugene Cotran's legacy', *Yearbook of Islamic and Middle Eastern Law*, Vol.18, 2017, 3-11.

'The Efficacy of lustration laws within the pyramid of accountability: Libya compared,' (with Oriene Shin et al.), *Yale Journal of International Law*, 2014, 112-33.

'Constitutionalism in 2014: Basic rights in Egypt and Tunis', in *IEMed Mediterranean Yearbook 2014*, Barcelona, 115-18 (French and English).

'En Marge des révolutions du Moyen-Orient: Israël-Palestine, préparer l'après-guerre', *Travaux et Jours*, 87, 2013, 103-112.

'Middle Eastern law' (with Mara Revkin), *Annual Review of Law and Social Science*, 9, 2013, 405-33.

'A strategy for Syria under international law,' with Jane Mansbridge, Sadeq Jalal al-Azm and others, *Harvard International Law Journal,* March 2012, 144-154.

'Drafting a joint proposal for a U.N. Security Council resolution on Israel-Palestine with Alan Dershowitz,' *Harvard International Law Journal,* published online 13 January 2012, 74-105.

'The Philosophy of the Middle East Revolution, Take one: Nonviolence', *Middle East Law and Governance*, 3 (2011), 136-47.

'Constitutional options in Bahrain', *Virginia Journal of International Law*, published online 12 April 2011, 1-16.

'Revising Egypt's Constitution : A Contribution to the Constitutional Amendment Debate'*, Harvard International Law Journal,* published online 22 February 2011, 182-203.

'Introduction à la pensée de Robert Fossaert', *Travaux et Jours*, 82, 2009, 97-112.

'Legal developments and constitutional structures in Iraq', *Michigan International Lawyer*, 31:1, 2009, 3-5.

'Appels d'Europe à l'Est de la Méditerranée', *Projet*, 298, Mai 2007, 68-73.

'Universalité de Michel Troper : du droit musulman', in Mallat ed., *Dossier de Philosophie du Droit*, Beirut, Université Saint-Joseph, in *Travaux et Jours*, 2007, 191-203.

'Introduction', *Id.*, 123-24.

'On the specificity of Middle Eastern constitutionalism', *Case Western Journal of International Law,* 38, 2006, 13-57.

'Communitarian Federalism: Addressing the Middle East constitutional impasse', *Puente Europa* (Buenos Aires), 2, 2005, 59-61. Also in Spanish, 'Federalismo comunitario: sobre la impasse constitucional de Medio Oriente', *idem,* 37-42.

'From Islamic to Middle Eastern law; a Restatement of the field', *American Journal of Comparative Law*, 2003:4, Part 1, 699-750, Part 2, 2004:1, 209-286

'Federalism in the Middle East and Europe', *Case Western Journal of International Law*, 35, 2003, 1-15.

'Special Dossier on the 'Sabra and Shatila' case in Belgium- Introduction: New Lights on the Sharon case', *The Palestine Yearbook of International Law*, 12, 2002-2003, 183-190.

'Pour un changement de paradigme dans la pensée américaine: Réponse à 'la Lettre des intellectuels américains', *Travaux et Jours*, 73, 2004, 115-145 (also published in English as 'The need for a paradigm shift in American thinking: Middle eastern responses to 'what we are fighting for'', in John Borneman ed., *The Case of Ariel Sharon and the Fate of Universal Jurisdiction*, Princeton Institute for International and Regional Studies, 2, 2004, 150-175, and in David Blankenhorn et al. eds, *The Islam/West Debate*, Rowman and Littlefield, Lanham Maryland 2005, 215-237; and in Arabic in *Nahar*, part 1, 20 January 2003; part 2, 27 January 2003.)

''Democracy as unwavering principle': World wars and failed promises', Contribution to the 'Global Progressive Forum', Brussels 27-29 November 2003

'Renforcer la Société Civile contre l'Etat: Horizons du travail international au Proche et Moyen Orient,' commentaire sur le Rapport de la Banque Mondiale sur la Gouvernance au Proche et Moyen Orient (Etats PMO, MENA countries), 2003, Paris, Beyrouth, Washington, Rabat, 21 Novembre 2003

'Peine de mort: présentation du dossier', *Travaux et Jours*, 2003, 157-168.

'September 11 and the Middle East: Footnote or watershed in world history ?', *Crimes of War Project*, September 2002 (Special issue on September 11, a year after), www.crimesofwar.org

'The original sin: 'Terrorism' or 'crime against humanity' ?', *Case Western Journal of International Law*, 34, 2002, 245-248.

'The search for equality in Middle Eastern family law', *al-Abhath* (American University of Beirut), 48-49, 2000-2001, 7-63.

'Union Européenne et devenirs nationaux: un regard libanais', *Travaux et Jours*, 67, 2001, 91-108.

'Commercial law in the Middle East between classical transactions and modern business', *American Journal of Comparative Law*, 2000, 81-141.

'The Syrian-Israeli boundaries in international law', *al-Nahar*, Beirut, Arabic version in full, 20 July 2000. Original French version, 'Les frontières syro-israéliennes en droit international', in *Conférences du Cedroma*, Bruxelles, Bruylant, 69-83. Shorter English version in the *Daily Star,* 20 July 2000.

'Non-violence et Etat de droit', *Travaux et Jours* (USJ, Beirut), 64, 1999, 29-41. (Also published in English, 'Non-violence and the rule of law', in Thomas Scheffler ed., *Religion between violence and reconciliation*, Beirut 2002, 419-31, and in Arabic)

'Islamic law research in the twentieth-century Middle East', *Asian Research Trends* (Tokyo), 8, 1998, 109-136.

'L'état de la recherche en droit musulman au Moyen-Orient', *Travaux et Jours* (USJ, Beirut), 61, 1998, 231-260.

'Country survey: Lebanon', *Yearbook of Islamic and Middle Eastern law, 1997-98,* 297-302.

'Khatami - a man amidst the waves', *The Daily Star* (Beirut, 23-28 June 1997, in six parts).

'The Lebanese legal system', *The Lebanon Report* (Beirut), 2, 1997, 29-36, with 'bibliographical essay' at 42-45.

'A comparative critique of the arbitration process in the Arab world', *Revue Libanaise de l'Arbitrage Arabe et International* (Beirut), 3, 1997, 5-7.

'Country survey: Lebanon', *Yearbook of Islamic and Middle Eastern law, 1996,* 221-241.

'Country survey: Lebanon', *Yearbook of Islamic and Middle Eastern law, 1995,* 163-182.

'Islamic law: Reflections on the present state of western research', *al-Abhath* (American University of Beirut), 43, 1995, 3-24.

'Thinking together the Gulf crisis and the Arab-Israeli conflict', Paper prepared for the American Society of International Law Annual Meeting, New York 4-8 April 1995. Serialised in Arabic in *al-Hayat,* May 1995.

'Recent judgments from the Yemen Supreme Court', *Islamic Law and Society,* 2:1, 1995, 71-90.

'Preface' (with E. Cotran), *Yearbook of Islamic and Middle Eastern law,* 1994, xi-xiii.

'Country survey: Lebanon', Id., 204-224.

'The search for law and stability in Iraq', *Orient*, 2/1994, 194-215.

'Droit comparé au 18ème siècle: Influences françaises sur la common law', *Revue Historique de Droit Français et Etranger*, 3/1994, 383-400.

'Readings of the Qur'an in Najaf and London: John Wansbrough and Muhammad Baqir al-Sadr', *Bulletin of the School of Oriental and African Studies*, 57:1, 1994, 158-173.

'International law and Iraq: the Safe Haven imperative', *The Brown Journal of World Affairs*, 1:2, 1994, 261-70.

'Muhammad Bahr al-'Ulum', *Orient*, 3/93, 342-345.

'The Middle East Peace Process: Those the Conference leaves out', lecture at the Centre for Near and Middle Eastern Studies, SOAS, 18 February 1992, publication in Arabic as ''*Amaliyyat al-salam fil-sharq al-awsat* (The Middle East peace process)' , in two parts, *al-Hayat*, 15-16 May 1993.

'*Tadhlil al-'aqabat min tariq al-masar al-dimukrati fil-'iraq* (Removing obstacles on the way to democracy in Iraq)', *al-Hayat*, 6 parts, 23-28 November 1992

'*Al-Mu'tamar al-duwali bayn al-huquq al-filistiniyya wal-atma' al-isra'iliyya*' (The International Conference between Palestinian rights and Israeli ambitions), *al-Bahith al-'Arabi* (London, in Arabic), April-June 1991, 20-29.

'Orientalism in a modern guise: a critique of *From Beirut to Jerusalem*', *Arab Affairs*, Summer 1990, 51-62.

'*Fin-nazariyya ad-dusturiyya al-amirkiyya al-mu'asira: Robert Bork wa John Hart Ely*' (On contemporary American constitutional law: Robert Bork and John Hart Ely), *Proche-Orient Etudes Juridiques* (Beirut, in Arabic), 1987 [published 1989], 9-26.

'Un envers juridique de Robert Bork: John Hart Ely', *Proche-Orient Etudes Juridiques*, 1987 [published 1989], 31-41.

'Religious militancy in contemporary Iraq: Muhammad Baqer as-Sadr and the Sunni-Shi'a paradigm', *Third World Quarterly*, Spring 1988, 699-729.

'Le Féminisme islamique de Bint al-Houdâ', *Maghreb-Machrek*, Paris, June 1987, 45-58.

'A l'origine de la guerre Iran-Irak: l'axe Najaf-Teheran', *Les Cahiers de l'Orient*, Paris, Autumn 1986, 119-136.

## 2. In collective books

'A Middle Eastern tradition', in Peter Cane et al. eds, *Oxford handbook of comparative administrative law*, Oxford, OUP 2021, 97-116.

'Introduction', in Jihad Yazigi ed., *Syria's security sector: A Legal handbook*, Beirut, The Syria Report 2019, 11-20.

'Breaks and continuities in Middle Eastern law- Women after the 2011 Revolution', in Nadjma Yassari ed., *Changing God's law: The Dynamics of Middle Eastern family law,* UK, Ashgate, 2017, 17-33

'From Amnesty International to Right to Nonviolence: Theory and practice in the Arab Spring context', in Muriel Schmid ed, *Religion, conflict, and peacemaking. An interdisciplinary conversation,* Salt Lake City, University of Utah Press 2017, 115-27.

'Préface et mise en perspective,' Muhammad Baqir al-Sadr, *La Banque sans intérêt en Islam,* tr. by Julien Pélissier, Paris, Karthala, 2017, 11-25..

'The background to civil resistance in the Middle East' (with Edward Mortimer), in Adam Roberts, Michael Willis, Rory McCarthy and Timothy Garton Ash eds., *Civil resistance in the Arab Spring*, Oxford, OUP, 2016, 1-29.

'Préface' to Antoine Charif Sfeir, *Genèse du Liban moderne* Paris, Riveneuve, 2013, 7-9.

'Des relations privilégiées entre l'Union Européenne et les pays voisins: Les promesses de l'Art. 8 du Traité de Lisbonne', *Réalisations et Défis de l'Union Européenne, Mélanges en hommage à Panayotis Soldatos*, Brussels, Bruylant 2012, 539-56.

'Islam and the constitutional order', in Michel Rosenfeld and Andras Sajo eds, *Oxford Handbook of comparative constitutional law,* Oxford University Press, 2012, 1287-1303 (Also in Japanese, published 2011 tr. and ed. Makoto Mizutani)

'Constitutions for the twenty-first century. Emerging patterns—The EU, Iraq, Afghanistan', in Peri Berman, Wolfhart Heinrichs, Bernie Weiss eds., *The Law applied: Contextualizing the Islamic shari'a*, I.B. Tauris, London, 2008, 194-215. 2004 Herbert Bernstein lecture also published in 1 Duke L. CICLOPs 41 (2009)

'On the philosophy of Islamic law', in Mallat, Chibli, and Tramontini, Leslie, eds., *From Baghdad to Beirut: Festschrift in honor of John Donohue*, German Orient Institute, Beirut 2007, 57-70.

'Shaping the future- John Donohue's living legacy', *Id.*, 7-11.

'Comparative law and the Islamic (Middle Eastern) legal culture', in Mathias Reimann and Reinhard Zimmermann eds., *Oxford handbook of comparative law*, OUP, 2006, 609-639. Paperback 2008. (Tr. in Arabic, Beirut 2011)

'Retour sur un monument législatif : la Majalla ottomane', in *Le Droit en Mouvement- Mélanges en Hommage à Méliné Topakian*, Beirut, PUSJ, 2005, 187-206.

'Démocratie au Moyen-Orient: un parcours personnel, 2004', in EU Commission, *Dialogue between peoples and cultures: Actors in the dialogue,* Brussels 2005, 130-69.

'Preface', in Sélim Abou, *Freedoms: Cultural Roots of the Cedar Revolution* (translated by Chibli Mallat), Beirut, Presses de l'Université Saint Joseph, 2005, 4-14.

'Accountability in the Middle East: The Sharon case polysemy', in John Borneman ed., *The Case of Ariel Sharon and the Fate of Universal Jurisdiction*, Princeton Institute for International and Regional Studies, 2, 2004, 31-53.

'Présentation: in Medias Res', in Mallat ed., *L'Union Européenne et le Moyen-Orient: Etat des Lieux,* Beirut 2004, 11-12.

'Du fait religieux dans les institutions', id., 83-95.

'Joint ventures', in R. Naser and T. Kashishian eds., *Lebanon and Europe: Forging New Partnerships,* Beirut, 1998, 29-37.

'Etat de la recherche en droit de la Méditerranée musulmane', in R. Ilbert, R. Deguilhem eds, *Individu et Société dans le Monde Méditerranéen Musulman: Questions et Sources,* Aix, 1998, 25-46.

'A comparative note on the judicial protection of basic rights', in Eugene Cotran and Adel Omar Sharif eds., The *role of the judiciary in the protection of human rights*, CIMEL book series 5, London 1997, 393-99.

'Comparative models of freedom of trade: the hurdle of Lebanese sole agency', in Shahin W. and Shehadi K. eds., *Pathways to Integration*. Beirut, 209-228.

'Tantawi on banking', in Masud, Messick and Powers eds., *Islamic Legal Interpretation: Muftis and their Fatwas*, Harvard UP, 1996, 286-296.

'Preface' (with E. Cotran), *The Arab-Israeli Accords: Legal Perspectives*, 1996, xix-xxiv.

'Introduction' (with H. Lewis-Ruttley), in H. Lewis-Ruttley and C. Mallat eds., *Commercial law in the Middle East*, Graham and Trotman, 1995, 1-28.

'A critical note on compensation: The view from Iraq', Id., 377-388.

'Introduction' (with J.A. Allan), in J.A. Allan and C. Mallat eds., *Water in the Middle East: Legal, Political and Commercial Implications*, British Academic Press, 1995, 1-18.

'The quest for water use principles: Reflections on *shari'a* and custom in the Middle East', Id., 127-137.

'Muhammad Baqer as-Sadr', in A. Rahnema ed., *Pioneers of Islamic Revival*, Zed Press, 1994, 251-272.

'Law and the Nile river: Emerging international rules and the *shari'a*', in J. A. Allan and P. Howell eds., *The Nile: Sharing a Scarce Resource*, Cambridge University Press, 1994, 365-384.

'*Madkhal ilal-adab al-saghir: al-mujtama' al-madani, Huquq al-aqalliyyat wath-thaqafa fil-mashriq* (Introduction to littérature mineure: Civil society, minority rights and culture in the Mashreq)', in A. al-Na'im ed., *Al-ab'ad ath-thaqafiyya li-huquq al-insan fil-watan al-'arabi* (Cultural perspectives on human rights in the Arab world), Cairo, 1993, 453-489.

'Obstacles to democratization in Iraq: A reading of post-revolutionary Iraqi history through the Gulf War', in E. Goldberg, R. Kasaba and J. Migdal eds., *Rules and rights in the Middle East: Democracy, law and society,* University of Washington Press, Seattle, 1993, 224-247.

'Voices of opposition: The International Committee for a Free Iraq', in Id., 174-187.

'Introduction: on Islam and democracy' in C. Mallat ed., *Islam and public law,* Graham and Trotman, 1993, 1-15.

'The Shi'a', in R. Tapper ed., *Some minorities in the Middle East,* Report to the Foreign and Commonwealth Office, SOAS, London, March 1992, 6-11.

'Human rights in the Middle East: an overview', in G. Nonneman ed., *The Middle East and Europe,* Report for the EC Commission, Federal Trust for Education and Research, London, 1992, 239-244.

'The Middle East', in N. Yasuda ed., *Introduction to the law of Third World development*, Institute of Developing Economies, Tokyo, 1992, 99-126. (in Japanese, abridged from original English ca. 45 pp.)

'Introduction' in Mallat and Connors eds, *Islamic Family law*, 1-8.

'Sunnism and Shi'ism in Iraq: Revisiting the codes', in Id., 71-91. Also in *Arab Law Quarterly*, 1993.

'Preface', in Mallat ed., *Islamic law and Finance*, ix-xiv.

'The debate on *riba* and interest in twentieth-century jurisprudence', in Id., 69-88.

'Iraq', in Shireen Hunter ed., *The Politics of Islamic Revivalism: Diversity and Unity,* Center for Strategic and International Studies and Indiana University Press, 1988, 71-87.

**Separate papers and booklets**

Protecting the rights of women in the Escwa region *through the proper use of UN resolutions and international protocols on war and armed conflict*, UNHCR and ESCWA publications, E/ESCWA/ECW/2009/1, 22 July 2009, 58 pp.

'The Middle East in the 21st century: an agenda for reform', SOAS, 22 October 1996.

'A policy for Iraq', prepared for and presented at the Council on Foreign Relations, New York, 18 October 1996, 20 pp.

'Constitutional law in the Middle East: The emergence of judicial power', SOAS Law Department Working Paper, February 1993, 34pp (newer version in *Yearbook of Islamic and Middle Eastern law, 1994,* 85-108).

'The Iraqi opposition: a dossier', SOAS, February 15, 1991, ca 50pp.

'A new Constitution for Lebanon: Examining the ways to institutional normalization', prepared for the Carter Center Consultation on Lebanon, Atlanta, 27-28 November 1990, 20pp.

'The Third Stage of Zionism: High technology in Israel' (with A. Kadifa), Occasional Paper 1, Centre of Near and Middle Eastern Studies, SOAS, May 1988, 46pp.

'Shi'i thought from the South of Lebanon', Papers on Lebanon 7, Centre for Lebanese Studies, Oxford, April 1988, 42pp.

'The Middle East: Perspectives on an International Conference', Middle East Situation Papers 4, Centre of Near and Middle Eastern Studies, SOAS, May 1987, 12pp.

**Entries in Encyclopaedias**

'Islamic law in Arab Countries', 'Commercial law: Islamic law (Modern)', 'Contract: Contracts and Unilateral Acts in Islamic law ', 'International law: Islamic Public law', 'Constitutional law: Constitutions and Constitutional law in Islamic law: Overview and The Arab Countries', Entries in Stanley Katz general ed., Baber Johansen, ME and Islam ed., *The Encyclopedia of Legal History*, Oxford UP 2009

'Attorney', entry in *Encyclopaedia of Islam 3d ed.*, 2008

 'Islamic Legal Theory- Introducing *usul al-fiqh*', entry in *IVR Encyclopaedia of Legal Theory and Philosophy of law*, online 2005, online and print, 2018.

 'Muhammad Baqer al-Sadr', 'Iraq', 'Contracts', entries in *Encyclopaedia of the Modern Islamic World*, Oxford University Press, 1995.

'The *shari'a*', entry in *Oxford Companion to World Politics*, Oxford University Press, New York, 1993.

**Book reviews**

*The American Journal of Comparative Law; Islamic Law and Society; Bulletin of the School of Oriental and African Studies; International Affairs; Middle East Journal; Middle East Reports; Times Higher Educational Supplement; Third World Quarterly; Maghreb-Machrek, al-Hayat,* and other publications.

## EDUCATION and LANGUAGES

University of London, School of Oriental and African Studies, Law Department Ph.D.in Islamic Law, 1990.

Georgetown University Law Center, Washington D.C.
L.L.M. in International and Comparative Law, 1983.

Université Saint-Joseph, Beirut,
Licence in Lebanese Law, 1982.
Maitrise in French Public Law, 1982.

Beirut University College,
B.A. in English Literature, interrupted in Senior year by the 1982 war (Dean's list).

French Baccalauréat, Paris, June 1977 (Mention Bien).
Lebanese Baccalauréat, Beirut, September 1977 (Best grades in Lebanon among 4,000 candidates).

Shakespearean Studies Scholarship, Stratford-on-Avon, England, 1981.
Latin-American and Spanish Civilization studies, Salamanca, Spain, 1980.
German language scholarship, Goethe Institut, Konstanz, Germany, 1979.

Fluency in Arabic, English, French, Spanish, German.
Working knowledge in Italian, Persian, Judeao-Arabic.
Basic study of Indonesian, Russian, Akkadian, Latin, Turkish.