# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| DR. SAAD ALJABRI,<br><br>　　　Plaintiff,<br><br>　　v.<br><br>MOHAMMED BIN SALMAN BIN<br>ABDULAZIZ AL SAUD, *et al*.<br><br>　　　Defendants. | Civil Action No. 1:20-cv-02146-TJK |

**DECLARATION OF DR. BETH VAN SCHAACK**

I, Dr. Beth Van Schaack, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

**I.      Expert Qualifications.**

1.      My name is Dr. Beth Van Schaack.  I am the Leah Kaplan Visiting Professor of Human Rights at Stanford Law School and a Faculty Fellow with Stanford's Center for Human Rights & International Justice.  I teach and write in the areas of international human rights, international criminal law, the law of armed conflict, transitional justice, and human trafficking, among other subjects.  I have also been the Acting Director of the Human Rights & Conflict Resolution Clinic at Stanford Law School.

2.      From 2012 to 2013, I served as Deputy to the Ambassador at Large for War Crimes Issues in the Office of Global Criminal Justice of the U.S. State Department.  In that capacity, I advised the Secretary of State and the Under Secretary for Civilian Security, Democracy, and Human Rights on the formulation of U.S. policy regarding the prevention of and accountability for mass atrocities, such as war crimes, crimes against humanity, and genocide.  This involved

1

extensive work within Executive branch agencies and multilateral spheres to coordinate the deployment of a range of diplomatic, legal, economic, military, and intelligence tools to deter atrocities and build the rule of law.  As the Office of Global Criminal Justice is also the main point of contact between the U.S. Government and various international justice efforts proceeding in the United Nations, in international and domestic tribunals, and in transitional states, I closely monitored international law jurisprudence to help frame U.S. policy toward these endeavors.

3.      Prior to my State Department appointment, I was a Full Professor at Santa Clara University School of Law where I taught a range of international law courses plus civil procedure and business organizations.  I have also been a practicing lawyer with the Center for Justice & Accountability (an international human rights organization) and Morrison & Foerster LLP.  I began my legal career with the Office of the Prosecutor of the International Criminal Tribunals for the former Yugoslavia and Rwanda established by the U.N. Security Council in the mid-1990s.

4.      I have degrees from Stanford (BA), Yale (JD) and Leiden (PhD) Universities.  I received my doctorate in international criminal law.  My thesis was published by Oxford University Press.  I have also produced two leading casebooks on international criminal law: INTERNATIONAL CRIMINAL LAW & ITS ENFORCEMENT (with Ronald C. Slye) (West Academic Press 2020) and INTERNATIONAL CRIMINAL LAW: INTERSECTIONS & CONTRADICTIONS (with Ronald C. Slye) (Foundation Press 2021).  I have appended my *Curriculum Vitae* to this report as Appendix 1.

## II.    Summary of Conclusions.

5.      I was asked to opine upon the concept of attempt under international law.  Attempt is a punishable offense and cause of action in all sources of international law enumerated in Article 38 of the Statute of the International Court of Justice: customary international law (as reflected in

state practice and *opinio juris*), treaty law (including treaties ratified by the United States and incorporated into U.S. domestic law), general principles of law, and international jurisprudence (reflecting both international custom and general principles).[1]   Together, these sources of law confirm the long-standing existence of the concept of attempt liability under the law of nations, including with respect to extrajudicial killings.  Indeed, when international law prohibits certain conduct, it also extends responsibility to those who would attempt to violate such proscriptions.  Accordingly, multilateral treaties defining international offenses oblige states parties to codify prohibitions against attempt to the same degree as consummated offenses.  Relying upon these uniform sources, international and domestic tribunals adjudicating international law—including cases of extrajudicial killing—have arrived at a consistent articulation of the elements of attempt liability.  As pronounced by these various legal systems and sources of international law, the concept of attempt is thus well defined under international law.

6.     In producing this expert report, I have relied upon established scholarly sources of international law: international legal instruments (including multilateral treaties and declarations emanating from United Nations entities and experts), international and domestic jurisprudence concerned with the adjudication of international offenses and attempts to commit such offenses, comparative domestic law as indicative of state practice and general principles of law, and academic literature produced by reputable scholars.

---

[1] Statute of the International Court of Justice art. 38, June 26, 1945, 59 Stat. 1005; *see also* Restatement (Third) of Foreign Relations § 102 (1987). U.S. courts routinely look to Article 38 to identify sources of international law.  *See, e.g.*, *United States v. Yousef*, 327 F.3d 56, 100-01 (2d Cir. 2003); *U.S. v. Mohammad*, 398 F. Supp. 3d 1233, 1242 & n.9 (U.S.C.M.C.R. 2019) (identifying Article 38 of the ICJ Statute as an authoritative statement of the sources of international law).

### III.     International Law Prohibits the Attempt to Commit International Offenses.

7.      Attempt doctrines are inherent to all mature legal systems, including international law.  This is for good reason.  Such doctrines contribute to the prevention of the commission of international offenses by enabling the adjudication of preparatory acts undertaken with the intention of committing harmful conduct.[2]  In addition, the concept of attempt reflects the fact that individuals who are intent on committing an international offense, but who are thwarted by circumstances beyond their control, still constitute a threat to society and should be subject to sanction.[3]  Finally, attempts can be independently harmful to the intended victims, who must contend with the experience of having been a target, escaping injury only because the perpetrator was somehow impeded.  To adopt a contrary approach would be anomalous: individuals should not go unpunished if, after undertaking to commit an offense, they are thwarted by circumstances independent of their will to proceed.  Indeed, in many legal systems around the world, attempt is, in essence, a lesser included offense to the primary offense that can be charged where the *actus reus* is not consummated due to factors outside of the control of the defendant.[4]  Attempt doctrines are thus concerned with ensuring the law can address those actors with unmistakably dangerous propensities as well as contribute to the imperative of prevention.

8.      Because there is no world legislature, international law finds expression in several different sources, including customary international law (which consists of state practice

---

[2] *See* Herbert Wechsler, et al., *The Treatment of Inchoate Crimes in the Model Penal Code of the American Law Institute: Attempt, Solicitation, and Conspiracy*, 61 COLUM. L. REV. 571, 572-3 (1961) (discussing rationale for attempt and other inchoate crimes doctrines).

[3] *See* Jérôme de Hemptinne, *Attempt, in* MODES OF LIAB. IN INT'L CRIM. L. 339, 339-40 (Jérôme de Hemptinne et al. eds., 2019). [4] *See, e.g.*, *United States v. Keenan*, 39 C.M.R. 108, 111, 113 (1969) (noting that attempted murder is a lesser included offense in war crimes trial from the Vietnam era).

[4] *See, e.g.*, *United States v. Keenan*, 39 C.M.R. 108, 111, 113 (1969) (noting that attempted murder is a lesser included offense in war crimes trial from the Vietnam era).

undertaken out of a sense of legal obligation or entitlement), treaty law, and general principles of law gleaned from the world's major legal systems.  Jurisprudence and scholarly research offer subsidiary means of determining the content of customary international law, the interpretation of treaty law, and applicable general principles of law.[5]  As detailed below, attempt doctrines find expression in all relevant sources of international law, indicating that states are entitled to adjudicate the attempt to commit international crimes under their operative legal frameworks.  Furthermore, when international law prohibits harmful conduct, it also prohibits attempts to commit such conduct; as such, states are obliged to prohibit completed offense and attempts in equal measure.

### A.      Customary International Law Recognizes Attempt Liability for Unlawful Conduct.

9.      Customary international law[6] results from a general and consistent practice of states[7] undertaken on the basis of the recognition of an international legal right or obligation (*opinio juris*).[8]  Decisions of international courts and tribunals and academic opinions constitute

---

[5] *See* Restatement (Third) Foreign Relations Law of the United States § 103(2) (prescribing that "substantial weight is accorded" to judicial tribunals and the writings of scholars in determination of whether a rule has become international law); *United States v. Smith*, 18 U.S. 153, 160-61 (1820) (Story, J.) (noting that U.S. courts can identify the law of nations by "consulting the works of jurists writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognising and enforcing that law").

[6] The International Law Commission (ILC) has been engaged in a process of identifying a methodology for identifying customary international law.  *See generally* Int'l Law Comm'n, Draft Conclusions on Identification of Customary International Law, with Commentaries, Seventieth Session, U.N. Doc. A/73/10 (2018) ("ILC CIL Conclusions").  The ILC is a subsidiary body of the General Assembly charged with codifying international law.  G.A. Res. 174 (II), Establishment of an International Law Commission (Nov. 21, 1947).

[7] The ILC has indicated that for a practice to be general, it must be "sufficiently widespread and representative, as well as consistent."  ILC CIL Conclusions, *supra* note 6, at 120.

[8] To establish *opinio juris*, the practice must be undertaken out of a sense of legal obligation, which can be evidenced by, for example, "public statements made on behalf of States; official publications; government legal opinions; diplomatic correspondence; decisions of national courts; treaty provisions; and conduct in connection with resolutions adopted by an international organization or at an intergovernmental conference."  ILC CIL Conclusions, *supra* note 6, at 120.

subsidiary means of identifying rules of customary international law.[9]  U.S. courts have adopted

this methodology for identifying customary international law.[10]  The D.C. Circuit often defines

customary international law as "law 'made over time by widespread practice of governments

acting from a sense of legal obligation,' and 'gradually ripening into a rule of international law.'"[11]

Judges also conceptualize customary international law as a type of "international common law."[12]

10.     The practice of states—as reflected in their treaty-making practices, controlling

executive acts, judicial pronouncements, and precepts of domestic law—reveals that attempt

liability is deeply embedded in customary international law.  Treaties aimed at suppressing

international offenses regularly prohibit attempts to commit the conduct in question within their

mandated enforcement regimes.  States have accordingly incorporated these prohibitions into their

domestic legal frameworks.[13]  As such, the domestic law on attempt is well established, both here

in the United States and across the consensus practices of states worldwide.[14]  In addition,

jurisprudence sheds light on the state of customary international law on attempt.  As early as the

---

[9] ILC CIL Conclusions, *supra* note 6, at 142.

[10] *See, e.g.*, *Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*, 743 F. Appx. 442, 449 (D.C. Cir. 2018) (noting that in addition to international agreements, "we give 'substantial weight' to the judgments and opinions of national and international judicial bodies, scholarly writings, and unchallenged governmental pronouncements that 'undertake to state a rule of international law.'" (quoting Restatement (Third) of Foreign Relations Law § 103(2) (Am. L. Inst. 1987)).

[11] *Mohammad*, 398 F. Supp. 3d at 1241 (quoting *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 42 (D.C. Cir. 2011), *vacated on other grounds*, 527 F. App'x 7 (D.C. Cir. 2013)); *see also The Paquete Habana*, 175 U.S. 677, 700 (1900) ("[W]here there is no treaty, and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of [c]ivilized nations; and, as evidence of these, to the works of jurists and commentators . . . .").

[12] *Al-Bihani v. Obama*, 619 F.3d 1, 17 (D.C. Cir. 2010) (*en banc*) (Kavanaugh, J., concurring).

[13] *Prosecutor v. Vasiljević*, Case No. IT-98-32-T, Judgment, ¶ 199 (Nov. 29, 2002) (noting that a prohibition can crystalize into customary international law once "a vast number of national jurisdictions have criminalised it or [it is contained within] a treaty provision which provides for its criminal punishment").

[14] *See generally* THE HANDBOOK OF COMPARATIVE CRIMINAL LAW (Kevin Jon Heller & Markus D. Dubber eds., 2011) (compiling attempt statutes worldwide).

post-World War II era Nuremberg proceedings, international tribunals with jurisdiction over these international offenses have consistently drawn upon customary international law to apply concepts of attempt liability to the parties who appear before them.[15]  In so doing, they have articulated consistent elements that must be proven by sufficient evidence for the pleading party to prevail. Each of these forms of state practice and accompanying evidence of *opinio juris* will be discussed in greater detail below.

**B.      All the Multilateral Treaties Devoted to Preventing and Punishing the Commission of International Offenses Explicitly Oblige State Parties to Punish Attempts.**

11.      The customary international law of attempt is reflected in a web of multilateral treaties that define and prohibit various international law offenses, oblige state parties to repress such violations within their domestic legal frameworks, and provide recompense to victims.[16] Multilateral treaties encompassing a broad range of international and transnational offenses— including narcotics trafficking, organized crime, human trafficking, the financing and commission of terrorism, genocide, torture, violations of the law of war, and corruption—all include provisions devoted to prohibiting attempts to commit the offense in question.[17]  The United States is a party

---

[15] *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 33 (D.C. Cir. 2011) ("[I]nternational tribunals mandated by their charter to apply only customary international law" are "important sources" for this analysis.).

[16] *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 256-57 (2d Cir. 2003) ("All treaties that have been ratified by at least two States provide some evidence of the custom and practice of nations. However, a treaty will only constitute sufficient proof of a norm of customary international law if an overwhelming majority of States have ratified the treaty, and those States uniformly and consistently act in accordance with its principles.  The evidentiary weight to be afforded to a given treaty varies greatly depending on (i) how many, and which, States have ratified the treaty, and (ii) the degree to which those States actually implement and abide by the principles set forth in the treaty." (emphases omitted)).  The ILC notes that "the fact that a rule is set forth in a number of treaties may, but does not necessarily, indicate that the treaty rule reflects a rule of customary international law."  ILC CIL Conclusions, *supra* note 6, at 121.

[17] *See, e.g.*, International Convention for the Protection of All Persons From Enforced Disappearance art. 6(1)(a), Dec. 20, 2006, 2716 U.N.T.S. 3; United Nations Convention against Corruption art. 23(1)(b)(ii), Oct. 31, 2003, 2349 U.N.T.S. 41; United Nations Convention against Transnational Organized Crime art. 6(1)(b)(ii), Nov. 15, 2000, T.I.A.S. No. 13127; Protocol to

to the majority of the treaties referenced (as is Saudi Arabia), without any reservations related to attempt liability.  As such, not only do these treaties demonstrate an international consensus around the cognizability and obligatory nature of attempt liability, but they also reflect the U.S. government's acceptance of this custom.

12.     By way of example, the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, with 170 state parties including the United States and Saudi Arabia, mandates that state parties prosecute attempts to commit torture.[18]  Other multilateral human rights treaties have similarly incorporated provisions prohibiting attempts to commit the international offense in question.[19]  The many terrorism treaties are in accord.[20]  The Convention

---

Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children art. 5(2)(a), supplementing the United Nations Convention against Transnational Organized Crime, Nov. 15, 2000, T.I.A.S. No. 13127; International Convention for the Suppression of the Financing of Terrorism art. 2(4), Dec. 9, 1999, T.I.A.S. No. 13075; International Convention for the Suppression of Terrorist Bombings art. 2(2)(a), Dec. 15, 1997, T.I.A.S. No. 02-726; United Nations Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances art. 3(c)(iv), Dec. 20, 1988, 1582 U.N.T.S. 95; Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment art. 4(1), Dec. 10, 1984, T.I.A.S. No 94-1120.1; Convention on the Prevention and Punishment of the Crime of Genocide art. III(d), Dec. 9, 1948, 78 U.N.T.S. 277.

[18] Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment art. 4, Dec. 10, 1984, T.I.A.S. No 94-1120.1; *see also* International Convention for the Protection of All Persons From Enforced Disappearance art. 6(1)(a), Dec. 20, 2006, 2716 U.N.T.S. 3.  The United States is not a party to this latter treaty, but for reasons unrelated to the forms of responsibility dictated.

[19] One of the first such treaties, the Convention on the Prevention and Punishment of the Crime of Genocide (1948), criminalized attempt to commit genocide.  Convention on the Prevention and Punishment of the Crime of Genocide art. 3(d), Dec. 9, 1948, 78 U.N.T.S. 278.  This treaty has attracted 152 state parties, including the United States and Saudi Arabia.  *See generally* Jens David Ohlin, *Attempt to Commit Genocide*, *in* THE UN GENOCIDE CONVENTION—A COMMENTARY 193 (Paola Gaeta ed., 2009); *Status of Treaty*, Convention on the Prevention and Punishment of the Crime of Genocide, UNITED NATIONS TREATY COLLECTION (as of June 6, 2021), https://treaties.un.org/Pages/ViewDetails.aspx?src=TREATY&mtdsg_no=IV-1&chapter=4.

[20] The International Convention for the Suppression of the Financing of Terrorism incorporates by reference prior multilateral terrorism treaties addressed to suppressing particular manifestations of terrorism in its Annex.  Individuals are in breach of the treaty if they attempt to commit any offense defined by the treaty, and state parties are equally obliged to punish attempts to finance terrorism.

on the Prevention and Punishment of Crimes Against Internationally Protected Persons, Including Diplomatic Agents is illustrative in prohibiting, and requiring state parties to penalize, the commission and attempt to commit the defined offense.[21]   The prohibition on attempted war crimes finds expression in international humanitarian law (or the law of armed conflict).   For example, the First Geneva Convention aims to protect members of the armed forces who are rendered *hors de combat* by illness or injury and indicates at Article 12 that "any attempts upon their lives, or violence to their persons, shall be strictly prohibited."[22]   The most recent codification exercise by the International Law Commission (ILC)—Draft Articles on Prevention and Punishment of Crimes Against Humanity—follows in lockstep with this long tradition in encompassing a provision condemning attempts to breach the treaty.   The Draft Articles thus contemplate states taking "the necessary measures" to ensure that committing or attempting to commit crimes against humanity,

---

International Convention for the Suppression of the Financing of Terrorism art. 2(4), Dec. 9, 1999, T.I.A.S. No. 13075; *see also* International Convention Against the Taking of Hostages art. 1(2), Dec. 17, 1979, T.I.A.S. No. 11081, 1316 U.N.T.S. 205 (obliging states to prohibit attempted hostage-taking).

[21] Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons, Including Diplomatic Agents art. 2, Dec. 14, 1973, 28 U.S.T. 1975, (prohibiting, and mandating the prosecution of the commission of, threats to commit, and attempts to commit, attacks on internationally protected persons given "their grave nature"); *see also* International Convention for the Suppression of Terrorist Bombings art. 2(2), Dec. 15, 1997, T.I.A.S. No. 02-726 ("Any person also commits an offence if that person attempts to commit an offense as set forth in paragraph 1.").   Both the United States and Saudi Arabia have ratified these treaties and others like them.

[22] Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field art. 12, Aug. 12, 1949, 75 U.N.T.S. 31.   The bulk of the Geneva Conventions (with the exception of Article 3, which is common to all four treaties) apply only in international armed conflicts.   *See also* Geneva Convention Relative to the Protection of Civilian Persons in Time of War art. 3(a), Aug. 12, 1949, 75 U.N.T.S. 287 (prohibiting "violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture" in non-international armed conflicts).

including through the responsibility of superiors, are actionable offenses within domestic law, guaranteeing victims "the right to obtain reparation for material and moral damages."[23]

13.     All these treaties oblige state parties to incorporate means of enforcement as appropriate to their particular legal systems.  The United States has ratified many of these treaties and has complied with this mandate by enacting implementing legislation in Title 18 and elsewhere.  Together, these treaties represent a crystallization of state practice and *opinio juris*, the two building blocks of customary international law, and carry particular weight in this instance given that they are well subscribed to by states representing different regions and legal traditions.

**C.     International Tribunals have Prosecuted Attempts to Commit International Crimes.**

14.     From at least the post-World War II era onward, states have empowered international tribunals to adjudicate attempted violations of international law.[24]  This includes military commissions convened by the victorious allies.[25]  Many of these tribunals have been obliged by their constitutive statutes to look to customary international law—"a general practice accepted as law"—to identify the elements of forms of responsibility like attempt.[26]  Through an

---

[23] Int'l Law Comm'n, Draft Articles on Prevention and Punishment of Crimes Against Humanity arts. 6, 12(3), Report on the Work of Its Seventy-first Session, U.N. Doc. A/74/10 (2019).

[24] *See* Trial of Gerhard Friedrich Ernst Flesch, SS OBE Strumbannführer, Oberregierungsrat, VI LAW REPORTS OF TRIALS OF WAR CRIMINALS, No. 36, at 120 (U.N. War Crimes Commission 1948) (reporting on case of attempted murder); *see also id.* at 109 n.1 (providing examples of national laws punishing attempts to commit war crimes to the same degree as completed acts).  To be sure, the Nuremberg Charter did not expressly mention attempt liability.  *See* Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis art. 6, Aug. 8, 1945, 59 Stat. 1544, 82 U.N.T.S. 279.  Acknowledging this, a subsequent tribunal noted: "yet surely it was not the intention … to eliminate attempts from international penal law."  IV LAW REPORTS, *supra*, at 109.

[25] *See* Trial of Gustav Becker, Wilhelm Weber and 18 Others, VII LAW REPORTS OF TRIALS OF WAR CRIMINALS 67, 73 (U.N. War Crimes Commission 1949) (reporting on war crimes trial for attempted illegal arrest and detention).

[26] Decisions of international courts, particularly those established by the U.N. Security Council, are recognized as authoritative sources of customary international law because their subject matter jurisdiction was limited to prohibitions that were beyond doubt part of customary international law. *See Exxon Mobil*, 654 F.3d at 30.

empirical examination of state practice backed by *opinio juris*, these tribunals have derived a stable set of standards that are employed to adjudicate attempt allegations.  As a result, jurisprudence has emerged attesting to the existence of attempt under customary international law and elucidating a stable set of standards for judicial application.[27]

15.     The original international tribunals adjudicated attempted murder in various ways, even though their constitutive statutes did not always expressly list attempt as a punishable form of responsibility for all offenses.  So, for example, the International Criminal Tribunal for the former Yugoslavia (ICTY), established by the U.N. Security Council, adjudicated cases of attempted murder under the residual provision allowing for the prosecution of "other inhumane acts"[28] so long as the conduct charged was of comparable seriousness, caused serious mental or physical suffering or injury, and was performed deliberately by the accused.[29]  In *Prosecutor v. Vasiljević*, the co-accused led seven men to a riverbank for execution; two survived.  Vasiljević

---

[27] The reason that the reported international attempt cases are not greater in number reflects practical realities, not doubt about whether customary international law prohibits attempt.  These tribunals were created to respond to the large-scale commission of international crimes that threaten international peace and security.  In addition, the tribunals usually operate well after the events that inspired them. Christoph Safferling, *The Demarcation Between Unpunished Preparation and Criminal Attempt in German, European and International Criminal Law*, 118(3) ZEITSCHRIFT FÜR DIE GESAMTE STRAFRECHTSWISSENSCHAFT 682, 707 (2006) ("The attempt to commit an international crime is a rare phenomenon in the history of international criminal justice; [a]t the same time, their punishment is considered desirable and required for the protection of human rights. . . .  Until now, in the absence of permanent international criminal jurisdiction, enforcement has been dependent on prosecution after the end of acts of war.") (author's translation on file with Plaintiff's counsel).  Limited resources have necessitated a focus on prosecuting the myriad of consummated offenses that the tribunals were established to address.  *See* GUÉNAËL METTRAUX, INTERNATIONAL CRIMES AND AD HOC TRIBUNALS 257 (2005) (noting limited prosecutorial resources within international tribunals as a reason charges of attempt are "unlikely" to be brought).

[28] *See* Statute of the International Criminal Tribunal for the Former Yugoslavia art. 5(i), May 25, 1993, as amended July 7, 2009.

[29] *Vasiljević*, Case No. IT-98-32-T, Judgment, ¶ 234 (noting that "inhumane acts" functions as "a residual category for serious charges which are not otherwise enumerated" within the Statute in a case involving an accused prosecuted for his participation in a joint criminal enterprise).

was convicted of attempted murder (as a war crime and crime against humanity) "pursuant to his participation in a joint criminal enterprise to murder them."[30]   The ICTY concluded that the attempted murder of the two survivors "constitute[d] a serious attack on their human dignity [that] caused [the survivors] immeasurable mental suffering . . . ."[31]  Similarly, in *Prosecutor v. Mrđa*, the accused was charged with participating in a death squad.[32]  Twelve of the would-be victims fell or jumped from the ravine where they had been assembled and escaped the executioner.[33]  The ICTY prosecuted the defendant for attempted murder, reasoning that although he was not an architect of the killings, his involvement in the attempted murders made the crimes charged especially serious.[34]  This jurisprudence thus makes clear that attempt can be charged when the intended harm is not consummated due to factors outside of the control of the defendant.

---

[30] *Vasiljević*, Case No. IT-98-32-T, Judgment, ¶ 239.

[31] *Id*.

[32] *Prosecutor v. Mrđa*, Case No. IT-02-59-S, Amended Indictment, ¶¶ 16-17 (Aug. 4, 2003).

[33] *Id.*; *Prosecutor v. Mrđa*, Case No. IT-02-59-S, Sentencing Judgment, ¶ 10 (Mar. 31, 2004); *see also Prosecutor v. Beqa Beqaj*, Case No. IT-03-66-T-R77, Judgement on Contempt Allegations, ¶ 25 (May 27, 2005) (discussing elements of attempt liability).

[34] *Mrđa*, Case No. IT-02-59-S, Sentencing Judgment, ¶ 31.  The International Criminal Tribunal for Rwanda ("ICTR") prosecuted attempted genocide.  In one case, where attempt liability was not at issue, a panel observed in *dicta* that the ICTR's Statute did not otherwise criminalize attempt.  *Prosecutor v. Akayesu*, Case No. ICTR-96-4-T, Judgement, ¶ 473 (Sept. 2, 1998); *Prosecutor v. Akayesu*, Case No. ICTR-96-4-I, Amended Indictment, at 5-7 (June 17, 1997) (charging the defendant with 15 counts, including genocide, incitement to commit and complicity in genocide, and murder, but no attempt crimes).  The panel did not apply customary international law in making that observation. Judgement, ¶ 473.  In contrast, the ICTY unambiguously imposed liability for an attempted killing.  *See supra* nn. 29-31 and accompanying text (*discussing Vasiljević*, Case No. IT-98-32-T, Judgment, ¶¶ 237-39).  The ICTY's decision—which necessarily found that attempt liability was "beyond any doubt customary law," *Prosecutor v. Tadic*, Case No. IT–94–1–T, Trial Chamber Opinion and Judgement, ¶ 662 (May 7, 1997) (quotation omitted)—reflects customary international law for attempt.  The ICTR was created after the genocide in Rwanda had concluded and was thus mandated by the Security Council to focus on the most egregious past and completed crimes.  The ICTR had no mandate or reason to interpret the customary international law of attempt.  By contrast, the ICTY was created before any lasting peace agreement had been concluded and while mass atrocities were still being planned, organized, attempted, and carried out on a daily basis.  *See* Ivan Simonovic, *The Role of the ICTY in the Development of International Criminal Adjudication*, 23 FORDHAM INT'L L. J. 440, 442-43

16.     The Special Tribunal for Lebanon, an international tribunal adjudicating Lebanese law, also recently convicted a defendant for attempted murder.[35]   It noted that the elements of attempted intentional homicide are: a preliminary physical action that marks the beginning of the crime's execution; the intent to commit the crime; and the absence of a voluntary abandonment of the offence before it is committed.[36]

17.     When states turned to the task of drafting an international penal code and establishing a permanent international criminal court in the 1990s, attempt liability featured prominently in the negotiating drafts.  This reflects the fact that the ILC considered attempts to commit international crimes to constitute threats to international peace and security. In this regard, the ILC noted:

> a high degree of culpability attaches to an individual who attempts to commit a crime and is unsuccessful only because of circumstances beyond his control rather than his own decision to abandon the criminal endeavor. . . .  [T]he fact that an individual has taken a significant step towards the completion of [an offense] entails a threat to international peace and security because of the very serious nature of these crimes.[37]

---

(1999).  As such, the ICTY sought to punish and deter continuing crimes (including attempted crimes) to the full extent contemplated by customary international law.  *Compare* S.C Res. 955 (Nov. 8, 1994) (the Security Council Resolution creating the ICTR and expressing "grave concern" about "violations of international humanitarian law that have been committed" and limiting ICTR to crimes "committed … between 1 January 1994 and 31 December 1994"), *with* S.C. Res. 827 (May 25, 1993) (the Security Council Resolution creating the ICTY and expressing "its grave alarm at continuing reports of widespread and flagrant violations of international humanitarian law occurring" and granting ICTY's open-ended mandate to prosecute crimes until "a date to be determined by the Security Council upon the restoration of peace").

[35] *Prosecutor v. Ayyash et al.*, Case No. STL-11-01/T/TC, Judgment, ¶ 6837 (Aug. 18, 2020).

[36] *Id*. ¶ 6314; *see also Prosecutor v. Ayyash*, Case No. STL-11-01/1/AC/R17bis, Interlocutory Decision on the Applicable Law: Terrorism, Conspiracy, Homicide, Perpetration, Cumulative Charging, ¶ 177 (Feb. 16, 2011).   Under Lebanese law, an attempt to commit an intentional homicide enjoys the same legal status as an intentional homicide, although the fact that the victim did not die may be addressed at sentencing.  *Ayyash et al.*, No. STL-11-01/T/TC, Judgment, ¶ 6311.

[37] Report of the International Law Commission on the Work of its Forty-Eighth Session, 6 May – 26 July 1996, U.N. Doc. A/51/10, art. 2(3)(g), ¶ 17 (1996).

As such, attempts were included within its Draft Code of Offenses against the Peace and Security

of Mankind, a precursor to the Rome Statute establishing the International Criminal Court (ICC).

18.     This concept was retained in the final text of the Rome Statute.  Article 25(3)(f)

thus applies attempt liability to all crimes within the ICC's jurisdiction:

> [A] person shall be criminally responsible and liable for punishment . . . if that
> person: . . . Attempts to commit [] a crime by taking action that commences its
> execution by means of a substantial step, but the crime does not occur because of
> circumstances independent of the person's intentions.  However, a person who
> abandons the effort to commit the crime or otherwise prevents the completion of
> the crime shall not be liable for punishment under this Statute for the attempt to
> commit that crime if that person completely and voluntarily gave up the criminal
> purpose.[38]

Because it was the product of inter-state negotiations and compromises, not all provisions of the

Rome Statute are considered to constitute customary international law.[39]  Nonetheless, Article

23(3)(f) is widely considered declaratory of customary international law.[40]  As states ratify the

Rome Statute, they incorporate these provisions into their domestic codes, including the provision

penalizing the attempt to commit international crimes.[41]  Notably, other international tribunals—

---

[38] Rome Statute of the International Criminal Court arts. 25(3)(f), July 17, 1998, 2187 U.N.T.S.
90.  Although the United States has not ratified the Rome Statute (primarily because it has
objections to the Court's personal jurisdiction framework), it was actively involved in the treaty's
negotiation, and the provisions addressed to prosecutable forms of responsibility, including
attempt liability, reflect U.S. standards.

[39] *See id*. at art. 10 ("Nothing in this Part shall be interpreted as limiting or prejudicing in any way
existing or developing rules of international law for purposes other than this Statute."); *Bahlul v.
United States*, 840 F.3d 757, 791-92 (D.C. Cir. 2016) (en banc) (Millet, J., concurring) (citing
codification within the Rome Statute as an indication that a norm has "settled roots in international
law"); *Mohammad*, 398 F. Supp.3d, at 1243-46 (summarizing debate over Rome Statute).

[40] Antonio Cassese, *Black Letter Lawyering v. Constructive Interpretation—The Vasiljević Case*,
2(1) J. INT'L CRIM. JUST. 265, 267 (2004) ("[I]n international criminal law, an attempt to commit
one of the crimes punished by law is criminalized.  One may hold the view that Article 25(3)(f) of
the ICC Statute is simply declaratory of customary international law.  This conclusion is, among
other things, borne out by national case law." (citations omitted)).

[41] *See, e.g.*, *Implementing the Rome Statute of the International Criminal Court*, CTR. FOR INT'L
L. RESEARCH AND POL'Y, at 55 (Sept. 2017) (highlighting Kenya's implementing legislation of the
attempt             provision             in             the             Rome             Statute),

see, for example, the Iraqi High Tribunal[42] and East Timor Special Panels[43]—featured a general attempt provision formulated along the lines of the Rome Statute.

19.     Pursuant to Article 23(3)(f), the ICC has adjudicated attempted murder in several proceedings before it.   Bosco Ntaganda, for example, was charged with, among other things, attempted murder as a crime against humanity and a war crime for attacks committed by his subordinates on civilians held as prisoners in his militia's camp.[44]   In convicting the defendant for multiple attempted murders perpetrated by forces under his control, an ICC Trial Chamber concluded that victims survived because of circumstances independent of the perpetrators' intentions.[45]   Germain Katanga was similarly charged with being a leader of a group of combatants engaged in a common plan to attack civilians.   An ICC Pre-Trial Chamber noted that Katanga's subordinates "commenced the execution of the conduct of killing civilians by means of a substantial step . . . but did not achieve the act because of circumstances independent of the perpetrator's intent."[46]   Finally, Laurent Gbagbo was charged with attempted murder as a crime against humanity on the theory that pro-Gbagbo forces under his control had attempted to kill the survivors, but "the fact that the death of the victims eventually did not occur was independent of

---

https://www.coalitionfortheicc.org/sites/default/files/cicc_documents/implementing_rome_statute.pdf.

[42] Iraqi Law of The Higher Criminal Court, Law No. 10, art. 15(2)(F) (Oct. 9, 2005), https://ihl-databases.icrc.org/applic/ihl/ihl-nat.nsf/0/62dfa419b75d039cc12576a1005fd6c1/$FILE/IST_statute_official_english.pdf.

[43] Regulation No. 2000/15 on the Establishment of Panels With Exclusive Jurisdiction Over Serious Criminal Offences, U.N. Doc. UNTAET/REG/2000/15, art. 14.3(f) (June 6, 2000), http://www.mj.gov.tl/jornal/lawsTL/UNTAET-Law/Regulations%20English/Reg2000-15.pdf.

[44] *Prosecutor v. Ntaganda*, Case No. ICC-01/04-02/06, Decision Pursuant to Article 61(7)(a) and (b) of the Rome Statute on the Charges of the Prosecutor Against Bosco Ntaganda, ¶¶ 97, 175 (June 9, 2014).

[45] *Prosecutor v. Ntaganda*, Case No. ICC-01/04-02/06, Judgment, ¶¶ 877-882 (July 8, 2019).

[46] *Prosecutor v. Katanga et al.*, Case No. ICC-01/04-01/07-717, Decision on the Confirmation of Charges, ¶ 458 (Sept. 30, 2008).

the perpetrators' intentions."[47]   In these cases, the ICC has noted the need to infer the intention to commit the predicate offense from available circumstantial evidence, such as the modalities of the attempted criminal act and the kinds of weaponry used.[48]

**D.   The Concept of Attempt Constitutes a General Principle of Law, Inherent to All Mature Legal Systems.**

20.     Attempt is a near-universal feature of domestic legal systems[49]—as either a separate mode of criminal liability (as is often the case in civil law jurisdictions) or a distinct inchoate offense (more common in common law jurisdictions)[50]—and thus constitutes a general principle of law within the meaning of Article 38 of the ICJ Statute.  General principles of law are an independent source of international law, but also undergird the state practice component of customary international law.[51]

21.     The constitutive elements of attempt are uniform across legal systems—both domestic and international—attesting to the specificity and universality of attempt doctrines under international law.  In general, attempt is defined in terms of the criminal intent (or mental state)

---

[47] *Prosecutor v. Gbagbo*, Case No. ICC-02/11-01/11-656-Red, Decision on the Confirmation of Charges against Laurent Gbagbo, ¶ 201 (June 12, 2014); *see also Prosecutor v. Blé Goudé*, Case No. ICC-02/11-02/11, Decision on the Confirmation of Charges against Charles Blé Goudé, ¶ 121 (Dec. 11, 2014) (same).

[48] *Blé Goudé*, Case No. ICC-02/11-02/11, ¶ 121.

[49] *See, e.g.*, ANTONIO CASSESE ET AL., CASSESE'S INTERNATIONAL CRIMINAL LAW 200 (2013); GUÉNAËL METTRAUX, 1 INTERNATIONAL CRIMES 331-32 (2019).

[50] Hemptinne, *supra* note 3, at 342.

[51] U.S. and international courts regularly rely on general principles of law to determine the content of international law.  *See Khulumani v. Barclay Nat. Bank Ltd.*, 504 F.3d 254, 267, 269 (2d Cir. 2007), *aff'd sub nom. Am. Isuzu Motors, Inc. v. Ntsebeza*, 553 U.S. 1028 (2008) (Katzmann, J., concurring); Oil Platforms (*Islamic Republic of Iran v. United States of America*), Separate Opinion of Judge Simma, 2003 I.C.J. Rep. 161, ¶¶ 66-74 (Nov. 6) (finding joint and several liability for multiple tortfeasors constitutes a general principle of law).  Resorting to general principles of law plays a gap-filling function to avoid a situation of *non liquet*.  *See generally* Alain Pellet, *Article 38*, *in* THE STATUTE OF THE INTERNATIONAL COURT OF JUSTICE: A COMMENTARY 731, 832-41, 850 (Andreas Zimmermann et al. eds., 2d ed. 2012); Catherine Redgwell, *General Principles of International Law*, *in* GENERAL PRINCIPLES OF LAW: EUROPEAN AND COMPARATIVE PERSPECTIVES 5, 7 (Stefan Vogenauer & Stephen Weatherill eds., 2017).

associated with the predicate offense coupled with an overt act or substantial step toward its completion.[52]

22.     In terms of the mental element, within most national legal systems, the *mens rea* required to prove an attempt is some version of the intent to accomplish the predicate act, where the offense is not completed due to reasons independent of the actor's state of mind.   The perpetrator must have intended the offense to occur (or the criminal result to have been achieved) and thus share the *mens rea* of those who have fully committed the offense.   In other words, "the attempt to commit a crime is a crime in which the objective elements are incomplete, while the subjective elements are complete."[53]

23.     When it comes to the material elements of attempt doctrines, for an actionable attempt to occur, it generally must be shown that the defendant has taken a "substantial step" toward the offense but that the offense was not consummated for reasons "independent of the perpetrator's intentions" or will.[54]   As such, it must be shown that the predicate offense was not committed or was frustrated due to external factors outside of the defendant's control.

24.     Many legal systems have adopted this substantial step requirement.   The commentary accompanying the Model Penal Code suggests some examples of conduct that are sufficient, but are not necessary, to constitute a substantial step: "lying in wait, searching for or following the contemplated victim of the crime;" enticing the victim to the contemplated place of

---

[52] *See* Charles Doyle, Congressional Research Service, Attempt: An Overview of Federal Criminal Law 3-7 (2020); *see also United States v. Hite*, 769 F.3d 1154, 1162 (D.C. Cir. 2014) ("At the time of the enactment of § 2422(b) in 1996, the general meaning of 'attempt' in federal criminal law was an action constituting a 'substantial step' towards commission of a crime and performed with the requisite criminal intent."); *Yousef*, 327 F.3d at 134 (adjudicating attempt to commit terrorism); *United States v. Farhane*, 634 F.3d 127, 145 (2d Cir. 2011) (same).
[53] *Prosecutor v. Katanga*, Case No. ICC-01/04-01/07, Decision on the Confirmation of Charges, ¶ 460 (Sept. 30, 2008).
[54] Hemptinne, *supra* note 3, at 346, 351.

the crime; "reconnoitering the place contemplated for the commission of the crime;" unlawful entry to the place of the crime; and possession of materials necessary for the crime's execution (particularly if they serve no lawful purpose under the circumstances).[55]  Jurisprudence suggests that "[t]he greater the harm of the completed offense, the farther from completion a substantial step will first be seen."[56]  Scholars have posited that when it comes to international crimes, given their extreme gravity, "the attempt threshold should not be set too high."[57]

25.     In addition to including attempt liability in their criminal codes, nation-states often provide civil remedies to victims of attempted harms through a variety of mechanisms: allowing civil compensation to victims of criminalized acts, using tort law to compensate for a range of non-pecuniary harm, and granting injunctive relief against tortious acts that threaten harm in the future.[58]  Additionally, states will expressly authorize civil suits to redress attempts of certain types of conduct where the traditional, harm-focused tort framework provides insufficient coverage.[59]  In civil law systems—as in continental Europe—victims are entitled to either commence or join

---

[55] MODEL PENAL CODE §5.01(2) (AM. LAW INST. 1985); *see also Ayyash*, Case No. STL-11-01/1/AC/R176bis, ¶ 178 (discussing the preparation of weapons and the surveillance of the target as substantial steps); *Ayyash*, Case No. STL-11-01/T/TC, ¶ 6323 (mentioning traveling with weapons to the location of the intended murder). International criminal law practitioners regularly look to the U.S. Model Penal Code. *See generally* Sarah Finnin, *Mental Elements under Article 30 of the Rome Statute of the International Criminal Court: A Comparative Analysis*, 61 INT'L & COMP. L. Q. 325 (2012) (discussing impact of the Model Penal Code on the ICC Statute).

[56] DOYLE, *supra* note 52, at 6.

[57] Kai Ambos, TREATISE ON INTERNATIONAL CRIMINAL LAW—VOLUME I: FOUNDATIONS AND GENERAL PART 255 (2013).

[58] *See* Hans Stoll, *Consequences of Liability: Remedies*, *in* 11 INTERNATIONAL ENCYCLOPEDIA OF COMPARATIVE LAW: TORTS 3, 37-44, 150 (André Tunc ed., 1986).

[59] *Cf., e.g.*, U.S. DEP'T OF JUSTICE, COMPETITION AND MONOPOLY: SINGLE-FIRM CONDUCT UNDER SECTION 2 OF THE SHERMAN ACT 6, 11 (2008) (walking through the U.S. prohibition on attempted monopolization and highlighting the role of private enforcement).

criminal suits as *parties civiles*.[60]   The primary remedy obtained is the punishment of the defendant, but victims may also seek civil reparations in connection with the criminal trial.[61]

### E. The Ability to Adjudicate Attempts to Commit International Crimes has been Part of U.S. Law since the Founding.

26.     To the extent that U.S. courts deem U.S. practice around the time of Congress's adoption of the Alien Tort Statute (ATS) to be relevant, that practice strongly supports the conclusion that attempts were recognized at the founding.  The concept of liability for attempts has long roots in Anglo-American common law; indeed, there is evidence of convictions for attempted homicide dating back to the reign of Edward III in the 1300s.[62]  Attempt liability existed well before its generalized application with respect to specific substantive offenses and was eventually codified into its modern, generally applicable form in the nineteenth century.[63]  Most importantly, the Crimes Act of 1790, which codified some of the earliest federal and international crimes, criminalized attempt in several contexts, including in attempts to commandeer a ship or otherwise participate in piracy.[64]  Thus, the Founders not only contemplated attempt liability but explicitly provided for it when addressing foundational international crimes like piracy.

---

[60] For a comparative discussion of civil remedies in criminal courts, see J.A. Jolowicz, *Procedural Questions*, *in* 11 INTERNATIONAL ENCYCLOPEDIA OF COMPARATIVE LAW: TORTS, § I (Civil Remedies in Criminal Courts) (André Tunc ed., 1986).

[61] *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 762-63 (2004) (Breyer, J. concurring) ("[T]he criminal courts of many nations combine civil and criminal proceedings, allowing those injured by criminal conduct to be represented, and to recover damages, in the criminal proceeding itself."); *Kiobel v. Royal Dutch Shell*, 569 U.S. 108, 137 (2013) (Breyer, J., concurring in the judgment) (noting that certain countries "permit private persons injured by [international law violations] to pursue '*actions civiles*,' seeking civil damages in the criminal proceeding").

[62] *See* Pasch. 15 Edw. II, 463 (1322) (in Corone 383); *see also* Francis Bowes Sayre, *Criminal Attempts*, 41 HARV. L. REV. 821, 825 & n.13 (1928) (discussing the aforementioned case).

[63] DOYLE, *supra* note 52, at 1-2.

[64] Crimes Act of 1790, ch. 9, § 12, 1 Stat. 112, https://www.loc.gov/law/help/statutes-at-large/1st-congress/session-2/c1s2ch9.pdf?loclr=bloglaw; *see also United States v. Kelly*, 24 U.S. 417, 418 (1826) (affirming conviction of seaman on a U.S. merchant vessel of endeavoring to revolt and overthrow the ship's commander).  U.S. law continues to define piracy with reference to the law

27.     Likewise, the Lieber Code, which governed the conduct of the Union forces during the Civil War, recognized the concept of attempt to treacherously injure the enemy.[65]  Over the years, U.S. courts subsequently adjudicated attempts to commit violations of the laws of war in a number of different contexts,[66] as discussed in William Winthrop's magisterial historical treatise on military law.[67]  Attempts by enemy combatants are thus punishable in the United States under the Military Commission Act (MCA), which accords military commission jurisdiction exclusively over extant violations of international humanitarian law (a.k.a. the law of armed conflict).[68]  In *Hamdan v. Rumsfeld*, the U.S. Supreme Court cited to *Ex Parte Quirin* and Winthrop's MILITARY LAW AND PRECEDENTS to note that military commissions have jurisdiction over "actual commission of or attempt to commit a 'hostile and warlike act.'"[69]  Accordingly, attempt charges have been levied in a number of high-profile military commission cases, including

---

of nations, and an attempt to corrupt a ship's commander remains specifically criminalized, now codified at 18 U.S.C. § 1657.  Likewise, U.S. law extended the rule to aircraft piracy.  *See* 18 U.S.C. § 46502(a) (criminalizing an attempt to commit aircraft piracy).

[65] *See* Instructions for the Government of Armies of the United States in the Field, General Orders No. 100 arts. 100-101(April 24, 1863); *Ex parte Quirin*, 317 U.S. 1, 31 n.10 (1942) (citing Civil War-era cases involving attempts to violate the laws of war).

[66] *See Quirin*, 317 U.S. at 22-23 (noting ability under international law to charge individuals with attempting to commit sabotage, espionage, hostile acts, or violations of the law of war).  Some of these cases involved a blend of U.S. martial law and international humanitarian law (or the law of armed conflict), as noted by the D.C. Circuit.  *See Bahlul v. United States*, 767 F.3d 1, 43 (D.C. Cir. 2014).

[67] WILLIAM WINTHROP, II MILITARY LAW AND PRECEDENTS 839 (Beard Books 2d ed. 2000) (1886) (listing offenses tried by military commission in their commission or attempt); *id*. at 841 ("the jurisdiction of the military commission should be restricted to cases of offence consisting in *overt acts*, *i.e.* in unlawful commissions or actual attempts to commit") (emphasis in original); *see also Bahlul*, 767 F.3d at 45 (citing this passage in Winthrop).

[68] 10 U.S.C. § 948a *et seq*.; 10 U.S.C. § 950p(d) ("The provisions of this subchapter codify offenses that have traditionally been triable by military commissions.  This chapter does not establish new crimes that did not exist before the date of enactment, . . . but rather codifies those crimes for trial by military commission.").

[69] 548 U.S. 557, 606-07 (2006) (plurality op.) (citation omitted); *id*. at 604 ("[I]t is not enough to intend to violate the laws of war . . . unless the overt acts either are themselves offenses against the law of war or constitute steps sufficiently substantial to qualify as an attempt.").

against Canadian citizen Omar Khadr, who was charged under the MCA with attempted murder in violation of the laws of war.[70]  The military law governing U.S. service members is in accord.[71]

28.     By the mid-20th century, the American Law Institute's Model Penal Code suggested a framework for criminalizing attempt:

> A person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for commission of the crime, he:
>
>> (a)   purposely engages in conduct that would constitute the crime if the attendant circumstances were as he believes them to be; or
>>
>> (b)   when causing a particular result is an element of the crime, does or omits to do anything with the purpose of causing or with the belief that it will cause such result without further conduct on his part; or
>>
>> (c)   purposely does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.[72]

The majority of U.S. states have adopted this general formulation into their criminal codes.[73]

## IV.   International Law Prohibits Attempted Extrajudicial Killing.

29.     It is axiomatic that customary international law prohibits extrajudicial killing; as such, it also prohibits the attempt to commit an extrajudicial killing.[74]  Although there is no treaty

---

[70]   Khadr ultimately pled guilty.  *See United States v. Khadr*, 717 F. Supp. 2d 1215, 1219 (U.S.C.M.C.R. 2007) (noting Khadr was charged with attempted murder in violation of the laws of war for planting an improvised explosive device).

[71]   *See* Uniform Code of Military Justice, 10 U.S.C. § 879; *see also id.* § 880 ("An act, done with specific intent to commit an offense under this chapter, amounting to more than mere preparation and tending, even though failing, to effect its commission, is an attempt to commit that offense"); *see also, e.g.*, *Keenan*, 39 C.M.R. at 113 (noting that "[s]o far as attempted murder is concerned, military law 'has tended toward the advanced and modern position' that holds one accountable for conduct which would constitute a crime if the facts were as he believed them to be").

[72]   MODEL PENAL CODE  § 5.01(1); *see also generally* Wechsler, *supra* note 2.

[73]   *See, e.g.*, MASS. GEN. LAWS ch. 274, §6 (2019) ("Whoever attempts to commit a crime by doing any act toward its commission, but fails in its perpetration, or is intercepted or prevented in its perpetration, shall, except as otherwise provided, be punished . . . .").

[74]   William J. Aceves, *When Death Becomes Murder: A Primer on Extrajudicial Killing*, 50 COLUM. HUM. RTS. L. REV. 116, 118-19 (2018) ("This norm is now codified in every major human rights treaty and has attained *jus cogens* status as a non-derogable norm that binds all states.").

dedicated solely to defining this offense, the right to life—and the right to be free from the arbitrary deprivation of life—is articulated in the majority of universal and regional human rights treaties.[75] Indeed, the right to life is considered the "supreme right from which no derogation is permitted."[76] The Arab Charter, which Saudi Arabia has ratified, recognizes the rights to life and the right not to be arbitrarily deprived of one's life.[77]   In doing so, it reaffirms "the principles of the Charter of the United Nations, the Universal Declaration of Human Rights and the provisions of the International Covenant on Civil and Political Rights and the International Covenant on Economic, Social and Cultural Rights."[78]   The international community's response to the assassination of Jamal Khashoggi has illuminated and further reinforced the duties of states to protect the right to life.   When investigating Khashoggi's death, the United Nations' Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions confirmed that the prohibition on extrajudicial killing constitutes a *jus cogens* norm, which brooks no derogation.[79]

---

[75] *See, e.g.*, International Covenant on Civil and Political Rights art. 6(1), Dec. 16, 1966, 999 U.N.T.S. 171 ("Every human being has the inherent right to life.  This right shall be protected by law.  No one shall be arbitrarily deprived of his life."); *see also* Aceves, *supra* note 75, at 126-140 (compiling treaty text and other sources).  Although Saudi Arabia has not ratified the ICCPR, it is bound by other treaties that prohibit extrajudicial killings, as well as the Arab Charter, which invokes and reaffirms the ICCPR.  *See infra* text accompanying note 77.

[76] U.N. Hum. Rts. Comm., General Comment No. 6: Article 6 (The Right to Life), ¶ 1, U.N. Doc. HRI/GEN/l/Rev.1 (1982).

[77] Arab Charter on Human Rights art. 5, May 22, 2004, *reprinted in* 12 Int'l Hum. Rts. Rep. 893 (2005),

https://www4.aucegypt.edu/CMRS/Files/2.2%20Arab%20Charter%20on%20Human%20Rights_EN.pdf.

[78] *Id*. at pmbl.

[79] U.N. General Assembly, Annex to the Report of the Special Rapporteur on extrajudicial, summary or arbitrary executions: Investigation into the unlawful death of Mr. Jamal Khashoggi, U.N. Doc. A/HRC/41/CRP.1, ¶ 197 (June 19, 2019).  In 2019, the Special Rapporteur published two key reports: one containing the findings of the office's investigation into the killing of Khashoggi, *supra*, and one focusing broadly on accountability for intentional state killings of human rights defenders, journalists, and dissidents.  *See* U.N. General Assembly, Investigation of, accountability for and prevention of intentional State killings of human rights defenders, journalists and prominent dissidents, U.N. Doc. A/HRC/41/36, ¶ 24 (Oct. 4, 2019).

30.     A number of U.N. and regional human rights treaty bodies have treated attempted killings as violations of the right to life under their constitutive treaties.  The European Court of Human Rights, for example, has held that

> [w]hile it is true that the first applicant did not sustain any actual bodily harm, the above-described circumstances clearly indicate that his life had been in serious and imminent danger. . . .   In the Court's opinion, the above-mentioned circumstances leave no doubt as to the existence of an imminent risk to the life of the first applicant, which brings his complaint on that account within the scope of Article 2 [protecting the right to life] of the [European] Convention [for the Protection of Human Rights and Fundamental Freedoms].   The fact that he survived and sustained no injuries has no bearing on this conclusion.[80]

States will be deemed to have violated the right to life even if no death results.[81]   The Inter-American Court of Human Rights[82] and African Commission of Human and People Rights[83] are

---

[80] *Makuchyan and Minasyan v. Azerbaijan and Hungary*, App No. 17247/13, Eur. Ct. H.R., ¶¶ 93-94 (2020), http://hudoc.echr.coe.int/eng?i=001-202524; *see also Makaratzis v. Greece*, App No. 50385/99, Eur. Ct. H.R. 195, ¶ 55 (2004) ("In light of the above circumstances, and in particular the degree and type of force used, the Court concludes that, irrespective of whether or not the police actually intended to kill him, the applicant was the victim of conduct which, by its very nature, put his life at risk, even though, in the event, he survived.  Article 2 [on the right to life] is thus applicable in the instant case."); *Soare and Others v. Romania*, App. No. 24329/02, Eur. Ct. H.R., ¶¶ 108-09 (2011), http://hudoc.echr.coe.int/eng?i=001-103722 (French language).

[81] *See, e.g.*, *Acar and Others v. Turkey*, App. Nos. 36088/97 & 38417/97,  Eur. Ct. H.R., ¶¶ 78-79 (2005),  http://hudoc.echr.coe.int/eng?i=001-69116; *Contreras  v.  Canada*, Commc'n, No. 2613/2015, Hum. Rts. Comm., ¶ 8.11 (Mar. 27, 2017) (holding that the right to life can be violated by deporting someone to a state where their life will be in danger).

[82] *Case of the Rochela Massacre v. Colombia*, Judgment, Inter-Am. Ct. H.R. (ser. C) No. 163, ¶¶ 123-128 (May 11, 2007).

[83] *Mouvement Burkinabé de l'Homme et des Peuples v. Burkina Faso*, Communication 204/97, Afr. Comm'n H.P.R., ¶¶ 41-42 (2001).

in accord that the right to life can be violated if the victim is not killed.  Violations of this right include threats and harassment by state agents and others who would harm the victim.[84]

31.     Attempts to deprive persons of the right to life are equally prohibited by normative statements made by the member states of the United Nations; as such, states are under explicit obligations to take preventative measures to ensure the right to life.  For example, in 1989, the U.N. Economic and Social Council (ECOSOC) adopted a set of "Principles on the Effective Prevention and Investigation of Extra-legal, Arbitrary and Summary Executions," which place detailed obligations on states to prevent extrajudicial killings through clear chain of command over law enforcement and intelligence bodies.[85]  These principles obligate states to prohibit "orders from superior officers or public authorities authorizing or inciting other persons to carry out" extrajudicial killings, attaching liability to those planning to violate the right to life, and not just those committing the killings.[86]  Thus, United Nations experts and fact-finding mechanisms over

---

[84] *Jiménez Vaca v. Colombia*, Commc'n No. 859/1999, Hum. Rts. Comm.,  ¶ 7.3 (Mar. 25, 2002) ("In the case in question, the State party has not denied the author's claims that the threats and harassment which led to an attempt on his life were carried out by agents of the State, nor has it investigated who was responsible.  In the light of the circumstances of the case, the Committee considers that there has been a violation of article 6, paragraph 1, of the Covenant [articulating the right to life].");  *R.R. and Others v. Hungary*, App. No. 19400, Eur. Ct. H.R., ¶ 32 (2012), http://hudoc.echr.coe.int/eng?i=001-115019 ("the Court cannot but conclude that the authorities' actions in this case may have potentially exposed Ms H.H. and her children to life-threatening vengeance from criminal circles and thus fell short of the requirements of Article 2 of the Convention" binding on the state).

[85] *See* Aceves, *supra* note 75, at 134-35.

[86] Economic and Social Council Res. 1989/65, Principles on the Effective Prevention and Investigation of Extra-legal, Arbitrary and Summary Executions, ¶ 3 (May 24, 1989).

the years have collected information not just on killings but on death threats and attacks[87] and have imposed extensive obligations on states to adopt proactive measures to prevent the loss of life.[88]

32.     The U.N. Human Rights Committee (HRC), which oversees implementation of the International Covenant on Civil and Political Rights (ICCPR)—a treaty to which the United States is a party along with over 170 other states—similarly stated in its 1982 General Comment 6 that the right to life must be interpreted broadly, requiring "that States adopt positive measures" to protect it.[89]  In 2019, the HRC released General Comment 36, replacing General Comment 6 with an updated assessment of the right to life and its related obligations following protracted consultations with states, civil society actors, and experts on important developments in the law since General Comment 6 was released.[90]  This latter Comment—essentially an authoritative interpretation of the treaty—recognized in several places that attempts to violate the right to life are themselves violations of international law.  First, the Committee explained that the right to life must not be "interpreted narrowly," because it "concerns the entitlement of individuals to be free from acts and omissions that are *intended or may be expected* to cause their unnatural or premature death, as well as to enjoy a life with dignity."[91]  The Committee then noted that "[d]eprivation of life involves intentional or otherwise foreseeable and preventable life-terminating harm or injury,

---

[87] *See, e.g.*, U.N. General Assembly, Report of the Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions on a Gender-Sensitive Approach to Arbitrary Killings, at ¶ 5, U.N. Doc. A/HRC/35/23 (June 6, 2017).

[88] *See generally* Christof Heyns, Rep. of the Special Rapporteur on Extrajudicial, Summary, or Arbitrary Executions, U.N. Doc. A/HRC/26/36 (Apr. 1, 2014).

[89] General Comment No. 6, *supra* note 77, ¶ 5; *see also, e.g.*, *Umetaliev v. Kyrgyzstan*, Commc'n No. 1275/2004, Hum. Rts. Comm. (Oct. 30, 2008) (finding state responsible for murder by government militia).  General Comments are authoritative interpretations of the treaty issued by the treaty's enforcement body.

[90] U.N. Hum. Rts. Comm., General Comment No. 36: Article 6 (Right to Life), ¶ 3, U.N. Doc. CCPR/C/GC/36 (2019).

[91] *Id.* ¶ 3 (emphasis added).

caused by an act or omission.  It goes beyond injury to bodily or mental integrity or a threat

thereto."[92]  Finally, the Committee stated explicitly that the obligation to respect and ensure the

right to life extends to threats and situations that can result in loss of life, and that "[s]tates parties

may be in violation of article 6 even if such threats and situations do not result in loss of life."[93]

33.    The United Nations General Assembly is increasingly concerned with states'

obligations to prevent human rights abuses before they occur.  In 2005, the General Assembly

adopted an important resolution dedicated to strengthening the international community's ability

to prevent conflict and promote human rights.[94]   In 2018, the U.N. Special Rapporteur on

Extrajudicial, Summary or Arbitrary Executions noted that "The State has a . . . duty to take

preventive action where there are foreseeable threats to life . . . .  The obligation of States to respect

and ensure the right to life extends to all threats that can cause death, *even if such threats have not*

*yet resulted in death.*"[95]   The message is clear: those connected to an attempt to violate the right to

life have violated international law.  The right is too fundamental to be construed narrowly and to

be applied only against those who are able to complete their intended offense.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 9th day of June 2021.

                                                                   _____

                                                                Dr. Beth Van Schaack

---

[92] *Id.* ¶ 6.

[93] *Id.* ¶ 7.  General Comment 36 also contains a detailed exploration of the duty of states to protect the right to life.  *Id.* ¶¶ 18-31.

[94] *See* 2005 World Summit Outcome, G.A. Res. 60/1, U.N. Doc. A/RES/60/1, ¶¶ 138-140 (Sept. 16, 2005) (endorsing the "responsibility to protect" framework).

[95] U.N. General Assembly, Report of the Special Rapporteur of the Human Rights Council on Extrajudicial, Summary or Arbitrary Executions: Saving Lives is Not a Crime, ¶ 18, U.N. Doc. A/73/314 (Aug. 7, 2018) (emphasis added).

# APPENDIX 1

**Beth Van Schaack**
**Leah Kaplan Visiting Professor in Human Rights, Stanford Law School**



## EDUCATION

**UNIVERSITY OF LEIDEN**, PhD (2020)
• Dissertation: *Imagining Justice for Syria: Water Always Finds Its Way.*

**YALE LAW SCHOOL**, J.D. (1997)
• *Student Director*, Schell Center for International Human Rights & Lowenstein Human Rights Clinic
• *Editor*, YALE LAW JOURNAL

**STANFORD UNIVERSITY**, B.A., *Phi Beta Kappa* (1991)

## EXPERIENCE

**STANFORD LAW SCHOOL** (2014-present)
• *Leah Kaplan Visiting Professor in Human Rights.* Teaching, blogging, and writing in multiple areas of international law. Courses developed and taught include:
  ▪ International Human Rights & Conflict Resolution Clinic;
  ▪ Human Rights Theory & Practice;
  ▪ Interdisciplinary Perspectives on Human Trafficking & Human Trafficking: Law & Policy (with a field study to Thailand);
  ▪ International Justice & Contemporary Issues in International Criminal Law;
  ▪ International Criminal Law: From Stanford to The Hague (with a field study to The Netherlands);
  ▪ Understanding the Impact of New Technologies on Human Rights Investigations & Transitional Justice (with field study to Colombia).
• *Resident Fellow,* Center for Advanced Study in the Behavioral Sciences (2017-18); Center for International Security & Cooperation (2013-14); Center on Democracy, Development, and the Rule of Law (2009-10).
• *Co-Founder & Co-Director*, Stanford Human Rights in Trauma Mental Health Program, Department of Psychiatry & Behavioral Sciences, School of Medicine.

**U.S. DEPARTMENT OF STATE**, Washington D.C.
• *Deputy,* Ambassador-at-Large for War Crimes Issues, Office of Global Criminal Justice (2012-2013). Advised the Secretary of State and the Under Secretary for Civilian Security, Democracy, and Human Rights on issues related to war crimes, crimes against humanity, and genocide; helped formulate U.S. policy on the prevention of, responses to, and accountability for mass atrocities; counseled U.S. and foreign governments on the appropriate use of transitional justice mechanisms; and coordinated U.S. government positions relating to international and hybrid courts.
• *Member*, Advisory Committee on International Law (ACIL) (2009-present).
• *Academic Adviser,* ICC Review Conference, Kampala, Uganda (2010). Advised inter-agency delegation to the first Review Conference on victim participation and the crime of aggression.

**SANTA CLARA UNIVERSITY SCHOOL OF LAW**, Santa Clara, CA (2003-2012)
• *Professor of Law.* Taught in the areas of public international law, international human rights, law of armed conflict, international criminal law, transitional justice, and civil procedure.

**THE CENTER FOR JUSTICE & ACCOUNTABILITY**, San Francisco, CA
• *Board Member, Acting Executive Director, Staff Attorney* (2001-present). Have helped fulfil CJA's mission; litigate human rights cases; develop and implement strategic planning; maintain budget, staffing, program development, and implementation; foster institutional relationships; and provide leadership in the human rights movement on the local, national, and international levels.

**MORRISON & FOERSTER LLP,** Palo Alto, CA (1999-2003)
• *Litigation Associate.* Engaged in litigation and arbitration in state, federal, and international fora.

**INTERNATIONAL CRIMINAL TRIBUNALS FOR THE FORMER YUGOSLAVIA & RWANDA**, The Hague, The Netherlands (1997-1998)
• *Office of the Prosecutor.* Assisted in the prosecution of individuals indicted for violations of international humanitarian law and international criminal law in the former Yugoslavia and Rwanda. Research and brief writing on issues of ICL and comparative criminal procedure.

## SELECT ACADEMIC PUBLICATIONS (Top 10% in SSRN downloads)

### Books & Book Reviews

• IMAGINING JUSTICE FOR SYRIA (Oxford University Press, 2020), reviewed by Michael Karnavas, http://michaelgkarnavas.net/blog/2021/04/12/book-review-imagining-justice-for-syria/.
• Contributor, WOOMERA MANUAL ON THE INTERNATIONAL LAW OF MILITARY SPACE OPERATIONS (forthcoming 2020) (clarifying rules applicable to military uses of space).
• THE ESSENTIALS OF INTERNATIONAL CRIMINAL LAW (2nd ed., Foundation Press, forthcoming 2020) (with Ron Slye).
• INTERNATIONAL CRIMINAL LAW & ITS ENFORCEMENT (4th ed., Foundation Press, 2019) (with Ron Slye), *reviewed by* Robert Sloane, 6 J. OF INT'L CRIM. JUSTICE 399 (2008).
• Book Review, SIGRID REDSE, THE MILITARY COMMANDER'S NECESSITY: THE LAW OF ARMED CONFLICT & ITS LIMITS, 115 A.J.I.L. 176 (2021).
• Book Review, RONALD C. SLYE, THE KENYAN TRUTH JUSTICE & RECONCILIATION COMMISSION: AN OUTSIDER'S VIEW FROM THE INSIDE, 113 A.J.I.L. 669 (2019).
• Book Review, MORTEN BERGSMO ET AL., HISTORICAL ORIGINS OF INTERNATIONAL CRIMINAL LAW: VOLUMES 1-5, 112 A.J.I.L. 142 (2018).
• Co-Editor (with Daryn Reicherter, M.D.) & Contributor, CAMBODIA'S INVISIBLE SCARS: TRAUMA PSYCHOLOGY IN THE WAKE OF THE KHMER ROUGE (2nd ed., 2016).
• Editor & Contributor, BRINGING THE KHMER ROUGE TO JUSTICE: PROSECUTING MASS VIOLENCE BEFORE THE CAMBODIAN COURTS (Mellon Press, 2005) (with Jaya Ramji(-Nogales)), *reviewed by* Margaret M. DeGuzman, 19 CRIM. L. FORUM 335 (2008).
• Primary Contributor & Editor, THE STATUTE OF THE INTERNATIONAL CRIMINAL COURT IN LIGHT OF THE DELIBERATIONS IN ROME (International Service for Human Rights, 1999).

### International Criminal Law

• *Deconstructing Syria's Would-Be International Criminal Court Referral: The Politics of International Justice*, 56 STANFORD J. INT'L L. 1 (2020).
• *Crimes Against Humanity in the "Western European and Other" Group of States: A Continuing Tradition*, 6(1) AFRICAN J. INT'L CRIM. JUSTICE 136 (2020)
• *Determining the Commission of Genocide in Myanmar: Legal & Policy Considerations,* 17 J. INT'L CRIM. JUST. 285 (2019).

- *The Iraq Investigative Team & Prospects for Justice for the Yazidi Genocide*, 16 J. INT'L CRIM. JUST. 113 (2018).
- *Crimes Against Humanity: Repairing Title 18's Blind Spots*, *in* ARCS OF GLOBAL JUSTICE (Margaret M. deGuzman & Diane Marie Amann eds., 2018).
- *More than a Domestic Mechanism": Options for Hybrid Justice in Sri Lanka*, *in* TRANSITIONAL JUSTICE IN SRI LANKA: MOVING BEYOND PROMISES 331 (Bhavani Fonseka ed., 2017).
- *The Building Blocks of Hybrid Justice*, 44 DENVER J. INT'L LAW & POLICY 169 (2016).
- *ICC Fugitives: The Need for Bespoke Solutions*, *in* CONTEMPORARY ISSUES FACING THE INTERNATIONAL CRIMINAL COURT 358 (Richard H. Steinberg ed., 2016).
- "Crimes against Humanity," in OXFORD BIBLIOGRAPHIES ONLINE: INTERNATIONAL LAW (Tony Carty ed., 2012).
- Co-Editor & Contributor, Special Issue, *Women & International Criminal Law*, 3 INT'L CRIM. LAW REVIEW (2011).
- *Atrocity Crimes: Year-In-Review*, 7 NORTHWESTERN HUM. RTS. L. J. 170 (2009).
- *Obstacles On The Road To Gender Justice: The International Criminal Tribunal for Rwanda As Object Lesson*, 17 AM. UNIV. J. GENDER, SOCIAL POLICY & LAW 355 (2009).
- *Darfur and the Rhetoric of Genocide*, 26 WHITTIER L. REV. 1101 (2005).
- *Command Responsibility: An Anatomy of Proof in* Romagoza v. Garcia, 36 U.C. DAVIS L. REV. 1213 (2003).
- *The Definition of Crimes Against Humanity: Resolving the Incoherence*, 37 COL. J. TRANSNAT'L L. 787 (1999).
- *The View from Beijing: The Establishment of the Permanent International Criminal Court in Light of the Experience of the Two* Ad Hoc *Tribunals*, 17 CHINESE Y.B. OF INT'L L. & AFFAIRS (1999).
- *The Definition of Genocide: Repairing the Genocide Convention's Blind Spot*, 7 YALE L. J. 2259 (1997).

## International Human Rights

- *The United States' Position on the Extraterritorial Application of Human Rights Obligations: Now is the Time for Change*, 90 INT'L L. STUD. 20 (2014).
- *The Prevalence of "Present-In" Jurisdiction*, 107 ASIL PROCEEDINGS 237 (2013) (with Zarko Perovic).
- *Stateways v. Folkways: International Human Rights & Gender Stereotypes*, 12 INT'L FEMINIST J. POLITICS (2010).
- *The Principle of Legality in International Criminal Law*, 2009 ASIL PROCEEDINGS 101.
- *Engendering Genocide:* Akayesu *and the Affirmation of Genocidal Rape*, *in* HUMAN RIGHTS ADVOCACY STORIES (Hurwitz, Satterthwaite & Ford eds., 2008).
- Crimen Sine Lege: *Judicial Lawmaking at the Intersection of Law & Morals*, 97 GEORGETOWN L. J. 119 (2008).
- *The Story Behind the Case that Launched a Legal Revolution*, 30 HUM. RTS. Q. 1042 (2008) (*reviewing* WILLIAM J. ACEVES, THE ANATOMY OF TORTURE: A DOCUMENTARY HISTORY OF *FILÁRTIGA V. PEÑA-IRALA* (2007)).
- *With All Deliberate Speed: Civil Human Rights Litigation As a Tool for Social Change*, 57 VANDERBILT L. REV. 2305 (2005).
- *Justice Without Borders: Civil Universal Jurisdiction*, 2005 ASIL PROCEEDINGS 120.
- *Unfulfilled Promise: The Human Rights Class Action*, 2003 UNIV. CHIC. LEGAL FORUM 279, *excerpted in* STEINHARDT ET AL., INTERNATIONAL HUMAN RIGHTS LAWYERING (2009).
- *In Defense of Civil Redress: The Enforcement of Human Rights Through Civil Litigation in the Context of the Proposed Hague Judgments Convention*, 42 HARV. INT'L L. J. 143 (2001), *reviewed in* FOREIGN POLICY (March/April 2002).

### Public International Law & International Humanitarian Law

- *The Law & Policy of Human Shielding*, in COMPLEX BATTLESPACES: THE LAW OF ARMED CONFLICT & THE DYNAMICS OF MODERN WARFARE (Christopher Ford & Winston Williams eds., 2018).
- *Human Shields: Complementary Duties under IHL*, 110 AJIL UNBOUND 317 (2017).
- *Mapping War Crimes in Syria*, 92 INT'L L. STUDIES 282 (2016).
- *The Killing of Osama Bin Laden & Anwar Al-Aulaqi: Uncharted Legal Territory*, 14 Y.B. HUMANITARIAN L. 255 (2012).
- Par In Parem Imperium Non Habet: *Complementarity and the Crime of Aggression*, 10 J. INT'L CRIM. JUSTICE 133 (2012) (named Editor's Choice).
- *The Crime of Aggression and Humanitarian Intervention on Behalf of Women*, 11(3) INT'L CRIM. L. REV. 477 (2011).
- *Negotiating at the Interface of Power & Law: The Crime of Aggression*, 49 COLUMBIA J. TRANSNAT'L L. 505 (2011).
- *The Grass That Gets Trampled When Elephants Fight: Will the Codification of the Crime of Aggression Protect Women?*, 15 UCLA J. INT'L L & FOR. AFF. 327 (2010).
- *Finding the Tort of Terrorism in International Criminal Law*, 28 TEXAS REV. LITIGATION 381(2009).
- *Forward*, *International Law in United States Courts*, 45 SANTA CLARA L. REV. 807 (2005).

JUST SECURITY: https://www.justsecurity.org/author/vanschaackbeth/

INTLAWGRRLS: https://ilg2.org/author/bethvanschaack/ &
http://www.intlawgrrls.com/search/label/BVS

## LITIGATION

Supreme Court & Circuit Court *Amicus* Brief Writing, including: *Doe v. Nestle, Inc.* (2020) and *Jesner v. Arab Bank* (2018).

## ORGANIZATIONAL AFFILIATIONS & CONSULTING

ACCOUNTABILITY COUNSEL, San Francisco, CA (2010-present)
- *Legal Adviser*. Advise staff attorneys on litigation and mediation strategies on behalf of local communities impacted upon by international development projects.

AMERICAN SOCIETY OF INTERNATIONAL LAW (2003-present)
- Task Force Co-Chair, The ICC & The United States; Executive Committee; Judicial Benchbook Editorial Board; Co-Chair ICL Group; Annual Meeting Committee Member.

COMMISSION ON INTERNATIONAL JUSTICE & ACCOUNTABILITY (2013-present)
- *Legal Adviser*. Advise Syrian investigators on documenting human rights violations and abuses committed during the Syrian war with an eye toward future transitional justice initiatives.

INSTITUTE FOR INTEGRATED TRANSITIONS, Barcelona, Spain (2016-present)
- *Law & Peace Practice Group*. Work with fragile and conflict-affected states to achieve sustainable transitions from war or authoritarianism through locally-led and integrated interventions.

INSTITUTE FOR INTERNATIONAL CRIMINAL INVESTIGATIONS, The Hague (2015-present)
- *Board of Directors*. Advise organization devoted to training and deploying multi-disciplinary investigators in situations marked by human rights violations and international crimes.

**LIEBER INSTITUTE ON LAW & LAND WARFARE**, U.S. Military Academy (2016-present)
- *Senior Fellow.* Contributing to efforts to build the relationship between law & warfare in order to educate and empower current and future combat leaders.

**NATIONAL INSTITUTE FOR MILITARY JUSTICE** (2013-present)
- *Advisor.* Assist with law of armed conflict issues, including military commission monitoring.

**NURU INTERNATIONAL**, Irvine, CA (2015-present)
- *Member, Board of Directors.* Advise organization devoted to international development and ending extreme poverty in fragile states beset by violent extremism.

*     *     *