# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DR. SAAD ALJABRI, <br><br> Plaintiff, <br><br> v. <br><br> MOHAMMED BIN SALMAN BIN ABDULAZIZ AL SAUD, *et al*. <br><br> Defendants. | Civil Action No. 1:20-cv-02146-TJK |

**DECLARATION OF JOHN PHILIP MUDD**

I, John Philip Mudd, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

**I.     Background and Experience.**

1.     My name is John Philip Mudd.  I am a former senior counterterrorism official with the United States Government, which I proudly served for almost twenty-five years.  I began working for the U.S. Central Intelligence Agency (the "CIA") in 1985 and began focusing on counterterrorism in approximately 1992.

2.     During my service for the U.S. Government, I held numerous high-level national security roles in the CIA, the Federal Bureau of Investigation ("FBI"), and the White House, including regularly handling matters involving highly classified overt and covert operations, sources, and methods.  My roles included Director for Gulf Affairs on the White House National Security Council, Deputy Director of the Counterterrorist Center at the CIA, and Deputy Director

of the National Security Branch at the FBI. I have also testified before Congress about terrorism and other national security issues in both open and closed sessions.

3. In these and other positions, I played a senior role in the U.S. Intelligence Community's work in the Middle East because of the importance of that region for the United States' counterterrorism efforts. In particular, and as described in more detail below, because Saudi Arabia was one of the U.S. Government's key intelligence partners following September 11th, I was well-acquainted with the Kingdom's contributions to the war on terrorism, with the importance of the U.S. Government to the Kingdom, and with the role of the Plaintiff in this case, Dr. Saad Aljabri ("Dr. Saad"), in the Saudi Arabian government and as a key foreign intelligence partner to the U.S. Government.

4. After leaving government service in 2010, I have spent the last decade speaking, writing, and consulting in the areas of counterterrorism and national security. My written work has been featured in numerous outlets, including, *inter alia*, *The New York Times*, *The Washington Post*, and *The Wall Street Journal*. I have also published three books about intelligence operations, analysis, and counterterrorism.

**II.    Summary of My Declaration.**

5. I am submitting this declaration on behalf of the Plaintiff, Dr. Saad, in the above-captioned case, based on my personal knowledge. I understand that in Dr. Saad's Amended Complaint, he alleges that he was a key partner of the U.S. Intelligence Community and that harming him would harm the United States. I agree. In the wake of the attacks on the American homeland on 9/11, there was no more important partner to the United States' counterterrorism efforts than Saudi Arabia, no more important supporter of Saudi Arabia than the United States, and few individuals more important to making that partnership work than Dr. Saad. At a time

when the United States faced persistent and potentially lethal threats from terrorism abroad, Dr. Saad was essential to turning the tide for the United States and saving American lives.

6. Because of the close national security partnership between the United States and Saudi Arabia, the U.S. Intelligence Community plays a key role in U.S. Government policy toward Saudi Arabia.  Within the U.S. Intelligence Community, Dr. Saad is deeply trusted and respected, and his reputation has lived on long past his departure from the Saudi government.  Because of this, Mohammed bin Salman's efforts to kill Dr. Saad would cause (and has caused) harm to the United States by depriving it of access to a close partner with unique knowledge.  The U.S.-Saudi partnership—like all foreign intelligence partnerships—depends on trust developed over years.  Without deep trust, it is impossible to work in close coordination.  Killing *the* key link to that partnership historically would curtail the U.S. Government's access to a trusted source with deep knowledge.

**III.   Counterterrorism Post-9/11 and Foreign Intelligence Partners.**

7. To understand why Dr. Saad has been so crucial to the United States, some context is necessary.

8. Following the September 11 attacks on the World Trade Center and Pentagon and the downed airliner in Pennsylvania, the United States engaged in a global fight to root out violent extremism and combat terrorism.  Apart from military engagement in Afghanistan (and later Iraq), the United States's counterterrorism efforts focused on terrorist groups in foreign countries, many in the Middle East, that were not formally backed by other governments.

9. But by 9/11, we had fallen behind—badly.  The United States had neglected the issue of terrorism for too long, and the threat had metastasized.  Al-Qaeda and other extremists were entrenched in areas of the world where U.S. law enforcement could not reach.  In the Middle East, sympathizers within legitimate governments were not only inadvertently protecting terrorist

groups, but also actively assisting them. The United States was not conducting large-scale military operations in any nation-state other than Afghanistan and Iraq, and the United States also lacked sufficient manpower to engage in the extensive global monitoring and on-the-ground operations that the moment required: worldwide collection and analysis of intelligence, communications intercepts, arrests and interrogations, raids, and tactical operations.

10. That's where foreign intelligence services come in: the United States needed, and continues to need, foreign partners on the ground across the globe. The United States had counterterrorism needs in many countries. It would have quite literally been impossible to keep the United States safe without the assistance of foreign intelligence services.

11. Reliable and trustworthy foreign intelligence partners are particularly crucial when it comes to following through on sensitive and actionable intelligence. Intelligence is "actionable" when knowing that information allows someone to take immediate action, such as conducting a raid, arresting an individual, or disrupting an imminent attack. For example, the CIA or FBI might obtain information about terrorist cell activity specific enough to locate someone and detain them—information that would become useless if not acted upon quickly. And if leaked, the information could be rendered unusable and endanger sources and methods, potentially jeopardizing American lives.

**IV.   The Centrality of Saudi Arabia in the War on Terror.**

12. As one of our strongest allies in the region, Saudi Arabia was the United States' central partner during the "Global War on Terror," a partnership that served both countries' interests. Most obviously, fifteen of the nineteen 9/11 hijackers were Saudi nationals, and many other members of Al-Qaeda and other terrorist groups were originally Saudi citizens. Saudi cooperation was thus essential to rooting out the infiltration of terrorist groups in its own country

and beyond. But the Kingdom was also itself the target of terrorism, in part because it was seen by some as complicit with the United States or influenced too heavily by Western culture, and Saudi Arabia could not fight this threat alone. In 2003, for example, a series of Al-Qaeda bombings targeted Riyadh (the Saudi capital), including several Western compounds—one of which housed employees of a U.S. defense contractor and their families—and killed dozens of people, including Americans.

13. Saudi Arabia's willingness to act based on tactical intelligence provided by the United States, and the Kingdom's ability to protect sensitive classified information, resulted in a level of trust between Washington and Riyadh that was critical to stopping attacks. The Kingdom's intelligence services, run by Dr. Saad, could be trusted. Further, the United States needed an intelligence service that could conduct on-the-ground surveillance and offensive operations in the region that the U.S. Government could not conduct directly. Saudi intelligence services, led by Dr. Saad and Mohammed bin Nayef (often known as "MBN"), served this role. The United States could pass highly sensitive information to the Kingdom—indeed, directly to Dr. Saad—and rely on the Saudis to act on the intelligence when the United States could not. The need was mutual; the Kingdom needed the valuable intelligence the United States could collect, as well as the broader political support from a global superpower like the United States.

14. In addition to providing information so that the Saudis could act, we also relied on the Saudis to gather information for the United States. On-the-ground surveillance and raids could be largely handled by Saudi intelligence. Apprehensions of senior terrorist suspects were handled by Saudi intelligence. And when operations in the region involved physical raids, the United States relied on Saudi intelligence services not only to conduct the raids but also to gather hard drives and other documents and transmit that data to the United States. The Saudis also provided valuable

assistance on stopping terror financing: the United States needed the assistance of Saudi intelligence to manage money flowing to, from, and within Saudi banking institutions. And because the royal family and the Kingdom depended on maintaining a positive relationship with the United States, Saudi Arabia was keen to help.

15.  Simply put, at the apex of the Global War on Terror, there was no country whose assistance the United States needed more than Saudi Arabia. Given the importance to the leadership of Saudi Arabia of continued support from the U.S. Government, the Saudi government was prepared to provide that assistance—assistance that went through Dr. Saad.

## V. Dr. Saad Aljabri.

16.  Until now, I have referred in the abstract to Saudi Arabia and Saudi intelligence services. But of course, we couldn't work with just anyone. The Kingdom is an amalgam of bureaucracies, between the various governmental Ministries, central banking agencies, thousands of princes in the royal family, and religious clerics. It is an opaque country with numerous constantly-competing factions. Getting actionable intelligence or other counterterrorism-related requests to the Saudis through formal diplomatic channels would have been glacially slow, leaked, and would likely not even get to the right people. It would not just have been inefficient to pass intelligence this way; it would have been dangerous.

17.  Our answer to this problem—and I do not say this lightly—was Dr. Saad.

18.  Dr. Saad was the United States's go-to person for all things counterterrorism in the Middle East. Dr. Saad worked directly with at least the CIA, FBI, Department of Homeland Security, White House, Department of State, and Department of the Treasury on projects as varied as vetting student visas to weed out terrorist sympathizers, halting the flow of funds to terrorist

groups, and coordinating tactical attacks on terrorist suspects.  Everyone knew that if the United States needed something done in Saudi Arabia, Dr. Saad was the interlocutor to call.

19. As one example, in 2003 the United States was highly focused on capturing Yusef al-Ayeri, a Saudi national and member of Al-Qaeda who went by the alias "Swift Sword."  Swift Sword was the mastermind of a planned cyanide attack on New York City public transportation (which was thwarted).  Dr. Saad was part of the team that captured Swift Sword and stopped the attack.

20. More generally, Dr. Saad got things done and cut through red tape when no one else could.  For example, I regularly participated in joint U.S.-Saudi meetings on counterterrorism operations in the United States, which in my day would be attended by then-FBI Director Robert Mueller, MBN, and Dr. Saad, among others.  As soon as such a meeting ended, it would be up to Dr. Saad to make the gears of government crank or plan out a U.S.-Saudi tactical operation.  I witnessed Dr. Saad literally working night and day in close partnership with the United States; twenty-hour days and 2:00 am meetings were not uncommon for him.  Those of us in the U.S. Intelligence Community knew we could rely on Dr. Saad to act.  That is why so many of us, across so many different agencies, contacted Dr. Saad first when we needed to get something done.

21. When the United States had actionable intelligence or tactical information, we gave it to Dr. Saad.  When the United States needed to conduct an operation to stop an imminent attack or to capture an Al-Qaeda leader, we went to Dr. Saad.  When the United States needed invaluable surveillance conducted to arm U.S. forces with the most accurate and up-to-date information, we went to Dr. Saad.  When the United States needed to raid a terrorist cell and detain and interrogate extremists hell-bent on attacking the United States, we went to Dr. Saad.  When the United States needed assistance to thoroughly vet visa applications (for terrorism risks) of Saudi nationals

entering the United States, we went to Dr. Saad.  The list goes on.  He was one-stop shopping for the United States's counterterrorism needs in Saudi Arabia and across the Middle East.

22. Simply put, when Saudi Arabia was at the center of U.S. counterterrorism efforts, Dr. Saad became the go-to person for the United States, and conversely, the go-to person when the Saudi government needed to request help from the United States.

23. But more important than productivity was trust.  During the years following 9/11—when trust was a precious commodity among our Middle Eastern partners—Dr. Saad was gold.  The U.S. Intelligence Community could rely upon the knowledge that anything the United States shared with Dr. Saad would not leak and would be acted upon.  If the United States had questions about reliable partners in the Saudi government, Dr. Saad would provide helpful advice discreetly.  To borrow an overused phrase, Dr. Saad said what he meant and meant what he said.  That is not to say every operation always turned out perfectly; counterterrorism does not work like that.  But we could always trust that if something did go wrong, or if Dr. Saad had a concern, we would hear the unvarnished truth about it, allowing us to adjust our operations going forward.

24. Dr. Saad was not just a reliable foreign intelligence partner but also a personal associate to so many officials in the U.S. Intelligence Community.  That is rare in the U.S. Intelligence Community.  In my twenty-five year career, I worked with officials from intelligence agencies across the globe, but it was rare to know a counterpart on a first-name basis, much less intimately.  But Dr. Saad worked so frequently and extensively with the United States that many officials in the U.S. Intelligence Community developed a relationship with Dr. Saad built around personal trust and loyalty that went beyond daily tasks—for example, we knew about his family, and he knew about ours.

25.     Because of Dr. Saad's close partnership with the United States, Dr. Saad was a great patriot for his home country and an invaluable friend of the United States.

### VI.     Bin Salman's Targeting of the United States.

26.     I understand that Dr. Saad has alleged in the Amended Complaint ("AC") that bin Salman targeted Dr. Saad because of his connections to the U.S. Intelligence Community, "in an attempt to influence and harm U.S. intelligence interests and foreign policy." AC ¶ 141.

27.     Because of Dr. Saad's prominence, anyone familiar with the U.S.-Saudi intelligence partnership would know that Dr. Saad was a staunch ally of the United States and one-in-the-same with the U.S.-Saudi alliance. The United States may not have risen to meet the Al-Qaeda threat without Dr. Saad—certainly many more Saudi and American lives would have been lost—and all of the strategic stakeholders, from high-level U.S. officials to Saudi royals, knew Dr. Saad's work for the Kingdom also served the interests of the United States, which in turn served the interests of the Kingdom.

28.     In this case, that close partnership with the U.S. Government generally and the U.S. Intelligence Community specifically made Dr. Saad perceived as a top threat to bin Salman. It is obvious that bin Salman viewed Jamal Khashoggi as a threat. But Khashoggi's influence in the United States, primarily through the media and foreign policy circles, paled in comparison to the access Dr. Saad had to levers of power in Saudi Arabia and the United States, including counterparts in the U.S. Intelligence Community. To the extent bin Salman was targeting those who he perceived could shape U.S. Government policy and threaten his rule, bin Salman would quite clearly view Dr. Saad as a much greater danger than Khashoggi.

**VII.    The Impact of Bin Salman's Attempted Killing.**

29.     Anyone familiar with counterterrorism in the post-9/11 era would know that harming Dr. Saad would harm the United States.  Despite being out of government for a few years, Dr. Saad is still universally recognized as one of the key players in the United States' successful dismantling of Al-Qaeda.  It is of no moment that Dr. Saad was not a current government official at the time of the attempted killing; his death would send a powerful warning to anyone who would consider partnering with the United States:  we need your help now, but it may make you a target later.

30.     Trust takes years to develop, but seconds to be ripped away.  Letting bin Salman carry out the enforced disappearance of MBN—our closest Saudi political partner—and the attempted killing of Dr. Saad—our closest Saudi intelligence partner—removes two trusted counterparts between the countries' intelligence services that we built post-9/11, and jeopardizes the cooperative relationship in furtherance of U.S. national security that we worked so hard to develop.  Taking a recent real life example, there was a terrorist attack at Naval Air Station Pensacola on December 6, 2019, killing three.  The perpetrator was an aviation student from Saudi Arabia who was inspired by Al-Qaeda in the Arabian Peninsula and had communicated with known terrorists in that group for years.  Clearly, something failed in the Saudi vetting process.  When Dr. Saad was on the case, I would have trusted that he would get to the bottom of it and fix the issue.

31.     I also understand that the Amended Complaint alleges that Defendant bin Salman used his personal foundation, the MiSK Foundation, to recruit and deploy a network of U.S.-based Saudi students to hunt Dr. Saad in the United States.  *E.g.*, AC ¶¶ 226-27.  There is no parallel to an ally sending personal operatives within the territory of the United States to surveil U.S.

residents. In the Intelligence Community, that is just something that is not done. It is unacceptable. Bin Salman deploying Saudi nationals in the United States is precisely the type of thing that enemies do, not allies.

32. And the killing of a U.S. Intelligence partner—particularly a highly trusted foreign intelligence partner—would obviously deprive the CIA and FBI of some of the most reliable and important information available to it.

33. Bin Salman targeting Dr. Saad has real world consequences, including limiting the United States' access to credible insider information about dynamics within the Royal Court. Indeed, bin Salman may have targeted Dr. Saad to remove a perceived threat to his power and thereby eliminate any impediment he perceived within the U.S. Intelligence Community.

34. I worked closely with Dr. Saad in efforts to save American lives. Were there any doubt that harming a U.S. intelligence partner would harm the United States, such doubt should have been dispelled when bin Salman directed the killing of Jamal Khashoggi. Even though Khashoggi's relationship to the United States was primarily as a journalist rather than a trusted foreign intelligence partner, that killing shook the U.S.-Saudi partnership to its core. Continuing to threaten or target someone who was intimately involved in protecting the United States during its hour of darkest need—Dr. Saad—even after the U.S. Government's repudiation of the Khashoggi killing can only be viewed as targeting the interests of the United States.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 9th day of June 2021.

Philip Mudd