**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SAAD ALJABRI,

     *Plaintiff*,

v.

MOHAMMED BIN SALMAN BIN
ABDULAZIZ AL SAUD, *et al.*,

     *Defendants*.

Civil Action No. 20-2146 (TJK)

---

## DEFENDANT MOHAMMED BIN SALMAN BIN ABDULAZIZ AL SAUD'S REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT

---

Michael K. Kellogg (DC 372049)
Gregory G. Rapawy (DC 493973)
Andrew C. Shen (DC 500071)
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900

*Attorneys for Defendant
Mohammed bin Salman bin Abdulaziz Al Saud*

August 9, 2021

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION ............................................................................. 1

ARGUMENT .................................................................................... 2

I.   This Court Lacks Personal Jurisdiction Over the Crown Prince ......................... 2

    A.   Aljabri Fails To Show Jurisdiction Over the Crown Prince Based on Supposed Purposeful Targeting of the United States ........................................ 3

    B.   Aljabri Fails To Show Jurisdiction Over the Crown Prince Based on Alleged Inquiries About Aljabri's Family by Other Defendants in the United States ........................................ 7

        1.   Aljabri Fails To Show a Basis To Attribute Actions of Other Defendants in the United States to the Crown Prince ....................... 7

        2.   The Allegations Regarding Conduct in the United States Do Not Create a "Strong Relationship" Between This Lawsuit, the Crown Prince, and the United States ..................... 11

    C.   Aljabri Asserts No Other Basis for Personal Jurisdiction ..................... 12

    D.   Personal Jurisdiction Would Violate Principles of Fair Play and Substantial Justice ........................................ 13

    E.   Jurisdictional Discovery Is Unwarranted ..................... 14

II.  The Crown Prince Is Immune from Suit ........................................ 15

    A.   Status-Based Immunity Bars Aljabri's Suit Against the Crown Prince ........................................ 15

    B.   Conduct-Based Immunity Bars Aljabri's Suit Against the Crown Prince ........................................ 17

        1.   The Crown Prince Is Entitled to Immunity Under the State Department's Policy ........................................ 17

        2.   The Crown Prince Is Entitled to Immunity Under the Second Restatement ........................................ 21

        3.   No Exception to the Crown Prince's Immunity Exists or Applies ........................................ 22

i

C.      Saudi Arabia Is a Necessary Party That Is Immune from Suit ............................23

D.      The Act of State Doctrine Requires Dismissal of Aljabri's Claims ....................24

III.    Aljabri Fails To State a Claim Under the TVPA ...................................................28

A.      The Amended Complaint Fails To Allege an "Extrajudicial Killing" ...............................................................................................28

B.      Aljabri Has Not Exhausted Adequate, Available Remedies.................................34

IV.     Aljabri Fails To Establish Jurisdiction or State a Claim Under the ATS .........................36

A.      An Attempted Extrajudicial Killing Does Not Violate Any Specific, Universal, and Obligatory Norm of International Law..........................36

B.      The Domestic Conduct Alleged in the Amended Complaint Did Not Plausibly Aid or Abet a Primary Violation of the Law of Nations ...............................................................................................39

V.      Aljabri Fails To State a Claim Against the Crown Prince for IIED .................................41

A.      Saudi Arabian Law Applies and Does Not Recognize IIED as a Cause of Action.....................................................................................41

B.      Aljabri Also Fails To State a Claim Under D.C. Law ...........................................43

C.      Without the Federal Claims, the Court Lacks or Should Decline Jurisdiction Over Aljabri's Emotional-Distress Claim ...........................................44

CONCLUSION..................................................................................................................45

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES[*]

Page

CASES

*Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184 (5th Cir. 2017) ........................................41

*Africa Growth Corp. v. Republic of Angola*, 2019 WL 3253367
(D.D.C. July 19, 2019)...............................................................................................................9

*Agency of Canadian Car & Foundry Co. v. American Can Co.*, 258 F. 363
(2d Cir. 1919)...........................................................................................................................19

\* *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1 (D.D.C. 2010)..........................................................36, 38

\* *Aldossari ex rel. Aldossari v. Ripp*, --- F. Supp. 3d ---, 2021 WL 1819699
(E.D. Pa. May 6, 2021), *appeal pending*, No. 21-2080 (3d Cir.) ....................................17, 18

*APA Assessment Fee Litig., In re*, 766 F.3d 39 (D.C. Cir. 2014) ..................................................41

*Appel v. Hayut*, 2021 WL 2689059 (S.D.N.Y. June 30, 2021).......................................................32

*Asahi Metal Indus. Co. v. Superior Ct. of California*, 480 U.S. 102 (1987) ................................14

\* *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................................44

*Atrium of Princeton, LLC v. NLRB*, 684 F.3d 1310 (D.C. Cir. 2012) ............................................9

*Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064 (9th Cir. 2017) ....................................7

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964) ......................................................26

*Belhas v. Ya'alon*, 515 F.3d 1279 (D.C. Cir. 2008).......................................................................26

*Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39 (D.D.C. 2008) ...............................42

*Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74 (D.D.C. 2006)........................................42

*Boniface v. Viliena*, 338 F. Supp. 3d 50 (D. Mass. 2018)............................................................32

*Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020) ........................................................................29

*Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124 (9th Cir. 2010)............................7

*Burnham v. Superior Ct. of California*, 495 U.S. 604 (1990).......................................................13

---

[*] Authorities principally relied upon are marked with an asterisk.

*Cabello Barrueto v. Fernáandez Larios*, 205 F. Supp. 2d 1325 (S.D. Fla. 2002),
    *aff'd*, 402 F.3d 1148 (11th Cir. 2005) .................................................................30

*Calder v. Jones*, 465 U.S. 783 (1984) ...................................................................3

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994) ..........................................................................................30

*Cheyenne Arapaho Tribes of Oklahoma v. United States*, 558 F.3d 592
    (D.C. Cir. 2009) ................................................................................................14

*Cmty. Oncology Alliance, Inc. v. OMB*, 987 F.3d 1137 (D.C. Cir. 2021) ....................29

*Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71 (D.D.C. 2017)........................33

*Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38 (D.D.C. 2000) ...............................7

*Dammarell v. Islamic Republic of Iran*, 2005 WL 756090 (D.D.C. Mar. 29, 2005)...................42

*Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42
    (1st Cir. 2002) ...................................................................................................8

*Dellmuth v. Muth*, 491 U.S. 223 (1989)..................................................................23

*Doe v. Constant*, 2006 U.S. Dist. LEXIS 101961 (S.D.N.Y. Oct. 24, 2006) .................32

*Doe v. Exxon Mobil Corp.*, 654 F.3d 11 (D.C. Cir. 2011), *vacated*, 527 F. App'x 7
    (D.C. Cir. 2013) ............................................................................................ 36-37

*Doe v. Nestle, S.A.*, 929 F.3d 623 (9th Cir. 2018), *rev'd and remanded sub nom.*
    *Nestlé USA, Inc v. Doe*, 141 S. Ct. 1931 (2021) .................................................39

*Doe I v. State of Israel*, 400 F. Supp. 2d 86 (D.D.C. 2005)........................................26

*Doğan v. Barak*, 932 F.3d 888 (9th Cir. 2019) .........................................................22

*Erwin-Simpson v. AirAsia Berhad*, 985 F.3d 883 (D.C. Cir. 2021)..............................14

*Escarria-Montano v. United States*, 797 F. Supp. 2d 21 (D.D.C. 2011) ......................35

*Estate of Klieman v. Palestinian Auth.*, 923 F.3d 1115 (D.C. Cir. 2019),
    *cert. granted, vacated, and remanded*, 140 S. Ct. 2713 (2020)..................2, 6, 7

*FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087 (D.C. Cir. 2008) ..........................14

\* *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323 (D.D.C. 2020) .........33, 43, 44

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017 (2021) ...........11, 12

*Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48 (D.D.C. 2018) ...........................................42

*Garcia v. Cty. of Spokane*, 2012 WL 12918364 (E.D. Wash. Apr. 2, 2012)................................30

*Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88 (D.D.C. 2017) .......................................33, 42

*Grace v. MacArthur*, 170 F. Supp. 442 (E.D. Ark. 1959) ...........................................................13

*Grand Jury Proceedings, Doe No. 700, In re*, 817 F.2d 1108 (4th Cir. 1987)............................16

*Gregorio v. Gordon*, 215 F. Supp. 3d 1 (D.D.C. 2015)...........................................................7, 8

*Hassen v. Nahyan*, 2010 WL 9538408 (C.D. Cal. Sept. 17, 2010) ..........................................6, 7

*Heath v. Alabama*, 474 U.S. 82 (1985)...............................................................................22, 27

*Hoffman v. State Regulatory Registry, LLC*, 2021 WL 2592960
(D.D.C. June 24, 2021) ...............................................................................................................15

* *Hourani v. Mirtchev*, 796 F.3d 1 (D.C. Cir. 2015)..............................................19, 25, 26, 27, 28

*IMAPizza, LLC v. At Pizza Ltd.*:

      334 F. Supp. 3d 95 (D.D.C. 2018) ......................................................................................14

      965 F.3d 871 (D.C. Cir. 2020) ...........................................................................................39

*Jackson v. Loews Wash. Cinemas, Inc.*, 944 A.2d 1088 (D.C. 2008)..........................................10

*Jefferson v. Collins*, 905 F. Supp. 2d 269 (D.D.C. 2012) ........................................................9, 10

*Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020 (D.C. Cir. 1997) .................20

*Kaiser Grp. Int'l, Inc., In re*, 730 F. Supp. 2d 247 (D.D.C. 2010), *aff'd sub nom.*
*Kaiser Grp. Int'l, Inc. v. World Bank*, 420 F. App'x 2 (D.C. Cir. 2011)...........................9

*Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12 (D.D.C. 2019)....................................33

* *Kickapoo Tribe of Indians of Kickapoo Rsrv. in Kansas v. Babbitt*,
43 F.3d 1491 (D.C. Cir. 1995)...................................................................................................23

*Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013) .......................................................40

* *Lewis v. Mutond*, 918 F.3d 142 (D.C. Cir. 2019), *cert. denied*, 141 S. Ct. 156
(2020) .....................................................................................................................................16, 23

* *Livnat v. Palestinian Auth.*, 851 F.3d 45 (D.C. Cir. 2017)......................................................6, 7

*Mamani v. Sánchez Bustamante*, 968 F.3d 1216 (11th Cir. 2020) ..............................................29

*McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066 (D.C. Cir. 2012) ....................25, 26

*Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012) ....................................................31

*Morris v. Khadr*, 415 F. Supp. 2d 1323 (D. Utah 2006)............................................8

*Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010) ..................................39, 41

*Mwani v. bin Laden*, 417 F.3d 1 (D.C. Cir. 2005)......................................4, 5, 6, 8, 14

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617 (2018) ........................................29

*Nat'l Cmty. Reinvestment Coal. v. NovaStar Fin., Inc.*, 631 F. Supp. 2d 1
(D.D.C. 2009) ..........................................................................8

\* *Nestlé USA, Inc v. Doe*, 141 S. Ct. 1931 (2021)..........................................36, 39, 40, 41

*Nnaka v. Federal Republic of Nigeria*, 756 F. App'x 16 (D.C. Cir. 2019) ...........................22, 27

*Ofisi v. Al Shamal Islamic Bank*, 2019 WL 1255096 (D.D.C. Mar. 19, 2019) ...........................6

*Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84 (D.D.C. 2017)....................................37, 39, 40

*Oveissi v. Islamic Republic of Iran*, 573 F.3d 835 (D.C. Cir. 2009) ...............................42

*Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017), *vacated in part
sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020) ..................................28, 31

*Pennington v. Islamic Republic of Iran*, 2021 WL 2592910 (D.D.C. June 24, 2021)..................33

*Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F. Supp. 2d 54
(D.D.C. 2003) ..........................................................................7

*Republic of Mexico v. Hoffman*, 324 U.S. 30 (1945) ....................................................23

\* *Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008)................................23, 24, 25

*Republic of Sudan v. Owens*, 194 A.3d 38 (D.C. 2018) ............................................43, 44

*RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090 (2016) ....................................41

*Roe v. Unocal Corp.*, 70 F. Supp. 2d 1073 (C.D. Cal. 1999) ........................................5

*Rotkiske v. Klemm*, 140 S. Ct. 355 (2019) ........................................................29

*Rush v. Savchuk,* 444 U.S. 320 (1980)..............................................................7

*Saleh v. Titan Corp.*, 580 F.3d 1 (D.C. Cir. 2009)....................................................36

\*   *Samantar v. Yousuf*, 560 U.S. 305 (2010) .............................................................................24, 26

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993)...............................................................................18

*Schertzman Cohen v. Islamic Republic of Iran*, 2019 WL 3037868
    (D.D.C. July 11, 2019)................................................................................................................33

*SEC v. Lines Overseas Mgmt., Ltd.*, 2005 WL 3579139 (D.D.C. Jan. 4, 2006)...........................13

*Sikhs for Justice v. Singh*, 64 F. Supp. 3d 190 (D.D.C. 2014).....................................................16

*Sisso v. Islamic Republic of Iran*, 448 F. Supp. 2d 76 (D.D.C. 2006) .............................................7

*Société Nationale Industrielle Aérospatiale v. United States Dist. Ct.*,
    482 U.S. 522 (1987)....................................................................................................................15

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)..............................................................36, 37, 38

*South Carolina Pub. Serv. Auth. v. FERC*, 762 F.3d 41 (D.C. Cir. 2014)....................................32

*Spanski Enters., Inc. v. Telewizja Polska, S.A.*, 883 F.3d 904 (D.C. Cir. 2018)...........................39

*Statewide Bonding, Inc. v. DHS*, 980 F.3d 109 (D.C. Cir. 2020) .................................................43

*Strange v. Islamic Republic of Iran*, 2016 WL 10770678 (D.D.C. May 6, 2016).........................8

*Terrorist Attacks on Sept. 11, 2001, In re*, 392 F. Supp. 2d 539 (S.D.N.Y. 2005),
    *aff'd*, 538 F.3d 71 (2d Cir. 2008) ..............................................................................................8

\*   *TJGEM LLC v. Republic of Ghana*, 26 F. Supp. 3d 1 (D.D.C. 2013), *aff'd*,
    2015 WL 3653187 (D.C. Cir. June 9, 2015) ...............................................................24, 25

*Triple Up Ltd. v. Youku Tudou Inc.*, 2018 WL 4440459 (D.C. Cir. July 17, 2018) ....................15

*UDC Chairs Chapter, Am. Ass'n of Univ. Professors v. Bd. of Trs.*, 56 F.3d 1469
    (D.C. Cir. 1995) ..........................................................................................................................34

*United States v. Cammorto*, 859 F.3d 311 (4th Cir. 2017) ..........................................................29

*United States v. First Nat'l City Bank*, 379 U.S. 378 (1965).......................................................14

*United States v. Williams*, 536 F.2d 810 (9th Cir. 1976) .............................................................13

*W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117 (D.D.C. 2019) .......................................42

\*   *Walden v. Fiore*, 571 U.S. 277 (2014) ...........................................................................2, 3, 4, 6, 7

*Warfaa v. Ali*, 33 F. Supp. 3d 653 (E.D. Va. 2014), *aff'd*, 811 F.3d 653
    (4th Cir. 2016)..................................................................................................................26, 32

*Wiwa v. Royal Dutch Petroleum Co.*, 2002 WL 319887 (S.D.N.Y. Feb. 28, 2002) ............... 31-32

*World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154
(D.C. Cir. 2002) ............................................................................................25

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980) ................................13

*Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216 (D.D.C. 2012), *aff'd*,
554 F. App'x 16 (D.C. Cir. 2014) .......................................................................42

*Yousuf v. Samantar*:

    2012 WL 3730617 (E.D. Va. Aug. 28, 2012)................................................32

    699 F.3d 763 (4th Cir. 2012) ..................................................................16, 23


INTERNATIONAL CASES

*Apex Global Mgmt. Ltd. v. Fi Call Ltd.*, [2013] EWHC 587 (Ch) ................................16

*Nevsun Res. Ltd. v. Araya*, 2020 SCC 5 (Can.) ....................................................34

*Prosecutor v. Blé Goudé*, Case No. ICC-02/11-02/11, Decision on the
Confirmation of Charges (Dec. 11, 2014) ........................................................37

*Prosecutor v. Gbagbo*, Case No. ICC-02/11-01/11, Decision on the Confirmation
of Charges (June 12, 2014) .........................................................................37

*Prosecutor v. Katanga*, Case No. ICC-01/04-01/07, Decision on Confirmation of
Charges (Sept. 30, 2008)............................................................................37

*Prosecutor v. Mrđa*, Case No. IT-02-59-S, Sentencing Judgement
(ICTY Mar. 31, 2004)................................................................................37

*Prosecutor v. Ntaganda*, Case No. ICC-01/04-02/06, Judgment (July 8, 2019) ...........37

*Prosecutor v. Vasiljević*, Case No. IT-98-32-T, Judgment (ICTY Nov. 29, 2002)......37


ADMINISTRATIVE PROCEEDINGS

*Darcy Lynn Shawver*, *In re*, 2 O.R.W. 649, 1982 WL 42982
(Dep't of Com. Feb. 12, 1982)......................................................................13

TREATIES, STATUTES, AND RULES

Geneva Convention for the Amelioration of the Condition of the Wounded and
Sick in Armed Forces in the Field, Aug. 12, 1949, 6 U.S.T. 3114 ....................................31

    Art. 3 ............................................................................................................................31

    Art. 12 ..........................................................................................................................31

\* Alien Tort Statute, 28 U.S.C. § 1350 ...........................................2, 36, 37, 38, 39, 40, 41

Copyright Act (17 U.S.C.) ...............................................................................................39

Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891
(codified as amended at, *inter alia*, 28 U.S.C. §§ 1602-1611) .................21, 24, 26, 33, 44

    28 U.S.C. § 1605A(a)(1) ..............................................................................................33

\* Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992),
*reprinted in* 28 U.S.C. § 1350 note .............................................................2, 22, 23, 28, 29,
30, 31, 32, 33, 34, 35

    § 2(a), 106 Stat. 73 ......................................................................................................30

    § 2(a)(1), 106 Stat. 73 ..................................................................................................30

    § 2(a)(2), 106 Stat. 73 ..................................................................................................30

    § 2(b), 106 Stat. 73.......................................................................................................34

    § 3(a), 106 Stat. 73..................................................................................................28, 31

15 U.S.C. § 2 ....................................................................................................................29

15 U.S.C. § 1692f .............................................................................................................29

18 U.S.C. § 1030(b) ..........................................................................................................29

18 U.S.C. § 1113 ...............................................................................................................29

18 U.S.C. § 1114 ...............................................................................................................29

18 U.S.C. § 1116 ...............................................................................................................29

18 U.S.C. § 1119(b) ..........................................................................................................29

18 U.S.C. § 1348 ...............................................................................................................29

18 U.S.C. § 1512 ...............................................................................................................29

18 U.S.C. § 1751 ...................................................................................................29

18 U.S.C. § 1841 ...................................................................................................29

18 U.S.C. §§ 2339A-2339C ..................................................................................29

26 U.S.C. § 7201 ...................................................................................................29

Fed. R. Civ. P.:

     Rule 4(k)(2) ......................................................................................................8

     Rule 19 ....................................................................................................23, 24

     Rule 19(a)(1)(B)(i) ...........................................................................................24

## LEGISLATIVE MATERIALS

H.R. Rep. No. 102-367, pt. 1 (1991), *reprinted in* 1992 U.S.C.C.A.N. 84 .......................30, 31, 35

S. Rep. No. 102-249 (1991) ...........................................................................30, 31

## ADMINISTRATIVE MATERIALS

Br. for the United States as Amicus Curiae, *Mutond v. Lewis*, No. 19-185
     (U.S. May 26, 2020), 2020 WL 2866592 ..........................................................21

Diplomatic Note, *Pruitt v. M/V Patignies* (E.D. Mich. July 18, 1968), *in*
     *Sovereign Immunity Decisions of the Department of State – May 1952 to*
     *January 1977*, *in* U.S. Dep't of State, *Digest of United States Practice in*
     *International Law* 1017, 1060-61 (Michael Sandler, Detlev F. Vagts &
     Bruno A. Ristau eds., 1977), *available at* https://law.yale.edu/sites/default/
     files/documents/pdf/cglc/Sanghvi_LessonsFromThePastForForeignSovereign
     Immunity.pdf ....................................................................................................21

Ltr. from Harold Hongju Koh, Legal Adviser, U.S. Dep't of State, to Stuart F.
     Delery, Acting Ass't Att'y Gen., Civil Div., U.S. Dep't of Justice (Sept. 7,
     2012), *docketed at Doe v. Zedillo*, No. 3:11-cv-01433-AWT, ECF No.
     38-1 (D. Conn. Sept. 7, 2012) ..........................................................................19

Ltr. from Harold Hongju Koh, Legal Adviser, U.S. Dep't of State, to Stuart F.
     Delery, Principal Dep. Ass't Att'y Gen., Civil Div., U.S. Dep't of Justice
     (Dec. 17, 2012), *docketed at Ragsdale v. Lashkar-E-Taiba*, No. 1:11-cv-
     03893-DLI-CLP, ECF No. 19-1 (E.D.N.Y. Dec. 17, 2012) .......................17, 21

Statement of Interest Submitted by the United States of America, *Miango v. Democratic Republic of Congo*, No. 15-cv-1265, ECF No. 151 (D.D.C. May 1, 2019) .................................................................................21

Suggestion of Immunity by the United States, *Doğan v. Barak*, No. 2:15-cv-08130, ECF No. 48 (C.D. Cal. June 10, 2016) ..............................................16

U.S. Dep't of State:

    *Digest of United States Practice in International Law* 571 (Sally J. Cummins & David P. Stewart eds., 2003), https://2009-2017.state.gov/documents/organization/139602.pdf .................................................................17

    *U.S. Relations With Iran*, Bilateral Relations Fact Sheet, Bureau of Near Eastern Affairs (Dec. 7, 2020), https://www.state.gov/u-s-relations-with-iran/ ....................................................................................................................42

    *U.S. Relations With Saudi Arabia* (Dec. 15, 2020), https://www.state.gov/u-s-relations-with-saudi-arabia/ .......................................................................5


OTHER MATERIALS

Basic Law of Governance, https://www.saudiembassy.net/basic-law-governance ......................17

Def.'s Renewed Motion To Dismiss, *Warfaa v. Ali*, No. 1:05-cv-00701 (LMB/JFA), ECF No. 91 (E.D. Va. May 31, 2014) .......................................32

*Distance between Ottawa (YOW) and Frankfurt (FRA)*, https://www.airmilescalculator.com/distance/yow-to-fra/.................................13

Restatement (Second) of Foreign Relations Law of the United States (1965) .......................21, 22

Restatement (Second) of Torts (1965) .........................................................................43

Restatement (Third) of Agency (2006) .........................................................................9

Beth Van Schaack, *Immunities and Criminal Prosecution within the United States & Beyond*, Just Security (July 9, 2014), https://www.justsecurity.org/12679/immunities-criminal-prosecution-united-states/ ..................................16

*Webster's Third New International Dictionary* (2002) .........................................29, 31

## INTRODUCTION

The claims brought by Plaintiff Saad Aljabri against His Royal Highness Mohammed bin Salman bin Abdulaziz Al Saud (the "Crown Prince") should be dismissed.  Like his Amended Complaint, Aljabri's opposition ("Opp.") is laden with rhetoric, digressions, and misguided appeals for sympathy from a man who stole billions in anti-terrorism funds.  It remains empty of what matters:  any factual or legal basis for this Court to exercise jurisdiction over this controversy or award Aljabri relief on any claim.

Lack of personal jurisdiction is the first fatal flaw in Aljabri's Amended Complaint. It would take much to show that a suit by a Saudi-Maltese expatriate against a senior Saudi government official based on an alleged attempt in Canada belongs in this Court.  Aljabri's self-serving assertions of past services to the intelligence community – to support the remarkable claim that any attack on him would be an attack on the United States – are not enough.  Nor are his conclusory allegations that the Crown Prince supposedly directed unsuccessful attempts to locate him in the United States by other Defendants.

Foreign official immunity presents an equally insurmountable bar.  The Crown Prince has status-based immunity as the son of and designated successor to his father the King. Alternatively, he has conduct-based immunity.  Taking the Amended Complaint's factual allegations (but not its labels and conclusions) as true, the Crown Prince had broad authority under Saudi law to pursue Aljabri for fraud and corruption, despite Aljabri's flight to Canada; and to direct the lawful arrest and prosecution of Aljabri's children for an attempted flight from justice and for helping launder money through their own accounts.  Indeed, the Canadian courts have recognized a strong *prima facie* case that Aljabri committed an extraordinary and brazen fraud, and they have frozen his assets worldwide.

Because this case is a thinly veiled challenge to Saudi Arabia's official acts on or rooted in its own soil, it should also be dismissed for failure to join a necessary party and as barred by the act of state doctrine.  Having launched a barrage of attacks on Saudi Arabia's current government – including an expert declaration challenging a pending criminal case as a "sham" – Aljabri now says those allegations do not matter and that this Court need adjudicate only Defendants' personal conduct.  No reasonable reader of the Amended Complaint, or indeed of Aljabri's opposition, could accept his argument that he is not challenging official acts.

Even if the Court finds jurisdiction, Aljabri still states no claim.  The plain language of the Torture Victim Protection Act of 1991 ("TVPA") creates a cause of action for an "extrajudicial killing."  The statute creates no such cause for attempt, and the Court should not add one.  Nor does an attempt violate customary international law, much less a specific, universal, and obligatory norm that could support an Alien Tort Statute ("ATS") claim.  Finally, Aljabri's common-law emotional-distress claim fails either under (governing) Saudi law or under D.C. law; and in any event that claim cannot stand jurisdictionally on its own.

## ARGUMENT

## I.    This Court Lacks Personal Jurisdiction Over the Crown Prince

The fundamental flaw in Aljabri's attempt to assert personal jurisdiction over the Crown Prince is that he seeks relief for an alleged attempted killing that he claims was directed by Saudi nationals in Saudi Arabia and carried out by other Saudi nationals against a Saudi and Maltese national in Canada.  He fails to show, as due process requires, that the Crown Prince's alleged "'*suit-related conduct . . .* create[d] a *substantial connection* with the forum.'"  *Estate of Klieman v. Palestinian Auth.*, 923 F.3d 1115, 1120 (D.C. Cir. 2019) (quoting *Walden v. Fiore*, 571 U.S. 277, 284 (2014)) (emphases in *Klieman*), *cert. granted, vacated, and remanded on other grounds*, 140 S. Ct. 2713 (2020).  None of his contrary arguments has merit.

### A.      Aljabri Fails To Show Jurisdiction Over the Crown Prince Based on Supposed Purposeful Targeting of the United States

Aljabri's first jurisdictional theory (at 53) is that the Crown Prince supposedly "[p]urposefully [t]argeted" the United States with an alleged attempt on Aljabri's life in Canada. That theory is foreclosed by controlling precedent.  Aljabri's allegations that, in his former career as a senior Saudi official, he worked with U.S. intelligence agencies cannot convert an alleged attempt on his life in a foreign country into an attack on the United States.  *Walden v. Fiore*, which Aljabri fails to address or cite, holds that a plaintiff cannot "satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State."  571 U.S. at 284.  Under that rule, Aljabri's purported former contacts with U.S. intelligence cannot support personal jurisdiction over the Crown Prince.

*Walden* reaffirmed the limits of the "effects" test of *Calder v. Jones*, 465 U.S. 783 (1984), which governs attempts to establish jurisdiction based on an intentional tort committed outside the forum with effects in the forum.  "Effects"-based jurisdiction applies where "the 'brunt' of th[e] injury was suffered by the plaintiff in" the forum.  *Walden*, 571 U.S. at 287 (quoting *Calder*, 465 U.S. at 788-89).  *Calder* itself involved a California plaintiff who suffered the effects of the defendants' libel in California, giving rise to personal jurisdiction in California. 465 U.S. at 789.  As *Walden* explained, *Calder*'s holding "was largely a function of the nature of the libel tort. . . . [B]ecause publication to third persons is a necessary element of libel, the defendants' intentional tort actually occurred in California."  *Walden*, 571 U.S. at 287-88 (citation omitted).  Here, the alleged attempt did not "actually occur[ ]" in the United States, nor did Aljabri suffer "the brunt of [any] injury" here.  Rather, the attempt allegedly involved directions given in Saudi Arabia to enter Canada to harm Aljabri.  Aljabri resides in Canada, was there during the alleged attempt, and suffered his alleged emotional injuries there.

Aljabri's argument is weaker than the one rejected in *Walden*, where the plaintiffs contended that the defendant knew that the plaintiffs resided in Nevada and could foresee that the plaintiffs would suffer a loss of funds in Nevada. *Id.* at 288-89. Here, Aljabri's novel jurisdictional theory relies on allegations of a past relationship with U.S. intelligence, years before the alleged attempted killing, when Aljabri served as chief of staff to the Saudi Minister of the Interior. *E.g.*, Am. Compl. ¶¶ 31-33, 146-148. That position ended on September 10, 2015, more than three years before the alleged attempted killing, and well before the Crown Prince assumed his current role, when Aljabri alleges King Salman removed him by royal decree for unauthorized meetings with the CIA. *Id.* ¶ 153. The most recent specific action that Aljabri alleges he took to assist U.S. intelligence was in 2010. *Id.* ¶ 147.

The Mudd Declaration, on which Aljabri relies, confirms that an alleged attack on Aljabri would not disrupt any present partnership with U.S. intelligence. Mudd repeatedly refers to Aljabri's partnership with U.S. intelligence in the past tense. *E.g.*, ECF No. 102-5 (Opp. Ex. D, Mudd Decl.) ¶ 5 (agreeing that Aljabri "was a key partner of the U.S. Intelligence Community . . . [i]n the wake of" the September 11, 2001 attacks); *id.* ¶¶ 17-25. Mudd nevertheless asserts that the United States has an interest in protecting Aljabri because of his involvement in past counterterrorism efforts and to protect the United States' access to others "who would consider partnering with the United States" in the future. *Id.* ¶ 29. Under *Walden*, even a current relationship between the plaintiff and the forum cannot support personal jurisdiction. It follows that a past relationship and speculative effects on hypothetical future relationships are not enough.

Aljabri relies heavily on *Mwani v. Bin Laden*, 417 F.3d 1 (D.C. Cir. 2005), but that case does not help him. Instead, *Mwani* illustrates the distance between the facts necessary to allege purposeful targeting and Aljabri's insufficient showing. In *Mwani*, the D.C. Circuit upheld a default judgment based on personal jurisdiction over Osama bin Laden and Al Qaeda in

connection with their attack on the U.S. embassy in Kenya, which was intended to and did kill many Americans. *Id.* at 13. That attack was part of Al Qaeda's broader conspiracy to terrorize the United States, including many attacks on U.S. soil, such as the 1993 World Trade Center bombing and the September 11, 2001 terrorist attacks. *Id.* at 13-14. The unique American status of the embassy, and the context of the embassy attack in Al Qaeda's broader conspiracy against the United States, provided the necessary jurisdictional contacts.

Aljabri is not an embassy, let alone an American citizen or resident. An attempted attack on Aljabri in Canada is not "purposefully directed" at the United States in any way comparable to Al Qaeda's bombing of a U.S. diplomatic facility. *Id.* at 13. Nor does Aljabri even assert, much less show, that the Crown Prince has conspired to harm the United States or its citizens. To the contrary, the Executive Branch describes Saudi Arabia as "a strong partner in security and counterterrorism efforts and in military, diplomatic, and financial cooperation," with "more than seven decades of close friendship and cooperation" with the United States.[1] To compare its leaders to bin Laden and Al Qaeda is offensive and ridiculous.

Aljabri further asserts (at 54) that personal jurisdiction exists because the Crown Prince "targeted [Aljabri] to disrupt the U.S. intelligence community's relationship with" Aljabri. Neither his factual allegations nor the Mudd Declaration plausibly support the inference he asks the Court to draw. As set forth above, neither the Amended Complaint nor Mudd identifies any current relationship between Aljabri and U.S. intelligence. Instead, Aljabri alleges that the Crown Prince views Aljabri as a threat to "the unencumbered throne of the Kingdom of Saudi

---

[1] U.S. Dep't of State, *U.S. Relations With Saudi Arabia* (Dec. 15, 2020), https://www.state.gov/u-s-relations-with-saudi-arabia/; *see also Roe v. Unocal Corp.*, 70 F. Supp. 2d 1073, 1078 (C.D. Cal. 1999) (taking judicial notice of the status of the United States' diplomatic relationship with a foreign nation on the basis of a State Department press release and country guide).

Arabia" because Aljabri knows, and threatens to reveal, "sensitive information" showing that the Crown Prince has engaged in serious and criminal misconduct.  Am. Compl. ¶¶ 3, 6.  Even if those allegations were true (which the Crown Prince in no way concedes), they would show that any supposed attempt to silence Aljabri would be focused on Saudi Arabia, not the United States.

Recent D.C. Circuit decisions confirm that *Walden* controls and that *Mwani* cannot support jurisdiction.  *Livnat v. Palestinian Authority*, 851 F.3d 45 (D.C. Cir. 2017), held that an extrajudicial killing abroad – even of United States citizens – did not give rise to personal jurisdiction here because the plaintiffs' allegations that the killings were designed "to influence United States public opinion and policy" were conclusory and unsupported.  *Id.* at 57.  *Klieman* confirms that *Mwani* – especially after *Walden* – does not and cannot support jurisdiction without purposeful direction by the defendant at the forum itself.  The D.C. Circuit emphasized that *Mwani* found sufficient bin Laden's and Al Qaeda's "attack[ ] [on] a U.S. government outpost" and their "indisputabl[e] aim[ ] to kill Americans."  923 F.3d at 1126.  But the Court distinguished *Mwani* for lack of a showing that the attackers had "manifestly sought purposefully [to] direct their terror at the United States" – the type of "intentional targeting" relevant to a tort case and absent here.  *Id.* at 1125-26 (internal quotation marks omitted; brackets in original).

The other cases on which Aljabri relies likewise fail to support his theory.  *Ofisi v. Al Shamal Islamic Bank*, 2019 WL 1255096 (D.D.C. Mar. 19, 2019), ordered discovery into allegations that the defendant had "acted in concert with, or at the direction of, al Qaeda to facilitate, plan, or execute" the same embassy bombings at issue in *Mwani*.  *Id.* at *8.  It is irrelevant for the same reasons as *Mwani*.  *Hassen v. Nahyan*, 2010 WL 9538408 (C.D. Cal. Sept. 17, 2010), found jurisdiction based on an abduction of an American who the defendants believed "worked for the CIA" to obtain American "state secrets."  *Id.* at *8-10.  Nothing of the

kind is alleged here.[2]  Aljabri's remaining authorities (at 53-54) were pre-*Walden* cases involving

attacks that harmed Americans abroad.  They do not survive *Walden*, *Livnat*, or *Klieman*.[3]

### B.   Aljabri Fails To Show Jurisdiction Over the Crown Prince Based on Alleged Inquiries About Aljabri's Family by Other Defendants in the United States

Aljabri's second theory of personal jurisdiction is that alleged actions of other Defendants

in "hunting" him in the United States support personal jurisdiction over the Crown Prince.  He

neither alleges a plausible basis to attribute such actions to the Crown Prince nor demonstrates

that those allegations are sufficiently related to his legal claims to support jurisdiction.

### 1.   Aljabri Fails To Show a Basis To Attribute Actions of Other Defendants in the United States to the Crown Prince

The general rule is that a plaintiff may not "aggregat[e] the[] forum contacts" of multiple

defendants to establish personal jurisdiction.  *Rush v. Savchuk*, 444 U.S. 320, 331-32 (1980); *see*

*also*, *e.g.*, *Gregorio v. Gordon*, 215 F. Supp. 3d 1, 5 (D.D.C. 2015).  Aljabri errs in contending

(at 60-62) that he can bypass that rule to attribute to the Crown Prince the alleged contacts of

other Defendants with the United States without well-pleaded factual allegations that establish

an agency relationship.  Such a relationship is an exception to the general rule of non-attribution

because background principles of law permit the conduct of an agent to bind the principal.

---

[2] *Hassen* also relied heavily on cases holding intentional targeting of a U.S. citizen abroad was sufficient.  Those cases are not good law after *Walden*, as the Ninth Circuit has recognized.  *Compare Hassen*, 2010 WL 9538408, at *9 (citing *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124 (9th Cir. 2010)), *with Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1069 (9th Cir. 2017) (citing *Brayton Purcell* and other cases as examples of precedent to be reconsidered "[i]n light of the Court's instructions in *Walden*").

[3] *See Sisso v. Islamic Republic of Iran*, 448 F. Supp. 2d 76, 90 (D.D.C. 2006) ("indiscriminate attack on civilians in . . . Tel Aviv," where it was "foreseeable" Americans would be hurt); *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F. Supp. 2d 54, 59-60 (D.D.C. 2003) (bombing of an international flight with "intentional targeting of foreign nationals at the risk of killing Americans"); *Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38, 54 (D.D.C. 2000) (detention and torture of U.S. citizens in Iraq).

*See, e.g., Gregorio*, 215 F. Supp. 3d at 5.[4]  Another basis for attributing contacts of others for jurisdictional purposes is conspiracy.  But as shown in the Crown Prince's motion (at 18-19), Rule 4(k)(2) does not authorize jurisdiction based on conspiracy.  Aljabri does not respond to this point and does not press conspiracy as a basis for jurisdiction over the Crown Prince.

None of Aljabri's cases supports his theory that Defendants' contacts can be aggregated to support jurisdiction without an agency or conspiracy relationship to support attributing the actions of one individual to another.  *Mwani* found that the defendants had engaged in "an ongoing conspiracy to attack the United States" and based jurisdiction on actions taken in furtherance of that conspiracy.  417 F.3d at 13.[5]  *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.* reasoned that the defendants "held themselves out . . . to be part of a joint venture or other agency relationship," which precluded them from denying such a relationship under "the doctrine of estoppel."  290 F.3d 42, 57 (1st Cir. 2002).  Aljabri's remaining cases are not about attribution of forum contacts at all.  Rather, they found personal jurisdiction based on personal participation in or support for terrorist attacks against the United States.[6]

---

[4] Aljabri errs (at 61) in characterizing *Gregorio* as a case purely about the D.C. long-arm statute.  *Gregorio* held that the provision of the long-arm statute at issue was "'coextensive with the due process clause'" and that exercising jurisdiction "would comport with neither the District of Columbia's long-arm statute nor the Constitution."  215 F. Supp. 3d at 5, 6 (quoting *Nat'l Cmty. Reinvestment Coal. v. NovaStar Fin., Inc.*, 631 F. Supp. 2d 1, 6 (D.D.C. 2009)).

[5] *Mwani* did not consider or address whether conspiracy jurisdiction is available under Rule 4(k)(2), likely because bin Laden and Al Qaeda (having defaulted) did not argue the point.

[6] *See Strange v. Islamic Republic of Iran*, 2016 WL 10770678, at *9 (D.D.C. May 6, 2016) (defendant allegedly "directly participat[ed] in the Taliban's and Al-Qaeda's campaign to attack America and U.S. military servicemen") (brackets in original); *Morris v. Khadr*, 415 F. Supp. 2d 1323, 1336 (D. Utah 2006) (defendant "actively participated in and helped plan al Qaeda's terrorist agenda"); *In re Terrorist Attacks on Sept. 11, 2001*, 392 F. Supp. 2d 539, 562 (S.D.N.Y. 2005) (defendant was "a founder, an admitted associate, and a provider of financial and logistical support to al Qaeda"), *aff'd*, 538 F.3d 71 (2d Cir. 2008).

Aljabri also errs in contending (at 62) that his factual allegations, taken as true, establish a *prima facie* case that any Defendant acted as the Crown Prince's agent in the United States. As set forth in the Crown Prince's motion (at 16-17), an agency relationship requires that the principal "manifests assent" that the agent act on the principal's behalf and subject to the principal's control. *In re Kaiser Grp. Int'l, Inc.*, 730 F. Supp. 2d 247, 251 (D.D.C. 2010) (quoting Restatement (Third) of Agency § 1.01 (2006)), *aff'd sub nom. Kaiser Grp. Int'l, Inc. v. World Bank*, 420 F. App'x 2 (D.C. Cir. 2011); *see also Africa Growth Corp. v. Republic of Angola*, 2019 WL 3253367, at *8 (D.D.C. July 19, 2019) (plaintiff "must plead that" the alleged principal "manifested a desire for" the alleged agents "to act on its behalf"). Aljabri points to no facts – either in his Amended Complaint or in his opposition – that show or plausibly suggest that the Crown Prince manifested assent for any other Defendant to act on his behalf in allegedly pursuing Aljabri in the United States.

Ignoring the requirement of assent, Aljabri argues (at 62) that it would be sufficient for agency if the Crown Prince had the right to control the purported agents. None of his authorities supports his claim that a plaintiff can show agency with generalized allegations of potential control. *Atrium of Princeton, LLC v. NLRB*, 684 F.3d 1310 (D.C. Cir. 2012), holds that control is necessary – not sufficient – for agency. *See id.* at 1315 ("an agency relationship arises *only* where the principal has the right to control") (emphasis added). Aljabri quotes a comment from the Third Restatement of Agency stating that no "communication from the *agent* to the principal" is required to establish agency, Restatement (Third) of Agency § 1.01 cmt. c (emphasis added), but omits language explaining that agency arises when the *principal* "manifests assent," *id.* § 1.01; *see also id.* § 3.01 ("Actual authority . . . is created by a principal's manifestation to an agent that . . . expresses the principal's assent that the agent take action on the principal's behalf."). Aljabri also quotes *Jefferson v. Collins*, 905 F. Supp. 2d 269 (D.D.C. 2012), but

9

omits its statement that agency requires "'evidence'" – here, well-pleaded facts – "'of the parties' consent to establish a principal-agent relationship.'"  *Id.* at 285 (quoting *Jackson v. Loews Wash. Cinemas, Inc.*, 944 A.2d 1088, 1097 (D.C. 2008)).

Aljabri's factual allegations do not plausibly support the existence of any relationship between the Crown Prince and the Defendants who allegedly acted in the United States, let alone an agency relationship.  Aljabri's contentions about purported Saudi agents infiltrating Twitter (at 37-38, 62) or monitoring the activities of students (at 62) are wholly unrelated to this case; Aljabri does not contend that any Defendant worked for Twitter or monitored other Saudi students.  Each of the sources on which Aljabri relies also involves alleged agents of the Saudi government; none suggests agency relationships with the Crown Prince in his personal capacity.

Aljabri's contention (at 62) that the student Defendants "fit to a tee the profile" of other supposed agents is a conclusory assertion divorced from his factual allegations.  None of those allegations establishes any "profile" of Saudi agents (let alone agents of the Crown Prince in his personal capacity) or that the student Defendants fit such a profile "to a tee."  As shown in the Crown Prince's motion (at 17), the facts Aljabri alleges are that the student Defendants participated in leadership programs, led student clubs, expressed political support for the Crown Prince on social media, and had contacts with a leader of a Saudi organization that served Saudi students.  Aljabri cites essentially the same facts in his opposition (at 14), adding only characterizations such as that the students were "deeply involved" with MiSK, enjoyed "unusual freedoms," or "declared allegiance" – in the sense of political support – to the Crown Prince.  None of that plausibly supports an inference that they served as agents in a murder plot.[7]

---

[7] Contrary to Aljabri's contention (at 63), he did not allege that the student Defendants "acted alongside" Alasaker.  He merely alleged that Alhamed and Alasaker attended an event at which a third person asked questions to Aljabri's friend about Aljabri's son.  Am. Compl. ¶ 238.

Aljabri's contention (at 63) that certain Defendants made inquiries in the United States "just when [the Crown Prince] and Alasaker needed them to do so" also does not support the inference of agency.  Aljabri alleges that the supposed surveillance efforts began in September 2017, roughly three months after he allegedly told the Crown Prince he was traveling to the United States in June 2017.  Am. Compl. ¶¶ 172, 225, 239.  If anything, that substantial gap in time weighs against Aljabri's speculative inference that the Crown Prince deployed these individuals as agents in an international manhunt.[8]

### 2. The Allegations Regarding Conduct in the United States Do Not Create a "Strong Relationship" Between This Lawsuit, the Crown Prince, and the United States

Even if the alleged inquiries by other Defendants about the location of Aljabri and his family were attributable to the Crown Prince, they would not create the requisite "strong relationship" between the Crown Prince, the United States, and this litigation.  *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1028 (2021).  As shown in the Crown Prince's opening brief (at 19-20), the alleged attempted killing occurred in Canada, and Aljabri does not allege that any efforts in the United States succeeded in locating him.  Aljabri objects (at 59) that he does not concede that "malware" supposedly planted on his phone by a message from Saudi Arabia to Canada yielded his location (though that is a fair reading of the Amended Complaint), but does not dispute the more important point that he fails to allege that any alleged efforts in the United States actually located him.  Instead, he argues vaguely (at 59) that Defendants in the

---

[8] No factual allegations support Aljabri's argument (at 63) that Hamed "could have only learned about" Aljabri's apartment at the Mandarin Oriental "through the efforts of other U.S.-Based Covert Agent Defendants."  The Amended Complaint contains no allegations linking Hamed to any other Defendants, even by association.  The suggestion that another Defendant informed Hamed of the location of one of Aljabri's apartments is entirely speculative.

United States "helped identify the vulnerabilities and habits necessary to trap and kill" Aljabri. Colorfully phrased though that assertion may be, it is conclusory and not factual.[9]

Aljabri errs in relying (at 60) on the Supreme Court's recent decision in *Ford Motor*. That case confirms that a "strong relationship" between claims and forum is needed.[10]  *Ford Motor* rejected a due process requirement of a "strict causal relationship" between forum contacts and litigation, but cautioned that its holding did not mean that "anything goes."  141 S. Ct. at 1026.  Ford, as a car manufacturer, "extensively serv[ed] the . . . market" in the forum states and could therefore be sued in those states by residents of those states for "in-state accident[s]."  *Id.* at 1028.  Indeed, the Court observed that the forum states were the "most natural State[s]" for the plaintiffs to sue.  *Id.* at 1031.  That holding provides no basis for a Saudi-Maltese national to sue a Saudi official for a purported injury suffered in Canada based on an alleged attempt supposedly directed from Saudi Arabia towards Canada.

### C.    Aljabri Asserts No Other Basis for Personal Jurisdiction

Aljabri also fails to establish personal jurisdiction (at 56, 69-70) based on a new factual assertion made through his counsel's hearsay summary of a written message from an airline employee:  that a flight from Frankfurt, Germany, to Ottawa, Canada, taken by other Defendants flew over U.S. airspace.  *See* ECF No. 102-1 (Opp., Hipp Decl.) ¶ 4.  Aljabri cites no case, and the Crown Prince is aware of none, holding that flying over a forum creates specific jurisdiction

---

[9] Aljabri argues (at 59) that the Crown Prince pursued him in Canada "only after ruling Boston out," but the Amended Complaint alleges no facts showing that any efforts in the United States ruled out Boston as a possible location – or, more importantly, that any such efforts ruled Toronto in as Aljabri's actual location.  *See infra* pp. 39-40.

[10] Aljabri argues (at 52 n.47) that *Ford Motor* did not hold that a "strong relationship" is necessary for specific jurisdiction, but the Court used those exact words to describe the "essential foundation" of specific jurisdiction.  141 S. Ct. at 1028.

there.[11]  Even if purposefully flying over U.S. airspace were a jurisdictionally relevant contact

(and it is not), Aljabri does not allege or present evidence that any Defendant knew or intended

that the flight would enter U.S. airspace.  The Court can take judicial notice that the shortest

flight path from Frankfurt to Ottawa would not do so.  *See Distance between Ottawa (YOW)*

*and Frankfurt (FRA)*, https://www.airmilescalculator.com/distance/yow-to-fra/.  The "fortuitous

circumstance" of a vehicle "passing through" a forum does not create jurisdiction there.

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980).[12]

> **D.**     **Personal Jurisdiction Would Violate Principles of Fair Play and Substantial Justice**

Concerns of fair play and substantial justice further weigh against jurisdiction here.

Aljabri does not dispute the core facts set out in the Crown Prince's motion (at 23-24) that make

jurisdiction unreasonable:  neither Aljabri nor the Crown Prince is a U.S. resident, the alleged

attempted killing occurred outside the United States, and the conduct that allegedly did occur in

the United States was less significant than the conduct alleged in Canada or Saudi Arabia and has

little connection to Aljabri's claims.  Aljabri's counterargument (at 77-78) is the same one that

---

[11] None of the cases cited by Aljabri holds otherwise.  *SEC v. Lines Overseas Management, Ltd.*, 2005 WL 3579139, at *4 (D.D.C. Jan. 4, 2006), and *Grace v. MacArthur*, 170 F. Supp. 442, 443-44 (E.D. Ark. 1959), found jurisdiction based on personal service in the forum, not based on sufficient contacts with the forum.  *Cf. Burnham v. Superior Ct. of California*, 495 U.S. 604 (1990) (holding that personal service during transient presence in a forum establishes personal jurisdiction).  In *In re Darcy Lynn Shawver*, 2 O.R.W. 649, 653, 1982 WL 42982 (Dep't of Com. Feb. 12, 1982), an agency found personal jurisdiction in the United States for illegal importation of dolphins where the defendant landed in Texas with the animals on a flight from Mexico.  *United States v. Williams*, 536 F.2d 810 (9th Cir. 1976), did not concern personal jurisdiction.  It held that *venue* existed in the Southern District of California where a criminal defendant flew from the Central District of California over the Southern District of California to Mexico to retrieve illegal drugs.  *Id.* at 812.

[12] Aljabri refers only in passing (at 56) to his allegation that in May 2020 the Crown Prince stated that he "planned to send men" to kill Aljabri by entering Canada through the United States.  Am. Compl. ¶ 355.  Aljabri does not allege that the Crown Prince actually carried out this alleged plan or that anyone ever acted on a directive from the Crown Prince to enter the United States (or to travel from the United States to Canada) to harm Aljabri.

underpins his erroneous purposeful-direction argument – that protecting him is a U.S. interest because, as a former Saudi government official, he previously worked with U.S. intelligence. He cites no case that has ever found jurisdiction reasonable on the basis of such allegations. The Supreme Court has warned that "'[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field.'" *Asahi Metal Indus. Co. v. Superior Ct. of California*, 480 U.S. 102, 115 (1987) (quoting *United States v. First Nat'l City Bank*, 379 U.S. 378, 404 (1965) (Harlan, J., dissenting)). That warning counsels against this Court exercising jurisdiction over this politically sensitive dispute about actions on foreign soil.

### E.    Jurisdictional Discovery Is Unwarranted

The Court should reject Aljabri's request for jurisdictional discovery. His primary argument for jurisdiction rests on the erroneous assertion that an alleged attempted attack on him in Canada is purposefully directed at the United States in the same way as Al Qaeda's bombing of the U.S. embassy in Kenya was in *Mwani*. That argument is legally meritless. No amount of discovery can improve it. *See Cheyenne Arapaho Tribes of Oklahoma v. United States*, 558 F.3d 592, 593 (D.C. Cir. 2009) (jurisdictional discovery properly denied where the party seeking it cannot "specify what facts discovery could produce that would alter the jurisdictional analysis").

Aljabri's secondary argument for jurisdiction rests on speculative and conjectural claims that others acted as the Crown Prince's agents in the United States, but "a request for jurisdictional discovery cannot be based on mere conjecture or speculation." *FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1094 (D.C. Cir. 2008), *overruled on other grounds by Erwin-Simpson v. AirAsia Berhad*, 985 F.3d 883 (D.C. Cir. 2021); *see also IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 108 (D.D.C. 2018). In addition, the lack of the required connection between the alleged unsuccessful attempt to locate Aljabri in the United States and the alleged

14

attempted killing in Canada is another legal defect in Aljabri's jurisdictional theory that cannot be remedied through discovery.

The broad and indiscriminate nature of Aljabri's requested topics further weighs against discovery.  For example, Aljabri seeks (at 78) all communications between a broad group of Defendants "leading up to" certain Defendants' flight to Canada, regardless of subject matter or relevance.  Aljabri's proposed "'fishing expedition'" is not an appropriate use of jurisdictional discovery.  *Hoffman v. State Regulatory Registry*, *LLC*, 2021 WL 2592960, at *5 (D.D.C. June 24, 2021) (Kelly, J.) (quoting *Triple Up Ltd. v. Youku Tudou Inc.*, 2018 WL 4440459, at *3 (D.C. Cir. July 17, 2018)).  Finally, as a matter of comity, this Court should avoid upsetting foreign relations between the United States and its ally Saudi Arabia by ordering intrusive jurisdictional discovery of Saudi Arabia's leadership.  *Cf. Société Nationale Industrielle Aérospatiale v. United States Dist. Ct.*, 482 U.S. 522, 546 (1987).

## II.      The Crown Prince Is Immune from Suit

### A.      Status-Based Immunity Bars Aljabri's Suit Against the Crown Prince

The Crown Prince is entitled to status-based immunity from any suit in U.S. court, because he sits with the King at the apex of Saudi Arabia's government.  None of the facts set forth in the Crown Prince's motion (at 28-29) – his place as designated successor to the King, his exercise of sovereign power alongside or on behalf of the King, or his roles as Deputy Prime Minister, Minister of Defense, and Chairman of the Councils for Economic and Development Affairs and of Political and Security Affairs – is or can be disputed.

Aljabri nevertheless asserts (at 23) that the Court should decline to grant status-based immunity because the State Department has yet to act on the Crown Prince's request for a Suggestion of Immunity.  It is settled, however, that, when the State Department "does not

grant a suggestion of immunity, the [court] is authorized" to independently decide the issue.
*Lewis v. Mutond*, 918 F.3d 142, 145-46 (D.C. Cir. 2019), *cert. denied*, 141 S. Ct. 156 (2020).[13]

In doing so, the Court must evaluate "'doctrine[s] of customary international law,'"
*Yousuf v. Samantar*, 699 F.3d 763, 768-69 (4th Cir. 2012) (quoting *In re Grand Jury Proceedings, Doe. No. 700*, 817 F.2d 1108, 1110 (4th Cir. 1987)), including the practice of other states.  As explained in the Crown Prince's motion (at 31 & n.24), the decisions of the English courts are particularly relevant.  Those courts have recognized immunity for a Defense Minister and a Minister for Commerce and International Trade, and have stated in well-reasoned dictum that the position of Crown Prince in Saudi Arabia would be entitled to status-based immunity.  *See Apex Glob. Mgmt. Ltd. v. Fi Call Ltd.*, [2013] EWHC 587 (Ch), ¶ 107.  Aljabri attempts to distinguish (at 25) the English cases as statutory, but ignores the Crown Prince's point (at 31 n.23) that the statute in question incorporates principles of customary international law.

Aljabri erroneously contends (at 23 n.21) that the United States' Suggestion of Immunity in *Doğan v. Barak*, No. 2:15-cv-08130, ECF No. 48 (C.D. Cal. June 10, 2016), denied status-based immunity for a minister of defense.  That case involved a former minister of defense, not a current one; and status-based immunity applies only during an official's "time in office." *Sikhs for Justice*, 64 F. Supp. 3d at 193.  Indeed, Aljabri's own expert has acknowledged that "some courts will include Ministers of Defense within th[e] orbit of this immunity," although she criticizes it as a "minority position."[14]

---

[13] *Sikhs for Justice v. Singh*, 64 F. Supp. 3d 190 (D.D.C. 2014), does not say that courts should decline to address head-of-state immunity when the State Department has not responded to a request for a suggestion of immunity.  It says that, where the State Department *does* suggest immunity, that suggestion is "generally . . . dispositive."  *Id.* at 194.

[14] Beth Van Schaack, *Immunities and Criminal Prosecution within the United States & Beyond*, Just Security (July 9, 2014), https://www.justsecurity.org/12679/immunities-criminal-prosecution-united-states/.

Moreover, it is undisputed that, under Saudi Arabia's Basic Law, the Crown Prince exercises sovereign power alongside the King.  Aljabri attempts (at 25) to downplay that authority by comparing his role to "U.S. cabinet officials" who may be delegated presidential powers under limited circumstances.  Unlike the U.S. Constitution's limited references to cabinet officials, Saudi Arabia's Basic Law explicitly delineates the role of Crown Prince and the authority of the Crown Prince to exercise sovereign power.  *See* Basic Law arts. 65, 66.  The Crown Prince is thus uniquely situated in Saudi Arabia's government and entitled to status-based immunity.

Status-based immunity also extends to a head of state's immediate family, which provides an independent basis for immunity.  Aljabari seeks (at 23-24) to cabin this doctrine only to spouses and minor children.  But the one authority he cites does not stand for that proposition.  Instead, it is an example where the State Department did suggest immunity for an adult child of a head of state after his election as head of government.[15]

### B.    Conduct-Based Immunity Bars Aljabri's Suit Against the Crown Prince

### 1.    The Crown Prince Is Entitled to Immunity Under the State Department's Policy

Because Aljabri's claims arise from the Crown Prince's alleged "acts . . . [in] exercising the powers of [his] office,"[16] the Crown Prince has conduct-based immunity.  The recent decision of the Eastern District of Pennsylvania in *Aldossari ex rel. Aldossari v. Ripp*, --- F. Supp. 3d ---, 2021 WL 1819699 (E.D. Pa. May 6, 2021), *appeal pending*, No. 21-2080 (3d Cir.),

---

[15] *See* U.S. Dep't of State, *Digest of United States Practice in International Law* 571 (Sally J. Cummins & David P. Stewart eds., 2003) (describing suggestion of immunity for the son of the President of Azerbaijan after the son was elected Prime Minister), https://2009-2017.state.gov/documents/organization/139602.pdf.

[16] Ltr. from Harold Hongju Koh, Legal Adviser, U.S. Dep't of State, to Stuart F. Delery, Principal Dep. Ass't Att'y Gen., Civil Div., U.S. Dep't of Justice, at 2 (Dec. 17, 2012) ("Koh Letter"), *docketed at Ragsdale v. Lashkar-E-Taiba*, No. 1:11-cv-03893-DLI-CLP, ECF No. 19-1 (E.D.N.Y. Dec. 17, 2012).

is on point and persuasive.  That decision found the Crown Prince immune from a claim that he

had interfered with a contract by allegedly ordering the arrest of his predecessor.  *See id.* at

\*13-15.  In reaching that conclusion, the court observed that, "[i]n his roles as Deputy Prime

Minister, Minister of Defense, and Chairman of the Council of Political and Security Affairs,"

the Crown Prince "oversees criminal prosecutions and national security."  *Id.* at \*15.  It further

reasoned that "[a]n executive decision to conduct a criminal investigation, including ordering an

arrest and directing an asset seizure, . . . is one that can only be made by one acting with official

authority," and that "an official's exercise of police powers against its own citizens that has not

been disavowed by the sovereign is conduct that is official in nature."  *Id.*[17]

Here, the actions of which Aljabri complains were within the scope not only of the

Crown Prince's general national-security and law-enforcement authority, but also of his authority

as Chairman of the Supreme Anti-Corruption Committee.  The Crown Prince operated under a

mandate from the King to (1) "identify offenses, crimes, persons and entities involved in cases of

public corruption"; and (2) undertake the "investigation, issuance of arrest warrants, travel ban,

disclosure and freezing of accounts and portfolios, tracking of funds, assets and preventing their

remittance or transfer by persons and entities, whatever they might be."  ECF No. 92-11 (MTD

Ex. J); *see also* ECF No. 92-12 (MTD Ex. K) (Royal Order granting authority over "Public

Prosecution" and other "oversight entities").  " 'Exercise of the powers of police and penal

officers' is conduct that is 'peculiarly sovereign in nature.' "  *Aldossari*, --- F. Supp. 3d ---,

2021 WL 1819699, at \*15 (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 361-62 (1993)).

---

[17] Aljabri fails to show error in the *Aldossari* court's reasoning that "ordering an arrest and directing an asset seizure" can only be done by use of "official authority" by arguing (at 33 n.30) that "[m]obsters can order enemies held incommunicado and their assets seized."  Official immunity cannot be circumvented by calling names.  The whole point of the analysis is that the Crown Prince has official authority to order legitimate uses of force on behalf of Saudi Arabia that would be crimes if committed by private individuals.

Further, Saudi Arabia has not disavowed any alleged actions taken by the Crown Prince relating to Aljabri, a fugitive who Saudi Arabia has sought to bring to justice for his massive corruption and embezzlement.  Nor has Saudi Arabia ever claimed that the Crown Prince undertook any relevant actions in a personal capacity.  To the contrary, Saudi Arabia, through its Ambassador to the United States, has supported the Crown Prince's claim to conduct-based immunity.[18]  That includes the alleged conduct that Aljabri claims (at 28-30) was personal in nature:  locating and returning an international fugitive to face criminal charges; the assembly of an inter-agency government team of "intelligence, military, and forensic operatives"; and the prosecution and conviction of Aljabri's adult children for their role in his corruption.

Each of Aljabri's arguments that the Crown Prince's actions were outside his official authority falls short.  *First*, Aljabri errs in contending (at 3, 29) that this case is about an order to "locate and kill" him that could not have been an official act.  The allegation that the Crown Prince gave an order to kill Aljabri, though the Amended Complaint repeats it frequently, is a conclusion, not a fact, *e.g.*, Am. Compl. ¶¶ 4-6, 9, 17, 317, 334, and it is not supported by the concrete facts that Aljabri has alleged.  As set forth above and in the Crown Prince's motion (at 33-35), each one of the concrete acts that Aljabri alleges to support that conclusion was within the Crown Prince's official authority.  As the State Department's past suggestions make clear, a mere allegation of involvement in an extrajudicial killing does not overcome official immunity.[19]

_____

[18] *See Hourani v. Mirtchev*, 796 F.3d 1, 13 (D.C. Cir. 2015) ("when an ambassador speaks in his or her official capacity, that statement 'must be regarded . . . as an authoritative representation by the [foreign] government' itself") (quoting *Agency of Canadian Car & Foundry Co. v. American Can Co.*, 258 F. 363, 368-69 (2d Cir. 1919)) (alterations in original).

[19] *See, e.g.*, Ltr. from Harold Hongju Koh, Legal Adviser, U.S. Dep't of State, to Stuart F. Delery, Acting Ass't Att'y Gen., Civil Div., U.S. Dep't of Justice, at 2 (Sept. 7, 2012) (explaining that a complaint that does not contain sufficient "particularized allegations of specific actions allegedly taken by former President Zedillo himself" will not overcome the presumption of immunity), *docketed at Doe v. Zedillo*, No. 3:11-cv-01433-AWT, ECF No. 38-1 (D. Conn. Sept. 7, 2012).

Further, although Aljabri's opposition emphasizes (at 15-17) the alleged October 15, 2018 attempt by six Saudi government officials to enter Canada, it ignores his own allegation that eight other members of the purported "hit squad" "successfully entered Canada" the very next day.  Am. Compl. ¶ 349.  Despite that successful entry, and the successful entry on October 15, 2018, of a ninth member of the same purported squad, *id.* ¶ 348, there is no allegation that these nine so-called "killers," *id.* ¶ 4, took any actions at all towards Aljabri.  Indeed, the Amended Complaint contains no non-conclusory allegations that any Saudi government employee who sought entry into Canada was there for any reason at all related to Aljabri.  Thus, nothing in the Amended Complaint rebuts the presumption that any actions the Crown Prince took towards Aljabri were within the scope of the Crown Prince's official authority.

*Second*, Aljabri misplaces reliance (at 30-31) on *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020 (D.C. Cir. 1997).  In that case, the eldest son of the Crown Prince of Abu Dhabi was involved in a boating accident, admitted responsibility to the victim and her family, and promised to pay the plaintiffs compensation if they would protect him from public and private scrutiny.  *See id.* at 1023-25.  The Crown Prince, however, allegedly made statements "demonstrat[ing] that the Abu Dhabi government would have no part in [his son's] allegedly corrupt bargain with the Jungquists."  *Id.* at 1028.  Crediting those allegations, the court of appeals concluded that the son's promise to pay was "not in furtherance of the interests of the sovereign but a personal and private action."  *Id*.  Here, by contrast, the Crown Prince's actions to bring Aljabri to justice were within his official authority; no one acting for Saudi Arabia has made any statement to the contrary; and Saudi Arabia, through its Ambassador, has expressly affirmed that the Crown Prince should be immune from litigation based on Aljabri's allegations.

*Third*, Aljabri fails to show (at 35-36) that there is an exception to immunity for cases involving "extensive physical conduct in the United States."  As set forth in the Crown Prince's

motion (at 5-12) and in Part I above, this case involves no extensive U.S. conduct by anyone and no U.S. conduct at all by the Crown Prince.  *See supra* pp. 7-12.  In any event, conduct-based immunity turns on the nature of acts, *see* Koh Letter at 2, not their location.  Neither of Aljabri's two authorities (at 35-36) suggests the contrary.  One is a pre-Foreign Sovereign Immunities Act of 1976 ("FSIA") diplomatic note stating that whether the Canadian government was immune in a case involving a marine collision should *not* "turn on the fortuity that the accident may have occurred in Canada"[20] – apparently, rejecting a geographical rule in favor of a functional one. The other is a recent statement of interest indicating that the State Department would not recognize immunity for "an entirely unprovoked attack on peaceful protesters exercising their First Amendment rights."[21]  Nothing in that analysis supports Aljabri's contention that the State Department would reject immunity solely because the acts at issue occurred in the United States.

      2.      **The Crown Prince Is Entitled to Immunity Under the Second Restatement**

For the reasons set forth in the Crown Prince's motion (at 31-32), the Court should assess immunity based on the State Department's policy, rather than on § 66(f) of the Restatement (Second) of Foreign Relations Law of the United States (1965) ("Second Restatement"), a position that the Executive Branch has described as "misplaced."  Br. for the United States as Amicus Curiae at 14, *Mutond v. Lewis*, No. 19-185 (U.S. May 26, 2020), 2020 WL 2866592. Even if the Court applies the Restatement standard, the Crown Prince remains immune because

---

[20] Diplomatic Note, *Pruitt v. M/V Patignies* (E.D. Mich. July 18, 1968), *in Sovereign Immunity Decisions of the Department of State – May 1952 to January 1977*, *in* U.S. Dep't of State, *Digest of United States Practice in International Law* 1017, 1060-61 (Michael Sandler, Detlev F. Vagts & Bruno A. Ristau eds., 1977), *available at* https://law.yale.edu/sites/default/files/documents/pdf/cglc/Sanghvi_LessonsFromThePastForForeignSovereignImmunity.pdf.

[21] Statement of Interest at 9, *Miango v. Democratic Republic of Congo*, No. 15-cv-1265, ECF No. 151 (D.D.C. May 1, 2019).

he is a "public minister, official, or agent" of Saudi Arabia being sued for alleged "acts performed in his official capacity," and because judgment in Aljabri's favor would have the practical effect of "enforc[ing] a rule of law against" Saudi Arabia.  Second Restatement § 66(f).

Although Aljabri insists (at 33) that he does not seek to "enforce a rule of law" against Saudi Arabia, his suit takes aim at Saudi Arabia's years-long efforts to investigate and prosecute the corrupt dealings of Aljabri and his associates, including members of his family.  Such "executive decision[s] to conduct . . . criminal investigation[s] . . . rank[] '[f]oremost among the prerogatives of sovereignty.'"  *Nnaka v. Fed. Republic of Nigeria*, 756 F. App'x 16, 18 (D.C. Cir. 2019) (per curiam) (quoting *Heath v. Alabama*, 474 U.S. 82, 93 (1985)) (last alteration in original).  Aljabri's opposition incorrectly claims (at 35-36) that this case would not "touch any government investigation."  But his Amended Complaint lists "corruption charges against [Aljabri]," Am. Compl. ¶ 131(o), and "criminal proceedings" against his son and daughter, *id.* ¶ 190, which he labels "kidnapping," *id.* ¶ 411, among the supposed wrongs done to him.  He has not brought this case thinking that if he prevails the cases against him and his family will just go on.  He wants this Court to rule them "pretextual," *id.* ¶ 190, declare them violations of U.S. and international law, and make them stop.  That is enforcing a rule of law in the plainest sense.  *See Doğan v. Barak*, 932 F.3d 888, 894 (9th Cir. 2019) (concluding that exercising jurisdiction over damages claims against the former Israeli Defense Minister "would be to enforce a rule of law against the sovereign state of Israel," where the allegations concerned the Defense Minister's exercise of his official powers at the instructions of Israel's Prime Minister).

### 3.       No Exception to the Crown Prince's Immunity Exists or Applies

Aljabri incorrectly asserts (at 26-27, 43-44) that conduct-based immunity is unavailable for alleged *jus cogens* violations of international law and for alleged violations of the TVPA.

As shown in the Crown Prince's motion (at 39), the Second and Ninth Circuits, courts in this District, and the Executive Branch have all rejected any *jus cogens* exception to conduct-based immunity.  The one contrary case Aljabri cites – *Yousuf v. Samantar* – is an outlier that conflicts with the considered view of the Executive Branch, which is "charged with the conduct of [the nation's] foreign relations."  *Republic of Mexico v. Hoffman*, 324 U.S. 30, 35 (1945).

Nor do Aljabri's allegations of a TVPA violation abrogate conduct-based immunity. The TVPA does not create a cause of action for attempted killing, and it certainly does not do so explicitly.  *See infra* Part III.A.  Accordingly, there is no "clear conflict" between any alleged TVPA violation here and the common-law doctrine of conduct-based immunity.  *Lewis*, 918 F.3d at 150 (Randolph, J., concurring in the judgment); *cf. Kickapoo Tribe of Indians of Kickapoo Rsrv. in Kansas v. Babbitt*, 43 F.3d 1491, 1496 (D.C. Cir. 1995) (noting, in the context of state sovereign immunity, that Congress's intent to abrogate immunity "must be 'unmistakably clear' ") (quoting *Dellmuth v. Muth*, 491 U.S. 223, 228 (1989)).  Further, Judge Randolph's concurring opinion in *Lewis v. Mutond*, which the majority described as an "alternative holding," 918 F.3d at 144, made clear that neither party had "briefed [ ]or argued' the issue and that it had not been "tested in an adversary proceeding," *id.* at 148, 150 (Randolph, J., concurring in the judgment). Whatever force that opinion may have does not extend to cases of attempt.

### C.    Saudi Arabia Is a Necessary Party That Is Immune from Suit

Aljabri's suit should also be dismissed under Rule 19.  Aljabri asks this Court to adjudicate numerous alleged acts of great "significance for [Saudi Arabia] and its people," *Republic of Philippines v. Pimentel*, 553 U.S. 851, 866 (2008), including alleged acts related to Saudi Arabia's criminal investigation and prosecution of a former high-ranking Saudi official and his co-conspirators.  He does not dispute that Saudi Arabia cannot be made a party because it is

entitled to foreign sovereign immunity under the FSIA.  That should end this case.  *See*, *e.g.*, *id.* at 867 ("A case may not proceed when a required-entity sovereign is not amenable to suit.").

Aljabri's arguments (at 45) that the Crown Prince's alleged conduct was undertaken "in his personal capacity" and that this case will not require the Court "to 'examine the validity' of any acts of state" are incorrect, *see supra* Part II.B (conduct-based immunity); *infra* Part II.D (act of state), and beside the point.  The necessary-party inquiry does not concern whether the Crown Prince acted in a personal or official capacity, or whether the act of state doctrine is implicated.  Instead, the relevant question is whether Saudi Arabia "has 'an interest relating to the subject of the action' and 'disposing of the action in [Saudi Arabia's] absence may . . . as a practical matter impair or impede [Saudi Arabia's] ability to protect the interest.' "  *Samantar v. Yousuf*, 560 U.S. 305, 324 (2010) (quoting Fed. R. Civ. P. 19(a)(1)(B)(i)) (ellipsis in original).  It would affront Saudi Arabia's "dignity interest[ ]," *Pimentel*, 553 U.S. at 866, for this Court to decide the validity of Saudi Arabia's criminal investigations and prosecutions in Saudi Arabia's absence.  Far from being "vague[ ]," as Aljabri contends (at 46), that interest is clear and compelling.

Aljabri further contends (at 46) that the case can proceed because it does not involve "any property or contractual interest of Saudi Arabia."  Again, this is beside the point.  The Supreme Court made clear in *Pimentel* that a sovereign nation's "dignity interests" are real interests that courts may not disregard in applying Rule 19.  553 U.S. at 866.  Likewise, the court in *TJGEM LLC v. Republic of Ghana*, 26 F. Supp. 3d 1 (D.D.C. 2013), *aff'd*, 2015 WL 3653187 (D.C. Cir. June 9, 2015), made clear that issues involving the propriety of government action and resolving allegations of government corruption give rise to "significant" sovereign interests and "disposing of the action in the [sovereign defendants'] absence may . . . impede the [sovereign defendants'] ability to protect the[ir] interest."  *Id.* at 13 (alterations in original).  When that sovereign is a necessary party but immune, as is the case here, then the litigation must be dismissed.  *See*

*Pimentel*, 553 U.S. at 867 ("A case may not proceed when a required-entity sovereign is not amenable to suit."); *see TJGEM*, 26 F. Supp. 3d at 13 ("*Pimentel* holds unambiguously that . . . , where a sovereign is a required party for the purposes of Rule 19, the case must be dismissed.").

### D.    The Act of State Doctrine Requires Dismissal of Aljabri's Claims

The Court should dismiss all of Aljabri's claims under the act of state doctrine.  Those claims arise from alleged official acts undertaken within Saudi Arabia or "rooted, in all relevant respects, within" Saudi Arabia, *Hourani*, 796 F.3d at 13, and in furtherance of Saudi Arabia's criminal investigation and prosecution of Aljabri's corruption.  The act of state doctrine requires this Court to "deem[ ]" those acts to be "valid."  *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1165 (D.C. Cir. 2002).  Aljabri's claims "could not be adjudicated without a court having to inquire into the legal validity or tortiousness" of those distinctly sovereign acts.  *Hourani*, 796 F.3d at 15 (applying the act of state doctrine in affirming the district court's dismissal of a complaint); *see also McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066, 1073 (D.C. Cir. 2012).

Aljabri's opposition underscores why the act of state doctrine applies here.  He asks this Court to infer that "an interagency group of [Saudi government] employees," Am. Compl. ¶ 337, travelling to Canada from Saudi Arabia, *id.* ¶¶ 348-349, one using a diplomatic passport, *id.* ¶ 348, was really (as he puts it at 47) a "hit squad" "dispatch[ed]" by the Crown Prince to "kill and dismember him."  That is the core of his case:  if his conclusory characterization of those acts turns out false, he has no claim.  But if the Court were to inquire into whether this "interagency group" in fact was a "hit squad," then it would be considering the lawfulness of alleged conduct that, by Aljabri's own allegations, was "rooted, in all relevant respects," in Saudi Arabia and "formulated and directed" from the highest levels of the Saudi government.  *Hourani*, 796 F.3d at 13; *see also* Am. Compl. ¶ 381 (alleging that the conduct was "orchestrated . . . from Saudi

Arabia").  For the same reason, the Court cannot resolve threshold jurisdictional and conduct-based immunity issues in Aljabri's favor without adjudicating the propriety of "distinctly sovereign" acts.  *McKesson*, 672 F.3d at 1073.

As further examples, Aljabri characterizes (at 48 n.43, 49) the arrest, detention, interrogation, and prosecution of his relatives and associates in Saudi Arabia as "torture" or "persecution," or as "kidnap[ings]" or "disappear[ances]."  This Court cannot assign those labels to the exercise of Saudi Arabia's police and prosecutorial powers without "inquir[ing] into the legal validity or tortiousness of the [Saudi] government's activities."  *Hourani*, 796 F.3d at 15.

Aljabri's arguments against the applicability of the act of state doctrine are meritless.  *First*, nearly all of those arguments ask the Court to accept the conclusory allegations that the Crown Prince's actions toward Aljabri were part of an attempted extrajudicial killing, as opposed to legitimate government actions.  *See*, *e.g.*, Opp. 51 ("[Aljabri's] allegations of an attempted extrajudicial killing, which must be accepted as true . . . , constitute *jus cogens* violations and therefore are not recognized as official sovereign acts.") (internal quotation marks omitted).  But that is precisely the sort of determination that the act of state doctrine "precludes."  *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964).[22]

---

[22] Aljabri cites to *Warfaa v. Ali*, 33 F. Supp. 3d 653, 662 (E.D. Va. 2014), *aff'd*, 811 F.3d 653 (4th Cir. 2016), as supporting the proposition that a *jus cogens* violation cannot be an act of state.  A court in this District has reached the opposite conclusion, *see Doe I v. State of Israel*, 400 F. Supp. 2d 86, 114 (D.D.C. 2005) (Bates, J.), and the D.C. Circuit has rejected in the context of the FSIA the argument "that *jus cogens* violations can never be authorized by a foreign state," *Belhas v. Ya'alon*, 515 F.3d 1279, 1287 (D.C. Cir. 2008), *abrogated on other grounds by Samantar*, 560 U.S. at 324 (holding that official immunity is governed by common law rather than by the FSIA itself).  *Warfaa* is also distinguishable on its facts.  There, the defendant allegedly " '[took] out his pistol and fir[ed] five shots,' several of which hit plaintiff, at the conclusion of an interrogation session."  33 F. Supp. 3d at 662 (concluding this was not an act of state).  Here, Aljabri has not been touched, let alone physically injured.  Instead, the Court is being asked to determine whether travel to Canada by several Saudi government officials was tortious conduct.  *See* Am. Compl. ¶ 349.

*Second*, Aljabri incorrectly suggests (at 49-50) that the extraterritorial acts alleged in the Amended Complaint do not qualify for treatment as acts of state under *Hourani*.  That case explained that the applicability of the doctrine "turns on what must be adjudicated," 796 F.3d at 13, and in this case the "what" are alleged acts that were part of Saudi Arabia's criminal investigation of Aljabri's corruption and directions purportedly provided by the Crown Prince in furtherance of that investigation.  Such acts "rank[ ] '[f]oremost among the prerogatives of sovereignty,'" *Nnaka*, 756 F. App'x at 18 (quoting *Heath*, 474 U.S. at 93) (second alteration in original), and qualify as "quintessentially sovereign" and thus as acts of state, *Hourani*, 796 F.3d at 13.  Moreover, contrary to Aljabri's suggestion (at 50), the Crown Prince had clear authority to order such acts.  *See supra* Part II.B.

*Third*, Aljabri insists (at 48-49) that the Court can decide the case "without determining the validity" of many of the acts of state alleged in the Amended Complaint (*e.g.*, those related to "travel prohibitions on his children" and "the seizure of his and his family's assets").  As *Hourani* makes clear, the act of state doctrine bars an adjudication that a sovereign act is "tortious[ ]."  796 F.3d at 15.  The Amended Complaint frames those allegations as critical elements of the supposed scheme to kill Aljabri.  *See*, *e.g.*, Am. Compl. ¶¶ 182 (alleging travel prohibitions on Aljabri's children were "to lure his return so that he can be killed") (capitalization removed), 267 (alleging that the Crown Prince "used asset seizure as an attempt to remotely trap [Aljabri] so that he could be targeted and killed").  If those allegations were not relevant, Aljabri should have withdrawn them when he amended.

Aljabri likewise puts those allegations at center stage in his opposition and expends significant effort to bolster them.  For example, Aljabri seeks (at 49) to cast the arrests, prosecutions, and convictions of his adult children – central to his claim for intentional infliction of emotional distress ("IIED"), *see infra* Part V.B – as pretextual, and dismisses an official

statement from Saudi Arabia's Public Prosecutor setting forth the charges and convictions, *see* ECF No. 92-13 (MTD Ex. L), as "irregular." He even proffers an "Expert Doe" to opine on the statement's purported irregularity. *See* Opp. 20. As shown in the Supplemental Declaration of Fahad Nasser Alarfaj (Ex. A), Doe's statements provide no basis for questioning the Public Prosecutor's certified record that Aljabri's two adult children were duly tried, convicted, and sentenced under Saudi law for the crimes of money laundering and attempting to flee the country. *Id.* ¶¶ 24-30. Among other things, the type of record at issue is not irregular and is used in other cases, *see id.* ¶ 26, and the Public Prosecutor is independent from the Royal Court under Saudi law, *see id.* ¶ 27. The larger point is that under the act of state doctrine this Court should not be assessing (based on dueling expert declarations or otherwise) the substantive or procedural validity of a criminal proceeding in the courts of another country. By relying on the Doe Declaration, Aljabri effectively concedes that his claims require this Court to do just that.

*Fourth*, and contrary to Aljabri's suggestion (at 49), this is not a case where adjudication will merely embarrass a foreign sovereign. Aljabri's claims depend on this Court finding that a host of acts by Saudi Arabian officials, on or rooted in Saudi Arabian soil, were not legitimate official acts at all, but instead part of a scheme to "lur[e]," "hunt[ ]," and "kill" him. Am. Compl. ¶ 10. That far-ranging inquiry into "the legal validity or tortiousness of the [Saudi] government's activities," *Hourani*, 796 F.3d at 15, is forbidden by the act of state doctrine.

## III.   Aljabri Fails To State a Claim Under the TVPA

### A.     The Amended Complaint Fails To Allege an "Extrajudicial Killing"

The TVPA's text unambiguously defines an "extrajudicial killing" as a "killing." TVPA § 3(a), 106 Stat. 73. As set forth in the Crown Prince's motion (at 51-52), the term "killing" means an action that "caused [a] death," *Owens v. Republic of Sudan*, 864 F.3d 751, 770 (D.C. Cir. 2017), *vacated in part sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020); *accord*,

*e.g.*, *Mamani v. Sánchez Bustamante*, 968 F.3d 1216, 1233 (11th Cir. 2020) ("[T]he [TVPA] requires, at a minimum, that there be a considered, purposeful act that takes another's life."); *Webster's Third New International Dictionary* 1242 (2002) (defining "kill" as "to deprive of life", "put to death", or "cause the death of").  Because the TVPA's "plain language . . . is unambiguous," this Court's "inquiry begins with the statutory text, and ends there as well." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 631 (2018) (citation omitted).

Aljabri fails to avoid this clear statutory text.  He contends (at 81-82) that the term "killing" should implicitly include an "attempted killing," and argues that, if Congress intended to exclude attempted killings from the reach of the statute, it should have "creat[ed] an[] attempt exception" in the statutory text.  That is backwards.  "[O]nly the words on the page constitute the law," *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1738 (2020), and "absent provisions cannot be supplied by the courts," *Rotkiske v. Klemm*, 140 S. Ct. 355, 360 (2019) (brackets omitted). When Congress creates liability for attempted conduct, it does so expressly, not by implication. *See*, *e.g.*, 18 U.S.C. § 1116 (killing foreign officials); *id*. §§ 2339A-2339C (material support for terrorism); *see also United States v. Cammorto*, 859 F.3d 311, 316 (4th Cir. 2017) ("attempt . . . is culpable only where expressly criminalized").[23]  The express provisions for attempt liability in the U.S. Code would be surplusage if, as Aljabri contends, attempt liability is presumed, absent an "attempt exception."  *Cmty. Oncology Alliance, Inc. v. OMB*, 987 F.3d 1137, 1141 (D.C. Cir. 2021) (courts "should avoid interpretations that treat statutory terms as surplusage") (internal quotation marks omitted).  Nor does Aljabri cite one example of Congress ever "creating an[]

---

[23] Many federal statutes expressly create attempt liability.  *See*, *e.g.*, 15 U.S.C. § 2 (monopolization of trade); *id.* § 1692f (unfair debt collection); 18 U.S.C. § 1030(b) (computer fraud and abuse); *id*. § 1113 (murder); *id*. § 1114 (killing federal agent); *id*. § 1119(b) (foreign killing of U.S. national); *id*. § 1348 (fraud); *id*. § 1512 (witness tampering); *id*. § 1751 (killing President or Vice President); *id*. § 1841 (killing "unborn child"); 26 U.S.C. § 7201 (tax evasion).

attempt exception" in a statute.  The Supreme Court has also rejected a similar argument about "implicit congressional intent" for aiding-and-abetting liability.  *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 182-85 (1994).

Other provisions of the TVPA confirm that the term "killing" means an act that causes death.  The statute grants a cause of action *only* to "the individual's legal representative, or to any person who may be a claimant in an action for wrongful death."  TVPA § 2(a)(2), 106 Stat. 73.  Congress did not provide a cause of action to the person "kill[ed]" because Congress understood that such a person "w[ould] not be alive to bring suit."  H.R. Rep. No. 102-367, pt. 1, at 4 (1991), *reprinted in* 1992 U.S.C.C.A.N. 84, 87.  Aljabri contends (at 84) that the term "individual's legal representative" encompasses the individual himself, but cites no relevant authority.  That strained reading cannot be squared with the immediately preceding subsection that makes an individual's torturer liable to "that individual."  TVPA § 2(a)(1), 106 Stat. 73.[24]

Aljabri's reading is not supported by his citation (at 84 n.79) to a string of irrelevant cases about individuals appearing *pro se* as their own legal counsel in court proceedings.  *See*, *e.g.*, *Garcia v. Cty. of Spokane*, 2012 WL 12918364, at *1 (E.D. Wash. Apr. 2, 2012) ("Litigants have a statutory right to self-representation in civil matters.").  The use of the term "legal representative" in these cases refers to parties acting as legal *counsel* and has nothing to do with statutory standing or the TVPA.  Aljabri also calls it (at 84) "absurd[]" that, if the Court adopts

---

[24] Aljabri misplaces reliance (at 84) on the Senate Judiciary Committee report's discussion of persons permitted to sue under the TVPA.  That report addressed an earlier version of the legislative text that contemplated a single class of persons who could sue for either torture or extrajudicial killing.  *See* S. Rep. No. 102-249, at 2 (1991).  The enacted legislation creates two separate classes of persons who can sue, *see* TVPA § 2(a), 106 Stat. 73, reflecting an acknowledgment that victims of "torture" alone could sue on their own behalf, while victims of "extrajudicial killing" would need someone else to sue for them.  *Cabello Barrueto v. Fernáandez Larios*, 205 F. Supp. 2d 1325, 1334-35 (S.D. Fla. 2002), *aff'd*, 402 F.3d 1148 (11th Cir. 2005) (per curiam), which Aljabri cites (at 84-85), relied on this same Senate report that addressed an earlier draft of the statutory text.

the plain-language reading of the statute, his heirs "could sue if, tomorrow, he were hit by a car." To the contrary, if Aljabri died in a car accident tomorrow, his heirs still could not recover under the TVPA because his death would not result from a "deliberated killing."

The TVPA contains other evidence that "killing" means only a completed killing.  The definition of "extrajudicial killing" excludes "any such killing . . . *carried out* under the authority of a foreign nation," TVPA § 3(a), 106 Stat. 73 (emphasis added), indicating Congress understood a "killing" as a completed act.  Moreover, the legislative history uses "summary execution" as a synonym for "extrajudicial killing."  H.R. Rep. No. 102-367, at 2-3, 1992 U.S.C.C.A.N. 85; S. Rep. No. 102-249, at 3-4; *see also Webster's Third New International Dictionary* 794 (2002) (defining "execution" as "putting to death").[25]

No other statutory language suggests that the term "killing" encompasses an attempted killing.  Aljabri's assertion (at 82-83) that the words "deliberated" and "subjects . . . to" expand the meaning of "killing" to include attempts is incorrect.  The modifier "deliberated" narrows TVPA liability by requiring that the killer plan and intend the victim's death, *see Owens*, 864 F.3d at 770; it does not expand liability to include attempts.  Nor does the verb "subjects" so expand the statute.  Congress's use of "subjects . . . to" shows that "the TVPA contemplates liability against officers who do not personally execute the . . . extrajudicial killing."  *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 458 (2012).  Indeed, the very case on which Aljabri relies (at 82) construes "subjects . . . to . . . extrajudicial killing" to mean "cause[s] someone to undergo . . . extrajudicial killing."  *Wiwa v. Royal Dutch Petroleum Co.*, 2002 WL 319887, at *15

---

[25] Aljabri errs in contending (at 86) that "the Geneva Convention bars attempted killings," citing Article 12 of the First Geneva Convention.  As shown in the Crown Prince's motion (at 52-53), Congress based the TVPA's definition of "extrajudicial killing" on a different part of the Geneva Convention (Article 3) that prohibits only "murder" and "carrying out of executions" without sufficient process.  Aljabri cites no support for his argument (at 86) that "murder" and "executions," contrary to their plain meaning, "encompass attempt."

(S.D.N.Y. Feb. 28, 2002).  It did not construe, and no court ever has construed, the statute to reach every instance in which a defendant makes a plaintiff "liable" or "vulnerable" (Opp. 82) to a potential extrajudicial killing that does not occur.  That would expand the TVPA beyond recognition and impose liability for a broad range of conduct no one has ever thought the TVPA prohibits, such as failing to take security measures to protect someone from an extrajudicial killing or deporting someone to a jurisdiction where extrajudicial killings occur.

The out-of-circuit district court decisions recognizing attempt liability under the TVPA on which Aljabri principally relies (at 80-81) are not persuasive.[26]  Two (*Constant* and *Yousuf*) were default judgments without adversarial briefing, and in *Warfaa* the defendant did not challenge the existence of attempt liability, *see* Def.'s Renewed Motion To Dismiss, No. 1:05-cv-00701 (LMB/JFA), ECF No. 91 (E.D. Va. May 31, 2014).  In the only case where the attempt issue was disputed (*Boniface*), the court's analysis of the issue was perfunctory; it did not evaluate the TVPA's text and allowed an attempt claim to proceed only because "several courts have permitted such claims to proceed."  338 F. Supp. 3d at 67-68.  A case that does not even discuss a statute's text is not a reliable guide to that statute's meaning.  *See South Carolina Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 55 (D.C. Cir. 2014) (per curiam) ("[i]n addressing issues of statutory interpretation, the court must begin with the text").  By contrast, a recent decision from the Southern District of New York persuasively reasoned that "the TVPA, on its face, imposes liability for a 'deliberated killing' but not an 'attempted deliberated killing,'" and criticized cases such as *Boniface* and *Constant* for failing to "grapple with the statutory language."  *Appel v. Hayut*, 2021 WL 2689059, at *9 (S.D.N.Y. June 30, 2021).

---

[26] *See Boniface v. Viliena*, 338 F. Supp. 3d 50, 69 (D. Mass. 2018); *Warfaa*, 33 F. Supp. 3d at 657; *Yousuf v. Samantar*, 2012 WL 3730617, at *2, *9, *15 (E.D. Va. Aug. 28, 2012); *Doe v. Constant*, 2006 U.S. Dist. LEXIS 101961, at *8-9 (S.D.N.Y. Oct. 24, 2006).

Aljabri also errs in relying (at 81) on cases decided under the terrorism exception in the FSIA, which incorporates the TVPA's definition of "extrajudicial killing."  The FSIA's terrorism exception is broader, not narrower, than the TVPA because it applies to claims involving either "personal injury or death . . . caused by" several types of acts, including an act of "extrajudicial killing," 28 U.S.C. § 1605A(a)(1), and it permits recovery for both "physical harm" to victims and "mental anguish" caused by physical injuries, *Schertzman Cohen v. Islamic Republic of Iran*, 2019 WL 3037868, at *3 (D.D.C. July 11, 2019).  The TVPA contains no similar language. Moreover, as shown in the Crown Prince's motion (at 54 n.43), "'courts resolve statutory ambiguities [in the FSIA's terrorism exception] flexibly and capaciously'" to serve the statute's "remedial purpose" – a purpose courts have invoked to expand the scope of the phrase "extrajudicial killing."[27]  The TVPA is not an immunity statute – it creates a substantive cause of action – and there is no reason to give it a "capacious" reading that expands it beyond its text.

In any event, no case applying "extrajudicial killing" under either the TVPA or the FSIA has ever recognized liability for the kind of conduct here:  a purported attempt to kill that results in no bodily injury and no immediate threat of physical harm.  Even courts applying the FSIA terrorism exception have uniformly concluded that conduct must have caused some kind of physical injury to qualify as an "extrajudicial killing."  *See Pennington v. Islamic Republic of Iran*, 2021 WL 2592910, at *2 (D.D.C. June 24, 2021) (requiring "casualties"); *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 363 (D.D.C. 2020) (requiring "physical injuries" or "imminent apprehension of physical harm"); *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 81 (D.D.C. 2017) (requiring "casualties").  The ruling Aljabri seeks from this Court – that he

---

[27] *See Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 57 (D.D.C. 2019) (Kollar-Kotelly, J.); *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 99 (D.D.C. 2017) (Walton, J.).

was "subject[ed] . . . to extrajudicial killing" without ever being touched or even in the presence of his supposed killers – would be an unprecedented expansion of the statute.

### B.    Aljabri Has Not Exhausted Adequate, Available Remedies

Aljabri's conceded failure to pursue adequate remedies available in Canada and Saudi Arabia is an independent basis to dismiss his TVPA claim.  *See* TVPA § 2(b), 106 Stat. 73.

*First*, the Supreme Court of Canada, the definitive authority on Canadian common law, *see* Ex. B (Suppl. Decl. of Sujit Choudhry) ¶¶ 4-7, has recognized a civil damages "remedy for breaches of customary international law norms," which would "ensure an effective remedy to victims" of those breaches.  *Nevsun Res. Ltd. v. Araya*, 2020 SCC 5, ¶¶ 119, 128 (Can.). Regardless of the exact contours of that remedy, its existence and adequacy are clear.

Nor is Aljabri's Canadian remedy futile merely because the Crown Prince could raise an official immunity defense.  The same immunity defense is available in U.S. courts and is asserted here.  Thus, the Canadian remedy is no more futile than the remedies Aljabri seeks to pursue now.  *See* Ex. B (Choudhry Suppl. Decl.) ¶¶ 8-10.  In any event, the possibility of an immunity defense does not make resort to Canadian courts "clearly useless," and "[t]he mere probability" of dismissal in Canada "does not excuse failure" to pursue remedies there.  *UDC Chairs Chapter, Am. Ass'n of Univ. Professors v. Bd. of Trs.*, 56 F.3d 1469, 1475 (D.C. Cir. 1995) (internal quotation marks omitted).

*Second*, all of Aljabri's excuses for not pursuing Saudi remedies (at 88-89) rely on material beyond the pleadings of which this Court cannot take judicial notice.  Even after he amended, his Amended Complaint contains no allegations that might excuse his failure to exhaust in the courts of Saudi Arabia.  Moreover, neither he nor his purported expert on Saudi law (Prof. Mallat) disputes that Saudi law recognizes remedies for extrajudicial killing.  *See* ECF No. 92-7 (MTD Ex. F, Decl. of Fahad Nasser Alarfaj) ¶ 12.  As set forth in the Supplemental Alarfaj

Declaration, the Saudi judiciary is entirely independent of the King and the Crown Prince, and there is no legal impediment to bringing a civil claim for extrajudicial killing against the Crown Prince in Saudi court. Ex. A (Alarfaj Suppl. Decl.) ¶¶ 4-10. Aljabri and his purported expert can only speculate about what the "practical consequence[s]" might be if Aljabri tried to pursue those remedies. ECF No. 102-3 (Opp. Ex. B, Mallat Rep.) ¶ 13; *see also id.* ¶ 19 n.15 (criticizing Saudi human rights agency for "statements praising the Saudi authorities"). As the Crown Prince explained in his motion (at 55-56), that is insufficient to satisfy the TVPA.

*Third*, although Aljabri tries (at 87-88) to avoid the exhaustion requirement altogether, these efforts fail because "the [TVPA's] exhaustion requirement is jurisdictional." *Escarria-Montano v. United States*, 797 F. Supp. 2d 21, 25 (D.D.C. 2011). Aljabri cites no case holding that the applicability of the TVPA's exhaustion requirement depends on the happenstance of whether relevant conduct occurred in one "place" or many. Regardless of whether a TVPA plaintiff must exhaust remedies in one "place" or several, it is undisputed that Aljabri has not exhausted remedies anywhere. Congress intended that TVPA exhaustion would occur "where the alleged . . . killing occurred." H.R. Rep. No. 102-367, pt. 1, at 5, 1992 U.S.C.C.A.N. 87. Here, if any attempted "extrajudicial killing" occurred, the "place" it occurred is Canada, where Aljabri was purportedly domiciled, Am. Compl. ¶¶ 34, 365, where he contends (at 102-03, 112) the "substantial step" triggering attempt liability took place, and where he alleges Defendants tried to kill him, *e.g.*, Am. Compl. ¶ 20 (alleging Crown Prince "failed to kill [Aljabri] in Canada in October 2018"); *id.* ¶ 114 ("[S]ome of the Tiger Squad members in fact traveled to Canada in October 2018 in an attempt to kill [Aljabri]."). At a minimum, Aljabri has failed to exhaust adequate and available remedies in Canada.

**IV.    Aljabri Fails To Establish Jurisdiction or State a Claim Under the ATS**

**A.    An Attempted Extrajudicial Killing Does Not Violate Any Specific, Universal, and Obligatory Norm of International Law**

The Supreme Court has set "a high bar to new private causes of action for violating international law."  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 727 (2004).  *Sosa* left the door "ajar" to new causes of action, *id*. at 729, but the Court "has never – not once in 230 years –" recognized one, *Nestlé USA, Inc v. Doe*, 141 S. Ct. 1931, 1942 (2021) (Gorsuch, J., concurring); *see also Saleh v. Titan Corp.*, 580 F.3d 1, 14 (D.C. Cir. 2009) (*Sosa* "expressed the imperative of judicial restraint").  As Judge Bates held in *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1 (D.D.C. 2010), "there is no basis" to recognize attempted killing as "a recognized tort, much less one that violates the present-day-law of nations."  *Id*. at 37-38.[28]  For the reasons given in the Crown Prince's motion (at 58-60), this Court should reject Aljabri's request to write new law.

Aljabri fails to clear *Sosa*'s "high bar."  He cites no case in which the type of conduct he alleges here – an inchoate attempted killing where there was no physical contact and no bodily injury whatsoever – has been held to violate international law.  That alone dooms his law-of-nations claim under *Sosa*'s "specificity" test, which requires a consensus that the particular conduct alleged violates a "well defined" norm.  542 U.S. at 736-38 & n.27 ("a single illegal detention of less than a day" does not violate "a principle against arbitrary detention").

Aljabri errs in relying on cases from the International Criminal Tribunal for the former Yugoslavia ("ICTY"), whose charter he concedes (at 109) does not recognize attempt liability, and the International Criminal Court ("ICC"), whose decisions the D.C. Circuit has held are "not . . . customary international law," *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 35-36 (D.C.

---

[28] Aljabri incorrectly asserts (at 108) that the Crown Prince "concedes" that a completed extrajudicial killing would satisfy the *Sosa* standard.

Cir. 2011), *vacated on other grounds*, 527 F. App'x 7 (D.C. Cir. 2013).[29]  None is sufficient to

establish ATS jurisdiction.  The two ICTY cases involved "crimes against humanity" and "war

crimes" stemming from ethnic cleansing massacres during the Bosnian War; in each case, a

small number of victims managed to survive mass executions.[30]  The four ICC cases similarly

involved injured victims narrowly escaping death during mass atrocities.[31]  As explained in the

accompanying Declaration of Professor Julian Ku, that small number of unusual cases

establishes no "customary international law prohibition on attempted extrajudicial killing,"

Ex. C (Decl. of Prof. Julian Ku) ¶ 30, let alone one with the specificity or universality that *Sosa*

requires, *see id.* ¶ 37 ("[T]here is no specific, universally accepted international obligation to

prohibit attempted extrajudicial killings.").  Nor do those cases resemble Aljabri's allegations,

which feature no physical confrontation, let alone any bodily injury.

Aljabri's reliance (at 110-12) on treaties and "general principles of law" fare no better.

None of the treaties Aljabri cites prohibits attempted extrajudicial killings beyond the unique

context of genocide, *see* Ex. C (Ku Decl.) ¶¶ 8-28 (explaining that "customary international law

---

[29] Aljabri also cites (at 110) the charters of two other tribunals – the Iraqi High Tribunal and the East Timor Tribunal – that authorize criminal liability for attempted murder, but no actual prosecution under either charter.

[30] *Prosecutor v. Vasiljević*, Case No. IT-98-32-T, Judgment ¶¶ 1-9, 96-98 (ICTY Nov. 29, 2002); *Prosecutor v. Mrđa*, Case No. IT-02-59-S, Sentencing Judgement ¶¶ 10, 22 (ICTY Mar. 31, 2004).  These attempted killings violated international law only because they occurred in the context of an "armed conflict" and/or a "widespread or systematic" attack on a civilian population – circumstances also not present here.  *See*, *e.g.*, *Vasiljević*, Judgment ¶¶ 24-38; *see also Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84, 105 (D.D.C. 2017) ("crimes against humanity" require proof of "a widespread or systematic attack . . . directed against a civilian population" to violate international law).

[31] *Prosecutor v. Ntaganda*, Case No. ICC-01/04-02/06, Judgment ¶¶ 545-546, 587, 600-601, 628, 874, 878-882 (July 8, 2019); *Prosecutor v. Gbagbo*, Case No. ICC-02/11-01/11, Decision on the Confirmation of Charges ¶¶ 24-72 (June 12, 2014) (defendant later acquitted); *Prosecutor v. Blé Goudé*, Case No. ICC-02/11-02/11, Decision on the Confirmation of Charges ¶¶ 17-50 (Dec. 11, 2014) (defendant later acquitted); *Prosecutor v. Katanga*, Case No. ICC-01/04-01/07, Decision on Confirmation of Charges ¶¶ 19-36 (Sept. 30, 2008).

does not recognize an attempt doctrine that applies to any and all international offenses"), and therefore do not establish the specific norm he proposes, *see* ECF No. 102-4 (Opp. Ex. C, Van Schaack Decl.) ¶¶ 11-13.  More broadly, *Sosa* held that "international agreements" like the ones Aljabri cites "have little utility" in evaluating whether to recognize new causes of action under the ATS.  542 U.S. at 734.  Like the plaintiff in *Sosa*, Aljabri relies only on treaties that are "not self-executing and so d[o] not [themselves] create obligations enforceable in the federal courts." *Id*. at 735.  Moreover, "general principles of law" are not customary international law.  Ex. C (Ku Decl.) ¶ 28.  At best, Aljabri's survey of domestic laws, like the "survey of national constitutions" in *Sosa*, reflects a consensus "at a high level of generality," which is insufficient. 542 U.S. at 736 n.27.  Federal courts may not recognize "new and debatable violations of the law of nations," *id.* at 728, based on an *ad hoc* survey of other countries' domestic laws.

Aljabri has no persuasive response to *Al-Aulaqi*.  He incorrectly contends (at 113) that *Al-Aulaqi* "has nothing to do with this case" because it involved a "threatened *future* killing" rather than a "past attempted killing."  *Al-Aulaqi* involved multiple "past attempted killing[s]," *id*., in the form of "almost a dozen unsuccessful drone and air-strikes."  727 F. Supp. 2d at 11. The court's characterization of those attempts as "a threat[ened] . . . future extrajudicial killing" only underscores that an attempt is "not an actual extrajudicial killing."  *Id*. at 36.  Moreover, Aljabri's IIED claim is identical to Al-Aulaqi's claim for "attempted extrajudicial killing," *see* Am. Compl. ¶¶ 396-414, and *Al-Aulaqi* rejected that specific claim under the ATS, *see* 727 F. Supp. 2d at 37 ("common law tort claims for . . . intentional infliction of emotional distress do not rise to the level of international torts" under *Sosa*).  This Court should follow that persuasive reasoning and dismiss Aljabri's law-of-nations claim.

**B.    The Domestic Conduct Alleged in the Amended Complaint Did Not Plausibly Aid or Abet a Primary Violation of the Law of Nations**

As shown in the Crown Prince's motion (at 57-58), an ATS claim should be dismissed as extraterritorial unless the plaintiff alleges domestic conduct that either violated universal norms of international law or aided and abetted such a violation.  Such violations are "the object[] of the [ATS's] solicitude," *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 267 (2010), their victims are who "the [ATS] seeks to protect," *id*. (brackets omitted), and such violations are "precisely what . . . the [ATS] regulates," *Spanski Enters., Inc. v. Telewizja Polska, S.A.*, 883 F.3d 904, 914 (D.C. Cir. 2018).  The domestic conduct must also have "a sufficient connection [to] the cause of action [plaintiffs] seek." *Nestlé*, 141 S. Ct. at 1936-37.  For example, conduct that does not violate international law, but finances and "perpetuate[s]" violations abroad, *Doe v. Nestle, S.A.*, 929 F.3d 623, 642 (9th Cir. 2018), *rev'd and remanded sub nom. Nestlé USA, Inc v. Doe*, 141 S. Ct. 1931 (2021), "cannot alone establish domestic application of the ATS," *Nestlé*, 141 S. Ct. at 1935-37; *cf. IMAPizza, LLC v. At Pizza Ltd.*, 965 F.3d 871, 878 (D.C. Cir. 2020) (no domestic application of Copyright Act without "complete acts of domestic infringement").

Aljabri's law-of-nations claim fails because his alleged "injuries occurred entirely overseas," and he does not allege domestic conduct that either violated international law or aided and abetted such a violation.  *Nestlé*, 141 S. Ct. at 1935-37.  He does not dispute that no injury or law-of-nations violation occurred in the United States.  He insists (at 59, 123-24) that the U.S. "hunt," which his allegations concede generated no information about his actual location, was "key" to finding him because the search "focused elsewhere only after ruling Boston out."  That allegation is not in the Amended Complaint and is irrelevant and implausible.  It is irrelevant because no domestic aiding and abetting occurred unless Defendants obtained the information "used to carry out" the purported attempt on Aljabri's life in the United States, *Ofisi*, 278 F.

Supp. 3d at 109 – that is, ruling Toronto in, not "ruling Boston out."  It is implausible that the U.S. hunt "rul[ed] Boston out" because, although Hamed allegedly failed to locate Aljabri at one Boston apartment, Am. Compl. ¶ 245, Aljabri and his family owned at least "five luxury condominiums in Boston," ECF No. 92-3 (MTD Ex. B) ¶ 81; *see* Opp. 12 (admitting that Aljabri "owned apartments" in Boston and had "four family members residing" there).  It is separately implausible that, absent ruling out Boston, locating Aljabri in Toronto "probably would have not have occurred."  *Ofisi*, 278 F. Supp. 3d at 109.[32]  The Amended Complaint thus presents no "link or connection," *id*. (internal quotation marks omitted), between the alleged domestic conduct and the alleged attempted killing in Canada, except that the latter took place after the former.

The remainder of Aljabri's extraterritoriality arguments fail because they do not relate to "conduct [that] . . . occurred in the United States," which is all that matters in determining whether a "case involves a permissible domestic application" of the ATS.  *Nestlé*, 141 S. Ct. at 1936 (citation omitted).  Aljabri grasps (at 117-20) for ties to the United States, such as purported connections between foreign conduct and "our national interests"; the U.S. residency of some Defendants; and the supposed "presence of an analogous cause of action under the TVPA."  None of these arguments is relevant to the "focus" test that the Supreme Court recently confirmed applies in deciding whether a claim under the ATS is extraterritorial.  *Nestlé*, 141 S. Ct. at 1936.  All of Aljabri's extraterritoriality arguments are based on a misreading of the phrase "touch and concern . . . with sufficient force" in *Kiobel v. Royal Dutch Petroleum Co*., 569 U.S. 108, 124-25 (2013).  The Supreme Court has since clarified that *Kiobel* did not displace the

---

[32] Aljabri (at 123 n.128) misreads *Ofisi* to say that probable non-occurrence of the violation absent the assistance is "sufficient but not necessary."  The court in *Ofisi* held that the plaintiffs' allegations were "insufficient to establish . . . the requisite actus reus" because they had "not plausibly shown that the [violations] 'probably would not have occurred' absent [the defendant's] conduct."  278 F. Supp. 3d at 109.

"focus" test first articulated in *Morrison*, *see RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2100-01 (2016); *see also Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 194 (5th Cir. 2017) ("*RJR Nabisco* makes clear that *Morrison*'s 'focus' test still governs.").

## V.    Aljabri Fails To State a Claim Against the Crown Prince for IIED

### A.    Saudi Arabian Law Applies and Does Not Recognize IIED as a Cause of Action

The Court should apply Saudi Arabian law to Aljabri's IIED claim.  As set forth in the Crown Prince's motion (at 66-67), Saudi Arabia has the most significant relationship to this case based on the parties' nationalities, the location of almost all of the alleged conduct, and the strong connection of the case and the parties to Saudi Arabia's government.  Aljabri contests none of those facts, nor could he.  Applying D.C.'s choice-of-law rules, *see In re APA Assessment Fee Litig.*, 766 F.3d 39, 51-53 (D.C. Cir. 2014), Saudi Arabian law governs Aljabri's claim for IIED in this case.

As explained by Fahad Nasser Alarfaj in his Declarations in support of Defendants' motions to dismiss, Saudi Arabian law does not recognize a cause of action analogous to IIED, and certainly not on the facts alleged here, where no one has touched Aljabri or even come close. *See* ECF No. 92-7 (MTD Ex. F, Alarfaj Decl.) ¶¶ 14-15; Ex. A (Alarfaj Suppl. Decl.) ¶¶ 13-22 (discussing Saudi Supreme Court precedent holding that claims for psychological damages violate Sharia law).  The contrary opinion of Aljabri's purported Saudi law expert, Professor Mallat, mischaracterizes the structure of Saudi Arabia's judiciary and ignores clear guidance from Saudi Arabia's Supreme Court.  *See* ECF No. 102-3 (Opp. Ex. B, Mallat Rep.) ¶¶ 20-30.

Aljabri cannot avoid the application of Saudi Arabian law by labeling his suit (at 129) a "U.S. national-security case."  As set forth in Part I.A above, the Court need not and should not credit Aljabri's implausible and conclusory allegations that – although not alleged to have

assisted U.S. intelligence in more than 10 years, *see* Am. Compl. ¶ 147 – he was targeted to harm the United States' interests.  Instead, as the Canadian courts have recognized in freezing Aljabri's personal assets worldwide, there is a strong *prima facie* case and compelling evidence that Aljabri committed an extraordinary fraud.  Saudi Arabia's efforts to pursue and prosecute him for these crimes implicate Saudi Arabia's interests, not those of the United States.

None of the cases Aljabri cites applying U.S. law helps him.  All but one involved the Islamic Republic of Iran,[33] which has "no formal diplomatic relationship"[34] with the United States and did not participate in the cases or contest the choice-of-law issue.  The remaining case involved the Syrian Arab Republic, which also did not participate in that case beyond contesting jurisdiction.[35]  As set out in footnotes, all but one case involved U.S. citizens (the other involved a U.S. contractor), and all involved abductions or physical injuries of those U.S. parties – mostly killings.  Here, the conduct involves the pursuit by Saudi Arabia – a close U.S. ally – of a Saudi-Maltese national and former Saudi government official whom Saudi Arabia has sought to

---

[33] *See Oveissi v. Islamic Republic of Iran*, 573 F.3d 835 (D.C. Cir. 2009) (action by U.S. citizen arising from assassination of his Iranian citizen-grandfather in Paris, France; concluding that French law applies); *Dammarell v. Islamic Republic of Iran*, 2005 WL 756090 (D.D.C. Mar. 29, 2005) (action by U.S. citizens, and their families and estates, based on car bomb at U.S. embassy in Beirut, Lebanon); *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74 (D.D.C. 2006) (action arising from killing of U.S. citizen in terrorist bombing); *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39 (D.D.C. 2008) (action by U.S. citizen-relatives of Israeli diplomat killed in suicide bombing); *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88 (D.D.C. 2017) (action arising from shooting of U.S. citizen in Israel by terrorist organization); *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48 (D.D.C. 2018) (action arising from abductions and killings of U.S. soldiers, all but one of whom were U.S. citizens, serving in Iraq); *W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117 (D.D.C. 2019) (action arising from kidnapping, torture, and killing of Iraqi citizen who worked as contractor for United States).

[34] U.S. Dep't of State, *U.S. Relations With Iran*, Bilateral Relations Fact Sheet, Bureau of Near Eastern Affairs (Dec. 7, 2020), https://www.state.gov/u-s-relations-with-iran/.

[35] *See Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216 (D.D.C. 2012) (action arising from abduction of U.S. citizens by terrorist organization), *aff'd*, 554 F. App'x 16 (D.C. Cir. 2014) (per curiam).

prosecute for violations of Saudi Arabian law.  Aljabri cannot and does not seek to recover for any injury to a U.S. national or any injury suffered in the United States.

### B.        Aljabri Also Fails To State a Claim Under D.C. Law

Even if the Court were to apply D.C. law to Aljabri's IIED claim, the claim would still fail.  In his Amended Complaint, Aljabri identifies two alleged acts that purportedly caused him to experience any measure of emotional distress:  (1) the arrest of his adult children in Saudi Arabia, Am. Compl. ¶ 194; and (2) the alleged "attempted extrajudicial killing," *id.* ¶ 365.  As shown in the Crown Prince's motion (at 67-68), neither allegation supports an IIED claim under D.C. law.  Aljabri was not present at his children's arrest, precluding an IIED claim on that basis. *See* Restatement (Second) of Torts § 46(2)(a) (1965); *see also Republic of Sudan v. Owens*, 194 A.3d 38, 42 (D.C. 2018).  And Aljabri's remedy in tort for an attempted killing would be assault, which Aljabri does not and cannot assert.  *See* Restatement (Second) of Torts § 47; *Force*, 464 F. Supp. 3d at 363.[36]

Aljabri's arguments to the contrary lack merit.  *First*, Aljabri mischaracterizes *Owens*, in which the D.C. Court of Appeals explained that, "as a general matter, to recover for IIED, a plaintiff whose emotional distress arises from harm suffered by a member of his or her immediate family must be 'present' when the harm" is inflicted.  194 A.3d at 42.  Contrary to Aljabri's contention (at 132 & n.137), *Owens* did not carve out a general exception to this requirement in "terrorism-type cases" (which this case is not, in any event).  Rather, the *Owens*

---

[36] Aljabri points (at 131) to additional conduct to support his IIED claim – the purported direction of "another plot on his life" (emphasis removed) and the "torture[ of] his son-in-law and other associates."  He cannot use his opposition brief to broaden the basis for his claim beyond the allegations of the Amended Complaint.  *See, e.g.*, *Statewide Bonding, Inc. v. DHS*, 980 F.3d 109, 117 n.5 (D.C. Cir. 2020) ("[I]t is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss.") (citation omitted).  In any event, those additional bases also do not give rise to an IIED claim.  Aljabri was not physically present for any purported torture, and an attempt on his life is not actionable as IIED.

court recognized a "quite limited" exception to the presence requirement in cases "where the jurisdictional elements of [the FSIA's terrorism exception] are satisfied and the plaintiff's severe distress arises from *a terrorist attack* that *killed or injured* a member of his or her immediate family." 194 A.3d at 44-45 (emphases added). Aljabri's allegations do not fit that exception: The requirements of the FSIA terrorism exception are not met, and Aljabri makes no allegation of a "terrorist attack" or that he or "a member of his immediate family" was "killed or injured."

*Second*, Aljabri relies (at 133) on the conclusory allegation at the end of his Amended Complaint that Defendants' "extreme and outrageous conduct was deliberately calculated to cause [Aljabri] extreme suffering." Am. Compl. ¶ 412. That assertion lacks factual support and is "not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). In any event, the law is clear that "[v]ictims of failed attempts to inflict bodily harm do have a remedy under tort law . . . , but it is under an assault (rather than intentional infliction of emotional distress) theory." *Force*, 464 F. Supp. 3d at 363. Here, as in *Force*, no assault claim would be available for lack of an "imminent apprehension" of physical harm. *Id.* Aljabri ignores *Force* and cites no case upholding an IIED claim based on allegations resembling his.

*Third*, as shown in the Crown Prince's motion (at 49-50) and in Part II.D above, Aljabri cannot rely on the arrest, prosecution, and conviction of his adult children as a basis for his IIED claim because the act of state doctrine prevents this Court from finding the prosecution invalid and a valid prosecution cannot be "extreme and outrageous conduct" giving rise to a civil tort.

### C.   Without the Federal Claims, the Court Lacks or Should Decline Jurisdiction Over Aljabri's Emotional-Distress Claim

Aljabri claims no independent basis for personal jurisdiction over his IIED claim against the Crown Prince, instead arguing only (at 52 n.46) for "pendent" personal jurisdiction over that claim as a result of the federal claims. As the Crown Prince explained in his motion (at 68-69)

and Aljabri does not dispute, if the Court dismisses the federal claims (as it should), any basis for

pendent personal jurisdiction disappears, and the Court should dismiss the IIED claim.  Aljabri

also does not dispute the Crown Prince's additional argument (at 69-70) that, if the Court

dismisses the federal claims, it should decline supplemental jurisdiction over the IIED claim.

## CONCLUSION

The Court should dismiss all of Aljabri's claims against the Crown Prince.

Dated:    August 9, 2021                         Respectfully submitted,

/s/ *Michael K. Kellogg* _____ ____

Michael K. Kellogg (DC 372049)
Gregory G. Rapawy (DC 493973)
Andrew C. Shen (DC 500071)
**KELLOGG, HANSEN, TODD, FIGEL**
  **& FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900

*Attorneys for Defendant*
*Mohammed bin Salman bin Abdulaziz Al Saud*

45

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 9, 2021, I electronically filed the foregoing DEFENDANT

MOHAMMED BIN SALMAN BIN ABDULAZIZ AL SAUD'S REPLY IN SUPPORT OF

MOTION TO DISMISS AMENDED COMPLAINT, using the ECF system, which sent notice

of filing in this matter to all counsel of record.


/s/ *Michael K. Kellogg*
Michael K. Kellogg
*Attorney for Defendant*
*Mohammed bin Salman bin Abdulaziz Al Saud*