# Exhibit C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAAD ALJABRI, <br><br> *Plaintiff*, <br><br> v. <br><br><br> MOHAMMED BIN SALMAN BIN ABDULAZIZ AL SAUD, *et al*., <br><br> *Defendants*. | Civil Action No. 20-2146 (TJK) |

### DECLARATION OF PROFESSOR JULIAN KU

I, Professor Julian Ku, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct.

## I.     EXPERT QUALIFICATIONS

1.      The opinions I offer herein reflect the expertise I have developed as a legal scholar focused on issues of public international law as well as its use by U.S. federal and state courts.  The conclusions expressed herein reflect my considered opinion as to the proper interpretation of international law as it is relevant to the application of the Alien Tort Statute and the Torture Victim Protection Act of 1991 given within a reasonable degree of professional certainty.

2.      I am currently the Senior Associate Dean for Academic Affairs, Maurice A. Deane Distinguished Professor of Constitutional Law, and Faculty Director of International Programs at the Maurice A. Deane School of Law at Hofstra University in New York.  I am a nationally recognized expert on the relationship between international law and the American legal system.  In 2012, I co-authored *Taming Globalization: International Law, the U.S. Constitution, and the New World Order* (Oxford University Press) (with John Yoo), which analyzes the treatment of international law in the U.S. legal system, including international laws used in claims similar to the ones that are the focus of this declaration.  I am also the author of over forty articles, essays, and book chapters, several of which are also focused on legal issues related to lawsuits brought against individuals and corporations invoking and applying public international law.  My work on this subject has appeared in leading peer-reviewed academic journals including the *American Journal of International Law*, *Supreme Court Review*, and *Constitutional Commentary*.  I have presented academic papers on this subject at leading academic conferences including the Annual Meeting of the American Society of International

1

Law.  I am also a member of the American Law Institute, which is a select group of lawyers and scholars charged with developing authoritative principles and "restatements" of different areas of American law.

3.     I am a graduate of the Yale University School of Law where I hold a Juris Doctor degree.  I am also a graduate of Yale College where I hold a Bachelor of the Arts degree in Ethics, Politics, and Economics.

## II.     SUMMARY OF OPINION

4.     I have been asked to address the status of the attempt doctrine under customary international law and to respond to the declaration submitted in this case by Professor Beth Van Schaack.  After my review of the various sources of customary international law, it is my view that there is no universally accepted obligation requiring United States courts to adopt the attempt doctrine for any and all violations of customary international law.  Rather, it is my view that the attempt doctrine has only recently gained recognition through certain multilateral treaties for a set of specific violations of international law, such as torture or genocide.  None of those multilateral treaties and related sources creates a specific and universal obligation under customary international law to prohibit attempted extrajudicial killings.

5.     Leading international tribunals, such as the post-World War II Nuremberg tribunal and the Former Yugoslavia and Rwanda tribunals, refused to apply the attempt doctrine outside the context of genocide.  Other more recent treaties, such as the Statute of the International Criminal Court, apply the attempt doctrine to core international crimes within their jurisdiction, such as crimes against humanity and war crimes, but have not purported to establish a universally applicable attempt doctrine for any and all international offenses.  None of these sources, in my view, establishes that the attempt doctrine is universally recognized under customary international law for all violations, including the type of attempted extrajudicial killing alleged in this case.  Nor do these sources establish that states, such as the United States, are obligated to recognize the attempt doctrine in a universally applicable way.

6.     Similarly, while the attempt doctrine is applied within many domestic legal systems, including the United States, important differences in how the attempt doctrine is defined in those domestic legal systems further undermine the case for recognizing a universally applicable attempt doctrine under customary international law.  While some sources have tried to combine the various domestic law attempt doctrines together, the uncertainties created by combining the different domestic versions of the attempt doctrine should give caution to any court trying to do so in the context of a domestic litigation.

7.     Not only is there insufficient support for a universally applicable attempt doctrine under international law, there also is insufficient support for an attempt doctrine that applies to extrajudicial killings.  Unlike specific violations of international law like genocide, which a variety of longstanding international law sources have long defined as including attempt liability, I have identified no sources of international law that apply the attempt doctrine to extrajudicial killings.  While the plaintiff's expert does point to human rights law cases that protect the right to life under international law, none of those cited sources purports to require states to adopt the attempt doctrine to protect the right to life.  None of the sources cited by the plaintiff's expert

recognizes the existence of an attempt doctrine for extrajudicial killings (much less one that is universally required), and none specifies what the elements of an attempt doctrine should be. For this reason, I am of the opinion that there is no specific, universal obligation requiring states to prohibit or punish attempted extrajudicial killings.

## III.   CUSTOMARY INTERNATIONAL LAW DOES NOT RECOGNIZE AN ATTEMPT DOCTRINE THAT APPLIES TO ANY AND ALL INTERNATIONAL OFFENSES

8.   Customary international law refers to unwritten rules of international law that arise from a general and consistent practice of states undertaken on the basis of a legal obligation.[1]  As the International Court of Justice ("ICJ") has explained, "[n]ot only must the acts concerned amount to a settled practice, but they must also be such, or be carried out in such a way, as to be evidence of a belief that this practice is rendered obligatory by the existence of a rule of law requiring it."[2]  Moreover, in rejecting an argument that Germany's actions in conformity with a treaty amounted to customary law, the ICJ further noted:

> The frequency, or even habitual character of the acts is not in itself enough. There are many international acts, e.g., in the field of ceremonial and protocol, which are performed almost invariably, but which are motivated only by considerations of courtesy, convenience or tradition, and not by any sense of legal duty.[3]

9.   Put another way, the mere fact that many states in the world adopt a practice, such as applying a doctrine of attempt crimes within their domestic jurisdiction, does not mean that practice alone has created a rule of customary international law.  In the context of the Alien Tort Statute, the Supreme Court has held that, to satisfy the "high bar to new private causes of action for violating international law," the violation must be "specific, universal, and obligatory."[4]  This requirement follows from the understanding that any state practice that is proposed as a customary rule must be accepted by all states as an obligation in the specific context it is being applied.  Thus, it is not sufficient to say that the attempt doctrine is widely accepted by states. One must also determine whether that doctrine is accepted by all states as an international legal obligation as applied to, for the purposes of this case, an alleged attempted extrajudicial killing.

### A.   International Law Sources Have Recognized Attempt Liability Only for Specific, Defined International Offenses

10.   Despite its wide acceptance as a matter of domestic law, international law has only recently begun to consider the concept of attempt liability for international offenses, and it has done so only for specific, defined international crimes.  For instance, none of the well-known

---

[1] See North Sea Continental Shelf (Federal Republic of Germany v. Denmark; Federal Republic of Germany v. The Netherlands), 1969 I.C.J. 3, 44.

[2] Id.

[3] Id.

[4] *Sosa v. Alvarez-Machain*, 542 U.S. 692, 727, 732 & n.20 (2004).

trials of war criminals following World War II recognized or applied the doctrine of attempt.  As
the history of the International Military Tribunal ("IMT") Statute reveals, drafters concluded that
"'an attempt to commit a crime' should not be made a war crime 'whatever may have been the
reason which caused the attempt to miscarry.'"[5]  None of the authorizing statutes for the post-
World War II war crimes tribunals criminalized attempt for any offense except for genocide.
The closest any of these post-World War II tribunals came to attempt liability was criminalizing
the "preparation" or "planning" of a crime.[6]  But these offenses applied only to "crimes against
peace" or aggressive war and did not apply to all possible war crimes.  Moreover, these crimes
were understood as separate offenses distinct from the doctrine of attempt because the conduct
(e.g., "preparation") was made part of the completed offenses and there is no defense of
abandonment.[7]  Planning as a distinct international crime is also not uniformly recognized under
customary international law because its precise definition remains uncertain and it appears in the
statutes of some but not all international tribunals.[8]

11.    Similarly, of the treaties concluded in the aftermath of World War II to impose
individual liability for international offenses, only the Convention on the Prevention and
Punishment of the Crime of Genocide specifically requires states to punish attempts.[9]  For
example, the Convention on the Non-Applicability of Statutory Limitations to War Crimes and
Crimes Against Humanity requires states to eliminate any statutory limitation for certain
international crimes, but only those crimes that have been fully executed.[10]  Nor do any of the
Geneva Conventions that codify the basic rules of international humanitarian law require
punishing all attempted wrongs.  While the plaintiff's expert does point to provisions in those
treaties that prohibit punishment of attempts upon the lives of wounded combatants, it is more

---

[5] See Kai Ambos, Treatise on International Criminal Law – Volume I: Foundations and General Part, 239
& n.63 (Oxford Univ. Press 2013) [hereinafter "Ambos"] (citing Rapporteur M de Baer, London Int'l Assembly,
"Commission for the Trial of War Criminals, Scope and Meaning of the Conception of War Crimes," at 6 (2013));
see also id. at 238 ("the post-WWII case law clearly only accepted attempt liability in the special case of genocide").

[6] See, e.g., IMT Statute, art. 6(a) (criminalizing "planning, preparation, initiation or waging of a war of
aggression"); International Military Tribunal for the Far East, art. 5(a) ("IMTFES") (same).  See also Control
Council Law No. 10, art. II(1)(a) ("CCL") (criminalizing "planning, preparation, initiation or waging a war of
aggression.");

[7] Ambos, supra note 5, at 235 (the crime of planning "is not attempt, but the conduct is made part of the
complete offense and there is no possibility of abandonment").

[8] See Robert Cryer, Hakan Friman, Darryl Robinson & Elizabeth Wilmshurst, An Introduction to
International Criminal Law and Procedure at 15.6.1 (2d ed. 2010) [hereinafter "Cryer, An Introduction to
International Criminal Law"] (noting that different chambers within the International Criminal Tribunal for the
former Yugoslavia ("ICTY") have defined the elements of "planning" differently).  See also Gerhard Werle &
Florian Jessberger, Principles of International Criminal Law at 701 (3d ed. 2014) (noting that planning as a separate
crime had been proposed in Draft ICC Statute article 23(7)(e), but not included in the final version of the ICC
Statute, and applies only to "planning" aggressive war); Statute of the Special Tribunal of Lebanon, art. 3(1)(a)
(imposing criminal responsibility when individual "[c]ommitted, participated as accomplice, organized or directed
others to commit the crime set forth in article 2 of this Statute").

[9] See Convention on the Prevention and Punishment of the Crime of Genocide, art. III(d) ("The following
acts shall be punishable:  . . . [a]ttempt to commit genocide[.]").

[10] See Convention on the Non-Applicability of Statutory Limitations to War Crimes and Crimes Against
Humanity, art. I (prohibiting statutes of limitation for war crimes and crimes against humanity.)

noteworthy that the same treaties fail to require attempt liability for committing any "grave breaches" that lie at the core of international humanitarian law.[11]  Indeed, as the official International Committee of the Red Cross ("ICRC") Commentary has noted:

> Humanitarian law does not specify whether the attempt of a grave breach is also punishable . . . .  At the present stage of the development of the law we find that under the relevant treatise the attempt to commit a grave breach or a similar crime is not always subject to universal jurisdiction or to penal suppression.[12]

12.    The treatment of attempt liability under the Geneva Conventions is a useful illustration of how international law can prohibit attempts for some internationally wrongful acts (e.g., attacking wounded soldiers) while not prohibiting attempts for other internationally wrongful acts (e.g., grave breaches such as killing civilians without a proper trial).  Moreover, as the ICRC Commentary acknowledges, some states might impose attempt liability for grave breaches of the Geneva Conventions while others might not.  This variety of approaches reflects how attempt liability is far from universally applicable, even among different violations of international humanitarian law.

### B.    No International Tribunals Have Recognized an Attempt Doctrine Applicable to All International Offenses

13.    During the 1990s, the United Nations authorized the creation of two ad hoc international tribunals to try international crimes that were committed in civil wars occurring in the former Yugoslavia and in Rwanda.  Neither of the statutes creating these tribunals authorized trial of attempted international crimes, except in the case of an "attempt to commit genocide."[13]

14.    To be sure, as the plaintiff's expert has pointed out, the tribunals did try and convict individuals of acts that might have qualified as "attempt."  The non-existence of the attempt crime in their statutes or in customary international law, however, led the tribunals to punish such uncompleted acts as "inhumane acts" or "a serious attack on human dignity" rather

---

[11] A proposal to include such attempted offenses was specifically rejected during the drafting of the Additional Protocol I to the Geneva Conventions.  See ICRC Commentary on the Additional Protocols of 8 June 1977, at 979 (¶ 3411 n.21) (1987) [hereinafter "ICRC Commentary"] (discussing that "[a] proposed amendment to Article 85 of the Protocol had explicitly covered:  '(a) complicity in grave breaches, (b) attempt to commit grave breaches, (c) direct incitement or conspiracy to commit grave breaches – if they are committed'.  This proposal was introduced by its sponsor and referred without discussion to the relevant Working Group and Sub-Group; it was not included in the drafts drawn up by these two groups.") (citation omitted), available at https://ihl-databases.icrc.org/applic/ihl/ihl.nsf/INTRO/470?OpenDocument.

[12] ICRC Commentary at 980 (¶¶ 3414-3416).  See also id. at 979 (¶ 3411 n.21) (noting that "[a] proposed amendment to Article 85 of the Protocol [that would have] explicitly covered . . . (b) attempt to commit grave breaches" was not included in final drafts).

[13] See Article 2(3)(d) of the ICTR Statute and Article 4(3)(d) of the ICTY Statute, both of which incorporate Article III(d) of the Genocide Convention sanctioning "attempt to commit genocide."

than under an attempt doctrine.[14]  Like the post-war tribunal prosecutions for "preparation" and "planning," the convictions did not require applying the elements of the attempt doctrine and were prosecuted as distinct and completed offenses.  A chamber of the ICTR confirmed this understanding when it held that "crimes which are attempted but not consummated are not punishable, except for the crime of genocide."[15]

15.     The unwillingness of these international criminal tribunals to impose attempt liability is not just a historical artifact.  It reflects real uncertainty about whether it was appropriate for tribunals to apply a legal doctrine like attempt as a rule of international law without explicit codification in a treaty and despite its widespread usage in most domestic legal systems.  For this reason, while it is worth noting (as the plaintiff's expert does) that the concept of attempt liability has been adopted in various multilateral treaties, none of those treaties should be read to establish a general rule of attempt liability that is applicable beyond the particular context of the treaty.  If such liability was assumed to exist under customary international law for all international law violations, there would be no need to explicitly codify the attempt doctrines for particular international offenses.  Moreover, there are some multilateral treaties that require states to prohibit international offenses but do not include attempt liability.  For instance, Article 4(a) of the International Convention on the Elimination of All Forms of Racial Discrimination requires states to "declare an offence punishable by law all dissemination of ideas based on racial superiority or hatred, incitement to racial discrimination, as well as all acts of violence or incitement to such acts against any race."  It does not, however, require states to punish attempted "acts of violence against any race."[16]  Other treaties, such as the Geneva Conventions, create attempt liability for some prohibited offenses but not for others.[17]  In these circumstances, the specific incorporation of the attempt doctrine as applied to specific offenses should not be understood as creating a generally applicable doctrine of attempt for any and all international wrongs.

16.     The difficulty of developing a universally applicable attempt doctrine can be seen in the deliberations of the International Law Commission ("ILC") on the concept of attempt.  According to reports of the discussions, many members and some governments considered attempt only possible in the case of war crimes or crimes against humanity.[18]  Other members

---

[14] See Jérôme de Hemptinne, Attempt at 340, in Jérôme de Hemptinne, Robert Roth, Elies van Sliedregt, Tom Gal, Dillon Roseen & Thomas Van Poecke (Authors) & Marjolein Cupido, Manuel J. Ventura & Lachezar Yanev (Eds.), Modes of Liability in International Criminal Law at 339-354 (Cambridge Univ. Press 2019) [hereinafter "de Hemptinne, Attempt"].

[15] *Prosecutor v. Kamuhanda*, Case No. ICTR-99-54A-T, Trial Chamber II, ¶ 589 (Jan. 22, 2004), https://unictr.irmct.org/sites/unictr.org/files/case-documents/ictr-99-54a/trial-judgements/en/040122.pdf.

[16] See also International Convention on the Suppression and Punishment of the Crime of Apartheid, art. III (requires states to impose criminal responsibility on those who "[c]ommit, participate in, directly incite or conspire in the commission of the acts" of violence on the basis of racial discrimination).

[17] See also Protocol to Eliminate Illicit Trade in Tobacco Products, art. 14(1)(b) (prohibiting "attempted smuggling" but not attempted "manufacturing, wholesaling, brokering, selling, transporting, distributing, storing, shipping, importing or exporting tobacco, tobacco products or manufacturing equipment").

[18] See ILC, Report of the Commission to the General Assembly on the Work of its 42d Session, Doc. A/45/10, vol. II(2) (1990) [hereinafter 1990 ILC Report], https://legal.un.org/ilc/documentation/english/reports/a_45_10.pdf (cited in Ambos, supra note 5, at 240 n.67).

believed that "a detailed article-by-article analysis would have to be made in order to determine whether the characterization of attempt was applicable to each crime taken individually."[19]  And some thought a separate offense for attempt "was unnecessary" because "if a criminal undertaking was halted before it was carried out there was certainly no need to call upon an international criminal court."[20]  The debate went on for decades.

17.     In sum, even scholars supportive of developing the attempt doctrine have conceded that prior to the adoption of the Statute of the International Criminal Court in 2002, "neither a duly generalized nor an adequate concept of attempt as criminal category of criminal responsibility of its own was in force."[21]

## C.     The ICC Statute's Criminalization of Certain Attempted Crimes Falling Within Its Jurisdiction Does Not Create a Universally Applicable Attempt Doctrine

18.     As noted, the ICC Statute represented the most ambitious effort to conceptualize a broader attempt doctrine that applies to serious international crimes other than genocide.  But even the ICC Statute's provisions on attempt are limited to the four categories of crimes falling within the ICC's limited substantive jurisdiction: genocide, crimes against humanity, war crimes, and aggression.

19.     As an initial matter, it is important to note that the ICC Statute should not always, or even usually, be cited as stating rules of customary international law.  As an ICTY Trial Chamber opined, "[d]epending on the matter at issue, the [ICC] Statute may be taken to restate, reflect or clarify customary rules or crystallise them, whereas in some areas it creates new law or modifies existing law."[22]  U.S. courts have recognized the limits of relying on the ICC Statute as a source of customary international law.  As the D.C. Circuit has concluded, the ICC Statute "is properly viewed in the nature of a treaty and not as customary international law."[23]

20.     With respect to the attempt doctrine, Article 25(3)(f) of the ICC Statute does set forth a rule for attempt liability for crimes "within the jurisdiction of the Court."  Thus, the attempt doctrine in Article 25(3)(f) applies only to the serious crimes of: genocide, crimes against humanity, war crimes, and aggression.  It does not purport to define an attempt doctrine

---

[19] ILC, Report of the Commission to the General Assembly on the Work of its 43rd Session, Doc. A/46/10, vol. II(2), at 99 (1991), https://legal.un.org/ilc/documentation/english/reports/a_46_10.pdf.

[20] 1990 ILC Report, supra note 18, at 16 (¶ 74).

[21] See de Hemptinne, Attempt, supra note 14, at 340.  See also Ambos, supra note 5, at 236 ("It is fair to say that Article 25(3)(f) of the ICC Statute is the first comprehensive provision on attempt and abandonment in the history of ICL").

[22] *Prosecutor v. Furundžija*, Case No. IT-95-17/1-T, Judgement ¶ 227 (Dec. 10, 1998), https://www.icty.org/x/cases/furundzija/tjug/en/fur-tj981210e.pdf.  See also *Prosecutor v. Germain Katanga and Mathieu Ngudjolo Chui*, Case No. ICC-01/04-01/07, Decision on the Confirmation of Charges ¶¶ 507-508 (Sept. 30, 2008) (noting that the Rome Statute does not necessarily represent customary international law), http://www.icc-cpi.int/iccdocs/doc/doc571253.pdf.

[23] *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 35 (D.C. Cir. 2011), *vacated on other grounds*, 527 F. App'x 7 (D.C. Cir. 2013).

that is applicable beyond these core crimes.  It is worth noting, as will be discussed below, that the alleged attempted extrajudicial killing at issue in this case does not fall within any of the four serious international crimes to which attempt liability applies under the ICC Statute.

21.     Indeed, the practice of states in creating other international tribunals suggests that Article 25(3)(f) did not represent a new across-the-board principle for attempt liability, even for serious international crimes.  For instance, the Statute of the Special Court for Sierra Leone, set up in 2002 by the United Nations and Sierra Leone to prosecute violations of international humanitarian law, does not criminalize attempt for crimes within its jurisdiction like the ICC Statute that had been signed four years earlier.  Rather, the Special Court for Sierra Leone follows the approach of the post-World War II tribunals by being authorized to punish those who "planned" or "prepared" one of the defined crimes, but not for those who "attempt" such crimes.[24]

22.     The distinction between criminalizing "planning" and "attempt" is hardly minor. Attempt liability, as will be discussed below, requires a showing of an intent to commit the underlying crime while also providing a defense of abandonment.  No such defenses are understood to flow from criminalizing "planning" or "preparing."[25]  In any event, this further demonstrates that, even for war crimes, state practice at the time the ICC Statute was signed and ratified did not uniformly endorse a broad conception of attempt for all serious international crimes.

23.     The dearth of international precedents for the ICC's version of the attempt doctrine has led at least one notable scholar to locate the origins of the ICC's attempt doctrine in sources other than international customary law.  Rather, Article 25(3)(f) can be understood, "at best, [as] a general principle of law within the meaning of Article 21(1)(c)."[26]

## D.     There Is No Universally Accepted Definition of Attempt Under Customary International Law

24.     As discussed earlier, the concept of attempt remained undefined at the international level until the adoption of the ICC Statute.  All of the multilateral treaties that referred to attempt liability left the elements of attempt undefined and thus to the discretion of national governments.  For instance, the U.N. Convention Against Corruption directs a state to "adopt, in accordance with fundamental principles of its domestic law, such legislative and other measures as may be necessary to establish as criminal offences, when committed intentionally: . . .attempts to commit" offenses in the treaty.[27]  Thus, a state is left to adopt

---

[24] See Statute of the Special Court for Sierra Leone, art. 6(1) (imposing individual criminal responsibility for those who "planned, instigated, ordered, committed or otherwise aided and abetted in the planning, preparation or execution of a crime").

[25] See Ambos, supra note 5, at 235 ("Prior to the ICC Statute, attempt liability only existed implicitly in the criminalization of the 'preparation' and 'planning' of a crime, especially a crime against peace as well as in the participation of a common plan or conspiracy to commit such rimes.  Art. 6(a) IMT Statute, Article 2(1)(a) CCL10, Article 5(a) IMTFES.  This is not attempt, but the conduct is made part of the complete offense and there is no possibility of abandonment.").

[26] Id. at 236.

[27] United Nations Convention against Corruption, art. 23(1)(b)(ii), Oct. 31, 2003, 2349 U.N.T.S. 41.

legislation to criminalize attempt "in accordance with fundamental principles of its domestic law."

25.     One of the reasons for this lack of an explicit definition is that, although most national legal systems criminalize the concept of attempt, their definitions often differ in important ways.  Rather than reflecting the codification of a general principle of law recognized in all jurisdictions, the attempt doctrine adopted by the ICC Statute can be understood as an effort to combine different legal traditions through compromise and negotiation.[28]

26.     For instance, the ICC Statute states that attempt liability may be imposed if there is a "commence[ment] of [the] execution by means of a substantial step" of a crime within the ICC's substantive jurisdiction.[29]  As commentators have noted, this formulation is a combination of attempt doctrines from French-speaking jurisdictions ("commencement d'execution") and U.S. law concepts developed in the Model Penal Code ("MPC") ("a substantial step").  Because "commence[ment] of its execution" implies that the underlying criminal act is at least partially executed, it seems different from the MPC idea of "a substantial step" that refer to an act "immediately preceding the accomplishment of elements of the offenses" and thus does not appear to require partial execution.[30]  While scholars have offered ways in which these concepts can be reconciled for the purposes of the ICC Statute, the larger point is that defining the elements of the attempt doctrine at the level of international law is much more difficult than simply adopting a doctrine that enjoys universally accepted definitions and elements.

27.     Similarly, the ICC Statute allows a defendant to assert abandonment as a complete defense to an attempt charge even after "a substantial step" has been taken as long as the defendant takes steps to prevent the crime from being completed.[31]  While abandonment as a defense to attempt after a substantial step is taken is recognized under the MPC and in several U.S. states, it is not universally recognized even within the United States.  For instance, federal courts have repeatedly rejected a similar defense in federal criminal cases.[32]  This doctrinal

---

[28] See Elies van Sliedregt, Individual Criminal Responsibility in International Criminal Law at 151 (2012) ("The statute's formulation of attempt has been a compromise of the different approaches found in the major legal traditions toward the concept."); see also Cryer, An Introduction to International Criminal Law, supra note 8, at 317.

[29] ICC Statute, art. 25(3)(f).

[30] de Hemptinne, Attempt, supra note 14, at 349 (citing Ambos, supra note 5, at 763).

[31] See Ambos, supra note 5, at 264.  See also de Hemptinne, Attempt, supra note 14, at 347 ("The ICC Statute seems to contain a stronger requirement than most national systems: the perpetrator must not only act voluntarily, he/she must 'completely and voluntarily give up the criminal purpose.'").

[32] See *United States v. Temkin*, 797 F.3d 682, 690 (9th Cir. 2015) ("Temkin's abandonment argument fails because abandonment is not a defense when as attempt, as here, 'has proceeded well beyond preparation.'") (quoting *United States v. Bussey*, 507 F.2d 1096, 1098 (9th Cir. 1974)); *United States v. Young*, 613 F.3d 735, 745 (8th Cir. 2010) ("We hold today that a defendant cannot abandon an attempt once it has been completed.  We emphasize that all of our sister circuits that have faced this issue have either held that a defendant cannot abandon a completed attempt or have alluded to such a determination.") (footnote omitted) (citing cases in accord from the Second, Sixth and Ninth Circuits).  See Congressional Research Service, Attempt: An Overview of Federal Criminal Law 9 (Updated May 13, 2020), https://fas.org/sgp/crs/misc/R42001.pdf.

difference is another example of how difficult it is to define a universally accepted definition of attempt.[33]

28.     The plaintiff's expert tried to characterize the attempt doctrine as a "general principle of law," but its status as a "general principle" is irrelevant for the purposes of this case. As the Statute of the ICJ makes clear, "general principles of law recognized by civilized nations" is a source of international law completely distinct from customary international law.[34]  Even if the attempt doctrine could be said to constitute a "general principle of law common to civilized nations," the uncertainties about its definition suggests it cannot be defined with the level of specificity and reach the level of universality necessary to become an obligation under international law.[35]

## IV.    CUSTOMARY INTERNATIONAL LAW DOES NOT REQUIRE THE PROHIBITION OF ATTEMPTED EXTRAJUDICIAL KILLINGS

29.     The only international law provision that has been interpreted to directly prohibit extrajudicial killings is Common Article 3 of the 1949 Geneva Conventions, which requires states to punish, among other things, killings lacking the authority of "a regularly constituted court affording all the judicial guarantees."[36]  Common Article 3, however, applies only to such killings that take place during armed conflicts and is not a general provision that would apply to peacetime killings.[37]  Thus, even if the Geneva Conventions contained a provision criminalizing attempted extrajudicial killings (which it does not, as I explained above in Part III(A)), such a provision would not apply to the alleged misconduct by the defendants here because there is no allegation that the defendants' alleged activities took place as part of an armed conflict.

30.     Perhaps for this reason, the plaintiff's expert does not claim that Common Article 3 has been violated in this case, and relies instead on non-binding opinions of U.N. officials and agencies as well as international treaties protecting the "right to life."  In my view, none of these

---

[33] Ambos, supra note 5, at 237 (describing "commence[ment] of [the] execution by means of a substantial step" is a combination of French and U.S. law, and used in the 1991 and 1996 Draft Codes).

[34] Statute of the ICJ, art. 38(1)(b), (c).

[35] de Hemptinne Attempt, supra note 14, at 341 ("Given the lack of international jurisprudence on this mode of liability, many issues regarding the definition of attempt remain unresolved.").

[36] See H.R. Rep. No. 102-367, pt. 1, at 5 (1991), reprinted in 1992 U.S.C.C.A.N. 84, 87.  See also Geneva Convention for the Amelioration of the Wounded and Sick in Armed Forces in the Field, art. 3(1), Aug. 12, 1949, 6 U.S.T. 3114, T.I.A.S. No. 3362, 75 U.N.T.S. 31 ("To this end, the following acts are and shall remain prohibited at any time and in any place whatsoever[:] . . . (d) The passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court, affording all the judicial guarantees which are recognized as indispensable by civilized peoples.").

[37] See Common Article 3(1), Geneva Conventions of 1949 (noting it applies "[i]n the case of armed conflict not of an international character occurring in the territory of one of the High Contracting Parties").  See also ICRC Commentary on Common Article 3 of 12 August 1949, ¶ 386 (2016) (noting "that the qualification of 'internal disturbances and tensions, such as riots, isolated and sporadic acts of violence and other acts of a similar nature' in Article 1 of Additional Protocol II as 'not being armed conflicts' is also considered accurate for common Article 3"), available at https://ihl-databases.icrc.org/applic/ihl/ihl.nsf/WebART/365-570006?OpenDocument.

sources is sufficient to establish a customary international law prohibition on attempted extrajudicial killing.

31.     For instance, the "Principles on the Effective Prevention and Investigation of Extra-Legal, Arbitrary and Summary Executions" are the recommendations of experts appointed by the U.N. Economic and Social Council.  But the principles are not intended to have binding legal force.  Moreover, even on their own terms, the Principles do not say anything about obligations on states to prohibit attempted, as opposed to completed, killings.

32.     Similarly, while the right to life is widely recognized in human rights treaties, none of the authorities cited by the plaintiff's expert requires states to protect the right to life by punishing attempted extrajudicial killings.  As Article 2(2) of the International Covenant on Civil and Political Right ("ICCPR") states, "each State Party to the present Covenant undertakes to take the *necessary* steps, in accordance with its constitutional processes and with the provisions of the present Covenant, to adopt such laws or other measures *as may be necessary* to give effect to the rights recognized in the present Covenant."[38]  As the U.S. government has stated, this provision means that, when "specific conditions, measures or requirements necessary to give effect to an ICCPR right are not expressly set forth in the relevant article, and therefore not an obligation undertaken upon ratification by the State Party, any elaboration of the measures necessary to give it effect *are for the State Party to determine and implement in accordance with its laws* and any other relevant ICCPR obligations."[39]  Thus, when confronted with a general obligation to protect the right to life, states have a choice under human rights treaties to determine how they choose to protect the right to life.  No sources cited by the plaintiff's expert, nor any source that I have found through independent research, holds that protecting the right to life requires a state to punish attempted extrajudicial killings.

33.     For instance, in the *Makuchyan and Minasyan v. Azerbaijan and Hungary* case discussed by the plaintiff's expert, one of the respondent states had convicted an individual of murder with respect to one victim, and "preparation for murder" of the second applicant who had survived.[40]  Convicting someone of "preparation" is not the same as attempted murder, but a conviction for "preparation" could plausibly fulfill a state's duties to protect the right to life.  Similarly, *Makaratzis v. Greece*[41] involved an *unintentional* serious injury, which an attempt doctrine would not be able to punish because the defendant would not have had the requisite intent.  Finally, other sources cited by the plaintiff's expert emphasize that the seriousness of the

---

[38] ICCPR art. 2(2) (emphases added).

[39] Observations of the United States of America On the Human Rights Committee's Draft General Comment No. 36 On Article 6 – Right to Life, ¶ 26 (Oct. 6, 2017) [hereinafter "U.S. Observations on HRC Comment No. 36"] (emphasis added), https://www.state.gov/wp-content/uploads/2019/05/U.S.-observations-on-Draft-General-Comment-No.-36-on-Article-6-Right-to-Life-.pdf.

[40] *Makuchyan and Minasyan v. Azerbaijan and Hungary*, Application No. 17247/13, Eur. Ct. H.R., Judgment ¶ 15 (May 26, 2020), http://hudoc.echr.coe.int/eng?i=001-202524.

[41] *Makaratzis v. Greece*, Application No. 50385/99, Eur. Ct. H.R., Judgment ¶ 55 (Dec. 20, 2004), http://hudoc.echr.coe.int/eng?i=001-67820.

injury is a factor in determining whether the right to life had been implicated.[42]  In this circumstance, a prohibition on assault and battery would better accomplish the same purpose as a prohibition on attempted killing because the seriousness of the injury could be a factor in weighing the punishment.  Thus, while states have a duty to protect the right to life, the jurisprudence interpreting that duty has not specified the particular legal measures required to do so, leaving it to the state "to determine and implement in accordance with its laws" how to protect this right.[43]

34.     Recognizing that a state holds discretion in choosing the means to protect the right to life in ways that do not necessarily include an attempt doctrine is also reflected in the United Nations Human Rights Committee's General Comment No. 36, an interpretation of the International Covenant on Civil and Political Right's provision on the right to life cited by the plaintiff's expert.  That Comment recommended that

> [s]tate parties must enact a protective legal framework which includes effective criminal prohibitions on all manifestations of violence or incitement to violence that are likely to result in a deprivation of life, such as intentional and negligent homicide, unnecessary or disproportionate use of firearms, infanticide, "honour" killings, lynching, violent hate crimes, blood feuds, ritual killings, death threats, and terrorist attacks.[44]

Notably missing from this laundry list of legal prohibitions identified by the Human Rights Committee is an obligation to prohibit *attempted* homicide.

35.     It is also important to note that the views of the Human Rights Committee merely represent the views of experts with no binding legal force.[45]  The U.S. government, for instance, has long criticized the HRC for exceeding its legal mandate by expressing "a purpose of influencing other international entities or an evolution of customary international law."[46]  In the view of the U.S. government, even treating the Committee's comments as authoritative exceeds the Committee's legal authority under the ICCPR and its protocols.[47]

---

[42] See *Ilhan v Turkey*, Application No. 22277/93, Eur. Ct. H.R., Report of the Commission ¶ 216 (Apr. 23, 1999), http://hudoc.echr.coe.int/eng?i=001-46170.

[43] U.S. Observations on HRC Comment No. 36, supra note 40, at ¶ 26.

[44] General Comment No. 36, ¶ 20 (footnotes omitted).

[45] See, e.g., U.N. Human Rights Committee, Annual Report, p. 151, U.N. Doc. A/43/40 (1988) ("The Committee's decisions on the merits are non-binding recommendations and as such are referred to as 'views' under article 5, paragraph 4, of the Optional Protocol."); Statement of Robert K. Harris, U.S. Dep't of State, Ass't Legal Adviser for Human Rights and Refugees, to the UN Human Rights Committee, July 17-18, 2006, *reprinted in* Digest of United States Practice in International Law 2006, pp. 284-287 at p. 285, ¶ 2, available at https://2009-2017.state.gov/documents/organization/138676.pdf.

[46] U.S. Observations on HRC Comment No. 36, supra note 40, at ¶ 10 & n.14.

[47] The Special Rapporteur on Extrajudicial, Summary, or Arbitrary Execution cited by the plaintiff's expert also has no authority to provide binding legal interpretations of the ICCPR or related treaties.  Rather, as the

36.     In sum, while the right to life exists under international law, there is far less clarity on what obligations states must undertake in order to protect that right to life.  None of the international law sources cited by the plaintiff's expert is a binding, authoritative source of customary international law.  Moreover, none of those sources specifies that there is a specific obligation (much less a universal one) to adopt an attempt doctrine for all extrajudicial killings.

## V.     CONCLUSION

I summarize my opinion as follows:

37.     Customary international law requires showing that states have adopted a consistent and general international practice out of a sense of legal obligation.  In the context of the Alien Tort Statute, the U.S. Supreme Court requires a plaintiff to "satisfy the high bar of demonstrating a specific, universal, and obligatory norm" in order for a court to recognize a new private cause of action for violation of that norm.[48]  It is my opinion that there is no specific, universally accepted international obligation to prohibit attempted extrajudicial killings.

38.     My view is based upon my review of the same international law sources cited by the plaintiff's expert, as well as other sources I have independently reviewed.  Those sources, largely multilateral treaties, should be understood as requiring states to prohibit attempted violations of international law for specifically defined treaty obligations.  Taken together, those sources do not establish a legal obligation on states to prohibit attempts of any and all possible international violations.

39.     This is especially true because attempt liability was specifically excluded from many international criminal treaties and in decisions by international criminal law tribunals. With the exception of attempted genocide, none of the post-World War II tribunals or the international criminal tribunals formed after the wars in the Former Yugoslavia and Rwanda was authorized to apply the attempt doctrine to prohibited acts within their jurisdiction.  The key sources of international humanitarian law, the Geneva Conventions and its protocols, also do not require states to impose attempt liability for "grave breaches," which would include extrajudicial killings.  Far from showing a consistent practice of states imposing liability for attempt for all international offenses, these sources show that attempt liability was often not required, or even prohibited, by key international treaties.

40.     The adoption of an attempt doctrine with the creation of the International Criminal Court in 2002 does not change this conclusion.  As numerous authorities, including the ICC itself, acknowledge, the ICC Statute does not necessarily represent a rule of customary international law.  But, even if it did, such a rule would apply only to the most serious international crimes falling within its limited subject matter jurisdiction: genocide, crimes against humanity, war crimes, and aggression.  In any event, the ICC Statute's provision on attempt does not purport to create a general obligation on states to impose attempt liability for any and all

---

mandate makes clear, the Special Rapporteur should submit "reports" and "recommendations."  Mandate of the Special Rapporteur on extrajudicial, summary or arbitrary executions, Human Rights Council, ¶ 7, A/HRC/RES/35/15 (July 11, 2017), https://www.right-docs.org/doc/a-hrc-res-35-15/.

[48] *Sosa v. Alvarez-Machain*, 542 U.S. 692, 727, 732 & n.20 (2004).

offenses.  Its prohibition on attempted war crimes, for instance, would not apply to the attempted extrajudicial killing alleged in this case, because that alleged act occurred during peacetime.

41.     One of the reasons to doubt the existence of a universal attempt doctrine is the uncertainty over what the elements of that attempt doctrine would be.  In creating the version of attempt liability used for ICC cases, the drafters combined conceptions of attempt from different national jurisdictions and added a defense of abandonment that would not be recognized in all national jurisdictions (including in U.S. federal courts).  This lack of a universally accepted definition of how to apply the attempt doctrine is another reason to reject the view that customary international law imposes an obligation to adopt that doctrine.

42.     Finally, it is important to point out that no international sources, including those put forth by the plaintiff's expert, require states to adopt the attempt doctrine for extrajudicial killings.  While the non-binding sources cited by the plaintiff's expert do require states to protect the right to life in a variety of contexts, those sources do not specify that the attempt doctrine is necessary to do so.  Rather, the broad obligations that states do have to protect the right to life leave states the discretion as to how best to carry out those obligations.  None of the sources can be said to require the United States to adopt an attempt doctrine for extrajudicial killings to fulfill its obligations to protect the right to life.

43.     In conclusion, while I do not believe the United States would violate customary international law by imposing attempt liability for extrajudicial killings, I also do not believe the United States is required by a specific, universal, obligatory rule of customary international law to do so.  This important distinction should guide the Court in its consideration of the related issues in this case.


        SIGNED:

        _____

Julian Ku
Maurice A. Deane Distinguished Professor of Constitutional Law
Hofstra University, New York
August 9, 2021