IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAAD ALJABRI | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 1:20-cv-02146-TJK |
| MOHAMMED   BIN   SALMAN   BIN | § | |
| ABDULAZIZ AL SAUD, et al. | § | |
| | § | |
| Defendants. | § | |

**BADER ALASAKER'S REPLY MEMORANDUM IN SUPPORT OF HIS MOTION TO DISMISS THE AMENDED COMPLAINT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

I.      THE COURT DOES NOT HAVE PERSONAL JURISDICTION OVER MR.
        ALASAKER. .......................................................................................................... 1

        A.      Plaintiff's Opposition Does Not Identify Any Factual Allegations
                Supporting Personal Jurisdiction Over Mr. Alasaker. ............................ 2

        B.      Mr. Alasaker Did Not Purposefully Target The United States. .............. 6

        C.      The Alleged U.S. Conduct Does Not Create A Relationship Between Mr.
                Alasaker, the United States, and Plaintiff's Claims. ............................... 9

        D.      Exercising Jurisdiction Would Violate Fair Play and Substantial Justice. ........... 10

        E.      Plaintiff Is Not Entitled To Jurisdictional Discovery. .......................... 12

II.     THE COURT LACKS SUBJECT MATTER JURISDICTION BECAUSE MR.
        ALASAKER IS IMMUNE. ..................................................................................... 13

III.    PLAINTIFF DOES NOT STATE A CLAIM UNDER THE TVPA AND ATS. ........... 14

        A.      The Federal Claims Against Mr. Alasaker Rest On Conclusory Allegations.
                ....................................................................................................................... 15

        B.      Plaintiff's "Principal" and "Commander" Theories Fail to State a Claim
                Against Mr. Alasaker. ................................................................................ 15

        C.      Plaintiff's Aiding and Abetting and Conspiracy Liability Theories For Mr.
                Alasaker Fail. .............................................................................................. 16

                1.      The TVPA Does Not Provide For Aiding and Abetting or
                        Conspiracy Liability ....................................................................... 16

                2.      Mr. Alasaker Is Not Liable For Aiding and Abetting or
                        Conspiracy. ..................................................................................... 19

IV.     PLAINTIFF FAILS TO STATE THE IIED CLAIM UNDER RULE 12(B)(6). ........... 21

CONCLUSION ..................................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Asahi Metal Indus. Co. v. Superior Court,*
480 U.S. 102 (1987) .................................................................. 11–12

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ...................................................................... 2, 15

*Atchley v. AstraZeneca UK Ltd.,*
474 F. Supp. 3d 194 (D.D.C. 2020) ............................................... 7, 8

*\*Bernhardt v. Islamic Republic of Iran,*
2020 WL 6743066 (D.D.C. Nov. 16, 2020) ...................... 11, 19, 20–21

*\*Bristol-Myers Squibb Co. v. Superior Court,*
137 S. Ct. 1773 (2017) ................................................................ 5, 10

*Calder v. Jones,*
465 U.S. 783 (1984) .......................................................................... 8

*Capital Area Immigrants Rights Coal. v. Trump,*
471 F. Supp. 3d 25 (D.D.C. 2020) ................................................... 17

*\*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
511 U.S. 164 (1994) .......................................................... 16, 17, 18

*Chavez v. Carranza,*
559 F.3d 486 (6th Cir. 2009) .......................................................... 18

*Cockrum v. Donald J. Trump for President, Inc.,*
319 F. Supp. 3d 158 (D.D.C. 2018) ................................................. 3–4

*Coley v. Bowser,*
2021 WL 1578295 (D.D.C. Apr. 22, 2021) ...................................... 21

*Corsi v. Mueller,*
422 F. Supp. 3d 51 (D.D.C. 2019) ..................................................... 2

*Daliberti v. Republic of Iraq,*
97 F. Supp. 2d 38 (D.D.C. 2000) ..................................................... 11

———

\* Authorities upon which we chiefly rely are marked with an asterisk.

*Doe I v. State of Israel,*
    400 F. Supp. 2d 86 (D.D.C. 2005) ............................................................................... 12

*Doe v. Exxon Mobil Corp.,*
    2015 WL 5042118 (D.D.C. 2015) ................................................................................ 20

*Doe v. Exxon Mobil Corp.,*
    654 F.3d 11 (D.C. Cir. 2011) ................................................................................. 18–19

*Dogan v. Barak,*
    932 F.3d 888 (9th Cir. 2019) ....................................................................................... 13

*Elbit Sys., Ltd. v. Credit Suisse Grp.,*
    917 F. Supp. 2d 217 (S.D.N.Y. 2013) .......................................................................... 18

*Estate of Klieman ex rel. Kesner v. Palestinian Auth.,*
    923 F.3d 1115 (D.C. Cir. 2019) ................................................................................... 10

*Estate of Underwood v. Nat'l Credit Union Admin.,*
    665 A.2d 621 (D.C. 1995) ............................................................................................ 21

*Flatow v. Islamic Republic of Iran,*
    999 F. Supp. 1 (D.D.C. 1998) ...................................................................................... 18

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Court,*
    141 S. Ct. 1017 (2021) ................................................................................................... 9

*Forti v. Suarez-Mason,*
    672 F. Supp. 1531 (N.D. Cal. 1987) ............................................................................ 17

*Groop Internet Platform Inc. v. Psychotherapy Action Network,*
    2020 WL 353861 (D.D.C. Jan. 21, 2020) .................................................................... 12

*IMAPizza, LLC v. At Pizza Ltd.,*
    334 F. Supp. 3d 95 (D.D.C. 2018) ......................................................................... 10–11

*In re Terrorist Attacks on Sept. 11, 2001,*
    538 F.3d 71 (2d Cir. 2008) ............................................................................................ 7

*In re Terrorist Attacks on Sept. 11, 2001,*
    714 F.3d 659 (2d Cir. 2013) ...................................................................................... 8, 9

*In re Yamashita,*
    327 U.S. 1 (1946) .......................................................................................................... 17

*Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan,*
    115 F.3d 1020 (D.C. Cir. 1997) ................................................................................... 14

*Mohamad v. Palestinian Auth.*,
566 U.S. 449 (2012)............................................................................................. 18

*Morris v. Khadr*,
415 F. Supp. 2d 1323 (D. Utah 2006)..................................................................... 8

*Mwani v. bin Laden*,
417 F.3d 1 (D.C. Cir. 2005)..................................................................................... 8

*Ofisi v. BNP Paribas, S.A.*,
278 F. Supp. 3d 84 (D.D.C. 2017),
*vacated in part*, 285 F. Supp. 3d 240 (D.D.C. 2018)............................................ 20

*\*Owens v. BNP Paribas, S.A.*,
897 F.3d 266 (D.C. Cir. 2018) ................................................................... 16, 17, 18

*Penaloza v. Drummond Co.*,
384 F. Supp. 3d 1328 (N.D. Ala. 2019).............................................................. 15

*PetEdge, Inc. v. Garg*,
234 F. Supp. 3d 477 (S.D.N.Y. 2017) ................................................................... 2

*Pugh v. Socialist People's Libyan Arab Jamahiriya*,
290 F. Supp. 2d 54 (D.D.C. 2003)...................................................................... 11

*Rimkus v. Islamic Republic of Iran*,
575 F. Supp. 2d 181 (D.D.C. 2008)..................................................................... 22

*Rush v. Savchuk*,
444 U.S. 320 (1980).......................................................................................... 7–8

*Sisso v. Islamic Republic of Iran*,
448 F. Supp. 2d 76 (D.D.C. 2006)....................................................................... 11

*Tarhuni v. Holder*,
8 F. Supp. 3d 1253 (D. Or. 2014) ......................................................................... 4

*Trump v. Comm. on Ways & Means*,
415 F. Supp. 3d 98 (D.D.C. 2019)...................................................................... 12

*Tx. Low Income Hous. Info. Serv. v. Carson*,
427 F. Supp. 3d 43 (D.D.C. 2019)....................................................................... 11

*Union Commercial Servs. Ltd. v. FCA Int'l Operations, LLC*,
785 F. App'x 309 (6th Cir. 2019) ....................................................................... 5–6

*United States v. Irving*,
665 F.3d 1184 (10th Cir. 2011) .......................................................................... 16

*United States v. Nitschke*,
   843 F. Supp. 2d 4 (D.D.C. 2011) ........................................................ 15–16

*United States v. Washington*,
   653 F.3d 1251 (10th Cir. 2011) .............................................................. 15

*Walden v. Fiore*,
   571 U.S. 277 (2014) ................................................................................ 7

*Williams v. Romarm, SA*,
   756 F.3d 777 (D.C. Cir. 2014) ............................................................... 12

*Wultz v. Islamic Republic of Iran*,
   755 F. Supp. 2d 1 (D.D.C. 2010) .................................................... 11, 18

## STATUTES

7 U.S.C. § 192 ............................................................................................ 18

## OTHER AUTHORITIES

*Al Asaker, Mohammed bin Salman's Invisible Hand*,
   Intelligence Online (Oct. 18, 2017), https://bit.ly/3rIpaFV ...................... 5

Appeal Judgment, *Ndahimana v. Prosecutor*,
   No. ICTR–01–68–A (Int'l Criminal Tribunal for Rwanda Dec. 16, 2013) ............................ 20

Appeal Judgment, *Prosecutor v. Kupreskic*,
   Case No. IT-95-16-A, (Int'l Tribunal for the Former Yugoslavia Oct. 23, 2001) .................. 19

Complaint, *Cengiz v. Bin Salman*,
   No. 1:20-cv-03009 (D.D.C. Oct. 20, 2020) .............................................. 6

H.R. Rep. No. 102-367, pt. 1 (1991),
   *as reprinted in* 1992 U.S.C.C.A.N. 84 ................................................ 17

Op. & Judgment, *Prosecutor v. Tadić*,
   No. IT–94–1–T, (Int'l Tribunal for the Former Yugoslavia May 7, 1997) ............................ 20

S. Rep. No. 102-249 (1992) ...................................................................... 17

## INTRODUCTION

Defendant Bader Alasaker submits this Reply to the Opposition to his motion to dismiss the Amended Complaint. It demonstrates that the Opposition does not counter the legal arguments in the motion to dismiss nor change the fatal insufficiency of the Amended Complaint. Accordingly, the Amended Complaint should be dismissed.[1]

## I.   THE COURT DOES NOT HAVE PERSONAL JURISDICTION OVER MR. ALASAKER.

Nothing in the Opposition converts the conclusory allegations regarding Mr. Alasaker's purported connection to this case into factual ones. Repeating allegations that Mr. Alasaker "directed" or "recruited" Defendants in the United States to look for Plaintiff does not change their inadequacy. Nor does Plaintiff's exaggerated description of irrelevant matters not involving Plaintiff establish jurisdiction here. At best, the Amended Complaint alleges that Mr. Alasaker is an important aide to the Crown Prince who travelled to the United States to attend events, also attended by some other Defendants, hosted by the MiSK Foundation. But there are no facts connecting Mr. Alasaker to the alleged scheme against Plaintiff.

As a result, the Opposition fails to rebut the arguments in Mr. Alasaker's motion to dismiss that this Court does not have jurisdiction over Mr. Alasaker because (1) Plaintiff's jurisdictional theory relies only on conclusory allegations that Mr. Alasaker "recruited" or "directed" other Defendants; (2) Mr. Alasaker did not purposefully target the United States; (3) the alleged U.S. conduct does not create the necessary relationship between Mr. Alasaker, the United States, and Plaintiff's claims; and (4) exercising jurisdiction over Mr. Alasaker would violate due process. There is no basis for jurisdictional discovery and the Amended Complaint must be dismissed.

---

[1] To avoid duplication, this Reply Brief incorporates and adopts parts of the Replies of other Defendants, including the Crown Prince's Reply Brief sections I.A, B, E, II.C–D, III, IV, and V.

A. **Plaintiff's Opposition Does Not Identify Any Factual Allegations Supporting Personal Jurisdiction Over Mr. Alasaker.**

Plaintiff's jurisdictional theory regarding Mr. Alasaker turns on whether the allegations that Mr. Alasaker "recruited" and "directed" Defendants in the United States, Am. Compl. ¶¶ 233–45, are sufficient to require him to come here and defend himself in this Court. As we demonstrated in our opening memorandum, "recruiting" and "directing" are naked assertions devoid of factual support and are not entitled to weight in determining personal jurisdiction. *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009). And although Plaintiff alleged three times in the Amended Complaint that Mr. Alasaker "supported" the October 2018 attempted killing in Canada, the Opposition makes no effort to defend those allegations. *See* Mot. 8–9.

Instead, Plaintiff's response is to understate his burden under *Iqbal*, accusing Mr. Alasaker of citing "cases applying Rule 9(b)'s heightened standard for fraud." Opp'n 65 (citing *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 493 (S.D.N.Y. 2017)). Plaintiff ignores *PetEdge*'s holding that the conclusory allegations "fail[ed] to meet the 'plausibility' standard of Rule 8(a)." 234 F. Supp. 3d at 494. And Plaintiff does not disagree with the holding in *Corsi v. Mueller*, 422 F. Supp. 3d 51, 65 (D.D.C. 2019) that allegations that someone acted "at the direction" of another are conclusory. Under the correct understanding of *Iqbal*, Plaintiff's allegations should be disregarded.

There are no facts alleging that Mr. Alasaker "recruited" or "directed" any Defendant in this case, and therefore no facts tying him to the scheme or the alleged conduct in the United States. This flaw is apparent from the Opposition, which claims to identify "specific facts" supporting the allegations that Mr. Alasaker "recruited" or "directed" Defendants Alharbi, Hamed, Alrajhi, Abuljadayel or Alhamed, Opp'n 64, but identifies no allegations that are factual. The absence of facts means that Plaintiff has not established a prima facie case of jurisdiction.

*First*, the Opposition does not identify any factual allegation connecting Mr. Alasaker to the Defendant who allegedly encountered Plaintiff in Canada (Alharbi), the Defendant who allegedly surveilled a family residence (Hamed), and the Defendant who allegedly provided the information about the family residence (Alrajhi). *See* Opp'n 64. The absence of any connection between them and Mr. Alasaker means those Defendants' acts are irrelevant for jurisdiction.

*Second*, as to the remaining two U.S.-based Defendants, Abuljadayel and Alhamed, Plaintiff's purported "facts" are illusory. As to Abuljadayel, there is—contrary to the Opposition's assertion—no allegation that Mr. Alasaker "met" her or that she declared "loyalty" to him. *Id.* (citing Am. Compl. ¶ 107). Instead, she thanked Mr. Alasaker—who has nearly 2 million Twitter followers—in a tweet that had nothing to do with this case.[2] Plaintiff likewise mischaracterizes a tweet from Alhamed as a declaration of "loyalty."[3] *Id.* (citing Am. Compl. ¶ 102). That tweet does not establish Mr. Alasaker's participation in the attempted killing plot.

Plaintiff also points to photographs of Alhamed and Mr. Alasaker at MiSK Foundation events at Harvard University and the United Nations. But presence together at meetings does not establish an inference that something unlawful was discussed. Plaintiff does not allege *anything* about the interactions between Mr. Alasaker and Alhamed at those events. *See Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158, 179 (D.D.C. 2018) ("Without more specific allegations, the Court cannot assume that meetings in the District in March and April involving the Trump Campaign's national security team or the Russian Ambassador related to plaintiffs'

---

[2] The translated tweet says: "On behalf of Misk's students for the Leadership Development Program, and on behalf of their families, I extend my thanks to his Highness Prince Mohammed bin Salman and to the very capable Mr. Badr al-Asaker for all that Misk has provided."

[3] The translated tweet and Instagram post state, in part, "The Chief of Staff of the Office of the #Crown_Prince is a smart and motivational person who inspires self-confidence. The key features of his identity are work and providing opportunities to young people for building [themselves up]. He is the Secretary of #Misk_CharitableFoundation."

claims."). For this same reason, the allegation ("on information and belief") that Mr. Alasaker sat at a table at one of the MiSK Foundation events, which Alhamed also attended, while someone else asked "Friend 1" about the immigration status of Plaintiff's son, Am. Compl. ¶ 238, has no effect.[4] *See Tarhuni v. Holder*, 8 F. Supp. 3d 1253, 1278 (D. Or. 2014) ("mere presence during allegedly illegal acts by other parties is insufficient to show that [defendant] . . . 'purposefully direct[ed]' any activity to the forum state" (citation omitted)). Plaintiff offers two contradictory reasons about how his son's immigration status could be relevant—asking the Court to speculate that the conversation relates to the "hunt." *Compare* Am. Compl. ¶ 238 (son's permanent resident card—which is not citizenship—"removed an avenue" to coerce son back to Saudi Arabia), *with id.* ¶ 243 (same son's lack of citizenship meant Crown Prince could control legal status).

*Third*, Plaintiff cannot rely on his arguments that the U.S. Defendants were agents of Mr. Alasaker and the Crown Prince. Opp'n 62–63. As described in the Crown Prince's Reply Brief (§ I.B.1), those arguments do not establish agency.

*Fourth,* Plaintiff relies on a September 2017 message from Mr. Alasaker to Plaintiff, who was then in Turkey, asking Plaintiff "where should we dispatch [an] airplane to fetch you." Am. Compl. ¶ 177; Opp'n 64. That message has no bearing on jurisdiction. It was more than a year before the alleged attempt, and Plaintiff does not allege that Mr. Alasaker sent it while he was in the United States, or to Plaintiff while he was in the United States.

Without facts connecting Mr. Alasaker to this case and the United States, Plaintiff relies on two articles in support of his jurisdictional theory that Mr. Alasaker had a connection to the U.S. Defendants. *See* Opp'n 64, 65. Neither has anything to do with this case. One article describes

---

[4] Plaintiff argues that "Alasaker attended with Defendant Alhamed a MiSK [Foundation] event where more attempts were made to learn the whereabouts of Dr. Saad's family." Opp'n 63 (citing Am. Compl. ¶ 238). Paragraph 238 makes no mention of learning the location of Plaintiff's family.

Mr. Alasaker as the "invisible hand" of the Crown Prince and says only that he is responsible for the Crown Prince's "diary, allotting time for his political work, his personal investments and his leisure activities."[5] It does not discuss Mr. Alasaker's contacts with the United States or the plot alleged in this case. Likewise, the article on Saudi government "spies" in student groups is irrelevant. *See* Am. Compl. ¶ 15 n.4. That article does not mention Plaintiff or Mr. Alasaker and does not suggest that "spies" were used for alleged attempted killing missions in foreign countries.

Plaintiff also relies on two unrelated matters in support of his jurisdictional theory. To make up for the absence of facts showing that Mr. Alasaker "recruited" any Defendant in the United States, Plaintiff states that "the Department of Justice has told us" that Mr. Alasaker "carried out a similar scheme to use former Saudi students to infiltrate Twitter." Opp'n 64. Mr. Alasaker is not charged in that case (*United States v. Abouammo*, No. 3:19-cr-621 (N.D. Cal.)), nor is anyone else in this lawsuit. And a "similar scheme"—even if one existed—is not sufficient for personal jurisdiction without any suit-related conduct in this case. *See Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773 (2017) (defendant's similar conduct in forum state insufficient for jurisdiction over nonresidents). Plaintiff cites in support a Sixth Circuit *dissent* for the proposition that being "involved previously" in "similar schemes" makes a claim more plausible, Opp'n 67—which the majority rejected. *Compare Union Commercial Servs. Ltd. v. FCA Int'l Operations, LLC*, 785 F. App'x 309, 317 (6th Cir. 2019) (holding no inference of improper motive for "allegations of other automobile companies bribing other officials in other countries' automobile markets"), *with id.* at 319 (Moore, J., concurring and dissenting) (relying on allegations that car company had been "involved previously in a similar bribery scheme in the past").

---

[5] *Al Asaker, Mohammed bin Salman's Invisible Hand*, Intelligence Online (Oct. 18, 2017), https://bit.ly/3rIpaFV. This innocuous characterization of Mr. Alasaker as the "invisible hand," does a lot of the heavy lifting in the Opposition, which uses the term no less than 13 times.

In any event, there is nothing "similar" here. An alleged extrajudicial killing is not analogous to "infiltrat[ing] Twitter" to access user information. Opp'n 66. And, in *Abouammo*, the allegations relate to a dual citizen of the United States and Lebanon and a Saudi citizen who are former Twitter employees (the latter presumably is a former student), and a Saudi citizen residing in Saudi Arabia. Unlike in the Amended Complaint, there are no allegations that SACM or any U.S. student organizations were involved. Nothing about *Abouammo* provides the necessary contacts for jurisdiction here.

The allegations regarding Jamal Khashoggi's death are even further afield. Opp'n 64. They are inflammatory and add nothing to Mr. Alasaker's contacts with the United States in this case. It would be improper for a court to consider alleged prior bad acts to save an insufficient complaint and they do not offer any support for the fact-specific inquiry on personal jurisdiction. To link that event to this case, Plaintiff alleges that Mr. Alasaker received four phone calls when Khashoggi was being killed in 2018. Those phone calls occurred a year after Plaintiff alleges that Mr. Alasaker's conduct in this case ended. There is also no argument that Khashoggi and Plaintiff are both victims of the same plot. Although Plaintiff now argues that Mr. Alasaker helped "lure Khashoggi back to Saudi Arabia," Opp'n 10 (citing Am. Compl. ¶¶ 291, 299, 303), the Amended Complaint alleges no such thing. It is telling that Plaintiff's law firm, in a lawsuit over Khashoggi's death, has not sued Mr. Alasaker despite naming 25 defendants in that suit. *See* Complaint, *Cengiz v. Bin Salman*, No. 1:20-cv-03009 (D.D.C. Oct. 20, 2020), ECF No. 1. None of these theories make up for Plaintiff's inability to plead, with facts, a connection between Mr. Alasaker and any Defendant he allegedly recruited or directed in this case.

## B.     Mr. Alasaker Did Not Purposefully Target The United States.

The Court should reject Plaintiff's argument that he establishes personal jurisdiction by alleging "purposeful targeting" of the United States, for the reasons described in the Crown

Prince's Reply Brief. *See* Crown Prince Reply Br. § I.A. An alleged attempted killing against a Saudi and Maltese citizen in Canada is not aimed at the United States. Moreover, Plaintiff's past U.S. intelligence connections are irrelevant and attenuated, in particular where his last action assisting U.S. intelligence occurred in 2010. *Id.*

As to Mr. Alasaker, Plaintiff's "targeting" theory is even more attenuated. Plaintiff argues that Mr. Alasaker targeted United States interests because he had an intent to "kill a *U.S. intelligence* partner." Opp'n 63 (emphasis added). Even assuming such an intent could suffice for jurisdiction (which it does not, for the reasons described by the Crown Prince), no factual allegations support that assertion. Instead, the Amended Complaint alleges only that Mr. Alasaker was "well aware" of the Crown Prince's alleged intent to influence U.S. intelligence. *See* Am. Compl. ¶ 130; *see also* ECF No. 102-5 ¶ 26 (John Philip Mudd Decl.) (stating that Plaintiff "has alleged" that "bin Salman targeted Dr. Saad because of his connections to the U.S. Intelligence Community"). But "awareness" of another's forum contacts does not suffice for personal jurisdiction. *See Walden v. Fiore*, 571 U.S. 277, 279 (2014) (holding that a court may not "exercise personal jurisdiction over a defendant on the basis that he knew his allegedly tortious conduct in Georgia would delay the return of funds to plaintiffs with connections to Nevada"); *Atchley v. AstraZeneca UK Ltd.*, 474 F. Supp. 3d 194, 204 (D.D.C. 2020) (holding that, even where defendants were "aware of . . . upcoming attacks or planned attacks on U.S. citizens," there was no personal jurisdiction). Even "foreseeability of harm in the" United States "is insufficient" for personal jurisdiction. *In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 93 (2d Cir. 2008). And, because personal jurisdiction "must be met as to each defendant," Plaintiff cannot "attribute [the Crown Prince]'s contacts to [Mr. Alasaker] by considering the 'defending parties' together and aggregating their forum contacts." *See Rush v. Savchuk*, 444 U.S. 320, 331–32 (1980). As a

result, Plaintiff has not satisfied his burden to show that Mr. Alasaker acted to influence U.S. intelligence.

Moreover, cases involving terrorists who publicly acknowledge an intent to attack the United States and attempt to do so abroad do not provide any support for personal jurisdiction here. As one of Plaintiff's cited cases explains, "terrorism inherently is the sort of 'conduct and connection with' the United States that should cause a foreign terrorist to 'reasonably anticipate being haled into court' here." *Morris v. Khadr*, 415 F. Supp. 2d 1323, 1336 (D. Utah 2006) (citation omitted). This case does not involve terrorism directed at the United States, and, for that reason alone, those cases are inapposite.

As the Crown Prince's Reply Brief (at 4–6) explains, the decision in *Mwani v. bin Laden*, 417 F.3d 1 (D.C. Cir. 2005), does not support jurisdiction here. But even if it were applicable, *Mwani* shows exactly why this Court does not have jurisdiction over Mr. Alasaker. *Mwani* found jurisdiction over the primary participants in the alleged attack on the United States—Osama bin Laden and Al Qaeda—consistent with *Calder v. Jones*, 465 U.S. 783, 790 (1984), which found personal jurisdiction over the "primary participants in an alleged wrongdoing intentionally directed at a California resident." Mr. Alasaker is not a "primary participant" in Plaintiff's alleged scheme, where he had no role after the fall of 2017 for an October 2018 attempt in Canada. *See Atchley*, 474 F. Supp. 3d at 204 (no jurisdiction where defendants were not "'primary participants' in the attacks").

Plaintiff also claims that *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 679 (2d Cir. 2013) shows that a "foundation official's 'travels to the United States' 'raised a plausible inference' [that] he intended to 'cause injury in the United States.'" Opp'n 65. That inaccurate description about a case with clear targeting of the United States highlights how far Plaintiff must

reach for jurisdiction over Mr. Alasaker. That "foundation official" worked at a bank, not a foundation. *In re Terrorist Attacks*, 714 F.3d at 679. The bank official provided "financial services to the Spanish and Hamburg al-Qaeda cells," and traveled to "the United States shortly before the September 11, 2001 attacks," and decided "to switch hotels *to stay in the same hotel as at least three of the hijackers*." *Id.* at 668–69, 679 (emphasis in original). Mr. Alasaker's two visits to the United States in 2017 for MiSK Foundation events with the United Nations and at Harvard University—more than a year before the alleged attempted killing—have nothing in common with those facts. Given that the more concrete allegations in *In re Terrorist Attacks* sufficed only for discovery, Mr. Alasaker's limited and unconnected U.S. contacts require dismissal.

### C. The Alleged U.S. Conduct Does Not Create A Relationship Between Mr. Alasaker, the United States, and Plaintiff's Claims.

Specific jurisdiction requires a "strong relationship among the defendant, the forum, and the litigation." *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 141 S. Ct. 1017, 1028 (2021) (citation omitted). According to Plaintiff, the required relationship exists because the acts of the "U.S. Defendants" were "key." Opp'n 15. The Opposition's reliance on the "key" role of the U.S. Defendants, and their alleged connection to Mr. Alasaker, falls flat when compared with the allegations in the Amended Complaint.

The only U.S. Defendant who located Plaintiff (in Canada) had no connection with Mr. Alasaker. Alharbi—a former close associate of Plaintiff's—"set his sights on" Plaintiff "in Canada" following a dinner with Plaintiff's son in October 2017. Am. Compl. ¶¶ 250–51. There is no allegation that Mr. Alasaker directed Alharbi, that they discussed these events, or that they ever met. And Plaintiff's statement that it "takes time" to get a Canadian tourist visa, Opp'n 60 n.55, indicates that Alharbi made his decision to go to Canada before much, if not all, of the purported U.S. conduct that same fall.

As to the remaining U.S. Defendants, and even assuming the allegations that Mr. Alasaker "directed" them were not conclusory, their activities were not "key" to the alleged attempted killing a year later in Canada. Plaintiff argues that they identified "vulnerabilities and habits necessary to trap and kill" him. Opp'n 59. But the Opposition does not explain what those "vulnerabilities and habits" were, how Plaintiff's son's immigration status or the location of Plaintiff's son's wife could have revealed such information, or whether the Defendants relayed this information to Mr. Alasaker, the Crown Prince, or the Tiger Squad Defendants. These are not "tangible allegations relating the" attempted killing to Mr. Alasaker's "contacts with the forum." *See Estate of Klieman ex rel. Kesner v. Palestinian Auth.*, 923 F.3d 1115, 1124 (D.C. Cir. 2019). Although Plaintiff argues that the acts by the U.S. Defendants allowed the Crown Prince to "rul[e] out" Boston, Opp'n 59, he never makes that allegation in the Amended Complaint.

Finally, Plaintiff does not address Mr. Alasaker's argument that the alleged "connection" between Plaintiff's claim and the United States is "weaker" because he is not a United States "resident[] and do[es] not claim to have suffered" harm here. *Bristol-Myers*, 137 S. Ct. at 1782. Because the United States is not where Plaintiff was harmed, or where any relevant conduct occurred, Mr. Alasaker should not be compelled to come here and defend himself against the baseless allegations..

### D.    Exercising Jurisdiction Would Violate Fair Play and Substantial Justice.

In his motion to dismiss, Mr. Alasaker demonstrated that the exercise of jurisdiction over him would not comport with notions of fair play and substantial justice. Plaintiff responds that declining to exercise jurisdiction here—where the Plaintiff, Defendant, and relevant conduct do not involve the United States—would "eliminate jurisdiction in most cases involving foreign defendants." Opp'n 76. "Most" cases involving foreign defendants in U.S. courts, however, do not have a foreign plaintiff alleging a tort in a foreign country, with the most conclusory allegations

of connection to the United States. *See, e.g.*, *IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 105 (D.D.C. 2018) (foreign defendants but forum-resident plaintiff).[6]

Plaintiff also misses the mark when he argues that Mr. Alasaker "is no stranger to U.S. courts," relying, again, on *Abouammo*. Opp'n 77.[7] Plaintiff does not bother to acknowledge that Mr. Alasaker is not charged in that case and has not entered an appearance. And of course the question in *this case* is whether haling Mr. Alasaker to a U.S. court based on this Complaint would be unfair. According to Plaintiff, Mr. Alasaker "should have thought about th[e] burdens before [he] tried to kill a U.S. intelligence partner via a manhunt on U.S. soil." *Id.* Mr. Alasaker, however, is not alleged to have attempted to kill or directed anyone to kill Plaintiff. Moreover, that argument suggests that foreign defendants can never raise a due process issue based on being haled into court in the United States, because every defendant is the subject of a claim against them. That approach conflicts with *Asahi*'s instruction that courts consider "the unique burdens placed upon one who must defend oneself in a foreign legal system," which "have significant weight." *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 114 (1987).

Plaintiff insists that he has an interest suing in the United States—the same claim made by every plaintiff who files suit here. So did the plaintiff in *Asahi*, but who failed to show that it was "more convenient for it to litigate . . . in California rather than in Taiwan or Japan." *Id.* at 114, 116. Plaintiff has not shown why the United States, as opposed to Canada where he resides, is the more

---

[6] Cases cited by Plaintiff are in accord. *See, e.g.*, *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F. Supp. 2d 54, 59-60 (D.D.C. 2003); *Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38, 54 (D.D.C. 2000); *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1 (D.D.C. 2010); *Bernhardt v. Islamic Republic of Iran*, 2020 WL 6743066, at *1 (D.D.C. Nov. 16, 2020); *Sisso v. Islamic Republic of Iran*, 448 F. Supp. 2d 76, 90 (D.D.C. 2006).

[7] The Court should disregard Plaintiff's reliance on a filing in *Abouammo* that is not mentioned in his Amended Complaint, *see* Opp'n 64 n.58 (citing May 19, 2021 filing). *See Tx. Low Income Hous. Info. Serv. v. Carson*, 427 F. Supp. 3d 43, 57 (D.D.C. 2019).

appropriate forum. Accordingly, exercising jurisdiction in the United States would violate notions of fair play and substantial justice.

### E.    Plaintiff Is Not Entitled To Jurisdictional Discovery.

The Court should also reject Plaintiff's request for jurisdictional discovery. "[W]hether to award jurisdictional discovery is a choice left to this Court's discretion and need not be permitted if such an award would amount to nothing more than a fishing expedition." *Groop Internet Platform Inc. v. Psychotherapy Action Network*, 2020 WL 353861, at *8 (D.D.C. Jan. 21, 2020) (citation omitted). Jurisdictional discovery is "intended to supplement, not substitute for, initial jurisdictional allegations." *Doe I v. State of Israel*, 400 F. Supp. 2d 86, 121–22 (D.D.C. 2005). Accordingly, "[m]ere conjecture or speculation is not enough." *Williams v. Romarm, SA*, 756 F.3d 777, 786 (D.C. Cir. 2014) (citation omitted).

Because the jurisdictional allegations against Mr. Alasaker are conclusory, discovery is not appropriate. Moreover, even with discovery, Plaintiff could not establish personal jurisdiction. Plaintiff does not seek any information demonstrating that the acts of the U.S. Defendants had an impact on the discovery of Plaintiff in Canada, which means the discovery he seeks cannot remedy the flaws in his jurisdictional arguments. And Plaintiff's generalized requests for communications showing "involvement" and "control," Opp'n 78, lack necessary detail. *See Trump v. Comm. on Ways & Means*, 415 F. Supp. 3d 98, 112 (D.D.C. 2019) ("general statements about wishing to conduct discovery into the New York Defendants' potential contacts with the District and into the alleged coordination between Attorney General James and the House to disclose Mr. Trump's financial information" were insufficient for discovery). Accordingly, his request should be denied.

II.   **THE COURT LACKS SUBJECT MATTER JURISDICTION BECAUSE MR. ALASAKER IS IMMUNE.**

The Amended Complaint should be dismissed as to Mr. Alasaker because it alleges that he acted as an extension of the Crown Prince and pursuant to his official government position[8] and is therefore immune from suit.[9] Plaintiff responds that it is "dubious" that Mr. Alasaker has an official government position. Opp'n 37. Plaintiff offers no reason to doubt an article explaining that Mr. Alasaker became a minister appointed by royal decree in July 2017, around the same time that the Crown Prince became the heir to the throne. *See* Mot. 24 n.14.

Plaintiff asserts that Mr. Alasaker's alleged "recruiting" of Defendants is outside his official duties, but Plaintiff alleged that Mr. Alasaker has "legal authority" to "exert control over" other those Defendants and acted "under color of law." Am. Compl. ¶¶ 366, 378; *see Dogan v. Barak*, 932 F.3d 888, 894 (9th Cir. 2019) (granting foreign official immunity where "[t]he Complaint's claims for relief state—several times—that Barak's actions were done under 'actual or apparent authority, or color of law'").[10] And the only factual allegation connecting Mr. Alasaker to this case is that he made calls and sent messages to Plaintiff to "coordinate the time and place

---

[8] Mr. Alasaker adopts and incorporates by reference the Crown Prince Reply Brief's arguments regarding immunity, including that the State Department test applies, no exceptions to immunity exist under the TVPA or for *jus cogens* violations, and, if the Restatement applies, Plaintiff seeks to enforce a rule of law against Saudi Arabia. *See* Crown Prince Reply Br. § II.B.

[9] The Opposition repeatedly misstates Mr. Alasaker's position, stating that *Mr. Alasaker* "says he used his control over SACM . . . to further bin Salman's scheme" and *Mr. Alasaker* "claims he was acting in a government capacity when he . . . tried to lure Dr. Saad." Opp'n 38. As Plaintiff knows, Mr. Alasaker makes no concessions about the truth of the allegations against him, but assumes that they are true for purposes of the motion.

[10] Plaintiff argues that the "key" part of *Dogan* was the allegation that the defendant had power to "plan, order, and control [a military] operation." Opp'n 39 n.37. But *Dogan* made no distinction between that allegation and the "color of law" allegations on which it also relied. And, like in *Dogan*, Plaintiff here alleges that Mr. Alasaker had "legal authority" to control others.

13

of a private jet." Am. Compl. ¶ 177. As the "invisible hand" article shows, such logistical duties are similar to the work Mr. Alasaker performed in his government position. *See supra* 6 n.6.[11]

Although Plaintiff asserts that *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020 (D.C. Cir. 1997) precludes immunity, the case actually supports it. In *Jungquist*, a government official promised to compensate a tort victim and allegedly lied to the Crown Prince of Dubai about his involvement. Despite finding that the government official was not immune, the court reached a different conclusion as to his purported "agents." In particular, the "Director of Patient Relations" acted in his official capacity, because that position included taking "care of logistical matters such as booking hotel accommodations, flights, and taxis." *Id.* at 1029. That director acted consistent with his position by "arrang[ing] for [the victim]'s medical treatment" and "processing . . . the payments for . . . medical services." *Id.* According to Plaintiff's allegations, Mr. Alasaker's actions were in line with his position as head of the Crown Prince's private office and he is therefore entitled to immunity.

## III.   PLAINTIFF DOES NOT STATE A CLAIM UNDER THE TVPA AND ATS.

To the extent the Court looks beyond the above threshold issues, it should also dismiss the Amended Complaint because it fails to state a claim under Rule 12(b)(6). The Crown Prince Reply Brief (at 28–41) shows that Plaintiff has no claim under the TVPA and ATS. As to Mr. Alasaker, these federal claims fail for additional reasons. First, they should be dismissed because they rely on the same conclusory allegations that underpin Plaintiff's jurisdictional theory. Second, even accepting as true Plaintiff's conclusory allegations, Mr. Alasaker is not liable as a "principal" or

---

[11] The article misunderstands Mr. Alasaker's position with the Saudi government in late 2017. In July 2017, Mr. Alasaker was appointed, by royal decree, to the position of minister.

"commander" for an attempted killing. Third, Plaintiff cannot rely on his secondary liability theories to state a claim.

### A. The Federal Claims Against Mr. Alasaker Rest On Conclusory Allegations.

Plaintiff's federal law claims rely on the same conclusory assertions of directing and recruiting as his jurisdictional theory. *See* Opp'n 96. After the Court disregards those allegations, there are no "well-pleaded factual allegations" that "plausibly give rise to an entitlement of relief" against Mr. Alasaker. *Iqbal*, 556 U.S. at 679. For that reason, the Court should dismiss the federal law claims.

### B. Plaintiff's "Principal" and "Commander" Theories Fail to State a Claim Against Mr. Alasaker.

Even taking the conclusory allegations as true, there is no basis for finding Mr. Alasaker liable as a principal or commander of the alleged attempted killing in Canada. *See* Mot. 35–36. There is no basis for command responsibility, as the Opposition does not argue that Mr. Alasaker directed or supervised the attempted killing in Canada or those who allegedly carried it out. *See Penaloza v. Drummond Co.*, 384 F. Supp. 3d 1328, 1344 (N.D. Ala. 2019) (requiring for command responsibility "superior-subordinate relationship between the commander and the perpetrator of the crime").

Mr. Alasaker is also not a "principal" in the alleged attempted killing (Opp'n 95). Plaintiff does not argue that Mr. Alasaker's conduct constituted a "substantial step"—the basis for attempt liability. And none of the acts Mr. Alasaker allegedly took "were of such substantiality" that they would result in a killing, especially where Mr. Alasaker is not alleged to have directed, planned, or participated in the alleged attempted killing in Canada. *See United States v. Washington*, 653 F.3d 1251, 1264 (10th Cir. 2011); *see also United States v. Nitschke*, 843 F. Supp. 2d 4, 10 (D.D.C. 2011) ("The substantial step must be necessary to the commission of the crime." (citation

omitted)). Plaintiff's citation (at 96) to *United States v. Irving* underscores why Mr. Alasaker cannot be directly liable. There, sufficient evidence supported a finding of attempted killing based on the defendant's "active solicitation of someone to kill Lt. Stark," "his actual consummation of a murder-for-hire contract," and "his concrete actions to facilitate the completion of the contract." 665 F.3d 1184, 1200–01 (10th Cir. 2011). The Amended Complaint alleges nothing similar against Mr. Alasaker.

Plaintiff has also failed to plead that Mr. Alasaker had an intent to kill him. Plaintiff argues, without support, that "Alasaker knew bin Salman had deployed the Tiger Squad to kill and torture other enemies," but the only supporting allegation is that Mr. Alasaker received four phone calls on the day of Khashoggi's death. Opp'n 96. Receiving phone calls in October 2018 that had nothing to do with Plaintiff does not suggest that Mr. Alasaker had an intent in the fall of 2017 to kill Plaintiff. Accordingly, Plaintiff's "principal" and "commander" theories should be dismissed.

### C.  Plaintiff's Aiding and Abetting and Conspiracy Liability Theories For Mr. Alasaker Fail.

#### 1.  The TVPA Does Not Provide For Aiding and Abetting or Conspiracy Liability.

Given the dearth of plausible allegations that Mr. Alasaker was directly liable for an attempting killing, Plaintiff resorts to secondary liabilities to state a claim against Mr. Alasaker. But the plain text of the TVPA does not provide for aiding and abetting or conspiracy liability. *See* Mot. 29–32 (citing *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 279 n.12 (D.C. Cir. 2018); *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994)).

*First*, Plaintiff does not rebut the D.C. Circuit's holding in *Owens* that "civil conspiracy" is unavailable in "the absence of an explicit congressional statement addressing it." 897 F.3d at 279 n.12. Nothing in the TVPA mentions conspiracy, and Plaintiff does not argue that the legislative history discusses it. Accordingly, there is no conspiracy under the TVPA.

16

*Second*, as to aiding and abetting liability, Plaintiff's argument that a solitary reference to "abetted" in the legislative history controls over the absence of aiding and abetting liability in the statute (Opp'n 94) ignores *Central Bank* and *Owens* and reverses principles of statutory interpretation. *See Capital Area Immigrants Rights Coal. v. Trump*, 471 F. Supp. 3d 25, 53 (D.D.C. 2020) (Kelly, J.) ("[T]he Court declines to rest its interpretation on legislative history, which is not the law." (citations omitted)). *Central Bank* held that if "Congress intended to impose aiding and abetting liability, we presume it would have used the words 'aid' and 'abet' in the statutory text." 511 U.S. at 177. Where Congress "did not" use such language, there is no aiding and abetting liability. *Id.*; *see also Owens*, 897 F.3d at 277 ("The key takeaway from *Central Bank* is that when Congress creates a private cause of action, aiding and abetting liability is not included in that cause of action *unless Congress speaks to it explicitly*." (emphasis added)). There is no explicit mention of aiding and abetting in the TVPA, and, as a result, there is no aiding and abetting liability.

The single reference to "abet" in the legislative history does not override the text. Indeed, *Owens* held that "[g]iven that [the statute] is silent with respect to aiding and abetting liability, Plaintiffs' appeals to . . . legislative history do not attempt to clarify the meaning of any words that appear in [the statute]." *Id.* at 279. The same is true here. *See also Capital Area*, 471 F. Supp. 3d at 53 (rejecting interpretation of statute that was "lifted from the House Report relating to the APA" and "unmoored from the legislative text").[12]

---

[12] Plaintiff relies on the Senate Report, but Congress adopted the House bill, with the House Report, which does not mention aiding or abetting liability. *See* H.R. Rep. No. 102-367, pt. 1, at 30 (1991), *as reprinted in* 1992 U.S.C.C.A.N. 84. The cases in the Senate Report discussing liability relied on ordering killings or torture, not aiding and abetting liability. *See* S. Rep. No. 102-249 (1992) (citing *Forti v. Suarez-Mason*, 672 F. Supp. 1531, 1537 (N.D. Cal. 1987); *In re Yamashita*, 327 U.S. 1 (1946)).

*Third*, Plaintiff's argument that "subjects" in the TVPA actually reads "aids and abets" is incorrect. *Central Bank* illustrates why.[13] In explaining that Congress knows how to provide aiding and abetting liability, the Supreme Court cited 7 U.S.C. § 192. 511 U.S. at 176–77. That statute makes a person liable for both "subject[ing]" another to unlawful conduct concerning livestock, 7 U.S.C. § 192(b), and for "aid[ing] or abet[ting]" such conduct, *id.* § 192(g). The inclusion of "aid or abet" would have been superfluous if "subject" had the broad meaning Plaintiff gives to it. *See Central Bank*, 511 U.S. at 175–76 (rejecting argument that statute's reference to "directly or indirectly" included aiding and abetting liability). At most, "subject" might encompass "command responsibility," as the Supreme Court implied in dicta in *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 458 (2012), by citing *Chavez v. Carranza*, 559 F.3d 486 (6th Cir. 2009), which applied only command responsibility under the TVPA. *See Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 26 (D.D.C. 1998) (explaining that command responsibility under TVPA is a "variation of *respondeat superior*"); *Elbit Sys., Ltd. v. Credit Suisse Grp.*, 917 F. Supp. 2d 217, 227 (S.D.N.Y. 2013) ("respondeat superior survived *Central Bank*").

Plaintiff is also wrong that the TVPA "invites" secondary liability. Opp'n 94. A pre-*Owens* district court made the same point as Plaintiff as to the Antiterrorism Act. *See Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 55 (D.D.C. 2010). Like Plaintiff, *Wultz* relied on legislative history, including a Senate Report stating that the statute imposed "liability at any point along the causal chain of terrorism." *Id.* at 56 (citation omitted). But *Owens* expressly overruled *Wultz* and its reasoning. More than an invitation and some legislative history is necessary for aiding and abetting liability—what is needed is a clear reference to such liability in the statute.

---

[13] The word "subjects" wears many hats for Plaintiff, as he also argues it means "attempted" extrajudicial killing. *See* Opp'n 82–83.

*Finally*, Plaintiff's reliance on the ATS cannot supply the language missing from the TVPA. The reason for including aiding and abetting in the ATS has nothing to do with *Central Bank* or *Owens*, but is based on principles of international law. *See Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 29 (D.C. Cir. 2011) ("Congress . . . directed that the courts derive the rule of law from the law of nations, and . . . [a]mple authority supports the conclusion that the First Congress considered aiding and abetting itself to be a violation of the law of nations."). Whether aiding or abetting is an international law violation is not relevant to the interpretation of the TVPA, which does not "derive" its rule from international law, but rather from the text Congress passed.

### 2. Mr. Alasaker Is Not Liable For Aiding and Abetting or Conspiracy.

As applied, Plaintiff's secondary liability theories also fail to state a claim under the ATS and TVPA.

**Aiding and Abetting.** According to Plaintiff, Mr. Alasaker is liable because he "recruited and deployed a cadre of operatives to hunt down Dr. Saad in the United States." Opp'n 96. As discussed, those allegations are conclusory. *See supra* § I.A. They also do not clear the "high bar" for aiding and abetting liability. *Bernhardt*, 2020 WL 6743066, at *5. For example, the Opposition sidesteps the requirement that Plaintiff must plead that Mr. Alasaker "*knowingly* and substantially assist[ed] the principal violation," i.e. the attempted killing. *See id.* at *6 (emphasis added). But there are no allegations that Mr. Alasaker knew, in the fall of 2017, that he was assisting an attempted killing in October 2018.

The allegations of recruiting and directing also do not constitute "substantial assistance." Contrary to Plaintiff's argument, Mr. Alasaker did not argue that a "cause-effect" relationship is required (*see* Opp'n 98), instead pointing out that such a causal relationship was lacking here, and any U.S. conduct did not "make a significant difference" to the extrajudicial killing. Mot. 41. Plaintiff ignores that the absence of a causal relationship is relevant to the substantial assistance

19

inquiry. *See* Appeal Judgment ¶ 277, *Prosecutor v. Kupreskic*, Case No. IT-95-16-A, (Int'l Tribunal for the Former Yugoslavia Oct. 23, 2001) (rejecting aiding and abetting liability for defendant who loaded weapons six months before an attack because there "was no evidence that the 'weapons,' whatever they were, were ever used during the" attack).

The cases in *Doe v. Exxon Mobil Corp.*, 2015 WL 5042118 (D.D.C. 2015), which Plaintiff cites, show that substantial assistance requires more than what Plaintiff alleges against Mr. Alasaker.[14] In *The Zyklon B Case*, "the manufacturer of the gas used in Nazi death camps" was "guilty of aiding and abetting crimes against humanity on the basis of having supplied the gas." *Id.* at *9. In a decision *Exxon* cited as "influential," *id.*, it was "clear" that substantial assistance "calls for a contribution that in fact has an effect on the commission of the crime." Op. & Judgment ¶ 688, *Prosecutor v. Tadić*, No. IT–94–1–T, (Int'l Tribunal for the Former Yugoslavia May 7, 1997). This conclusion was "supported by the . . . Nürnberg cases where, in virtually every situation, the criminal act most probably would not have occurred in the same way had not someone acted in the role that the accused in fact assumed." *Id.* In this circuit, Judge Bates dismissed an aiding and abetting claim where the plaintiffs had "not plausibly shown that the terrorist attacks on the U.S. embassies 'probably would not have occurred' absent [the defendant]'s conduct." *Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84, 109 (D.D.C. 2017), *vacated in part*, 285 F. Supp. 3d 240 (D.D.C. 2018). This Court dismissed an aiding and abetting claim where

---

[14] *Exxon* relied on Appeal Judgment ¶ 141, 149, *Ndahimana v. Prosecutor*, No. ICTR–01–68–A (Int'l Criminal Tribunal for Rwanda Dec. 16, 2013), where the defendant aided and abetted a massacre because he "must have known that his presence would have a significant encouraging effect on the perpetrators of the attack and would likely be considered as tacit approval of the attack and killings," even though he may not have caused the killings. Mr. Alasaker did not provide similar assistance.

defendant-banks were not alleged to have "finance[d] the Camp Chapman attack or . . . caused Plaintiffs' injuries." *Bernhardt*, 2020 WL 6743066, at *6.

Nothing in the Amended Complaint suggests that the alleged attempted killing "probably would not have occurred" without Mr. Alasaker's conduct. *See supra* § I.C; Crown Prince Reply Br. § IV.B; Student-Defendants and Defendant Hamed Reply Br. § I.C.1.

**Conspiracy/Joint Criminal Enterprise.** For similar reasons, Plaintiff's theory that Mr. Alasaker "conspired to commit the killing by leading the hunt knowing the Tiger Squad would use the information to kill Dr. Saad" fails (*see* Opp'n 97). The Amended Complaint does not allege any connection between Mr. Alasaker and the Tiger Squad, and Plaintiff never explains what information the Tiger Squad "use[d]" from the "hunt." He does not allege what specific information the U.S. Defendants "directed" by Mr. Alasaker obtained, or that they provided such information to him or the Tiger Squad. In addition, Plaintiff's argument that Mr. Alasaker had knowledge about the conspiracy fails for the same reasons as with aiding and abetting.

## IV.   PLAINTIFF FAILS TO STATE THE IIED CLAIM UNDER RULE 12(B)(6).

Plaintiff's IIED claim is based on the same conclusory allegations about Mr. Alasaker's involvement in "recruiting" and "directing" and should be dismissed for that reason.

The Court should also dismiss the claim under Rule 12(b)(6) because Mr. Alasaker is not alleged to have participated in any "outrageous conduct"—which Plaintiff defines as the "hostage taking, torture, and extrajudicial killing." Opp'n 131. The Amended Complaint does not allege that Mr. Alasaker took a hostage, tortured anyone, or killed (or attempted to kill) anyone. His purported directing of individuals who never came in contact with Plaintiff is not extreme or outrageous conduct as to Plaintiff. *See Coley v. Bowser*, 2021 WL 1578295, at *7 (D.D.C. Apr. 22, 2021) ("[C]ourts consistently require some direct connection between the IIED defendant and the plaintiff upon whom they allegedly inflict severe emotional distress."). Plaintiff's argument

that the Court should consider the acts of other Defendants because the case law allows the Court to consider the "context" of Mr. Alasaker's conduct misunderstands the case law. Opp'n 134. Cases looking at the "context" of an IIED claim do not use "context" to find a defendant liable for acts he did not commit, support or direct, but rather to determine whether the defendant's act is "outrageous." *Estate of Underwood v. Nat'l Credit Union Admin.*, 665 A.2d 621, 641 (D.C. 1995).

The Court should set aside Plaintiff's effort to justify the IIED claim against Mr. Alasaker by comparing him to Iran, *a designated state sponsor of terrorism*, in material support for terrorism cases. Opp'n 134. This vilification of Mr. Alasaker might play well in the press, but is wrong on the facts and the law. Plaintiff cites *Rimkus v. Islamic Republic of Iran*, which applied Missouri law in finding that Iran and the Iranian Islamic Revolutionary Guard Corps (IRGC) were liable for IIED where the FBI had "obtained specific information from the six [attackers] about how each was recruited and trained by the Iranian government in Iran." 575 F. Supp. 2d 181, 188 (D.D.C. 2008). An expert concluded that Iran and the IRGC "were responsible for" and directed the attack at issue, and Iran had spent "$50 million and $150 million on terrorist activities." *Id.* at 189. Mr. Alasaker's alleged conduct has nothing in common with these facts. He is a Saudi government official who leads a charitable foundation. He did not recruit or train anyone who allegedly committed an attempted killing, he did not provide funding for the plot, and he did not direct it.

Finally, for the same reasons described above, Plaintiff's aiding and abetting and conspiracy theories do not sustain the IIED claim. *See supra* § III.C.2.

## CONCLUSION

The Court should dismiss the Amended Complaint against Mr. Alasaker.

22

Respectfully submitted,


  /s/ William W. Taylor, III
By: William W. Taylor, III (D.C. Bar No. 84194)
Margarita K. O'Donnell (D.C. Bar No. 1005972)
ZUCKERMAN SPAEDER LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036
Tel: (202) 778-1800
Fax: (202) 822-8106
E-mail: wtaylor@zuckerman.com
 E-mail: modonnell@zuckerman.com
*Attorneys for Defendant Bader Alasaker*

**CERTIFICATE OF SERVICE**

I certify that on August 9, 2021, I electronically filed the foregoing Bader Alasaker's Reply Memorandum In Support Of His Motion To Dismiss The Amended Complaint, using the ECF system, which sent notice of filing in this matter to all counsel of record.

/s/ William W. Taylor III

William W. Taylor, III
*Attorney for Defendant Bader Alasaker*