IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DR. SAAD ALJABRI | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 1:20-cv-02146-TJK |
| | § | |
| MOHAMMED BIN SALMAN BIN | § | |
| ABDULAZIZ AL SAUD, et al., | § | |
| | § | |
| Defendants. | § | |

**PRINCE MOHAMMED BIN SALMAN ABDULAZIZ FOUNDATION'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................... 1

ARGUMENT ....................................................................................................... 1

I.    THE COURT LACKS PERSONAL JURISDICTION OVER THE FOUNDATION. ................................................................................................. 1

    A.    Plaintiff Has No Response To The Foundation's Arguments That The Jurisdictional Allegations Are Conclusory. ........................................ 2

    B.    There Is No Relationship Between The MiSK Foundation, Washington, D.C., And Plaintiff's IIED Claim. .......................................... 3

    C.    Plaintiff Relies On Irrelevant Issues To Establish Jurisdiction. ............................ 7

    D.    Exercising Jurisdiction Offends Notions Of Fair Play And Substantial Justice. ............................................................................................. 8

    E.    Plaintiff Is Not Entitled To Jurisdictional Discovery. ............................ 9

II.    THE FOUNDATION IS IMMUNE AND THEREFORE THIS COURT LACKS SUBJECT-MATTER JURISDICTION. ......................................................... 10

III.    PLAINTIFF HAS NOT PLEADED AN INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM. ............................................................... 11

    A.    The Conclusory Allegations Fail To State A Claim For IIED. ............................ 11

    B.    Even If The Conclusory Allegations Had Support, The Foundation Is Not Liable For IIED. .......................................................................... 13

    C.    Plaintiff Cannot Hold The Foundation Liable For IIED Based On The Acts Of Other Defendants. .............................................................. 16

IV.    THE COURT SHOULD EXERCISE ITS DISCRETION TO DISMISS THE IIED CLAIM IF IT DISMISSES THE OTHER DEFENDANTS AND FEDERAL CLAIMS. ........................................................................................... 19

CONCLUSION ................................................................................................... 19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Alkanani v. Aegis Def. Servs., LLC,*
  976 F. Supp. 2d 13 (D.D.C. 2014) ........................................................................... 5

*Asahi Metal Indus. Co. v. Superior Court,*
  480 U.S. 102 (1987) ................................................................................................. 8

*Bernhardt v. Islamic Republic of Iran,*
  2020 WL 6743066 (D.D.C. Nov. 16, 2020) ........................................................... 15

*Bigelow v. Garrett,*
  299 F. Supp. 3d 34 (D.D.C. 2018) ............................................................................ 4

*\*Bristol-Myers Squibb Co. v. Superior Court,*
  137 S. Ct. 1773 (2017) .......................................................................................... 5, 6

*Brunson v. Kalil & Co.,*
  404 F. Supp. 2d 221 (D.D.C. 2005) ....................................................................... 8–9

*Butera & Andrews v. Int'l Bus. Machs. Corp.,*
  456 F. Supp. 2d 104 (D.D.C. 2006) ......................................................................... 17

*Coley v. Bowser,*
  2021 WL 1578295 (D.D.C. Apr. 22, 2021) ............................................................. 13

*Corsi v. Caputo,*
  2020 WL 1703934 (D.D.C. Apr. 7, 2020) ................................................................. 4

*Daley v. Alpha Kappa Alpha Sorority, Inc.,*
  26 A.3d 723 (D.C. 2011) ........................................................................................... 6

*Gonzalez v. Internacional De Elevadores, S.A.,*
  891 A.2d 227 (D.C. 2006) ......................................................................................... 5

*Grainger v. Ensley,*
  2019 WL 4044323 (D. Or. July 26, 2019) ............................................................... 19

*Halberstam v. Welch,*
  705 F.2d 472 (D.C. Cir. 1983) .......................................................................... 12, 15

---

\* Authorities upon which we chiefly rely are marked with an asterisk.

*Heroes, Inc. v. Heroes Foundation*,
  958 F. Supp. 1 (D.D.C. 1996) ................................................................ 5

*IMAPizza, LLC v. At Pizza Ltd.*,
  334 F. Supp. 3d 95 (D.D.C. 2018) .......................................................... 6

*Kayemeth Leisrael-Jewish Nat'l Fund v. Educ. for a Just Peace in the Middle E.*,
  2021 WL 1177965 (D.D.C. Mar. 29, 2021) .......................................... 11–12, 15–16

*Kirschenbaum v. Islamic Republic of Iran*,
  572 F. Supp. 2d 200 (D.D.C. 2008) ...................................................... 14

*Livnat v. Palestinian Auth.*,
  851 F.3d 45 (D.C. Cir. 2017) ................................................................ 2

*M3 USA Corp. v. Qamoum*,
  2021 WL 2324753 (D.D.C. June 7, 2021) .............................................. 18

*McCoy v. United States*,
  890 A.2d 204 (D.C. 2006) .................................................................... 12

*Millman v. State Nat'l Bank of Md.*,
  323 A.2d 723 (D.C. 1974) .................................................................... 16

*Motir Servs., Inc. v. Ekwuno*,
  191 F. Supp. 3d 98 (D.D.C. 2016) ........................................................ 17

*MPC Franchise, LLC v. Tarntino*,
  826 F.3d 653 (2d Cir. 2016) ................................................................ 14

*Ofisi v. BNP Paribas, S.A.*,
  278 F. Supp. 3d 84 (D.D.C. 2017),
  *vacated in part*, 285 F. Supp. 3d 240 (D.D.C. 2018) ............................ 14–15, 16

*Parks v. Fed. Home Loan Bank of S.F.*,
  2020 WL 417795 (D.D.C. Jan. 27, 2020) .............................................. 6

*Pro-Choice Network of W.N.Y. v. Project Rescue W.N.Y.*,
  828 F. Supp. 1018 (W.D.N.Y. 1993) .................................................... 19

*Quality Air Servs., L.L.C. v. Milwaukee Valve Co.*,
  567 F. Supp. 2d 96 (D.D.C. 2008) ........................................................ 5–6

*Roz Trading Ltd v. Zeromax Grp., Inc.*,
  517 F. Supp. 2d 377 (D.D.C. 2007) ...................................................... 9

*Samantar v. Yousuf,*
  560 U.S. 305 (2010) ........................................................................... 10

*Toumazou v. Turkish Republic of N. Cyprus,*
  71 F. Supp. 3d 7 (D.D.C. 2014) ........................................................... 9

*Twycross v. Dreyfus,*
  5 Ch.D. 605 (1877) ........................................................................... 10

*Tx. Low Income Hous. Info. Serv. v. Carson,*
  427 F. Supp. 3d 43 (D.D.C. 2019) ....................................................... 8

*United States v. Emor,*
  850 F. Supp. 2d 176 (D.D.C. 2012) ............................................... 17–18

*United States v. One Parcel of Land Located at 7326 Highway 45 N.,*
  965 F.2d 311 (7th Cir. 1992) ......................................................... 16–17

*Walden v. Fiore,*
  571 U.S. 277 (2014) ............................................................................. 3

*Willis v. Willis,*
  655 F.2d 1333 (D.C. Cir. 1981) ........................................................... 8

*Wyatt v. Syrian Arab Republic,*
  908 F. Supp. 2d 216 (D.D.C. 2012) ...................................... 13–14, 15

## STATUTES

28 U.S.C. § 1603 ............................................................................... 10

## OTHER AUTHORITIES

No. 62, *Cole v. Heidtman,* (S.D.N.Y. 1968), *Sovereign Immunity Decisions of the Department of State – May 1952 to January 1977* (M. Sandler, D. Vagts, & B. Ristau, eds.) ......................... 10

Respondent Br., *Bristol-Myers,*
  2017 WL 1207530 (Mar. 31, 2017) ..................................................... 6

*Reverse piercing of corporate veil,*
  1 Fletcher Cyc. Corp. § 41.70 ........................................................... 17

*United States v. Abouammo,*
  No. 3:19-cr-621, ECF No. 53 (N.D. Cal. July 28, 2020) ....................... 7

## INTRODUCTION

The Prince Mohammed Bin Salman Abdulaziz Foundation ("MiSK Foundation" or "Foundation"), a Saudi Arabian nonprofit, submits this Reply to the Opposition to its motion to dismiss the Amended Complaint.[1] It demonstrates that the Opposition does not rebut the legal arguments in the motion to dismiss nor change the fatal insufficiency of the Amended Complaint. Accordingly, the Amended Complaint should be dismissed.

## ARGUMENT

### I.     THE COURT LACKS PERSONAL JURISDICTION OVER THE FOUNDATION.

Plaintiff cannot assert jurisdiction over the MiSK Foundation because he is unable to identify a single act in Washington, D.C. that has any relation to his claim of intentional infliction of emotional distress (IIED). His theory of jurisdiction depends on the Foundation's events serving as a "legitimate" cover for "recruiting" individuals for an alleged search of Plaintiff that occurred outside the District, even though he does not allege that the Foundation itself "recruited" anyone. *See* Am. Compl. ¶ 134; *see also id.* ¶¶ 90, 106 (alleging two Defendants recruited "through" the Foundation). Moreover, in his Amended Complaint and Opposition, Plaintiff is unable to identify a single U.S. Defendant "recruited" at an event in Washington, D.C. or how the only two activities in D.C. that occurred before the "search" for Plaintiff began—a contract for a business school in Saudi Arabia and a donation to a global women's initiative—had any "legitimizing" function connected to this case. The Opposition's efforts to rehabilitate the Amended Complaint's jurisdictional theory and justify jurisdictional discovery fail for the reasons below.

---

[1] To avoid duplication, this Reply Brief incorporates and adopts parts of the Replies of other Defendants, including the Crown Prince's Reply Brief sections II.C–D and V.

A.     **Plaintiff Has No Response To The Foundation's Arguments That The Jurisdictional Allegations Are Conclusory.**

The Foundation's motion identified three deficiencies in the Amended Complaint that demonstrated the absence of factual support for the allegations of "recruiting" and "legitimizing." First, Plaintiff "does not identify a single person recruited at a single Foundation event anywhere, much less in Washington D.C." Mot. 7. Second, Plaintiff does not identify any D.C. Foundation events before, or during, the alleged September to December 2017 search for Plaintiff, which is the only allegedly relevant U.S. conduct. *Id.* at 8. (Plaintiff identifies two irrelevant business transactions before the "search"). And third, Plaintiff does not allege that anyone in this case was "recruit[ed]" (or "develop[ed]" or "fund[ed]" or "legitimiz[ed]") in D.C. *Id.* at 7, 13.

The Opposition has no response to these jurisdictional deficiencies. Plaintiff does not dispute that he "has not identified a *particular* U.S. Based Covert Agent Defendant recruited through MiSK's D.C. events." Opp'n 73. Because his jurisdictional theory *relies* on establishing that individuals were recruited at the Foundation's D.C. events, Am. Compl. ¶ 134, his failure to do so is dispositive. And the deficiencies go further than that: Plaintiff has failed to identify *any* individual, in this case or elsewhere, recruited at a Foundation event, rendering his allegations conclusory. *See Livnat v. Palestinian Auth.*, 851 F.3d 45, 57 (D.C. Cir. 2017) (holding that "[c]onclusory statements or a bare allegation of conspiracy or agency do not satisfy this burden" to plead personal jurisdiction (citation omitted)).

Rather than defend the conclusory "recruiting" allegations, the Opposition relies on the purported "legitimizing" function of the MiSK Foundation events. Opp'n 72–73. It argues that "to carry out covert operations like the one targeting Dr. Saad," the Foundation "needed public-facing activities that projected an image of legitimacy." *Id.* But just as there no factual allegations showing any individual recruited at a D.C. event, there are no factual allegations explaining how

any D.C. events allowed the Foundation to "carry out covert operations," let alone to search for Plaintiff. *See* Mot. 10. Plaintiff argues that he need not "gainsay" that the Foundation "conduct[ed] legitimate activities." Opp'n 72. In other words, he suggests that the Foundation could conduct both legitimate activities and serve as a "legitimizing" tool for an undercover agenda. *See id.* But Plaintiff's argument misstates his burden to establish a prima facie case for jurisdiction. Plaintiff has not proffered any factual allegations establishing that the Foundation's events in D.C. served cover for some nefarious purpose—including not a single allegation that anyone in this case was "legitimized" at a D.C. event.

**B.     There Is No Relationship Between The MiSK Foundation, Washington, D.C., And Plaintiff's IIED Claim.**

Even assuming the allegations about "recruiting" and "legitimizing" had factual support, there is still no jurisdiction over the Foundation because there is no "suit-related conduct" in D.C., let alone such conduct with a "substantial connection" to this forum. *See Walden v. Fiore*, 571 U.S. 277, 284 (2014). Plaintiff's Opposition is wrong on the facts and the law.

The Opposition confirms the absence of any relevant D.C. allegations establishing a factual connection to the claims. According to Plaintiff, the Foundation events relevant to the "search" occurred in Boston and New York, not in D.C. *See* Opp'n 56 (arguing that the Crown Prince and Mr. Alasaker purportedly "activated" a network of agents "developed through . . . MiSK [Foundation] events in the Boston area"); *id.* (discussing New York event as part of "search").

Plaintiff nonetheless asserts that three allegations involving D.C. show a "relationship" between the Foundation's activities here and his claims. He points to "June 2016 . . . contracts" signed by the Foundation, by which he means a single agreement establishing a business school in Saudi Arabia, a 2017 donation to a women's development organization, and a March 2018 cultural

event at which unidentified Saudi students spoke. Opp'n 71–72.[2] But Plaintiff does not allege that any person in this case was recruited, deployed, or legitimized at those two transactions and one event—indeed no "U.S. Based Defendant" attended any of them. A few events and transactions over three years in this nation's capital, which are unconnected to Plaintiff's claim, are not sufficient for personal jurisdiction. *See Corsi v. Caputo*, 2020 WL 1703934, at \*2 (D.D.C. Apr. 7, 2020) (no personal jurisdiction where "alleged events and motives, piled on top of each other jenga-like, are far too attenuated to show that [plaintiff's] . . . claim arose from any of [defendant]'s business in the District"); *Bigelow v. Garrett*, 299 F. Supp. 3d 34, 45 (D.D.C. 2018) (no personal jurisdiction in copyright case where defendant "raised funds in the District and maintained professional relationships" there because plaintiff did "not explain how those funds and those relationships were used to create or disseminate" the copyrighted work).

Plaintiff's "legitimizing" theory also does not provide the necessary relationship with D.C. *See* Opp'n 72. The argument that the Foundation "used D.C. events to promote itself to students and the public," *id.*, does not provide any connection to this case, where there is no allegation that any U.S. Defendant attended a D.C. event. Indeed, Plaintiff cites a "September 15, 2017" event in New York—not D.C.—as a purported example of "how legitimate MiSK events furthered these illegitimate ends." *Id.* at 73; *see* Am. Compl. ¶ 131 (describing event with United Nations in September 2017). As to the only two D.C. transactions before the purported "search"—the donation to a global women's initiative and a contract for a Saudi business school—Plaintiff does not allege how those legitimate transactions furthered the purported recruiting or the search for

---

[2] The March 2018 event "feature[d] speakers Usman Ahmed, Head of Global Public Policy, Paypal; Matt McGrath, Director of the Albright Stonebridge Group; Mentor Dida, Senior Intrapreneur at Ashoka; as well as students from Georgetown, George Mason and other universities." (article cited in Am. Compl. ¶ 134 n.121).

Plaintiff, neither of which occurred in D.C. And "the mere existence of a contract between a foreign corporation and a local resident is not enough to establish minimum contacts sufficient to satisfy due process." *Gonzalez v. Internacional De Elevadores, S.A.*, 891 A.2d 227, 236 (D.C. 2006); *Alkanani v. Aegis Def. Servs., LLC*, 976 F. Supp. 2d 13, 27 (D.D.C. 2014) ("Courts have appropriately concluded that an injury sounding in tort does not 'arise from' a contract for services for the purpose of specific jurisdiction.").

The Court should also ignore Plaintiff's contention that general jurisdiction principles are relevant to the Court's specific jurisdiction analysis. He argues that jurisdiction is proper because the Foundation has "many events" in D.C. Opp'n 73 n.69. Although hosting "many events" in D.C. might be a relevant general jurisdiction argument, such "general connections with the forum are not enough" for specific jurisdiction. *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1781 (2017) ("specific jurisdiction is lacking *regardless* of the extent of a defendant's unconnected activities in the State" (emphasis added)). *Heroes, Inc. v. Heroes Foundation*, 958 F. Supp. 1 (D.D.C. 1996), on which Plaintiff relies, Opp'n 72, shows the relationship required for specific jurisdiction. There, the defendant advertised in D.C.—and received substantial contributions as a result—using the name that was the subject of the trademark dispute. *See* 958 F. Supp. at 4. Thus, the suit-related acts in D.C. in *Heroes* had a strong connection to the claim.

Rather than attempt to make that connection here, Plaintiff insists that he need not allege that anyone was recruited, legitimized, or deployed at a MiSK Foundation event in Washington, D.C., so long as his IIED claim "relate[s] to the same 'type of activity' conducted in the District." Opp'n 71, 73 (quoting *Quality Air Servs., L.L.C. v. Milwaukee Valve Co.*, 567 F. Supp. 2d 96, 101 (D.D.C. 2008)). *Quality Air* does not stand for that proposition. The footnote Plaintiff cites explained that "making sales through a regional distributor that specifically targets the District is

considered 'transacting business' in the District" and "Plaintiff's claim clearly arises out of this type of activity by defendant." 567 F. Supp. 2d at 101 n.4. The court did not hold, as Plaintiff suggests, that activities in the forum unconnected to the claim can provide specific jurisdiction. Unlike here, *Quality Air* had suit-related conduct in the District because the product broke here and the defendant encouraged the selling of its product here.[3]

The Court need look no further than the Supreme Court to dispose of Plaintiff's "same type of activity" argument. In *Bristol-Myers*, the defendant sold the drug Plavix in California to California residents, who suffered the same injuries as the nonresident plaintiffs suing in California even though they had not been injured there. Although the defendant engaged in what Plaintiff would call the "same type of activity" in California—selling Plavix—the Supreme Court held there was no specific jurisdiction because the connection between the nonresidents' claim and the defendant's conduct was lacking: the nonresident plaintiffs "were not prescribed Plavix in California, did not purchase Plavix in California, did not ingest Plavix in California, and were not injured by Plavix in California."[4] 137 S. Ct. at 1781; *see also Parks v. Fed. Home Loan Bank of S.F.*, 2020 WL 417795, at *3 (D.D.C. Jan. 27, 2020) (where "suit relate[d] only to the mediation, the Directors' other contacts . . . in D.C. are irrelevant").

---

[3] Similarly, Plaintiff cites this Court's *IMAPizza, LLC v. At Pizza Ltd.* decision for the proposition that "holding a board meeting in the District" satisfies the D.C. long-arm statute. 334 F. Supp. 3d 95, 111 (D.D.C. 2018). The Court was discussing what activity constitutes "transacting business"—which is only one element of the D.C. long-arm statute. In any case, *IMAPizza* quoted *Daley v. Alpha Kappa Alpha Sorority, Inc.*, 26 A.3d 723, 727–28 (D.C. 2011), where holding a board meeting was sufficient for specific jurisdiction—not standing alone—but because the "allegations in the case . . . focus[ed] in large part on wrongdoing with respect to the 2008 meeting" in the District. No similar connection is present here.

[4] Plaintiff's argument is a recycled version of the losing position in *Bristol-Myers*. *See* Respondent Br. 61, *Bristol-Myers*, 2017 WL 1207530 (Mar. 31, 2017) (arguing that "[t]he conduct that injured respondents in their home states is *the same very activity* being conducted, in part, in California and it is fair and appropriate for California to adjudicate the litigation" (emphasis added) (citation omitted)).

Under *Bristol-Myers*, there is no jurisdiction over the Foundation in this forum. Even with the (unjustified) assumption that the Foundation was used for "recruiting" or "legitimizing" in other situations, no recruiting or legitimizing in *this case* occurred in Washington, D.C. As a result, nothing connecting the Foundation and Plaintiff's IIED claim occurred in this forum.

### C.      Plaintiff Relies On Irrelevant Issues To Establish Jurisdiction.

The Amended Complaint lacks any facts connecting the MiSK Foundation's D.C. activities to the attempted killing plot in Canada. In order to bridge that gap, Plaintiff relies on allegations that are irrelevant to the claims in this case and uses the Opposition to advance allegations that are not in the Amended Complaint. These arguments serve no jurisdictional purpose, and are designed to drag the Foundation's name through the mud.

Plaintiff first misreads the *Abouammo* filings, which involve the alleged access of Twitter user information, and in which the Foundation is not charged. According to Plaintiff, the Crown Prince and Mr. Alasaker "used" the Foundation "to recruit and deploy U.S. students as operatives, including through meetings in the District (because the Department of Justice has said as much in an indictment and related filings)." Opp'n 71 (citing *Abouammo*). The Justice Department has said nothing of the sort. Although "Foreign Official-1" is alleged to be the Secretary General of "Organization 1" and the head of the Crown Prince's private office, there is no allegation in the indictments or complaint that any person was recruited or deployed through "Organization 1." *See, e.g.*, *United States v. Abouammo*, No. 3:19-cr-621, ECF No. 53 (N.D. Cal. July 28, 2020). Moreover, *Abouammo* did not involve any Foundation events in Washington, D.C., let alone an individual recruited at such an event. *Abouammo* is irrelevant.

The Opposition also offers a new allegation absent from the Amended Complaint, that the MiSK Foundation has been placed "under review," citing an article dated months before the

Amended Complaint, and nearly three years after the purported conduct in this case. Opp'n 73.[5] The Court should disregard this allegation, which is irrelevant to the question of jurisdiction in Washington, D.C. *See Tx. Low Income Hous. Info. Serv. v. Carson*, 427 F. Supp. 3d 43, 57 n.1 (D.D.C. 2019) (Kelly, J.) ("It is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss." (citation omitted)). Plaintiff also claims that "MiSK's U.S. activities targeting Dr. Saad and others" are "often centered in the District," citing paragraphs 109 and 245 of the Amended Complaint. Opp'n 13–14. But those paragraphs do not mention the Foundation or the District and do not affect the jurisdictional inquiry.[6]

### D.     Exercising Jurisdiction Offends Notions Of Fair Play And Substantial Justice.

Plaintiff's Opposition offers no specific responses to the Foundation's arguments that exercising jurisdiction in D.C. would offend notions of fair play and substantial justice. Plaintiff makes no argument as to why *Washington, D.C.* has an interest in adjudicating this suit. He argues only that the United States, as a whole, has a purported interest here. Opp'n 76–77. But the inquiry as to the Foundation is not about the interests of the United States, but rather the interests of the District of Columbia. *See Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113 (1987) (assessing interests of California, not the United States). Under D.C. Circuit precedent, "the District of Columbia has little interest in providing a forum to a nonresident plaintiff." *See Willis v. Willis*, 655 F.2d 1333, 1338 (D.C. Cir. 1981). And that negligible interest is "considerably diminished" where, like here, "the parties are both non-residents." *Brunson v. Kalil & Co.*,

---

[5] This article relies on an unidentified "Saudi official." The Foundation made a significant investment in a Japanese company a couple months after this "review," undermining any assertion that Saudi Arabia curtailed the Foundation's activities. *See* Am. Compl. ¶ 70 n.54.

[6] Plaintiff also asserts that unidentified "covert agents" received "invitations to lavish" MiSK Foundation events, citing a paragraph of the Amended Complaint that does not mention the Foundation. Opp'n 13 (citing Am. Compl. ¶ 227).

404 F. Supp. 2d 221, 238 (D.D.C. 2005) (citation omitted). Likewise, Plaintiff does not argue that he has any interest in suing in Washington, D.C., as opposed to the United States generally. Opp'n 77–78. Plaintiff's failure to identify any interest that the District or he has in adjudicating this case here confirms that exercising jurisdiction over the Foundation offends traditional notions of fair play and substantial justice.

### E.   Plaintiff Is Not Entitled To Jurisdictional Discovery.

The Court should deny Plaintiff's request for jurisdictional discovery regarding the Foundation. Plaintiff's jurisdictional allegations regarding the Foundation are all conclusory, and relate to events that have nothing to do with his IIED claim. Because Plaintiff has no factual basis for jurisdiction over the Foundation in Washington, D.C., his request for discovery should be denied. *See Roz Trading Ltd v. Zeromax Grp., Inc.*, 517 F. Supp. 2d 377, 388–90 (D.D.C. 2007) (discovery "can be denied when the plaintiff has failed to present facts that could establish jurisdiction" and is unwarranted where a plaintiff has alleged "'conclusory' jurisdictional facts"); *Toumazou v. Turkish Republic of N. Cyprus*, 71 F. Supp. 3d 7, 18 (D.D.C. 2014) (denying jurisdictional discovery where plaintiffs relied "only on conclusory statements that the TRNC advertises and sells property through its D.C. office and website").

Despite resting his jurisdictional theory on allegations that the Foundation was used for "recruiting" and "deploying," *see* Am. Compl. ¶ 134, Plaintiff does not assert that discovery will show that anyone was recruited or deployed in D.C. Instead, he contends that "[d]iscovery will show that D.C. events *facilitated* the recruitment and deployment of the U.S.-Based Covert Agent Defendants in the months before the hunt for Dr. Saad." Opp'n 73 (emphasis added). This request demonstrates that Plaintiff knows there is no evidence that anyone was recruited or deployed in Washington, D.C. Accordingly, Plaintiff is not entitled to a fishing expedition under the guise of jurisdictional discovery.

## II.     THE FOUNDATION IS IMMUNE AND THEREFORE THIS COURT LACKS SUBJECT-MATTER JURISDICTION.

Plaintiff's efforts to challenge the conduct-based immunity of the Foundation fail.[7] His principal argument is that the Foreign Sovereign Immunities Act (FSIA) forecloses the availability of conduct-based immunity for non-government corporate entities. As Plaintiff acknowledges, however, FSIA applies to entities that are "an organ of a foreign state or political subdivision" or where "a majority of . . . [the] ownership interest is owned by a foreign state." 28 U.S.C. § 1603(b)(2). The Foundation is not a state-owned entity, and accordingly common-law immunity, not FSIA, should apply. *See Samantar v. Yousuf*, 560 U.S. 305, 325 (2010) (holding that a case "is properly governed by the common law because it is not a claim against a foreign state as the Act defines that term"). Such immunity is consistent with historical practice. *See Twycross v. Dreyfus*, 5 Ch.D. 605 (1877) (holding, with regard to corporations that were agents of Peruvian government, "[y]ou cannot sue the Peruvian Government at all, and therefore you cannot sue its agents").

Plaintiff does not identify any cases holding that a corporation is barred from obtaining conduct-based immunity. The single case that Plaintiff cites, *Cole v. Heidtman*, (S.D.N.Y. 1968), does not stand for that proposition. Consistent with the immunity doctrine at the time, the State Department assessed whether the entity at issue was engaged in government or private acts. *See* No. 62, *Sovereign Immunity Decisions of the Department of State – May 1952 to January 1977* (M. Sandler, D. Vagts, & B. Ristau, eds.). Because the entity was engaged in private acts, it was

---

[7] The Foundation incorporates by reference the arguments from the Crown Prince's Reply Brief that the State Department test applies, that there is no exception for *jus cogens* violations, and that, if the Restatement test applies, Plaintiff seeks to enforce a rule of law against Saudi Arabia. Crown Prince Reply Br. § II.B.

not immune. If the State Department's policy had been that such entities could *never* be immune, it would not have engaged in that inquiry.

Finally, for the reasons articulated in the motion to dismiss, immunity is appropriate given Plaintiff's allegations regarding the Foundation's role in this alleged scheme.

## III.   PLAINTIFF HAS NOT PLEADED AN INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM.

Each of the issues discussed above require that the Amended Complaint be dismissed as to the Foundation. The only claim against the Foundation, for intentional infliction of emotional distress, must also be dismissed under Rule 12(b)(6).[8] Plaintiff's arguments in support of the various IIED liability theories fail for several reasons. First, the Opposition identifies no facts from the Amended Complaint that support a claim for IIED against the Foundation. Second, even assuming the conclusory allegations had factual support, Plaintiff cannot state a claim for IIED. Third, Plaintiff fails in his attempts to impute the acts of other Defendants to the Foundation.

### A.   The Conclusory Allegations Fail To State A Claim For IIED.

The Opposition argues that the Foundation is liable for IIED because it "recruit[ed]" and "deploy[ed]" the U.S. Defendants. *See* Opp'n 136–37. But the Amended Complaint alleges that only two of the U.S. Defendants—Abuljadayel and Alrajhi—were "recruited" "through" the Foundation. Am. Compl. ¶¶ 90, 106. Plaintiff offers *no* response to the Foundation's argument, *see* Mot. 26, that these allegations are conclusory. As to the remaining U.S. Defendants, there are no allegations, and no argument in the Opposition, that they were "recruited" or "deployed" by the Foundation. Because Plaintiff's IIED cause of action rests on these conclusory allegations of

---

[8] The Foundation also adopts and incorporates by reference the arguments that Saudi Arabian law applies to the IIED claim, which does not recognize such a claim, and that under D.C. law, there can be no IIED claim. *See* Crown Prince Reply Br. §§ V.A, B.

recruiting and deploying, the claim against the Foundation should be dismissed. *See Kayemeth Leisrael-Jewish Nat'l Fund v. Educ. for a Just Peace in the Middle E.*, 2021 WL 1177965, at *4 (D.D.C. Mar. 29, 2021) (granting motion to dismiss by non-profit organization where "plaintiffs make threadbare assertions that defendant provided substantial assistance and played an integral role in Hamas and other foreign terror organizations' terrorist activities, without specifying what support played such a role, or how").

The Opposition's contrary arguments do not change the conclusory allegations into factual ones. Plaintiff tries to turn the Foundation's funding and employment structure into an IIED claim. *See* Opp'n 138 ("bin Salman g[a]ve MiSK $1 billion [since 2011, Am. Compl. ¶ 70], and installed his right-hand man as its chief").[9] But these allegations do not provide any factual support to conclude that the Foundation is liable for IIED by assisting in a plot to kill Plaintiff. Likewise, the allegation that an individual, who was not a Foundation employee, asked someone about Plaintiff's son's immigration status at a Foundation event with the United Nations, Am. Compl. ¶¶ 131.a, 238, is not relevant to liability. *See McCoy v. United States*, 890 A.2d 204, 211 (D.C. 2006) ("Of course, mere presence or awareness is insufficient to make out a conviction for either aiding and abetting or conspiracy."); *Halberstam v. Welch*, 705 F.2d 472, 483 (D.C. Cir. 1983) (explaining that "[e]vidence that [an individual] was merely present at . . . the assault and battery would not be enough to create liability").

Because there are no well-pleaded facts supporting the IIED claim, it should be dismissed.

---

[9] In support of this direct liability claim, Plaintiff argues that the Crown Prince "installed" Mr. Alasaker as the Foundation's Executive Director, citing paragraphs 40 and 68 of the Amended Complaint. Opp'n 136. But in another example of Plaintiff using his Opposition to amend his Amended Complaint, those paragraphs never allege how Mr. Alasaker obtained his position.

**B.      Even If The Conclusory Allegations Had Support, The Foundation Is Not Liable For IIED.**

*Direct liability.* Even if the allegations of recruiting and deploying had some factual backbone, the Foundation could not be directly liable for "recruiting" or "deploying" Defendants who never contacted Plaintiff. *See Coley v. Bowser*, 2021 WL 1578295, at *7 (D.D.C. Apr. 22, 2021) ("[C]ourts consistently require some direct connection between the IIED defendant and the plaintiff upon whom they allegedly inflict severe emotional distress."). If those Defendants never contacted Plaintiff, then they could not have caused Plaintiff's distress.

Plaintiff's Opposition confirms that he has not alleged that the Foundation caused his emotional distress. Mot. 26. The Opposition concedes that the "detail" Plaintiff provided about the nature of his emotional distress and when it began is only from the kidnapping. Opp'n 132. And Plaintiff contends only that he has "experienced severe distress from the repeated attempts on his life, from the around-the clock security that must be stationed at his door, and from his children's abduction." *Id.* at 131. The Foundation had no involvement in the kidnapping or in the "attempts" on Plaintiff's life. Plaintiff's failure to allege causation is an independent ground for dismissal.

Plaintiff also cannot rely on an inapposite case arising from terrorist organizations and terrorist attacks to state a direct liability claim against the Foundation. He argues that the Foundation acted "recklessly" and with "knowledge" about the Crown Prince's "plots." Opp'n 135–36. According to Plaintiff, the Foundation's "role" is the "same" as Syria's role in providing material support for terrorism, which Plaintiff describes as "giving money" to the PKK, a terrorist group. *Id.* (citing *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 228 (D.D.C. 2012)). *Wyatt* is irrelevant because this is not a terrorism case, and the Foundation did not fund a terrorist group.

Plaintiff also errs in arguing that *Wyatt* is comparable because it was just about "giving money." In *Wyatt*, Syria had been "designated a state sponsor of terrorism." 908 F. Supp. 2d at 228. Its support consisted of giving the PKK "(1) weapons and ammunition; (2) financial assistance; (3) safe haven and shelter in Syria to PKK leadership; and (4) terrorist training by members of the Syrian armed forces and intelligence agencies." *Id.* An expert in *Wyatt* testified that "the PKK would not have been able to conduct its operations without Syrian [s]upport" and that the kidnapping at the center of that case "would have been impossible without the approval and support of the top leadership of the Syrian government." *Id.* at 223; *see also id.* (95 percent of PKK funding from Syrian government). Nothing approaching that situation is present here. The Foundation is not a state sponsor of terrorism. It did not provide shelter, weapons, or ammunition to any Defendants. There was no terrorist training at the Foundation's various events, which involved Harvard University and the United Nations, among others. *See* Am. Compl. ¶ 131.a. And the Foundation's "approval" or "support" were not necessary to the attempted killing in Canada. Accordingly, Plaintiff's direct liability claim fails.

**Conspiracy/Aiding and abetting.** The Opposition confirms the weakness of these secondary liability theories by again relying on terrorism cases, and arguing that organizations that provide "'material support' to terrorist organizations are liable for conspiring to inflict IIED." Opp'n 136 & n.140. As with direct liability, those cases—in which Iran provided "funding, training, and safe haven to Hamas and its members so that they may undertake terrorist attacks," *Kirschenbaum v. Islamic Republic of Iran*, 572 F. Supp. 2d 200, 211 (D.D.C. 2008)—are irrelevant. The MiSK Foundation is not a terrorist organization, nor has Plaintiff made any attempt to plead that it is.

Moreover, Plaintiff's argument that the Foundation acted "recklessly," not intentionally, undermines his assertion that the Foundation had actual knowledge of an alleged plot to kill Plaintiff. Opp'n 135. Recklessness is a "somewhat less stringent standard than actual knowledge." *MPC Franchise, LLC v. Tarntino*, 826 F.3d 653, 660 n.5 (2d Cir. 2016). Accordingly, allegations of recklessness do not suggest that the Foundation knew "of the existence of the larger conspiracy and of the necessity for the other participants," *Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84, 110 (D.D.C. 2017), *vacated in part*, 285 F. Supp. 3d 240 (D.D.C. 2018), or that the Foundation had the knowledge necessary for aiding and abetting.

On aiding and abetting, Plaintiff also contends that the Foundation "misstates" the legal standard for knowledge, because Plaintiff need allege only the Foundation's knowledge of violent tactics generally. Opp'n 137. But Plaintiff never alleged that the Foundation had a general knowledge of violent tactics generally, instead he alleged that the Foundation "was aware of its role in the overall scheme." Am. Compl. ¶ 373; *see id.* ¶ 370 (explaining that "scheme" consists of the allegations regarding Plaintiff). Plaintiff's argument also ignores *Bernhardt*, which makes clear that aiding and abetting requires that the defendant "knowingly and substantially assist[ed] the principal violation"—here, the attempted killing. *Bernhardt v. Islamic Republic of Iran*, 2020 WL 6743066, at *6 (D.D.C. Nov. 16, 2020) (citation omitted).[10]

As to the substantial assistance element, Plaintiff insists that the actions of the Student-Defendants who never came in contact with Plaintiff, or discovered his location, were "key." Opp'n 59–60. As explained in the reply briefs of the other Defendants, Plaintiff's emotional distress claim was not "'heavily dependent' on the assistance provided" by the Student-

---

[10] Although Plaintiff accuses the Foundation of misstating the legal standard, Plaintiff's own recitation of the purported standard is from *Wyatt*, a case that did not discuss aiding and abetting at all. Opp'n 137 (citing *Wyatt*, 908 F. Supp. 2d at 228).

Defendants, nor was their assistance "'indisputably important' to, or an 'essential part of' the act." *Kayemeth*, 2021 WL 1177965, at *4 (quoting *Halberstam*, 705 F.2d at 488); *see also* Crown Prince Reply Br. § IV.B; Alasaker Reply Br. § I.C; Student-Defendants and Defendant Hamed Reply Br. § I.C.1.[11] The alleged acts of Alrajhi and Abuljadayel (the only two Defendants allegedly recruited "through" the Foundation) had no impact on the later discovery of Plaintiff in Canada, who was discovered by Alharbi, a close associate of Plaintiff—not of the Foundation. *See* Am. Compl. ¶¶ 250–51. Nor has Plaintiff alleged with facts, what "habits" or "vulnerabilities" those individuals allegedly uncovered. Opp'n 59. Absent such allegations, the "required . . . link between the aid rendered and the principal violation (or violations) alleged" is absent. *See Ofisi*, 278 F. Supp. 3d at 110–11 (citation omitted).[12]

Thus, the Court should dismiss the IIED claim because there are no facts supporting any theory of liability for the Foundation.

### C. Plaintiff Cannot Hold The Foundation Liable For IIED Based On The Acts Of Other Defendants.

The Court should reject Plaintiff's efforts to make up for the absence of factual allegations against the Foundation by imputing the acts of other Defendants to the Foundation.

First, Plaintiff argues that Mr. Alasaker's knowledge and conduct are imputed to the Foundation. Opp'n 136–37. The allegations in the Amended Complaint do not sustain that theory. The Amended Complaint has not alleged that Mr. Alasaker was acting within the scope of his

---

[11] Plaintiff quibbles with this standard, ignoring that courts do rely on the "heavily dependent" language. Opp'n 138 n.142. Even under a more generous standard, the Foundation is not liable for aiding and abetting.

[12] Plaintiff relegates to a footnote his implausible web of control over Saudi students between the Foundation, a Saudi government entity, and various Defendants and non-Defendants. Opp'n 138 n.142. Plaintiff continues to rely on a 2018 agreement that does not support his theory and is unconnected from the U.S. conduct in this case that occurred months before the agreement's signing.

Foundation employment when he allegedly recruited or directed other Defendants, which is necessary for an employee's knowledge to be imputed to a corporation. *See Millman v. State Nat'l Bank of Md.*, 323 A.2d 723, 725 (D.C. 1974); *United States v. One Parcel of Land Located at 7326 Highway 45 N.*, 965 F.2d 311, 316 (7th Cir. 1992). And such allegations would be inconsistent with Plaintiff's theory that Mr. Alasaker was acting "under color of law" for the TVPA claim and that he and the Crown Prince used the Foundation for personal objectives. *See Butera & Andrews v. Int'l Bus. Machs. Corp.*, 456 F. Supp. 2d 104, 112 (D.D.C. 2006) (employer not liable for acts of employee where "all the plaintiff alleges is that John Doe in his capacity as IBM employee or agent, initiated, directed and managed these attacks").

Second, Plaintiff argues that the Foundation is liable for the acts of the Crown Prince and Mr. Alasaker under the "extraordinary procedure" of piercing the corporate veil. *Motir Servs., Inc. v. Ekwuno*, 191 F. Supp. 3d 98, 109 (D.D.C. 2016) (citation omitted). Such a theory is appropriate only where "extreme circumstances" "call for disregard of the corporate form." *Id.* (citation omitted). The Opposition offers no argument regarding the quintessential alter ego factors, including "whether corporate formalities have been observed; whether there has been commingling of corporate and shareholder funds, staff and property" or "whether the corporation is adequately capitalized." *Id.* at 108.[13] While Plaintiff argues that the Crown Prince gave $1 billion to the Foundation, Opp'n 139, an allegation regarding substantial funding is not sufficient for reverse piercing the corporate veil. *See United States v. Emor*, 850 F. Supp. 2d 176, 207 (D.D.C.

---

[13] Nor did Plaintiff cite a single analogous case in which the court permitted reverse veil-piercing, which is the unusual theory presented here. In this case, Plaintiff seeks to hold the Foundation liable for the actions of the Crown Prince and Mr. Alasaker rather than hold an individual liable for the actions of a corporation. *Cf. Reverse piercing of corporate veil*, 1 Fletcher Cyc. Corp. § 41.70 (explaining that reverse veil-piercing may "permit a third-party creditor to pierce the corporate veil to satisfy the debts of an individual shareholder out of the corporation's assets").

2012) ("[D]omination of a corporation by a single individual, by itself, is not enough to find the corporation to be the individual's alter ego.").

As to Mr. Alasaker, the alter ego allegations are even more meagre. There are no factual allegations showing that Mr. Alasaker had any ownership of, or control over, the Foundation. Plaintiff does not argue that Mr. Alasaker gave any money to the Foundation, commingled his funds with the Foundation, or disregarded corporate formalities. The sole allegation that Mr. Alasaker was the Secretary General of the Foundation is insufficient. *See M3 USA Corp. v. Qamoum*, 2021 WL 2324753, at *10 (D.D.C. June 7, 2021) (holding that allegations about employees' relationship with founder of company and their relevant expertise "do not, by any measure, support a conclusion that [company] lacks a separate legal identity").

According to Plaintiff, the "thrust" of his alter ego argument is that the Crown Prince and Mr. Alasaker used the Foundation as their "personal tool" when they "leveraged MiSK to hunt for Dr. Saad" and "exploit[ed] . . . MiSK to infiltrate Twitter." Opp'n 139. That theory does not make up for the absence of the facts satisfying the elements of an alter ego claim. Moreover, as the Foundation's motion to dismiss and this brief have explained, the allegations regarding the Foundation's connection to Plaintiff are conclusory. Likewise, the Foundation did not "infiltrate Twitter." *See supra* § I.C.

Finally, even if the Foundation were an alter ego of the Crown Prince and Mr. Alasaker, it would not be liable here. The Opposition argues only that the Crown Prince and Mr. Alasaker "leveraged" the Foundation to search for Plaintiff. Opp'n 139. There is no argument that the Foundation was used for any other part of the alleged attempted killing plot. As discussed in the briefs of the Crown Prince and Mr. Alasaker, any connection between them and the search for

Plaintiff is illusory. *See* Crown Prince Reply Br. § I.B.2; Alasaker Reply Br. § I.C. As a result, even if those acts are imputed to the Foundation, it would not be liable for IIED.

## IV.   THE COURT SHOULD EXERCISE ITS DISCRETION TO DISMISS THE IIED CLAIM IF IT DISMISSES THE OTHER DEFENDANTS AND FEDERAL CLAIMS.

Plaintiff concedes that it is only the "rare case" in which a court keeps jurisdiction over state law claims when the federal ones are dismissed before discovery. Opp'n 139. That case is not presented here. The few out-of-circuit district court cases cited by Plaintiff for retaining jurisdiction are distinguishable. In *Grainger v. Ensley*, "fact discovery ha[d] been completed." 2019 WL 4044323, at *2 (D. Or. July 26, 2019). In *Powell v. Saint Joseph's University*, the "plaintiff could feasibly amend his Title IX claim to include allegations supporting an inference of gender bias, thereby reinstating the federal claim." 2018 WL 994478, at *10 (E.D. Pa. Feb. 20, 2018). And, in *Pro-Choice Network*, the case was "in a discovery posture," the plaintiff was granted leave file a fifth amended complaint, and "the list of motions and issues addressed by this Court over the past three years [was] substantial." *Pro-Choice Network of W.N.Y. v. Project Rescue W.N.Y.*, 828 F. Supp. 1018, 1028 (W.D.N.Y. 1993). This case is at its earliest stages, with no discovery, and supplemental jurisdiction is not appropriate.

## CONCLUSION

The Court should dismiss the Amended Complaint as to the MiSK Foundation.

Respectfully submitted,

  _/s/ William W. Taylor, III_
By: William W. Taylor, III (D.C. Bar No. 84194)
Margarita K. O'Donnell (D.C. Bar No. 1005972)
ZUCKERMAN SPAEDER LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036
Tel: (202) 778-1800

Fax: (202) 822-8106
E-mail: wtaylor@zuckerman.com
 E-mail: modonnell@zuckerman.com
 *Attorneys for Defendant Prince Mohammed Bin Salman*
*Abdulaziz Foundation*

## CERTIFICATE OF SERVICE

I certify that on August 9, 2021, I electronically filed the foregoing Prince Mohammed Bin Salman Abdulaziz Foundation's Reply Memorandum In Support Of Its Motion To Dismiss Plaintiff's Amended Complaint, using the ECF system, which sent notice of filing in this matter to all counsel of record.

*/s/ William W. Taylor III*

William W. Taylor, III
*Attorney for Defendant Prince Mohammed*
*Bin Salman Abdulaziz Foundation*