# Exhibit A

12 F.4th 789
United States Court of Appeals, District of Columbia Circuit.

BROIDY CAPITAL MANAGEMENT LLC and Elliott Broidy, Appellees

v.

Nicolas D. MUZIN, et al., Appellants

No. 20-7040
|
Argued February 26, 2021
|
Decided September 3, 2021

**Synopsis**

**Background:** Business executive and his company brought action against public relations contractors, citizens and residents of the United States who performed work on behalf of Qatar, alleging that, in their efforts to discredit plaintiffs for speaking out against Qatar, defendants distributed e-mails illegally hacked from plaintiffs' private servers, and asserting claims for violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), Stored Communications Act (SCA), Computer Fraud and Abuse Act (CFAA), Defend Trade Secrets Act (DTSA), and California law. The United States District Court for the District of Columbia, Dabney L. Friedrich, J., 2020 WL 1536350, granted in part defendants' motions to dismiss, dismissing certain claims as legally inadequate, but rejecting their immunity defense. Defendants filed interlocutory appeal.

**Holdings:** The Court of Appeals, Pillard, Circuit Judge, held that:

Court of Appeals had appellate jurisdiction over defendants' interlocutory appeal;

defendants were not entitled to conduct-based sovereign immunity based on allegation that they acted on behalf of Qatar;

to the extent that derivative immunity applied in foreign sovereign immunity context, defendants were not entitled to such immunity; and

to the extent that provision of the Restatement (Second) of Foreign Relations Law of the United States extending a foreign state's immunity to public officials for acts performed in official capacity if effect of exercising jurisdiction would be to enforce a rule of law against the state, furnished a relevant standard, defendants' claim of immunity was foreclosed by such standard.

Affirmed; remanded.

**\*792**  Appeal from the United States District Court for the District of Columbia (No. 1:19-cv-00150)

**Attorneys and Law Firms**

Stephen J. Obermeier argued the cause for appellants. With him on the joint briefs were Jeremy J. Broggi, Krystal B. Swendsboe, Jeffrey A. Udell, Alison L. Andersen, Laura E. Zell, and Charles S. Fax.

Shannen W. Coffin argued the cause for appellees. With him on the brief were Filiberto Agusti and Linda C. Bailey. Michael J. Baratz entered an appearance.

Before: Pillard and Walker, Circuit Judges, and Randolph, Senior Circuit Judge.

**Opinion**

Pillard, Circuit Judge:

Defendants-Appellants, public relations contractors who are citizens and residents of the United States, appeal the district court's order denying their claim of immunity from suit for alleged violations of U.S. law in the course of their work here on behalf of the State of Qatar. Business executive and activist Elliott Broidy and his company (collectively, Broidy) sued the defendants, claiming that, in their efforts to discredit Broidy for speaking out against Qatar, they distributed emails illegally hacked from Broidy's private servers. Without acknowledging any involvement in such a scheme, the defendants argue that Broidy's allegations that they had acted on Qatar's behalf mean they are shielded by Qatar's foreign sovereign immunity. All agree that the Foreign Sovereign Immunities Act (FSIA) by its terms does not apply, but the defendants say residual common-law immunity protects them as agents of Qatar acting at its behest. Broidy argues that the district court's nonfinal judgment is not immediately appealable and that, in any event, the defendants lack immunity.

The jurisdictional question is close, but we believe we have jurisdiction over the appeal based on the defendants' colorable claim of immunity. On the merits, we affirm the district court's order denying immunity. The State of Qatar has not said that the conduct challenged as unlawful was at its behest nor has it urged the United States to recognize the defendants' immunity. The United States Department of State, for its part, has never suggested that the defendants are immune as agents of Qatar. In the absence of any such acknowledgement or suggestion, a private party claiming foreign sovereign immunity bears a heavy burden. The defendants here are U.S. citizens and a U.S. firm sued in their private capacities by U.S. plaintiffs for violations of U.S. and California law within the United States. We hold they have failed to establish that any foreign official immunity shields them from further proceedings and ultimate liability.

**BACKGROUND**

Because we review the district court's decision on a motion to dismiss, we draw much of the background from Broidy's amended complaint. See Kareem v. Haspel, 986 F.3d 859, 865-66 & n.7 (D.C. Cir. 2021). But where, as here, "the motion is based on a claim of foreign sovereign immunity," which, if meritorious, "provides protection from suit and not merely a defense to liability," the court "must engage in sufficient pretrial factual and legal determinations to satisfy itself of" jurisdiction. Belhas v. Ya'alon, 515 F.3d 1279, 1281 (D.C. Cir. 2008) (citation omitted). We rely for the most part on the complaint, on which the defendants have chosen to rest, and make limited reference to a consulting  *793  agreement of record in a California case arising from the same events.

Broidy describes himself as "a prominent business and civic leader who has actively served in leadership roles in U.S. government advisory groups, Jewish organizations, and the Republican Party for decades." Amended Compl. ¶ 45, J.A. 23. In recent years, Broidy has urged the United States to oppose the State of Qatar's alleged funding and harboring of terrorists and to support the efforts of Qatar's neighbors to isolate it economically. "Beginning in early 2017," he explains, he "became a vocal critic of Qatar's support for terrorists and friendly relationship with Iran, which he sees as a major threat to the security of the United States and its allies." *Id.* ¶ 46, J.A. 24. And Broidy has had powerful audiences for his advocacy, including "directly interact[ing] with" then-President Donald Trump. *Id.* ¶ 45, J.A. 23.

Broidy alleges that Qatar sought to counter his advocacy. It engaged in "a multi-million dollar dark money effort to recruit lobbyists and influencers to polish Qatar's public image within the United States." *Id.* ¶ 50, J.A. 24. Broidy dubs that effort the

"Qatari Enterprise." *Id.*; *see also id.* ¶ 2, J.A. 13. That is where the defendants enter the picture: Nicholas D. Muzin is a former Republican legislative aide and Trump campaign staffer; Joseph Allaham is a former restauranteur; Stonington Strategies, LLC, is a public relations consulting firm those two men co-founded; and Gregory Howard is a media placement expert at another public strategy firm. Qatar allegedly paid them millions in hopes of rehabilitating its image with "the Republican, American Jewish community and other conservative supporters of Israel." *Id.* ¶ 51, J.A. 25.

Broidy acknowledges the lawfulness of the defendants' initial efforts, including their outreach to relevant stakeholders. But, Broidy alleges, "Muzin's and Allaham's efforts ... were largely ineffective, in part because of Mr. Broidy's actions to undercut any efforts by Qatar ... to change the minds of other Republican Jewish community leaders." *Id.* ¶ 71, J.A. 29. That failure allegedly drove the Qatari Enterprise to turn to lawless actions to silence Broidy. The Enterprise retained a cybersecurity firm, Global Risk Advisors LLC, "to coordinate an offensive cyber and information operation against" Broidy and his company, "including by infiltrating [their] computer networks and obtaining unauthorized access to Google email accounts of United States persons associated with [Broidy]" such as his spouse and executive assistant. *Id.* ¶ 79, J.A. 30-31.

Muzin and Allaham's alleged role was to distribute hacked information. They collaborated with Howard "to place information illegally obtained from the hacking in the hands of journalists, media organizations, and public relations professionals." *Id.* ¶ 116, J.A. 39. Broidy alleges that their purpose in "disseminating emails and documents hacked and stolen from Broidy to the U.S. media" was "to destroy Broidy's public standing," and with it his ability to influence public and presidential opinion on Qatar. *Id.* ¶ 52, J.A. 25.

In January 2019, Broidy and his company, Broidy Capital Management, LLC, sued Muzin, Allaham, Howard, and Stonington Strategies in the District of Columbia under U.S. and California law. As amended, his thirteen-count complaint asserts violations of the Racketeer Influenced and Corrupt Organizations Act, Stored Communications Act, Computer Fraud and Abuse Act, Defend Trade Secrets Act, and California law.

This is not Broidy's first lawsuit over this general course of events. First, in early 2018 in the Central District of California, **\*794** Broidy sued each of the defendants named here except Howard, along with Global Risk Advisors, the State of Qatar, and Qatari officials. See *Broidy Cap. Mgmt., LLC v. State of Qatar*, 982 F.3d 582, 586 (9th Cir. 2020). That court dismissed Broidy's claims against Qatar for lack of subject-matter jurisdiction under the FSIA and nixed the remaining claims against the other defendants for lack of sufficient contacts with California to support personal jurisdiction. *Id.* at 586, 596. The Ninth Circuit affirmed. *Id.*

Broidy also sued two of the defendants' alleged coconspirators in separate lawsuits in the Southern District of New York. One of those defendants, a former U.N. official not named in the California case, obtained a dismissal based on diplomatic immunity, which the Second Circuit affirmed. See *Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 439-40 (2d Cir. 2019). In the other New York lawsuit, Global Risk Advisors successfully argued that Broidy's complaint lacked sufficient allegations linking the cybersecurity firm to the hack. See *Broidy v. Glob. Risk Advisors LLC*, No. 1:19-cv-11861, 2021 WL 1225949, at \*8-10 (S.D.N.Y. Mar. 31, 2021). In dismissing the suit, however, the court held that Global Risk Advisors was not entitled to any form of immunity from suit. *Id.* at \*5-7.

Shortly after Broidy filed his amended complaint in federal district court here, the defendants moved to dismiss. They claimed immunity based on Broidy's allegations regarding their relationship to Qatar, a foreign sovereign, and, alternatively, that the complaint failed to state a legally adequate claim on its merits. The court granted the motions in part, dismissing certain claims as legally inadequate, but rejecting the immunity defense. In this interlocutory appeal, the defendants challenge only the district court's denial of immunity.

The defendants asserted that Broidy's own allegations that they acted on behalf of Qatar must be taken as true at the motion-to-dismiss stage. They emphasized that Qatar's foreign sovereign immunity in relation to the same events had been recently

affirmed by the Ninth Circuit, *see State of Qatar*, 982 F.3d at 586, 596, and contended that if they acted for Qatar as Broidy alleges they are entitled to conduct-based foreign official immunity.

The district court rejected the immunity defense. It noted at the outset that because the defendants are private individuals and not a foreign state the FSIA does not apply, so any immunity must arise from the common law. *Broidy Cap. Mgmt. LLC v. Muzin*, No. 19-cv-0150, 2020 WL 1536350, at *5 (D.D.C. Mar. 31, 2020) (citing *Samantar v. Yousuf* (*Samantar I*), 560 U.S. 305, 325, 130 S.Ct. 2278, 176 L.Ed.2d 1047 (2010)); *see also Lewis v. Mutond*, 918 F.3d 142, 145 (D.C. Cir. 2019). The court evaluated the defendants' assertions of immunity under two distinct analyses without "resolv[ing] which ... properly applies[.]" *Broidy Cap. Mgmt.*, 2020 WL 1536350, at *6.

The district court first sought to ascertain whether the U.S. Department of State has an established policy to recognize the defendants' asserted grounds for immunity, and held it does not. *Id.* Relying on the Fourth Circuit's description of State Department policy in its decision on remand from the Supreme Court in *Samantar*, the district court observed that "U.S. residents ... who enjoy the protections of U.S. law ordinarily should be subject to the jurisdiction of the courts, particularly when sued by U.S. residents." *Id.* (alteration in original) (quoting *Yousuf v. Samantar* (*Samantar II*), 699 F.3d 763, 777 (4th Cir. 2012)). The court also considered and rejected the defendants' claim to protection by what they call "derivative" foreign sovereign immunity. ***795** *Id.* at *6-7. Neither this court nor the State Department has ever endorsed a derivative foreign sovereign immunity doctrine for private agents of a foreign government, the district court noted, and it was unpersuaded by the analogy the defendants drew to derivative immunity for private parties acting as U.S. government agents in the domestic context. *Id.* at *7. The court described derivative immunity as materially different in the domestic context from immunity that might appropriately shield agents under the direction of a foreign sovereign: "The rationale for domestic derivate sovereign immunity is that the United States and agents of the United States have 'the same interest in getting the government's work done.' " *Id.* (citation omitted). "But," the court observed, "the United States does not necessarily share an interest with the agents of a foreign sovereign, and those interests will routinely diverge, as they do in this case." *Id.*

The court concluded that, because each of the defendants is a U.S. resident and citizen facing claims brought by a U.S. plaintiff under U.S. domestic law for conduct alleged to have occurred on U.S. soil, "the State Department would not grant immunity to these defendants." *Id.* at *8.

Second, the district court held that the defendants are not shielded from Broidy's claims under the standard for foreign official immunity set out in section 66(f) of the Restatement (Second) of Foreign Relations Law of the United States (Am. L. Inst. 1965) (hereinafter Restatement). The court noted that the Supreme Court has not decided whether the Restatement correctly sets out the scope of common-law immunity applicable to current or former foreign officials, nor have we. *Broidy Cap. Mgmt.*, 2020 WL 1536350, at *6. It, too, avoided taking a position on the Restatement standard because whether it applied would have no effect on the outcome; the defendants lacked immunity under any standard. Section 66(f) of the Restatement would afford immunity to "any [ ] [p]ublic minister, official, or agent of the state with respect to acts performed in his official capacity if the effect of exercising jurisdiction would be to enforce a rule of law against the state." *Lewis*, 918 F.3d at 145 (alterations in original) (quoting Restatement § 66(f)). The district court held it decisive under the Restatement test that "Broidy is suing the defendants 'in their individual capacities' and 'is not seeking compensation out of state funds.' " *Broidy Cap. Mgmt.*, 2020 WL 1536350, at *8 (quoting *Lewis*, 918 F.3d at 147).

Because none of the defendants' theories supported the immunity defense, the district court held that it had jurisdiction and, as relevant here, denied the motion to dismiss insofar as it asserted immunity.

The defendants promptly moved to certify the immunity question for interlocutory review under 28 U.S.C. § 1292. The district court denied the motion. The defendants noticed this appeal. Broidy moved to dismiss the appeal summarily for want of a final order from the district court. Our motions panel declined to make a summary ruling, instead referring that motion to us.

ANALYSIS

We review de novo the district court's decision denying the defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction. *de Csepel v. Republic of Hungary*, 714 F.3d 591, 597 (D.C. Cir. 2013). On appeal from pleading-stage orders, we ordinarily "accept the well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor." *See Kareem*, 986 F.3d at 865 (quoting *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015)). **\*796** But a defendant claiming sovereign immunity in a motion to dismiss "bears the burden of proving" they qualify for it. *Lewis*, 918 F.3d at 145; *see also Ivanenko v. Yanukovich*, 995 F.3d 232, 236 (D.C. Cir. 2021). And because immunity, where it applies, requires us to relinquish our jurisdiction over the merits of the dispute, we "must engage in sufficient pretrial factual and legal determinations to" adjudicate an immunity claim made in a motion to dismiss. *Belhas*, 515 F.3d at 1281 (citation omitted); *see Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, ––– U.S. ––––, 137 S. Ct. 1312, 1324, 197 L.Ed.2d 663 (2017); *Ex parte Republic of Peru*, 318 U.S. 578, 588, 63 S.Ct. 793, 87 L.Ed. 1014 (1943).

We begin with our own jurisdiction to hear this appeal, which Broidy contests, before proceeding to the substance of the immunity issue.

A.

Our jurisdiction to hear this appeal is a close question. An order denying a motion to dismiss is typically not an appealable final order. *See Lauro Lines s.r.l. v. Chasser*, 490 U.S. 495, 498, 109 S.Ct. 1976, 104 L.Ed.2d 548 (1989); *Bombardier Corp. v. Nat'l R.R. Passenger Corp.*, 333 F.3d 250, 253 (D.C. Cir. 2003); 28 U.S.C. § 1291. But sovereign immunity, where it applies, protects a sovereign's dignitary interests in avoiding suit, not just ultimate liability. To that end, orders denying colorable claims of sovereign immunity generally are immediately appealable pursuant to the collateral order doctrine. *See P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 143-44, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993) (recognizing immediate appealability of order denying sovereign immunity as involving important interests separate from the merits that would be effectively unreviewable on appeal after judgment); *Process & Indus. Devs. Ltd. v. Federal Republic of Nigeria*, 962 F.3d 576, 584 (D.C. Cir. 2020). That must be so, because if immunity appeals had to await final judgment on the merits, immunity erroneously denied would lose its litigation-avoidance component before the error could be corrected. *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126 (D.C. Cir. 2004).

At the same time, immediate appealability is strong medicine that is harmful when misused. Collateral order appeals contravene strong judicial-efficiency interests supporting the final judgment rule. *See Will v. Hallock*, 546 U.S. 345, 349-50, 126 S.Ct. 952, 163 L.Ed.2d 836 (2006). To prevent baseless appeals that delay and potentially obstruct just claims, courts generally confine interlocutory immunity appeals to legal questions of at least colorable merit that are separate and distinct from the underlying claims. *See Johnson v. Jones*, 515 U.S. 304, 317, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995) (limiting immunity appeal to legal questions); *Process & Indus. Devs.*, 962 F.3d at 583-84 (allowing appeal of colorable claim of immunity).

Broidy acknowledges that denials of foreign sovereign immunity are typically immediately appealable but contends that we lack jurisdiction here for two interrelated reasons. First, he asserts that immediate appeals from orders denying foreign sovereign immunity are available only to foreign states—not individuals sued as a foreign state's agents. "Because Qatar is not a party here" and has not otherwise asserted its sovereign interests in immunizing these defendants, Broidy argues, "the interests usually attendant to litigation against foreign states are not implicated." Appellees' Br. 25. But the Supreme Court in *Samantar* acknowledged that, in addition to the immunity of sovereign states that Congress codified in the FSIA, residual **\*797** conduct-based immunity may protect certain individual officials of foreign governments. *Samantar I*, 560 U.S. at 320-21, 130 S.Ct. 2278. As a general matter, where a colorable defense of such conduct-based foreign official immunity is raised, an order denying it is immediately appealable. *See Samantar II*, 699 F.3d at 768 n.1; *Mamani v. Berzain*, 654 F.3d 1148, 1151 n.3 (11th Cir. 2011); *cf. Process & Indus. Devs.*, 962 F.3d at 583 (appeals "must be colorable").

Relatedly, Broidy argues that the defendants' immunity assertion does not raise a matter of sufficient "public interest" or "identify a 'particular value of high order' " to support immediate review. Appellees' Br. 23-24 (emphasis omitted) (quoting *Will*, 546 U.S. at 352-53, 126 S.Ct. 952). The reasoning in *Will v. Hallock* on which Broidy relies identifies general categories of important interests that courts have recognized to support immediate appeal under the collateral order doctrine. *See* 546 U.S. at 351-53, 126 S.Ct. 952. But Broidy's contention that the "defendants' claims of conduct-based foreign official immunity do not raise weighty enough public interests to justify this Court's collateral-order jurisdiction," Appellees' Br. 27, is based on what he sees as weaknesses in the defendants' immunity claims rather than any doubt that a denial of a colorable claim of conduct-based immunity for individual agents of a foreign state would be immediately appealable. In the absence of binding precedent foreclosing such an immunity defense, we think Broidy's argument is appropriately directed at the merits of the defendants' immunity, not their appealability.

We conclude that we have appellate jurisdiction because the asserted defense of conduct-based immunity for the defendants' acts allegedly taken on behalf a foreign state satisfy the requirements of the collateral order doctrine. Based on allegations that they acted at the behest of a foreign state, their immunity defense draws on sparse authorities in an unsettled area of law. This appeal provides an opportunity to mark some limits. We recognize that, in doing so, our decision may nudge previously colorable claims into the realm of non-colorable. Clarification of the principles of immunity law should help to ensure that our acceptance of jurisdiction here does not invite a host of appeals asserting non-colorable claims of immunity. When a future litigant situated similarly to the defendants cites today's decision in support of immediate appeal, we will face the threshold question "[w]hether after our holding in this case, ... such a defendant may bring an interlocutory appeal." *Toussie v. Powell*, 323 F.3d 178, 182 (2d Cir. 2003).

**B.**

We proceed to de novo review of the district court's denial of the defendants' motions to dismiss on immunity grounds. *See de Csepel*, 714 F.3d at 597.

**1.**

United States courts historically have recognized a common-law doctrine of foreign sovereign immunity as "a matter of grace and comity on the part of the United States" toward other sovereign states. *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). In the Foreign Sovereign Immunities Act of 1976 (FSIA), Congress codified the doctrine insofar as it protects a foreign state sued in its sovereign capacity. *See* 28 U.S.C. § 1602 *et seq.*; *Helmerich & Payne*, 137 S. Ct. at 1319-21. Under the FSIA, a foreign state is "presumpti[vely]" immune from suit in U.S. courts, subject to enumerated exceptions. **\*798** *Schermerhorn v. State of Israel*, 876 F.3d 351, 358 (D.C. Cir. 2017); *see* 28 U.S.C. §§ 1603-1607. But the FSIA covers only civil actions against a "foreign state" or its "political subdivisions and agencies or instrumentalities," not individuals. *Samantar I*, 560 U.S. at 317-19, 130 S.Ct. 2278; *see* 28 U.S.C. § 1603(a)-(b).

Foreign sovereign immunity may, in certain circumstances, also protect individuals even though the FSIA does not. *See Samantar I*, 560 U.S. at 324-25, 130 S.Ct. 2278. Residual common-law foreign sovereign immunity includes: (1) "[s]tatus-based immunity[, which] is reserved for diplomats and heads of state," *Lewis*, 918 F.3d at 145, and (2) "conduct-based immunity," for an "act performed by the individual as an act of the State," *Samantar II*, 699 F.3d at 774 (quoting Hazel Fox, The Law of State Immunity 455 (2d ed. 2008)); *see also Lewis*, 918 F.3d at 145. The defendants here are not diplomats or heads of state; they claim only conduct-based immunity.

Immunity claims not covered by the FSIA are governed by a two-step analysis. *Samantar I*, 560 U.S. at 311-12, 130 S.Ct. 2278. We ask first whether the State Department has made a "suggestion of immunity" applicable to the defendant. *Id.* at 311, 130

S.Ct. 2278. The diplomatic representative of the implicated sovereign may request that the State Department make a suggestion of immunity, and if the State Department agrees immunity is appropriate, the district court typically dismisses the case on that ground. *Id.*; *see Republic of Mexico v. Hoffman*, 324 U.S. 30, 34-35, 65 S.Ct. 530, 89 L.Ed. 729 (1945). Broidy does not allege, nor do the defendants assert, that the State Department offered its views in this case or that Qatar ever sought them. We thus proceed to step two.

In the absence of any suggestion of immunity, the court is left at the second step "to decide for itself whether all the requisites for immunity exist[ ]." *Samantar I*, 560 U.S. at 311, 130 S.Ct. 2278 (quoting *Ex parte Peru*, 318 U.S. 578, 587, 63 S.Ct. 793, 87 L.Ed. 1014 (1943)). The Supreme Court has not explained precisely what "requisites" an individual claiming immunity must establish, nor have we. But the Court in *Samantar* observed that courts historically "inquired 'whether the ground of immunity is one which it is the established policy of the [State Department] to recognize.' " *Id.* at 312, 130 S.Ct. 2278 (alteration in original) (quoting *Hoffman*, 324 U.S. at 36, 65 S.Ct. 530)). That focus on State Department policy reflects the reality that the branches of our government "responsible for the conduct of the nation's foreign relations" are best positioned to assess whether exercising jurisdiction over a foreign sovereign's official or agent might frustrate the United States' foreign relations interests. *Heaney v. Gov't of Spain*, 445 F.2d 501, 503 (2d Cir. 1971); *accord Verlinden*, 461 U.S. at 486, 103 S.Ct. 1962. We glean State Department policy and practice in this area "by reference to prior State Department decisions," *Verlinden*, 461 U.S. at 487, 103 S.Ct. 1962, such as suggestions of immunity and statements of interest in other cases.

2.

The defendants advance a sweeping theory of conduct-based sovereign immunity for the private agents of foreign sovereigns. They contend that the principles laid down by the State Department in past cases afford conduct-based immunity to any defendant who is alleged to have acted at the behest of a foreign sovereign. If it were otherwise, say the defendants, a plaintiff such as Broidy, "having tried and failed to sue Qatar directly," could "simply repackage his case by leveling the same **\*799** accusations of cyberespionage against agents who allegedly carried out Qatari policy" and try to obtain "sensitive diplomatic material in discovery" just as if Qatar itself were on trial. Appellants' Br. 27.

In support, the defendants cite several suggestions of immunity the State Department made in lawsuits brought against former officials of foreign sovereigns, including a former President of Mexico and two former Israeli defense officials. *See* Suggestion of Immunity, Addendum to Appellees' Br. (Add.) at 236, Doğan v. Barak, No. 2:15-cv-8130 (C.D. Cal. June 10, 2016); Suggestion of Immunity, Add. at 224, Doe v. Zedillo Ponce de Leon, No. 3:11-cv-1433 (D. Conn. Sept. 7, 2012); Statement of Interest, Add. at 284, Matar v. Dichter, 500 F. Supp. 2d 284 (S.D.N.Y. 2007) (No. 1:05-cv-10270). In the defendants' view, those cases illustrate a general policy that "exercising jurisdiction over the agent of a foreign sovereign would 'intrude on core aspects of the foreign state's sovereignty and give rise to serious diplomatic tensions.' " Appellants' Br. 23 (quoting Brief for United States as Amicus Curiae at 25, Add. at 378, Matar v. Dichter, 563 F.3d 9 (2d Cir. 2009) (No. 07-2579)). To them, Broidy's lawsuit is "a paradigmatic example of how a claim nominally against an individual agent can target the alleged acts of a sovereign" such as Qatar, despite the Ninth Circuit's recognition of Qatar's immunity from Broidy's suit. *Id.* at 19-20.

The defendants' narrower, alternative argument is that an agent of a foreign sovereign is entitled to immunity insofar as the agent's challenged actions were taken at the sovereign's specific direction. For that theory, sometimes referred to as "derivative" immunity, defendants rely principally on *Butters v. Vance International, Inc.*, 225 F.3d 462 (4th Cir. 2000).

Broidy invokes our opinion in *Lewis v. Mutond* to counter that, in his view, the appropriate immunity standard for agents of foreign states is found in section 66(f) of the Restatement (Second) of Foreign Relations Law. In *Lewis*, we observed that conduct-based foreign official immunity under section 66(f) applies only "if the effect of exercising jurisdiction would be to enforce a rule of law against the state." 918 F.3d at 145 (quoting Restatement § 66(f)). Broidy asserts that standard cannot be met where private contractors such as the defendants here are sued in their private capacities.

Guided by the State Department's past practice, we conclude that the defendants have not demonstrated they would be granted immunity under any established State Department policy. Given the lack of precedent supporting immunity for private parties in circumstances like those of the defendants here, we again need not resolve the question whether section 66(f) accurately restates the law to hold that the immunity defense falls short.

At the outset, the defendants' immunity claim is unsupported. Recall that the defendants "bear[ ] the burden of proving" they qualify for immunity, *id.*, and that we "must engage in sufficient pretrial factual and legal determinations to satisfy" ourselves of jurisdiction, *Belhas*, 515 F.3d at 1281. When assessing immunity, "the nature of the court's inquiry depends on the nature of the defendant's challenge." *Kilburn*, 376 F.3d at 1127.

Here, the defendants choose to rely on the amended complaint alone. Broidy's complaint alleges that Qatar hired the defendants to assist it in rehabilitating the country's image and that the defendants ultimately resorted to unlawful means to accomplish that goal. In particular, it alleges that the defendants came together as what the complaint dubs the "Qatari Enterprise," which included Qatari officials **\*800** among others. The defendants allegedly worked to advance Qatar's interests and objectives, especially by influencing public and official opinion in the United States to favor Qatar and tarnish the reputation of Broidy, an influential critic of Qatar. *See* Amended Compl. ¶¶ 50, 78-79, 199, J.A. 24, 30-31, 56-57. Broidy alleges generally that the "[d]efendants targeted [Broidy] on behalf of Qatar." *Id.* ¶ 32, J.A. 21. Broidy's complaint does not, however, allege that Qatar hired the defendants to act as its agents to carry out any sovereign functions, nor does it specify that Qatar requested, approved, or even knew of the unlawful conduct at the heart of Broidy's claims.

Past expressions of State Department policy do not support immunity for private individuals in the defendants' circumstances. The defendants do not contend that Qatar sought immunity on their behalf. The allegations of the complaint describe defendants' link to Qatar as an arms-length, general agreement to provide public relations services to burnish Qatar's reputation, in part by tarnishing that of its vocal and powerful critic Elliott Broidy.

State Department practice suggests that the State of Qatar's apparent silence on this case weighs heavily against immunity. Indeed, the State Department's position in *Samantar* itself shows that the foreign government's interest—or lack thereof—bears "principal[ ]" weight in the immunity analysis. *See* Brief for the United States as Amicus Curiae at 22, Samantar v. Yousuf, 571 U.S. 1156 (2014) (No. 12-1078). To be sure, in *Samantar* "there was no recognized government of Somalia to assert immunity," *id.*, but the result is the same: Here, as in *Samantar*, we have no reason to believe that any sovereign has indicated an interest the State Department would seek to protect. The court's analysis may take into account whether the foreign sovereign on whose behalf the defendants were acting even requested that the State Department submit a suggestion of immunity to the court. *Cf. Lewis*, 918 F.3d at 146 (noting that the Democratic Republic of the Congo sought a suggestion of immunity, albeit unsuccessfully). It is therefore notable that Qatar, on whose behalf the defendants purportedly acted, has not indicated any interest in this case, whether by requesting a formal suggestion of immunity or otherwise.

Contract terms between certain defendants and Qatar do not support the defendants' assertion of immunity. Some of the defendants acknowledge that a consulting agreement between Stonington Strategies and Qatar—the only written agreement between a defendant and Qatar that is available for our review—expressly disclaims the creation of an agency relationship. Filed as part of Muzin's registration as a foreign agent and proffered as an exhibit in the California litigation between many of these same parties, that agreement states in particular that it was "not intended to establish a[ ] ... principal-agent relationship" between Stonington Strategies and Qatar. Agreement for Consulting Services, Ex. 9 to Plaintiff's Ex Parte Application for TRO at 100-01, Broidy Cap. Mgmt., LLC v. State of Qatar, No. 18-cv-02421 (C.D. Cal. Apr. 2, 2018), ECF 31-9. In a filing before the district court in this case, Muzin and Stonington Strategies acknowledged as much, even as they argued they should nevertheless be held immune. *See* Muzin & Stonington's Brief in Support of Motion to Dismiss at 23 n.11, Broidy Cap. Mgmt., LLC v. Muzin, No. 19-cv-00150 (D.D.C. May 7, 2019), ECF 40-1 (recognizing that "[t]he [agreement] states that it does not establish an agency relationship").

Pressed at oral argument for information showing that the defendants acted as **\*801** Qatar's official agents or followed its directives, defendants' counsel said that some of the defendants were registered foreign agents of Qatar under the Foreign Agents Registration Act (FARA), 22 U.S.C. § 611 et seq., for at least some of the period relevant to this appeal. But never has the State Department suggested, nor has this court held, that registered foreign agents are entitled to their principal's sovereign immunity as a matter of law. Indeed, counsel conceded that registration as a foreign agent under FARA is "absolutely not" sufficient to establish the sort of agency relationship necessary to cloak a private-party agent in any residuum or derivative of the foreign sovereign's immunity. Oral Arg. Tr. 15. Simply put, the defendants point to no State Department policy supporting immunity for private parties with the kind of loose and limited agency relationship that Broidy alleges these defendants had with the State of Qatar, and they offer no independent factual basis for their theory. Because Broidy's allegations stop short of describing even the sort of agency relationship the defendants contend would immunize them, their claim to immunity fails.

In addition to the weakness of the defendants' claimed connection with Qatar, the close connections of the parties and the claims to the United States counts against immunity. Broidy directs our attention to multiple cases in which the State Department found a defendant's affiliation with the United States to militate against immunity. In *Samantar* and *Ahmed v. Magan*, for instance, plaintiffs sued former high-ranking Somali officials for alleged misconduct in office. The officials had since moved to the United States. In responding to requests for suggestions of immunity in both cases, the State Department observed that "U.S. residents ... who enjoy the protections of U.S. law ordinarily should be subject to the jurisdiction of our courts, particularly when sued by U.S. residents." Statement of Interest ¶ 9, Add. at 443, Samantar II, No. 12-2178 (4th Cir. Dec. 20, 2012); *see also* Statement of Interest ¶ 9, Add. at 135, Ahmed v. Magan, No. 10-cv-342 (S.D. Ohio Mar. 15, 2011). The defendants here are (1) U.S. residents (and, indeed, citizens) (2) sued by U.S. plaintiffs (3) under U.S. law (4) for conduct that allegedly took place in the United States. Amended Compl. ¶ 11-19, 22, 26-29, J.A. 16-20. The defendants are correct that the State Department has not necessarily treated those factors as individually dispositive, *see* Brief for the United States as Amicus Curiae at 5-6, 22-23, Samantar v. Yousuf, 571 U.S. 1156 (2014) (No. 12-1078), but it is clear that together they weigh heavily against claims of conduct-based immunity.

At bottom, the defendants argue that because Broidy alleges they acted on behalf of Qatar, they must be immune from suit. But the defendants have not identified any established State Department policy of extending foreign official immunity to defendants in circumstances like theirs.

The defendants alternatively contend they are immune under a distinct doctrine that they call "derivative" immunity. They describe that doctrine as covering any action "specifically ordered" by a foreign sovereign. Appellants' Br. 28. In support of that defense, the defendants rely almost exclusively on *Butters v. Vance International, Inc.*, 225 F.3d at 465. There, the Fourth Circuit affirmed a district court's decision to extend "derivative FSIA immunity" to a private U.S. contractor providing security to members of the Saudi royal family in the United States. *Id.* A security guard of the contractor sued it for sex discrimination in violation of U.S. law after the contractor, acting at the direction of a Saudi Arabian general not to place a **\*802** woman in the position in question, withdrew its recommendation that she be promoted within the royal security detail. In dismissing the claim on foreign official immunity grounds, the court reasoned by analogy to sovereign immunity in the domestic context: "Imposing liability on private agents of the government would directly impede the significant governmental interest in the completion of its work." *Id.* at 466. In that court's view, "[a]ll sovereigns need flexibility to hire private agents to aid them in conducting their governmental functions," including foreign sovereigns "operating within the United States." *Id.* Any other rule, the court suggested, "would discourage American companies from entering lawful agreements with foreign governments." *Id.* The *Butters* court thus saw it as "but a small step" to extend the doctrine of domestic derivative sovereign immunity to the agents of foreign nations operating in the United States. *Id.* The defendants argue that the same is true here.

*Butters* is out-of-circuit precedent and not binding on us, and this court has never suggested a derivative immunity doctrine might apply in the foreign immunity context. Moreover, *Butters* predates *Samantar* and by its own terms applies the FSIA itself to a private actor's claim of immunity. *Id.* at 465, 467 (construing "FSIA immunity"). The Supreme Court foreclosed that approach in *Samantar*. Such claims of immunity must rise or fall not under the FSIA, but the residual law and practice that the FSIA did not displace. *See Samantar I*, 560 U.S. at 316, 319, 324-25, 130 S.Ct. 2278 (holding the FSIA applies only to states and

their "agenc[ies] or instrumentalit[ies]," excluding private entities or individuals). The district court's thoughtful opinion also identified reasons the State Department might hesitate to recognize derivative immunity for agents or officials of presumptively immune foreign sovereign states. *Broidy Cap. Mgmt.*, 2020 WL 1536350, at *7 ("[T]he United States does not necessarily share an interest with the agents of a foreign sovereign, and those interests will routinely diverge, as they do in this case.").

Although we are inclined to agree with the district court, the defendants do not even meet the standard the Fourth Circuit embraced in *Butters*. We thus need not decide whether derivative immunity might apply were a sovereign specifically to order a private party to take action on its behalf as sovereign in violation of U.S. law. As the defendants acknowledge, where it applies in the domestic context, derivative immunity reaches only conduct "specifically ordered," Appellants' Br. 28, or "authorized and directed by the Government," *In re OPM Data Sec. Breach Litig.*, 928 F.3d 42, 69 (D.C. Cir. 2019) (per curiam) (citation omitted); *see Butters*, 225 F.3d at 466. The defendants characterize Broidy's complaint as alleging that they "disseminated [Broidy's] hacked materials at Qatar's direction." Appellants' Br. 6; *accord id.* at 33. But the complaint lacks any such allegation. Instead, as noted previously, Broidy alleges that the defendants were part of a group he calls the "Qatari Enterprise," which also included third parties such as Qatari officials, and that the Enterprise collectively executed a scheme of influence and intrigue aimed at discrediting Broidy. *See, e.g.*, Amended Compl. ¶¶ 50, 78-79, 199, J.A. 24, 30-31, 56-57. The closest Broidy comes to alleging that Qatar itself directed the defendants' misconduct is in his allegations about compensation: He says that the defendants "were paid millions of dollars by Qatar, its agents, and its instrumentalities to participate in the conspiracy to disseminate hacked materials and join the Qatari Enterprise," *id.* ¶ 7, J.A. 15, and that the defendants received sizeable payments from Qatar soon after the alleged **\*803** hack. Broidy alleges those facts imply "that [the defendants] were aware of the Qatari Enterprise's efforts to attack [Broidy] and that these payments were compensation to the defendants for their role in the conspiracy and unlawful scheme." *Id.* ¶ 170, J.A. 50.

But the complaint simply does not allege Qatar "specifically ordered" the defendants to participate in a scheme to hack and distribute Broidy's private emails, as the defendants themselves concede is necessary to support their theory of derivative immunity. Appellants' Br. 28. That gap in Broidy's allegations contrasts with *Butters*, where the issue was decided at the summary judgment stage based on the absence of a material factual dispute that the defendant contractor acted "under the direct military orders of" a Saudi official to take action contrary to U.S. antidiscrimination law. 225 F.3d at 465-67. We have held in the domestic context that a contractor might avail itself of the government's derivative immunity only where it acts pursuant to specific directions from the government. *In re OPM Data Sec. Breach*, 928 F.3d at 70; *see also Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 732 (9th Cir. 2015) (noting that derivative immunity does not apply to contractors exercising discretion in working to accomplish broad governmental objectives). We do not suggest that we would apply a derivative immunity theory in the foreign official immunity context. But the allegations here could not support that defense in any event.

Finally, Broidy relies on *Lewis v. Mutond* to argue that, under section 66(f) of the Second Restatement, an "agent" of a foreign state is entitled to immunity only "if the effect of exercising jurisdiction would be to enforce a rule of law against the state," 918 F.3d at 145 (quoting Restatement § 66(f)), a standard he says is not met where private contractors like the defendants here are sued in their private capacities. The district court held in the alternative that defendants lack immunity because permitting this litigation to proceed would not have the effect of "enforc[ing] a rule of law against" Qatar. *Broidy Cap. Mgmt.*, 2020 WL 1536350, at *8 (citation omitted). According to the defendants, that analysis is "overly restrictive" and categorically eliminates immunity for foreign officials sued in their personal capacities. Appellants' Br. 49.

It is unclear whether the Restatement articulates the correct standard. Neither the Supreme Court nor this court has ever endorsed it. *See Samantar I*, 560 U.S. at 321 & n.15, 130 S.Ct. 2278. In *Lewis*, we emphasized that both parties had assumed the Restatement's test controlled, and that their assumptions were central to our analysis. *See* 918 F.3d at 146-47; *id.* at 148 (Srinivasan, J., concurring); *id* at 150 (Randolph, J., concurring in the judgment). The State Department, too, has registered its skepticism regarding the Restatement's test. *See* Brief for the United States as Amicus Curiae at 14-15, Mutond v. Lewis, 141 S. Ct. 156 (2020) (No. 19-185).

If the Restatement furnished a relevant standard, however, our application of section 66(f) at the parties' behest in *Lewis* illustrates why the immunity claim of the defendants here would likewise be foreclosed. There, we concluded that any costs to the sovereign resulting from sitting officials being forced to "defend their handling of high-profile domestic security matters in U.S. courts" were "collateral effects ... too attenuated to be equated with the direct fiscal impacts on the foreign state that are contemplated by the Restatement." 918 F.3d at 147 (citation omitted). The same is surely true here, where the defendants are private contractors rather than **\*804** officials of a foreign sovereign. The indirect risk to Qatar that, by pursuing his claims against the defendants on remand, Broidy will seek to "gain access to Qatar's sensitive, diplomatic communications," Appellants' Reply 1, does not suffice. In any event, we trust the district court has the appropriate tools to protect Qatar's absolute FSIA "immunity from trial and the attendant burdens of litigation," *Kilburn*, 376 F.3d at 1126 (citation omitted).

\* \* \*

The defendants have not shown "all the requisites for ... immunity [to] exist[ ]." *Samantar I*, 560 U.S. at 311, 130 S.Ct. 2278 (quoting *Ex parte Peru*, 318 U.S. at 587, 63 S.Ct. 793). Accordingly, we affirm.

## CONCLUSION

The judgment of the district court is affirmed and the matter remanded for further proceedings consistent with this opinion.

*So ordered.*

**All Citations**

12 F.4th 789

---

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.