# EXHIBIT A

 Neutral

As of: September 22, 2022 7:26 PM Z

## Force v. Islamic Republic of Iran

United States District Court for the District of Columbia

July 5, 2022, Decided; July 5, 2022, Filed

Civil Action No. 16-1468 (RDM)

**Reporter**
2022 U.S. Dist. LEXIS 118083 *; 2022 WL 2452606

TAYLOR FORCE, et al., Plaintiffs, v. THE ISLAMIC REPUBLIC OF IRAN, et al., Defendants.

## Core Terms

killing, extrajudicial, terrorism, rocket, injuries, state-sponsored, terrorist, cases, resources, bomb, default, foreign state, decisions, courts, foreign sovereign immunities, personal injury, Plaintiffs', deliberated, dictionary, claimant, attacks, renewed, default judgment, direct victim, Merriam-Webster, incorporating, emotional, damages, hostage, reasons

**Counsel:** [*1] For STUART FORCE, individually and as personal representative of the estate of Taylor Force, Plaintiff: Robert Joseph Tolchin, LEAD ATTORNEY, THE BERKMAN LAW OFFICE, LLC, Brooklyn, NY; Joseph Z. Hellerstein, HELLERSTEIN & CO.; Modin, Israel, +972-777-940, PRO HAC VICE.

For ROBBI FORCE, MENACHEM MENDEL RIVKIN, individually and as the natural guardian of minor plaintiffs S.S.R., M.M.R., R.M.R., S.Z.R., BRACHA RIVKIN, individually and as the natural guardian of minor plaintiffs S.S.R., M.M.R., R.M.R., S.Z.R, S.S.R., minor, M.M.R., minor, R.M.R., minor, S.Z.R., minor, YEHUDA GLICK, individually and as natural guardian of minor plaintiffs S.G., R.T. and T.T.; and as Executor of the Estate of Yaffa Glick, NERIA DAVID GLICK, SHLOMO GLICK, HALLEL GLICK, S.G., minor, R.T., minor, T.T., minor, MICAH LAKIN AVNI, individually and as personal representative of the Estate of Richard Lakin, MANYA LAKIN, individually and as personal representative of the Estate of Richard Lakin, RIVKA MARTHA MORIAH, individually and as personal representative of the Estate of Avraham David Moses, and as the natural guardian of minor plaintiffs N.M., C.M. and Z.G.M., NAFTALI ANDREW MOSES, individually and as personal [*2] representative of the Estate of Avraham David Moses and as the natural guardian of minor plaintiffs O.D.M. and A.M., DAVID MORIAH, individually and as the natural guardian of minor plaintiffs N.M., C.M. and Z.G.M, N.M., minor, C.M., minor, Z.G.M., minor, O.D.M., minor, A.M., minor, ELISHA DAN MOSES, AVIAD MORIAH, HAGIT GIBOR MORIAH, EITAN YOEL MORIAH, YIFAT MORIAH, ATARA NESIA MORIAH, NAFTALI SHITRIT, GILA RACHEL SHITRIT, individually and as the natural guardian of minor plaintiffs N.S., Y.S., A.S., E.S. and H.S, YAAKOV SHITRIT, individually and as the natural guardian of minor plaintiffs N.S., Y.S., A.S., E.S. and H.S, MEIRI SHITRIT, OSHRAT SHITRIT, N.S., minor, Y.S., minor, A.S., minor, E.S., minor, H.S., minor, SHMUEL ZEV SHIMON BRAUNER, individually and as the natural guardian of minor plaintiffs C.Y.B., M.H.B., Y.A.L.B.;, NECHAMA BRAUNER, individually and as the natural guardian of minor plaintiffs C.Y.B., M.H.B., Y.A.L.B., C.Y.B., minor, M.H.B., minor, Y.A.L.B., minor, MORDECHAI BRAUNER, ESTHER CHAYA BRAUNER, DANIELLA SCHWADRON PARNAS, individually and as the natural guardian of minor plaintiff A.P, A.P., minor, NOA PARNAS, DANA PARNAS, ALL PLAINTIFFS, Plaintiffs: Robert Joseph [*3] Tolchin, LEAD ATTORNEY, THE BERKMAN LAW OFFICE, LLC, Brooklyn, NY; Joseph Z. Hellerstein, PRO HAC VICE.

For YAFFA GLICK, individually and as natural guardian of minor plaintiffs S.G., R.T. and T.T., Plaintiff: Robert Joseph Tolchin, LEAD ATTORNEY, THE BERKMAN LAW OFFICE, LLC, Brooklyn, NY.

**Judges:** RANDOLPH D. MOSS, United States District Judge.

**Opinion by:** RANDOLPH D. MOSS

## Opinion

**MEMORANDUM OPINION AND ORDER**

This is a civil action for compensatory and punitive damages against the Islamic Republic of Iran, the Iranian Ministry of Information and Security, and the Syrian Arab Republic under the state-sponsored terrorism exception the Foreign Sovereign Immunities Act ("FSIA"), *28 U.S.C. § 1605A*. Although the Court previously entered a default judgment as to most of the 57 Plaintiffs in this action, the Court declined to enter judgment in favor of six Plaintiffs. Dkt. 111. One such Plaintiff—Daniella Schwadron Parnas—has now renewed her motion for default judgment. Dkt. 117.

For the following reasons, the Court will **DENY** Parnas's renewed motion. In reaching that conclusion, the Court reconsiders and changes its view about whether the waiver of foreign sovereign immunity contained in *§ 1605A* applies to attempted extrajudicial killings when no [*4] one is, in fact, killed in the attack at issue. Because the Court concludes that *§ 1605A* does not apply to attempts of this type, the Court reaffirms its decision declining to enter judgment in Parnas's favor but does so on alternative grounds.

I. BACKGROUND

This is not the Court's first word in this case, *see* Dkt. 111, and, accordingly, the Court provides only the background necessary for disposition of the instant motion.

Plaintiff Daniella Schwaron Parnas ("Parnas") is an Israeli-born, dual Israeli-U.S. citizen. Dkt. 69 at 1 (D. Parnas Decl. ¶ 1); Dkt. 82-23. In November 2012, Parnas was living with her three children in Timorim, in southern Israel; Parnas's mother lived in an adjoining house. Dkt. 69 at 1 (D. Parnas Decl. ¶ 5). Between November 14, 2012, and November 21, 2012, terrorists operating in the Gaza Strip launched roughly 1,500 rockets into Israel. Dkt. 33 at 114-15 (Spitzen Decl. ¶ 301); Dkt. 104 at 76-77 (Spitzen). One such rocket—a 122 mm Grad rocket—traveled some 40 kilometers from the Gaza Strip before exploding "near houses in Moshav Timorim" and causing "heavy damage" to Parnas's home. Dkt. 33 at 114-15 (Spitzen Decl. ¶¶ 300-01); Dkt. 69 at 2 (D. Parnas Decl. ¶¶ 10-15).

[*5] At the time, Parnas was not home. Just minutes before, she had left "to go to the grocery store and to throw away" some cardboard boxes her mother had used to "cover [some] windows" that were destroyed by a rocket attack three days earlier. Dkt. 69 at 1-2 (D. Parnas Decl. ¶ 8). As Parnas was driving to the store, a "siren started sounding across the village," *id.* at 2 (D. Parnas Decl. ¶ 9), and she "rush[ed] in a panic to the closest bomb shelter," Dkt. 117-1 at 1 (D. Parnas Suppl. Decl. ¶ 3); *see also* Dkt. 69 at 2 (D. Parnas Decl. ¶ 10) ("I pulled my car to the side of the road and hurried into a nearby bomb shelter where I took shelter with several other people.") Once inside, Parnas heard a "very loud 'BANG,'" which she took as an "indication that a rocket had fallen not far from the bomb shelter." Dkt. 69 at 2 (D. Parnas Decl. ¶ 10). When Parnas emerged from the bomb shelter several minutes later, she "immediately" noticed a tree on fire in her yard. Dkt. 117-1 at 2 (D. Parnas Suppl. Decl. ¶ 7); *see also* Dkt. 69 at 2 (D. Parnas Decl. ¶ 11). Parnas ran, "shouting hysterically . . . that [the rocket] fell on [her] house," and when she reached her house, she "was shocked and frightened by the scene playing out before [her]." Dkt. 69 at 2 (D. Parnas Decl. ¶ 12). She was "terrified," *id.* (D. Parnas Decl. ¶ 13) "fear[ing] for [her] mother's safety and life," Dkt. 117-1 at 2 (D. Parnas Suppl. Decl. ¶ 6). "Two men found [her] mother standing in her hallway in a state of shock and confusion." Dkt. 69 at 2 (D. Parnas Decl. ¶ 14). Parnas describes feeling "completely devastated" following the attack, "as if [she] were no longer living in reality, but in some sort of nightmare." *Id.* (D. Parnas Decl. ¶ 15).

A psychiatric evaluation conducted five years later, in 2017, revealed that she initially felt "overwhelming anxiety and fright" and that she subsequently experienced "symptoms of depression, anxiety and PTSD [from] the shock and stress" of the incident. Dkt. 35-34 at 2, 7 (Daniella Parnas Psych. Eval.). Since that evaluation, Parnas reports that her "condition" has "worsened" and that, in September 2019, she significantly reduced her work schedule on "the recommendation of [her] occupational physician." Dkt. 117-1 at 2 (D. Parnas Suppl. Decl. ¶¶ 9-10). "In July 2020, [Parnas's] psychiatrist and physician ordered the continuation of part-time work until [she] retires." *Id.* (D. Parnas Suppl. Decl. ¶ 10). Parnas is currently 59 years old. Dkt. 69 at 1 (D. Parnas Decl. ¶ 1).

Parnas's [*6] three children also allegedly "suffer[ed] severe psychological and emotional injuries as a result of" the rocket attack. Dkt. 1 at 28 (Compl. ¶ 112). Her youngest child, A.P., was seven years old at the time of the attack and "was staying with a relative nearby." *Id.* at 27 (Compl. ¶ 111). "[W]hen the rocket siren sounded," A.P. "was forced to run or cover." *Id.* Parnas "picked up [A.P.] that afternoon and arrived home [with him] later that evening." Dkt. 69-1 at 3 (D. Parnas Decl. ¶ 23). Her two older daughters, Noa and Dana, "were

serving in the Israeli army," *id.* at 1 (D. Parnas Decl. ¶ 7), but "returned home as soon as they heard the news," Dkt. 1 at 27-28 (Compl. ¶ 111). Noa and Dana arrived "[a]pproximately an hour" after the attack, Dkt. 69 at 3 (D. Parnas Decl. ¶ 18), "and were shocked and devastated to see the extensive damage to their house," Dkt. 1 at 27-28 (Compl. ¶ 111). Since the rocket attack both Noa and Dana have "experienced a severe amount of shock and anxiety," and A.P. has "suffer[ed] from fear and anxiety." Dkt. 69-1 at 7-8 (D. Parnas Decl. ¶¶ 47-49).

Parnas and her children sought to recover for these emotional injuries when they, along with dozens of other U.S. **[*7]** citizens, filed this suit against the Islamic Republic of Iran, the Iranian Ministry of Information and Security, and the Syrian Arab Republic, based on a series of alleged terrorist attacks (including the November 2012 rocket attack) in Israel. Dkt. 1 at 27-28 (Compl. ¶¶ 108-15). To establish jurisdiction, Plaintiffs invoked the FSIA's state-sponsored terrorism exception, *28 U.S.C. § 1605A(a)*, on the theory that the Defendants had provided material support to the terrorist groups that were responsible for those attacks, Dkt. 1 at 5, 28 (Compl. ¶¶ 3, 113-15). Parnas alleges, specifically, that Hamas carried out the November 2012 rocket attack "utilizing funds, weapons, terrorist training and other material support" from the Defendants. *Id.* at 28 (Compl. ¶¶ 114-15).

None of the Defendants appeared, and so, at Plaintiffs' request, the Clerk of Court entered defaults against each Defendant. Dkt. 23; Dkt. 24. All Plaintiffs, including Parnas, subsequently moved for the entry of default judgment against all three Defendants, Dkt. 91, and requested that the Court appoint a special master to make a recommendation as to damages, Dkt. 85. The Court held a two-day hearing that included testimony from five experts **[*8]** and the submission of a dozen exhibits, Dkt. 104; Dkt. 105, and the Court separately considered over fifty affidavits, Dkts. 21-22, 29-81. Plaintiffs also submitted proposed findings of fact and conclusions of law. Dkt. 87.

Although the Court entered a default judgment in favor of nearly all Plaintiffs, the Court denied Plaintiffs' motion without prejudice as to Parnas and her children (as well as two children of another Plaintiff, who were not yet born at the time of the attack on that Plaintiff). *See* Dkt. 111. Of the various requirements necessary to invoke the FSIA's state-sponsored terrorism exception to foreign sovereign immunity, the Court noted that "the only substantial jurisdictional question . . . [wa]s whether Plaintiffs' claims [we]re for 'personal injury or death that were caused by acts of torture, extrajudicial killing[,] hostage taking, or the provision of material support or resources' by an official, employee, or agent of' Iran or Syria." Dkt. 111 at 45 (alterations omitted) (quoting *28 U.S.C. § 1605A(a)(1)*). As to Parnas, the Court was not "persuaded"—at least based on the record and briefing before it—"that the terrorism exception is sufficiently capacious to include the missile attack **[*9]** that struck the Parnases' house and caused them related emotional distress." *Id.* at 49. The Court noted that Parnas was not "home—or even in the immediate vicinity—when the missile struck," *id.*; that no one was killed or wounded in the attack, *id.*; and that "[p]ermitting recovery under such circumstances would open the door to a cascade of claims for emotional distress that are unmoored to the types of grievous injury, death, or imminent, life-altering peril resulting from the uniquely heinous acts that Congress elected to redress: torture, extrajudicial killing, aircraft sabotage, and hostage taking," *id.* at 53.

In particular, although the Court was persuaded, at least at that time, "that the waiver of sovereign immunity [included in *§ 1605A*] includes attempted extrajudicial killings that result in serious physical injuries," *id.* at 48, it concluded that the direct victim of such an attack must, at a minimum, face "imminent apprehension," *id.* at 52, of the "intended harmful . . . contact," *id.* (quoting *Restatement (Second) of Torts § 47 cmt. a*). Because "the destruction of the Parnases' home" did not qualify as an "extrajudicial killing[]" under this test, the Court concluded that it lacked jurisdiction to hear Parnas's claim. *Id.* **[*10]** at 55.

Parnas renewed her motion for entry of a default judgment on February 21, 2021, arguing that she is entitled to relief under the FSIA "based on established case law" holding that the victim of a state-sponsored terrorist attack may seek "monetary relief for psychological injuries even without physical injuries." Dkt. 117 at 2. In support of that motion, Parnas submitted a supplemental declaration. *See* Dkt. 117-1 (D. Parnas Suppl. Decl). The motion did not, however, include renewed requests for a default judgment on behalf of Parnas's children.

The Court set a hearing to address the unique issues raised by Parnas's motion and, in advance of the hearing, identified concerns regarding "whether a plaintiff may avail herself of the [FSIA's] terrorism exception for injuries incurred as part of an *attempted* killing in which no one was killed." Min. Order (Sept. 29, 2021) (emphasis added). The Court explained those

concerns as follows:

> The Court notes that the [FSIA] carves out an exception to the jurisdictional immunity enjoyed by foreign states "for personal injury or death that was caused by an . . . extrajudicial *killing*," *28 U.S.C. § 1605A(a)(1)* (emphasis added), and that "extrajudicial killing ha[s] the **[\*11]** meaning given [that] term[] in section 3 of the Torture Victim Protection Act of 1991," *id.* *§ 1605A(h)(7)*. Section 3 of the Torture Victim Protection Act, in turn, defines an extrajudicial killing as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." *Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1991)* (codified at *28 U.S.C. § 1350*, note). . . . The Court further notes that the parallel provision of the Torture Victim Protect Act of 1991 arguably contemplates that an attempt will not suffice, since the provision provides a remedy to "the individual's legal representative or to any person who may be a claimant in an action for wrongful death." *28 U.S.C. § 1350*, note.

*Id.* In response to the Court's order, Parnas submitted a supplemental memorandum in advance of the hearing. Dkt. 122. The Court held the hearing on October 26, 2021. *See* Min. Entry (Oct. 26, 2021). Because Defendants are in default, Plaintiffs' submissions constitute the only briefing and argument before the Court.

## II. ANALYSIS

The entry of a default judgment "is not automatic," *Mwani v. bin Laden, 417 F.3d 1, 6, 368 U.S. App. D.C. 1 (D.C. Cir. 2005)*, and requires the exercise of "sound discretion," *Boland v. Yoccabel Const. Co., Inc, 293 F.R.D. 13, 17 (D.D.C. 2013)* (citing *Jackson v. Beech, 636 F.2d 831, 836, 205 U.S. App. D.C. 84 (D.C. Cir. 1980)*). As in every case, the Court must first satisfy **[\*12]** itself that it has subject-matter jurisdiction over the plaintiff's claims—and that duty persists throughout the proceeding. A case in which the defendant has defaulted is no different because, absent subject-matter jurisdiction, the Court is without power to act, and a defendant's failure to appear cannot fill a jurisdictional void left by Article III or the Congress. *See Fritz v. Islamic Republic of Iran, 320 F. Supp. 3d 48, 76 (D.D.C. 2018)*. Because Parnas brings suit against the Islamic Republic of Iran, the Iranian Ministry of Information and Security, and the Syrian Arab Republic, this Court's jurisdiction is controlled by the FSIA, which deprives state and federal courts of jurisdiction to adjudicate claims against foreign states in the absence of an applicable exception. The Court's consideration of Parnas's renewed motion for a default judgment begins and ends with this requirement.

As explained above, the Court concluded in its prior opinion in this matter that it lacks subject-matter jurisdiction over Parnas's claim because she was not at home at the time of the rocket attack and thus was not "put in 'imminent apprehension' of physical harm." Dkt. 111 at 53. In reaching that conclusion, the Court first held that—although a close question—the state-sponsored **[\*13]** terrorism exception to the FSIA can be read to include at least certain extrajudicial killings, "even if no one is killed in the attack." *Id.* at 48. But it reasoned that the scope of this exception must be defined in light of "'well-established principles of law, such as those found in the Restatement (Second) of Torts and other leading treatises, as well as those principles that have been adopted by the majority of state jurisdictions to outline the boundaries of [plaintiffs'] theory of recovery.'" *Id. at 50*. Then, borrowing from analogous principles found in the law of assault, the Court concluded that the state-sponsored terrorism exception to the FSIA is available in cases of attempted extrajudicial killing only if the defendant intended to kill the direct victim and the attack placed her in "apprehension of the immediate infliction of [that] intended harmful or offensive contact." *Id. at 52*.

On further reflection, and after further briefing and argument, the Court is no longer persuaded that this approach represents the best reading of the FSIA, and the Court now concludes that the state-sponsored terrorism exception to the FSIA's grant of foreign sovereign immunity does not include attempted extrajudicial **[\*14]** killings when no one is, in fact, killed in the attack.

Under *§ 1605A*, a foreign state is not "immune from the jurisdiction of courts of the United States or of the States in any case . . . in which money damages are sought against a foreign state for person injury or death," if (1) the injury or death "was caused by an act of . . . extrajudicial killing . . . or the provision of material support or resources for such an act" and (2) that "act or provision of material support or resources [was] engaged in by" a state official acting within the scope of his or her official duties. *28 U.S.C. § 1605A(a)*. Here, Parnas contends that the rocket attack that destroyed

her home was an act of "extrajudicial killing" carried out with the material support of Iran and Syria. To establish that Iran and Syria provided material support for the rocket attack, Parnas relies on the same evidence that this Court previously found sufficient, *see* Dkt. 111 at 7-10 (Iran); *id.* at 14-16 (Syria), and the Court has no occasion to revisit that conclusion here. The only question, then, is whether the rocket attack constitutes "an act of . . . extrajudicial killing . . . or the provision of material support or resources for such an act," **[*15]** for purposes of the FSIA's state-sponsored terrorism exception, 28 U.S.C. § 1605(a). Because no one was killed in that attack, the Court's jurisdiction turns on whether an "extrajudicial killing"—or the provision of material support "for such an act"—includes an attempted (but unsuccessful) extrajudicial killing.

The Court's analysis starts with the statutory text, and it must end there if the text is clear. *See* Nat'l Ass'n of Mfrs. v. Dep't of Def., 138 S. Ct. 617, 631, 199 L. Ed. 2d 501 (2018). The FSIA provides that courts must give the phrase "extrajudicial killing" the same meaning that same phrase is given "in section 3 of the Torture Victim Protection Act of 1991" ("TVPA"). 28 U.S.C. § 1605A(h)(7). Under the TVPA, "extrajudicial killing" means

> a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

*Pub. L. No. 102-256, § 3(a), 106 Stat. 73*. The D.C. Circuit has read this definition to "contain[] three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." Owens v. Republic of Sudan, 864 F.3d 751, 770, 431 U.S. App. D.C. 163 (D.C. Cir. 2017), *vacated on other* **[*16]** *grounds sub nom.* Opati v. Republic of Sudan, 140 S. Ct. 1601, 1610, 206 L. Ed. 2d 904 (2020).

The ordinary understanding of the word "killing," of course, means that someone has died—it does not mean that the person came close to death, was placed in imminent apprehension of death, or even sustained life-threatening injuries. Merriam-Webster, for example, defines a "killing" as "the act of one that kills" and defines "kill" to mean "to deprive of life" or "cause the death of." *See Killing*, Merriam-Webster, https://www.merriam-webster.com/dictionary/killing (last visited July 5, 2022); *Kill*, Merriam-Webster, https://www.merriam-webster.com/dictionary/kills (last visited July 5, 2022). Another dictionary defines "killing" to mean "an occasion when a person is murdered." *See Killing*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/killing (last visited July 5, 2022). In short, as a matter of common usage, "an act of . . . extrajudicial killing" cannot occur without a death.

The structure of the TVPA further supports this understanding. Although the statute permits an "individual" who was subjected to torture to recover damages, *Pub. L. No. 102-256, § 2(a)(1)*, for extrajudicial killings the TVPA limits recovery to the victim's "legal representative" or "any [other] **[*17]** person who may be a claimant in an action for wrongful death," *id.* § 2(a)(2). The TVPA, in other words, contemplates that the direct victim in an extrajudicial killing will not survive.[1] As the House Report accompanying the TVPA explains, "[i]n cases of extrajudicial killing . . . the *victim will not be alive* to bring the suit," and thus "the victim['s] 'legal representative'" is authorized to "bring suit." H.R. Rep. No. 102-367, at 4 (1991) (emphasis added).

Nor is the Court aware of any principle of statutory interpretation that, as a matter of course, deems criminal or tortious acts to include attempted crimes or torts. To the contrary, when Congress intends to include attempts in a statutory proscription, it does so expressly. *See, e.g.*, 8 U.S.C. § 1326(a) (attempted reentry into the United States); 18 U.S.C. § 1113 (attempted murder or manslaughter); 21 U.S.C. § 846 ("Any person who attempts . . . to commit any" controlled substance offense "shall be subject to the same penalties as those prescribed for the offense"); Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 648, 128 S. Ct. 2131, 170 L. Ed. 2d 1012 (2008) (civil RICO conspiracy claim includes attempted mail fraud as a predicate offense because the mail fraud statute criminalizes "[u]sing the mail to execute *or attempt* to execute a scheme to defraud" (emphasis **[*18]** added)). As the D.C. Circuit has observed in the context of the criminal law, "[t]here

---

[1] The Court distinguishes *direct* victim from other victims of an extrajudicial killing because the FSIA's terrorism exception applies in the event of "personal injury or death that was caused by *an act of* . . . extrajudicial killing," 28 U.S.C. § 1605A(a)(1) (emphasis added), and "the same *act* of killing one person can quite obviously injure another," Owens v. Republic of Sudan, 174 F. Supp. 3d 242, 266 (D.D.C. 2016).

is no general 'attempt' statute," and thus "[a] defendant . . . can only be found guilty of an attempt to commit a federal offense if the statute defining the offense also expressly proscribes an attempt." *United States v. Hite, 769 F.3d 1154, 1162, 413 U.S. App. D.C. 66 (D.C. Cir. 2014)* (quotation marks omitted).

Just two weeks ago, the Supreme Court reinforced this principle when interpreting the *Armed Career Criminal Act, 18 U.S.C. § 924*. *See United States v. Taylor, 142 S. Ct. 2015, 2022 U.S. LEXIS 3017 (U.S. 2022)*. There, the Supreme Court held that attempted Hobbs Act robbery does not qualify as a crime of violence under *18 U.S.C. § 924(c)(3)(A)* because the statute "does not ask whether the defendant committed a crime of violence *or* attempted to commit one" and instead "asks whether the defendant *did* commit a crime of violence." *Taylor, 2022 U.S. LEXIS 3017 at *14*. The Court went on to explain that the Congress "might have swept in those federal crimes that require as an element 'the use or threatened use of force' *and* those 'that constitute an attempt to commit an offense that has such an element,'" but—because Congress did not do so—the Court would not read attempts into the scope of that provision. *Id.*

That same reasoning applies to federal statutes giving rise to civil liability, cf. **[*19]** *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, 511 U.S. 164, 176, 114 S. Ct. 1439, 128 L. Ed. 2d 119 (1994)* (declining to permit recovery for aiding and abetting in a private civil liability action under *§10(b)* of the *Securities Exchange Act of 1934*, noting among other things that "Congress knew how to impose aiding and abetting liability when it chose to do so"), and to jurisdictional provisions, like the exception to the FSIA at issue here. Indeed, the FSIA itself incorporates at least two definitions that expressly include attempts. *See* Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation, Sept. 23, 1971, 974 U.N.T.S. 178, art. I § 2 (defining "aircraft sabotage" to include attempt); *28 U.S.C. § 1605A(h)(1)* (incorporating this definition); International Convention Against the Taking of Hostages, Dec. 17, 1979, 1316 U.N.T.S. 205, art. I § 2(a) (defining "hostage taking" to include attempt); *28 U.S.C. § 1605A(h)(2)* (incorporating this definition). Those provisions stand in clear contrast to the definition of "extrajudicial killing" that Congress employed. There may—or may not—be good reasons for including some attempted terrorist acts and not others. But that choice is one for Congress, and not the courts, to make.

To be sure, the Court must "interpret [the FSIA's] ambiguities flexibly and capaciously" in light of the statute's broad remedial purposes. *Van Beneden v. Al-Sanusi, 709 F.3d 1165, 1167, 404 U.S. App. D.C. 223 (D.C. Cir. 2013)*. As the D.C. Circuit has explained, "[c]oncerned **[*20]** with victims' inability to obtain redress in terrorism cases," Congress "enacted the terrorism exception expressly to bring state sponsors of terrorism . . . to account for their repressive practices" and "to prevent [them] from escaping liability for their sins." *Han Kim v. Democratic People's Republic of Korea, 774 F.3d 1044, 1048, 413 U.S. App. D.C. 356 (D.C. Cir. 2014)*; *see also* H.R. Rep. No. 104-383, at 62 (1995) (noting that Iran and Syria, among others, "consider[ed] terrorism a legitimate instrument of achieving their foreign policy goals," and emphasizing the importance of "giv[ing] citizens an important economic and financial weapon against these outlaw states"). But neither the FSIA nor the TVPA admits of ambiguity with respect to whether the state-sponsored terrorism exception to the FSIA includes attempted extrajudicial killings, so this interpretive principle is of little use here.

It is a mistake, moreover, to conclude that every expansion of *§ 1605A* serves the statute's remedial purpose. Given the difficulty in executing a judgment against a state sponsor of terrorism, most plaintiffs who recover under *§ 1605A* receive compensation, if at all, on a pro rata basis from a fund created by Congress and administered by a special master appointed by the Attorney General. *See 34 U.S.C. § 20144(d)(3)*. That fund, which is **[*21]** largely derived from "proceeds from penalties paid by companies and individuals that violate sanctions imposed on state sponsors of terrorism," is limited, and thus claimants typically receive only pennies on the dollar from each, periodic distribution. *Braun v. United States, 31 F.4th 793, 795(D.C. Cir. 2022)* (claimant received $105,000 of a $2.5 million compensatory judgment in 2019, another $146,000 in 2020, and nothing in 2021). It follows that expanding the pool of eligible claimants will inevitably affect the ability of other claimants to receive prompt compensation, and that one FSIA plaintiff's remedial purpose may be another plaintiff's obstacle to recovery. The question of how best to balance these competing interests in a limited fund is best left to Congress.

As this case illustrates, opening the door to attempted killings raises a related problem: if courts were to construe *§ 1605A* to include attempted killings, notwithstanding the absence of clear congressional direction, they would then be required to make a series of policy-laden decisions about the scope of that waiver

of foreign sovereign immunity. In a country like Israel, which is plagued by repeated, large-scale rocket attacks launched by terrorist groups supported by Iran and **[*22]** Syria, for example, is every U.S. person (or dual national) and every U.S. employee or contractor who suffers emotional distress due to these attacks entitled to recover? If not, how should the Court distinguish between those entitled to invoke the state-sponsored exception and those not entitled to do so? Although courts can reason by analogy to common law tort doctrines, that process is fraught, given the difficulty in identifying the appropriate analogy to a tort or crime that Congress did not expressly identify (or, as far as the Court can discern, even contemplate) when it enacted the statute.

The Court premised its prior decision, in part, on the fact that the state-sponsored terrorism exception to the FSIA applies not only to acts of extrajudicial killing but also to "the provision of material support or resources for such an act." *28 U.S.C. § 1605A(a)(1)*. The Court noted that "[n]othing on the face of *Section 1605A(a)(1)* . . . requires that the material support or resources for an intended extrajudicial killing actually result in someone's death, as long as the victim represented in the case was injured." Dkt. 111 at 48 (quoting *Karcher v. Islamic Republic of Iran, 396 F. Supp. 3d 12, 57 (D.D.C. 2019)*). On reflection, however, the Court is no longer convinced that the material-support prong **[*23]** of the exception can be read so broadly.

Focusing on the plain language of *§ 1605A*, the statute does not waive sovereign immunity whenever a foreign state provides material support to a designated terrorist organization and that organization inflicts some form—*any* form—of "personal injury or death" on the direct victim. Rather, the material-support prong applies only if the foreign state provides "material support or resources for *such an act*"—that is, as relevant here, for "an act of . . . extrajudicial killing," *28 U.S.C. § 1605A* (emphasis added), and, without a killing, the Court cannot conclude that the asserted injury was caused by "an act of . . . extrajudicial killing" or that the material support was provided for "such an act." Were *§ 1605A* to reach any personal injury caused by the provision of material support to a terrorist organization that engages in torture, extrajudicial killings, aircraft sabotage, or hostage taking—regardless of whether the direct, personal injury was itself the product of one of those acts—the provision would sweep far too broadly and would cover, for example, everyday (but foreseeable) torts committed by terrorist organizations that bear no connection to the "repressive practices" **[*24]** that Congress intended to redress, *Han Kim, 774 F.3d at 1048*.

It is true that the FSIA provides that "the term 'material support or resources' has the meaning given that term in *section 2339A* of title 18," *28 U.S.C. § 1605A(h)(3)*, and *§ 2339A* criminalizes both the provision of material support or resources and "attempts or conspir[acies]" to do so, *18 U.S.C. § 2339A(a)*. But *§ 2339A* applies to "attempts or conspir[acies]" *to provide material support*, rather than "attempts" *to commit the underlying act*. *See, e.g., United States v. Demirtas, 204 F. Supp. 3d 158, 162-63 (D.D.C. 2016)* (describing indictment under *§ 2339A* for "providing, attempting to provide, and conspiring to provide material support to terrorists"). Moreover, and even more to the point, the FSIA incorporates only the definition of "material support or resources" from *§ 2339A(b)*, *28 U.S.C. § 1605A(h)(3)*, and not the liability provisions of *§ 2339A(a)*, which broadly reach the provision of material support; the concealment of the nature, source, or ownership of material support; or "attempts or conspir[acies] to do such an act," *18 U.S.C. § 2339A(a)*. There is no indication that by incorporating the definition of "material support or resources" from *§ 2339A(b)* into the FSIA's state-sponsored terrorism exception, Congress intended for courts to read that FSIA exception in light of the liability provisions of *§ 2339A*.

Parnas responds by pointing to other decisions from this **[*25]** Court that, she contends, permit recovery under the FSIA in situations in where no one has died. Dkt. 117 at 3; Dkt. 122 at 7.[2] As an initial matter, several

---

[2] At one point in her supplemental filing, Parnas claims that "[t]he rocket that hit the Parnas home was not a stand-alone event involving just one rocket" and, instead, "was part of a protracted, seven-day barrage of rockets . . . during which 1,500 rockets were fired" and, according to Parnas, "multiple people in Israel were killed and injured." Dkt. 122 at 3. Parnas later observes that, "[i]f the attack is viewed in the larger context, it is not true that nobody was killed or physically injured." *Id.* at 4. But Parnas never argues that the rocket attack at issue here constituted a completed (as opposed to an attempted) extrajudicial killing for purposes of the FSIA, and, indeed, she acknowledges that "in this case there was no successful extrajudicial killing." *Id.* at 3. Nor has Parnas introduced any competent evidence of any death resulting from the rocket attack (or even attacks) at issue. Instead, her brief merely includes a hyperlink to a Wikipedia page that generates an error message. *See 28 U.S.C. § 1608(e)* (providing that a FSIA plaintiff is not entitled to default judgment "unless the claimant establishes his claim or right to

of the cases that she relies upon involved fatalities—that is, "extrajudicial killings." One such case involved "a gasoline tanker, modified to serve as a bomb," that exploded outside of the Khobar Towers residential complex in Saudi Arabia, resulting in "the largest non-nuclear explosion ever up to that time" and the killing of 19 members of the U.S. Air Force. *Schooley v. Islamic Republic of Iran, No. 17-cv-1376, 2019 U.S. Dist. LEXIS 108011, 2019 WL 2717888, at \*1, \*3 (D.D.C. June 27, 2019)* (quotation marks omitted). Another involved the bombing of the U.S.S. Cole in Yemen, which "ripped a large hole in the port side of the ship," killing 17 sailors and injuring 42 more. *Harrison v. Republic of Sudan, 882 F. Supp. 2d 23, 31 (D.D.C. 2012)*. And yet others arose out of the 1983 bombing of a Marines barracks in Beirut that killed 241 servicemen. See *Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 57 (D.D.C. 2010)*; *Est. of Brown v. Islamic Republic of Iran, 872 F. Supp. 2d 37, 40 (D.D.C. 2012)*. These cases, accordingly, have no bearing on the question whether *§ 1605A* applies to an attempted extrajudicial killing in which no one dies. In each case, the plaintiffs' injuries were caused by "an act of . . . extrajudicial killing"—specifically, a deadly bombing.

Parnas is correct, however, that a handful of decisions **[\*26]** from this Court—including the earlier decision in this case—have concluded that attempted extrajudicial killings are covered by *§ 1605A*. See *Gill v. Islamic Republic of Iran, 249 F. Supp. 3d 88*, (collecting cases). Of these, however, only two (beyond the prior decision in this case) discuss the issue at hand at any length, and the Court is now unpersuaded by that reasoning. The first relied on two decisions permitting suit for attempted extrajudicial killings under the TVPA and held that, "because the terrorism exception adopts the [TVPA's] definition of extrajudicial killing for the purposes of determining whether a foreign state has waived its sovereign immunity for particular categories of terrorism, . . . [the] attempted extrajudicial killing of the plaintiff constitute[d] an extrajudicial killing under the terrorism exception." *Id. at 99*. But one of the underlying cases involves no reasoning at all, *see Doe v. Constant, No. 10108-cv-04, 2006 U.S. Dist. LEXIS 101961, 2006 WL 3490503 (S.D.N.Y. Oct. 24, 2006)*, while the other merely observed that the "TVPA claims are premised on alleged acts that violate *jus cogens* norms" and that

relief by evidence satisfactory to the court"). The Court need not, as a result, reach the question of whether the FSIA's state-sponsored terrorism exception is sufficiently capacious that a "seven-day barrage of rockets" might constitute a singular "act of . . . extrajudicial killing."

"[e]xtrajudicial killing has long been condemned by international law," *Warfaa v. Ali, 33 F. Supp. 3d 653, 662 (E.D. Va. 2014)*. Neither decision grappled with those aspects of the TVPA's text or legislative history indicating that Congress limited liability for "extrajudicial **[\*27]** killings" to situations in which a direct victim is killed.

For precisely this reason, a recent decision from the U.S. District Court for the Southern District of New York declined to rely on a line of cases finding attempted killings covered by the TVPA and the FSIA. *Appel v. Hayut, No. 20-cv-62652021 U.S. Dist. LEXIS 122511, 2021 WL 2689059, at \*9 (S.D.N.Y. June 30, 2021)*. There, the court expressed skepticism that "the TVPA allows for civil liability for *attempted* deliberative killing," noting that "the TVPA, on its face, imposes liability for a 'deliberated killing' but not an 'attempted deliberated killing.'" *Id.* In addressing *Constant* and similar decisions, the court observed that those decisions "often, if not always . . . *assumed* that there was attempted liability under the TVPA, without any objection from the defendant, . . . [and] thus did not have occasion to truly grapple with the statutory language." *2021 U.S. Dist. LEXIS 122511, [WL] at \*10*. Ultimately, the court had no occasion to resolve this question, however, because other grounds warranted dismissal of the TVPA claim. *Id.*

The second decision from this Court that requires discussion is *Karcher*, which informed the prior decision in this case holding that *§ 1605A* applies to attempted extrajudicial killings, even when no one is killed. See Dkt. 111 at 48. *Karcher* acknowledged that the FSIA's **[\*28]** terrorism exception "does not expressly address attempts to commit acts that are listed in that provision" but concluded that "injuries resulting from 'deliberated' attempts to kill fall within the scope of *[§] 1605A(a)(1)*." *396 F. Supp. 3d at 58*. That conclusion was based, in part, on the D.C. Circuit's instruction (discussed above) that courts should "construe[] the FSIA's ambiguities broadly," *id.* (citing *Van Beneden, 709 F.3d at 1167* & n.4), a principle that the Court accepts, but only to the extent the reach of the statute is unclear. *Karcher* also relied on the material-support prong of the exception, *see id. at 54-58*, but for the reasons explained above, the Court is unpersuaded that *§ 1605A* applies to material support used for an attempted, as opposed to a successful, extrajudicial killing.

The Court recognizes that there may be cases in which individuals suffer grievous injuries in attacks in which no

one dies. Indeed, three other Plaintiffs in this case fall into that category. These include Menachem Mendel Rivkin, who "was stabbed and injured by a terrorist while on his way to dinner with his wife," causing damage to his "left main pulmonary artery" resulting in "massive internal bleeding;" Dkt. 119 at 12-13; *see also* Dkt. 72 at 1-2 (Rivkin Decl. ¶¶ 3, 5-8); Shmuel **[\*29]** Brauner, who "suffered extensive shrapnel wounds that resulted in permanent physical injuries" caused by a rocket attack resulting in the loss of a "kidney and part of his stomach;" Dkt. 119 at 95; *see also* Dkt. 39 at 2-3 (Brauner Decl. ¶¶ 7, 11); and Yehuda Glick, who was "shot four times in the center of his body" during "an attempt to assassinate" him that left him "in a medically induced coma for ten days" and requiring "nine surgeries," Dkt. 52 at 4-6 (Glick Decl. ¶¶ 21, 25-26, 43). There is no doubt that these Plaintiffs endured vicious attacks that caused grave injuries. The severity of those injuries, moreover, likely exceeded those suffered by others who are entitled to recover under the plain language of *§ 1605A*; someone sustaining a less severe injury in a terrorist attack that resulted in the deaths of others, for example, might successfully invoke the FSIA's state-sponsored terrorism exception. The question, then, is whether Congress could have intended such an incongruity.

A version of this question surfaced in the long-running *Owens* litigation when the Republic of Sudan argued that "plaintiffs who did not die cannot sue under *§ 1605A* because their injuries were not caused by the extrajudicial **[\*30]** killing of others." *174 F. Supp. 3d at 266* (quotation marks omitted). Sudan argued, specifically, that a contrary rule would be "absurd" because "an injured person's ability to bring a claim [would] turn on the happenstance of whether others were killed in the bombing." *Id.* (quotation marks and alterations omitted). Judge Bates was unpersuaded. First, he explained that "*§ 1605A* covers 'personal injury or death that was caused by an act of . . . extrajudicial killing,' and the same act of killing one person can quite obviously injure another," *id.* (citation omitted)—a principle that the Court today reiterates. Second, he reasoned that "there is nothing absurd about eliminating immunity only for those acts that actually cause death, for those are likely to be the most heinous." *Id.*

The Court finds the reasoning in *Owens* convincing, and, indeed, the idea encompassed by that reasoning is the crux of the issue presented by Parnas's motion. Although the Court can, in theory, see why Congress might choose to include attempted extrajudicial killings within the ambit of the FSIA's terrorism exception, the Court can also see why Congress might have limited the reach of the exception to the most heinous and destructive acts. Each **[\*31]** prong of the state-sponsored terrorism exception to the FSIA requires line-drawing and will inevitably exclude some cases that involve horrific conduct and grievous injuries. The question for the Court is not whether Congress drew the line in the proper place or even whether, if presented with the facts of this case, Congress might decide to waive foreign sovereign immunity. All that the Court can—and should—do is construe the statute that Congress enacted.

The Court's decision is not an easy one. It is at odds with other decisions from this Court, and it risks leaving those who have suffered terrible injuries—including, perhaps, Rivkin, Brauner, and Glick—without a remedy. The Court further notes that although Rivkin, Brauner, and Glick's counsel has been heard on the legal question decided here, the Court has yet to provide those plaintiffs with the opportunity to argue that they remain entitled to recover for reasons that may differ from those pressed by Parnas. The Court, accordingly, will hold a status conference to hear from counsel for Rivkin, Brauner, Glick, and their relatives about how they would like to proceed. In the meantime, the Court will proceed to issue a damages decision **[\*32]** applicable to the remaining Plaintiffs who the Court previously found were entitled to the entry of a default judgment.

## CONCLUSION

For the foregoing reasons, the Court will **DENY** Plaintiff Daniella Parnas's renewed motion for default judgment, Dkt. 117. Counsel for Plaintiffs is **ORDERED** to appear by video for a status conference on July 26, 2022, at 2:00 p.m., to discuss how to proceed in this case, including with respect to the claims of Plaintiffs Menachem Mendel Rivkin, Shmuel Brauner, and Yehuda Glick, and those Plaintiffs whose claims are tied to their direct injuries.

**SO ORDERED**.

/s/ Randolph D. Moss

RANDOLPH D. MOSS

United States District Judge

Date: July 5, 2022

**End of Document**