## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SAAD ALJABRI,

       *Plaintiff*,

    v.

MOHAMMED BIN SALMAN BIN
ABDULAZIZ AL SAUD et al.,

       *Defendants*.

Civil Action No. 20-2146 (TJK)

## MEMORANDUM OPINION

The allegations in this case are the stuff of a Tom Clancy novel.  Dr. Saad Aljabri was a high-ranking official in the Kingdom of Saudi Arabia and an advisor to its former Crown Prince. But after the former Crown Prince seemingly threatened then-Deputy Crown Prince Mohammed bin Salman bin Abdulaziz al Saud's efforts to consolidate power, Aljabri feared that he would be blamed for the threat.  So he fled Saudi Arabia, first to Turkey and then to Canada.  In his complaint, Aljabri claims that, since he left Saudi Arabia, bin Salman has tried to hunt him down and kill him.  He sues all those allegedly involved in this plot—bin Salman, other Saudi officials, several U.S.-based individuals, a Saudi foundation, and eight John Doe defendants—and brings claims of attempted extrajudicial killing in violation of the Torture Victim Protection Act, extrajudicial killing in violation of the law of nations under the Alien Tort Statute, and intentional infliction of emotional distress.  The defendants he has served have moved to dismiss, arguing—among other things—that this Court lacks personal jurisdiction over them and that Aljabri has failed to state a claim.  Because the Court agrees that it lacks personal jurisdiction over all but two of the moving defendants and that Aljabri has failed to state a claim against the remaining two, the Court will grant their motions and dismiss all the served defendants.

I.      **Aljabri's Allegations**

      A.      **Aljabri's Relationship with bin Salman**

Aljabri is a dual citizen of Malta and Saudi Arabia.  For almost forty years, he worked for the Saudi government, specializing in national security and counterterrorism.  He served in several positions in the Ministry of Interior, eventually becoming an advisor to then-Crown Prince Mohammed bin Nayef, then the Minister of the Interior.

Along with bin Nayef, Aljabri led the development of Saudi Arabia's security and counterterrorism agencies.  In this role, Aljabri had significant contact with the United States intelligence community, and he claims that he discovered and helped prevent several terror attacks.  In particular, Aljabri asserts that he "thwart[ed] a bombing attack on the United States by an al-Qaeda affiliate," saving American lives.  ECF No. 66 ¶ 143.  Aljabri alleges that, under his and then-Crown Prince bin Nayef's leadership, Saudi Arabia became one of the United States' "key partners in counterterrorism," which in turn "formed the backbone of the historic American-Saudi relationship."  *Id.* ¶ 148.

According to Aljabri, through his position he learned not only about global terror threats but also about the inner workings of the Saudi Royal Court, including bin Salman's conduct.  At the time, bin Salman was the Deputy Crown Prince, second in line to the throne after bin Nayef.  But bin Salman was supposedly plotting a change to the line of succession—that is, for him to become the Crown Prince and eventually King.  And Aljabri claims that bin Salman was involved in more than just politics.  Aljabri alleges that he "was privy to sensitive information about Defendant bin Salman's covert political scheming within the Royal Court, corrupt business dealings, and creation of a team of personal mercenaries that Defendant bin Salman would use to carry out extrajudicial killings and renditions in pursuit of his personal interests."  ECF No. 66 ¶ 6.

At one point in 2015, Aljabri says that he relayed information to the United States about bin Salman's activities.  In July of that year, Aljabri allegedly met with the Director of the Central Intelligence Agency and told the CIA about bin Salman's communications with Russian President Vladimir Putin.  According to Aljabri, the CIA was worried that bin Salman was encouraging Russian intervention in Syria.  When Aljabri recounted the CIA's concerns to bin Salman, bin Salman supposedly "responded with fury."  ECF No. 66 ¶ 151.

Aljabri alleges that he met with the Director of the CIA again in August 2015.  At that time, the Director told Aljabri that his role in the Saudi government was important to the United States' national security.  One month later, Aljabri claims that the King of Saudi Arabia removed him from his government position—purportedly at bin Salman's behest—citing Aljabri's "unauthorized" meetings with the CIA.  ECF No. 66 ¶ 153.

**B.      Aljabri's Flight to Turkey**

Aljabri alleges that over the next year, bin Salman worked to consolidate his power in Saudi Arabia.  Key to bin Salman's plan, Aljabri says, was support from the United States.  Thus, throughout 2016, bin Salman allegedly tried to ingratiate himself with potential Trump administration officials.  Aljabri claims that he was told of "significant and suspicious promises" made by bin Salman to the incoming Trump administration after the 2016 election.  ECF No. 66 ¶ 156.  And months into President Trump's term, Trump's son-in-law and advisor, Jared Kushner, supposedly began asking about the United States' "ability to influence the succession of the next king" of Saudi Arabia.  *Id.* ¶ 157.  In March 2017, President Trump hosted bin Salman in the State Dining Room of the White House, which is usually reserved for foreign heads of state.  The following May, President Trump announced that he would visit Saudi Arabia during his first foreign trip.

At the same time, the U.S. intelligence community was supposedly "resistant" to bin Salman's efforts to garner support and continued to show "public signals of support" for then-Crown Prince bin Nayef.  ECF No. 66 ¶¶ 159, 161.  In February 2017, the CIA Director allegedly presented bin Nayef with a medal for his counterterrorism work.  And in May, soon after President Trump announced his trip to Saudi Arabia, it was reported that the Ministry of Interior, led by bin Nayef, hired a lobbying firm with ties to the Trump administration.  Aljabri says he feared that bin Salman would assume that he was involved in pursuing the contract.  So Aljabri fled to Turkey. Soon after, Aljabri claims, bin Salman ordered the arrest of everyone involved in the lobbying contract, and a former colleague allegedly told Aljabri that those involved "were very eager" to get their hands on Aljabri as well.  ECF No. 66 ¶ 165 (cleaned up).

Since then, Aljabri claims, bin Salman has tried to lure him back to Saudi Arabia.  Aljabri says that bin Salman texted him via WhatsApp, asking when he would return.  Aljabri, "seeking any excuse to delay any return," allegedly responded that he could not return before late June 2017 because of ongoing medical care.  ECF No. 66 ¶ 170.  But bin Salman supposedly pushed Aljabri to come before then, and Aljabri claims that he soon learned why.  Just a few days after those texts, bin Salman "ousted" bin Nayef as the Crown Prince of Saudi Arabia.  *Id.* ¶ 171.  Aljabri believes that bin Salman wanted Aljabri "within his grasp" before that "coup" took place.  *Id.* ¶ 170.

As the Crown Prince, bin Salman allegedly continued his efforts to entice Aljabri to come back.  The same day as the purported coup, bin Salman supposedly reiterated his request that Aljabri return, but Aljabri refused, falsely claiming that he was leaving soon for medical treatment in the United States, more specifically, in Boston.  Aljabri alleges that, in response, bin Salman became more forceful.  Bin Salman purportedly barred two of Aljabri's children from leaving Saudi Arabia and ignored Aljabri's requests to let the children resume their educations in the

United States.  Bin Salman also allegedly cut off the scholarship of Aljabri's son.  Aljabri further alleges that bin Salman offered to send a private jet to secure Aljabri's return, and the head of bin Salman's private office, Bader Alasaker, repeatedly called and messaged Aljabri to coordinate that flight.  When Aljabri still would not return, bin Salman allegedly started threatening him, promising to "use all available means" to get Aljabri, including "measures that would be harmful."  ECF No. 66 ¶ 173 (cleaned up).  In September 2017, bin Salman purportedly asked Turkey to return Aljabri to Saudi Arabia.  The next day, bin Salman issued an arrest warrant for Aljabri, and requested the issuance of a "red notice" by INTERPOL—an intergovernmental law enforcement agency—based on that warrant.[1]  At that point, Aljabri fled Turkey to Toronto, Canada.

### C.    Activities Bin Salman Directed in the United States

According to Aljabri, bin Salman also tried to pin down his exact location.  Aljabri claims that, because he told bin Salman that he was going to Boston, bin Salman focused his search on the United States, using what Aljabri calls a "clandestine network" of Saudi students supposedly created via bin Salman's foundation, MiSK.  ECF No. 66 ¶ 219.

MiSK is a foundation founded by bin Salman in his personal capacity.  The head of bin Salman's private office, Alasaker, is its Executive Director, and bin Salman provides a substantial portion of its funding.  MiSK's mission is to "cultivat[e] and encourag[e] learning and leadership in youth for a better future in Saudi Arabia."  ECF No. 66 ¶ 71 (cleaned up).  It hosts events throughout the United States, such as "MiSK talks" and leadership programs for students.  Aljabri believes that MiSK also "provides funding and support to Saudi student groups in the United

---

[1] INTERPOL eventually deleted the notice after determining that its filing had been "politically motived."  ECF No. 66 ¶¶ 259, 332.

States" through the Saudi Arabian Cultural Ministry ("SACM").  *Id.* ¶ 75.  Alasaker has traveled to the United States several times for various MiSK events.

Aljabri alleges that bin Salman, Alasaker, and MiSK are tied to Saudi espionage in the United States.  Aljabri points to a criminal case in California, in which two Twitter employees were indicted for trying to obtain personal information from the Twitter accounts of individuals critical of bin Salman and the Saudi Royal Family.  The employees were allegedly acting on the instructions of Alasaker, and Alasaker eventually hired one of the employees to work for MiSK. *See* Superseding Indictment, *United States v. Abouammo*, No. 3:19-cr-00621-EMC, ECF No. 53 (N.D. Cal. July 28, 2020).  Aljabri alleges that, at one point in 2015, bin Salman "bragged" to him that bin Salman had someone "in Twitter."  ECF No. 66 ¶ 45.

Aljabri claims that bin Salman and Alasaker used MiSK to recruit Saudi students.  To support this accusation, Aljabri cites reports that Saudi student clubs in the United States are closely watched; that each club has "one or two spies" that report to a "handler" on the club's activities.  ECF No. 66 ¶ 229.  Students are purportedly prohibited from "speaking with the media or with law enforcement for any purpose."  *Id.* ¶ 230.  And those who step out of line allegedly face "death threats, intimidation, retraction of scholarships, and attempts to lure them back to the country."  *Id.* (cleaned up).

This case, though, involves the actions of three specific students—Youseff Alrajhi, Mo-hammed Alhamed, and Layla Abuljadayel.  Aljabri alleges that these students participated in MiSK-sponsored events and retweeted and replied on Twitter to each other, Alasaker, and MiSK. Alrajhi and Alhamed were allegedly close with the head of SACM.  Alhamed and Abuljadayel also supposedly had leadership roles in Saudi student clubs.  And they both work now for a public relations firm with loose ties to bin Salman.  That firm allegedly partners with an organization for

which bin Salman serves as Chairman of the Board of Directors.  Aljabri also alleges that Alhamed works for a public relations firm allegedly founded by one of Alasaker's "close associate[s]."  ECF No. 66 ¶ 97.

Based on these alleged connections to MiSK, SACM, and the Saudi government, Aljabri alleges that Alrajhi, Alhamed, and Abuljadayel were agents for bin Salman and Alasaker.  And allegedly at bin Salman and Alasaker's request, these three helped "hunt" for Aljabri in the United States.  *E.g.*, ECF No. 66 ¶ 74.  This so-called "hunt" consisted of these students, the head of SACM, and Bijard Alharbi (an old acquaintance of Aljabri and bin Nayef), speaking with Aljabri's friends and family in the United States.  Alharbi is the only one alleged to have asked about Aljabri explicitly.  Aljabri also alleges that, as part of the "hunt," an individual named Hani Hamed, who is not alleged to have any connection with MiSK, SACM, or a Saudi student organization, supposedly tried to visit Aljabri in Boston and then surveilled a hotel in which he thought Aljabri resided.

### D.    Bin Salman Locates Aljabri in Canada

By December 2017, bin Salman knew Aljabri was in Canada.  Aljabri alleges that Alharbi—the same person who met with his son in Boston the month before—visited him then in Toronto.  Alharbi allegedly showed up at Aljabri's office unannounced.  Aljabri claims that Alharbi repeatedly tried to convince him to move to Turkey, suggesting to him that he would be less lonely there.  Alharbi also allegedly tried to learn where Aljabri lived, "pepper[ing]" one of Aljabri's friends with questions.  ECF No. 66 ¶ 253.  Alharbi visited Toronto on several other occasions and allegedly tried to find out more about Aljabri's pattern of life.  In July 2018, Aljabri alleges that a "friendly intelligence service" told him that malware had been planted in his personal phones—possibly via a video file sent by a Saudi journalist on WhatsApp.  ECF No. 66 ¶ 333.  On

Aljabri's information and belief, this malware allowed bin Salman to access information on his phone, including "potentially" his location.  *Id.*

### E.    Bin Salman's "Tiger Squad"

According to the complaint, bin Salman now had what he needed to dispatch his "Tiger Squad" to kill Aljabri.  Allegedly, the Tiger Squad is "a private death squad made up of approximately 50 intelligence, military, and forensic operatives recruited from different branches of the Saudi government with one unifying mission: loyalty to the personal whims of Defendant bin Salman."  ECF No. 66 ¶ 111.  The Tiger Squad was supposedly formed in 2015 when Aljabri, still working for then-Crown Prince bin Nayef and the Ministry of Interior, refused bin Salman's request to use a Saudi agency to retaliate against another Saudi prince.  According to Aljabri, bin Salman ultimately created and used the Tiger Squad to kidnap and torture the Saudi prince.  Aljabri claims that bin Salman has used the Tiger Squad for other "personal vendettas" as well, including the murder of Saudi journalist Jamal Khashoggi.  *Id.* ¶ 81.

Aljabri alleges that the Tiger Squad is overseen by bin Salman and Alasaker and that three other defendants have leadership roles in the Tiger Squad.  Saud Alqahtani is allegedly one of bin Salman's supposed "chief enforcers," who has been involved "in nearly every extrajudicial operation directed by Defendant bin Salman."  ECF No. 66 ¶ 53.  In fact, Alqahtani allegedly helped "create" the Tiger Squad.  *Id.* ¶ 49.  Meanwhile, Ahmed Alassiri was the Deputy Intelligence Chief for Saudi Arabia's main intelligence agency.  On Aljabri's information and belief, Alassiri "supervised and directed the Tiger Squad."  *Id.* ¶ 64.  And Aljabri claims that Saud Abdulaziz Alsaleh, a senior military intelligence officer, "served as a coordinator or leader" of the Tiger Squad members dispatched to kill Aljabri.  *Id.* ¶ 118.

Aljabri alleges that, in October 2018, members of the Tiger Squad traveled to Canada to

kill him.  These included Mishal Fahad Alsayed, Khalid Ibrahim Abdulaziz Algasem, Bander

Saeed Alhaqbani, Ibrahim Hamad Abdulrahman Alhomid, Ahmed Abdullah Fahad Albawardi,

and Bader Mueedh Saif Alqahtani, who all flew from Frankfurt, Germany, to Ottawa, Canada.

Aljabri alleges that when these Tiger Squad members tried to clear customs, they claimed not to

know each other.  On Aljabri's information and belief, border agents—growing suspicious—

searched through the Tiger Squad members' bags and found photos contradicting that claim, as

well as "forensic tools."  ECF No. 66 ¶ 347 (cleaned up).  Still, the Tiger Squad members appar-

ently insisted that they wanted to enter Canada as "tourists."  *Id.*  In the end, Aljabri claims, border

agents only allowed Alhomid to enter the country, as he had a diplomatic passport, thereby appar-

ently foiling the plot.[2]

But Aljabri alleges that bin Salman did not give up there.  Aljabri claims that in May 2020,

bin Salman's advisors were overheard discussing a "fatwa" that bin Salman obtained for Aljabri's

killing.  A fatwa, Aljabri alleges, is a determination by religious authorities that, in this case, would

have been a "ruling endorsing the killing of [Aljabri]."  ECF No. 66 ¶ 354 (footnote omitted).  At

the same meeting, bin Salman and his advisors were overheard saying that they planned to send

men to kill Aljabri "by land," which Aljabri took to mean sending agents from the United States

to Canada to finish the job.  *Id.* ¶ 355 (cleaned up).  Later, Aljabri alleges, people working for bin

Salman have "repeatedly" made attempts on his life.  *Id.* ¶ 362.  He alleges that in July 2020—as

Aljabri was being "smeared" on Twitter and in the media, supposedly at bin Salman's behest—

Canadian security agencies warned Aljabri about a "credible and imminent threat to his life."  *Id.*

---

[2] A separate team of Tiger Squad members—Defendants John Does 1–8—allegedly arrived in
Montreal the next day.  According to Aljabri, they were permitted to enter Canada.

¶¶ 263, 363.  Aljabri says that he received similar warnings again from other "sources" in November 2020.  *Id.* ¶ 364.  As of late 2020, Aljabri claims that the above attempts to kill him were the "subject of law enforcement activity" in the United States, Canada, Germany, and France.  ECF No. 66 ¶ 352.

  **F.**  **This Case**

  In August 2020, Aljabri sued, bringing claims of attempted extrajudicial killing in violation of the Torture Victim Protection Act ("TVPA"), extrajudicial killing in violation of the law of nations under the Alien Tort Statute ("ATS"), and intentional infliction of emotional distress.  *See* ECF No. 1.  Aljabri then amended his complaint, identifying previously unnamed defendants and adding allegations.  *See* ECF No. 66.  Defendants now include:

- bin Salman, the man supposedly behind the alleged plot to kill Aljabri;

- Alasaker, Alqahtani, and Alassiri, bin Salman's so-called "henchmen";

- MiSK, Alrajhi, Alhamed, Abuljadayel, Alharbi, and Hamed, the individuals and organizations involved in the alleged "hunt"; and

- Alsaleh, Alsayed, Algasem, Alhaqbani, Alhomid, Albawardi, Bader Alqahtani, and John Does 1–8, the members of the "Tiger Squad" allegedly dispatched to kill Aljabri.

Aljabri served all defendants except Alharbi and the John Does.  *See* ECF No. 91.

  The served defendants all moved to dismiss.  Bin Salman, Alasaker, Alqahtani, Alassiri, MiSK, Alrajhi, Hamed, Alsaleh, Alsayed, Algasem, Alhaqbani, Alhomid, Albawardi, and Bader Alqahtani challenged (among other things) the Court's personal jurisdiction.  Alhamed and Abuljadayel did not, instead arguing (among other things) that Aljabri has not alleged facts showing that they—students at the time of their alleged involvement—knowingly signed up to help carry out an extrajudicial killing.

## II.      Legal Standards

A motion to dismiss under Rule 12(b)(2) tests whether the Court may exercise personal jurisdiction over the defendant.  The plaintiff bears "the burden of establishing a factual basis for the exercise of personal jurisdiction." *Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990).  Absent jurisdictional discovery or an evidentiary hearing on jurisdiction, a plaintiff can carry his burden by making "a prima facie showing" of personal jurisdiction. *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005).  To do so, a plaintiff need not "adduce evidence that meets the standards of admissibility reserved for summary judgment and trial." *Urb. Inst. v. FINCON Servs.*, 681 F. Supp. 2d 41, 44 (D.D.C. 2010).  Instead, the plaintiff "may rest [his] arguments on the pleadings," bolstered by affidavits and other written materials. *Id.*  That said, he "cannot rest on bare allegations or conclusory statements." *GTE New Media Servs., Inc. v. Ameritech Corp.*, 21 F. Supp. 2d 27, 36 (D.D.C. 1998).  The plaintiff "must allege specific facts connecting each defendant with the forum." *Id.*

Meanwhile, a "Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a plaintiff's complaint; it does not require a court to assess the truth of what is asserted or determine whether a plaintiff has any evidence to back up what is in the complaint." *Herron v. Fannie Mae*, 861 F.3d 160, 173 (D.C. Cir. 2017) (cleaned up).  "In evaluating a Rule 12(b)(6) motion, the Court must construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (cleaned up).  "But the Court need not accept inferences drawn by plaintiff if those inferences are not supported by the facts set out in the complaint, nor must the court accept legal conclusions cast as factual allegations." *Id.*  To survive the motion, the "complaint must have

'facial plausibility,' meaning it must 'plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## III.   Analysis

### A.   Personal Jurisdiction

Personal jurisdiction is "an essential element of the jurisdiction of a district court, without which the court is powerless to proceed to an adjudication." *Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1086 (D.C. Cir. 2007) (cleaned up).  It "ensure[s] fairness to the defendant," and "protect[s] the sovereign concerns of other nations whose courts might otherwise adjudicate the claims." *Livnat v. Palestinian Auth.*, 851 F.3d 45, 55 (D.C. Cir. 2017) (cleaned up).  Aljabri argues that this Court has personal jurisdiction over bin Salman, Alasaker, Alqahtani, Alassiri, Alsaleh, Alsayed, Algasem, Alhaqbani, Alhomid, Albawardi, and Bader Alqahtani under Federal Rule of Civil Procedure 4(k)(2), and over MiSK, Alrajhi, and Hamed under D.C. Code § 13-423(a)(1).  *See* ECF No. 102 at 84.

#### 1.   Federal Rule of Civil Procedure 4(k)(2)

Federal Rule of Civil Procedure 4(k)(2) permits a federal court to exercise jurisdiction over (1) a claim arising under federal law,[3] (2) against a defendant served by a summons, (3) that is not subject to the jurisdiction of any single state court, (4) provided that the exercise of federal jurisdiction is consistent with the Constitution (and laws) of the United States.  *See Mwani*, 417 F.3d at 10.  The only dispute here is over the fourth element.

---

[3] If Rule 4(k)(2) provides jurisdiction for the federal claims, then pendent jurisdiction would lie for any others—in this case, the intentional infliction of emotional distress claim.  *See Geier v. Conway, Homer & Chin-Caplan, P.C.*, 983 F. Supp. 2d 22, 31 (D.D.C. 2013).

"Whether the exercise of jurisdiction is 'consistent with the Constitution' for purposes of Rule 4(k)(2) depends on whether a defendant has sufficient contacts with the United States as a whole to justify the exercise of personal jurisdiction under the Due Process Clause of the Fifth Amendment." *Mwani*, 417 F.3d at 11.  "[C]ourts must ensure that the defendant[s'] conduct and connection with the forum State are such that [they] should reasonably anticipate being haled into court there." *Lans v. Adduci Mastriani & Schaumberg, LLP*, 786 F. Supp. 2d 240, 267 (D.D.C. 2011) (cleaned up).  In a case like this, where the plaintiff does not argue that the defendants are essentially "at home" in the United States, due process requires the plaintiff to show that the Court has "specific" personal jurisdiction.  That is, the plaintiff's factual allegations must demonstrate that each defendants' "suit-related conduct . . . create[d] a substantial connection with" the United States. *Walden v. Fiore*, 571 U.S. 277, 284 (2014).

Even if a plaintiff alleges facts showing that a defendant had (1) minimum contacts showing that he purposely availed himself of the forum; and (2) relatedness between the contacts and the claim, he must also show that a court's exercise of personal jurisdiction (3) comports with "traditional notions of fair play and substantial justice."  *Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102, 105 (1987) (cleaned up).  In that situation, it is the defendant's burden to "present a compelling case that . . . other considerations would render jurisdiction unreasonable." *Mwani*, 417 F.3d at 14 (cleaned up).  Those considerations include "the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief," as well as "the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies." *Asahi*, 480 U.S. at 113 (cleaned up).

### a.      bin Salman

Aljabri argues that exercising personal jurisdiction over bin Salman is proper for "two independent reasons." ECF No. 102 at 85. First, he says that bin Salman's alleged "plot" to kill him in Canada in fact "targeted the *United States*." *Id.* Second, he claims that bin Salman directed conduct that took place "on *U.S. soil*." *Id.* Both arguments come up short. And even if they succeeded, exercising personal jurisdiction over bin Salman under these circumstances would still violate traditional notions of fair play and substantial justice.

### i.      "Purposeful Targeting" of the United States

The "targeting" theory is Aljabri's primary argument, and it is common in the tort context. As the Circuit has explained, when a "defendant has purposefully directed his activities at residents of the forum," that "satisfie[s]" the requirement that the defendant "have fair warning that a particular activity may subject [him] to the jurisdiction of a foreign sovereign." *Mwani*, 417 F.3d at 11–12 (cleaned up). In such cases, the "absence of physical contacts" with the forum cannot "defeat personal jurisdiction." *Id.* at 13 (cleaned up). Thus, personal jurisdiction is proper over "a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985) (cleaned up). So too over a publisher who "circulat[ed] magazines to deliberately exploit a market in the forum." *Walden*, 571 U.S. at 285 (cleaned up). Likewise, in the Rule 4(k)(2) context, where contacts must be with the United States as a whole, a court can exercise jurisdiction over a terrorist who planned the bombing of an American embassy "to cause pain and sow terror in the . . . United States." *Mwani*, 417 F.3d at 13.

Aljabri claims that bin Salman "purposefully targeted" the United States because bin Salman's attempt to kill Aljabri was meant "to disrupt an important U.S. intelligence partnership, to

limit the U.S. intelligence community's access to valuable information, and to alter the U.S. intelligence community's behavior."  ECF No. 102 at 85.  The problem with this theory is that the Court does not have before it factual allegations from which it can reasonably infer that this was bin Salman's motive.

To review: Aljabri alleges that he was an advisor for the former Crown Prince of Saudi Arabia, bin Nayef.  ECF No. 66 ¶ 32.  While bin Nayef's chief of staff, Aljabri alleges that he developed a close relationship with the U.S. intelligence community.  *Id.* ¶¶ 146–50.  He also supposedly learned information that could damage bin Salman's reputation.  *Id.* ¶ 145.  At the time, bin Salman was the Deputy Crown Prince of Saudi Arabia—and thus second in line to the throne behind bin Nayef.  *Id.* ¶ 156.  Twice in 2015, Aljabri alleges that he met with the Director of the CIA, and at one of those meetings he discussed bin Salman, which supposedly angered bin Salman.  *Id.* ¶¶ 151–52.  One month after the second CIA meeting, the King of Saudi Arabia (supposedly at bin Salman's behest) removed Aljabri from his government positions, allegedly citing Aljabri's "unauthorized meetings with [the] CIA" as justification.  *Id.* ¶ 153.  Fast forward almost two years; bin Salman was allegedly trying to build a rapport with the incoming Trump administration, supposedly making (unspecified) promises.  *Id.* ¶¶ 155–57.  Then Aljabri alleges that it was reported that bin Nayef hired a lobbying firm with ties to the administration.  *Id.* ¶ 163.  Aljabri alleges that then, he decided to flee Saudi Arabia.  *Id.* ¶ 164.  And that soon after he left, bin Salman had all those involved with the lobbying contract arrested, and bin Salman's people were looking for Aljabri.  *Id.* ¶¶ 164–65.  A month later, bin Salman allegedly "ousted" bin Nayef as Crown Prince.  *Id.* ¶ 171.  The specific attempt to kill Aljabri alleged in the complaint supposedly took place in Canada in 2018.  *Id.* ¶ 17.  By that time, Aljabri had not worked for the Saudi government for over three years.

From these allegations, the Court could reasonably infer various motives on bin Salman's part related to his efforts to seize and maintain power in Saudi Arabia.  But inferring that he tried to kill Aljabri specifically to impact the U.S. intelligence community is a bridge too far.

Another court in this Circuit recently refused to draw a similarly speculative inference.  In that case, an American citizen sued officials in the Democratic Republic of the Congo ("DRC") for allegedly kidnapping and torturing him in the DRC.  *Lewis v. Mutond*, 568 F. Supp. 3d 47, 49 (D.D.C. 2021).  The plaintiff argued that the court could exercise personal jurisdiction over the defendants because their actions were "purposefully directed" at the United States and American citizens.  *Lewis v. Mutond*, Pl.'s Mem. Opp., No. 16-cv-1547 (RCL), ECF No. 16 at 22 (D.D.C. Mar. 24, 2017).  His reasoning, in part, was that the defendants targeted him "to ensnare the United States in DRC affairs by promoting a narrative about American mercenaries operating in the DRC."  *Lewis*, 568 F. Supp. 3d at 53.  The plaintiff alleged that the defendants made comments about him being a mercenary, and at press conferences one allegedly said "that 600 United States citizens and some ex-soldiers had entered the DRC . . . and were part of a supposed plot by [the President's opponent] to destabilize the DRC."  *Id.* at 52 (cleaned up).  Still, the court found that it could not plausibly draw such a line connecting the defendants' alleged actions and the United States.  The court explained that those "references" to the United States "appear[ed] incidental to [the defendants'] goal—affecting politics in the DRC."  *Id.* at 53.  And the court could not "infer that [the defendants] purposefully directed their conduct at the United States when [the plaintiff's] allegations point their intent squarely at the DRC."  *Id.*  Similarly, in this case, Aljabri's allegations "point [bin Salman's] intent squarely at" Saudi Arabia and consolidating his power there, as opposed to affecting the U.S. intelligence community.  *Id.*

16

Aljabri argues that the Circuit's decision in *Mwani* counsels against this approach.  There, the Circuit found that personal jurisdiction was proper over Osama bin Laden and al Qaeda for a bombing orchestrated outside the American embassy in Kenya because the plaintiffs offered "allegations and evidence . . . that bin Laden and al Qaeda orchestrated the bombing . . . to cause pain and sow terror in . . . the United States."  *Mwani*, 417 F.3d at 13.  According to Aljabri, the Circuit "did not ask whether bin Laden had targeted Kenya *more than* the United States," so this Court should not ask whether bin Salman targeted Saudi Arabia more than the United States.  ECF No. 102 at 90.  Fair enough.  But the problem for Aljabri is not that the facts alleged suggest that bin Salman was targeting Saudi Arabia *more than* the United States, but that they do not support an inference that bin Salman was targeting the United States *at all*.  For that reason, Aljabri's theory that bin Salman was "purposefully targeting" the U.S. intelligence community fails.

### ii.    "Directed Conduct" in the United States

Aljabri's second theory, that bin Salman directed conduct "on U.S. soil," is perhaps a closer call, but in the end, it fares no better.  ECF No. 102 at 85 (cleaned up).  Aljabri's logic is that, to kill him, bin Salman had to find him.  And to find him, bin Salman "deployed operatives into the United States" where they questioned Aljabri's family and friends.  *Id.* at 88.  In other words, Aljabri argues that the alleged conduct of these third parties in the United States can be imputed to bin Salman for this Court to exercise jurisdiction over him.

In general, "a plaintiff cannot aggregate factual allegations concerning multiple defendants in order to demonstrate personal jurisdiction over any individual defendant."  *Duarte v. Nolan*, 190 F. Supp. 3d 8, 11 (D.D.C. 2016) (cleaned up), *aff'd*, 2017 WL 7736939 (D.C. Cir. Apr. 18, 2017) (per curiam).  Of course, the defendant's relationship with others in the United States "may be significant in evaluating [his] ties to the [country]."  *Rush v. Savchuk*, 444 U.S. 320, 332 (1980).

But the minimum contacts necessary for personal jurisdiction must be shown for "each defendant over whom a . . . court exercises jurisdiction." *Id.* One exception to this general rule is to adequately plead the existence of an agency relationship. *See, e.g.*, *Gregorio v. Gordon*, 215 F. Supp. 3d 1, 5 (D.D.C. 2015); *Williamson v. Petrosakh Joint Stock Co.of the Closed Type*, 952 F. Supp. 495, 498 (S.D. Tex. 1997).[4]   Aljabri, however, has alleged insufficient specific facts that would allow the Court to infer that bin Salman directed an agent of his to look for Aljabri in the United States.[5]

Aljabri's factual support for this theory falls into three categories.  First, there are his allegations about MiSK.  Bin Salman allegedly funds MiSK, which is run by bin Salman's close associate, Alasaker.  ECF No. 66 ¶¶ 68, 70.  Bin Salman is also the Chairman of the Board of Directors.  *Id.* ¶ 68.  Allegedly, MiSK "has carried out extensive activities in the United States," including programs for Saudi students.  *Id.* ¶¶ 72, 74.  On Aljabri's information and belief, MiSK also "provides funding and support to Saudi groups in the United States via SACM, with which . . . MiSK entered into a cooperation agreement in 2018 at Defendant bin Salman's directive."  *Id.*

---

[4] Conspiracy allegations are another exception.  For example, under the District of Columbia long-arm statute, "acts undertaken within the forum by one co-conspirator in furtherance of an alleged conspiracy may subject a non-resident co-conspirator to personal jurisdiction."  *Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119, 140 (D.D.C. 2004).  But "as far as the Court is aware, no court to have considered the question has permitted the assertion of conspiracy jurisdiction under Rule 4(k)(2)."  *Ofisi v. Al Shamal Islamic Bank*, No. 15-cv-2010 (JDB), 2019 WL 1255096, at *5 n.8 (D.D.C. Mar. 19, 2019) (citing *In re Aluminum Warehousing Antitrust Litig.*, 90 F. Supp. 3d 219, 226-27 (S.D.N.Y. 2015)).  And in any event, Aljabri does not seek to invoke this exception.

[5] Aljabri tries to argue that an agency relationship is unnecessary because the question is whether bin Salman "purposefully directed" actions at the forum.  ECF No. 102 at 93.  He says that, in other cases involving purposeful "targeting" or "direction," the courts did not ask if the defendants had an agency relationship with those that helped them carry out torts aimed at the United States. *Id.* at 93–94.  But this argument conflates Aljabri's two theories, which even he describes as "independent."  *Id.* at 85.  And the Court has already rejected the argument that bin Salman was purposefully targeting the United States.

¶ 75; *see also id.* ¶ 228.  And Saudi students have anonymously told reporters that the Saudi government watches their conduct in the United States, with "one or two spies" inside every Saudi student club.[6]  *Id.* ¶ 229.  From these facts, Aljabri concludes that bin Salman and Alasaker "control[]" MiSK and, by extension, SACM, and the two use both organizations "to cultivate and consolidate control over a network of deeply loyal and trusted Saudi students in the United States, all while maintaining an air of legitimacy that prevented serious scrutiny of [his] operations."  *Id.* ¶¶ 69, 79–80, 238.

The second category of allegations concerns three specific Saudi nationals and then-students in the United States—Alrajhi, Alhamed, and Abuljadayel—each of whom allegedly has loose connections to MiSK and SACM.  Taking each in turn, Alrajhi allegedly lives somewhere "in the Washington, D.C. metropolitan area" and is a Ph.D. candidate in the Microbiology Department at Howard University.  ECF No. 66 ¶ 88.  On Aljabri's information and belief, Alrajhi "either works or has worked" for MiSK.  *Id.* ¶ 90.  Alrajhi also participated in a MiSK-sponsored leadership event at Harvard University in 2015.  *Id.*  In addition, Alrajhi supposedly "attended events" for a Saudi student group "in which Defendants Alhamed and Albuljadayel held leadership positions."  *Id.*  After bin Salman was named the Crown Prince, Alrajhi allegedly went to the Saudi embassy in Washington, D.C. and "sw[ore] his allegiance to Defendant bin Salman."  *Id.* ¶ 91.  Alrajhi is also supposedly close with the head of SACM; Alrajhi visited him in the hospital and spoke at his retirement party.  *Id.* ¶ 92.  And Alrajhi "regularly retweets and replies . . . on Twitter"

---

[6] There is a criminal case pending in California that claims former Twitter employees tried to get private information about accounts critical of bin Salman and the Saudi Royal Family at Alasaker's behest, and one of the Twitter employees was eventually hired by MiSK.  *Id.* ¶ 45.  But the employees are not alleged to be involved in this case.

to Alhamed, Abuljadayel, Alasaker, and MiSK.  *Id.* ¶ 91.  That said, Aljabri points to no tweets about him, nor does he allege that any Defendant ever responded to Alrajhi.

Alhamed was allegedly a student at Lasell University in Massachusetts from 2016 to 2020. During those years, he was allegedly involved in several Saudi student groups, at least one of which was "a SACM student club."  ECF No. 66 ¶ 98.  Like Alrajhi, Alhamed "was selected to deliver a speech at the retirement party for" the head of SACM and "visited [him] in the hospital." *Id.* ¶ 95.  Aljabri also alleges that Alhamed "founded .  .  . an organization that holds itself out as a public relations and youth advocacy organization focused on promoting Defendant bin Salman's plan for economic and social reform."  *Id.* ¶ 96.  Bin Salman is supposedly Chairman of the Board of Directors of the organization's "partner and project sponsor."  *Id.*  Aljabri further alleges that, since 2018, Alhamed has been the Event Manager at a different "public relations firm purportedly focused on the United States-Saudi Arabia relationship," which "was founded by .  .  . a close associate of Defendant Alasaker."  *Id.* ¶ 97.  On Aljabri's information and belief, bin Salman "substantially fund[s]" the firm.  *Id.*  And Alhamed "has been widely quoted in the media and has published articles about these roles and organizations."  *Id.* ¶ 99.  Additionally, Alhamed allegedly "made frequent trips to Washington, D.C., which often involved meetings at the Saudi Embassy." *Id.* ¶ 94.  He also supposedly "provided assistance in connection with a visit by Defendant Alassiri to Washington, D.C., and has been tasked with handling sensitive matters for Defendant bin Salman's brother," though these allegations lack any further detail.  *Id.* ¶ 101.  Lastly, Aljabri alleges that Alhamed too "regularly retweets, replies to, and mentions other Defendants on Twitter," though, again, Aljabri does not point to any tweets about him, or allege that any Defendant ever responded to Alhamed.  *Id.* ¶ 104.

Finally, Abuljadayel is alleged to have graduated from Boston University School of Dental Medicine in 2017.  ECF No. 66 ¶ 105.  She was a leader in the same Saudi student clubs as Alhamed, one of which "was overseen by SACM."  *Id.* ¶ 106.  Abuljadayel allegedly participated in MiSK leadership programs in Boston in 2016 and 2017, and Aljabri alleges that she "has been paid for work for the MiSK Foundation," though he does not specify the work for which she was paid.  *Id.*  Aljabri also highlights that Abuljadayel once "publicly thanked Defendants Alasaker and bin Salman 'for everything that MiSK has provided,'" citing a tweet.  *Id.* ¶ 107 & n.100.  Like Alrajhi and Alhamed, she too allegedly "regularly retweets and replies to other Defendants on Twitter," but, again, Aljabri does not point to any tweets about him, or allege that any Defendant ever responded to her.  *Id.* ¶ 107.  According to Aljabri, Abuljadayel now works as the head of international communications for Alhamed's public relations firm.  *Id.* ¶ 106.

Aljabri alleges, based on all the above, that "like other Saudi students in the United States, Alrajhi, Alhamed, and Abuljadayel were subject to Defendants bin Salman's and Alasaker's ulti-mate control and authority."  ECF No. 66 ¶ 86.  He also concludes, based on their "leadership" roles and freedom to give "media interviews," that the three were "distinctly trustworthy" and thus "tapped to assist with Defendant bin Salman's campaign to extrajudicially kill [Aljabri]" by "hunt-ing [Aljabri] in the United States."  *Id.* ¶ 85–86.

The third category of allegations concern the actions these three Saudi students and other defendants allegedly took in the United States, supposedly on behalf of bin Salman.  Aljabri alleges that in 2017, months after Aljabri fled Saudi Arabia, and months after Aljabri alleges he falsely told bin Salman that he was going to Boston for medical treatment, the following happened:

- On September 15, MiSK "organized" an event in New York.  ECF No. 66 ¶ 238. Alasaker and Alhamed allegedly "attended" the event.  *Id.*  At that event, the head of SACM supposedly "interrogated a close acquaintance of [Aljabri's]

family," "repeatedly inquir[ing] about [Aljabri's] son's U.S. immigration status." *Id.* On Aljabri's information and belief, Alasaker was at their table when this questioning occurred, though Aljabri does not say that Alasaker participated in any way. *Id.* When the friend told the head of SACM that Aljabri's son had "a permanent resident card," the head of SACM "became visibly upset." *Id.* Aljabri believes that the head of SACM was "upset . . . because [this update] removed an avenue for Defendant bin Salman to coerce [Aljabri's son] back to Saudi Arabia, and thereby gain leverage to lure [Aljabri] back to Saudi Arabia as well." *Id.*

- On September 25, Alhamed and Alrajhi supposedly "made multiple calls to" the same friend that the head of SACM questioned at the MiSK event. ECF No. 66 ¶ 239. On Aljabri's information and belief, they were "directed to do so by Defendant Alasaker, or by [the head of SACM] or one of his close associates acting at the behest of Defendant Alasaker." *Id.* Like the head of SACM, Alhamed and Alrajhi "questioned" the friend about the visa status of Aljabri's son. *Id.* ¶ 240. They also allegedly sought "to extract information about the location and contact information of [Aljabri's] wife on the false pretext of arranging a marriage with [Aljabri's] daughter." *Id.* Aljabri claims that "[b]y adopting this pretext," the two "were able to obscure their true intent and avoid asking about [Aljabri] directly." *Id.*

- On September 28 and 29, Alhamed and Alrajhi allegedly "each proceeded to contact" the same friend again, "demanding" that the friend "meet with Defendant Alrajhi in person." ECF No. 66 ¶ 241. Alrajhi said that "he would fly to Boston, Massachusetts for the meeting." *Id.* "Instead, . . . Alrajhi obtained from [the friend] a phone number for [Aljabri's] son." *Id.* ¶ 242.

- On September 29, Alrajhi allegedly contacted Aljabri's son, "who had just finished a medical fellowship in Boston," to set up a meeting to "discuss a medical conference organized by SACM." ECF No. 66 ¶ 243. The two met at a hotel in Boston. *Id.* ¶ 243. There, Aljabri alleges that Alrajhi "attempted to extract information about [the son's] U.S. immigration status and contact information for [Aljabri's] wife" to "propose a marriage to one of [Aljabri's] daughters." *Id.* ¶ 243. Aljabri's son allegedly "revealed that members of his family were residing in London." *Id.* And he "informed Defendant Alrajhi that he was not a U.S. citizen." *Id.* According to Aljabri, this was "significant for purposes of the hunt for [Aljabri] insofar as it meant that Defendant bin Salman could control [Aljabri's son's] legal status and in turn use him as a tool to lure [Aljabri] back to Saudi Arabia." *Id.*

- On October 2, Abuljadayel supposedly contacted Aljabri's son's wife "out of the blue," using contact information provided by the same family friend discussed above. ECF No. 66¶ 244. She told Aljabri's son's wife "that she had recently arrived in London and purportedly suddenly thought of [the] wife." *Id.* Aljabri alleges that Abuljadayel then used "the pretext of getting together in

London" in an "attempt[] to extract the whereabouts and contact information of [Aljabri's] wife." *Id.*

- On October 7, Alharbi, another defendant who is an old acquaintance of Aljabri, allegedly met with a different one of Aljabri's sons in Boston. ECF No. 66 ¶ 249. The "Aljabri family trusted Defendant Alharbi because he had worked for many years in Saudi Arabia in close cooperation with [Aljabri] and Mr. bin Nayef." *Id.* When he met with Aljabri's son, Alharbi focused in on Aljabri and his family, "ask[ing] highly intrusive and unusual questions about [Aljabri], including about his health and doctors' appointments and whether he was attending checkups." *Id.* ¶ 250. Alharbi also allegedly "requested information about [the son's] siblings, travel of the Aljabri family from Turkey to the United Sates, and about whether his family remained in Turkey." *Id.*

- More than a month later, around November 27, another defendant, Hani Hamed, allegedly "approached the front desk" of the same hotel Alrajhi met one of Aljabri's sons, and "said that he was there to visit [Aljabri]." ECF No. 66 ¶ 245. When the front desk connected Hamed with Aljabri's son, Hamed "stated that he was attempting to contact [Aljabri] to obtain financial assistance for cataract surgery." *Id.* Aljabri's son "advised that [Aljabri] was not presently at the Boston, Massachusetts home," which Aljabri says, "allow[ed] Defendant Hamed to confirm [Aljabri's] affiliation with the [hotel] apartment." *Id.* "The concierge and security personnel for the [hotel] observed Defendant Hamed surveilling the hotel on numerous occasions thereafter." *Id.*[7]

Aljabri further alleges that these events all took place while "Defendant Alqahtani and members of Defendant bin Salman's Tiger Squad were torturing [Aljabri's] son-in-law . . . in Saudi Arabia and interrogating him about [Aljabri's] location." *Id.* ¶ 246.

---

[7] Aljabri also alleges that bin Salman's brother "attempted to extract information from [Aljabri's] son . . . in Boston, Massachusetts regarding [Aljabri's] locations." ECF No. 66 ¶ 131. But based on Aljabri's more specific allegations it is not clear that this conduct happened in Boston. Aljabri goes on to allege only that bin Salman's brother messaged Aljabri's son on WhatsApp asking about Aljabri's location. *Id.* ¶ 237. And Aljabri does not rely on this "contact" at all in support of personal jurisdiction in his opposition to Defendants' motions to dismiss. *See generally* ECF No. 102. But even if this did constitute a contact with the United States, and the Court could infer that bin Salman's brother was acting as an agent of bin Salman, a single WhatsApp message looking for Aljabri a year before the alleged attempted killing would be insufficient to establish personal jurisdiction.

Based on all the above, Aljabri alleges that bin Salman "had control over" Alrajhi, Alhamed, Abuljadayel, and Hamed, and "deployed" them to "carr[y] out" a "U.S. hunt" for him, thus allowing the Court to exercise personal jurisdiction.  ECF No. 102 at 95.

The Court disagrees that the "specific facts" alleged sufficiently support that inference.  *See First Chi. Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378 (D.C. Cir. 1988).  To begin, it cannot say, based on the above, that there was a plausible "agency relationship" between bin Salman and Alrajhi, Alhamed, Abuljadayel, and Hamed such that their U.S.-based conduct could be imputed to him for purposes of personal jurisdiction.  *See Jefferson v. Collins*, 905 F. Supp. 2d 269, 285 (D.D.C. 2012) (a plaintiff must "plead facts that plausibly support an inference" of agency).

"To determine if a party is an 'agent,'" courts look "to the entire relationship for evidence of mutual consent and a sufficient degree of control exercised by the principal."  *Schwartz v. CDI Japan, Ltd.*, 938 F. Supp. 1, 7 (D.D.C. 1996) (citing *Johnson v. Bechtel Assocs. Pro. Corp.*, 717 F.2d 574, 580 (D.C. Cir. 1983), *rev'd on other grounds sub nom, Wash. Metro. Area Transit Auth. v. Johnson*, 467 U.S. 925 (1984)).  But Aljabri has alleged no facts that would allow the Court to infer that there was *any* relationship between bin Salman and the four "operatives."  There is no allegation that any of the four are (or were) employed by bin Salman or the Executive Office of the Crown Prince.  Nothing alleged suggests that they ever met or spoke with bin Salman—even in passing—much less that he even knows who they are.  True, Aljabri points to Alrajhi's and Abuljadayel's participation in a MiSK leadership event, Alrajhi and Alhamed's relationship with the head of SACM, all three students' roles in Saudi student clubs and other Saudi organizations, and all three's posts on social media supportive of bin Salman.  ECF No. 66 ¶¶ 90–92, 95–99, 101, 104–107.  But at best, such allegations show only that three of the four "operatives" have interacted with organizations and individuals connected to bin Salman.  The Court cannot jump from such

tangential connections to finding an agency relationship with bin Salman.  *Cf. Walden*, 571 U.S. at 286 ("Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the random, fortuitous, or attenuated contacts he makes by interacting with other persons affiliated with the State.") (cleaned up).  And allegations about alleged Saudi agents infiltrating Twitter or broadly monitoring the activities of students are no more helpful—indeed, they are wholly unrelated to this case.

Aljabri gets a little closer through his allegations about the actual U.S.-based conduct—but still not close enough.  If Alrajhi, Alhamed, Abuljadayel, or Hamed were "hunting" Aljabri, ECF No. 102 at 95, as agents of bin Salman participating in a murder plot, one would expect allegations more nefarious than what Aljabri has supplied, which amount to several contacts or conversations with or about Aljabri and his family.  To summarize: Alrajhi and Alhamed allegedly asked Aljabri's son about the location of Aljabri's wife to help "arrang[e] a marriage with [Aljabri's] daughter."  ECF No. 66 ¶ 240.  Abuljadayel reached out to Aljabri's wife directly asking to "get[] together in London."  *Id.* ¶ 244.  Hamed supposedly went to the hotel in which Alrajhi met with Aljabri's son looking for Aljabri "to obtain financial assistance for cataract surgery."  *Id.* ¶ 245. He was allegedly seen "surveilling" the hotel after.  *Id.*  On top of that, Alrajhi was allegedly present when the head of SACM asked an "acquaintance" of the Aljabri family about the immigration status of Aljabri's son.  *Id.* ¶ 238.  And another friend of the Aljabri family asked Aljabri's son about Aljabri and his health.  *Id.* ¶ 249.  All this allegedly took place *months* after Aljabri told bin Salman that he was going to the United States and about *a year* before the alleged attempted killing.  *Id.* ¶¶ 172, 272.

To be sure, it is *possible* that these interactions were all intended to find Aljabri so that bin Salman could kill him—that Alrajhi, Alhamed, Abuljadayel, and Hamed were *not* actually trying

to help arrange the marriage of Aljabri's daughter, plan a get together with Aljabri's wife, or obtain financial assistance.  But it is a stretch to say that it is *plausible*.  *See Arora v. Buckhead Fam. Dentistry, Inc.*, 263 F. Supp. 3d 121, 135 (D.D.C. 2017) (asking whether the plaintiff's "amended complaint established any plausible basis for asserting personal jurisdiction").  Even if it were plausible, the best the Court could say is that the "operatives" were acting consistent with bin Salman's interests, not that they were acting subject to his control—and with their consent—such that they were his agents for personal-jurisdiction purposes.  *See Associated Producers, LTD v. Vanderbilt Univ.*, 76 F. Supp. 3d 154, 166–67 (D.D.C. 2014) ("[A]n employer's simple encouragement and approval of an employee's outside activities without any allegation that the employee's activities were in any way subject to the employer's control does not establish an agency relationship.").

All in all, from the specific facts alleged, Aljabri has not plausibly alleged that bin Salman "authorize[d]" any of the above individuals "to act on his behalf subject to his control" and that they "consent[ed] to do so."  *Gregorio*, 215 F. Supp. 3d at 5 (cleaned up).  Thus, the Court cannot use their conduct to find that bin Salman "purposefully avail[ed]" himself "of the privilege of conducting activities" in the United States.  *Id.* (cleaned up).

Aljabri also tries to tie the "Tiger Squad" defendants to the United States and then back to bin Salman.  But there is no allegation that any member of the Tiger Squad ever had any contact with the United States.  Aljabri alleges that bin Salman and his "agents" were overheard saying that they "planned to send men to kill [Aljabri] in Canada 'by land' this time."  ECF No. 66 ¶ 355. And Aljabri takes that to mean through the United States and "across the border into Canada."  *Id.* But Aljabri does not allege that the Tiger Squad in fact did that.  Grasping at straws, Aljabri asserts for the first time in his opposition that some Tiger Squad defendants would have flown over U.S.

airspace to get to Canada.  ECF No. 102-1 ¶ 4.  But Aljabri cannot make new allegations in his opposition brief.  *See Reeves v. Fed. Bureau of Prisons*, 885 F. Supp. 2d 384, 389 n.4 (D.D.C. 2012).  In any event, the "fortuitous circumstance" of an airplane "passing through" United States airspace would not amount to sufficient minimum contacts.  *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980).

*     *     *

For all these reasons, this Court cannot exercise personal jurisdiction over bin Salman. Under either theory, his alleged suit-related contacts with the United States do not satisfy due process.  But even if those tenuous contacts *were* somehow sufficient, the Court could still not exercise personal jurisdiction over him, because doing so would not comport with "traditional notions of fair play and substantial justice."  *Asahi*, 480 U.S. at 105 (cleaned up).  When looking to the reasonableness of exercising jurisdiction, the Supreme Court has instructed courts to consider several factors: (1) the "burden on the defendant," (2) the "interests of the forum," (3) "the plaintiff's interest in obtaining relief," (4) "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and (5) "the shared interest of the several States in furthering fundamental substantive social policies."  *Asahi*, 480 U.S. at 113 (cleaned up).

Under the circumstances, bin Salman has made a "compelling" showing why it would be unreasonable for the Court to exercise personal jurisdiction.  *See Mwani*, 417 F.3d at 14.  First, the burden on him would obviously be substantial.  He is a high-ranking foreign official—the Crown Prince and de facto head of state—who would be forced "not only to traverse the distance between" Saudi Arabia and this Court, "but also to submit [this] dispute with [Aljabri] to a foreign nation's judicial system."  *Asahi*, 480 U.S. at 114.  "The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of

27

stretching the long arm of personal jurisdiction over national borders." *Id.* And this burden is even more substantial given that the dispute at issue is an internal one between current and former members of the Saudi government.

Second and third, "the interests of the plaintiff and the forum in [the United States'] assertion of jurisdiction over [bin Salman] are slight." *Asahi*, 480 U.S. at 114. The Court finds these factors particularly relevant. The plot to kill Aljabri was allegedly hatched in Saudi Arabia as part of an internal dispute between members of the Saudi government, and it came close to being fully realized in Canada. Neither Aljabiri nor bin Salman are United States citizens, nor do either reside in the United States, which "considerably diminishe[s]" the United States' interest in the dispute. *Id*. For Aljabri's part, he has not shown that "it is more convenient . . . to litigate [his] . . . claim against [bin Salman] in [the United States] rather than in" Canada, where the plot almost came to fruition and where he resides. *Id.*

Finally, for all the above reasons, the "procedural and substantive interests" of Saudi Arabia and Canada in this matter are no doubt greater than that of the United States. *Asahi*, 480 U.S. at 115. The Supreme Court has cautioned that "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." *Id*. (quoting *United States v. First Nat'l City Bank*, 379 U.S. 378, 404 (1965)). Thus, "[c]onsidering the international context, the heavy burden on the alien defendant, and the slight interests of the plaintiff and the [United States]," the Court holds that its exercise of personal jurisdiction over bin Salman "in this instance would be unreasonable and unfair." *Id*. at 116.

        **b.**      **Alasaker, Alqahtani, Alassiri, and the "Tiger Squad" Defendants**

For largely the same reasons this Court cannot exercise personal jurisdiction over bin Salman, it also cannot exercise personal jurisdiction over the other Rule 4(k)(2) defendants—Alasaker, Alqahtani, Alassiri, and the members of the "Tiger Squad" allegedly dispatched to kill Aljabri.

Aljabri's primary justification for exercising personal jurisdiction over these defendants is that they "knowingly executed bin Salman's plot," which was purportedly targeted at the United States, so they too purposefully targeted the United States. ECF No. 102 at 97; *see also id.* at 99–102. But the Court has explained why Aljabri has not shown that any plot by bin Salman was so targeted at the United States, based on the facts alleged.

Aljabri also points to individual contacts some of these defendants supposedly had with the United States, but none of these contacts relate to this suit, so they do not satisfy the requirement that there be a "strong relationship among the defendant, the forum, and the litigation." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1028 (2021) (cleaned up). For instance, Aljabri alleges that Alasaker travelled to the United States an average of two times a year, sometimes attending MiSK events. ECF No. 66 ¶¶ 41, 45, 104 n.96, 238. But Aljabri never alleges that these visits had anything to do with an alleged plot to kill him.[8] Aljabri also claims that Alqahtani "executed contracts with U.S. public relations firms" and "served as a director of MiSK," and that Alassiri "visited the United States." ECF No. 102 at 100–101 (citing ECF No. 66 ¶¶ 57–58, 67). But again, he alleges no facts tying those contacts to the claims here.[9] And the

---

[8] The closest Aljabri gets is with his allegations surrounding the MiSK event in New York in September 2017, which Alasaker supposedly attended. There**,** the head of SACM, sitting at Alasaker's table, allegedly questioned Aljabri's family friend about Aljabri's son. ECF No. 66 ¶ 238. But Aljabri does not allege that Alasaker took part in the questioning, or even that he witnessed it.

[9] Contrary to Aljabri's claims, a lack of specific facts does not create a "factual discrepanc[y]" to be resolved in his favor. ECF No. 102 at 101.

Court has already rejected Aljabri's argument that the Tiger Squad defendants' alleged flight over the United States on their way to Canada subjects them to this Court's personal jurisdiction.

Finally, just like bin Salman, exercising jurisdiction over these defendants would not comport with "traditional notions of fair play and substantial justice." *Asahi*, 480 U.S. at 105 (cleaned up). Alasaker, Alqahtani, Alassiri, and the Tiger Squad defendants are all government officials in Saudi Arabia that would have to travel to the United States and submit this dispute to a foreign tribunal. *Id.* at 114. And for the reasons already explained, the United States has little interest in asserting jurisdiction over this dispute, and Aljabri has not shown that it is more convenient to litigate the suit here as opposed to Canada. *See id.* Thus, the Court may not exercise personal jurisdiction over these defendants.

### 2. The District of Columbia's Long Arm Statute

Aljabri also argues that this Court has "specific" personal jurisdiction over MiSK, Alrajhi, and Hamed through the District of Columbia's long-arm statute—specifically, D.C. Code § 13-423(a)(1). ECF No. 102 at 84. This section allows "the exercise of personal jurisdiction over nonresident defendants to the extent permitted by the due process clause of the United States Constitution where a claim for relief arises out of business a defendant transacts in the District of Columbia." *Citadel Inv. Grp., L.L.C. v. Citadel Cap. Co.*, 699 F. Supp. 2d 303, 309 (D.D.C. 2010) (cleaned up). "To invoke § 13-423(a)(1), the plaintiff must first make a threshold showing 'that the defendant has purposefully engaged in some type of commercial or business-related activity directed at District residents.'" *IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 110 (D.D.C. 2018) (emphasis removed) (quoting *Holder v. Haarmann & Reimer Corp.*, 779 A.2d 264, 270–71 (D.C. 2001)). Once that is met, the provision is "coextensive with the due process clause" requirements outlined above for the Rule 4(k)(2) context. *Helmer v. Doletskaya*, 393 F.3d 201, 205 (D.C.

Cir. 2004). The only difference is that contacts must be with the District specifically, not just the United States.

### a.   MiSK

Aljabri claims that this Court has personal jurisdiction over MiSK under § 13-423(a)(1) because MiSK "conducted business in the District that recruited, developed, funded, and legitimized a network of U.S. agents to further the personal goals of its founder, bin Salman, and this activity relates to [Aljabri's] claim." ECF No. 102 at 104. But the Court already explained that Aljabri has not plausibly alleged that bin Salman and Alasaker used MiSK to recruit Saudi student "agents" generally or to recruit the supposed "operatives" involved here specifically.

Even if the Court could infer from Aljabri's factual allegations that MiSK was somehow involved in the plot against Aljabri, Aljabri offers no specific facts tying MiSK's involvement to the District. Aljabri never alleges that a specific "operative" involved here was recruited at an event in the District of Columbia. He does not deny that all but two of MiSK's alleged "activities" in the District occurred *after* the supposed Saudi student "operatives" searched for Aljabri. *See* ECF No. 113 at 7; *see also* ECF No. 102 at 104–05; ECF No. 66 ¶ 134 & n.121, 122. And it is unclear how the two that occurred beforehand—signing a contract for a business school in Saudi Arabia and donating to a global women's initiative—had anything to do with this case. ECF No. 66 ¶¶ 135–36. Aljabri claims that MiSK's District-based conduct was used to "project[] an image of legitimacy" that provided "cover" for more nefarious doings. ECF No. 102 at 105. But that vague theory—unsupported by any specific factual allegations—is in no way tied to the claims here. Put differently, there are no specific facts that allow this Court to infer that MiSK's activities in the District provided cover specifically for any activity related to Aljabri. *See Bristol-Myers*

*Squibb Co. v. Super. Ct. of Cal.*, 137 S. Ct. 1773, 1781 (2017) (When there is no "affiliation be-tween the forum and the underlying controversy, . . . . specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State.").

      **b.**      **Alrajhi**

The Court cannot exercise personal jurisdiction over Alrajhi for a different reason.  According to Aljabri, jurisdiction over Alrajhi is proper because Alrajhi (1) "leveraged his status" as a student at Howard University, which is in the District, to meet with Aljabri's son; (2) flew from the District to Boston, to meet with Aljabri's son; and (3) "leveraged ties" made in the District as a graduate student at Howard.  ECF No. 102 at 107, 108 (citing ECF No. 66 ¶¶ 91–92, 138, 242–43).  But, for one thing, flying *out* of the District, presumably from Reagan National Airport in Virginia, is not a contact *with* the District.  And the other two arguments fail given the requirement that "the defendant [must have] purposefully engaged in some type of *commercial or business-related activity* directed at District residents."  *IMAPizza*, 334 F. Supp. 3d at 110 (cleaned up).  Aljabri alleged that Alrajhi participated in professional activities in the District—attending school at Howard and programming with the Saudi Embassy and SACM.  ECF No. 102 at 108.  But this Court has pointed out that "professional activities that physically take place in the District" do not "necessarily constitute 'business transactions' within the meaning of the statute."  *IMAPizza*, 334 F. Supp. 3d at 111.  Indeed, in *Etchebarne-Bourdin v. Radice*, 982 A.2d 752 (D.C. 2009), the District of Columbia Court of Appeals concluded that attending continuing-medical-education courses in the District "did not constitute 'transacting any business.'" *Id.* at 758.  Thus, Aljabri has not alleged that Alrajhi conducted any business in the District relevant to Aljabri's claims.  For

this reason, the Court lacks personal jurisdiction over him as well.[10]

### c.   Hamed

Aljabri's only argument for exercising personal jurisdiction over Hamed is based on Hamed's alleged "participation in a conspiracy to kill [Aljabri]." ECF No. 102 at 108. "Conspiracy jurisdiction under [§ 13-423(a)(1)] presumes that persons who enter the forum and engage in conspiratorial acts are deemed to transact business there directly; and [co-]conspirators who never enter the forum are deemed to transact business there by an agent." *Jung*, 300 F. Supp. 2d at 141 (cleaned up). To rely on the theory, the plaintiff "must allege (1) the existence of a conspiracy; (2) the nonresident's participation in or agreement to join the conspiracy; and (3) an overt act taken in furtherance of the conspiracy within the forum's boundaries" by a co-conspirator. *Id.* Critically, that "overt act" must have been "sufficient to subject the alleged co-conspirator to jurisdiction under the D.C. long-arm statute." *FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 479 F. Supp. 2d 30, 42 (D.D.C. 2007), *aff'd*, 529 F.3d 1087 (D.C. Cir. 2008), *overruled on other grounds by Erwin-Simpson v. AirAsia Berhad*, 985 F.3d 883 (D.C. Cir. 2021). Aljabri has not sufficiently alleged the latter two elements.

First, even if Aljabri has sufficiently alleged a conspiracy to kill him, he has not alleged sufficient facts to tie Hamed to any such conspiracy. Indeed, Aljabri has alleged no facts connecting Hamed to the other defendants, only that Hamed in some way "surveilled" a hotel in Boston after Aljabri's son suggested to Alrajhi that Aljabri was staying there. ECF No. 66 ¶ 245. Aljabri

---

[10] Aljabri cites one case in which a court in this Circuit concluded that it had personal jurisdiction over a defendant because he "attended the George Washington School of Business in Washington, D.C." *Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107, 121- 22 (D.D.C. 2012). But in that case, the defendant did not contest personal jurisdiction. Indeed, the defendant did not "identify any basis for asserting lack of personal jurisdiction" or make any "legal, factual, or other arguments whatsoever regarding personal jurisdiction." *Id.*

claims that his residence there was not public knowledge, so the only way Hamed could have learned about it was if Alrajhi told him. *Id.* But Hamed points out that Aljabri and his son filed public records reflecting his ownership of property there months before Alrajhi met with Aljabri's son. ECF No. 111 at 17.[11] Either way, the Court cannot infer that Hamed entered a conspiracy to kill Aljabri from this single allegation.

Second, the relevant "overt acts" Aljabri alleges took place in the District are those undertaken by MiSK and Alrajhi. ECF No. 102 at 75–76. But the Court has already found these contacts insufficient for exercising specific jurisdiction under § 13-423(a)(1). This independently precludes the use of conspiracy jurisdiction to exercise personal jurisdiction over Hamed. *See FC Inv. Grp.*, 479 F. Supp. 2d at 41 ("Because plaintiffs have failed to demonstrate that this Court may exercise jurisdiction over [defendant's] co-conspirator, the Court may not exercise jurisdiction over [defendant] under the doctrine of conspiracy jurisdiction."); *see also Orellana v. CropLife Int'l*, 740 F. Supp. 2d 33, 40 (D.D.C. 2010).

### 3.    Jurisdictional Discovery

As an alternative, Aljabri requests jurisdictional discovery for bin Salman, Alasaker, Alqahtani, Alassiri, the Tiger Squad defendants, MiSK, Alrajhi, and Hamed. But he has not made the requisite showing.

A court "has broad discretion in its resolution of jurisdictional discovery problems, and the standard for permitting jurisdictional discovery is quite liberal." *Staggs v. Smith & Wesson*, No. 21-cv-2535 (JEB), 2022 WL 444110, at *7 (D.D.C. Feb. 14, 2022) (cleaned up). That said, "to obtain jurisdictional discovery a 'plaintiff must have at least a good faith belief that such discovery

---

[11] "[C]ourts may consider extrinsic evidence in disposing of a motion to dismiss for lack of personal jurisdiction." *Frost v. Cath. Univ. of Am.*, 960 F. Supp. 226, 231 (D.D.C. 2013), *aff'd*, 555 F. App'x 6 (D.C. Cir. 2014).

will enable it to show that the court has personal jurisdiction over the defendant.'" *Livnat v. Pal-estinian Auth.*, 82 F. Supp. 3d 19, 24 (D.D.C. 2015) (quoting *Caribbean Broad. Sys. Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1090 (D.C. Cir. 1998)).   To show such a good faith basis, a plaintiff must allege at least some facts on which "jurisdiction could be found after discovery is completed." *Doe I v. Israel*, 400 F. Supp. 2d 86, 122 (D.D.C. 2005).   A plaintiff's requests "cannot be based on mere conjecture of speculation." *Lewis*, 568 F. Supp. 3d at 54 (cleaned up), at *4; *see also IMAPizza*, 334 F. Supp. 3d at 108.   And a "court does not abuse its discretion when it denies a discovery request that would amount to nothing more than a fishing expedition." *Bastin v. Fed. Nat'l Mortg. Ass'n*, 104 F.3d 1392, 1396 (D.C. Cir. 1997).

Aljabri claims that he would seek discovery about five categories of information: (1) communications between defendants that he thinks will "underscore the involvement of and control exercised by bin Salman, Alasaker, Alqahtani, Alassiri, and MiSK over the U.S.-Based Covert Agent Defendants in the United States"; (2) communications with the Tiger Squad defendants that he thinks will show that they acted "in concert with and at the direction of the other defendants and targeted U.S. interests"; (3) information about the Tiger Squad defendants' travel, in case they went through the United States; (4) any "D.C.-based suited-related contacts of MiSK, Alrajhi, and Hamed"; and (5) bin Salman's "directive" to kill Aljabri in Canada by going through the United States, "including efforts to carry it out."   ECF No. 102 at 111–12.   There are several problems with these requests.

To start, any information revealed by such discovery would not change this Court's con-clusion that due process bars it from exercising personal jurisdiction over the Rule 4(k)(2) defend-ants—bin Salman, Alasaker, Alqahtani, Alassiri, and the Tiger Squad defendants.   As the Court explained above, even if Aljabri had pled facts showing these defendants had sufficient minimum

contacts with the United States, exercising personal jurisdiction still would be unreasonable.  *See also Asahi*, 480 U.S. at 114.  There is no reason to believe the information Aljabri seeks would change that conclusion.

Even if the Court had not reached that conclusion, though, it would still deny Aljabri's request.  For one thing, the categories of discovery he seeks are largely "ill-defined and overly broad."  *Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158, 188 (D.D.C. 2018).  Requests for all "communications" between defendants related to the "hunt" in the United States and "leading up to or concerning" the Tiger Squad's alleged attempts to enter Canada in 2018 are not "narrowly tailored to produce information relevant to the issue of" personal jurisdiction.  *Coal. for Mercury–Free Drugs v. Sebelius*, 725 F. Supp. 2d 1, 5 (D.D.C. 2010), *aff'd*, 671 F.3d 1275 (D.C. Cir. 2012).  Nor do they constitute the requisite "detailed showing" of the new, relevant information such discovery would yield.  *Shaheen v. Smith*, 994 F. Supp. 2d 77, 89 (D.D.C. 2013) (cleaned up).

For another, the requests are based on "conjecture" and "speculation."  *Lewis*, 586 F. Supp. 3d at 54 (cleaned up).  Aljabri has not shown "plausible factual support" that "communications" between defendants would yield any information relevant to personal jurisdiction.  *Toumazou v. Turkish Republic of N. Cyprus*, 71 F. Supp. 3d 7, 18 (D.D.C. 2014) (cleaned up).  He just guesses that it would, based on speculative inferences the Court has already rejected.  Likewise, Aljabri has shown no reason to believe that MiSK, Alrajhi, or Hamed had any other relevant contacts with the District of Columbia, other than the ones the Court has already found insufficient.  His request for any information about their "D.C.-based suit related contacts" is nothing but a "fishing expedition in the hopes of discovering some basis of jurisdiction."  *In re Papst Licensing GMBH & Co. KG Litig.*, 590 F. Supp. 2d 94, 101 (D.D.C. 2008) (cleaned up); *see also Trump v. Comm. on Ways*

*& Means*, 415 F. Supp. 3d 98, 112 (D.D.C. 2019) (finding insufficient "general statements about wishing to conduct discovery into the New York Defendants' potential contacts with the District and into the alleged coordination between Attorney General James and the House to disclose Mr. Trump's financial information").

The closest Aljabri comes to a sufficiently detailed request with "plausible factual support" are his requests about the Tiger Squad defendants' travel. He has already alleged that bin Salman was overheard directing the Tiger Squad to reach Aljabri a second time by traveling to Canada "by land," which could mean by going through the United States. ECF No. 66 ¶ 355. And discovery on efforts to carry out that directive could corroborate that. But again, even if that happened, it would not change the Court's decision. Assuming the Court could infer that the Tiger Squad defendants were acting as bin Salman's agents, and they went "by land" at some point to reach Aljabri in Canada, such "contact" with the United States would not render personal jurisdiction over bin Salman appropriate here. For example, that would not suggest that bin Salman "purpose-fully directed" the plot at the United States. And going through the United States to reach *another* country, to carry out the plot in that *other* country, would not amount to a "substantial connection" to the United States "sufficient for a court to assert specific jurisdiction." *Bronner v. Duggan*, 249 F. Supp. 3d 27, 39 (D.D.C. 2017) (cleaned up).

Finally, granting Aljabri's discovery requests would "draw this Court into endless discovery disputes." *Cockrum*, 319 F. Supp. 3d at 189. When evaluating a discovery request, "[a] party's need for information is only one facet of the problem. An important factor weighing in the opposite direction is the burden imposed by the discovery orders." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 385 (2004). And disputes stemming from Aljabri's discovery requests would be far from routine. His request for "documents and depositions" would mean deposing not only officials

in the Saudi Arabian government, but also the Crown Prince and de facto head of state.  This Court will not "lightly" set two sovereign nations "onto a collision course," especially when many of Aljabri's jurisdictional requests "ask for everything under the sky," and there is no particular reason to believe any of the material sought would change this Court's conclusion.  *Id.* at 387, 389.

*     *     *

In the end, Aljabri has sued bin Salman, Alasaker, Alqahtani, Alassiri, Alsaleh, Alsayed, Algasem, Alhaqbani, Alhomid, Albawardi, Bader Alqahtani, MiSK, Alrajhi, and Hamed about an alleged plot orchestrated in Saudi Arabia, by the Crown Prince of Saudi Arabia, to kill a Saudi and Maltese national in Canada.  Given the nature of such claims as well as the specific facts alleged, the Court cannot exercise personal jurisdiction over those defendants.  Nor will it grant Aljabri's alternative request to wade into their communications and contacts with the forum.  Thus, the claims against these defendants are dismissed.[12]

### B.      Failure to State a Claim

Alhamed and Abuljadayel did not raise personal jurisdiction and thus waived that argument.  But that does not mean Aljabri's claims against Alhamed and Abuljadayel will proceed. *See Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 453 (D.C. Cir. 1990).

---

[12] Because the Court is dismissing their claims for lack of personal jurisdiction, it need not consider or address these defendants' other arguments, including those about the Court's subject-matter jurisdiction.  *See Galvan v. Fed. Prison Indus., Inc.*, 199 F.3d 461, 463 (D.C. Cir. 1999) (it is "perfectly proper for a court to resolve personal jurisdiction . . . without having first determined subject matter jurisdiction"); *see also Forras v. Rauf*, 812 F.3d 1102, 1105–06 & n.4 (D.C. Cir. 2016).

For the reasons below, the Court finds that Aljabri has failed to state a claim against either.[13]

Aljabri brings three claims against all defendants: attempted extrajudicial killing in violation of the TVPA, extrajudicial killing in violation of the law of nations under the ATS, and intentional infliction of emotional distress.  But for Alhamed and Abuljadayel, these claims hinge on a theory of secondary liability—that is, that Alhamed and Abuljadayel are liable because they conspired and aided and abetted bin Salman's plot to kill Aljabri.  *See* ECF No. 102 at 136, 160, 168.  But Aljabri has not adequately alleged any such claim against Alhamed or Abuljadayel.

Much of the parties' arguments concern the types of claims that can be brought under either the TVPA or the ATS.  Alhamed and Abuljadayel argue that neither the TVPA nor the ATS allow liability for claims of *attempted* extrajudicial killings and that the TVPA does not provide for secondary liability.  *See, e.g.*, ECF No. 111 at 9.  Aljabri, of course, disagrees.  But even if the Court assumes that the TVPA and the ATS allow claims for attempted extrajudicial killing, and that the TVPA allows secondary liability claims, Aljabri's claims still fail.  For the Court cannot conclude based on the facts alleged that Alhamed or Abuljadayel entered into a conspiracy with bin Salman to kill Aljabri, or aided and abetted such an effort.

Conspiracy and aiding-abetting are two distinct "legal concepts" that provide for "vicarious liability."  *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983).  "The prime distinction between civil conspiracies and aiding-abetting is that a conspiracy involves an agreement to participate in a wrongful activity.  Aiding-abetting focuses on whether a defendant knowingly gave 'substantial assistance' to someone who performed wrongful conduct, not on whether the defendant

---

[13] Alhamed and Abuljadayel raise the possibility that foreign official conduct immunity bars Aljabri's claims against them.  But they say that this argument only applies if the Court credits Aljabri's claims that they are "agents" of bin Salman.  *See, e.g.*, ECF No. 111 at 25.  The Court agrees with Alhamed and Abuljadayel that Aljabri has not alleged facts sufficient to support such an inference.  Thus, the Court can proceed to their Rule 12(b)(6) arguments.

agreed to join the wrongful conduct." *Id.* at 478.  The distinctions "can make a difference.  There is a qualitative difference between proving an *agreement to participate* in a tortious line of conduct, and proving *knowing action* that substantially aids tortious conduct." *Id.*  Regardless, under either concept, the defendant must knowingly participate.  And the facts outlined above do not allow the Court to infer that either Alhamed or Abuljadayel had any relationship with bin Salman, much less that they *knew* that their alleged conduct was supposedly assisting a plot by bin Salman to kill a former Saudi official.  Indeed, just as this Court cannot tie bin Salman to the conduct of these former students for the purpose of personal jurisdiction, it cannot tie bin Salman's alleged effort to kill Aljabri to them to hold them liable.

## IV.     Conclusion

For all these reasons, the Court will grant the motions to dismiss.  A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: September 30, 2022

40